**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

<table>
<tr><td>

CONCORD MUSIC GROUP, INC., ET AL.,

    *Plaintiffs*,

v.

ANTHROPIC PBC,

    *Defendant*.

</td><td>

Case No. 3:23-cv-01092

Chief Judge Waverly D. Crenshaw, Jr.
Magistrate Judge Alistair E. Newbern

</td></tr>
</table>

**DEFENDANT ANTHROPIC PBC'S OPPOSITION TO
<u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 3

    A.    What Claude is and is not ................................................................. 3

    B.    How Claude works............................................................................ 4

    C.    The role of the copyrighted works-in-suit in training Claude............................... 6

    D.    Preventing Claude from outputting undesired responses........................................ 7

    E.    The injunction Plaintiffs seek ................................................................. 8

LEGAL STANDARD.................................................................................................. 10

ARGUMENT............................................................................................................... 11

    I.    PLAINTIFFS' MOTION SHOULD BE DENIED BECAUSE THIS CASE IS IN THE WRONG COURT ............................................................... 11

    II.    EVEN IF THIS COURT HEARS THE MOTION, IT SHOULD DENY PLAINTIFFS' REQUEST FOR EXTRAORDINARY RELIEF ........................ 12

        A.    There is no basis for a preliminary injunction concerning Claude's outputs..............................................13

            1.    Plaintiffs cannot show a likelihood of success on the merits with respect to their infringement claim concerning Claude's outputs................................................ 13

                a.    Plaintiffs' request for relief is moot ................................. 13

                b.    Plaintiffs themselves, not Anthropic, engaged in the "volitional conduct" that is a prerequisite to direct copyright infringement liability for the outputs Plaintiffs' attacks extracted................................................ 14

            2.    Plaintiffs cannot show irreparable harm from Claude's outputs absent injunctive relief...................................... 17

        B.    There is no basis for a preliminary injunction concerning Claude's training ...............................................20

1.  Plaintiffs cannot show irreparable harm from Claude's training absent injunctive relief ..................................................... 21

2.  Plaintiffs cannot show a likelihood of success on the merits with respect to their infringement claims concerning Claude's training ............................................................................ 22

a.  Factor One: Anthropic's use of Plaintiffs' lyrics to train Claude is a transformative use ................................... 23

b.  Factors Two and Three together support a fair use finding ............................................................................. 24

c.  Factor Four: Anthropic's use of Plaintiffs' lyrics to train Claude does not harm any cognizable market .......... 25

C.  The balance of the equities and public interest favor Anthropic ...............27

III.  PLAINTIFFS' REQUESTED INJUNCTION IS IMPERMISSIBLY OVERBROAD ..................................................................................... 28

CONCLUSION ........................................................................................... 30

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*ABKCO Music, Inc. v. Sagan*,
50 F.4th 309 (2d Cir. 2022) ...................................................................................18

*Abney v. Amgen, Inc.*,
443 F.3d 540 (6th Cir. 2006) .................................................................................17

*Am. Geophysical Union v. Texaco Inc.*,
60 F.3d 913 (2d. Cir. 1994)....................................................................................26

*Andersen v. Stability AI Ltd.*,
2023 WL 7132064 (N.D. Cal. Oct. 30, 2023)........................................................20

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023).........................................................................................23, 24

*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014).........................................................................22, 25, 27

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015)..............................................................................22, 24

*Authors Guild v. OpenAI, Inc.*,
No. 23-cv-08292-SHS (S.D.N.Y.) ..........................................................................20

*Average Joe's Ent. Grp., LLC v. SoundCloud, Ltd.*,
2018 WL 6582829 (M.D. Tenn. Oct. 17, 2018) .....................................................14

*Balsley v. LFP, Inc.*,
691 F.3d 747 (6th Cir. 2012) .................................................................................24

*Basbanes v. Microsoft Corp.*,
No. 24-cv-00084 (S.D.N.Y.).....................................................................................20

*Bell v. Eagle Mountain Saginaw Indep. Sch. Dist.*,
27 F.4th 313 (5th Cir. 2022) ..................................................................................26

*Bill Graham Archives v. Dorling Kindersley, Ltd.*,
448 F.3d 605 (2d Cir. 2006)..............................................................................24, 27

*Cambridge Univ. Press v. Patton*,
769 F.3d 1232 (11th Cir. 2014) ..............................................................................27

iii

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994)......................................................................................23, 25, 27, 28

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
    536 F.3d 121 (2d Cir. 2008).....................................................................................14, 15

*Chabon v. OpenAI, Inc.*,
    No. 23-cv-04625-AMO (N.D. Cal. Dec. 8, 2023) ...................................................20

*Cheetah Miner USA, Inc. v. 19200 Glendale, LLC*,
    2023 WL 6601863 (6th Cir. Oct. 10, 2023)............................................................18

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983).................................................................................................13

*City of New York v. Mickalis Pawn Shop, LLC*,
    645 F.3d 114 (2d Cir. 2011)...................................................................................29

*Commonwealth v. Biden*,
    57 F.4th 545 (6th Cir. 2023) ............................................................................10, 29

*D.T. v. Sumner Cnty. Schs.*,
    942 F.3d 324 (6th Cir. 2019) ....................................................................... *passim*

*Doughtie & Co. v. Rutherford County*,
    2013 WL 3995277 (M.D. Tenn. Aug. 5, 2013) ..................................................10, 21

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006)...............................................................................................18

*Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*,
    958 F.3d 532 (6th Cir. 2020) ..........................................................................10, 12, 17

*F.W. Woolworth Co. v. Contemp. Arts, Inc.*,
    344 U.S. 228 (1952)...............................................................................................19

*Fourth Estate Pub. Ben. Corp. v. Wall-Street.com, LLC*,
    139 S. Ct. 881 (2019).............................................................................................29

*Fox Broad. Co. v. Dish Network LLC*,
    747 F.3d 1060 (9th Cir. 2014) ...............................................................................19

*Getty Images (US), Inc. v. Stability AI, Inc.*,
    No. 23-cv-00135-GBW (D. Del.) ...........................................................................20

*Gibson Found., Inc. v. Norris*,
    2020 WL 1676911 (M.D. Tenn. Apr. 6, 2020)........................................................11

*Google LLC v. Oracle Am., Inc.*,
   141 S. Ct. 1183 (2021)........................................................................................22, 23, 24, 28

*Hall v. Edgewood Partners Ins. Ctr., Inc.*,
   878 F.3d 524 (6th Cir. 2017) ..............................................................................................10

*Kadrey v. Meta Platforms, Inc.*,
   2023 WL 8039640 (N.D. Cal. Nov. 20, 2023) ................................................................15, 20

*Kelly v. Arriba Soft Corp.*,
   336 F.3d 811 (9th Cir. 2003) ..............................................................................................22

*Kendall Holdings, Ltd. v. Eden Cryogenics LLC*,
   630 F. Supp. 2d 853 (S.D. Ohio 2008) ................................................................................28

*King v. Taylor*,
   694 F.3d 650 (6th Cir. 2012) ..............................................................................................11

*Kremer v. Reddit, Inc.*,
   2022 WL 3702092 (M.D. Tenn. Aug. 26, 2022) ..................................................................14

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
   941 F.2d 970 (9th Cir. 1991) ..............................................................................................29

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   387 F.3d 522 (6th Cir. 2004) ..............................................................................................24

*Memphis A. Philip Randolph Inst. v. Hargett*,
   2 F.4th 548 (6th Cir. 2021) ................................................................................................11

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
   545 U.S. 913 (2005)............................................................................................................28

*Mitchell v. 3PL Sys., Inc.*,
   2013 WL 12129617 (C.D. Cal. Apr. 8, 2013) ......................................................................29

*N.Y. Times Co. v. Microsoft Corp.*,
   No. 23-cv-11195-SHS (S.D.N.Y.)........................................................................................20

*Ohio v. EPA*,
   969 F.3d 306 (6th Cir. 2020) ..............................................................................................13

*Perfect 10, Inc. v. Giganews, Inc.*,
   847 F.3d 657 (9th Cir. 2017) ........................................................................................14, 17

*Princeton Univ. Press v. Mich. Doc. Servs., Inc.*,
   99 F.3d 1381 (6th Cir. 1996) ..............................................................................................24

v

*Proctor & Gamble Co. v. Ranir, LLC*,
    2017 WL 3537197 (S.D. Ohio Aug. 17, 2017)........................................................12

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*,
    923 F. Supp. 1231 (N.D. Cal. 1995) ....................................................................30

*Rhinehart v. Scutt*,
    509 F. App'x 510 (6th Cir. 2013) ........................................................................28

*Ruhrgas AG v. Marathon Oil Co.*,
    526 U.S. 574 (1999)..............................................................................................11

