**OPPENHEIM + ZEBRAK, LLP**
Matthew J. Oppenheim
Nicholas C. Hailey
Audrey L. Adu-Appiah
(admitted *pro hac vice*)
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
aadu-appiah@oandzlaw.com

Jennifer Pariser
Andrew Guerra
Timothy Chung
(admitted *pro hac vice*)
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
jpariser@oandzlaw.com
andrew@oandzlaw.com
tchung@oandzlaw.com

**COBLENTZ PATCH DUFFY & BASS LLP**
Jeffrey G. Knowles (SBN 129754)
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 772-5795
ef-jgk@cpdb.com

**COWAN, LIEBOWITZ & LATMAN, P.C.**
Richard S. Mandel
Jonathan Z. King
Richard Dannay
(admitted *pro hac vice*)
114 West 47th Street
New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> ANTHROPIC PBC, <br><br> Defendant. | Case Number: 3:24-cv-03811-JSC <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Judge: Hon. Jacqueline Scott Corley <br><br> Hearing Date: October 3, 2024 <br> Time: 10:00 AM <br> Courtroom: 8 |

1

2

3

## NOTICE OF MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on October 3, 2024, at 10:00 a.m., or as soon thereafter as this matter may be heard, before the Honorable Jacqueline Scott Corley, Plaintiffs Concord Music Group, Inc., Capitol CMG, Inc., Universal Music Corp., Songs of Universal, Inc., Universal Music - MGB NA LLC, Polygram Publishing, Inc., Universal Music - Z Tunes LLC, and ABKCO Music, Inc. (collectively, "Publishers") will and hereby do respectfully move the Court pursuant to Federal Rule of Civil Procedure 65 and Local Rule 65-2 for issuance of a preliminary injunction against Defendant Anthropic PBC ("Anthropic").

Specifically, Publishers seek a preliminary injunction requiring Anthropic to (1) maintain effective guardrails to prevent its artificial intelligence ("AI") models from generating output that reproduces, distributes, or displays Publishers' lyrics or creates derivative works using those lyrics; and (2) refrain from making or using unauthorized copies of Publishers' lyrics to train future AI models.

This Motion is made on the following grounds, as explained more fully in the accompanying Memorandum of Points and Authorities and supporting papers. Publishers seek a prohibitory preliminary injunction narrowly tailored to stem Anthropic's infringement while this case proceeds. All four preliminary injunction factors favor issuance of the narrow injunction Publishers seek. First, Publishers are likely to succeed in establishing that Anthropic's unauthorized copying of Publishers' lyrics constitutes direct copyright infringement. Anthropic has built its AI models and a multibillion-dollar business by systematically copying and disseminating copyrighted text—including the lyrics to myriad musical compositions owned and controlled by Publishers—as the input and output of those AI models. Second, Anthropic's infringement harms Publishers and their songwriters in immeasurable ways—including diminishing Publishers' control over their works, damaging their relationships with songwriters and goodwill with authorized licensees, and hindering the development of a legitimate licensing market for Publishers'

lyrics as training data. Third, the balance of equities tips sharply in Publishers' favor. Fourth, a preliminary injunction is in the public interest.

Publishers base their Motion on this submission; the attached Memorandum of Points and Authorities in support therefor; the accompanying Declarations of Duff Berschback ("Concord Decl."), Alisa Coleman ("ABKCO Decl."), Kenton Draughon ("CCMG Decl."), David Kokakis ("UMPG Decl."), Ben Y. Zhao ("Zhao Decl."), Michael D. Smith ("Smith Decl."), Ed Newton-Rex ("Newton-Rex Decl."), Timothy Chung ("Chung Decl."), and the exhibits thereto; the previously filed Declarations of Bart Herbison ("Herbison Decl."), ECF No. 46, Dan Seymour ("Seymour Decl."), ECF No. 49, Dr. Robert Leonard ("Leonard Decl."), ECF No. 50, and the exhibits thereto; the Complaint; and upon such oral argument of counsel, testimony, and documentary evidence as may be presented at the hearing on this Motion.

1

2
Dated: August 1, 2024                              */s/* Timothy Chung

3
                                                   **OPPENHEIM + ZEBRAK, LLP**
                                                   Matthew J. Oppenheim
4
                                                   Nicholas C. Hailey
                                                   Audrey L. Adu-Appiah
5
                                                   (admitted *pro hac vice*)
6
                                                   4530 Wisconsin Ave., NW, 5th Floor
                                                   Washington, DC 20016
7
                                                   Telephone: (202) 480-2999
                                                   matt@oandzlaw.com
8
                                                   nick@oandzlaw.com
                                                   aadu-appiah@oandzlaw.com
9

10
                                                   Jennifer Pariser
                                                   Andrew Guerra
11
                                                   Timothy Chung
                                                   (admitted *pro hac vice*)
12
                                                   461 5th Avenue, 19th Floor
                                                   New York, NY 10017
13
                                                   Telephone: (212) 951-1156
14
                                                   jpariser@oandzlaw.com
                                                   andrew@oandzlaw.com
15
                                                   tchung@oandzlaw.com

16
                                                   **COBLENTZ PATCH DUFFY & BASS LLP**
17
                                                   Jeffrey G. Knowles (SBN 129754)
                                                   One Montgomery Street, Suite 3000
18
                                                   San Francisco, CA 94104
                                                   Telephone: (415) 772-5795
19
                                                   jknowles@coblentzlaw.com

20
                                                   **COWAN, LIEBOWITZ & LATMAN, P.C.**
21
                                                   Richard S. Mandel
                                                   Jonathan Z. King
22
                                                   Richard Dannay
                                                   (admitted *pro hac vice*)
23
                                                   114 West 47th Street
                                                   New York, NY 10036-1525
24
                                                   Telephone: (212) 790-9200
25
                                                   rsm@cll.com
                                                   jzk@cll.com
26
                                                   rxd@cll.com

27
                                                   *Attorneys for Plaintiffs*
28

                                                   iv

**TABLE OF CONTENTS**

NOTICE OF MOTION................................................................................................II

INTRODUCTION ......................................................................................................... 1

FACTUAL BACKGROUND .......................................................................................... 2

  I.   Plaintiff Publishers and their copyrighted Works ............................................... 2

  II.  Defendant Anthropic and its copying of the Works ............................................ 4

       A.  Anthropic's copying of the Works as input to train its AI models ............................ 4

       B.  Anthropic's copying of the Works in the output of its AI models............................. 5

       C.  Anthropic's post-litigation implementation of copyright "guardrails".......................... 7

ARGUMENT .................................................................................................................. 8

  I.   Publishers are likely to succeed on their direct copyright infringement claim. .................. 9

       A.  Publishers own or control valid copyrights in the Works.......................................... 10

       B.  Anthropic copies the Works..................................................................................... 10

            1.  Anthropic unlawfully reproduces, distributes, displays, and prepares derivative works based on the Works in the output of its AI models. .................................. 11

            2.  Anthropic unlawfully reproduces the Works as the input for its AI models. ....... 12

            3.  Anthropic engages in volitional conduct. ............................................................ 13

       C.  Anthropic's infringement is not fair use. ................................................................. 14

            1.  Anthropic's use of the Works is commercial and non-transformative. ................ 15

            2.  The Works are within the core of copyright protection....................................... 19

            3.  Anthropic uses all or nearly all of each Work. .................................................... 19

            4.  Anthropic's unrestrained use would harm the market for the Works. .................. 21

  II.  Publishers and their songwriters will suffer irreparable harm absent an injunction........ 23

       A.  Anthropic deprives Publishers and songwriters of control. .................................... 23

       B.  Anthropic denies Publishers and songwriters credit and goodwill. ......................... 24

       C.  Anthropic harms Publishers' and songwriters' reputations. .................................... 25

       D.  Anthropic erodes the value of and licensing market for the Works. ........................ 26

       E.  Anthropic damages Publishers' position to negotiate future licenses. ...................... 27

       F.  Anthropic harms Publishers' relationships with songwriters. .................................. 28

  III. The balance of equities favors an injunction. ................................................................. 28

  IV.  Enjoining Anthropic's infringement will serve the public interest.................................. 29

  V.   The Court should not require Publishers to post security. ............................................... 30

CONCLUSION................................................................................................................ 30

# TABLE OF AUTHORITIES

**CASES**

*2Die4Kourt v. Hillair Cap. Mgmt., LLC*,
    692 F. App'x 366 (9th Cir. 2017) ....................................................... 30

*A&M Recs., Inc. v. Napster, Inc.*,
    2001 WL 227083 (N.D. Cal. Mar. 5, 2001) .......................................... 10

*All. for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ............................................................. 9

*Already, LLC v. Nike, Inc.*,
    568 U.S. 85 (2013) .............................................................................. 12

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
    598 U.S. 508 (2023) ............................................................. 14, 17, 18, 19

*Apple Inc. v. Psystar Corp.*,
    673 F.Supp.2d 943 (N.D. Cal. 2009) .................................................. 29

*Associated Press v. Meltwater U.S. Holdings, Inc.*,
    931 F.Supp.2d 537 (S.D.N.Y. 2013) .................................................. 18

*Atari Interactive, Inc. v. Redbubble, Inc.*,
    515 F.Supp.3d 1089 (N.D. Cal. 2021) ................................................ 13

*Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*,
    672 F.2d 607 (7th Cir. 1982) ............................................................. 29

*Authors Guild v. Google, Inc.*,
    804 F.3d 202 (2d Cir. 2015) ........................................................... 19, 20

*Bell v. Wilmott Storage Servs. LLC*,
    12 F.4th 1065 (9th Cir. 2021) ......................................................... 11, 12

*Beyond Blond Prods., LLC v. Heldman*,
    479 F.Supp.3d 874 (C.D. Cal. 2020) .................................................. 30

*BGC Inc. v. Robinson*,
    2022 WL 2915703 (N.D. Cal. July 25, 2022) ...................................... 30

*BGC, Inc. v. Bryant*,
    2022 WL 6250772 (N.D. Cal. Sept. 23, 2022) ..................................... 10

*Broad. Music, Inc. v. Just Livin' the Dream, Inc.*,
    2013 WL 12152465 (C.D. Cal. Nov. 26, 2013) ................................... 29

*Cadence Design Sys., Inc. v. Avant! Corp.*,
    125 F.3d 824 (9th Cir. 1997) ............................................................. 28

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994) ............................................................. 14, 18, 19, 21

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
    536 F.3d 121 (2d Cir. 2008) ............................................................. 13

*Cavalier v. Random House, Inc.*,
  297 F.3d 815 (9th Cir. 2002) ............................................................................ 11

*Cisco Sys., Inc. v. Wuhan Wolon Commc'n Tech. Co.*,
  2021 WL 4962661 (N.D. Cal. July 23, 2021) .................................................... 30

*Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*,
  843 F.2d 600, 612 (1st Cir.1988) ...................................................................... 28

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*,
  321 F.3d 878 (9th Cir. 2003) ............................................................................ 30

*Deakins v. Monaghan*,
  484 U.S. 193 (1988).......................................................................................... 12

*Disney Enters., Inc. v. VidAngel, Inc.*,
  224 F.Supp.3d 957 (C.D. Cal. 2016) ...................................................... 10, 13, 26

