**OPPENHEIM + ZEBRAK, LLP**
Matthew J. Oppenheim
Nicholas C. Hailey
Audrey L. Adu-Appiah
(admitted *pro hac vice*)
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
aadu-appiah@oandzlaw.com

Jennifer Pariser
Andrew Guerra
Timothy Chung
(admitted *pro hac vice*)
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
jpariser@oandzlaw.com
andrew@oandzlaw.com
tchung@oandzlaw.com

**COBLENTZ PATCH DUFFY & BASS, LLP**
Jeffrey G. Knowles (SBN 129754)
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 772-5795
ef-jgk@cpdb.com

**COWAN, LIEBOWITZ & LATMAN, P.C.**
Richard S. Mandel
Jonathan Z. King
Richard Dannay
(admitted *pro hac vice*)
114 West 47th Street
New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> ANTHROPIC PBC, <br><br> Defendant. | Case Number: 3:24-cv-03811-JSC <br><br> **DECLARATION OF MICHAEL D. SMITH IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Hon. Jacqueline Scott Corley |

I, Michael D. Smith, hereby declare pursuant to 28 U.S.C. § 1746:

1.    I am the J. Erik Jonsson Professor of Information Technology and Marketing at Carnegie Mellon University's Heinz College of Information Systems Management and Public Policy Management.

2.    I submit this declaration in connection with Plaintiffs' renewed Motion for a Preliminary Injunction filed by Plaintiffs Concord Music Group, Inc., Capitol CMG, Inc., Universal Music Corp., Songs of Universal, Inc., Universal Music – MGB NA LLC, Polygram Publishing, Inc., Universal Music – Z Tunes LLC, and ABKCO Music, Inc. (collectively, "Publishers"), in their lawsuit against Defendant Anthropic PBC ("Anthropic").

3.    My statements set forth below are based on my specialized knowledge, education, and experience, as applied to the facts and circumstances of this case. If called upon, I would and could competently testify as to the matters contained herein.

## I.    My Assignment

4.    I have been retained to serve as an economic expert on behalf of Publishers. I have been asked to offer an opinion on two matters: (1) the economic impact of Anthropic's use of Publishers' copyrighted works on Publishers and the songwriters they represent; and (2) the economic feasibility of Anthropic's complying with the preliminary injunction Publishers seek.

5.    In addition to my general background in understanding economics and intellectual property, I have reviewed various filings by the Parties in connection with Publishers' Motion for Preliminary Injunction and the supporting declarations filed concurrently with this declaration; Anthropic's Public Comments to the U.S. Copyright Office's Notice of Inquiry Regarding Artificial Intelligence and Copyright; and the market for license agreements for song lyrics and other copyrighted materials as detailed herein.

## II.    My Background

6.    Much of my training and research is in economics and management issues, but I have a particular expertise in economic issues associated with intellectual property. My research has focused on the impact of unlicensed distribution of copyrighted entertainment goods on the legal markets for those goods.

7.      I co-direct Carnegie Mellon University's Initiative for Digital Entertainment Analytics.

8.      I am co-author of the book *Streaming, Sharing, Stealing: Big Data and the Future of Entertainment* (MIT Press, 2016).

9.      I teach a course on managing disruption in media and entertainment and have written book chapters and articles discussing how unlicensed access to copyrighted works impacts legal markets for entertainment products in a variety of outlets including the World Trade Organization, U.S. Patent and Trademark Office [1] and the World Intellectual Property Organization.[2]

10.     I have testified on economic issues associated with copyright law before the Senate Judiciary Committee, Subcommittee on Intellectual Property in a hearing titled "Copyright Law in Foreign Jurisdictions: How are other countries handling digital piracy?"[3]

11.     In December 2019, I gave the Digital Piracy Summit keynote address on the impact of digital piracy at the National Intellectual Property Rights Coordination Center in Arlington, Virginia.[4]

---

[1] Brett Danaher, Michael D. Smith & Rahul Telang. *Piracy Landscape Study: Analysis of Existing and Emerging Research Relevant to Intellectual Property Rights Enforcement of Commercial-Scale Piracy* (U.S. Pat. and Trademark Off., Economic Working Paper No. 2020-02, March 20, 2020), https://www.uspto.gov/sites/default/files/documents/USPTO-Piracy-Landscape.pdf.

[2] Brett Danaher, Michael D. Smith & Rahul Telang, *Copyright Enforcement in the Digital Age: Empirical Economic Evidence and Conclusions*, World Intell. Prop. Org., Advisory Comm. on Enf't (Aug. 25, 2015), https://www.wipo.int/edocs/mdocs/enforcement/en/wipo_ace_10/wipo_ace_10_20.pdf.

[3] Michael D. Smith, Written Testimony Before Senate Judiciary Committee, Subcommittee on Intellectual Property: Copyright Law in Foreign Jurisdictions: How Are Other Countries Handling Digital Piracy? (Mar. 10, 2020), https://www.judiciary.senate.gov/imo/media/doc/Smith%20Testimony1.pdf.

[4] Michael D. Smith, Keynote Address at the Digital Piracy Summit at the National Intellectual Property Rights Coordination Center: Digital Piracy: Industry Harm, Consumer Harm, and Law Enforcement Effectiveness (Dec.13, 2019).

12.     In April 2013, I also served as a panelist for the Congressional International AntiPiracy Caucus, discussing education, enforcement, and the economics of piracy and counterfeiting.[5]

13.     I have also given a talk at the White House Office of the Intellectual Property Coordinator on piracy, regulation, and digital media.[6]

14.     I hold a B.S. degree in Electrical Engineering and a M.S. degree in Telecommunications from the University of Maryland, and a Ph.D. degree in Management Science from MIT's Sloan School of Management. My full curriculum vitae is attached to this declaration as **Exhibit A**.

### III.    Anthropic's Economic Model

15.     The rapid development of generative AI is poised to change the way people and businesses operate across the world. Generative AI also comes with the potential for immense global economic growth—with some estimates of as much as $4.4 trillion in value added annually.[7] As more and more firms seek to adopt AI tools for their businesses, companies that develop, license, and provide these AI tools and systems will have increasingly great value. As AI licensing and deployment by companies increases over time, the economic impact will similarly grow— perhaps exponentially—to be greater in the next several years than today.

16.     At a high level, generative AI developers such as Anthropic operate on a technology licensing and direct-to-consumer model. After the technology is developed, AI developers offer product licenses to customer firms. Developers like Anthropic also make their AI products directly available to retail consumers through chatbots on website interfaces and/or as mobile applications, often with monthly paid subscriptions for upgraded services. This revenue model is a consumer-

---

[5] Michael D. Smith, Panelist at the Congressional Institutional Anti-Piracy Caucus at the Rayburn House Office Building: Education, Enforcement, and the Economics of Piracy and Counterfeiting (Apr. 28, 2014).

[6] Michael D. Smith, Address at the Office of the Intellectual Property Coordinator, Executive Office of the President, Eisenhower Executive Office Building: Piracy, Regulation, and Digital Media (Apr. 22, 2013).

