# EXHIBIT A

Benjamin S. Akley (State Bar No. 278506)
bakley@pryorcashman.com
**PRYOR CASHMAN LLP**
1801 Century Park East
Los Angeles, CA 90067
(310)683-6900

Frank P. Scibilia (*pro hac vice* admission pending)
fscibilia@pryorcashman.com
Joshua Weigensberg (*pro hac vice* admission pending)
jweigensberg@pryorcashman.com
Maya Katalan (*pro hac vice* admission pending)
mkatalan@pryorcashman.com
**PRYOR CASHMAN LLP**
7 Times Square, 40th Fl.
New York, NY 10036
(212) 421-4100

*Counsel for the below-identified Amici*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ANTHROPIC PBC,<br><br>Defendant. | Case Number: 3:24-cv-03811-JSC<br>Hon. Jacqueline Scott Corley<br><br>**BRIEF OF THE RECORDING INDUSTRY ASSOCIATION OF AMERICA, NATIONAL MUSIC PUBLISHERS' ASSOCIATION, THE ASSOCIATION OF AMERICAN PUBLISHERS, INC., NEWS/MEDIA ALLIANCE, SONGWRITERS OF NORTH AMERICA, BLACK MUSIC ACTION COALITION, MUSIC ARTISTS COALITION, ARTIST RIGHTS ALLIANCE, AND AMERICAN ASSOCIATION OF INDEPENDENT MUSIC AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

1

**TABLE OF CONTENTS**

2   TABLE OF AUTHORITIES ...................................................................................................... ii

3   INTERESTS OF *AMICI CURIAE* ......................................................................................... 1

4   PROCEDURAL HISTORY .................................................................................................... 4

5   PRELIMINARY STATEMENT .............................................................................................. 4

6   ARGUMENT ......................................................................................................................... 5

7       I.    ACCEPTING AI TECHNOLOGY'S BENEFITS DOES NOT REQUIRE

8           ABANDONING COPYRIGHT LAW PRINCIPLES ........................................... 5

9           A.  Anthropic Must License The Copyrighted Works

10             That It Uses, Like Its Competitors Do ................................................... 5

11          B.  Requiring Anthropic to License the Copyrighted Works That It Uses

12             Will Not Stifle Technological Progress ................................................. 8

13      II.   A PRELIMINARY INJUNCTION AGAINST ANTHROPIC IS

14          APPROPRIATE ........................................................................................... 10

15          A.  The Motion Entails Applying Well-Established Copyright Principles to

16             Admitted Facts .................................................................................... 10

17          B.  The Public Interest Is Best Served By Granting Publishers' Motion ............................ 12

18  CONCLUSION ..................................................................................................................... 13

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**PAGE(s)**

## CASES

*2Die4Kourt v. Hillair Cap. Mgmt., LLC*,
    692 F. App'x 366 (9th Cir. 2017)................................................................ 7

*A&M Recs., Inc. v. Napster, Inc.*,
    114 F. Supp. 2d 896 (N.D. Cal. 2000), *affirmed in part, reversed in part,*
    *and remanded for modification of injunction by* 239 F.3d 1004 (9th Cir. 2001) .......................... 9

*A&M Recs., Inc. v. Napster, Inc.*,
    Nos. C 99-5183 MHP (ADR), C 00-0074 MHP (ADR), 2000 WL 34016494
    (N.D. Cal. July 26, 2000) .......................................................................... 8, 9, 11

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
    143 S. Ct. 1258 (2023) ....................................................................... 8, 11, 12

*Associated Press v. Meltwater U.S. Holdings, Inc.*,
    931 F. Supp. 2d 537 (S.D.N.Y. 2013) ........................................................... 11

*Basic Books, Inc. v. Kinko's Graphics Corp.*,
    758 F. Supp. 1522 (S.D.N.Y. 1991) ........................................................... 6, 9

*BGC Inc. v. Robinson*,
    No. 22-cv-01582-JSW, 2022 WL 2915703 (N.D. Cal. July 25, 2022) .......................... 7

*Cadence Design Sys., Inc. v. Avant! Corp.*,
    125 F.3d 824 (9th Cir. 1997), *cert. denied*, 523 U.S. 1118 (1998) .............................. 7

*Cook v. Meta Platforms Inc.*,
    No. 4:22-CV-02485-YGR, 2023 WL 6370891 (N.D. Cal. Jan. 4, 2023) ...................... 10

*Dr. Seuss Enters., L.P. v. ComicMix LLC*,
    983 F.3d 443 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2803 (2021) ............................ 11

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
    471 U.S. 539 (1985) .......................................................................... 5, 11

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,

No. 04-480, 2005 WL 508120 (U.S.), (Mar. 1, 2005) ...................................... 8

*MGM Studios Inc. v. Grokster, Ltd.*,

545 U.S. 913 (2005) ............................................................................................ 9

*Stross v. Meta Platforms, Inc.*,

No. 2:21-CV-08023-MCS-AS, 2022 WL 1843129 (C.D. Cal. Apr. 6, 2022) .............................. 10

**WEBSITES**

*Adobe Firefly*, ADOBE, https://www.adobe.com/products/firefly.html ................................................. 6

*Alphabet A (Ex Google)*,

MARKETS INSIDER, https://markets.businessinsider.com/stocks/googl-stock .................................. 8

