**LATHAM & WATKINS LLP**
  Joseph R. Wetzel (SBN 238008)
  *joe.wetzel@lw.com*
  Andrew M. Gass (SBN 259694)
  *andrew.gass@lw.com*
  Brittany N. Lovejoy (SBN 286813)
  *brittany.lovejoy@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, California  94111
Telephone:  415.391.0600

  Sarang V. Damle (admitted *pro hac vice*)
  *sy.damle@lw.com*
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004

  Allison L. Stillman (admitted *pro hac vice*)
  *alli.stillman@lw.com*
1271 Avenue of the Americas
New York, New York 10020
Telephone: 212.906.1747

*Attorneys for Defendant Anthropic PBC*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., ET AL. | Case No. 5:24-cv-03811-EKL |
| Plaintiffs, | **DEFENDANT ANTHROPIC PBC'S OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION** |
| vs. | |
| ANTHROPIC PBC, | **Hon. Eumi K. Lee** |
| Defendant. | Hearing Date: TBD<br>Time: TBD<br>Courtroom: 7, 4th Floor |
| | **REDACTED** |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ANTHROPIC'S OPP. TO RENEWED
MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

    A.    Claude is a general-purpose AI assistant, not a lyrics database............................ 3

    B.    Claude learns the patterns of language from trillions of tiny textual data points. .................................................................................................... 4

    C.    Given the volume of data required, some copyrighted works may be used in training Claude............................................................................. 6

    D.    Anthropic works hard to prevent Claude from outputting undesired responses, including copyrighted content. ............................................ 6

    E.    Plaintiffs seek extraordinary and unwarranted injunctive relief. ........................... 8

LEGAL STANDARD ........................................................................................................ 10

ARGUMENT .................................................................................................................... 10

I.    This Court Should Deny Plaintiffs' Request for Extraordinary Relief ......................................... 10

    A.    Plaintiffs cannot show irreparable harm absent injunctive relief......................... 10

        1.    There is no reasonable expectation that the complained-of activity is likely to recur. .................................................................... 11

        2.    The alleged harms Plaintiffs identify are speculative and/or reparable by monetary damages.................................................. 13

        3.    Plaintiffs' delay in pursuing preliminary relief belies their claims of irreparable harm. ................................................. 15

    B.    Plaintiffs cannot show a likelihood of success on the merits with respect to either of their two theories of direct infringement.............................. 16

        1.    Plaintiffs cannot show a likelihood of success on the merits with respect to their infringement claims concerning Claude's training .............................................................. 17

        2.    Plaintiffs cannot show a likelihood of success on the merits with respect to their infringement claim concerning Claude's outputs.............................................................. 25

    C.    The balance of equities and public interest tip in Anthropic's favor .................... 26

II.    Plaintiffs' Requested Injunction Is Overbroad................................................................... 27

CONCLUSION ................................................................................................................. 28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

i

ANTHROPIC'S OPP. TO RENEWED
MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**CASES**

*3M Unitek Corp. v. Ormco Co.*,
 96 F. Supp. 2d 1042 (C.D. Cal. 2000) ...................................................27

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
 562 F.3d 630 (4th Cir. 2009) ......................................................18, 21

*ABKCO Music, Inc. v. Sagan*,
 50 F.4th 309 (2d Cir. 2022) ...............................................................14

*Alliance for the Wild Rockies v. Cottrell*,
 632 F.3d 1127 (9th Cir. 2011) ......................................................10, 11

*Am. Geophysical Union v. Texaco Inc.*,
 60 F.3d 913 (2d Cir. 1994)..................................................................23

*American Passage Media Corp. v. Cass Comm'cns, Inc.*,
 750 F.2d 1470 (9th Cir. 1985) ............................................................13

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
 598 U.S. 508 (2023).............................................................18, 19, 20

*Associated Press v. Meltwater U.S. Holdings, Inc.*,
 931 F. Supp. 2d 537 (S.D.N.Y. 2013)...................................................20

*Authors Guild v. Google, Inc.*,
 804 F.3d 202 (2d Cir. 2015)...............................................17, 18, 20, 21

*Authors Guild, Inc. v. HathiTrust*,
 755 F.3d 87 (2d Cir. 2014)...........................................................18, 24

*Bell v. Eagle Mountain Saginaw Indep. Sch. Dist.*,
 27 F.4th 313 (5th Cir. 2022) ...............................................................23

*Bill Graham Archives v. Dorling Kindersley, Ltd.*,
 448 F.3d 605 (2d Cir. 2006)................................................................21

*Boardman v. Pac. Seafood Grp.*,
 822 F.3d 1011 (9th Cir. 2016) .............................................................11

*Brach v. Newsom*,
 38 F.4th 6 (9th Cir. 2022) ..............................................................11, 12

*Cambridge Univ. Press v. Patton*,
 769 F.3d 1232 (11th Cir. 2014) ...........................................................24

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994)................................................................................18, 22, 24, 27

*Center for Food Safety v. Vilsack*,
    636 F.3d 1166 (9th Cir. 2011) ..............................................................................16

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983)................................................................................................12

*Disney Enters., Inc. v. VidAngel, Inc.*,
    869 F.3d 848 (9th Cir. 2017) ................................................................................20

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006)..............................................................................................14

*Fahmy v. Jay-Z*,
    908 F.3d 383 (9th Cir. 2018) ................................................................................15

*Famous Birthdays, LLC v. SocialEdge, Inc.*,
    2022 WL 1592726 (C.D. Cal. Feb. 11, 2022)......................................................16

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
    82 F.4th 664 (9th Cir. 2023) ................................................................................10

*Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*,
    654 F.3d 989 (9th Cir. 2011) ..........................................................................10, 15

*Fox Broad. Co. v. Dish Network LLC*,
    747 F.3d 1060 (9th Cir. 2014) ..............................................................................14

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) ....................................................................10, 15, 16

*Goldie's Bookstore, Inc. v. Superior Court*,
    739 F.2d 466 (9th Cir. 1984) ................................................................................14

*Google LLC v. Oracle Am., Inc.*,
    593 U.S. 1 (2021)......................................................................................18, 20, 27

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*,
    736 F.3d 1239 (9th Cir. 2013) ..............................................................................13

*Hunley v. Instagram, LLC*,
    73 F.4th 1060 (9th Cir. 2023) ..............................................................................25

*In re Excel Innovations, Inc.*,
    502 F.3d 1086 (9th Cir. 2007) ..............................................................................11

*In re Meta Pixel Healthcare Litig.*,
    647 F. Supp. 3d 778 (N.D. Cal. 2022) ..................................................................27

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN FRANCISCO

iii

ANTHROPIC'S OPP. TO RENEWED
MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL

*Int'l Medcom v. S.E. Int'l, Inc.*,
  2015 WL 7753267 (N.D. Cal. Dec. 2, 2015) .........................................................................16

*Kelly v. Arriba Soft Corp.*,
  336 F.3d 811 (9th Cir. 2003) ..............................................................................................18

*Klein v. City of San Clemente*,
  584 F.3d 1196 (9th Cir. 2009) ............................................................................................10

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
  941 F.2d 970 (9th Cir. 1991) ..............................................................................................28

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  387 F.3d 522 (6th Cir. 2004) ..............................................................................................20

*Lilith Games (Shanghai) Co. v. UCool, Inc.*,
  2015 WL 5591612 (N.D. Cal. Sept. 23, 2015) ....................................................................26

*McGucken v. Pub Ocean Ltd.*,
  42 F.4th 1149 (9th Cir. 2022) .............................................................................................20

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005) (Breyer, J., concurring) .....................................................................27

*Mitchell v. 3PL Sys., Inc.*,
  2013 WL 12129617 (C.D. Cal. Apr. 8, 2013) .....................................................................28

*Monster Energy Co. v. Integrated Supply Network, LLC*,
  2021 WL 2986355 (C.D. Cal. Mar. 10, 2021) ....................................................................12

*N.D. v. Reykdal*,
  102 F.4th 982 (9th Cir. 2024) .............................................................................................10

*Ncontracts LLC v. Holmberg*,
  2022 WL 17724148 (M.D. Tenn. Dec. 15, 2022) ...............................................................15

*Newton v. Diamond*,
  204 F. Supp. 2d 1244 (C.D. Cal. 2002) ..............................................................................21

*Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*,
  762 F.2d 1374 (9th Cir. 1985) ............................................................................................16

*Ojmar US, LLC v. Sec. People, Inc.*,
  2017 WL 2903143 (N.D. Cal. July 7, 2017).......................................................................16

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*,
  923 F. Supp. 1231 (N.D. Cal. 1995) ...................................................................................28

*Richmond v. Weiner*,
  353 F.2d 41 (9th Cir. 1965) ................................................................................................25

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iv

ANTHROPIC'S OPP. TO RENEWED
MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL

*Rivera v. Remington Designs, LLC*,
   2017 WL 3476996 (C.D. Cal. July 7, 2017) ......................................................................26

*Sega Enters. Ltd. v. Accolade, Inc.*,
   977 F.2d 1510 (9th Cir. 1992) ...............................................................................18, 20, 21

*Seltzer v. Green Day, Inc.*,
   725 F.3d 1170 (9th Cir. 2013) .........................................................................................21, 22

*Sony Comput. Ent., Inc. v. Connectix Corp.*,
   203 F.3d 596 (9th Cir. 2000) ............................................................................................18

*Splunk Inc. v. Cribl, Inc.*,
   2024 WL 2701627 (N.D. Cal. May 24, 2024) ...................................................................20

*Stern v. Does*,
   978 F. Supp. 2d 1031 (C.D. Cal. 2011) ............................................................................21

*Stormans, Inc. v. Selecky*,
   586 F.3d 1109 (9th Cir. 2009) ..........................................................................................27

*Strike 3 Holdings, LLC v. Andaya*,
   2021 WL 5123643 (N.D. Cal. Nov. 4, 2021) ....................................................................28

*Swarmify, Inc. v. Cloudflare, Inc.*,
   2018 WL 1142204 (N.D. Cal. Mar. 2, 2018) ....................................................................16

