1 | **OPPENHEIM + ZEBRAK, LLP** | **COBLENTZ PATCH DUFFY & BASS LLP**

**OPPENHEIM + ZEBRAK, LLP**
Matthew J. Oppenheim
Nicholas C. Hailey
Audrey L. Adu-Appiah
(admitted *pro hac vice*)
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
aadu-appiah@oandzlaw.com

Jennifer Pariser
Andrew Guerra
Timothy Chung
(admitted *pro hac vice*)
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
jpariser@oandzlaw.com
andrew@oandzlaw.com
tchung@oandzlaw.com

**COBLENTZ PATCH DUFFY & BASS LLP**
Jeffrey G. Knowles (SBN 129754)
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 772-5795
ef-jgk@cpdb.com

**COWAN, LIEBOWITZ & LATMAN, P.C.**
Richard S. Mandel
Jonathan Z. King
Richard Dannay
(admitted *pro hac vice*)
114 West 47th Street
New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

CONCORD MUSIC GROUP, INC., ET AL.,

    Plaintiffs,

    v.

ANTHROPIC PBC,

    Defendant.

Case Number: 5:24-cv-03811-EKL

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Judge: Hon. Eumi K. Lee

Hearing Date: Forthcoming
Time: Forthcoming
Courtroom: 7

1

## **TABLE OF CONTENTS**

2
TABLE OF AUTHORITIES............................................................................................................. ii

3
INTRODUCTION ........................................................................................................................... 1

BACKGROUND ............................................................................................................................. 2

4
    I.    Factual Background ............................................................................................ 2

5
    II.   Relevant Procedural History .............................................................................. 4

6
LEGAL STANDARD ..................................................................................................................... 5

7
ARGUMENT .................................................................................................................................. 5

8
    I.    Anthropic's Motion to Dismiss is untimely. ..................................................... 5

9
    II.   Anthropic's Motion to Dismiss fails to identify any legitimate basis for dismissal. .......... 8

        A.   Publishers plausibly allege predicate acts of direct infringement. .................................. 8

10
        B.   Publishers plausibly allege Anthropic's knowledge of infringement in connection with

11
        their contributory liability claim. .......................................................................... 14

12
        C.   Publishers plausibly allege that Anthropic received a direct financial benefit in
connection with their vicarious liability claim.................................................................. 17

13
        D.   Publishers plausibly allege that Anthropic intentionally removed CMI. ...................... 20

14
    III.   Alternatively, Publishers should be permitted to amend their Complaint. ................... 25

15
CONCLUSION............................................................................................................................. 25

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **TABLE OF AUTHORITIES**

2

**CASES**

3
*Andersen v. Stability AI Ltd.*,
    700 F.Supp.3d 853 (N.D. Cal. 2023) ......................................................... 14

4
*Annabooks, LLC v. Issuu, Inc.*,
    2020 WL 6873646 (N.D. Cal. Sept. 24, 2020) ............................................ 20

5

6
*APL Microscopic, LLC v. Steenblock*,
    2022 WL 4830687 (9th Cir. Oct. 3, 2022) ................................................... 5

7
*Arista Recs. LLC v. Greubel*,
    453 F.Supp.2d 961 (N.D. Tex. 2006) ......................................................... 14

8

9
*Arista Recs. LLC v. Usenet.com, Inc.*,
    633 F.Supp.2d 124 (S.D.N.Y. 2009) .......................................................... 12

10
*Arista Recs., LLC v. Doe 3*,
    604 F.3d 110 (2d Cir. 2010) ....................................................................... 13

11
*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..................................................................................... 5

12

13
*August Image, LLC v. Trend Hunter*,
    2023 WL 6783845, at *2 (C.D. Cal. Sept. 12, 2023) ................................. 11

14
*BanxCorp v. Costco Wholesale Corp.*,
    723 F.Supp.2d 596 (S.D.N.Y. 2010) .......................................................... 22

15

16
*Batra v. PopSugar, Inc.*,
    2019 WL 482492 (N.D. Cal. Feb. 7, 2019) ................................................ 22

17
*Beijing Meishe Network Tech. Co. v. TikTok Inc.*,
    2024 WL 3522196 (N.D. Cal. July 23, 2024) ............................................ 22

18
*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................ 5, 13

19

20
*Bell v. Pac. Ridge Builders, Inc.*,
    2019 WL 13472127 (N.D. Cal. June 4, 2019) ............................................ 20

21
*BMG Rts. Mgmt. (US) LLC v. Joyy Inc.*,
    2024 WL 1098786 (C.D. Cal. Feb. 12, 2024) ............................................ 16

22

23
*Clifton v. Pearson Educ., Inc.*,
    2012 WL 1565236 (N.D. Cal. May 2, 2012) .............................................. 13

24
*Coles Valley Church v. Oregon Land Use Bd. of Appeals*,
    2021 WL 1950181 (D. Or. May 14, 2021) ................................................... 7

25

26
*Cook v. Meta Platforms Inc.*,
    2023 WL 6370891 (N.D. Cal. Jan. 4, 2023) .............................................. 19

27

28

*DISH Network L.L.C. v. Jadoo TV, Inc.*,
  2020 WL 5816579 (N.D. Cal. Sept. 30, 2020) ....................................................... 19

*Doe 1 v. GitHub, Inc.*,
  2024 WL 235217 (N.D. Cal. Jan. 22, 2024) ........................................................... 25

*Doe 1 v. GitHub, Inc.*,
  672 F.Supp.3d 837 (N.D. Cal. 2023) .............................................................. passim

*Ellison v. Robertson*,
  357 F.3d 1072 (9th Cir. 2004) ................................................................. 15, 17, 19

*Elohim EPF USA, Inc. v. Total Music Connection, Inc.*,
  2015 WL 12655556 (C.D. Cal. Oct. 1, 2015) ......................................................... 11

*Free Speech Sys., LLC v. Menzel*,
  390 F.Supp.3d 1162 (N.D. Cal. 2019) .................................................................. 25

*Harrell v. City of Gilroy*,
  2019 WL 452039 (N.D. Cal. Feb. 5, 2019) .............................................................. 6

*Harrington v. Pinterest, Inc.*,
  2021 WL 4033031 (N.D. Cal. Sept. 3, 2021) ......................................................... 16

*Harrington v. Pinterest, Inc.*,
  2022 WL 4348460 (N.D. Cal. Sept. 19, 2022) ....................................................... 20

*In re Apple iPhone Antitrust Litig.*,
  846 F.3d 313 (9th Cir. 2017) ............................................................................... 6

*In re Bill of Lading Transmission & Processing Sys. Patent Litig.*,
  681 F.3d 1323 (Fed. Cir. 2012 ........................................................................... 12

*Interscope Recs. v. Duty*,
  2006 WL 988086 (D. Ariz. Apr. 14, 2006) ............................................................ 14

*Izmo, Inc. v. Roadster, Inc.*,
  2019 WL 13210561 (N.D. Cal. Mar. 26, 2019) ..................................................... 16

*Keck v. Alibaba.com Hong Kong Ltd.*,
  369 F.Supp.3d 932 (N.D. Cal. 2019) .............................................................. 17, 19

*Kifle v. YouTube LLC*,
  2021 WL 10331555 (N.D. Cal. Oct. 5, 2021) ........................................................ 17

*Kuhmstedt v. Enttech Media Grp., LLC*,
  2022 WL 1769126 (C.D. Cal. Apr. 11, 2022) ....................................................... 16

*Logan v. Meta Platforms, Inc.*,
  636 F.Supp.3d 1052 (N.D. Cal. 2022) ............................................................ 21, 24

*London-Sire Recs., Inc. v. Doe 1*,
  542 F.Supp.2d 153 (D. Mass. 2008) .................................................................... 13

*Malibu Media, LLC v. Dhandapani*,
  2020 WL 6120175 (N.D. Tex. Feb. 12, 2020) ....................................................... 13

*Microsoft Corp. v. EEE Bus. Inc.*,
   555 F.Supp.2d 1051, 1058 (N.D. Cal. 2008) ...............................................11, 12

*Microsoft Corp. v. Rivera*,
   2019 WL 1641349 (C.D. Cal. Apr. 16, 2019) ................................................. 12

*Mills v. Netflix, Inc.*,
   2020 WL 548558 (C.D. Cal. Feb. 3, 2020) ..................................................... 24

*Murguia v. Langdon*,
   61 F.4th 1096 (9th Cir. 2023) ......................................................................... 19

*Nayab v. Capital One Bank (USA), N.A.*,
   942 F.3d 480 (9th Cir. 2019) ............................................................................ 5

*Neo4j, Inc. v. Graph Found., Inc.*,
   2020 WL 6700480 (N.D. Cal. Nov. 13, 2020) ................................................ 23

*Olan Mills v. Linn Photo Co.*,
   23 F.3d 1345 (8th Cir. 1994) ...........................................................................11

*Perfect 10, Inc. v. Giganews, Inc.*,
   847 F.3d 657 (9th Cir. 2017) ..................................................................... 19, 20

*Rearden LLC v. Walt Disney Co.*,
   2018 WL 3031885 (N.D. Cal. June 18, 2018) ................................................ 19

