**OPPENHEIM + ZEBRAK, LLP**
Matthew J. Oppenheim
Nicholas C. Hailey
Audrey L. Adu-Appiah
(admitted *pro hac vice*)
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
aadu-appiah@oandzlaw.com

Jennifer Pariser
Andrew Guerra
Timothy Chung
(admitted *pro hac vice*)
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
jpariser@oandzlaw.com
andrew@oandzlaw.com
tchung@oandzlaw.com

*Attorneys for Plaintiffs*

**COBLENTZ PATCH DUFFY & BASS LLP**
Jeffrey G. Knowles (SBN 129754)
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 391-4800
ef-jgk@cpdb.com

**COWAN, LIEBOWITZ & LATMAN, P.C.**
Richard S. Mandel
Jonathan Z. King
Richard Dannay
(admitted *pro hac vice*)
114 West 47th Street
New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., ET AL., | Case Number: 5:24-cv-03811-EKL |
| Plaintiffs, | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| ANTHROPIC PBC, | REDACTED |
| Defendant. | Judge: Hon. Eumi K. Lee |
| | Hearing Date: October 24, 2024<br>Time: 2:00 p.m.<br>Courtroom: 7 |

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................... 2

    I.    Anthropic's latest guardrails continue to be inconsistent and ineffective. ........................... 2

    II.    Anthropic finetuned Claude to respond to prompts for lyrics. ............................................. 2

ARGUMENT ........................................................................................................................ 3

    I.    Publishers are plainly entitled to the limited preliminary injunction they request. ............ 3

        A.    Anthropic cannot excuse the irreparable harm it causes Publishers. .............................. 3

            1.    Anthropic's post-litigation guardrails do not moot Publishers' motion. ..................... 3

            2.    Anthropic disregards the irreparable harm its infringement causes. ........................... 5

            3.    Publishers did not unreasonably delay in seeking a preliminary injunction. ............... 7

        B.    Publishers are likely to succeed on their direct copyright infringement claim. .............. 9

            1.    Anthropic's copying of Publishers' lyrics for AI training is not fair use. ................... 9

            2.    Anthropic cannot defend its copying of Publishers' lyrics in its AI output. .............. 13

        C.    The balance of equities and public interest both strongly favor Publishers. ................ 13

    II.    Publishers' requested preliminary injunction is not overbroad. ......................................... 14

    III.    Anthropic's request for a ▮▮▮▮▮▮ security bond is unjustifiable. ............................... 15

CONCLUSION .................................................................................................................... 15

1

## **TABLE OF AUTHORITIES**

2

3 **CASES**

4
*2Die4Kourt v. Hillair Capital Mgmt., LLC,*
5    692 F. App'x 366 (9th Cir. 2017) ........................................................................ 13

6 *A.O. v. Cuccinelli,*
   457 F.Supp.3d 777 (N.D. Cal. 2020) .................................................................... 3
7

8 *A&M Recs., Inc. v. Napster, Inc.,*
   239 F.3d 1004 (9th Cir. 2001) ........................................................................ 7, 9

9 *Alacritech, Inc. v. Microsoft Corp.,*
10    2005 WL 850729 (N.D. Cal. Apr. 12, 2005) ........................................................ 8

11 *Align Tech., Inc. v. Strauss Diamond Instruments, Inc.,*
   2019 WL 1586776 (N.D. Cal. Apr. 12, 2019) .................................................... 15
12

13 *Already, LLC v. Nike, Inc.,*
   568 U.S. 85 (2013) ............................................................................................ 3

14 *Am. Impex Corp. v. Int'l Ace Tex, Inc.,*
15    2009 WL 3963791 (C.D. Cal. Nov. 16, 2009) .................................................... 13

16 *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith,*
   598 U.S. 508 (2023) .......................................................................................... 10
17

18 *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith,*
   11 F.4th 26 (2d Cir. 2021) ................................................................................ 12

19 *Apple Inc. v. Psystar Corp.,*
20    658 F.3d 1150 (9th Cir. 2011) .......................................................................... 14

21 *Apple Inc. v. Psystar Corp.,*
   673 F.Supp.2d 943 (N.D. Cal. 2009) ................................................................ 14
22

23 *Arc of Cal. v. Douglas,*
   757 F.3d 975 (9th Cir. 2014) .............................................................................. 9

24 *Arista Recs. LLC v. Usenet.com, Inc.,*
25    633 F.Supp.2d 124 (S.D.N.Y. 2009) .................................................................. 4

26 *Atari Games Corp. v. Nintendo of Am., Inc.,*
   1993 WL 214886 (N.D. Cal. Apr. 15, 1993) ...................................................... 10
27

28 *Bd. of Trs. of Glazing Health & Welfare Tr. v. Chambers,*
   941 F.3d 1195 (9th Cir. 2019) ............................................................................ 3

*BNSF Ry. Co. v. Float Alaska IP, LLC*,
　2023 WL 6783506 (C.D. Cal. Aug. 28, 2023) ................................................. 8

*BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*,
　229 F.3d 254 (3d Cir. 2000) ........................................................................... 8

*California v. Health & Hum. Servs.*,
　390 F.Supp.3d 1061 (N.D. Cal. 2019) ............................................................ 9

*Campbell v. Acuff-Rose Music, Inc.*,
　510 U.S. 569 (U.S. 1994) .............................................................................. 12

*Candle Factory, Inc. v. Trade Assocs. Grp., Ltd.*,
　23 F. App'x 134 (4th Cir. 2001) ..................................................................... 8

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*,
　321 F.3d 878 (9th Cir. 2003) ......................................................................... 15

*Cuviello v. City of Vallejo*,
　944 F.3d 816 (9th Cir. 2019) ........................................................................... 9

*Deakins v. Monaghan*,
　484 U.S. 193 (1988) ......................................................................................... 4

*Disney Enters., Inc. v. VidAngel, Inc.*,
　869 F.3d 848 (9th Cir. 2017) ................................................................... passim

*Dr. Seuss Enters., L.P. v. ComicMix LLC*,
　983 F.3d 443 (9th Cir. 2020) ......................................................................... 10

