**LATHAM & WATKINS LLP**
  Joseph R. Wetzel (SBN 238008)
    *joe.wetzel@lw.com*
  Andrew M. Gass (SBN 259694)
    *andrew.gass@lw.com*
  Brittany N. Lovejoy (SBN 286813)
    *britt.lovejoy@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: +1.415.391.0600

  Sarang V. Damle (*pro hac vice*)
    *sy.damle@lw.com*
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004
Telephone: +1.202.637.2200

  Allison L. Stillman (*pro hac vice*)
    *alli.stillman@lw.com*
1271 Avenue of the Americas
New York, New York 10020
Telephone: +1.212.906.1747

*Attorneys for Defendant Anthropic PBC*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN JOSE DIVISION

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., ET AL.,<br><br>Plaintiffs,<br><br>vs.<br><br>ANTHROPIC PBC,<br><br>Defendant. | Case No. 5:24-cv-03811-EKL<br><br>**DECLARATION OF JARED KAPLAN IN SUPPORT OF DEFENDANT'S [PROPOSED] SURRESPONSE TO PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION**<br><br>**REDACTED**<br><br>**Related Sealing Motion Pending at Dkt. 249**<br><br>Hon. Eumi K. Lee |

1. I am a co-founder and the Chief Science Officer of Defendant Anthropic PBC and submit this surresponse declaration in connection with Anthropic's Opposition to Plaintiffs' Renewed Motion for Preliminary Injunction. Unless stated otherwise, all facts stated herein are within my personal knowledge. If called upon, I would and could competently testify as to matters contained in this declaration and my prior submitted declarations (Dkt. 67-1, 209).

**I.     Claude's Guardrails are Effective Despite Plaintiffs' Jailbreaking Attempts**

2. I understand that, for the first time in its reply to our opposition, Plaintiffs introduced evidence that their expert, Mr. Edward Newton-Rex, was able to circumvent Claude's updated guardrails and extract some of Plaintiffs' lyrics from the model, including lyric mashups and versions of the lyrics endorsing products or political candidates. Such extractions are not evidence of ineffective guardrails; they are attempts to exploit Claude's built-in safety measures and ethical guidelines in order to elicit responses and behaviors that are typically restricted or prohibited. This is also known as "jailbreaking."

3. Jailbreaks propagated by hackers like "Pliny the Liberator" are not at all a typical use of Claude. Dkt. 209 ¶¶ 12–14 (describing Claude use cases and demo videos). I understand that in order to elicit the song lyrics and mashups to a subset of the songs at issue in this litigation, Mr. Newton-Rex used a jailbreak attack, publicized by "Pliny the Liberator" on X (formerly Twitter). Specifically, he entered a space between each letter of the output in order to "purposefully trigger[] a refusal, discombobulat[e] and reorient[] [Claude] with a divider, and then leverag[e] the refusal to elicit a jailbreak" as depicted below. *See* Newton-Rex Reply Decl. Ex. A.



4.      This is not how an ordinary, good-faith Claude user would prompt Claude for song lyrics, especially where that user can easily look up the song lyrics elsewhere on the internet. *See* Dkt. 209 ¶¶ 12–14. It is an example of someone misusing Claude to intentionally "break" the safety guardrails we have put in place, and violates Claude's terms of service.[1]

5.      Jailbreaking is a technique Anthropic studies and attempts to correct for on a regular basis.[2] However, it can be difficult to detect jailbreaks because they are constantly evolving, real-time detection requires significant computational resources that impact system

---

[1] *See* Claude Terms of Service, section 3 (June 13, 2024), https://www.anthropic.com/legal/consumer-terms (last accessed Oct. 7, 2024).

[2] Many-shot jailbreaking, Anthropic (Apr. 2, 2024), https://www.anthropic.com/research/many-shot-jailbreaking.

performance, and overly strict detection can lead to false positives that degrade user interactions. Anthropic works continuously to improve our models' robustness against jailbreaking, including through extensive red-teaming and a recently expanded bug bounty program, where a select number of experienced participants receive early access to unreleased safety mitigation systems for red-teaming purposes.[3]

6. Mr. Newton-Rex's hack is indicative of a fundamental problem AI developers face: the responsibility of balancing effective and evolving implementation of guardrails to block harmful, illegal, or otherwise undesired outputs while enhancing model performance and functionality. It is yet another reason why Plaintiffs' rigid relief—which entails freezing the current guardrails in place as a "status quo" approach—would be harmful. Anthropic must have the ability to iterate in real time on its systems and guardrails to make improvements as misuse arises and evolves.

