Pages 1 - 138

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Eumi K. Lee, Judge

CONCORD MUSIC GROUP, INC., et )
al.,                          )
                              )
          Plaintiffs,         )
                              )
  VS.                         )    NO. C 24-03811 EKL
                              )
ANTHROPIC PBC,                )
                              )
          Defendant.          )
_____)
                          San Jose, California
                          Monday, November 25, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    OPPENHEIM & ZEBRAK LLP
                    4530 Wisconsin Avenue NW - 5th Floor
                    Washington, D.C.  20016
               BY:  **MATTHEW J. OPPENHEIM, ATTORNEY AT LAW**
                    **NICHOLAS C. HAILEY, ATTORNEY AT LAW**
                    **AUDREY ADU-APPIAH, ATTORNEY AT LAW**

                    OPPENHEIM & ZEBRAK LLP
                    461 5th Avenue - 19th Floor
                    New York, New York  10017
               BY:  **JENNIFER PARISER, ATTORNEY AT LAW**

                    COBLENTZ, PATCH, DUFFY & BASS
                    One Montgomery Street - Suite 3000
                    San Francisco, California  94104
               BY:  **JEFFREY G. KNOWLES, ATTORNEY AT LAW**

               **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

Remotely Reported:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
                    U.S. District Court - Official Reporter

```
 1    APPEARANCES:  (continued)

 2    For Defendant:
                         LATHAM & WATKINS LLP
 3                       505 Montgomery Street - Suite 2000
                         San Francisco, California  94111
 4                 BY:   JOSEPH R. WETZEL, ATTORNEY AT LAW
                         ANDREW M. GASS, ATTORNEY AT LAW
 5                       IVANA DUKANOVIC, ATTORNEY AT LAW

 6                       LATHAM & WATKINS LLP
                         555 Eleventh Street NW - Suite 1000
 7                       Washington, D.C.  20004
                   BY:   SARANG V. DAMLE, ATTORNEY AT LAW
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | **<u>Monday - November 25, 2024</u>**                              **<u>1:35 p.m.</u>** |
| 2 | <u>P R O C E E D I N G S</u> |
| 3 | ---o0o--- |
| 4 | **THE CLERK:**  All rise.  The United States District |
| 5 | Court for the Northern District of California is now in |
| 6 | session.  The Honorable Eumi K. Lee presiding. |
| 7 | **THE COURT:**  You may be seated.  Good afternoon, |
| 8 | everybody. |
| 9 | **ALL:**  Good afternoon, Your Honor. |
| 10 | **THE CLERK:**  We are calling case number |
| 11 | 5:24-CV-3881-EKL, Concord Music Group, et al. versus Anthropic |
| 12 | PBC. |
| 13 | Counsel, please come forward stating your appearance for |
| 14 | the record starting with Counsel for the Plaintiff.  Thank you. |
| 15 | **MR. OPPENHEIM:**  Good afternoon, Your Honor, Matthew |
| 16 | Oppenheim on behalf of the Plaintiffs.  I'm here with my |
| 17 | colleagues Nick Hailey, Jenny Pariser and Audrey Adu-Appiah |
| 18 | from Oppenheim & Zebrak as well as our local counsel, Jeffrey |
| 19 | Knowles. |
| 20 | We also have here today in the rear from our clients |
| 21 | Universal Music Group, Nick Hailey [sic]; from Concord, Duff |
| 22 | Berschback and from ABKCO, Wil Pittenger. |
| 23 | **THE COURT:**  Good afternoon, everybody. |
| 24 | **MR. WETZEL:**  Good afternoon, Your Honor, Joe Wetzel |
| 25 | from Latham & Watkins; and I'm joined by my colleagues Andy |

1  Gass, Sy Damle, Ivana Dukanovic and Christopher Shmoeller at

2  counsel table.

3       In terms of our presentation today, I'm going to be

4  splitting the PI hearing with Mr. Gass; and Mr. Damle will be

5  handling the motion to dismiss hearing.

6       **THE COURT:**  Could you repeat again who is doing the

7  motion to dismiss.

8       **MR. WETZEL:**  Sy Damle.

9       **THE COURT:**  All right.  Wonderful.

10                  (Pause in the proceedings.)

11      **THE COURT:**  All right.  So, we are beginning with the

12  motion for preliminary injunction as we had discussed

13  previously.  I also -- in terms of sealing and such, we are

14  going to touch base about that a little bit at the end.  I'm

15  thinking if there's anything which needs to be in closed

16  session, we will save that until the end.

17      **MR. OPPENHEIM:**  Thank you, Your Honor.  I will begin

18  with one correction.  I introduced my client from Universal

19  Music Group and I used my colleague's name.  He is Nick Tardif,

20  not Nick Hailey.

21                  (Laughter)

22      **THE COURT:**  I was wondering.  I was thinking same

23  names.  All right.  Thank you so much.

24      **MR. OPPENHEIM:**  And today I will be addressing the

25  preliminary injunction issues, Your Honor, and my colleague

1  Nick Hailey will be addressing the motion to dismiss.

2          **THE COURT:**  Hi, Mr. Oppenheim.  Beginning with the

3  scope.

4          **MR. OPPENHEIM:**  Yes, Your Honor.  So, just by way of

5  very brief background before we get to the scope, the

6  Plaintiffs in this case are some of the largest, most

7  successful music publishers in the world.  They own and control

8  copyrights in many of our most beloved songs that we know, that

9  we grew up with, that we sing and hum to ourselves, and that we

10  all know the words of.

11      Anthropic is an AI company that's only three years old but

12  already with a value of over $18 billion is bigger than the

13  entire U.S. music publishing business together.

14      This case is not about whether or not somebody is for or

15  against AI.  This case is about whether or not Anthropic has to

16  abide by the copyright laws.  And with that, I will turn to the

17  scope of the injunction, Your Honor.

18      As you requested, we met and conferred at some length with

19  Counsel for Anthropic in an effort to resolve -- to see whether

20  we could come to agreement on a stipulation relating to the

21  injunction on the output portion of the preliminary injunction

22  motion.

23          **THE COURT:**  Correct, the first form.

24          **MR. OPPENHEIM:**  Yes.  And, Your Honor, those

25  discussions went all the way up until this morning.  I will say

1    I think both parties made substantial efforts and concessions.

2    I think we are very close.  We have two issues, I believe --

3    two substantive issues that I believe separate us.  And so, I

4    think maybe it makes sense to address those to Your Honor and

5    put those forward because I think they will become key in the

6    course of our discussion.

7         The injunction itself that we are seeking with respect to

8    the guardrails is that Anthropic should maintain their already

9    implemented guardrails that they have told us they have put in

10   place to stem the infringement of our works.

11        There seems to be no dispute that those are in place and

12   they have said that they will maintain them.  As we will

13   discuss, those guardrails are imperfect; but the Plaintiffs are

14   willing to accept some of those imperfections, recognizing that

15   we need to be reasonable and this is a preliminary injunction

16   and we can't ask for comprehensive relief early.

17            **THE COURT:**  Yes.

18            **MR. OPPENHEIM:**  So, the injunction intends to restrain

19   Anthropic from removing the guardrails or, frankly, we thought,

20   it was clear but not instituting guardrails on new versions of

21   the product that they would release.

22        And the idea was that we were holding them to their word;

23   that they were going to do what they said they were going to

24   do.

25        In the course of the back and forth, the two issues that

1    came up were, one, Anthropic wanted to include language that

2    would allow it to degrade the guardrails so long as that

3    degradation was not material.

4        So, the Plaintiffs agreed that they were permitted to

5    improve the guardrails.

6            **THE COURT:**  Uh-huh.

7            **MR. OPPENHEIM:**  We had no problem with that,

8    Your Honor.  And we even agreed that to the extent in that

9    effort to improve them there was a de minimis degradation, we

10   would accept that.  But Anthropic wanted language that would

11   allow them to modify the guardrails so long as the degradation

12   was not material.

13       We don't want to have to be in here arguing about what

14   materiality is.  They have a set of guardrails.  They have

15   offered to keep them in place.  They have said they want the

16   ability to improve them.  We are fine with that.

17       Adding into the injunction a provision that says they can

18   degrade -- essentially degrade the guardrails so long as it is

19   not material to us went down a road we think we should not go

20   down.

21           **THE COURT:**  I understand or could sense -- I could

22   foresee why there might be nervousness around that is part of

23   the reason -- and I will hear from Anthropic on this as well

24   obviously -- but is part of the reason for the degradation to

25   ensure efficiency of any modifications which then happen in

1  terms of improvement?

2      **MR. OPPENHEIM:**  Certainly, Your Honor, one can imagine

3  that they might say, well, we want to improve these but in the

4  process it might lead to some minor degradation and they are

5  concerned about that.  And that's when counsel picks up the

6  phone and has discussion with opposing counsel.  And if it is

7  really improving the guardrails in the whole, of course we are

8  not going to complain.

9      **THE COURT:**  Because I wonder if there is some way to

10  craft that if the end goal -- because I could also see them

11  saying, well, we want to do this in order to ensure that the

12  next iteration of a guardrail would be --

13      **MR. OPPENHEIM:**  That's why we added the de minimis

14  language.  We said, you know, if they make a change and it

15  leads to a de minimis degradation, we were okay with that; but

16  materiality can be a substantial portion.  Materiality is a

17  pretty high bar here, and don't believe that you build an

18  injunction with a loophole from the beginning that says they

19  are allowed to degrade up to a material amount.

20      Now, of course, the way injunctions work, they have the

21  right at any time not only to meet and confer with us but to

22  come and seek to modify the injunction if they deem it fit.

23      There is no -- very little likelihood that if they call us

24  and say, "We want to improve these and it's going to result in

25  a small amount of degradation," that there is going to be an

 1  issue.  But if you build in a loophole that says they are

 2  allowed to degrade so long as it is not material, you can

 3  easily see them saying, "Wow, this is really slowing

 4  performance.  Let's eliminate 40 percent of the guardrails'

 5  efficacy," and that's not yet material.

 6      And then we have got a dispute that we have got to fight

 7  over, and the whole goal here is to avoid fighting on that and

 8  to get to -- the case so it's teed up for summary judgment and

 9  ultimately trial.

10      **THE COURT:**  Yes, I would like to actually get to the

11  merits.

12      **MR. OPPENHEIM:**  Yes, I agree.  So, that was issue one.

13      **THE COURT:**  I feel that there is, like -- there should

14  be some way of working around -- I don't have enough

15  understanding of what degradation -- the reasons for or why

16  there may need to be degradation by just -- it seems as though

17  there might be some way to craft this.

18      **MR. OPPENHEIM:**  I completely agree.

19      **THE COURT:**  So --

20      **MR. OPPENHEIM:**  The -- Anthropic would not move off

21  the language that would allow them to modify up to a material

22  amount, and that -- that -- they told us that was critical for

23  them and that was a line that we wouldn't cross.

24      **THE COURT:**  Right.  And I'm wondering if both parties

25  can come to something which is sort of in between because they

1  may need to degrade to a certain degree for whatever reason as

2  long as the overall goal and output is still protected.  So, I

3  guess I'm just wondering if there is --

4          **MR. OPPENHEIM:**  I completely agree.  There should be a

5  middle ground on that, Your Honor.

6          **MR. GASS:**  Would it be helpful to hear from Anthropic

7  on these issues as we go or should we just wait until the end?

8          **THE COURT:**  Let me hear the two and I might pull you

9  up because it might be easier just if we are going to go try to

10 resolve something or I will, perhaps, take it a little bit

11 closer to the end of the proceedings so that we can actually

12 just informally discuss it.  If there is anything I can do to

13 help resolve this, it seems like it would be a big win and we

14 would really focus our discussion today.

15         **MR. OPPENHEIM:**  I completely agree.  And if we can

16 resolve this before we talk about the merits, I think that

17 would be helpful.

18         **THE COURT:**  Okay.

19         **MR. OPPENHEIM:**  So, let me speak to the second issue.

20 So, Anthropic asked that language be added that the order

21 should only apply to future text -- to text models, which

22 Plaintiffs are willing to agree to, but Anthropic insisted that

23 it not apply to future models that are licensed to third

24 parties.

25         **THE COURT:**  The APIs?

1        **MR. OPPENHEIM:**  The APIs.  This is a massive portion

2   of their business.  I don't know what percentage, Your Honor;

3   but, for example, one of their largest investors -- and I think

4   largest clients -- is Amazon.  That is a third party API.

5        And if they are saying for every commercial customer that

6   we have where that commercial customer is not using this LLM,

7   not using Claude, in the public; that is, they are using it in

8   their business, they don't have to install any guardrails,

9   that, to us, undermines everything we are doing here.  It's

10  even a larger loophole than the first one.  And that's an

11  exception we can't live with, Your Honor.

12       **THE COURT:**  Well, this ties to one of my early

13  questions for Plaintiffs on the scope of the preliminary

14  injunction both in terms of the first and second forms of

15  relief.  What is -- what would be covered by the APIs?  What --

16  what are the implications in terms of the APIs?

17       **MR. OPPENHEIM:**  So, the APIs are just another flavor,

18  if you will, of how Claude is being distributed to the public;

19  right.  The APIs are commercial implementations provided to

20  everybody from Amazon to DuckDuckGo, right, to Quora who does

21  Pell.

22       So, you have all of these different commercial entities

23  that want to -- that want to use Claude, which is great, and

24  those commercial entities may or may not make their

25  accessibility to Claude public facing.  So, what I mean by that

 1   is you go on DuckDuckGo --

 2          **THE COURT:**  Right.  You don't know.  It doesn't say,

 3   "Hi, this is Claude model."  It is embedded within the

 4   interface.

 5          **MR. OPPENHEIM:**  No.  Actually, on DuckDuckGo you can

 6   push a button to go to Claude --

 7          **THE COURT:**  Okay.

 8          **MR. OPPENHEIM:**  -- and run your queries.  But Amazon

 9   or whatever company -- I don't know specifically how each

10   company runs it -- but any company that has an API and has

11   Claude as the back end, if there are no guardrails, every

12   employee in the company can be using Claude to be doing exactly

13   what we have seen leads to massive infringement of our works.

14       And there is in exception to the copyright laws that says,

15   well, if it is happening behind the closed doors of a business,

16   it is not infringement.  That doesn't exist.  It is still a

17   public distribution.

18       So, whether it's a -- access to Claude is through a

19   chatbot or through an API, the guardrails should be applied

20   exactly the same.  That is, it should avoid the infringing

21   outputs.

22          **THE COURT:**  So, as the Court disclosed to the parties,

23   I did review the tutorial per -- which was before Judge Van

24   Kuelen last week.

25       So, by the description, which I believe Plaintiffs had

given, it was:  Okay, here is Claude and then there is going to

be this packaging, you know, which might be individualized --

sorry -- per each of these third parties.

    And there's some back and forth, I think, in terms of what

that packaging would look like; but when you are saying -- and

I believe it was Plaintiffs who had asserted that, okay, well,

there might be additional guardrails or additional things which

are happening within that context of the packaging.

    So, I'm just trying to imagine the scope of injunctive

relief, which is being requested then by Plaintiffs in the

context of APIs, which are out there existing and what that

would look like because the papers didn't really squarely

address the issue of APIs.

    And so, now that -- one of my first questions for you was:

Is this included because the papers did not squarely address

the declarations like -- there is mention but did not discuss

what this would look like, what the implications would be, what

the cost would be and the equities.  So, now that this is

suddenly part of the equation, I'm a little taken aback by the

scope.

        **MR. OPPENHEIM:**  Yeah.  So, I guess as a level set,

Your Honor --

        **THE COURT:**  Uh-huh.

        **MR. OPPENHEIM:**  -- Anthropic has one product.  It is

Claude.  Now, they have different flavors of it, different

1    varieties.

2        So, the analogy I used last week when we were describing

3    the technology is a Macbook.  You can buy a Macbook.  It may

4    have a different size screen.  It may be a different color on

5    the outside.  It may have a different processor, different

6    amount of memory; but at the end of the day it is a Macbook and

7    it runs -- they all run the same way and so on and so forth.

8    That's what Claude is, whether it is a chatbot or it is an API.

9        So, that API is just simply an interface back to Claude

10   as -- as it is run by Anthropic.  Whether that interface is

11   coming through an API or a chatbot makes no difference.

12       And so, they may institute the guardrails somewhat

13   differently as a matter of engineering but that's just

14   engineering.

15       **THE COURT:**  So, then I'm trying to imagine this out in

16   terms of the guardrails and any modification of that.  If you

17   are including that with the APIs, you are saying, okay,

18   anything that is more than X de minimis would need to be run

19   by -- would need to be run by Plaintiffs.  And if there is, as

20   you are describing, hundreds or that this is such a big

21   percentage of their business, then are you asking that they

22   basically clear that with you with every circumstance?  In

23   terms of the scope of the stipulated --

24       **MR. OPPENHEIM:**  So, Your Honor, Anthropic has said

25   they have implemented the guardrails across Claude.

1          **THE COURT:**  Okay.

2          **MR. OPPENHEIM:**  So we believe based -- we take them at

3     their word; that they have already implemented across those

4     commercial APIs.

5          **THE COURT:**  Okay.

6          **MR. OPPENHEIM:**  The question here in the -- in the

7     stipulated -- in the stipulation we were negotiating was

8     whether or not that will continue to occur in the future.

9          They didn't -- in the back and forth drafting, they did

10    not attempt to say we are not going to implement the guardrails

11    on APIs now or we haven't.  They have told us that they have

12    implemented the guardrails to stop infringing outputs.  We take

13    them at their word on that.

14         So, now the only question is are they going to continue

15    what they are doing in the future on APIs?

16         **THE COURT:**  Okay.

17         **MR. OPPENHEIM:**  And we see no reason since they have

18    told us they have done it now that they wouldn't do it in the

19    future.

20         **THE COURT:**  Okay.  Let me hear just briefly -- and we

21    have already blown our schedule for today.  Let me just hear

22    briefly regarding the -- where we stand right now in terms of

23    the possible stipulation as to the first form of relief.

24         **MR. GASS:**  Thank you, Your Honor.  May I offer

25    Your Honor the latest draft of the agreement that Anthropic

 1    sent across the transom?  May I approach with that information?

 2    I have a copy for --

 3            **THE COURT:**  I see there is no objection.  I'm sure

 4    Mr. Oppenheim would like to see -- have it reviewed first.

 5            **MR. OPPENHEIM:**  That's fine, Your Honor.  And we can

 6    hand up the version that we were offering, but I will allow

 7    Mr. Gass to proceed.

 8            **MR. GASS:**  May I approach?

 9            **THE COURT:**  Madam Clerk can hand it to me.

10            **MR. GASS:**  Okay.  So, you need not read the whole

11    thing, Your Honor, but what I have passed up is correspondence

12    that I and others from Mr. Oppenheim's firm were having over

13    the weekend along with the last complete draft that Anthropic

14    sent across of the stipulation.  Just so there is no ambiguity

15    of about who said what to whom we have this written record.

16        A couple of points here.  First, I would start by saying

17    our approach to this has proceeded from the presumption that we

18    are seeking to solve for the preliminary injunction that the

19    Plaintiffs seek, which is to maintain the guardrails in their

20    current state.

21        And contrary to Mr. Oppenheim's suggestion right now, the

22    current state of the guardrails is predictably a flexible one

23    that takes account of circumstances across the board; and

24    Anthropic is confident that what it does makes sense and

25    protects all of the relevant interests.  But the purpose of the

1    language that we have proposed is to deal with that wide array

2    of circumstances.

3        There are fundamentally three components of the bargain

4    that the parties were describing.  One concerns continuing the

5    current guardrails.  The second concerns applying the

6    guardrails to future products, and the third concerns a product

7    for dealing on a going forward basis with respects in which the

8    Plaintiffs perceive that the existing approaches are

9    insufficient.

10        Not part of what the Court ordered us to do but everyone

11    thought it would be a good idea to see if we could hammer that

12    out as well.

13        With respect to the first one, Mr. Oppenheim is correct.

14    We are all agreed that Anthropic, as we have said repeatedly

15    throughout the course of this case, has every intention of

16    maintaining its guardrails in approximately the form that they

17    are.

18        In the delta between the two sides concerns the point that

19    the Court focused in on a moment ago, which is that this is a

20    rapidly moving technology which is deployed in a vast array of

21    different circumstances.  And, of course, Anthropic requires as

22    a matter of conducting its business the flexibility to modify

23    the guardrails, continually improve them provided that there is

24    no material diminution of the efficacy of the tools.

25        Mr. Oppenheim kept using the word "degradation."  That

