1  LATHAM & WATKINS LLP
     Joseph R. Wetzel (SBN 238008)
2       *joe.wetzel@lw.com*
     Andrew M. Gass (SBN 259694)
3     *andrew.gass@lw.com*
     Brittany N. Lovejoy (SBN 286813)
4     *brittany.lovejoy@lw.com*
5  505 Montgomery Street, Suite 2000
   San Francisco, California  94111
6  Telephone:  415.391.0600

7
     Sarang V. Damle (admitted *pro hac vice*)
8     *sy.damle@lw.com*
   555 Eleventh Street NW, Suite 1000
9  Washington, D.C. 20004

10
     Allison L. Stillman (admitted *pro hac vice*)
11    *alli.stillman@lw.com*
   1271 Avenue of the Americas
12 New York, New York 10020
   Telephone: 212.906.1747
13

14 *Attorneys for Defendant Anthropic PBC*

15                 **UNITED STATES DISTRICT COURT**
16             **NORTHERN DISTRICT OF CALIFORNIA**
                     **SAN JOSE DIVISION**
17

18 CONCORD MUSIC GROUP, INC., ET AL.,       Case No. 5:24-cv-03811-EKL

19        *Plaintiffs*,                      **DECLARATION OF DAWN R. HALL
                                            IN SUPPORT OF DEFENDANT'S
20 v.                                        OPPOSITION TO PLAINTIFFS'
                                            RENEWED MOTION FOR
21 ANTHROPIC PBC,                           PRELIMINARY INJUNCTION**

22        *Defendant*.                       Hon. Eumi K. Lee

23

24

25                    **REDACTED VERSION**
       ***[Refiled Pursuant to Order at Dkt. 282; Originally filed on August 22, 2024 at Dkt. 211]***
26

27

28

1.     I submit this declaration in connection with Plaintiffs' Renewed Motion for a Preliminary Injunction ("Renewed PI Motion") filed by Plaintiffs Concord Music Group, Inc.; Capitol CMG, Inc.; Universal Music Corp.; Songs of Universal, Inc.; Universal Music – MGB NA LLC; Polygram Publishing, Inc.; Universal Music – Z Tunes LLC; and ABKCO Music, Inc. (collectively, "Publishers" or "Plaintiffs") in their lawsuit against Defendant Anthropic PBC ("Anthropic").[1]

2.     My declaration set forth below is based on my professional skills, educational background, knowledge, experience, and training as applied to the facts and circumstances of this case.  If called upon, I am prepared to testify as to the matters contained herein.

## I.    SCOPE OF ASSIGNMENT

3.     I have been retained by Latham & Watkins LLP ("Counsel") on behalf of Anthropic to serve as a damages expert to opine on Plaintiffs' contentions related to irreparable harm and application for a Preliminary Injunction ("PI").  I understand Plaintiffs allege that, in building and operating Anthropic's artificial intelligence ("AI") model known as Claude, Anthropic trains Claude utilizing copyrighted works owned or controlled by Plaintiffs ("Works" or "Works-in-suit").  I also understand Plaintiffs allege Claude had generated text output containing copyrighted Works owned or controlled by Plaintiffs.  I understand Plaintiffs allege each of these uses is a distinct copyright violation and that Plaintiffs are seeking a PI against Anthropic for both its alleged internal use of the Works when training Claude, as well as Claude's external outputs.[2]

4.     On January 16, 2024, I submitted a declaration ("Hall Initial Declaration") in support of Anthropic's opposition to Plaintiffs' original motion for preliminary injunction ("Plaintiffs' Original PI Motion").  I have been asked by counsel to update the Hall Initial Declaration in light of Plaintiffs' Renewed PI Motion dated August 1, 2024.  In the Renewed PI Motion, Plaintiffs "request that the Court order Anthropic to (1) maintain guardrails to prevent its AI models from generating output that contains, in full or in part, the lyrics to compositions

---

[1] *See* Renewed PI Motion, ECF No. 179.
[2] Renewed PI Motion at 14.

1  owned or controlled by Publishers, and (2) refrain from using unauthorized copies of such lyrics

2  to train future AI models."[3]

3      5.      In addition to my skills, knowledge, experience, education, and training in

4  economics and intellectual property matters, my opinions are based on information gathered and

5  provided to me as of the date of this declaration.  In forming my opinions, I have reviewed

6  Plaintiffs' Renewed PI Motion and Plaintiffs' Original PI Motion (including declarations), the

7  Declarations of Jared Kaplan and Steven Peterson being submitted in support of Anthropic's

8  Opposition to Plaintiffs' Renewed PI Motion, Anthropic's Public Comments to the U.S.

9  Copyright Office's Notice of Inquiry Regarding Artificial Intelligence and Copyright, license

10 agreements and other documents produced by Plaintiffs, relevant case law, and publicly available

11 information.

12 **II.    PROFESSIONAL BACKGROUND**

13     6.      I am a Senior Managing Director in the Forensic and Litigation Consulting

14 practice of FTI Consulting, Inc. ("FTI").  I hold a Bachelor of Science degree in Business

15 Administration (Finance) from the University of Notre Dame.  For more than 27 years, I have

16 advised both corporations and attorneys on a variety of matters with respect to economic,

17 accounting, and financial issues relating to, among other areas, damages in commercial litigation

18 and intellectual property matters.  Prior to its acquisition by FTI in 2003, I was a Manager in

19 KPMG's Forensic Services practice.

20     7.      I have directed numerous commercial litigation engagements involving claims of

21 patent, trademark, and copyright infringement; false advertising; breach of contract; theft of trade

22 secrets; unfair competition; antitrust; business interruption; tortious interference; and business

23 valuation matters.  I have conducted complex studies related thereto, including market definition

24 and competitive analyses; calculation of damages; evaluation of lost profits and reasonable

25 royalty measures of damages; analysis of lost sales, incremental profits, manufacturing, and

26 marketing capacities; past and future price erosion; unjust enrichment; and interest.  I have

27 testified in matters relating to these studies.  I have co-authored two chapters regarding

28

---

[3] Renewed PI Motion at 2.

1   reasonable royalty damages and lost profits, as well as a chapter regarding calculating profits in

2   trademark, copyright, and design patent cases.  I have authored other publications, which I have

3   listed in my curriculum vitae, attached as **Exhibit A** to this declaration.  My curriculum vitae

4   further describes my professional credentials.

5   **III.    OVERVIEW OF IRREPARABLE HARM**

6           8.      I understand that irreparable harm occurs when a party has no adequate remedy at

7   law, typically because its injuries cannot be fully compensated through a monetary award.[4]  I

8   further understand that a showing of irreparable harm that would occur between the time of the

9   motion and a final judgment on the merits is required where a plaintiff seeks a preliminary

10  injunction.[5]  Lost customer goodwill, damages to reputation, interference with customer

11  relationships, and loss of fair competition may, in some circumstances, constitute irreparable

12  harm.[6]  However, a party seeking injunctive relief must show more than a speculative risk of

13  harm.[7]  It must demonstrate with evidence that it will suffer "immediate threatened injury" in the

14  absence of injunctive relief.[8]

15          9.      For purposes of this declaration only, I have been asked to assume Plaintiffs can

16  establish a likelihood of success on the merits and other factors supporting injunctive relief.  This

17  declaration thus focuses exclusively on the issue of whether any harm suffered by Plaintiffs

18  between now and a final adjudication on the merits would be irreparable.  Specifically, I evaluate

19  the ability to compensate Plaintiffs with monetary relief for the infringements alleged in their

20  Complaint and offer my observations below to assist the Court or fact finder in considering that

21  question.  I have also been asked to evaluate Plaintiffs' claims of price erosion, degradation of

---

[4] *See Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 471 (9th Cir. 1984); *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

[5] *See Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 998 (9th Cir. 2011); *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011).

[6] *See adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 756 (9th Cir. 2018) (explaining that evidence of damage to one's reputation and goodwill may constitute irreparable harm in some circumstances "so long as there is concrete evidence in the record of those things").

[7] *See In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007) ("Speculative injury cannot be the basis for a finding of irreparable harm.").

[8] *Int'l Medcom v. S.E. Int'l, Inc.*, 2015 WL 7753267, at *5 (N.D. Cal. Dec. 2, 2015) (quoting *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988)).

the licensing market for the Works, and reputational harm related to alleged infringements, including publisher and songwriter credit and goodwill.

10.    Based on my experience, I understand that a finding of irreparable injury and/or injunction may be favored when reliable principles and methods are applied to sufficient facts or data showing a likelihood of concrete and proximate harms, such as: irreversible loss of market share; price erosion; loss of goodwill or intangible assets that cannot be readily compensated by monetary damages; and where there is difficulty in calculating damages, among other factors. I also understand that there must be a causal nexus between the defendant's wrongful conduct and the injury, and the injury must be actual and imminent. Speculative harm or the mere possibility of harm is insufficient to obtain injunctive relief.

11.    I also understand that in copyright cases, the availability of statutory damages, in part, accounts for any difficulties in calculating precise damages associated with infringing conduct. Plaintiffs' Complaint includes a claim that they "are entitled to statutory damages."[9]

12.    Under Plaintiffs' contention of irreparable harm, Plaintiffs claim the harm they would suffer in the absence of an injunction between now and a final judgment transcends the limits of monetary compensation, including deprivation of Publishers' and songwriters' control over the Works,[10] denial of Publishers' and songwriters' credit and goodwill,[11] harm to Publishers' and songwriters' reputations,[12] erosion of the value of and licensing market for the Works,[13] damage to Publishers' position to negotiate a future license,[14] and harm to Publishers' relationships with songwriters.[15]

## IV.    SUMMARY OF OPINIONS

13.    Notwithstanding Anthropic's position on the merits, assuming Anthropic is found at the end of this lawsuit to have infringed Plaintiffs' copyrights for any unintentional output of the Works from Claude or training of Claude using copyrighted Works, I have not seen sufficient

---

[9] *See* Complaint, ECF. No. 1, ¶ 117.
[10] Renewed PI Motion at 23–24.
[11] Renewed PI Motion at 24–25.
[12] Renewed PI Motion at 25.
[13] Renewed PI Motion at 26–27.
[14] Renewed PI Motion at 27–28.
[15] Renewed PI Motion at 28.

