1

2

3

4          UNITED STATES DISTRICT COURT

5          NORTHERN DISTRICT OF CALIFORNIA

6

7

8    CONCORD MUSIC GROUP, INC., et al.,          Case No. 24-cv-03811-EKL

9                      Plaintiffs,
                                                 **ORDER DENYING MOTION FOR**
10          v.                                   **PRELIMINARY INJUNCTION**

11   ANTHROPIC PBC,                              Re: Dkt. Nos. 179, 295

12                      Defendant.

13

14

15          This action arises out of the Defendant's alleged use of Plaintiffs' copyrighted song lyrics

16   to train a generative artificial intelligence ("AI") model.  Plaintiffs, eight music publishing

17   companies who own or control exclusive rights to millions of musical compositions, seek a

18   preliminary injunction that prohibits Defendant from using the copyrighted lyrics for training

19   purposes.  Mot. for Prelim. Inj., ECF No. 179 ("Mot.").  The Court reviewed the briefs and

20   supporting declarations and exhibits, and heard argument on November 25, 2024.  For the reasons

21   discussed below, the motion is DENIED.[1]

22

23

24

25   _____
     [1] On February 11, 2025, Plaintiffs filed an administrative request to file supplemental authority.
26   ECF No. 295 (submitting the opinion, *Thomson Reuters Enter. Centre GmbH v. ROSS
     Intelligence, Inc.*, No. 20-cv-613-SB, 2025 WL 458520 (D. Del. Feb. 11, 2025), for
27   consideration).  The Court reviewed the subject opinion and notes that it is distinguishable because
     (1) it addressed the merits of the parties' respective infringement claims and defenses at the
28   summary judgment stage; (2) it did not concern a generative AI model; and (3) the parties in that
     case were direct competitors.  The Court does not rely on the opinion in making its ruling.

United States District Court
Northern District of California

# I.    BACKGROUND

## A.    Factual Background

Plaintiffs, hereinafter referred to as "Publishers," are Concord Music Group, Inc. ("Concord"); Capitol CMG, Inc. ("CCMG"); Universal Music Corp., Songs of Universal, Inc., Universal Music - MGB NA LLC, Polygram Publishing, Inc., Universal Music - Z Tunes LLC (collectively, "UMPG Plaintiffs"); and ABKCO Music, Inc. ("ABKCO"). Publishers own or control the exclusive rights to millions of musical compositions (the "Works"). Mot. at 2. Publishes identify 500 examples of the Works in Exhibit A to the complaint. Compl. Ex. A, ECF No. 1. Publishers license the Works to digital music services, social media platforms, and lyrics aggregators. Mot. at 3. Publishers depend on revenues from the licenses to support and promote songwriters, and songwriters depend on licensing royalties for their livelihoods. *Id.*

Defendant Anthropic PBC ("Anthropic") is a technology company whose signature product line is "Claude," a series of general-purpose AI large language models ("LLMs"). Decl. of Jared Kaplan ¶ 8, ECF No. 209 ("Kaplan Decl."). LLMs, including Claude, are trained by creating a "neural network," a computer program that can study large datasets (referred to as the "corpus") "consisting of hundreds of millions, if not billions, of pieces of content." *Id.* ¶¶ 17, 18. An LLM's training corpus may be assembled from information publicly available on the Internet, non-public data from third parties, or internally created data. *Id.* ¶ 28. The corpus is broken down into "tokens," which may be words or characters. *Id.* ¶ 19. The tokens are grouped into sequences, shuffled, and analyzed by the neural network in the context of surrounding tokens in order to learn language patterns and relationships between words and phrases. *Id.* ¶¶ 19-20. After Claude learns statistical language patterns, Anthropic fine-tunes it to adhere to a set of principles that train Claude to be "helpful" and "harmless." *Id.* ¶¶ 38-39. "Helpful" means that Claude will answer questions and assist with tasks; "harmless" means that Claude will not do or say things that people find dangerous or harmful. *Id.* ¶ 39. According to Anthropic, Claude is designed to use the learning from its training to generate original content. *Id.* ¶ 9.

