UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ANTHROPIC PBC,<br><br>Defendant. | Case No. 24-cv-03811-EKL<br><br>**ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND**<br><br>Re: Dkt. No. 205 |

This action arises out of Defendant's alleged use of Plaintiffs' copyrighted song lyrics to train a generative artificial intelligence ("AI") model. Plaintiffs, eight music publishing companies who own or control exclusive rights to millions of musical compositions, assert claims for direct and secondary copyright infringement, and removal of copyright management information. Before the Court is Defendant's motion to dismiss the secondary infringement and removal of information claims. Mot. to Dismiss, ECF No. 205 ("Mot."). The Court reviewed the parties' briefs, and heard oral argument on December 19, 2024. For the reasons discussed herein, the Court GRANTS Defendant's motion with leave to amend.

**I.  BACKGROUND**

**A.  Factual Background**

Plaintiffs Concord Music Group, Inc., Capitol CMG, Inc., Universal Music Corp., Songs of Universal, Inc., Universal Music - MGB NA LLC, Polygram Publishing, Inc., Universal Music - Z Tunes LLC, and ABKCO Music, Inc. (collectively, "Publishers") are "among the world's foremost music publishers."[1] Compl. ¶ 34, ECF No. 1 ("Compl."). Publishers own or control the

---

[1] The facts are taken from the complaint and assumed to be true for purposes of this motion.

exclusive rights to millions of musical compositions, including 500 original works that are listed in Exhibit A to the complaint (the "Works"). *Id.* ¶¶ 37-39; *see also id.* Ex. A. Publishers collect income from licenses and agreements regarding the Works. *Id.* ¶ 44. Publishers depend on revenues from the licenses to support and promote songwriters, and songwriters depend on licensing royalties for their livelihoods. *Id.* ¶ 47.

Defendant Anthropic PBC ("Anthropic") is a technology company whose signature product line is "Claude," a series of general-purpose AI large language models ("LLMs"). *Id.* ¶¶ 49-50. Anthropic provides access to Claude through a chat interface ("chatbot") on its website; the chatbot is available to the public through a paid subscription or through a more limited free version. *Id.* ¶ 52. Anthropic also provides access to Claude "as a commercial Application Programming Interface ("API") through which custom third-party client software interacts with Claude AI models." *Id.* Anthropic sells or licenses the API-based access to its commercial customers.[2] *Id.*

Anthropic trains Claude by first creating a training "corpus," meaning it collects (or "scrapes") a large amount of content from the Internet "and potentially other sources" to create a training dataset. *Id.* ¶ 54(a). Anthropic then removes unwanted content from the corpus, *i.e.*, material that is duplicative or offensive, and converts the information into words or parts of words called "tokens." *Id.* ¶ 54(b)-(c). Once this material is copied into computer memory, Anthropic "finetunes" Claude through "reinforcement learning" based on human and AI feedback. *Id.* ¶ 54(d). After this process is complete, Claude models generate output consistent with the material in the training corpus and the reinforcement feedback. *Id.* ¶ 55.

According to Publishers, Anthropic "engages in the wholesale copying" of copyrighted lyrics when assembling Claude's training corpus, *id.* ¶ 56, when finetuning Claude, *id.* ¶ 62, and when disseminating copies of lyrics in response to user prompts, *id.* ¶¶ 64-65. Publishers allege that Claude has responded to prompts for lyrics to songs to which Publishers own the copyrights

---

[2] Publishers filed the complaint on October 18, 2023. For purposes of ruling on this motion, the Court assumes that the allegations related to Anthropic's business practices, including Claude's availability, training and functionality, remain current.

by providing "nearly word-for-word" copies of the lyrics. *See, e.g.*, *id*. ¶¶ 66-67. Publishers claim that Anthropic infringes their copyrights by copying the lyrics for Claude's training, and then distributing them in Claude's output in response to "queries related to songs and various other subject matter." *Id.* ¶ 80.

