**OPPENHEIM + ZEBRAK, LLP**
Matthew J. Oppenheim
Nicholas C. Hailey
Audrey L. Adu-Appiah
(admitted *pro hac vice*)
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
aadu-appiah@oandzlaw.com

Jennifer Pariser
Andrew Guerra
Timothy Chung
(admitted *pro hac vice*)
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
jpariser@oandzlaw.com
andrew@oandzlaw.com
tchung@oandzlaw.com

*Attorneys for Plaintiffs*

**COBLENTZ PATCH DUFFY & BASS LLP**
Jeffrey G. Knowles (SBN 129754)
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 772-5795
ef-jgk@cpdb.com

**COWAN, LIEBOWITZ & LATMAN, P.C.**
Richard S. Mandel
Jonathan Z. King
Richard Dannay
(admitted *pro hac vice*)
114 West 47th Street
New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> ANTHROPIC PBC, <br><br> Defendant. | Case Number: 5:24-cv-03811-EKL-SVK <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** <br><br> Judge Eumi K. Lee <br> Magistrate Judge Susan van Keulen <br><br> Hearing Date: July 30, 2025 <br> Time: 10:00 am PT <br> Courtroom: 7 |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

LEGAL STANDARD .......................................................................................................... 4

ARGUMENT ...................................................................................................................... 5

    I.    Publishers plausibly allege Anthropic's knowledge for contributory liability. ................... 5

      A.   Anthropic argues for an unduly stringent standard for pleading knowledge. ................. 5

      B.   Anthropic knew or should have known of specific infringing activity. .......................... 7

    II.    Publishers plausibly allege Anthropic's direct financial benefit for vicarious liability. ... 13

    III.    Publishers plausibly allege Anthropic's dual scienter under § 1202(b). ...................... 14

      A.   Anthropic intentionally removed or altered CMI, in violation of § 1202(b)(1). .......... 15

      B.   Anthropic distributed Publishers' lyrics knowing CMI had been removed or altered, in violation of § 1202(b)(3). ...................................................................... 17

      C.   Anthropic knew or had reason to know its conduct would induce, enable, facilitate, or conceal infringement. ................................................................................ 19

        1.   Anthropic concealed its own infringement. ................................................. 19

        2.   Anthropic induced, enabled, facilitated, and concealed infringement by its users and others. ............................................................................................. 20

    IV.    Alternatively, Publishers should be permitted to amend their Complaint. ................... 25

CONCLUSION .................................................................................................................. 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3  *A&M Recs., Inc. v. Napster, Inc.*,
     239 F.3d 1004 (9th Cir. 2001) ........................................................................ 6

4  *Andersen v. Stability AI Ltd.*,
     2024 WL 3823234 (N.D. Cal. Aug. 12, 2024) ............................................. 13

5
   *Annabooks, LLC v. Issuu, Inc.*,
6    2020 WL 6873646 (N.D. Cal. Sept. 24, 2020) .............................................. 6

7  *APL Microscopic, LLC v. Steenblock*,
     2022 WL 4830687 (9th Cir. Oct. 3, 2022) .................................................... 5

8
   *Ashcroft v. Iqbal*,
9    556 U.S. 662 (2009) ...................................................................................... 4

10 *Baker v. Cuomo*,
     58 F.3d 814 (2d Cir. 1995) ............................................................................ 5

11 *BanxCorp v. Costco Wholesale Corp.*,
12   723 F.Supp.2d 596 (S.D.N.Y. 2010) ........................................................... 18

13 *Batra v. PopSugar, Inc.*,
     2019 WL 482492 (N.D. Cal. Feb. 7, 2019) ................................................. 19

14 *Bell Atl. Corp. v. Twombly*,
     550 U.S. 544 (2007) ...................................................................................... 4

15
   *BMG Rts. Mgmt. (US) LLC v. Joyy Inc.*,
16   716 F. Supp. 3d 835 (C.D. Cal. 2024) ......................................................... 12

17 *Clark v. InComm Fin. Servs., Inc.*,
     2023 WL 8522952 (C.D. Cal. Dec. 1, 2023) ............................................... 14

18
   *Creech v. Tewalt*,
19   84 F.4th 777 (9th Cir. 2023) ........................................................................ 25

20 *Doe 1 v. GitHub, Inc.*,
     2024 WL 235217 (N.D. Cal. Jan. 22, 2024) ................................................ 25

21 *Doe 1 v. GitHub, Inc.*,
     672 F. Supp. 3d 837 (N.D. Cal. 2023) .............................................. 14, 17, 23

22
   *Elec. Constr. & Maint. Co., Inc. v. Maeda Pac. Corp.*,
23   764 F.2d 619 (9th Cir. 1985) ......................................................................... 5

24 *Ellison v. Robertson*,
     357 F.3d 1072 (9th Cir. 2004) ............................................................. 5, 6, 13

25 *Erickson Prods., Inc. v. Kast*,
26   921 F.3d 822 (9th Cir. 2019) ..................................................................... 5, 6

27

28

*Ernst & Haas Mgmt. Co., Inc. v. Hiscox, Inc.*,
   23 F.4th 1195 (9th Cir. 2022) ............................................................................ 4

*Harrington v. Pinterest, Inc.*,
   2021 WL 4033031 (N.D. Cal. Sept. 3, 2021) ...................................................... 12

*Izmo, Inc. v. Roadster, Inc.*,
   2019 WL 13210561 (N.D. Cal. Mar. 26, 2019) .................................................... 24

*Kadrey v. Meta Platforms, Inc.*,
   2025 WL 744032, at *2 (N.D. Cal. Mar. 7, 2025) ......................................... 19, 22

*Kirk Kara Corp. v. W. Stone & Metal Corp.*,
   2020 WL 5991503 (C.D. Cal. Aug. 14, 2020) ...................................................... 6

*Leadsinger, Inc. v. BMG Music Publ'g*,
   512 F.3d 522 (9th Cir. 2008) .............................................................................. 25

*Logan v. Meta Platforms, Inc.*,
   636 F.Supp.3d 1052 (N.D. Cal. 2022) ................................................................ 14

*Lopez v. Smith*,
   203 F.3d 1122 (9th Cir. 2000) ............................................................................ 25

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*,
   658 F.3d 936 (9th Cir. 2011) ................................................................................ 6

*Luvdarts, LLC v. AT&T Mobility, LLC*,
   710 F.3d 1068 (9th Cir. 2013) .............................................................................. 6

*Mango v. BuzzFeed, Inc.*,
   970 F.3d 167, 172 (2d Cir. 2020) ....................................................................... 19

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
   519 F.3d 1025 (9th Cir. 2008) .......................................................................... 4, 7

*McDougal v. Cnty. of Imperial*,
   942 F.2d 668 (9th Cir. 1991) ................................................................................ 4

*McGary v. City of Portland*,
   386 F.3d 1259 (9th Cir. 2004) .............................................................................. 5

*Neo4j, Inc. v. Graph Found., Inc.*,
   2020 WL 6700480 (N.D. Cal. Nov. 13, 2020) ................................................... 21

*New York Times Co. v. Microsoft Corp.*,
   2025 WL 1009179 (S.D.N.Y. Apr. 4, 2025) ..........................................11, 17, 23

*Philips N. Am. LLC v. Vartanian*,
   2023 WL 8937615 (C.D. Cal. Nov. 16, 2023) ...................................................... 6

*Rearden LLC v. TWDC Enters. 18 Corp.*,
   2024 WL 5191980 (N.D. Cal. Dec. 20, 2024) ................................................ 6, 12

*Rivas v. Kijakazi*,
   2023 WL 8006846, (N.D. Cal. Nov. 17, 2023) ................................................... 25

*San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*,
  360 F.Supp.3d 1039 (S.D. Cal. 2019) ........................................................................ 14

*Splunk Inc. v. Cribl, Inc.*,
  662 F.Supp.3d 1029 (N.D. Cal. 2023) ........................................................................ 12

*Stevens v. Corelogic, Inc.*,
  899 F.3d 666 (9th Cir. 2018) ........................................................................... 15, 24

*Telemasters, Inc. v. Vintage Club Master Ass'n*,
  371 F. App'x 771 (9th Cir. 2010) ............................................................................. 6

*The Intercept Media, Inc. v. OpenAI, Inc.*,
  2025 WL 556019 (S.D.N.Y. Feb. 20, 2025) .......................................................... 21, 23

*Tremblay v. OpenAI, Inc.*,
  716 F.Supp.3d. 772 (N.D. Cal. 2024) .................................................................. 24, 25

*Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*,
  953 F.3d 1108 (9th Cir. 2020) .................................................................................. 5

*YZ Prods., Inc. v. Redbubble, Inc.*,
  545 F. Supp. 3d 756 (N.D. Cal. 2021) .................................................................. 6, 12

**Statutes**

17 U.S.C. § 1202(b) ................................................................................. 1, 19, 22, 25

17 U.S.C. § 1202(b)(1) ................................................................................... passim

17 U.S.C. § 1202(b)(3) ................................................................................... passim

**Rules**

Fed. R. Civ. P. 12(b)(6) ........................................................................................ 12

Fed. R. Civ. P. 9(b) ....................................................................................... 5, 12

**INTRODUCTION**

Anthropic's renewed Motion to Dismiss disregards both the detailed factual allegations set forth in Publishers' First Amended Complaint ("FAC") and the important developments in the law since Anthropic's first motion to dismiss. Instead, Anthropic simply rehashes the same arguments from its first motion. Because these recycled arguments fail to identify any legitimate basis for dismissing Publishers' FAC, Anthropic's Motion to Dismiss should be denied in full.

