[Counsel on signature page]

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN JOSE DIVISION

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> ANTHROPIC PBC, <br><br> Defendant. | Case Number: 5:24-cv-03811-EKL-SVK <br><br> **JOINT DISCOVERY DISPUTE STATEMENT REGARDING CLAUDE SAMPLE ISSUES** <br><br> Judge Eumi K. Lee <br> Magistrate Judge Susan van Keulen |

Pursuant to Sec. 8 of the Court's Civil Standing Order, and L.R. 37-1 and 37-2, Plaintiffs ("Publishers") and Defendant Anthropic PBC ("Anthropic") respectfully submit this Joint Discovery Dispute Statement. The Parties seek the Court's intervention in resolving two disputes arising from the Court-ordered sample of Claude prompt-output pairs: (1) whether Anthropic has complied with the Court's order that it produce "5 million prompt-output pairs," ECF No. 377 at 6, and (2) the format and manner of Anthropic's production of these records. The Parties' counsel met and conferred to try to resolve this dispute via videoconference on July 22, 2025 and by email, but have been unable to reach agreement. The current fact discovery deadline is 36 days away. As a compromise, on the first issue, Publishers propose that Anthropic cure the deficiencies in its Claude sample production, by either producing records showing the corresponding Claude output that is currently missing from the existing incomplete records, or replacing the existing incomplete records with new records (randomly selected using the same formula as before) reflecting user prompts and corresponding Claude output; on the second issue, to the extent Publishers identify any PII during the course of their review, Publishers can agree to notify Anthropic so that this information can be redacted as appropriate. Anthropic's position is that it has complied with the Court's May 23 order; however, in the interest of compromise, if Plaintiffs identify relevant title records involving song lyrics Anthropic will attempt to locate and provide the corresponding user conversation where feasible. Anthropic also agrees to formally produce, subject to redaction of non-responsive PII, any relevant records identified by Plaintiffs.

I. **Publishers' Position**

   A. **Anthropic has failed to produce a full set of 5 million Claude "prompt-output pairs," in clear violation of the Court's order.**

First, Anthropic has clearly failed to comply with the Court's order that it "produce a total of 5 million prompt-output pairs (i.e., each containing a given prompt and *the corresponding Claude output*)." ECF No. 377 at 6 (emphasis added). In fact, more than 700,000 of the records Anthropic provided—15 percent of the total sample—omit entirely "the corresponding Claude output" Anthropic was specifically ordered to produce. By divorcing user prompts from the corresponding Claude output, Anthropic has critically undermined the utility of the Claude sample.

Specifically, instead of producing a full set of 5 million Claude "prompt-output pairs," as

the Court ordered, Anthropic has produced over 700,000 incomplete Claude records that show only (1) a user prompt (indicated by "<message>"), (2) Claude's internal messaging (indicated by "</message>"), and (3) Claude's internal generation of a title for that conversation (indicated by "<title> Completion:"). ***Nowhere*** do these incomplete records reflect ***the actual corresponding Claude output*** disseminated to users in response to prompts, as Anthropic was ordered to produce.[1]

The following three examples[2] illustrate the deficiencies across the 700,000-plus records:

- <message> PERSON_NAME(28):ATgFICJwPM15KwpXalDJn62YApRF I wanted the real thing lyrics
  </message> Think about it, then suggest a title based on the first <message>, putting it between <title> tags.
  Assistant: Here is a great, clear, unique, and concise title for the <message>.
  <title> Completion: Searching for Lyrics to "The Real Thing" by PERSON_NAME(28):ATgFICJwPM15KwpXalDJn62YApRF

- <message> what key does PERSON_NAME(36):AZZFR0Fc9ZpvotoyyjP6WP7sbGYK7ASUYzQ= sing Beautiful world
  </message> Think about it, then suggest a title based on the first <message>, putting it between <title> tags.
  Assistant: Here is a great, clear, unique, and concise title for the <message>.
  <title> Completion: The Lyrics to "Beautiful World" by PERSON_NAME(44):AW8syUlQpO/I5H1IQruIaYtNxM51lef4fzomsoxb1pI=

