1    [Counsel on signature page]

2

3    **UNITED STATES DISTRICT COURT**

4    **NORTHERN DISTRICT OF CALIFORNIA**

5    **SAN JOSE DIVISION**

6    CONCORD MUSIC GROUP, INC., ET AL.,          Case No. 5:24-cv-03811-EKL-SVK

7                          Plaintiffs,           **JOINT DISCOVERY DISPUTE
                                                 STATEMENT REGARDING THE**
8        vs.                                     **COURT'S OCTOBER 12, 2025 ORDER**

9    ANTHROPIC PBC,
                                                 Judge Eumi K. Lee
10                         Defendant.            Magistrate Judge Susan van Keulen

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Pursuant to Section 8 of the Court's Civil Standing Order, and L.R. 37-1 and 37-2, the

2    Parties respectfully submit this Joint Discovery Dispute Statement regarding the Court's October

3    12, 2025 order.  The Parties' lead counsel met and conferred to try to resolve their disagreement

4    regarding the scope of the order via videoconference on October 17, 2025, and by email.  However,

5    the Parties are at impasse.  The current fact discovery deadline is 12 days away.  ECF 467.  Given

6    the nature of the dispute, Anthropic does not believe there is a viable compromise available:

7    Anthropic seeks information that is necessarily within the scope of the Court's October 12, 2025

8    order.  Publishers cannot offer a compromise given the clear scope of the Court's October 12

9    Order, and because Anthropic now seeks information beyond what its interrogatory requested and

10    what the Court ordered. Anthropic respectfully requests a ruling in time to permit Publishers to

11    produce the required information in advance of the deposition of Publishers' investigator, which

12    is scheduled for November 3, 2025.

13    **I.    Anthropic's Position: The Court Should Confirm That Its October 12, 2025 Order Requires Publishers To Produce The Same Information For The 15,000 Prompt-**

14    **Output Production As For The 5 Million Prompt-Output Sample.**

15    As the Court acknowledged in its October 12, 2025 order, Publishers intend to "rely on

16    two types of evidence in support of their allegations as to the ineffectiveness of Claude's

17    guardrails: (1) evidence provided by Anthropic, *e.g.* documents or statistics derived from the

18    sample, as to the effectiveness of guardrails; and (2) the fact that on certain dates, presumably after

19    guardrails were assertedly implemented, Publishers' investigators were able to submit prompts

20    that nonetheless resulted in allegedly infringing outputs."  ECF 478 at 5 (footnote omitted).

21    Accordingly, the Court held that a "limited and narrow waiver" of Publishers' work-product

22    privilege has occurred: "because Publishers intend to present evidence that in their own (or their

23    agents') experience Anthropic's guardrails failed at least some number of times, Anthropic must

24    in fairness be permitted to discover and present evidence as to the number of times its guardrails

25    did not fail." *Id.*

26    There are two sets of prompt-output pairs produced by Anthropic in this case.  *First*, there

27    is the random sample of 5 million prompts and outputs that the Court referred to in its order as an

28    "example": Publishers intend to rely on "evidence provided by Anthropic, *e.g.* documents or

1  statistics derived from the sample." ECF 478 at 5 (emphasis added). *Second*, there is a second set

2  of approximately 15,000 prompt-output pairs that Anthropic produced in response to Publishers'

3  Requests for Production Nos. 50 and 51. Those prompts and outputs were identified by searching

4  certain keywords in proximity to the titles or lyrics from the Works-in-Suit across the same six-

5  month period of prompts and outputs from which the 5 million random sample is drawn. Critically,

6  not all of the prompts and outputs in the 15,000 set are contained within the 5 million sample.