*Sancton v. OpenAI, Inc.*,
    No. 23-cv-10211-SHS (S.D.N.Y.)........................................................................20

*Sega Enters. Ltd. v. Accolade, Inc.*,
    977 F.2d 1510 (9th Cir. 1992) .............................................................................22

*Silverman v. OpenAI, Inc.*,
    No. 23-cv-03416-AMO (N.D. Cal. Dec. 8, 2023) ...............................................20

*Sony Comput. Ent., Inc. v. Connectix Corp.*,
    203 F.3d 596 (9th Cir. 2000) ...............................................................................22

*Spanski Enters., Inc. v. Telewizja Polska, S.A.*,
    883 F.3d 904 (D.C. Cir. 2018).............................................................................15

*Strike 3 Holdings, LLC v. Andaya*,
    2021 WL 5123643 (N.D. Cal. Nov. 4, 2021) ......................................................30

*Swatch Grp. Mgmt. Servs., Ltd. v. Bloomberg L.P.*,
    756 F.3d 73 (2d Cir. 2014)...................................................................................26

*Thomson Reuters Enter. Ctr. GmbH v. Ross Intel., Inc.*,
    2023 WL 6210901 (D. Del. Sept. 25, 2023)..............................................2, 24, 25

*Tremblay v. OpenAI, Inc.*,
    No. 23-cv-03223-AMO (N.D. Cal. Dec. 8, 2023) ...............................................20

*Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*,
    953 F.3d 638 (9th Cir. 2020) .........................................................................25, 27

*TTAC, LLC v. TATC, LLC*,
    2020 WL 11191824 (M.D. Tenn. Sept. 17, 2020)...............................................12

*Ty, Inc. v. Le Clair*,
    103 F. Supp. 2d 1047 (N.D. Ill. 2000) ................................................................20

*U.S. Naval Inst. v. Charter Commc'ns, Inc.*,
  936 F.2d 692 (2d Cir. 1991).................................................................................16

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
  562 F.3d 630 (4th Cir. 2009) ..........................................................................22, 24

*Visual Scis., Inc. v. Integrated Commc'ns, Inc.*,
  660 F.2d 56 (2d Cir. 1981).................................................................................12

*Warner Amex Cable Commc'ns, Inc. v. Am. Broad. Cos.*,
  499 F. Supp. 537 (S.D. Ohio 1980) .....................................................................28

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)...............................................................................................28

## STATUTES

17 U.S.C.
  § 106......................................................................................................................16
  § 107...............................................................................................................23, 25

## OTHER AUTHORITIES

5 Nimmer on Copyright § 14.06 (2023) ....................................................................29

6 Patry on Copyright § 22:42....................................................................................20

Chief Justice John G. Roberts, *2023 Year-End Report on the Federal Judiciary* 5 (Dec. 31,
  2023), https://www.supremecourt.gov/publicinfo/year-end/2023year-endreport.pdf...............1

**INTRODUCTION**

In their Motion for a Preliminary Injunction ("PI Mot.," ECF No. 40), Plaintiffs seek an order, with minimal discovery, condemning one of the leading tools of generative artificial intelligence as unlawful. It is not. But the Court need not reach that issue to deny the relief sought, because this case was filed in the wrong court, and Plaintiffs' assertions of irreparable harm are unpersuasive on their face. At the proper time and in the proper venue, Plaintiffs will have ample opportunity to test their substantive legal theories, and Defendant Anthropic PBC will explain on a complete record why their attack on this new category of digital tools misconceives the technology and the law alike. At this stage, the Court should simply find that reaching those substantive issues is unnecessary to deny the motion.

The latest Year-End Report on the Federal Judiciary is in large part dedicated to a discussion of evolving technologies in general, and AI in particular. "At its core," Chief Justice Roberts writes, "AI combines algorithms and enormous data sets to solve problems." Chief Justice John G. Roberts, *2023 Year-End Report on the Federal Judiciary* 5 (Dec. 31, 2023), https://www.supremecourt.gov/publicinfo/year-end/2023year-endreport.pdf. Generative AI tools like those at issue here are built on "large language models" ("LLMs"). LLMs in turn are built using a computer program called a "neural network" and showing it *trillions* of data "tokens," from which the program derives unfathomably complex statistical correlations among the constitutive elements of the texts it has seen, to approximate an understanding of human language. Decl. of Jared Kaplan ("Kaplan Decl.") ¶¶ 13–20. "AI obviously has great potential to dramatically increase access to key information[.]" Roberts, *supra*, at 5. It is beyond dispute that these tools have not just legitimate applications, but potentially revolutionary ones.

Plaintiffs complain that they were able to use Anthropic's generative AI tool to elicit some of their own copyrighted song lyrics. As a threshold matter, it is important to appreciate that

1

Anthropic's generative AI tool is not designed to output copyrighted material, and Anthropic has always had guardrails in place to try to prevent that result. If those measures failed in some instances in the past, that would have been a "bug," not a "feature," of the product. Plaintiffs provide no evidence that anyone other than themselves, let alone a meaningful subset of users, has entered prompts that resulted in Plaintiffs' lyrics being shown to them. And since the filing of the Complaint, Anthropic has implemented additional technological guardrails to prevent a reprise of what Plaintiffs did. One form of relief Plaintiffs seek—an order preventing Anthropic's tool from including those lyrics in response to future users' queries—is thus moot.

Plaintiffs also complain that Anthropic used their songs as an infinitesimally small fraction of the trillions of tokens used to train the LLM underlying its generative AI service. That same substantive issue—whether generative AI companies can permissibly use copyrighted content to train LLMs without licenses—is currently being litigated in nearly two dozen copyright infringement cases around the country, none of which has sought to resolve the issue in the truncated posture of a preliminary injunction motion. It speaks volumes that no other plaintiff— including putative class plaintiffs purporting to represent the music publishers in this case—has asserted irreparable harm from this conduct. So does the fact that Plaintiffs allowed at least several months to pass without any notice to Anthropic of the allegedly incurable wrong. While Anthropic is confident that using copyrighted content as training data for an LLM is a fair use under the law—meaning that it is not infringement at all—there is no basis to conclude that money damages would not make Plaintiffs whole if they ultimately prevail on the merits. The Court, accordingly, should not stretch to get ahead of the other cases where the same substantive copyright issue will be adjudicated on a full summary judgment or trial record. *Cf. Thomson Reuters Enter. Ctr. GmbH v. Ross Intel., Inc.*, 2023 WL 6210901, at *6–11 (D. Del. Sept. 25, 2023) (addressing the issue on

2

summary judgment and denying cross motions). That said, if the Court does choose to grapple with the issue, it should conclude that there is no likelihood of success on the merits of this novel claim, which no other court has previously endorsed.

At bottom, the efficient resolution of this Motion is not to reach the vast majority of it. But whatever approach the Court chooses to take, the relief Plaintiffs seek is unavailable as a matter of prevailing personal jurisdiction doctrine, venue doctrine, irreparable harm doctrine, and substantive copyright doctrine alike.

## BACKGROUND

### A.    What Claude is and is not

Anthropic—a Delaware corporation with its principal place of business in San Francisco, California, Decl. of Julia Lowd ("Lowd Decl.") ¶ 3—is an AI safety and research company that aims to "create reliable, beneficial AI systems," Decl. of Andrew M. Gass ("Gass Decl.") Ex. C. Anthropic's mission is "to ensure transformative AI helps people and society flourish" "by building frontier systems, studying their behaviors, working to responsibly deploy them, and regularly sharing [] safety insights." *Id.* Ex. D; *see also* Kaplan Decl. ¶ 7. Anthropic's signature product is a series of AI models called Claude. Kaplan Decl. ¶ 8; Gass Decl. Ex. E. Users can submit various forms of queries known as "prompts" to Claude, and Claude in turn answers or otherwise responds. After years of research and development, Anthropic released Claude to the public in January 2023 and released Claude 2 in July. Kaplan Decl. ¶ 8.

A generative AI model like Claude is designed and intended to respond as an intelligent human would to an infinitely broad array of user prompts. In practice, businesses use Claude to develop online tutoring programs, evaluate proposed contracts, facilitate productivity and product management improvements, and more. *Id.* ¶ 11. Typical individual users, meanwhile, rely on Claude to assist with original writing projects, such as editing, rewriting, and summarizing;

3

brainstorming and problem solving; and drafting professional emails.  *Id.* ¶ 10.  They also use Claude to help them develop their own creative outputs.  *Id.* ¶¶ 9–10.