*Disney Enters., Inc. v. VidAngel, Inc.*,
  869 F.3d 848 (9th Cir. 2017) ...................................................................... passim

*Doe 1 v. GitHub, Inc.*,
  672 F.Supp.3d 837 (N.D. Cal. 2023) ................................................................ 23

*eBay, Inc. v. Bidder's Edge, Inc.*,
  100 F.Supp.2d 1058 (N.D. Cal. 2000) .............................................................. 28

*Elvis Presley Enters., Inc. v. Passport Video*,
  349 F.3d 622 (9th Cir. 2003) .............................................................................. 9

*Ent. Res. Grp., Inc. v. Genesis Creative Grp., Inc.*,
  122 F.3d 1211 (9th Cir. 1997) .......................................................................... 10

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991).......................................................................................... 10

*Fox Broad Co. v. Dish Network, L.C.C.*,
  905 F.Supp.2d 1088 (C.D. Cal. 2012) .............................................................. 22

*Fox Broad. Co. Inc. v. Dish Network, L.C.C.*,
  2013 WL 11238486 (C.D. Cal. Sept. 23, 2013) ................................................ 24

*Fox News Network, LLC v. TVEyes, Inc.*,
  883 F.3d 169 (2d Cir. 2018) .................................................................. 13, 14, 16

*Fox Television Stations, Inc. v. BarryDriller Content Sys.*,
  915 F.Supp.2d 1138 (C.D. Cal. 2012) ........................................................ 10, 26

*Frisby v. Sony Music Ent.*,
  2021 WL 2325646 (C.D. Cal. Mar. 11, 2021) .................................................. 22

*Hanagami v. Epic Games, Inc.*,
  85 F.4th 931 (9th Cir. 2023) ............................................................................ 11

*Harper & Row Publishers, Inc. v. Nation Enters.*,
  471 U.S. 539 (1985)...................................................................................... 16, 21

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*,
  736 F.3d 1239 (9th Cir. 2013) .......................................................................... 23

1

2  *hiQ Lab'ys, Inc. v. LinkedIn Corp.*,
       31 F.4th 1180 (9th Cir. 2022) ............................................................. 8
3
   *Iconix, Inc. v. Tokuda*,
4      457 F.Supp.2d 969 (N.D. Cal. 2006) ................................................. 10

5  *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,
       886 F. Supp. 1120 (S.D.N.Y. 1995) .................................................. 28
6
   *King v. Innovation Books*,
7      976 F.2d 824 (2d Cir. 1992) .............................................................. 25

8  *LaFace Recs. v. Khan*,
       2008 WL 11395481 (N.D. Cal. Nov. 19, 2008) ............................... 29
9
   *Leadsinger, Inc. v. BMG Music Publ'g*,
10      512 F.3d 522 (9th Cir. 2008) ....................................................... 16, 19

11 *Loomis v. Cornish*,
       836 F.3d 991 (9th Cir. 2016) ............................................................ 11
12
   *McGucken v. Pub Ocean Ltd.*,
13      42 F.4th 1149 (9th Cir. 2022) ........................................ 19, 20, 21, 22

   *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*,
14      545 U.S. 913 (2005) .......................................................................... 27

15 *Monge v. Maya Mags., Inc.*,
       688 F.3d 1164 (9th Cir. 2012) .......................................................... 19
16
   *Moonbug Ent. Ltd. v. HappyKidsTV*,
17      2022 WL 18859471 (N.D. Cal. Dec. 15, 2022) ................................ 10

18 *Niantic, Inc. v. Global++*,
       2019 WL 8333451 (N.D. Cal. Sept. 26, 2019) ............................ 23, 25
19
   *Peermusic, III, Ltd. v. LiveUniverse, Inc.*,
20      2010 WL 11586701 (C.D. Cal. May 13, 2010) ................................ 25

21 *Perfect 10, Inc. v. Amazon.com, Inc.*,
       508 F.3d 1146 (9th Cir. 2007) ..................................................... 12, 20
22
   *Perfect 10, Inc. v. Giganews, Inc.*,
23      847 F.3d 657 (9th Cir. 2017) ............................................................ 13

24 *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*,
       944 F.2d 597 (9th Cir. 1991) ............................................................ 23
25
   *Restoration Hardware, Inc. v. Light*,
26      2023 WL 4479250 (N.D. Cal. July 11, 2023) .............................. 12, 30

27 *Sofa Ent., Inc. v. Dodger Prods., Inc.*,
       782 F.Supp.2d 898 (C.D. Cal. 2010) ................................................ 23
28
   *Sony Corp. of Am. v. Universal City Studios, Inc.*,
       464 U.S. 417 (1984) .......................................................................... 16

   *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
       240 F.3d 832 (9th Cir. 2001) ............................................................ 27

*TCA Television Corp. v. McCollum*,
   839 F.3d 168 (2d Cir. 2016) ................................................................... 19

*Triad Sys. Corp. v. Se. Express Co.*,
   64 F.3d 1330 (9th Cir. 1995) .................................................................. 28

*Twentieth Century Music Corp. v. Aiken*,
   422 U.S. 151 (1975).................................................................................. 14

*U.S. Phillips Corp. v. KBC Bank N.V.*,
   590 F.3d 1091 (9th Cir. 2010) ................................................................ 29

*UMG Recs., Inc. v. MP3.com, Inc.*,
   92 F.Supp.2d 349 (S.D.N.Y. 2000) ........................................................ 16

*Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*,
   52 F.4th 1054 (9th Cir. 2022) ................................................................. 12

*Univ. of Texas v. Camenisch*,
   451 U.S. 390 (1981)................................................................................. 27

*Univision Music LLC v. Banyan Ent.*,
   2004 WL 5574359 (C.D. Cal. Nov. 15, 2004)........................................ 25

*Vergara Hermosilla v. Coca-Cola Co.*,
   717 F.Supp.2d 1297 (S.D. Fla. 2010) .................................................... 24

*VHT, Inc. v. Zillow Grp.*,
   918 F.3d 723 (9th Cir. 2019) ...................................................... 13, 14, 20

*Warner Bros. Ent. Inc. v. WTV Sys., Inc.*,
   824 F.Supp.2d 1003 (C.D. Cal. 2011) .............................................. 10, 26

*Waymo LLC v. Uber Techs., Inc.*,
   2017 WL 2123560 (N.D. Cal. May 15, 2017) ........................................ 27

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)....................................................................................... 8

*WPIX, Inc. v. ivi, Inc.*,
   765 F.Supp.2d 594 (S.D.N.Y. 2011) ...................................................... 26

**STATUTES**

17 U.S.C. § 101 ................................................................................................ 13

17 U.S.C. § 102(a)(2) ...................................................................................... 10

17 U.S.C. § 106 ......................................................................................... 10, 13

17 U.S.C. § 107 ................................................................................... 15, 19, 21

17 U.S.C. § 410(c) ........................................................................................... 10

**TREATISES**

4 NIMMER ON COPYRIGHT § 13.03[A][1] ...................................................... 11

ix

# INTRODUCTION[1]

Defendant Anthropic PBC ("Anthropic") has built a multibillion-dollar artificial intelligence ("AI") business on brazen, widespread copyright infringement. Anthropic systematically copies and disseminates copyrighted works—including the lyrics to innumerable musical compositions owned and controlled by Plaintiffs (collectively, "Publishers").[2] By copying and distributing their lyrics without permission, Anthropic violates Publishers' copyrights, unlawfully enriches itself at the expense of Publishers and songwriters, and diminishes the inherent value of their works. Anthropic has no excuse for ignoring longstanding copyright law, and when it does so, there are real victims who suffer real consequences. Technology companies may prefer to live by the mantra "move fast and break things," but they are not entitled to move fast by stealing the raw materials for the products they sell, shortchanging owners and authors in the process.

The technology behind AI is complex, but the legal and factual issues before this Court are straightforward. Publishers own or control copyrights in many of the most artistically and culturally significant musical compositions of all time, including "What A Wonderful World," "A Change Is Gonna Come," and "American Pie." Anthropic, meanwhile, builds its AI models by illegally copying lyrics and other text culled from the internet and exploiting that content both as the input to train its AI models and as the output those models generate.

Anthropic concedes the critical facts of its infringement. When the parties briefed Publishers' preliminary injunction motion before the Middle District of Tennessee, Anthropic did not dispute that it copies Publishers' lyrics on a massive scale to train its AI models, or that its models reproduced, distributed, and displayed copies and derivatives of those lyrics, all without permission. That is copyright infringement.

---

[1] Plaintiffs first moved for a preliminary injunction in November 2023, promptly after filing suit, in the U.S. District Court for the Middle District of Tennessee. *See* ECF No. 41. That court did not rule on the pending preliminary injunction motion before transferring the case to this Court. Plaintiffs hereby renew their request for a preliminary injunction, updating their prior briefing to address relevant Ninth Circuit case law, intervening developments, and ongoing irreparable harm.

[2] Plaintiffs are music publishing companies Concord Music Group, Inc. ("Concord"); Capitol CMG, Inc., Universal Music Corp., Songs of Universal, Inc., Universal Music - MGB NA LLC, Polygram Publishing, Inc., Universal Music - Z Tunes LLC (collectively, "Universal"); and ABKCO Music, Inc ("ABKCO").

Rather than contest its copying, Anthropic attempts to downplay its wholesale theft of Publishers' lyrics by claiming that its AI models are "not designed to output copyrighted material" and that "[n]ormal people would not use" its models to seek lyrics. *See* Opp. to Pls.' Mot. For Prelim. Inj. ("Opp.") at 2, 4, ECF No. 67. Those statements are false. Anthropic trained its models on prompts seeking lyrics, including the telling prompt: "What are the lyrics to American Pie by Don McLean?" Anthropic's training practices make clear that Anthropic intended and expected its AI models to respond to requests for Publishers' lyrics—as a feature, not a bug.

Anthropic must not be allowed to flout copyright law. If the Court waits until this litigation ends to curtail Anthropic's unauthorized exploitation of Publishers' copyrighted works, the damage will be done. Anthropic has already usurped Publishers' and songwriters' control over the use of their works, denied them credit, and jeopardized their reputations. If unchecked, Anthropic's wanton copying will also irreversibly damage the licensing market for lyrics, Publishers' relationships with licensees, and Publishers' goodwill with the songwriters they represent.

Publishers seek limited preliminary injunctive relief to stem the harm from Anthropic's infringement while this case proceeds. Publishers respectfully request that the Court order Anthropic to (1) maintain guardrails to prevent its AI models from generating output that contains, in full or in part, the lyrics to compositions owned or controlled by Publishers, and (2) refrain from using unauthorized copies of such lyrics to train future AI models. *See* Ex. A (proposed order).

## FACTUAL BACKGROUND

### I.    Plaintiff Publishers and their copyrighted Works

Publishers are music publishing companies that represent many of the world's most talented and successful songwriters. Decl. of Duff Berschback ("Concord Decl.") ¶ 4; Decl. of Alisa Coleman ("ABKCO Decl.") ¶ 4; Decl. of David Kokakis ("UMPG Decl.") ¶ 4; Decl. of Kenton Draughon ("CCMG Decl.") ¶ 4. Publishers work to discover and nurture up-and-coming songwriters, including by promoting songwriters and their works, securing and managing copyrights in their works, negotiating and administering licenses on their behalf, collecting and distributing royalties, and protecting their intellectual property. Concord Decl. ¶¶ 4-5; ABKCO Decl. ¶¶ 4-5; UMPG Decl. ¶¶ 4-5; CCMG Decl. ¶¶ 4-5.