[7] Yiwen Lu, *Generative A.I. Can Add $4.4 Trillion in Value to Global Economy, Study Says*, N.Y. TIMES (June 14, 2023), https://www.nytimes.com/2023/06/14/technology/generative-ai-global-economy.html.

driven one and capable of generating massive amounts of revenue, particularly from advertising, much like it does for large tech firms such as Google. Anthropic alone reportedly projects to earn more than $850 million in annualized revenue by the end of 2024.[8]

17.    All companies that create products, whether real or intellectual, have a cost of the goods sold. Companies like Nike must pay for fabric, Nestlé must pay for cocoa, and IKEA must pay for wood. Companies regularly pay for their raw materials, and they then factor the cost of those raw materials into the price of their products. The same is true in the context of intellectual property. Netflix pays for movie rights, Apple pays for patents, and Universal Music Group pays artists. These companies are paying for the intellectual property that they use, sell, or license.

18.    For AI models like Claude, the raw materials are the training materials—such as Publishers' lyrics—and the ultimate products are the programs that allow user to enter queries and obtain responses.

19.    The promise of AI and its growth potential has attracted enormous investment from all sectors, with the so-called "Big Tech" companies alone, many of which represent trillions of dollars in market value, pouring billions of dollars of investment and developmental resources into AI companies.[9] Even in just the last year, AI company valuations have skyrocketed, with numerous companies achieving valuations that dwarf the entire music publishing industry's market size in 2024.[10]

20.    As of February 2024, OpenAI had tripled its valuation over the course of 10 months to hit $80 billion or more.[11] Similarly, Nvidia-backed CoreWeave, which offers cloud-computing

---

[8] *Anthropic forecasts more than $850 mln in annualized revenue rate by 2024-end-report*, REUTERS (Dec. 26, 2023), https://www.reuters.com/technology/anthropic-forecasts-more-than-850-mln-annualized-revenue-rate-by-2024-end-report-2023-12-26/.

[9] Will Henshall, *Big Tech Companies Were Investors in Smaller AI Labs. Now They're Rivals*, TIME (May 13, 2024), https://time.com/6977424/ai-competition-openai-anthropic-microsoft-amazon/.

[10] Mordor Intelligence estimates the music publishing industry's market size at $7.62 billion in 2024. *Music Publishing Market Size (2024–2029)*, MORDOR INTELLIGENCE (last visited Jul. 19, 2024), https://www.mordorintelligence.com/industry-reports/music-publishing-market/market-size.

[11] Cade Metz and Tripp Mickle, *OpenAI Completes Deal That Values the Company at $80 Billion*, N.Y. TIMES (Feb. 16, 2024), https://www.nytimes.com/2024/02/16/technology/openai-artificial-intelligence-deal-valuation.html.

for AI, also tripled its valuation in a five-month timespan to hit a $19 billion valuation in May 2024.[12] French startup Mistal AI has recently sought a deal to raise $600 million in funds at a $6 billion valuation.[13]

21.      Today, Anthropic is reportedly valued at over $18 billion, having raised more than $7.3 billion in the last year,[14] and was allegedly seeking a valuation of between $20 billion and $30 billion inclusive of newly raised funds in recent months.[15] Anthropic has benefited from high-profile partnerships and received billions of dollars from large tech firms including Google—which agreed to invest up to $2 billion in the company[16]—and Amazon—which recently invested up to $4 billion.[17] Anthropic also signed a multiyear deal with Google Cloud reportedly worth more than $3 billion,[18] making Anthropic's latest Claude models available to Google Cloud customers.[19]

---

[12] Asa Fitch, *AI Startup CoreWeave Nearly Triples Valuation to $19 Billion in Five Months*, WALL STREET JOURNAL (May 1, 2024), https://www.wsj.com/tech/ai/ai-cloud-computing-startup-coreweave-valued-at-19-billion-in-new-funding-round-dfdb47cd.

[13] Berber Jin et al., *AI Challenger Mistral Set to Nearly Triple Valuation to $6 Billion in Six Months*, WALL STREET JOURNAL (May 9, 2024), https://www.wsj.com/tech/ai/french-ai-startup-taking-on-silicon-valley-is-set-to-stuff-its-war-chest-4071522a.

[14] Ingrid Lunden, *Anthropic is expanding to Europe and raising more money*, TECHCRUNCH (May 13, 2024), https://techcrunch.com/2024/05/13/anthropic-is-expanding-to-europe-and-raising-more-money/; Erin Griffith and Cade Metz, *Inside the Funding Frenzy at Anthropic, One of A.I.'s Hottest Start-Ups*, N.Y. TIMES (Feb. 20, 2024), https://www.nytimes.com/2024/02/20/technology/anthropic-funding-ai.html.

[15] Chris McKay, *Anthropic Discussing $2B Funding with Google and Others Just Days After $1.25B Amazon Investment*, MAGINATIVE (Oct. 4, 2023), https://www.maginative.com/article/anthropic-discussing-2b-funding-with-google-and-others-just-days-after-1-25b-amazon-investment/.

[16] Berber Jin and Miles Kruppa, *Google Commits $2 Billion in Funding to AI Startup Anthropic*, WALL STREET JOURNAL (Oct. 27, 2023), https://www.wsj.com/tech/ai/google-commits-2-billion-in-funding-to-ai-startup-anthropic-db4d4c50.

[17] Hayden Field and Kate Rooney, *Amazon spends $2.75 billion on AI startup Anthropic in its largest venture investment yet*, CNBC (Mar. 27, 2024), https://www.cnbc.com/2024/03/27/amazon-spends-2point7b-on-startup-anthropic-in-largest-venture-investment.html.

[18] Berber Jin and Miles Kruppa, *Google Commits $2 Billion in Funding to AI Startup Anthropic*, WALL STREET JOURNAL (Oct. 27, 2023), https://www.wsj.com/tech/ai/google-commits-2-billion-in-funding-to-ai-startup-anthropic-db4d4c50.

[19] *Announcing Anthropic's Claude 3 models on Google Cloud Vertex AI*, GOOGLE CLOUD (Mar. 4, 2024), https://cloud.google.com/blog/products/ai-machine-learning/announcing-anthropics-claude-3-models-in-google-cloud-vertex-ai.

22.    As is the case for other firms, there is no economic reason for Anthropic or any AI company to get a free pass from paying for the content they use to make money. Indeed, in its filing to the Copyright Office's Notice of Inquiry on AI, Anthropic explicitly says "[w]e recognize the importance of proactively addressing the perspectives of rights holders, artists, and creators."[20] There is little to suggest that Anthropic cannot afford to pay the artists and creators whose works it exploits.