*Amazon*, MARKETS INSIDER, https://markets.businessinsider.com/stocks/amzn-stock ......................... 8

*Amazon and Anthropic announce strategic collaboration to advance generative AI*,

AMAZON (Sept. 25, 2023), https://www.aboutamazon.com/news/company-

news/amazon-aws-anthropic-ai ...................................................................................... 7, 8

https://www.humanartistrycampaign.com ....................................................................... 1

https://www.regulations.gov/docket/COLC-2023-0006/comments......................................... 1

*Meet Claude*, ANTHROPIC, https://www.anthropic.com/product........................................ 12

*Moving Pictures: NVIDIA, Getty Images Collaborate on Generative AI*,

NVIDIA (Mar. 21, 2023) https://blogs.nvidia.com/blog/generative-ai-getty-images/ ................... 6

*Music in the Air*, GOLDMAN SACHS (June 13, 2022),

https://www.goldmansachs.com/intelligence/pages/gs-research/music-in-the-

air/report.pdf........................................................................................................... 7

*Music Rights Management on YouTube*,

YouTube, https://support.google.com/youtube/answer/7071269; .................................. 7

*MusicXMatch for Publishers*,

MUSICXMATCH, https://about.musixmatch.com/business/overview;........................................ 7

*Press Release, Introducing Claude*, ANTHROPIC (Mar. 14, 2023),

https://www.anthropic.com/news/introducing-claude .................................................. 12

*Publishing With LyricFind*, LYRICFIND, https://www.lyricfind.com/publishing ................................ 7

Robert Stoner et al., *Copyright Industries in the U.S. Economy, 2022 Report,*
    IIPA, https://www.iipa.org/files/uploads/2022/12/IIPA-Report-
    2022_Interactive_12-12-2022-1.pdf ................................................................. 13

**OTHER AUTHORITIES**

Anna Tong, Echo Wang, Martin Coulter, *Exclusive: Reddit in AI content licensing
    deal with Google,* REUTERS (Feb. 21, 2024) ................................................ 6

*Apple Music strikes new multiyear deals with major record labels*, FINANCIAL TIMES
    (Mar. 12, 2020) .............................................................................................. 7

Berber Jin, Miles Kruppa, *Google Commits $2 Billion in Funding to AI Startup
    Anthropic*, WALL STREET JOURNAL (Oct. 27, 2023) ...................................... 9

*Google Invests In Anthropic For $2 Billion As AI Race Heats Up*, FORBES (Oct. 31, 2023) ............... 8

Helen Coster, *Global news publisher Axel Springer partners with OpenAI in landmark
    deal*, REUTERS (Dec. 13, 2023) .................................................................. 6

Ingrid Lunden, *Anthropic is expanding to Europe and raising more money*,
    TECHCRUNCH (May 13, 2024) ..................................................................... 7

Jeff Goodell, *Steve Jobs: Rolling Stone's 2003 Interview*, ROLLING STONE (Oct. 6, 2011) ................ 9

Jess Weatherbed, *YouTube is trying to make AI music deals with major record labels*,
    THE VERGE (June 27, 2024) ........................................................................ 6

Marlize van Romburgh, *Anthropic Reportedly In Talks To Raise $750M At $18B-Plus
    Valuation,* CRUNCHBASE NEWS (Dec. 21, 2023) .......................................... 8

Matt O'Brien, *ChatGPT-maker OpenAI signs deal with AP to license news stories*,
    THE ASSOCIATED PRESS (July 13, 2013) ...................................................... 6

NEWS CORP, *News Corp and OpenAI Sign Landmark Multi-Year Global Partnership*
    (May 22, 2024) .............................................................................................. 6

Press Release, SHUTTERSTOCK, *Shutterstock Expands Partnership with OpenAI, Signs
    New Six-Year Agreement to Provide High-Quality Training Data* (July 11, 2023) ................. 6

REUTERS, OpenAI strikes deal to bring Reddit content to ChatGPT (May 16, 2024) .......................... 6

Case No. 3:24-cv-03811-JSC
                                    Amicus Brief in Support of Preliminary Injunction Motion

THE ATLANTIC, *The Atlantic announces product and content partnership with OpenAI*
(May 29, 2024) ............................................................................................................... 6

Tim Ingham, *Spotify and Warner Music Group Agree New Global Licensing Deal,*
*MUSIC BUSINESS WORLDWIDE* (Apr. 1, 2020) ................................................................ 7

TIME, *TIME and OpenAI Announce Strategic Content Partnership* (June 27, 2024) .......................... 6

Tom Dotan, Berber Jin, Deepa Seetharaman, *Amazon to Invest Up to $4 Billion in*
*Anthropic as AI Arms Race Escalates*, WALL STREET JOURNAL (Sept. 25, 2023) ........................ 9

VOX MEDIA , *Vox Media and OpenAI Form Strategic Content and Product*
*Partnership*, (May 29, 2024) ............................................................................................ 6

## INTERESTS OF *AMICI CURIAE*[1]

*Amici curiae* submitting this memorandum ("*Amici*") are trade groups representing owners and authors of some of this country's most valuable creative content.  Many of the *Amici* have previously submitted comments to the U.S. Copyright Office on artificial intelligence ("AI") issues,[2] and many are members of the Human Artistry Campaign.[3]

RIAA is a nonprofit trade organization that supports and promotes the creative and financial vitality of recorded music and the people and companies that create it.  RIAA's several hundred members – ranging from major American music companies with global reach to artist-owned labels and small businesses – make up this country's most vibrant and innovative music community.  RIAA's members create, manufacture, and/or distribute sound recordings representing the majority of all legitimate recorded music consumption in the U.S., and own the copyrights and/or other exclusive rights in sound recordings embodying the performances of some of the most popular and successful recording artists of all time.  RIAA has been actively involved in representing the interests of its members as they relate to AI issues.