*Swatch Grp. Mgmt. Servs., Ltd. v. Bloomberg L.P.*,
   756 F.3d 73 (2d Cir. 2014) ...............................................................................................23

*Thomson Reuters Enter. Ctr. GmbH v. Ross Intel., Inc.*,
   694 F. Supp. 3d 467 (D. Del. Sept. 25, 2023) ...............................................2, 20, 21, 24

*Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*,
   953 F.3d 638 (9th Cir. 2020) ..................................................................................21, 23, 24

*UMG Recs. v. Suno, Inc.*,
   1:24-cv-11611 (D. Mass.) ...................................................................................................2

*UMG Recs. v. Unchartered Labs, Inc.*,
   1:24-cv-04777 (S.D.N.Y.) ...................................................................................................2

*Winter v. Natural Resources Defense Council*,
   555 U.S. 7 (2008) ...........................................................................................10, 11, 27

**STATUTES**

17 U.S.C. § 107 ...............................................................................................................18

17 U.S.C. § 107(3) ...........................................................................................................21

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

v

ANTHROPIC'S OPP. TO RENEWED
MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL

1

## OTHER AUTHORITIES

2

11A Wright & Miller Fed. Prac. & Proc. § 2942 (3d ed. 2019) ......................................11

3

5 Nimmer on Copyright § 14.06 (2023) .......................................................................28

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## INTRODUCTION

In their Renewed Motion for a Preliminary Injunction ("Mot.," Dkt. 179), Plaintiffs seek an order condemning one of the leading tools of generative artificial intelligence as unlawful. It is not. But the Court need not reach that issue to deny the relief sought, because Plaintiffs' claims of irreparable harm are untimely and unlikely on their face. After months of delay in seeking relief, Plaintiffs now effectively concede the precautions Anthropic implemented in response to their concerns work, making any claimed injury purely speculative. Plaintiffs will have ample opportunity after the close of discovery, only seven months away under Plaintiffs' proposed extension, to test their substantive legal theories, and Anthropic will demonstrate on a complete record why their attack on this new category of digital tools misconceives both the technology and the law. At this stage, the Court should simply find that reaching those substantive issues is unnecessary to deny the motion, which comes nearly a year after Plaintiffs filed this action.

Plaintiffs originally moved for a preliminary injunction nine months ago. Dkt. 40. Even then, their request was delayed: they learned of the alleged infringement at least five months earlier, when they allegedly prompted Anthropic's generative AI tool to regurgitate their song lyrics in June 2023. *See* Decl. of Brittany Lovejoy ("Lovejoy Decl.") Ex. B at 5–6 (also admitting they prompted allegedly infringing outputs in July, August, and September 2023). Instead of promptly notifying Anthropic of these outputs, Plaintiffs chose to sit on their claims until October, when they filed this lawsuit in Tennessee—"a strategic decision" that risked delay rather than "play[ing] it safe by filing in a forum that clearly has personal jurisdiction." Dkt. 123 at 23–24 (citation omitted). The delay caused by Plaintiffs' failed attempt at litigation gamesmanship is entirely of their own making, and by itself warrants denying their motion.

On the merits, Plaintiffs effectively seek two different injunctions for two separate allegations of infringement. The Court should deny both.

*First*, Plaintiffs seek relief from Anthropic's alleged use of their songs as an infinitesimally small fraction of the trillions of tokens used to train the "large language model," or "LLM," underlying its generative AI service. That same substantive issue—whether generative AI companies can permissibly use copyrighted content to train LLMs without

licenses—is currently being litigated in roughly two dozen copyright infringement cases around the country, *none* of which has sought to resolve the issue in the truncated posture of a preliminary injunction motion. It speaks volumes that no other plaintiff—including the parent company record label of one of the Plaintiffs in this case—has sought preliminary injunctive relief from this conduct. *See UMG Recs. v. Suno, Inc.*, 1:24-cv-11611 (D. Mass.); *UMG Recs. v. Unchartered Labs, Inc.*, 1:24-cv-04777 (S.D.N.Y.). While Anthropic is confident that using copyrighted content as training data for an LLM is a fair use under the law—meaning that it is not infringement at all—there is no basis to conclude that money damages would not make Plaintiffs whole if they ultimately prevailed on the merits. The Court, accordingly, should not stretch on this underdeveloped record to get ahead of the other cases where the analogous substantive copyright issue will be adjudicated on a full summary judgment or trial record. *Cf. Thomson Reuters Enter. Ctr. GmbH v. Ross Intel., Inc.*, 694 F. Supp. 3d 467, 476–487 (D. Del. Sept. 25, 2023) (addressing the issue on summary judgment and denying cross motions). That said, if the Court does choose to grapple with the issue, it should conclude there is no likelihood of success on the merits of this novel claim, which no other court has endorsed to date.

*Second*, Plaintiffs seek injunctive relief based on their alleged use of Anthropic's generative AI tool to elicit some of their own copyrighted song lyrics. As a threshold matter, Anthropic's tool is not designed to output copyrighted material, and Anthropic has always had guardrails in place aimed at preventing this result. If those measures failed in some instances many months ago, that would have been a "bug," not a "feature," of the product. But here again, events have overtaken Plaintiffs' motion. In its current iteration, Plaintiffs effectively concede that additional guardrails Anthropic has implemented are effective at preventing what Plaintiffs supposedly did in the past. As the Motion itself says, Plaintiffs "take Anthropic at its word" that those guardrails work, even as Plaintiffs continue to refuse in discovery to disclose any information about failed attempts to pierce those, and prior, guardrails. This relief Plaintiffs seek—an order preventing Anthropic's tool from outputting those lyrics in response to future users' queries—is thus moot, and Plaintiffs cannot show any ongoing or future harm they will suffer (let alone "irreparable" harm) between now and trial absent that relief.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    Ultimately, the Court need not reach the merits of Plaintiffs' dual infringement theories

2    to deny them the preliminary injunction they seek, because Plaintiffs have failed to establish they

3    would suffer irreparable harm between now and trial in the absence of such extraordinary relief.

4    Each of the other three preliminary injunction factors likewise points in Anthropic's favor.

5    Respectfully, the Court should deny this Motion.

6    **BACKGROUND**

7    **A.  Claude is a general-purpose AI assistant, not a lyrics database.**

8    Anthropic is an AI safety and research company headquartered in San Francisco that

9    aims to create reliable, beneficial AI systems. Decl. of Jared Kaplan ("Kaplan Decl.") ¶ 7; Decl.

10   of Brittany N. Lovejoy ("Lovejoy Decl.") Ex. C. Anthropic's mission is to ensure transformative

11   AI helps people and society flourish by building frontier systems, studying their behaviors,

12   working to responsibly deploy them, and regularly sharing safety insights. Lovejoy Decl. Ex. D.

13   Anthropic's signature product is a series of AI models called Claude. Kaplan Decl. ¶ 8; Lovejoy

14   Decl. Ex. E. Users can submit various forms of queries known as "prompts" to Claude, and

15   Claude in turn answers or otherwise responds. After forming in early 2021, Anthropic released

16   Claude to certain business users in late 2022 and released Claude 2 in July of last year. Kaplan

17   Decl. ¶ 8. Since this lawsuit's filing, Anthropic released the Claude 3 model family (Haiku,

18   Sonnet, and Opus) in March 2024, and Claude 3.5 Sonnet at the end of June 2024. *Id.*

19   A generative AI model like Claude is designed and intended to respond as an intelligent

20   human would to a vast array of user prompts. In practice, businesses use Claude to develop

21   online tutoring programs, evaluate proposed contracts, facilitate productivity and product

22   management improvements, and more. *Id.* ¶ 13. Typical individual users, meanwhile, rely on

23   Claude to assist with original writing projects, such as editing, rewriting, and summarizing;

24   brainstorming and problem solving; and drafting professional emails. *Id.* ¶ 12. They also use

25   Claude to help them develop their own creative outputs. *Id.* ¶¶ 10–12, 14.

26   Typical Anthropic users do not request song lyrics from Claude. *See id.* ¶¶ 15–16. There

27   would be no reason to: song lyrics are available from a slew of freely accessible websites.

28   Compl. ¶¶ 46, 60; Declaration of Dawn Hall ("Hall Decl.") ¶ 41.

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

3

ANTHROPIC'S OPP. TO RENEWED
MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL

**B. Claude learns the patterns of language from trillions of tiny textual data points.**

AI models like Claude are built from a technological tool known as a "neural network"—a computer program inspired by the human brain, capable of studying enormous sets of data to identify and extract statistical patterns in data. Kaplan Decl. ¶ 17. The process of training a text-based LLM like Claude starts by showing the underlying software engine many, many examples of pre-existing text, so it can learn language patterns and the typical relationships between words and phrases. *Id.* ¶¶ 17–21. The ultimate goal is "to develop a probabilistic but comprehensive map of how language works." *Id.* ¶ 20. More precisely, AI models like Claude ingest hundreds of millions, if not *billions*, of pieces of textual content, which they break down into trillions of component parts known as "tokens." *Id.* ¶¶ 18–19, 22. The models then analyze the "tokens to discern statistical correlations—often at staggeringly large scales—among features of the content on which the model is being trained." Lovejoy Decl. Ex. F at 159. Those statistical correlations effectively yield "insights about patterns of connections among concepts or how works of [a particular] kind are constructed." *Id.* Based on those insights, AI models like Claude are able to create new, original outputs with a degree of sophistication and verisimilitude that approximates human capabilities. Kaplan Decl. ¶¶ 5–6.