*Redd Grp., LLC v. Glass Guru Franchise Sys., Inc.*,
   2013 WL 3462078 (N.D. Cal. July 8, 2013) ................................................... 12

*Richmond v. Weiner*,
   353 F.2d 41 (9th Cir. 1965) ............................................................................ 14

*Rivas v. Kijakazi*,
   2023 WL 8006846, (N.D. Cal. Nov. 17, 2023) ............................................... 25

*Robbins v. PlushCare, Inc.*,
    2022 WL 2988344 (N.D. Cal. July 28, 2022) ................................................... 7

*Ryan v. CARL Corp.*,
   23 F.Supp.2d 1146 (N.D. Cal. 1998) ................................................................11

*Sanders v. Polaris Indus., Inc.*,
   2022 WL 16713089, at *5 (D. Colo. Nov. 4, 2022) .......................................... 8

*Shah v. General Motors LLC*,
   2023 WL 8852491 (N.D. Cal. Dec. 21, 2023) ................................................... 6

*Sims v. Amazon.com, Inc.*,
   2022 WL 739524 (C.D. Cal. Jan. 27, 2022) ................................................... 24

*Soo Park v. Thompson*,
    851 F.3d 910 (9th Cir. 2017) .......................................................................... 13

*Sousa v. Walmart, Inc.*,
   2023 WL 5278662 (E.D. Cal. Aug. 16, 2023) ................................................... 6

*Splunk Inc. v. Cribl, Inc.*,
   662 F.Supp.3d 1029 (N.D. Cal. 2023) ............................................................. 16

*Stevens v. CoreLogic, Inc.*,
   194 F.Supp.3d 1046 (S.D. Cal. 2016) .............................................................. 24

*Stevens v. Corelogic, Inc.*,
   899 F.3d 666 (9th Cir. 2018) ...................................................................... 20, 24

*Ticketmaster L.L.C. v. Prestige Ent. W., Inc.*,
   315 F.Supp.3d 1147 (C.D. Cal. 2018) .......................................................... 12, 13

*Tremblay v. OpenAI, Inc.*,
   2024 WL 557720 (N.D. Cal. Feb. 12, 2024) ...................................................... 25

*U.S. Naval Inst. v. Charter Commc'ns, Inc.*,
   936 F.2d 692 (2d Cir. 1991) ......................................................................... 14

*UMG Recordings, Inc. v. Alburger*,
   2009 WL 3152153 (E.D. Pa. Sept. 29, 2009) ................................................... 13

*Universal City Studios Prods. LLLP v. TickBox TV LLC*,
   2018 WL 1568698 (C.D. Cal. Jan. 30, 2018) ................................................11, 12

*Ventura Content, Ltd. v. Motherless, Inc.*,
   885 F.3d 597 (9th Cir. 2018) ....................................................................... 18

*Wheeler v. City of Oakland*,
   2006 WL 1140992 (N.D. Cal. Apr. 28, 2006) ................................................... 25

*Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*,
   953 F.3d 1108 (9th Cir. 2020) ........................................................................ 5

*YZ Prods., Inc. v. Redbubble, Inc.*,
   545 F.Supp.3d 756 (N.D. Cal. 2021) ............................................................. 16

**STATUTES**

17 U.S.C. § 1202(b) .................................................................................... 4, 20

17 U.S.C. § 1202(b)(1) .................................................................................... 20

17 U.S.C. § 1202(b)(3) .................................................................................... 20

**RULES**

Fed. R. Civ. P. 1 ............................................................................................ 8

Fed. R. Civ. P. 12(b)(2) .................................................................................... 4

Fed. R. Civ. P. 12(b)(3) .................................................................................... 4

Fed. R. Civ. P. 12(b)(6) .................................................................................. 18

Fed. R. Civ. P. 12(g)(2) ................................................................................. 5, 6

Fed. R. Civ. P. 12(h)(2) ................................................................................. 5, 6

Fed. R. Civ. P. 9(b) ........................................................................................ 5

**TREATISES**

5C FED. PRAC. & PROC. CIV. § 1385 ............................................................................................. 6

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## INTRODUCTION

Defendant Anthropic PBC ("Anthropic") is an artificial intelligence ("AI") company that has become a multibillion-dollar enterprise in just three years. And it has built that business largely on the unauthorized copying of millions of copyrighted works, including the life's work of countless songwriters. Plaintiffs[1] ("Publishers") are leading music publishers who foster the creation and lawful exploitation of musical compositions and who serve as representatives and advocates for the interests of their songwriters. Publishers filed this lawsuit to address Anthropic's systematic, widespread, and ongoing infringement of Publishers' copyrighted lyrics in connection with Anthropic's AI products. Anthropic, like virtually all AI companies, is now facing multiple lawsuits over its unauthorized copying and distribution of copyrighted works. Anthropic's defense of this case so far has been to stall as much as possible, mischaracterize the facts alleged in Publishers' Complaint and their pending Motion for Preliminary Injunction, and misstate the law.

Anthropic's Motion to Dismiss (the "Motion" or "Mot."), rife with misdirection, should be denied. Notably, Anthropic does not challenge the sufficiency of Publishers' direct copyright infringement claims, because the facts of Anthropic's underlying infringement are largely undisputed. Instead, Anthropic follows the playbook of other AI defendants and moves to dismiss Publishers' claims of contributory copyright infringement, vicarious copyright infringement, and removal or alteration of copyright management information. But those arguments fail in this case. Anthropic's reliance on other pending lawsuits against AI companies in this District disregards the significant differences between those cases and this one—including the overwhelming evidence of infringing and harmful output generated by Anthropic's AI models in response to user prompts, as Publishers have detailed in their Complaint.

Publishers respectfully request that the Court deny Anthropic's Motion to Dismiss in full.

---

[1] Plaintiffs are Concord Music Group, Inc., Capitol CMG, Inc., Universal Music Corp., Songs of Universal, Inc., Universal Music - MGB NA LLC, Polygram Publishing, Inc., Universal Music - Z Tunes LLC, and ABKCO Music, Inc.

## **BACKGROUND**

### I.   **Factual Background**

Publishers "serve as representatives and advocates for the interests of the songwriters they represent," including by developing and promoting talented lyricists and composers, administering copyrights in their musical compositions, licensing those compositions, and distributing the resulting royalties. Complaint ¶ 34, ECF No. 1 (the "Complaint" or "Compl."). Publishers own and control exclusive rights to "millions of valuable musical compositions, including the compositions listed on Exhibit A" to the Complaint. *Id.* ¶ 37; Ex. A, ECF No. 1-3.

Publishers disseminate their copyrighted lyrics to the public through licensees, such as "licensed lyrics aggregators and websites where consumers can find genuine, authorized copies of the lyrics to their favorite songs." *Id.* ¶ 46. "Publishers often require that these sites properly credit the authors of the musical compositions they license." *Id.*

Anthropic is a company "in the business of developing, operating, selling, and licensing AI technologies." *Id.* ¶ 6. Anthropic built its main product, "a series of AI models referred to as 'Claude,'" by copying and downloading text—including Publishers' lyrics—from the internet or from third-party datasets containing unlicensed copies of those lyrics. *Id.* ¶¶ 6, 54(a). The "corpus" or collection of training data for Claude "relied heavily on datasets (*e.g.*, the 'Common Crawl' dataset) that include massive amounts of content from popular lyrics websites such as genius.com, lyrics.com, and azlyrics.com." *Id.* ¶ 60.

Anthropic copies Publishers' lyrics several times over while building and operating its AI models. After selecting the materials that will form the training corpus for Claude, "Anthropic copies this massive corpus of previously copied text into computer memory[.]" *Id.* ¶ 54(c). Next, "Anthropic 'cleans' the text . . . to remove offensive language and filter out other materials that it wishes to exclude from its training corpus." *Id.* ¶ 62; *see also id.* ¶ 54(b). Anthropic does not "take[] any steps to remove copyrighted content" when cleaning the training corpus. *Id.* ¶ 62. Anthropic then "us[es] that vast corpus to train its AI models and generate output based on this copied text." *Id.* ¶ 6. "Anthropic processes the data further as it 'finetunes' the Claude AI model and engages in additional 'reinforcement learning,' based both on human feedback and AI feedback[.]" *Id.* ¶ 54(d).

Anthropic offers the public access to its AI models and the output they generate in several ways. Anthropic offers a Claude AI chatbot product, including through its own website, that "responds to user-submitted questions and commands with seemingly sophisticated and conversational AI-generated replies." Compl. ¶ 52. Anthropic also sells or licenses access to Claude as "a commercial Application Programming Interface ('API') through which custom third-party client software can interact with Claude AI models." *Id.*

Because Anthropic has copied and ingested Publishers' lyrics in the training of its AI models, those "models generate identical or nearly identical copies of those lyrics" when prompted to do so by users. *Id.* ¶ 8; *see also id.* ¶ 55 ("Claude AI models generate output consistent in structure and style with both the text in their training corpora and the reinforcement feedback"). "Upon accessing Anthropic's Claude AI models through Anthropic's commercially available API or via its public website, users can request and obtain through Claude verbatim or near-verbatim copies of lyrics for . . . copyrighted lyrics owned and controlled by Publishers." *Id.* ¶ 65. For example, "[w]hen a user prompts Anthropic's Claude AI chatbot to provide the lyrics to songs such as 'A Change Is Gonna Come,' 'God Only Knows,' 'What a Wonderful World,' 'Gimme Shelter,' 'American Pie,' 'Sweet Home Alabama,' 'Every Breath You Take,' 'Life Is a Highway,' 'Somewhere Only We Know,' 'Halo,' 'Moves Like Jagger,' "Uptown Funk," or any other number of Publishers' musical compositions, the chatbot will provide responses that contain all or significant portions of those lyrics." *Id.* ¶ 8.