*E. Bay Sanctuary Covenant v. Biden*,
　993 F.3d 640 (9th Cir. 2021) ........................................................................... 5

*Edmo v. Corizon, Inc.*,
　935 F.3d 757 (9th Cir. 2019) ........................................................................... 8

*Fox Broad. Co. Inc. v. Dish Network, L.C.C.*,
　2013 WL 11238486 (C.D. Cal. Sept. 23, 2013) ............................................. 7

*Fox Broad. Co. v. Dish Network, L.C.C.*,
　905 F.Supp.2d 1088 (C.D. Cal. 2012) ...........................................................11

*Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*,
　915 F.Supp.2d 1138 (C.D. Cal. 2012) ............................................................ 6

*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*,
　528 U.S. 167 (2000) ......................................................................................... 3

*Fujikura Composite Am., Inc. v. Dee*,
　2024 WL 3261214 (S.D. Cal. June 28, 2024) ................................................. 8

*Gilley v. Stabin*,
    2024 WL 1007480 (9th Cir. Mar. 8, 2024) ............................................................ 3

*GoTo.com, Inc. v. Walt Disney Co.*,
    202 F.3d 1199 (9th Cir. 2000) ............................................................................... 15

*Hachette Book Grp., Inc. v. Internet Archive*,
    2024 WL 4031751 (2d Cir. Sept. 4, 2024) ............................................................ 12

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*,
    736 F.3d 1239 (9th Cir. 2013) ................................................................................. 5

*Iglesia Ni Cristo (Church of Christ) v. Samson*,
    2022 WL 20208932 (N.D. Cal. May 12, 2022) ....................................................... 5

*Illumina, Inc. v. Qiagen, N.V.*,
    207 F.Supp.3d 1081 (N.D. Cal. 2016) .................................................................. 13

*L.A. Times v. Free Republic*,
    54 U.S.P.Q.2d 1453 (C.D. Cal. 2000) ..................................................................... 9

*LaFace Recs. v. Khan*,
    2008 WL 11395481 (N.D. Cal. Nov. 19, 2008) .................................................... 14

*Leadsinger, Inc. v. BMG Music Publ'g*,
    512 F.3d 522 (9th Cir. 2008) ................................................................................. 11

*Los Angeles County v. Davis*,
    440 U.S. 625 (1979) ................................................................................................. 4

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*,
    2010 WL 5598337 (N.D. Cal. Mar. 19, 2010) ......................................................... 4

*Mandrigues v. World Sav., Inc.*,
    2008 WL 5221074 (N.D. Cal. Dec. 12, 2008) ......................................................... 8

*McGucken v. Pub Ocean Ltd.*,
    42 F.4th 1149 (9th Cir. 2022) ............................................................................... 12

*Monge v. Maya Mags.*,
    688 F.3d 1164 (9th Cir. 2012) ............................................................................... 11

*OpenAI, Inc. v. Open Artificial Intel., Inc.*,
    2024 WL 1218331 (N.D. Cal. Feb. 28, 2024) ......................................................... 9

*Porter v. Bowen*,
    496 F.3d 1009 (9th Cir. 2007) ................................................................................. 4

*Restoration Hardware, Inc. v. Light*,
    2023 WL 4479250 (N.D. Cal. July 11, 2023) ....................................................... 15

*Sega Enters. Ltd. v. Accolade, Inc.*,
   977 F.2d 1510 (9th Cir. 1992) ...........................................................................10, 11

*Sony Computer Ent., Inc. v. Connectix Corp.*,
   203 F.3d 596 (9th Cir. 2000) .............................................................................10, 11

*Thomson Reuters Enter. Ctr. GmbH v. Ross Intel. Inc.*,
   694 F.Supp.3d 467 (D. Del. 2023) ........................................................................ 12

*Universal City Studios Prods. LLLP v. TickBox TV LLC*,
   2018 WL 1568698 (C.D. Cal. Jan. 30, 2018) ...................................................... 4, 6

*VHT, Inc. v. Zillow Grp.*,
   918 F.3d 723 (9th Cir. 2019) ................................................................................ 13

*Wetzel's Pretzels, LLC v. Johnson*,
   797 F.Supp.2d 1020 (C.D. Cal. 2011).................................................................. 15

*Wingsurfing Int'l Inc. v. AMF, Inc.*,
   782 F.2d 995 (Fed. Cir. 1986) .............................................................................. 13


**STATUTES**

17 U.S.C. § 107(2) ...................................................................................................11


**PROPOSED LEGISLATION**

AI Foundation Model Transparency Act of 2023, H.R. 6881, 118th Cong. § 2 .......................... 14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **INTRODUCTION**

Anthropic is intent on building ever-more powerful, ever-more-profitable AI models. Its opposition makes clear that it will stop at nothing to amass ever-more-vast sets of text to fuel those models—even if that means infringing copyrights on a monstrous scale. Anthropic does not dispute it copies Publishers' lyrics wholesale, both as input to train its "Claude" AI models and in the output those models generate. But it fights the narrow preliminary injunction Publishers seek so that it can prolong its theft of Publishers' lyrics and delay answering for its infringing behavior.

To avoid even a limited injunction preserving the status quo, Anthropic advances a series of false narratives. First, it wrongly contends that Publishers "delayed" in seeking relief. To the contrary, the record shows the urgency with which Publishers investigated Anthropic's sprawling infringement, filed suit, and moved for a preliminary injunction, all within a matter of months.

Second, Anthropic baselessly claims its new "guardrails"—adopted as a litigation strategy after this suit was filed—moot Publishers' motion and cure their injuries, rendering an injunction unnecessary. That is wrong. While the guardrails prevent certain infringing output (and must at a bare minimum be maintained going forward), they are hardly the perfect solution Anthropic claims. They do not prevent all output copying Publishers' lyrics, nor do they do anything to stop Anthropic's reproduction of lyrics to train its models. After Anthropic's opposition, Publishers identified dozens of new instances in which the guardrails failed and Claude generated responses copying their lyrics. Moreover, absent an injunction ordering Anthropic to maintain these guardrails, it remains free to abandon them, such that Publishers continue to face irreparable injury.