**II.  General Purpose LLMs Require Vast Amounts of Training Data**

7. Dr. Zhao claims—with no personal knowledge of Anthropic's training processes and performance goals—that future models of Claude will not require ▮▮▮▮▮▮ to continue to show performance gains. His uninformed opinion contradicts substantial research to the contrary,[4] ▮▮▮▮▮▮ that have informed Anthropic's need for additional data, as well as what type of data will yield the most significant model improvements.

8. Dr. Zhao's general reliance on "observations and literature from the wider AI development community" that, in terms of data, bigger is not always better is also misguided. Even though researchers are investigating how to make LLM training more efficient, including

---

[3] Expanding our model safety bug bounty program, Anthropic (Aug. 8, 2024), https://www.anthropic.com/news/model-safety-bug-bounty.

[4] *See, e.g.*, Jared Kaplan et al., Scaling Laws for Neural Language Models (Jan. 23, 2020), available at https://arxiv.org/pdf/2001.08361, a true and correct copy of which is attached as Ex. A. Aarohi Srivastava et al., Beyond the Imitation Game: Quantifying and extrapolating the capabilities of language models (June 12, 2023), https://arxiv.org/pdf/2206.04615, a true and correct copy of which is attached as Ex. B.

through the use of synthetic data, it is still the case that vast troves of training data are required to train *general purpose* generative AI models like Claude. Again, while there are AI models trained on fewer tokens, those models have fewer capabilities and do not operate on the same scale as Claude. For instance, Microsoft's phi-1—one of the smaller scale LLMs mentioned by Plaintiffs' expert Dr. Zhao—is specialized in Python coding. Furthermore, typically models of this type are overfit to academic benchmarks. That is, they are specifically crafted to "memorize the test" in order to provide the appearance of strong performance, but they tend to generalize poorly and are of limited utility. While smaller in size compared to Claude, in its current form, phi-1 is strictly a text-to-code model, and its performance on real-world tasks is greatly inferior to that of Claude. As such, it does not compete with, and is fundamentally different from, Claude and other general purpose LLMs trained on the same scale of data.

9. With respect to Dr. Zhao's claims regarding the ability to use synthetic data in lieu of copyrighted material, they are wrong for several reasons. As an initial matter, as Dr. Zhao appears to acknowledge, to train a high quality LLM purely on synthetic data, that synthetic data must be generated by a model that itself was trained on vast volumes of real-world human generated content. So using synthetic data does not solve the need for huge volumes of data, potentially including copyrighted material.

10. Dr. Zhao's assumption that a model trained on purely synthetic data could have all the capabilities of Claude is also mistaken. In support of his baseless claim that Claude can be trained on *less* data, Dr. Zhao discounts the "garbage in, garbage out" phenomenon synthetic data poses for training. Recent research suggests that when generative AI is trained on synthetic data, the output can drift away from reality in such a way that it is further from the original, human-generated data that it is largely trained on and intended to imitate. Some researchers have referred to this as "model collapse," where the use of synthetic data results in a narrower range of AI output over time. This is consistent with Anthropic's own research on the impact of synthetic data on its AI models, which shows that, at best, synthetic data can augment a tiny portion (less than ▉ of the real-world data. Contrary to Dr. Zhao's opinions, synthetic data is not a

substitute for high quality, diverse, real-world, human-generated data. For that reason, the amount of real-world text required to train each version of Claude cannot be substantially decreased as he suggests.

### III. The Training Costs and Burden Associated With Plaintiffs' Requested Relief Remain Even If Limited to Future Models Not Already in Development

11. Contrary to Dr. Smith's and Dr. Zhao's reply testimony, it would be costly to modify Claude's training data set to excise Plaintiffs' song lyrics, or any specific subsets of publicly available text, on a going forward basis.

12. As previously explained, a narrowing of Plaintiffs' requested relief to future models that have not begun training does not eliminate delay or harm to Anthropic's business. Anthropic, unlike any of its competitors, would still have to train any new model it builds from scratch in order to attempt to remove Plaintiffs' song lyrics for millions of songs from the training corpus in those future training runs. And it would have to do so, according to Plaintiffs, on a quarterly basis, potentially out of model production cycle, to account for any "update" in Plaintiffs' song catalogs. That is burdensome, costly, and ███████████████ for all the reasons explained in detail in my prior declaration at paragraphs 62–65. Dkt. 209 ¶¶ 62–65.

13. I understand that Dr. Zhao also "doubt[s] the accuracy" of my assessment of the burden and costs of retraining Anthropic's AI models consistent with the requested relief, including the basis for why cumulative ███████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████
█████████████████████████████ Dr. Zhao, respectfully, has no insight into Anthropic's business, its production schedules, performance and evaluation targets, and I stand by those statements.

I declare under penalty of perjury that to the best of my knowledge, information, and belief, the foregoing statements are true and correct.

Executed on October 7, 2024 in San Francisco, California.

_____
Jared Kaplan