```
 1   appears nowhere in the discussion.  If you open the draft that
 2   I passed up on page 2, paragraph 6A --
 3            THE COURT:  Okay.
 4            MR. GASS:  -- the last sentence is the language that
 5   Anthropic proposed.  (As read:) "Nothing herein prevents
 6   Anthropic from expanding, modifying or improving such
 7   guardrails provided that such changes do not materially
 8   diminish the efficacy of the guardrails."
 9        That's all we are talking about.  Seems not unreasonable
10   from our perspective.
11        With respect to the future products issue, here again, our
12   position is simply we will agree to continue doing essentially
13   what we have been doing; and we propose two different versions
14   of language that would accomplish that goal.
15        First -- actually, three I think.  The first -- there is
16   some trickiness around what it means to continue what we are
17   doing because the product may evolve over time, but the
18   Plaintiffs worked with us to figure out how to sort of define,
19   you know, roughly comparable products to which similar
20   guardrails would apply.
21        And what we have proposed in a couple of different ways is
22   language that simply says with respect to -- and here, I can
23   direct you to the cover e-mail that I passed up.  This is about
24   two-thirds of the way down the page.  Do you see the passage
25   that's in quotes there?
```

1              **THE COURT:**  Yes.

2         **MR. GASS:**  "Anthropic will maintain its guardrails."

3    With respect to text-to-text models that are released in the

4    future -- this is sort of a rough proxy for the species of tool

5    that we are talking about here -- Anthropic will apply

6    guardrails in a similar manner as it currently does and then

7    addresses that with respect to additional modalities as well

8    and how to deal with that.

9         There is -- we have never said we will not apply our

10   guardrails to APIs or anything like that.  The point is simply

11   the injunction asks us to continue doing what we are doing.  We

12   have offered to continue doing what we are doing including with

13   respect to future tools that are roughly comparable.  That's

14   where we are.

15        And, again, I think that there is virtue in all of this

16   including the rest of this proposed approach, which affords the

17   parties ample opportunities and a prescribed process where if

18   they feel there is a particular implementation that isn't

19   working or that the tools are -- the guardrails are being

20   insufficiently protective, the parties spell out in

21   paragraph 6B exactly how they raise that with us and we talk

22   through it and work it out.

23        So, I don't think that Mr. Oppenheim intended to

24   misrepresent what Anthropic's position is, but he said a few

25   things that are pretty fundamentally incorrect; and I want to

makes sure that you have appreciated those important

distinctions.

                **THE COURT:**  Thank you.

                **MR. OPPENHEIM:**  Thank you, Your Honor.  The effect of

the language that Mr. Gass pointed you to, the modifying such

guardrails provided that such changes do not materially

diminish the efficacy of the guardrails, the effect of that is

to allow degradation up to a point of materiality.  And that's

what I said.  That's what we have told them.

      We have told them that we are fine with the provision if

you remove the word "modifying" and you say unless there is

more than a de minimis effect.  That's what we offered,

Your Honor.  So, we are fine with the provision other than the

modifying.  They have already got expanding and improving.  We

are fine with that, and we are even fine with some de minimis

efficacy impact.  We just had a problem with materiality.  So,

I don't believe I made any misrepresentations, Your Honor.

      Secondly, maybe the last issue is resolved.  If Mr. Gass

is saying now that they are okay with the application to APIs,

the guardrails, then we are fine.  In the back and forth --

there were many drafts that went back and forth -- we had

language that said that it would apply to public versions and

commercially released versions, and they kept taking out

"commercially released;" and that led us to believe that they

were only applying the guardrails in the future to those that

```
 1    were in the public.

 2         But if Mr. Gass is representing that they are doing it now

 3    and they are going to continue to do it, then I think that

 4    issue is resolved and that's great.  So, we are down to just

 5    the one issue.

 6         THE COURT:  So, it seems pretty clear to me unless we

 7    go in chambers and knock this out over the next two hours, that

 8    this is not going to resolve itself right now, so, but that

 9    parties are close.  And in some ways -- I mean, what I find

10    interesting is this is going beyond -- arguably beyond some of

11    the relief, which is sought to begin with, by Plaintiffs in

12    their preliminary injunction as to the first form of relief.

13         So, I do believe to a large degree that this is a win/win

14    for both parties, but I don't think I'm going to need to

15    resolve it in the argument posture which we are in right now.

16         I would say in terms of take, it says, "expanding, modify

17    or improving such guardrails;" and if your only concern is the

18    "modifying" and you wanted to have a more beneficial twist to

19    it, it seems like that might be able to stay in terms of that

20    paragraph 6A while at the same time, you know, materially

21    diminish -- I understand the pushback about that; but if you

22    have the verbs above that sort of protecting what that change

23    might be, that might be sufficient to address your concern as

24    well -- Plaintiffs' concern as well.  Just a proposal just at a

25    quick blush look at this.
```

1      **MR. OPPENHEIM:**  Just so I make sure I understand what

2  you are proposing, you are suggesting maybe remove the word

3  "modifying" but leaving "do not materially diminish" as a

4  compromise?

5      **THE COURT:**  Uh-huh, because I think what Plaintiffs

6  are concerned is that it is only done -- that those changes are

7  only done for a beneficial purpose in terms of protecting

8  copyright and --

9      **MR. OPPENHEIM:**  Yes.

10      **THE COURT:**  -- Defendants, I think, are saying, okay,

11  well, this may end up being a greater change in terms of things

12  which need to be -- so, I'm wondering if that would just --

13      **MR. OPPENHEIM:**  If that resolved it, Your Honor,

14  I believe the Plaintiffs would agree to that.

15      **MR. GASS:**  Yeah, I -- one thing that I am supremely

16  confident of, Your Honor, is that I do not have authority to

17  negotiate changes to this agreement --

18      **THE COURT:**  I agree, which is the reason I'm saying --

19  and I also -- we have a whole motion to dismiss to argue too as

20  well today --

21      **MR. GASS:**  Agreed.

22      **THE COURT:**  -- but we are -- that is a suggestion off

23  the top of my head.  I feel like you are closer.  And I just

24  want to point out, this goes beyond the relief that Plaintiffs

25  are seeking as to the first form of relief.  So keeping that in

 1    mind --

 2             **MR. OPPENHEIM:**  Yes, Your Honor.

 3             **THE COURT:**  But with that, I'm going to just assume

 4    that none of that time counted, which may mean we are here even

 5    later today, but let's get started.

 6         So, and we will -- 15 minutes per party beginning with the

 7    first part in terms of the scope of the relief as well as

 8    anything in terms of the technology you wanted to clarify for

 9    the Court assuming that I have already looked at the tutorial.

10    I may have one or two questions from the tutorial, and we will

11    take it from there.

12             **MR. OPPENHEIM:**  Thank you, Your Honor.  And I would

13    like to spend some -- not insignificant amount of my time in

14    this 15 minutes talking about how the technology works for

15    purposes of the PI, which is different than maybe what was in

16    the tutorial for purposes of the discovery issues, Your Honor.

17         But just very quickly, on the scope of the injunction with

18    respect to the training corpus, Your Honor, the Plaintiffs are

19    seeking to restrain Anthropic from copying lyrics in future

20    training.  Nothing more.

21         So, we are not asking Anthropic to have to retrain

22    existing models.  We are not asking them to pull models out of

23    the marketplace.  And if Anthropic chooses not to release new

24    models, there is no obligation here whatsoever.

25             **THE COURT:**  Let me clarify.  Based on your -- the

1    Plaintiffs' reply brief, my interpretation of form of -- the

2    scope of form of relief number 2 was that it did not include

3    any models that are currently under development.  Is that

4    correct or incorrect?

5        **MR. OPPENHEIM:**  Let me be very clear.  To the extent

6    that the model has already been trained, we are not seeking to

7    have them retrain it.

8        **THE COURT:**  Okay.

9        **MR. OPPENHEIM:**  If they have something under

10   development, which has not been trained --

11       **THE COURT:**  Okay.

12       **MR. OPPENHEIM:**  -- they shouldn't train it on our

13   lyrics.  Put it another way, when they are going -- the next

14   time they are going to engage in training, let's not use the

15   entirety of our music catalogs in that training process.

16       **THE COURT:**  So, the distinction Plaintiff is drawing

17   is not because -- it sort of made it seem like

18   "underdevelopment" versus "not underdevelopment" was the

19   language from the reply brief.

20      So, I'm just putting a fine point on this because I want

21   to have a clear understanding is that you are now saying if it

22   has been trained or not been trained would be the line that

23   Plaintiffs are requesting.

24       **MR. OPPENHEIM:**  Right.  Under development is kind of

25   vague.

1          **THE COURT:**  Yes.

2          **MR. OPPENHEIM:**  So, wanted to clarify.

3          **THE COURT:**  Okay.

4          **MR. OPPENHEIM:**  Thank you, Your Honor.

5          **THE COURT:**  All right.  Great.

6          **MR. OPPENHEIM:**  Yes.

7      So, before we dive into the legal issues a little later,

8  it is important that we have an understanding of what Claude is

9  and how it works.  And I'm going to endeavor not to repeat what

10  was said in -- last week because Your Honor has already

11  reviewed those materials but some background and context for

12  this motion is critical.

13      So, as you know, right, like any LLM, Claude at its base

14  begins with a very complex algorithm that predicts responses

15  based off of statistical inferences.  Those statistical

16  inferences are generated based on the content that the LLM

17  trains on.

18      Until the LLM is trained, it is essentially an empty bag.

19  It has the ability to function but nothing in it on which to

20  function.  There are no parameters within it.  It can't respond

21  to queries.  It is just an algorithm.

22      Many refer to the training data as data, but that's a

23  complete misnomer.  The training corpus, which is what I will

24  call it, is a massive accumulation of expressive content.

25  Anthropic will argue, oh, it's just trillions of bits of data.

1  It is zeros and ones.  And, yes, because it is digitized, it's

2  zeros and ones.  And, yes, because the content is sliced up

3  into tiny little pieces, it is trillions of pieces; but that

4  doesn't change what it is.

5      It is not just zeros and ones.  It is not even just words.

6  It is not -- it is not even many, many copies of the Bible or

7  many, many copies of Shakespeare; right.  None of that would

8  train an LLM.

9      Anthropic needs to be trained on expressive content.  In

10  order to be able to respond in natural language, it needs its

11  input to be natural language.

12      So, as our expert Professor Zhao explains in his

13  declaration, while LLMs are designed to mimic fluent speech and

14  text composition, the perfect or near perfect reproduction of

15  song lyrics cannot have been generated naturally by the LLMs

16  themselves without having been trained on those lyrics.

17      In order to respond to queries about lyrics -- right, this

18  is what Professor Zhao is saying -- in order to respond to

19  queries about lyrics, it must have copies of lyrics in it.  And

20  in order to know what the word that follows "blowing in the"

21  should be, it needs to have been trained on Bob Dillon.

22      In order to write lyrics to music, it has to have seen

23  lots of lyrics.  And the fact that Anthropic has included

24  lyrics in it is no mistake.  It is not an oversight.  It is a

25  necessity.  It is a necessity for Claude to do what Anthropic

wants it to do.

Anthropic wants Claude to be culturally aware.  It needs Claude to know that when somebody asks a question about "you hold me down but I got up," that it's a question about Katy Perry's "Roar."

It is undoubtedly true that the training corpus for Claude includes lots and lots of other expressive things, not just lyrics.  Indeed, Plaintiffs' catalog of lyrics may represent the tiniest of percentage of Claude's overall training corpus; but the question that we are going to grapple with in this hearing is not what portion of the training corpus is Plaintiffs' lyrics but the amount and substantiality of Plaintiffs' works on which Claude is trained.

What's relevant here is that Anthropic copied what appears to be virtually all of Plaintiffs' catalogs of works.  The fact that Anthropic did so in the context of copying lots and lots of other things is a total red herring.

It's not a defense for Anthropic to say, "We may have infringed lots of other works that aren't yours.  So, the infringement of your works should be fair use."

Anthropic has complete control over its -- what it puts in its training corpus.  I will repeat that again.  It may be the most important thing we say today.  Anthropic has complete control over what it trains its LLM on.  It has chosen to use lyrics.

1    And while Anthropic has said Claude's purpose is not to

2    output lyrics, that's not true.  The fine tuning process shows

3    that Anthropic expected Claude to be able to helpfully respond

4    to queries about lyrics.  Having been trained --

5         **THE COURT:**  Is it Plaintiffs' allegations, based on --

6    some of the case law which it cited to, to be heavily relying

7    on this notion of direct copying, and that part of Claude's

8    purpose was actually to be a lyricist, aggregator or something

9    comparable.

10    Was -- is that Plaintiffs' allegation?

11         **MR. OPPENHEIM:**  I don't think we need to allege that,

12    Your Honor.  I don't think we need to allege --

13         **THE COURT:**  I don't think so either, but it seemed

14    like that that was -- that there was a push in terms of the

15    briefs -- and maybe I'm getting too much into the merits here.

16    I will come back to the scope because I do have some scope

17    questions for you -- but is -- it seemed that some of

18    Plaintiffs' arguments were verging on that.  So, I just wanted

19    to have Plaintiff clarify.

20         **MR. OPPENHEIM:**  It's -- so, that's not what Plaintiffs

21    need to show in order to demonstrate --

22         **THE COURT:**  I agree.

23         **MR. OPPENHEIM:**  -- the copying, in order to

24    demonstrate it is not fair use -- to demonstrate it is not fair

25    use, which is obviously the Defendant's burden to prove; and it

is not needed in order to demonstrate irreparable harm; but the

reason it is important is because it pushes back on what

Anthropic says over and over and over again, which is that the

end purpose of this -- of this LLM is to create other creative

expression outside of lyrics.

And that statement is not accurate.  It's not that it is

completely untrue.  Yes, Claude can be used for many other

things, but Claude can also be used for generating infringing

lyrics.

So, having been trained with Plaintiffs' lyrics and having

been fine tuned with questions relating to lyrics, Anthropic

provides its users -- yes?

        THE COURT:  Let me ask you a question about those

lyrics in terms of tying into the scope.

There are 500 songs, which were attached as Exhibit A.,

either examples that have been provided through the jail break

process, examples in the declarations.  The proposed order

itself talks about a continual -- continuing update to reflect

the Plaintiffs' catalog on a quarterly basis updating.

        MR. OPPENHEIM:  Yes, Your Honor.

        THE COURT:  So, but -- and maybe I missed it.  I

looked through -- I have got binders surrounding me right

now -- but what is the scope of what we are talking about here?

        MR. OPPENHEIM:  In terms of the scope of the

preliminary injunction we are seeking?

1    **THE COURT:**  Yeah, the scope of the number of songs and

2    then when there is a request that they -- that there is going

3    to be a continuing update every quarter, what is -- what does

4    Plaintiff have in mind?  Is it:  Okay, well, as new songs and

5    new artists are brought on, those are going to be included

6    within the injunction?  Talk to me about the scope.

7    **MR. OPPENHEIM:**  So, it is common in mass infringement

8    cases as this is that the Plaintiffs will proceed on a set of

9    works but then the ultimate injunctive relief extends to all of

10    Plaintiffs' works.  Obviously, if we put forward a case with

11    every one of Plaintiffs' works, it would be a list too large to

12    manage.

13    **THE COURT:**  Well, right, but you are asking me to

14    manage it on a preliminary injunction.  So, what are --

15    **MR. OPPENHEIM:**  So, we are seeking to have the

16    guardrails and the training data extend to all of Plaintiffs'

17    works, and there are many ways we can cooperate with the --

18    **THE COURT:**  So how many works, ballpark?

19    **MR. OPPENHEIM:**  I don't know the number.  We have

20    provided them with a comprehensive list already, Your Honor,

21    and we are happy to update it in any whatever manner they would

22    like.  We have expressed this to them.  We have said --

23    **THE COURT:**  When you say "update," are you talking

24    about updates of new songs, new artists who are signed on?

25    What do you mean by "updates?"

1          **MR. OPPENHEIM:**  Yes, it would be that.  But to the

2    extent, for instance, that a song came off of Plaintiffs'

3    catalog, we might update to remove it as well so that they

4    would know of that.

5          **THE COURT:**  So, but you have no number to give me a

6    sense of --

7          **MR. OPPENHEIM:**  I don't have offhand and my colleagues

8    can look, but we have -- it is a large number, Your Honor.  The

9    catalog of songs that Plaintiffs own is a very large number.  I

10   would endeavor to say hundreds of thousands at least.  And we

11   have had a discussion with Anthropic about that.  They asked

12   about it and asked about a process for doing that.

13        There are lots of ways they could implement that including

14   not getting it from the Plaintiffs.  There is a -- a

15   third-party entity called the MLC, the mechanical licensing

16   cooperative, I think -- I may have gotten the last -- the C

17   wrong -- that keeps a running list of all of -- all

18   compositions owned by U.S. copyright owners.  And they could

19   easily get it from there.  We have offered to provide it.  We

20   have offered to find a mechanism to provide it and do that.

21   But even if we got an injunction just for the -- for

22   Plaintiffs' existing works, we would take that until we got to

23   the --

24          **THE COURT:**  When you say "existing works," do you mean

25   the ones that have been shown through declarations?  Do you

mean the ones -- the 500 which are attached to the complaint or

do you mean existing as of today, which are currently signed

which could be in the hundreds of thousands?

    **MR. OPPENHEIM:**  All of Plaintiffs' existing ones,

Your Honor.

    **THE COURT:**  Okay.

    **MR. OPPENHEIM:**  I will give you an analogy,

Your Honor, which we can discuss at more length later.

    In the *Napster* case there was -- which Mr. Knowles and I

litigated in this district many years ago -- the original case

was brought on a limited number of works.  Judge Patel

ultimately issued an injunction that included all of

Plaintiffs' works.

    **THE COURT:**  A preliminary injunction?

    **MR. OPPENHEIM:**  Yes, a preliminary injunction.  It was

affirmed on appeal with slight modifications.  But it -- my

recollection is that there was a process put into place to

provide lists -- in that case it was sound recordings not

compositions.

    **THE COURT:**  Yes, I remember.

    **MR. OPPENHEIM:**  So, having -- returning to kind of the

process, right, Anthropic having trained and fine tuned Claude,

it -- as we discussed earlier, it makes that available to the

world either through the chatbot or through the API.

    But whether somebody accesses it through the chatbot or

the API, Claude can be queried for lyrics among many other
things.

     After Plaintiffs filed their preliminary injunction
motion, Anthropic developed and deployed external guardrails in
an effort to stop Claude from responding to queries about
Plaintiffs' lyrics.

     Now, I will say there were some -- I don't want to call
them guardrails.  There were some copyright limitations in
Claude as Plaintiffs were first investigating their case.

     They were -- in no way limited our ability to get
infringing lyrics out.  So, it was only after we implemented --
after we filed our preliminary injunction motion that they --
that Anthropic implemented functional guardrails that had the
effect -- real effect of stopping some of the infringement.

     Those -- that -- those functional guardrails are supposed
to work in two different ways.  They filter queries on the
prompts.  So, in other words, if a user asks for the lyrics to
say Neil Diamond "Sweet Caroline," Claude should know not to
provide responses to that query knowing that it is seeking an
infringing response and tell the user it can't provide that
response.

     The second way the guardrails work is Claude is supposed
to check a response before it gives it back to a query.  And if
that response includes verbatim or near verbatim lyrics, it
doesn't send that response out or it sends it out and pulls it

back.

These external guardrails can be deployed after the model is trained.  But this is critical.  Those are external guardrails, if you will.  They are not built into the training of the model.  And as such because they are external to the model, they are part of the packaging, if you will.

THE COURT:  Which is the terminology that you used before?

MR. OPPENHEIM:  Right, because they are part of the packaging, they can be modified.  They can be completely removed.  They can be changed.  If they were built into the training, they couldn't be changed without retraining the model.

Guardrails, however, will always be flawed at some level because they are not built into the actual LLM model.  They are programmed into what is essentially interfaces for Claude.  And sure enough not long after Anthropic implemented its guardrails, Plaintiffs were able to generate infringing responses.  As you have seen in the papers, Your Honor, users online have sought ways to bypass Claude's guardrails to obtain copyrighted outputs from the model.  I will go through that a little more later.

Our own experts were able to obtain full lyrics to works-in-suit despite the model claiming it couldn't do so. They were also able to obtain derivative advertising jingles

and the what including political endorsements using lyrics from

artists who are publicly opposed to those candidates.  It was

not hard to circumvent the guardrails.

So, as I said, the guardrails will always be flawed at

some level.  They are addressing a symptom, not an underlying

cause because, remember, Claude was built to have lyrics in it;

and Anthropic wants Claude to be able to speak the language of

our lyrics.

Anthropic wants Claude to know the expression "these boots

are made for walking" is about a woman who refuses to be pushed

around and not about an advertisement for hiking boots.

Anthropic wants to use our language of the lyrics so they put

it into Claude, and now they are trying to restrict it with

guardrails, which while we appreciate may stem the flow of

infringement, is never going to wholly stop it.

**THE COURT:**  So, let's talk about the scope of the

first form of relief then.  If the stipulation is not reached

and the Court proceeds in terms of evaluating the first form of

relief Plaintiffs seek, the language of the proposed order

talks about maintaining effective guardrails.  Okay.

So, in terms of the monitoring of that, how would that

work?  So -- I guess let me ask a question before then.  Are

there any other -- are there any examples in the record of

duplicate lyrics, infringing lyrics being output of

infringement outside of Plaintiffs' own experts or Plaintiffs

1  themselves or Plaintiffs' agents?

2         MR. OPPENHEIM:  So, yes, Your Honor; right.  So, you

3  look at the fine tuning process; right.  Those are Anthropic's

4  people, if you will, who are asking questions about lyrics.  It

5  is in their own papers that they publish; that Anthropic's own

6  people were asking Claude to deliver lyrics, and it is included

7  in our papers; right.  Then we see Reddit users --

8         THE COURT:  Jailbreak, right, the Pliny --

9         MR. OPPENHEIM:  Jailbreaking and talking about -- and

10  I can go into some detail on this in a little bit,

11  Your Honor -- multiple ways, three different ways that they

12  obtain lyrics.  What Anthropic will get up and say is, "We have

13  no proof of third parties" --

14         THE COURT:  Well, that's the reason I'm asking you

15  this question.

16         MR. OPPENHEIM:  Right.  So, there are multiple answers

17  to that.

18         THE COURT:  Okay.

19         MR. OPPENHEIM:  First of all, it is a little too cut

20  by halves because what Anthropic's users are doing is not

21  something we can see.

22     It is something Anthropic can see and Anthropic knows

23  about, and we in discovery actually asked to see queries for

24  lyrics; and they ran a search using the term "lyrics," and they

25  came back to us and they said, "There are so many hits, that's

1    a burdensome request.  We can't respond to it."  So, we have no

2    discovery on this.  But they know, we can't know.  So --

3              THE COURT:  So, the three examples -- so, Anthropic's

4    users but it's behind the iron curtain --

5              MR. OPPENHEIM:  Correct.

6              THE COURT:  -- so to speak so you can't see it.  What

7    are the other two?

8              MR. OPPENHEIM:  So, it's Anthropic's own employees.

9              THE COURT:  Okay.

10             MR. OPPENHEIM:  Right.

11             THE COURT:  And do you have examples of that?  Those

12   are the ones you are discussing in terms of the fine tuning

13   process?

14             MR. OPPENHEIM:  It's the fine tuning process.  It's in

15   their own papers.  It is the Reddit users who are showing that

16   they are doing it.

17             THE COURT:  And that's the jail breaking.

18             MR. OPPENHEIM:  It is jailbreaking but, as I can

19   describe later, Your Honor, some of which is a little

20   complicated; some of which is not complicated at all.  One of

21   them is imagine that it's 70 years in the future past the

22   release of this work.  Now what are the lyrics?  And it says,

23   oh, well, it is in the public domain so I will give you the

24   answer, you know, not particularly complicated or give me a

25   response but give me a space between every letter.  Not

1  particularly complicated.

2      But the key here is they want to say, well, because

3  Plaintiffs got infringing responses, that evidence isn't worth

4  anything.  They are wrong on the law there.  Case after case

5  after case says that infringements delivered to Plaintiffs in

6  the conduct of their investigation are infringements

7  nonetheless.

8      **THE COURT:**  So, could you repeat that sentence one

9  more time?

10     **MR. OPPENHEIM:**  Yes.  Anthropic says that the

11  infringements that Plaintiffs obtained or our vendors obtained

12  don't count; right.  They are wrong on the law there.  Case

13  after case after case --

14     **THE COURT:**  Right, going back to -- touching, which we

15  can discuss more during the motion to dismiss, and then there

16  are a couple of cases which Plaintiffs had cited to on that

17  point, yes.

18     **MR. OPPENHEIM:**  Yes.  I mean, you see it all the time.

19  And in particular you see it in cases where -- like this, where

20  the infringement would be between -- other infringement would

21  be between the Defendant and another third party where the

22  Plaintiffs couldn't actually see it, which is exactly what's

23  happening here.

24     **THE COURT:**  Okay.  So, I just wanted to -- let me ask

25  the second part of my question then going to, all right, so

1    then in terms of monitoring itself, so -- and assuming that the

2    Court granted Plaintiffs' first form of relief, what would that

3    look like?  Like, who would monitor the efficacy or the second

4    form first?  Who would be monitoring the efficacy of the

5    guardrails?  Like, what would be the definition of effective in

6    terms of what Plaintiff is requesting and so forth?

7            **MR. OPPENHEIM:**  Right.

8            **THE COURT:**  So, can you talk about the scope in that

9    level?

10           **MR. OPPENHEIM:**  So, Your Honor, our assumption is that

11    Anthropic will be true to their word and maintain the

12    guardrails as they are.  And we are not building in some

13    process whereby there is some third party who is going and

14    checking to see whether they are working.  We are not building

15    in a process where we come back to the Court every quarter and

16    report on what's happening.  Our assumption is that Anthropic

17    will do what they said that they are going to do.

18        Now, if Plaintiffs were to find that something had

19    happened; that the guardrails were not functioning the way they

20    were supposed to, what we would do is we would first meet and

21    confer with Anthropic to see whether we could resolve the

22    situation.  And if not, then we would have the opportunity if

23    we thought it was appropriate to come to the Court and request

24    any kind of leave, either a modification of the injunction if

25    we thought that was necessary to address it; if we thought it

1  was out and out kind of removing the guardrails, it might be

2  contempt.

3      The idea here, Your Honor, is once the preliminary

4  injunction is in place, we recognize that the guardrails will

5  stem the bleeding.  They will not be comprehensive.  They will

6  not comprehensively stop the infringement.  Our goal is to get

7  relief now and move on in the merits of the case so that we can

8  get this case to summary judgment and ultimately trial.

9      **THE COURT:**  Okay.  So, we are well past the 20

10  minutes, so, I'm going to turn it --

11      **MR. OPPENHEIM:**  Absolutely, thank you, Your Honor.  I

12  appreciate the indulgence.

13                  (Pause in the proceedings.)

14      **MR. WETZEL:**  Good afternoon, Your Honor, Joe Wetzel

15  from Latham & Watkins.  I'm going to try not to retread on any

16  of the stipulation discussion that Mr. Gass already covered,

17  but I do want to address the scope issues here and some of the

18  technology points that Mr. Oppenheim raised.

19      **THE COURT:**  Yes.

20      **MR. WETZEL:**  Before I go into the scope of the relief,

21  I do feel compelled to put on the record that Anthropic's

22  position is that injunctive relief -- the extraordinary relief

23  that Plaintiffs are seeking here is absolutely unwarranted on

24  this record.  And so, it is difficult to be talking about how

25  to fashion an injunction when we don't think they have made out

 irreparable harm and --

**THE COURT:** We are going to be headed that way for part 2.

**MR. WETZEL:** Understood.

**THE COURT:** So --

**MR. WETZEL:** Having put that out there. So, I would like to go to slide 3 first here. And obviously we have been discussing that Plaintiffs have proposed two injunctions here, and Your Honor put your finger on the fact that this is how those injunctions were described in the briefing.

The output injunction was to maintain already implemented guardrails. We took that language at its word, and the training injunction would enjoin Anthropic from using the lyrics to develop or train future models; and we have had some clarification on that in their briefing as well; but when you look past the briefs, both of these injunctions that they propose are, in fact, mandatory injunctions. And I will explain that in a moment.

With respect to the outputs injunction, as we have said over and over again, Anthropic has no issue maintaining guardrails that help to prevent the regurgitation of copyrighted information in the training dataset. Mr. Gass said this but Dr. Kaplan testified to that fact. Anthropic has never wanted Claude to output lyrics. Doesn't plan to stop using guardrails of some form to prevent unwanted