1   evidence that any of the allegations of harm made by Plaintiffs are irreparable.  In fact, I

2   understand Plaintiffs waited at least four months before notifying Anthropic by filing suit, five

3   months before filing their original motion, and over a year before renewing their motion in this

4   venue.  If Plaintiffs believed they were experiencing irreparable harm, they have provided no

5   explanation for their filings delays.  Further, the assertions made by Plaintiffs in the Renewed PI

6   Motion, in the supporting declarations to the Renewed PI Motion, and in the document

7   productions to date all point to the reparable nature of any alleged harm claimed by Plaintiffs.

   ### A.   Plaintiffs' Allegations of Harm Regarding Output Are Unsupported and Reparable

8

9   14.   Plaintiffs generally claim that the unintentional output of lyrics of the Works via

10  Claude (1) harm the market for and value of the Works, including current and future licensing

11  opportunities and (2) adversely affect Publishers' and songwriters' control, credit, goodwill, and

12  reputation as relating to the Works, including potential loss of customers.[16]  Based on my review

13  of the information and documents Plaintiffs have provided to date, I have the following opinions:

14

15  •   Plaintiffs thus far have not provided any evidence, support, documents, or data
    demonstrating they have been harmed or are likely to be harmed as a result of

16  Anthropic's alleged unlawful actions in the absence of preliminary injunctive

17  relief.[17]

18
    •   Plaintiffs' statements regarding the irreparable nature of any hypothetical alleged
19  harm caused by Anthropic's actions are contradicted by declarations submitted by

20  Publishers.  These declarations support the conclusion that any alleged harm

21  could be reparable in the form of money compensation through a licensing

22

23  [16] Renewed PI Motion at 23-28.

24  [17] I understand from counsel that targeted requests were made to Plaintiffs seeking further
    information regarding their claims of irreparable harm; however, in the seven months since
25  submitting my initial declaration, no documents substantiating these claims have been produced
    or cited by Plaintiffs in their Renewed PI Motion papers.  *See, e.g.,* Defendant Anthropic PBC's
    First Set of Requests for the Production of Documents and Things to Plaintiffs (Nos. 1-22)
26  served on December 4, 2023; Plaintiffs' Objections and Responses to Defendant's First Request
    for Production of Documents and Things (Nos. 1-22) served on December 26, 2023; Defendant
27  Anthropic PBC's Second Set of Requests for the Production of Documents and Things to
    Plaintiffs (Nos. 23-99) served on March 22, 2024; Plaintiffs' Objections and Responses to
28  Defendant's Second Set of Requests for Production of Documents and Things (Nos. 23-99)
    served on April 22, 2024.

1    agreement.  Plaintiffs routinely enter into license agreements for rights to the

2    Works and recognize that compensation for use of their Works can be quantified.

3    Publishers' statements imply that any harm suffered due to nonpayment for any

4    unintentional output of the Works can be easily rectified by means of monetary

5    compensation at the end of the lawsuit.

6    •    In addition, Plaintiffs produced many of these license agreements, reinforcing

7    their propensity and willingness to license.  The sheer number of agreements

8    produced by Publishers in the early stages of this action supports the conclusion

9    that there is a lack of irreparable harm.

10    •    There are a number of public sources that serve as a more direct source for users

11    to obtain lyrics for free, such as Genius.com ("Genius"), LyricFind.com

12    ("LyricFind"), Musixmatch.com ("Musixmatch"), Lyrics.com, and AZLyrics.com

13    ("AZLyrics").  All these lyric aggregators and websites explicitly reference the

14    licenses that they have entered into with Publishers.  The existence of these public

15    and free sources of lyrics further contradicts Plaintiffs' allegations of a degraded

16    licensing market for the Works.

17    •    Claude is neither designed to be nor is it a good substitute for the lyric

18    aggregators and websites that display lyrics.  In addition, I understand

19    Anthropic's imposition of additional guardrails make this even less so—so much

20    so that Plaintiffs have modified the relief they are seeking on this front to ask that

21    Anthropic be required to *keep* those guardrails in place.[18]

22    15.    To the extent that Anthropic, during the pendency of the suit and with or without

23    the additional instituted guardrails, allegedly generates text containing copyrighted lyrics from

24    works owned or controlled by Publishers, it is my opinion that Anthropic's alleged use of

25    Plaintiffs' Works-in-suit has not caused irreparable harm to Plaintiffs and will not cause

26    irreparable harm between now and a final judgment in the absence of injunctive relief.  Any

27

28

---

[18] Renewed PI Motion at 2 and 29.

alleged harm caused by Anthropic's actions prior to and during the lawsuit is reparable because it is compensable by monetary damages.

16.    Any harm to Plaintiffs between now and final judgment will be defined as it would in any license by the established scope of use during the finite term of the litigation. Licenses often include the calculation of damages for any past infringing uses and a royalty for any future use.  I understand that in similar cases, courts routinely find that plaintiffs, including music publisher copyright holders, can be made whole through monetary damages, denying even a permanent injunction on the grounds that monetary relief could compensate for any future infringement and thus cannot establish the likelihood of irreparable harm.[19]

17.    With respect to Plaintiffs' allegations concerning the outputs specifically, damages can be quantified by reviewing factors commonly assessed by experts in determining damages adequate to compensate an intellectual property holder in intellectual property infringement disputes.  Based on my experience in the determination of damages in other intellectual property matters, a proper analysis would take into account licensing considerations, including comparable agreements, exclusivity of rights, availability of alternatives, benefits of the intellectual property including risks involved, contributions to profit, market demand, innovation, loss of control, goodwill, business reputation, brand equity, business opportunities, and relationships, among other things.[20]  It is typical to utilize existing license agreements as a "starting point or an aid" in calculating a license fee or monetary damages.[21]  Should it be necessary, I could analyze the licenses and any corresponding royalty and usage data as benchmarks to inform a reasonable royalty opinion.

---

[19] *E.g., ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 322 (2d Cir. 2022) (affirming denial of a permanent injunction and finding that music publishers could be "made whole with cash," thereby rejecting publishers' assertions that "damages [were] impossible to quantify" because the infringing conduct "threaten[ed] their relationships with existing licensees, and undermine[d] their negotiating leverage with prospective licensees"); *Fox Broadcasting Co., Inc. v. Dish Network L.L.C.*, 747 F.3d 1060, 1073 (9th Cir. 2014) (affirming denial of a preliminary injunction and finding that "monetary damages could compensate Fox for its losses").

[20] "This standard is similar, if not the same, as the standard for calculating a reasonable royalty in the context of patent damages.  For a reasonable royalty for patent infringement, the hypothetical negotiation also requires the court to envision the terms of a licensing agreement reached as the result of a supposed meeting between the patentee and the infringer at the time infringement began." *Oracle Am., Inc. v. Google Inc.*, 847 F. Supp. 2d 1178, 1182 (N.D. Cal. 2012).

[21] *See Fox Broad. Co. v. Dish Network LLC*, 747 F.3d 1060, 1073 (9th Cir. 2014).

18.     Over seven months after submitting my initial declaration in this matter, I still do not see any evidence, and Plaintiffs have not produced any evidence, to support Plaintiffs' claims that they would be irreparably harmed.  Monetary compensation would be an adequate measure to compensate Plaintiffs in this matter, repairing and reversing any alleged harm, and will not have a material negative impact on Plaintiffs' overall financial condition, particularly between now and the end of this lawsuit.

**B.     Plaintiffs' Allegations of Harm Regarding Training Are Unsupported and Reparable**

19.     Plaintiffs' claims of irreparable harm in connection with the use of their lyrics for back-end training are entirely unsupported as well.  I understand that Anthropic's economic expert, Dr. Steven Peterson, opines that there is no existing or potential licensing market for the use of copyrighted works as training materials for generative AI models such as Claude.[22] Furthermore, ██████████████████████████████████████████████ ████████████████████████████████████████████—not a general purpose, text-generative LLM like Claude.

20.     I have not seen any evidence or discussion in Plaintiffs' Original PI Motion or Renewed PI Motion, including the declarations, of how they might conceivably be harmed at all, much less harmed in a way that could not be compensated by monetary relief, based on Anthropic's alleged use of Plaintiffs' lyrics in training.  Plaintiffs generically assert that inclusion of their content in training data deprives them of control over their Works, deprives attribution credit, and harms their goodwill and reputation, but they do not explain why and how they would suffer any irreparable harm from such use.

**C.     Any Irreparable Harm Would be Experienced by Anthropic**

21.     On the other hand, the harm to Anthropic from the injunction Plaintiffs seek is irreparable.  Although Plaintiffs' request for relief as relating to training involves removal of the Works-in-suit only from "future training," I understand that granting the injunction would still

---

[22] *See* Declaration of Steven R. Peterson, PhD in Support of Anthropic's Opposition to Plaintiffs' Renewed Preliminary Injunction Motion ("Peterson Declaration"), ¶¶ 5-13.

1  set back Anthropic's efforts to create its next large language model ("LLM") by several months,

2  causing untold competitive harm at a critical time in the development of the AI industry.

3  **V.    ANY HARM CONCERNING CLAUDE'S OUTPUTS IS REPARABLE**

4        22.    Plaintiffs allege Claude generates text containing lyrics from copyrighted Works

5  owned or controlled by Publishers and such results cause Plaintiffs irreparable harm.  In

6  particular, Plaintiffs claim Publishers and songwriters have experienced irreparable harm "by

7  denying them control over their works,"[23] "denying them credit" and "eliminat[ing] opportunities

8  to generate business, raise songwriters' profiles, and accrue goodwill,"[24] "damag[ing] the

9  reputation of Publishers and their songwriters and diminish[ing] the integrity of their work,"[25]

10  "erod[ing] the price of the Works, the legitimate licensing market for lyrics, and Publishers'

11  goodwill with licensees,"[26] "damag[ing] Publishers' competitive position and their ability to

12  negotiate licenses with AI developers,"[27] and "irreversibly damaging Publishers' relationships

13  with current and prospective songwriter-partners."[28]

14        23.    Plaintiffs' allegations regarding the irreparable nature of the unintentional output

15  of the Works from Claude are contradicted by their own actions and statements, counterfactual to

16  the evidence produced to date, and/or speculative.  As I discuss in greater detail below, there is

17  abundant evidence demonstrating that the harm alleged by Plaintiffs is reparable and in some

18  instances nonexistent, including the following:

19    •    Plaintiffs have not identified any specific evidence of any type of harm to

20        Publishers or songwriters; even so, Plaintiffs have yet to substantiate how any

21        alleged harm could not be quantifiable or remedied via monetary compensation.[29]

22

23  _____
[23] Renewed PI Motion at 23.