United States District Court
Northern District of California

Publishers allege that Anthropic's training corpus includes the lyrics to many of the Works. Mot. at 5. Publishers contend that when prompted, Claude has responded with output containing "verbatim or near-verbatim copies of the Works." *Id*. at 5-6. Publishers argue that by using the Works to train Claude, and reproducing the Works in Claude's output, Anthropic violates their rights under the Copyright Act, causing "incalculable harm." *Id*. at 8.

Anthropic does not meaningfully dispute that Claude's training corpus includes the Works. *See* Kaplan Decl. ¶ 31 ("If [the Works] were included in the training set, it is likely because they are commonly found all across the Internet[.]"). Anthropic asserts, however, that Claude's intended purpose is not to reproduce existing materials in response to user queries, but "to generate original outputs that meet the full range of customer needs." *Id*. ¶ 15.

**B.    Procedural Background**

On October 18, 2023, Publishers commenced this action in the U.S. District Court for the Middle District of Tennessee by filing a complaint asserting claims for direct copyright infringement, contributory infringement, vicarious infringement, and removal or alteration of copyright management information. ECF No. 1. On November 16, 2023, Publishers moved for a preliminary injunction. ECF No. 40. On November 22, 2023, Anthropic moved to dismiss the case for lack of personal jurisdiction or, in the alternative, to transfer venue. ECF No. 54. On June 24, 2024, the court granted Anthropic's motion in part, and transferred the case to the Northern District of California without ruling on the preliminary injunction motion. ECF No. 124.

On August 1, 2024, Publishers filed a renewed motion for preliminary injunction in this district. ECF No. 179. On August 15, 2024, Anthropic filed a motion to dismiss Counts II, III, and IV under Federal Rule of Civil Procedure 12(b)(6).[2] ECF No. 205. On August 21, 2024, this case was reassigned to the undersigned. On November 25, 2024, the Court heard argument on the motion for preliminary injunction. ECF No. 272. On December 30, 2024, the parties submitted a stipulation and proposed order regarding the preliminary injunction, ECF No. 290, which the Court entered on January 2, 2025, ECF No. 291.

---

[2] The Court heard argument on Anthropic's Rule 12(b)(6) motion on December 19, 2024, and took the matter under submission. ECF No. 281.

3

United States District Court
Northern District of California

## II.    LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Id.* at 20.  These four factors are often referred to as the *Winter* factors, and all must be satisfied.  *Id.*  Under the Ninth Circuit's "sliding scale approach," a preliminary injunction may issue where "serious questions going to the merits were raised and the balance of hardships tips sharply in [the movant's] favor."  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

"[I]n a copyright infringement case, the plaintiff must demonstrate a likelihood of irreparable harm as a prerequisite for injunctive relief, whether preliminary or permanent." *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 998 (9th Cir. 2011).  The party seeking injunctive relief has the burden of demonstrating that it has met the necessary elements.  *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009).

## III.    DISCUSSION

This case involves alleged copyright infringement based on Claude's "input" (*i.e.,* the use of the Works as an "input" in its training corpus), and on Claude's "output" (*i.e.*, the responses it generates to user prompts).  Publishers sought preliminary injunctive relief to address both forms of alleged infringement.

With respect to output-based infringement, this issue has been resolved for purposes of this motion by the parties' recent stipulation.  ECF No. 291.  Publishers originally sought a preliminary injunction ordering Anthropic to "maintain effective guardrails that prevent its current and future AI models from generating output that reproduces, distributes, or displays the lyrics, in whole or in part, to compositions owned or controlled by Publishers . . . or creates derivative works using those lyrics."  *See* Prop. Order at 3, ECF No. 179-1.  In the joint stipulation entered by the Court on January 2, 2025, Anthropic has agreed to maintain already-implemented guardrails as to its current AI models and products.  ECF No. 291.  For new LLMs and products,

1   Anthropic will apply guardrails on input and output in a manner consistent with the already-

2   implemented guardrails.  *Id.*

3         In light of the stipulation, this Order focuses solely on the relief related to the alleged

4   input-based infringement – that is, Anthropic's use of unauthorized copies of the Works for

5   training.  In that regard, Publishers seek to restrain Anthropic "from using copies of lyrics (or

6   portions of lyrics) to compositions owned or controlled by Publishers for future training of

7   Anthropic's AI models (unless expressly authorized to do so by Publishers via license or other

8   written agreement)."  Prop. Order at 3.