### B.  Procedural Background

On October 18, 2023, Publishers commenced this action in the U.S. District Court for the Middle District of Tennessee by asserting claims for direct copyright infringement, contributory infringement, vicarious infringement, and the removal of copyright management information ("CMI") in violation of Section 1202(b) of the Digital Millenium Copyright Act ("DMCA").[3] ECF No. 1. On November 22, 2023, Anthropic filed a motion to dismiss the case for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), or, in the alternative, to transfer venue. ECF No. 54. On June 24, 2024, the Middle District of Tennessee granted Anthropic's motion in part, and transferred the case to the Northern District of California. ECF No. 124.

On August 15, 2024, Anthropic filed a motion to dismiss all but the direct copyright infringement claims under Rule 12(b)(6).[4] ECF No. 205. On August 21, 2024, this case was reassigned to the undersigned. On December 19, 2024, the Court heard argument on the motion to dismiss and took the motion under submission. ECF No. 281.

## II.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To avoid dismissal, the plaintiff must allege

---

[3] The DMCA amended existing copyright law to add, *inter alia*, Sections 1201-1205, concerning Copyright Protection and Management Systems.

[4] The Court DENIES Publishers' request to deny this motion as untimely. Publishers argue that Anthropic violated Rule 12(g) by failing to include its Rule 12(b)(6) arguments in the earlier-filed Rule 12(b)(2) motion. *See* ECF No. 54. This argument lacks merit because the parties' pre-transfer stipulated case management schedule permitted Anthropic to file an answer "or otherwise respond" after the Middle District of Tennessee ruled on Anthropic's Rule 12(b)(2) motion to dismiss. *See* ECF No. 64. The Court further notes that the interest of judicial efficiency would be poorly served by denying this motion on untimeliness grounds, only to have Anthropic seek to re-file it under Rule 12(c), thereby prolonging the pleadings phase of this case. ECF No. 1.

"enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the pleaded facts allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For purposes of a Rule 12(b)(6) motion, the court generally "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, the court need not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)).

If dismissal is warranted, the court should grant leave to amend "unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)).

### III.    DISCUSSION

Anthropic seeks to dismiss Counts II (contributory infringement), III (vicarious infringement), and IV (the intentional removal of CMI), arguing that Publishers have failed to state a claim. The Court addresses each in turn.

####    A.    Contributory Infringement (Count II)

To state a claim for contributory infringement, Publishers must allege that Anthropic (1) has knowledge of another's infringement, and (2) materially contributes to or induces that infringement. *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007). "[T]he existence of direct infringement is a necessary element of a claim for contributory infringement." *Petroliam Nasional Berhad v. GoDaddy.com, Inc.*, 897 F. Supp. 2d 856, 867 (N.D. Cal. 2012) (citing *Perfect 10*, 494 F.3d at 795). Anthropic moves to dismiss Count II on the grounds that Publishers fail to allege either a predicate act of direct infringement by a third party, or specific knowledge by Anthropic of any third-party infringement.

4

### 1. Publishers have not alleged a predicate act of direct third-party infringement.

According to Publishers, the complaint adequately alleges predicate acts of third-party infringement by both individual Claude users and Anthropic business customers. Opp. at 8. Publishers point to allegations that individual users, through Anthropic's website, "can request and obtain through Claude verbatim or near-verbatim copies of lyrics[.]" Compl. ¶ 65. Publishers also allege that "[w]hen a user prompts . . . Claude's AI chatbot to provide the lyrics to songs . . . the chatbot will provide responses that contain all or significant portions of those lyrics." *Id*. ¶ 8. Publishers argue that because Claude is available to users "in a variety of ways," individual users "could and would direct Claude to deliver copies of Publishers' lyrics."[5] Opp. at 9. Publishers further contend that Anthropic's business customers "might use the Claude API tool" to seek copyrighted lyrics in the process of prompting Claude to generate creative output.[6] *Id*. at 9-10.

Publishers' allegations and arguments do not support the requested inference of direct third-party infringement. The allegations assert what unidentified users "can" do when prompting Claude, but Publishers have not clearly alleged a predicate act of direct third-party infringement. Other allegations emphasized by Publishers in their opposition are conclusory, and provide no facts regarding direct third-party infringement.[7] *See* Compl. ¶¶ 11, 120 and 134.