Notably, Anthropic has never challenged the sufficiency of Publishers' direct copyright infringement claims, because the facts of Anthropic's underlying infringement are largely undisputed. There is no question that Anthropic has trained its "Claude" AI models by copying Publishers' copyrighted lyrics without permission, and the evidence that Anthropic further copies Publishers' lyrics in Claude's output is overwhelming.

What's more, while Anthropic previously sought dismissal of Publishers' secondary infringement claims by arguing that Publishers failed to allege a predicate act of third-party infringement, Anthropic abandons that position here, conceding that Publishers plausibly allege such third-party infringement. Anthropic's retreat is not surprising. The FAC identifies numerous specific instances from Anthropic's own records of third-party users prompting Claude for lyrics to Publishers' Works in Suit and receiving output copying those lyrics. Anthropic can no longer deny the reality that it has copied and distributed Publishers' lyrics, repeatedly and systematically.

Instead, Anthropic's Motion to Dismiss repeats more narrow challenges it previously made to Publishers' secondary infringement and 17 U.S.C. § 1202(b) claims. But these old arguments ignore the new allegations in the FAC. First, Publishers plausibly allege Anthropic's knowledge of specific acts of infringement for purposes of contributory liability, based on, among other things, a Claude user's posting specific output infringing Publishers' lyrics to a Reddit forum Anthropic monitors under the title "Claude using copyrighted material." Second, the Court has already found that Publishers plausibly allege Anthropic's direct financial benefit for purposes of vicarious liability. Third, Publishers plausibly allege Anthropic's scienter in connection with their § 1202(b) claims, including that Anthropic deliberately decided to use extractor tools to strip Publishers' CMI from the lyrics it used to train Claude and prevent that CMI from appearing in Claude's output.

1    For all of these reasons, Anthropic's Motion to Dismiss should be denied in full.

2                                    **BACKGROUND**

3    Publishers represent and advocate for the interests of songwriters. First Am. Compl.

4    ("FAC") ¶¶ 4, 37-38, ECF No. 337. Among other things, Publishers develop and promote talented

5    lyricists and composers, administer the copyrights in their musical compositions, license those

6    compositions in myriad contexts, and distribute the resulting royalties. *Id.*

7    Publishers own and control exclusive rights to "millions of valuable musical compositions,

8    including the compositions listed on Exhibit A" to the FAC. *Id.* ¶ 40; Ex. A, ECF No. 337-1. These

9    works include timeless classics as well as today's chart-topping hits, such as "God Only Knows,"

10   "What a Wonderful World," "American Pie," "Sweet Home Alabama," "Every Breath You Take,"

11   "Life Is a Highway," "Halo," "Moves Like Jagger," "Uptown Funk," and many others. FAC ¶ 8.

12   Publishers disseminate their copyrighted lyrics to the public through licensees, such as

13   "licensed lyrics aggregators and websites where consumers can find genuine, authorized copies of

14   the lyrics to their favorite songs." *Id.* ¶ 49. Publishers require licensees to properly credit the lyrics'

15   authors and rightsholders, by including copyright management information. *Id.* ¶¶ 49, 129.

16   Anthropic, meanwhile, is "in the business of developing, operating, selling, and licensing

17   AI technologies." *Id.* ¶ 6. Anthropic's signature product is a series of AI models referred to as

18   "Claude." *Id.* Anthropic offers individual users access to Claude through a chat interface on

19   Anthropic's Claude.ai website, a mobile application, and a desktop program. *Id.* ¶ 55. Anthropic

20   also sells or licenses access to Claude to thousands of businesses as "a commercial API through

21   which third-party client software can interact with Claude AI models." *Id.* ¶¶ 55, 144.

22   Anthropic has developed and trained Claude through the unauthorized copying and

23   downloading of text—including, in particular, Publishers' lyrics—from the internet and from third-

24   party datasets that themselves contain unlicensed copies of those lyrics. *Id.* ¶¶ 6, 58(a). The

25   "corpus" of training data for Claude includes a number of datasets, such as "Common Crawl" and

26   "The Pile," that contain "a trove of Publishers' copyrighted lyrics scraped from the websites of

27   Publishers' licensees and other entities that Publishers have authorized to reproduce their

28   copyrighted lyrics, including MusixMatch, LyricFind, and Genius." *Id.* ¶¶ 67, 69.

During the process of training Claude, Anthropic utilizes extractor tools such as the Newspaper algorithm "to remove copyright notices from texts that Anthropic scraped from the internet"—including, in particular, Publishers' lyrics—"and to 'clean' copyright management information from works contained in third-party datasets." *Id.* ¶¶ 68, 72. Anthropic's goal in stripping this copyright management information from Publishers' lyrics is to ensure Claude is trained to reproduce only the lyrics' expressive content, not the copyright management information that Anthropic dismisses as "junk" and seeks to exclude from Claude's input and output. *Id.* ¶ 130.

Anthropic trains Claude further by "finetuning" the AI models to generate the output Anthropic desires. *Id.* ¶¶ 58(d)-59, 75. During this finetuning process, temporary employees hired by Anthropic have repeatedly prompted the AI models for Publishers' specific lyrics, including by querying, "What are the lyrics to American Pie by Don McLean?" *Id.* ¶ 110; *see also id.* ¶ 103.

Before releasing Claude publicly, Anthropic "took steps to confirm that Claude would copy the lyrics to Publishers' works and other songs." *Id.* ¶ 111. In January 2023, Anthropic employees "discussed prompting Claude for copies of Publishers' lyrics" and confirmed, among other things, that Claude would respond to prompts seeking "a coherent poem made up of fragments" of "lyrics from the Beatles [and] Bob Dylan," *id.* ¶ 112, the latter of whom is the songwriter of dozens of Works in Suit, *id.*, Ex. A. The next month, Anthropic's co-founder Tom Brown queried, "@Claude what are the lyrics to desolation row by [Bob] Dylan?", a Work in Suit. *Id.* ¶ 113.

Following Claude's launch, real-world users have prompted Claude for Publishers' lyrics and the model has generated output copying those lyrics, just as Anthropic intended. *See, e.g.*, *id.* ¶¶ 8-10, 15, 87-90, 94, 104-05. Anthropic's records reveal third-party user requests for Publishers' lyrics and Claude output containing those lyrics, including to Works in Suit "Highway 61 Revisited," "Sweet Caroline," "The Boys are Back in Town," and "Message in a Bottle." *Id.* ¶ 9. These users have also "received unauthorized copies of Publishers' lyrics" from Claude even when they did not request them, such as when one user "prompted Claude to assist with writing a short story, [and] Claude generated output copying lyrics from 'House at Pooh Corner,'" a Work in Suit. *Id.* ¶¶ 104, 123. That user posted this Claude interaction publicly to the r/ClaudeAI Reddit forum that Anthropic monitors. *Id.* Publishers' investigation has confirmed Claude generates output

copying Publishers' lyrics verbatim and near-verbatim in response to a range of requests. *Id.* ¶ 78. In most cases, this output omits Publishers' copyright management information. *Id.* ¶¶ 131-33.

Since Claude's release, Anthropic has closely monitored and studied user interactions with Claude, including analyzing instances in which users requested lyrics to Publishers' works and Claude generated output copying those lyrics. *Id.* ¶ 117. After learning of specific instances of Claude prompts and output infringing Publishers' lyrics, Anthropic implemented limited guardrails that "feigned a desire to protect copyrighted content" but were ultimately ineffective. *Id.* ¶ 121.

Anthropic, which is now valued at $61.5 billion, profits richly from its unauthorized copying of Publishers' works. *Id.* ¶ 18. Among other things, "Anthropic is paid every time one of its [commercial] customers' end users submits a request for Publishers' song lyrics, and it is paid again every time its Claude API generates output copying and relying on those lyrics." *Id.* ¶ 142; *see also id.* ¶¶ 144, 147 (describing paid plans for individual users). "One of the reasons that Anthropic's AI models are so popular and valuable is because of the substantial underlying text corpus that includes Publishers' copyrighted lyrics," meaning Publishers' lyrics "serve[] as a draw for individual users, commercial customers, and ultimately investors." *Id.* ¶ 146; *see also id.* ¶ 186.