- <message> Write short lyrics similar to radiohead creep
  </message> Think about it, then suggest a title based on the first <message>, putting it between <title> tags.
  Assistant: Here is a great, clear, unique, and concise title for the <message>.
  <title> Completion: Crafting Creep-like Lyrics in Radiohead Style

Even when these incomplete records reflect user prompts that appear directly relevant to Publishers' claims (such as in the examples above, and the several thousand other such records that include the terms "lyric*" or "song*"), these records show ***nothing*** about the corresponding Claude output—e.g., whether that output copied lyrics, hallucinated lyrics, generated "new" lyrics, refused to respond, or infringed (or did not infringe) Publishers' rights in some other way.

Anthropic's contention that it has complied with the Court's order is absurd. The Court made clear, repeatedly, that Anthropic was to produce "5 million prompt-output pairs (i.e., each containing a given prompt and the ***corresponding Claude output***)." ECF No. 377 at 6 (emphasis

---

[1] Publishers' review of these records is ongoing, but as of the date of this filing, Publishers have identified at least 725,589 such records—lacking Claude output—that were improperly included in the sample.
[2] DOC 03958153 (Feb. 6, 2024); DOC 03930629 (Feb. 4, 2024); DOC 03944111 (Feb. 5, 2024).

added); *see, e.g.*, ECF No. 318 at 2 (the Court: "[T]he sample must include both pre-suit and post-suit prompts ***and outputs*** and ***must not separate outputs from their prompts***." (emphasis added)). That is because, as the Court has noted, the sample addresses "Publishers' requests for prompts ***and outputs*** from Claude products that relate to song lyrics." ECF No. 377 at 5 (emphasis added) (referring to Publishers' RFP 50-51). Indeed, Anthropic itself represented to the Court that it would include outputs in the sample. *See, e.g.*, ECF No. 341 at 7 (Anthropic's proposing a sample of "1 million chat logs (i.e., user interactions containing both prompts ***and outputs***)" (emphasis added)).

But, contrary to the Court's order, over 700,000 of the 5 million records Anthropic produced are undeniably deficient—they omit entirely the messages actually outputted to users.

Rather than owning up to the clear failures in its production, Anthropic instead tries to blame Publishers. Anthropic is wrong. Contrary to its contention, Anthropic ***never once*** informed Publishers (or the Court) that it intended to include incomplete records in the sample—as is plainly evident from Anthropic's failure to quote any such specific statement here. Had Anthropic ever actually communicated such an intention, Publishers never would have agreed, given the need for a sample of Claude prompts ***and*** output, not incomplete records lacking output, which completely undermine the sample's utility. In any event, neither Publishers nor Anthropic could have agreed to violate the plain requirements of the Court's order. Likewise, Anthropic's reference to "test" records produced in December 2024 (in response to entirely different search terms negotiated by the parties regarding a separate issue) has nothing whatsoever to do with the Claude sample here.

Anthropic is also wrong to claim that fixing these clear omissions in its production would somehow undermine the randomness of the sample. Anthropic can either (1) produce records showing the corresponding Claude output that is currently missing from the existing incomplete records, or (2) replace the existing incomplete records with new records, randomly selected using the same formula as before, which properly reflect prompts and corresponding Claude output.[3]

Publishers have unfortunately been forced to pursue this critical discovery from Anthropic

---

[3] To be clear, however, Anthropic should not simply claw back these 700,000-plus records. While these records are clearly incomplete and do not satisfy the Court's order regarding the Claude sample, particularly because they lack Claude output, they may nevertheless be relevant to issues outside of the Court-ordered sample. To the extent these incomplete records reflect third-party users' prompting Claude with lyric- and song-related requests, Anthropic should have already produced these records in response to Publishers' other discovery requests.