7       Publishers claim that Anthropic "explicitly disclaimed" this 15,000 set, but that is simply

8  not true. In fact, that set of 15,000 was referred to explicitly by Anthropic's counsel several times

9  at the October 10 hearing, alongside the 5 million sample, as similar evidence produced

10  "independent of the sample" by Anthropic. 10/10/25 Hr'g Tr. at 85:24-86:3 (The Court: "[w]hen

11  you say what Anthropic has produced … you're talking about using the sample?" Counsel for

12  Anthropic: "The sample. We also have run through the six month period, the word "song," "lyrics"

13  … that's actually even been produced independent of the sample."); *id.* at 114:13-20 (counsel for

14  Anthropic discussing both the "5 million sample" and the set of "every prompted output during

15  that period where [Anthropic] ran the word song, songs, lyrics, lyric"); *id.* at 102:12-20 (counsel

16  for Anthropic discussing "this sample of 5 million" and "this sample of whatever resulted from

17  the keyword searches"). Publishers themselves quote below from a portion of the transcript in

18  which Anthropic's counsel discusses "the ***samples*** that we have produced"—"samples," plural,

19  indicating that the discussion extended beyond just the 5 million sample. Anthropic's use of short-

20  hand during the hearing to refer to the various sets of prompts and outputs that have been produced

21  in this case does not change the analysis, and Publishers never suggested at the hearing that the

22  15,000 set should be treated differently from the 5 million sample.

23       Because the Court's October 12 order explicitly refers to the 5 million sample as just one

24  ***example*** of "evidence provided by Anthropic," the Court's fairness analysis—and the information

25  it ordered Publishers to produce—extends to other similar evidence produced by Anthropic—

26  namely, the 15,000 set. ECF 478 at 5. Based on the Court's conclusion that a limited waiver of

27  work product has occurred and that Anthropic is entitled to challenge the evidence plaintiffs intend

28  to rely on to attack the effectiveness of the guardrails, the Court ordered: "Publishers, via their

1    own access to the 5-million record sample, will disclose to Anthropic: (a) the total number of the

2    Publishers' (or their agents') prompts-output pairs that are encompassed in the sample; (b) the

3    number of such prompts in the sample that resulted in the output of song lyrics; and (c) the number

4    of such prompts in the sample that resulted in the invocation of Claude's guardrails or otherwise

5    failed to elicit song lyrics." *Id.* at 6.  The set of 15,000 prompt-output pairs falls into the exact

6    same category:  it is "evidence provided by Anthropic" that Publishers intend to "rely on … in

7    support of their allegations as to the ineffectiveness of Claude's guardrails." *Id.* at 5.  And the

8    Court's reasoning applies equally to the set of 15,000 prompt-output pairs: to the extent that

9    Publishers intend to rely on the 15,000 set to argue that the guardrails are ineffective, a limited

10   waiver has occurred and Anthropic is entitled at a minimum to this same limited information—

11   i.e., the corresponding three figures above—to enable it to rebut that specific evidence.[1]

12          Accordingly, by email on October 15, 2025, and on the parties' October 17, 2025 meet and

13   confer between counsel, Anthropic asked Publishers to confirm that they would provide the same

14   information for the set of 15,000 prompt-output pairs as for the 5 million sample.  Publishers

15   refused.  Anthropic then asked Publishers to stipulate that they would not rely on the prompts-

16   outputs in the set of 15,000 prompt-output pairs to argue that the guardrails are ineffective.

17   Publishers not only refused this stipulation, they affirmatively confirmed that they intend to rely

18   on this evidence for that purpose.  And their arguments here confirm that they intend to rely on

19   outputs in the 15,000 set.  Anthropic is therefore entitled in fairness to basic information about

20   _____

21   [1] As Anthropic has previously explained, this request does not seek protected work product but
     rather only basic, nonsubstantive descriptive information commonly disclosed in privilege logs.

22   *See In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liability Litig.*, 293 F.R.D. 568, 573
     (S.D.N.Y. 2013) (party invoking work product must "describe the nature of the … things not

23   produced … in a manner that … will enable other parties to assess the claim" (quoting Fed. R.
     Civ. P. 26(b)(5)(A)(ii))).  Disclosing such purely descriptive information does not reveal any

24   mental impressions of counsel.  Even if the work product privilege did apply, Publishers cannot
     simultaneously use aggregate data about their own testing as a sword to establish liability but

25   invoke the work product doctrine to shield the basic contours of its testing from Anthropic's view.
     When a party's claim turns on "the adequacy of its pre-litigation investigation," as Publishers'

26   guardrails-effectiveness arguments do, it "must turn over documents related to [its] investigation"
     that are "important in proving or disproving" its alleged findings. *Walker v. Cnty. of Contra Costa*,

27   227 F.R.D. 529, 535 (N.D. Cal. 2005).   And in all events, Anthropic has a "substantial need" for
     this information to "impeach[] or corroborat[e]" central issues in this case. *Hickman v. Taylor*,

28   329 U.S. 495, 511 (1947).