Existing song lyrics are not among the outputs that typical Anthropic users request from Claude.  *See id.* ¶¶ 10–12.  There would be no reason to: song lyrics are available from a slew of freely accessible websites.  Decl. of Dawn Hall ("Hall Decl.") ¶ 12.  Normal people would not use one of the world's most powerful and cutting-edge generative AI tools to show them what they could more reliably and quickly access using ubiquitous web browsers.  Doing so would violate Anthropic's Terms of Service, which prohibit the use of Claude to attempt to elicit content that would infringe third-party intellectual property rights.  Lowd Decl. ¶ 10, Ex. C §§ 4, 6(a).

### B.      How Claude works

AI models like Claude are built from a technological tool known as a "neural network." Kaplan Decl. ¶ 13.  Essentially, the process of training an LLM like Claude starts with a piece of software that is capable of studying unimaginably large sets of data in order to identify patterns and statistical correlations between and among the constitutive elements of the content the software is shown.  For a text-based model like Claude, that means showing the underlying software engine many, many examples of pre-existing text, so that it can analyze how words do and do not typically fit together.  *Id.* ¶¶ 14–16.  The ultimate goal is "to develop a comprehensive map of how language works." *Id.* ¶ 16.  More precisely, AI models like Claude ingest *billions* of different kinds of texts, which they break down into trillions of component parts known as "tokens." *Id.* ¶¶ 14–15.  The models then analyze the "tokens to discern statistical correlations—often at staggeringly large scales—among features of the content on which the model is being trained." Gass Decl. Ex. F at 159.  Those statistical correlations effectively yield "insights about patterns of connections among concepts or how works of [a particular] kind are constructed." *Id.*  Based on those insights, AI

models like Claude are able to create new, original outputs with a degree of sophistication and verisimilitude that approximates human cognition.  Kaplan Decl. ¶¶ 4–5.

Claude 2 in particular was "trained" on ▮▮▮▮▮▮ tokens.  *Id.* ¶ 23.  The texts from which those tokens were derived came from a combination of "publicly available information from the Internet, datasets that [Anthropic] license[s] from third party businesses, and data that . . . crowd workers provide."  *Id.* ¶ 22 & Ex. A at 2.  But the essential characteristic of this "training corpus," as the datasets used to train generative AI models are known, is its scale.  It would not be possible to create a product like Claude without *trillions* of tokens of pre-existing text.  *Id.* ¶ 23.

In addition to the sheer volume of tokens, LLMs like Claude require some diversity among the types of tokens they are trained on.  *Id.* ¶¶ 24–27.  These are, after all, general purpose tools, which will have no familiarity with any genre of content they have not encountered.  For the model to be able to respond sensibly to queries about rap music, or cheesecake recipes, or physics equations, it must have been shown examples of texts that constitute instances of those concepts.  But critically, the purpose of including instances of those genres in the training dataset is not to ultimately replicate the particular way any original author expressed the idea embodied in the text—which is what copyright law protects.  It is to expose the model to the full range of types of texts that exist, encompassing as broad an array of facts as possible, so that the model can synthesize the information embodied in the texts into new and different outputs.  *Id.*

In the service of achieving that goal, Claude does not use its training texts as a database from which pre-existing outputs are selected in response to user prompts.  Instead, it uses the statistical correlations gleaned from analyzing texts to construct a "model" of how language operates and what it means.  *Id.* ¶¶ 15–16, 28.  The model represents those correlations in a series of numerical parameters (sometimes called "weights" and "biases") that enable software to

5

generate sensible-seeming responses to requests from end users. *Id.* ¶¶ 15–16. Those parameters are what the model stores—not the texts of the training data. *Id.*



*Id.* ¶ 43.

*Id.*

*Id.*

, without incurring immense and incalculable harm not just to Anthropic, but also to the users who will benefit from the innumerable legitimate uses of this revolutionary next-generation tool. *Id.* ¶ 44.

**C.    The role of the copyrighted works-in-suit in training Claude**

Anthropic does not seek out song lyrics in particular and does not deliberately assign any greater weight to them than to any other text collected from the web. *Id.* ¶¶ 24–26. But like other generative AI platforms, Anthropic does use data broadly assembled from the publicly available Internet, including through datasets compiled by third party non-profits for the research community. In practice, there is no other way to amass a training corpus with the scale and diversity necessary to train a complex LLM with a broad understanding of human language and the world in general. Any inclusion of Plaintiffs' song lyrics—or other content reflected in those datasets—would simply be a byproduct of the only viable approach to solving that technical challenge. *See id.* ¶ 24. All told, song lyrics constitute a minuscule fraction of Claude's training data, and the 500 works-in-suit constitute a minuscule fraction of that minuscule fraction.

While it would of course be possible for a generative AI platform like Anthropic to enter a business relationship with the Plaintiffs in this lawsuit, it would not be possible to amass sufficient content to train an LLM like Claude in arm's-length licensing transactions, at any price. Decl. of Dr. Steven Peterson ("Peterson Decl.") ¶¶ 14, 16–21. The scale of the datasets required is too

6

large.  *Id.* ¶¶ 22–25.  One could not enter licensing transactions with enough rights owners to cover the billions of texts necessary to yield the trillions of tokens that general-purpose LLMs require for proper training.  *See id.* ¶ 25.  If licenses were required to train LLMs on copyrighted content, today's general-purpose AI tools simply could not exist.  *Id.* ¶ 6.

### D.    Preventing Claude from outputting undesired responses

Just because certain content was part of Claude's training data set does not, however, mean that an end user can access it.  Claude is, after all, a *generative* AI system.  It is designed to *generate* novel content, not simply regurgitate verbatim the texts from which it learned language.  While it does on occasion happen that the model's output may reproduce certain content—particularly texts that escaped deduplication efforts when preparing the training set—as a general matter, outputting verbatim material portions of training data is an unintended occurrence with generative AI platforms, not a desired result.  Kaplan Decl. ¶ 26.

From the beginning, Anthropic has implemented a broad array of safeguards to prevent that sort of reproduction from occurring.  These are described in detail in the Kaplan Declaration.  In short, they include a combination of limits on the kinds of outputs that can be generated by the model; efforts to train the model itself to recognize and thus refrain from generating outputs that might infringe copyright; and other approaches.  *Id.* ¶¶ 34–42.  These measures are generally quite effective.  *Id.* ¶¶ 38–40.  But they are not perfect.  It is true that, particularly for a user who has set out to deliberately misuse Claude to get it to output material portions of copyrighted works, some shorter texts may slip through the multi-pronged defenses Anthropic has put in place.  *Id.* ¶ 26.

With respect to the particular songs that are the subject of this lawsuit, Plaintiffs cite no evidence that any, let alone all, had ever been output to any user other than Plaintiffs or their agents.  Plaintiffs' efforts to induce Claude to produce song lyrics in the service of creating facts to allege in the operative Complaint is the only evidence of alleged infringement of song lyrics.

7

They signed up to use Anthropic's service, Lowd Decl. ¶¶ 12–18, which entails agreeing to litigate any resulting claims in the Northern District of California, *id.* ¶¶ 8–9, and agreeing not to request the production of copyrighted works, *id.* ¶ 10.  And they input a number of prompts that allegedly had the effect of eliciting outputs from Claude consisting of some of their lyrics.  *Id.* ¶¶ 17–20.  As of this writing, and despite having been served with discovery requests in early December, Plaintiffs have disclosed no further information about failed attempts to elicit similar results.  *See* Decl. of Ben Y. Zhao ("Zhao Decl.") ¶ 42, ECF No. 47; *id.* Ex. B at 6–7, ECF No. 47-2 (examples of Claude refusing to provide lyrics "due to copyright restrictions"); Kaplan Decl. Exs. B, C; Lowd Decl. Exs. H, I.  What is clear, however, is that their own expert refers to their efforts as "attacks" on Claude, specifically designed to see if the model could be coaxed to do things everyone understands it is not supposed to do.  Zhao Decl. ¶ 30.  Preliminary efforts (without the benefit of discovery) to untangle what those "attacks" consisted of suggest many failed.  Lowd Decl. ¶ 17.