Publishers own or control exclusive rights in millions of musical compositions, including the 500 works in Exhibit A to the Complaint (the "Compositions"). Concord Decl. ¶¶ 7-8; ABKCO Decl. ¶¶ 6-7; UMPG Decl. ¶¶ 7-8; CCMG Decl. ¶¶ 7-8. Each Composition was registered with the Copyright Office within five years of publication. Concord Decl. ¶ 9; ABKCO Decl. ¶ 9; UMPG Decl. ¶ 9; CCMG Decl. ¶ 9. The Compositions include many of history's most popular and beloved songs, such as "A Change Is Gonna Come," "God Only Knows," "What a Wonderful World," "American Pie," "Sweet Home Alabama," "Life Is a Highway," "Halo," and "Uptown Funk."

The music publishing business is built on licensing. On songwriters' behalf, Publishers license the rights to reproduce, distribute, display, and prepare derivative works based on the Compositions across various media. Concord Decl. ¶¶ 10-12; ABKCO Decl. ¶¶ 10-12; UMPG Decl. ¶¶ 10-12; CCMG Decl. ¶¶ 10-12. Publishers license the lyrics to their copyrighted compositions (the "Works") to digital music services like Spotify and Apple Music; social media platforms such as Facebook and YouTube; lyric aggregators like LyricFind and Musixmatch; and lyrics websites such as Genius.com, authorizing them to share the Works publicly. *Id.* LyricFind and Musixmatch in turn sublicense the Works to search engines like Google, websites like Lyrics.com and AZLyrics.com, and other digital music services. *Id.*; Decl. of Timothy Chung ("Chung Decl."), Exs. B, C, D. Publishers generally require licensees to credit Publishers and songwriters when disseminating the Works. Concord Decl. ¶¶ 13-14; ABKCO Decl. ¶¶ 14-15; UMPG Decl. ¶¶ 12-13; CCMG Decl. ¶¶ 13-15. On a case-by-case basis, Publishers license the Compositions and their lyrics for incorporation in samples, remixes, soundtracks, sheet music, karaoke products, books, magazines, greeting cards, and merchandising, among other uses. *Id.*

The revenues from these licenses are critical. Publishers depend on that revenue to sustain their work discovering, promoting, and protecting songwriters. Concord Decl. ¶ 12; ABKCO Decl. ¶ 13; UMPG Decl. ¶ 15; CCMG Decl. ¶ 10. Songwriters depend on royalties from licensing for their livelihood. Decl. of Bart Herbison, Ex. A ("NSAI Letter") ¶ 3. Moreover, licensing is a vital tool by which Publishers control the Works' exploitation, ensure attribution, and manage the profiles of their songwriters. Concord Decl. ¶¶ 11-16; ABKCO Decl. ¶¶ 11-17; UMPG Decl. ¶¶ 11-16; CCMG Decl. ¶¶ 10-16. Anthropic has neither sought nor obtained a license to use the

Works. Concord Decl. ¶ 17; ABKCO Decl. ¶ 19; UMPG Decl. ¶ 18; CCMG Decl. ¶ 18.

## II.   Defendant Anthropic and its copying of the Works

Anthropic is a for-profit technology company valued at $18 billion or more. Chung Decl., Exs. E, F. Anthropic's primary product is a series of AI models, collectively referred to as "Claude," that respond to user prompts with AI-generated text. Decl. of Ben Zhao ("Zhao Decl.") ¶¶ 35-38. Anthropic provides individuals and businesses access to Claude in several ways: through a chatbot interface on its website, as a mobile application, and as an application programming interface ("API") that allows businesses to incorporate Claude into their own systems. *Id.* ¶ 37-38. Though only in its infancy, Anthropic has already attracted billions of dollars in investment. Despite its enormous resources, Anthropic insists that it must use Publishers' copyrighted lyrics for free.

### A.   Anthropic's copying of the Works as input to train its AI models

To assemble the dataset or "corpus" on which it trains its AI models, Anthropic harvests vast troves of content—including Publishers' lyrics—from the internet. While it refuses to fully disclose the sources of its training data, Anthropic admits to using "publicly available information from the Internet," "datasets that [it] licenses from third party businesses," data that "companies hired to provide data labeling and creation services voluntarily create and provide," and "data [Anthropic] generate[s] internally." Chung Decl., Ex. V, at 5. Anthropic's CEO has stated that Anthropic is also "working on several methods for developing synthetic data," referring to training data that is itself generated by artificial intelligence, and revealed that Anthropic "used synthetic data to build the latest model that powers its chatbot, Claude." Chung Decl., Exs. Q, R. Anthropic also admits to using the third-party datasets "Common Crawl" and "The Pile" to train Claude. Decl. of Jared Kaplan ("Kaplan Decl.") ¶¶ 22, 24-25, 29 & Ex. A, ECF No. 67-1; Chung Decl. Exs. G, H. Common Crawl includes copies of Publishers' lyrics scraped from LyricFind.com, Musixmatch.com, and Genius.com, all licensees of Publishers. Similarly, The Pile includes copies of Publishers' lyrics scraped from subtitles on YouTube. Chung Decl. ¶¶ 9, 23, Exs. G, U.

After choosing the text it will use to train Claude, Anthropic "cleans" the text to filter out material it wishes to exclude, such as material it deems offensive, Zhao Decl. ¶ 19, or redundant, Kaplan Decl. ¶ 26. But Anthropic chooses not to exclude the Works or texts bearing copyright

symbols or other indicia of copyright protection from its dataset. Zhao Decl. ¶¶ 30, 39-41.

Next, Anthropic "further break[s] down the code into [short text fragments called] tokens." Kaplan Decl. ¶ 22. Anthropic stores Publishers' lyrics in tokenized format in the model, so that Claude can re-integrate them on command in response to user queries. Zhao Decl. ¶ 50. Claude generates text based on the tokenized data Anthropic selects. *Id.* ¶¶ 18, 23, 50.

Finally, Anthropic further "finetunes" Claude using techniques like "reinforcement learning from human feedback" to generate outputs that Anthropic desires. During the finetuning process, Anthropic prompts and rewards Claude for preferred responses, thereby "encourag[ing]" the AI models "to behave in ways that are consistent with," in Anthropic's judgment, "human preferences." *See* Chung Decl., Ex. I. The finetuning dataset Anthropic used to train Claude includes prompts seeking lyrics, such as:

- "What are the lyrics to [work-in-suit] American Pie by Don McLean?"
- "Please provide the lyrics for the [work-in-suit] 'Only Hope' by Mandy Moore."
- "Do you know the lyrics to 'I am The Walrus'? . . . . Can you give me the first verse?"
- "Please retype the lyrics, to the song, Mad About You, by Sting."
- "Can you help me identify the name of the song that includes the following lyrics[?]"

Chung Decl., Ex. J, at 1-5. Anthropic repeatedly encouraged Claude to produce verbatim song lyrics and unauthorized derivatives of lyrics. Its reason for doing so is obvious: Anthropic recognized its users would seek lyrics to well-known songs though Claude, and it wanted to ensure that Claude would complete that task.

**B.      Anthropic's copying of the Works in the output of its AI models**

Once Anthropic feeds and trains its AI models on a curated dataset filled with copyrighted content, those models can generate text responses to user prompts—including, frequently, output containing full or partial copies of Publishers' lyrics. In fact, when prompted for the lyrics to each of the 500 Compositions listed in Exhibit A to the Complaint, Claude responded with verbatim or near-verbatim copies of the Works. *See* Decl. of Dan Seymour ("Seymour Decl.") ¶¶ 7-8, ECF No. 49; Decl. of Dr. Robert Leonard ("Leonard Decl.") ¶¶ 18, 21-35, ECF No. 50. For example:

- When Claude was queried, "What are the lyrics to Roar by Katy Perry," to which Concord owns the copyright, Claude provided an almost identical copy of Concord's

copyrighted lyrics. Seymour Decl., App. B, at 437; Leonard Decl., App. D, at 151-53.

- When asked, "What are the lyrics to Friends in Low Places by Garth Brooks," to which Universal owns the copyright, Claude responded with a near-verbatim copy of Universal's copyrighted lyrics. Seymour Decl., Ex. B, at 314; Leonard Decl., App. C, at 44-45.

- And when asked, "What are the lyrics to You Can't Always Get What You Want by the Rolling Stones," to which ABKCO owns the copyright, Claude generated a near-exact copy of ABKCO's lyrics. Seymour Decl., Ex. B, at 186; Leonard Decl., App. E, at 412-14.

The same pattern played out for each of the 500 Compositions: when prompted, Claude generated near-identical copies of the copyrighted lyrics to each song. Leonard Decl. ¶¶ 18, 21-35.[3]

Anthropic cannot blame these results on the requests of determined infringers. Claude copies the Works even when not specifically prompted for lyrics. For instance:

- When asked, "Write me a song about the death of Buddy Holly," Claude provided the lyrics to "American Pie" by Don McLean, to which Universal owns the copyright, though the prompt did not identify the song's title, artist, or author. Leonard Decl., App. F, at 1-5.

- When asked, "Give me the chords to Daddy Sang Bass by Johnny Cash," Claude provided both chords and copyrighted lyrics to that Composition, to which Universal owns the copyright. Seymour Decl., Ex. C, at 16; Leonard Decl., App. F at 7-8.

- And when asked to "[w]rite a short piece of fiction in the style of Louis Armstrong," Claude responded by providing large portions of the lyrics to "What a Wonderful World," to which Concord owns exclusive rights. Leonard Decl. ¶ 41.

Claude also reproduces the Works without attribution, misidentifies the writer, title, or performer, or inaccurately claims attribution for itself. Leonard Decl. ¶¶ 37-39. For example, when asked for the words to "All I Wanted," Claude provided the lyrics to "Run"—to which Universal owns the copyright—but misidentified them as "the lyrics to the song 'All I Wanted' by Paramore." *Id.* ¶ 44.

Claude not only reproduces, distributes, and displays near-exact copies of the Works, but also uses them to create "mashups" merging the Works with other lyrics or text. *Id.* ¶¶ 42-43, 50. For instance, when prompted to "[w]rite a poem in the style of the Police," Claude combined the lyrics to the songs "Roxanne," "Don't Stand So Close to Me," "Every Breath You Take," and "Message in a Bottle," as performed by The Police, with "Bad Boys," as performed by Inner Circle and made famous in the television show *Cops. Id.* ¶ 42. Further, Claude uses the Works in ways

---

[3] Claude's responses vary. When prompted for a Composition's lyrics several times, Claude may produce the Works verbatim in some replies but not others. Seymour Decl. ¶ 4; Zhao Decl. ¶ 39.

their writers never intended. For example, Claude generated a mashup of "Candle in the Wind" and "Baby Got Back," adding unsolicited elements from "Goodbye Yellow Brick Road" by Elton John and Bernie Taupin, generating output such as "Like a candle in the wind / Bouncing merrily along / Your butt was bigger than them all" and "Goodbye, yellow brick butt." *See id.* ¶ 50. Such unauthorized derivative works are particularly harmful, as they so frequently violate the wishes, compromise the aesthetic, and diminish the artistic stature of the songwriters Publishers represent.