### A.    Value of Publishers' Lyrics to Anthropic

23.    As described in the Declaration of Ben Zhao ("Zhao Decl."), Anthropic has trained on Publishers' lyrics and "fine-tuned" Claude with the expectation that users will seek copies of Publishers' lyrics.[21]

24.    However, Publishers' works also have value beyond serving as simple raw material to train LLMs to generate content and may be used for internal research purposes that aid in the development of generative AI models. ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

25.    Additionally, Publishers' lyrics are likely to become increasingly valuable over time to Anthropic and other LLM developers to meet the exponentially growing needs and demands of their newer and larger models, which are projected to outstrip the supply of available public high-quality data on the *entire Internet* as early as 2026.[24]

---

[20] *Public Comments of Anthropic PBC*, ANTHROPIC (Oct. 30, 2023), https://perma.cc/8DBX-H3XU.
[21] Zhao Decl. ¶ 49.
[22] *See* Exhibit B.
[23] *Id.* at 20.
[24] *See* Deepa Seetharaman, *For Data-Guzzling AI Companies, the Internet is Too Small*, WALL STREET JOURNAL (Apr. 1, 2021), https://www.wsj.com/tech/ai/ai-training-data-synthetic-openai-anthropic-9230f8d8.

1

**IV.    Music Publishers' Economic Model**

2      26.    Music publishers occupy an integral place in the music industry by facilitating the

3   creation and promotion of musical compositions. By seeking out songwriters to create, exploit,

4   and distribute compositions, Publishers generate opportunities for songwriters to compose works

5   and receive compensation and/or royalties for the exploitation of their works.

6      27.    Historically, music publishing consisted of the acquisition of compositions, printing

7   of sheet music and books, distribution and sale of printed music, and compensation of songwriters

8   and composers. Although music technology and the consumption habits of consumers have

9   changed over the years, music publishers' roles and economic models have largely remained the

10   same: facilitating the creation and exploitation of works by songwriters and collecting payments

11   on their behalf.

12      28.    Today, music publishers' business models center around securing agreements with

13   songwriters, in which songwriters assign their works (or a percentage of control) to the publishers

14   or commit to create works in return for advance payments and/or royalty payments from the works'

15   exploitation. Songwriters can negotiate the terms of these agreements and may reserve rights of

16   approval related to certain exploitations by the music publishers based on their personal or business

17   values.

18      29.    Given their central role in music publishers' businesses, songwriters and their

19   compositions hold great economic value for Publishers. Critical to the success of both parties is

20   the ability to control and commercially exploit the songwriters' works as they see fit. Unauthorized

21   uses of songwriters' works disrupt Publishers' businesses and diminish the economic value of

22   songwriters and their creations.

23      **A.    The Value of Song Lyrics**

24      30.    Song lyrics have important commercial value, generally.  Apart from being the

25   fabric for countless sound recordings, they are regularly licensed on their own in many ways or in

26   addition to the sound recordings, including, among others, by music services, websites, other

27   artists, and karaoke businesses. They are enjoyed by consumers, studied by critics, and sampled

28   by musicians.

31. Song lyrics also play an important commercial role for music publishers. The Declarations of Duff Berschback, Alisa Coleman, Kenton Draughon, and David Kokakis describe numerous licenses of different sorts for complete song lyrics, demonstrating the existence of a strong market for these works.

**B.  AI Company Licenses**

32. Song lyrics can also be valuable in the licensing market for use by AI companies. Rights holders could license their song lyrics to AI companies for a variety of uses, including music recommendation or music search services. Under such arrangements, music publishers could license compositions and could deliver works to enable a variety of AI-powered technologies.

**C.  Catalog Agreements**

33. One category of lyric licenses is catalog licenses. These are licenses to use Publishers' entire catalog of compositions (sometimes excluding certain songwriters, who may reserve the right of approval for such uses). Given the sheer size of Publishers' collective catalogs, these licenses can implicate a very large number of works and value for the Publishers. These include licenses for lyrics only and for music and lyrics together. Lyrics-only licenses include deals with LyricFind, which is a service that allows users to look up song lyrics, lyric translations, and lyric videos and display them on demand. Publishers have also granted LyricFind the right to issue sublicenses to other websites to deliver the same or similar services.

34. Publishers have also licensed their lyrics to streaming services—which often display lyrics alongside the work being streamed—karaoke businesses, and others. Such licensees include Apple, Singa, and Sybersound. These licenses are generally subject to strict limits on the use of the compositions.

35. Publishers have also issued catalog licenses to numerous online services, authorizing those services to display and/or publicly perform both the music and lyrics to Publishers' compositions. Publishers have licensed their catalogs to social media sites such as YouTube, Facebook, and others. While these licenses permit users to utilize Publishers' compositions in various ways without individually clearing those uses ahead of time, there are typically strict limits on the amount of the original work that may be used, the context in which

the work is used, and other requirements. These licenses by necessity also limit the use of Publishers' songs to audiovisual works on that particular site. In other words, social media sites are "walled gardens" where Publishers' works can be used only in certain limited ways.

36.    Anthropic's failure to take a license from each of the Publishers has obviously damaged them to the extent of the value of those licenses. But the harm goes beyond that.

### D.  Market for Individual Compositions

37.    In addition to licenses for their full catalogs, Publishers routinely license whole or parts of individual musical works. These include using the lyrics in merchandise (e.g., posters, clothing, and coffee mugs), advertising, motion pictures and television programs, books, and many other uses. One of the most common types is so-called "lyrical sample" licenses in which music publishers grant the right to use a portion of musical composition in another songwriter's work. These licenses are individually negotiated, taking into consideration the value of the licensed work and the likely commercial value of the licensee's work. Lyrical samples are typically licensed for a flat fee of $500–$2,500, but can be as high as $20,000 for a famous work, particularly where the sample was initially used without authorization. Importantly, these agreements specify the exact use that will be made of the lyric sample, including the precise amount to be used and in what context. Licensees are not given "free rein" to do anything they want with Publishers' compositions.

38.    Anthropic uses Publishers' lyrics as samples in new works generated by Claude. This is essentially what Publishers offer when their works are licensed as individual compositions. But Anthropic's use vastly exceeds the scope of any existing license. Claude generates its own "samples" of varying lengths, to be combined with some unknown set of new lyrics, to be used in any type of written work or musical work with lyrics. No existing license represents a perfect comparison for the extent of this grant of rights. It would certainly represent multiples of any current commercial license.

39.    Anthropic's uses of Publishers' compositions contrary to the songwriters' and Publishers' intent also devalue the works themselves. Such is the case for consumers who enjoy songs based on the content or messaging in the lyrics. For example, unauthorized "mashups" of religious faith-based music with sexually explicit words or themes can erode consumers'

perception of songwriters or publishers.[25] This, in turn, could discourage the future consumption of works from these songwriters or publishers with the consequence of devaluing current and future works.

### E.  Anthropic Competes with Publishers' Licensees

40.    In copying Publishers' entire catalog of compositions as training material, and then delivering copies of Publishers' lyrics on demand, for free, Anthropic offers a service that is similar to many of Publishers' licensees, but without any of the accompanying restrictions on use.