NMPA is the principal trade association representing the U.S. music publishing and songwriting industry.  NMPA's membership includes publishers of all sizes, from "major" music publishers to independently owned and operated publishers, who represent musical works of all genres.  Taken together, compositions owned or controlled by NMPA's hundreds of members account for the vast majority of musical compositions licensed for commercial use in the U.S.  NMPA has been actively engaged in the conversation around generative AI and its relationship with, and impact on, the creative economy, and has participated in numerous panels, roundtables and other industry discussions.

The Association of American Publishers, Inc. ("AAP") represents book, journal, and education

---

[1] No counsel for any party authored this brief in whole or in part, and no entity or person other than amici, their members, or their counsel made any monetary contribution intended to fund the preparation or submission of this brief.  Certain of the plaintiff music publishers in this lawsuit are among the members (or affiliates of such members) of amici the National Music Publishers' Association ("NMPA") and the Recording Industry Association of America ("RIAA"), each of whom also represents the interests of hundreds of other companies in the music industry.

[2] *See* https://www.regulations.gov/docket/COLC-2023-0006/comments.

[3] *See* https://www.humanartistrycampaign.com.

publishers in the U.S. on matters of law and policy, including major commercial houses, small and independent houses, and university presses and other noncommercial scholarly publishers.  AAP seeks to promote an effective and enforceable framework that enables publishers to create and disseminate a wide array of original works of authorship to the public on behalf of their authors.  AAP members support and embrace innovation, including responsibly designed AI tools that are accountable, transparent, and respect copyright protections.  The works AAP members publish are especially valuable to training generative AI systems, including because they provide high quality expression that results in commercially valuable, expressive output.  AAP has been actively involved in representing the interests of its members as they relate to AI issues.

The News/Media Alliance (the "Alliance") represents over 2,200 diverse publishers in the U.S. and internationally, ranging from the largest news and magazine publishers to hyperlocal newspapers, and from digital-only outlets to papers who have printed news since before the Constitutional Convention.  Its membership creates quality journalistic content that accounts for nearly 90 percent of daily newspaper circulation in the U.S., over 500 individual magazine brands, and dozens of digital-only properties.  The Alliance diligently advocates for newspapers, magazine, and digital publishers, and like the other *Amici*, has been active on AI issues, such as publishing a White Paper documenting systemic uses of media content in generative AI training, leading the development of global publisher AI principles, and participating in numerous discussions, including the U.S. Senate's AI Insight Forum.

Songwriters of North America ("SONA") is a membership-based advocacy organization formed by and for professional songwriters in 2015.  SONA advocates on behalf of songwriters' interests before legislative bodies, administrative agencies, and the courts.  SONA is an open and diverse community that unites enthusiastic music creators and thoughtful business leaders to create a unified voice to protect artistic expression, compensation, and the rights of songwriters in North America.  Regarding AI, SONA represented its members by participating in the recent U.S. Copyright Office Listening Sessions, and continues to advocate for and educate songwriters about AI developments.

Black Music Action Coalition ("BMAC") works to create a unified force of action for racial equity and justice within the music industry and to use the power of its collective voice to improve

communities and drive systemic change.  BMAC advocates on behalf of Black artists, songwriters, producers, managers, agents, executives, and lawyers to create access, equity and opportunity for Black artists and industry professionals.  BMAC works together with business leaders to hold companies accountable and ensure change takes root.  BMAC works to drive policy change around social and racial justice and protection of artists with a focus on causes that directly impact Black people and Black communities.  Regarding AI, BMAC advocates on behalf of a network of music managers, entertainment attorneys, and Black creatives, and participated in the U.S. Copyright Office's Listening Sessions.  In its ongoing fight for economic justice, AI is at the forefront of BMAC's agenda.

The Music Artists Coalition ("MAC") was founded by music creators and industry leaders to advocate on pressing topics that impact music creators.  MAC represents artists' and songwriters' interests without compromise because music creators should be driving the conversation about the issues that shape their lives.  MAC believes artists should have the opportunity to decide how best to protect the fate of their music, and that the advancement of AI can be a benefit to music creators and music lovers, but only if properly regulated so that artists' interests are protected.

The Artist Rights Alliance ("ARA") is an artist-run, non-profit organization fighting for the rights of working musicians in the modern music economy.  Co-founded by a group of dedicated artists including GRAMMY winner Rosanne Cash, ARA's Board of Directors includes award-winning producer/songwriter/engineer Ivan Barias, music manager Thomas Manzi, John McCrea of CAKE, critically acclaimed singer/songwriter Tift Merritt, guitar innovator Matthew Montfort, and Indie label executive and musician Maggie Vail.