The texts from which the ▮▮▮▮▮▮▮ of tokens used to train Anthropic's newest model (Claude 3.5 Sonnet) were derived came from a combination of publicly available information from the Internet, as well as non-public data from third parties, data provided by data labeling services and paid contractors, and data Anthropic generates internally. *Id.* ¶¶ 28–29 & Ex. C at 3. Anthropic uses data generated internally and non-public data from third parties to supplement, rather than replace, publicly available information on the Internet because optimizing Claude's performance requires the use of increasing amounts of data. *Id.* ¶¶ 28–30. That is to say that the essential characteristic of this "training corpus," as the datasets used to train generative AI models are known, is its scale. It would not be possible to create a product like Claude without many *trillions* of tokens of pre-existing text. *Id.* ¶¶ 22, 25–26.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

ANTHROPIC'S OPP. TO RENEWED
MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL

1    In addition to the sheer volume of tokens, LLMs like Claude require diversity among the

2    types of tokens they are trained on. *Id.* ¶¶ 23–25. These are, after all, general purpose tools,

3    which will have no familiarity with any genre of content they have not encountered. For the

4    model to be able to respond sensibly to queries about rap music, or cheesecake recipes, or

5    physics equations, it must have been shown examples of texts that approximate those concepts.

6    But critically, the purpose of including instances of those genres in the training dataset is not to

7    ultimately replicate the particular way any original author expressed the idea embodied in the

8    text—which is what copyright law protects. It is to expose the model to the full range of types of

9    texts that exist, encompassing as broad an array of facts as possible, so that the model can

10   synthesize the information embodied in the texts into new and different outputs. *Id.*; *see also*

11   Declaration of Ben Y. Zhao ("Zhao Decl."), Dkt. 181 ¶ 44 (recognizing that training on

12   Plaintiffs' lyrics "enables Claude's generation of outputs generally by adding to its overall

13   lexicon as part of the larger training dataset").

14   In service of achieving that goal, Claude does not use its training texts as a database from

15   which pre-existing outputs are selected in response to user prompts. Instead, it uses the statistical

16   correlations gleaned from analyzing texts to construct a model of how language operates and

17   what it means. Kaplan Decl. ¶¶ 19–21, 36. The model represents those correlations in a series of

18   numerical parameters (sometimes called "weights" and "biases") that enable software to generate

19   responses to requests from end users. *Id.* ¶¶ 20–21. Those parameters are what the model

20   stores—not the texts of the training data. *Id.* ¶ 36.



21   

22   *Id.* ¶¶ 60–61.

23   *Id.* ¶ 60.

24   *Id.*

25   , without incurring

26   immense and incalculable harm not just to Anthropic, but also to the users who will benefit from

27   the innumerable legitimate uses of this revolutionary next-generation tool. *Id.* ¶ 61.

28   

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

ANTHROPIC'S OPP. TO RENEWED
MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL

**C.  Given the volume of data required, some copyrighted works may be used in training Claude.**

In training Claude, Anthropic does not seek out song lyrics in particular and does not deliberately assign any greater weight to them than to any other text collected from the web. *Id.* ¶¶ 31–33. But like other generative AI platforms, Anthropic does use data broadly assembled from the publicly available Internet, including through datasets compiled by third party non-profits for the research community. In practice, there is no other way to amass a training corpus with the scale and diversity necessary to train a complex LLM with a broad understanding of human language and the world in general. *Id.* ¶ 26; Decl. of Dr. Steven Peterson ("Peterson Decl.") ¶¶ 25–26. Any inclusion of Plaintiffs' song lyrics—or other content reflected in those datasets—would simply be a byproduct of the only viable approach to solving that technical challenge. *See* Kaplan Decl. ¶¶ 23–25, 31. All told, song lyrics constitute a minuscule fraction of Claude's training data, and the 500 works-in-suit constitute a minuscule fraction of that minuscule fraction. *See* Zhao Decl. ¶ 43 (conceding that "song lyrics will naturally be a small portion of the overall dataset in an LLM model").

It would not be possible for a generative AI platform like Anthropic to amass sufficient content to train an LLM like Claude in arm's-length licensing transactions, at any price. Peterson Decl. ¶¶ 18–26. The scale of the datasets required is far too large. *Id.* ¶¶ 23–25. One could not enter licensing transactions with enough rights owners to cover the billions of texts necessary to yield the trillions of tokens that general-purpose LLMs require. *See id.* ¶¶ 25–26. If licenses were required to train LLMs on publicly available copyrighted content, today's general-purpose AI tools simply could not exist. *Id.* ¶ 10.

**D.  Anthropic works hard to prevent Claude from outputting undesired responses, including copyrighted content.**

Just because certain content was part of Claude's training dataset does not, however, mean that an end user can access it. Claude is, after all, a *generative* AI system. It is designed to *generate* novel content, not simply regurgitate verbatim the texts from which it learned language. Kaplan Decl. ¶¶ 5–6, 15. Anthropic did not design Claude to regurgitate copyrighted content,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

ANTHROPIC'S OPP. TO RENEWED
MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL

including song lyrics, and has never intended for it to do so. *Id.* ¶¶ 15, 21, 36, 48–52. Since Anthropic first launched a commercial product, it has incorporated guardrails to militate against such behavior. *Id.* ¶ 52.

Plaintiffs mistakenly argue that Anthropic must have designed Claude to provide outputs containing their song lyrics because "Anthropic repeatedly encouraged Claude to produce verbatim song lyrics and unauthorized derivatives of lyrics" during the training process. Mot. 5. Plaintiffs misunderstand how Claude is trained. After first learning statistical relationships about language, Claude is then "fine-tuned" to adhere to a set of principles—a Constitution—that governs its behavior and helps it evaluate its own outputs during training. Kaplan Decl. ¶ 38. In this fine-tuning process, Claude is trained to be both helpful and harmless: "helpful" in that it will provide responsive, contextually appropriate answers to users' questions, and "harmless" in that it will resist doing or saying things that people would find harmful or dangerous. *Id.* ¶ 39. Both types of fine-tuning are necessary to teach Claude to "behave helpfully when appropriate, while encouraging the polite refusal of harmful requests." Kaplan Decl. Ex. G at 5. The research data Plaintiffs rely on preceded the commercial release of Claude by nearly a year and focused on only the "helpfulness" side of the process.[1] In this part of the fine-tuning process, Anthropic paid crowdworkers to test the model's helpfulness, without providing any specific guidance over the specific prompts used by the crowdworkers as part of their testing. Kaplan Decl. ¶ 44.

But, of course, all of Anthropic's consumer-facing models have *also* undergone "harmlessness" fine-tuning based on Claude's Constitution, so that they can recognize when otherwise helpful outputs are nevertheless inappropriate. Kaplan Decl. ¶¶ 39–46. Put another way, Claude has to be trained to understand and respond to a variety of requests so that it can sort out which requests may be seeking harmful outputs. *Id.* ¶ 41.

---

[1] Plaintiffs provided excerpts from the dataset in Exhibit J to the Declaration of Timothy Chung ("Chung Decl."), Dkt. 180, but they failed to provide a copy of the webpage from which they took this data or the research paper to which the data are connected. *See* Kaplan Decl., Ex. H (webpage); Ex. G (April 2022 research paper). That webpage clearly specifies that the prompt data used in the study "are *not* meant for supervised training" of consumer-facing AI agents and that training a conversational AI on these data alone "is likely to lead to harmful models and should be avoided." Kaplan Decl. ¶ 43 & Ex. H.

1    Anthropic has also implemented a broad array of safeguards to prevent reproduction of

2    copyrighted works from occurring in Claude outputs. These are described in detail in the Kaplan

3    Declaration at ¶¶ 47–51. ████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████████████████████

5    ██████████████████████ Kaplan Decl. ¶ 49. ████████████████████████████████

6    ████████████████████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████████████

8    ██████████████████████████████ *Id.* ¶¶ 49–51. These guardrails are effective, *id.* ¶¶ 52–59,

9    and will remain in place in some form indefinitely. *See id.* ¶ 60. Plaintiffs have pointed to no

10   evidence that purportedly infringing outputs are possible with Anthropic's current guardrails in

11   place, instead relying on prompts and outputs that are at least six months old. *See* Mot. 5–6

12   (citing to the declarations of Dan Seymour and Dr. Robert Leonard from November 2023 to

13   support their contention that outputs containing their lyrics are possible); Zhao Decl. ¶ 58

14   (identifying certain outputs from February). With the current guardrails in place, it is far less

15   likely that an ordinary Claude user could replicate what Plaintiffs did to engineer the facts on

16   which this lawsuit is based. *See* Kaplan Decl. ¶ 56.

### E.  Plaintiffs seek extraordinary and unwarranted injunctive relief.

18   Even before Plaintiffs filed their original preliminary injunction motion in November

19   2023, Anthropic told them that it was working to build additional guardrails and offered to

20   cooperate to create further guardrails covering not just the 500 works-in-suit, but also any other

21   text that Plaintiffs claimed to own and could provide to Anthropic. Plaintiffs first responded that

22   it would be difficult to exhaustively document that broader set because it is "constantly being

23   updated," and then directed Anthropic to a publicly available list of song titles—not lyrics—to

24   which they purport to control the rights. Lovejoy Decl. Ex. A at 4. Subsequent correspondence

25   was not constructive. *See id.* Anthropic has since developed additional guardrails without the

26   assistance of Plaintiffs, which have been in place for over six months. Kaplan Decl. ¶¶ 54–57.

27   Today, Plaintiffs concede that those guardrails are effective. *See* Mot. 29; Lovejoy Decl.

28   Ex. B at 7 (RFA No. 9). Nonetheless, they filed a renewed preliminary injunction, *over a year*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

ANTHROPIC'S OPP. TO RENEWED
MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL

*after* first discovering the allegedly infringing outputs, seeking to "maintain" those guardrails. *See* Mot. 2; Dkt. 179-1 (proposed order). They also seek an injunction preventing Anthropic from training on their lyrics between now and trial. *Id.* But despite having over eight months since their initial motion, they offer no new evidence of allegedly infringing outputs and fail to identify *any* examples of harm that has befallen them since they filed this suit last October. Yet they ask this Court to believe that they will be irreparably harmed between now and trial, little more than a year from now, without an injunction.