Anthropic's Claude AI models also "copy and distribute Publishers' lyrics as output in response to a wide range of more generic queries related to songs and various other subject matter," including requests for original fiction, poetry, and chords. *Id.* ¶ 80. For instance, "when Anthropic's Claude is queried, 'Write me a song about the death of Buddy Holly,' the AI model responds by generating output that copies directly from the song 'American Pie' written by Don McLean . . . despite the fact that the prompt does not identify that composition by title, artist, or songwriter[.]" *Id.* ¶ 73. At the same time, "when Anthropic's AI models regurgitate Publishers' lyrics" in response to those open-ended requests, the lyrics "are often unaccompanied by the corresponding song title, songwriter, or other critical copyright management information." *Id.* ¶ 86.

"Anthropic is well aware of its licensees' and users' infringing activity through its AI products," Compl. ¶ 122, but did nothing to materially stop the infringement until Publishers filed suit, because it profits richly from unauthorized copies of Publishers' works. Because Anthropic charges its commercial API customers "on a per-word, pay-as-you-go model," "Anthropic is paid every time one of its [commercial] customers' end users submits a request for Publishers' song lyrics, and it is paid again every time its Claude API generates output copying and relying on those lyrics." *Id.* ¶ 94. "One of the reasons that" both Anthropic's Claude chatbot interface and API products "are so popular and valuable is because of the substantial underlying text corpus that includes Publishers' copyrighted lyrics," meaning that Publishers' lyrics "serve[] as a draw for individual users, commercial customers, and ultimately investors." *Id.* ¶ 98. Moreover, "[c]ustomers and users are drawn to Anthropic's AI models, at least in part, by the models' ability to generate copies of song lyrics, including Publishers' copyrighted lyrics[.]" *Id.* ¶ 138.

## II. Relevant Procedural History

On October 18, 2023, Publishers sued Anthropic in the U.S. District Court for the Middle District of Tennessee for direct copyright infringement, contributory infringement, vicarious infringement, and removal or alteration of copyright management information in violation of 17 U.S.C. § 1202(b). *See generally* Compl. Shortly thereafter, on November 16, 2023, Publishers moved for a preliminary injunction. ECF No. 40. On November 22, 2023, Anthropic moved to dismiss the Complaint for lack of personal jurisdiction and improper venue, pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(3), or, in the alternative, to transfer venue. ECF No. 55. On June 24, 2024, the U.S. District Court for the Middle District of Tennessee granted Anthropic's motion in part and denied it in part, transferring this case to the U.S. District Court for the Northern District of California. ECF Nos. 123–24. Shortly after transfer, Publishers filed a renewed Motion for Preliminary Injunction, updating their prior motion to address relevant and controlling caselaw in the new Court as well as other intervening developments. ECF No. 179.

Anthropic has not yet answered Publishers' Complaint. Now, Anthropic has filed a second Rule 12 motion to dismiss—the present Motion—this time seeking to dismiss Publishers' non-direct infringement claims for failure to state a claim.

1

**LEGAL STANDARD**

2      To withstand a motion to dismiss for failure to state a claim under Rule 12(b)(6),

3   Publishers' Complaint need only "contain sufficient factual matter, accepted as true, to 'state a

4   claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

5   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When applying this plausibility standard,

6   courts "do not require heightened fact pleading of specifics" or "detailed factual allegations."

7   *Twombly*, 550 U.S. at 555, 570. "[S]cienter need not be pleaded with particularity, but may be

8   alleged generally." *Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d

9   1108, 1122 (9th Cir. 2020) (citing Fed. R. Civ. P. 9(b)). Moreover, "evidence is not required at the

10   motion to dismiss stage." *APL Microscopic, LLC v. Steenblock*, 2022 WL 4830687, at *1 (9th Cir.

11   Oct. 3, 2022) (citing *Twombly*, 550 U.S. at 570).

12      Instead, the Court must accept the Complaint's factual allegations as true, "draw on its

13   judicial experience and common sense," and evaluate whether the Complaint includes "factual

14   content that allows the court to draw the reasonable inference that the defendant is liable for the

15   misconduct alleged." *Nayab v. Capital One Bank (USA), N.A.*, 942 F.3d 480, 496 (9th Cir. 2019)

16   (quoting *Iqbal*, 556 U.S. at 678–79). Unless a complaint's allegations fail to "raise a right to relief

17   above the speculative level," dismissal is improper. *See Twombly*, 550 U.S. at 555.

18

**ARGUMENT**

19   **I.      Anthropic's Motion to Dismiss is untimely.**

20      As a threshold matter, Anthropic's Motion to Dismiss is untimely and violates the Federal

21   Rules of Civil Procedure. *See* Fed. R. Civ. P. 12(g)(2), 12(h)(2). Anthropic has already filed a Rule

22   12 motion in which it could have—but failed to—challenge the sufficiency of the Complaint under

23   Rule 12(b)(6). *See* ECF No. 55. Now, rather than answer the Complaint, Anthropic has filed a

24   *second* motion to dismiss under Rule 12, raising a Rule 12(b)(6) defense for the first time.

25      Anthropic may not file another Rule 12 motion to dismiss without first answering the

26   Complaint. Rule 12(g) clearly states that "a party that makes a motion under [Rule 12] ***must not***

27   make another motion under this rule raising a defense or objection that was available to the party

28   but omitted from its earlier motion," "[e]xcept as provided in Rule 12(h)(2) or (3)." Fed. R. Civ.

P. 12(g)(2) (emphasis added). Rule 12(h)(2) further clarifies that, in such circumstances, a defense of "[f]ailure to state a claim upon which relief can be granted . . . may be raised" *only* in a Rule 7(a) pleading (such as an answer), a post-answer Rule 12(c) motion, or at trial. *Id.* at 12(h)(2).

The Ninth Circuit affirmed that "[i]f a failure-to-state-a-claim defense under Rule 12(b)(6) was not asserted in the first motion to dismiss under Rule 12, Rule 12(h)(2) tells us that it can be raised, but only in a pleading under Rule 7, in a post-answer motion under Rule 12(c), or at trial." *In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 318 (9th Cir. 2017), *aff'd sub nom. Apple Inc. v. Pepper*, 587 U.S. 273 (2019). Accordingly, Anthropic was required to answer Publishers' Complaint either concurrently with or before filing the present Motion to Dismiss. *See* Fed. R. Civ. P. 12(g)(2), 12(h)(2); *see also* 5C Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1385 (3d ed. 2024) ("[I]f the defendant first moves to dismiss on the ground of lack of jurisdiction over the person, he is not allowed to make a second preliminary motion to dismiss on the ground of failure to state a claim upon which relief can be granted."). Because Anthropic failed to do so, its Motion to Dismiss violates the Federal Rules and should be denied. *See, e.g.*, *Shah v. Gen. Motors LLC*, 2023 WL 8852491, at *9 (N.D. Cal. Dec. 21, 2023) (denying successive Rule 12 motion); *Sousa v. Walmart, Inc.*, 2023 WL 5278662, at *11 (E.D. Cal. Aug. 16, 2023) (same); *Harrell v. City of Gilroy*, 2019 WL 452039, at *7 (N.D. Cal. Feb. 5, 2019) (same).

Anthropic deliberately contravened the Federal Rules. Publishers told Anthropic over a month before it filed this Motion that doing so without first answering the Complaint would violate Rules 12(g) and (h). Decl. of Timothy Chung, Ex. A, at 1. Publishers explained this point in even greater detail in the Parties' prior Joint Case Management Statement (the "Joint Statement") submitted to Judge Corley on August 8, 2024—a week before Anthropic filed this Motion—and cited numerous cases that denied motions to dismiss for similar violations. *See* Joint Statement, ECF No. 203, at 9–11. Anthropic ignored this authority and filed this Motion anyway.

None of the cases cited by Anthropic in the Parties' prior Joint Case Management Statement, Joint Statement at 12–14, address a situation like the present case, where Publishers raised the issue of the sequencing of Anthropic's Answer and Motion to Dismiss well before Anthropic filed the instant Motion. In fact, Anthropic had its Answer ready to file at that time, *see*

ECF No. 175, at 3 n.2, but ultimately elected to file its Motion instead. Rather, the cases cited by Anthropic address instances in which Rule 12(g) and (h) arguments were not raised until after the fact, and none of the alleged inefficiencies or prejudices addressed in those cases support Anthropic's backwards timing here. More broadly, Anthropic's reliance on the Ninth Circuit's *In re Apple* decision, Joint Statement at 12, is misplaced. *In re Apple* "does ***not*** stand for the blanket proposition that district courts may freely flout the Federal Rules whenever a party asks them to do so." *Robbins v. PlushCare, Inc.*, 2022 WL 2988344, at *2 n.3 (N.D. Cal. July 28, 2022) (quoting *Coles Valley Church v. Or. Land Use Bd. of Appeals*, 2021 WL 1950181, at *8 (D. Or. May 14, 2021)) (emphasis added). Yet, flouting the Rules is precisely what Anthropic has done.