Third, Anthropic tries to diminish its mass theft of Publishers' lyrics by claiming that its "[t]ypical" users do not seek lyrics from its AI models and that infringing outputs are a "'bug,' not a 'feature.'" Def.'s Opp'n 2, 3, ECF No. 207 ("Opp."). That claim is disproven by Anthropic's own finetuning data, which reveals that individuals hired by Anthropic intentionally and repeatedly prompted Claude for lyrics—including asking, "What are the lyrics to American Pie by Don McLean?"—and that Anthropic finetuned its AI models to "helpfully" respond to those requests. While Anthropic now tries to distance itself from that training, those facts are indisputable.

Finally, Anthropic misstates the preliminary injunction Publishers seek and exaggerates the

burden of compliance. Publishers request a narrow injunction, requiring only that Anthropic (1) maintain its already-implemented guardrails, and (2) refrain from copying Publishers' lyrics to train future AI models. Pls.' Mem. 2, 28-29, ECF No. 179 ("Mem."). This limited relief, while no long-term solution, will stem the harm to Publishers in part without overburdening Anthropic. Requiring Anthropic to maintain its existing—albeit flawed—guardrails will at least reduce infringing outputs going forward, without impeding it from improving those guardrails as holes are identified. Ordering Anthropic to refrain from exploiting Publishers' lyrics for future training will prevent the harm from metastasizing, without requiring Anthropic to change its current AI models or those for which training has begun. Far from asking the Court to "stretch" to "get ahead" of other cases, Opp. 2, this modest prohibitory injunction will simply preserve the status quo, and limit further infringement and injury to Publishers, until the Court renders a decision on the merits.

## **FACTUAL BACKGROUND**

### **I.**     **Anthropic's latest guardrails continue to be inconsistent and ineffective.**

While Anthropic's post-suit guardrails prevent some output copying Publishers' lyrics, they often fail. Claude users openly discuss online how they bypass the guardrails and obtain copyrighted material, including song lyrics. Chung Decl., Ex. A; *see also* ECF No. 180-12. Using those methods, Publishers' expert prompted Claude for lyrics to a sample of 46 works in suit—including "God Only Knows," "California Dreamin'," "I Will Survive," "Fresh Prince of Bel-Air," and "Yellow"—and received output copying those lyrics in each instance. Newton-Rex Decl. ¶¶ 13-14 (detailing infringing output); Zhao Decl. ¶¶ 5-6 (analyzing same). Claude also continues to generate derivatives when prompted, twisting lyrics in ways inimical to authorial intent, such as by generating versions of "Viva La Vida" to sell cigarettes, "Roar" to promote beer, and "You Can't Always Get What You Want" to endorse Donald Trump. Newton-Rex Decl., Ex. C. In short, despite the guardrails, Claude continues to deliver infringing output to users.

### **II.**     **Anthropic finetuned Claude to respond to prompts for lyrics.**

When "finetuning" its Claude AI models, Anthropic does not dispute it hired crowdworkers who, under its guidance, prompted Claude for lyrics to works in suit like "American Pie" and "Only Hope." ECF No. 180-10, at 1-2. Those prompts also contained lyrics for works in suit, like

"Anaconda" and "Wild Horses." *Id.* at 9, 12. Anthropic even finetuned Claude to "help" with requests for derivative works, like prompts to "make a short story from the lyrics to the song, All Along the Watchtower" and rewrite "Listen" in "Eminem['s] style" and "Not Afraid" in "Beyonce's style." *Id.* at 10, 13, 14. Regardless of Anthropic's claimed distinction between "helpfulness" and "harmfulness" training, this shows that Anthropic anticipated its AI models would be used to search for and provide lyrics, and it finetuned its models to fulfill those requests.

## ARGUMENT

### I.      Publishers are plainly entitled to the limited preliminary injunction they request.

All four preliminary injunction factors clearly favor issuance of the narrow injunctive relief Publishers seek. None of Anthropic's arguments warrants denying Publishers' motion.

#### A.      Anthropic cannot excuse the irreparable harm it causes Publishers.

##### 1.      Anthropic's post-litigation guardrails do not moot Publishers' motion.

Anthropic's post-suit guardrails do not "moot" the irreparable harm to Publishers or their need for preliminary relief. Opp. 11. Under the voluntary cessation doctrine, Anthropic "cannot automatically moot a case simply by ending its unlawful conduct once sued," *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013), "because, if the case were dismissed as moot, the defendant would be free to resume the conduct," *Bd. of Trs. of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195, 1198 (9th Cir. 2019). Anthropic "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 190 (2000). These principles apply equally to preliminary injunctions. *A.O. v. Cuccinelli*, 457 F.Supp.3d 777, 787-90, 795-96 (N.D. Cal. 2020).

Anthropic adopted its new guardrails as a litigation strategy only after being sued. ECF No. 209, at ¶ 54 ("Kaplan Decl."). Unless ordered to maintain them, Anthropic could abandon its guardrails at any time. Moreover, Anthropic's refusal to disclose necessary information about the guardrails, Chung Decl. ¶ 4, impedes efforts to measure their efficacy. Given the guardrails' lack of transparency, "lack of formality," "relative novelty, how easily [they] can be reversed, and the lack of procedural safeguards to protect from arbitrary action," Anthropic has "not met its heavy burden" to show mootness. *Gilley v. Stabin*, 2024 WL 1007480, at *1 (9th Cir. Mar. 8, 2024).

Because Anthropic remains "free to return to [its] old ways" unless enjoined, Publishers' request is not moot. *Already*, 568 U.S. at 92 (quoting *Deakins v. Monaghan*, 484 U.S. 193, 201 n.4. (1988)).