```
 1   regurgitation.  That is not the design of the product.  That's
 2   not what we wanted to do.
 3        Now, the reason that the outputs injunction is a mandatory
 4   injunction is because Plaintiffs' proposed order asked the
 5   Court to require Anthropic to apply guardrails to future models
 6   where it is unclear whether and to what extent guardrails would
 7   be appropriate at all to mitigate against the specific
 8   infringements that they are talking about and whether those
 9   technologies would be good fit for subsequent iterations and
10   subsequent models, which are going to be trained on different
11   datasets and have different purposes and potentially different
12   modalities.
13        So, we think that the requirement that we have to build
14   and implement guardrails in future models is a mandatory
15   injunction.  It is not just a request that we maintain or leave
16   in place technical measures that we have already implemented.
17                    (Pause in proceedings.)
18        MR. WETZEL:  With respect to the training
19   injunction --
20        THE COURT:  Actually, let me clarify.  I was going to
21   get into this a bit more in terms of the merits; but under the
22   description Counsel just gave, are you saying that form of
23   relief 1 and the rest of form of relief 2 are prohibitory?
24        MR. WETZEL:  Sorry, form of relief 1 as it applies to
25   future models is mandatory.  Form of relief 2 is also mandatory
```

1    for reasons that I will explain.

2          **THE COURT:** Okay.

3          **MR. WETZEL:** And I have to say it is a little bit

4    difficult because the training injunction scope has been a

5    shifting -- you know, a shifting target over the course of this

6    litigation which has been going on for over a year now.

7          And I have to admit I actually -- I still don't understand

8    at what point in the process of developing a model Plaintiffs'

9    proposed injunction would apply. Training is not a "happens on

10   day one and then is over" sort of process. The development of

11   models is an ongoing process training. Has multiple steps to

12   it. And so, it is unclear at what point their proposed

13   injunction would apply; but it doesn't even matter because it

14   is going to be a mandatory injunction regardless.

15         And the reason for that is that Plaintiffs' works are all

16   over the internet. They are all over the public internet that

17   is used as a source of data for training large language models.

18   And there is no one site or website or sites that Anthropic

19   could avoid to avoid putting their works in the training model

20   in the first place.

21         So, it's going to be a filtering process inherently is

22   what Plaintiffs are proposing here is that there is going to be

23   this vast -- this vast training dataset that is going to have

24   billions and billions of works in it, and we would have to --

25   to abide by an injunction like that, we would have to filter

out the works that they are proposing to include in the
injunction; and that is difficult for the 500 works that they
are proposing because you would have to filter every
permutation of those works, works with certain words out of
place.  They have sought to apply the injunction to portions of
works, so not something less than the full work that may or may
not be an appropriate use.

I would dispute Mr. Oppenheim's example that using a
single line from a famous song lyric to describe a metaphor or
a theme is infringement in the first place.  So, you are going
to end up having lots of false positives, you know, the tighter
that you make the sieve that you put all the data through in
order to try to extract their works from that data.

And you, frankly, can't account for every permutation.  We
have seen from the Pliny example and whatnot, there are people
who are putting examples where there are spaces between
characters, where people replace characters with numbers.  None
of those would be blocked or kept out of the process.

And so, it is just a very challenging technical process
that I plan to actually get into a little bit later in the
presentation; but I wanted to say up front that it should be
viewed more in the context of a mandatory injunction requiring
a filtering of their works from a vast, vast dataset and not
simply avoiding to, like, select an individual work and include
it or bring it into the dataset in the first place.

1              **THE COURT:**  Is the dataset different for each?

2         **MR. WETZEL:**  For each model?

3         **THE COURT:**  Yes.

4         **MR. WETZEL:**  It is.  Each model -- as I mentioned in

5    the tech tutorial, each Claude model, each model is trained

6    from scratch.  There may be some overlap in the datasets

7    between the models, but that's a determination that's made --

8    that's a determination that's made based on which -- you know,

9    which larger datasets are included in the first instance.

10             **THE COURT:**  And is that because the overlap because of

11   what is being scraped from the internet or is that because of

12   an overlap of data shared?

13             **MR. WETZEL:**  That could be -- there could be overlap.

14   That could be one example.  You know, the internet tomorrow is

15   going to be the internet today plus whatever has been added in

16   the meantime.  I think there is any number of reasons why there

17   could be overlap in datasets.  It could be that data appears in

18   two different places from which it is sourced, whether it is

19   the internet or otherwise.

20        I did want to also in the context of the, you know, false

21   negatives or attempting to, like, filter too finely down to a

22   sentence, down to a phrase, you know, that you get a lot of

23   instances of proper uses that would be excluded, Mr. Oppenheim

24   suggested that in the context of our discovery negotiations

25   over search terms, the fact that searching for outputs or

prompts that included the term "lyric" yielded so many results
was evidence of rampant infringement occurring on the site.
That has been addressed in the sur-response declaration of
Ms. Dukanovic.  Frankly, it is a function of the vast, vast
number of false positives when you attempt to search just for
the word "song" or "lyrics."  There's so many instances in
which it comes up when somebody is not requesting that as an
output.

On the note of the scope of the relief as it applies to
the publisher's broader catalog, I was going to raise that
point as well because they want an injunction that covers what
is millions of works.

In December when they sent us a list, it was over
3.7 million works cumulatively that they want to be subject to
this injunction.  And courts say that this is overreaching in
copyright injunctive relief requests because copyright requires
a work-by-work proof of ownership, registration and copying;
and they can't establish a likelihood of success for unpleaded
claims and works.  They -- they can't because they --

**THE COURT:**  What's your best authority?

**MR. WETZEL:**  Best authority is going to be -- we have
two examples on the slide number 8 here.  We have the
*Mitchell v. 3PL Systems* case from C.D. Cal in 2013.  And we
have the *Strike 3 Holdings* case in November 2021.

And it is especially important to keep that in mind

1  because this is not an example where we are a service like

2  Napster.  First of all, Napster's preliminary injunction was

3  issued under a completely different standard.  There was a

4  presumption of irreparable harm back then.  It was before *Ebay*

5  and before *Winter*, but it is also a fundamentally different

6  service as I will get into more detail later.

7       Ultimately I think that, if anything, the shifting scope

8  of Plaintiffs' injunctions over the course of this litigation

9  kind of proves them unwarranted when it boils down to it.

10      Their latest output proposal, as they characterize it, is

11  kind of keep doing what we are doing, which is consistent with

12  how we have approached preventing our platforms and our models

13  from generating regurgitated works.  Their latest training

14  proposal I thought before today exempted current and in

15  development models.

16          **THE COURT:**  I thought so too.

17      **MR. WETZEL:**  So, we were talking about prospective

18  models that we haven't even begun to develop yet.  And so, it

19  seems like keep doing what you are doing and then train the

20  models you are already training or release the models you are

21  already training but then stop training on it in the future, it

22  seems like they are not undergoing the requisite imminent

23  irreparable harm that would warrant an injunction.

24      Now, on the tech front -- I'm not going to belabor any of

25  the points from the tech tutorial last week.  Thank you for

1    watching that -- but I do want to focus on what we think are

2    three big mischaracterizations about Claude.  And the first one

3    appropriately is that Claude is at all similar to Napster for

4    purposes of this analysis here.

5        The second is the notion that Claude was fine tuned to

6    output song lyrics, and the third is that Anthropic's

7    guardrails were somehow just made for litigation in response to

8    them having filed their complaint.

9        I think these three fallacies, I will call them, are at

10   the core of Plaintiffs' arguments.  And so, once you put the

11   light to them, you know, they can't succeed.

12       So, as you saw -- this slide will look familiar -- Claude

13   is a general purpose AI model.  That fact is effectively

14   undisputed.  I think Kaplan, Zhao, Newton-Rex all agree that

15   LLMs are designed to respond to a wide variety of requests with

16   new and original outputs and that LLMs are trained on vast

17   amounts of data in order to be able to do that.  I don't think

18   that kind of core fact is in dispute.

19       Your Honor also saw that Claude has infinite potential

20   uses.  It can be used to help draft code; summarize legal

21   documents; ideate new creative works, and for customer service

22   applications.  And Kaplan and Zhao appeared to agree on this

23   point as well.

24       But what Claude is not -- and here on the right you will

25   see a list of services that Plaintiffs I think identified in

1   the conference we had in October where injunctions were granted

2   against copyright infringers.  No matter what they say, Claude

3   is nothing like any of these enjoined services.

4       As I mentioned *Napster* and also *Aimster* were decided under

5   the wrong standard regarding irreparable harm but even the

6   others bear no resemblance here.

7       Claude's purpose is to generate new texts, original

8   outputs, and interact with humans.  It is not designed to

9   output existing works.  That's just not its mission.  It's not

10  Anthropic's mission.  Dr. Kaplan discusses that in his

11  declaration at paragraph 15.

12      As for copyright protections, Anthropic has always had

13  copyright protections.  When we learned of Plaintiffs'

14  complaint for the first time -- it was the first time they

15  notified us that there was any issue, we immediately set about

16  developing additional guardrails to prevent regurgitation of

17  their works.

18      And the other services on this slide, had no such measures

19  and in some cases they actively circumvented the protections

20  that would protect against infringement.

21      Then, finally, from the terms of market substitution,

22  Claude customers are not using Claude to generate song lyrics;

23  and they are not using Claude to substitute for any of the

24  primary markets for Plaintiffs' works, which you will recall

25  are musical compositions.  The lyrics are just one part of

those larger musical composition.  People aren't using Claude

instead of going to Spotify, instead of going to concerts.

Claude does not interfere or compete with publishers and

publisher's licensees in any meaningful way.  And you will see

later that it doesn't even compete meaningfully with lyric

websites when it comes down to it.

So, ultimately when -- you know, when you look at all

these together, one of these is not like the others and Claude

is just a distinct service.

Now, I want to talk about pretraining a little bit because

I think it is important to the issue of transformative use.

Pretraining is the process where an LLM developer collects

billions of texts that the model is going to convert into

trillions of tokens.  And then it is -- the models study the

tokens in order to extract statistical and factual information

about language.

It is not studying this to copy expression the way that

copyright is concerned with.  It is not a collage tool.  It is

not a database of works.

What is happening here is that the LLMs study the

relationship of all of the tokens in all of the training data

relative to each other to do something other than to reproduce

the expression of any of the individual works that was part of

the data -- training dataset.

And once that studying is done, the model -- if we can go

1    to the next slide -- the model and code's numerical weights

2    that encode the strength and the significance of those

3    connections between the tokens and the training data; but,

4    again, it is not encoding the relationship between the words in

5    this particular sentence as you see it.  It's studying the

6    words in this sentence as they relate to each other and as they

7    relate to the same words when used in other sentences in other

8    parts of the billions and billions of texts in the training

9    data.

10        And by converting into these weights, that allows the

11   model to understand the statistical -- the probability, the

12   likelihood, that any two words or concepts go together so that

13   it can respond to novel requests that it has never seen before

14   from the users that are using Claude.

15        So, this is -- because the training corpus is so vast, the

16   map that Claude makes of how all these interrelate is

17   comprehensive; and it is not tied to any one work's expression.

18        Now, here we have a visual depiction of the training

19   process here; and you will see that as different sentences or

20   instances of a word cycle through the training process, each of

21   these little dials adjusts a bit to reflect the relationship of

22   the various terms and concepts across the model.  And this is

23   going to happen billions of times across the trillions of

24   tokens as it is trained.

25        The result that you get is like a map where each token is

1    represented by a set of numbers and coordinates and the

2    distance between the tokens on the map is going to reflect

3    their relationship to each other in meaning and usage generally

4    speaking, not within any particular text.  And that allows the

5    model to successfully predict contextually appropriate response

6    when it is prompted.

7                    (Pause in proceedings.)

8        **MR. WETZEL:**  Now, for this reason, these models

9    require trillions of tokens to gain a comprehensive contextual

10   understanding of language to enable these responses, and there

11   doesn't seem to be any dispute in the record that LLMs like

12   Claude, state-of-the-art large language models, require

13   trillions of tokens in order to achieve the purpose that they

14   do and to approximate human conversation.

15       Now, before I move on to the second part of the training

16   process, fine tuning, which I will have something to say about,

17   I do want to pause for a moment just to try to wrap our head

18   around the staggering size of the training purpose that a model

19   like Claude has to deal with.

20       If you were to think of a token of data, one word, one

21   character, one whatever as a Lego piece, a trillion tokens

22   would go from here to the moon many times.  It would be

23   millions of miles of Lego pieces stacked on one another.  That

24   represents one trillion.  Some of these models are trained on

25   many trillions of tokens in order to perform better, to gain a

 1    more comprehensive understanding.  And all of this is going to

 2    become very important when you hear from Mr. Gass on fair use

 3    later in the presentation.

 4                     (Pause in proceedings.)

 5            **MR. WETZEL:**  Now, I want to address fine tuning for a

 6    moment.  Once the model has been pretrained on the trillions of

 7    token, billions of texts, the model is going to undergo a

 8    process called fine tuning to improve its performance, to make

 9    it better at its underlying purpose.

10        And that brings me to the second big fallacy that

11    underpins Plaintiffs' claims here; that Claude unambiguously

12    and unequivocally was fine tuned to reproduce lyrics.  That's

13    what Mr. Oppenheim said at the October 24 conference.  I think

14    he stood by that statement today, but Plaintiffs' evidence of

15    this is an April 22 study -- a research study that predates the

16    training of Claude, and it predates the fine tuning of the

17    first Claude model that was released to the public in early

18    2023.

19        Not only that, but this study is about a completely

20    different type of LLM than Claude, and it says so on the

21    document that Plaintiffs rely on.  The call out here says (as

22    read:) "this data is meant to train preference or reward models

23    for subsequent reinforcement learning training.  These data are

24    not meant for supervised training of dialogue agents; in other

25    words, models that interact with humans."

1          "Training dialogue agents on this data is likely to lead

2      to harmful models and this should be avoided."

3          Now, that research study discussed in this paper, it did

4      involve crowd workers.  And I want to clarify, those crowd

5      workers were not Anthropic employees as Mr. Oppenheim said.

6      They were effectively survey participants to provide data in

7      the context of training or fine tuning this reinforcement

8      learning model, which is an independent model that is not

9      Claude.

10         So, from the start, this document is not what Plaintiffs

11     make it out to be.  It certainly is not what Mr. Oppenheim just

12     described it as; but even if data from that study ultimately

13     had been used later to train or fine tune Claude, the only

14     competent witness in the record on this is Dr. Kaplan.  And

15     this is what he testified, he said that helpfulness and

16     harmfulness fine tuning, which is the use to which this type of

17     data would be put, is not intended to train a model to respond

18     to requests for song lyrics or to respond to any other form of

19     regurgitation.  It serves an entirely different purpose, and it

20     is just one of many, many steps in the fine tuning process.

21         So, I just wanted to make that very clear.  Also,

22     Mr. Oppenheim, when he speaks about the instances of the crowd

23     workers, who were not directed to ask for specific things.

24     They were just set about to try to help train the reinforcement

25     model -- sorry -- help train the preference model to be better

 1    in fine tuning along the lines of helpfulness and harmfulness,

 2    there were three instances I think cited in Plaintiffs' briefs

 3    of regurgitation of Plaintiffs' works in this suit.

 4         Three instances of all of the crowd worker prompts that

 5    formed a part of this study, which in turn may or may not have

 6    been used at some point in time to aid in the fine tuning of

 7    Claude down the road.  That's -- none of that is in the record,

 8    and -- and ultimately, it is just a wild overstatement to say

 9    that those three data points in that context, in a model that's

10    not Claude in any way would affect or bear on the design of

11    Claude when it comes to its desire to output or not output song

12    lyrics.

13                        (Pause in proceedings.)

14         THE COURT:  So, Mr. Wetzel, I'm going to give you a

15    one or two-minute warning.

16         MR. WETZEL:  Okay.  I can do this.

17                            (Laughter)

18         MR. WETZEL:  So, I'm going to wrap up this section

19    with just a couple points about guardrails.  Those are the

20    external rules and constraints that are applied to models to

21    further influence the behavior of the model after it has been

22    trained.

23         THE COURT:  Do you agree with Mr. Oppenheim's

24    characteristics of when the guardrails take place; the sort of

25    packaging, etc., distinction?  Can you --

1          **MR. WETZEL:**  I don't know that I can -- I don't know

2     that I'm either qualified or quite agree with how he has

3     described it as packaging.  I can agree that guardrails are

4     external.  They are not --

5          **THE COURT:**  Okay.

6          **MR. WETZEL:**  They are not part of the underlying

7     model.

8          **THE COURT:**  Okay.

9          **MR. WETZEL:**  Now, there's two broad types of

10    guardrails, prompt guardrails and output guardrails.  And

11    Anthropic has always had them -- has always had guardrails in

12    place.  The output guardrails and constitutional principles of

13    Anthropic predated the complaint, and then we have done some

14    additional work since we were made aware of the concerns that

15    Plaintiffs had.

16         And I want to get just to one final point here before I

17    conclude on slide 27.  So, I think at this point just based on

18    what we are going to see from Plaintiffs and their requested

19    relief, they have abandoned the claim that you can simply ask

20    Claude and receive a full copy of their song lyrics.  They have

21    gone to, you know, people being able to trick Claude or

22    circumvent guardrails that are currently in place.

23         **THE COURT:**  By that, you mean in terms of with

24    existing guardrails?

25         **MR. WETZEL:**  Exactly.

1          **THE COURT:**  Because I think they may disagree

2     otherwise with you.

3          **MR. WETZEL:**  Yeah, fair point.  But I want to point

4     out, like, if you look at the Pliny example on the right here,

5     it kind of invites the question of:  Why would anybody do this

6     when, as Mr. Oppenheim said, you can go to Google and search

7     for the lyrics directly and receive them.  This is a very

8     cumbersome way to do it; but I do think this is a helpful way

9     to think about the prompt output process for later discussion.

10         Because Claude is in a collage tool and it is not a

11    database of -- or menu of stored content but instead is a

12    model -- sorry -- statistical model that can respond to almost

13    any input, prompts and outputs need to be thought of together

14    as a combination; right.

15         The prompt is the equation or the program that triggers

16    the bespoke output to that prompt as a result of, you know, the

17    statistical likelihood that that response is helpful in

18    answering the question or prompt that has been put.

19         So, when you look in the Pliny example, it is pretty

20    extreme, that he literally has to write something that looks a

21    bit like computer code of some sort to get it to circumvent

22    certain guardrails.  That kind of framework for thinking about

23    is helpful, I think, even if you are talking about a

24    straightforward prompt.  Ultimately, the natural language you

25    put to Claude is broken into tokens is fed into the model; and

1    the model uses its statistical understanding of the facts and

2    whatnot in the training data to predict what a useful response

3    to that prompt would be.

4        So, prompts and outputs should be thought of together when

5    we are thinking about this analysis.  And with that, I will sit

6    down.

7        **THE COURT:**  Thank you.  All right.  We are going to

8    do -- let's say a ten-minute stretch break, and then we are

9    going to pick up with the merits.  So, okay.  We will now be in

10   recess for ten minutes.

11       **THE CLERK:**  All rise.

12                  (Recess taken at 2:58 p.m.)