24  [24] Renewed PI Motion at 24–25.
[25] Renewed PI Motion at 25.

25  [26] Renewed PI Motion at 26.
[27] Renewed PI Motion at 27.

26  [28] Renewed PI Motion at 28.
[29] I understand from counsel that targeted requests were made to Plaintiffs seeking further

27  information regarding their claims of irreparable harm; however, in the seven months since
submitting my initial declaration, no responsive documents have been produced.  *See, e.g.,*

28  Defendant Anthropic PBC's First Set of Requests for the Production of Documents and Things
to Plaintiffs (Nos. 1-22) served on December 4, 2023.

- Plaintiffs' own witnesses concede Plaintiffs' demonstrated propensity to license their Works and that a license is adequate to compensate for use of the Works.

- Plaintiffs have produced numerous licenses further supporting a propensity to license, and these licenses could be used to quantify any alleged harm.

- Free licensed lyric aggregators and websites already provide public, easy access to the Works' lyrics.

- Anthropic is not intended to be a substitute for lyrics aggregator websites and already has guardrails in place, which Plaintiffs have asked for.

### A. Publishers' Statements and Other Produced Documents Demonstrate a Propensity to License

24.     Plaintiffs admit their business model involves routinely entering into license agreements relating to the musical compositions in their catalogs and collecting the related applicable share of income to compensate their songwriters.[30]  Plaintiffs also admit "licensing is a vital tool by which Publishers control the Works' exploitation, ensure attribution and manage the profiles of their songwriters."[31]  In contradiction to the positions taken in Plaintiffs' preliminary injunction motions claiming irreparable harm, Plaintiffs' own witnesses admit that Plaintiffs regularly license their works and that a license from Anthropic would adequately compensate Plaintiffs for the use of their Works.

25.     Admissions from Professor Michael D. Smith, Plaintiffs' economic expert,[32] highlight Plaintiffs' contradictory irreparable harm position:

---

[30] Complaint ¶ 44; Declaration of Michael D. Smith in Support of Plaintiffs' Renewed Motion for Preliminary Injunction ("Smith Declaration"), ECF No. 182, ¶¶ 30–31; *see also* Complaint ¶ 47 ("Licensing for the use of musical compositions—including for use of lyrics in internet-based media—is an important revenue source for Publishers and a fundamental means by which songwriters earn a living. Publishers depend on licensing and otherwise exploiting these exclusive rights under the Copyright Act, among others, to earn revenue from their catalogs of musical compositions….").
[31] Renewed PI Motion at 3; Declaration of Duff Berschback ("Concord Declaration"), ECF No. 184, ¶¶ 10–12; Declaration of Alisa Coleman ("ABKCO Declaration"), ECF No. 185, ¶¶ 10–13; Declaration of David Kokakis ("UMPG Declaration"), ECF No. 187, ¶¶ 10–12; Declaration of Kenton Draughon ("CCMG Declaration"), ECF No. 186, ¶¶ 10–12.
[32] For purposes of this declaration only, I assume the truth of the statements in Professor Smith's declaration.

- Song lyrics "are regularly licensed on their own in many ways or in addition to the sound recordings, including, among others, by music services, websites, other artists, and karaoke businesses."[33]

- "Song lyrics can also be valuable in the licensing market for use by AI companies. Rights holders could license their song lyrics to AI companies for a variety of uses, including music recommendation or music search services. Under such arrangements, music publishers could license compositions and could deliver works to enable a variety of AI-powered technologies."[34]

- Catalog licenses "are licenses to use Publishers' entire catalog of compositions… Lyrics-only licenses include deals with LyricFind, which is a service that allows users to look up song lyrics, lyric translations, and lyric videos and display them on demand.  Publishers have also granted LyricFind the right to issue sublicenses to other websites to deliver the same or similar services."[35]

- "Publishers have also licensed their lyrics to streaming services—which often display lyrics alongside the work being streamed—karaoke businesses, and others.  Such licensees include Apple, Singa, and Sybersound.  These licenses are generally subject to strict limits on the use of the compositions."[36]

- "Publishers have also issued catalog licenses to numerous online services, authorizing those services to display and/or publicly perform both the music and lyrics to Publishers' compositions."[37]

- "Publishers have licensed their catalogs to social media sites such as YouTube, Facebook, and others."[38]

- Professor Smith concludes "Anthropic can license Publishers' lyrics, much in the same way as others – like YouTube, Spotify, and Apple Music – have licensed

---

[33] Smith Declaration ¶ 30.
[34] Smith Declaration ¶ 32.
[35] Smith Declaration ¶ 33.
[36] Smith Declaration ¶ 34.
[37] Smith Declaration ¶ 35.
[38] Smith Declaration ¶ 35.

those lyrics, and just like various other AI developers have licensed the data on which they have trained their models."[39]

26.    Admissions from Duff Berschback, Executive Vice President of Business and Legal Affairs at Concord Music Group, Inc.,[40] also highlight Plaintiffs' contradictory irreparable harm position:

- Concord, one of the Plaintiffs in this matter, "promotes, markets, and licenses musical compositions; and administers licenses, collects royalties, and provides various other important administrative functions on behalf of songwriters."[41]

- "Concord possesses and exploits its exclusive rights, among other things, to reproduce and/or distribute the Concord Works to the public, including the lyrics contained in those Works, and to license these exclusive rights, including the exercise of these rights over the internet."[42]

- "As a music publisher, Concord actively seeks out and enters into licensing opportunities for its songwriters' compositions (including with respect to the Concord Works), collects the income arising from such transactions, and compensates its songwriters with their applicable share of the income. Concord's songwriters, in turn, rely on that income to earn a living so that they can continue to enrich the world with new music."[43]

- "Concord licenses the Concord Works and other compositions from its catalog for use by third parties in all media formats, including in sound recordings, public performances, printed sheet music, commercials, advertisements, motion pictures, television shows, and by various digital services, lyrics aggregators, and/or lyrics websites."[44]

---

[39] Smith Declaration ¶ 67.
[40] For purposes of this declaration only, I assume the truth of the statements in Mr. Berschback's declaration.
[41] Concord Declaration ¶ 5.
[42] Concord Declaration ¶ 8.
[43] Concord Declaration ¶ 10.
[44] Concord Declaration ¶ 11.

- "[T]here is a well-established market through which Concord licenses its lyrics to trusted lyric services providers.  In particular, Concord licenses the lyrics to the Concord Works to lyric aggregators and lyric websites (such as LyricFind.com) and certain other digital services (such as Apple Music and Music Choice)."[45]

27.    Admissions from Alisa Coleman, Chief Operating Officer of ABKCO Music, Inc.,[46] also highlight Plaintiffs' contradictory irreparable harm position:

- "ABKCO possesses and exploits its exclusive rights, among other things, to reproduce and/or distribute the ABKCO Works to the public, including the lyrics contained in those Works, and to license these exclusive rights, including the exercise of these rights over the internet."[47]

- "ABKCO regularly enters into licensing agreements relating to the musical compositions in its extensive catalog, collects the income from these agreements, and compensates its songwriters accordingly."[48]

- "ABKCO licenses the ABKCO Works and various other musical compositions, including their lyrics, for use in sound recordings, public performances, printed sheet music and musical notation websites and applications, commercials, advertisements, motion pictures, television shows, karaoke products, greeting cards, books and magazines, various digital services, social media platforms, lyrics aggregators, and/or lyrics websites.  Through these licensing arrangements and others, ABKCO and its licensing partners disseminate ABKCO's compositions to the public and foster the enjoyment of those works."[49]

- "ABKCO also frequently enters into licenses relating to the lyrics to the ABKCO Works in particular.  That includes licenses for the lyrics to the ABKCO Works to be displayed on the internet, including through licenses with various websites and

---

[45] Concord Declaration ¶ 12.
[46] For purposes of this declaration only, I assume the truth of the statements in Ms. Coleman's declaration.
[47] ABKCO Declaration ¶ 7.
[48] ABKCO Declaration ¶ 10.
[49] ABKCO Declaration ¶ 11.

14

1  other online services, for example, lyric aggregators (such as Musixmatch.com

2  and LyricFind.com), lyric websites (such as Genius.com), and other digital

3  services and platforms (such as Apple Music, Facebook, and Instagram).  Other

4  licenses that involve lyrics include those relating to greeting cards (such as

5  Hallmark and American Greetings), karaoke products (such as Touchtunes and

6  Singa), books and novels (such as Stephen King's *11/22/63* and Jacqueline

7  Woodson's *Brown Girl Dreaming*) and merchandise (such as Lyric Culture's

8  apparel and jewelry products).  In addition, ABKCO also has a longstanding

9  license with Alfred Music that includes lyrics. Alfred Music produces physical

10  and digital sheet music and other types of musical notations such as guitar

11  tablatures in the form of songbooks, personality folios, piano/vocal folios, among

12  others.  ABKCO's licenses with lyric aggregators and Alfred Music permit these

13  licensees to further license to third parties."[50]

14      28.  Admissions from David Kokakis, Chief Counsel at Universal Music Publishing

15  Group ("UMPG"),[51] also highlight Plaintiffs' contradictory irreparable harm position:

16      •  "The UMPG Plaintiffs rely on a model of licensing[.]"[52]

17      •  "The UMPG Plaintiffs license the UMPG Works (along with various other

18  musical compositions from UMPG's extensive catalog) and their accompanying

19  lyrics for use in sound recordings, public performances, samples, printed sheet

20  music, commercials, advertisements, motion pictures, television shows, lyric

21  aggregators, lyric websites, and numerous other digital platforms and services.

22  Through these licensing agreements, the UMPG Plaintiffs and their partners offer

23  consumers a variety of authorized means to enjoy the UMPG Plaintiffs' musical

24  compositions."[53]

25

26

---

[50] ABKCO Declaration ¶ 12.
[51] For purposes of this declaration only, I assume the truth of the statements in Mr. Kokakis's declaration.
[52] UMPG Declaration ¶ 10.
[53] UMPG Declaration ¶ 11.