9         **A.**      **The Nature and Scope of the Requested Relief**

10        The nature and scope of the requested relief has shifted over the course of these

11  proceedings.  Initially, it was unclear whether an injunction prohibiting "future training of

12  Anthropic's AI models" would include models that are currently in development or that have

13  already been released.  The difference in scope – and possibly the nature of the remedy – is

14  significant:  An injunction requiring Anthropic to retrain already-released models, or to rebuild the

15  training corpus for models in development, could impose unforeseeable costs on Anthropic.

16  Kaplan Decl. ¶ 61.  In addition, it was unclear which lyrics Anthropic would be prohibited from

17  using.  In its opposition, Anthropic raised concerns that it would be forced to change its practices,

18  resulting in large costs and causing "incalculab[le]" harm in the broader marketplace.  Opp. to

19  Mot. at 9, 26-27, ECF No. 207 ("Opp.").  In reply, Publishers stated that they "are not asking that

20  Anthropic retrain or extract data from its existing or in-progress AI models."  Reply in Support of

21  Mot. at 13, ECF No. 225 ("Reply").  At hearing, Publishers further clarified that they "are not

22  asking Anthropic to have to retrain existing models" or "to pull models out of the marketplace,"

23  and that the requested injunction would "not include any models that are currently under

24  development."  Hr'g Tr. at 23-24, ECF No. 276.

25        Although Publishers have tried to clarify the scope of the proposed injunction, the details

26  remain elusive and poorly defined.  The complaint incorporates and references 500 songs listed in

27  Exhibit A, but this list is "illustrative and non-exhaustive."  Compl. Ex. A; *see also id.* ¶ 37.  At

28  hearing, Publishers confirmed that the injunction would extend "to all of Publishers' works,"

United States District Court
Northern District of California

which number in the "hundreds of thousands at least." Hr'g Tr. at 29-32. Publishers' counsel could not say how many songs would be subject to the injunction. *Id.* at 31. Moreover, the injunction would apply to songs that Publishers currently own and to an unknowable universe of songs that they may acquire while the injunction is in place. *Id.* at 30-31. Publishers would also "update" the list to add or remove songs as necessary. *Id.* at 30. Publishers did not offer a concrete or definitive way for Anthropic – as the party subject to the injunction and the legal repercussions of a violation – to ascertain its parameters or comply with its terms.[3]

The enormous and seemingly ever-expanding scope of Works included in the requested injunction raises significant concerns regarding enforceability and manageability. According to Anthropic, excluding an undefined amount of unknown material from its training corpus would be "virtually impossible," and would require Anthropic to "have to undertake constant efforts to update the corpus, and restart the future model's training process, potentially out of cycle, every time [Publishers] 'update' their catalogs." Kaplan Decl. ¶ 65. "If the expectation is that Anthropic is to re-start the training process from scratch every quarter as [Publishers] update their works, as suggested in the proposed order," Anthropic's ability to release any new models would be severely curtailed by the length of its training process. *Id.*

Thus, even if the Court charged Publishers with "policing the system within the limits of the system," *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1027 (9th Cir. 2001), given the unknown number of Works involved, there is no manageable process through which the Court could enjoin the use of the Works for training purposes without unduly burdening Anthropic. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (acknowledging rule that injunctive relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs"). At hearing, Publishers did not squarely respond to the Court's concern about

---

[3] Publishers argue that the requested relief is not overbroad, citing to *Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1161 (9th Cir. 2011). In that summary judgment opinion, the Ninth Circuit affirmed a permanent injunction prohibiting future infringement of copyrighted works that belonged to Apple but which were not at issue in that litigation. There, the injunction including the additional works was appropriate "because liability has been established as between the parties[.]" Here, by contrast, the Court has not decided the merits of Publishers' infringement claims or Anthropic's fair use defense.