---

[5] This argument relies on an unsupported assumption. First, Publishers point to allegations that Anthropic provides individual users with access to Claude "in a variety of ways, including as a 'limited free version'" on Anthropic's website. Opp. at 9 (citing Compl. ¶ 52). Next, Publishers allege that there is a "well-established market of users searching for lyrics online." *Id*. (citing Compl. ¶¶ 9, 108). From these allegations, Publishers ask the Court to infer that "typical users may have sought lyrics from Claude as that service is no more costly or inconvenient than any other [lyrics aggregator] method." *Id*. Publishers also attempt to shift the burden to Anthropic, noting that "Anthropic has not explained why users would *not* seek to use Claude . . . to obtain lyrics." *Id*. Neither the allegations nor Publishers' arguments on this point support the requested inference.

[6] This argument involves similar assumptions. Publishers assert that Anthropic makes Claude AI models available to business customers through its API, which interacts with third-party client software. Opp. at 9-10 (citing Compl. ¶ 52). Publishers note Anthropic's acknowledgement that some of its customers "might use the Claude API as a tool to 'brainstorm[] plot ideas for stories.'" *Id*. at 10 (citing Mot. at 1). Based on these facts, Publishers conclude that "[i]t is reasonable to infer that some requests will seek copyrighted works," citing an alleged prompt, by an unidentified user, to "[w]rite a short piece of fiction in the style of Louis Amstrong." *Id*. (citing Compl. ¶ 79). Publishers' assertions do not support a reasonable inference of direct infringement by Anthropic's business customers.

[7] Publishers cite *August Image, LLC v. Trend Hunter Inc*., No. CV 22-7120-DMG (MAAx), 2023 WL 6783845, at *2 (C.D. Cal. Sept. 12, 2023), in support of their argument that the complaint

The parties spent time at hearing and in their briefs disputing whether prompts that were entered by Publishers' investigators – as opposed to a third party – could satisfy this threshold pleading requirement. Although the complaint contains numerous examples of output containing copyrighted lyrics generated by Claude in response to prompts, the complaint does not attribute the prompts to an author. *See e.g.*, *id*. ¶¶ 66-69. Anthropic argues that these allegations "reflect Plaintiffs' attempts to generate alleged copies of their own lyrics," and are therefore "*per se* non-infringing, so they cannot support a secondary infringement claim." Mot. at 6. Publishers appear to concede that at least some of the prompts discussed in the complaint were entered by Publishers or their investigators. *See* Opp. at 13 (arguing that "[i]t would be premature to dismiss the [c]omplaint for failure to specify other third-party infringements when Publishers have alleged that Claude regurgitates lyrics in response to . . . Plaintiffs and their investigators") (citing Compl. ¶¶ 66-74, 75-79). None of the allegations in the complaint indicate who submitted the prompts that resulted in infringing output, let alone whether they were submitted by Publishers' investigators. *See, e.g.*, Compl. ¶ 67 (alleging that "when Anthropic's Claude is prompted 'What are the lyrics to I Will Survive by Gloria Gaynor,' . . . the model responds by providing a nearly word-for-word copy of those lyrics"). If the "users" referenced in the complaint are Publishers' investigators, Publishers should allege this.[8] The Court declines to decide at this time whether output prompted by Publishers' investigators would constitute a predicate act of third-party infringement as a matter of law because Publishers have not alleged these facts.

### 2. Publishers have not alleged that Anthropic had knowledge of specific acts of third-party infringement.

Even if Publishers had alleged a predicate act of third-party infringement, they have not

---

adequately alleges direct third-party infringement. Opp. at 11. Much of the language quoted by Publishers related to the direct infringement claim in *August Image*. *Id*. The plaintiff in *August Image* included more detail, including the URL location of the allegedly infringing uses. *Id*. *August Image* does not otherwise assist Publishers as the court did not directly discuss the third-party infringement requirement.