## LEGAL STANDARD

"It is axiomatic that the motion to dismiss . . . is viewed with disfavor and is rarely granted." *Ernst & Haas Mgmt. Co. v. Hiscox, Inc.*, 23 F.4th 1195, 1199 (9th Cir. 2022) (quoting *McDougal v. Cnty. of Imperial*, 942 F.2d 668, 676 n.7 (9th Cir. 1991)) (reversing grant of motion to dismiss).

To withstand a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Courts "do not require heightened fact pleading of specifics" or "detailed factual allegations." *Twombly*, 550 U.S. at 555, 570.

Rather, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008)). Unless allegations fail to "raise a right to relief above the speculative level," dismissal is improper. *Twombly*, 550 U.S. at 555.

Moreover, "scienter need not be pleaded with particularity, but may be alleged generally." *Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1122 (9th Cir. 2020) (citing Fed. R. Civ. P. 9(b)). Likewise, "evidence is not required at the motion to dismiss stage." *APL Microscopic, LLC v. Steenblock*, 2022 WL 4830687, at *1 (9th Cir. Oct. 3, 2022).

Finally, "Rule 12(b)(6) dismissals 'are especially disfavored in cases where the complaint sets forth a novel legal theory that can best be assessed after factual development.'" *McGary v. City of Portland*, 386 F.3d 1259, 1270 (9th Cir. 2004) (quoting *Baker v. Cuomo*, 58 F.3d 814, 818-19 (2d Cir. 1995)). That is because "it is important that new legal theories be explored and assayed in the light of actual facts rather than a pleader's suppositions.'" *McGary*, 386 F.3d at 1270 (quoting *Elec. Constr. & Maint. Co., Inc. v. Maeda Pac. Corp.*, 764 F.2d 619, 623 (9th Cir. 1985)).

## ARGUMENT

## I.    Publishers plausibly allege Anthropic's knowledge for contributory liability.

Publishers' detailed factual allegations regarding Anthropic's knowledge of specific acts of infringement are more than sufficient to state a claim for contributory copyright infringement (Count II). In the Ninth Circuit, knowledge "for contributory copyright infringement . . . include[s] both those with *actual knowledge* and those who *have reason to know* of direct infringement." *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004) (emphasis in original).

### A.    Anthropic argues for an unduly stringent standard for pleading knowledge.

As a threshold matter, Anthropic urges the Court to adopt an overly exacting legal standard for pleading knowledge at this stage. Anthropic is mistaken that "actual knowledge" of specific infringements is required to state a claim for contributory liability. Rather, Publishers need only plausibly allege that Anthropic knew **or had reason to know** of such infringement. *Id.*

Indeed, the Ninth Circuit's own model jury instructions provide that liability for contributory infringement arises where "the defendant knew or had reason to know of the infringing activity." Ninth Circuit Model Civil Jury Instruction 17.21 (rev. Dec. 2023), https://www.ce9.uscourts.gov/jury-instructions/node/279. Likewise, numerous recent decisions by the Ninth Circuit and district courts in this Circuit have endorsed and applied that same standard. *See, e.g.*, *Erickson Prods., Inc. v. Kast*, 921 F.3d 822, 832 (9th Cir. 2019) (holding that jury

instruction that "'knowledge' for contributory infringement purposes includes having a 'reason to know' of the infringement" was not plainly erroneous, while recognizing some inconsistency in the case law); *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936, 943 (9th Cir. 2011) ("Contributory liability requires that the secondary infringer 'know or have reason to know' of direct infringement.'" (quoting *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1020 (9th Cir. 2001))); *Telemasters, Inc. v. Vintage Club Master Ass'n*, 371 F. App'x 771, 775 (9th Cir. 2010) (affirming district court decision applying "knew or had reason to know" standard for contributory liability); *Philips N. Am. LLC v. Vartanian*, 2023 WL 8937615, at *10 (C.D. Cal. Nov. 16, 2023) ("The Ninth Circuit has 'interpreted the knowledge requirement for contributory copyright infringement to include both those with *actual knowledge* and those who *have reason to know* of direct infringement.'" (quoting *Ellison*, 357 F.3d at 1076)); *Annabooks, LLC v. Issuu, Inc.,* 2020 WL 6873646, at *5 (N.D. Cal. Sept. 24, 2020); *Kirk Kara Corp. v. W. Stone & Metal Corp.*, 2020 WL 5991503, at *5 (C.D. Cal. Aug. 14, 2020); *see also* ECF No. 322 at 7 ("MTD Order") (granting Anthropic's first motion to dismiss "because the complaint does not allege that Anthropic knew or ***had reason to know*** of any third-party infringement" (emphasis added)).

Indeed, Anthropic itself concedes at least once in its Motion to Dismiss that "actual ***or constructive*** knowledge" is sufficient. ECF No. 359 at 6 ("Mot.") (emphasis added). What's more, many of the cases upon which Anthropic relies in its Motion applied this same "knew or had reason to know" standard. *See, e.g.*, *Erickson*, 921 F.3d at 832; *Rearden LLC v. TWDC Enters. 18 Corp.*, 2024 WL 5191980, at *5 (N.D. Cal. Dec. 20, 2024); *YZ Prods., Inc. v. Redbubble, Inc.*, 545 F. Supp. 3d 756, 763 (N.D. Cal. 2021). By contrast, the *Luvdarts* case on which Anthropic relies to argue that actual knowledge is required is inapposite. That case involved infringing content supplied by mobile phone users over which the defendant mobile wireless carriers had little or no control. *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1071 (9th Cir. 2013). The principle underpinning the knowledge analysis applied in *Luvdarts* was that "contributory liability [does] not automatically follow where the 'system allows for the exchange of copyrighted material'" by users. *Id.* at 1072 (quotation omitted)). That situation is very different from this case. Here, it is Anthropic that is supplying the infringing output in response to user requests.

**B.    Anthropic knew or should have known of specific infringing activity.**

In addition to misreading the law, Anthropic also ignores Publishers' extensive factual allegations set forth in the FAC, which detail the multiple ways in which Anthropic knew or had reason to know of the specific infringing activity here. Publishers allege numerous facts showing (and from which the Court can infer) Anthropic's actual and constructive knowledge that Claude users infringed specific lyrics owned by Publishers, including that (1) Anthropic intended, designed, and trained Claude to respond to user prompts requesting copies of specific Publishers' lyrics, and it confirmed that Claude operated in the real world as it intended; (2) Anthropic closely monitored and studied Claude user prompts and output, including identifying specific prompts and output copying Publishers' lyrics; (3) later, after detecting particular instances of Claude output infringing Publishers' lyrics, and in an effort to feign respect for copyright, Anthropic implemented pre-suit guardrails (albeit extremely ineffective ones) to block certain Claude output copying Publishers' lyrics; (4) Anthropic learned, through public discussions in online forums it monitored, that Claude users generated output copying specific Publishers' lyrics and circumvented guardrails; and (5) Anthropic indemnified its users for the infringement it knew was taking place.

Thus, far from being only "generally aware of the possibility of infringement," as Anthropic claims, Mot. at 4, the FAC makes clear that Anthropic knew (or should have known) of the specific infringements of Publishers' lyrics. Viewing these allegations in the light most favorable to Publishers—as required at the motion to dismiss stage, *Manzarek*, 519 F.3d at 1031—these allegations more than suffice to plausibly allege knowledge for contributory infringement.

<u>First</u>, Publishers allege that "Anthropic intended, expected, and designed its AI models to respond to prompts for Publishers' and others' lyrics and to copy the lyrics in output—as a feature, not a bug." FAC ¶ 12. Publishers describe how Anthropic knowingly trained Claude on datasets containing Publishers' copyrighted lyrics, *id.* ¶¶ 6, 66-70, "in order to enable those models to generate responses to user prompts that infringe Publishers' copyrighted lyrics," *id.* ¶ 170.

Publishers explain in detail how Anthropic then specifically designed and trained Claude to respond to user requests for Publishers' lyrics by generating output copying the lyrics on which Claude was trained. Publishers cite multiple instances in which Anthropic's own employees

prompted Claude for specific lyrics to Publishers' works during pre-deployment testing and trained the AI model to respond to these very requests. *Id.* ¶¶ 112-113. One Anthropic employee prompted Claude to "'[w]rite a coherent poem made up of fragments' of 'lyrics from the Beatles, Bob Dylan, and other classics from the 60s/70s,'" *id.* ¶ 112, which "predicted with astonishing accuracy how third-party users would later prompt Claude for lyrics in the same manner," *id.* ¶ 95, demonstrating Anthropic's intent and knowledge that Claude would be used in exactly this way in the real world. *See also id.* ¶ 94 (detailing similar prompt by third-party Claude user). Numerous other Anthropic employees similarly tested and confirmed that Claude would respond to specific requests for Publishers' lyrics, including Anthropic's own co-founder Tom Brown prompting, "@Claude what are the lyrics to desolation row by [Bob] Dylan?", a Work in Suit. *Id.* ¶¶ 112-113.