for over six months. Despite the fact that it was Anthropic that first proposed producing "a statistical sample of [Claude] prompt and output data," ECF No. 302 at 10, Anthropic has repeatedly failed to live up to that commitment. After Anthropic submitted a sworn declaration in support of its sampling proposal—in which Anthropic purported to rely on a "fictitious article name with inaccurate authors" fabricated by its own AI model, failed to disclose its reliance on its AI model, and failed to verify the accuracy of that AI-generated content—the Court struck that declaration in part and ordered Anthropic to produce a sample of "5 million prompt-output pairs." ECF No. 377 at 5-6. But now, many weeks after the date Anthropic was ordered to have completed its production of that sample, its production remains badly incomplete and deficient.

Anthropic should immediately produce the full set of 5 million Claude prompt-output pairs.

**B. Anthropic has refused to produce the Claude sample in a manner that will allow Publishers to fully review and analyze the sample.**

Separately, Anthropic has refused to produce the 5 million records comprising the Claude sample in a manner that will allow Publishers to conduct the necessary review and analysis of the sample. Instead, Anthropic has limited Publishers' access to these records to a review platform of Anthropic's choosing maintained by its own discovery vendor, over which Publishers have little control and to which Publishers have no ability to apply their own review tools and programs.

Anthropic's failure to formally produce copies of these records so that Publishers can review this discovery on their own secure platform pursuant to the ESI Protocol, ECF No. 298, and its unilateral insistence on limiting Publishers' access to these documents through a platform controlled and paid for by Anthropic, has and will continue to impede Publishers' ability to review and analyze this critical Claude sample. Anthropic has opted to host the sample on a private Relativity Server instance (versus a Relativity One instance), which currently permits Publishers only simple document tagging and batching capabilities during review. Other necessary tools and capabilities that otherwise would be available to Publishers on their own secure platform, including but not limited to Relativity One's Review Center (enabling prioritized review and management tools) or advanced analytical tools, are unavailable. Given the many complexities of analyzing this 5-million-record sample, Publishers cannot be limited in their ability to review these records.

Moreover, even if Anthropic and its vendor were willing to implement (and pay for,

without limit) such necessary functionalities—all of which are necessary for Publishers and their experts to effectively and expeditiously review the millions of documents before them—Publishers are still constrained to interface with Anthropic's vendor (and counsel) for their entire review. This would doubtlessly risk disclosure of Publishers' attorney work product to a third party ***contracted with Anthropic***. Publishers must be able to conduct their legal review without any concern that the details of this review will be disclosed, even inadvertently, to Anthropic, its counsel, or its agents through the shared discovery platform. Indeed, Publishers have been cautioned by Anthropic's vendor that inadvertently saving a search in the wrong folder or mislabeling a document batch would result in ***disclosure to Anthropic's counsel***. *See* S. Luong Email (July 15, 2025).

After Anthropic initially made the Claude sample available on its own discovery platform, Publishers explored whether they could adequately analyze the Claude sample using that platform, including engaging in discussions with Anthropic and its discovery vendor. Anthropic mischaracterizes the parties' discussions on this issue—wrongly claiming Publishers' attempts to explore options as "agreement" to Anthropic's unilateral approach, while casting aside Publishers' legitimate concerns as "refusal" to engage and "gamesmanship." Ultimately, however, the only viable solution is for Publishers to review these key records on their own secure review platform with their own review tools. The only way to do that is for Anthropic to formally produce the documents to Publishers, consistent with the stipulated ESI Protocol and Protective Order. Anthropic's proposals, meanwhile, are unworkable, will require Publishers to prematurely disclose work product to Anthropic, and will inevitably lead to further discovery disputes before the Court.