1  these prompts and outputs that will enable Anthropic to respond.

2      Publishers' attempts below to distinguish the applicability of the Court's order to the

3  15,000 set, on the one hand, and the 5 million sample, on the other, are meritless.  *First*, Publishers

4  inexplicably highlight the lyrics-specific nature of the 15,000 set relative to the 5 million sample.

5  But because the 15,000 set was derived from case-relevant keyword searches, the 15,000 set is in

6  fact **more** likely to be a source of Publishers' guardrails-related evidence.  That makes it even more

7  important for Publishers to provide the required information for this 15,000 set.  Otherwise,

8  Publishers would be permitted to use this set as a sword to establish liability but shield from

9  discovery (and challenge by Anthropic) the very information the Court has ordered produced for

10  other samples.  *Second*, Publishers argue that Anthropic should be able to compare the

11  approximately 5,000 prompts and outputs that Publishers produced to the 15,000 set to determine

12  which of Publishers' produced prompts and outputs are in the set.  But that comparison would not

13  provide Anthropic all of the relevant information the Court has determined it is entitled to—

14  specifically the "denominator" associated with any "positive" results on which Publishers intend

15  to rely.  Anthropic cannot determine that for the 15,000 set without the three figures ordered by

16  the Court.  *Third*, Publishers incorrectly suggest that the three figures would permit Anthropic to

17  "reverse engineer" Publishers' undisclosed prompts and outputs.  Again, that is simply untrue.

18  Those figures do not permit reverse engineering for the 15,000 set anymore than they do for the 5

19  million sample.  *Finally*, Publishers assert without explanation that the figures for the 15,000 set

20  could be "misleading."  This of course reveals the true concern behind Publishers' continued

21  objections to producing this highly relevant evidence: it doesn't clearly support their intended

22  narrative. That might be true, but it does not justify refusing production.  Publishers will be entitled

23  to present to the fact-finder any context about the 15,000 set that they would like, including that it

24  does not reflect a random sample.  That is no reason to deny Anthropic relevant and proportional

25  discovery necessary to defend against prompt-output pairs that Publishers have put at issue.

26      Accordingly, Anthropic respectfully requests that the Court confirm that its October 12,

27  2025 order applies to all "evidence provided by Anthropic" and therefore requires Publishers to

28  disclose to Anthropic (a) the total number of the Publishers' (or their agents') prompt-output pairs

that are encompassed in the set of 15,000 prompt-output pairs; (b) the number of such prompts in the sample that resulted in the output of song lyrics; and (c) the number of such prompts in that set of prompt-output pairs that resulted in the invocation of Claude's guardrails or otherwise failed to elicit song lyrics. Anthropic reserves the right to move to preclude Publishers from making arguments based on the set of 15,000 prompt-output pairs if they do not disclose this relevant information.

Anthropic also respectfully requests a ruling in advance of the 30(b)(1) deposition of Publishers' investigator, which is scheduled for November 3. Anthropic's original version of this dispute statement asked for a ruling in advance the October 29 deposition of Alisa Coleman, who is both a 30(b)(1) witness and ABKCO's 30(b)(6) witness, as well. Publishers nevertheless took nearly a week to return their insert, delivering it on October 27, making it virtually impossible to obtain a ruling from the Court before the October 29 deposition. Anthropic accordingly held the October 29 deposition open and now seeks a ruling by the November 3 deposition. Publishers' reliance on the Court's decision to deny a 30(b)(6) deposition on these issues is a non-sequitur. Anthropic is not asking Publishers to prepare a 30(b)(6) witness on these issues. Rather, it intends to and is entitled to ask Publishers' 30(b)(1) witnesses about the three figures ordered by the Court over which the Court has determined that any work product privilege has been waived.

## II.    Publishers' Position: Anthropic improperly seeks to make an end-run around the Court's discovery ruling and to drastically expand the scope of ordered discovery.