Although Plaintiffs generated at least some of the complained-of outputs many months prior to filing suit, it did not inform Anthropic. Since the suit was filed, ████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████  The operation of those technological barriers is described in the Kaplan Declaration at ¶¶ 41–42. They are a part of the model and will remain in place indefinitely.  *See id.* ¶ 43.  As of now and going forward, no one should be able to replicate what Plaintiffs did to engineer the facts on which this lawsuit is based.  *See id.*

E.    **The injunction Plaintiffs seek**

Before Plaintiffs filed this Motion, Anthropic told them that it was working to build those additional guardrails and offered to cooperate with them to create even broader ones—covering not just the 500 works-in-suit, but also anything else that Plaintiffs claimed to own—while the lawsuit was pending.  Plaintiffs first responded that it would be difficult to exhaustively document

that broader set because it is "constantly being updated," and then simply directed Anthropic to a publicly available list of song titles—not lyrics—as to which they purport to control the rights. *See* Gass Decl. Ex. A.  Subsequent correspondence was not constructive.  *See id.*

Knowing full well that the primary relief they seek—an order requiring the construction of "guardrails" to ensure that Claude would not output the text of the works-in-suit—would be moot, Plaintiffs went ahead and filed their Motion anyway.  It appears to seek judicial relief not just with respect to the copyrighted works at issue in the case, but also with respect to that same "constantly" changing set of millions of other songs and underlying lyrics, for which Plaintiffs have not made any of the necessary allegations in the Complaint or in the moving papers to support their ability to even assert copyright infringement claims.  *See generally* Compl. ¶¶ 111–18, ECF No. 1; Mem. L. Supp. Pls.' Mot. Prelim. Inj. ("Br.") at 4–5, ECF No. 41.

Evidently with respect to that broader, ever-shifting category of works, the Motion asks for both the *output-restricting* injunction referenced above and an injunction requiring the extraction of the song lyrics from training datasets for unreleased models.  *See* Br. at 2.  Doing so would require Anthropic ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for each new work or set of works, incurring over ▮▮▮▮▮ in additional costs and incalculably harming Anthropic in the broader marketplace ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Kaplan Decl. ¶ 44.  Even more troubling, after waiting at least that long before notifying Anthropic by filing this lawsuit,[1] Plaintiffs now seek this extraordinary relief to prevent the distribution or display of works that they admit are routinely the subject of licensing transactions that price, down to the penny, the money

---

[1] Plaintiffs' limited and incomplete document production in the week before this submission reveals that Plaintiffs and their agents used Claude to output their lyrics as early as June 2023, but said nothing until filing this lawsuit about four months later.

9

that licensors receive for what Plaintiffs contend are comparable uses.[2]  Plaintiffs nevertheless also contend that money could *not* compensate them in the event they prevail on their infringement claims.  Br. at 22–23.

## LEGAL STANDARD

A preliminary injunction is "reserved only for cases where it is necessary to preserve the status quo until trial."  *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 526 (6th Cir. 2017).  It "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020).  A plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Id.* at 536.  The showing of irreparable harm is "indispensable."  *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019); *see Commonwealth v. Biden*, 57 F.4th 545, 555 (6th Cir. 2023) ("Even with a high likelihood of success on the merits, a preliminary injunction is not warranted unless the plaintiffs are likely to suffer irreparable injury in the absence of interim relief.").  "[A]bsent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief."  *See Doughtie & Co. v. Rutherford County*, 2013 WL 3995277, at *2 (M.D. Tenn. Aug. 5, 2013).

---

[2] For example, just eight days before this submission, Plaintiffs began a "rolling" production of targeted discovery materials requested by Anthropic. The early returns confirm Anthropic's positions in this brief, but the record on the merits is far from complete.

## ARGUMENT

### I.    PLAINTIFFS' MOTION SHOULD BE DENIED BECAUSE THIS CASE IS IN THE WRONG COURT

At the outset, Plaintiffs' Motion should be denied because this Court lacks personal jurisdiction over Anthropic and this District is an improper venue.  As set forth in Anthropic's pending motion to dismiss, this case does not belong in the Middle District of Tennessee.  *See* Mem. L. Supp. Def.'s Mot. Dismiss at 14–22, ECF No. 55.  Anthropic has no relevant connection to Tennessee.  It did not train its generative AI model in Tennessee, but rather directed those operations from its headquarters in California.  *Id.* at 9–12.  There is no allegation that any of the allegedly infringing "outputs" of the model were made, received, or displayed in Tennessee. *Id.* at 27; *cf. Gibson Found., Inc. v. Norris*, 2020 WL 1676911, at *3–4 (M.D. Tenn. Apr. 6, 2020) (Crenshaw, C.J.) (the mere operation of a generally accessible online platform does not suffice to establish venue).  And Plaintiffs themselves admit they accessed and created Claude accounts through the Anthropic website.  *See* Decl. of Duff Berschback ("Berschback Decl.") ¶ 18, ECF No. 42; Decl. of Alisa Coleman ("Coleman Decl.") ¶ 20, ECF No. 43; Decl. of David Kokakis ("Kokakis Decl.") ¶ 19, ECF No. 44; Decl. of Kenton Draughton ¶ 19, ECF No. 45.  In doing so, Plaintiffs agreed to be bound by Anthropic's Terms, which require any dispute "be resolved exclusively in the state or federal courts located in San Francisco, California."  Lowd Decl. Ex. C § 14(i).  Plaintiffs thus cannot establish personal jurisdiction or venue in Tennessee.

That alone should end the Court's inquiry.  "In the absence of personal jurisdiction, a federal court is 'powerless to proceed to an adjudication.'"  *King v. Taylor*, 694 F.3d 650, 655 (6th Cir. 2012) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999)); *see also Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 554 (6th Cir. 2021) ("If a plaintiff cannot

show a likelihood of jurisdiction, then the court will deny the preliminary injunction.").[3]  Likewise, "[c]ourts faced with an argument that venue is improper must resolve that issue prior to addressing the merits of any claim, including a preliminary injunction."  *Proctor & Gamble Co. v. Ranir, LLC*, 2017 WL 3537197, at *4 (S.D. Ohio Aug. 17, 2017) (emphasis omitted).  Because Plaintiffs' allegations regarding jurisdiction and venue are plainly deficient, the Court should deny the request for a preliminary injunction without reaching other issues.

## II.    EVEN IF THIS COURT HEARS THE MOTION, IT SHOULD DENY PLAINTIFFS' REQUEST FOR EXTRAORDINARY RELIEF

Setting aside those failings, Plaintiffs still cannot make the necessary "clear showing" that the "extraordinary and drastic remedy" of a preliminary injunction is necessary to preserve the status quo for trial.  *Enchant Christmas*, 958 F.3d at 539 (cleaned up).

Plaintiffs seek two distinct kinds of relief.  First, they seek an order requiring Anthropic "to implement effective guardrails in its *currently available* AI models to prevent output that reproduces, distributes, or displays Publishers' lyrics, including the 500 representative works identified in Exhibit A to the Complaint."  PI Mot. at 1–2 (emphasis added).  Second, Plaintiffs seek an order "precluding Anthropic from creating or using unauthorized copies of Publishers' lyrics to train *future* AI models," regardless of whether those models contain the same "effective guardrails" that Plaintiffs seek to impose as part of their first request.  *Id.* at 2 (emphasis added).  Neither of these requested remedies is limited to the works-in-suit.  Instead, the relief sought improperly encompasses an ever-changing list of millions of other works purportedly owned by Plaintiffs but to date entirely absent from the record of this litigation.  Plaintiffs do not come close

---

[3] Plaintiffs' burden to demonstrate jurisdiction merits less "procedural leeway" in the preliminary injunction context than in opposition to a Rule 12 motion, where a prima facie showing may suffice.  *Visual Scis., Inc. v. Integrated Commc'ns, Inc.*, 660 F.2d 56, 58 (2d Cir. 1981); *see also TTAC, LLC v. TATC, LLC*, 2020 WL 11191824, at *1 n.1 (M.D. Tenn. Sept. 17, 2020).

to satisfying their burden with respect to either form of injunctive relief sought.

### A.      There is no basis for a preliminary injunction concerning Claude's outputs

The Court first should reject Plaintiffs' request to enjoin the *outputs* elicited from Claude.

### 1.      Plaintiffs cannot show a likelihood of success on the merits with respect to their infringement claim concerning Claude's outputs

### a.      Plaintiffs' request for relief is moot

As noted above, Anthropic does not want the lyrics of Plaintiffs' works to be output by its AI models.  In fact, as Plaintiffs' own expert declaration demonstrates, Anthropic already had guardrails in place to prevent that from occurring even before this lawsuit.  For example, given the prompt for "the lyrics to I will survive by gloria gaynor [sic]," Claude responded that "I cannot provide full lyrics to songs due to copyright restrictions."  Zhao Decl. Ex. B at 2.  Again, the purpose of training on data including songs is not to reproduce the lyrics themselves, but to learn general ideas and concepts about how language works, in all its forms.  Kaplan Decl. ¶¶ 16, 26.