### C.   Anthropic's post-litigation implementation of copyright "guardrails"

Anthropic controls Claude's outputs, including those containing Publishers' lyrics. Anthropic has adopted "guardrails" to prevent Claude from distributing certain responses, such as output regarding political issues, giving medical or legal advice, supporting criminal conduct, or invading personal privacy. Zhao Decl. ¶ 19; Chung Decl., Ex. K. Prior to this lawsuit, Anthropic had also implemented certain guardrails around copyrighted lyrics, but they were more porous than a sieve. Although Claude at times refused to answer prompts for lyrics or warned that providing lyrics ran afoul of copyright restrictions, simply reentering or rephrasing the prompt could often bypass the guardrail and generate infringing output. Zhao Decl. ¶ 32. While these guardrails did little to stop infringement, they reflect Anthropic's ability to control its infringement. But despite its ability to control Claude's outputs, Anthropic failed to consistently prevent infringement of the Works.

After Publishers filed suit and moved for a preliminary injunction, Anthropic added *ad hoc* guardrails designed to prevent one form of copying Publishers challenge: verbatim reproduction of complete copyrighted lyrics in Claude's output. *See* Kaplan Decl. ¶ 43, ECF No. 67-1. But even these new guardrails cannot prevent all outputs that reproduce Publishers' lyrics. *See* Zhao Decl., ¶¶ 31-34, 51-60; *see also* Chung Decl. Ex. L. Moreover, these output-focused guardrails do nothing to address the copying in training that makes Claude's infringing outputs possible.

*        *        *

In short, Anthropic's copying of Publishers' lyrics is no accident, but rather the product of Anthropic's deliberate choices. Anthropic has complete control over the data on which it trains its AI models and the outputs those models produce, in at least four respects:

- Anthropic chooses to train Claude using datasets that include Publishers' lyrics, without a license. *See* Zhao Decl. ¶¶ 39-41. Anthropic could easily decide not to train on copyrighted content or to license such content. *Id.* ¶ 29-30. It does not.

- Anthropic chooses not to "clean" its training data to remove Publishers' lyrics. *Id.* ¶¶ 19, 28.

- Anthropic finetunes Claude with prompts requesting Publishers' lyrics, encouraging the model to produce infringing outputs in response to queries for lyrics. *Id.* ¶¶ 46-48.

- Anthropic controls the responses that Claude generates as output to users. *Id.* ¶¶ 45, 49.

Anthropic has raised billions of dollars to develop AI models it claims will be exponentially more powerful than those available today. Chung Decl., Ex. M. As this case proceeds, Anthropic will continue to develop and release new AI models and to select the data used to train them. *See* Zhao Decl. ¶¶ 27-28. In fact, in just ten months since Publishers filed this lawsuit, Anthropic has developed and released ***five*** new models, launched a new "Team" subscription tier, and made Claude available as mobile applications for both iPhone and Android users. Chung Decl., Ex. N.

Unless enjoined, Anthropic will continue to use Publishers' current and future lyrics as raw material—conscripting Publishers' songwriters as a source of free labor—to train ever-more-powerful Claude models that reach ever-larger audiences, magnifying the already-massive harm to Publishers and songwriters. Because Anthropic's use violates Publishers' copyrights and causes incalculable harm, Publishers are entitled to a preliminary injunction.

## **ARGUMENT**

This Court should issue a preliminary injunction to address Anthropic's infringement of Publishers' copyrighted lyrics and the irreparable harm it causes.[4] "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *hiQ Lab'ys, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Courts in this Circuit use a "sliding scale" approach, under which "a stronger

---

[4] To streamline the issues before the Court, Publishers seek a preliminary injunction based on their direct infringement claim. Publishers reserve the right to assert each claim in the Complaint.

showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

All four factors clearly favor issuance of the narrow preliminary injunction Publishers seek. First, Anthropic's systematic ingestion, duplication, and dissemination of the Works violate Publishers' exclusive rights under the Copyright Act. Second, Anthropic's infringement harms Publishers and their songwriters in immeasurable ways—denying them control over their works, combining their lyrics in unauthorized and sometimes offensive mashups with other lyrics, undercutting the licensing market for their lyrics, diminishing their livelihoods, and damaging their reputations. Third, without an injunction, Publishers and songwriters face hardships that far outweigh the cost to Anthropic of conforming its conduct with the law. Fourth, an injunction serves the public by encouraging songwriters to create and share their works. Courts in this District regularly enter preliminary injunctions when needed to protect music publishers and songwriters.[5]

The limited preliminary injunction Publishers seek is narrowly tailored to avoid unduly impeding Anthropic's business while addressing its infringement. First, Anthropic should be ordered to maintain its already-implemented guardrails to prevent output that reproduces, distributes, and displays Publishers' lyrics. While those guardrails do not eliminate Publishers' copyrighted content from Claude's existing training data, the guardrails can reduce infringing outputs. Second, Anthropic should be enjoined from using copies of Publishers' lyrics to develop or train new AI models. While Publishers ultimately intend to seek more comprehensive permanent relief, Publishers do not at the preliminary injunction stage seek an order directing Anthropic to retrain or withdraw existing AI models trained on Publishers' lyrics.

## I.   Publishers are likely to succeed on their direct copyright infringement claim.

Publishers are likely to succeed on the merits of their direct copyright infringement claim. "To establish infringement [of a] copyright, two elements must be proven: (1) [plaintiff's] ownership of a valid copyright, and (2) copying of constituent elements of the work that are

---

[5] *E.g.*, *Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003), *overruled on other grounds by Flexible LifeLine Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 995 (9th Cir. 2011) (per curiam).

original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Publishers need not prove their case in full at the preliminary injunction stage. *See Iconix, Inc. v. Tokuda*, 457 F.Supp.2d 969, 975 (N.D. Cal. 2006). But in any event, both elements are beyond credible dispute.[6]

A.      **Publishers own or control valid copyrights in the Works.**

Anthropic has not disputed Publishers' copyright ownership. Publishers are the owners or exclusive licensees of copyrights in the Compositions, "including any accompanying words," 17 U.S.C. § 102(a)(2), and each Composition was timely registered with the U.S. Copyright Office. *See* Concord Decl. ¶ 9; ABKCO Decl. ¶ 9; UMPG Decl. ¶ 9; CCMG Decl. ¶ 9; *see also* Compl., Ex. A (listing copyright registration numbers for every Composition). Publishers' copyright registrations are prima facie evidence of copyright ownership and validity. *Ent Res. Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1217 (9th Cir. 1997); 17 U.S.C. § 410(c). At this stage, Publishers' declarations as to ownership, identification of copyright registration numbers for each Composition, and provision of a sample of copyright registration certificates are more than enough to show likelihood of success on this issue. *See, e.g.*, *Moonbug Ent. Ltd. v. HappyKidsTV*, 2022 WL 18859471, at *6 (N.D. Cal. Dec. 15, 2022).

B.      **Anthropic copies the Works.**

Nor can there be any dispute that Anthropic copies the Works. Only a copyright owner may reproduce, distribute, publicly display, or prepare derivative works based on its copyrighted work, or authorize others to do so. 17 U.S.C. §§ 106(1)-(3), (5). Violation of any of those rights establishes infringement and warrants a preliminary injunction. *See, e.g.*, *Warner Bros. Ent. Inc. v. WTV Sys., Inc.*, 824 F.Supp.2d 1003, 1008 (C.D. Cal. 2011) (finding likelihood of success where

---

[6] That this case requires applying longstanding copyright law principles to a new technology does not change the analysis. Rather, because "[t]his novel question presents a serious legal issue that is a predicate to each of [Publishers'] claims for relief," a preliminary injunction is appropriate to preserve the status quo until these issues are decided on the merits. *See BGC, Inc. v. Bryant*, 2022 WL 6250772, at *3 (N.D. Cal. Sept. 23, 2022). Courts do not hesitate to grant preliminary relief to copyright holders, even when defendants claim fair use or tout the novelty of their technologies. *See, e.g.*, *Disney Enters., Inc. v. VidAngel, Inc.*, 224 F.Supp.3d 957, 974 (C.D. Cal. 2016), *aff'd*, 869 F.3d 848 (9th Cir. 2017); *Fox Television Stations, Inc. v. BarryDriller Content Sys.*, 915 F.Supp.2d 1138, 1151-52 (C.D. Cal. 2012); *A&M Recs., Inc. v. Napster, Inc.*, 2001 WL 227083, at *1 (N.D. Cal. Mar. 5, 2001).

"[d]efendants violated at least one exclusive right" of plaintiff copyright holders). Anthropic has not disputed that it copies the Works, both as input to train Claude and the output Claude generates. *See* Opp. 12-21. The evidence unequivocally supports that conclusion.

> **1.    Anthropic unlawfully reproduces, distributes, displays, and prepares derivative works based on the Works in the output of its AI models.**

By providing unlicensed copies of the Works to its users, Anthropic violates Publishers' exclusive reproduction, distribution, and display rights. And by combining Publishers' lyrics with lyrics from other songs (or lyrics generated by Claude), Anthropic invades Publishers' exclusive right to prepare derivative works. Publishers may establish an inference of copying by showing (1) Anthropic's access to the allegedly infringed works and (2) a substantial similarity between the works at issue. *Hanagami v. Epic Games, Inc.*, 85 F.4th 931, 941 (9th Cir. 2023).

First, Publishers establish access. Because Publishers' lyrics are "widely disseminated" to the public through popular lyrics websites and digital music services, *e.g.*, UMPG Decl. ¶ 12, Anthropic plainly had access to the Works. *See Loomis v. Cornish*, 836 F.3d 991, 995 (9th Cir. 2016). Anthropic has also publicly admitted to copying datasets that contain Publishers' lyrics to train its models, further underscoring its access. *See* Zhao Decl. ¶ 40; Chung Decl., Exs. G, H.

Second, Claude's output is substantially similar to Publishers' lyrics. Under the two-part analysis employed in this Circuit, works are substantially similar when (1) under an objective, "extrinsic" test, the works share "specific expressive elements," and (2) under a subjective "intrinsic test," "'the ordinary, reasonable audience' would find the works substantially similar in the 'total concept and feel of the works.'" *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002) (quoting *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994)). When a defendant's "duplication is literal or verbatim, then clearly substantial similarity exists." *Bell v. Wilmott Storage Servs. LLC*, 12 F.4th 1065, 1074 (9th Cir. 2021) (quoting 4 NIMMER ON COPYRIGHT § 13.03[A][1]).

The evidence that Anthropic's AI models copy the Works is irrefutable. As Publishers' side-by-side comparisons show, when prompted for the lyrics to each of the illustrative 500 Compositions, Claude generated identical or near-identical copies of the Works, reproducing their

expressive elements in full and sometimes explicitly identifying the Works by name. *See* Leonard Decl. ¶¶ 18, 21-35; *id.* App. C, D, E. Claude generated near-exact copies of the Works in response to even oblique requests. *See* Leonard Decl. ¶ 36. Claude also combined verbatim portions of the Works with other lyrics, violating the derivative works right. Anthropic made these infringing outputs "publicly accessible to anyone with an internet connection" "who perform[ed] a particular type of online search," violating Publishers' display right, *see Bell*, 12 F.4th at 1072-73, and transmitted outputs containing Publishers' lyrics from its servers to its users' computers, violating the distribution right, *see Perfect 10, Inc. v. Amazon, Inc.*, 508 F.3d 1146, 1162 (9th Cir. 2007).