41.    The many instances of infringement cited by Publishers in their Complaint confirm that Claude is capable of identifying Publishers' works and displaying lyrics at a user's request.[26]

42.    Fundamental economics dictates that where two firms offer the same service to an audience, the two firms compete in the same market. Thus, Anthropic competes with Publishers' licensees by offering the display of lyrics to users in response to online searches. In a submission to the U.S. Copyright Office regarding artificial intelligence and copyright, Anthropic touted the many search capabilities and applications of Claude, claiming:

- "Claude tends to perform well at general, open-ended conversation; **search**, writing, editing, outlining, and summarizing text; coding; and providing helpful advice about a broad range of subjects."[27]

- "Claude has been integrated into productivity tools offered by crowdsourced **question and answer platforms**, allowing users of those products to engage with a conversational assistant as they **search for information** . . ."[28]

- "Claude is also helping to power AI research assistants on AI-based **search engines** and chatbots."[29]

---

[25] *See* Declaration of Kenton Draughon ¶ 22.
[26] Complaint, Exhibit A.
[27] *See* Anthropic, Public Comments of Anthropic PBC on U.S. Copyright Office's Notification of Inquiry and Request for Public Comments Regarding Artificial Intelligence and Copyright (Oct. 30, 2023) 2, https://downloads.regulations.gov/COLC-2023-0006-9021/attachment_1.pdf (emphasis added).
[28] *Id.* at 3 (emphasis added).
[29] *Id.* at 4 (emphasis added).

43.    Anthropic has also advertised Claude's ability to "search over web sources"[30] on its own website and announced efforts to "integrate Claude with sources of solid, real-time information like those found in search engines such as DuckDuckGo."[31] This demonstrates to me Anthropic's intent to participate in the online search market through Claude.

44.    Anthropic's fine-tuning process also indicates that one use case for Anthropic's Claude product is to search for and deliver copyrighted lyrics. This is based on my review of datasets uploaded by Anthropic to the Hugging Face website that reflect Anthropic's fine-tuning efforts to improve or refine Claude's outputs.[32] Examples of prompts I saw in the dataset include:

- "What are the lyrics to American Pie by Don McLean?"[33]

- "I'm trying to figure out an artist by using the lyrics. Are you able to help?"[34]

- "Ok what song starts with the lyrics: . . . ."[35]

- "Please provide the lyrics for the song 'Only Hope' by Mandy Moore."[36]

45.    I understand the datasets reflect human feedback from Anthropic workers who initiated conversations with Claude and then chose preferred responses consistent with Anthropic's objectives as part of the fine-tuning process.[37] The documented use of fine-tuning prompts related to lyrics show that Claude could be used to search, identify, and display content including Publishers' lyrics as well as other copyrighted works when prompted. This service is nearly identical to those offered by some of Publishers' licensees, such as the lyrics catalog MusixMatch. Therefore, Anthropic operates as a competitor to Publishers' licensees in the general market for lyrics online.

---

[30] *Introducing Claude 2.1*, ANTHROPIC, https://www.anthropic.com/news/claude-2-1(last visited Jul. 17, 2024).

[31] *Introducing Claude*, ANTHROPIC (Mar. 14, 2023), https://www.anthropic.com/news/introducing-claude.

[32] *Datasets: Anthropic/hh-rlhf*, HUGGING FACE, https://huggingface.co/datasets/Anthropic/hh-rlhf.

[33] Exhibit C, at 1.

[34] *Id*. at 2.

[35] *Id*. at 3.

[36] *Id.* at 4.

[37] Yuntao Bai et al., *Training a Helpful and Harmless Assistant with Reinforcement Learning from Human Feedbac*k (Apr. 12, 2022) 5, 65, arXiv:2204.05862v1, https://arxiv.org/pdf/2204.05862.pdf.

1

### F.    The Economic Impact of Anthropic's Failure to License Lyrics

2

46.    Anthropic's conduct gives rise to several economic harms felt by Publishers.

3

47.    First, by using Publishers' lyrics without paying a license fee, Anthropic cheats

4 Publishers of substantial fees they otherwise would have enjoyed had Anthropic entered into a

5 licensing agreement to use Publishers' lyrics. The value of similar licensing agreements for

6 Publishers' song lyrics is generally subject to the exact terms negotiated by the contracting parties

7 but, as described above, they serve an integral role in Publishers' core businesses. Publishers'

8 losses in licensing fees can be expected to be significant, directly stemming from Anthropic's

9 failure to license for Publishers' lyrics.

10

48.    Further, by not paying a license fee, Anthropic undermines Publishers' ability to

11 renew licenses with the existing licensees. For example, lyric aggregators would be disincentivized

12 from entering into license agreements with Publishers when Anthropic is effectively allowed to

13 take and exploit the lyrics for free. Similarly, other potential licensees would be disincentivized

14 from entering into agreements with Publishers in the first place.

15

49.    Second, Anthropic's unauthorized use of Publishers' lyrics undermines the value of

16 the market for song lyrics. Where one firm in a market acquires an unfair advantage—such as not

17 having to pay for inputs required to provide its services—its competitors are likely to lose market

18 share or seek out similar competitive advantages to compensate. In other words, Anthropic's failure

19 to pay Publishers for the use of their lyrics allows Anthropic to display lyrics at a lower cost to

20 consumers than those enterprises that today duly acquire licenses.

21

50.    Anthropic's unauthorized uses also divest songwriters of their ability to object to

22 harmful or objectionable uses of their lyrics. The loss of the ability to control the supply and use

23 of lyrics could also affect the value of their market for song lyrics.

24

51.    As my colleagues and I have demonstrated in extensive research, the unauthorized

25 use or reproduction of copyrighted works reduces the market value of these works, which in this

26

27

28

context means lowered income for publishers and songwriters.[38] Specifically, in a 2020 Piracy Landscape Study conducted for the U.S. Patent and Trademark Office, my colleagues and I document that 29 of the 33 peer-reviewed academic studies of the impact of piracy on legal sales found that piracy caused statistically and economically significant harm to sales in legal markets.[39]

52.     This contraction in the market has an indirect effect as well. When illegal content circulates widely in the marketplace, it has a depressing effect on even legal sales. Our research has shown that the presence of freely available unlicensed content reduces the prices consumers would otherwise be willing to pay for licensed content.[40]

53.     These harms are felt by Publishers whether Anthropic provides complete copies of Publishers' lyrics or in part. In delivering complete, verbatim or near-verbatim copies of Publishers' lyrics, Anthropic usurps a service typically provided by licensees such as lyric aggregators or karaoke services, which are required to pay licensing fees for their use of Publishers' lyrics. As detailed above, this conduct robs Publishers of licensing fees, inhibits their ability to negotiate licenses, undermines the value of the market for song lyrics, and reduces the prices consumers are willing to pay.