The American Association of Independent Music ("A2IM") is a not-for-profit organization that exists to support and strengthen the independent recorded music sector and the value of recorded music copyrights.  Membership currently includes a broad coalition of hundreds of independently owned American music labels.  A2IM represents these small and medium-sized enterprises' interests in the marketplace, in the media, on Capitol Hill, and as part of the global music community.  In doing so, it supports a key segment of America's creative class that represents America's diverse musical and cultural heritage.  Billboard Magazine identified the independent music label sector as over 40% of the music industry's global recorded music revenue in 2020 based on copyright ownership.

**PROCEDURAL HISTORY**

*Amici* sought leave to file an amicus brief in support of the plaintiffs' ("Publishers") motion for a preliminary injunction against Anthropic PBC ("Anthropic") in the U.S. District Court, Middle District of Tennessee.  *Amici's* motion was pending when this case was transferred.  In their prior brief, *Amici*, *inter alia*, responded to various erroneous arguments made by Anthropic and putative *amici* supporting Anthropic, Chamber of Progress and NetChoice, LLC (together, "COP").  *Amici* now submit this brief, which incorporates and supersedes their prior brief, and which is offered in support of Publishers' preliminary injunction motion filed in this Court on August 1, 2024 (ECF No. 179, *et seq.*).

**PRELIMINARY STATEMENT**

AI programs that generate text and other media depend on the copying, on a massive scale, of existing works, which are then used to generate other works that substitute for and compete with the works that were copied.  Many of those copied works are under copyright, including Publishers' protected lyrics, as well as works by many of *Amici's* constituents.  Copying such copyrighted works without permission is illegal.

Recognizing that the law requires them to obtain such permission, many companies in the AI field have obtained licenses to use copyrighted content for AI model training and other purposes.  These companies are willing and able to comply with the law as they develop generative AI software.  But not Anthropic.  In order to obtain an advantage over its competitors, Anthropic has refused to license or compensate the authors and owners of the highly creative, copyrighted works that it copies and uses to generate competing works.  Anthropic has argued this is a "fair use."  It is not.

*Amici* respectfully submit this brief to offer the Court context concerning, *inter alia*, the licensing marketplace that reveals the hollowness of Anthropic's arguments, including its arguments that technological novelty and the inconvenience of licensing excuse its infringement.  These are the same tired (and rejected) arguments made by others who have used technology to infringe creative works on a massive scale.

AI can reach its full potential and respect the rights of creators at the same time.  The arguments that no one in the AI field, including Anthropic, can or should have to license copyrighted works before

copying and exploiting them are a pretense belied by industry practice and well-established legal principles.  Anthropic's infringement is harming copyright owners such as those represented by *Amici*, and their licensees, and if unchecked that harm will be irreparable.

<u>**ARGUMENT**</u>

**I.**    **ACCEPTING AI TECHNOLOGY'S BENEFITS DOES NOT REQUIRE ABANDONING COPYRIGHT LAW PRINCIPLES.**

Copyright law, "the engine of free expression," incentivizes and advances individual creativity and the public interest in the creation and distribution of new expressive works.  *See Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985).  To do so, the Copyright Act requires that those who wish to use such works obtain necessary authorizations, usually in the form of licenses that compensate the author or owner, prior to exploiting the works.

These principles have coexisted with technological progress for well over a hundred years.  Anthropic has, however, contended that its product, which concededly copies protected works on a massive scale, should be exempt from complying with copyright law.  (ECF No. 67 ("Def. Br.") at 28 (arguing compliance would "subvert the public interest by hampering access" to AI).)  Anthropic and COP have touted the potential of AI technology and suggested that an injunction against infringers such as Anthropic would supposedly threaten technological progress.  (*See id*.; Putative *Amici Curiae* Brief of Chamber of Progress and NetChoice, LLC, ECF Doc. 75-1 ("COP Br.") at 3-10.)

These are scare-tactic arguments.  Publishers' Motion (and this case) is not a referendum on the technology or the field of generative AI.  Rather, it concerns only the particular acts – the unlicensed reproduction and distribution of lyrics to musical works – by one party, Anthropic.  Enjoining Anthropic from copying the lyrics to Don McLean's "American Pie" will not hamper the development of technology that may someday help mitigate climate change or bring about a medical breakthrough.  (*See id.*)  The choice presented by Anthropic and COP between realizing the benefits of technology and enforcing copyright law is a false one.  Technology companies, like all others, must follow the law.

**A.**    **Anthropic Must License The Copyrighted Works That It Uses, Like Its Competitors Do.**

Anthropic's defense has been that supposedly AI technology is too important, and licensing is

too difficult, to require Anthropic to comply with the law.  (*E.g.*, Def. Br. at 6-7, 26.)  This argument is meritless.  There is no such thing as "fair use by reason of necessity."  *See, e.g.*, *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1535 (S.D.N.Y. 1991) (rejecting fair use argument that requiring licenses to reproduce excerpts of books in course packs would "halt the educational process"). And Anthropic ignores that many of its competitors ***are*** obtaining licenses.