Their renewed motion, like their original motion, seeks judicial relief not just with respect to the copyrighted works at issue in the case, but also with respect to that same "constantly" changing set of millions of other songs and underlying lyrics, for which Plaintiffs have not pleaded even a *prima facie* claim of copyright infringement. *See* Lovejoy Decl. Ex. A at 4; Compl. ¶¶ 111–18; Dkt. 179-1 at 3. Evidently with respect to that broader, ever-shifting category of works, the Motion asks for both the output-restricting injunction referenced above *and* an injunction requiring the removal of the song lyrics from training datasets for unreleased models. *See* Mot. 2. Doing so would require Anthropic ███████████████████████ ███████████████████████████████████████████████, incurring approximately $███████ in additional costs and incalculably harming Anthropic in the broader marketplace ██████████████████████████████████████████████████ █████████████████████████████. Kaplan Decl. ¶ 61.

After waiting at least four months before notifying Anthropic by filing this lawsuit, five months before filing their original motion, and over a year before renewing their motion in the proper forum, Plaintiffs now seek this extraordinary relief to prevent the distribution or display of works that they and their *amici* admit are routinely the subject of licensing transactions with knowable prices. *See, e.g.*, Dkt. 193-1 (Amici Br.) at 6–7. And yet: Plaintiffs simultaneously contend that money could *not* compensate them in the event they prevail on their infringement claims. Mot. 23–28. Plaintiffs' dilatory motion vastly overreaches and should be denied.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9

ANTHROPIC'S OPP. TO RENEWED
MOT. FOR PRELIM. INJ.
CASE NO. 5:24-CV-03811-EKL

1                              **LEGAL STANDARD**

2       "A preliminary injunction is an extraordinary remedy never awarded as of right."

3 *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (quoting *Winter v.*

4 *Natural Resources Defense Council*, 555 U.S. 7, 24 (2008)). The party seeking the injunction

5 bears the burden of proving that it is entitled to one. *Klein v. City of San Clemente*, 584 F.3d

6 1196, 1201 (9th Cir. 2009). Plaintiffs must establish "(1) that they are likely to succeed on the

7 merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief, (3)

8 that the balance of equities tips in their favor, and (4) that an injunction is in the public interest."

9 *N.D. v. Reykdal*, 102 F.4th 982, 991–92 (9th Cir. 2024) (internal quotation marks omitted and

10 alterations adopted).[2] Where a preliminary injunction "goes well beyond simply maintaining the

11 status quo" by requiring the defendant affirmatively to take action, it is considered a "mandatory

12 injunction" and "is particularly disfavored." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir.

13 2015) (requesting the removal of content from an online platform calls for a "mandatory"

14 injunction). Mandatory injunctions "place a higher burden on the plaintiff to show the facts and

15 law clearly favor the moving party." *Fellowship of Christian Athletes v. San Jose Unified Sch.*

16 *Dist. Bd. of Educ.*, 82 F.4th 664, 684 (9th Cir. 2023) (internal quotation marks omitted).

17                                  **ARGUMENT**

18 **I.**     **This Court Should Deny Plaintiffs' Request for Extraordinary Relief**

19       **A.**     **Plaintiffs cannot show irreparable harm absent injunctive relief**

20       Plaintiffs' preliminary injunction request fails, first and foremost, because Plaintiffs

21 cannot show they are likely to suffer irreparable harm from any alleged infringement between

22 now and trial, whether as a result of Claude's outputs or of any use of Plaintiffs' lyrics in

23 Claude's training data. The Ninth Circuit requires Plaintiffs to demonstrate irreparable harm as a

24 "prerequisite for injunctive relief." *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d

25

26 ―――――――――――――――
[2] Plaintiffs suggest that the Ninth Circuit employs a "sliding scale" approach when evaluating these four factors. Mot. 8–9 (citing *Cottrell*, 632 F.3d at 1131). But *Cottrell* held that the sliding

27 scale approach remained viable only where there are "serious questions going to the merits"— and even then, a preliminary injunction will not issue unless the movant *also* demonstrates "a

28 balance of hardships that tips sharply towards the plaintiff," "a likelihood of irreparable injury," *and* that the injunction is in the public interest." *Cottrell*, 632 F.3d at 1135.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

ANTHROPIC'S OPP. TO RENEWED
MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL

989, 998 (9th Cir. 2011). They "must establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction." *Cottrell*, 632 F.3d at 1131 (citing *Winter*, 555 U.S. at 22) (emphasis in original). To show that irreparable injury is likely, Plaintiffs must "do more than merely allege imminent harm"—they "must *demonstrate* immediate threatened injury[.]" *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (emphasis in original). Assertions of remote and speculative injury will not suffice. *See In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007).

Plaintiffs cannot meet their burden to show a likelihood of irreparable harm between now and trial absent injunctive relief, for several independent reasons.

### 1.   There is no reasonable expectation that the complained-of activity is likely to recur.

Injunctive relief, by its nature, "looks to the future": it can only be awarded where the challenged conduct is likely to cause immediate injury going forward. 11A Wright & Miller Fed. Prac. & Proc. § 2942 (3d ed. 2019). Plaintiffs cannot show prospective irreparable harm where there is no "reasonable expectation" of the challenged conduct occurring again. *Id.*; *see Brach v. Newsom*, 38 F.4th 6, 15 (9th Cir. 2022) (explaining that "[r]easonable expectation means something more than a mere physical or theoretical possibility" (internal quotation marks omitted)). That is fatal to Plaintiffs' request for an injunction based on the alleged harm from Claude's outputs, for two reasons.

*First*, the record contains no evidence whatsoever that the latest versions of Claude have ever produced copies of Plaintiffs' works. Since Plaintiffs filed their original preliminary injunction motion, Anthropic has built heightened safeguards specifically designed to prevent display of Plaintiffs' works-in-suit. Kaplan Decl. ¶¶ 54–57; *see also supra* at 8–9. ████████
█████████████████████████████████████████████████████████████████
██████████████████████████████. Kaplan Decl. ¶ 56. ████████
██████████████████████████████████████████████████. *See id.*
Plaintiffs effectively concede the efficacy of these guardrails. *See* Mot. 29; Zhao Decl. ¶ 59.

1    As a result, *nothing* in the record shows that Claude's outputs are currently infringing or

2    are likely to infringe Plaintiffs' song lyrics going forward, much less cause the speculative

3    alleged irreparable harm Plaintiffs complain of. This eliminates the need for prospective

4    injunctive relief, because Plaintiffs have demonstrated no reasonable expectation of the

5    challenged conduct occurring in the future. *See Monster Energy Co. v. Integrated Supply*

6    *Network, LLC*, 2021 WL 2986355, at *2 (C.D. Cal. Mar. 10, 2021) (denying claim for equitable

7    relief where defendant had "taken significant steps to make clear that its allegedly wrongful

8    behavior ceased . . . and is unlikely to recur"); *cf. City of Los Angeles v. Lyons*, 461 U.S. 95, 105

9    (1983) (holding that the fact of a past wrong "does nothing to establish a real and immediate

10   threat" of an otherwise improbable future wrong, and denying Article III standing to pursue such

11   a claim). Plaintiffs' argument that Anthropic's improved guardrails might not prevent infringing

12   outputs because guardrails are not "foolproof" (Zhao Decl. ¶¶ 62–65) is exactly the kind of

13   "theoretical possibility" of recurring harm that fails to establish a need for injunctive relief.

14   *Brach*, 38 F.4th at 14.

15       *Second*, Plaintiffs cite no evidence that any Claude user—other than Plaintiffs

16   themselves—has *ever* prompted Claude for outputs like the examples Plaintiffs ginned up for

17   this lawsuit. Plaintiffs bemoan the harms they claim would come to them and their songwriters

18   if, for example, a mashup of Sir Mix-A-Lot's "Baby Got Back" and Elton John and Bernie

19   Taupin's "Candle in the Wind" containing the incongruous lyric "Goodbye, yellow brick butt,"

20   or an "Atheist version" of a Christian rock anthem, were to proliferate on the Internet. Mot. 7;

21   Decl. of Kenton Draughon (Dkt. 186) ¶ 24. But even if these purported harms constituted real,

22   cognizable, irreparable injury to the publishers of these songs, it was Plaintiffs' own agents who

23   provoked Claude to generate the offending outputs and then published them for the world to see

24   in their renewed motion. Plaintiffs have identified no record evidence to establish that users

25   unaffiliated with them have ever caused Claude to reproduce their works-in-suit, much less a

26   "reasonable expectation" that anyone will do so going forward. *Brach*, 38 F. 4th at 15. Indeed,

27   preliminary discovery suggests even Plaintiffs had to work hard to coax older models to generate

28   the allegedly infringing output—though just how hard is unknown, since Plaintiffs continue to

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

ANTHROPIC'S OPP. TO RENEWED
MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL

1   resist disclosing any information about their failed attempts. Dkt. 67-5 (Lowd Decl.) ¶ 17; *see*

2   *also* Lovejoy Decl. Ex. B at 6 (RFAs 5–8); *Id.* Ex. G at 19. And that was all before Anthropic

3   implemented the heightened guardrails that Plaintiffs have not bothered to test. Zhao Decl. ¶ 59.

4
5              2.      **The alleged harms Plaintiffs identify are speculative and/or reparable by monetary damages.**

6          Plaintiffs' purported harms fall into two major categories: (i) harm to the lyrics' monetary

7   value and licensing market, and (ii) reputational damage based on a "loss of control" over the

8   song lyrics. Neither supports the preliminary injunctive relief Plaintiffs seek.

9              a.   **Alleged harms to the value of Plaintiffs' works and the licensing market**

10         Plaintiffs fail to establish irreparable harm by asserting that the alleged reproduction of

11  their lyrics in Claude's training data and outputs "lowers the market value of the lyrics, reduces

12  demand for legitimate licenses for lyrics, and impedes Publishers' negotiations with existing

13  licensees." Mot. 26. Any such harm is either speculative or compensable by money damages.

14         In the first place, that argument lacks any evidentiary support. Hall Decl. ¶¶ 57–63.

15  Plaintiffs rely exclusively on the declaration of their economic expert, Michael D. Smith, who

16  cites no data, studies, financial reports, or quantitative information. *See* Decl. of Michael D.