Anthropic's decision was not without consequence—it has seriously prejudiced Publishers. Publishers filed their Complaint in October 2023, but Anthropic has still not filed its Answer. Anthropic seeks to gain a litigation advantage by prioritizing resolution of its second Motion to Dismiss while delaying answering the Complaint indefinitely, ignoring the sequencing the Rules require. When Anthropic answers the Complaint, it will have to admit facts that it so far refuses to acknowledge directly, including that Anthropic copied Publishers' lyrics when training Claude and made no effort to remove those lyrics from its training dataset despite its ability to do so. Those facts are directly relevant to Publishers' pending Motion for Preliminary Injunction, ECF No. 179, which is based on Publishers' claim—unchallenged in the instant Motion—that Anthropic directly infringes Publishers' lyrics. Anthropic's delay in filing an Answer unfairly denies Publishers and the Court the benefit of its Answer in resolving Publishers' request for preliminary relief.

Anthropic, on the other hand, has no legitimate basis to argue unfair prejudice if it must answer the Complaint before again moving to dismiss the Complaint. Anthropic's predicament is entirely of its own making, since it decided to file the present Motion knowing that doing so without having answered the Complaint violated the Rules. Over a month ago, before the previously scheduled Case Management Conference before Judge Corley, Anthropic agreed to have its Answer ready to file by August 15, 2024, if needed. ECF No. 175, at 3 n.2; Joint Statement at 10. But after that Case Management Conference was vacated, Anthropic filed the Motion without filing its already-prepared Answer. There is no excuse for that failure. Anthropic could

have easily filed its already-prepared Answer alongside a Rule 12(c) motion, rather than seeking to fast-track its Motion while stalling on its Answer.

Anthropic invokes Rule 1 to defend its untimely Motion, but that argument is unavailing. While courts interpret Rules 12(g) and (h) in light of the broader policy considerations of Rule 1, which promotes the "just, speedy, and inexpensive determination of every action and proceeding," Fed. R. Civ. P. 1, those considerations do not excuse Anthropic's flouting of the Rules. Efficiency considerations favor Publishers, because, among other reasons, "[h]ad Defendant[] raised [its] Rule 12(b)(6) argument in [its] Motion to Transfer, the [Middle District of Tennessee] likely would have ruled on only the portion of the Motion seeking transfer, preserving the Rule 12(b)(6) arguments for the transferee court in this District and obviating the need for [Anthropic] to file a second motion[, which] would have furthered the efficiency goals of Rule 12(g)(2)." *See Sanders v. Polaris Indus., Inc.*, 2022 WL 16713089, at *5 (D. Colo. Nov. 4, 2022). Additionally, given that Anthropic's Motion does not seek to dismiss Publishers' direct infringement claim, the Motion— even if granted in its entirety—would not resolve this case or render an Answer unnecessary.

In sum, Anthropic's Motion to Dismiss should be denied as untimely and for violating Federal Rules 12(g) and (h). Alternatively, Anthropic should be ordered to file its Answer to Publishers' complaint immediately and without further delay, in accordance with the Rules.

## II. Anthropic's Motion to Dismiss fails to identify any legitimate basis for dismissal.

Even if Anthropic's Motion to Dismiss were somehow permissible, Anthropic fails to identify any substantive basis for dismissal. None of Anthropic's four arguments regarding Publishers' non-direct infringement claims justifies dismissal.

### A. Publishers plausibly allege predicate acts of direct infringement.

Anthropic's contention that Publishers fail to allege acts of direct infringement sufficient to contributory and vicarious liability is wrong on both the facts and the law.

On the facts, Anthropic disregards the Complaint's repeated allegations of predicate acts of direct infringement by both third-party individual Claude users and Anthropic business customers. With respect to individual users, Publishers allege that Anthropic "provides individual users access" to Claude as a "chatbot" through Anthropic's public website, which "responds to

user-submitted questions and commands with seemingly sophisticated and conversational AI-generated replies." Compl. ¶ 52; *see also* Mot. 3 (stating that "Anthropic's flagship product, Claude, is offered as a conversational interface with which users can interact, chatbot-style"). "Upon accessing Anthropic's Claude AI models through Anthropic's public website," these third-party "users can request and obtain through Claude verbatim or near-verbatim copies of lyrics for . . . copyrighted lyrics owned and controlled by Publishers," constituting infringement. Compl. ¶ 65. In response to such user prompts requesting Publishers' lyrics, Claude generates output that copies those lyrics. *See, e.g., id.* ¶¶ 66–70. For example, "[w]hen a user prompts Anthropic's Claude AI chatbot to provide the lyrics to songs such as 'A Change Is Gonna Come,' 'God Only Knows,' 'What a Wonderful World,' 'Gimme Shelter,' 'American Pie,' 'Sweet Home Alabama,' 'Every Breath You Take,' 'Life Is a Highway,' 'Somewhere Only We Know,' 'Halo,' 'Moves Like Jagger,' "Uptown Funk," or any other number of Publishers' musical compositions, the chatbot will provide responses that contain all or significant portions of those lyrics." *Id.* ¶ 8.

Even if Publishers' lyrics may be available "free of charge to anyone with internet access,"[2] Mot. 9, Publishers also plausibly allege that individual users could and would direct Claude to deliver copies of Publishers' lyrics, contrary to Anthropic's unsupported claim. Specifically, Publishers have alleged Anthropic provides users access to Claude in a variety of ways, including as a "limited free version" available on Anthropic's public website. Compl. ¶ 52. Publishers also allege the existence of a well-established market of users searching for lyrics online. *Id.* ¶¶ 9, 108. It is therefore more than reasonable to infer that typical users may have sought lyrics from Claude as that service is no more costly or inconvenient than any other method. Anthropic has not explained why users would ***not*** seek to use Claude, which is marketed as an all-purpose text generation tool, *see* Compl. ¶¶ 50; Mot. 1, 3, to obtain lyrics.

As to infringement by Anthropic's business customers, Publishers allege that Anthropic sells or licenses its Claude AI models to business customers as "a commercial Application Programming Interface ('API') through which custom third-party client software can interact with

---

[2] That other online services provide Publishers' lyrics "free of charge" does not mean that they do so without first paying licensing fees.

Claude AI models," and through which those customers "incorporat[e] Claude interactions into [their] software, products, and systems." Compl. ¶ 52. Anthropic acknowledges that its business customers or its end customers might use the Claude API as a tool to "brainstorm[] plot ideas for stories," *See* Mot. 1. It is reasonable to infer that some requests will seek copyrighted works. When the third-party business itself or its end customer prompts the Claude to "[w]rite a short piece of fiction in the style of Louis Armstrong," *see* Compl. ¶ 79, the third-party business relays that prompt to an Anthropic server, which then "passes the prompt as input" to Anthropic's Claude model, *id.* ¶ 52. When Claude generates its response—a story that copies verbatim from Publishers' lyrics to the work "What a Wonderful World," *id.* ¶ 79—"an Anthropic server sends the model's response back to the [third-party business] customer's software," which then relays that response to the end customer. *Id.* ¶ 52. In this instance, the third-party business and/or its end customer directly infringe Publishers' reproduction, distribution, display, and derivative works rights.

Publishers explicitly allege that "Anthropic's AI models are used by its commercial customers and their end users . . . to infringe Publishers' copyrights[.]" *Id.* ¶ 94. "Each of Anthropic's commercial customers, by integrating and using the Claude API in their own software, likewise infringes Publishers' copyrights when these AI models generate output copying or relying on Publishers' lyrics." *Id.* ¶ 95. In particular, "[u]pon accessing Anthropic's Claude AI models through Anthropic's commercially available API," those third-party businesses themselves and their ultimate end users (to the extent the businesses make the API available to their own customers) "can request and obtain through Claude verbatim or near-verbatim copies of lyrics for a wide variety of songs," similar to individual users that access Claude through Anthropic's website. *Id.* ¶ 65; *see also id.* ¶ 94 (alleging that "Anthropic is paid every time one of its customers' end users submits a request for Publishers' song lyrics, and it is paid again every time its Claude API generates output copying and relying on those lyrics.").