Further, Anthropic's latest guardrails are not the complete solution it claims. Publishers have identified numerous instances of the latest guardrails' failure. Newton-Rex Decl., Exs. B-D; Zhao Decl. ¶¶ 5-6; *see also* ECF No. 92, at 3, 4 (identifying guardrail failures in connection with prior preliminary injunction briefing). Indeed, Anthropic's output-based guardrails are unlikely to ever be entirely effective, so long as the model is trained on Publishers' lyrics. Zhao Decl. ¶ 6; Kaplan Decl. ¶¶ 33 (conceding that repeated use of lyrics in training corpus causes "memorization"). Because Anthropic's guardrails cannot "completely and irrevocably eradicate[] the effects of the alleged violation," they do not moot the need for relief. *Porter v. Bowen*, 496 F.3d 1009, 1017 (9th Cir. 2007) (quoting *Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979)).

Nor can Anthropic escape responsibility by claiming Publishers—as opposed to third-party users—prompted its infringements. Only Anthropic has complete information about its users' prompts and the resulting outputs, but it has so far failed to produce it. Anthropic thus provides no basis for its claim that users do not typically search for lyrics. Its own finetuning data, its history of generating outputs copying lyrics, and public discussions by Claude users all strongly suggest otherwise. *See* ECF Nos. 180-10, 180-12. Moreover, during discovery meet and confers, Anthropic's counsel represented that searching for the terms "lyric" and "song" within its prompt and output data returns such an unmanageably large number of results that its vendor's system crashed, Chung Decl. ¶ 6, indicating a potentially huge volume of requests for lyrics by its users.

In any event, "[c]ourts routinely base findings of infringement on the actions of plaintiffs' investigators." *Arista Recs. LLC v. Usenet.com, Inc.*, 633 F.Supp.2d 124, 150 n.16 (S.D.N.Y. 2009); *accord Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 2010 WL 5598337, at *3 n.7 (N.D. Cal. Mar. 19, 2010) ("[The] contention that any sales made to Plaintiffs' investigator cannot constitute direct infringement because they were . . . authorized by Plaintiff is without merit, as several courts have rejected this exact contention."), *aff'd in relevant part*, 658 F.3d 936 (9th Cir. 2011); *Universal City Studios Prods. LLLP v. TickBox TV LLC*, 2018 WL 1568698, at *9 (C.D. Cal. Jan. 30, 2018) (issuing injunction upon finding expert's "repeated access to Plaintiffs' copyrighted

content" via defendant's product "sufficient evidence of actual access to that content by [defendant's] users").

### 2.    Anthropic disregards the irreparable harm its infringement causes.

Anthropic misstates the standard for establishing irreparable harm. *See* Opp. 15. The correct test is whether the harms Publishers suffer from copyright infringement are "the kind of harms for which a preliminary injunction is warranted," *Iglesia Ni Cristo (Church of Christ) v. Samson*, 2022 WL 20208932, at *3 (N.D. Cal. May 12, 2022), such as hard-to-quantify or "[i]ntangible injuries," *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021).

Anthropic's conduct threatens such injuries—usurping Publishers' control over their works, damaging their relationships with songwriters, denying attribution and goodwill, harming their reputations, weakening their position in future licensing negotiations, and eroding the lyrics licensing market. ECF No. 184, at ¶¶ 19-27; ECF No. 185, at ¶¶ 21-29; ECF No. 186, at ¶¶ 20-28; ECF No. 187, at ¶¶ 20-31. Anthropic glosses over those harms and ignores that Claude not only copies lyrics in full, but also creates bastardized derivatives. ECF No. 50, at ¶¶ 42-43, 49-51

Rather than addressing the profound harms to Publishers' relationships with songwriters, goodwill, and reputations, Anthropic argues that Publishers' songwriters are not plaintiffs in this suit and rehashes its theory that distributions to Publishers' investigators cannot show infringement or its ensuing harms. These arguments misunderstand the law and the nature of Publishers' harm.

First, while individual songwriters are not parties to this suit, Publishers act as their representatives in developing their careers, licensing their songs, administering the relevant copyrights, and advocating on their behalf. ECF No. 184, at ¶¶ 4-6; ECF No. 185, at ¶¶ 4-5; ECF No. 186, at ¶¶ 4-6; ECF No. 187, at ¶¶ 4-6. Anthropic's appropriation hinders Publishers' ability to protect the interests of songwriters they represent, *see* Chung Decl., Ex. D, injuring Publishers' most critical business relationships. That harm cannot be cured by a damages award. Just as "loss of customer goodwill supports [a] finding of irreparable harm" even when those customers are not plaintiffs, loss of songwriter trust here constitutes injury for which no adequate remedies exist at law. *See Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013).

Second, when Claude generates verbatim copies of Publishers' lyrics without crediting

Publishers or songwriters, Anthropic denies them attribution and the opportunity to promote their works and generate goodwill. And when Claude distributes inaccurate versions or offensive derivatives of Publishers' lyrics, Anthropic harms their reputations by associating them with unwanted content that may be inimical to their interests or aesthetics. Anthropic is wrong that there is no risk of injury "since the only allegedly infringing outputs were generated by Plaintiffs themselves." Opp. 15. When details about use of a defendant's product are within the defendant's control, courts find infringement—and irreparable harm—based on unlicensed distributions to investigators. *See, e.g.*, *TickBox*, 2018 WL 1568698, at *9, 12-13 (inferring harm to goodwill and licensing market from distributions to investigator and rejecting claim that plaintiffs "failed to show [defendant's] users have actually . . . accessed [p]laintiffs' copyrighted works").

Separately, Publishers also face irreparable damage to the licensing market for their works and their position in future negotiations. Anthropic confuses a compensable injury—Publishers' loss of a one-time licensing fee from Anthropic—with the immeasurable threat Anthropic poses to the businesses of Publishers' legitimate licensees, the existing legitimate market to display lyrics, and the development of a legitimate market for Publishers' lyrics as training data. Anthropic's unauthorized generation of offensive derivatives of lyrics exacerbates these harms.