13                  (Proceedings resumed at 3:10 p.m.)

14       **THE CLERK:**  All rise.

15       **THE COURT:**  You may be seated.

16       **MR. OPPENHEIM:**  Thank you.  Before we proceed to the

17   merits, let me quickly respond on the injunction -- if I may,

18   on three points on the scope of the injunction.

19       **THE COURT:**  It is your time to do with what you so

20   choose.

21       **MR. OPPENHEIM:**  I know we have a lot to cover and

22   limited time, and I will do my best to do it within the time we

23   have allocated.  I understand, Your Honor.

24       The argument that the injunctive we're seeking on the

25   output is a mandatory injunction simply ignores what we are

1  asking.  We are asking for the maintenance of the existing

2  guardrails.  That is not a mandatory injunction.  That's a --

3  that is a prohibitory injunction.

4      The fact that Anthropic may in the future want to release

5  new models, that is something they're affirmatively doing; but

6  we are not -- we want to maintain the status quo, and that's

7  the way it was drafted.

8      The reason it has changed over time is because when we

9  filed the case the first time and the motion for the PI the

10  first time, the guardrails didn't really exist.  There were

11  some very minimal guardrails, but they really didn't exist.

12  And then we changed the injunctive we were seeking as the case

13  went through its somewhat tortured history from Tennessee to

14  here, right, in order to make the injunction we were seeking

15  simpler and more reflective of the landscape that existed.

16      So, we accept that -- the guardrails as they are, as

17  imperfect as they are.  We are asking that they be maintained

18  in place.  It is hard to imagine anything by definition being

19  more prohibitory than that.

20          **THE COURT:**  Even if it is as to new models?  So,

21  because I think that I -- I just want to double-check my notes.

22  So, Plaintiff -- there are two arguments because this was a

23  point I was going to ask pretty early on in this discussion was

24  mandatory/prohibitory and talking me through it.

25      So, Defendants had argued that there were mandatory

aspects to both the first and second form of relief; mandatory
in terms of the first form of relief as it applies to future
models because there is -- you know, their future models to
include that within the guardrails, and then they also said
that there was a mandatory portion as to the second.  And so
can you address both?

        **MR. OPPENHEIM:**  Okay.  So I will address the second in
a second.

        **THE COURT:**  Yes.

        **MR. OPPENHEIM:**  To the extent in the future Anthropic
intends to release new models, that's their choice.  We are not
seeking an injunction to preclude them from doing so.  We are
just saying use the same guardrails.  That's all we are saying.
Same guardrails.  And couldn't have made it simpler and less
onerous than that.

    In terms of the injunctive on the training data,
Anthropic's argument basically is, you know, it is really hard
to follow the law because we want to scoop up the entirety of
what's on the internet.  If it is out there, we get to just
take it and that's really hard.

    That doesn't fly.  That's not an excuse.  You don't get to
say it is really, really hard to follow the law because the
lyrics are out there and because they are accessible, we get to
copy them.  That -- that's their argument as to why it is a
mandatory injunction on the training; that they would have to

1  build a filter?  That's not mandatory.

2      If they are going to train new models -- we are not asking

3  them to retrain existing models.  To the extent they have a

4  model that's not trained, do so on whatever you want.  Just

5  don't do so on our lyrics.  That's all we are asking, and that

6  is not by any stretch a mandatory injunction.

7      Your Honor, you asked Mr. Wetzel for authority as to why

8  the injunctive relief should be limited to the 500 works.  He

9  pointed you to two district court decisions that are not on

10  point.  I believe the Ninth Circuit's decision in *Apple, Inc.*

11  *versus Psyster*, P-S-Y-S-T-E-R, is the case that applies and

12  compels that conclusion here.

13      Let me turn to --

14          **THE COURT:**  Can you repeat the -- you went very

15  quickly.

16          **MR. OPPENHEIM:**  Sorry.

17          **THE COURT:**  Can you repeat the --

18          **MR. OPPENHEIM:**  Apologies, Your Honor.  *Apple, Inc.*

19  *versus Psyster*, P-S-Y-S-T-E-R -- if I have mispronounced it, I

20  apologize.  I believe it is 658 F.3d, 1150.  It is a 2011

21  decision.  There are many others but that's the Ninth Circuit

22  decision on point, Your Honor.

23      So, with that, let me turn to the merits, Your Honor.  So,

24  we spoke -- both Mr. Wetzel and I and you spoke about *Napster*;

25  and 24 years ago we were here, these -- several of the

1    Plaintiffs that are here and many record companies -- in this

2    court seeking a preliminary injunction for what was then the

3    most recent Silicon Valley darling technology company, which

4    was building a business off of music.

5        That company, Napster, defended their actions claiming

6    fair use; and they sought to avoid a preliminary injunction on

7    the grounds there was no irreparable harm and that the company

8    issued the issuance of an injunction would be a tremendous

9    hardship to them because they already had millions of users.

10       The legal issues from the *Napster* case then carried over

11   to numerous other cases including *Grokster* and *Kazaa* that

12   ultimately went to the Supreme Court in what were then highly

13   disputed issues, vigorously litigated.  Now seem obvious with

14   the benefit of hindsight.  Indeed, the Ninth Circuit affirmed

15   this court's injunction and the Supreme Court held 9-0 against

16   *Grokster* and *Kazaa*.

17       And those decisions ultimately paved the way for the

18   creation of really cool new technologies, like Apple iTunes,

19   Spotify, YouTube Content ID.  I could go on and on and on about

20   lots of cool licensed ways to consume music.

21       What we face today with Anthropic is very similar.  And

22   when Anthropic says that a preliminary injunction should not be

23   issued in this case because it is the -- the cause is novel, in

24   fact, the opposite is true.

25       The PI is needed especially because the case raises issues

1    of first impression.  And with that in mind, let's discuss the

2    merits of Plaintiffs' claim.

3        The Plaintiffs' briefs have set forth in detail the

4    evidence in support of that preliminary injunction.  That

5    evidence described goes well beyond what is necessary to

6    support a PI.

7        On the underlying infringement claim, there is no dispute

8    that Plaintiffs own or control the compositions in the case.

9    No dispute.  Nor is there any dispute that Anthropic copied

10   those lyrics in their training corpus and that Anthropic has

11   distributed verbatim and near verbatim copies of those lyrics

12   to users.

13       Can we get -- oh, sorry.

14                     (Pause in proceedings.)

15       **MR. OPPENHEIM:**  Nor is there any dispute that Claude

16   was built using unauthorized copies of Plaintiffs' lyrics as

17   part of the training corpus.

18       There is no dispute that Anthropic's fine tuning process

19   specifically asked Claude to provide lyrics.  And contrary to

20   what Mr. Wetzel said, the Claude 2 model card specifically

21   points to the paper and evidence that that fine tuning process

22   that we cite to -- and that is on this slide -- were part of

23   the fine tuning process for Claude 2.  I cite you to ECF 209-4,

24   Your Honor.

25       What you see here in that fine tuning process was an

Anthropic worker asking Claude in fine tuning what are the

lyrics to "American Pie" by Don McLean.  And while Anthropic

will say that its fine tuning process did not intend to train

Claude to provide verbatim lyrics, the evidence speaks for

itself.  This user was asking Claude for the lyrics to our

songs.

In terms of outputs, the evidence is irrefutable.  Simply

put users would enter a prompt like they would in Google and

Claude drawing on streaming data would generate a text

response.

Here you see that when asked, Claude gave near verbatim

copies of lyrics.  We have put forward proof of that for the

500 songs in the complaint.  We ask for the lyrics to:  "A

Change Is Going To Come" by Sam Cooke; the lyrics to "Roar" by

Katy Perry; the lyrics to "Friends In Low Places" by Garth

Brooks; the lyrics to "You Can't Always Get What You Want" by

The Rolling Stones.  These are iconic pieces of our cultural

history, and they are owned by rights holders and composers;

and they don't get to be used without permission.

Claude even copied lyrics when they were not -- when

Claude was not specifically asked for lyrics.  So, we asked

Claude to write a song about the death of Buddy Holly.  And

sure enough what did we get?  The lyrics to "American Pie,"

which if you didn't know, that's what American Pie is about,

the death of Buddy Holly.

1    We asked for Claude to provide chords to "Daddy Sang Bass"

2    by Johnny Cash.  We didn't just get lyrics.  We got the chords

3    as well.

4        We asked Claude to write a short piece of fiction in the

5    style of Louie Armstrong, and we got lyrics for "What A

6    Wonderful World."

7        Anthropic's argument, there is no evidence that customers

8    are using Claude to output lyrics, is both wrong and

9    misleading.

10        As I described before, we saw that Anthropic's own --

11    well, they call them crowd workers were doing it.  We saw users

12    online doing it, but we have also done it ourselves.

13        Anthropic is the only one who has the data about public

14    queries and responses, and Mr. Wetzel getting up here and

15    saying users aren't doing that when they refuse to produce

16    discovery on it is a little too cute by halves, Your Honor.

17        Anthropic discounts what the Plaintiffs and their vendors

18    have repeatedly obtained in terms of infringing lyrics.  Courts

19    have routinely held that the distribution of infringing copies

20    to copyright holders and their vendors is sufficient

21    distribution for liability.

22        And I would cite Your Honor to the *Louis Vuitton* case in

23    the Northern District of California, which was affirmed in

24    2011, by the Ninth Circuit; the *Arista versus Usenet* case in

25    the Southern District of New York where the court said, quote,

1    "Courts routinely base findings of infringement on the actions

2    of plaintiffs' investigators."

3        I will also cite the Court to *Universal City Studios*

4    *Productions versus Tickbox TV*, 2018 Westlaw 156 8698.

5            **THE COURT:**  And those are the cases you cited in your

6    brief to this point, which I reviewed this weekend.

7            **MR. OPPENHEIM:**  Yes, thank you, Your Honor.  Evidence

8    of the infringing outputs is overwhelming.  We will discuss the

9    infringing outputs post guardrails in the context of

10   irreparable injury.  So, let me turn to the issue of volitional

11   use.

12       Plaintiffs have easily demonstrated volitional use.

13   Anthropic decided what would be in its training corpus and

14   oversaw a fine tuning process that we have discussed at length.

15       Claude helpfully was answering queries about lyrics and

16   Anthropic built Claude in a manner that would respond to

17   queries using -- seeking lyrics.  Anthropic argues that

18   Claude's use of the lyrics is automated and not controlled by

19   Anthropic, but that automation was created by Anthropic.  The

20   algorithm was created by Anthropic.  The training data was

21   selected by Anthropic.  The fine tuning process was regulated

22   by Anthropic.

23       Anthropic created the automation that ultimately resulted

24   in the output of infringing lyrics.  And under the Ninth

25   Circuit's decision in *Zillow*, when every step of the process

1    was done because of something that was set up by the Defendant,

2    the Plaintiff has shown volitional use.

3                    (Pause in proceedings.)

4        **MR. OPPENHEIM:**  Let me turn Your Honor to the issue of

5    fair use.

6        Anthropic bears the burden on fair use and has only

7    asserted the fair use defense, to be clear, on the copying for

8    the training data.  Anthropic has not asserted a fair use

9    defense on the outputs.

10       If Anthropic fails to show likelihood of success on fair

11   use --

12           **THE COURT:**  Talk me through that last sentence.

13       **MR. OPPENHEIM:**  Yes, Your Honor.  In their opposition

14   papers, Your Honor, Anthropic's assertion of the fair use

15   defense is focused on the training data.  They have not argued

16   that they had a fair use right to output verbatim and near

17   verbatim copies of Plaintiffs lyrics.

18           **THE COURT:**  Thank you.

19       **MR. OPPENHEIM:**  So, the fair use defense that we are

20   discussing right now only pertains to the training data.

21                    (Pause in proceedings.)

22       **MR. OPPENHEIM:**  Before speaking to the four factors

23   individually, it's worth focusing on the purpose and goal of

24   fair use.

25       The Supreme Court's recent *Warhol* decision teaches us a

lot on fair use, and it starts by reminding us that fair use's
intent is to incentivize the cause of promoting broad public
availability of literature, music and the other arts.

Unlike people, AI engines do not create copyrightable
works.  And *Fahrer versus Parameter*, the D.C. court decision,
the court rejected the idea that an AI created output could be
protected by copyright law.

The court recognized that human creativity was the sine
qua non at the core of copyrightability.

What Claude does is mechanic -- mechanistically use
complex algorithms to predict word sequence based on words in
its training data.

Mr. Wetzel went through and described for you how
Anthropic takes its training data and cuts it into tiny little
pieces and assigns weights and statistical probabilities to it.

Let's pause on that for a moment.  If an individual goes
and steals -- copies without permission thousands of copies of
sheet music, they can't put those copies in a paper shredder
and say "because I have now divided those infringing copies
into tiny pieces, I haven't infringed."

Then if they take those pieces and they throw them in a
big garbage bag and they shake them up and mix them up, that's
not a defense either.  They still have made a copy of the
infringing lyrics for their use.

And while they have assigned these statistics and

probabilities to it, the reason they assigned those statistics and probabilities is so that it can understand when somebody asked Claude to speak to lyrics.

What that means is that Claude will use the expressions from others' works that it has been trained on.

It's a really cool new program that distributes Plaintiffs' works verbatim or if not verbatim, by derivative works. The fact that they do it by chunking all of our works into tiny little pieces and mixing them up doesn't change the fact that they are using our lyrics.

By definition, Claude is incapable of generating its own creative work. Everything it does is a result of others' creativity.

The preamble of Section 107 sets forth an illustrative list of fair use purposes; criticism, comment, news reporting, teaching, scholarship, research.

Anthropic is doing none of these or I should say Claude is doing none of these. Anthropic may argue that Claude can create criticism, comment, scholarship, research; but that's not right.

Claude can aggregate others' criticism, comment and scholarship and then aggregate that into its own; but at bottom, it's using others' comment, criticism, scholarship to generate a response to a query.

Claude follows the directions in its programming to

1  respond to specific queries based on the works Claude trained.

2      From the music perspective, think of it this way:  There

3  is zero chance that Claude is ever going to write lyrics like

4  Sam Cooke's "Change Is Going To Come" because Claude didn't

5  live through the racism in the south of the '60s.

6      And there is zero chance that Claude is going to come up

7  with lyrics like "Blowing In The Wind" because Claude has never

8  known or participated in a protest and felt helpless.

9      Claude wouldn't even know what those songs meant but-for

10 consuming those songs and consuming a discussion about those

11 songs.  So, when Anthropic gets up and says "Claude is creating

12 new creative works," take that with a grain of salt.

13     Nobody will reasonably dispute that Claude ingests certain

14 works that will benefit scholarship and research broadly

15 speaking.

16     For example, training that facilitates a medical discovery

17 because Claude can analyze lots of data at once, that's great

18 and we applaud it.  Where if Claude can analyze ocean

19 temperatures to predict the next hurricane, awesome; but they

20 don't need Bob Dillon to do that.

21     Indeed, copying the entire catalog of Plaintiffs' lyrics

22 to create computer generated music serves no similar beneficial

23 purpose.

24     At the broadest level, training on copyrighted music is

25 squarely at odds with the interests that the fair use doctrine

1   is intended to protect.

2       Anthropic argues that fair use is necessary to incentivize

3   and protect AI developers in the advancement of AI, but fair

4   use isn't the way to protect a new industry.

5       Anthropic can turn to the patent laws and the trademark

6   laws and Congress if they need that.  Fair use has a very

7   specific purpose and it is not this one.

8       Let's turn to the first factor, the purpose and character

9   of the use.  Here the use is indisputably commercial.  I don't

10  think there can be any debate about that nor is it

11  transformative.

12      The Supreme Court's decision in *Warhol* actually created a

13  sea change in the way we analyze this first factor, and it

14  directly implicates a case like this.

15      *Warhol* teaches us to consider whether the new work adds

16  something new with a further purpose or different character.

17      So, when Anthropic copies our works in full and chops them

18  into pieces and assigns them weight, that is not adding

19  anything.  It is not adding anything to it.

20          **THE COURT:**  Let's take that D.C. case, which I can't

21  remember the name of it right now.

22          **MR. OPPENHEIM:**  *Thaler*.

23          **THE COURT:**  It is a beautiful piece of art, which was

24  produced arguably, some might say.  Not copyrightable.

25          **MR. OPPENHEIM:**  Correct.

 1          **THE COURT:**  But some might say that that was a

 2   beautiful piece of art, something which came out differently

 3   from all the input which went in.

 4          How does that play out in terms of the analogy comparing

 5   it here?  So, this notion of, okay, so you have all this and

 6   then this other product may be a whole different song, not by a

 7   human -- and I -- another set of lyrics gets spit out; right.

 8          So, maybe not copyrightable but where does that -- in

 9   terms of the fair use analysis and whether or not that was

10   transformative, that first --

11          **MR. OPPENHEIM:**  Right.

12          **THE COURT:**  Because I don't think it is clear under

13   the existing case law at this point.  I think what Plaintiff is

14   asking us to do is to answer that question right here at the

15   threshold, and I don't think *Warhol* is a perfect fit either.

16          **MR. OPPENHEIM:**  So, Your Honor, the *Thaler* case, there

17   was never a discussion about what the AI engine relied on to

18   create that work.

19          **THE COURT:**  I understand that.  I'm just --

20          **MR. OPPENHEIM:**  The better analogy -- the better

21   vehicle for thinking about this is the *Getty* case --

22          **THE COURT:**  Okay.

23          **MR. OPPENHEIM:**  -- which also is images.  And so,

24   *Getty* is a large owner of photographs and maybe other images

25   but at least photographs.  And what *Getty* found is when they

1    went to an AI imaging model and they sought to create images,

2    many of the images they got back were composite images that

3    included large pieces of their own images; and that's what is

4    set forth in that *Getty* case.

5         And the reason you know that it's large pieces of the

6    *Getty* images is because the AI couldn't discriminate the

7    watermark that *Getty* had put in the images that said owned by

8    Getty and not to be copied and that appeared on the outputs.

9         And so, I can't -- I can't speak to whether or not in

10   *Thaler*, the work that was created whether it was truly creative

11   on its own.  I don't believe as a matter of how AI works that

12   it could have.

13        **THE COURT:**  Okay.

14        **MR. OPPENHEIM:**  Because AI can only create from what

15   it already has.  That's all it can do.  It can't create on its

16   own.

17             (Pause in proceedings.)

18        **THE COURT:**  Mr. Oppenheim, Plaintiffs wanted to

19   reserve ten minutes for rebuttal?

20        **MR. OPPENHEIM:**  Your Honor --

21        **THE COURT:**  Okay.  Just so you know, you are at

22   23 minutes now.

23        **MR. OPPENHEIM:**  Okay.  Your Honor, I apologize.  So,

24   let me speak to the intermediate copying cases.

25        **THE COURT:**  I do want to make sure -- at some point I

 1  really do want to hear about irreparable harm as well -- I
 2  mean, the other factors as well.  So when I said "merits," I
 3  meant broadly the four because we have a lot.
 4          **MR. OPPENHEIM:**  We do have a lot, Your Honor.  I will
 5  endeavor to go as quickly as I can.
 6      On the intermediate copying point, Your Honor, Anthropic
 7  argues it has a right to use Plaintiffs' catalog of works
 8  because it doesn't intend to output verbatim outputs of the
 9  lyrics.
10      Back up.  What does that mean?  What they are saying is
11  they get to -- essentially say I -- my analogy, I would get to
12  illegally download a thousand of the greatest romance novels of
13  all time because I wanted to study up on how to write a romance
14  novel.  Obviously, that's not the case.
15      In any event, Anthropic isn't just studying the works.
16  It's actually copying them and putting them into its
17  repository, storing them for future use.
18      So, the cases that Anthropic relies on *Sega* and *Sony*, the
19  two Ninth Circuit cases, completely distinguishable.  Both are
20  cases where the court permitted some limited reverse
21  engineering of computer, quote, in order to facilitate
22  individuals being able to play video games on consoles and
23  computers.
24      The result that -- was to allow it because the court
25  recognized that it would ultimately result in an increase in

1  the number of games that ultimately could be purchased and
2  played.
3      Critically, the Ninth Circuit cabined *Sega* and *Sony* to
4  those decisions in the *VidAngel* decision because VidAngel,
5  right, they made unlicensed copies of movies in order to tag
6  and remove what VidAngel deemed inappropriate; and the Ninth
7  Circuit rejected VidAngel's argument that the intermediate
8  copying was permissible because the end result was allowed.
9      In other words, intermediate copying as a fair use defense
10 was limited to only permitted -- excuse me -- was limited for
11 purposes of accessing otherwise unprotectable content.
12     VidAngel limited Sony and Sega to their very limited
13 computer code facts.
14     The other cases that Anthropic cites do not bear much
15 better.  The *Authors Guild* case in *Google*, yes, wholesale
16 copying on the front end; but the purpose was to allow users to
17 read snippets of books.  It was intended for research and
18 Google said it was not commercializing it.
19     The first sentence of the *Google* decision is maybe the
20 most important.  Quote, this copyright dispute tests the
21 boundaries of fair use.
22     The court recognized that in allowing full copying of
23 entire libraries, even for very limited purposes was at the