1    •    "The UMPG Plaintiffs have entered into various licensing agreements for the

2         lyrics to the UMPG Works specifically.  Among other things, the UMPG

3         Plaintiffs have licensed lyrics to lyric 'aggregators,' such as LyricFind.com and

4         Musixmatch.com."[54]

5    •    "These lyric aggregators are granted the right to distribute the UMPG Plaintiffs'

6         lyrics through their own websites, as well as the right to sublicense the UMPG

7         Plaintiffs' lyrics to other lyric websites and digital services, subject to the UMPG

8         Plaintiffs' prohibition on certain uses and/or right to object to certain

9         sublicenses."[55]

10   •    "Additionally, the UMPG Plaintiffs have also licensed directly to lyric websites,

11        such as Genius.com, and to various other digital services, including Amazon

12        Music, Apple Music, Meta, Snapchat, Spotify, and YouTube, among others.

13        Through these licensed channels and others, authorized copies of the lyrics to the

14        UMPG Works are widely disseminated and available to the public, allowing

15        consumers to access and enjoy authorized copies of the lyrics to the UMPG

16        Works in the form intended by their authors."[56]

17        29.    Finally, admissions from Kenton Draughon, Vice President of Administration and

18   Operations for Capitol CMG, Inc. ("CCMG"),[57] also highlight Plaintiffs' contradictory

19   irreparable harm position:

20   •    "As a music publisher, a core part of CCMG's business is negotiating and

21        entering into licensing agreements with respect to the CCMG Works and the other

22        faith-based musical compositions in CCMG's catalog."[58]

23

24

25

---

26   [54] UMPG Declaration ¶ 12.
     [55] UMPG Declaration ¶ 12.
27   [56] UMPG Declaration ¶ 12.
     [57] For purposes of this declaration only, I assume the truth of the statements in Mr. Draughon's
28   declaration.
     [58] CCMG Declaration ¶ 10.

- "CCMG relies on these licenses to earn revenue from our catalogs of musical compositions, to compensate our songwriters, and to further our mission of promoting songwriters and their creation of Christian music."[59]

- "CCMG has licensed its lyrics to Christian Copyright Licensing International ('CCLI'), through which CCMG licenses its lyric reproduction rights for use in church services. CCMG's income from its CCLI licensing constitutes a substantial portion of CCMG's revenues.  Similarly, CCMG has also licensed its lyrics to PraiseCharts.com, a website that provides licensed digital sheet music for popular praise and worship songs.  Additionally, CCMG has licensed its lyrics to MultiTracks.com, in connection with church karaoke performances."[60]

- "Beyond these licenses with CCLI, PraiseCharts.com, and MultiTracks.com, CCMG has also entered into lyrics licenses with lyric aggregators like Musixmatch and LyricFind, lyric websites, and other digital platforms like Meta and YouTube.  More broadly, CCMG licenses the CCMG Works and other musical compositions for various other uses in sound recordings, public performances, printed sheet music, commercials, advertisements, motion pictures, television shows, and numerous digital services."[61]

- "CCMG licenses the CCMG Works and the lyrics contained in them in a number of different ways, including through lyric aggregators, lyric websites, and other digital services."[62]

- "[T]here is a well-established licensing market for lyrics."[63]

**B.    Plaintiffs' Licenses Produced to Date Reinforce Plaintiffs' Propensity to License and Provide a Basis for Calculating Any Damages**

30.    Plaintiffs admit in their Complaint that "there is an existing market through which Publishers license their copyrighted lyrics."[64]  As noted above, Plaintiffs have also repeatedly

---

[59] CCMG Declaration ¶ 10.
[60] CCMG Declaration ¶ 11.
[61] CCMG Declaration ¶ 12.
[62] CCMG Declaration ¶ 20.
[63] CCMG Declaration ¶ 25.
[64] Complaint ¶ 9.



1  established that they routinely enter into license agreements with authorized lyrics aggregators

2  and websites.  For example, Mr. Berschback,[65] Mr. Kenton Draughon,[66] Mr. David Kokakis,[67]

3  and Ms. Alisa Coleman[68] all discussed various licenses that would be probative in this matter.

4       31.     I understand from Counsel that the Plaintiffs were requested to produce

5  documents detailing their licensing history, licensing policy and procedures, licensing

6  negotiations, and royalty reports, among other things.[69]  On January 8, 2024, January 11, 2024,

7  January 14, 2024, February 12, 2024, and February 19, 2024, Plaintiffs produced approximately

8  180 signed and draft license agreements, amendments, and term sheets.  ███████████

9  ███████████████████████████████████████████████

10 ███████████████████████████████████████████████

11 ███████████████████████████████████████████████

12 ██████████████████████████████[70] ████████████████

13 ███████████████████████████████████████████

14 ███████████████████████████████████████████████

15 ███████████████████████████████████████████[71]

16 ████████████████████████████████████

17

<hr>

18  [65] Mr. Berschback mentioned the following licenses entered into by Concord: lyric websites,
such as LyricFind.com, and other digital services, such as Apple Music and Music Choice.  *See*

19  Concord Declaration ¶ 12.
[66] Mr. Draughon mentioned the following licenses that CCMG has entered into: Christian

20  Copyright Licensing International ("CCLI"), PraiseCharts.com, MultiTracks.com, lyrics licenses
with lyric aggregators like Musixmatch and LyricFind, lyric websites, and other digital platforms

21  like Meta and YouTube. *See* CCMG Declaration ¶ 12.
[67] Mr. Kokakis mentioned the following licenses that UMPG has entered into: lyric websites,

22  such as Genius.com digital services, including Amazon Music, Apple Music, Meta, Snapchat,
Spotify, and YouTube. *See* UPMG Declaration ¶ 12.

23  [68] Ms. Coleman mentioned the following as licenses that ABKCO has entered into: lyrics
licenses with lyric aggregators like Musixmatch and LyricFind; lyric websites, such as

24  Genius.com; digital services and platforms such as Apple Music, Facebook, and Instagram; and a
license with Alfred Music that includes lyrics. *See* ABKCO Declaration ¶ 12.

25  [69] *See* Defendant Anthropic PBC's First Set of Requests For the Production of Documents and
Things ("RFPs") to Plaintiffs (Nos. 1-22).

26  [70] *See* ABKCO_0000000001-0020; ABKCO_0000000414-0452; CONCORD_0000000001-
0145; CONCORD_0000000311-0760; UMPG_0000000001-0047; UMPG_0000000053-0066;

27  UMPG_0000000452-0532.
[71] *See* ABKCO_0000000001-0020; ABKCO_0000000025-0368; ABKCO_0000000414-0452;

28  CONCORD_0000000001-0145; CONCORD_0000000311-0760; UMPG_0000000001-0047;
UMPG_0000000053-0066; UMPG_0000000452-0532.

1 ███████████████████████████████████████████

2 ██████████████████████████████[72]

3    32.   The agreements produced are further evidence that Plaintiffs have entered into

4 license agreements, or have the propensity to enter into license agreements, with third parties for

5 their music catalog.  These agreements may be instructive to a reasonable royalty analysis.

6 Professor Smith, in his declaration, discusses the viability of licenses in which the Plaintiffs'

7 entire catalog is licensed and notes that based on "the sheer size of Publishers' collective

8 catalogs, these licenses can implicate a very large number of works and value for the

9 Publishers."[73]  In other words, Plaintiffs themselves recognize that use of their Works can be

10 valued and quantified in monetary terms.

11    33.   Further, Professor Smith, in discussing the economic impact of Anthropic's

12 failure to license lyrics, establishes the possibility of monetary compensation to reverse and

13 repair the harm.[74]  His opinion hinges on the notion that Publishers' harm is due to Anthropic

14 "using Publishers' lyrics without paying a license fee," exploiting "the lyrics for free," and

15 similar statements made by him throughout his declaration.[75]  Such statements imply that any

16 harm suffered due to nonpayment for usage can be easily rectified by means of monetary

17 compensation at the end of the lawsuit.

18    34.   Publishers also allege that when Anthropic offers access to its Claude application

19 programming interface ("API") models to commercial clients, it is essentially including

20 Publishers' copyrighted content, which it has no right to and is unauthorized.[76]  However, if

21 Plaintiffs were to establish that they have been harmed during the pendency of litigation due to

22 uses of their copyrighted content in connection with Anthropic's Claude API models, such harm

23 can be rectified by a monetary award to Publishers at the end of this lawsuit, just like a licensing

24 fee or royalty, which can be quantified using standard economic models.

---

[72] *See* ABKCO_0000000413; CONCORD_0000000668; UMPG_0000000531.
[73] Smith Declaration ¶ 33.
[74] Smith Declaration ¶¶ 40–61.
[75] *See, e.g.*, Smith Declaration ¶¶ 40, 47–49, 53, 55–56, and 59.
[76] Complaint ¶ 95.

HALL DECL. ISO ANTHROPIC'S OPP. TO
RENEWED MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL

35.    Not all licenses will be equally probative or useful to the exercise of calculating a monetary award, but at least some of the licenses produced to date provide benchmarks to calculate damages for Anthropic's alleged unauthorized outputs between now and a final judgment on the merits.  While I have not calculated damages in this Declaration, should it be necessary, I could analyze the licenses, any corresponding royalty and usage data, and any other related documents as benchmarks to inform a reasonable royalty opinion relating to any unintentional outputs from Claude.

36.    Relevant factors when assessing the comparability of preexisting licenses may include, amongst other things, the date of the agreement, intended purpose of the license, type of content being licensed, the scope of the license and rights granted, territory, exclusivity conditions, the bargaining positions of the parties, the presence of any threat of litigation, and/or if the agreement was entered into for settlement purposes or as a cross license.  Based on my experience in the determination of reasonable royalty rates, adjustments to a preexisting license may be necessary to determine the most appropriate rate for a specific matter.  It is routine for experts to provide opinions on those necessary adjustments and for the fact finder to issue monetary awards based on those opinions.  To the extent additional information is produced subsequent to this declaration, I reserve the right to review such information and amend my opinions accordingly.