United States District Court
Northern District of California

1  managing such a vague and unwieldy injunction.  *See* Hr'g Tr. at 30-31.

2      The undefined nature of the relief sought here casts a long shadow over Publishers'

3  request.  *See Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017) ("Crafting a

4  preliminary injunction is an exercise of discretion and judgment, often dependent as much on the

5  equities of a given case as the substance of the legal issues it presents.").  The Court does not have

6  unfettered discretion to issue an injunction that may be overbroad because it includes works for

7  which Publishers may not have established ownership or control.  *United States v. BNS, Inc.*, 858

8  F.2d 456, 460 (9th Cir. 1988) (concluding that district court's injunction was an abuse of

9  discretion because it "was overbroad under the circumstances"); *see also Religious Tech. Ctr. v.*

10  *Netcom On-Line Commc'n Servs., Inc.*, 923 F. Supp. 1231, 1259 (N.D. Cal. 1995) (declining to

11  expand TRO to include additional works protected by copyright and trade secret law, noting that

12  "a broad injunction which goes beyond the scope of the allegedly infringing activities should be

13  avoided for First Amendment reasons").  Even if the Court were inclined to issue an injunction

14  that is limited in scope to the 500 Works identified in the complaint, Publishers have not requested

15  this narrower form of relief, and at hearing Publishers insisted that the injunction apply "to all of

16  [their] works."  Hr'g Tr. at 30.  The Court therefore finds it inappropriate to issue a more limited

17  injunction.

18      The Court turns next to the *Winter* factors, and also finds an injunction inappropriate on

19  the independent ground that Publishers have not shown irreparable harm on the record presented.

20      **B.    Irreparable Harm**

21      A showing of irreparable harm is a prerequisite for injunctive relief.  *Flexible Lifeline Sys.*,

22  654 F.3d at 998.  Irreparable harm must be "likely," not just possible.  *Winter*, 555 U.S. at 22.  "A

23  plaintiff must do more than merely allege imminent harm sufficient to establish standing; a

24  plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive

25  relief."  *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (quoting *Caribbean*

26  *Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir.1988)).

27      Publishers contend they will suffer two primary types of irreparable harm should

28  Anthropic continue to use the copyrighted works:  reputational harm and market-related harm.

The Court addresses each in turn.

### 1.     Reputational Harm

Publishers contend that Anthropic's ongoing use of the copyrighted works will cause them to suffer reputational harm by depriving them of control over the works, denying them credit and goodwill associated with the works, and harming their reputations through the creation of unauthorized derivative works. Mot. at 23-25. A loss of control over business reputation or damage to customer goodwill "could constitute irreparable harm" where supported by evidence. *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc*., 736 F.3d 1239, 1250 (9th Cir. 2013). For the reasons discussed below, Publishers have not made this showing here.

The Court notes that the reputational harm described by Publishers appears largely related to Claude's outputs rather than the use of the Works for training purposes alone. *See* Mot. at 24-25. For example, Publishers claim that "Claude routinely reproduces, distributes, and displays Publishers' copyrighted lyrics in its output but fails to identify Publishers or their songwriters as the source." *Id*. And "Claude frequently generates output that combines portions of the Works with other lyrics or text, often in ways inconsistent with and inimical to authorial intent – and for which the songwriter would never have granted a license." *Id*. at 25. The parties' stipulation addressed and resolved Publishers' motion for injunctive relief to the extent it concerns Claude's output.