[8] The record contains a significant amount of evidence that Publishers' experts prompted Claude for output containing protected song lyrics. That evidence, which was submitted in connection with Publishers' motion for preliminary injunction, may not be considered for purposes of ruling on this motion.

6

1  stated a plausible claim because the complaint does not allege that Anthropic knew or had reason
2  to know of any third-party infringement. The first prong of a contributory infringement claim
3  "requires more than a generalized knowledge" of "the possibility of infringement." *Luvdarts, LLC*
4  *v. AT & T Mobility, LLC*, 710 F.3d 1068, 1072 (9th Cir. 2013) (holding that conclusory allegations
5  that defendants had the required knowledge of infringement were "plainly insufficient" to satisfy
6  specific knowledge requirement). To state a claim for contributory infringement, Publishers must
7  allege "actual knowledge of specific acts of infringement." *Id*.

8        Publishers contend that Anthropic is "well aware of its licensees' and users' infringing
9  activities through its AI products" because it "knowingly trained its AI models on infringing
10 content on a massive scale in order to enable those models to generate responses to user prompts
11 that infringe Publishers' copyrighted lyrics." Opp. at 15 (citing Compl. ¶ 122). Such allegations
12 are conclusory at best. Claude may be capable of "substantial lawful as well as unlawful uses,"
13 but contributory liability does not "automatically follow" where the technology arguably permits
14 both. *Luvdarts*, 710 F.3d at 1072 (first quoting *Metro-Goldwyn-Mayer Studios Inc. v. Grokster,*
15 *Ltd.*, 545 U.S. 913, 932-33 (2005); then citing *A&M Record, Inc. v. Napster Inc.*, 239 F.3d 1004,
16 1021 (9th Cir. 2001)). In other words, the inclusion of protected lyrics in Claude's training corpus
17 alone does not establish actual knowledge by Anthropic of third-party infringement.

18       The cases cited by Publishers in support of this theory do not assist them in light of the
19 conclusory nature of the allegations in the complaint. *See* Opp. at 16. For example, in *BMG Rts.*
20 *Mgmt. (US) v. Joyy Inc.*, the court held that the defendant's responses to over half of plaintiffs'
21 takedown requests for copyrighted material supported a reasonable inference that the defendant
22 had specific knowledge of third-party infringement related to the requests. 716 F. Supp. 3d 835,
23 843 (C.D. Cal. 2024). And in *Splunk Inc. v. Cribl, Inc.*, the court held that the plaintiff adequately
24 alleged knowledge of infringement because the defendant's CEO "'derived go-S2S from Splunk's
25 copyrighted source code,' 'provided this code to Cribl . . . with knowledge that go-S2S was an
26 unlicensed derivative of Splunk's copyrighted S2S version 3 code,' and 'each new version of
27 Cribl's Stream software includes a new copy of this unlicensed derivative of Splunk's copyrighted
28 S2S version 3 code.'" 662 F. Supp. 3d 1029, 1052 (N.D. Cal. 2023) (citation omitted). In those

cases, the plaintiffs made specific allegations establishing the element of knowledge or supporting an inference of knowledge. Here, the allegations regarding knowledge are conclusory and speculative. They do not satisfy the pleading standard.

Because the complaint fails to allege either a predicate act of direct third-party infringement or actual knowledge of infringement, the Court grants the motion as to Count II with leave to amend.

### B. Vicarious Infringement (Count III)

"To state a claim for vicarious copyright infringement, a plaintiff must allege that the defendant has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity." *Perfect 10*, 494 F.3d at 802 (citing *Ellison v. Robertson*, 357 F.3d 1072, 1078 (9th Cir. 2004)). Stated differently, "[o]ne . . . infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." *Id*. (quoting *Grokster*, 545 U.S. at 930). "Like contributory liability, vicarious liability requires an underlying act of direct infringement." *Perfect 10, Inc. v. Yandex N.V.*, 962 F. Supp. 2d 1146, 1158 (N.D. Cal. 2013). As discussed above, Publishers fail to allege the necessary predicate act of direct infringement by a third party. Thus, the Court grants the motion to dismiss Count III with leave to amend.