Publishers further explain how the temporary employees that Anthropic hired to test and finetune Claude likewise prompted the AI model for output copying Publishers' lyrics in precisely the way Anthropic intended. *Id.* ¶¶ 11, 58(d), 59, 103, 110. These temporary employees prompted Claude with queries like "What are the lyrics to American Pie by Don McLean?", *id.* ¶ 110, and requests to rewrite existing song lyrics in the style of other artists, *id.* ¶ 103, finetuning the AI model to respond to the exact same types of requests that Anthropic knew third-party users were also entering, *see, e.g.*, *id.* ¶¶ 87-89 (examples of third-party Claude users' requesting specific lyrics to Publishers' works); *id.* ¶¶ 93, 101-102 (examples of Claude's generating infringing output "in the style of" various artists in response to Publishers' investigator's requests). Anthropic was certainly aware of these finetuning prompts and output, given that Anthropic posted them publicly.

On top of all this, Publishers also describe how Anthropic knew that Claude memorized and regurgitated the copies of Publishers' lyrics on which it was trained. *Id.* ¶¶ 107-109, 170. In fact, Tom Brown—the same Anthropic founder who prompted Claude for the lyrics to Publishers' Work in Suit "Desolation Row"—is the lead author of an article discussed in the FAC detailing Anthropic's understanding that AI models regurgitate their training data. *Id.* ¶ 108 & n.29.

All of "[t]his activity demonstrates that Anthropic and its employees deliberately, knowingly, and purposefully designed and trained Claude to satisfy requests for lyrics—and then confirmed that this unlawful functionality worked as intended" with respect to specific lyrics. *Id.*

¶¶ 114-15. Anthropic knew or had reason to know Claude generated output infringing Publishers' lyrics, including to works like "American Pie" and "Desolation Row" that Anthropic purposely tested, because that is exactly what it designed Claude to do and what it confirmed Claude did. In light of these facts, Anthropic's denial of knowledge of infringements is entirely implausible.

Second, Publishers allege "Anthropic closely monitors and analyzes its users' interactions with Claude and the output generated by Claude," *id.* ¶ 117, such that it knows or has reason to know of specific infringements of Publishers' lyrics. "Anthropic collects user prompts and corresponding Claude output to study the specific ways in which Claude is being used," and that "extensive study of user behavior, analysis of Claude's prompts, and monitoring of Claude output necessarily examines instances in which users request lyrics to Publishers' works and Claude outputs those lyrics and other works." *Id.*; *see also id.* ¶ 170 (alleging Anthropic "actively studied its users' activity and Claude's outputs, including prompts seeking copyrighted content and output copying such content"); *id.* ¶ 121. Anthropic's extensive analysis of users' prompts and resulting output necessarily vested Anthropic with actual or constructive knowledge of the many infringing uses the FAC identifies, particularly given the large volume of such infringements. *See id.* ¶ 10.

Anthropic latches onto one example of its wide-ranging analysis of Claude prompts and output—a paper describing the "Clio" platform it developed to study Claude usage, *id.* ¶ 117 & n.34—and claims this somehow contradicts Publishers' allegations regarding Anthropic's examination of user behavior. Not so. The fact that Anthropic may have studied "aggregated" Claude usage in this particular paper does not mean that Anthropic does not study all kinds of individual prompts and output in more granular detail, or that its aggregated analysis did not reveal specific infringements. The paper also "underscores the importance of complementing Clio's analysis with other methods." Tamkin et al., *Clio: Privacy-Preserving Insights into Real-World AI Use* at 13 (Dec. 18, 2024), https://arxiv.org/pdf/2412.13678. As Publishers explain in the FAC, "Anthropic's broader study of user behavior and Claude output" involves manually reviewing prompts and output—including specific infringements of Publishers' lyrics. *See, e.g.*, FAC ¶ 121 (alleging Anthropic "collected Claude user prompts and output data, including specific output copying lyrics," "analyz[ed] specific efforts by users to avoid those guardrails," and "identif[ied]

instances in which the guardrails have failed and Claude has generated infringing output, including output copying Publishers' lyrics"). In fact, Anthropic's own Terms of Service (of which Publishers cite multiple versions in the FAC, *id.* ¶¶ 116 n.33, 127 n.37) emphasize that Anthropic (a) "may use or analyze" Claude prompts and output "flagged for trust and safety review"—including specific infringements; (b) uses that content to "improve [Anthropic's] ability to detect" other such infringements; and (c) conducts "algorithmic and human review" of Claude prompts and output.[1]

Third, Anthropic's pre-suit adoption of so-called copyright "guardrails" further highlights its knowledge of specific infringement by its users, in multiple ways. *See id.* ¶¶ 119-122, 170. Anthropic's Motion seriously misunderstands Publishers' pleadings on this important issue.

Publishers allege that, before being sued, Anthropic adopted limited guardrails regarding Publishers' lyrics, such that Claude responded (albeit inconsistently) to requests for such lyrics by "warning" that "'song lyrics are copyrighted material' and that providing those lyrics runs afoul of 'copyright restrictions.'" *Id.* ¶ 119. Notwithstanding that these guardrails were "ineffective" and "simply feigned a desire to protect copyrighted content," the ***reason*** Anthropic adopted them in the first place was because "it understood that Claude users were prompting the models regarding Publishers' lyrics and other copyrighted works, and it knew that the models were generating output that unlawfully copied Publishers' lyrics and other copyrighted works." *Id.* ¶ 121–22.

Moreover, when Anthropic studied the efficacy of these guardrails (including instances in which they failed), monitored user activity with respect to the guardrails (including efforts to circumvent them), and modified the guardrails based on those findings, Anthropic learned of additional instances of users' prompting Claude for Publishers' lyrics and Claude's generating output copying lyrics. *See id.* ("When Anthropic developed and refined these guardrails, it collected Claude user prompts and output data, including specific infringing output copying lyrics. . . . . Anthropic's broader study of user behavior and Claude output has included analyzing specific efforts by users to avoid these guardrails and identifying instances in which the guardrails have failed and Claude has generated infringing output, including output copying Publishers' lyrics."). As such, these guardrails are unlike the automated software in the cases relied upon by Anthropic.

---

[1] FAC ¶ 116 n.33 (*Terms of Service*, ANTHROPIC, https://console.anthropic.com/legal/terms).

1    What's more, even when Anthropic's guardrails did prevent output copying Publishers'

2  lyrics, "simply reentering or rephrasing the prompt could often bypass these limited guardrails and

3  generate infringing output." *Id.* ¶ 120. In such instances, Anthropic knew (or should have known)

4  of both the guardrail-triggering prompt, and the ensuing guardrail failure and infringing output.

5    Fourth, Publishers allege that Anthropic learned of particular infringing activity by

6  monitoring online forums in which Claude users publicly discuss infringing Claude output—

7  including output copying Publishers' lyrics—and circumventing Claude's guardrails. *Id.* ¶¶ 104,

8  123, 170. Publishers allege that "Anthropic employees often read and comment on online forums

9  and websites that discuss Anthropic's Claude AI models, including on the website Reddit," *id.* ¶

10  123; that "[o]n forums frequented by Anthropic employees, like the subreddit r/ClaudeAI, Claude

11  users openly discuss their infringing uses of Claude, including specific methods of circumventing

12  Claude's guardrails . . . [and] instances in which Claude has generated infringing output," including

13  copying Publishers' lyrics, *id.*; and cite a specific example of a Claude user posting to a Reddit

14  forum monitored by Anthropic about Claude output infringing the lyrics to "House at Pooh

15  Corner," a Work in Suit, *id.* ¶¶ 104, 123. Anthropic suggests that its employees who saw this

16  particular Reddit post might not have known this Claude output was infringing. Mot. at 6. That is

17  non-sensical. The title of the post is "Claude using copyrighted material." FAC ¶ 104.

18    Fifth, Anthropic's adoption of an indemnification policy further demonstrates its

19  knowledge that even "'authorized' uses of the Claude API will nonetheless generate outputs that

20  infringe copyrighted works," including Publishers' lyrics. *Id.* ¶ 127. Other courts have found such

21  indemnification policies show knowledge of infringement in the context of § 1202(b) claims. *See,*

22  *e.g.*, *New York Times Co. v. Microsoft Corp.*, 2025 WL 1009179, at *17 (S.D.N.Y. Apr. 4, 2025).