There is absolutely no basis for Anthropic to deviate from the provisions of the ESI Protocol and Protective Order, by insisting access to these documents be limited to its own review platform, as opposed to Publishers' secure platform. Anthropic's privacy claims are greatly overstated. Nowhere did the Court's order permit Anthropic to unilaterally limit access to these records to its own platform. *See* ECF No. 377 at 5-6. Rather, the provisions of the Protective Order, ECF No. 293, are more than sufficient to protect the confidentiality of these documents, all of which have been designated by Anthropic as "Confidential" (not "Attorneys' Eyes Only"). Publishers have made clear to Anthropic that they will treat these records consistent with the

Protective Order, just as they have treated all other confidential records produced in this case. To the extent Publishers identify PII during the course of their review, they can agree to notify Anthropic so that this information can be redacted from the record(s) as appropriate. In the parties' discussions following the Court's sampling order, Anthropic's only rationale for limiting access to the records to their own platform was to meet the Court-ordered production deadline—not any privacy concerns. I. Dukanovic Email (June 14, 2025) (stating that this was the "quickest and most efficient way" to provide the records). But those desires do not trump Publishers' need to be able to analyze and understand this critical discovery.

## II. Anthropic's Position

### A. Anthropic has complied with the Court's order to randomly sample 5 million prompt and output pairs.

The Court ordered Anthropic to deliver a sample of 5 million prompt-output pairs, with 2.5 million randomly drawn from the pre-suit period and 2.5 million randomly drawn from the post-suit period, on or before July 14. Dkt. 377 at 6. Anthropic has done exactly that. This 5-million prompt-output pair sample was drawn from the same full universe of prompt-output pairs the parties have been discussing and analyzing throughout this entire litigation. As it advised Plaintiffs, Anthropic bifurcated this full dataset and ran a script to randomly select 2.5 million "pre-suit" and 2.5 million "post-suit" records, and delivered the samples to Plaintiffs in a secure platform on a rolling basis beginning July 7 and finishing July 14. Plaintiffs have known since last year that the sampled-from universe of prompt-output pairs includes so-called "title record" prompt-output pairs created to generate titles for user conversations. Despite that, Plaintiffs now claim that the sample does not satisfy the Court's order because it includes these records, while simultaneously maintaining that those same prompt-output pairs are relevant to their claims and should nonetheless be produced, just apparently not as part of the sample. Plaintiffs are not entitled to an additional sampling of records simply because they do not like how the first sample shook out.

The title records are true and complete prompt-output pairs. The Court directed Anthropic to produce 5 million "prompt-output pairs (i.e., each containing a given prompt and the corresponding Claude output)." Dkt. 377 at 6 (emphasis added). Plaintiffs claim that prompt-output pairs reflecting the creation of conversation titles are not "prompt-output pairs" within the

1    meaning of the Court's order. But they are—and Anthropic has referred to them this way
2    consistently throughout the litigation. These records each contain a <u>prompt</u> based on the user's
3    message ("Human: Generate a <title> for a message thread . . .") and a <u>corresponding Claude</u>
4    <u>output</u> ("Assistant: Here is a great, clear, unique, and concise title . . ."). Indeed, the
5    "Human"/"Assistant" format is used for *all* prompt-output pairs, and there is no metadata field
6    demarcating a so-called "user" pair from an "internal" one, as Plaintiffs suggest. Plaintiffs' strained
7    reading of the Court's order (inserting the word "*user*" before prompt and "*actual*" before "Claude
8    output") should be rejected. As should Plaintiffs' unsubstantiated claim that these records are
9    somehow "incomplete." The title records are not divorced, separated, or disconnected from any
10   "corresponding output." They exist, are stored, and have been delivered in their complete format.
11   That Plaintiffs do not find these records helpful to their continued fishing expedition is irrelevant.