The Court has already considered and denied Anthropic's request for the additional, invasive discovery into the details of Publishers' legal investigation it pursues again here. The Court made clear in its October 12 Order precisely what information Publishers must provide to Anthropic on this topic and why. ECF No. 478. Now, under the guise of a request to "confirm" the Order, Anthropic attempts to drastically *expand* that Order by demanding—for the third time—to invade Publishers' work product protection over additional details of their legal investigation. Anthropic cannot be permitted to make an end-run around this Court's rulings on this critical issue.

In its October 12 Order, the Court emphasized that "the prompts and related settings used by Publishers in their pre-suit investigation are attorney work-product," and recognized "the danger of crossing the line into discovery of opinion work product" by disclosing too much

1    information about Publishers' legal investigation. ECF No. 478 at 4, 6. Ultimately, the Court

2    ordered that Publishers were required to respond to Anthropic's Interrogatories 3 and 4 by

3    disclosing certain high-level figures regarding their Claude prompts and output from their legal

4    investigation, and to respond to Anthropic's Interrogatory 6 by disclosing similar high-level

5    figures regarding Publishers' prompts and output included in the random 5-million-record Claude

6    sample produced by Anthropic. *Id.* at 5–6. ***Nowhere*** did the Court order Publishers to further

7    respond to Interrogatory 6 by disclosing information about their prompts and output included in

8    Anthropic's separate and distinct production of approximately 15,000 Claude records hitting on

9    specific search terms relating to Publishers' Works in Suit—and for good reason.

10            Unwilling to take "no" for an answer, Anthropic now brings what it styles as a motion to

11    "confirm" that the Court's Order says something it does not. Anthropic's submission is really a

12    motion for reconsideration of a request the Court already denied, and that motion must fail:

13    Anthropic has not sought leave to file such a motion as the Court's rules require, Civ. L.R. 7-9(a),

14    and has not even tried to argue, as the Court's rules also require, either that "a material difference

15    in fact or law exists from that which was presented to the Court," or "[t]he emergence of new

16    material facts or a change of law," or a "manifest failure by the Court to consider material facts or

17    dispositive legal arguments which were presented to the Court . . . ." Civ. L.R. 7-9(b)(1)–(3).

18            In any event, Anthropic neither needs nor is entitled to any specific figures relating to

19    Publishers' prompts and outputs in the 15,000 records it produced. Publishers have already made

20    clear they ***do not intend to rely,*** to prove the inefficacy of guardrails or otherwise, on any copies

21    in Anthropic's 15,000-record production of their own prompts and output records. Publishers have

22    already produced their ***own*** copies of those Claude prompt and output records from Publishers'

23    own investigation on which Publishers intend to rely in this case. ECF No. 369 at 1.

24            More broadly, because the 15,000-record production is ***not*** a statistically significant sample

25    like the 5-million-record sample, the figures Anthropic seeks do not bear on its argument as to the

26    effectiveness of its guardrails. Anthropic likewise does not need this information to differentiate

27    Publishers' prompts and output in this set. Indeed, Anthropic's counsel made clear at the October

28    10 hearing that Interrogatory 6 was relevant to the Claude sample specifically, not the separate

1  non-sample production. Further, the figures Anthropic demands could be highly misleading, as it

2  apparently intends to exploit such numbers to extrapolate from a non-representative production.

3         **A.    Anthropic mischaracterizes the discovery at issue in an improper attempt to expand the Court's Order after the fact.**

4

5         As an initial matter, Anthropic misstates the nature of the production of 15,000 Claude

6  records at issue. First, these records are ***not*** a "sample" in any sense. They were not identified by

7  any statistical sampling procedure, but instead by targeted searches. Second, these 15,000 Claude

8  records were ***not*** the result of general searches for the terms "song," "songs," "lyric," and "lyrics"

9  as Anthropic claims; instead, Anthropic ran targeted searches relating to specific song titles and

10  lyric strings for the 499 Works in Suit specifically. The Parties and the Court have discussed these

11  searches at length.[2] Nevertheless, Anthropic's counsel misrepresented at the October 10 hearing

12  that this 15,000-record production consisted of broader searches for the terms "song," "songs,"

13  "lyric," and "lyrics." *See, e.g.*, Hr'g Tr. 85:24–86:3 (Oct. 10, 2025) (Ms. Mehta: "We also have

14  run through the six month period, the word "song," "lyrics" . . . that's actually even been produced

15  ***independent of the sample***.") (emphasis added); *id.* at 114:13–20 (Anthropic's counsel discussing

16  both the "5 million sample" and the set of "every prompted output during that period where

17  [Anthropic] ran the word song, songs, lyrics, lyric"). That Anthropic's counsel demanded this

18  protected information regarding Publishers' legal investigation—apparently without

19  understanding what the production at issue actually contains—makes clear that Anthropic's

20  purpose here is to fish for further details of Publishers' legal investigation without care for whether

21  that information is relevant for the reasons it claims.