Since the filing of the Complaint and Plaintiffs' Motion, Anthropic has built additional safeguards to prevent display of Plaintiffs' works-in-suit.  *Id.* ¶¶ 41–42; *see also supra* at 7–8.  ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████.  Kaplan Decl. ¶ 37.  ███████████████████████████████████ ██████████████.  *See id.* ¶ 41.  As a result, it is unlikely that any future user could prompt Claude to reproduce any material portion of the works-in-suit.  *Id.*  This eliminates the need for injunctive relief here: a request for a preliminary injunction is moot where there is no "reasonable possibility" of the challenged conduct occurring again.  *Ohio v. EPA*, 969 F.3d 306, 309 (6th Cir. 2020); *cf. City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (holding that the fact of a past wrong "does

nothing to establish a real and immediate threat" of an otherwise improbable future wrong and denying Article III standing to pursue such a claim).

b.     **Plaintiffs themselves, not Anthropic, engaged in the "volitional conduct" that is a prerequisite to direct copyright infringement liability for the outputs Plaintiffs' attacks extracted**

Even apart from the mootness defect, Plaintiffs' output-based injunction request separately and independently fails because they cannot show that Anthropic is liable for "direct infringement"—the *sole basis* for Plaintiffs' preliminary injunction motion. *See* Br. at 7 n.3.[4] Specifically, "[c]ourts widely recognize that direct infringement requires 'volitional conduct' by the alleged infringer." *Kremer v. Reddit, Inc.*, 2022 WL 3702092, at \*7 (M.D. Tenn. Aug. 26, 2022) (Newbern, M.J.) (citation omitted), *adopted by* 2022 WL 4241273 (M.D. Tenn. Sept. 14, 2022) (Crenshaw, C.J.). "The volition requirement applies regardless of which exclusive right a plaintiff claims the defendant infringed." *Average Joe's Ent. Grp., LLC v. SoundCloud, Ltd.*, 2018 WL 6582829, at \*2 (M.D. Tenn. Oct. 17, 2018). Plaintiffs are thus required to show that Anthropic *itself* engaged in the conduct that factually caused the creation of the output copies of Plaintiffs' works at issue here. *See Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 130 (2d Cir. 2008); *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666 (9th Cir. 2017) ("[I]nfringement of the reproduction right requires copying *by* the defendant, which comprises a requirement that the defendant cause the copying.").

They cannot do so. With respect to the copies that Plaintiffs' prompts yielded, the only evidence in the record is that *Plaintiffs and their agents*, rather than Anthropic, made the allegedly infringing copies. Plaintiffs went onto Anthropic's website and entered the inputs that allegedly returned the outward-facing text that Plaintiffs complain about in this case, which was shown to

---

[4] While the Complaint also asserts secondary infringement (and other theories of liability), those equally meritless theories are not before the Court for purposes of this Motion. *See* Br. at 7 n.3.

14

no one but themselves. *See* Decl. of Daniel Seymour ¶ 6, ECF No. 49 ("On behalf of the Publishers, BCGuardian submitted requests to Claude's API and Web Console and recorded evidence of Claude's responses."); *see also* Br. at 10 (admitting that Plaintiffs' agents "prompted" Claude "for the lyrics to each of the illustrative 500 Compositions"). Plaintiffs do not allege that anyone at Anthropic, or anyone else for that matter, ever prompted Claude to produce outputs that are substantially similar to the works-in-suit.

Under these circumstances, the output copies do not constitute copying *by Anthropic*. *Cf. Kadrey v. Meta Platforms, Inc.*, 2023 WL 8039640, at *1 (N.D. Cal. Nov. 20, 2023) (analyzing copyright liability for generative AI outputs under *secondary liability* doctrines, which treat the *user* as the direct infringer, not as a matter of *direct liability* for the platforms). The Second Circuit's decision in *Cartoon Network* is instructive. There, the defendant Cablevision created a remote DVR system that allowed subscribers to make copies of shows on demand, on hard drives controlled by Cablevision. 536 F.3d at 124–25. While Cablevision "select[ed] the programming that it would make available for recording," Cablevision's customers chose what specific program to copy. *Id.* at 131–32 (citation omitted). The Second Circuit concluded that Cablevision had not engaged in the requisite volitional conduct for direct liability—only Cablevision's customers had. *Id.* at 133. Just as in *Cartoon Network*, here it was Plaintiffs—as the technology's users—who chose to create the infringing copies, not Anthropic itself.

This is not a case where the defendant stores complete infringing copies of the plaintiff's works and produces them automatically on demand. *Cf. Spanski Enters., Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904, 910 (D.C. Cir. 2018). As Plaintiffs' own expert declaration makes clear, that is not how Anthropic's technology works. A generative AI model like Claude is not "a simple database of the training content." Zhao Decl. ¶ 24. Instead, it is "the encapsulation of a massive

compilation of correlations between text prompt and content, largely stored as conditional probabilities." *Id.* ¶ 11. At the output stage, in response to a user prompt, the generative AI system uses those probabilities "to predict and generate content in response to a prompt." *Id.* ¶ 13. Because of the probabilistic nature of this process, it is not possible for a user to reliably obtain copies of works used in training from the model; even as to the examples in Plaintiffs' Complaint, their proffered expert concedes that "getting consistent results of this sort from Claude is *unlikely*." *Id.* ¶ 42 (emphasis added). Indeed, in many cases, this request to generate copies of Plaintiffs' works was simply denied. *Id.*; *see also* Lowd Decl. ¶ 17. As a result, Plaintiffs had to devise special "attacks" to evade Claude's built-in guardrails and generate allegedly infringing copies through an exercise of trial and error. Zhao Decl. ¶ 30. On those facts, it is Plaintiffs, not Anthropic, who engaged in the volitional conduct that resulted in the allegedly infringing outputs.

While that alone is dispositive, it is also the case that, given the lack of evidence that anyone other than Plaintiffs and their agents was involved in any way, Plaintiffs cannot show that there has been a violation of the Copyright Act *at all* with respect to Claude outputs. Plaintiffs' exclusive rights to distribute or display their works to the public are not even implicated in their submissions, because the only alleged display and distribution was to Plaintiffs themselves. *See* 17 U.S.C. §§ 106(3), (5) (defining exclusive rights as the right to "distribute copies . . . of the copyrighted work to the public" or "display the copyrighted work publicly"). To the extent Plaintiffs' exclusive right "to reproduce the copyrighted work in copies," *id.* § 106(1), is implicated, Plaintiffs and their agents are of course entirely authorized to make those copies. *See U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 936 F.2d 692, 695 (2d Cir. 1991) ("It is elementary that the lawful owner of a copyright is incapable of infringing a copyright interest that is owned by him.").

Given Plaintiffs' failure to show volitional conduct on Anthropic's part, or indeed any violation of the Copyright Act whatsoever, Plaintiffs' output-based direct infringement claim and associated request for injunctive relief fails as a matter of law.

### 2. Plaintiffs cannot show irreparable harm from Claude's outputs absent injunctive relief

Plaintiffs' preliminary injunction request with respect to Anthropic's outputs also fails for the independent reason that Plaintiffs cannot show they will likely suffer irreparable harm from Claude's allegedly infringing outputs—an "indispensable" element of a request for such relief. *D.T.*, 942 F.3d at 327.[5]   To demonstrate irreparable harm, Plaintiffs must show "'actual and imminent' harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006) (citation omitted).

Plaintiffs contend via their proffered economic expert, Professor Michael Smith, that the use of their songs in Claude's responses "lowers the market value of the lyrics, reduces demand for legitimate licenses for lyrics, and impedes Publishers' negotiations with existing licenses." Br. at 26 (citing Decl. of Prof. Michael Smith ("Smith Decl."), ECF No. 52). But that assertion lacks any evidentiary support.  Hall Decl. ¶¶ 10, 21–32.  Professor Smith's declaration cites no data, studies, financial reports, or quantitative information at all.  *See* Smith Decl. ¶¶ 21–26.  He does not and cannot assert that license fees for the use of Plaintiffs' lyrics have decreased since Claude was introduced.  And while he offers the conclusory assertion that they are likely to go down due to Claude's outputs in the future, that self-serving suggestion makes no sense on its face: there is no evidence in the record that anyone other than Plaintiffs has ever sought to attack Anthropic's

---

[5] Plaintiffs suggest that they can benefit from a "presumption" of irreparable harm due to their likelihood of success on the merits. *See* Br. at 22 n.7.  But the Sixth Circuit has already recognized that the presumption is "inconsistent with modern Supreme Court case law regarding injunctions." *Enchant Christmas*, 958 F.3d at 540 n.3 (citations omitted); *see also Perfect 10,* 653 F.3d at 981 (holding that the presumption has been overruled by the Supreme Court).

models to extract song lyrics, and Plaintiffs admit that such attacks are unreliable at best. *See supra* at 14–16. Professor Smith's high-level assumptions cannot establish the "certain and immediate" harm that is necessary to justify an injunction. *D.T.*, 942 F.3d at 327 (citations omitted); *see Cheetah Miner USA, Inc. v. 19200 Glendale, LLC*, 2023 WL 6601863, at *3 (6th Cir. Oct. 10, 2023) (no irreparable harm where movant "offered little more than 'pronouncements [that] are grounded in platitudes rather than evidence'") (citations omitted).