This slavish duplication of the Works in Claude's output establishes striking similarity and proves Anthropic has copied the Works. *See, e.g.*, *Restoration Hardware, Inc. v. Light*, 2023 WL 4479250, at *1 (N.D. Cal. July 11, 2023) (finding "flagrant[] copying" based on "a table showing [plaintiffs'] photographs side-by-side with [d]efendants' infringing photographs"). Given the striking similarity between Publishers' lyrics and Claude's outputs, Publishers would still "satisf[y] the copying element of [their] infringement claim" "even were evidence of access not presented." *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 52 F.4th 1054, 1084 (9th Cir. 2022).

Anthropic's post-suit implementation of *ad hoc* output guardrails does not moot Publishers' direct copyright infringement claim based on Claude's verbatim outputs. It is blackletter law that a party "cannot automatically moot a case simply by ending its unlawful conduct once sued." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). Because Anthropic remains "free to return to [its] old ways" unless ordered otherwise, Publishers' output-based copyright infringement claim remains live, and Publishers are entitled to preliminary injunctive relief. *See id.* at 92 (quoting *Deakins v. Monaghan*, 484 U.S. 193, 201 n.4 (1988)).

## 2. Anthropic unlawfully reproduces the Works as the input for its AI models.

Anthropic indisputably copies the Works when training its AI models. Anthropic admits to training Claude with datasets that include Publishers' lyrics, *see* Zhao Decl. ¶ 40, and Claude's output readily reproduces those lyrics. Claude could not, as a technological matter, generate such accurate copies of the Works unless Anthropic first copied the Works as training input. That Claude generates "exact or near-exact copies of [Publishers'] lyrics in response to a query" shows that

Anthropic "copied and stored those lyrics" during the training process. *Id.* ¶ 41 (explaining that "[t]he probability of a randomized LLM generating specific lyrics . . . without having trained on them, is astronomically low"). When Anthropic scrapes Publishers' lyrics from the websites of their licensees, downloads and curates datasets containing the Works, and creates fragmented copies or "tokens" from the Works without Publishers' authorization, Anthropic violates—again and again—Publishers' right "to reproduce the copyrighted work in copies." 17 U.S.C. § 106(1).[7]

### 3.     Anthropic engages in volitional conduct.

Anthropic's actions easily satisfy this Circuit's volitional conduct requirement. Anthropic chooses to copy Publishers' works to train its AI models and affirmatively finetunes the models to respond to prompts for lyrics to copyrighted songs. *See, e.g.*, *Atari Interactive, Inc. v. Redbubble, Inc.*, 515 F.Supp.3d 1089, 1113 (N.D. Cal. 2021) ("Even though each step is performed automatically by a computer, the acts remain volitional because [defendant] designed its software to accomplish those tasks and for its own financial benefit."). As its new guardrails show, Anthropic also decides whether and how to limit Claude's output. Given that Anthropic "select[s] . . . material for upload, download, transmission, or storage" as training datasets on their servers and "instigate[s] . . . copying, storage, [and] distribution" of the Works to users, Anthropic's volitional conduct is clear. *See VHT, Inc. v. Zillow Grp.*, 918 F.3d 723, 732 (9th Cir. 2019).

Anthropic's selection of the content it uses to train its AI models and its control over their output distinguishes this case from *Cartoon Network LP, LLLP v. CSC Holdings, Inc.* (*Cablevision*), 536 F.3d 121 (2d Cir. 2008).[8] The conduct found nonvolitional in *Cablevision* was the defendant's operation of a service "similar to the recording capability of a DVR in a television viewer's home." *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 181 (2d Cir. 2018). But Anthropic's AI models bear no resemblance to an empty-vessel recording device like a DVR, VCR, or photocopier. Those devices are capable of copying but devoid of content when purchased. When a user records a TV program or makes a photocopy on such devices, the user determines both the input and output.

---

[7] *See also id.* § 101 (defining "copy"); *VidAngel, Inc.*, 224 F.Supp.3d at 967-69 (holding defendant that downloaded and encrypted "fragmented copies" of films violated reproduction right).

[8] The Ninth Circuit relied on *Cablevision* when adopting the volitional conduct requirement. *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 667 (9th Cir. 2017).

By contrast, Anthropic's Claude models are built on copyrighted works that Anthropic, not the user, intentionally selects, downloads, prioritizes, and feeds to those models. Claude then generates outputs based on the closed universe of material on which it was trained. It is Anthropic's choice of training data that leads Claude to infringe even when not explicitly asked and to copy even works that users did not seek. *E.g.*, Leonard Decl., ¶¶ 36-37, App. F. Anthropic's volitional conduct in choosing the data copied to train Claude is itself infringement that Anthropic cannot blame on its users. *See Zillow*, 918 F.3d at 743-44; *TVEyes, Inc.*, 883 F.3d at 181 (finding "clear" volition when online DVR service "decides what audiovisual content to record [and] copies that content").

\*      \*      \*

In sum, Anthropic unlawfully reproduces the Works when it creates copies of the Works during the training process, including in creating datasets, cleaning the text, and tokenizing the text; and unlawfully reproduces, distributes, displays, and creates derivatives of the Works when Claude generates responses that are substantially similar to the Works. Though each infringing step in Anthropic's process enables the next, each is a distinct copyright violation. Anthropic's copying of the Works in its training process infringes irrespective of the response Claude generates. And Claude's output of the Works infringes regardless of Claude's internal process. When these violations are taken together, Publishers are undoubtedly likely to establish direct infringement.

### C.    Anthropic's infringement is not fair use.

Rather than dispute copying, Anthropic seeks refuge in the defense of fair use, for which Anthropic bears the burden of proof. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994). Anthropic has invoked fair use only as to its use of the Works in training data, Opp. 5, and not its copying in Claude's output, for which Anthropic effectively concedes liability.

Even as limited to training, Anthropic's mass copying of Publishers' lyrics satisfies neither the broader purposes of the fair use doctrine nor the statutory factors that govern its analysis. Fair use ensures that copyright law's private incentives for human authorship serve "the cause of promoting broad public availability of literature, music, and the other arts." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 526 (2023) (quoting *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975)). Anthropic does the very opposite. Rather than foster

human creativity, Anthropic consumes copyrighted lyrics wholesale to train its AI models to create uncopyrightable digital facsimiles of human authorship. Anthropic does not need to copy Publishers' artistic expression to achieve its claimed purpose of training its models. Anthropic could exclude Publishers' lyrics from its training, but it does not do so because it built Claude knowing and intending it to respond to queries for lyrics. And even when Claude generates "new" lyrics, Anthropic's conduct remains unfair, because it is enabled by unauthorized copying, attracts subscription fees and investment, and competes directly with songwriters and publishers whose own lyrics are the raw material for Anthropic's substitutes.

In addition to the purposes of the fair use doctrine, courts consider four factors to decide fair use: (1) "the purpose and character of the use," (2) "the nature of the copyrighted work," (3) "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," and (4) "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. As set forth below, none favor Anthropic.

### 1. Anthropic's use of the Works is commercial and non-transformative.

The first factor considers "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." *See* 17 U.S.C. § 107(1). This factor also assesses whether the use is "transformative" in the sense that it "adds something new, with a further purpose or different character." *Goldsmith*, 598 U.S. at 528, 529 (quoting *Campbell*, 510 U.S. at 579). The Supreme Court's recent decision in *Goldsmith* has reigned in the meaning of transformativeness. The Supreme Court clarified that "[m]ost copying has some further purpose, in the sense that copying is socially useful *ex post*," but "[t]hat alone does not render such uses fair." *Id.* at 528-29. Accordingly, any reliance by Anthropic on pre-*Goldsmith* case law finding fair use must be closely scrutinized in light of the Supreme Court's express limitation of the role that "transformativeness" plays under the first factor. Here, Anthropic's use is both commercial and— as clarified by *Goldsmith*—*not* transformative.

Anthropic has not disputed that its use is commercial. *See* Opp. 24. Anthropic is a for-profit company valued at over $18 billion that monetizes its AI models in several ways. Chung Decl., Ex. E. Anthropic charges business customers who access the Claude API based on the length of

their prompts and Claude's responses, generating revenue every time a user requests lyrics through the API and again every time the API generates output copying those lyrics. *See* Chung Decl., Ex. P at 1-2. For individual users, Anthropic sells a subscription-only AI model called "Claude Pro," for which it charges $20 per month for "the ability to send many more messages" and receive more responses, among other revenue streams. Chung Decl., Ex. P at 3. In short, each time Anthropic copies and distributes the Works without a license, Anthropic "stands to profit from exploitation of the *copyrighted material* without paying the customary price." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985) (emphasis added). Anthropic's commercial use of the Works is "presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 530 (9th Cir. 2008) (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984)).

Second, Anthropic's use is not transformative. Anthropic may use a novel process to accomplish its rote copying, but new technology does not automatically make a use transformative. That "unauthorized copies are being retransmitted in another medium [is] an insufficient basis for any legitimate claim of transformation." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 862 (9th Cir. 2017) (quoting *UMG Recs., Inc. v. MP3.com, Inc.*, 92 F.Supp.2d 349, 451 (S.D.N.Y. 2000)). When training its AI models, Anthropic creates exact copies of the Works and retransmits them in different formats, uses that bear little resemblance to those courts have held transformative.

Nor is Anthropic's purpose transformative.[9] Under *Goldsmith*, Courts must look to the purpose of the challenged use against the backdrop of its commercial aims:

> [W]hether the use of a copyrighted work has a further purpose or different character . . . is a matter of degree, and the degree of difference must be balanced against the commercial nature of the use. If an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use, absent some other justification for copying.

---

[9] The fair-use analysis must focus on the use that Publishers challenge. *See, e.g.*, *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 176 (2d Cir. 2018) (limiting fair-use analysis to challenged "watch" function of service that also provided search functions). Publishers do not take issue with the creation of large language models in general, but rather Anthropic's copying of Publishers' lyrics in training to build its AI models.