54.     Third, Claude affects demand in Publishers' existing markets by producing outputs that mimic or are derived from human works of authorship, including Publishers' lyrics. Where Claude generates creative outputs, such as lyrics, it produces products that compete with the works of human authors, such as songwriters and artists represented by Publishers and other rights holders. This is particularly the case where Claude generates lyrics based on copyrighted works created by Publishers' songwriters. From an economic perspective, lyrics from Claude and human-made lyrics are competing products—they are both lyrics consumed by human audiences. Simply

---

[38] Brett Danaher, Michael D. Smith & Rahul Telang. *Piracy Landscape Study: Analysis of Existing and Emerging Research Relevant to Intellectual Property Rights Enforcement of Commercial-Scale Piracy* (U.S. Pat. and Trademark Off., Economic Working Paper No. 2020-02, March 20, 2020), https://www.uspto.gov/sites/default/files/documents/USPTO-Piracy-Landscape.pdf.
[39] *Id.*
[40] *See, e.g.,* Miguel Godinho de Matos, Pedro Ferriera & Michael D. Smith, *The Effect of Subscription Video-On-Demand on Piracy: Evidence from a Household Level Randomized Experiment*, 64 MGMT. SCIENCE 12, 5610 (2017).

put, by generating poems and musical lyrics to users upon request, Claude usurps demand for Publishers' lyrics as creative expression and usurps opportunities for Publishers' songwriters, especially where any outputs are based on creative works created by those very same songwriters.

55.    The same harms befall Publishers when Anthropic provides Publishers' lyrics in part or combined with other texts or materials obtained from other sources, since such uses of Publishers' lyrics would require licensing agreements as well.

56.    Similarly, Anthropic's infringements and refusal to seek authorization to use Publishers' lyrics also have the overall effect of squelching the development of the licensing market for copyrighted AI training materials. If LLM developers like Anthropic were permitted to take lyrics and other copyrighted works without compensating rightsholders, this growing market for copyrighted works would likely contract and may collapse. Likely or prospective participants would be discouraged from entering the market, while existing participants would be pushed out due to decreased negotiating leverage or higher costs of doing business compared to their competitors. But this would constitute a market failure, not a market feature. This is a scenario that has played out in a similar market at least once before where unlicensed use of Bollywood movies weakened market demand, and "[w]eaker effective demand undermined creative incentives" for Bollywood studios, resulting in reduced creative output and reduced creative quality.[41]

57.    Finally, and importantly, Anthropic's delivery of Publishers' lyrics without attribution divests songwriters of recognition and reputation among consumers and music publishers, further undermining the economic value of their compositions and services. This also includes the delivery of mangled or inaccurate lyrics.

58.    The economic harms and impacts above are overlapping in important respects, mutually reinforcing one another and causing additional harm.

59.    Even assuming Anthropic's guardrails could completely prevent Claude from regurgitating infringing outputs, Publishers would still face the significant economic harms so long as Anthropic continues to exploit Publishers' lyrics without obtaining any licenses for its uses.

---

[41] Rahul Telang & Joel Waldfogel, *Piracy and New Product Creation: A Bollywood Story*, 43 INFO. ECON. AND POLICY, 1 (2018).

60.    Ultimately, all of this combines to depreciate the value of creative output. In the context of music publishing, this hurts the publisher companies, the songwriters, and their licensees.

61.    In the long run, this depreciation in market incentives reduces artists' incentives to create, which harms everyone.[42]

### G.    Claude Is Not Like a VCR Machine

62.    Claude is unlike certain other devices capable of infringing conduct, such as a VCR machine. Before a user could potentially infringe with a VCR, they were first required to purchase the equipment, then they could use that VCR to copy content to which the user had access. A VCR is a standalone product that essentially has no contact with its manufacturer after it has been sold, whereas an AI service like Claude is completely controlled by its creator on an ongoing basis.

63.    Claude is more akin to an online content distribution service. Anthropic curates and controls a pre-loaded "library" of content—i.e., the universe of training data—which users interact with on a per-query basis. The user gets infringing content from Claude's training data because Claude is preloaded with the infringing content.

## V.    The Remedy Sought Is Economically Reasonable

64.    The remedy sought by Publishers is comprised of two pieces. Specifically, Publishers request a preliminary injunction requiring Anthropic to (1) refrain from using Publishers' lyrics for training purposes in future AI models, and (2) maintain guardrails in currently available AI models to prevent outputs that copy Publishers' lyrics.

65.    With regard to item (1), an injunction would not require Anthropic to incur any operation-ending fees, even were it to assume some costs to exclude Publishers' lyrics from its AI models training data for future models. The economic obligation would be limited to forward-looking expense in complying with the injunction.

---

[42] *See, e.g.,* Rahul Telang & Joel Waldfogel, *Piracy and New Product Creation: A Bollywood Story*, 43 INFO. ECON. AND POLICY, 1 (2018); Brett Danaher & Michael D. Smith, *Digital Piracy, Film Quality, and Social Welfare*, 24 GEO. MASON L. REV. 4, 923 (2017).

66.     With regard to item (2), Anthropic claims to have already developed the technology to deploy guardrails that can prevent certain infringing outputs. According to Anthropic, it has already implemented the requested guardrails. Any additional expense of maintaining those existing guardrails is likely to be minimal.

67.     Alternatively, Anthropic can license Publishers' lyrics, much in the same way as others—like YouTube, Spotify, and Apple Music—have licensed those lyrics, and just like various other AI developers have licensed the data on which they have trained their models.

68.     Anthropic is currently valued at over $18 billion and is projected to generate $850 billion in revenue by the end of 2024.[43] In addition to requiring Anthropic to seek permission from Publishers for the use of their lyrics, the payment of a reasonable license fee for the use of Publishers' content is economically justified.

69.     Anthropic CEO Dario Amodei claims AI models currently in development may cost from $100 million and up to $1 billion to train, but costs of training may go up to $10 billion or more within three years from today.[44] While these are not meager figures, these are costs AI companies like Anthropic presumably have accounted for and are willing to pay. The relatively moderate costs of licensing Publishers' lyrics, or opting not to use them, should also be accounted for as a price of doing business, particularly since Anthropic benefits from its unauthorized exploitation of lyrics. As a point of comparison, the *entire* music publishing industry market size is estimated to be $7.62 billion in 2024.[45]

70.     Or simply, Anthropic can choose not to license Publishers' works and use other materials to train its models.

---

[43] *Anthropic forecasts more than $850 mln in annualized revenue rate by 2024-end-report*, REUTERS (Dec. 26, 2023), https://www.reuters.com/technology/anthropic-forecasts-more-than-850-mln-annualized-revenue-rate-by-2024-end-report-2023-12-26/.

[44] Jowi Morales, *AI models that cost $1 billion to train are underway, $100 billion models coming—largest current models take 'only' $100 million to train*, TOM'S HARDWARE (Jul. 7, 2024), https://www.tomshardware.com/tech-industry/artificial-intelligence/ai-models-that-cost-dollar1-billion-to-train-are-in-development-dollar100-billion-models-coming-soon-largest-current-models-take-only-dollar100-million-to-train-anthropic-ceo.

[45] *Music Publishing Market Size (2024–2029)*, MORDOR INTELLIGENCE (last visited Jul. 19, 2024), https://www.mordorintelligence.com/industry-reports/music-publishing-market/market-size.

71.    Ultimately, the economic harms for Publishers are likely to be greater than any costs incurred by Anthropic. Continued unauthorized use by Anthropic of Publishers' works inflicts upon Publishers present and future losses in revenue and severe disruptions to Publishers' core businesses, relationships, and competitive standing. Over time, these harms would likely exceed the potential costs Anthropic might incur in order to comply with the injunction.