For example, Adobe has stated a commitment to training its Firefly AI model solely on licensed and public domain content.[4]  NVIDIA has partnered with Getty Images to develop fully licensed generative AI models.[5]  Google has entered into a license with Reddit to use text on Reddit for training Google's AI models.[6]  YouTube is seeking to license songs to use to train its music-generating AI products.[7]  OpenAI, while seemingly having trained on some unlicensed data, nonetheless has entered into licensing deals with the Associated Press, Vox Media, News Corp, Dotdash Meredith, Time, The Atlantic, Financial Times, Le Monde, Prisa Media, Axel Springer, Reddit, and Shutterstock.[8]

These examples belie Anthropic's claim that its purported need to copy millions of works renders compliance impossible.  So too does technology companies' licensing of copyrighted works in similar contexts.  In music streaming, on-demand services including Spotify and Apple Music have

---

[4] *Adobe Firefly*, ADOBE, https://www.adobe.com/products/firefly.html.

[5] *Moving Pictures: NVIDIA, Getty Images Collaborate on Generative AI*, NVIDIA (Mar. 21, 2023) https://blogs.nvidia.com/blog/generative-ai-getty-images/.

[6] Anna Tong, Echo Wang, Martin Coulter, *Exclusive: Reddit in AI content licensing deal with Google*, REUTERS (Feb. 21, 2024).

[7] Jess Weatherbed, *YouTube is trying to make AI music deals with major record labels*, THE VERGE (June 27, 2024).

[8] Matt O'Brien, *ChatGPT-maker OpenAI signs deal with AP to license news stories*, THE ASSOCIATED PRESS (July 13, 2013); *Vox Media and OpenAI Form Strategic Content and Product Partnership*, VOX MEDIA (May 29, 2024); NEWS CORP, *News Corp and OpenAI Sign Landmark Multi-Year Global Partnership* (May 22, 2024); REUTERS, *Investopedia-owner Dotdash Meredith signs content license deal with OpenAI* (May 7, 2024); TIME, *TIME and OpenAI Announce Strategic Content Partnership* (June 27, 2024); THE ATLANTIC, *The Atlantic announces product and content partnership with OpenAI* (May 29, 2024); FINANCIAL TIMES, *Financial Times announces strategic partnership with OpenAI* (Apr. 29, 2024); REUTERS, *ChatGPT users to get access to news content from Le Monde, Prisa Media* (Mar. 14, 2024); Helen Coster, *Global news publisher Axel Springer partners with OpenAI in landmark deal*, REUTERS (Dec. 13, 2023); REUTERS, *OpenAI strikes deal to bring Reddit content to ChatGPT* (May 16, 2024); Press Release, SHUTTERSTOCK, *Shutterstock Expands Partnership with OpenAI, Signs New Six-Year Agreement to Provide High-Quality Training Data* (July 11, 2023).

negotiated and entered into licenses for tens of millions of sound recordings.[9]  Audiovisual services such as YouTube, and fitness services like Peloton, have licensed millions of recordings and songs.[10]  Lyrics services have likewise licensed the lyrics to millions of songs – the very same works that Anthropic used but chose not to license – a fact that was admitted by Anthropic's own witness.[11]

Anthropic's refusal to comply with copyright law is thus not representative of all of its competitors' practices, and so compelling Anthropic to cease infringing Publishers' copyrights does not threaten non-infringing competitors.  To the contrary, an injunction will help level the playing field for Anthropic's competitors that pay for copyrighted content that Anthropic takes for free, and encourage AI development in a sustainable manner.  And while Anthropic has previously admitted that its concern is that, by having to pay to use copyrighted works, it may lose the competitive "advantage" it currently enjoys (Hall Decl. ¶ 68), courts do not dignify the argument that a defendant should be allowed to continue infringing because ceasing such practices would harm its business interests.  *See, e.g.*, *Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 829 (9th Cir. 1997), *cert. denied*, 523 U.S. 1118 (1998); *BGC Inc. v. Robinson*, No. 22-cv-01582-JSW, 2022 WL 2915703, at *5 (N.D. Cal. July 25, 2022); *2Die4Kourt v. Hillair Cap. Mgmt., LLC*, 692 F. App'x 366, 369 (9th Cir. 2017).

Moreover, to be clear, Anthropic cannot plausibly claim that it lacks the means to license the creative content on which its technology depends.  It is a highly capitalized venture funded by some of the largest companies in the world – including Google and Amazon, two trillion-dollar companies that are themselves significant players in the AI space.[12]  Anthropic itself is valued in the tens of billions

---

[9] *See, e.g.*, Tim Ingham, *Spotify and Warner Music Group Agree New Global Licensing Deal,* MUSIC BUSINESS WORLDWIDE (Apr. 1, 2020); *Apple Music strikes new multiyear deals with major record labels*, FINANCIAL TIMES (Mar. 12, 2020).

[10] *Music Rights Management on YouTube*, YouTube, https://support.google.com/youtube/answer/7071269; *Music in the Air*, GOLDMAN SACHS (June 13, 2022), at 32, https://www.goldmansachs.com/intelligence/pages/gs-research/music-in-the-air/report.pdf.

[11] (Declaration of Dawn R. Hall, ECF Doc. 67-17 ("Hall Decl."), ¶ 41.)  *See also MusicXMatch for Publishers*, MUSICXMATCH, https://about.musixmatch.com/business/overview; *Publishing With LyricFind*, LYRICFIND, https://www.lyricfind.com/publishing.