17  Smith ("Smith Decl."), Dkt. 182 ¶¶ 26–31, 48–49. He does not assert that license fees for the use

18  of Plaintiffs' lyrics have decreased since Claude was introduced, or even in the year since

19  Plaintiffs filed this lawsuit. And his conclusory assertion that Claude's outputs will drive future

20  licensing fees down is belied by the absence of evidence that anyone other than Plaintiffs has

21  ever sought to coax Claude to extract Plaintiffs' song lyrics—or that any meaningful

22  circumvention of Anthropic's latest guardrails will occur between now and trial in the absence of

23  an injunction. *Supra* at 11–13. Professor Smith's unsupported assumptions thus cannot establish

24  the immediate irreparable harm necessary to justify an injunction. *See American Passage Media*

25  *Corp. v. Cass Comm'cns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (finding insufficient

26  evidence of irreparable harm where supporting affidavits were "conclusory and without

27  sufficient support in facts"); *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239,

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13

ANTHROPIC'S OPP. TO RENEWED
MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL

1250 (9th Cir. 2013) (vacating preliminary injunction where "comb[ing] the record for support or inferences of irreparable harm" failed to reveal any concrete evidence of harm).

Even if Plaintiffs could show Anthropic's conduct between now and trial were likely to harm their future licensing prospects, any such harm is not "irreparable" because it can be remedied by money damages. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 471 (9th Cir. 1984). Courts routinely find that copyright plaintiffs alleging similar harms can be made whole through money damages. *E.g.*, *ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 322 (2d Cir. 2022) (denying injunctive relief where music publishers alleged that infringing conduct "threaten[ed] [their] relationships with . . . existing licensees, and undermine[d] their negotiating leverage with prospective licensees," because publishers could "be made whole with cash"). So too here. *See* Hall Decl. ¶¶ 24–37. By Plaintiffs' own admission, "there is a well-established market" for licensing the right to display their lyrics to the public. Decl. of Duff Berschback (Dkt. 184) ¶ 12 (Concord); *see also* Decl. of Alisa Coleman (Dkt. 185) ¶¶ 10–12 (ABKCO); Decl. of David Kokakis (Dkt. 187) ¶¶ 10–12 (UMPG). Because Plaintiffs routinely license the works at issue, any alleged harm to their ability to do so can be easily quantified. Hall Decl. ¶¶ 32–34. The parties can look to any appropriate "licensing agreements" that exist today as "a starting point or an aid in calculating damages" for Plaintiffs' alleged harm. *Fox Broad. Co. v. Dish Network LLC*, 747 F.3d 1060, 1073 (9th Cir. 2014); *see* Hall Decl. ¶¶ 17, 37. That is the definition of harm that is *reparable*.

### b. Alleged reputational and goodwill-based harms

Plaintiffs' arguments as to other kinds of injuries fare no better. Hall Decl. ¶¶ 20, 62. Publishers contend generically that the inclusion of the asserted works in AI training datasets deprives both them and the original songwriters—who are neither the copyright owners nor plaintiffs in this lawsuit—of "control" over the "integrity" of their works, deprives them of "credit," or harms their "goodwill" or "reputations." Mot. 23–25. But they do not explain how the inclusion of their lyrics in an internal technological process invisible to the end user could have this effect. Nor do they offer any concrete evidence that Publishers have, in fact, been harmed in this way, more than a year after they first discovered the alleged infringement. The

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14

ANTHROPIC'S OPP. TO RENEWED
MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL

1    same is true with respect to outputs: Especially since the only allegedly infringing outputs were

2    generated by Plaintiffs themselves—and only before Anthropic implemented its most recent

3    guardrails—the Publishers cannot demonstrate that they have been or will be denied "credit and

4    goodwill" or that there is a legitimate risk of appreciable injury to their "reputations." *Id.*

5           Plaintiffs' claim that the alleged loss of "control" over the licensing and dissemination of

6    their works causes them irreparable harm is equally meritless. Mot. 23. The Ninth Circuit has

7    expressly rejected such a presumption of irreparable harm for run-of-the-mill infringement

8    claims. *See Flexible Lifeline*, 654 F.3d at 998.

9           Finally, insofar as Publishers allege that third-party songwriters' reputations could be

10    threatened by Claude outputs that are supposedly "inconsistent with and inimical to authorial

11    intent" (Mot. 25), such alleged harms would not be cognizable as *copyright* harms even if the

12    songwriters were plaintiffs here. U.S. copyright law generally does not recognize authors'

13    "moral rights," such as the right to "control the integrity of their works and to guard against

14    distortion, manipulation, or misappropriation." *Garcia*, 786 F.3d at 746. Those types of concerns

15    are "untethered from—and incompatible with—copyright and copyright's function as the engine

16    of expression." *Id.* at 745; *cf. Fahmy v. Jay-Z*, 908 F.3d 383, 390 (9th Cir. 2018) (denying

17    plaintiff standing because "[n]o provision of the [Copyright] Act recognizes a moral right to

18    prevent distortions or mutilations of copyrighted music").

19
20           3.     **Plaintiffs' delay in pursuing preliminary relief belies their claims of irreparable harm.**

21           Finally, Plaintiffs' severe delay in coming to this Court for injunctive relief is

22    incompatible with their claims of irreparable harm. "The best way for a plaintiff to avoid a delay

23    in the consideration of a motion for TRO pending resolution of a serious challenge to personal

24    jurisdiction is to play it safe by filing in a forum that clearly has personal jurisdiction."

25    *Ncontracts LLC v. Holmberg*, 2022 WL 17724148, at *10 n.16 (M.D. Tenn. Dec. 15, 2022).

26    Plaintiffs waited months after discovering the allegedly infringing Claude outputs before they

27    filed this lawsuit and, when they finally did file, they did so in Tennessee, a forum they knew

28    lacked a clear connection to Anthropic or the conduct at issue and to which Anthropic objected.

LATHAM&WATKINS^{LLP}
ATTORNEYS AT LAW
SAN FRANCISCO

15

ANTHROPIC'S OPP. TO RENEWED
MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL

1    That choice led to further delay of Plaintiffs' own making. *See* Dkt. 123 at 24 (explaining that

2    "Plaintiffs made a strategic decision" that "ran the risk of encountering a jurisdictional hurdle too

3    high to climb"). The upshot is that Plaintiffs are now ambling to this Court for allegedly "urgent"

4    injunctive relief *more than a year* after discovering the complained-of conduct.

5          The logical inference from Plaintiffs' months-long delay is that they prioritized perceived

6    litigation advantage over taking the steps necessary to actually redress ostensibly imminent and

7    irreparable harm. *See Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1377

8    (9th Cir. 1985) (plaintiff's delay in seeking relief could "impl[y] a lack of urgency and

9    irreparable harm"). But for Plaintiffs' strategic decision to sit on their claims for months

10   followed by their forum shopping, their motion could have been heard and fully decided a year

11   ago. *See Famous Birthdays, LLC v. SocialEdge, Inc.*, 2022 WL 1592726, at *4 (C.D. Cal. Feb.

12   11, 2022) (5-month delay after investigating alleged infringement "warrant[ed] denial" of

13   preliminary injunction motion); *Garcia*, 786 F.3d at 746 (delay of "months" between alleged

14   infringement and preliminary injunction motion "undercut [plaintiff's] claim of irreparable

15   harm"); *Ojmar US, LLC v. Sec. People, Inc.*, 2017 WL 2903143, at *3 (N.D. Cal. July 7, 2017)

16   (no irreparable harm where plaintiff waited months before moving for preliminary relief); *Int'l*

17   *Medcom v. S.E. Int'l, Inc.*, 2015 WL 7753267, at *6 (N.D. Cal. Dec. 2, 2015) (12-month delay

18   before pursuing preliminary injunction "strongly suggests the absence of imminent irreparable

19   harm"). Plaintiffs' delay in seeking relief belies any need to urgently grant it.

20
     **B.    Plaintiffs cannot show a likelihood of success on the merits with respect to**
21   **        either of their two theories of direct infringement**

22         Because Plaintiffs have failed to establish irreparable harm, a preliminary injunction

23   cannot issue, and the Court need not consider the remaining factors. *See Center for Food Safety*

24   *v. Vilsack*, 636 F.3d 1166, 1174 (9th Cir. 2011) (declining to address the remaining elements of

25   the preliminary injunction standard because plaintiffs failed to show likelihood of irreparable

26   harm); *Swarmify, Inc. v. Cloudflare, Inc.*, 2018 WL 1142204, at *6 (N.D. Cal. Mar. 2, 2018)

27   (concluding that "failure to show a likelihood of irreparable harm is a showstopper"); *Ojmar*,

28   2017 WL 2903143, at *4 (same).

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
SAN FRANCISCO

16

ANTHROPIC'S OPP. TO RENEWED
MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL

1    All the same, Plaintiffs' request for relief should be denied for the independent reason

2    that they cannot show they are likely to prevail on the merits of their two direct infringement

3    theories—that Anthropic infringed their works by including them in Claude's training data, and

4    separately through certain Claude outputs.

5            1.       **Plaintiffs cannot show a likelihood of success on the merits with

6                     respect to their infringement claims concerning Claude's training**

7    Plaintiffs fail to clear the high bar establishing a likelihood of success in arguing that the

8    transformative use of copyrighted works to train groundbreaking generative AI products is

9    infringement, rather than a paradigmatic fair use.

10    For context, this case is one among roughly two dozen other actions in which copyright

11    holders have sued generative AI companies. *See* Dkt. 67 at 20 n.6 (collecting cases as of January

12    2024). The central question in virtually all of these cases is whether an AI company's unlicensed

13    use of copyrighted material as *inputs* in a vast dataset (comprising billions of works) to train AI

14    models is a "fair use" and thus not infringement. In none of those cases—including putative class

15    actions purporting to represent Plaintiffs here and suits filed by corporate affiliates of

16    Plaintiffs—has any of the dozens of plaintiffs even sought, much less won, a preliminary

17    injunction. And no court has found a party likely to succeed on the merits of this hotly contested

18    issue. Under these circumstances, the Court should not rush to resolve a significant, market-

19    moving issue that cannot possibly be properly teed up in this posture—particularly where, as

20    here, there is no plausible irreparable injury.