The Complaint makes clear that "Anthropic unlawfully enables, encourages, and profits from massive copyright infringement **by its users**," giving rise to Publishers' claims for contributory and vicarious copyright infringement. *Id.* ¶ 11 (emphasis added). The Complaint alleges, without reference to Publishers' investigators or agents, that "[w]hen a user prompts

Anthropic's Claude AI chatbot to provide the lyrics to . . . [a] number of Publishers' musical compositions, the chatbot will provide responses that contain all or significant portions of those lyrics." *Id*. ¶ 8. Indeed, Publishers allege that "the licensees and users of Anthropic's AI models, without Publishers' permission or consent, have unlawfully reproduced, distributed to the public, publicly displayed, and/or prepared derivative works based upon Publishers' musical compositions, including the song lyrics contained therein," which "constitutes direct infringement." *Id*. ¶¶ 120, 134. The allegations in the Complaint more than suffice to establish direct infringement for which Anthropic is secondarily liable. *See August Image, LLC v. Trend Hunter*, 2023 WL 6783845, at *2 (C.D. Cal. Sept. 12, 2023) (holding that plaintiff who "pled enough to notify [defendant] as to the type of infringing conduct and the source of the claims," as well as that defendant had "full knowledge of the strictures of federal copyright law" and "benefitted financially," "adequately allege[d] that [defendant] may be liable for contributory or vicarious copyright infringement in the alternative").

On the law, Anthropic's contention—which goes beyond the four corners of the Complaint—that Claude generated infringing outputs only in response to prompts by Publishers' investigators and that such outputs are "*per se* non-infringing," Mot. 6, is baseless. A defendant who, without authorization, distributes or displays copyrighted works to a plaintiff's agent or investigator is liable for infringement. *See, e.g.*, *Universal City Studios Prods. LLLP v. TickBox TV LLC*, 2018 WL 1568698, at *9 (C.D. Cal. Jan. 30, 2018) ("[Plaintiffs' investigator's] repeated access to [p]laintiffs' copyrighted content via the [d]evice is sufficient evidence of actual access to that content by [d]evice users"); *Elohim EPF USA, Inc. v. Total Music Connection, Inc.*, 2015 WL 12655556, at *12 (C.D. Cal. Oct. 1, 2015) ("Plaintiffs' agents' acts of public performance and display at [d]efendants' establishments constituted infringement"); *Microsoft Corp. v. EEE Bus. Inc.*, 555 F.Supp.2d 1051, 1058 (N.D. Cal. 2008) (holding that distributions to unlicensed users, including plaintiff's investigators, violated plaintiff's exclusive right to distribution); *Ryan v. CARL Corp.*, 23 F.Supp.2d 1146, 1148–49 (N.D. Cal. 1998) (citing *Olan Mills v. Linn Photo Co.*, 23 F.3d 1345 (8th Cir. 1994)). In sum, "[Publishers] may have set events in motion, but [Anthropic] had a hand in inflicting that injury." *Ryan*, 23 F.Supp.2d. at 1149. That Anthropic's models served

infringing outputs to Publishers' agents investigating infringement does not absolve Anthropic from contributory and vicarious liability in connection with that infringement. *See, e.g.*, *Microsoft Corp. v. Rivera*, 2019 WL 1641349, at *3 (C.D. Cal. Apr. 16, 2019) (holding that plaintiff "sufficiently pleaded a meritorious copyright infringement claim" and "a meritorious claim for contributory copyright infringement" where infringing copies were "sold and delivered to [the plaintiff's] investigator"); *TickBox*, 2018 WL 1568698, at *9–12 (finding Plaintiffs "are likely to succeed on the merits of their [] inducement liability claim" based on evidence of distribution to investigators); *EEE Bus., Inc.*, 555 F.Supp.2d at 1059–60 (holding defendant liable for direct and contributory infringement based on sales to plaintiffs' investigators).

Publishers are not required to name and date every instance of direct infringement to state a claim for secondary infringement. Publishers plausibly allege that Anthropic's AI models respond to queries from users seeking copyrighted lyrics—including queries from Publishers' investigators—by delivering those lyrics as requested. That allegation, without naming specific infringing users, is sufficient to set forth a valid claim for secondary copyright liability. *See, e.g.*, *Ticketmaster L.L.C. v. Prestige Ent. W., Inc.*, 315 F.Supp.3d 1147, 1166 (C.D. Cal. 2018) (denying dismissal of secondary liability claim where plaintiff alleged direct infringement by unidentified primary infringers); *see also Redd Grp., LLC v. Glass Guru Franchise Sys., Inc.*, 2013 WL 3462078, at *4 (N.D. Cal. July 8, 2013) (explaining in patent infringement context that "[t]o state a claim for indirect infringement, 'a plaintiff need not identify a specific direct infringer if it pleads facts sufficient to allow an inference that at least one direct infringer exists'") (quoting *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1336 (Fed. Cir. 2012)).

In an analogous context, the court in *Arista Recs. LLC v. Usenet.com, Inc.*, 633 F.Supp.2d 124, 149 (S.D.N.Y. 2009), determined on summary judgment that the plaintiffs had "established the threshold of [defendants'] users' direct infringement for their claims of secondary liability" where plaintiffs had set forth evidence of their investigators' downloads from the defendant's system and additional evidence of user infringement obtained from the defendant during discovery. Naturally, when the complaint was filed, plaintiffs could only have alleged direct infringement based on their own investigator's interaction with the defendant's system. This was evidently

sufficient for pleading purposes. Courts routinely hold that plaintiff copyright owners need not identify particular individuals who downloaded a copyrighted work or specific instances of direct infringement to maintain an infringement claim against an unauthorized uploader. *See e.g.*, *Malibu Media, LLC v. Dhandapani*, 2020 WL 6120175, at *3 (N.D. Tex. Feb. 12, 2020) ("By alleging that [d]efendant made the [copyrighted works] available for others to download . . . [p]laintiff has adequately alleged a claim of copyright infringement through the unlawful distribution of the [copyrighted works]"); *UMG Recs., Inc. v. Alburger*, 2009 WL 3152153, at *3 n.41 (E.D. Pa. Sept. 29, 2009) ("There is no requirement that plaintiffs show that the files were actually downloaded by other users from [d]efendant, only that the files were available for downloading."); *London-Sire Recs., Inc. v. Doe 1*, 542 F.Supp.2d 153, 169 (D. Mass. 2008) (court may infer distribution occurred where all necessary steps for distribution were completed). "Without more knowledge about the nature of the relationship between [Anthropic] and [its users]," Publishers "cannot be expected to plead with any greater specificity." *Ticketmaster*, 315 F.Supp.3d at 1166.

Dismissal is especially unwarranted where Publishers have not had the opportunity to discover from Anthropic what other third parties have requested from the Claude chatbot or APIs; such information is exclusively in Anthropic's possession. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible.") (quoting *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)). It would be premature to dismiss the Complaint for failure to specify other third-party infringements when Publishers have alleged that Claude regurgitates lyrics in response to user prompts, Compl. ¶¶ 8, 80, including to Publishers and their investigators, *see*, *e.g.*, *id.* ¶¶ 66–74, 75–79, and there is a known market for users looking for lyrics online, *id.* ¶¶ 9, 45–46. Discovery will further reveal specifics concerning acts of infringement and Anthropic's role in them. *Clifton v. Pearson Educ., Inc.*, 2012 WL 1565236, at *6 (N.D. Cal. May 2, 2012) (plausibility standard "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence supporting the allegation") (quoting *Twombly*, 550 U.S. at 556). Indeed, "specific dates

and times for the alleged instances of copyright infringement are matters that can be clarified during discovery." *Arista Recs. LLC v. Greubel*, 453 F.Supp.2d 961, 967 (N.D. Tex. 2006); *see also Interscope Recs. v. Duty*, 2006 WL 988086, at *2 (D. Ariz. Apr. 14, 2006) ("To the extent that there remains confusion with regard to the exact date or time of the incidences of alleged infringement, that can be clarified during discovery").

The cases on which Anthropic relies are inapposite. Anthropic cites *Richmond v. Weiner*, 353 F.2d 41, 42 (9th Cir. 1965), and *U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 936 F.2d 692, 695 (2d Cir. 1991), to argue that copyright owners cannot infringe their own copyrights. Mot. 6. But Anthropic fails to note that both courts' articulation of that proposition arose where the accused parties were found to hold ownership rights as joint owners or licensees for the works at issue. *Richmond*, 353 F.2d at 46; *Charter*, 936 F.2d at 695. Neither circumstance is remotely applicable here. Publishers have not conveyed any rights to Anthropic related to their lyrics, nor does Anthropic argue that it is insulated from liability as a co-owner of any of Publishers' works.

Anthropic's reliance on *Andersen v. Stability AI Ltd.*, 700 F.Supp.3d 853, 869 (N.D. Cal. 2023), Mot. 8–9, also fails to pass muster. Nowhere does *Andersen* state that the failure to identify an instance where a "third[]party . . . successfully generated an unauthorized copy of [a plaintiff's] works," Mot. 8, will doom a vicarious infringement claim at the motion-to-dismiss stage. Instead, the *Andersen* court determined the plaintiff's vicarious infringement claim could not be sustained where, *inter alia*, the plaintiff had not alleged direct infringement claims concerning AI-generated outputs against the relevant defendants, including by failing to allege facts that would support a finding of substantial similarity between any copyrighted works and the models' outputs. *Id.* at 864–69. No such deficiency exists here. In fact, Publishers' evidence of direct infringement is so compelling that Anthropic has neither moved to dismiss Publishers' direct infringement claims, nor challenged Publishers detailed allegations that the Claude outputs cited in the Complaint are identical or substantially similar to Publishers' copyrighted works. Compl. ¶¶ 65–79.

## B.   Publishers plausibly allege Anthropic's knowledge of infringement in connection with their contributory liability claim.