Taking Publishers' lyrics for free threatens the businesses of Publishers' licensees and erodes Publishers' relationships with them. In *Fox Television Stations, Inc. v. BarryDriller Content Systems, PLC*, the court found irreparable harm when defendant's internet television streaming service "compete[d] with [p]laintiffs' ability to develop their own internet distribution channels." 915 F.Supp.2d 1138, 1147 (C.D. Cal. 2012). Given that plaintiffs already "license[d] a variety of entities . . . to distribute programming over the Internet on a time-delayed basis," "[d]efendants' competing activity puts the same kind of pressure on those licensing relationships as it does on [p]laintiffs' traditional retransmission relationships, but to a greater degree, because the services are more directly substitutable." *Id.* Likewise, Publishers license their lyrics to digital music platforms, lyrics aggregators, and search engines. When Anthropic copies those same lyrics and generates outputs that serve as a ready substitute, the business models of Publishers' licensees become less viable and the lyrics licensing market shrinks, causing Publishers incalculable damage.

Even if Anthropic were correct that its conduct has not devalued Publishers' lyrics in the established licensing market for lyrics, "lack of harm to an established market cannot deprive the copyright holder of the right to develop alternative markets for the works." *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1017 (9th Cir. 2001). Copyright holders in literary works of all stripes are striking deals to license textual works as training data for AI models. Smith Decl. ¶ 8. Anthropic's infringement, unless enjoined, threatens to stifle that emerging market as it develops.

The harms to these licensing markets cannot be remedied by monetary damages. Anthropic relies on *Dish Network* to argue that licensing fees are a cure-all for copyright infringement. But Anthropic omits that the district court in that case found licensing fees a reasonable starting point for damages because the parties' relationship was "already defined and monetized under [an existing] [a]greement." *Fox Broad. Co. Inc. v. Dish Network, L.C.C.*, 2013 WL 11238486, at *5 (C.D. Cal. Sept. 23, 2013). Here, Anthropic neither sought nor received a license from Publishers, so there is no line item in a license to use as a basis for a damages award. The harm from suppressing a potentially valuable, nascent market is inherently impossible to calculate.

These harms have only increased during this case, making the need for relief more urgent. Anthropic has launched multiple new Claude versions since the case was filed, and it plans to train models on ever-larger datasets as the case proceeds. Kaplan Decl. ¶¶ 8, 29-30. Anthropic and Amazon also reportedly intend to use Claude to power Amazon's Alexa. Chung Decl., Ex. C. With each new Claude product that exploits Publishers' lyrics without permission, the harm grows. ECF No. 184, at ¶ 27; ECF No. 185, at ¶ 29; ECF No. 186, at ¶ 28; ECF No. 187, at ¶ 31.

### 3. Publishers did not unreasonably delay in seeking a preliminary injunction.

Finally, rather than "delay" in seeking relief, Publishers moved swiftly at every stage to address the irreparable harm caused by Anthropic. Considering the massive scope of Anthropic's infringement, its lack of transparency about its training data, and the resulting challenges of collecting evidence of its infringement, the fact that Publishers completed their investigation and filed suit all within a matter of months shows the urgency with which they acted. Chung Decl. ¶ 8.

Publishers cannot be faulted for investigating and gathering evidence of Anthropic's infringement before suing. *See id.* "[C]ourts have declined to weigh 'delay caused by a plaintiff's

good faith efforts to investigate'" against a finding of irreparable harm. *Fujikura Composite Am., Inc. v. Dee*, 2024 WL 3261214, at *6 (S.D. Cal. June 28, 2024) (quoting *BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254 (3d Cir. 2000)); *accord Mandrigues v. World Sav., Inc.*, 2008 WL 5221074, at *4 (N.D. Cal. Dec. 12, 2008). Where Publishers and their counsel "diligently investigated and compiled the necessary record to move for injunctive relief," the mere fact "that it took them months to do their diligence does not suggest that [Publishers] will not be harmed absent an injunction." *See Edmo v. Corizon, Inc.*, 935 F.3d 757, 798 (9th Cir. 2019). Indeed, courts have found significantly longer timelines to be reasonable. *See, e.g.*, *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017) (affirming irreparable harm finding where one-year delay was partly due to "cautious investigation" of infringing service).

Publishers also quickly moved for a preliminary injunction after filing suit and promptly moved to renew that motion after transfer. Publishers filed each motion—significant undertakings that entailed preparing 30-page memoranda of law supported by multiple declarations and many hundreds of pages of exhibits—within roughly one month. That is not undue delay. *See, e.g.*, *Alacritech, Inc. v. Microsoft Corp.*, 2005 WL 850729, at *7 (N.D. Cal. Apr. 12, 2005) (three-month delay between complaint and preliminary injunction motion did not undercut irreparable harm).

Any delay caused by Anthropic's motion to dismiss in the Middle District of Tennessee and the resulting transfer to this District cannot be held against Publishers. *See Candle Factory, Inc. v. Trade Assocs. Grp., Ltd.*, 23 F. App'x 134, 138-39 & n.4 (4th Cir. 2001) (affirming entry of preliminary injunction and rejecting claims of undue delay, reasoning that "[a] substantial portion of the delay in this case is satisfactorily explained by [defendant's] filing of its motion to dismiss, stay, or transfer"). In a similar case, the district court found a "roughly 12-month delay" in seeking a preliminary injunction was not undue, because—like here—the delay was caused by a motion to dismiss for lack of personal jurisdiction and ensuing transfer. *BNSF Ry. Co. v. Float Alaska IP, LLC*, 2023 WL 6783506, at *9 (C.D. Cal. Aug. 28, 2023). Notably, that court did not fault the plaintiff for filing suit in the Northern District of Texas, though the case was transferred for lack of personal jurisdiction. Instead, the court found "any delay is explained by [the defendant's] own conduct"—including its motion to dismiss—"rather than any lack of urgency by [the plaintiff]."

*Id.* Nor did that court find it unreasonable that the plaintiff waited until after transfer to move for a preliminary injunction. *Id.* Here, of course, Publishers moved with considerably more urgency.