24 outer edge of what was permissible under fair use.
25         **THE COURT:**  Arguably these cases do the same.

1          **MR. OPPENHEIM:**  Your Honor, the difference -- the

2    difference here is significant.  There's no argument --

3    Anthropic can make no claim that what they are doing is going

4    to help facilitate sales of Plaintiffs' works.

5                      (Pause in proceedings.)

6          **MR. OPPENHEIM:**  Which is the case for *Google, Sega* and

7    *Sony*, all three of them, the court found that it would

8    facilitate sales of Plaintiffs' works.

9          So, not only could the plaintiffs not suffer market harm,

10   the defendants showed that there was a market benefit to what

11   they were seeking to do.

12         I think the better cases on intermediate copying to look

13   at are the *Fox News versus TV*Eyes case where there the

14   Defendant developed a service where they made wholesale copies

15   of Fox News programming in order to allow subscribers to search

16   the programming and play snippets.

17         The court held that the wholesale copying on the front end

18   was not fair use.  The court said --

19          **THE COURT:**  How does tokenization play in?

20          **MR. OPPENHEIM:**  So, what Anthropic is doing is they

21   are saying they get to make wholesale copying on the front

22   end -- just like TVEyes -- because on the back end they are

23   creating other works.  Tokenization has nothing to do with it.

24   It is the process.  It is like ripping a vinyl album to

25   digital.  It is just a computer process to get a copyrighted

1    work from one form into another form.  It's the most recent

2    version of digitization.

3            You can also look to *Fox Broad versus Dish Network*.

4    There, Dish Network wanted to have an auto hop/skip

5    functionality so you could skip commercials, which the court

6    said was fine, but to do so Dish Network needed to make

7    complete ongoing constant copies of all programming to quality

8    control the commercial skipping.  And the court said that

9    intermediate copying was not permissible.  That decision, out

10   of Central District of California, went up to the Ninth Circuit

11   and was affirmed.

12           You look to the *Texaco* case out of the Second Circuit in

13   1995.  Texaco was getting journal articles -- was getting

14   journals legitimately from scientific publishers.  They would

15   buy one copy; circulate it so all of their scientists could

16   make copies for their own office.  And they said that's okay,

17   that copying -- even though they could have gotten a license

18   for additional copies -- they argued it is okay for our

19   scientists to copy it because the end result is it is going to

20   lead to scientific creation.

21           These are scientists at a lab in Texaco doing things that

22   will be beneficial for people.  And the Second Circuit said no.

23           **THE COURT:**  But this is, again, assuming that the

24   purpose of Claude is to create a wholesale copy.

25           **MR. OPPENHEIM:**  No, Your Honor.  We don't need to

1  assume that.  All we need to know is that it does, in fact, do

2  it.  Claude may do other things too, but all we need to know is

3  on the back end --

4      **THE COURT:**  So, let's play this out because I think --

5  I mean, in terms of all the cases we are looking at, there is

6  this -- it is almost -- I was -- whether or not this is an

7  off-label use is something we are trying to draw a comparison

8  of -- there is a lot of debate in the record about the purpose

9  of Claude, you know, and then you are trying to lay this on top

10  of fair use -- both parties are trying to figure out how this

11  current technology fits in, in terms of the fair use doctrine

12  and in terms of the case law there is into itself.

13      I just -- if technology here can do this, provide the

14  wholesale reproduction, right, but let's say that its primary

15  purpose was not to do that, does that matter for purposes of

16  Plaintiffs' analysis or in terms of the case law which the

17  Court should consider?

18      **MR. OPPENHEIM:**  The primary purpose is not part of the

19  test.  So, the question is whether it's -- so, the first

20  question in factor one is:  Is it transformative?  And we know

21  under *Warhol*, they haven't added anything.  They haven't

22  changed anything to the copyrighted works.

23      Remember, they have only asserted the fair use defense on

24  the training data, and those works are going in in full as is.

25  And the fact that they chop them into pieces is just the latest

1  version of digitization.

2      So, the -- the purpose is irrelevant.  What we know,

3  though --

4      **THE COURT:**  Doesn't *Goldsmith* and some other case law

5  indicate that the purpose does -- I need to pull up that

6  case -- but is relevant?  But, continue, Counsel.

7      **MR. OPPENHEIM:**  I will go back and look, Your Honor.

8  I do not believe ultimately -- certainly, we don't need to

9  prove anything because they have the burden.

10      **THE COURT:**  Right.  It is a fair use defense.

11      **MR. OPPENHEIM:**  Right, it is a fair use defense.  But

12  we don't need to show any kind of intent, any kind of purpose.

13  We know that it does this.  We know that it's intended to

14  regurgitate portions or in full pieces of our works.  And we

15  know that because it's done it.  It has done it over and over

16  and over again.  That's why we have so many copies of the works

17  that we have put forward in our evidence.

18                  (Pause in proceedings.)

19      **MR. OPPENHEIM:**  Your Honor, I'm going to skip factor 2

20  because the nature of the copyrighted work lyrics are as core

21  to the copyright as anything.

22      And factor 3, amount of substantiality of the use, they

23  are using the entirety of our works.  They are not using pieces

24  of them.  It's -- this is not a case where they said, oh, we

25  have only, you know, one -- one chorus.  They are using the

1    entirety of our works.

2        Anthropic argues that other alternatives were not

3    available, but that -- that's not an argument against the

4    amount of substantiality of use.

5        As *Feist* tells us if someone copies to avoid the drudgery

6    in working up something fresh, the claim to fairness and

7    borrowing from another's work diminishes accordingly if it does

8    not vanish and other factors like the extent of commerciality.

9        Let me turn to the market harm factor.  To establish

10   market harm under the fourth factor, the Plaintiffs need only

11   show that if the activity were to become widespread, it would

12   adversely affect the potential market for the copyrighted work.

13       Anthropic focuses on the fact that Plaintiffs have not put

14   forward showing actual market harm has already occurred.

15   That's not required under the law.

16       Under *Sony Corp.* *versus Universal Studios* from the Supreme

17   Court, it's very clear that all you need to show is that if the

18   particular use should become widespread, it would adversely

19   affect potential market.  And as the court said there, actual

20   present harm need not be shown.

21       So, there are two ways -- so, before jumping into the two

22   types of market harm here, understand Plaintiffs are in the

23   business of licensing.  That's what music publishers do.

24   That's their -- almost if not almost the entirety of their

25   business.  They represent songwriters in order to license their

1    works into the marketplace.

2         So, Plaintiffs have numerous licenses with entities to

3    display their song lyrics.  Many examples are set forward in

4    the Plaintiffs' papers.

5         If an individual wants to find out what the lyrics to

6    "Don't Stand So Close To Me" by the Police are, right, a user

7    might likely go to Google and ask for the lyrics as you can see

8    on the left here.

9         Google has a license through -- has a license to display

10   those lyrics, and the publishers are ultimately compensated

11   through that license for that usage; but unfortunately now, a

12   user may choose not to go to Google and may instead ask Claude

13   either through a chatbox or through DuckDuckGo or some other

14   way; and that user will receive almost the same response.  The

15   key difference is attribution.

16        With Google it tells you who wrote the song and who owns

17   the lyrics.  Claude provides none of that.  There is no

18   attribution.

19        Claude does more, though, than just give lyrics verbatim.

20   Claude also creates greeting cards that use Plaintiffs' works

21   as we have seen.  So, long after the guardrail --

22   advertisements or commercials that use --

23             THE COURT:  Counsel, I believe there is an outstanding

24   objection to these slides and the late submission of this

25   evidence after the record was closed.

1          **MR. OPPENHEIM:**  So, Your Honor, Anthropic continues to

2     argue that the guardrails are effective.  We produced this

3     evidence to them last week shortly after we obtained it.

4          **THE COURT:**  But you didn't request leave from the

5     Court to submit additional evidence.

6          **MR. OPPENHEIM:**  Your Honor, it would be no difference

7     than our calling up Claude live and showing you -- here we

8     could do it right now -- to show the fallibility of the

9     guardrails but --

10         **THE COURT:**  Hold --

11         **MR. OPPENHEIM:**  Sorry.

12         **THE COURT:**  We can discuss this at the end of the

13    hearing along with the seal, along with a couple other things;

14    but move on, Counsel.

15         **MR. OPPENHEIM:**  Thank you.  What we have -- the reason

16    greeting cards are important --

17         **THE COURT:**  So, we can discuss this at the end of the

18    hearing.  I said move on.

19         **MR. OPPENHEIM:**  Oh, I'm sorry.  I apologize.  I didn't

20    understand.

21                   (Pause in proceedings.)

22         **MR. OPPENHEIM:**  Plaintiffs also found the use of the

23    works in advertisements and commercials.  Our experts have

24    demonstrated that users on the internet have figured out how to

25    circumvent the guardrails as we discussed earlier.  One way

1    they have done it is through God -- something that has been

2    dubbed God-mode; the others simply a time skip asking Claude to

3    imagine that it is 70 years after publication.

4         **THE COURT:**  Counsel, I have reviewed these exhibits.

5    I mean, I read --

6         **MR. OPPENHEIM:**  Very good, Your Honor.

7         **THE COURT:**  I spent a lot of time in the last week or

8    so going through declarations and the exhibits and so forth.

9    We are at 37 minutes of the 30, and I'm giving leeway because I

10   do believe that the case here today is -- it is cutting edge.

11   We are testing the boundaries of fair use and copyright laws

12   and I recognize that.  I really need us to --

13        **MR. OPPENHEIM:**  Very well, Your Honor.

14        **THE COURT:**  -- focus on -- just assume that I have

15   read your materials.

16        **MR. OPPENHEIM:**  So --

17        **THE COURT:**  I do really want you to get to irreparable

18   harm because the Court has some concerns.  So, why don't you

19   wrap up the points you would like to regarding fair use and --

20        **MR. OPPENHEIM:**  So, the last part on the market harm.

21        **THE COURT:**  Yeah.

22        **MR. OPPENHEIM:**  Plaintiffs have licenses that allow

23   for the display of their lyrics.  The way Claude can be used

24   can completely undermine those licenses, whether it be licenses

25   for lyric entities or licenses with other commercial entities,

1    Your Honor, and that -- that's the potential for market harm.

2    We believe, Your Honor, that all four factors weigh in

3    Plaintiffs' favor on fair use.

4        **THE COURT:**  Anthropic kept pointing to, well, they

5    have no actual evidence that this has happened to any degree;

6    that the decrease in value regarding the other licenses with

7    lyrics aggregators and so forth.  In terms of authority -- and

8    I hear Plaintiffs' point being we don't have to show that there

9    was actual harm present.  In terms of authority for that, what

10   is your best case for that, going to that point?

11       **MR. OPPENHEIM:**  The Supreme Court, Your Honor, in the

12   *Sony versus Universal Studios* case.  There are many others and

13   happy to provide other authorities if Your Honor would like.

14   Irreparable harm, Your Honor?

15       **THE COURT:**  Yes.

16       **MR. OPPENHEIM:**  This case actually presents what is a

17   classic case of irreparable harm.  And let me kind of explain

18   how before we get into the little -- the pieces if you will.

19       If the Court were to deny the preliminary injunction and

20   the Plaintiffs were ultimately to win on the merits, we will

21   end up having extensive briefing on a potential permanent

22   injunction; and it is absolutely certain at that point in time

23   Anthropic will say it cannot undo the training for all of its

24   models that it has already issued.

25       Anthropic will say they cannot unmake the cake that they

have baked.  Use whatever analogy you want.  How do I know that Anthropic is going to say that?  Because they already have, Your Honor.

**THE COURT:**  So, let me go back for one second.  I mean, the point which we had left fair use at was this notion of the bread and butter -- and understandably so -- for the publishers is licensing; so licensing fees, licensing, so forth.

So, assuming that it is this sort of monetized basis, so if that was the case and Anthropic were to say that, then it sounds like they would owe you a lot of money in that case, if it was -- that there was no way they could undo or -- if -- is it compensable?

**MR. OPPENHEIM:**  So, Your Honor, there are -- Plaintiffs are willing to do licenses with Anthropic or other AI companies but those -- here, it is not compensable down the road for multiple reasons.

One is Anthropic isn't in any way counting or controlling what it is doing.  In order to have compensable injury down road, you have to be able to calculate the harm.

The law is clear that irreparable harm exists when it is hard to quantify or impossible to calculate the harm after the fact.  The *Rent-A-Center versus Canyon Television* case out of the Ninth Circuit, Your Honor, says if you can show its intangible or difficult to value the injuries.  Here, we have

1    no extent of the usage either on the input or the output.

2    Here, the use by Anthropic is completely unquantifiable.

3              **MR. WETZEL:**  Sorry, Your Honor.  I'm not sure where

4    this appears in Plaintiffs' briefing, this argument that we are

5    hearing for the first time, *Rent-A-Center*.

6              **THE COURT:**  Are you arguing -- are you concerned about

7    the case law or the argument itself?

8              **MR. WETZEL:**  I'm concerned about a new argument being

9    raised at oral argument that has not been presented in any of

10   the Plaintiffs' briefing.

11             **MR. OPPENHEIM:**  Your Honor, we have clearly argued

12   that money damages are insufficient.

13             **THE CLERK:**  Mr. Wetzel, please use the microphone if

14   you need to.  Sorry.

15             **MR. OPPENHEIM:**  We have clearly made that argument.

16   Whether we have cited that particular case or not is not -- we

17   haven't --

18             **THE COURT:**  It is pertinent but you have argued that

19   it is compensable.

20             **MR. OPPENHEIM:**  We have argued that it is not

21   compensable, yes.

22             **THE COURT:**  That it's not compensable, yes.

23             **MR. WETZEL:**  Yeah, I will acknowledge that Plaintiffs

24   have argued --

25             **THE COURT:**  Mr. Wetzel, we have a court reporter

 1  remote so you need to use the mic -- either mic but you have to

 2  get close.

 3       **MR. WETZEL:**  I'm sorry.  Yeah, we will acknowledge

 4  that they have argued that the harm is not compensable; but we

 5  just wanted to point out that this is new case law and argument

 6  that was not presented in the briefing.

 7       **THE COURT:**  Okay.  So, I'm going to finish hearing

 8  them because we are at 42 minutes.  I'm going to give 3 more

 9  minutes.  Make note.  And if you are requesting something from

10  that point, we can deal with it afterwards; but make note of

11  what you are concerned about, but we are going to keep going.

12       **MR. WETZEL:**  Thank you, Your Honor.

13       **THE COURT:**  Mr. Oppenheim, please continue.

14       **MR. OPPENHEIM:**  Yes.  There are at least six different

15  kinds of irreparable harm here.  First, publishers have lost

16  control of the presentations of their work and Anthropic robs

17  them of that control.  Licenses that the publishers have with

18  others require contribution; prohibit alteration; specify

19  platforms.  You can't -- one of the examples in the papers,

20  Your Honor, is a band that wrote a religious song --

21       **THE COURT:**  Right.

22       **MR. OPPENHEIM:**  -- having a perverted use that was not

23  religious.

24       **THE COURT:**  So, I believe, that you had raised four

25  bases for irreparable harm or types of irreparable harm, what

 1  are the six we are now --

 2      MR. OPPENHEIM:  It is just breaking them down a

 3  different way, Your Honor.  It is the same arguments that are

 4  there, Your Honor.

 5      THE COURT:  So, I had lack of control over use, in my

 6  notes, lack of credit to artists, reputational harm and erode

 7  values of the work with related citations -- oh, there is

 8  actually damages to competitive -- damage to competitive

 9  negotiating position.

10      MR. OPPENHEIM:  Right.

11      THE COURT:  Oh, no.  You do have six -- and harm to

12  Plaintiffs' relationship.  So, I folded some within others but

13  if you are breaking them out that way, maybe those are the six

14  you are referring to.

15      MR. OPPENHEIM:  And my colleague just tells me we do

16  cite *Rent-A-Center* in our brief on page 23.

17      THE COURT:  Okay.

18      MR. OPPENHEIM:  So, I can walk through these,

19  Your Honor, but when you think about the way Anthropic can be

20  used, let's talk about the unapproved versions of the songs;

21  right.  When derivatives can be created, such as "Candle In The

22  Wind" with "Baby Got Back," Elton John, that's not a version he

23  would have written; an atheist version of "Meant To Live";

24  Sympathy For The Devil" from the perspective of God, right, all

25  of these perverted uses --

1      **THE COURT:**  Some might argue that that is satire in

2  the epitome of fair use.

3      **MR. OPPENHEIM:**  Actually -- well, there might be an

4  argument for satire but I don't believe so and certainly not in

5  the commercial aspects, right, of what they are doing.  What

6  they are doing is hurting the publishers and the songwriter's

7  reputations.  The songwriters write the songs with something in

8  mind.

9      These unauthorized matchups have not been solved by the

10  guardrails, Your Honor, as set forth in our briefing.  You get

11  false political endorsements.  "You Can Always Get What You

12  Want" endorsing soon-to-be President Trump.  You get

13  unauthorized advertising uses of Katy Perry's "Roar" selling

14  beer.  They are laid out in our briefing, Your Honor.

15      But without having a license, which controls this to some

16  extent, that provides for attribution, that is the definition

17  of market harm.  I want to come back to the big point here,

18  Your Honor.

19      **THE COURT:**  I'm going to have you wrap it up.

20  Otherwise, we are not going to finish the argument on the

21  motion in this hearing today.

22      **MR. OPPENHEIM:**  Your Honor, the question on

23  irreparable harm is:  If at the end of the day the injunction

24  isn't issued, is there a way to unwind things?  And the answer

25  here is no.  We know that once a model is trained, it is

 1   impossible to remove anything specifically from the training.

 2   You have to just retrain the model from new.  You can't take

 3   copyrighted works out after the fact.  Mr. Kaplan has said that

 4   in his declaration.

 5       So, we know this is a classic case of irreparable harm

 6   because once the models are issued, they are out there.  They

 7   are functioning, and they are going to go forward and that's

 8   what -- that's what irreparable harm is.  All we are seeking to

 9   do is maintain the status quo.  No new models being trained on

10   our works.  Thank you, Your Honor.

11       THE COURT:  Thank you.  So, doing a time check folks,

12   we are at 4:00 o'clock.  We have 40 minutes more of the motion

13   to dismiss, which was supposed to be argued today.  That may

14   need to be put over given where we are at.  I rather not.  But

15   we are going to hear -- that argument went well over by about

16   15 minutes.  So, I will give leave for, Counsel, if you need a

17   few more minutes but asking trust -- I mean, things that would

18   be helpful as best authority for different points as well as

19   just recognizing -- point me to where in the papers because we

20   have made a real effort to be prepared today.  So...

21       MR. GASS:  Thank you, Your Honor.

22       THE COURT:  Thank you.

23       MR. WETZEL:  For this portion of the argument, I'm

24   going to start out and talk about the overarching merits, the

25   lack of irreparable harm, and the merits of their output

claims.  And then I'm going to turn it over to Mr. Gass for the fair use training question, and then I have a couple minutes of conclusion afterwards.

First, I want to do a little bit of cleanup on the scope issue.  I should have mentioned to Your Honor the *Netcom* case cited at page 28 of our opposition brief on the issue of tying injunctive relief to the works identified in a complaint, so, scope in that context.

And on the issue of fine tuning, again, I commend you to Dr. Kaplan's testimony on fine tuning and its purpose and Anthropic's intent for its products.

On the evidence that's in Anthropic's possession that Plaintiffs have not had access to yet, we have not refused discovery to Plaintiffs.  There will be discovery in this case, and we can address the issue of how Claude has been used and whatnot on a full record once we have that record.  I think it is premature to address the merits of Plaintiffs' case before we have done that discovery.

Finally, on the *Apple versus Psyster* case, that case involved a finding that defendants' actions revealed -- quote, reveal a dogged determination to continue the conduct in question.

So, as pertains to the requested relief with respect to outputs and whatnot, I don't think there is any record of a dogged determination on the part of Anthropic to output

1    Plaintiffs' lyrics.  It is an undesirable bug if it happens and

2    we have been working to address it when it has been brought to

3    our attention.

4         Also, in -- I know that Plaintiffs raised that case in the

5    context of extrapolating the injunctive relief beyond the works

6    at issue in the case.

7         But there it was just extrapolated from one version of

8    Apple software to subsequent versions of Apple software in

9    light of the defendant's expressed or determination to continue

10   infringement.

11        So, it was not a case involving extrapolating 500 works to

12   4 million works or anything of that sort.  It was just applying

13   to subsequent versions of the same or similar software that was

14   at issue in that case.

15        Now, if I could actually get the slides switched over,

16   please.  Thank you.

17                    (Pause in proceedings.)

18        **MR. WETZEL:**  We can go straight to slide 30.  So,

19   Your Honor is familiar with the law obviously, but it is really

20   critical to keep in mind here how high the bar is for

21   Plaintiffs on this motion.  And I will reiterate, no matter how

22   they spin them, they are mandatory injunctions just the way

23   they would apply to Anthropic here.

24        Now, there's four --

25        **THE COURT:**  Can you go ahead and just address that?