37.    For the reasons I discuss below, I have not seen evidence that Anthropic's actions have caused Plaintiffs any harm or would cause any harm between now and a final judgment on the merits.  To the extent that the Court finds Plaintiffs are likely to suffer harm during this period, however, this harm can be remedied through monetary damages in the form of license fees that Plaintiffs themselves argue Anthropic should pay.[77]  The license agreements for lyric display rights routinely entered by Plaintiffs can easily provide a "starting point or an aid" for calculating monetary damages regarding any allegedly infringing outputs by Claude.[78]

---

[77] *See* Renewed PI Motion at 21.
[78] *See Fox Broad. Co. v. Dish Network LLC*, 747 F.3d 1060, 1073 (9th Cir. 2014).

**C.** **Plaintiffs' Irreparable Harm Allegations Regarding Output Are Hypothetical and Speculative**

    **i.** **Anthropic's use has not harmed any established market for the Works, has not eroded the value of any licensing market for the Works, and has not damaged Publishers' position to negotiate future licenses, and there is no evidence showing that such use is likely to cause these harms.**

38.    Plaintiffs claim Anthropic inflicts market harm by evading licensing fees, eroding the Works' value, reducing Publishers' revenue from licenses to digital platforms and from lyric aggregators and their sublicensees, and shrinking the lyrics licensing market.[79]  Plaintiffs claim "Anthropic's use harms the market for the Works by reducing their value, weakening demand for licenses, and threatening the viability of licenses."[80]

39.    But as I explained above, any of these hypothetical harms caused by Anthropic's actions is quantifiable and compensable by monetary damages because it flows from the alleged loss of licensing revenues that can be contractually defined and quantified.  Moreover, Plaintiffs have failed to provide any evidence that demonstrates an actual or potential loss of licensing revenue, difficulty in maintaining royalty rates over time, or examples of any licensees who did not renew their license as a result of Anthropic's alleged unlawful use.[81]

40.    In addition, the nature of Anthropic's product makes it unlikely that the absence of an injunction between now and a final judgment in this lawsuit, estimated by 2025, would cause any such harms in the future.[82]  Anthropic's product is not a material substitute, let alone a close substitute, for existing sites licensed by Plaintiffs that provide free display of the lyrics of the Works-in-suit.  And Anthropic's text-generative AI models are even further removed from any existing use of Plaintiffs' compositions extending beyond lyric aggregators and song lyric websites, including in connection with sales of sound recordings, music streaming services, "karaoke products, books, magazines, greeting cards, [] merchandising," and any other of a range

---

[79] Renewed PI Motion at 21.
[80] Renewed PI Motion at 21–22.
[81] Professor Smith does not cite any data, studies, financial reports, or quantitative information as support to assert that license fees for the use of Plaintiffs' lyrics have decreased since Anthropic introduced Claude.  *See generally* Smith Declaration.
[82] *See* Initial Case Management Order, ECF No. 64, at 11 (setting a schedule that anticipates case resolution by the end of 2025).

HALL DECL. ISO ANTHROPIC'S OPP. TO
RENEWED MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL

1  of licenses that output the music and lyrics of Plaintiffs' compositions.[83]  Moreover, it is

2  unreasonable to suggest Anthropic's alleged conduct threatens Plaintiffs' relationships with

3  existing licensees and undermines negotiating leverage with prospective licensees,[84] given

4  Publishers filed a public lawsuit against Anthropic seeking up to $150,000 per work infringed.[85]

5  Either Plaintiffs prevail on their lawsuit against Anthropic and any award can be used as

6  negotiating leverage with licensees, or Plaintiffs lose on the merits and Anthropic's actions are

7  deemed non-infringing.  Regardless, the pendency of the lawsuit itself could enhance Plaintiffs'

8  leverage in licensing negotiations between now and a final judgment.

9                **1.    Freely-available licensed lyric sites are prevalent and provide
                       easy access to the lyrics of the Works**

10

11       41.    I understand there are several public sources, such as Genius, LyricFind,

12  Musixmatch, Lyrics.com, and AZLyrics, that serve as more direct sources for users to access and

13  obtain free lyrics.  Publishers license the copyrighted lyrics to "lyric aggregators like LyricFind

14  and Musixmatch; and lyrics websites such as Genius.com," authorizing them to share lyrics

15  publicly on their freely-accessible websites.[86]  Further, LyricFind and Musixmatch sublicense

16  those lyrics to "search engines like Google, websites like Lyrics.com and AZLyrics.com, and

17  other digital music services,"[87] which are also publicly and freely-accessible.

18       42.    For example, Genius, which boasts "the world's biggest collection of song lyrics

19  and musical knowledge,"[88] states that it "is fully licensed to display lyrics across all of its

20  properties . . . [, and since] 2013, entered into licenses with every major music publisher:

21  Sony/ATV Music Publishing, EMI Music Publishing, Universal Music Publishing Group, and

22  Warner/Chappell Music.  In addition, [Genius] developed a form license with the National Music

23

24  [83] Renewed PI Motion at 3.
    [84] Renewed PI Motion at 23–28.

25  [85] Ethan Millman, "Music Publishers Sue Amazon-Backed AI Platform for Copyright
    Infringement," Rolling Stone, October 18, 2023, https://www.rollingstone.com/music/music-

26  news/umg-concord-abkco-sue-anthropic-ai-company-copyright-infringement-1234856761/.
    [86] Renewed PI Motion at 3; CCMG Declaration ¶ 12; UMPG Declaration ¶ 12; ABKCO

27  Declaration ¶ 12; Concord Declaration ¶ 12.
    [87] Renewed PI Motion at 3; Declaration of Timothy Chung in Support of Plaintiffs' Renewed

28  Motion for Preliminary Injunction, ECF No. 180, Exs. B, C, and D.
    [88] Genius, accessed August 21, 2024, https://genius.com/.

Publishers' Association (NMPA) which today covers more than 96% of the independent

publisher market."[89]



43.     Genius' market coverage alone proves that the lyrics to Publishers' Works are

freely available and not exclusive, as Plaintiffs suggest.[90]

44.     Similarly, LyricFind, identifying itself as "your source for lyrics & data

licensing," claims to set itself apart from the competitors by providing the "highest quality

lyrics" which are "[r]eliable and accurate."[91]  It also touts having proper "rights management"

through "[d]etailed and trusted publisher royalty reporting" and "global licensing" capabilities

with "[w]orldwide coverage from over 60,000 publisher partners."[92]  LyricFind partners with

platforms such as Google, YouTube, Amazon, TikTok, Pandora and others, and is trusted by

publishers, including Sony Music Publishing, Universal Music Publishing Group, and Walt

---

[89] "Licensing," Genius, accessed August 21, 2024, https://genius.com/static/licensing.
[90] "Promote with Genius," Genius, accessed August 21, 2024, https://promote.genius.com/.
[91] LyricFind, accessed August 21, 2024, https://www.lyricfind.com.
[92] LyricFind, accessed August 21, 2024, https://www.lyricfind.com.

HALL DECL. ISO ANTHROPIC'S OPP. TO
RENEWED MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL

Disney.[93]  Further, LyricFind is the official lyric data provider to Sony Music and Universal Music Publishing Group.[94]

45.    Since 2004, LyricFind has licensed lyrics, providing royalties to songwriters and publishers.[95]  As shown below, LyricFind explicitly references its lyric licenses and provides information for how publishers, distributors, performing rights organizations, or music societies can license lyrics to LyricFind.[96,97]



**Publishing With LyricFind**

LyricFind licenses over 200,000 catalogues of lyrics from music publishers, aggregators, and performing rights organizations worldwide. By providing licensed lyric display and monetization services, LyricFind ensures songwriters and publishers earn royalties for each and every use of their lyrics.

**A Trusted Licensing Partner**

LyricFind is the preferred partner of music publishers everywhere. Since pioneering the lyric licensing space in 2004, LyricFind has paid millions of dollars to publishers year after year for an otherwise untapped resource.

**1. How do I display my lyrics?**

If you are a publisher, distributor, performing rights organization, or music society, and you would like to license your lyrics to us, please email publisher@lyricfind.com.

If you're an artist or songwriter who administers the copyright for your lyrics and wishes to monetize your lyrics, we suggest registering with one of our global partners and opting in to our licensing agreement through them. This will allow you to collect royalties generated from the usage of your lyrics on the platforms we power. For a complete list of our partners and how to register, go to Partner Registration.

Artists and songwriters, as well as self-publishers, can also join the Verified Artist Program to retain full control over their lyrics, copyrights and more. Learn more here.

---

[93] LyricFind, accessed August 21, 2024, https://www.lyricfind.com.
[94] LyricFind, accessed August 21, 2024, https://www.lyricfind.com.
[95] "Company," LyricFind, accessed August 21, 2024, https://www.lyricfind.com/company/our-story.
[96] "Publishing with LyricFind," LyricFind, accessed August 21, 2024, https://www.lyricfind.com/publishing.
[97] "Frequently Asked Questions," LyricFind, accessed August 21, 2024, https://www.lyricfind.com/faq.

46. It is a simple and straightforward task to obtain lyrics of a particular song from LyricFind, generating the output in no time with little effort. Dr. Robert Leonard admits he was able to identify publicly available lyrics from LyricFind.[98]

47. Musixmatch enables distribution of lyrics "worldwide" and "[o]ver 20 million people from around the world contribute to creating the largest catalog of lyrics ever."[99] It boasts of "making music better"[100] by working with "thousands of music publishers worldwide to create the industry's most comprehensive lyrics catalog."[101] Once a song is chosen, Musixmatch generates the output in seconds.[102]



48. Musixmatch also "[e]arn[s] royalties from global distribution" and "pay[s] royalties directly back to the rights' owners."[103,104] AZLyrics receives its lyrics from Musixmatch.[105]

---

[98] Declaration of Dr. Robert Leonard in Support of Plaintiffs' Original Motion for Preliminary Injunction, ("Leonard Declaration"), ECF No. 50, at 3.
[99] Musixmatch, accessed August 21, 2024, https://www.Musixmatch.com.
[100] Musixmatch, accessed August 21, 2024, https://www.Musixmatch.com.
[101] "Monetize Your Lyrics Catalog," Musixmatch, accessed August 21, 2024, https://about.musixmatch.com/publishers/musixmatch-for-publishers.
[102] "Get Your Lyrics Everywhere," Musixmatch, accessed August 21, 2024, https://about.musixmatch.com/artists/verified-artist.
[103] Musixmatch, accessed August 21, 2024, https://www.Musixmatch.com.
[104] "Monetize Your Lyrics Catalog," Musixmatch, accessed August 21, 2024, https://about.musixmatch.com/publishers/musixmatch-for-publishers.
[105] "Customer Story Websites," Musixmatch, accessed August 21, 2024, https://about.musixmatch.com/business/customer-stories/websites.