Publishers have not demonstrated reputational harm based on the use of the Works as training input. Publishers cite to several declarations, which are largely duplicative of each other. The declarations discuss the effect of unlicensed use of copyrighted works as "damaging" or "harmful" generally, but they fail to identify any specific harm. For example, Concord's Executive Vice President of Business and Legal Affairs and Publishing states that Anthropic's conduct denies Concord and its songwriters "the right and ability to control the exploitation of their copyrighted works," and that this "loss of control is enormously damaging." Decl. of Duff Berschback ¶ 21, ECF No. 184 ("Concord Decl.").[4] Although the Court acknowledges the value

---

[4] Other declarations submitted by Publishers echo these general sentiments. ABKCO's Chief Operative Officer states that when Anthropic "engages in unauthorized uses of the ABKCO

United States District Court
Northern District of California

an artist places on control of their own works, none of the declarations explain how or why the use of the Works to train Claude has been, or will be, "enormously damaging" to Publishers or songwriters. To a certain extent, all copyright infringement involves a loss of control. But accepting Publishers' argument on this record would imply automatic entitlement to injunctive relief in all copyright cases, a premise the Ninth Circuit has rejected. *See Perfect 10, Inc. v. Google, Inc*., 653 F.3d 976, 980 (9th Cir. 2011) ("[T]he propriety of injunctive relief in cases arising under the Copyright Act must be evaluated on a case-by-case basis in accord with traditional equitable principles and without the aid of presumptions[.]").

Publishers also cite a statement from the Board of Directors of the Nashville Songwriters Association International ("NSAI"). Decl. of Bart Herbison Ex. A, ECF No. 46-1 ("NSAI Letter"). There, NSAI Board members expressed concern that by creating new compositions using copyrighted lyrics, or by turning "important, award-winning, socially meaningful songs" into "something the composers never intended," Claude will diminish the value of the works or result in a "misuse of [songwriters'] art." *Id*. The NSAI letter, which cites several examples of output where Claude has changed lyrics or created mashups of certain Works, relies on Appendix E to the Declaration of Dr. Robert Leonard. *See id*. Ex. E, ECF No. 46-1. The Claude outputs discussed in the Leonard Declaration dated November 16, 2023, pre-date Publishers' filing of the original preliminary injunction motion. *See* ECF No. 50. Accordingly, this and other outputs were addressed by the parties' stipulation, and do not provide a basis for injunctive relief.[5]

A preliminary injunction must be "grounded in evidence," not based on what harm Publishers "might suffer." *Herb Reed Enters., LLC*, 736 F.3d at 1250 (holding that district court erred in issuing preliminary injunction without sufficient evidence of irreparable harm). Because

---

Works and exploits those works to its own ends without permission," it "wrests . . . control away from ABKCO and our songwriters" and deprives them of the ability to decide how the works are used "in ways that are enormously damaging and cannot be undone." Decl. of Alisa Coleman ¶ 23, ECF No. 185 ("ABKCO Decl."); *see also* Decl. of David Kokakis ¶¶ 13-16, 25, ECF No. 187 ("UMPG Decl."); Decl. of Kenton Draughon ¶¶ 13-16, 22, ECF No. 186 ("CCMG Decl.").

[5] Moreover, Publishers' theory that mashups or other similar outputs may cause irreparable harm if they offend songwriters would essentially require the Court to engage in a hypothetical fair use analysis as to each example. The Court declines to decide such questions in the hypothetical.

1   Publishers' evidence does not demonstrate a likelihood of irreparable harm arising from

2   reputational harm, Publishers are not entitled to a preliminary injunction on this basis.

3                    **2.    Market-Related Harm**

4        Publishers also contend that Anthropic's use of copyrighted lyrics will erode the value of

5   the Works by undermining the licensing market, damaging Publishers' position to negotiate future

6   training licenses with AI developers, and harming Publishers' relationships with songwriters.