According to Anthropic, Publishers also fail to state a claim for vicarious infringement because they have not alleged that Anthropic had a direct financial interest in any infringing activity. On this point, the Court disagrees. "Financial benefit exists where the availability of infringing material 'acts as a draw for customers.'" *Napster*, 239 F.3d at 1023 (citing *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 263-64 (9th Cir. 2001)). "The size of the draw relative to a defendant's overall business is immaterial." *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 673 (9th Cir. 2017) (quoting *Perfect 10, Inc. v. Giganews, Inc.*, No. CV 11-07098-AB (SHx), 2014 WL 8628031, at *3 (C.D. Cal. Nov. 14, 2014)). "The essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of *how substantial* the benefit is in proportion to a defendant's overall profits." *Ellison*, 357 F.3d at 1079. "There is no requirement that the draw be

'substantial.'" *Id.*

Assuming for the sake of argument that Publishers will amend the complaint to allege a predicate act of third-party infringement, the current allegations plausibly state that Anthropic received a direct financial benefit. *See, e.g.*, Compl. ¶ 94 (alleging that Anthropic receives revenues from commercial customers based on the amount of text submitted by the customers' end users into the Claude API and the amount of text generated as output); *id.* (alleging that Anthropic "is paid every time one of its customers' end users submits a request for Publishers' song lyrics, and it is paid again every time its Claude API generates output copying and relying on those lyrics"); *id.* ¶ 98 ("One of the reasons that Anthropic's AI models are so popular and valuable is because of the substantial underlying text corpus that includes Publishers' copyrighted lyrics. As such, Publishers' copyrighted content serves as a draw for individual users, commercial customers, and ultimately investors."). Accepting these allegations as true for purposes of this motion, Publishers have plausibly alleged that Anthropic received a direct financial benefit from potentially infringing activity. *See e.g.*, *Keck v. Alibaba.com Hong Kong Ltd.*, 369 F. Supp. 3d 932, 938 (N.D. Cal. 2019) (denying motion to dismiss vicarious infringement claim where the plaintiff alleged that defendants reproduced plaintiff's artwork on their websites; the infringing material drew customers to the websites; defendants received commissions from the sale of unauthorized copies of her work; and defendants had monetized increased traffic due to the work). However, because Publishers have failed to allege direct infringement by Anthropic's users, the Court grants the motion with leave to amend as to Count III.

### C. Removal or Alteration of Copyright Management Information (Count IV)

Count IV alleges that Anthropic "intentionally removed or altered copyright management information from Publishers' musical compositions, and/or distributed or imported for distribution copies of Publishers' musical compositions knowing that copyright management information has been removed or altered, without Publishers' authorization," in violation of Section 1202(b) of the DMCA. Compl. ¶ 149. The complaint does not specify which subsections of Section 1202(b) are at issue. At hearing, Publishers clarified that Count IV includes subsections (b)(1) and (b)(3). 12/19/2024 Hr'g Tr. at 20.

"Copyright law restricts the removal or alteration of copyright management information ("CMI") – information such as the title, the author, the copyright owner, the terms and conditions for use of the work, and other identifying information set forth in a copyright notice or conveyed in connection with the work." *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 671 (9th Cir. 2018) (citing 17 U.S.C. § 1202(b)-(c)). Section 1202(b)(1) provides, "No person shall, without the authority of the copyright owner or the law . . . intentionally remove or alter any copyright management information." 17 U.S.C. § 1202(b)(1). Section 1202(b)(3) states:

> No person shall, without the authority of the copyright owner or the law . . . distribute . . . copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law, knowing, or . . . having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

"Both provisions thus require the defendant to possess the mental state of knowing, or having a reasonable basis to know, that [the removal of CMI] 'will induce, enable, facilitate, or conceal' infringement." *Stevens*, 899 F.3d at 673; *see also Doe 1 v. GitHub, Inc.*, 672 F. Supp. 3d 837, 858 (N.D. Cal. 2023) ("On a motion to dismiss, a plaintiff must allege sufficient facts to support the reasonable inference that the defendant 'knew or had a reasonable basis to know that the removal or alteration of CMI . . . w[ould] aid infringement.'").