23  Likewise, Anthropic's policy evinces its knowledge of users' infringement here.

24    Separately, and as discussed further below with respect to Publishers' § 1202(b) claims,

25  Anthropic's utilization of extractor tools to strip Publishers' lyrics of their copyright management

26  information, FAC ¶¶ 74, 130, such that Claude's output copying those same lyrics omits indicia of

27  Publishers' copyright ownership, evidences Anthropic's willful blindness to such infringements.

28    Given all of these allegations, it is more than plausible that Anthropic knew or should have

known of the infringing activities by its users and licensees, including with respect to the specific

infringing prompts and output copying Publishers' lyrics at issue in this case. These "allegations

establish[] the element of knowledge or support[] an inference of knowledge," which the Court

has recognized is all that is required of Publishers to satisfy the pleading standard. MTD Order at

7-8. No more is required under Fed. R. Civ. P. 9(b) or the plausibility standard at this stage.

Meanwhile, the cases upon which Anthropic relies are inapposite. Anthropic cites *Rearden*

to argue that, by identifying "limited instances" of third-party infringement, Publishers do not

establish Anthropic's knowledge that third parties infringed the Works in Suit. But the *Rearden*

plaintiff did not allege that defendant Disney extensively monitored the company alleged to have

copied the material at issue, only that Disney continued to work with that company. 2024 WL

5191980 at *5-6. Here, Publishers allege that Anthropic closely scrutinizes its users' behavior.

Anthropic's reliance on *Harrington* and *YZ Prods.* is similarly misplaced. In *Harrington*,

the defendant, Pinterest, operated a website that hosted user-generated content and "had [no]

reason to know that these two photographs" owned by the plaintiff "were on Pinterest, much less

that Pinterest knew or had reason to know that these photographs were infringing." *Harrington v.

Pinterest, Inc.*, 2021 WL 4033031, at *4 (N.D. Cal. Sept. 3, 2021). In *YZ Prods.*, the plaintiff

company pleaded only the bare allegations that it "notified [d]efendant of its infringement" and

that the defendant had "specific knowledge of the Infringing Goods advertised or sold." 545 F.

Supp. 3d at 764. Publishers, in contrast, plead facts showing that Anthropic had every reason to

know that Publishers' copyrighted lyrics were being accessed and outputted through Claude.

Indeed, Anthropic chose to copy Publishers' lyrics to train Claude in the first place.

Given the FAC's detailed factual allegations regarding Anthropic's knowledge, dismissing

Publishers' claim for contributory infringement at the motion to dismiss stage would be entirely

contrary to legal standards for a Rule 12(b)(6) motion. Courts in the Ninth Circuit have routinely

denied motions to dismiss in similar circumstances. *See, e.g.*, *BMG Rts. Mgmt. (US) LLC v. Joyy

Inc.*, 716 F. Supp. 3d 835, 843 (C.D. Cal. 2024) (factual allegations supported a "reasonable

inference" of defendant's specific knowledge of infringement); *Splunk Inc. v. Cribl, Inc.*, 662 F.

Supp. 3d 1029, 1052 (N.D. Cal. 2023) (taking factual allegations in complaint as true to find

sufficient allegations of knowledge). That includes cases involving similar claims of mass copyright infringement against AI companies. *See, e.g.*, *Andersen v. Stability AI Ltd.*, 2024 WL 3823234, at *5 (N.D. Cal. Aug. 12, 2024) (where defendant moved to dismiss induced copyright infringement claim and argued that plaintiff failed to allege intent, denying motion to dismiss and finding that plaintiff's "allegations of induced infringement are sufficient"). Meanwhile, Anthropic does not identify a single AI copyright infringement case in which a contributory infringement claim was dismissed on these grounds. Anthropic's Motion to Dismiss should be denied here.[2]

## II.    Publishers plausibly allege Anthropic's direct financial benefit for vicarious liability.

As the Court has already found, Publishers plausibly allege that Anthropic derives a direct financial benefit from the infringing activity sufficient to state a claim for vicarious copyright infringement (Count III). *See* MTD Order at 8-9 (finding the "allegations [in the original Complaint] plausibly state that Anthropic received a direct financial benefit"). Anthropic concedes that the Court has already resolved this issue in Publishers' favor. It does not offer any reason for reaching a different outcome the second time around. Instead, it just "renews" the same argument that the Court has already rejected, "[t]o preserve the issue for further review." Mot. at 7.

Anthropic's direct financial benefit argument fails here for the same reasons as before. The Ninth Circuit has emphasized that "[t]he essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps." *Ellison*, 357 F.3d at 1079. The FAC alleges, like the original Complaint, that Anthropic "receives revenues from [] commercial customers based both on the amount of text submitted by each customers' end users into the Claude API, and the amount of text generated as output," FAC ¶ 142; Compl. ¶ 94, ECF No. 1; Anthropic "is paid every time one of its customers' end users submits a request for Publishers' song lyrics, and it is paid again every time its Claude API generates output copying and relying on those lyrics," FAC ¶ 142; Compl. ¶ 94; and "[o]ne of

---

[2] Anthropic tries to minimize Publishers' secondary liability claims as ancillary to the core issues in the case, Mot. at 1, but that is wrong. While Anthropic has never moved to dismiss Publishers' direct infringement claims, it has argued it lacks volition sufficient for direct liability to arise as to Claude's infringing output, claiming that secondary liability is the "right framework." Hr'g Tr. 107:15-24 (Nov. 25, 2024). Publishers disagree on volition. But Anthropic's argument illustrates the critical importance of Publishers' alternative claims for contributory and vicarious liability.

the reasons that Anthropic's AI models are so popular and valuable is because of the substantial underlying text corpus that includes Publishers' copyrighted lyrics. As such, Publishers' copyrighted content serves as a draw for individual users, commercial customers, and ultimately investors," FAC ¶ 146; Compl. ¶ 98; among other allegations (*e.g.*, FAC ¶¶ 18, 138-147, 185-186).

The Court previously found these allegations "plausibly alleged that Anthropic received a direct financial benefit from potentially infringing activity," and consequently denied Anthropic's first motion to dismiss on these grounds. MTD Order at 8-9 (quoting same allegations in Compl. ¶¶ 94, 98). Anthropic fails to identify any legitimate basis for challenging the Court's earlier ruling. Its argument should be rejected for the same reasons as before. *See, e.g.*, *Clark v. InComm Fin. Servs., Inc.*, 2023 WL 8522952, at *7 (C.D. Cal. Dec. 1, 2023) (where court "already considered [defendant's] argument in its previous MTD Order and found that [p]laintiffs did sufficiently plead [the element at issue]," and defendant repeated same argument in subsequent motion to dismiss, "declin[ing] to rehash this analysis" and again denying motion to dismiss on this issue); *San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 360 F. Supp. 3d 1039, 1047 (S.D. Cal. 2019) (relying on "prior analysis" to again deny motion to dismiss, "because the facts on the first four causes of action for declaratory judgment have not been amended").

In sum, the Court rightly denied Anthropic's motion to dismiss on this basis before, and Anthropic's rehash of its previous argument should be rejected again for the same reasons.

## III.     Publishers plausibly allege Anthropic's dual scienter under § 1202(b).

Publishers plausibly allege that (A) Anthropic intentionally removed or altered copyright management information ("CMI") associated with Publishers' lyrics, and (B) distributed copies of Publishers' lyrics knowing CMI had been removed or altered, all while (C) knowing or having reason to know doing so would induce, enable, facilitate, or conceal infringement, in violation of §§ 1202(b)(1) and (3) (Count IV). "[I]ntent, knowledge, and other conditions of a person's mind" may be alleged "generally" for § 1202(b) claims. *Logan v. Meta Platforms, Inc.*, 636 F. Supp. 3d 1052, 1063 (N.D. Cal. 2022); *see also Doe 1 v. GitHub, Inc.*, 672 F. Supp. 3d 837, 858 (N.D. Cal. 2023) ("At the pleading stage, mental conditions generally need not be alleged with specificity.").

CMI refers to "the title, the author, the copyright owner, the terms and conditions for use

of the work, and other identifying information set forth in a copyright notice or conveyed in connection with the work." *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 671 (9th Cir. 2018). In this case, CMI is particularly critical. It is the means by which Publishers' copyrighted lyrics are identified, ensuring that Publishers' songwriters receive the credit and goodwill that they deserve for their artistic works, and are protected against unauthorized exploitation and misuse. FAC ¶ 17. Publishers' Works in Suit include many "timeless classics" from the 1960s, '70s, and '80s. *Id.* ¶ 84. Without accurate and complete CMI, third-party users may mistakenly believe that the works have entered the public domain, or that Claude's purportedly original output leaves them free to copy and distribute the works further. Such CMI protections are particularly important given the frequency with which Claude hallucinates and fabricates false authorship information in its output, as evidenced by Anthropic's own filing of such information in this case. *See* ECF No. 373 at 1-2.