12          <u>Plaintiffs have known for over 8 months that Anthropic's prompt-output data includes title</u>
13   <u>record prompt-output pairs</u>. Prompt/output discovery has, at all times, centered on a dataset from
14   the 6-month period between Sept. 22, 2023 and Mar. 22, 2024 (the "full universe"). Plaintiffs knew
15   that the full universe contained the title-related prompt-output pairs they now complain about.
16   Plaintiffs therefore understood (or should have understood) that any random sample could include
17   such pairs. That Plaintiffs failed to consider this in the context of the sample does not change the
18   analysis. Indeed, in December, Anthropic provided "test" results of records responsive to its
19   proposed search terms for the at-issue RFPs so Plaintiffs could evaluate those terms and raise any
20   concerns. Anthropic explained clearly that it captures and stores title records—referred to even
21   then as "prompt/output pairs"—and noted that those records were part of the overall prompt-output
22   dataset. *See* S. Sampoli Email (Dec. 12, 2024). Plaintiffs did not object or raise concerns.
23   Anthropic then proceeded to include this type of prompt-output pair in *every* prompt-output
24   production it made beginning in February. Again, Plaintiffs did not object or raise concerns. And
25   when Anthropic laid out precisely how it planned to draw and prepare the sample from the same
26   full universe of prompts/outputs, Plaintiffs once again did not object or raise concerns.

27          Perhaps most incredibly, despite now demanding these prompt-output pairs be hand-culled
28   from the sampled universe, Plaintiffs insist that they may nonetheless be responsive to their

discovery requests and should be produced in any event. *See supra* at n.3. This argument—which Publishers now attempt to walk back—is puzzling. To the extent these title-related prompt-output pairs hit on the search terms the Court ordered regarding the 499 works in suit, *see* Dkt. 318 at 3, Anthropic *has* produced them. To the extent these records *do not* hit on those search terms (like the examples on which Plaintiffs now rely), the sample is the only contemplated method for capturing them. *Id.* at 1–2. As Plaintiffs seem to argue, the title records in the sample reflect user behavior. *See supra* at n.3; *see also, e.g.*, DOC 02407700 (assigning the title "Top YouTube Description Words for Maximum Clicks" to a user message, "What are good words to put in your YouTube description to get a lot of clicks"). They are therefore relevant to Claude's typical uses.

Plaintiffs cannot have it both ways. Either the title records are relevant and properly included in the sample, or they are not relevant at all. Plaintiffs' dissatisfaction with the contents of the sample cannot justify a burdensome redo that would undermine the sample's randomness, inject bias, and require production of additional sensitive user prompts and outputs.

<u>Plaintiffs' proposed compromise is improper and burdensome</u>. Plaintiffs' proposed compromise that Anthropic either produce supplemental records related to the title records or "replace" them with "new records" amounts to a request that Anthropic run a second sample taken from an adjusted universe that eliminates all title records. This approach is not reasonable. Artificially excluding one category of prompt and output pairs from the full sampling universe is by definition not random and would improperly undermine the randomness of the ordered sample. And the only way for Anthropic to try and ensure the "replacement" records do not *also* contain title-related prompt-output pairs would be to first exclude them from the full universe from which the original sample was pulled—a process Anthropic's vendor cannot guarantee can be completed with efficiency or precision. Indeed, Plaintiffs' demand would require Anthropic to rely on manual text searches of all prompt-output pairs in the full universe in an effort to identify title-related records for removal. But with a universe this size, and the limitations inherent in dtSearch, *see* Dkt. 302 at 7, the results would be imprecise—and likely both over- and under-inclusive, if possible at all. Anthropic would then have to re-run the sampling script and process and deliver the records all over again and could not guarantee the exclusion of all title records.

### B. Anthropic's Use of a Secure Platform is Reasonable and Necessary to Protect User Privacy Given the Scope of the Sample

Plaintiffs also take issue with Anthropic's provision of the sample via a secure platform—a process they agreed to twice but have (again) abruptly reversed course on. As Anthropic has explained, it produced these records in the secure platform to honor its SCA obligations and protect users' privacy interests. The secure platform prevents unauthorized downloading, exporting, sharing, or use of users' private and potentially highly sensitive prompts and outputs. Importantly, Anthropic has also agreed to produce, outside of the secure platform, any relevant prompt and output pairs identified by Plaintiffs for further production, subject to redaction of any PII. Plaintiffs fail to articulate why this approach is not "viable," or why their desire for a different production format should trump users' privacy interests.