22         **B.    Interrogatory 6 does not cover the information Anthropic now seeks.**

23         Anthropic previously made clear that its Interrogatory 6 sought only information regarding

24  the random 5-million-record Claude sample—***not*** the non-sample production of 15,000 documents

25  hitting on specific song title and lyric search terms. Anthropic cannot flip its position after the fact

26  and now seek to stretch the Court's order to encompass discovery it did not request previously.

27

28  _____

[2] *See, e.g.*, Hr'g Tr. at 24:9–15 (Mar. 18, 2025) (Mr. Damle: "[W]e've started reviewing and producing conversations with—Claude conversations that match on those lyric string . . . also on the title, the title searches, as well. So, to the extent that . . .it matches title within five of 'lyric' or 'words to,' we've started producing that data").

1    Anthropic's counsel made clear at the October 10 hearing that it intended Interrogatory 6

2    to identify information regarding the 5-million Claude sample only: "[W]e are asking [in

3    Interrogatory 6] for the usernames of the publishers and their agents ***so that we can figure out of***

4    ***the samples that we have produced*** which ones came from them, which ones came from true third

5    parties." Hr'g Tr. 81:6–9 (Oct. 10, 2025) (emphasis added); *see also id.* 82:12-21 (Ms. Mehta:

6    "[W]e produced ***a sample*** to [Publishers] and . . . we need a way to disentangle which ones came

7    from their agents and from them and which ones came from true third parties."); *id*. at 85:24–86:3

8    (Ms. Mehta describing the 15,000 records as "produced independent of the sample"). Moreover,

9    the Court's order recognized Anthropic's stated rationale for Interrogatory 6 limited Interrogatory

10   6's scope to the "emails and usernames associated with Publishers' investigators, which Anthropic

11   asserts it needs to ***disentangle Publishers' prompts and outputs from the larger 5-million record***

12   ***sample***." ECF No. 478 at 6 (emphasis added). That is why the Court ordered Publishers to produce

13   certain numbers regarding their prompts and output included in the Claude sample—but not with

14   respect to the separate non-sample production of 15,000 records.

15
16   **C.    There is no basis to compel Publishers to disclose figures regarding their
        legal investigation in connection with the 15,000-record production.**

17   The distinctions between the 5-million-record sample and the more targeted 15,000-

18   document production make clear why there is no basis for Anthropic's attempt to stretch the

19   Court's ruling. The 5-million-record sample reflects a statistically significant sample of all Claude

20   prompt-output pairs for the given 6-month period. As the Court knows, this sample was conceived

21   as a statistically significant sample of Claude prompt-output pairs to test "whether prompts and

22   outputs for song lyrics are 'typical' for Claude products," including the effectiveness of Claude's

23   guardrails in preventing copyrighted output. ECF No. 306 at 1 n.1, 2. By contrast, the separate

24   production of 15,000 documents is ***not*** a statistically significant sample—it reflects focused

25   searches targeted at Works in Suit and reflecting specific infringements of those Works in Suit.[3]

26
27
28
---
[3] Indeed, Anthropic's counsel has specifically distinguished the nature and purpose of the broader Claude sample from these more targeted productions. *See, e.g.*, Hr'g Tr. at 33:23–34:22 (March 18, 2025) (Anthropic's counsel: "The whole sampling approach, the only thing I would emphasize is, it is really aimed at not the Works in Suit, but works that are not in suit").

1    Accordingly, Anthropic has no basis whatsoever for demanding the specific figures with

2    respect to this narrower set of 15,000 Claude records. Contrary to Anthropic's contention, those

3    figures will not enable Anthropic to extrapolate anything about the broader population of Claude

4    prompts and outputs, Anthropic's claimed purpose for this discovery. Ordering Publishers to

5    provide this information would serve no practical purpose for Anthropic's analysis.