Even if Plaintiffs could show that Claude's future outputs could possibly harm their ability to license their songs, such harm is not "irreparable" because it can be remedied by money damages. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (explaining that irreparable injury exists only where "remedies available at law, such as monetary damages, are inadequate to compensate" a plaintiff's injury). Because Plaintiffs routinely license the works at issue, there is no valid reason to assume that a license fee would not adequately compensate them for any alleged infringement by Anthropic. Hall Decl. ¶ 14. "[S]tandard economic models" can assess the harms alleged, which can be easily quantified to a reasonable degree of certainty using "comparable [licensing] agreements" and other considerations as a guide. *Id.* ¶¶ 14–15. Courts routinely find that copyright holders, including music publishers and plaintiffs asserting substantially similar claims, can be made whole through money damages and thus cannot establish a likelihood of irreparable harm. *E.g.*, *ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 322 (2d Cir. 2022) (denying injunctive relief where publishers alleged that infringing conduct "threaten[ed] [their] relationships with . . . existing licensees, and undermine[d] their negotiating leverage with prospective licensees," because publishers could "be made whole with cash" for their alleged injuries (second alteration and omission in original)). So too here. *See* Hall Decl. ¶¶ 12–18.

Indeed, by Plaintiffs' own admission, "there is a well-established market" for licensing "lyrics to trusted lyric service providers" like LyricFind and MusixMatch, and Plaintiffs regularly negotiate licenses in that market. Berschback Decl. ¶ 12 (Concord); *see also* Coleman Decl. ¶ 12 (ABKCO); Kokakis Decl. ¶¶ 10–12 (UMPG); Hall Decl. ¶ 33 ("Publishers routinely enter into license agreements with authorized lyrics aggregators and websites."). Accordingly, if Claude's outputs actually harmed Plaintiffs' ability to negotiate licenses and command certain fees, the parties could look to any appropriate "licensing agreements" that exist today as "a starting point or an aid in calculating damages" for Plaintiffs' alleged harm. *Fox Broad. Co. v. Dish Network LLC*, 747 F.3d 1060, 1073 (9th Cir. 2014); *see* Hall Decl. ¶¶ 22–36. That is the definition of harm that is *reparable*.

Plaintiffs' arguments as to other kinds of injuries fare no better. Hall Decl. ¶¶ 37–61. Especially since the only allegedly infringing outputs were generated by Plaintiffs themselves, they cannot demonstrate that they have been or will be denied "credit and goodwill" or that there is a legitimate risk of appreciable injury to their "reputations." Br. at 24–25. Plaintiffs' claim that they have lost "control" over how to license the works is equally meritless. If the unpermitted use of copyrighted works *vel non* constituted a loss of "control" that favored a preliminary injunction, there would be a presumption in favor of that relief in intellectual property cases—but the Supreme Court has expressly rejected that contention. *See supra* at 17 n.5.

Finally, to the extent any of these alleged harms were both real and hard to quantify, the potential availability of statutory damages already accounts for that possibility and provides a way to compensate for such injuries. *See F.W. Woolworth Co. v. Contemp. Arts, Inc.*, 344 U.S. 228, 231 (1952) (noting that statutory damages "give the owner of a copyright some recompense for injury done him, in a case where the rules of law render difficult or impossible proof of damages

19

or discovery of profits"); *Ty, Inc. v. Le Clair*, 103 F. Supp. 2d 1047, 1050–51 (N.D. Ill. 2000) (citing statutory damages as reason to deny injunctive relief); *see also* 6 Patry on Copyright § 22:42 (statutory damages "may eliminate a principal basis on which irreparable harm is based, difficulty in calculation").  There is no additional need for an injunction and the Court may deny one "based solely on the lack of an irreparable injury."  *D.T.*, 942 F.3d at 327.

**B.      There is no basis for a preliminary injunction concerning Claude's training**

Plaintiffs' second, and separate, request for relief—that the Court enjoin Anthropic from using the works-in-suit in the training corpus for the next version of Claude—is equally infirm.

Some initial context for this issue is important.  When Plaintiffs filed this lawsuit against Anthropic, they brought claims that mirror those in roughly two dozen other actions, in which copyright holders have sued generative AI companies.[6]  The central question in virtually all of these cases is whether an AI company's unlicensed use of copyrighted material as *inputs* in a vast dataset (comprising billions of works) to train AI models is a "fair use" and thus not infringement. In none of those cases—including putative class actions purporting to represent Plaintiffs here— has any of the dozens of plaintiffs even sought, much less won, a preliminary injunction.  Nor have Plaintiffs individually brought suit against any of the many other LLM providers that trained their models on the same or similar publicly accessible text from the internet including Plaintiffs' lyrics.

---

[6] *See, e.g.*, *Kadrey*, 2023 WL 8039640, at *2 (granting motion to dismiss all claims except the training claim); *Andersen v. Stability AI Ltd.*, 2023 WL 7132064, at *1, *17 (N.D. Cal. Oct. 30, 2023) (dismissing all claims against AI companies except unchallenged direct infringement claims relating to training); *Silverman v. OpenAI, Inc.*, No. 23-cv-03416-AMO (N.D. Cal. Dec. 8, 2023), ECF No. 63 (announcing intention to grant motion to dismiss in written order); *Tremblay v. OpenAI, Inc.*, No. 23-cv-03223-AMO (N.D. Cal. Dec. 8, 2023), ECF No. 85 (same); *Chabon v. OpenAI, Inc.*, No. 23-cv-04625-AMO (N.D. Cal. Dec. 8, 2023), ECF No. 32 (same); *see also* Gass Decl. Ex. B (Dec. 7, 2023 hearing transcript); *Getty Images (US), Inc. v. Stability AI, Inc.*, No. 23-cv-00135-GBW (D. Del.); *Authors Guild v. OpenAI, Inc.*, No. 23-cv-08292-SHS (S.D.N.Y.); *Sancton v. OpenAI, Inc.*, No. 23-cv-10211-SHS (S.D.N.Y.); *N.Y. Times Co. v. Microsoft Corp.*, No. 23-cv-11195-SHS (S.D.N.Y.); *Basbanes v. Microsoft Corp.*, No. 24-cv-00084 (S.D.N.Y.).

They delayed at least four months before bringing this case, ███████████████████

███████████. The logical inference is that there is no legitimate perceived irreparable harm

from that conduct, and assessing the merits of the claim requires meaningful discovery and the

development of a complete record. *See Doughtie*, 2013 WL 3995277, at *2. Under these

circumstances, the Court should not rush to resolve a hugely significant, market-moving

substantive issue that cannot possibly be properly teed up in the present posture—particularly

where, as here, there is no plausible irreparable injury. *See D.T.*, 942 F.3d at 326–27 (courts may

deny a preliminary injunction "based solely on the lack of an irreparable injury").

### 1. Plaintiffs cannot show irreparable harm from Claude's training absent injunctive relief

With respect to their complaints concerning the use of copyrighted content as *training data*,

as with their complaints concerning output, Plaintiffs have failed to demonstrate anything remotely

approaching irreparable harm. The salient feature of this portion of Plaintiffs' case is that it barely

exists; there is almost no discussion, much less evidence, of how they might conceivably be

harmed in a way that would not be compensable through monetary relief by the bare inclusion of

the works-in-suit as part of a back-end technological process invisible to the public. *See generally*

Hall Decl. Plaintiffs contend generically that the inclusion of their content in training data sets for

generative AI tools deprives them of "control" over the "integrity" of their works, deprives them

of "credit," or harms their "goodwill" or "reputations." Br. at 24–25. But they offer no explanation

of how or why any of that would be the case. With respect to harms to the value of licensing

opportunities, those are readily measurable and compensable through monetary relief. Hall Decl.

¶¶ 22–33. And the alleged "damage" to Plaintiffs' "ability to negotiate future licenses with AI

developers," Br. at 26, is eminently reparable; if Plaintiffs prevail on the merits in this litigation,

they will be able to seek compensation from those AI developers at that point.