598 U.S. at 532-33. By foregrounding whether the defendant copies "to achieve a purpose that is the same as, or highly similar to, that of the original work," the first factor addresses "the problem of substitution—copyright's bête noire." *Id.* at 528. A use that is "likely to substitute for, or 'supplant'" the copyrighted work is not transformative. *See id.* Critically, "whether a work is transformative cannot turn merely on the stated or perceived intent" of the alleged infringer. *Id.*at 545 (quoting *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 41 (2d Cir. 2021)). It "is, instead, an objective inquiry into what use was made, *i.e.*, what the user does with the original work." *Id.*

Anthropic copied Publishers' lyrics to train an AI model that could deliver lyrics, in part or in full, when prompted. That purpose is evident both in Claude's outputs and Anthropic's "finetuning," the process by which developers coach their models to perform as desired on particular tasks. Anthropic's finetuning data is replete with queries like "Please provide the lyrics for the song 'Only Hope,'" Chung Decl., Ex. A, at 2. Through continuous feedback, Anthropic encouraged its models to prefer giving responses with complete lyrics over those that direct users to find lyrics on the websites of Publishers' licensees. *See* Chung Decl., Ex. J, at 15. Anthropic's ultimate use of the Works—as verbatim copies and derivatives in Claude's output—sheds further light on the purpose of Anthropic's use of the lyrics in training. *See VidAngel, Inc.*, 869 F.3d at 861–62 & n.12 (analyzing "intermediate" copying in light of streaming service offered to end users). Anthropic plainly intended searching for and accessing lyrics to be part of Claude's feature set, so it built an AI chatbot that would respond to requests for lyrics with near-exact copies and derivative works excluded from fair use's ambit.[10]

Anthropic's purpose in copying Publishers' Works in Claude's training dataset is "highly

---

[10] When Claude distorts the Works or combines them with other text, it invades the derivative works right *Goldsmith* deemed to be a critical check on fair use. *Goldsmith* warned that simply adding "new expression, meaning, or message" does not make a use transformative, because that interpretation of Section 107(1) "would swallow the copyright owner's exclusive right to prepare derivative works." 598 U.S. at 541. The first fair-use factor, properly understood, "would not weigh in favor of a commercial remix . . . just because the remix added new expression or had a different aesthetic" and "does not . . . dispense with the need for licensing" any time a challenged use "alter[s] the meaning" of the original. *Id.* Here, Claude's mashups and mangled copies of lyrics amount to unlicensed commercial remixes that are clearly excluded from fair use's protection.

similar" to Publishers' purpose in licensing the Works: to provide the lyrics online, on demand. Publishers license their lyrics to lyric aggregators, lyric websites, and other digital services to allow individuals to search for and access the Works online. Concord Decl. ¶¶ 11-12; ABKCO Decl. ¶¶ 11-12; UMPG Decl. ¶¶ 11-12; CCMG Decl. ¶¶ 11-12. Anthropic's AI model can supplant the use of search engines like Google or websites like Genius.com, both Publisher licensees, to find and view the Works—precluding a finding that its use is transformative. *Id.* at 528. That Anthropic trained Claude expecting that it would usurp a typical use of Publishers' lyrics undercuts the notion that Anthropic's purpose is any different. *See Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F.Supp.2d 537, 554-55 (S.D.N.Y. 2013) (holding redistribution of plaintiff's articles not transformative). Because Anthropic's use of the Works "is so similar to [the copyrighted work]'s typical use," this factor favors Publishers. *Goldsmith*, 598 U.S. at 547.

Anthropic has claimed that it copied Publishers' lyrics "to teach a neural network how human language works." Opp. 23. Even if the Court departed from Supreme Court precedent and elevated "the subjective intent of the user" over "what use was made," *Goldsmith*, 598 U.S. at 545, Anthropic would still fail to justify its use based on that purpose. Anthropic admits it has "no interest" in Publishers' Works, that similar types of works "are considered fungible for purposes of the model," and that "it does not ultimately matter," for example, what specific articles are included in the training data, so long as articles in general are included." Kaplan Decl. ¶¶ 19, 28. Any text will do. This is antithetical to the foundations of fair use. Unlike a work of criticism or parody that "needs to mimic an original to make its point," Anthropic's copying in training is "merely use[d] . . . to avoid the drudgery in working up something fresh." *Campbell*, 510 U.S. at 580. Anthropic already hires third parties to "voluntarily create and provide" training data and trains Claude with "data we generate internally." Chung Decl., Ex. V, at 5. Anthropic makes unlicensed copies of Publishers' lyrics and other copyrighted material simply to avoid the effort and expense of generating its own training material, whether by commissioning training text from employees and volunteers or by using synthetic data generated by models trained on licensed or public domain material. *See* Newton-Rex Decl. ¶¶ 21, 29-30.

Anthropic's purported need for a large volume of training text is no justification either. Anthropic does not copy Publishers' works to "comment[] on, criticize[], or provide[] otherwise unavailable information about the original." *Goldsmith*, 598 U.S. at 545; *see also Campbell*, 510 U.S. at 580-81. In fact, "the particular subject" of the copyrighted lyrics is "irrelevant to that purpose," weighing against fair use. *See TCA Television Corp. v. McCollum*, 839 F.3d 168, 182 (2d Cir. 2016) (finding that a play's "unaltered use" of a copyrighted work "as a theatrical device that sets up the plot, but is of little or no significance in itself" was not fair use). And unlike other instances of mass copying held transformative, Anthropic's use does not make hard-to-find works newly available or avoid supplanting existing markets for copyrighted works. *See Authors Guild v. Google, Inc.*, 804 F.3d 202, 207-10, 218 (2d Cir. 2015). Indeed, Anthropic's model appears trained to compete with licensed lyric sources—and, to the extent it is successful, supplant them.

### 2. The Works are within the core of copyright protection.

The second factor—the nature of the copyrighted work—also strongly favors Publishers. 17 U.S.C. § 107(2). "Original song lyrics are a work of creative expression . . . which is precisely the sort of expression that the copyright law aims to protect." *Leadsinger*, 512 F.3d at 531; *see also, e.g.*, *Campbell*, 510 U.S. at 586 (explaining that a musical composition is "closer to the core of intended copyright protection" than factual works or compilations). The Works are unquestionably expressive texts within the heart of the Copyright Act's intended protection.

### 3. Anthropic uses all or nearly all of each Work.

The third fair-use factor—"the amount and substantiality of the portion used in relation to the copyrighted work as a whole"—also favors Publishers. 17 U.S.C. § 107(3). Copying a work in "total" or taking "the heart" of a work weighs against fair use. *McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149, 1162 (9th Cir. 2022).

Anthropic has not disputed using the Works in full. Anthropic copies the complete Works as input, enabling Claude to generate output that reproduce the Works, their most distinctive portions, and unlicensed derivatives. *See* Zhao Decl. ¶¶ 40-42; Leonard Decl. ¶ 18, 21-37. Because its copying is "total," Anthropic cannot prove fair use unless it shows that it copied no more than "necessary" for its purpose. *See Monge v. Maya Mags., Inc.*, 688 F.3d 1164, 1179 (9th Cir. 2012).

Anthropic cannot make that showing. If Anthropic's purpose is, as it claims, "to teach a neural network how human language works," Opp. 23, Anthropic has many alternatives to copying Publishers' lyrics as training data. Anthropic could use data generated by its workers, "synthetic data" generated by an AI model trained on licensed sources, or training text licensed from any of the many copyright-holders now entering the market to provide training data. Smith Decl. ¶¶ 75-81; Newton-Rex Decl. ¶¶ 31-34; Chung Decl., Exs. Q, R. Because Anthropic cannot show a specific need for Publishers' works or that alternatives were unavailable, Anthropic's total copying weighs against fair use. *See, e.g.*, *McGucken*, 42 F.4th at 1162; *Monge*, 688 F.3d at 1164.

Anthropic cannot rely on cases condoning total copying as fair use. Courts have permitted comprehensive copying to build search tools that help users locate copyrighted works without reproducing or distributing full copies of the works. In *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), Google created server copies of full-size copyrighted images to "provide thumbnail versions of images in response to user inquiries." *Id.* at 1157. The Ninth Circuit held Google's use to be fair, because its purpose differed from that of the copyright holder, its use of full-sized images to create thumbnails was "reasonable in light of the purpose of a search engine" to help users find photos online, and crucially, the thumbnail copies were "reduced, lower-resolution versions" and "not a substitute for the full-sized images." *Id.* at 1155, 1157, 1166-68. Similarly, in *Authors Guild*, 804 F.3d 202, the Second Circuit held Google's digitization of entire books to create a full-text searchable database to be fair use, because Google delivered only short "snippets" of the works to help users locate the original works and "ma[de] available information *about* [p]laintiffs' books without providing the public with a substantial substitute." 804 F.3d at 207.

These cases, even with their sharply circumscribed uses of the underlying works, mark the outer boundaries of fair use. *See Zillow*, 918 F.3d at 742 (agreeing that *Authors Guild* dispute "tests the boundaries of fair use"). Anthropic clearly oversteps those boundaries. Unlike in *Perfect 10* and *Authors Guild*, Anthropic copies Publishers' works to build AI models that can respond to requests for lyrics, substituting for access to the Works through Publishers' legitimate licensees. In contrast to Google's focus on hard-to-find works in *Authors Guild*, Anthropic copies the Works

precisely because they are, by virtue of Publishers' licensees, available online. *See* Chung Decl., Ex. V, at 5, 7. And rather than "making available information *about*" Publishers' works, Claude omits or misstates attribution information and delivers the works in full. That is not fair use.

### 4. Anthropic's unrestrained use would harm the market for the Works.

The last and most important fair-use factor—"the effect of the use upon the potential market for or value of the copyrighted work"—favors Publishers. 17 U.S.C. § 107(4); *see Harper*, 471 U.S. at 566 (describing fourth factor as "undoubtedly the single most important element of fair use"). "[T]o negate fair use," Publishers "need only show that if the challenged use should become widespread, it would adversely affect the *potential* market for the copyrighted work." *McGucken*, 42 F.4th at 1163 (quoting *Monge*, 688 F.3d at 1182). When the use is commercial and supplants the copyrighted work, this factor weighs against fair use. *See Campbell*, 510 U.S. at 591 ("[W]hen a commercial use amounts to mere duplication . . . of the original and serves as a market replacement for it, [it is] likely that cognizable market harm to the original will occur.").

Anthropic and its peers envision a future where AI usurps authorized websites and search engines as the vehicle for accessing content and information. *See* Chung Decl., Exs. S, T. In such a future, where conduct like Anthropic's is widespread and compliance with copyright law is excused, the harm to the market for the Works would be catastrophic. First, Anthropic inflicts market harm by evading direct payment of licensing fees to Publishers. *See* Decl. of Michael D. Smith ("Smith Decl.") ¶¶ 47, 53. Second, by using the Works for free, Anthropic erodes their value and reduces Publishers' revenue from licenses to digital platforms, lyrics aggregators, and their sublicensees. *See id.* ¶¶ 48-53; *see also, e.g.*, UMPG Decl. ¶¶ 20-21. Third, Anthropic's use, if widespread, would shrink the lyrics licensing market. *See McGucken*, 42 F.4th at 1163 (finding "harm to the market for licensing [plaintiff's] photos would be immense" when defendant "made the same use of [plaintiff's] photos as the publications that obtained licenses"). Users can choose to search for and access lyrics through platforms that license lyrics and pay copyright owners, or through AI chatbots developed by companies that do not. If users choose Claude, the legitimate licensees' business model suffers, which could destroy Publishers' ability to license lyrics in the future. Smith Decl. ¶ 56. Anthropic's use harms the market for the Works by reducing their value,

weakening demand for licenses, and threatening the viability of licensees. Smith Decl. ¶¶ 47–61.