### A.    The Market Always Adjusts to Disruptive Technologies

72.    There have been numerous examples of technological developments in which emerging technology companies said they would not be able to afford the price of content licenses. These include:

- Peer-to-peer music sharing (P2P) (e.g., Napster);

- Internet radio (e.g., Pandora);

- Social media platforms (e.g., YouTube, Instagram)

- Streaming media (e.g., Apple Music, Spotify, Deezer); and

- The "metaverse."

73.    In each instance, emerging technology companies were sued and took the position that paying for licenses would bankrupt them. In some cases, individual companies were not able to stay in business because their particular business model was not sustainable. But in every instance, the technology model itself survived after licensing, with some platforms learning to operate legitimate businesses even while paying for content, and in other instances with the market finding different technologies that accomplished the same thing. Examples include:

- P2P: In general, none of the more notorious P2P companies such as Napster, Grokster, and Limewire continued to operate as P2P companies after being sued for copyright infringement. Following its loss in *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001) related to copyright infringement arising out of its peer-to-peer file sharing network, Napster obtained licenses with major record groups to begin operating as a legal music service.[46] The development of peer-to-

---

[46] Jeff Leeds and Jon Healey, *Napster Strikes a Deal With 3 Major Labels*, LA TIMES (June 6, 2001), https://www.latimes.com/archives/la-xpm-2001-jun-06-fi-6954-story.html.

peer technology similarly spurred record companies to "work[] with download sites and new subscription services to create a legitimate alternative to piracy networks" "all of which pay the creators."[47] Similarly, Mega (a company related to Megaupload founded by Kim Dotcom) now removes infringing files within hours of a request.[48]

- Internet radio: Internet radio (webcasting) services of all sizes complained that they could not afford licenses. In 2007, the Copyright Royalty Board ruled that they would have to pay certain statutory rates and many threatened to go out of business. But in 2009, SoundExchange and the webcasters came together to negotiate rates that have allowed the webcasters to thrive.[49]

- Social media platforms: When YouTube first launched, it was sued by Viacom for copyright infringement. The parties tried to negotiate a license but the deal fell through.[50] Eventually YouTube was purchased by Google and implemented a ContentID system and agreed to compensate creators for content. In 2017,

---

[47] *Piracy of Intellectual Property on Peer-to-Peer Networks: Hearing Before the Subcommittee on Courts, the Internet, and Intellectual Property of the Committee on the Judiciary*, 117th Cong. 54 (2002) (statement of Miranda Rosen, Chairman and Chief Executive Officer, Recording Industry Association of America), available at https://commdocs.house.gov/committees/judiciary/hju81896.000/hju81896_0.HTM.

[48] Andy Maxwell, *Mega: 144,000+ Users Have Been Terminated for Repeat Copyright Infringement*, TORRENTFREAK (Oct. 21, 2021), https://torrentfreak.com/mega-144000-users-have-been-terminated-for-repeat-copyright-infringement-211021/.

[49] *See* John Timmer, *Pandora Lives! SoundExchange Cuts Deal on Webcasting Rates*, ARSTECHNICA (Jul. 7, 2009), https://arstechnica.com/tech-policy/2009/07/soundexchange-cuts-deal-on-music-webcasting-rates/; David Oxenford, *Pureplay Webcasters and SoundExchange Enter into Deal Under Webcaster Settlement Act to Offer Internet Radio Royalty Rate Alternative for 2006-2015*, BROADCAST LAW BLOG (Jul. 7, 2009), https://www.broadcastlawblog.com/2009/07/articles/pureplay-webcasters-and-soundexchange-enter-into-deal-under-webcaster-settlement-act-to-offer-internet-radio-royalty-rate-alternative-for-2006-2015/.

[50] *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012) (No. 10–3270–cv) ECF No. 63 at 16.

1

2

Facebook signed a deal with Universal Music Group to license content and began
to respond to takedown notices.[51]

3

4

5

6

7

8

9

10

11

12

13

14

15

- Streaming media: Most streaming services started out with content licenses, but
they paid low rates, complaining that they could not pay more. Over time they
began to pay higher rates. For example, Apple Music agreed to pay artists for
streams even during its free trial period.[52] Spotify has been the subject of
complaints from artists for years that it paid below market rates. One of Spotify's
executives said that the platform was designed to distribute music, not to pay
artists.[53] After considerable pushback, Spotify recently announced it will increase
its payments to artists and rights holders.[54] Deezer, a French streaming music
service, also recently increased payments to rights holders. Its predecessor,
Blogmusik.net launched without content licenses and was quickly shuttered. But
the company was reformed and struggled for several years, complaining that it
could not afford market-based license fees.[55] Today it is financially healthy, and
just agreed to increase the amounts it pays rights holders.[56]

16

17

18

19

20

21

22

23

24

25

26

27

28

[51] Kerry Flynn, *Facebook Signs First-Ever Music Deal with a Record Label*, MASHABLE (Dec.
21, 2017),
https://mashable.com/article/facebook-music-rights-record-label-universal-music-group.
[52] Tim Fernholz and Heather Timmons, *Taylor Swift Has Successfully Shamed Apple Music into
Paying Artists All the Time*, QUARTZ (June 21, 2015), https://qz.com/433499/taylor-swift-wont-
put-1989-on-apples-streaming-music-app-until-she-gets-paid.
[53] Paul Resnikoff, *Spotify Executive Calls Artist 'Entitled' for Requesting Payment of One Penny
Per Stream*, DIGITAL MUSIC NEWS (June 29, 2021),
https://www.digitalmusicnews.com/2021/06/29/spotify-executive-entitled-pay-penny-per-
stream/.
[54] Tim Ingham, *Spotify Is Changing Its Royalty Model to Crush Streaming Fraud and Introduce
a Minimum Payment Threshold. Its Plan? To Shift $1 Billion in Payouts Towards 'Working
Artists' Over the Next 5 Years*, MUSIC BUSINESS WORLDWIDE (Oct. 24, 2023),
https://www.musicbusinessworldwide.com/spotify-is-changing-its-royalty-model-to-crush-
streaming-fraud/.
[55] Pascal Rozat, *Deezer: Profitability Down the Line?*, INA GLOBAL (Aug. 18, 2011),
https://web.archive.org/web/20150403164334/http://www.inaglobal.fr/en/music/article/deezer-
profitability-down-line?tq=4.
[56] Umar Shakir, *Universal Music Group Lands New Royalty Model That Boosts Popular Artists*,
VERGE (Sept. 6, 2023), https://www.theverge.com/2023/9/6/23861232/universal-music-deezer-
streaming-deal.

- The "metaverse": Web3 presents a vast array of complicated licensing rules in a nascent technology. While many platforms are likely to argue that they cannot afford licenses and should not have to pay for them, there is general acknowledgement that just because the technology is new, that does not mean emerging companies do not have to pay for licenses.[57]

74.    Ultimately, AI is just another form of content distribution; it should pay for its inputs or absorb the costs of not using content just as other tech platforms have done. To the extent licensing is appropriate, a thriving market for licensing copyrighted content for use in connection with AI technology has already emerged and continues to develop.