[12] Ingrid Lunden, *Anthropic is expanding to Europe and raising more money*, TECHCRUNCH (May 13, 2024) (Lunden) (identifying Amazon, Google, Salesforce, SAP and Zoom as among "Anthropic's list of nearly 60 current investors"); *Amazon and Anthropic announce strategic collaboration to advance generative AI*, AMAZON (Sept. 25, 2023),

of dollars.[13]  There is no reason why Anthropic cannot pay the authors and owners of the works that it uses, and no public policy reason to create legal immunities for such a company.  *Cf. Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith* ("*Warhol*"), 143 S. Ct. 1258, 1286 (2023) ("It will not impoverish our world to require AWF to pay Goldsmith a fraction of the proceeds from its reuse of her copyrighted work.").

## B.  Requiring Anthropic to License the Copyrighted Works That It Uses Will Not Stifle Technological Progress.

Anthropic is also incorrect to portray copyright law as a supposed obstacle to innovation.  In fact, copyright is responsible for incentivizing creative expression to society's great benefit, and serving as a key driver for the American culture and economy.

The false choice that Anthropic and COP have presented between compliance with copyright law and technological progress is a well-worn, losing policy argument previously made by other mass infringers such as Napster and Grokster in their heyday.  Anthropic and COP even employ the same rhetoric as those pirate sites.  *Compare, e.g.*, Opposition of Defendant Napster, Inc. to Plaintiffs' Motion for Preliminary Injunction in *A&M Recs., Inc. v. Napster, Inc*., Nos. C 99-5183 MHP (ADR), C 00-0074 MHP (ADR), 2000 WL 34016494 (N.D. Cal. July 26, 2000) (contending that Napster's file-sharing service "has ignited a revolution" and that "extend[ing] judicially copyright protection [would] stifle a new technology") *with* Def. Br. at 1, 28 (contending AI is "revolutionary" and that an injunction would "hamper[] access to this highly useful, general-purpose technology") & COP Br. at 1 (arguing that an injunction "would stifle the promise and potential of this new technology").  *Compare also, e.g.*, Brief for Respondents in *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, No. 04-480, 2005 WL 508120 (U.S.), at *8 (Mar. 1, 2005) ("[P]eer-to-peer file-sharing software has obvious benefits….  Condemning its distribution as unlawful … would cause real social harm.") (internal citation omitted), *with* Def. Br. at 1, 3 (touting the "innumerable legitimate uses" and "applications" of

---

https://www.aboutamazon.com/news/company-news/amazon-aws-anthropic-ai; *Google Invests In Anthropic For $2 Billion As AI Race Heats Up*, FORBES (Oct. 31, 2023); *Alphabet A (Ex Google)*, MARKETS INSIDER, https://markets.businessinsider.com/stocks/googl-stock; *Amazon*, MARKETS INSIDER, https://markets.businessinsider.com/stocks/amzn-stock.

[13] Lunden; *see also* Marlize van Romburgh, *Anthropic Reportedly In Talks To Raise $750M At $18B-Plus Valuation,* CRUNCHBASE NEWS (Dec. 21, 2023) ("Romburgh").

1   Anthropic's tool and of AI more generally that could supposedly be lost through an injunction), COP

2   Br. at 14 (arguing an injunction would "deprive the public of generative AI's substantial benefits").

3       In the file sharing cases, the courts (including the Supreme Court) rightfully rejected those

4   arguments; indeed, in *Napster* this Court granted a preliminary injunction to the plaintiffs.  *A&M Recs.,*

5   *Inc. v. Napster, Inc.*, 114 F. Supp. 2d 896, 911-25 (N.D. Cal. 2000), *affirmed in part, reversed in part,*

6   *and remanded for modification of injunction by* 239 F.3d 1004 (9th Cir. 2001); *MGM Studios Inc. v.*

7   *Grokster, Ltd.*, 545 U.S. 913 (2005); *Basic Books*, 758 F. Supp. at 1535.  Far from stifling growth,

8   prohibiting bad actors from engaging in illegal practices while file downloading technology developed

9   helped the responsible, licensed business models employing that technology to flourish – such as

10  Apple's iTunes store, which paid for the content it offered.[14]

11      Anthropic's suggestion that a Court decision enforcing well-established copyright principles

12  and requiring it to license the copyrighted works that it copies would jeopardize its operations is also

13  belied by the market response to this lawsuit.  In October 2023, one week after this case was filed,

14  Google reportedly agreed to invest up to $2 billion in Anthropic, on top of the $4 billion Amazon had

15  already committed to invest.  In December, Anthropic was engaged in yet another funding round.

16  Anthropic reportedly "more than triple[d] its valuation" over the course of 2023, reaching $15 billion

17  in value in December 2023, the month ***after*** Publishers filed their original preliminary injunction

18  motion in Tennessee.[15]  By early 2024, Anthropic had reportedly raised $8 billion, at an $18.4 billion

19  valuation.[16]

20

21

22

23

24  [14] Jeff Goodell, *Steve Jobs: Rolling Stone's 2003 Interview*, ROLLING STONE (Oct. 6, 2011) (quoting
    Steve Jobs: "If copyright dies, if patents die, if the protection of intellectual property is eroded, then
25  people will stop investing.  That hurts everyone. . . .  It is corrosive to one's character to steal.  We
    want to provide a legal alternative.").

26  [15] Berber Jin, Miles Kruppa, *Google Commits $2 Billion in Funding to AI Startup Anthropic*, WALL
    STREET JOURNAL (Oct. 27, 2023); Tom Dotan, Berber Jin, Deepa Seetharaman, *Amazon to Invest Up*
27  *to $4 Billion in Anthropic as AI Arms Race Escalates*, WALL STREET JOURNAL (Sept. 25, 2023);
    Romburgh.