21    Regardless, Plaintiffs' training-based claims fail under copyright's fair use doctrine. "For

22    nearly three hundred years . . . courts have recognized that, in certain circumstances, giving

23    authors *absolute* control over all copying from their works would tend in some circumstances to

24    limit, rather than expand, public knowledge." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 212

25    (2d Cir. 2015). Fair use is the legal rule embodying that recognition. *Id.* Anthropic's use of the

26    works-in-suit to train an AI model, particularly one *designed not to output the texts of those*

27    *songs*, is a classic fair use that does not constitute infringement of Plaintiffs' copyrights. Relying

28    on the fair use doctrine, courts have consistently found that making "intermediate" copies of

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17

ANTHROPIC'S OPP. TO RENEWED
MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL

copyrighted materials to develop new technologies does not violate copyright law. *See Sega Enters. Ltd. v. Accolade, Inc*., 977 F.2d 1510, 1520–28 (9th Cir. 1992) (fair use to copy a videogame in the service of creating a competing product); *Sony Comput. Ent., Inc. v. Connectix Corp.*, 203 F.3d 596, 602–09 (9th Cir. 2000) (fair use to create a digital "emulation" of copyrighted video game operating system); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 817–22 (9th Cir. 2003) (fair use to copy essentially all images on the Internet to create an image search tool); *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 638–45 (4th Cir. 2009) (fair use to copy student papers to create a plagiarism detection tool); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 94–101 (2d Cir. 2014) (fair use to create a searchable database of millions of copyrighted books); *Authors Guild*, 804 F.3d at 212 (same); *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 26–40 (2021) (fair use to borrow copyrighted computer software to create a competing smartphone platform).

The fair use analysis turns on four factors: "(1) the purpose and character of the use . . . ; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of" the work. 17 U.S.C. § 107; *see Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994). Here, all factors support the conclusion that Anthropic's training process "fulfill[s] the objective of copyright law to stimulate creativity for public illumination" and is a paradigmatic fair use. *Oracle*, 593 U.S. at 29 (citation omitted) (alteration in original)

### a.   Factor One: Anthropic's use of Plaintiffs' lyrics to train Claude is a transformative use

When a defendant uses copyrighted material in a way that is "transformative" because the challenged use adds "a further purpose or different character" than the original works, the first factor weighs heavily towards a fair use finding. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 525 (2023). Innovative creations that "add[] something new" to the original works are transformative under this standard. *Campbell*, 510 U.S. at 579.

Using Plaintiffs' copyrighted song lyrics as part of a multi-trillion token dataset to train a generative AI model about the world and how language works is the very definition of

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ANTHROPIC'S OPP. TO RENEWED
MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL

"transformative" under the fair use doctrine. The lyrics are literally transformed, in that they are broken down into small tokens used to derive statistical weights, rather than stored as intact copies. Kaplan Decl. ¶¶ 19–20, 36. And the *purpose* of the use is transformative, in the sense that Anthropic's alleged use of the lyrics was not for the same end for which they were created. *Cf. Warhol*, 598 U.S. at 526–35 (holding lack of transformativeness where original work and challenged use "share substantially the same purpose" because "[b]oth are portraits of Prince used in magazines to illustrate stories about Prince"). Instead, Anthropic's alleged use was for an entirely new end: creating a dataset to teach a neural network how human language works so that it can generate an infinite number of language-based responses to human queries. *See* Zhao Decl. ¶ 44 ("[O]nce an LLM is trained on a given piece of content, it can then use that content for any purpose. . . . [Anthropic's use of song lyrics] enables Claude's generation of outputs generally by adding to its overall lexicon as part of the larger training dataset.'"); *cf. id.* ¶ 23 (conceding that an LLM "may use the tokens representing song lyrics to generate lyrics, poetry, nonfiction essays, marketing materials, movie scripts, or anything else").

Plaintiffs offer a variety of arguments why using their content in these obviously new and different ways is not "transformative" under the first fair use factor, but none is sound. The suggestion that the purpose of training Claude is "to provide [Plaintiffs'] lyrics online, on demand," is categorically false. Mot. 18. That is not Claude's purpose, and Anthropic's guardrails are designed to prevent such outputs. *See supra* at 2, 8–9. Anthropic has never intended Claude to be used as a means of regurgitating song lyrics available on the open Internet. *See* Kaplan Decl. ¶¶ 15, 45–48. The analogies to *Napster* and *Grokster* made by Plaintiffs' *amici*, Amici Br. at 8–9, founder against this reality, since those cases involved products *specifically designed* to provide market substitutes for the plaintiffs' works. Neither the alleged use of data in training of Claude, nor Claude itself, is a substitute for Plaintiffs' lyrics.

Plaintiffs are also wrong when they argue that a use cannot be transformative under the fair use doctrine if it involves copying without "comment[ing] on, criticiz[ing], or provid[ing]

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ANTHROPIC'S OPP. TO RENEWED
MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL

1  otherwise unavailable information about the original." Mot. 19.[3] Their position is incompatible

2  with the law. *See also Splunk Inc. v. Cribl, Inc.*, 2024 WL 2701627, at *3 (N.D. Cal. May 24,

3  2024) (relying on *Sega*, 977 F.2d at 1522–23, to hold that defendant's use of plaintiff's code to

4  create its own software with "its own distinct purpose" was transformative); *Lexmark Int'l, Inc.*

5  *v. Static Control Components, Inc.*, 387 F.3d 522, 544 (6th Cir. 2004) (allegedly infringing use

6  of computer code was fair because the final product, a computer chip, "use[d] the [work] for a

7  different purpose, one unrelated to copyright protection"); *Ross*, 694 F. Supp. 3d at 483–84

8  (explaining that "stud[ying] the language patterns" in Westlaw headnotes "to learn how to

9  produce judicial opinion quotes" as part of AI training would be transformative intermediate

10 copying favoring fair use). Nor does the fact that Anthropic is a for-profit company change the

11 analysis. *See* Mot. 15–16. "[M]any common fair uses are indisputably commercial" and the

12 transformativeness of the use may outweigh its commercial character. *Oracle*, 593 U.S. at 32;

13 *Warhol*, 598 U.S. at 531.[4]

14    b. **Factor Two and Three together support a fair use finding**

15       The second factor considers the nature of the copyrighted works and "typically has not

16 been terribly significant in the overall fair use balancing[.]" *McGucken v. Pub Ocean Ltd.*, 42

17 F.4th 1149, 1161 (9th Cir. 2022) (internal quotation marks omitted); *accord Authors Guild*, 804

18 F.3d at 220. It is similarly unilluminating here. Anthropic includes Plaintiffs' works in the corpus

19 to teach its AI models to recognize language patterns, not to appropriate the songs' creative

---

21 [3] Plaintiffs cite to *Warhol* for this proposition, but they omit the preceding clause: "[T]he
meaning of a secondary work . . . should be considered to the extent necessary to determine
22 whether the purpose of the use is distinct from the original, *for instance*, because the use
comments on, criticizes, or provides otherwise unavailable information about the original." 598
23 U.S. at 544–45 (emphasis added). Moreover, Plaintiffs fundamentally misunderstand that
*Warhol*'s analysis was predicated on an admission that the new work was substantially similar to
24 the original, *see* 598 U.S. at 525, and limited to the use of that substantially similar work for
"substantially the same purpose," *id.* at 526. Plaintiffs would have to show that their lyrics were
25 created for the purpose of AI training, which they cannot do. Moreover, *Warhol* did nothing to
alter the holdings of any of the "intermediate copying" decisions that are directly relevant here—
26 but that Plaintiffs do not address in their brief.

27 [4] Plaintiffs' reliance on *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848 (9th Cir. 2017), and
*Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 554–55 (S.D.N.Y.
2013), is misplaced. Both involved technologies designed for the sole purpose of retransmitting
28 "undiluted" copyrighted works in a different medium, *see Associated Press*, 931 F. Supp. 2d at
552, rather than using the works as raw material to build something new and distinct.

LATHAM&WATKINS<sup></sup>
ATTORNEYS AT LAW
SAN FRANCISCO

20

ANTHROPIC'S OPP. TO RENEWED
MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL

1   elements. Courts have invariably found that the second factor does not weigh against fair use

2   under such circumstances. *E.g.*, *iParadigms*, 562 F.3d at 641 (using student essays to build

3   plagiarism-detection software was "not related to the creative core of the works"); *Bill Graham*

4   *Archives v. Dorling Kindersley, Ltd.*, 448 F.3d 605, 612–13 (2d Cir. 2006) ("[W]e hold that even

5   though [the] images are creative works, which are a core concern of copyright protection, the

6   second factor has limited weight in our analysis because the purpose of [the] use was to

7   emphasize the images' historical rather than creative value."); *cf. Sega*, 977 F.2d at 1526

8   (concluding second factor favored defendant where copying object code in video game cartridges

9   "was necessary in order to understand the functional requirements" for software compatibility).

10      The third factor, which considers "the amount and substantiality of the portion used in

11  relation to the copyrighted work as a whole," favors fair use, too. 17 U.S.C. § 107(3). Plaintiffs

12  emphasize that Anthropic's "copying is 'total'" because it "copies the complete Works as input."

13  Mot. 19. But that assertion is false. Plaintiffs' claims relate to the alleged copying of their *lyrics*,

14  not the "rhythm, harmony, and melody" that also comprise the asserted musical compositions.

15  *See Newton v. Diamond*, 204 F. Supp. 2d 1244, 1249 (C.D. Cal. 2002). And the third fair use

16  factor asks not how much copying was done *in the abstract*, but whether the secondary user

17  "takes no more than is necessary" to accomplish that user's intended purpose. *Seltzer v. Green*

18  *Day, Inc.*, 725 F.3d 1170, 1178 (9th Cir. 2013); *accord Authors Guild*, 804 F.3d at 221–22.