Publishers plausibly allege Anthropic's knowledge of infringement sufficient to state a

claim for contributory liability. "[T]he knowledge requirement for contributory copyright infringement . . . include[s] both those with actual knowledge and those who have reason to know of direct infringement." *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004). "At the pleading stage, mental conditions generally need not be alleged with specificity," including allegations that a defendant knew of acts of direct infringement. *Doe 1 v. GitHub, Inc.,* 672 F.Supp.3d 837, 858 (N.D. Cal. 2023).

Viewed in the light most favorable to Publishers, the Complaint more than meets that standard. Publishers allege that "Anthropic has knowledge of specific infringing responses generated by its AI models in response to user prompts," Compl. ¶ 122, including the numerous examples of specific Claude outputs copying Publishers' lyrics identified in the Complaint, *see, e.g.*, Compl. ¶¶ 66–79. Moreover, the Complaint explains that "Anthropic is well aware of its licensees' and users' infringing activity through its AI products," given that "Anthropic knowingly trained its AI models on infringing content on a massive scale in order to enable those models to generate responses to user prompts that infringe Publishers' copyrighted lyrics." Compl. ¶ 122.

Publishers' allegations regarding Anthropic's so-called copyright "guardrails" highlight Anthropic's knowledge of infringement by its users. Publishers allege that Anthropic "has the ability to program 'guardrails' into its AI models, so as to prevent the models from responding to certain prompts or generating output that copies Publishers' lyrics or other copyrighted content"; that, "in some cases, Anthropic's AI models affirmatively refuse to respond to prompts seeking certain song lyrics, warning users that providing those lyrics runs afoul of 'copyright restrictions'"; and that these guardrail "responses make clear that Anthropic understands that generating output that copies others' lyrics violates copyright law." Compl. ¶ 83. Yet, "despite this knowledge" by Anthropic, "in the majority of instances, Anthropic fails to implement effective and consistent guardrails to prevent against the infringement of Publishers' works" by its users, and the guardrails that do exist can be easily "evade[d]." *Id.* These facts provide critical additional support to Publishers' allegations of Anthropic's knowledge.

Publishers also allege that Anthropic's refusal to fully disclose the source of its training data further underscores Anthropic's knowledge: "[t]he reason that Anthropic refuses to disclose

the materials it has used for training Claude is because it is aware that it is copying copyrighted materials without authorization from the copyright owners." Compl. ¶ 59.

Given these allegations, it is more than plausible that Anthropic knew or should have known of the infringing activities by its users and licensees. No more is required of Publishers under Federal Rule 9(b) or the plausibility standard at the motion to dismiss stage. The argument on which Anthropic focuses, "whether [it] knew or should have known that its activities would induce or enable an infringement of [Publisher's] rights[,] is more suited to summary judgment." *Izmo, Inc. v. Roadster, Inc.*, 2019 WL 13210561, at *4 (N.D. Cal. Mar. 26, 2019).

Courts in this Circuit have denied motions to dismiss in similar circumstances. *See, e.g.*, *BMG Rts. Mgmt. (US) LLC v. Joyy Inc.*, 2024 WL 1098786, at *4 (C.D. Cal. Feb. 12, 2024) (factual allegations supported a "reasonable inference" of defendant's specific knowledge of infringement); *Splunk Inc. v. Cribl, Inc.*, 662 F.Supp.3d 1029, 1052 (N.D. Cal. 2023) (taking factual allegations in complaint as true to find sufficient allegations of knowledge); *Kuhmstedt v. Enttech Media Grp., LLC*, 2022 WL 1769126, at *4 (C.D. Cal. Apr. 11, 2022) ("Plaintiff's allegations support the circumstantial inference that [d]efendants acted with the knowledge (or even intent) to facilitate infringement of [p]laintiff's copyright. It is unreasonable to demand that a plaintiff offer more detailed allegations regarding a defendant's mental state at this early stage before a plaintiff has even conducted any discovery."). Anthropic's argument should likewise be rejected here.

Meanwhile, Anthropic relies on cases that are again inapposite. Unlike the plaintiff in *Harrington v. Pinterest, Inc.*, who alleged the defendant had general knowledge of infringement occurring on its website, 2021 WL 4033031, at *4 (N.D. Cal. Sept. 3, 2021), Publishers have pleaded that Anthropic had knowledge or reason to know that its Claude AI models outputted specific infringing song lyrics, including by programming some guardrails to prevent the output of certain song lyrics while allowing others. *See, e.g.*, Compl. ¶ 83. At a minimum, Publishers' allegations support a reasonable inference that Anthropic had specific knowledge that Claude outputted or would output specific works to motivate the programming of its guardrails. Anthropic's reliance on *YZ Prods., Inc. v. Redbubble, Inc.*, 545 F.Supp.3d 756, 764 (N.D. Cal. 2021), where the plaintiff offered no allegations of specific knowledge, is deficient for the same

reason. Publishers' allegations similarly go beyond the "conclusory allegations" that formed the basis of the plaintiff's claim in *Kifle v. YouTube LLC*, 2021 WL 10331555, at *6 (N.D. Cal. Oct. 5, 2021), given that Publishers allege multiple demonstrations of Anthropic's specific knowledge of infringement on Claude. *See, e.g.*, Compl. ¶¶ 59, 66–70, 83, 122.

### C. Publishers plausibly allege that Anthropic received a direct financial benefit in connection with their vicarious liability claim.

Publishers plausibly allege that Anthropic derives a direct financial benefit from infringing activity sufficient to state a claim for vicarious liability. "The essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps." *Ellison*, 357 F.3d at 1079. Thus, a defendant who operates a website derives a "financial benefit" from infringing activity "where the availability of infringing material acts as a draw for customers." *Id.* at 1078. Plaintiffs need not show that infringing material is the primary draw of defendant's product, or that profits from infringement make up a "substantial" proportion of defendant's income, to satisfy this element. *Id.* at 1079. "[A]t the pleading stage, the Court is not asked whether [Publishers have] sufficient evidence to create a triable issue of material fact. Instead, the question is whether Plaintiff plausibly alleged a direct financial benefit to [Anthropic] due to the alleged infringing activity[.]" *Keck v. Alibaba.com Hong Kong Ltd.*, 369 F.Supp.3d 932, 939 (N.D. Cal. 2019).

Publishers' allegations more than suffice to survive a motion to dismiss. The Complaint alleges that "licensees and users of Anthropic's AI models, without Publishers' permission or consent, have unlawfully reproduced" Publishers' lyrics, Compl. ¶ 134, and that "Anthropic has derived a direct financial benefit from licensees and users' infringement of Publishers' copyrighted musical compositions through Anthropic's AI models" in numerous ways. *Id.* ¶ 137. Publishers plead that "Anthropic has commercialized its AI models"—which are built and trained on Publishers' lyrics and other text—"including by selling API access to commercial customers on a per-word basis," through which "Anthropic receives revenues every time a user submits a request for Publishers' song lyrics through the API, and again every time the API generates output copying or relying on those lyrics." *Id.* Publishers allege that "Anthropic is paid every time its Claude API

generates output copying and relying on those lyrics," *id*. ¶ 94, increasing Anthropic's revenue. Publishers also allege that "[c]ustomers and users are drawn to Anthropic's AI models, at least in part, by the models' ability to generate copies of song lyrics." *Id*. ¶ 138. Further, the inclusion of Publishers' lyrics in Claude's text corpus attracts valuable publicity, subscribers, and investment funding for Anthropic. *See* Compl. ¶ 98; *see also id*. ¶ 94 (alleging that "Anthropic charges its commercial customers for using its Claude API on a per-word, pay-as-you-go model," such that "the more Anthropic's AI models are used by its commercial customers and their end users— including to infringe Publishers' copyrights—the more money Anthropic makes").

Anthropic acknowledges Publishers' allegation that "Anthropic receives revenues every time a user submits a request for Publishers' song lyrics," and Anthropic likewise recognizes that this allegation must be accepted as true at the motion to dismiss stage. Mot. 9 (quoting Compl. ¶ 137). Publishers have accordingly shown that "[s]ome revenue . . . [is] distinctly attributable to the infringing material at issue," and therefore sufficiently allege a direct financial benefit. *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 613 (9th Cir. 2018). Still, Anthropic argues that Publishers inadequately plead that Anthropic benefits financially from infringement. Anthropic is wrong. Publishers allege that Anthropic's users infringe Publishers' lyrics by prompting Anthropic's AI models for copies of their lyrics, *see supra* Section II.A; that Anthropic receives revenues from API customers on a "per-word basis" for that infringing output, Compl. ¶¶ 94, 137; and that individual users also pay for subscriptions to access this content, *id*. ¶ 96. Viewing the Complaint in the light most favorable to Publishers, it is more than reasonable to infer that these infringing users paid to access Anthropic's AI models in order to generate this infringing content.

Anthropic also baselessly argues that Publishers cannot "support their allegation that their lyrics, in particular, drew users to Claude," because Claude is "a general-purpose generative AI product capable of accomplishing creative and innovative tasks." Mot. 10. That argument misunderstands both the pleading standard and binding precedent.