Lastly, delay alone does not warrant denial of the preliminary injunction. "[D]elay is only one factor among the many that we consider in evaluating whether a plaintiff is likely to suffer irreparable harm." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019). Moreover, "tardiness is not particularly probative in the context of ongoing, worsening injuries." *Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014). For these reasons, "'courts are loath to withhold relief solely' because of delay." *VidAngel*, 869 F.3d at 866 (quoting *Douglas*, 757 F.3d at 990); *accord OpenAI, Inc. v. Open Artificial Intel., Inc.*, 2024 WL 1218331, at *10 (N.D. Cal. Feb. 28, 2024); *California v. Health & Hum. Servs.*, 390 F.Supp.3d 1061, 1067 (N.D. Cal. 2019).

**B.     Publishers are likely to succeed on their direct copyright infringement claim.**

Publishers are likely to succeed on their direct infringement claim. It is undisputed that Publishers own or control copyrights in the works in suit; that Anthropic copied those works to build its AI models; and that those models distributed verbatim and near-verbatim copies of those works, as well as unauthorized derivatives. *See* Mem. 9-14. Anthropic's ancillary arguments fail.

**1.     Anthropic's copying of Publishers' lyrics for AI training is not fair use.**

Anthropic invokes fair use only as to its copying of Publishers' lyrics in training, and not its copying in Claude's output, for which it effectively concedes liability. But even as to training, Anthropic cannot meet its burden of showing fair use. All four fair use factors favor Publishers.

**a.     Anthropic's use is commercial and not transformative.**

Under the first fair use factor, Anthropic's use of the works to build an $18 billion business is undisputedly commercial, weighing against fair use. *See* ECF No. 180-5. Anthropic also fails to show its use is transformative. Lyrics are not "literally transformed" when Anthropic copies them wholesale, divides them into "tokens" a few characters long, and feeds those tokens to its model. Anthropic may use new technology to reproduce the works, but that "mechanical 'transformation' bears little resemblance to the creative metamorphosis" the Supreme Court has held transformative. *See L.A. Times v. Free Republic*, 54 U.S.P.Q.2d 1453, 1460 (C.D. Cal. 2000) (quotation omitted); *accord Napster*, 239 F.3d at 1015 (finding use non-transformative when "original work is merely

retransmitted in a different medium"); *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 454 (9th Cir. 2020) (finding use non-transformative when work "was merely repackaged into a new format"). Nor is Anthropic's objective purpose—using Publisher's works to train Claude to deliver outputs that compete directly with those works—transformative. Anthropic's subjective description of its purpose is given no weight. *See Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 544 (2023) (rejecting focus on the "the subjective intent of the user").

Anthropic overstates the holdings of *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992), and *Sony Computer Entertainment, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000), arguing for a broad rule that "making 'intermediate' copies of copyrighted materials to develop new technologies does not violate copyright law." Opp. 17-18. The Ninth Circuit has already rejected that interpretation. In *Disney Enterprises, Inc. v. VidAngel, Inc.*, the defendant, like Anthropic, "argue[d] that creating an 'intermediate copy' for filtering is a 'classic fair use.'" 869 F.3d at 862 n.12. The court was unpersuaded by the analogy to *Sega* and *Connectix*, "because [the defendant] does not copy the [plaintiffs'] works to access unprotected functional elements it cannot otherwise access." *Id.* In *Sega* and *Connectix*, defendants reverse-engineered computer programs to study their "unprotected elements," *Connectix*, 203 F.3d at 602, helping developers to create interoperable products, *Atari Games Corp. v. Nintendo of Am., Inc.*, 1993 WL 214886, at *7 (N.D. Cal. Apr. 15, 1993). That reverse-engineering increased the number of games compatible with the plaintiffs' videogame consoles and disrupted plaintiffs' "*de facto* monopoly over those ideas and functional concepts" embodied in their object code. *Sega*, 977 F.2d at 1523, 1527.

Here, by contrast, Anthropic asserts no need to "disassemble" Publishers' lyrics "to gain access to the functional elements of the copyrighted product," *Connectix*, 203 F.3d at 599, but only a desire "to teach its AI models to recognize language patterns" generally, Opp. 20. Publishers threaten no monopoly over grammar, rendering irrelevant the antitrust concerns that undergird *Sega* and *Connectix*. Furthermore, it beggars belief to argue that the "unprotected aspects" of written language—the ideas that Publishers' lyrics convey, their shades of meaning—"cannot be examined without copying." *Cf. Connectix*, 203 F.3d at 603. Anthropic copies the expressive elements of Publishers' lyrics to create outputs that directly replace those works. Its conduct is thus

1   more akin to cases in which the Ninth Circuit has found "intermediate" copying unfair. *See, e.g.*,

2   *VidAngel*, 869 F.3d at 862; *Fox Broad. Co. v. Dish Network, L.C.C.*, 905 F.Supp.2d 1088, 1106

3   (C.D. Cal. 2012) (holding that "[a]lthough they are 'intermediate' copies not ultimately used in

4   any end product," defendant's copies were "not a fair use"), *aff'd*, 747 F.3d 1060 (9th Cir. 2014).

5              **b.      Lyrics are unquestionably within the core of copyright protection.**

6            Under the second factor, lyrics are well within the core of copyright protection. *Leadsinger,*

7   *Inc. v. BMG Music Publ'g*, 512 F.3d 522, 531 (9th Cir. 2008). Unable to dispute that, Anthropic

8   instead minimizes this express statutory factor as "unilluminating." Opp. 20. But Anthropic relies

9   on cases involving copyrighted computer code, Opp. 17-18, 20 (citing *Sega*, *Connectix*, *Google*,

10  and *Splunk* cases), which are "accord[ed] . . . a 'lower degree of protection than more traditional

11  literary works,'" *Connectix*, 203 F.3d at 603 (quoting *Sega*, 977 F.2d at 1526). Because Publishers'

12  works are highly expressive, this factor weighs more heavily here.

13           Anthropic also wrongly focuses on the nature of its own use, rather than the "the nature of

14  the copyrighted work." 17 U.S.C. § 107(2). It muddies the analysis by claiming it did not copy the

15  works "to appropriate the songs' creative elements." Opp. 20. But fair use grants no special

16  exemption for "non-expressive" copying. Even if it did, Anthropic would not qualify. Anthropic's

17  copying is not purely computational. It does not derive only "statistical correlations" that show

18  "how language operates and what it means." Opp. 5. Anthropic copies Publishers' lyrics to make

19  a "generative" AI product that imitates human expression—in this case, Publishers' expression.