```
 1    It is a pretty important threshold question; right.  The
 2    determination of that sort of sets the stage in terms of what
 3    must be shown.  So, can you respond directly to Mr. -- to
 4    opposing counsel's points?
 5            MR. WETZEL:  Sure.  What I will say with respect to
 6    future guardrails on future products, there is no guarantee
 7    that the existing guardrails will -- you know, will interact
 8    with or be appropriately meshed or applied to future models
 9    that Claude trains.
10        And so, the request that we apply existing guardrails as
11    they stand today to new -- new -- completely new models,
12    completely new products that we put in the marketplace is --
13    it's overly rigid and it doesn't allow us the ability to
14    innovate.
15        We -- again, I will stand here today and say to you that
16    we have no desire that our products output their lyrics, but
17    we -- we would ask that Your Honor afford us some grace in the
18    conduct of our business to do that in the best way possible.
19        And again, I don't think that they have made the showing
20    here that's required to -- for Your Honor to require us to do
21    that as a matter of injunction.  It is something we have been
22    willing to discuss as a voluntary agreement and that should
23    demonstrate our good faith, but I think an injunction is
24    another thing altogether.
25        Ultimately -- and sorry, I will address training briefly.
```

1    I -- you know, I think Mr. Gass will actually, frankly, be able

2    to address Mr. Oppenheim's discussion of that as it pertains to

3    training because it is just the nature of the beast, the volume

4    of data, the exercise, the purpose that is being put to this

5    data to derive the statistical weights and whatnot, it makes

6    it -- it makes it a filtering exercise rather than a, you know,

7    selecting piece-by-piece exercise.  And that's why it is a

8    mandatory injunction rather than a prohibitive one.

9        So, with that in mind, we have four independent reasons

10   that Your Honor can deny Plaintiffs' motion.  The first is

11   that, you know, we have been going for 18 months now; and I

12   don't think that there is evidence in the record of irreparable

13   harm that's occurring right now.

14       Mr. Oppenheim may, in the context of arguing the fourth

15   factor for fair use, say it is not his burden to show ongoing

16   harm.  Well, it is in the injunction context.  And so, to the

17   extent the record does not reflect ongoing or imminent

18   irreparable harm to Mr. Oppenheim's clients, that is going to

19   be dispositive of this issue.

20       Second, as Mr. Gass will discuss, training in LLM is a

21   paradigmatic fair use under the existing legal framework.

22   Third, an injunction would disproportionately harm Anthropic

23   and the public.  And fourth, the factual record overall

24   precludes an injunction here.

25           **THE COURT:**  Can you provide the case law as to the

1  first two or three of those points?

2           MR. WETZEL:  Sure.

3           THE COURT:  It can be later on in your presentation.

4           MR. WETZEL:  Yes, it will come up organically.

5       So, our case law on irreparable harm being a prerequisite

6  for injunctive relief, we have the *Flexible Lifeline Systems*

7  *versus Precision Lift* case in the Ninth Circuit.  We have

8  actually a case cited by Plaintiffs for another purpose, the

9  *Herb Reed Enterprises* case says there is no presumption of

10 irreparable harm and says those seeking injunctive relief must

11 proffer evidence rather than platitudes to establish a

12 likelihood of irreparable harm.  That's the *Herb Reed*

13 *Enterprises versus Florida Entertainment Management*.

14                    (Pause in proceedings.)

15          MR. WETZEL:  Now, there is three reasons that

16 Plaintiffs failed to establish irreparable harm here.  The

17 first is their conduct has not been consistent with people who

18 are undergoing irreparable harm, and I will explain that later.

19 It is more than the simple delay point that they have attempted

20 to rebut in their reply.

21      Two, there is no evidence of actual ongoing harm here or

22 imminent harm; and three, there is no reason why monetary

23 damages can't make them whole at the end of the day.

24      Now, with respect to their conduct, again, this is not a

25 simple point of delay an investigation before bringing suit.

1   We understand that people should act cautiously before

2   involving the courts in their conduct, but what happened here

3   is that Plaintiffs discovered infringement at least as early as

4   June 2023 and said nothing to Anthropic.  They prompted Claude

5   to output their lyrics in July, in August, in September without

6   saying a word to Anthropic.  In late October they filed a

7   complaint, and this is the first that we are hearing about

8   this; but they made a strategic decision to file in Nashville

9   where Anthropic had no offices and no jurisdictional

10  connections.

11      We promptly objected.  We said this is not the proper

12  place to hear this case.  There is no jurisdiction over us

13  and -- but at least five months after they discovered

14  infringement the first time, they went ahead with their

15  Nashville strategy and they filed their PI motion in Nashville.

16      And when Judge Crenshaw issued his order, he noted that

17  that was a strategic choice.  They looked at the landscape, and

18  they said, "We would rather bring our case in Nashville and

19  jurisdictional risk is acceptable to us."

20      That's not -- that's not something you do if you are

21  really on the ropes and need to stop something out of the

22  gates.

23      Finally, over a year into the timeline, they decided to

24  rebrief this motion; and here we are 18 months later still

25  talking about this urgent need for relief.

1    We think that it makes sense to proceed to the merits of

2    the case on a full record before Your Honor so that you can

3    make an informed decision on what is a novel question or a

4    novel application of the law to a new technology, and that we

5    should -- we shouldn't rush to judgment here on an incomplete

6    record.

7                    (Pause in proceedings.)

8         MR. WETZEL:  Now, I want to go from here -- and by the

9    way, all the while during this time period Anthropic's first

10   offer to enhance its guardrails to work with Plaintiffs to do

11   something broader than the 500 works in suit was playing out in

12   November of last year.  It was playing out in December of last

13   year and it is continuing to this day.  We are still talking to

14   them, and we don't have an agreement.  Again, before they filed

15   their motion, we volunteered to discuss with them how we could

16   apply guardrails to our models that might satisfy some of their

17   concerns.

18        THE COURT:  And I'm hoping that with the Court -- with

19   the progress that has been made since the status conference,

20   parties will get there.

21        MR. WETZEL:  Thank you, Your Honor, okay.

22        THE COURT:  You both have cases -- I mean, you both

23   have cited and discussed this time period whether or not it

24   affects and impacts the irreparability or the imminency issue.

25        MR. WETZEL:  And I --

1          **THE COURT:**  I did look at the case law regarding this.

2          **MR. WETZEL:**  And I just wanted Your Honor to

3     understand that we are not making this point just that

4     18 months is some magic number or that a year is a magic

5     number.  It is that every step in the way, their conduct was

6     preferencing a litigation strategy as opposed to, like,

7     actually working to get to the heart of these issues; but I can

8     move on from that.

9          Let's go to slide 41, please.  But we are here 18 months

10    in and without a record of harm, like, let alone irreparable

11    harm here.  There is no evidence of declining publisher

12    revenues.  And I want to remind Your Honor, the works in

13    question here are musical compositions.  They are not the

14    lyrics.  The lyrics are just --

15         **THE COURT:**  So, I didn't totally follow this argument,

16    I will just be honest, in terms of the Defendants --

17         **MR. WETZEL:**  Yeah, so --

18         **THE COURT:**  -- in terms of Anthropic raising this

19    because, say, okay, well, it is just lyrics, it is still

20    creativity.  That is still -- and so to say --

21         **MR. WETZEL:**  We are --

22         **THE COURT:**  -- it is part of this but it's not the

23    music.  So, talk me through your logic on this because it has

24    come up a couple of times.

25         **MR. WETZEL:**  Sure.  There's a couple points of

relevancy.  The first time I raised it, I think, was in the context of what will be a third factor issue that Mr. Gass might discuss briefly; but it's that Anthropic is only taking the text --the text of the lyrics because that is what is required for the transformative purpose to which Anthropic is putting that music.  Anthropic is not engaged in --

**THE COURT:**  So, your argument is partial versus whole.

**MR. WETZEL:**  Exactly.

**THE COURT:**  Okay.

**MR. WETZEL:**  We are only taking the piece -- the text piece that we need for the transformative purpose that we are engaged in.  But as it pertains to evidence of harm, I'm saying it to remind you that the bread and butter of the publisher's business is not licensing musical composition -- snippets of lyrics of musical compositions to use in greeting cards as Mr. Oppenheim mentioned.

It is licensing the actual musical compositions for listening, for streaming, for sales, for whatever.  And that's why the harms that they are complaining of here are really de minimis in the context of their overall business.

I am not saying that there is no harm if they are able to establish a claim.  What I am saying is that this is not existential to the publisher's business.  It is very orthogonal to their primary business of licensing entire musical compositions.

1          **THE COURT:**  But they do license their lyrics; correct?

2          **MR. WETZEL:**  They do.  And I will add just really

3     quickly in response to something that Mr. Oppenheim said, the

4     uncertainty as to the exact amount to compensate them if they

5     were to establish infringement here is not a grounds -- is not

6     a grounds to enter an injunction when we are dealing with this

7     context here.

8          The copyright law affords statutory damages, which provide

9     a wide range of potential recoveries for them.  And one of the

10    legislative purposes of that wide range is that it may be in

11    some cases hard to pinpoint the exact number.  And so, this is

12    something that's entirely solvable -- Dawn Hall I think

13    mentions that as part of her opinion that -- you know, that

14    these --

15         **THE COURT:**  Who?  I'm sorry.

16         **MR. WETZEL:**  Sorry, Dawn Hall is our expert on the

17    compensability of --

18         **THE COURT:**  Yes.

19         **MR. WETZEL:**  -- monetary damages.  I think she

20    mentions that point.  And I will concede that Plaintiffs cited

21    *Rent-A-Center* but not for the proposition it was offered here.

22    Had they offered it for that purpose, we probably would have

23    briefed this issue about statutory damages, the wide range of

24    available recovery if they were to establish infringement here.

25         So, the fact that you might not know whether the answer is

1    one dollar or ten dollars is not a grounds to find that -- you

2    know, that harm is not compensable by monetary damages.

3                      (Pause in proceedings.)

4        **MR. WETZEL:**  Ultimately, though, what we have on the

5    record, if you go to slide 42, is that Plaintiffs raise the

6    mere possibility of harm here.

7        And, you know, I think it is instructive to look to

8    Professor Smith's -- or Dr. Smith's testimony where he says

9    that the loss of the ability to control the supply and use of

10   lyrics could also affect the value of the market for song

11   lyrics.

12       But the *Herb Reed* case that I mentioned to Your Honor at

13   the beginning of this segment, it actually vacated the

14   injunction that issued in that case where the pronouncements

15   were grounded in platitudes rather than actual evidence of

16   harm.  That case is quite a good one for us, and we thank

17   Plaintiffs for citing it.

18       If we go to the next slide, a lot of the focus of

19   Plaintiffs' evidence is how harm can be remedied with monetary

20   damages.  There's lots of talk about licensing agreements and

21   how, you know, publishers are being deprived of potential

22   licensing fees and whatnot.  So, Dawn Hall testified that they

23   can be made whole with those damages but those are money

24   damages.

25       Likewise, if you look at the publisher declarations, which

1    are all very similarly structured, they show how license fees

2    can compensate for any harms that are found here if they are.

3        And so, these all speak about the license agreements that

4    publishers issue for the rights to display their lyrics.  So,

5    that would address the outputs issue.  And Dawn Hall testified

6    that those agreements could be used as a starting point to

7    calculate damages if Plaintiffs win among other things.

8    There's -- we would have a full record, of course.

9        So ultimately, Plaintiffs failure to show irreparable harm

10    is enough to deny the motion.  The *Swarmify* case that you see

11    here on this slide from this district says that the failure to

12    do so is a showstopper and requires the denial of injunctive

13    relief.  They acted with no urgency in seeking to get to this

14    relief.  They have provided no concrete evidence of harm, and

15    there's no harm that can't be remedied with money damages.

16        So, that's what we have to say on the issue of irreparable

17    harm.  If Your Honor doesn't have further questions, I can turn

18    to the output.

19        **THE COURT:**  Go ahead.  I'm just double-checking my

20    notes.

21        **MR. WETZEL:**  Great.  Before I turn things over to

22    Mr. Gass, I just want to spend a couple minutes here on

23    Plaintiffs' claims in support of the output injunction.

24        You know, Mr. Oppenheim mentioned that we are not raising

25    a fair use defense as to the outputs.  I would say that for the

1    purposes of this motion that is correct.

2        I think many of the examples of outputs that Mr. Oppenheim

3    has cited, as Your Honor pointed out, would be in many cases

4    examples that we would argue are fair uses.  There may be other

5    fair use arguments that we would make as to outputs.  I'm not

6    making them here today but I want to be clear that we are not

7    waiving those defenses.  We haven't answered yet.

8        So, with respect to the output injunction, our first

9    argument is that it is moot.  We have already done what

10   Plaintiffs are asking for in developing and maintaining

11   additional guardrails to the ones that we had before the suit

12   was filed.

13       **THE COURT:**  What is your best case law to this point?

14   I didn't find the papers particularly -- I wasn't convinced in

15   terms of this point that there was a mootness argument that

16   could be raised.

17       **MR. WETZEL:**  Sure.  Well, I think our best case is the

18   *Rosebrook versus Mathis* case in the Ninth Circuit, 745 F.3d 963

19   at 973.

20       **THE COURT:**  Okay.

21       **MR. WETZEL:**  Because we -- we have -- we not only have

22   the actions of Anthropic before and after the lawsuit, but we

23   also have testimony about how the display or output of lyrics

24   is not a desired feature of this product.  It is not something

25   that we endeavor to do.

And in those circumstances the Ninth Circuit acknowledges that courts can have confidence that the actions taken by the Defendant to address the alleged harm are -- are going to stick, so to speak.  We have no intention of just opening flood gates tomorrow and releasing regurgitated outputs from our models.  That is not -- there is nothing in the record that indicates that that is an intention of ours.

I also wanted to make the point that this argument doesn't really make sense in the preliminary injunction context, the voluntary cessation argument that Plaintiffs make.

The parties are going to be before Your Honor until there is a final judgment here.  And, of course, if Anthropic were to take a left turn and do something outrageous, we would be before Your Honor in something that could be addressed here.  So, I think there is an additional layer of confidence.  This is not a final injunction that we are talking about.  So, you don't have to worry about the parties kind of going -- you know, going off into the world and not being, you know, in regular contact with Your Honor.

But beyond that, there is no evidence in the record, again, of anybody other than Plaintiffs who even tried to use Claude this way.  And we asked them -- in an interrogatory, we asked Plaintiffs if they had heard of anybody doing it before they filed their lawsuit; and we are still waiting for them to respond.  They initially objected.  I think they ultimately

said they would provide us a response.  I think if they had

examples of people in the world using Claude for these

purposes, we would have seen them in the complaint or certainly

in the intervening year or so that we have been briefing this

issue.

THE COURT:  Let me ask you the same question I was

trying to get at -- and I don't think phrased artfully with

Mr. Oppenheim -- is there a comparable -- one of Defendant's

arguments is that this is, again, almost like this off-label

use.  Like, this was not how this product was intended to be

used.  How does that play out in the analysis?  And if this

makes more sense --

MR. WETZEL:  Yeah, I'm going to defer to Mr. Gass on

that.  I have a lot to say on what Mr. Oppenheim had to say

about that, but I appreciate time is short and only one of us

should speak to that.

THE COURT:  Okay.

MR. WETZEL:  So, we will -- I promise we will get to

that later in the presentation.

Going to the next slide, beyond being moot, Plaintiffs'

output injunction fails because they are the ones who engaged

in the volitional conduct that caused the direct infringement,

not Anthropic.

And this is important because, as the Ninth Circuit

recognized in the *Hunley* case against Instagram, volitional

1    conduct is the copyright's version of proximate cause; and it

2    tells you who the direct infringer is.

3        So, Anthropic would at most be secondarily liable for the

4    output claims that Plaintiffs are putting forth here, and this

5    relates to the concept of the prompt and output pairs that I

6    talked about in the first session.  You know, none of the

7    outputs that exist, exist but-for the very specific prompt that

8    caused the model to predict them.

9        And it is not the case of saying:  I'm requesting this

10   work that you are offering to me, platform.  It is the case

11   that each -- each prompt is broken down, analyzed and run

12   against the training corpus to return a result.

13       So, it is not the same as if I were operating a website

14   where you had a catalog of sound recordings or whatever and you

15   could just pick which ones you wanted to download or whatever.

16   That is completely different.  No output of Claude exists

17   independent of the prompt that caused the model to generate it.

18   So, it's a -- it's a program and a return, so to speak.

19       And that's illustrated in the Pliny example that we have

20   on the slide again here.  This is a pretty complicated prompt

21   that you have to do to get Claude to do what's going on here.

22   And you see the description of what's happening is that the

23   prompts are purposefully triggering a refusal by the model,

24   discombobulating it and then reorienting it with some -- a

25   divider -- I don't exactly know what that is -- and then

1  leveraging the refusal to elicit a jailbreak.

2      This is a very elaborate way to get lyrics out there, and

3  I would hope it would speak to our intent to return lyrics as

4  outputs to users.

5      And the reason that I bring the direct

6  infringement/secondary infringement up here in this context is

7  that Plaintiffs have very expressly limited this motion to

8  their direct infringement claims.

9      The secondary infringement claims are going to be the

10  subject of the motion to dismiss if we hear it this afternoon.

11  And the thing I want to say is that the framework -- in that

12  case -- in that case the Plaintiffs argue that the users supply

13  the predicate act of infringement for Anthropic's secondary

14  liability.  That's their argument.

15      And they say that their investigators can supply the

16  predicate act because if they did it, users could do it and so

17  to speak.  The framework is user generating output is the

18  direct liability that's predicate for the secondary liability

19  of the model of Anthropic.

20      And I think that's the right framework, and I think their

21  arguments in their pleadings fail for other reasons that you

22  will hear from Mr. Damle about, but it is very important to

23  understand in the context of this motion which has been

24  expressly limited to district infringement theories.

25      So, outputs, frankly, are not a direct infringement theory

1    as Plaintiffs have pled them and argued them in the context of