49.    In addition, Musixmatch works with Spotify, Apple Music, Amazon, Google, etc. and with music publishers such as Sony Music Publishing, Universal Music Group, and BMG.[106]

50.    Lyrics.com states that it is the "Web's Largest Resource for Music, Songs & Lyrics" with "a vast compilation of song lyrics, album details, and featured video clips for a seemingly endless array of artists."[107]  As shown below, lyrics offered by Lyrics.com are licensed.

---

[106] "Monetize Your Lyrics Catalog," Musixmatch, accessed August 21, 2024, https://about.musixmatch.com/publishers/musixmatch-for-publishers.
[107] Lyrics.com, accessed August 21, 2024, https://www.lyrics.com.  Lyrics.com also has a mobile application.  *See* "App Store Preview," Apple, accessed August 21, 2024, https://apps.apple.com/us/app/lyrics-com/id1467868195.

51.     Neither Plaintiffs' Renewed Motion for PI nor their supporting declarations has pointed to evidence showing that Claude's operations caused their licensing revenue from these lyric aggregators and websites to suffer, let alone revenues attributable to the Works more generally.  This makes good sense given that, as I discuss below, Claude is not a comparable or good substitute for lyric aggregators and websites.[108]  And an LLM like Claude is not a competitor for licensees of the Works such as music streaming services, karaoke providers, and other distributors of content including recordings of musical compositions.

### 2.     Anthropic's product is not a substitute for licensed lyric sites

52.     I understand that as a general matter, outputting verbatim material portions of training data is an unintended occurrence with generative AI platforms, not a desired result.[109] Relatedly, I understand Anthropic's Claude is not designed to output copyrighted material and Anthropic has always had guardrails in place to prevent such a result.[110]

53.     I further understand that, since learning of Plaintiffs' claims, Anthropic has now implemented additional technological guardrails to further prevent outputs containing lyrics to the Works at issue in this case.[111]  As evidence that Anthropic's guardrails have been successful, Plaintiffs changed the relief they are seeking on this front to ask that Anthropic be required to *keep* those guardrails in place: "Anthropic should be ordered to maintain its already-implemented

---

[108] Anthropic has not developed Claude, nor does it intend to develop Claude, to function simply as a resource for users to obtain copies of already-existing materials in response to queries. *See* Declaration of Jared Kaplan in Support of Anthropic's Opposition to Plaintiffs' Renewed PI Motion ("Kaplan Declaration") ¶ 15.
[109] Kaplan Declaration ¶¶ 33, 47–48.
[110] Kaplan Declaration ¶¶ 15, 50.
[111] Kaplan Declaration ¶ 54; Renewed PI Motion at 29; Declaration of Ben Y. Zhao in Support of Plaintiffs' Renewed PI Motion ("Updated Zhao Declaration"), ECF No. 181, ¶ 59 (conceding that he had not "done additional testing of Claude's guardrails" since Plaintiffs filed their reply in support of their original PI motion).

1  guardrails to prevent output that reproduces, distributes, and displays Publishers' lyrics."[112]  I

2  further understand the only evidence in the record of allegedly infringing outputs of Plaintiffs'

3  song lyrics was created by the Plaintiffs (or their agents) themselves using Claude.ai and an

4  undisclosed API version as far back as June 2023.[113]  I understand from Dr. Ben Zhao's

5  declaration in support of the Publishers' Original PI Motion that he had tried to generate output

6  from Claude for lyrics/works in dispute and that there were instances when Claude refused to

7  provide Publishers' Works due to guardrails preventing copyright infringement.[114]  Anthropic's

8  Jared Kaplan, co-founder and Chief Science Officer, has testified that Anthropic enhanced its

9  guardrails to make the future output of the Works-in-suit "extremely unlikely."[115]

10        54.    I understand that, even before Anthropic put in place its most recent guardrails, it

11  was not possible to reliably obtain lyrics of the works-in-suit via Claude.  As Plaintiffs' own

12  technical expert, Dr. Zhao, admits regarding the outputs referenced in the Complaint, "getting

13  consistent results of this sort from Claude is unlikely."[116]  His report indicated that Anthropic's

14  product often declines to fulfill requests to obtain lyrics from Claude.[117]  A limited review of pre-

15  suit prompts and outputs by Plaintiffs and their agents reveals many instances where Claude did

16  not provide the requested song lyrics.[118]  Licensed lyric websites, and indeed a simple Google

17  search, much more quickly and reliably output explicit lyric requests.  I understand that after

18

19

---

20  [112] Renewed PI Motion at 9.

21  [113] *See, e.g.*, Declaration of Dan Seymour in Support of Plaintiffs' Original PI Motion ("Seymour Declaration"), ECF No. 49, ¶ 9; Leonard Declaration ¶¶ 10–11; Updated Zhao Declaration ¶ 52; Plaintiffs' Objections and Response to Defendant's Request for Admission Nos. 1–4 served on

22  April 22, 2024.
   [114] Declaration of Ben Y. Zhao in Support of Plaintiffs' Original Preliminary Injunction Motion

23  ("Initial Zhao Declaration"), ECF No. 47, ¶ 42.
   [115] Kaplan Declaration ¶ 56.

24  [116] Initial Zhao Declaration at ¶ 42; *see also* Kaplan Declaration ¶¶ 55–59.  It does not appear that Mr. Zhao has updated his declaration since to identify any new examples of infringing

25  outputs from Claude. *See* Updated Zhao Declaration ¶ 59.
   [117] Initial Zhao Declaration ¶ 42.

26  [118] Declaration of Julia Lowd in Support of Anthropic's Opposition to Plaintiffs' Original Preliminary Injunction Motion ("Lowd Declaration"), ECF No. 67-5, ¶¶ 17–20.  I understand

27  that Plaintiffs have categorically refused to respond to Anthropic's discovery requests for documents relating to their unsuccessful attempts to regurgitate their song lyrics using Claude.

28  *See, e.g.*, Pls.' Responses & Objections to Defendant's Second Set of Requests for Production Nos. 38, 41.

implementation of additional guardrails, it is very unlikely for Anthropic's product to output lyrics of the Works-in-suit.[119]

55.     This is confirmed by information from Anthropic.  Below is an example of what a Claude user sees if lyrics to one of the Works subject to this litigation is requested, followed by an example of lyrics requested from a lyrics website, which also includes a player for the song:[120]



JK  What are the lyrics to the Ariana Grande song Seven Rings?

I apologize, but I can't reproduce or provide the full lyrics to "7 Rings" by Ariana Grande, as that would infringe on copyright. However, I can give you some general information about the song:

"7 Rings" was released in 2019 as part of Ariana Grande's album "Thank U, Next." The song samples "My Favorite Things" from The Sound of Music and puts a modern, materialistic spin on it. The lyrics generally focus on themes of wealth, independence, and friendship.

The song title refers to friendship rings Grande reportedly bought for herself and six friends. It became a major hit, reaching number one on charts in many countries.

If you'd like to read the full lyrics, I'd recommend looking them up on an official lyrics website or listening to the song directly. Many music streaming platforms also provide lyrics alongside the audio.

JK  Can you give me the chords at least?
🖉 Edit

I understand you're looking for the chords to "7 Rings" by Ariana Grande. While I can't provide the full chord progression or lyrics due to copyright concerns, I can offer some general information about the song's musical structure that might be helpful:

"7 Rings" is primarily built around a simple chord progression that repeats throughout the song. It's in the key of F# minor and uses a trap-style beat. The song's harmony is relatively straightforward, focusing on a few chords common in pop music.

If you're looking to play the song yourself, I'd recommend checking out guitar tab websites or sheet music retailers for accurate chord charts. Many of these sites offer free basic chord charts or previews that can get you started.

For the most accurate information, you might also consider looking up video tutorials by music teachers or checking official sheet music. This would ensure you're getting the correct chords and rhythm for the song.

Is there a particular part of the song you're most interested in learning? I could potentially provide some general music theory insights about that section without infringing on copyright.

---

[119] Kaplan Declaration ¶¶ 54–58.
[120] *See* Kaplan Declaration ¶ 54 and "7 Rings," Lyrics.com, accessed August 22, 2024, https://www.lyrics.com/lyric/35927052/Ariana+Grande/7+rings.



56.    During the pendency of the litigation, Anthropic's product is not likely to be, or be perceived by others as, a substitute for Plaintiffs' licensing market for lyric sites and will not affect Publishers' existing licensing market for lyrics or for the Works more generally.[121] Plaintiffs have sued Anthropic in a very public lawsuit, claiming to support the interests of songwriters (although I understand those songwriters in many cases have assigned their rights to Publishers) and alleging the need for AI developers to secure licenses to use Publishers' works. In light of Plaintiffs' litigation efforts, it is even more unlikely that licensees will somehow perceive a lack of need for licenses due to any allegedly unauthorized uses by Anthropic between now and a final judgment in this lawsuit in 2025, thereby irreparably harming Plaintiffs and affecting Plaintiffs' negotiations with longtime lyric aggregators (or other) licensees.[122]

### ii.    Anthropic does not deny Publishers and songwriters control, credit and goodwill; has not harmed Publishers' and songwriters' reputations; and has not caused potential loss of customers

#### 1.    Publishers, not songwriters, are named as Plaintiffs

---

[121] *See* Kaplan Declaration ¶¶ 9–15.
[122] *See* Renewed PI Motion at 27.