7   Mot. at 26-28.  In effect, Publishers argue that output containing the Works and the use of the

8   Works to train Claude affects Publishers' position both (1) in the existing licensing market and (2)

9   in the emerging market for licensing copyrighted works for use by AI developers.  *Id*. at 26.  The

10  Court addresses each of these in turn.

11       As to the existing licensing market, Publishers argue that Anthropic's unlicensed use of the

12  Works reduces demand for licenses for the lyrics, and undermines Publishers' ability to negotiate

13  new licenses and to renew existing licenses.  Mot. at 26.  Publishers have not submitted any

14  evidence that Anthropic's use of lyrics to train Claude reduces license fees with lyric aggregators,

15  lyric websites, or other existing licensees, which provide entirely different services and do not

16  compete with Claude.  To the extent Publishers are arguing that lyrics appearing in Claude's

17  *output* undermines their ability to license to lyrics aggregators, this potential harm is addressed by

18  the parties' stipulation.  In addition, Anthropic vigorously disputes that Claude could be used as an

19  alternative to lyrics aggregators, as Claude was designed precisely not to perform these functions.

20  *See* Opp. at 2 ("Anthropic's tool is not designed to output copyrighted material, and Anthropic has

21  always had guardrails in place aimed at preventing this result.  If those measures failed in some

22  instances many months ago, that would have been a 'bug,' not a 'feature,' of the product.").

23       The evidence submitted by Publishers in the form of declarations by Publishers'

24  representatives are largely duplicative of each other, and state in a general and conclusory manner

25  that Anthropic's use of the Works is harmful.  But they do not demonstrate how using the Works

26  to train Claude is affecting – let alone diminishing – the value of any of the Works.  Nor do they

27  show that training Claude with the Works is harming Publishers' negotiating position vis-à-vis

28  new or existing licensees like lyrics aggregators.  *See* Decl. of Michael D. Smith ¶¶ 48-49, ECF

United States District Court
Northern District of California

10

1    No. 182 ("Smith Decl."); Concord Decl. ¶¶ 19-27; ABKCO Decl. ¶¶ 21-29; CCMG Decl. ¶¶ 20-

2    28; UMPG Decl. ¶¶ 20-31.  For example, Publishers have not identified any lost licensing deal or

3    any licensing arrangement that Publishers have had to renegotiate on less favorable terms.

4         Even if Publishers' evidence demonstrated that Anthropic's use of the Works to train

5    Claude diminished Publishers' position in the existing licensing market, Publishers fail to

6    demonstrate that their losses could not be compensated through monetary damages.  *See Fox*

7    *Broad. Co. v. Dish Network LLC*, 747 F.3d 1060, 1073 (9th Cir. 2014) (denying preliminary

8    injunction because Fox's harm was not "irreparable," as it could be compensated monetarily

9    through existing licensing agreements that "could, at the very least, constitute a starting point or an

10   aid in calculating damages").  Thus, Publishers do not demonstrate irreparable harm on this basis.

11        As to the emerging market related to AI developers, Publishers argue that Anthropic's use

12   of the Works will negatively impact the emerging market for AI training licenses and diminish

13   their ability to negotiate such licenses in the future.  Mot. at 27.  They theorize that "[i]f Anthropic

14   continues to exploit and devalue the Works, even if only during the pendency of this case, its

15   conduct will become entrenched in the AI industry and the public consciousness."  *Id.*  Publishers

16   further contend that Anthropic's use "will permanently undermine Publishers' leverage in future

17   negotiations with AI developers to license lyrics as training data."  *Id*.

18        The evidence cited by Publishers is insufficient to support this theory.  For example,

19   Publishers' economics expert states that "*[i]f* LLM developers like Anthropic were permitted to

20   take lyrics and other copyrighted works without compensating rightsholders, this growing market

21   for copyrighted works *would* likely contract and *may* collapse."  Smith Decl. ¶ 56 (emphasis

22   added).  This statement is both conclusory and speculative.  Other declarations cited by Publishers

23   on this point are similarly general in nature.  They fail to provide details or specifics regarding

24   how, if at all, Anthropic's use of the Works to train Claude has affected their respective abilities to

25   negotiate training licenses with other AI developers, or how it will inflict harm on the emerging

26   licensing market.  *See* Concord Decl. ¶¶ 25, 27; ABKCO Decl. ¶ 29; CCMG Decl. ¶ 28; UMPG

27   Decl. ¶ 31.  Publishers have not demonstrated a likelihood of harm arising from Anthropic's use of

28   the Works for training purposes.  *Am. Passage Media Corp. v. Cass Comm'cns, Inc.*, 750 F.2d

United States District Court
Northern District of California

1470, 1473 (9th Cir. 1985) (finding insufficient evidence of irreparable harm where supporting affidavits were "conclusory and without sufficient support in facts").