According to Publishers, the allegations reflect that Anthropic intentionally removed CMI. Publishers highlight paragraphs 84 and 149 of the complaint, but those allegations are conclusory. They simply repeat the statutory language without stating any facts to show that Anthropic intentionally removed CMI. Publishers identify other portions of the complaint relating to the omission of CMI from Claude's output, and contend these sections support an inference that CMI was intentionally removed. *See* Opp. at 21-22 (citing Compl. ¶¶ 11, 73, 74, 86, 87). They do not. Although Publishers plausibly allege that the output omits the CMI regarding the Works, they have not sufficiently pled that Anthropic acted intentionally as to the removal of CMI. *See* Compl. ¶ 11 (alleging that Claude's output "often omits critical [CMI]" regarding the Works"), ¶ 86 (alleging that when Claude has reproduced lyrics they are "often unaccompanied by" CMI), ¶¶ 73, 74, 87 (examples of song lyrics where Claude allegedly omitted attribution).

Citing *GitHub*, Publishers urge the Court to infer from these allegations that the removal of CMI was intentional, or that Anthropic intentionally designed Claude's training process to remove CMI. *See* Opp. at 21, 24. *Github* does not support this argument because the plaintiff's allegations in that case were much more specific. There, the court concluded it could reasonably infer intentional removal of CMI based on the allegations that (1) the defendants knew the source code they used to train their AI programs contained CMI, (2) the defendants knew that CMI was important for protecting copyright interests, and (3) Github had regularly processed takedown notices "such that it was aware its platform was used to distribute code with removed or altered CMI in a manner which induced infringement." *Github*, 672 F. Supp. 3d at 858. Here, Publishers' allegations are conclusory. Unlike *Github*, Publishers allege no specific facts that reflect Anthropic's intentional removal of CMI or that it was on notice that CMI had been removed.

The Court notes that Publishers have alleged that some outputs *do* include attribution for lyrics. *See, e.g.*, Compl. ¶ 76 (alleging that Claude produced chords and lyrics to "Daddy Sang Bass" in response to query of "Give me the chords to Daddy Sang Bass by Johnny Cash"). These allegations arguably undermine Publishers' theory that Anthropic intentionally removes CMI by design, *see* Opp. at 24, because they suggest that CMI was *not* removed across the board – intentionally or otherwise – during Claude's training process. In *Tremblay v. OpenAI, Inc.*, the court found that similarly contradictory allegations undermined the plaintiffs' Section 1202(b) claim. 716 F. Supp. 3d 772, 779 (N.D. Cal. 2024) (noting that plaintiffs could not support their assertion that defendants removed CMI from copyrighted books used in AI training "by design" because their allegations included excerpts of outputs, which referenced authors' names). At minimum, the contradictory nature of Publishers' allegations undermines their argument that CMI was intentionally removed.

Turning to Section 1202(b)(3), Publishers contend that their allegations regarding Claude's training process support a reasonable inference that Anthropic "knew its conduct would induce, enable, facilitate, or conceal further infringement." Opp. at 24. This argument seems to rely on the same allegations regarding Anthropic's training process, and the same underlying theory that

11

Claude's training process imbued Anthropic with knowledge that the removal of CMI would induce third party infringement. Once again, Publishers' allegations are too conclusory to establish such knowledge, and Publishers fail to state a plausible claim under Section 1202(b). Accordingly, the Court grants the motion to dismiss Count IV with leave to amend.

## IV.   CONCLUSION

For the foregoing reasons, Anthropic's motion to dismiss Counts II, III, and IV is GRANTED with leave to amend. Publishers may file an amended complaint within 30 days of this order. Publishers shall not add any new claims without leave of court.

**IT IS SO ORDERED.**

Dated:  March 26, 2025

Eumi K. Lee
United States District Judge