Notably, Anthropic has not challenged or disputed Publishers' allegations regarding the underlying removal and alteration of Publishers' CMI. Indeed, there appears to be no dispute that Anthropic has removed and altered Publishers' CMI during the training of its Claude AI models, and that Claude generates output copying Publishers' lyrics but omitting CMI. The evidence of Anthropic's removal of Publishers' CMI in the output Claude generates is extensive. *See, e.g.*, FAC ¶¶ 17, 97-98, 132-34; *id.*, Ex. B. Indeed, the Court has already found that "Publishers plausibly allege that the [Claude] output omits the CMI regarding the Works." MTD Order at 10.

Instead, Anthropic's Motion to Dismiss questions only whether Publishers have sufficiently pled the necessary scienter under §§ 1202(b)(1) and (3). But, contrary to Anthropic's contentions, the FAC plausibly alleges Anthropic's scienter in connection with both claims.

### A. Anthropic intentionally removed or altered CMI, in violation of § 1202(b)(1).

As an initial matter, Anthropic does not explicitly challenge the sufficiency of Publishers' allegations as to the first scienter element of their § 1202(b)(1) claim—that Anthropic intentionally removed and altered CMI. In fact, while Anthropic's Motion to Dismiss is not entirely clear, it appears to concede "Plaintiffs plausibly alleged facts as to the first scienter element." Mot. at 8.

To the extent Anthropic does dispute Publishers' satisfaction of the first scienter element on this claim, any such argument must fail. There is no question that Publishers plausibly allege

that Anthropic intentionally removes or alters Publishers' CMI, in multiple ways.

First, Anthropic intentionally removes and alters Publishers' CMI from the copies of Publishers' lyrics it uses as input to train Claude. FAC ¶¶ 130, 199. Indeed, Anthropic deliberately utilizes extraction tools to strip Publishers' lyrics of copyright notices and other key CMI. *Id.*

When Publishers license their lyrics to online digital music platforms, lyrics aggregators, and search engines, Publishers require those licensees to display song titles, songwriter credits, and other important CMI. *See id.* ¶ 129. And when Anthropic scrapes Publishers' lyrics from these websites to then use them in training its AI models, or utilizes third-party training datasets likewise scraped from the internet in this manner, the copies Anthropic makes of Publishers' lyrics initially include Publishers' CMI. *Id.* ¶¶ 67-68. For example, Anthropic created copies of Publishers' lyrics when it "reproduced the Common Crawl dataset," which includes copies of Publishers' lyrics from the MusixMatch, LyricFind, and Genius websites "accompanied by copyright management information," including "a copyright notice, copyright owner names, songwriter credits, performing artist name, and song title." *Id.*

However, the FAC explains how Anthropic subsequently employed extractor tools to intentionally strip copyright notices and other critical CMI from Publishers' lyrics. *Id.* ¶¶ 58(c), 68, 73-74, 130. The FAC details discussions among Anthropic's founders and senior executives regarding their intent to remove CMI from Claude training data, dismissing this critical information as "useless junk" and expressing a "desire that the AI 'model will learn to ignore [this] boilerplate" information; how Anthropic tested three different extraction tools for use in removing CMI; and how "Anthropic ultimately chose to employ the Newspaper [extraction] algorithm to remove copyright notices and other copyright management information from Publishers' lyrics and other copyrighted works." *Id.* ¶ 73. Further, Anthropic's own founder and CEO Dario Amodei had previously used the very same Newspaper extraction tool and other similar tools to remove CMI and other information from multiple training datasets in the same way. *Id.* ¶ 71.

The reason Anthropic chose to strip Publishers' lyrics of their CMI in this manner is because "Anthropic wanted to train its Claude AI models specifically on the content of Publishers' lyrics, so that the models' output would reproduce that expressive content, rather than copyright

notices or other copyright management information accompanying those lyrics," which Anthropic deemed to be "useless" and counter to its objectives. *Id.* ¶ 74; *see id.* ¶ 130 (further allegations).

Other courts have found similar allegations sufficient. In *GitHub*, plaintiffs similarly alleged where CMI typically appeared, that defendants were aware of CMI, and that defendants "subsequently trained [their] programs to ignore or remove CMI and therefore stop reproducing it." 672 F. Supp. 3d at 858. Those allegations supported a "reasonable inference that [d]efendants intentionally designed the programs to remove CMI." *Id.*; *see also, e.g.*, *New York Times*, 2025 WL 1009179, at *16-17 (finding similar allegations regarding OpenAI's use of the same extractor tools to remove CMI sufficient at the pleadings stage). Likewise, Publishers' allegations suffice.

<u>Second</u>, Anthropic also intentionally removes and alters Publishers' CMI when Claude generates output copying Publishers' lyrics but omitting the required CMI. *Id.* ¶ 131. "Anthropic's AI models regurgitate Publishers' lyrics as output to users, unaccompanied by the corresponding copyright notice, song title, songwriter, or other critical copyright management information, consistent with Anthropic's training and design." *Id.*; *see also id.* ¶¶ 97-98, 132-135 (identifying instances of Claude output lacking CMI). "Anthropic does so by design. . . . its objective is for the models to reproduce [Publishers' lyrics'] expressive content, while it believes that corresponding [CMI] is 'useless junk' and 'boilerplate'" to be excluded. *Id.* ¶ 130; *see id.* ¶ 74. Anthropic also intentionally removes Publishers' CMI in this manner to "prevent the models from displaying such information alongside Publishers' lyrics in outputs, thereby concealing Anthropic's infringement from Anthropic's users, Publishers, and other copyright owners." *Id.* ¶ 74.

These allegations are more than sufficient to plausibly allege Anthropic's intentional removal of CMI from Publishers' copyrighted works. *See, e.g.*, *GitHub*, 672 F .Supp. 3d at 858 (finding allegations that defendants knew CMI appeared on copyrighted works used as training data for AI coding tool, trained AI coding tool to remove CMI, and knew AI-coding tool reproduced training data supported reasonable inference of intentional removal of CMI).

### B.   Anthropic distributed Publishers' lyrics knowing CMI had been removed or altered, in violation of § 1202(b)(3).

As with Publishers' § 1202(b)(1) claim, Anthropic does not expressly challenge Publishers'

allegations as to the first scienter element of their § 1202(b)(3) claim—that Anthropic distributed Publishers' lyrics or copies of those lyrics knowing that CMI had been removed or altered. Notably, § 1202(b)(3) does not require intent—only knowledge. Again, Anthropic appears to concede that "Plaintiffs plausibly alleged facts as to the first scienter element." Mot. at 8. In any event, Publishers clearly do plausibly allege Anthropic's knowledge as to their § 1202(b)(3) claim.

As an initial matter, there does not appear to be any dispute as to Anthropic's underlying distribution of Publishers' lyrics with CMI removed or altered. *See* MTD Order at 10 ("Publishers plausibly allege that the [Claude] output omits the CMI regarding the Works."). The FAC identifies numerous instances in which Anthropic's Claude distributed copies of Publishers' lyrics without the song's title, songwriter, copyright owner, or other CMI. *See, e.g.*, *id.* ¶¶ 97-98, 132-135. Moreover, all the infringing Claude output cited in the FAC omitted copyright notices. *Id.* ¶ 135.

It is also clear that Anthropic has done so ***knowing*** CMI was removed or altered:

First, Publishers allege that Anthropic trained Claude using datasets that it knew contained copies of Publishers' lyrics from which CMI had been removed. As noted above, for the copies of Publishers' lyrics collected via Anthropic's own web-scraping or included in the Common Crawl dataset, Anthropic of course knew that CMI had been removed because it was Anthropic itself that employed extraction tools to do so. *See supra,* Sec. III.A. Anthropic also trained Claude using copies of Publishers' lyrics from another training dataset, "The Pile," which Anthropic knew contained copies of Publishers' lyrics from which CMI had been removed. *See* FAC ¶¶ 69-70, 72.

Second, Publishers also allege that Anthropic knew that Claude disseminated copies of the texts on which the model was trained, including Publishers' lyrics, via the processes of memorization and regurgitation. *Id.* ¶¶ 106-09. But because Anthropic removed CMI from its training data, Anthropic's Claude distributed these copies of Publishers' lyrics without that critical information. *Id.* Again, Anthropic knew CMI had been removed, because Anthropic removed it.

As such, Publishers have pleaded facts that go far beyond conclusory allegations. *See BanxCorp v. Costco Wholesale Corp.*, 723 F. Supp. 2d 596, 610 (S.D.N.Y. 2010) ("Providing an actual example of the allegedly infringing [use] is obviously more than a conclusory allegation.").