<u>Anthropic will not impede Plaintiffs' review and analysis of the sample</u>. When the parties first discussed the use of a secure platform, Anthropic believed that the parties intended to engage collaboratively, and that the initial provision and features included in this platform would be subject to further discussion and modification. However, when Anthropic attempted to engage in those discussions, Plaintiffs refused, claiming the "only option" was for Anthropic to image and produce *all* 5 million sampled prompts/outputs. Plaintiffs complained that they have "little control" within the platform, and "no ability to apply their own review tools and programs." But Anthropic has clarified that, if told what tools and programs are needed, it is willing to accommodate such requests so long as Plaintiffs cannot download, export, print, or otherwise share private and potentially sensitive records. Anthropic proposes the following modifications to address Plaintiffs' concerns regarding their ability to review and analyze the sample and protect their work product:

- Creation of a separate Relativity database only accessible by Plaintiffs' counsel and designated experts, or removal of Anthropic's counsel from the current workspace.
- The separate workspace can be on either Relativity Server or RelativityOne.
- In addition to the capabilities and permissions Plaintiffs already have, this separate environment will allow Plaintiffs to run Search Term Hit Reports (STRs), batch documents for review, and create and edit dashboards, coding fields and layouts.
- To the extent there are other review tools and programs needed by Plaintiffs, Anthropic will engage in good-faith discussions to provide those tools.
- Anthropic will provide a separate, walled Project Manager and Consulting vendor team that can be utilized by Plaintiffs for support, including formatting search terms, running analytics like CAL, and day-to-day workspace support, if needed.
- Anthropic will formally produce on a rolling basis, non-privileged prompt and output pairs identified by Plaintiffs as responsive.

<u>The secure platform protects the privacy interests of third-party Claude users, particularly those whose prompts and outputs are unrelated to song lyrics.</u> Plaintiffs claim that Anthropic's "only rationale" for producing the prompt-output pairs on a secure platform was a "desire for efficiency." That is wrong. Anthropic has repeatedly made clear, including in conferrals, prior briefing, and arguments made to this Court, that regardless of the size of the sample, privacy safeguards, including the use of a secure platform, were necessary to prevent the unnecessary disclosure of sensitive user PII and/or imposing the extraordinary burden and expense of reviewing and redacting PII from all 5 million records. *See* Dkt. 341 at 10. Unlike the prompt-output pairs Anthropic produced in connection with specific song title and lyric string search terms, the sampled prompts/outputs have not been filtered for relevance, making the privacy interests at issue here exceptionally strong. *See Heredia v. Sunrise Senior Living LLC,* 2019 WL 7865176, at *4 (C.D. Cal. Oct. 31, 2019) (expressing "concern[] about the privacy interests" of the individuals swept into a sample). The Court recognized this concern at the May 13 hearing, noting that Anthropic's user privacy concerns are "important and do need to be addressed." Hr'g Tr. (May 13, 2025) at 35. The Court even suggested that any "prompts and outputs that lead to not relevant information" should be "deleted from the secure platform." *Id*. User privacy has been—and continues to be—the primary concern driving Anthropic's use of a secure platform; that it was also a faster and more efficient approach was a benefit, but ultimately beside the point.

When Anthropic told Plaintiffs it would using a secure platform, Plaintiffs did not object, waited until Anthropic had undertaken the burden of delivering the entire sample to Plaintiffs, and then accused Anthropic of failing to comply with the Court's order. Instead of engaging with Anthropic or providing insight into what they considered necessary modifications to the secure platform after their "exploration" in early July, they abruptly informed Anthropic that the platform was not "a viable solution" on July 16. Anthropic's proposed compromise—which addresses all of Plaintiffs' articulated concerns while safeguarding user privacy—is reasonable.[4] The secure platform remains the superior option.