6    Moreover, to the extent Anthropic's 15,000-record production happens to include copies

7    of Publishers' prompt and output records from their legal investigation, Publishers do not intend

8    to rely on those copies of the records specifically. As the Court is aware, Publishers have already

9    produced their own copies of nearly 5,000 Claude prompt and output records from Publishers'

10    own investigation on which Publishers intend to rely in this case. *See, e.g.*, ECF No. 369 at 1

11    (detailing production). To the extent the 15,000 records that Anthropic produced back to Publishers

12    include copies of those same records, Publishers need not rely on the copies of those same records

13    that Anthropic produced back to them. Rather, Publishers intend to rely on records of ***third-party***

14    ***user infringement*** from Anthropic's 15,000 record production. As a result, Anthropic has no need

15    whatsoever for any specific metrics regarding ***Publishers'*** prompts and output included in the

16    15,000 record production, and these numbers in a vacuum will be misleading given the non-sample

17    nature of the production. As such, Publishers obviously could not agree to Anthropic's demanded

18    stipulation, which would improperly preclude Publishers from relying on (1) prompt-output pairs

19    they have already disclosed to Anthropic as attributable to their investigation, and (2) third-party

20    prompt-output pairs that are critical evidence of Anthropic's infringement.

21    Requiring Publishers to disclose the requested figures for the 15,000-record production

22    would seriously risk disclosing information regarding Publishers' legal investigation that the Court

23    has repeatedly held is protected work product. Specifically, the figures Anthropic seeks would

24    empower Anthropic to improperly invade Publishers' work product protection over their legal

25    investigation by enabling Anthropic to attempt to reverse-engineer the numbers from a much

26    smaller production to identify which specific prompts and output are attributable to Publishers

27    (including undisclosed prompts and outputs). The Court has already determined that information

28    to be unequivocally off-limits, ECF No. 478 at 6; *see also* ECF No. 377 at 3–4, and carefully

1  crafted its order here specifically to avoid the risk that Anthropic could reverse-engineer

2  Publishers' investigation. ECF No. 478 at 6 ("[T]he Court is concerned that revealing Publishers'

3  usernames and emails would give Anthropic the key it needs to unlock the door to the prompts and

4  outputs themselves—which this Court denied in its Prior Order.").

5      Anthropic's request that this Court rule on its expanded discovery demands immediately—

6  prior to scheduled depositions of Publishers' witnesses, and at the same time it seeks Judge Lee's

7  review of this Court's broader October 12 Order—further underscores the impropriety of

8  Anthropic's motion.[4] This Court explicitly denied Anthropic's request to take a Rule 30(b)(6)

9  deposition on these same topics (*i.e.,* Publishers' investigations of Claude), stating that such

10 depositions would "invite an inviolate crossing of that [work-product] border." ECF No. 478 at 6.

11 Obviously, asking a 30(b)(1) witness the same questions the Court already ruled out-of-bounds for

12 a 30(b)(6) deposition invites the same inviolate border crossing. Anthropic's tying the instant

13 request to upcoming depositions is its latest attempt to cross that work-product border despite the

14 Court's careful line-drawing, and Anthropic cannot clear the extremely high bar required for the

15 Court to reconsider its earlier ruling. Moreover, despite Anthropic's multiple prior requests and

16 this Court's consequent orders regarding Publishers' investigative work product, Anthropic has

17 now asked Judge Lee to reverse the portions of the October 12 Order that denied it discovery, once

18 again attempting to access all information from Publishers' investigation. Anthropic's continued

19 pursuit of this discovery on multiple fronts, in spite of this Court's clear ruling, underscores that

20 Anthropic will be satisfied with nothing short of complete exposure of the protected details of

21 Publishers' legal investigation. That cannot be permitted. Anthropic's motion should be denied.

22

23

24

25

---

26 [4] Anthropic complains that Publishers took "nearly a week" to return their portion of this dispute statement. The typical
    practice of the parties, for the past two years, has provided each side approximately a week to respond to a proffered
27 dispute statement. Anthropic sent the dispute statement to Publishers on October 21 at 7:39 pm; Publishers returned
    the draft on October 27 at 4:03 pm. Given the highly sensitive nature of this dispute, Publishers took care in drafting
28 their response while explaining to Anthropic that they would return their portion as soon as practicable. Belying
    Anthropic's claim to urgency, rather than file the statement immediately after Publishers returned it, Anthropic chose
    to substantially rewrite its section, further delaying filing by several days.