**2.      Plaintiffs cannot show a likelihood of success on the merits with respect to their infringement claims concerning Claude's training**

Plaintiffs' training-based claims would fail on the merits in any event under copyright's fair use doctrine. "For nearly three hundred years . . . courts have recognized that, in certain circumstances, giving authors *absolute* control over all copying from their works would tend in some circumstances to limit, rather than expand, public knowledge." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 212 (2d Cir. 2015). Fair use is the legal rule embodying that recognition. *Id.*

Anthropic's use of the works-in-suit to train an AI model, particularly one *not technologically capable of outputting the texts of those songs going forward*, is a classic fair use that does not constitute infringement of Plaintiffs' copyrights. Relying on the fair use doctrine, courts have consistently found that making "intermediate" copies of copyrighted materials to develop new technologies does not violate copyright law. *See Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1520–28 (9th Cir. 1992) (fair use to copy a videogame in the service of creating a competing product); *Sony Comput. Ent., Inc. v. Connectix Corp.*, 203 F.3d 596, 602–09 (9th Cir. 2000) (fair use to create a digital "emulation" of copyrighted video game operating system); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 817–22 (9th Cir. 2003) (fair use to copy essentially all images on the Internet to create an image search tool); *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 638–45 (4th Cir. 2009) (fair use to copy student papers to create a plagiarism detection tool); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 94–101 (2d Cir. 2014) (fair use to create a searchable database of millions of copyrighted books); *Authors Guild*, 804 F.3d at 212 (same); *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1201–08 (2021) (fair use to borrow copyrighted computer software to create a competing smartphone platform).

The fair use analysis turns on four factors: "(1) the purpose and character of the use . . . ; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in

relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the work."  17 U.S.C. § 107; *see Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994).  Here, all factors support the conclusion that Anthropic's training process "fulfill[s] the objective of copyright law to stimulate creativity for public illumination" and is a paradigmatic fair use.  *Oracle*, 141 S. Ct. at 1203 (citation omitted) (alteration in original).

### a.        Factor One: Anthropic's use of Plaintiffs' lyrics to train Claude is a transformative use

When a defendant uses copyrighted material in a way that is "transformative" because the challenged use adds "a further purpose or different character" than the original works, the first factor weighs heavily towards a fair use finding.  *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 525 (2023).  Innovative creations that "add[] something new" to the original works are transformative under this standard.  *Campbell*, 510 U.S. at 579.  Using Plaintiffs' copyrighted song lyrics as part of a multi-trillion token dataset to train a generative AI model about the world and how language works is the very definition of "transformative" under the fair use doctrine.  The lyrics are literally transformed, in that they are broken down into small tokens used to derive statistical weights, rather than stored as intact copies.  Kaplan Decl. ¶¶ 15, 23.  And the *purpose* of the use is transformative, in the sense that Anthropic used the lyrics not for the same end for which they were created, *cf. Warhol*, 598 U.S. at 526, but instead for an entirely new end: creating a dataset to teach a neural network how human language works.

Plaintiffs offer a variety of arguments why using their content in these obviously new and different ways is not "transformative" under the first fair use factor, but none is sound.  The suggestion that the purpose of training Claude is "to Provide the Works' original expression on demand," Br. at 15, is categorically false.  It reflects a profound misunderstanding of what Claude is and does.  *See supra* at 3, 7–8.  The contention that a use cannot be transformative under the fair

use doctrine if it involves wholesale copying without "add[ing] commentary or criticism," Br. at 15, is also incorrect. Literally none of the cases cited above, excusing copying in the service of creating new technologies, would pass Plaintiffs' invented test. Their position is simply incompatible with the law. *See also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 544 (6th Cir. 2004) (allegedly infringing use of computer code was fair because the final product, a computer chip, "use[d] the [work] for a different purpose, one unrelated to copyright protection"); *Ross*, 2023 WL 6210901, at *8 (explaining the circumstances under which copying data for AI training would be fair use). Nor does the fact that Anthropic is a for-profit company, *see* Br. at 14, change the analysis. As the Supreme Court has recognized, "many common fair uses are indisputably commercial" and the transformativeness of the use may outweigh its commercial character. *Oracle*, 141 S. Ct. at 1204; *Warhol*, 598 U.S. at 537. So too here.[7]

### b.    Factors Two and Three together support a fair use finding

The second factor considers the nature of the copyrighted works and "has rarely played a significant role in the determination of a fair use dispute." *Authors Guild*, 804 F.3d at 220. It is similarly unilluminating here. Anthropic includes Plaintiffs' works in the corpus to teach its AI models to recognize language patterns, not to appropriate the songs' creative elements. Courts have invariably found that the second factor does not weigh against a fair use determination under such circumstances. *See, e.g., iParadigms*, 562 F.3d at 641 (using student essays to build plagiarism-detection software was "not related to the creative core of the works"); *Bill Graham Archives v. Dorling Kindersley, Ltd.*, 448 F.3d 605, 612–13 (2d Cir. 2006) ("[W]e hold that even though [the] images are creative works, which are a core concern of copyright protection, the

---

[7] Plaintiffs' reliance on *Balsley v. LFP, Inc.*, 691 F.3d 747 (6th Cir. 2012), and *Princeton University Press v. Michigan Document Services, Inc.*, 99 F.3d 1381 (6th Cir. 1996), is misplaced. Both involved "mechanical" reproduction that bore "little resemblance to the creative metamorphosis" in *Campbell*. *Princeton Univ. Press*, 99 F.3d at 1389.

24

second factor has limited weight in our analysis because the purpose of [the] use was to emphasize the images' historical rather than creative value.").

The third factor, which considers "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," 17 U.S.C. § 107(3), favors fair use too. Plaintiffs emphasize that Anthropic "makes comprehensive use of the Works" as "training fodder" and "copies the entirety of the Works as input." Br. at 18. But the key question is not how much copying was done *in the abstract*, but whether "no more was taken than necessary" to accomplish the secondary user's purpose. *HathiTrust*, 755 F.3d at 98 (citation omitted). Accordingly, "[e]ven entire verbatim reproductions are justifiable" when the allegedly infringing work serves a different purpose from the original. *Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638, 650 (9th Cir. 2020) (quotation omitted). That is the case here, where the task at hand requires trillions of inputs to effectively train AI models to recognize language patterns, and the training process thus necessarily sweeps up billions of texts including song lyrics. Kaplan Decl. ¶¶ 14–15, 23. In this context, "the scale of copying . . . [is] practically necessary and further[s] its transformative goals." *Ross*, 2023 WL 6210901, at *10; *see also HathiTrust*, 755 F.3d at 99 (third factor favors fair use even where complete copies were made because they were "reasonably necessary to facilitate" the project's legitimate aim).

### c.    Factor Four: Anthropic's use of Plaintiffs' lyrics to train Claude does not harm any cognizable market

Finally, the fourth factor weighs in favor of fair use because the use of the works-in-suit as part of Claude's training dataset has no "substantially adverse impact" on a legitimate market for Plaintiffs' copyrighted works. *Campbell*, 510 U.S. at 590. Plaintiffs argue that "Anthropic's unlicensed use [of their works to train Claude's corpus] . . . threatens to stifle the burgeoning market for the Works as AI training input." Br. at 22. But that is wrong.

25

There is no basis for the Court to find that a "burgeoning market" for song lyrics as general-purpose AI training inputs exists, or is likely to be developed in the future. *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d. Cir. 1994) ("Only an impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets should be legally cognizable when evaluating a secondary use's effect upon the potential market for or value of the copyrighted work." (citation omitted)).  Plaintiffs provide no evidence of licenses they have issued to other LLMs.  Nor do they provide any evidence of a general AI LLM that has licensed all the copyrighted material used to train its model.  Indeed, the evidence points the other way.  As explained in the Declaration of Dr. Steven Peterson, the need for trillions of tokens of text to properly train general-purpose LLMs is incompatible with a working licensing market of sufficient scale.  Peterson Decl. ¶¶ 22–25.  This is an essential point: the licensing market Plaintiffs posit simply could not exist for the inputs to technological tools like Claude.

That Plaintiffs may *wish* to receive licensing revenue for this particular use of their works is legally irrelevant. *See Texaco*, 60 F.3d at 929 n.17.[8]  They point to deals that other AI companies have done with other categories of copyright owners.  *See* Smith Decl. ¶ 28 (referring to licenses ostensibly covering news, images, and audio rights owners).  But there is no evidence in the record of what those deals are actually for, or whether they in fact constitute bare licenses to train generative AI models at all (as opposed to any of innumerable other potential transactions between AI companies and content owners—*e.g.*, to obtain *access* to additional training data that would not otherwise be accessible).  *See* Peterson Decl. ¶¶ 35–39.  And even if there did exist a handful of

---

[8] Courts reject attempts to define the market so narrowly as to recognize a "theoretical market for licensing the very use at bar" in order to show market harm. *Swatch Grp. Mgmt. Servs., Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 91 (2d Cir. 2014) (citation omitted); *see Bell v. Eagle Mountain Saginaw Indep. Sch. Dist.*, 27 F.4th 313, 324–25 (5th Cir. 2022).

agreements along the lines Plaintiffs posit—though they have not identified any—that would not change the calculus under fair use law, which requires a *bona fide market*, not isolated deals entered for other reasons, including an abundance of caution to eliminate risk. *See Tresóna*, 953 F.3d at 652 ("[T]he decision by secondary users to pay, or not pay" does not "establish whether" the fourth factor's market analysis weighs in favor of fair use).[9]

There is also no legitimate threat of substitution for any existing licensing market from the inclusion of the works-in-suit in Claude's training dataset. *See HathiTrust*, 755 F.3d at 99; *Campbell*, 510 U.S. at 593 (the only harm to consider under the fourth factor "is the harm of market substitution"). It makes no sense to suggest that someone who might have paid licensing fees for the kinds of uses Plaintiffs legitimately exploit—displaying their song lyrics on third-party websites or as part of karaoke videos—will decline to do so because Anthropic used the songs to train a generative AI model. Peterson Decl. ¶ 40. The real complaint here is that *this use* isn't being licensed—but that is a feature of every single fair use case that courts decide.