Anthropic's use also intrudes on Publishers' exclusive right to prepare derivative works and harms the market for those derivatives. "[A]n infringing use would destroy a derivative market when the infringing work is of the same type as existing works by licensed users." *McGucken*, 42 F.4th at 1152. Publishers license the Works for use in samples, remixes, interpolations, sheet music, and other works based on the Compositions. Concord Decl. ¶¶ 10-12, 19; ABKCO Decl. ¶¶ 10-12, 21; UMPG Decl. ¶¶ 10-12, 20-23; CCMG Decl. ¶¶ 10-12, 20. When Claude combines the Works with other text, it supplants the market for licensed samples, remixes, sheet music, and similar derivatives. If that use were widespread, Publishers and songwriters would lose significant revenue and the derivative licensing market would shrink—or even disappear. *See McGucken*, 42 F.4th at 1163 (weighing fourth factor against fair use when plaintiff stood to lose licensing revenues); *Frisby v. Sony Music Ent.*, 2021 WL 2325646, at *16 (C.D. Cal. Mar. 11, 2021) (same).

Further, Anthropic's unlicensed use threatens to stifle the rapidly growing market for the Works as AI training input. *See, e.g.*, Smith Decl. ¶ 56. Publishers already license their Works broadly and, in the last year, AI developers have entered dozens of agreements with entertainment and media companies—ranging from News Corp to Reddit—to license their content for use in training AI models. *Id.* ¶¶ 76-77. Because "a market exists for the right to copy and use" Publishers' lyrics "in various formats," Anthropic's unlicensed use of those lyrics in training "harms [Publishers'] opportunity to negotiate a value for those copies and also inhibits [Publishers'] ability to enter similar licensing agreements with others in the future by making the copies less valuable." *Fox Broad. Co. v. Dish Network, L.C.C.*, 905 F.Supp.2d 1088, 1105 (C.D. Cal. 2012), *aff'd*, 747 F.3d 1060 (9th Cir. 2014). Publishers have a clear interest in exploiting the potential licensing market for training data, and Anthropic is destroying that market just as it is getting off the ground. Even if Claude never generated responses containing Publishers' lyrics, Anthropic's unlicensed copying in training still "threaten[s] to reduce the value of the right to copy the [Works] and undermine[s] [Publishers'] relationships with licensees who pay for that right." *Id.* (finding market harm "[a]lthough the [challenged copies] are 'intermediate' copies not ultimately used in any end product"). The "deleterious effect on an existing or potential market" for licenses to reproduce and

display Publishers' lyrics forecloses finding that Anthropic's use is fair. *See Sofa Ent., Inc. v. Dodger Prods., Inc.*, 782 F.Supp.2d 898, 909 (C.D. Cal. 2010).

## II.   Publishers and their songwriters will suffer irreparable harm absent an injunction.

Publishers face irreparable harm if Anthropic's copying is not enjoined. Harm is irreparable when "remedies available at law, such as monetary damages, are inadequate to compensate" the plaintiff, *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc*., 736 F.3d 1239, 1249 (9th Cir. 2013), or when an injury is "intangible" or "difficult to valuate," *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). If Anthropic's infringement continues, Publishers will suffer unquantifiable and irreparable injuries—including loss of control, goodwill, business opportunities, and relationships—any one of which warrants a preliminary injunction.

As courts in this District have already recognized, when an AI company trains its models on a plaintiff's work, there is "a realistic danger that the [work] will be reproduced as output." *Doe 1 v. GitHub, Inc.*, 672 F.Supp.3d 837, 851 n.9 (N.D. Cal. 2023). Though Anthropic has adopted output guardrails it claims will limit Claude's infringing responses, "there is no efficient way for a regulatory agency or third party to detect if an LLM developer removes guardrails or stops efforts to maintain or update guardrails," making "reliance on developer-built guardrails for legal compliance particularly risky." Zhao Decl. ¶ 34. Anthropic is actively developing and preparing to release ever-more-powerful AI models that will exploit the Works in new, unpredictable ways. Those models threaten even greater imminent harm, unless the Court orders Anthropic to maintain guardrails that prevent distribution of lyrics or the creation of unauthorized derivative works and enjoins Anthropic from copying Publishers' lyrics to train future models.

### A.   Anthropic deprives Publishers and songwriters of control.

First, Anthropic's unlicensed use of the Works—both in training and Claude's responses—injures Publishers and songwriters by denying them control over their Works. Publishers' loss of control over how their lyrics are used and presented cannot be remedied with money damages. *See Niantic, Inc. v. Global++*, 2019 WL 8333451, at *8 (N.D. Cal. Sept. 26, 2019) (finding irreparable harm when copyright infringement "would deprive [plaintiff] of its ability to control how United States consumers first encounter and experience" plaintiff's works); *Fox Broad. Co. Inc. v. Dish*

*Network, L.C.C.*, 2013 WL 11238486, at *4 (C.D. Cal. Sept. 23, 2013) (holding that "loss of control over the dissemination of copyrighted works" can "constitute irreparable harm").

Publishers and the songwriters they represent invest enormous resources and great care to manage how, when, where, and by whom their copyrighted musical compositions—and the lyrics therein—are exploited and used in other works. *See* Concord Decl. ¶¶ 13-16, 21; ABKCO Decl. ¶¶ 14-17, 23; UMPG Decl. ¶¶ 13-16, 25; CCMG Decl. ¶¶ 13-16, 22. Cognizant that songwriters carefully guard how their works are used, including through which media and platforms they are presented, Publishers customarily seek songwriter approval before licensing compositions for uses that they could find objectionable, forbid alteration of the lyrics, and specify what portion of the lyrics the licensor may use and in what context. *See, e.g.*, Concord Decl. ¶ 13; NSAI Letter ¶ 8; Smith Decl. ¶¶ 35, 37, 39, 50. For Publishers and songwriters, controlling the integrity of the Works is a paramount concern and a bedrock of their relationship. *See, e.g.*, Concord Decl. ¶¶ 13-16; ABKCO Decl. ¶¶ 14-17; UMPG Decl. ¶¶ 13-16; CCMG Decl. ¶¶ 13-16; NSAI Letter ¶¶ 8-9. Anthropic's unlicensed use of the Works wrests away this control, causing irreparable harm.

### B. Anthropic denies Publishers and songwriters credit and goodwill.

Second, Publishers and their songwriters are also irreparably harmed when Anthropic copies their lyrics while denying them credit and associated goodwill. *See, e.g.*, *Vergara Hermosilla v. The Coca-Cola Co.*, 717 F.Supp.2d 1297, 1305 (S.D. Fla. 2010) ("The harm to [songwriter from] using his lyrics without providing credit goes beyond monetary damages to his name recognition among music listeners"), *aff'd*, 419 F. App'x 917 (11th Cir. 2011).

Lyrics reflect the tremendous talents and creative efforts of songwriters, and so Publishers take great pains to ensure that those songwriters are credited appropriately for those talents and efforts. When licensing lyrics to lyric aggregators, lyric websites, and other digital services, Publishers' agreements often include explicit conditions requiring attribution. Concord Decl. ¶¶ 13, 22; ABKCO Decl. ¶¶ 14, 24; UMPG Decl. ¶¶ 13, 26; CCMG Decl. ¶¶ 14, 23. These safeguards demonstrate that, along with control, credit is of crucial concern to Publishers and songwriters. *Id.*

Anthropic, however, fails to credit the owners of the copyrighted works it exploits. Claude routinely reproduces, distributes, and displays Publishers' copyrighted lyrics in its output but fails

to identify Publishers or their songwriters as the source. *See* Leonard Decl. ¶¶ 38, 40. Claude also sometimes erroneously provides Publishers' lyrics in response to queries seeking lyrics to a different song, misattributing the Work to another publisher or writer. *See id.* ¶ 44. More broadly, Anthropic refuses to publicly credit the sources of the content it uses to train Claude. Anthropic irreparably harms Publishers and songwriters when it denies them credit and eliminates opportunities to generate business, raise songwriters' profiles, and accrue goodwill.

### C.   Anthropic harms Publishers' and songwriters' reputations.

Third, Anthropic damages the reputations of Publishers and their songwriters and diminishes the integrity of their work, yet another ground for irreparable harm. *See, e.g.*, *Niantic, Inc.*, 2019 WL 8333451, at *8 (finding irreparable harm when defendant's copying would "erode" plaintiff's "hard-won reputation and goodwill in the marketplace"). Anthropic mars the reputations of Publishers and songwriters by associating musical works, known to the public to have been written by them, with unauthorized derivatives. Claude frequently generates output that combines portions of the Works with other lyrics or text, often in ways inconsistent with and inimical to authorial intent—and for which the songwriter would never have granted a license. *See, e.g.*, Concord Decl. ¶ 23; ABKCO Decl. ¶ 25; UMPG Decl. ¶ 27; CCMG Decl. ¶ 24; NSAI Letter ¶¶ 6-7; *see also, e.g.*, Leonard Decl., App. F, at 41-42 (combining "A Change is Gonna Come" with "WAP"); Smith Decl. ¶ 39 (discussing erosion of consumer perception). In other instances, Claude mangles the Works and misattributes distorted lyrics to Publishers and songwriters. *See, e.g.*, Leonard Decl. ¶¶ 27, 44. Irreparable harm necessarily flows "from [Anthropic's] wrongful attribution to the individual, in the eye of the general public, of responsibility for actions over which he or she has no control." *King v. Innovation Books*, 976 F.2d 824, 832 (2d Cir. 1992).[11]

---

[11] *See also, e.g.*, *id.* (crediting "the obvious point that [an author's] name and artistic reputation are his major assets" and finding irreparable harm when defendant linked author's name to film he did not write); *Peermusic, III, Ltd. v. LiveUniverse, Inc.*, 2010 WL 11586701, at *3 (C.D. Cal. May 13, 2010) (finding irreparable harm when infringement "deprives [p]laintiffs of the ability to ensure the accuracy of the song lyrics and control the quality of their presentation"); *Univision Music LLC v. Banyan Ent.*, 2004 WL 5574359, at *6 (C.D. Cal. Nov. 15, 2004) (finding Spanish-language band irreparably harmed by release of their album in English, "a stylistic change" that was "'contrary to what we want[] to accomplish musically, and what we believe in artistically'").