**B.    The Content Licensing Market Is Sustainable**

75.    To the extent AI companies suggest they cannot be expected to pay for the content they use, a robust content licensing market for AI training data is not only viable but has greatly expanded within the span of less than three years, with major AI developers seeking authorization from copyright holders before utilizing their archives for training data and rights to display content.

76.    In just the last few months, leading LLM developer (and Anthropic competitor) OpenAI entered into a slew of multi-million dollar deals for access to terabytes of written content, largely for training purposes, including:[58]

- A content licensing agreement with Wall Street Journal owner News Corp reportedly worth $250 over 5 years;[59]

---

[57] Stuart Dredge, *Metaverse Music Licensing: 'We Have a Window to Sort This out'*, MUSICALLY (June 30, 2022), https://musically.com/2022/06/30/metaverse-music-licensing-we-have-a-window-to-sort-this-out/.

[58] In addition to the deals subsequently listed, a full list of OpenAI's 32 publicly announced deals with various tech and media brands may be found at https://originality.ai/blog/openai-partnerships.

[59] Alexandra Bruell et al., *OpenAI, WSJ Owner News Corp Strike Content Deal Valued at Over $250 Million*, WALL STREET JOURNAL (May 22, 2024), https://www.wsj.com/business/media/openai-news-corp-strike-deal-23f186ba.

- A strategic partnership granting access to Vox Media's portfolio of media properties, including *Vox*, the *Verge*, *Eater*, *New York* magazine, the *Cut*, *Vulture*, and *SB Nation*;[60]

- A content licensing agreement for the Associated Press' archive of news stories;[61]

- A multiyear content deal for Time's published archives from the last 101 years;[62]

- A content and product partnership with the *Atlantic*;[63]

- A content licensing agreement with global publisher Axel Springer, owner of *Business Insider*, *Politico*, and European publications *BILD* and *WELT*;[64]

- A content licensing agreement with the *Financial Times* reportedly worth between $5 million and $10 million;[65]

- A multiyear license agreement with French publisher *Le Monde*;[66]

---

[60] *Vox Media and OpenAI Form Strategic Content and Product Partnership*, Vox Media (May 29, 2024), https://www.voxmedia.com/2024/5/29/24166483/vox-media-openai-strategic-content-and-product-partnership.

[61] Matt O'Brien, *ChatGPT-maker OpenAI signs deal with AP to license news stories*, AP News (Jul. 13, 2023), https://apnews.com/article/openai-chatgpt-associated-press-ap-f86f84c5bcc2f3b98074b38521f5f75a.

[62] Sara Fischer, *Exclusive: Time strikes licensing deal with OpenAI*, Axios (Jun. 27, 2024), https://www.axios.com/2024/06/27/openai-time-licensing-deal-chatgpt.

[63] *The Atlantic announces product and content partnership with OpenAI*, The Atlantic (May 29, 2024), https://www.theatlantic.com/press-releases/archive/2024/05/atlantic-product-content-partnership-openai/678529/.

[64] Emilia David, *Politico, Business Insider parent Axel Springer inks deal with OpenAI*, Verge (Dec. 13, 2023), https://www.theverge.com/2023/12/13/23999861/openai-axel-springer-chatgpt-ai-content-insider-politico.

[65] Emilia David, *Financial Times signs licensing deal with OpenAI*, Verge (Apr. 29, 2024), https://www.theverge.com/2024/4/29/24141869/financial-times-licensing-deal-openai-news; Alexandra Bruell, *OpenAI, WSJ Owner News Corp Strike Content Deal Valued at Over $250 Million*, Wall Street Journal (May 22, 2024), https://www.wsj.com/business/media/openai-news-corp-strike-deal-23f186ba.

[66] Louis Dreyfus and Jérôme Fenoglio, *Le Monde and Open AI sign partnership agreement on artificial intelligence*, Le Monde (Mar. 13, 2024), https://www.lemonde.fr/en/about-us/article/2024/03/13/le-monde-signs-artificial-intelligence-partnership-agreement-with-open-ai_6615418_115.html.

- A content licensing deal with publisher Dotdash Meredith for content across its media portfolio, which includes *People*, *Food & Wine*, *Investopedia*, *InStyle*, and *Better Homes & Gardens*;[67] and

- A partnership with Reddit granting real-time access to content on the platform,[68] following a similar deal for AI training data struck between Google and Reddit worth about $60 million a year.[69]

77.    Licensing agreements by various other AI companies in recent years, both for written and non-written creative content, further demonstrate the development of a viable content licensing market for training AI. For example:

- OpenAI entered into a multiyear content-licensing deal with Shutterstock allowing OpenAI to train its AI models on Shutterstock's archive of images, videos, music, and metadata.[70]

- Amazon, Apple, Databricks, Meta, and Google have entered into similar agreements with Shutterstock, with some deals ranging from $25 million to $50 million each.[71]

---

[67] Sara Fischer, *OpenAI inks licensing deal with Dotdash Meredith*, Axios (May 7, 2024), https://www.axios.com/2024/05/07/openai-dotdash-meredith-licensing-deal.

[68] *OpenAI strikes deal to bring Reddit content to ChatGPT*, Reuters (May 16, 2024), https://www.reuters.com/markets/deals/openai-strikes-deal-bring-reddit-content-chatgpt-2024-05-16/.

[69] Anna Tong et al., *Exclusive: Reddit in AI content licensing deal with Google*, Reuters (Feb. 21, 2024), https://www.reuters.com/markets/deals/openai-strikes-deal-bring-reddit-content-chatgpt-2024-05-16/.

[70] *Shutterstock Partners with OpenAI and Leads the Way to Bring AI-Generated Content to All*, Shutterstock (Oct. 25, 2022), https://www.shutterstock.com/press/20435; *Shutterstock Expands Partnership with OpenAI, Signs New Six-Year Agreement to Provide High-Quality Training Data*, Shutterstock (Jul. 11, 2023), https://investor.shutterstock.com/news-releases/news-release-details/shutterstock-expands-partnership-openai-signs-new-six-year ("As part of this expanded collaboration, OpenAI has secured a license for access to additional Shutterstock training data including Shutterstock's image, video and music libraries and associated metadata").

[71] Katie Paul and Anna Tong, *Inside Big Tech's underground race to buy AI training data*, Reuters (Apr. 5, 2024), https://www.reuters.com/technology/inside-big-techs-underground-race-buy-ai-training-data-2024-04-05/. Mark Sullivan, *Databricks and Shutterstock are trying to remove the copyright risk from AI image generation (exclusive)*, Fast Company (Jun. 12, 2024), https://www.fastcompany.com/91139544/databricks-shutterstock-ai-images-exclusive.