28  [16] *See* Lunden.

## II.    A PRELIMINARY INJUNCTION AGAINST ANTHROPIC IS APPROPRIATE

*Amici* and their members have a significant interest in this Court applying well-settled copyright principles to undisputed facts on this Motion, particularly where the infringement is on a massive scale.

### A.    The Motion Entails Applying Well-Established Copyright Principles to Admitted Facts.

Anthropic previously admitted many facts that are fundamental to the Motion.  It admitted its AI platform is capable of generating reproductions or derivative works of copyrighted material, and that its platform did so in the case of Publishers' lyrics.  (*See* Def. Br. at 7.)  It did not deny that it trained its AI model on Publishers' lyrics.  (Declaration of Jared Kaplan, ECF No. 67-1 ("Kaplan Decl."), ¶ 21 (acknowledging Anthropic may have done so via, *inter alia*, the Common Crawl dataset).)[17]  It has not claimed to have obtained a single license to undertake any copying.

Anthropic further admitted that it, not its users or another third party, trained its AI models, and that it can exercise direct control over its platform's output.  (*See, e.g.*, Kaplan Decl. ¶ 21; Def. Br. at 7.)[18]  Companies like Anthropic whose technology plays an active role in infringing are directly liable just the same as if their flesh-and-blood employees performed such actions.  *Cook v. Meta Platforms Inc.*, No. 4:22-CV-02485-YGR, 2023 WL 6370891, at *4-5 (N.D. Cal. Jan. 4, 2023) (rejecting Facebook's claim that targeted advertising on its platform is non-volitional where Facebook made user data available, monitored ads, and could change target audiences); *Stross v. Meta Platforms, Inc.*, No. 2:21-CV-08023-MCS-AS, 2022 WL 1843129, at *3 (C.D. Cal. Apr. 6, 2022) ("There is no basis in the law to conclude that active management of a website, which would constitute volitional conduct if performed by a human, fails to meet that element because an algorithm designed by a human engineer manages the website instead.").

Although Anthropic has argued its model does not "store" copyrighted works, that is a red herring.  (*See* Def. Br. at 6, 15-16.)  Publishers need not demonstrate storage in order to prevail on

---

[17] Anthropic has not offered any theory for how its large language model, Claude, is able to include Publishers' lyrics in its output other than by having previously been trained on those lyrics.

[18] Anthropic has claimed that the "mix" of content on which it has trained Claude is ***"proprietary" to it***.  (*Id*. ¶ 22.)  Not only is it audacious for Anthropic to claim a proprietary interest in content it argues the content's own creators have no right to protect, but its claim to an interest in its selection further demonstrates volitional conduct and an ability to cease training on particular content.

1   claims of copying and distribution.  That representation is also dubious.  If Claude does not "store" the

2   lyrics to "American Pie," for example, it would not be able to reproduce those lyrics in response to the

3   query, "Write me a song about the death of Buddy Holly."  (Complaint ¶ 73.)

4         What Anthropic is doing is also not "fair use" as it has claimed.  (*See* Def. Br. at 22-27.)  With

5   respect to the first fair use factor, Anthropic's use is for a commercial purpose.  By copying and

6   displaying lyrics on its own platform (rather than directing users to view the lyrics on licensed third-

7   party sites), Anthropic usurps those lyrics' commercial value to both the licensed third-party sites and

8   to their copyright owners (whose ability to license and collect royalties from such sites is diminished).

9   *See Harper & Row Publishers*, 471 U.S. at 562 ("The crux of the [first factor's] profit/nonprofit

10  distinction is not whether the sole motive of the use is monetary gain but whether the user stands to

11  profit from exploitation of the copyrighted material without paying the customary price.").  Anthropic

12  stands to profit from exploiting the very same lyrics it scrapes from websites that license those lyrics.

13  *See, e.g.*, *Warhol*, 143 S. Ct. at 1274-80 ("[T]he first factor relates to the problem of substitution—

14  copyright's bête noire.  . . .  If the secondary use "is of a commercial nature," that "tends to weigh

15  against a finding of fair use.").

16        Anthropic's use of the lyrics is decidedly not "transformative."  Anthropic has not transformed

17  the lyrics themselves – it copied them verbatim in training, and copied them again in response to queries

18  *See, e.g.*, *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 455 (9th Cir. 2020), *cert. denied*,

19  141 S. Ct. 2803 (2021) (defendant's mere "repackaging, copying, and lack of critique of [the plaintiff's

20  copyright works], coupled with its commercial use of [same], do not result in a transformative use");

21  *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 552-61 (S.D.N.Y. 2013)

22  (program that scraped news articles on the web and provided excerpts of same to end users was not

23  transformative nor a fair use).  Nor is converting lyrics into "tokens" and then converting them back

24  into lyrics in response to queries a transformative use.  *Napster, Inc.*, 239 F.3d at 1015 ("Courts have

25  been reluctant to find fair use when an original work is merely retransmitted in a different medium.").