19  Accordingly, "[e]ven entire verbatim reproductions are justifiable" when the allegedly infringing

20  work serves a different purpose from the original. *Tresóna Multimedia, LLC v. Burbank High*

21  *Sch. Vocal Music Ass'n*, 953 F.3d 638, 650 (9th Cir. 2020) (quotation omitted); *see also Stern v.*

22  *Does*, 978 F. Supp. 2d 1031, 1047–48 (C.D. Cal. 2011) (finding copying of entire work fair

23  where work was short and copying was reasonable in light of defendant's legitimate purpose).

24      Finally, to the extent Plaintiffs suggest Anthropic cannot show a "specific need for

25  Publishers' works or that alternatives were unavailable," Mot. 20, that argument has been

26  rejected in the only summary judgment decision concerning the application of fair use to

27  generative AI technology. *See Ross*, 694 F. Supp. 3d at 485 (explaining that the defendant need

28  not prove that use of each specific asserted work was "strictly necessary" for the scale of the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

ANTHROPIC'S OPP. TO RENEWED
MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL

1    copying to further its transformative goals). Plaintiffs' own expert concedes the utility of song

2    lyrics for outputs "requiring the[ir] unique structure," such as "musical compositions, poems,

3    short stories, marketing pitches," and other forms of written work. Zhao Decl. ¶ 44. While

4    Plaintiffs' lyrics in particular may not be "critical to the general functionality of Claude," *id.*

5    ¶ 11, song lyrics as a category are an important piece of training data for teaching Claude about

6    the unique use of language in poetic and lyrical texts. *See* Kaplan Decl. ¶ 35.

   c.    **Factor Four: Anthropic's use of Plaintiffs' lyrics to train Claude does not harm
          any cognizable market**

9    Finally, the fourth factor weighs in favor of fair use because any alleged use of the

10    works-in-suit as part of Claude's training dataset has no "substantially adverse impact" on a

11    legitimate market for Plaintiffs' copyrighted works. *Campbell*, 510 U.S. at 590. "[W]hen a

12    commercial use . . . serves as a market replacement" for the original, it is "likely that cognizable

13    market harm to the original will occur." *Id.* at 591. Plaintiffs argue that "Anthropic's unlicensed

14    use [of their works to train Claude's corpus] threatens to stifle the rapidly growing market for the

15    Works as AI training input." Mot. 22.[5] They are wrong.

16    There is no basis for the Court to find that a "rapidly growing market" for song lyrics as

17    general-purpose AI training inputs exists, or is likely to be developed in the future. *Seltzer*, 725

18    F.3d at 1179 (fourth factor considers the impact on "traditional, reasonable, or likely to be

19    developed markets"). Plaintiffs provide no evidence of licenses they have issued to other LLM

20    providers. In fact, they admit the opposite: that they "have not executed a copyright license

21    agreement with any AI company that allows a licensee to train a general purpose Generative AI

22    model" on the Asserted Works. Lovejoy Decl. Ex. B at 9 (RFA No. 15). Nor do Plaintiffs

23    provide any evidence of a general purpose LLM like Claude that has licensed *all* the copyrighted

24    material used to train its model. KL3M, the LLM to which Plaintiffs' expert points, is a smaller,

25    non-commercial LLM that is not designed to do anything close to what Claude or other general

---

[5] Plaintiffs also assert various market harms flowing from the availability of their lyrics in
Claude outputs. *See* Mot. 21–22. Even if Plaintiffs' assertions of harms relating to *outputs* were
not conclusory and speculative, *see supra* at 11–15, such harms would not show that Anthropic's
*training* is unfair. And any material hypothetical harms relating to Claude outputs have been
rendered moot by Anthropic's updated guardrails. Mot. 29.

1    purpose LLMs can do. *See* Kaplan Decl.¶ 26 (explaining that the KL3M models have been

2    trained on ▉▉▉▉▉% of the tokens used to train Claude 3.5 and support neither an API nor a

3    chat model). It is a fundamentally different product than Claude. *Id.*; Peterson Decl. ¶ 37.

4         The evidence favors Anthropic: Plaintiffs' new expert Mr. Newton-Rex concedes that an

5    LLM "trained solely on licensed and public domain data may not match the performance" of an

6    LLM trained on data from the open internet. Decl. of Ed Newton-Rex ("Newton-Rex Decl."),

7    Dkt. 183 ¶¶ 29, 35. As explained in the Peterson Declaration, the need for ▉▉▉▉▉▉▉▉ of

8    tokens of text to properly train general-purpose LLMs like Claude is incompatible with a

9    working licensing market of sufficient scale for training data. Peterson Decl. ¶¶ 22–25. This is an

10   essential point: the licensing market Plaintiffs posit simply could not exist for all of the inputs

11   required to train general purpose, generative AI models like Claude or its competitors.

12        It does not matter, legally speaking, that Plaintiffs may *wish* to receive licensing revenue

13   for this particular use of their works. *See Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913,

14   929–30 & n.17 (2d Cir. 1994).[6] They point to unseen deals that other AI companies have done

15   with other categories of copyright owners. *See* Smith Decl. ¶ 76–77 (referring to licenses

16   ostensibly covering news, magazine, social media, images, and audio rights owners, none of

17   which appear to involve lyrics). But the agreements themselves are not in the record, making it

18   impossible to determine whether they in fact constitute bare licenses to train generative AI

19   models, as opposed to any of innumerable other potential transactions between AI companies

20   and content owners—*e.g.*, to obtain *access* to additional training data that would not otherwise

21   be accessible on the open web or additional rights requiring a license. *See* Peterson Decl. ¶¶ 39–

22   44. Indeed, the majority of the deals that Plaintiffs highlight were inked by OpenAI, a company

23   that has publicly staked out a position in favor of fair use, including in the many litigations it is

24   facing against copyright owners. *See id*. ¶ 41. OpenAI's fair use position casts doubt on

25   Professor Smith's assumption that these deals must be about licensing data for LLM training. *Id.*

26

27   ───────────────────────

     [6] Courts reject attempts to define the market so narrowly as to recognize a "theoretical market for
     licensing the very use at bar" in order to show market harm. *Tresóna*, 953 F.3d at 652 (citation

28   omitted); *see also Swatch Grp. Mgmt. Servs., Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 91 (2d Cir.
     2014); *Bell v. Eagle Mountain Saginaw Indep. Sch. Dist.*, 27 F.4th 313, 324–25 (5th Cir. 2022).

1        Even if there were a handful of agreements along the lines Plaintiffs posit—though they

2  have not produced any—that would not change the calculus under fair use law, which requires a

3  *bona fide market*, not isolated deals entered for other reasons, including an abundance of caution

4  to eliminate risk. *See Tresóna*, 953 F.3d at 652 (holding "the decision by secondary users to pay,

5  or not pay" does not "establish whether" the fourth factor's market analysis weighs in favor of

6  fair use, and "a copyright holder cannot prevent others from entering fair use markets merely by

7  developing or licensing a market for . . . transformative uses of its own creative work") (cleaned

8  up); *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1265 (11th Cir. 2014) ("[I]f the use is a

9  fair use, then the copyright owner is not entitled to charge for the use, and there is no 'customary

10  price' to be paid in the first place."). The main justifications that Plaintiffs' expert, Mr. Newton-

11  Rex, offers for licensing training data are more normative than rooted in economic analysis of

12  the marketplace: for example, that it is "ethical" to do so, avoids "alien[ating]" large copyright

13  holders who may be potential customers of AI products, and "may help AI companies attract and

14  retain critical talent in a competitive market." Newton-Rex Decl. ¶¶ 24–25, 27.

15        Including the disputed works in Claude's training dataset threatens no existing licensing

16  market for the works in suit. *See HathiTrust*, 755 F.3d at 99; *Campbell*, 510 U.S. at 593 (the only

17  harm to consider under the fourth factor "is the harm of market substitution"). It makes no sense

18  to suggest that someone who might have paid licensing fees for the kinds of uses Plaintiffs

19  legitimately exploit—displaying their song lyrics on third-party websites or as part of karaoke

20  videos—will decline to do so because Anthropic used the songs to train a generative AI model.

21  Peterson Decl. ¶ 49. Plaintiffs have produced not even a single example of such harm after nearly

22  a year. Plaintiffs' real complaint is that *this use* isn't being licensed—but that is a feature of

23  every single fair use case that courts decide. Recognizing that tension, courts will not "readily

24  infer[]" market substitution or market harm "when . . . a use is plainly transformative." *Tresóna*,

25  953 F.3d at 651; *see also Ross*, 694 F. Supp. at 486 (explaining that if the use of the plaintiff's

26  works as training data is found to be transformative, "it is not a market substitute").

27        Because the challenged conduct is fair use, Plaintiffs cannot establish that they are likely

28  to prevail on the merits of their training claim.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

24

ANTHROPIC'S OPP. TO RENEWED
MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL

1
    2.  **Plaintiffs cannot show a likelihood of success on the merits with respect to their infringement claim concerning Claude's outputs.**

2

3    Plaintiffs are unlikely to succeed on the merits of their claim that Anthropic infringed

4 their copyrights through some Claude outputs that reproduced portions of their song lyrics. As

5 discussed above, Plaintiffs acknowledge that no further relief is required to address this alleged

6 harm, including because Anthropic has implemented guardrails designed to prevent Claude from

7 generating copies of Plaintiffs' lyrics (which Plaintiffs have not even bothered to confirm are

8 effective). Mot. 29 ("Publishers are willing to take Anthropic at its word at this stage and seek

9 simply to maintain these already-implemented guardrails[.]").