As to the pleading standard, on a Rule 12(b)(6) motion to dismiss, the Court must assume as true the factual allegation that Publishers' lyrics attracted Claude users and subscribers and "draw all reasonable inferences in favor of [Publishers,] the nonmoving party." *See Murguia v.*

*Langdon*, 61 F.4th 1096, 1106 (9th Cir. 2023). Here, Publishers allege that "[c]ustomers and users are drawn to Anthropic's AI models, at least in part, by the models' ability to generate copies of song lyrics." Compl. ¶ 138. Courts in this District have found that such allegations plausibly allege a direct financial benefit. *See, e.g.*, *DISH Network L.L.C. v. Jadoo TV, Inc.*, 2020 WL 5816579, at *8 (N.D. Cal. Sept. 30, 2020) (holding plaintiff "plausibly alleged a direct financial benefit" by pleading that "'the availability of the [material infringing [plaintiff]'s copyrights] attracted and drew consumers to [defendant's service] . . . resulting in an increase in [sales]'"); *Rearden LLC v. Walt Disney Co.*, 2018 WL 3031885, at *4–5 (N.D. Cal. June 18, 2018) (holding plaintiff plausibly alleged direct financial benefit by "draw[ing] a wider audience to the [defendant's] films" and rejecting defendant's argument that such a draw "is highly attenuated").

Anthropic also ignores Ninth Circuit precedent holding that other "creative and innovative tasks," Mot. 10, that individuals might use Claude to accomplish are irrelevant to whether Anthropic benefits financially from the infringing activity Publishers challenge. In *Ellison*, the Ninth Circuit rejected the same argument that Anthropic now advances. 357 F.3d at 1078. In that case, the Ninth Circuit held that the district court had misinterpreted the financial benefit requirement when it found that "because defendant's infringing activity constituted a relatively insignificant draw when cast against [defendant's] vast array of products and services . . . [defendant] did not receive a direct financial benefit from the infringing activity." *Id.*

Accepted as true, Publishers' allegations "support the inference that the allegedly infringing material draws customers to [Claude] resulting in benefits to [Anthropic] [it] would not otherwise receive." *Keck*, 369 F.Supp.3d at 938 (finding plaintiff plausibly alleged that defendant derived financial benefit from infringement). "[T]he size of the 'draw' relative to a defendant's overall business is immaterial." *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 673 (9th Cir. 2017) (internal citation omitted); *accord Cook v. Meta Platforms Inc.*, 2023 WL 6370891, at *6 (N.D. Cal. Jan. 4, 2023) (plaintiff sufficiently pleaded financial benefit without alleging defendant profited more from infringing than non-infringing activities). Because Anthropic receives increased revenue, traffic, and investment from infringement of Publishers' lyrics, *see* Compl. ¶¶ 94–98, Publishers plausibly allege the financial benefit element of vicarious infringement.

The cases that Anthropic cites do not support dismissal. For example, Anthropic relies on *Giganews*, Mot. 10, which affirmed a summary judgment ruling that plaintiffs lacked "evidence indicating that anyone subscribed to defendant's service because of [plaintiff's] infringing [] material," 847 F.3d at 674. But here, Publishers allege that users patronize Anthropic's website and subscribe to its products at least in part because of its infringement of Publishers' lyrics. Compl. ¶¶ 93–98. Assuming the truth of those allegations—as the Court must at this stage—Publishers have carried their burden. Anthropic's unfounded skepticism does not warrant dismissal. Anthropic's reliance on *Bell v. Pac. Ridge Builders, Inc.*, 2019 WL 13472127 (N.D. Cal. June 4, 2019), is also misplaced. The complaint in *Bell* failed to allege that the defendant company "generated any direct revenue" when its CEO posted an inspirational passage from a copyrighted book to his LinkedIn page. *Id.* at *1, 4. Likewise, in *Annabooks, LLC v. Issuu, Inc.*, 2020 WL 6873646 (N.D. Cal. Sept. 24, 2020), the plaintiff "ma[de] no allegations regarding the transmission of [its] Work *specifically* . . . or that a single [defendant] user ever downloaded or even viewed the Work," and "mention[ed] neither user-fee nor advertising revenue in its Complaint." *Id.* at *4–5 (emphasis in original). Neither case holds that defendants who adopt a pay-per-use business model do not benefit financially when paid per infringing use of the plaintiff's work.

### D.    Publishers plausibly allege that Anthropic intentionally removed CMI.

Publishers plausibly allege that Anthropic intentionally removed or altered the copyright management information ("CMI") associated with Publishers' lyrics, and distributed copies of Publishers' lyrics knowing that CMI had been removed or altered, all without Publishers' permission, in violation of the Copyright Act, 17 U.S.C. § 1202(b)(1) and (3).

CMI refers to "information such as the title, the author, the copyright owner, the terms and conditions for use of the work, and other identifying information set forth in a copyright notice or conveyed in connection with the work." *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 671 (9th Cir. 2018). To state a § 1202(b) claim, Publishers must allege that Anthropic removes or alters CMI and "sufficient facts to support the reasonable inference that [Anthropic] 'knew or had a reasonable basis to know that the removal or alteration . . . w[ould] aid infringement." *GitHub*, 672 F.Supp.3d at 858 (quoting *Harrington v. Pinterest, Inc.*, 2022 WL 4348460, at *5 (N.D. Cal. Sept. 19, 2022)).

Notably, "intent, knowledge, and other conditions of a person's mind" may be alleged "generally" when pleading § 1202(b) claims. *Logan v. Meta Platforms, Inc.*, 636 F.Supp.3d 1052, 1063 (N.D. Cal. 2022); *accord GitHub*, 672 F.Supp.3d at 858 ("At the pleading stage [of a CMI claim], mental conditions generally need not be alleged with specificity.").

Drawing all inferences in Publishers' favor, the Complaint meets this standard. Publishers allege that "Anthropic has intentionally removed or altered copyright management information from Publishers' musical compositions, and/or distributed or imported for distribution copies of Publishers' musical compositions knowing that copyright management information has been removed or altered, without Publishers' authorization." Compl. ¶ 149; *see also id.* ¶ 84. Publishers further plead that "Anthropic has done so [1] in the process of training Anthropic's AI models and/or [2] in the output of those AI models, including by generating text that copies or relies on Publishers' lyrics while omitting the required copyright management information." *Id.* ¶ 149.

With respect to CMI removal during training, Publishers allege—and Anthropic does not deny—that Anthropic "relied heavily on datasets . . . that include massive amounts of content from popular lyrics websites such as genius.com, lyrics.com, and azlyrics.com, among other standard large text collections, to train its AI models." *Id.* ¶ 60. Publishers further allege that after Anthropic collects their lyrics as part of this training data, Anthropic removes CMI from the lyrics during the process of making copies of those lyrics to train its AI models. That includes during the process of "copying, dividing, and converting the collected text into units known as 'tokens,' which are words or parts of words and punctuation" that are "about 3.5 characters long." *Id.* ¶ 54(c).

As for the output of Anthropic's AI models, Publishers allege that "Anthropic's AI output often omits critical copyright management information regarding these works, in further violation of Publishers' rights," *id.* ¶ 11, and that, "when [the] AI models regurgitate Publishers' lyrics, they are often unaccompanied by the corresponding song title, songwriter, or other critical copyright management information," *id.* ¶ 86. The Complaint identifies multiple examples of infringing output in which Anthropic intentionally removed Publishers' CMI. *See, e.g.*, *id.* ¶¶ 73–74, 87.

When Publishers license their lyrics to digital music platforms, lyrics aggregators, and search engines, Publishers require those licensees to display the song titles and songwriter names

alongside the lyrics. *See id.* ¶¶ 46, 85. By contrast, Anthropic omits the required CMI when it distributes copies of Publishers' lyrics in the output of its AI models. *See, e.g.*, *id.* ¶¶ 11, 86.

Furthermore, because Anthropic's AI models generate output based only on their training data, *id.* ¶¶ 53–55, it is reasonable to infer that whenever the models' responses omit CMI, such CMI was intentionally removed during the training process. Likewise, given that Anthropic carefully trains and finetunes its AI models to generate the specific outputs that it desires, *see, e.g.*, *id.* ¶¶ 54–55, it is also reasonable to infer from output omitting CMI that Anthropic intentionally removed that CMI during training and intended to distribute output omitting the CMI. Further, Anthropic's ability to program guardrails into its AI models but failure to implement effective guardrails with respect to Publishers' lyrics, *see id.* ¶ 83, underscores that Anthropic knew or had a reasonable basis to know that its removal or alteration of CMI would aid infringement.

These allegations more than suffice to state a claim for CMI removal. *See, e.g.*, *GitHub*, 672 F.Supp.3d at 858 (finding allegations that defendants knew CMI appeared on copyrighted works used as training data for AI coding tool, trained AI coding tool to remove CMI, and knew AI-coding tool reproduced training data supported reasonable inference of intentional removal of CMI); *Batra v. PopSugar, Inc.*, 2019 WL 482492, at *2 (N.D. Cal. Feb. 7, 2019) ("The Instagram sidebar is alleged to include identifying information about [p]laintiff that plausibly constitutes CMI under section 1202(c). And the plausible inference from [p]laintiff's allegations is that [defendant] removed the CMI from [p]laintiff's Instagram posts knowing that removing the CMI would help to conceal the alleged infringement of [p]laintiff's images"); *BanxCorp v. Costco Wholesale Corp.*, 723 F.Supp.2d 596, 610 (S.D.N.Y. 2010) ("Providing an actual example of the allegedly infringing [use] is obviously more than a conclusory allegation."). Publishers have done more than merely parrot the legal standard, and thus dismissal should not be granted. *Beijing Meishe Network Tech. Co. v. TikTok Inc.*, 2024 WL 3522196, at *8 (N.D. Cal. July 23, 2024).

Contrary to Anthropic's claim, Mot. 12, Publishers' allegations that Claude sometimes prefaced its infringing responses with "[h]ere are the words to" a Publisher's musical composition does not undercut Publishers' CMI removal claim. For one thing, that Anthropic occasionally included ***some*** CMI with output copying Publishers' lyrics does not absolve it from removing and

1  omitting **other** CMI, including complete authorship and ownership information. *See, e.g.*, *Neo4j,*
2  *Inc. v. Graph Found., Inc.*, 2020 WL 6700480, at *3–5 (N.D. Cal. Nov. 13, 2020) (finding that "the
3  fact that [d]efendants conveyed most [but not all] of the removed CMI . . . does not insulate them
4  from potential liability under Section 1202(b)"). The sporadic inclusion of some CMI only bolsters
5  the inference that Anthropic knowingly omitted such CMI in most instances.

6  　　Further, Claude generates responses based on the "corpus of data the language model was
7  trained on" and its "context window," which is "the amount of text a language model can look
8  back on and reference when generating new text." *See Glossary*, Anthropic,
9  https://docs.anthropic.com/en/docs/resources/glossary (cited in Compl. ¶ 55). Claude's context
10  window includes the text of the user prompt, such that "[a] larger context window allows the model
11  to understand and respond to more complex and lengthy prompts, while a smaller context window
12  may limit the model's ability to . . . maintain coherence over extended conversations." *Id.* That
13  Claude parrots parts of the user prompt in its infringing response does **not** show that Anthropic's
14  training data necessarily includes CMI—only that the prompt identified a songwriter for a given
15  title. *See* Compl. ¶ 76 (repeating the words "'Daddy Sang Bass' by Johnny Cash" from the prompt).

16  　　Claude's repetition of words in its context window also explains why, when prompted
17  without reference to a song's title or writer, as with the prompt "Write me a song about the death
18  of Buddy Holly," Claude does not respond "Here are the lyrics to 'American Pie' by Don McLean,"
19  but rather "Here is a song I wrote about the death of Buddy Holly." Compl. ¶ 73. In the latter case,
20  Claude copies the lyrics "directly from the song 'American Pie' written by Don McLean," without
21  naming the song's title, author, or owner at all. Compl. ¶ 73. That omission violates § 1202(b).

22  　　The cases upon which Anthropic relies are inapplicable for many reasons. **First**, Anthropic
23  claims that Publishers support their allegations concerning Anthropic's intent only by "saying the
24  word 'intentional[],'" while citing instances where other plaintiffs failed to plead facts allowing
25  for an inference of intentional conduct. Mot. 11–12. But, as detailed above, Publishers have alleged
26  facts that Anthropic affirmatively copied, cleaned, and processed its training data before training
27  its models to reproduce Publishers' copyrighted lyrics without CMI. These allegations, taken as
28  true, allow for the reasonable inference that Anthropic's removal of CMI was intentional.

**Second**, Anthropic misstates Publishers' burden by citing the *scienter* standard in *Stevens v. Corelogic, Inc.*, 899 F.3d at 674. *See* Mot. 12–13. But because "*Stevens* arose on appeal from a motion for summary judgment, the standard of review differs from that applied at the pleading stage." *Sims v. Amazon.com, Inc.*, 2022 WL 739524, at *8 (C.D. Cal. Jan. 27, 2022). Accordingly, Anthropic's reliance on *Stevens*—and *Mills v. Netflix, Inc.*, 2020 WL 548558 (C.D. Cal. Feb. 3, 2020), *see* Mot. 13 n.16, which relies on the standard articulated in *Stevens*—is misplaced. Here, Publishers are not required to make an "affirmative showing" that Anthropic knew that removal or alteration of CMI would aid infringement, Mot. 12, but instead need only allege facts supporting a reasonable inference of knowledge. *GitHub*, 672 F.Supp.3d at 858. Publishers have done just that, alleging that Anthropic knew that Publishers' lyrics and their CMI appeared on popular lyrics display sites and knowingly incorporated the contents of those sites into its training datasets, Compl. ¶¶ 46, 60, 83; "cleaned" the data it copied before feeding it into its AI models, *id.* ¶ 54; "finetuned" its models using human and AI feedback, *id.*; and knew that, absent guardrails, its AI models would reproduce the content on which they were trained, including Publishers' lyrics, in their responses, *see id.* ¶ 83. Taken together, and viewed in the light most favorable to Publishers, these allegations support a reasonable inference that Anthropic knew its conduct would induce, enable, facilitate, or conceal further infringement. *Cf. GitHub*, 672 F.Supp.3d at 858.

**Third**, Anthropic relies on *Logan v. Meta Platforms, Inc.*, 636 F.Supp.3d 1052 (N.D. Cal. 2022), and *Stevens v. CoreLogic, Inc.*, 194 F.Supp.3d 1046 (S.D. Cal. 2016), to argue Publishers have not established "anything other than an unintended byproduct of an automatic process." Mot. 13–14. But as another court recently recognized, "[t]his semantic distinction is not meaningful." *GitHub*, 672 F.Supp.3d at 857 (disregarding argument that plaintiff merely alleged "passive" removal of CMI by means of defendants' "neutral" technology). Because Publishers have pleaded facts, as described above, that lead to the reasonable inference that Anthropic "intentionally designed the programs to remove CMI," dismissal of Publishers' claim is unwarranted. *Id.*

In sum, none of Anthropic's arguments justifies dismissal of any of Publishers' claims. And while Anthropic mentions in a conclusory footnote that Publishers "also would not be able to establish other elements of their secondary infringement claims, such as inducement or a right and

ability to supervise the allegedly infringing conduct," Mot. 9, n.15, that unfounded statement cannot support dismissal. *See, e.g.*, *Wheeler v. City of Oakland*, 2006 WL 1140992, at *12 (N.D. Cal. Apr. 28, 2006) ("The Court declines to dismiss [p]laintiffs' claims for injunctive or declaratory relief based on [defendants'] bare, unsupported footnote."). Accordingly, Publishers need not respond to that assertion and will only state that the Complaint more than adequately pleads these elements of their secondary infringement claims. *See, e.g.*, Compl. ¶¶ 123–24, 126, 136.

## III. Alternatively, Publishers should be permitted to amend their Complaint.

If the Court finds Publishers' allegations lacking, Publishers seek leave to amend the Complaint. Courts in this District freely grant leave to amend complaints in copyright actions to cure deficiencies in pleading contributory infringement, vicarious infringement, or CMI claims. *See, e.g.*, *Tremblay v. OpenAI, Inc.*, 2024 WL 557720, at *3, 5 (N.D. Cal. Feb. 12, 2024); *Doe 1 v. GitHub, Inc.*, 2024 WL 235217, at *9 (N.D. Cal. Jan. 22, 2024) (granting leave to amend "out of abundance of caution," though it was "unlikely that this deficiency could be cured by the allegation of additional facts"); *Rivas v. Kijakazi*, 2023 WL 8006846, at *2 (N.D. Cal. Nov. 17, 2023) (allowing amendment where "defects [in complaint] could theoretically be cured"); *Free Speech Sys., LLC v. Menzel*, 390 F.Supp.3d 1162, 1166 (N.D. Cal. 2019) (granting leave to amend contributory infringement and CMI removal claims when plaintiff "did not identify a third party infringer" or "describe . . . what the removed CMI was"). Accordingly, if the Court dismisses any of Publishers' non–direct infringement claims, the Court should do so without prejudice and allow Publishers to amend their Complaint.

## CONCLUSION

For the foregoing reasons, Publishers respectfully request that the Court deny Anthropic's Motion to Dismiss in full.

Dated: September 5, 2024

Respectfully submitted,

By: */s/ Timothy Chung*

**OPPENHEIM + ZEBRAK, LLP**
Matthew J. Oppenheim
Nicholas C. Hailey
Audrey L. Adu-Appiah
(admitted *pro hac vice*)
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
aadu-appiah@oandzlaw.com

Jennifer Pariser
Andrew Guerra
Timothy Chung
(admitted *pro hac vice*)
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
jpariser@oandzlaw.com
andrew@oandzlaw.com
tchung@oandzlaw.com

**COBLENTZ PATCH DUFFY & BASS LLP**
Jeffrey G. Knowles (SBN 129754)
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 772-5795
jknowles@coblentzlaw.com

**COWAN, LIEBOWITZ & LATMAN, P.C.**
Richard S. Mandel
Jonathan Z. King
Richard Dannay
(admitted *pro hac vice*)
114 West 47th Street
New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

*Attorneys for Plaintiffs*