20             **c.      Anthropic does not deny it copies Publishers lyrics fully or nearly so.**

21           As to the third factor, Anthropic does not dispute copying Publishers' lyrics in their entirety,

22  which weighs against fair use. *Monge v. Maya Mags.*, 688 F.3d 1164, 1178-79 (9th Cir. 2012). Its

23  contention that copying lyrics in full was necessary to "accomplish [its] purpose" of training its AI

24  models, Opp. 25, is belied by its own admission that lyrics form "an infinitesimally small fraction"

25  of its training data, *id.* at 1. If Publishers' lyrics are so inconsequential, Anthropic should have no

26  objection to excluding them from training future models. Anthropic's citation to an out-of-Circuit

27  summary judgment decision omits that district court's next words: "[Defendant] must show that

28  the scale of copying (if any) was practically necessary and furthered its transformative goals."

*Thomson Reuters Enter. Ctr. GmbH v. Ross Intel. Inc.*, 694 F.Supp.3d 467, 485 (D. Del. 2023). Anthropic has not established, as a technological matter, that its broad copying of Publishers' lyrics was practically necessary to teach Claude "about the unique use of language in poetic and lyrical texts." Opp. 22. Because Anthropic "failed to put forward any evidence that other [sources of training data] were unavailable or an inadequate substitute for [Publishers' lyrics]," the third factor weighs against fair use. *McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149, 1162 (9th Cir. 2022).

### d.   Anthropic's use harms the value and market for Publishers' lyrics.

On the fourth factor, Anthropic tries to shrug off the significant evidence of licensing markets for lyrics by insisting it does not compete with Publishers' licensees. But Publishers' lyrics are licensed and sublicensed to digital music services, lyrics aggregators, lyrics websites, and search engines, authorizing those services to display lyrics to those who search for them online. ECF No. 184, at ¶¶ 10-12, 19; ECF No. 185, at ¶¶ 10-12, 21; ECF No. 186, at ¶¶ 10-12, 20; ECF No. 187, at ¶¶ 10-12, 20-23. Claude serves the same function. And "[t]o the extent [Anthropic] faults Publishers' lack of empirical data, it forgets the burden of proof . . . . Publishers need not present empirical data of their own in connection with [Anthropic]'s asserted affirmative defense." *Hachette Book Grp., Inc. v. Internet Archive*, 2024 WL 4031751, at *18 (2d Cir. Sept. 4, 2024).

Anthropic also ignores that the fourth factor asks whether the challenged use undermines the market for the copyrighted work or "any derivative markets that exist or that its author might reasonably license others to develop, regardless of whether the particular author claiming infringement has elected to develop such markets." *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 48 (2d Cir. 2021). Here, there is a rapidly developing licensing market for AI training data. *See* Newton-Rex Decl. ¶ 6. Anthropic admits to licensing training data from third parties, Kaplan Decl. ¶ 28, and other AI companies license works from other large copyright holders, Smith Decl. ¶ 8; Newton-Rex Decl. ¶ 6. Anthropic's conduct, if allowed to expand, would destroy this market just as it is getting off the ground. Where "unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market" for Publishers' lyrics, that weighs further against fair use. *McGucken*, 42 F.4th at 1163 (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (U.S. 1994)).

**2.        Anthropic cannot defend its copying of Publishers' lyrics in its AI output.**

Anthropic does not deny copying Publishers' lyrics in its AI models' output, nor does it contend such copying is fair use. Instead, it rehashes its argument that post-suit guardrails moot Publisher's claims—an argument that has been firmly rejected by courts. *See supra* Sec. I.A.1. Likewise, Anthropic's claim that it lacks volition ignores the many steps it takes to generate infringing outputs. It chooses to copy Publishers' works to train its AI models, enabling the models to copy those lyrics as output; it finetunes its models to respond to prompts for lyrics as it desires; and it controls what the models distribute, including through guardrails. *See* ECF No. 181, at ¶¶ 40-60. That is volitional conduct. *See VHT, Inc. v. Zillow Grp.*, 918 F.3d 723, 732 (9th Cir. 2019).

**C.        The balance of equities and public interest both strongly favor Publishers.**

The balance of equities favors Publishers. In copyright infringement cases, courts ignore the profits and opportunities a defendant may lose if an injunction issues, because "that is the price of [the defendant's] election to build a business on a product found to infringe[.]" *Illumina, Inc. v. Qiagen, N.V.*, 207 F.Supp.3d 1081, 1094 (N.D. Cal. 2016) (quoting *Wingsurfing Int'l Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986)). Even if Anthropic incurs significant costs to comply with the law or falls behind other AI companies, "when the harm complained of results from a defendant's allegedly infringing conduct, [courts] have nonetheless approved the entry of a preliminary injunction." *2Die4Kourt v. Hillair Capital Mgmt., LLC*, 692 F. App'x 366, 369 (9th Cir. 2017). Any minimal financial impact on Anthropic pales in comparison to Publishers' harm.

To distort the balance of equities, Anthropic mischaracterizes the scope of the injunction. Publishers' first request is modest, asking only that Anthropic be ordered to maintain guardrails it claims to have *already* adopted. As a result, "[t]he balance of equities tips in Plaintiff[s'] favor, since Plaintiff[s] only seek[] an injunction ordering Defendant[] to do what [it] ha[s] already agreed to do." *Am. Impex Corp. v. Int'l Ace Tex, Inc.*, 2009 WL 3963791, at *3 (C.D. Cal. Nov. 16, 2009).

As for Publishers' second request, Anthropic misstates the relief sought to inflate the purported burden. Publishers are ***not*** asking that Anthropic retrain or extract data from its existing or in-progress AI models. At this stage, Publishers ask only that Anthropic refrain from exploiting Publishers' lyrics for ***future*** training. Anthropic already cleans its datasets to remove unwanted

material, like duplicate data, *see* Kaplan Decl. ¶ 33, so it can surely exclude Publishers' lyrics from future training data, as other AI companies have done voluntarily with copyrighted material. Zhao Decl. ¶ 14; Chung Decl., Ex. E. Because the requested relief is forward-looking, it will not "dramatically disrupt[]" Anthropic's existing business, given Anthropic's representation that lyrics make up an "infinitesimally small fraction" of its current training corpus. *See* Opp. 1, 26.

Likewise, the public interest is best served by upholding copyright protections that safeguard "copyright owners' marketable rights to their work and the economic incentive to continue creating" and distributing new works. *VidAngel*, 869 F.3d at 868 (quotation omitted). Anthropic and its *amici* cry wolf that any checks on Anthropic, however modest, will strangle innovation. But the narrow injunction requested will not hamper the public's access to AI models more broadly. Moreover, the proliferation of proposed bills addressing the threat that AI can pose to creators underscores the public interest in the entry of a preliminary injunction here. *See, e.g.*, AI Foundation Model Transparency Act of 2023, H.R. 6881, 118th Cong. § 2 ("[U]sers should be equipped with the information necessary to enforce their copyright protections.").

## II. <u>Publishers' requested preliminary injunction is not overbroad.</u>

Publishers have made clear that the 500 works in suit are a non-exhaustive list of their works that Anthropic has infringed. Compl. ¶¶ 37, 113, 127. Courts often "extend[] injunctive relief beyond the four corners of the litigated copyrighted works to cover non-litigated items of similar character." *Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1161 (9th Cir. 2011). Further, "[t]he weight of authority supports the extension of injunctive relief to future works." *LaFace Recs. v. Khan*, 2008 WL 11395481, at *7 (N.D. Cal. Nov. 19, 2008) (quotation omitted). In cases like this one, such injunctions "ensure[] that litigation need not be needlessly replicated when the defendant's infringing *acts* are the same, but the copyrighted work has changed." *Apple Inc. v. Psystar Corp.*, 673 F.Supp.2d 943, 953 (N.D. Cal. 2009), *aff'd*, 658 F.3d 1150 (9th Cir. 2011).

As a practical matter, Anthropic should have little trouble identifying the works that will be subject to an injunction. Publishers months ago provided Anthropic detailed spreadsheets identifying their catalogs of works by song title, songwriter, and unique identifying numbers, and Publishers made clear they are willing to work with Anthropic to provide additional information

1    and updated lists of works to ensure the injunction is not needlessly limited. *See* ECF No. 208-1.

2    **III.        Anthropic's request for a ▮▮▮▮▮ security bond is unjustifiable.**

3    Anthropic fails to justify its grossly disproportionate demand for a ▮▮▮▮▮ bond. Opp.

4    28 n.7. Publishers' two-part injunction would impose few—if any—costs on Anthropic, warranting

5    no more than a nominal bond. There is no basis for the exorbitant bond Anthropic demands. *See*

6    *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1211 (9th Cir. 2000) (rejecting $20 million

7    bond request as so high that it "would risk denying [plaintiff's] access to judicial review).

8    First, requiring that Anthropic maintain *already-implemented* guardrails imposes no

9    burden beyond what Anthropic has already committed to bear. *See* Opp. 8 ("These guardrails . . .

10   will remain in place in some form indefinitely."). That obviates the need for any bond. *See, e.g.*,

11   *Align Tech., Inc. v. Strauss Diamond Instruments, Inc.*, 2019 WL 1586776, at *16-17 (N.D. Cal.

12   Apr. 12, 2019) (where defendant "represent[ed] that it has ceased the challenged conduct," finding

13   "a preliminary injunction will not impose any additional cost" and thus "no bond is necessary").

14   Second, enjoining Anthropic from copying Publishers' lyrics to train *future* models would

15   not require it to "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" or spend ▮▮▮▮▮▮▮" to

16   redevelop them, as it claims. Opp. 26, 28 n.7; Zhao Decl. ¶ 14, Smith Decl. ¶ 28. Those claimed

17   costs are overstated and speculative. They also stem largely from Anthropic's choice to continue

18   copying Publishers' lyrics in training nearly a year after Publishers first moved for an injunction.

19   Those self-inflicted costs do not factor into the bond analysis. *See Wetzel's Pretzels, LLC v. Johnson*,

20   797 F.Supp.2d 1020, 1028-29 (C.D. Cal. 2011) (setting $40,000 bond despite defendants' claim

21   that injunction would put them out of business, because "[d]efendants brought on those risks").

22   Ultimately, the injunction will protect lyrics that form a fraction of Anthropic's training

23   data but the whole of Publishers' business. The narrow nature of the requested relief and

24   Anthropic's choice to build its business on infringement warrant a bond not exceeding $10,000—

25   or none at all. *See Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th

26   Cir. 2003); *Restoration Hardware, Inc. v. Light*, 2023 WL 4479250, at *3 (N.D. Cal. July 11, 2023).

27   **CONCLUSION**

28   Publishers respectfully request that the Court grant their Motion for Preliminary Injunction.

Dated: September 12, 2024

Respectfully submitted,

*/s/ Timothy Chung*

**OPPENHEIM + ZEBRAK, LLP**
Matthew J. Oppenheim
Nicholas C. Hailey
Audrey L. Adu-Appiah
(admitted *pro hac vice*)
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
aadu-appiah@oandzlaw.com

Jennifer Pariser
Andrew Guerra
Timothy Chung
(admitted *pro hac vice*)
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
jpariser@oandzlaw.com,
andrew@oandzlaw.com
tchung@oandzlaw.com

**COBLENTZ PATCH DUFFY & BASS LLP**
Jeffrey G. Knowles (SBN 129754)
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 391-4800
ef-jgk@cpdb.com

**COWAN, LIEBOWITZ & LATMAN, P.C.**
Richard S. Mandel
Jonathan Z. King
Richard Dannay
(admitted *pro hac vice*)
114 West 47th Street
New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

*Attorneys for Plaintiffs*