2    the motion to dismiss.

3         THE COURT:  Because there are no third parties who are

4    doing it or because --

5         MR. WETZEL:  No.  Plaintiffs' argument is that they

6    have sufficiently pleaded that third parties are doing it and

7    that those third parties are the users --

8         THE COURT:  Right.

9         MR. WETZEL:  -- generating but if the user generating

10   the output is the direct infringement, that can't also be

11   Anthropic's direct infringement.

12        THE COURT:  Oh, okay.

13        MR. WETZEL:  So, bottom line, there is no viable

14   direct infringement claim against Anthropic for outputs on the

15   record and those claims shouldn't be at issue in this motion.

16        Very briefly before I give it to Mr. Gass, I want to

17   address some of the cases that Mr. Oppenheim was discussing.

18        First are cases that base infringement or irreparable harm

19   findings on the actions of Plaintiffs' investigators.  We think

20   all of those cases that they cited on reply are

21   distinguishable.  The *TickBox* case was a case where the

22   defendants didn't even contest irreparable harm so that was not

23   at issue before the court.

24        The evidence was that the investigators were able to get

25   it to download the infringing app when paired with evidence

that the Defendant had induced people to download that and to
engage in that infringement.

So, it was a pairing of the investigator's evidence with
evidence -- other evidence in the record to support the
findings there.

In the *Arista Records versus Usenet* case, there was plenty
of other record evidence that made it plausible that other
users were doing the same thing that the investigators had
engaged in including inducement behavior by the Defendant.  So,
that was another case where it was a Defendant actively
inducing people to infringe.

Similarly --

**THE COURT:**  Right.

**MR. WETZEL:**  -- in the *Louis Vuitton* case against
actively knock there is no indication that the only evidence of
direct infringement in the record was the investigator's
evidence so, I think all of those cases are distinguishable.

On the volitional conduct point, Mr. Oppenheim mentioned
the *VHT/Zillow* case; and we think that's a totally different
situation here.  It is inapposite.

The Claude outputs here are more akin to the images in
that case that were displayed on gigs by -- on user's personal
boards but were not part of the searchable moderated set.  That
was the distinction.  So, the set of content that was moderated
and curated and selected by Zillow, sure, there was volitional

conduct there because of their involvement in what was

selected, moderated, curated and displayed to people; but where

you had -- where you had responses or other content that was

provided to the platform by others -- supplied by others --

like in the context of people supplying prompts to Claude,

those -- those were not found to be subject -- those were not

found to have volitional conduct.

And one last one, I want to say that the *Atari/Redbubble*

case, our case, again, is more akin to the part -- the holding

in *Redbubble* that there was no volitional conduct where website

users were the ones who selected the designs and uploaded them,

and the display on the website occurred automatically once

people selected it; but the service was found not to have

volitional conduct in connection with that activity that the

users contributed to.

It was only where -- it was only where Redbubble

controlled the entire process.  Even though each step was

automated, each step of the process was controlled by

Redbubble.  They designated specific tasks that the mechanism

would perform printing onto a T-shirt, for example, printing an

image -- a copyrighted image onto a mug, all of those

applications and tasks were dictated and preloaded by

Redbubble, so to speak.

Here, Claude has no outputs preloaded into it.  Again, all

of them are responses to the specific prompt that a given user

gives.  So, we think there's ways to distinguish all of these

cases.  And now I will turn it over to Mr. Gass for fair use.

          **THE COURT:**  Thank you.

                    (Pause in proceedings.)

          **MR. GASS:**  Good afternoon, Your Honor.

          **THE COURT:**  Good afternoon.

          **MR. GASS:**  Andy Gass for Defendant Anthropic.

    I think the place to begin the fair use analysis is

probably by picking up on a comment that Your Honor made

earlier -- and I don't mean to quote you, so I'm going to

divine what I took from it, which was that it might be a bit of

a reach or perhaps imprudent to even address this issue on the

truncated posture of a preliminary injunction motion given the

limited record we have here.

    And while I very much look forward to discussing these

issues, I think that there is some merit to that and that

ultimately the right disposition of this motion is to resolve

it on other bases, not this one.

    That said, we are here to talk about fair use in the

training process in particular.  And in order to figure out

whether the use is fair, we need to first figure out what use

is actually at issue.  And here, the use that's at issue is

indeed making copies of texts here at the publisher's lyrics.

After all, you never get to the fair use question if there

hasn't been a prima facie act of infringement but why and for

1    what purpose -- and I will return to this purpose question in a

2    moment, which I think Your Honor is absolutely right to hone

3    in -- but the actual purpose of the copies that are made are to

4    do that as part of a technological process to study the

5    constitutive elements of the texts, the sentences that they

6    contain, in order to extract uncopyrightable facts about the

7    world, about how language works, and all of that in the service

8    of enabling a tool that allows for limitless new expression.

9        That is an absolutely quintessential fair use under the

10   copyright law.

11       **THE COURT:**  But this sort of goes back to the problem

12   of this technology and the fit with fair use.  I mean, to some

13   degree if you are saying, okay, we can take something apart so

14   that basically it is expressionless even though it is

15   expressive to begin with and then say then it is protected by

16   fair use, that is slightly troubling too.  No?

17       **MR. GASS:**  Well, let me answer that question directly.

18   I think that the best and most apposite precedent is the *Google*

19   *Books* decision in the Second Circuit.  And Your Honor will

20   recall that what was going on in that litigation is that Google

21   had the audacity to scan the books in, like, eleven university

22   libraries without getting anyone's permission.  They just went

23   and did it.

24       **THE COURT:**  Right.

25       **MR. GASS:**  A lot of projected expression in those

books.  And in the resulting decision by Judge Leval for the
Second Circuit, he concluded that that was permissible for a
wide range of reasons but chief among them is that their
purpose was a different one than the purpose for which the
books had been written.

Google was making those copies in the service of allowing
several different tools that couldn't otherwise previously
exist.  One of them that he focused on was the creation of a
functionality that allowed for what are called Ngrams, which is
to be able to track over time how frequently a word occurs.
Another one, of course, was the more commonly known purpose of
the tool, which is to provide snippet views.

And in that context the analysis that honestly pervades
all four of the factors in the court's opinion is the idea that
Google's use of the books is so fundamentally orthogonal to the
original purpose for which they were created, that its
transformative nature -- the transformative nature of the
product means that the first factor weighs against and so on
all down the line.

I want to briefly address a perplexing comment that
Mr. Oppenheim made, and I think I got the quote right.  He
said, "primary purpose is not part of the test."  Literally, it
is the words of the statute; 17 U.S.C. 107 require us to look
for the purpose and the character of the use.  That is, in
fact, the most important consideration.

And here, what is the purpose and character of the use?
Well, I think I want to put to one side the -- what I will
charitably call the minority use case.  You called it the
off-label use of having the tool generate outputs that are
substantially similar to the publisher's works in suit.

And let's just agree -- everyone in this case agrees that
at least in addition to that, maybe instead of that, is that
Claude is intended to be a generalist AI assistant.

You can use it as a biomedical research tool.  My wife
used it the other night to teach our ten-year-old what a bell
curve is.  And there is literally a limitless set of potential
use cases for this technology.

So, what do we do of the fact that in some instances, it
seems it can be used for these other purposes?  Well, at that
couple of important points on that.

First, the record evidence is absolutely unambiguous
that -- these are not the intended purposes of Claude.
Mr. Kaplan, the chief science officer of Anthropic, testifies
to that.  The Plaintiffs resisted the opportunity to
cross-examine here and probe the voracity of those contentions.
The evidence in this record consists essentially of Dr.
Kaplan's sworn declaration and then argument from counsel for
the other side.

But putting that to one side, what do the cases do with
circumstances where the technology is intended to do a thing

but sometimes it doesn't do it that way; and sometimes the way that it doesn't do it that well winds up to be either neutral or counterproductive to the primary intended purpose.

We have answers to those questions too.  In the *iParadigms* case in the Fourth Circuit, one of the primary arguments that the Plaintiffs made -- and, again, that was a case where the technology company was using reams and reams and reams of papers in order to detect plagiarism.  And the arguments that the Plaintiffs made, well, it is not a very good plagiarism detection tool; right.  It is allowing all kinds of things to get through that are clearly plagiarism.

So, that ineffectiveness suggests that that's not really your primary purpose at all.  The court rejected that contention.  The court was content to say it doesn't actually matter if it achieves its result a hundred percent of the time.  What we are looking for in the first factor is the purpose of the use, and it is clear that their purpose is the one that they are saying, not something else.

Maybe even more on point -- going back to the *Google Books* litigation -- there is a long discussion in this case of the fact that while Google has taken a lot of steps to make sure that the snippets that it shows people don't effectively substitute for the market for the Plaintiffs' works, in some instances that may not be the case; and in some instances it may, in fact, have that effect.  And the court expressly

1   concludes that doesn't matter.  It doesn't matter because their

2   primary purpose is something else.

3       On the topic of that case, before I move on, Mr. Oppenheim

4   suggested to you that the *Warhol* case was a sea change in

5   copyright law.  We don't need to answer that broader question.

6   I will tell you *Warhol* cites the *Google Books* decision

7   favorably four times.  So, clearly there was no intention to

8   overrule or even disagree with the reasoning in that case.

9       Before I move on to the next slide, one more point on this

10  idea of substitutionary effect and unintended consequences,

11  Mr. Oppenheim suggested that in no case has a court held that

12  it's fair use where the copying of the material didn't somehow

13  help the Plaintiff actually sell more copies.  I don't know if

14  you recall that comment.  He made it in the course of talking

15  about the *Google Books* decision, how there was some decision

16  that in some instances, you know, the revelation of these

17  snippets may, in fact, have the effect of boosting the sales

18  and he was saying that that was really important.

19          THE COURT:  Right, if it was for the benefit of the

20  Plaintiff --

21          MR. GASS:  Right --

22          THE COURT:  -- that each of those cases had a

23  benefit --

24          MR. GASS:  Right.  And then he somewhat --

25          THE COURT:  -- for the Plaintiff --

1          MR. GASS:  And then he somewhat -- so sorry to

2     interrupt, Your Honor.

3          THE COURT:  That's okay.

4          MR. GASS:  Then he somewhat baffling lumped *Sega*

5     *versus Accolade* into that collection of judicial decisions,

6     which are predicated on the idea that the defendant's use is

7     actually helping the Plaintiff somehow.  It was the exact

8     opposite in that case.

9          So, what was happening there is you had the company

10    Accolade wanted to make unauthorized video games for the Sega

11    Genesis platform.  And Sega Genesis really didn't want them to

12    mainly because Accolade was making a bunch of games like

13    football games but Sega also offered to the public.

14         So, the issue in the case was whether the unauthorized

15    copying was permissible by Accolade to engineer compatibility

16    with the Sega system even though Accolade's purpose was selling

17    a literally directly competing football game.

18         The example in the opinion is Sega has Joe Montana

19    football, Accolade has Mike Ditka football.  And the court

20    found that despite that direct competition that the copying was

21    fair use.

22         We have had a lot of discussion about the technology here.

23    I have talked about the transformative purpose.  I think that

24    the only thing that I want to be sure the Court appreciates

25    here is that there are innumerable uses of lyrics in particular

that are perfectly legitimate uses.  Why in the world would you
legitimately and for some non-offensive purpose want lyrics in
your training set?

Well, maybe you want to allow the tool to write a
criticism of the lyrics of "American Pie."  Claude, write me a
criticism of "American Pie" without reproducing any of the
copyrighted content they contain.  That would be a perfectly
legitimate thing to do.

Claude, write me a parody of "American Pie" that is no
less transformative than the parody of the song "Pretty Woman",
made without authorization that the U.S. Supreme Court decided
was likely a fair use in the *Campbell versus Acuff-Rose* case.
Of course, those are legitimate use cases for lyrics in
particular even beyond the vast other applications to which
those works could be put that are perfectly legitimate.

Instructing the model what cadences look like, how songs
are structured, none of these elements of song lyrics are
proprietary to the music publishers in this case.  These are
standard tropes of the genre.  And the way a model learns them
is by seeing instances of those types.

I touched on this briefly.  This is just an absolutely
essential point for the Court's consideration.  I don't know
that there really is a factual dispute about what the purpose
of Claude is and whether it is to be sort of the world's
largest thumb drive or not.  It would be crazy for that to be

the case, right, to imagine that this is some kind of elaborate
rouse where Anthropic, you know, even as it is building
guardrails and having its chief science officer testify that
this isn't really its goal but actually because a couple of
crowdworkers two years ago used lyrics to train a preference
model, that's Anthropic's real purpose, that would be crazy.
So, I don't think that there actually is a genuine dispute
here.  If there was, right, then you would need to balance the
evidence and consider the actual testimony of the people who
are doing this work.

     Now, I don't want to get bogged down in the question of:
Is it the subjective intent that matters or the objective
intent that matters or whatever it is.  I think any way you
slice it -- whether it is what Anthropic is saying, how people
are, in fact, using it, how the world understands this tool,
everyone other than the Plaintiffs, I think, appreciates
Anthropic's purpose for Claude is to do a vast number of things
that are not to allow people to access song lyrics in a way
they could do much more easily by going to Google.

     Moving on quickly here to the remaining fair use factors.
I'm going to use the second and third as efficiently as I can.

     The second factor has never moved the needle in
intermediate copying cases; that is, cases involving the back
end use of works as part of a technological process and visible
to the public.

1       And the third point that I will make is simply on the

2  fact -- three point, excuse me, that I will make is simply that

3  the way this factor works is that you assess the amount and

4  substantiality of the original work used, not as part of some

5  mathematical process where you say, well, if it was

6  three-quarters of the work or a hundred percent of the work,

7  then the factor weighs against fair use but instead by

8  reference to the purpose of the use.

9       So, if you look at the cases, you'll see the *Dorling*

10 *Kindersley* cases -- the one that's highlighted on the screen

11 here -- that's the coffee table book that used verbatim

12 replications of concert posters from the past.  And what the

13 court ruled in that case is that, well, yeah, they used a

14 hundred percent of the posters; but you sort of had to for the

15 use that you were doing.  So, this factor favors fair use.

16      Finally, on the fourth factor, the effect of the use upon

17 the potential market for value of the copyrighted work -- lots

18 to be said about this one.  We could do a whole hour on this

19 alone.  I will be as brief as I can.

20      When you read the cases assessing fourth factor market

21 harm, what you see essentially is an inquiry by courts into

22 whether the use at issue is properly within the province of the

23 rights owner to exploit; right.  That's fundamentally what it

24 is.

25      Is this kind of thing -- the type of thing that even

though it's not the main market for the work is some adjacent

one that, nevertheless, we think should be properly compensable

or is it instead the kind of thing that we are going to draw

the line and say, no, this is an adjacent ancillary use that's

sort of different from what the goals of copyright were

intended to allow for.

Courts often answer this question by reference to the

purpose of copyright, right, by saying:  Is the use in question

one that furthers copyrights goals or not?  And that is why --

that is the reason why the more transformative a use is, the

more likely it is that there is no cognizable fourth factor

harm; right.

And that's, I think, an intuitive point.  And we see it

throughout the cases.  Here are some quotes -- all of the

circuits recognize this principle in varying ways of

strength -- but the idea is that if the use is really

transformative, a court is either going to be less likely to

find market harm or more likely to find that the goals of

copyright are simply not served by finding that any conceivable

loss in sales can account in the analysis.

And that's exactly the case here as it was in the *Google

Books* decision where, again, they audaciously were copying

millions and millions of books.

The use of texts to break it down into tokens and analyze

the statistical correlations between the constitutive elements

1    of those tokens in the service of creating an infinitively

2    extensible and adaptable tool that can answer literally any

3    question that anybody asks is the very essence of a

4    transformative use that thus strongly militates in favor of the

5    fourth factor not counting against the Defendant's here.

6         Mr. Oppenheim raised a point that I have never considered

7    before -- it certainly wasn't in their brief -- which is that

8    because the copyright -- excuse me -- because the outputs of

9    generative AI tools have been ruled not to be copyrightable,

10   those outputs aren't part of the value of copyright that is

11   sort of the driving purpose of this frame of legal regulation.

12   Do you recall that point he made?

13        THE COURT:  Right, dealing with the -- given with that

14   piece of art and the finding of --

15        MR. GASS:  Yeah, the *Thaler* --

16        THE COURT:  -- the AI --

17        MR. GASS:  -- *versus Pearlmutter* case, exactly, which

18   was just argued in the D.C. circuit last week I believe.  It is

19   an interesting suggestion.  The suggestion that the output of a

20   technological process isn't valued by copyright law or doesn't

21   count in the fair use analysis if it is not copyrightable

22   creativity is flat wrong.  I can point to a couple cases for

23   that.  Certainly, the *Google Ngrams* decision is absolutely

24   chief among them.  There, the court ascribes significant

25   value -- this is the *Google Books* case, excuse me.

 1          THE COURT:  Okay, I was like, do I --

 2          MR. GASS:  You got it -- significant value to the fact

 3     that one of the things you can do with this tool that didn't

 4     previously exist is this factual analysis of, like, how

 5     frequently words occur over time.  There is nothing

 6     copyrightable about that.  Nevertheless, it weighed heavily in

 7     favor of fair use.  Exact same thing in the *iParadigms* case.

 8     There, the point of the tool is to figure out what is

 9     plagiarism and what isn't.  There is nothing copyrightable

10     there.  Nevertheless, the purpose is transformative in a way

11     that matters throughout all four factors.  That is the

12     principle that should carry the day here.

13          It also bears mention that the transformative purpose that

14     Anthropic has using these multitrillion token datasets to

15     derive a working model of how language works and what facts in

16     the world consist of, that purpose could not be achieved via

17     licensing in general.  And, in fact, the parties are actually,

18     like, in violent agreement about this point.

19          Dr. Peterson for Anthropic notes that just -- you could

20     never do enough deals with enough rights owners to license that

21     number of tokens.  And even Mr. Newton-Rex for the Plaintiffs

22     acknowledges that LLMs trained only on licensed and public

23     domain public data will not match the performance of today's

24     cutting edge LLMs.  You couldn't do it.

25          And I'm not saying this because there is some kind of too

1    big to fail principle in copyright law.  I'm saying this

2    because another thing that matters in the fourth fair use

3    factor is that market failure counts; right.  If it turns out

4    that the market actually never could in an arm's length

5    transaction way facilitate the number of agreements that would

6    be necessary for the transformative use, then the court doesn't

7    say, well, then the transformative use can't exist.

8        To the contrary, it says, the values underlying the

9    copyright principle that get us to transformative use in the

10   first place are the ones that trump.  We are going to say the

11   fourth factor isn't going to count against in that

12   circumstances.  I see a quizzical look, which makes me very --

13       **THE COURT:**  It makes it seem slightly contradictory to

14   the argument in terms of irreparable harm, right, that it is

15   compensable; that it is --

16       **MR. GASS:**  Let me be crystal clear.  The suggestion

17   that the uses are compensable, that is principally about the

18   outputs, right, and so on.  That said, it is also the case that

19   in the event, as Mr. Wetzel pointed out, statutory damages are

20   sort of the copyright law's solution to this problem.  And so,

21   you know, in a world where the court concluded that this was

22   not fair use, the reason we have statutory damages is to say

23   even if you -- you can't calculate precisely what the license

24   fee was, you still get made whole.

25       This is a different point.  This is the point that the

fourth fair use factor looks among other things to the question
whether the use at issue here using billions of texts yielding
trillions of tokens ever could be achieved by going by one by
one to private parties and saying, "Here is the deal I would
like to do with you.  Here is the deal I would like to do with
you."

     And there is no dispute between the parties on this motion
but that would be literally impossible.  So, the transformative
purpose that Anthropic has would be thwarted.

          THE COURT:  Okay.

     MR. GASS:  Finally, I just want to very briefly touch
on the illusion in the record to various third-party agreements
that supposedly constitute licenses for training data.

     There is no actual evidence of these agreements in the
record.  They are alluded to at various points.  There is an
illusion to one by another AI company.  It is not in the
record.  There are many, many, many, many forms of commercial
agreement that technology companies in general and AI companies
in particular may enter with content suppliers or other folks
who control training data that are not copyright licenses, and
there's absolutely no evidence in the record that any of the
deals pointed to are licenses for training data as opposed to
something else.

          THE COURT:  Okay.  So, Counsel, we are basically at
the -- including giving the Plaintiffs a five-minute rebuttal,

 1   we are basically at that time, so --

 2        **MR. GASS:**  Well, that's perfect because I will wrap it

 3   up.  I will wrap it up by just quoting a line from the *Sega*

 4   *versus Accolade* opinion to you, which I think is deeply

 5   apposite here.  Again, this case was about the back end copying

 6   of a copyrighted work in the service of creating new games that

 7   the plaintiff desperately did not want to exist, and the court

 8   says:  It is precisely this growth in creative expression based

 9   on the dissemination of other creative works; that is, the

10   copyrighted works in suit, and the unprotected ideas contained

11   in those works that the Copyright Act was intended to promote.

12   That is 977 F.2d at 1523.  That is exactly what is going on

13   with this case, and that's why the use at issue is the

14   paradigmatic fair one.

15                  (Pause in proceedings.)

16        **THE COURT:**  Thank you.  Mr. Oppenheim or --

17        **MR. WETZEL:**  Your Honor, I just had two minutes to

18   close out --

19        **THE COURT:**  Okay, you are giving Mr. Oppenheim seven

20   minutes then versus the five.  You can take your two minutes,

21   but I am going to give the court staff a break, Mr. Oppenheim,

22   before you go.  So, and with that, it's going to be seven

23   minutes total.  We have got to wrap it up.

24        **MR. WETZEL:**  I will go quickly.  Mr. Shmoeller, could

25   we -- first of all, I just want to direct Your Honor on the

balance of equities and whatnot too, we have confidential slide

68 and 69, so we won't put them up here.  They are in the

materials that Your Honor has that deals with the testimony of

Jared Kaplan in his declaration at paragraph 63 and 65, which

speak to some of the difficulties that would ensue if

Your Honor were to order the injunction that Plaintiffs are

seeking here.  So, I think that testimony is illuminating.  We

spoke about that earlier though.

**THE COURT:**  Slide 68 and 69?

**MR. WETZEL:**  Slide 68 and 69.

**THE COURT:**  Thank you.

**MR. WETZEL:**  Yeah, Jared Kaplan declaration.

Finally on the issue of the status quo here, Mr. Oppenheim

said that this injunction needs to issue to preserve the status

quo, but I think the injunction they are proposing would

disrupt rather than preserve the status quo here in a way

that's harmful to Anthropic and the public.

So, if we can go to slide 71, the status quo here is that

there are plenty of cases challenging the use of copyrighted

works to train AI.  There are 37 of them as we count.  We

haven't seen a single preliminary injunction issue in those

cases nor have we seen sought anywhere else including in two

cases brought by the parent company of Universal Music

Publishing.  And I will add, Getty is one of the Plaintiffs

here.  I don't know what case Mr. Oppenheim was referring to

because there has been no finding on the merits on that *Getty*

case in the U.S.  *Getty* hasn't sought a preliminary injunction.

Just to tie it to some of the arguments that Mr. Oppenheim is

making.

    And the last point that I want to make here, which is the

fourth kind of grounds for denial here, is on slide 75 the

disputed facts -- oh, maybe I have the wrong here -- sorry, the

disputed facts in their incomplete record prevent the

Plaintiffs from meeting their burden here, and that's because

Your Honor pointed out at the last conference when we sought an

evidentiary hearing, that that would kind of resemble a trial

just given the number of witnesses and the scope of the record

here.

    The cases that -- one of the cases, at least, that

Plaintiffs cited to you in service of that objection by them to

an evidentiary hearing stands for the proposition that if there

are material disputed facts in the record, if there are novel

questions here, that's a reason alone to deny the injunction.

    We think the record is one sided on the matters that

Mr. Gass testified to.  We don't think there are material

disputed facts that would allow you to find fair use or a lack

of irreparable harm.  If you found that there was evidence on

both sides of the ledger, that would be another reason to allow

the case to proceed through discovery, get to summary judgment

and ultimately a trial on the merits if necessary.

1          **THE COURT:**  Thank you.

2          **MR. WETZEL:**  Thank you, Your Honor.

3          **THE COURT:**  All right.  Mr. Oppenheim, I'm keeping you

4    to seven minutes, but we are going to take a break first.  So,

5    the court staff needs a break, so we are going to take a

6    stretch break sometime between five or ten minutes because I

7    would like to get out shortly after 5:15.

8         Just so everyone knows what we are expecting to do, we are

9    going to come back -- let's keep it at about five-minute break,

10   stretch break; run to the restroom.  Do what you need to do.  I

11   realize it might be a little bit longer.  After that, we will

12   hear, Mr. Oppenheim, from you briefly.  I'm hoping it is closer

13   to five minutes versus seven minutes.

14        Then after that, I just want to touch briefly upon setting

15   a time to discuss the sealing motion -- housekeeping.  It is

16   going to be housekeeping.  So, we will do that.  We will do the

17   objections, and then I'm going to send you all home to enjoy

18   your Thanksgiving.  All right.  So, we are in recess for the

19   next five plus minutes, however much time you need.

20         **THE CLERK:**  All rise.

21              (Recess taken at 5:00 p.m.)

22            (Proceedings resumed at 5:10 p.m.)

23         **THE COURT:**  All right.  Mr. Oppenheim.

24         **MR. OPPENHEIM:**  I will endeavor to be brief,

25   Your Honor.  First, let me address fair use.  What's been lost

here is a real discussion of fair use in the context of what
the evidence shows.

So, what I said -- what I struggled with was when I was
asked the question about the primary purpose for the intent.
There is no doubt that the purpose is relevant, but what the
Defendants want to do is elevate that to be a test of primary
purpose or intent.  And that's not what the test is.

The test is -- the question is what is the purpose, and
the purpose is not defined by what Counsel argues Claude could
do, not defined by what the chief science officer says Claude
could do.  The purpose can be determined based off of the
record of what it has done.

And what's been lost in the argument and what Defendants
refuse to acknowledge is that Claude has been used -- can be
used, has been used to distribute verbatim and near verbatim
copies of lyrics, over and over and over again.

And so, that the idea that Claude could be used to create
criticism is interesting.  There is no evidence of that in the
record unlike the evidence of infringement.

So, that's the key purpose there.  And when you think
about the case law on that first -- on that first factor and
you talk about *Google Books*, you have to recognize what *Google
Books* says about using more than a snippet.

Judge Leval says in the opinion (as read:) "Without doubt
enabling searchers to see portions of the copied text could

have determinative effect on fair use analysis.  The larger the

quantity of the copyrighted text the searcher can see and the

more control the searcher can exercise over what part of the

text she sees, the greater the likelihood that those

revelations can serve her as an effective free substitute for

the purchase of the Plaintiffs' book."  *Google* weighs in

Plaintiffs' favor here.

     And what *Warhol* tells us is that you have to weigh the

transformativeness with commerciality, which *Warhol* said had

been lost in some recent case law.  And here, the use is

undoubtedly commercial.

     Now, in considering the fair use defense, it must be

considered in -- here in what Plaintiffs are seeking to stop

and that's not other expression.  We are only seeking to enjoin

the infringement of our works, nothing more.

     Let me turn to market harm.  The question is:  Is the use

displacing legitimate use?  Well, we see -- we saw the slide of

a Google search versus a Claude search.  That is exact

displacement.

     And I believe that if the Court looks at the *VidAngel*

decision, it is sufficient to show that the Defendant's action

undermined a negotiating position.  And I believe that supports

us, Your Honor.

     The argument that Mr. Gass made that no AI company could

possibly license everything, and he says that we don't -- that

1   there is no dispute between the parties on that and even our

2   expert agrees to that and he cites to our expert Ed Newton Rex,

3   he took liberties with that, Your Honor.

4       If you read the entirety of Mr. Rex's opinion, he goes on

5   to say essentially -- and these are my words, not his -- that

6   essentially if you don't have to follow the laws at all, you

7   can do more.  He doesn't say that you can't be in an AI company

8   and develop an LLM if you license.

9       And there is evidence in the record of licenses being done

10  by Open AI for training data.  We don't have those licenses in

11  front of you.  We have the articles saying that they have

12  occurred without dispute from Open AI.  The fact that Anthropic

13  doesn't want to enter into licenses doesn't mean that they can

14  say that it can't be done.

15      Ultimately that slippery slope argument he makes that says

16  can't do it because we would have to do it with everybody,

17  that's not what is before the Court.

18      Courts are regularly admonished to consider only the case

19  that is in front of them, and that's particularly true here at

20  the preliminary injunction stage when we are seeking very

21  narrow relief.

22      Last issue on fair use before I leave it, I never

23  suggested that there was any kind of decision in the *Getty*

24  case.  If you read the complaint and the evidence there, it

25  will show what I described earlier in terms of the photos

1    containing the watermarks.

2          **THE COURT:**  Okay.

3          **MR. OPPENHEIM:**  Let me turn to, very quickly,

4    volitional use before I speak to irreparable harm.  Volitional

5    use, the argument on volitional use is that no output exists

6    without a user's trigger.  The same is true for a jukebox.

7          If a jukebox is in a diner and it contains tons of

8    infringing recordings in it but it doesn't output them until a

9    user puts a quarter in and pushes the button asking for that

10   particular recording, you can argue that the jukebox company

11   there is no volitional use even though they completely loaded

12   it with infringing recordings.  That argument doesn't hold

13   water, and -- and the *Redbubble* case, Redbubble didn't upload

14   themselves the infringing works.  Let me turn to irreparable

15   harm and then I will be done, Your Honor.

16         Your Honor, we are seeking a very narrow injunction here

17   intentionally, and we are seeking that injunction to best as we

18   can save our licensing market going forward.  The *VidAngel*

19   decision, which, again, I think I will recommend to Your Honor,

20   supports our showing that we don't need to show actual harm.

21   We need to show the prospective possibility of harm.

22         And I will -- last but not least, I want to speak to the

23   voluntary cessation issue, Your Honor.  The case law is clear;

24   that the fact that a Defendant may have taken action after

25   infringement was identified to them after a PI motion was filed

1    doesn't somehow obviate the need for an injunction.

2        The Defendant's Counsel are very capable and very

3    convincing in telling you that they don't intend to allow

4    Anthropic to infringe again, but Anthropic did not put up

5    guardrails that changed usage until a PI motion was filed.  And

6    they have fought us in the meet-and-confer process and have

7    refused to stipulate on an injunction on that.

8        **THE COURT:**  I think the record shows they are making

9    efforts, and I will do, which we will talk about next, to see

10   whether or not there can be agreement and if there is anything

11   the Court can do, but --

12       **MR. OPPENHEIM:**  Your Honor, and they have made efforts

13   but we haven't reached agreement.  And without reaching an

14   agreement, Your Honor, they could withdraw the guardrails or

15   change them.

16       **THE COURT:**  Submitted.

17       **MR. OPPENHEIM:**  Thank you, Your Honor.

18       **THE COURT:**  All right.  All right.  Let's do a little

19   bit of housekeeping as I described it.  An objection was raised

20   during the hearing regarding slides -- well, parties, pursuant

21   to the Court's standing order, slides were submitted --

22   demonstrative slides, the ones we were looking at today, were

23   submitted to the Court over the weekend.  Anthropic submitted

24   an objection particularly as to slide 7 through 9 of the

25   demonstrative.

1    So, the Court is inclined to sustain those objections to

2    slide 7 and 9.  The record was closed at the Plaintiffs' behest

3    and out of the Court's concern that we were going to have a

4    mini trial.

5    So, this preliminary injunction motion has had two

6    briefings, both in Nashville and now here.  The first

7    declaration -- the first set of declarations submitted with

8    Plaintiffs with their moving papers even responded back to the

9    Nashville papers.  There have been more than enough

10   opportunities to respond to respond to respond.  Everything has

11   been re-filed.  There was a surresponse which was filed and

12   there was open discussion about whether or not to have --

13   whether or not to have an evidentiary hearing with live

14   testimony.

15   At this point, as I said during the status conference, the

16   record is indeed closed.  In addition, any evidence --

17   demonstratives aren't evidence; right.  So, those slides

18   themselves did not -- were not proffered appropriately to the

19   Court.  They are demonstratives.  So, there is no evidence

20   which form the basis of those, and so the Court is inclined to

21   sustain the objections as to those three slides, 7 through 9,

22   and strike those from the record -- well, they are not even

23   really in the record because they are demonstratives, but I

24   think Counsel understands where I'm headed with that.

25   Mr. Oppenheim, did you want to speak very briefly about this?

1          **MR. OPPENHEIM:**  I'm sorry, Your Honor, I would -- A,

2     we didn't show them, so they are not on the record --

3          **OFFICIAL COURT REPORTER:**  I'm sorry, Counsel.  I

4     cannot hear you.

5          **THE COURT:**  Can both lead Counsel come back up because

6     some of the housekeeping such as motion to dismiss and the

7     sealing motion, we should talk about briefly.

8          **MR. OPPENHEIM:**  My only point, A, we didn't show the

9     slides at the Court's directions.  B, they were in response to

10    Anthropic's continued assertion about the efficacy of the

11    guardrails.  So, they were just rebuttal evidence but we

12    understand Your Honor's ruling.

13         **THE COURT:**  Okay.  So, just so the record is clear --

14    well, I think the record is clear but the Court sustained

15    objections stated in Defendant Anthropic's PBC's local

16    Rule 7-3(d) objection to reply evidence.

17       Okay.  So, sealing, can I speak about that?

18         **MR. WETZEL:**  Yes, Your Honor.

19         **THE COURT:**  Or is there something else we need to

20    discuss?

21         **MR. OPPENHEIM:**  No.  That's fine.  May I allow my

22    colleague Mr. Hailey to speak to that?

23         **THE COURT:**  Come on up.  So, with sealing I'm actually

24    going to put this off a little bit, but my major point is I

25    think there is still some -- there is still a little bit of

1    inconsistency with the sealing.  I think we can resolve it with

2    a closed session on Zoom probably pretty easily.

3        My concerns are things such as, like, the specific number

4    of tokens that are sometimes generalized in terms of

5    discussion, which are unsealed in certain parts such as the --

6    in certain places in the record versus I understand the need to

7    or want to seal a specific number.  So, there's just little

8    bits which are inconsistent.  So, I would kind of like to

9    discuss it through with Counsel and then for us just to make

10   some decisions about that and then have Counsel re-file.

11       **MR. WETZEL:**  Understood.  That makes sense.

12       **THE COURT:**  Okay.  So, we will set a time for that.

13   We are obviously not to the motion to dismiss.

14       **MR. WETZEL:**  Yes.

15       **THE COURT:**  Despite it being fully prepared and for

16   the Court to be ready to proceed, so we are going to look at

17   another date.  I'm going to have Ms. Thompson get in touch with

18   you all about possible dates rounding that.

19       **MR. WETZEL:**  Thank you, Your Honor.

20       **THE COURT:**  And is there anything else housekeeping?

21   I see Mr. Oppenheim shaking his head know.

22       **MR. HAILEY:**  Nothing on Plaintiffs' side, Your Honor.

23       **MR. WETZEL:**  Nothing for Anthropic.

24       **THE COURT:**  All right.  Okay.  Well, I wish you all a

25   very happy Thanksgiving.  The Court is taking the motion for

1   preliminary injunction under submission and we are now

2   adjourned.

3          **MR. WETZEL:**  Thank you, Your Honor.

4          **THE COURT:**  Thank you.

5              (Proceedings adjourned at 5:23 p.m.)

6                      ---oOo---

1

2

3                    <u>**CERTIFICATE OF REPORTER**</u>

4              I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:    December 1, 2024

8

9

10

11     _____

12          Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
            United States District Court - Official Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25