57.    Plaintiffs have not identified or demonstrated any "hardships" that would be faced by Publishers as a result of Anthropic's alleged unlawful use between now and a final judgment that are not compensable by monetary damages.  Plaintiffs allege that songwriters (who are not parties to this lawsuit) would suffer alleged unquantifiable harms, despite explicitly acknowledging that "Publishers are the owners or exclusive licensees of copyrights in the Compositions."[123]  I have not seen any evidence presented by Plaintiffs supporting the assertion that songwriters have endured irreparable harm, other than Plaintiffs' generic statements in their Original Motion for PI or their Renewed Motion for PI, or that Plaintiffs, the Publishers, have directly experienced these specific irreparable harms.  In fact, Universal Music Publishing revenue increased by 8.7% year-over-year in 2023.[124]  Universal describes this as "strong underlying growth… primarily due to the continued growth in subscription and streaming revenue and improvements in Performance, Synchronisation and Mechanical revenue."[125] Plaintiffs, seeking injunctive relief, must offer more than "mere speculation" of immediate threatened injury.[126]  I understand Plaintiffs must demonstrate with "non-conclusory evidence," not just because Plaintiffs say so, that they will suffer actual and imminent harm in the absence of immediate injunctive relief.[127]  From the limited information Plaintiffs have produced thus far,

███████████████████████████████████████████████████████████

██████████████████████████████[128]

## 2.    Plaintiffs have not identified any support for their broad claims that the alleged harm is irreparable

---

[123] Renewed PI Motion at 10.

[124] This increase is understated because of one-time accruals and changes in standards. ("Universal Music Group N.V. Reports Financial Results for the Fourth Quarter and Full Year Ended December 31, 2023," Universal Music Group, February 28, 2024, https://www.universalmusic.com/universal-music-group-n-v-reports-financial-results-for-the-fourth-quarter-and-full-year-ended-december-31-2023/).

[125] "Universal Music Group N.V. Reports Financial Results for the Fourth Quarter and Full Year Ended December 31, 2023," Universal Music Group, February 28, 2024, https://www.universalmusic.com/universal-music-group-n-v-reports-financial-results-for-the-fourth-quarter-and-full-year-ended-december-31-2023/.

[126] *Isle of Capri Casinos, Inc. v. Flynt*, 2016 WL 6495380, at *9 (C.D. Cal. Nov. 1, 2016) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008)); *see also Goldie's Bookstore*, 739 F.2d at 472.

[127] *Int'l Medcom*, 2015 WL 7753267, at *5.

[128] *See, e.g.,* UMPG_0000000531.

1        58.     Notwithstanding Anthropic's position on the merits and the fact that over nine

2 months have passed since Plaintiffs filed this action, Plaintiffs' evidence regarding irreparable

3 harm is virtually nonexistent.  I understand that the court requires Plaintiffs to "proffer evidence"

4 actually demonstrating that Plaintiffs' claimed harm is irreparable and unquantifiable[129] because

5 of Anthropic's infringing conduct.  Plaintiffs have not provided any evidence, support,

6 documents, or data demonstrating they have been harmed or are likely to be harmed as a result of

7 Anthropic's alleged unlawful actions in the absence of preliminary injunctive relief.  For

8 example, at the time of the filing of the Hall Initial Declaration in January 2024, and even seven

9 months later at the present date of this declaration:

10      •     Plaintiffs have also not identified or demonstrated any actual or potential

11           confusion among artists and customers due to alteration of lyrics, let alone

12           confusion that harms Plaintiffs.

13      •     Plaintiffs have not provided any evidence that "Anthropic lowers the market value

14           of the lyrics, reduces demand for legitimate licenses for lyrics, and impedes

15           Publishers' negotiations with existing licensees."[130]

16      •     Plaintiffs have not produced any evidence demonstrating Plaintiffs had to reduce

17           their licensing fees as a result of Anthropic's actions.

18      •     Plaintiffs have not identified a single potential licensee or customer lost.

19      •     Plaintiffs have not identified a single negotiation with an existing licensee that

20           was impacted and how it was impacted as a result of Anthropic's actions.

21      •     Plaintiffs have not provided any evidence a licensee was unwilling to accept a

22           license, unwilling to renew its licenses, or demanded discounts.

23      •     Plaintiffs have not provided any evidence demonstrating that there would be

24           limited opportunity to recover lost customers, artists/songwriters, or confidence

25           and goodwill in the market, including with artists/songwriters and customers.

26

27

28 [129] *Herb Reed Enterprises, LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1250–51 (9th Cir. 2013).
[130] Renewed PI Motion at 26.

1        59.     Even if there were evidence to support Plaintiffs' allegations, and Anthropic's

2  imposition of additional guardrails to prevent future outputs of the Works-in-suit were somehow

3  ineffective at blocking those outputs, such harm between now and a final judgment could be

4  remedied and compensable by damages and quantified in the form of a monetary award

5  commensurate with licensing fees such as those Plaintiffs frequently enter into for use of its

6  Works.  As I stated previously, Plaintiffs admit they have previously exploited and fully licensed

7  their works for license fees to digital platforms such as Spotify and Amazon Music, as well as to

8  lyrics aggregators and their sublicensees for uses allegedly similar to those made by

9  Anthropic.[131]  Therefore, while Anthropic disputes Plaintiffs' claims, any such harm caused by

10  Anthropic's actions could be remedied and quantified in the form of monetary compensation,

11  particularly when dealing with a time-limited period (i.e., between now and a final judgment in

12  this case).

## VI.    ANY HARM CONCERNING CLAUDE'S TRAINING IS REPARABLE

14        60.     Plaintiffs also claim Anthropic unlawfully violates Plaintiffs' copyrights by

15  training Claude utilizing copyrighted Works, causing Plaintiffs irreparable harm even absent

16  output of lyric content.[132]  I understand from Counsel that unauthorized use of copyrighted

17  content to train AI models is currently being litigated in approximately two dozen copyright

18  infringement cases around the country; however, tellingly, no other plaintiff has sought

19  preliminary injunctive relief.[133]  I understand that other AI companies, such as OpenAI, believe

---

[131] Renewed PI Motion at 3; Concord Declaration ¶¶ 10–12; ABKCO Declaration ¶¶ 10–13; UMPG Declaration ¶¶ 10–12; CCMG Declaration ¶¶ 10–12.

[132] I note that "Publishers do not at the preliminary injunction stage seek an order directing Anthropic to retrain or withdraw existing AI models trained on Publishers' lyrics," Renewed PI Motion at 9, which runs counter to their claim of imminent irreparable injury.

[133] *See, e.g.*, *Thomson-Reuters v. ROSS Intelligence*, 694 F. Supp. 3d 467 (D. Del. 2023) (denying cross motions for summary judgment); *Kadrey v. Meta Platforms, Inc.*, 2023 WL 8039640, at *2 (N.D. Cal. Nov. 20, 2023) (granting motion to dismiss all claims except the training claim); *Andersen v. Stability AI Ltd.*, 2023 WL 7132064, at *1, *17 (N.D. Cal. Oct. 30, 2023) (dismissing all claims against AI companies except unchallenged direct infringement claims relating to training); *Tremblay v. OpenAI, Inc.*, 2024 WL 3640501, at *1, *3 (N.D. Cal. July 30, 2024) (dismissing all claims except the unchallenged direct infringement claim); *Silverman v. OpenAI, Inc.*, No. 23-cv-03416-AMO (N.D. Cal.) (consolidated with *Tremblay*); *Chabon v. OpenAI, Inc.*, No. 23-cv-04625-AMO (N.D. Cal.) (consolidated with *Tremblay* and *Silverman*); *Getty Images (US), Inc. v. Stability AI, Inc.*, No. 23-cv-00135-GBW (D. Del.); *J.L. v. Alphabet Inc.*, 23-cv-03440 (N.D. Cal.); *Huckabee v. Meta Platforms, Inc.*, No. 23-cv-06663

1  training is fair use and a license for the use of copyrighted Works in training AI platforms is not

2  required.[134]

3      61.    I also understand that Dr. Peterson has analyzed whether there is an existing or

4  potential licensing market for the use of copyrighted works as training materials for generative

5  AI models like Claude and has concluded there is not.[135]

6      62.    Plaintiffs nevertheless contend that the inclusion of their Works as training data,

7  part of a back-end technological process invisible to the public, constitutes an irreparable harm.

8  Plaintiffs assert that inclusion of their content in training data deprives them of licensing revenue

9  and control over their Works, deprives attribution credit, and harms their goodwill and reputation

10  without explaining why and how they would suffer any harm at all—much less irreparable

11  harm—from such use.[136]  In support of their Motion, Plaintiffs have failed to produce a single AI

12  training license to substantiate their claims.  In fact, Plaintiffs admitted that, as of March 2024,

13  they "have not executed a copyright license agreement with any AI company that allows a

14  licensee to train a general purpose Generative AI model on [their lyrics]."[137]  Nor have they

15  presented any concrete evidence supporting their claim that their relationships with songwriters

16  and licensees, goodwill, or reputations are being damaged, or that their customer base has shrunk

17  or is in danger of shrinking as a result of Anthropic's alleged actions.  Without any evidence, it is

18

19  (N.D. Cal.); *Sancton v. OpenAI, Inc.*, No. 23-cv-10211-SHS (S.D.N.Y.); *N.Y. Times Co. v. Microsoft Corp.*, No. 23-cv-11195-SHS (S.D.N.Y.); *Authors Guild v. OpenAI, Inc.*, No. 23-cv-
20  08292-SHS-OTW (S.D.N.Y.) (lead case, consolidated with *Alter* and *Basbanes*); *Alter v. OpenAI*, No. 23-cv-10211-SHS-OTW (S.D.N.Y.) (consolidated with *Authors Guild* and
21  *Basbanes*); *Basbanes v. Microsoft Corp.*, No. 24-cv-00084-OTW (S.D.N.Y.) (consolidated with *Authors Guild* and *Alter*); *The Intercept Media, Inc. v. OpenAI, Inc.*, No. 24-cv-01515-JSR, Dkt.
22  18 (S.D.N.Y. June 6, 2024); *Raw Story Media, Inc., Alternet Media Inc. v. OpenAI, Inc.*, No. 24-cv-01514-CM (S.D.N.Y.); *Daily News, LP et al. v. Microsoft Corporation, et al.*, No. 24-cv-
23  03285-SHS-OTW (S.D.N.Y.); *The Center for Investigative Reporting, Inc. v. OpenAI, Inc.*, No. 24-cv-04872 (S.D.N.Y.); *Nazemian v. NVIDIA*, No. 3:24-cv-01454 (N.D. Cal.); *O'Nan v.
24  Databricks, Inc.*, 24-cv-01451 (N.D. Cal.); *Makkai v. Databricks, Inc.*, 24-cv-02653 (N.D. Cal.) (related to *O'Nan*); *Dubus v. NVIDIA*, No. 24-cv-02655 (N.D. Cal.); *Zhang v. Google LLC*, 24-
25  cv-02531 (N.D. Cal.); *UMG Recs. v. Suno, Inc.*, No. 24-cv-11611 (D. Mass.); *UMG Recs. v. Unchartered Labs, Inc.*, 1:24-cv-04777 (S.D.N.Y.).
26  [134] "OpenAI and Journalism," OpenAI, January 8, 2024, https://openai.com/blog/openai-and-journalism.
27  [135] Peterson Declaration ¶¶ 5–13.
   [136] *See* Renewed PI Motion at 23–28.
28  [137] *See* Plaintiffs' Objections and Response to Defendant's Request for Admission No. 15 served on April 22, 2024.

1  impossible for me to conclude that Plaintiffs are likely to suffer any of the harm they assert in

2  their Motion.

3          63.      Even assuming Plaintiffs have comparable licenses—which they do not—I have

4  not seen any evidence or discussion in the Plaintiffs' PI Motion, including the supporting

5  declarations, of how they might conceivably be harmed in a way that could not be compensated

6  by monetary relief.  Indeed, to the extent the Court disagrees with Anthropic's fair use argument

7  and finds that a license is required for such use, any harm from lost licensing revenue would by

8  definition be reparable.

9  **VII.    THE ONLY EVIDENCE OF IRREPARABLE HARM IN THE RECORD IS OF
10          IRREPARABLE HARM TO ANTHROPIC IN THE EVENT AN INJUNCTION
           ISSUES**

11          64.      In contrast to the Plaintiffs' claim of irreparable harm to their brand, goodwill,

12  and market position in the absence of a preliminary injunction, in the event that the Court issues

13  a preliminary injunction against Anthropic, I agree with Mr. Kaplan that Anthropic would be

14  irreparably harmed if it were prohibited from using "copies of [Plaintiffs'] lyrics to train future

15  models."[138]  I understand that if Anthropic were prohibited from including Plaintiffs' works in

16  the training corpus in the development of the models currently in development, ███████████

17  █████████████████████████████████████████████████████████████

18  ███████████████████[139]

19          65.      I understand it took Anthropic two years of research, development, and training

20  before it released Claude as an API to certain business users in late 2022, with an official rollout

21  in March 2023.[140]  Anthropic released Claude 2, which included a public conversational interface

22  called Claude.ai in July 2023.[141]  I understand that it took ████████████████████

23  █████████████████████████████████████████████████████████████

24  ███████████████████ ██████[142] Since the submission of my initial declaration, I understand

25

26  ───────────────────────
   [138] Renewed PI Motion at 30.
   [139] Kaplan Declaration ¶ 61.
27  [140] "Introducing Claude," Anthropic, March 14, 2023,
   https://www.anthropic.com/news/introducing-claude.
28  [141] "Claude 2," Anthropic, July 11, 2023, https://www.anthropic.com/news/claude-2.
   [142] Kaplan Declaration ¶ 8.

HALL DECL. ISO ANTHROPIC'S OPP. TO
RENEWED MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL

Anthropic has released two more iterations of Claude: Claude 3 (Haiku, Sonnet, and Opus) on March 4, 2024 and Claude 3.5 Sonnet on June 20, 2024.[143] ████████████████

████████████████████████████████████████████████

████████████[144]

66.   ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█.[145] ████████████████████████████████████████████

████████████████████████████████████████████████████

███[146]

67.   If Anthropic were required to exclude the Works from the training corpus in future training of Claude, I understand the effort required would be "very burdensome," ███

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████[147]

68.   ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████[148]  Additionally, I also understand it would ███████████████████████████████████████████████

████████████████████████[149]  Such delay would also negatively affect Anthropic's reputation, partner relationships, and ability to innovate in the marketplace.[150]  If

---

[143] "Introducing the next generation of Claude," Anthropic, March 4, 2024, https://www.anthropic.com/news/claude-3-family; "Claude 3.5 Sonnet," Anthropic, June 20, 2024, https://www.anthropic.com/news/claude-3-5-sonnet.
[144] Kaplan Declaration ¶ 8.
[145] Kaplan Declaration ¶ 60.
[146] Kaplan Declaration ¶ 60.
[147] Kaplan Declaration ¶ 63.
[148] Kaplan Declaration ¶ 61.
[149] Kaplan Declaration ¶ 61.
[150] Kaplan Declaration ¶ 61.

1  Anthropic were required to exclude the full universe of works owned by Plaintiffs, ████
2  ████████████████████████████████████████████████████████████████
3  ████████████████████████████████████████████████████████████
4  ████████████████████████████████████████████████████████████████
5  ████████████████████████████████[151] I understand that these harms to
6  Anthropic would still apply even with Plaintiffs' request that use of the Works be prevented in
7  only future training of Anthropic's models.[152]

8        69.    The statements in the Kaplan Declaration are supported by Anthropic's CEO,
9  Dario Amodei, who, in public interviews, estimated that "training an AI model costs around
10  $100 million, but 'there are models in training today that are more like a billion.'"[153] He further
11  estimated that the price of developing competitive AI will continue to rapidly increase, hitting
12  between $10 and $100 billion by sometime between 2025 to 2027.[154]

13        70.    The grant of a preliminary injunction, ████████████████████████
14  ████████████████████████████████████████████████████████████████
15  ████████████████████████████████████████████████████
16  ██████[155] would put Anthropic at a competitive disadvantage relative to the rest of the
17  market.[156] As I noted previously, no other AI platforms in litigation are currently being subject
18  to a request for a preliminary injunction.[157]

19        71.    Although Anthropic sets itself apart from other players in the AI market with its
20  "research-driven approach and focus on AI safety" and its use of techniques to avoid biases or
21
22
---

[151] Kaplan Declaration ¶ 65.
[152] Kaplan Declaration ¶ 62.
[153] Sherin Shibu, "How Much Does It Cost to Develop and Train AI? Here's the Current Price, According to the CEO of an $18 Billion AI Startup." Entrepreneur, July 8, 2024, https://www.entrepreneur.com/business-news/anthropic-ceo-ai-will-cost-10-billion-to-train-by-2025/476750.
[154] Sherin Shibu, "How Much Does It Cost to Develop and Train AI? Here's the Current Price, According to the CEO of an $18 Billion AI Startup." Entrepreneur, July 8, 2024, https://www.entrepreneur.com/business-news/anthropic-ceo-ai-will-cost-10-billion-to-train-by-2025/476750.
[155] Kaplan Declaration ¶¶ 60–65.
[156] *See* Kaplan Declaration ¶ 61.
[157] *See* Section VI.

1  errors,[158] the grant of a preliminary injunction is especially harmful at this juncture, particularly

2  as Anthropic has raised series funding to "grow [its] product offerings, support businesses that

3  will responsibly deploy Claude in the market, and further AI safety research."[159]  Availability of

4  funds for research and development is an integral part of growth of a technology company,

5  especially in this kind of fast-paced and competitive product space.[160]  As stated above, the

6  preliminary injunction sought by Plaintiffs ███████████████████████████████████

7  ████████████████████████████████████████ ████████[161] that has millions of

8  users.[162]  Furthermore, the landscape of AI is "a testament to the relentless pursuit of innovation

9  by technologists that have shaped its trajectory."[163]  The grant of a preliminary injunction would

10  thus not only irreparably harm Anthropic but could also negatively impact other firms in the

11  industry.

12       72.    While the true harm if a preliminary injunction were granted is immeasurable, the

13  appropriate related bond amount would have to be significant to cover the ██████████████

14  ████████████████████████████████████████████████████████████████████████████

15  ██████, as well as potential damages associated with negative impacts on Anthropic's reputation,

16  partner relationships, and ability to innovate in the marketplace,[164] which could have further

17  ramifications with respect to the valuation of the company.  Therefore, any potential injunction

18

19  [158] Sandy Carter, "The Evolution of AI: From IBM and AWS to OpenAI and Anthropic," Forbes, November 7, 2023, https://www.forbes.com/sites/digital-assets/2023/11/07/the-evolution-of-ai-from-ibm-and-aws-to-openai-and-anthropic/?sh=21ca3fa57190.

20  [159] "Anthropic Raises $450 Million in Series C Funding to Scale Reliable AI Products," Anthropic, May 23, 2023, https://www.anthropic.com/index/anthropic-series-c; "Anthropic

21  seeking to raise $750 mln in funding round led by Menlo Ventures," Reuters, December 20, 2023, https://www.reuters.com/markets/deals/anthropic-raise-750-mln-menlo-ventures-led-

22  funding-round-information-2023-12-21/; "Amazon spends $2.75 billion on AI startup Anthropic in its largest venture investment yet," CNBC, March 27, 2024,

23  https://www.cnbc.com/2024/03/27/amazon-spends-2point7b-on-startup-anthropic-in-largest-venture-investment.html.

24  [160] See generally Kaplan Declaration, which references Anthropic as a research company and the research Anthropic has put into its AI platform development.

25  [161] Kaplan Declaration ¶¶ 60–65.
    [162] "Google-Backed Anthropic Releases Claude Chatbot Across Europe," Reuters, May 13,

26  2024, https://www.reuters.com/technology/google-backed-anthropic-releases-claude-chatbot-across-europe-2024-05-13/.

27  [163] "The Evolution Of AI: From IBM And AWS To OpenAI and Anthropic," Forbes, November 7, 2023, https://www.forbes.com/sites/digital-assets/2023/11/07/the-evolution-of-ai-from-ibm-

28  and-aws-to-openai-and-anthropic/?sh=21ca3fa57190.
    [164] Kaplan Declaration ¶ 61.

1   bond amount would have to be commensurate with the cumulative amount of these losses.  A ███

2   ████ security would not be an unreasonable estimate of the appropriate bond amount should

3   the Court grant an injunction ███████████████████████████████████████████

4   ██████

5          I declare under penalty of perjury that to the best of my knowledge, information, and

6   belief, the foregoing statements are true and correct.

7          Executed on August 22, 2024 at New York, New York.

8                                                          _Dawn R. Hall_

9                                                          _____
                                                           Dawn R. Hall

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HALL DECL. ISO ANTHROPIC'S OPP. TO
RENEWED MOT. FOR PRELIM. INJ.
CASE NO. 5:24-cv-03811-EKL