Even if Publishers had shown that the use of the Works to train Claude will cause them harm within the emerging AI licensing market, they once again fail to show that such harm is irreparable. According to Publishers' evidence, the market for AI training licenses has grown over the course of this lawsuit rather than diminished. *See* Smith Decl. ¶¶ 76-77 (listing content licensing agreements that OpenAI and other AI developers have entered into in recent years). If other AI developers are obtaining licenses to use copyrighted material for training purposes, then it follows that (1) the market is not being significantly harmed by Anthropic's use of the Works without licenses, and (2) the value of the loss of licensing fees could be ascertained. Thus, any harm arising from the emerging AI licensing market would be compensable rather than irreparable. *See Fox Broad. Co.*, 747 F.3d at 1073. Publishers have not shown a likelihood of irreparable harm based on Anthropic's use of the Works to train Claude.[6]

Publishers cite several cases for the proposition that courts must treat the use of copyrighted works in emerging technology markets with caution and care. Mot. at 26-27 (citing *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 929 (2005), *Waymo LLC v. Uber Tech. Inc.*, No. C-17-00939-WHA, 2017 WL 2123560, at *11 (N.D. Cal. May 15, 2017), and *Warner Bros. Ent. Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1012 (C.D. Cal. 2011)). The Court does not disagree. However, Publishers fail to explain how this general proposition entitles them to relief. To the contrary, these cases demonstrate that emerging technologies often test the bounds and principles of copyright law. Here, it is an open question whether training generative AI models with copyrighted material is infringement or fair use. By seeking a preliminary injunction, Publishers are essentially asking the Court to define the contours of a licensing market for AI training where the threshold question of fair use remains unsettled. The Court declines to

United States District Court
Northern District of California

---

[6] Publishers' third argument is that the use of the Works for training purposes harms Publishers' relationships with songwriters. *See* Mot. at 28 (citing ABKCO Decl. ¶ 28 ("If Anthropic is permitted to continue to violate [ABKCO's] rights, that will cause permanent and lasting damage to our relationship and reputation with our songwriters that will undermine our business as a music publisher.")). The evidence cited for this proposition is similarly general and conclusory, and thus fails to establish irreparable harm.

1    award Publishers the extraordinary relief of a preliminary injunction based on legal rights (here,

2    licensing rights) that have not yet been established.  *See Perfect 10,* 653 F.3d at 980.

3          Because Publishers have not established the prerequisite factor of irreparable harm, the

4    Court does not address the other *Winter* factors.  *See Famous Birthdays, LLC v. SocialEdge, Inc.*,

5    No. CV 21-9562 PA (MRWx), 2022 WL 1592726, at *4 (C.D. Cal. Feb. 11, 2022) ("Because the

6    Court concludes that Famous Birthdays has failed to establish that it will likely suffer irreparable

7    harm in the absence of preliminary relief, the Court does not reach the other elements required for

8    a preliminary injunction." (citing *Tech. & Intell. Prop. Strategies Grp. PC v. Fthenakis*, No. C 11-

9    2373 MEJ, 2012 WL 159595, at *4 n.6 (N.D. Cal. Jan. 17, 2012))).

**IV.    CONCLUSION**

          For the foregoing reasons, Publishers are not entitled to the extraordinary remedy of a

preliminary injunction.  Publishers' Motion is DENIED without prejudice.  In reaching this

conclusion, the Court does not address whether Publishers could plausibly state either direct or

secondary infringement claims against Anthropic, as those questions are appropriately reserved for

Anthropic's motion to dismiss the complaint and subsequent proceedings on the merits.

          **IT IS SO ORDERED.**

Dated:  March 25, 2025

Eumi K. Lee
United States District Judge