**C.    Anthropic knew or had reason to know its conduct would induce, enable, facilitate, or conceal infringement.**

Rather than meaningfully challenge Publishers' allegations as to the first scienter elements of their § 1202(b) claims, Anthropic instead nitpicks Publishers' allegations as to the second scienter element. But that argument also fails. Publishers plausibly allege Anthropic knew or had reasonable grounds to know its removal and alteration of Publishers' CMI, and its distribution of Publishers' lyrics with CMI removed and altered, would both (1) conceal its own infringement, and (2) induce, enable, facilitate, and conceal infringement by others, including its Claude users.

**1.    Anthropic concealed its own infringement.**

First, Anthropic knew that its CMI removal and distribution with CMI removed would conceal its ***own*** infringement. "[A] defendant's awareness that distributing copyrighted material without proper attribution of CMI will conceal *his own* infringing conduct satisfies [§ 1202(b)'s] second scienter requirement." *Mango v. BuzzFeed, Inc.*, 970 F.3d 167, 172 (2d Cir. 2020).

Anthropic's omission of CMI from Publishers' lyrics, both in the input to train Claude and in the output Claude generates, ultimately obscures Anthropic's own underlying infringement, having copied those lyrics without permission in training and output. *Id.* ¶ 200. Publishers allege that, "[b]y employing extraction tools to systematically remove copyright notices and other copyright management information during the training of its AI models, and programming those models to generate output that copies Publishers' lyrics while omitting such copyright management information, Anthropic hides that the lyrics it copies during training and in output are owned by Publishers and protected by copyright." *Id.* ¶ 136. As another court recognized in a similar case, such actions show that Anthropic "removed CMI to try to prevent [the AI model] from outputting CMI and thus revealing that it was trained on copyrighted material," which "is clearly an identifiable (alleged) infringement." *Kadrey v. Meta Platforms, Inc.*, 2025 WL 744032, at *2 (N.D. Cal. Mar. 7, 2025) (finding plaintiffs adequately alleged intentional CMI removal to conceal infringement); *see also Batra v. PopSugar, Inc.*, 2019 WL 482492, at *2 (N.D. Cal. Feb. 7, 2019) (reasoning that when defendant removed CMI and republished plaintiffs' images, "the plausible inference . . . is that [defendant] removed the CMI . . . knowing that removing the CMI would help

to conceal the alleged infringement of [p]laintiff's images").

Furthermore, in several instances identified in the FAC, Anthropic's Claude generated output containing Publishers' lyrics, but falsely disclaimed having copied any copyrighted material. For example, when prompted by Publishers' investigators, Claude generated output copying the lyrics to Works in Suit "American Pie" and "Born to be Wild," without identifying the songwriters of those works or other CMI. FAC ¶¶ 97, 132-33. Rather, in both cases, Claude *falsely* claimed authorship of the copyrighted lyrics, prefacing its output copying the lyrics with "Here is a song I wrote . . . ." *Id.* That Anthropic trained Claude to generate this type of output further evidences that its removal of CMI was for the precise purpose of enabling and concealing its infringement. In these instances, the obvious consequence of Anthropic's CMI omissions is to conceal that (a) Claude did not, in fact, generate original song lyrics; (b) Claude instead blatantly copied Publishers' lyrics; and (c) Claude falsely claimed ownership of those copyrighted lyrics.

### 2. Anthropic induced, enabled, facilitated, and concealed infringement by its users and others.

Anthropic also knew or had reason to know its CMI removal and distribution with CMI removed would induce, enable, facilitate, and conceal infringement by its users. Again, Anthropic knows Claude memorizes and regurgitates training data, FAC ¶¶ 108-09, and its removal of Publishers' CMI during training results in output copying those lyrics without CMI, *id.* ¶ 130.

Anthropic's conduct induces, enables, and facilitates infringement by Claude users who prompt the model to obtain those lyrics. *See, e.g.*, *id.* ¶¶ 86-90, 94. The limited records Anthropic has produced so far confirm specific instances of Claude users' requesting specific Publishers' lyrics and receiving output copying those lyrics, in violation of Publishers' rights. *See id.* But as a result of Anthropic's CMI removal, these users "are not informed that the output they receive from Anthropic's AI models contains copyrighted content," despite the fact that "Anthropic—given its indemnification policy—anticipated [these users] would be defendants in copyright infringement suits." *Id.* ¶ 200; *see also id.* ¶ 136. Indeed, Anthropic's adoption of an indemnification policy to cover downstream copyright infringements, *id.* ¶ 127, "provides additional support for [Publishers'] allegation that the company knew some users would likely infringe copyright,"

further supporting Anthropic's scienter. *The Intercept Media, Inc. v. OpenAI, Inc.*, 2025 WL 556019, at *8 (S.D.N.Y. Feb. 20, 2025). But Anthropic's removal of CMI conceals from those same users the extent to which the output they receive infringes Publishers' copyrights.

What's more, "[e]ven in certain instances when Anthropic's users suspect that Claude output may contain infringing copies of Publishers' lyrics, Anthropic actively conceals that infringement and falsely claims authorship for itself." *Id.* ¶ 136. Anthropic's CMI removal thus facilitates downstream infringement of Publishers' lyrics by its users—even when these users may have no idea they are doing so—while also concealing the magnitude of that infringement.

Anthropic is wrong when it argues, in a footnote, that the fact that certain infringing Claude output identifies Publishers' lyrics by song title or artist name "belies the allegation that users 'are not informed that the output . . . contains copyrighted lyrics.'" Mot. 10 n.2. For one thing, Claude generates output based in part on its "context window," including the text of the user prompt. *Glossary*, ANTHROPIC, https://docs.anthropic.com/en/docs/resources/glossary (cited in FAC ¶ 58(c)). In the instances of infringing output cited by Anthropic, Claude simply parrots the song title or artist name from the user prompt. *See* FAC ¶¶ 88-89, 99. That does ***not*** show that Anthropic informed the user of CMI, only that Claude echoed the user's prompt. In any event, Anthropic's inclusion of some CMI in some output would not absolve it from (1) omitting other required CMI from such output or (2) removing CMI altogether from other output. *See, e.g.*, *Neo4j, Inc. v. Graph Found., Inc.*, 2020 WL 6700480, at *3-5 (N.D. Cal. Nov. 13, 2020) (finding that "the fact that [d]efendants conveyed most [but not all] of the removed CMI . . . does not insulate them from potential liability under Section 1202(b)"). Only complete CMI will alert Claude's users that Publishers' song lyrics are not owned by Anthropic and are still subject to copyright protection.

For users accessing Claude through Anthropic's customer DuckDuckGo, Anthropic knowingly enables their infringement in another way. "When users access Claude anonymously through Anthropic's partner, DuckDuckGo, DuckDuckGo communicates the user's prompts to Anthropic's server and Anthropic's server sends the model's response back to DuckDuckGo, which displays Claude's response on the user's screen and—rather than storing that response on Anthropic's or DuckDuckGo's servers—downloads the response onto the user's device." *Id.* ¶ 55.

Thus, when users access Claude via DuckDuckGo, and receive Claude output copying Publishers' lyrics that is downloaded to their devices, *id.* ¶ 124, that directly violates not only Publishers' exclusive distribution, display, and derivative work rights, but also Publishers' reproduction right.

In addition to its users, Anthropic also knew its distribution of Publishers' lyrics with CMI removed would conceal infringement by the creators of the third-party training datasets Anthropic used to train Claude, who violated Publishers' rights by building those datasets with unauthorized copies of their lyrics. For example, "Anthropic understood that The Pile dataset upon which it trained its AI models contained unauthorized copies of Publishers' copyrighted lyrics from which copyright notices and ownership information had been removed," including by the same extractor tools that Anthropic employed to strip CMI from Publishers' lyrics. FAC ¶ 70. By distributing Publishers' lyrics from these training datasets in output with CMI removed, Anthropic knowingly concealed the underlying infringement by these dataset creators, as well as its own infringement.

*    *    *

Anthropic fails to even mention the three most recent decisions addressing § 1202(b) claims in the context of AI models. All three cases support the sufficiency of Publishers' pleadings.

First, in *Kadrey v. Meta*, another court in the Northern District of California held two months ago that plaintiffs "adequately alleged that Meta intentionally removed CMI to conceal copyright infringement," based on allegations "that Meta 'knew that [AI model] Llama was especially 'prone' to memorizing and generating outputs of CMI unless CMI was removed from' its training data," and "Meta took a number of other steps to reduce the likelihood that Llama would generate outputs that would reveal or indicate that copyrighted material was included in training datasets." 2025 WL 744032, at *2. Here, Publishers' allegations are even more robust. Publishers plead, among other things, that Anthropic knew Claude memorized and regurgitated the texts on which it was trained, FAC ¶¶ 108-09, 131, 170, 199; Anthropic went to great lengths to "hide[] that the lyrics it copies during training and in output are owned by Publishers and protected by copyright," including using extractor tools to strip Publishers' lyrics of CMI, *id.* ¶ 136; and Anthropic "largely conceals the specific sources of the text it uses to train its AI models" because, conscious that its training data contains pirated copyrighted works, it wants to "conceal

1    that infringement from its users, copyright owners, its investors, and the greater public," *id.* ¶ 65.

2        Separately, in *New York Times v. Microsoft* and *Intercept Media v. OpenAI*, two courts in

3    the Southern District of New York applied the same "double-scienter" requirements and found

4    allegations similar to Publishers' sufficient to state § 1202(b)(1) claims. *See, e.g.*, *New York Times*,

5    2025 WL 1009179, at *16-17 (denying motion to dismiss as to *Daily News* and Center for

6    Investigative Reporting plaintiffs' § 1202(b)(1) claims against OpenAI, and finding both scienter

7    elements satisfied, where plaintiffs alleged, among other things, that OpenAI used copyrighted

8    works to train its AI models, utilized extractor tools to remove CMI, was aware its AI models were

9    "capable of distributing unlicensed copies of copyrighted works" and "regurgitat[ing] material in

10   response to user prompts," made a "recent adjustment to ChatGPT's settings to limit

11   regurgitation," and adopted a "policy of agreeing to indemnify end users accused of infringement,"

12   while dismissing other claims); *Intercept,* 2025 WL 556019, at *7-8 (denying motion to dismiss

13   as to plaintiff's § 1202(b)(1) claim against OpenAI, and finding both scienter elements satisfied,

14   where plaintiff alleged, among other things, that OpenAI employed extractor tools to remove CMI,

15   its AI model regurgitated plaintiff's works verbatim without CMI "[a]t least some of the time,"

16   such infringing AI output could be used by users to "generate content for a further audience," and

17   it adopted an indemnification policy showing that it "knew some users would likely infringe

18   copyright," while dismissing other claims). The *Intercept* court emphasized that it did "not expect

19   more at this early stage of the litigation, particularly because of [the AI company's] secrecy over"

20   its training data. *Id.* at *7. For the same reasons, Publishers' allegations more than suffice here.

21       Likewise, the *GitHub* court earlier rejected similar challenges to §§ 1202(b)(1) and (3)

22   claims, further supporting the sufficiency of Publishers' pleadings. *See* 672 F. Supp. 3d at 858-59.

23       Anthropic's attempts to distinguish *GitHub* are unavailing. Among other things, the fact

24   that the *GitHub* plaintiffs alleged that the defendant "regularly processed DMCA takedowns" does

25   not undermine Publishers' pleadings here. *Id.* at 858. Unlike *GitHub*, where users may upload

26   infringing content, in this case, it is Anthropic that uploads infringing content into its training data,

27   so the DMCA does not apply. Also, unlike *GitHub*, where any user can see what is on the website,

28   here, Anthropic hides what is contained in its training data and the output its AI models generate

in response to user queries. As such, sending DMCA notices in this case would be impossible.

Furthermore, processing DMCA notices is far from the only way a company can learn that "its platform was used to distribute [copyrighted works] with removed or altered CMI in a manner which induced infringement." *Id.* Here, Anthropic itself removed the CMI from the Publishers' lyrics that were distributed in Claude's output. Moreover, Anthropic also knew Claude was distributing Publishers' lyrics without CMI because it closely monitored and even intervened to alter Claude's prompts and output. FAC ¶¶ 119, 121. When developing its ineffective pre-suit guardrails, Anthropic "collected Claude user prompts and output data, including specific infringing output copying lyrics." *Id.* ¶ 121. Then, after Publishers filed suit, Anthropic broadened its indemnification policy to cover users' copyright infringement, confirming its awareness of such infringement. *Id.* ¶¶ 123, 200. Dismissal is plainly unwarranted on these facts.

None of the other cases cited by Anthropic require a different outcome. Anthropic strains to compare Publishers' § 1202(b) claims to the insufficient claims in *Tremblay v. OpenAI*, but that case is inapplicable. First, the *Tremblay* court erroneously relied on the scienter standard in *Stevens*, requiring plaintiffs to plead "a past 'pattern of conduct' or 'modus operandi' [showing] that the defendant was aware of the probable future impact of its actions." *Tremblay v. OpenAI, Inc.*, 716 F. Supp. 3d 772, 778–79 (N.D. Cal. 2024) (quoting *Stevens,* 899 F.3d at 674). Anthropic urges the Court to commit the same error, but "*Stevens* concerned a plaintiff's burden of proof at summary judgment, not at the pleading stage." *Izmo, Inc. v. Roadster, Inc.*, 2019 WL 13210561, at *4 (N.D. Cal. Mar. 26, 2019); *see also Logan*, 636 F. Supp. 3d at 1064. Second, the *Tremblay* plaintiffs alleged that OpenAI's AI model was trained on copyrighted books from which CMI was removed, but not that the model ever reproduced identical copies of the plaintiffs' works. *Tremblay*, 716 F. Supp. 3d at 778–79. Accordingly, the Court's analysis focused solely on "the alleged removal of CMI in an internal database." *Id.* at 779. Here, by contrast, Publishers allege in detail that Anthropic's AI model regurgitates copies of Publishers' lyrics as output, but omits the CMI that ordinarily accompanies those lyrics—and that Anthropic knew of this phenomenon.

In sum, none of Anthropic's arguments justifies dismissal of Publishers' §§ 1202(b)(1) and (3) claims. Accepting Publishers' factual allegations in the FAC and construing them in the light

most favorable to Publishers, these allegations are more than sufficient to support a reasonable inference of Anthropic's scienter in connection with Publishers' § 1202(b) claims.

**IV.    Alternatively, Publishers should be permitted to amend their Complaint.**

Finally, if the Court finds Publishers' allegations lacking, Publishers request leave to amend. As this Court has recognized, "[i]f dismissal is warranted, the court should grant leave to amend 'unless it determines that the pleading could not possibly be cured by the allegation of other facts.'" MTD Order at 4 (quoting *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000)); *see also Creech v. Tewalt*, 84 F.4th 777, 787 (9th Cir. 2023) ("Dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment." (citation omitted)). Absent "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, [or] undue prejudice to the opposing party," *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008) (citation omitted), courts allow amendment whenever a complaint's deficiencies can conceivably be cured, *see, e.g.*, *Rivas v. Kijakazi*, 2023 WL 8006846, at *2 (N.D. Cal. Nov. 17, 2023).

Anthropic does not articulate any legitimate basis for dismissing Counts II-IV of the FAC with prejudice, and it fails to cite a single case to support that argument. Publishers have amended their Complaint only once. Publishers have not exhibited, and Anthropic does not allege, any bad faith or dilatory motive. Anthropic has not articulated any prejudice from amendment.

Courts in this District frequently grant leave to amend in such cases. Particularly in other AI copyright infringement cases involving similarly novel issues, courts have allowed plaintiffs multiple amendments to cure alleged deficiencies in pleading contributory liability, vicarious liability, and § 1202(b) claims. *See, e.g.*, *Tremblay*, 716 F. Supp. 3d at 778, 780; *Doe 1 v. GitHub, Inc.*, 2024 WL 235217, at *9 (N.D. Cal. Jan. 22, 2024) (granting leave to amend complaint "out of abundance of caution," even though it was "unlikely that this deficiency could be cured").

Accordingly, if the Court dismisses any of Publishers' non-direct infringement claims, Publishers request that the Court do so without prejudice and allow Publishers to amend their FAC.

## CONCLUSION

Publishers respectfully request that the Court deny in full Anthropic's Motion to Dismiss.

Dated: May 23, 2025

Respectfully submitted,

By: */s/ Nicholas C. Hailey*

**OPPENHEIM + ZEBRAK, LLP**
Matthew J. Oppenheim
Nicholas C. Hailey
Audrey L. Adu-Appiah
(admitted *pro hac vice*)
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
aadu-appiah@oandzlaw.com

Jennifer Pariser
Andrew Guerra
Timothy Chung
(admitted *pro hac vice*)
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
jpariser@oandzlaw.com
andrew@oandzlaw.com
tchung@oandzlaw.com

**COBLENTZ PATCH DUFFY & BASS LLP**
Jeffrey G. Knowles (SBN 129754)
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 772-5795
jknowles@coblentzlaw.com

**COWAN, LIEBOWITZ & LATMAN, P.C.**
Richard S. Mandel
Jonathan Z. King
Richard Dannay
(admitted *pro hac vice*)
114 West 47th Street
New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

*Attorneys for Plaintiffs*