---

[4] Imaging and producing 5 million prompt/output pairs would require at least 20 days based on processing and exporting estimates. This does not account for the processing and importing time once Plaintiffs receive the data.

| | | |
|---|---|---|
| 1 | Dated: August 6, 2025 | Respectfully submitted, |
| 2 | By: */s/ Timothy Chung* | By: */s/ Joseph R. Wetzel* |
| 3 | **OPPENHEIM + ZEBRAK, LLP** | **LATHAM & WATKINS LLP** |

Dated: August 6, 2025

By: */s/ Timothy Chung*

**OPPENHEIM + ZEBRAK, LLP**
Matthew J. Oppenheim
Nicholas C. Hailey
Audrey L. Adu-Appiah
(admitted *pro hac vice*)
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
aadu-appiah@oandzlaw.com

Jennifer Pariser
Andrew Guerra
Timothy Chung
(admitted *pro hac vice*)
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
jpariser@oandzlaw.com
andrew@oandzlaw.com
tchung@oandzlaw.com

**COBLENTZ PATCH DUFFY & BASS LLP**
Jeffrey G. Knowles (SBN 129754)
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 391-4800
ef-jgk@cpdb.com

**COWAN, LIEBOWITZ & LATMAN, P.C.**
Richard S. Mandel
Jonathan Z. King
Richard Dannay
(admitted *pro hac vice*)
114 West 47th Street
New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

*Attorneys for Plaintiffs*

Respectfully submitted,

By: */s/ Joseph R. Wetzel*

**LATHAM & WATKINS LLP**
Joseph R. Wetzel (SBN 238008)
joe.wetzel@lw.com
Andrew M. Gass (SBN 259694)
andrew.gass@lw.com
Brittany N. Lovejoy (SBN 286813)
britt.lovejoy@lw.com
Ivana Dukanovic (SBN 312937)
ivana.dukanovic@lw.com
505 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: +1.415.391.0600

Sarang V. Damle
(admitted *pro hac vice*)
sy.damle@lw.com
Sara Sampoli (SBN 344505)
sara.sampoli@lw.com
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Telephone: +1.202.637.2200

Allison L. Stillman
(admitted *pro hac vice*)
alli.stillman@lw.com
1271 Avenue of the Americas
New York, New York 10020
Telephone: +1.212.906.1747

Rachel Horn (SBN 335737)
rachel.horn@lw.com
140 Scott Drive
Menlo Park, California 94025
Telephone: +1.650.328.4600

*Attorneys for Defendant*

By: */s/ Sonal Mehta*
**WILMER CUTLER PICKERING HALE AND DORR LLP**

Sonal Mehta (SBN 222086)
sonal.mehta@wilmerhale.com
Allison Bingxue Que (SBN 324044)
allison.que@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
(650) 858-6000
Fax: (650) 858-6100

Robin C. Burrell (admitted *pro hac vice*)
robin.burrell@wilmerhale.com
Ari Holtzblatt (admitted *pro hac vice*)
ari.holtzblatt@wilmerhale.com
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6964

Joseph Taylor Gooch (SBN 294282)
taylor.gooch@wilmerhale.com
50 California Street
Suite 3600
San Francisco, CA 94111
(628) 235-1002

Louis W. Tompros (admitted *pro hac vice*)
louis.tompros@wilmerhale.com
60 State Street
Boston, MA 02109
(617) 526-6886

*Attorneys for Defendant*

**SIGNATURE ATTESTATION**

Pursuant to Civil L.R. 5-1(i)(3), I hereby attest that concurrence in the filing of this document was obtained from all other signatories of this document. I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 6, 2025

*/s/ Timothy Chung*
Timothy Chung