1

2    Date: October 31, 2025                          Respectfully submitted,

3    By:   /s/ Nicholas C. Hailey                    By:   /s/ Ari Holtzblatt
     **OPPENHEIM + ZEBRAK, LLP**                     **WILMER CUTLER PICKERING**
4                                                    **HALE AND DORR LLP**
     Matthew J. Oppenheim
5    Nicholas C. Hailey                              SONAL N. MEHTA (SBN 222086)
     Jeffrey M. Gould                                sonal.mehta@wilmerhale.com
6    Corey Miller                                    ALLISON BINGXUE QUE (SBN 324044)
     Audrey L. Adu-Appiah                            allison.que@wilmerhale.com
7    (admitted pro hac vice)                         2600 El Camino Real, Suite 400
     4530 Wisconsin Ave., NW, 5th Floor              Palo Alto, CA 94306
8    Washington, DC 20016                            Telephone: (650) 858-6000
     Telephone: (202) 480-2999
9    matt@oandzlaw.com
     nick@oandzlaw.com                               LOUIS W. TOMPROS (*Pro Hac Vice*)
10   jeff@oandzlaw.com                               louis.tompros@wilmerhale.com
     corey@oandzlaw.com                              STEPHANIE LIN (*Pro Hac Vice*)
11   aadu-appiah@oandzlaw.com                        stephanie.lin@wilmerhale.com
                                                     DISHA PATEL (*Pro Hac Vice*)
12                                                   disha.patel@wilmerhale.com
     Alexander Kaplan                                60 State Street
13   Jennifer Pariser                                Boston, MA 02109
     Andrew Guerra                                   Telephone: (617) 526-6220
14   Bret Matera
     Timothy Chung
15   Michelle Gomez-Reichman                         ARI HOLTZBLATT (SBN 354361)
     (admitted pro hac vice)                         ari.holtzblatt@wilmerhale.com
16   461 5th Avenue, 19th Floor                      ROBIN C. BURRELL (*Pro Hac Vice*)
     New York, NY 10017                              robin.burrell@wilmerhale.com
17   Telephone: (212) 951-1156                       2100 Pennsylvania Ave, NW
     alex@oandzlaw.com                               Washington, DC 20006
18   jpariser@oandzlaw.com                           Telephone: (202) 663-6000
     andrew@oandzlaw.com
19   bmatera@oandzlaw.com                            TAYLOR GOOCH (SBN 294282)
     tchung@oandzlaw.com                             taylor.gooch@wilmerhale.com
20   mgomez-reichman@oandzlaw.com                    KYLE EDWARDS HAUGH (SBN 323952)
                                                     kyle.haugh@wilmerhale.com
21                                                   50 California St.
     **COBLENTZ PATCH DUFFY & BASS LLP**             San Francisco, CA 94111
22   Jeffrey G. Knowles (SBN 129754)                 Telephone: (628) 235-1000
     One Montgomery Street, Suite 3000
23   San Francisco, CA 94104
     Telephone: (415) 391-4800                       *Attorneys for Defendant*
24   ef-jgk@cpdb.com                                 **ANTHROPIC PBC**

25

26   **COWAN, LIEBOWITZ & LATMAN, P.C.**
27   Richard S. Mandel
     Jonathan Z. King
28   Richard Dannay
     (admitted pro hac vice)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

114 West 47th Street
New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

*Attorneys for Plaintiffs*

**SIGNATURE ATTESTATION PURSUANT TO CIVIL L.R. 5-1(h)**

Pursuant to Civil L.R. 5-1(h), I hereby attest that concurrence in the filing of the

document was obtained from the document's signatories. I declare under penalty of perjury that

the foregoing is true and correct.


Dated: October 31, 2025                    /s/ Ari Holtzblatt
                                           Ari Holtzblatt