\* \* \*

Because the challenged conduct is fair use, Plaintiffs cannot establish, particularly on this undeveloped record, that they are likely to prevail on the merits of their training claim.

## C.    The balance of the equities and public interest favor Anthropic

The balance of equities and public interest factors also favor Anthropic, whose product development and competitive standing would be dramatically disrupted, at catastrophic cost, by a preliminary injunction. ██████████████████████████████████████

---

[9] Even if Plaintiffs were to manufacture some licenses in this space, "a copyright holder cannot prevent others from entering fair use markets merely 'by developing or licensing a market for . . . transformative uses of its own creative work." *Dorling Kindersley Ltd.*, 448 F.3d at 614–15 (quotation marks omitted); *see also Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1265 (11th Cir. 2014) ("[I]f the use is a fair use, then the copyright owner is not entitled to charge for the use, and there is no 'customary price' to be paid in the first place.").

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████. Kaplan Decl. ¶ 44. And to what

end? ████████████████████████████████████████████████

████████████████████████████ *See id.* ¶ 43. There is thus no real

countervailing equity in favor of Plaintiffs to balance here. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 27 (2008); *Rhinehart v. Scutt*, 509 F. App'x 510, 516 (6th Cir. 2013).

In addition to the outsized harm to Anthropic, an injunction would also subvert the public interest by hampering access to this highly useful, general-purpose technology. *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 960 (2005) (Breyer, J., concurring) ("[T]he law . . . leans in favor of protecting technology."); *cf. Warner Amex Cable Commc'ns, Inc. v. Am. Broad. Cos.*, 499 F. Supp. 537, 549 (S.D. Ohio 1980) (recognizing the "genuine public interest in development of new technology"). Such an outcome would also conflict with copyright law's goal of "stimulat[ing] creativity for public illumination." *Oracle*, 141 S. Ct. at 1203 (quotations omitted). And any public interest in enforcing copyright protections in general is not implicated here because Anthropic's use of the works-in-suit for training is fair, not infringing, and Plaintiffs have not come close to showing they would suffer any irreparable harm between now and trial in any event. *See supra* at 17–20, 21–22; *Campbell*, 510 U.S. at 578 n.10; *see also Kendall Holdings, Ltd. v. Eden Cryogenics LLC*, 630 F. Supp. 2d 853, 869 (S.D. Ohio 2008) (finding a TRO would not "substantially further" the public's interest in copyright protections where movant made a weak showing of imminent and irreparable harm).

## III.    PLAINTIFFS' REQUESTED INJUNCTION IS IMPERMISSIBLY OVERBROAD

Plaintiffs' requested relief is grossly overbroad, as it seeks to enjoin Anthropic not only with respect to the 500 copyrighted works asserted in the Complaint, but with respect to some

28

*millions* of *additional* works that are not identified in the Complaint or Motion, *see* Br. at 2, and are "constantly being updated," Gass Decl. Ex. A.  The law precludes such overreach.

Because injunctions "must be tailored to remedy the specific harm alleged," *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991), injunctions that "seek[] to restrain" a defendant "from engaging in illegal conduct that was not fairly the subject of litigation" are overbroad and should be rejected, *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 145 (2d Cir. 2011); *see also Biden*, 57 F.4th at 556 ("[F]ederal courts should not issue relief that extends further than necessary to remedy the plaintiff's injury.").  In the copyright context, this means that "the scope of the injunction should be coterminous with the [alleged] infringement."  5 Nimmer on Copyright § 14.06 (2023); *see also Mitchell v. 3PL Sys., Inc.*, 2013 WL 12129617, at *6 (C.D. Cal. Apr. 8, 2013) (enjoining infringement of "any copyrighted work" in defendant's control was "well beyond the subject matter of this litigation").

Plaintiffs' motion runs afoul of that principle.  Plaintiffs have never alleged that Anthropic infringed their copyrights in any work other than the 500 listed in Exhibit A of their Complaint—including, *inter alia*, works that were the subject of *unsuccessful* attacks by Plaintiffs.  *See* Lowd Decl. ¶ 17; Kaplan Decl. ¶¶ 38–40.  Even in their moving papers, Plaintiffs do not identify any other works, let alone explain how they have been infringed or why a preliminary injunction would be warranted.[10]  There are simply no operative claims with respect to other works not asserted in the Complaint on which to grant any form of relief (let alone the drastic and sweeping relief sought here).  As courts have recognized, these defects are fatal to Plaintiffs' request for sweeping

---

[10] Nor have Plaintiffs demonstrated standing to assert such additional claims.  They have not established that any of the millions of other works that they reference are even registered—a requirement for any copyright claim.  *See Fourth Estate Pub. Ben. Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 887 (2019) ("[R]egistration is akin to an administrative exhaustion requirement that the owner must satisfy before suing to enforce ownership rights.").

injunctive relief. *See, e.g.*, *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 923 F. Supp. 1231, 1258 (N.D. Cal. 1995) (denying injunction as to works "beyond those listed in [e]xhibits" to the complaint); *Strike 3 Holdings, LLC v. Andaya*, 2021 WL 5123643, at *7 (N.D. Cal. Nov. 4, 2021) (denying injunction "concerning rights that have not been clearly identified in this litigation or works . . . for which infringement has not been established").

## CONCLUSION

This Court lacks personal jurisdiction over Anthropic and is an improper venue for Plaintiffs' suit. And the four preliminary injunction factors do not weigh in favor of awarding Plaintiffs extraordinary equitable relief. Accordingly, their Motion should be denied.[11]

---

[11] ██████████████████████████████████████████████████████████████████████████████████████ Kaplan Decl. ¶ 44; Hall Decl. ¶¶ 65–71.

Dated:  January 16, 2024

Respectfully submitted,

**NEAL & HARWELL, PLC**

*/s/ Aubrey B. Harwell III*
Aubrey B. Harwell III (BPR # 17394)
Nathan C. Sanders (BPR # 33520)
Olivia R. Arboneaux (BPR # 40225)
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
(615) 244-1713
tharwell@nealharwell.com
nsanders@nealharwell.com
oarboneaux@nealharwell.com


**LATHAM & WATKINS LLP**
Joseph R. Wetzel (*pro hac vice*)
Andrew M. Gass (*pro hac vice*)
505 Montgomery St., Suite 2000
San Francisco, CA 94111
(415) 395-8806
(415) 395-6007
joe.wetzel@lw.com
andrew.gass@lw.com

Sarang V. Damle (*pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
(212) 906-1659
sy.damle@lw.com

Allison L. Stillman (*pro hac vice*)
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1747
alli.stillman@lw.com

*Counsel for Defendant Anthropic PBC*

31

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2024, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system and served all parties of record via the CM/ECF system as indicated below:

Steven A. Riley
Tim Harvey
RILEY & JACOBSON, PLC
1906 West End Avenue
Nashville, TN 37203
(615) 320-3700
sriley@rjfirm.com
tharvey@rjfirm.com

Matthew J. Oppenheim
Nicholas C. Hailey
Audrey Adu-Appiah
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
(202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
aadu-appiah@oandzlaw.com

Jennifer Pariser
Andrew Guerra
Timothy Chung
OPPENHEIM + ZEBRAK, LLP
461 5th Avenue, 19th Floor
New York, NY 10017
(212) 951-1156
jpariser@oandzlaw.com
andrew@oandzlaw.com
tchung@oandzlaw.com

Richard S. Mandel
Jonathan Z. King
Richard Dannay
COWAN, LIEBOWITZ & LATMAN, P.C.
114 West 47th Street
New York, NY 10036-1525
(212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

*Counsel for Plaintiffs*

Dated: January 16, 2024

/s/ *Aubrey B. Harwell III*
Aubrey B. Harwell III