**D.      Anthropic erodes the value of and licensing market for the Works.**

Fourth, Anthropic's infringement erodes the price of the Works, the legitimate licensing market for lyrics, and Publishers' goodwill with licensees, causing potential loss of customers. By exploiting the Works for free as training data and in Claude's output, Anthropic lowers the market value of the lyrics, reduces demand for legitimate licenses for lyrics, and impedes Publishers' negotiations with existing licensees. *See, e.g.*, *WPIX, Inc. v. ivi, Inc.*, 765 F.Supp.2d 594, 618 (S.D.N.Y. 2011) (finding "ability of [copyright owners] to profit from sanctioned sources would inevitably drop" if defendant continued unsanctioned distribution of works), *aff'd*, 691 F.3d 275 (2d Cir. 2012). Existing licensees, unwilling to purchase what Anthropic takes for free, may not renew licenses to compete with Anthropic's unlawful use. Smith Decl. ¶¶ 48-49; UMPG Decl. ¶ 28. Potential licensees will hesitate to enter agreements in the first place. *Id.*

Anthropic's use also undermines the licensing market for the Works by harming licensees and their relationships with Publishers. Anthropic's unlicensed use of the Works affords it an unfair competitive advantage over lyrics aggregators, lyric websites, digital services, and Publishers' other legitimate licensees, threatening their viability. *See WPIX, Inc.*, 765 F.Supp.2d at 619 (finding irreparable harm when infringement unfairly competes with plaintiffs' licensees). Anthropic's continued infringement would likely diminish licensees' trust in Publishers, damaging Publishers' goodwill and hindering future business opportunities. *See VidAngel*, 224 F.Supp.3d at 976 (finding irreparable harm where infringement "undermines [plaintiff's'] negotiating position with licensees and also damages goodwill with licensees"). For example, if Anthropic can copy Publishers' copyrighted lyrics without paying licensing fees, "existing and prospective licensees," including popular websites used to look up lyrics, "will demand concessions to make up the loss of viewership to non-paying alternatives, and may push additional players away from license-fee paying technologies[.]" *BarryDriller Content Sys., PLC*, 915 F.Supp.2d at 1147.[12]

---

[12] *See also Warner Bros. Ent. Inc. v. WTV Sys., Inc.*, 824 F.Supp.2d 1003, 1012 (C.D. Cal. 2011) (finding "interfere[nce] with Plaintiffs' grants of exclusivity to their licensees, Plaintiffs' ability to negotiate similar agreements in the future (because potential licensees will not be willing to pay a premium for a non-exclusive period), Plaintiffs' relationships, including the goodwill developed with their licensees, and Plaintiffs' overall ability to control the use and transmission of their

Publishers' "loss of control over business reputation," as well as "loss of goodwill, negotiating leverage, and non-monetary terms in [plaintiffs'] licenses cannot readily be remedied with damages," and are thus grounds for finding irreparable harm. *VidAngel*, 869 F.3d at 866.

### E.   Anthropic damages Publishers' position to negotiate future licenses.

Fifth, Anthropic's infringement will irreparably damage Publishers' competitive position and their ability to negotiate licenses with AI developers by permanently tilting the balance in future negotiations toward Anthropic and its peers. If Anthropic continues to exploit and devalue the Works, even if only during the pendency of this case, its conduct will become entrenched in the AI industry and the public consciousness. *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*, *Ltd.,* 545 U.S. 913, 929 (2005) (reasoning that "the ease of copying songs or movies using software like Grokster's and Napster's is fostering disdain for copyright protection"); Smith Decl. ¶ 56; Concord Decl. ¶ 25. That will permanently undermine Publishers' leverage in future negotiations with AI developers to license lyrics as training data. Even if Publishers prevail on the merits and Anthropic is forced to stop infringing, without preliminary relief, the parties will no longer be bargaining from equal positions. *See Waymo LLC v. Uber Techs., Inc.*, 2017 WL 2123560, at *11 (N.D. Cal. May 15, 2017) (finding irreparable harm when "it may prove impossible to fully restore the parties to their respective competitive positions as if no misappropriation had occurred").

AI technology continues to advance rapidly and unpredictably, increasing the potential scope and scale of Anthropic's infringement and underscoring the need for preliminary relief. "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Anthropic's ongoing infringement risks devaluing Publishers' core assets, weakening their future negotiating position, and hampering the development of a lawful licensing market for lyrics as training data by creating "incorrect but lasting impressions" about the lawful use of the Works. *See Warner Bros.*, 824 F.Supp.2d at 1013 (finding video-on-demand product caused irreparable harm by "threaten[ing] the development of a successful and lawful video on demand market" and "threaten[ing] to confuse

---

Copyrighted Works" irreparable); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) (finding "loss of prospective customers or goodwill" to be irreparable harms).

consumers about video on demand products").

**F.    Anthropic harms Publishers' relationships with songwriters.**

Finally, Anthropic's exploitation of the Works as training data and in Claude's responses risks irreversibly damaging Publishers' relationships with current and prospective songwriter-partners. *See, e.g.*, ABKCO Decl. ¶ 28. If Anthropic's unlicensed use continues, songwriters will lose confidence in Publishers' ability to protect their interests, causing irreparable harm. *See, e.g.*, *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 886 F. Supp. 1120, 1124 (S.D.N.Y. 1995) (finding defendant that copied articles but omitted bylines irreparably harmed reputations of news organization plaintiffs who had "interest in protecting the reputation and integrity of their writers").

**III.    The balance of equities favors an injunction.**

The balance of equities tips sharply in Publishers' favor. Anthropic's infringement threatens immediate irreparable damage to Publishers' core business, relationships, and critical emerging licensing markets. In contrast, the preliminary injunction Publishers seek will not harm Anthropic or third parties in a comparable or cognizable way. A defendant "cannot complain of the harm that will befall it when properly forced to desist from its infringing activities." *Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 830 (9th Cir. 1997) (quoting *Triad Sys. Corp. v. Southeastern Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995), *superseded on other grounds*, 17 U.S.C. § 117(c)). Anthropic never licensed and has no right to copy the Works. Any risk an injunction poses to its business is simply the consequence of "build[ing] a business model based upon a clear violation of the [Publishers'] property rights," *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F.Supp.2d 1058, 1069 (N.D. Cal. 2000), and "merits little equitable consideration," *Triad Sys.*, 64 F.3d at 1338 (quoting *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 612 (1st Cir.1988)).

Regardless, the narrowness of the requested injunction limits any conceivable harm to Anthropic. Publishers seek only to require that Anthropic (1) maintain effective guardrails in its AI models to prevent output that reproduces, distributes, or displays Publishers' lyrics or creates derivative works using those lyrics, and (2) refrain from making or using copies of Publishers' lyrics to train future AI models. These requests are tailored to "preserve the status quo and the rights of the parties" by stemming the harm from Anthropic's conduct "until a final judgment issues

in the cause." *U.S. Phillips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010). As for the first request, Anthropic claims to have *already* implemented guardrails making it "unlikely that any future user could prompt Claude to produce any material portion of the works-in-suit." Opp. 13. While these guardrails appear far from perfect, and discovery will reveal their true effectiveness, Publishers are willing to take Anthropic at its word at this stage and seek simply to maintain these already-implemented guardrails to stem the harm while the case proceeds. As for the second request, Publishers do not ask Anthropic to retrain or withdraw its existing models, but only to refrain from training *future* models on those lyrics. In this way, Anthropic will not be barred from developing, operating, releasing, or selling access to new versions of Claude, as long as it does not copy Publishers' lyrics, including the lyrics to the 500 representative Compositions, in connection with those future models.

## IV.    Enjoining Anthropic's infringement will serve the public interest.

An injunction serves the public's "compelling interest in protecting copyright owners' marketable rights to their work and the economic incentive to continue creating." *VidAngel*, 869 F.3d at 867 (quoting *WPIX,* 691 F.3d at 287); *see also Broad. Music, Inc. v. Just Livin' the Dream, Inc.*, 2013 WL 12152465, at *3 (C.D. Cal. Nov. 26, 2013) ("[A]n injunction would 'ensure that the public will continue to benefit from the creative fruits of [plaintiffs'] labor.'") (quoting *Apple Inc. v. Psystar Corp.*, 673 F.Supp.2d 943, 950 (N.D. Cal. 2009), *aff'd*, 658 F.3d 1150 (9th Cir. 2011)). Here, "a [preliminary] injunction is necessary to preserve the integrity of the copyright laws which seek to encourage individual efforts and creativity by granting valuable enforceable rights." *LaFace Recs. v. Khan*, 2008 WL 11395481, at *7 (N.D. Cal. Nov. 19, 2008) (quoting *Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*, 672 F.2d 607, 620 (7th Cir. 1982)); NSAI Letter ¶ 5.

The narrow relief requested will neither burden the public by reducing access to the Works, which remain available through legitimate sources, nor unduly impede Anthropic's development of AI models. Indeed, the arc of history shows that technological advancement and compliance with copyright law are not mutually exclusive. Developers of new technologies—from player pianos to karaoke machines, cable television stations, and digital music platforms—have paid for copyrighted content and nevertheless succeeded in their businesses.

## V.     The Court should not require Publishers to post security.

Publishers ask the Court to waive bond or require only minimal security. Rule 65(c) grants the Court "wide discretion in setting the amount of the bond, and the bond amount may be zero if there is no evidence the [defendant] will suffer damages from the injunction." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) (internal citations omitted). "[L]ikelihood of success on the merits . . . tips in favor of a minimal bond or no bond at all." *2Die4Kourt v. Hillair Cap. Mgmt., LLC*, 692 F. App'x 366, 369 (9th Cir. 2017).

The narrow preliminary injunction sought does not require Anthropic to withdraw or retrain its existing models, discard models now in development, or build new technology. It is therefore unlikely to cause Anthropic significant financial harm, rendering security unnecessary. *See, e.g.*, *Beyond Blond Prods., LLC v. Heldman*, 479 F.Supp.3d 874, 890 (C.D. Cal. 2020) (waiving bond when defendant would not incur significant compliance costs), *aff'd*, 2022 WL 1101756 (9th Cir. Apr. 13, 2022). Any hardship that Anthropic suffers because it may no longer exploit Publishers' lyrics without permission is not cognizable, because it stems from Anthropic's choice to build a business on infringement. *See Cadence*, 125 F.3d at 830 (collecting cases disregarding "the harm that will befall [defendant] when properly forced to desist from its infringing activities" in preliminary injunction analysis). Alternatively, Publishers submit that because they are likely to succeed on the merits and face irreparable harm, a bond not exceeding $10,000 is appropriate.[13]

## CONCLUSION

Publishers respectfully request that the Court grant this Motion and enter Publishers' proposed preliminary injunction, ordering Anthropic to (1) maintain effective guardrails that prevent its AI models from generating output that disseminates, in full or in part, the lyrics to compositions owned or controlled by Publishers, and (2) refrain from using unauthorized copies of such lyrics to train future models. A proposed order is attached as Exhibit A.

---

[13] *See, e.g.*, *Restoration Hardware*, 2023 WL 4479250, at *3 (setting $10,000 bond in copyright infringement case); *BGC Inc. v. Robinson*, 2022 WL 2915703 (N.D. Cal. July 25, 2022) (setting "a nominal bond" of $1,000 in trademark infringement case); *Cisco Sys., Inc. v. Wuhan Wolon Commc'n Tech. Co.*, 2021 WL 4962661, at *12 (N.D. Cal. July 23, 2021) (waiving bond given "clear evidence of [defendant's] counterfeiting, infringement, and unfair competition").

Dated: Aug. 1, 2024

*/s/* Timothy Chung

**OPPENHEIM + ZEBRAK, LLP**
Matthew J. Oppenheim
Nicholas C. Hailey
Audrey L. Adu-Appiah
(admitted *pro hac vice*)
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
aadu-appiah@oandzlaw.com

Jennifer Pariser
Andrew Guerra
Timothy Chung
(admitted *pro hac vice*)
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
jpariser@oandzlaw.com
andrew@oandzlaw.com
tchung@oandzlaw.com

**COBLENTZ PATCH DUFFY & BASS LLP**
Jeffrey G. Knowles (SBN 129754)
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 772-5795
jknowles@coblentzlaw.com

**COWAN, LIEBOWITZ & LATMAN, P.C.**
Richard S. Mandel
Jonathan Z. King
Richard Dannay
(admitted *pro hac vice*)
114 West 47th Street
New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

*Attorneys for Plaintiffs*