- Google partnered with Adobe to make Adobe Firefly the AI art generator for Google's AI model Bard. Firefly was allegedly trained on Adobe stock images, openly licensed content, and public domain content.[72]

- Stability AI's Stable Audio (an AI music generator) was trained on AudioSparx, which purports to be a legitimate library of licensed music.[73]

- Generative AI by Getty Images is an image-generation program trained on licensed images.[74]

78.    The value of these agreements, including on an individual basis, exceed millions of dollars. OpenAI reportedly offers between $1 million and $5 million a year to license copyrighted news articles,[75] with its agreement with News Corp alone reportedly valued at $250 million.[76] Similarly, Apple was allegedly offering $50 million over multiple years to media companies for content on which to train their AI models.[77] This demonstrates the underlying content owned by copyright holders like Publishers holds great value to AI companies seeking sources of high-quality data.

79.    That other AI companies have willingly entered and continue to enter into dozens of licensing agreements for finite archives of content also demonstrates the economic viability of a licensing market for AI training content. Notably, ████████████████████████████

---

[72] Ely Greenfield, *Adobe Firefly Generative AI & Adobe Express to inspire millions to create in partnership with Google*, ADOBE (May 10, 2023), https://blog.adobe.com/en/publish/2023/05/10/adobe-firefly-adobe-express-google-bard.
[73] Emilia David, *Stability AI Releases AI Audio Platform*, VERGE (Sept. 13, 2023), https://www.theverge.com/2023/9/13/23871635/stability-ai-generative-audio-model-platform.
[74] *Getty Images Launches Commercially Safe Generative AI Offering*, GETTY IMAGES (Sept. 25, 2023), https://newsroom.gettyimages.com/en/getty-images/getty-images-launches-commercially-safe-generative-ai-offering.
[75] Emilia David, *OpenAI's news publisher deals reportedly top out at $5 million a year*, VERGE (Jan. 4, 2024), https://www.theverge.com/2024/1/4/24025409/openai-training-data-lowball-nyt-ai-copyright.
[76] Alexandra Bruell et al., OpenAI, WSJ Owner News Corp Strike Content Deal Valued at Over $250 Million, WALL STREET JOURNAL (May 22, 2024), https://www.wsj.com/business/media/openai-news-corp-strike-deal-23f186ba.
[77] Emilia David, *OpenAI's news publisher deals reportedly top out at $5 million a year*, VERGE (Jan. 4, 2024), https://www.theverge.com/2024/1/4/24025409/openai-training-data-lowball-nyt-ai-copyright.

1 ██████████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████████ .[78]

3     80.    For many AI developers, representations that their models are trained on rights-

4 cleared content have become a marketable asset—non-profit Fairly Trained has begun offering

5 certifications to AI models that exclusively utilize rights cleared content.[79]

6     81.    Further still, other industry participants have reacted to growth of the licensing

7 market by developing mechanisms that facilitate future transactions and reduce inefficiencies that

8 might impede market participants and the expansion of the market:

9     • Content-licensing sellers recently formed the AI sector's first trade group, Dataset

10       Providers Alliance (DPA), to "advocate[] for the interests of rights holders and

11       work[] to create a sustainable and equitable ecosystem for the licensing of

12       intellectual property content." [80]

13     • In July 2024, the Copyright Clearance Center began offering collective licenses for

14       use of copyrighted materials within AI systems for internal uses.[81]

15     • Rightsify launched Global Copyright Exchange (GCX), an AI music dataset

16       licensing service that provides rights-cleared datasets—totaling over 3 *petabytes* of

17       music data—to AI developers.[82]

18     • Calliope Networks has begun aggregating licensed catalogs of copyrighted works,

19       including films, books, podcast transcripts, news, and research papers, for AI

20

21

22

---

[78] *See* Exhibit B.

[79] *Licensed Model Certification*, FAIRLY TRAINED, https://www.fairlytrained.org/certifications (last visited Jul. 17, 2024).

[80] Katie Paul, *AI dataset licensing companies form trade group*, REUTERS (Jun. 26, 2024), https://www.reuters.com/technology/artificial-intelligence/ai-dataset-licensing-companies-form-trade-group-2024-06-26/; DATASET PROVIDERS ALLIANCE, https://www.thedpa.ai/ (last visited Jul. 19, 2024).

[81] *CCC Pioneers Collective Licensing Solution for Content Usage in Internal AI Systems*, COPYRIGHT CLEARANCE CENTER (Jul. 16, 2024), https://www.copyright.com/media-press-releases/ccc-pioneers-collective-licensing-solution-for-content-usage-in-internal-ai-systems/.

[82] GLOBAL COPYRIGHT EXCHANGE, https://www.gcx.co/ (last visited Jul. 22, 2024).

ingestion.[83] Calliope Networks operates on a revenue share basis, paying out royalties to rights holders it represents.[84]

- vAIsual now offers ready-made datasets to AI developers, drawing from a library of over 300 million images and videos either owned by vAIsual or licensed from third-parties.[85]

- Trip Adler, founder of Scribd, launched Created by Humans, an online platform created to allow authors and publishers to license their content to AI developers, with plans to expand services to artists, photographers, musicians, and other creatives to do the same.[86]

82.    These developments further exhibit an established and growing market for licensed training data between AI companies and rights holders.

83.    Additionally, to the extent the licensing deals between AI companies and copyright holders are exclusive, even a relatively small number of words could give an AI company an enormous competitive advantage over their rivals who do not have access to the same text. The possibility of exclusivity could also enhance the economic viability of licensing markets by creating a strong competitive impetus for AI companies to license with copyright holders as a way to differentiate their service from their competitors.[87]

84.    In the end, licensing may not be the appropriate course in all circumstances, and in fact may prove undesirable to the parties involved. For example, copyright holders might never authorize uses where AI models output mangled or misattributed song lyrics, in which case licensing may not present an appropriate solution. However, recent developments in the market show that it is an open pathway for many AI companies, and the suggestion that market barriers prevent licensing wholesale is not supported by broader economic trends.

---

[83] CALLIOPE NETWORKS, https://calliopenetworks.ai/ (last visited Jul. 22, 2024).
[84] *FAQ*, CALLIOPE NETWORKS, https://calliopenetworks.ai/faq (last visited Jul. 22, 2024).
[85] *Why vAIsual*, VAISUAL, https://vaisual.com/about/ (last visited Jul. 22, 2024).
[86] Trip Adler, *Introducing Created by Humans*, CREATED BY HUMANS (Jun. 25, 2024), https://www.createdbyhumans.ai/post/introduction.
[87] Cade Metz et al., *How Tech Giants Cut Corners to Harvest Data for A.I.*, New York Times (Apr. 8, 2024), https://www.nytimes.com/2024/04/06/technology/tech-giants-harvest-data-artificial-intelligence.html.

1  I declare under penalty of perjury under the laws of the United States that the foregoing is

2  true and correct to the best of my personal knowledge and belief.

3

4

5  Michael D. Smith

6  Executed in Pittsburgh, PA, this __31st__ day of July, 2024

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SIGNATURE ATTESTATION PURSUANT TO CIVIL L.R. 5-1(h)**

Pursuant to Civil L.R. 5-1(h), I hereby attest that concurrence in the filing of this document was obtained from all other signatories of this document. I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 1, 2024
                                                    */s/* Timothy Chung
                                                    _____
                                                    Timothy Chung