26        Anthropic's purpose is also not "transformative."  It copies copyrighted content to provide that

27  content, or derivatives thereof, to its users.  It wants to be the destination for getting any type of written

28

content, on demand.[19]  "The use of an original work to achieve a purpose that is the same as, or highly similar to, that of the original work is more likely to substitute for, or supplan[t], the work," which "weigh[s] against a finding of fair use."  *Warhol*, 143 S. Ct. at 1274, 1280.[20]

The other fair use factors also weigh heavily in favor of Publishers.  Their works are expressive and creative (factor two), and they are copied in their entirety by Anthropic in its training and also verbatim or nearly so in Anthropic's output (factor three).  As for potential market harm (factor four), where the harm is to a licensing market, as Anthropic acknowledges, courts consider whether a licensing market exists or is likely to be developed.  (*See* Def. Br. at 26.)  As discussed *supra*, such a market already exists for training AI models, and its continued development must not be impeded by free riders.  And music publishers and songwriters also license lyrics sites in exchange for royalties.  If lyrics can be obtained from Anthropic, there will be no need for its users to go to those licensed sites, hindering copyright owners' efforts to license in the future.[21]

## B.    The Public Interest Is Best Served By Granting Publishers' Motion.

Any further delay in enjoining Anthropic's misconduct may lead to its infringing models becoming ever more entrenched in our society, to the detriment of copyright owners as well as Anthropic's competitors that pay to license the works for their AI platforms.  If Anthropic is not enjoined immediately, it may be too late for AI models that avoided training on copyrighted works or

---

[19]  *See Press Release, Introducing Claude*, Anthropic (Mar. 14, 2023), https://www.anthropic.com/news/introducing-claude ("Claude can help with . . . summarization, search, creative and collaborative writing, Q&A, coding, and more."); *Meet Claude*, Anthropic, https://www.anthropic.com/product ("Claude has extensive general knowledge honed from its vast training corpus, with detailed background on technical, scientific, and cultural knowledge."); *Claude Android app*, Anthropic (July 16, 2024) ("Whether you're drafting a business proposal between meetings, translating menus while traveling, brainstorming gift ideas while shopping, or composing a speech while waiting for a flight, Claude is ready to assist you.").

[20]  In this respect, Anthropic's copying of lyrics in training its model would not be fair use even if it did not (as the facts show) result in output that consists of verbatim or near-verbatim copies of lyrics, or derivatives thereof, but rather, new lyrics that compete with the originals.  *See id.*

[21]  Anthropic and COP previously pointed to other AI cases filed by different plaintiffs against different defendants with different facts to argue that Publishers are not entitled to an injunction.  (Def. Br. at 20-21; COP Br. at 13-14.)  Many of those cases are class action lawsuits not conducive to preliminary adjudication and many have been bogged down by the defendants through motion practice.  While Anthropic has claimed that the plaintiffs in certain of those actions purport to represent Publishers (Def. Br. at 2), Publishers did not bring those actions and are not bound by positions taken therein.  The issues here are ripe for preliminary adjudication regardless of the posture and issues in other cases.

licensed such uses to "catch up." Indeed, this appears to be Anthropic's admitted strategy.[22]

At the same time, copyright owners will suffer enormous damage from Anthropic's ongoing infringement. The full extent of such damage is incalculable, but very real. Anthropic's infringement imperils the fundamental manner by which content creators are compensated. By seeking to become the destination for users to access (unlicensed) copies of copyrighted content, Anthropic unfairly competes with and usurps those who pay copyright owners for the right to use protected content.

Development of AI cannot come at the cost of harming creators, rightsholders, or their licensees. U.S. copyright industries contributed nearly $3 trillion to GDP in 2021 and employed over 15 million workers.[23] Protecting copyrights is also a Constitutional mandate, one that incentivizes the creation and licensed dissemination of new works, with immense attendant public benefits. The Copyright Act balances those benefits with the interests of those seeking to develop new technologies. Enforcing the Copyright Act against Anthropic is necessary to ensure that the owners of copyrighted content do not become casualties of the technology industry's relentless pursuit of profits under the guise of so-called "progress."

### CONCLUSION

For the foregoing reasons, *Amici* respectfully request that the Motion be granted.

Dated: August 5, 2024

Respectfully submitted,

PRYOR CASHMAN LLP

*s/ Benjamin S. Akley*
Benjamin S. Akley (State Bar No. 278506)
1801 Century Park East
Los Angeles, CA 90067
(310)683-6900
bakley@pryorcashman.com

---

[22] (Hall Decl. ¶ 67 ("particularly [for] AI, the importance of entering the market early is of utmost importance, with all major technology companies clamoring to create a niche for themselves with enhanced products and new product offerings, while the late entrants try to play catch-up.").)

[23] Robert Stoner et al., *Copyright Industries in the U.S. Economy, 2022 Report*, IIPA, at 8, https://www.iipa.org/files/uploads/2022/12/IIPA-Report-2022_Interactive_12-12-2022-1.pdf.

Frank P. Scibilia (*pro hac vice* admission pending)
Joshua Weigensberg (*pro hac vice* admission pending)
Maya Katalan (*pro hac vice* admission pending)
7 Times Square, 40th Fl.
New York, NY 10036
(212) 421-4100
fscibilia@pryorcashman.com
jweigensberg@pryorcashman.com
mkatalan@pryorcashman.com

*Counsel for Amici*

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on August 5, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send Notices of Electronic Filing to all counsel of record.

*s/ Benjamin S. Akley*
Benjamin S. Akley