10    Regardless, Plaintiffs are unlikely to successfully establish that Anthropic, as opposed to

11 Plaintiffs themselves, engaged in the necessary volitional conduct to establish a claim of direct

12 infringement—the sole basis for Plaintiffs' preliminary injunction motion. *See* Mot. 8 n.4. To

13 succeed on that claim, Plaintiffs must supply "proof of volitional conduct, the Copyright Act's

14 version of proximate cause." *Hunley v. Instagram, LLC*, 73 F.4th 1060, 1074 (9th Cir. 2023).

15 They cannot meet that burden. With respect to the copies Plaintiffs' prompts yielded, the only

16 evidence in the record is that *Plaintiffs and their agents*, not Anthropic, caused those copies.

17 Plaintiffs entered the prompts that allegedly returned the outputs they complain about, which was

18 shown to no one but themselves until they filed it on the public docket. *See* Dkt. 49 (Seymour

19 Decl.) ¶ 6 ("On behalf of the Publishers, BCGuardian submitted requests to Claude's API and

20 Web Console and recorded evidence of Claude's responses."); *see also* Mot. 11 (admitting

21 Plaintiffs' agents "prompted" Claude "for the lyrics to each of the illustrative 500

22 Compositions"); Lovejoy Decl. ¶ 11 & Ex. H at 7 (objecting to March 22, 2024 interrogatory

23 requesting identity of "all Persons other than" Publishers who extracted the asserted works as

24 Claude outputs). Copies generated by Plaintiffs and their agents, and distributed or displayed

25 only to them, do not violate the Copyright Act at all. *Richmond v. Weiner*, 353 F.2d 41, 42 (9th

26 Cir. 1965) ("[A] copyright owner cannot infringe against his own copyright."). And save for the

27 fine-tuning research example discussed above, Plaintiffs do not allege that anyone *else* ever

28 prompted Claude to produce outputs that are substantially similar to the works-in-suit. Even that

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

25

ANTHROPIC'S OPP. TO RENEWED
MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL

1  example from the pre-release development of Claude was not directed by Anthropic, which did

2  not dictate, screen, or review the prompts invented by third-party crowdworkers to test Claude's

3  helpfulness. Kaplan Decl. ¶¶ 44–45; *see supra* at 7. Anthropic's lack of volitional conduct

4  disposes of Plaintiffs' direct infringement theory with respect to outputs.

    **C.      The balance of equities and public interest tip in Anthropic's favor**

6        The balance of equities and public interest factors also favor Anthropic, whose product

7  development and competitive standing would be dramatically disrupted, at potentially

8  catastrophic cost, by a preliminary injunction.

9        During the year-plus since Plaintiffs admit they discovered the alleged infringement,

10  Anthropic has invested ████████████ into building its business and developing its AI

11  models. Kaplan Decl. ¶¶ 8, 27, 61. Indeed, courts have recognized a plaintiff's delay "affects the

12  equities" of a case. *Lilith Games (Shanghai) Co. v. UCool, Inc.*, 2015 WL 5591612, at *12 (N.D.

13  Cal. Sept. 23, 2015) (finding balance of equities tipped in favor of the defendant where it "made

14  huge investments" during plaintiff's four-month delay in bringing suit "that would likely be lost

15  if the Court were to grant a preliminary injunction"). Plaintiffs claim that their requests are

16  intended to "preserve the status quo" and "limit[] any conceivable harm to Anthropic" because

17  they "do not ask Anthropic to retrain or withdraw its existing models, but only to refrain from

18  training *future* models on [their] lyrics." Mot. 28–29. But here, where Plaintiffs' motion comes

19  more than a year after they discovered the alleged infringement, granting the motion would not

20  maintain the status quo, but rather "effect a material change in the marketplace." *Rivera v.*

21  *Remington Designs, LLC*, 2017 WL 3476996, at *4 (C.D. Cal. July 7, 2017).

22  ████████████████████████████████████████

23  ████████████████████████████████████

24  ██████████████████████████████████████████

25  ████████████████████████████████████████

26  ████████████. Kaplan Decl. ¶ 61. And to what end? ████████████████

27  ███████████████████████████████████████████

28  ██████████. *See id.* ¶ 60. Plaintiffs concede that they are working and have not even tested the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

26

ANTHROPIC'S OPP. TO RENEWED
MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL

1   models released since they filed suit. Mot. 29; Zhao Decl. ¶ 59. There is thus no real

2   countervailing equity in favor of Plaintiffs to balance here. *See Winter*, 555 U.S. at 27. Yet

3   Plaintiffs' requested injunction could require Anthropic not only to ███████████████

4   ██████████████████████████████████████████████████████████████

5   ██████████████████████████████████████████████████████████.

6   Kaplan Decl. ¶ 58. ████████████████████████████████████████████

7   ██████████████████████████████████████████████████████████████

8   ███████████████████████████ should outweigh the lack of harm demonstrated by Plaintiffs.

9          In addition to the outsized harm to Anthropic, an injunction would also subvert the public

10  interest by hampering access to this highly useful, general-purpose technology and conflict with

11  copyright law's goal of "stimulat[ing] creativity for public illumination." *Oracle*, 593 U.S. at 29

12  (quotations omitted); *see also Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S.

13  913, 960 (2005) (Breyer, J., concurring) (explaining that copyright law "leans in favor of

14  protecting technology."). Plaintiffs argue an injunction would serve the public interest in

15  "protecting copyright owners' marketable rights to their work" (Mot. 29), but any such interest is

16  not implicated here because Anthropic's use of the works-in-suit for training is fair, not

17  infringing. *See Campbell*, 510 U.S. at 578 n.10; *cf. 3M Unitek Corp. v. Ormco Co.*, 96 F. Supp.

18  2d 1042, 1052 (C.D. Cal. 2000) ("If [protecting IP rights] were a sufficient public interest it

19  would render the public interest element of the four part test superfluous, as it would always

20  favor the plaintiff."). Plaintiffs therefore have not met their "initial burden of showing that [an]

21  injunction is in the public interest." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir.

22  2009); *see also In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 805 (N.D. Cal. 2022)

23  (finding "public consequences" outweighed imposing mandatory injunction "against a company

24  that has already gone to some lengths to address" plaintiffs' concerns).

25  **II.     Plaintiffs' Requested Injunction Is Overbroad**

26         Plaintiffs' requested relief is grossly overbroad, as it seeks to enjoin Anthropic not only

27  with respect to the 500 copyrighted works asserted in the Complaint, but with respect to some

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

27

ANTHROPIC'S OPP. TO RENEWED
MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL

1   *millions* of *additional* works that are not identified in the Complaint or Motion and that are

2   "constantly being updated." Mot. 2 & Dkt. 179-1 (proposed order); Lovejoy Decl. Ex. A at 4.

3         The law forbids Plaintiffs' overreach. *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941

4   F.2d 970, 974 (9th Cir. 1991) (injunctions "must be tailored to remedy the specific harm

5   alleged"). In the copyright context, this means that "the scope of the injunction should be

6   coterminous with the [alleged] infringement." 5 Nimmer on Copyright § 14.06 (2023); *see also*

7   *Mitchell v. 3PL Sys., Inc.*, 2013 WL 12129617, at *6 (C.D. Cal. Apr. 8, 2013) (enjoining

8   infringement of "any copyrighted work" in defendant's control was "well beyond the subject

9   matter of this litigation"). Plaintiffs have never alleged that Anthropic infringed their copyrights

10  in any work other than the 500 listed in Exhibit A of their Complaint—including, *inter alia*,

11  works that Plaintiffs tried *unsuccessfully* to elicit from Claude and that Plaintiffs have so far

12  refused to provide any information about. *See* Lovejoy Decl. Ex. B at 6 (admitting that "Claude

13  did not output all lyrics [Plaintiffs] requested in [their] investigation leading to this Lawsuit");

14  Kaplan Decl. ¶¶ 52–54. Eight months after filing suit, Plaintiffs do not identify any other

15  registered works, let alone explain how they have been infringed or why a preliminary injunction

16  would be warranted. These defects are fatal to Plaintiffs' request for sweeping injunctive relief.

17  *See, e.g.*, *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 923 F. Supp. 1231, 1258

18  (N.D. Cal. 1995) (denying injunction as to works "beyond those listed in [e]xhibits" to the

19  complaint); *Strike 3 Holdings, LLC v. Andaya*, 2021 WL 5123643, at *7 (N.D. Cal. Nov. 4,

20  2021) (denying injunction "concerning rights that have not been clearly identified in this

21  litigation or works . . . for which infringement has not been established").

22                                  **CONCLUSION**

23        None of the four preliminary injunction factors weighs in favor of awarding extraordinary

24  equitable relief. The Court should deny Publishers' meritless and overbroad Motion.[7]

25  _____

26  [7] ████████████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████. Kaplan Decl.
    ¶ 61; Hall Decl. ¶¶ 64–72. Should the Court fashion an injunction that only affects future models

28  yet to be developed, a bond should be set to compensate Anthropic for the significant costs
    Anthropic would incur. Kaplan Decl. ¶¶ 63–65.

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

28

ANTHROPIC'S OPP. TO RENEWED
MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL

Dated:  August 22, 2024                    Respectfully submitted,

                                        LATHAM & WATKINS LLP

                                        By */s/ Joseph R. Wetzel*
                                            Joseph R. Wetzel (SBN 238008)
                                              *joe.wetzel@lw.com*
                                          Andrew M. Gass (SBN 259694)
                                              *andrew.gass@lw.com*
                                        Brittany N. Lovejoy (SBN 286813)
                                            *brittany.lovejoy@lw.com*
                                        505 Montgomery Street, Suite 2000
                                        San Francisco, California 94111
                                        Telephone: +1.415.391.0600

                                        Sarang V. Damle (*pro hac vice*)
                                            *sy.damle@lw.com*
                                        555 Eleventh Street NW, Suite 1000
                                        Washington, DC 20004
                                        Telephone: +1.202.637.2200

                                        Allison L. Stillman (*pro hac vice*)
                                            *alli.stillman@lw.com*
                                        1271 Avenue of the Americas
                                        New York, New York 10020
                                        Telephone: +1.212.906.1747

                                        *Attorneys for Defendant Anthropic PBC*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO