[Counsel on signature page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

CONCORD MUSIC GROUP, INC., ET AL.,

    Plaintiffs,

    v.

ANTHROPIC PBC,

    Defendant.

Case Number: 5:24-cv-03811-EKL-SVK

**JOINT DISCOVERY DISPUTE STATEMENT REGARDING THE DEPOSITION OF DARIO AMODEI**

Judge Eumi K. Lee
Magistrate Judge Susan van Keulen

Pursuant to Section 8 of the Court's Civil Standing Order, and L.R. 37-1 and 37-2, Plaintiffs ("Publishers") and Defendant Anthropic PBC ("Anthropic") respectfully submit this Joint Discovery Dispute Statement. The Parties seek the Court's intervention in resolving Anthropic's objection to the deposition notice Publishers issued for Anthropic's founder and Chief Executive Officer, Dario Amodei. The Parties' lead counsel met and conferred to try to resolve this dispute via videoconference on Sept. 23, 2025 and by email. The Parties have been unable to resolve the issues below. The current fact discovery deadline is 21 days away. ECF No. 416. In terms of compromise, Publishers cannot withdraw their deposition notice given the importance of Mr. Amodei's deposition to the case, but Publishers would be willing to accommodate Mr. Amodei's schedule by taking the deposition during evening or weekend hours if needed. Anthropic proposes that no deposition be scheduled at this time, and that the parties reevaluate whether Publishers can meet their burden for taking this apex deposition after Publishers complete their other noticed depositions, including those of other founders and senior executives.

## I.    Publishers' Position: Mr. Amodei possesses personal knowledge of relevant issues and must be made available for a deposition.

Mr. Amodei is Anthropic's CEO and founder. He is no typical CEO. Mr. Amodei has plunged himself deeply into nearly all aspects of Anthropic's business, from the company's founding in 2021 until today. Indeed, the limited documents Anthropic has produced demonstrate that Mr. Amodei involved himself intimately with details of significant decisions across Anthropic's departments, including the early design, training, and development of Claude and Anthropic's data acquisition and copyright strategies. While Publishers have served a deposition notice pursuant to Fed. R. Civ. P. 30(b)(1) on Mr. Amodei, *see* Ex. 1, Anthropic has refused to make him available for a deposition. Anthropic cannot evade having Mr. Amodei appear for a deposition simply by invoking his executive position. To the contrary, Mr. Amodei is a percipient witness with unique firsthand knowledge of many facts relevant to Publishers' allegations.

Six months ago, Mr. Amodei was ordered by another court in this District to appear for a deposition in a similar copyright infringement case. Am. Minute Entry (Mar. 4, 2025), *In re Motion to Compel Compliance with Non-Party Subpoenas*, 3:25-mc-80017-AMO (N.D. Cal.), ECF No.

28 ("OpenAI Order"). Likewise, he was scheduled to be deposed in *Bartz v. Anthropic* before Anthropic agreed to settle that copyright infringement action for $1.5 billion a few days before his deposition. Just as in these similar cases, Anthropic must make Mr. Amodei available for his deposition in this case without further delay.

**A.    A witness's "apex" status does not preclude their deposition where the witness has personal knowledge of relevant facts.**

"It is very unusual for a court to prohibit the taking of a deposition altogether and absent extraordinary circumstances, such an order would likely be in error." *Celerity, Inc. v. Ultra Clean Holding, Inc.*, 2007 WL 205067, at *3 (N.D. Cal. Jan. 25, 2007) (quoting *Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir.1979)); *see also, e.g.*, *Powertech Tech., Inc. v. Tessera, Inc.*, 2013 WL 3884254, at *1 (N.D. Cal. July 26, 2013) (same). Courts consider two factors in determining whether to permit or preclude a so-called "apex" deposition of a company executive or officer: "(1) whether the deponent has unique first-hand, non-repetitive knowledge of the facts at issue in the case and (2) whether the party seeking the deposition has exhausted other less intrusive discovery methods." *In re Google Litig.*, 2011 WL 4985279, at *2 (N.D. Cal. Oct. 19, 2011). With respect to the first consideration, Publishers need not "prove conclusively" that Mr. Amodei "certainly has unique non-repetitive information; rather, where a corporate officer may have any first-hand knowledge of relevant facts, the deposition should be allowed." *Finisar Corporation v. Nistica, Inc.*, 2015 WL 3988132, *1 (N.D. Cal. June 30, 2015).

In addition, the party opposing the discovery—Anthropic—bears the "heavy" burden of showing that Mr. Amodei's deposition should not proceed. *In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2014 WL 939287, at *2 (N.D. Cal. March 6, 2014). The apex principle "is not an automatic bar that [Publishers] must overcome by a showing of good cause. Rather, it is a protective tool that is selectively employed on a case by case basis when deemed appropriate." *Powertech*, 2013 WL 3884254, at *1. Notably, Mr. Amodei's busy schedule is insufficient to overcome Anthropic's burden. *See In re Google*, 2011 WL 4985279 at *2. Anthropic has not shown why Mr. Amodei's deposition must be precluded, and as a witness with firsthand knowledge of many of the key facts at issue, his deposition must proceed.

**B.   Mr. Amodei has unique, non-repetitive, firsthand knowledge regarding Claude's development and capabilities, Anthropic's business operations and practices, and Anthropic's user experience and use cases.**

There is no question that Mr. Amodei possesses unique personal knowledge of relevant facts. Both documents Anthropic has produced and publicly available information show that Mr. Amodei was and continues to be thoroughly involved at a granular level regarding Claude's development and capabilities, Anthropic's business operations and practices, and Anthropic's user experience and use cases—all of which are directly relevant to Publishers' claims in this case.

Mr. Amodei knew as early as 2020, prior to founding Anthropic, that LLMs trained on a "broad swath of internet data" (like Claude) tend to memorize and regurgitate that training data as output. ECF No. 337 ¶ 108. Mr. Amodei also claims he is the "co-inventor of reinforcement learning from human feedback,"[1] a method of finetuning LLMs that Anthropic employed to train Claude, including by using datasets containing Publishers' lyrics and prompting Claude for song lyrics. *See, e.g.*, ECF No. 337 ¶¶ 11, 58, 103, 110, 170. As co-inventor of Claude's training methodology, Mr. Amodei possesses invaluable firsthand knowledge of the nuances of the finetuning process, precisely how reinforcement learning from human feedback works, and specifically how Anthropic applied those techniques to Claude—issues critical to developing Publishers' allegations regarding Anthropic's use of their Works during the training process.

Beyond his unique foundational role in Claude's training methodology, Anthropic's limited custodial productions to date[2] reveal Mr. Amodei actively involved himself in nearly every aspect of Anthropic's business. For example, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Anthropic_0000014088. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[1] DARIO AMODEI, https://www.darioamodei.com/.
[2] Publishers are separately challenging Anthropic's deficient custodial searches and productions, including its unjustified refusal to collect, search, or produce Mr. Amodei's custodial files. *See* ECF No. 439.

1  ███████████████████████████████████████████

2  ████████████████████████████ Anthropic_0000014110. Mr. Amodei

3  was also an early proponent of Anthropic's creating its own web scraper to collect data from the

4  open internet for training purposes. *See* Anthropic_0000014146.

5      Mr. Amodei led development of Anthropic's broader data acquisition strategies, including

6  the decision not to purchase or license data sources for AI training—and to use completely

7  unlicensed, unauthorized data for training instead—because, as he put it, "it's a huge

8  legal/practice/business slog" to purchase or license such training data. Anthropic_0000215992.

9  Mr. Amodei made key decisions regarding potential data licensing partnerships with third parties.

10  *See, e.g.*, Anthropic_0000216075. He gave final sign-off on product launches, and was familiar

11  with all the details of the Claude models prior to launch, including Anthropic's guardrails against

12  infringement and its decisions regarding user consequences for use policy violations. *See, e.g.*,

13  Anthropic_0000012437. Mr. Amodei was also aware of concerns regarding infringing Claude

14  output. *See*, Anthropic_0000240524. In short, he personally touched almost every issue relevant

15  to this case in unique ways given his background and position.

16      These documents confirm that Mr. Amodei has unique firsthand knowledge of key facts.

17  As noted *supra* n.2, Publishers are separately seeking production of all responsive documents from

18  Mr. Amodei's custodial files; those documents will undoubtedly further demonstrate Mr.

19  Amodei's unique knowledge of and involvement in these matters.

20      Acknowledging Mr. Amodei's unique firsthand knowledge, Anthropic's Rule 26(a)(1)

21  disclosures in *Bartz* identified Mr. Amodei as an individual likely to have relevant discoverable

22  information regarding "Anthropic's business operations, finances, and practices; technical aspects

23  of Anthropic's large language models, including training, design, development, and operations;

24  Anthropic's product management, product engineering, and product design efforts; Anthropic's

25  user experience and customer use cases; [and] Anthropic's uses of datasets containing books."

26  Anthropic PBC's Supp. Disclosures Pursuant to Fed. R. Civ. P. 26(A)(1) at 3 (July 22, 2025),

27  *Bartz et al. v. Anthropic PBC*, 3:24-cv-05417-WHA (N.D. Cal.). As a result of this disclosure, Mr.

28  Amodei was scheduled to be deposed in *Bartz* just a few days after that case settled. As Anthropic

itself recognizes, the claims in *Bartz* are similar to the issues in this action, *see* ECF No. 220 at 1 (noting "the overlapping defendant, claims, defenses, and factual issues"), such that Mr. Amodei also likely has information relevant to Publishers' claims.

Significantly, a court in this District recently ordered Mr. Amodei to sit for a deposition in a similar copyright infringement case against OpenAI, Mr. Amodei's former employer and one of Anthropic's chief competitors. *See* OpenAI Order. It would be an absurd result for Mr. Amodei to escape testifying here about the company he founded and currently runs in a case where his company is the defendant based on his apex status, when that same status did not excuse him from being deposed about a company he left years ago in a case where Anthropic is not a party.

Recognizing that depositions of "apex" figures are necessary in cases like this, other courts in this Circuit have ordered depositions of high-ranking executives similarly involved in the details and decision-making pertaining to relevant facts at issue. *See, e.g.*, *Kadrey v. Meta Platforms, Inc.*, 2024 WL 4293910, at *1 (N.D. Cal. Sept. 24, 2024) (requiring that CEO Mark Zuckerberg sit for deposition as he had "specific involvement in [Meta's] AI initiatives"); *Wonderland Nurserygoods Co. v. Baby Trend, Inc.*, 2022 WL 1601402, at *2 (C.D. Cal. Jan. 7, 2022) (permitting deposition of party's CEO where he was "was actively involved in" promoting the products at issue).

### C.    Publishers have sought less intrusive methods that have been insufficient to secure the information Publishers seek from Mr. Amodei.

Any obligation to exhaust other discovery methods does not support precluding Mr. Amodei's deposition. Publishers need not formally exhaust ***all*** other discovery methods before seeking his deposition: that is not an "absolute requirement" for permitting an apex deposition. *Hunt v. Continental Casualty Co.*, 2015 WL 1518067, at *2 (N.D. Cal. April 3, 2015) (exhaustion is an "important, but not dispositive, consideration"); *Transpacific*, 2014 WL 939287, at *5.

In any event, Publishers have diligently pursued all discovery avenues since this action's inception: Publishers have propounded extensive RFPs and Interrogatories and, as the Court is well aware, Anthropic's plainly deficient responses and productions have forced Publishers to raise numerous discovery disputes to this Court. *See, e.g.*, ECF No. 439; ECF No. 396; ECF No. 399. The limited documents Anthropic has produced demonstrate that Mr. Amodei likely possesses

unique, firsthand knowledge of the relevant issues, and Publishers' diligent employment of other discovery devices cannot substitute for Mr. Amodei's live testimony. Requiring Publishers to depose all other Anthropic witnesses before challenging Anthropic's refusal to produce Mr. Amodei would be impractical in light of the condensed deposition schedule and needless given Mr. Amodei's obvious centrality to the case's key issues. Mr. Amodei should not be permitted to evade testifying as to his unique, relevant knowledge at his deposition here.

## II.    **Anthropic's Position:** **Publishers are not entitled to Mr. Amodei's deposition and have not made the evidentiary showing necessary to require it in this case.**

Publishers fail to make the rigorous showing required for an apex deposition of Anthropic's CEO, Dario Amodei. "Virtually every court that has addressed deposition notices directed at an official at the highest level or 'apex' of corporate management has observed that such discovery creates tremendous potential for abuse or harassment." *Celerity*, 2007 WL 205067, *3. Accordingly, courts will not allow apex depositions unless the "parties seeking to depose a high ranking corporate officer … first establish that the executive (1) has unique, non-repetitive, firsthand knowledge of the facts at issue in the case, ***and*** (2) that other less intrusive means of discovery, such as … depositions of other employees, have been exhausted without success." *Affinity Labs of Texas v. Apple, Inc.*, 2011 WL 1753982, at *15 (N.D. Cal. May 9, 2011) (emphasis added) (denying apex deposition). Publishers cannot make the first showing, and have not even attempted the second. Nearly two years into the case, ***Publishers have not taken a single deposition***. Publishers' request—that the Court allow an apex deposition of Anthropic's CEO before Publishers have deposed anyone else—is extraordinary. Their rush to bring this dispute to the Court (before taking a single deposition) is indicative of their broader tactic of raising a barrage of discovery disputes in their bid to extend the discovery schedule. *See* Dkt. 435.

### A. Publishers Have Not And Cannot Show That Mr. Amodei Possesses Unique, First-hand, Non-repetitive Knowledge.

*First*, Publishers contend that Mr. Amodei has firsthand knowledge of the finetuning process and its application in training Claude as a "co-inventor of reinforcement learning from human feedback." *Supra* at 3 (citing FAC allegations). But Mr. Amodei is not directly responsible

for overseeing any aspect of Claude training, including finetuning, nor is he involved in the execution of specific training techniques or practices.  And even if Mr. Amodei had first-hand knowledge, Publishers have not shown that it is unique or non-repetitive.  To the contrary, Jared Kaplan, Anthropic's Chief Science Officer, and Benjamin Mann, a high-ranking member of Anthropic's Technical Staff, are both Anthropic co-founders with direct responsibility for and involvement in Claude training, including finetuning and the extent to which Anthropic incorporates reinforcement learning from human feedback.  Publishers have noticed both for depositions.  *See* Anthropic's Amended Initial Disclosures (Sept. 11, 2025) (identifying both as knowledgeable about "technical aspects of Anthropic's generative artificial intelligence models, including training, design, development, and operations); *see also* ECF No. 67-1 (declaration by Mr. Kaplan establishing his deep understanding of all aspects of Claude's creation and training). Publishers have not shown that Mr. Amodei has knowledge about finetuning Claude that is distinct and non-repetitive  of the information they seek from Mr. Kaplan and Mr. Mann.

*Second*, Publishers cite various documents in an effort to show that Mr. Amodei "actively involved himself in nearly every aspect of Anthropic's business"—but do not explain how those documents show that Mr. Amodei was uniquely knowledgeable about the relevant aspects of Anthropic's operations.  *Supra* at 3.  That Mr. Amodei is the CEO and therefore involved in all manner of discussions does not establish that he possesses "unique, non-repetitive knowledge" of the specific topics at issue here.  *See, e.g.*, *Computer Acceleration Corp. v. Microsoft Corp.*, 2007 WL7684605 (E.D. Tx. June 15, 2007) (barring deposition of CEO who directed employees to concentrate on issue and cited emails were authored by custodians); *Charter Twp. of Clinton Police & Fire Ret. Sys. v. LPL Fin. Holdings Inc.*, 2019 WL 13178511, at *7 (S.D. Cal. Mar. 29, 2019) (refusing to assume CEO status meant CEO knew "everything about their business").

For example, Publishers point to two Slack threads where Anthropic employees discuss training dataset composition—but cite nothing showing Mr. Amodei has any unique, non-repetitive knowledge.  *Supra* at 3 (citing Anthropic_0000014088; Anthropic_0000014110).  Mr. Kaplan and Mr. Mann, along with other Anthropic employees, were the primary participants on those Slack threads discussing the intricacies of the various datasets and the feasibility of their use;

1    Plaintiffs have not yet taken their depositions.  Nor have Publishers identified **any** information
2    related to training dataset composition that is uniquely known by only Mr. Amodei.

3        Publishers also point to documents related to data acquisition through web crawling and
4    licensing—but cite to nothing that shows that Mr. Amodei has any unique, non-repetitive
5    knowledge about data acquisition.  *Supra* at 3-4. Indeed, Mr. Amodei was not responsible for
6    directing or effectuating data acquisition efforts.  The documents show that various Anthropic
7    employees discussed web crawling, data acquisition, and data licensing, and that Mr. Amodei
8    occasionally weighed in.  *See* Anthropic_0000014146 (web crawling discussion led by Nick
9    Joseph), Anthropic_0000215992 (Mr. Kaplan commenting on data acquisition efforts),
10   Anthropic_0000216075 (Tom Brown and Nick Joseph negotiating data licensing agreement).  As
11   those documents show, other employees were directly involved in data acquisition efforts,
12   including Pranay Sangani (former Manager of the Tokens Team), Nick Joseph (Member of
13   Technical Staff), and Tom Brown (Chief Compute Officer and Anthropic co-founder).  Mr. Kaplan
14   and Mr. Mann were also both heavily involved in driving data acquisition strategy.  Publishers
15   have noticed depositions for all of those employees, and Anthropic also intends to make Thomas
16   Turvey, Head of Strategic Data Partnerships, available for deposition.  Publishers have failed to
17   demonstrate how Mr. Amodei's testimony could offer anything beyond that of these witnesses,
18   who are directly responsible for leading or effectuating Anthropic's data acquisition strategy.

19       *Finally*, Publishers point to documents about product launches and concerns about
20   infringement—again, citing nothing that shows any unique, non-repetitive knowledge by Mr.
21   Amodei.  *Supra* at 4.  Mr. Kaplan and Daniela Amodei—President and co-founder of Anthropic,
22   who Anthropic has listed on its initial disclosures but whose deposition Publishers have elected
23   not to take—are also listed as "leadership signs-offs" on the cited product launch document.  *See*
24   Anthropic_0000012437.  Mr. Kaplan, Mr. Mann, and Mr. Brown—all co-founders who Publishers
25   intend to depose—were involved in discussions regarding product features prior to launch.  *Id.*
26   And other Anthropic employees discussed copyright concerns on the Slack thread, including Dawn
27   Drain, a member of Anthropic's Technical Staff who Publishers also plan to depose.

28       **B.  Publishers Have Not Exhausted Less Intrusive Discovery Methods.**

"Less intrusive discovery methods may include interrogatories directed at the apex, the deposition of lower-level employees with relevant information, and a Rule 30(b)(6) deposition of the corporation itself." *Brown v. Google, LLC*, 2022 WL 2289059, at *1 (N.D. Cal. Apr. 4, 2022). Publishers make no meaningful attempt to show that they have exhausted less intrusive discovery methods. Nor could they: ***Publishers have not yet deposed a single witness***.

*First*, Publishers suggest that exhaustion of less intrusive discovery methods is not a strict requirement. *Supra* at 5. But courts in this district have reaffirmed that "[t]he party moving for the deposition ***shall*** exhaust less intrusive discovery methods before requesting [an apex] deposition" and that "[t]he trial court should consider whether such requirements have been met before ordering that an apex be produced for deposition." *Brown*, 2022 WL 2289059, at *1 (reversing court order permitting deposition of CEO because decision did not address "whether plaintiffs exhausted all less intrusive means of discovery" with respect to CEO).

*Second*, Publishers attack a straw man. Anthropic does not contend that Publishers are required to depose ***all*** other Anthropic witnesses before seeking to depose Mr. Amodei. But Publishers cannot show that they have exhausted less intrusive discovery methods without deposing ***any*** employees with more intimate or direct knowledge of the relevant information. *See, e.g.*, *Mehmet v. PayPal, Inc.*, 2009 WL 921637, at *2 (N.D. Cal. Apr. 3, 2009) ("Courts generally refuse to allow the immediate deposition of high-level executives, the so-called 'apex deponents,' before the depositions of lower level employees with more intimate knowledge…."); *Rembrandt Diagnostics, LP v. Innovacon, Inc.*, 2018 WL 692259, at *6 (S.D. Cal. Feb. 2, 2018).

Courts routinely grant protective orders barring depositions of high-level executives on the basis that plaintiffs must first depose 30(b)(6) witnesses. *See, e.g.*, *Anderson v. Cty. of Contra Costa*, 2017 WL 930315, at *4 (N.D. Cal. Mar. 9, 2017) (denying apex deposition and requiring plaintiffs first "depose a Rule 30(b)(6) witness" on relevant topics); *Stelor Prods., Inc. v. Google, Inc.*, 2008 WL 4218107, at *4 (S.D. Fla. Sept. 15, 2008) (denying apex depositions of Google founders because same information may be obtainable through deposition of designated spokesperson). Plaintiffs have noticed a sweeping 30(b)(6) deposition spanning 64 topics, including on precisely the same subjects they purport to need to cover with Mr. Amodei.

Publishers' Notice of 30(b)(6) Deposition (overlapping topics include Anthropic's design of Claude, including training and finetuning (Topic 4); training dataset composition and acquisition, including web crawl collections (Topic 5); and guardrails Anthropic considered to modify outputs generated by Claude (Topic 32)). Publishers must first depose 30(b)(6) witnesses on the relevant topics before attempting to show what non-repetitive information only Mr. Amodei can provide.

### C. Publishers' References To Other Cases Are Irrelevant.

The apex inquiry is context-specific: It depends on whether other witnesses in a given case can provide the relevant information and whether plaintiffs have exhausted less intrusive discovery methods. *See Affinity Labs*, 2011 WL 1753982, at *15. That Mr. Amodei's deposition was scheduled in *Bartz* does not require the same result here: *Bartz* addressed claims and allegations not at issue in this case. As the Court is aware, Plaintiffs are attempting to inject allegations from *Bartz* into this case, but their motion for leave to amend is still pending; they cannot rely on his purported relevance to that case here. And even if the motion for leave to amend is granted, Plaintiffs would still have to show (and have not) that they have exhausted less intrusive discovery methods. Moreover, contrary to Publishers' statement, *supra* at 5, there is nothing "absurd" about Mr. Amodei sitting for a deposition in a case against a former employer, OpenAI, but requiring Publishers to satisfy the apex doctrine in this case, where Mr. Amodei is the CEO. The apex doctrine's rationale is to prevent abuse where high-level executives of companies involved in litigation would be forced to spend all of their time in depositions. *See, e.g.*, *Celerity*, 2007 WL 205067, at *3. That rationale does not apply to the OpenAI Order. It applies with great force here.

Finally, the cases cited by Publishers, *supra* at 5, are inapposite. *Kadrey* involved far more specific evidence of unique first-hand knowledge than Publishers have shown here. 2024 WL 4293910, at *1 (evidence showed CEO "was the principal decision maker concerning Meta's decision to open source the language model" and "direct[ly] supervis[ed]" work on the relevant topics). And *Wonderland* involved exhaustion of less-intrusive discovery methods not shown here. 2022 WL 1601402, at *4 (party seeking apex deposition had already deposed 30(b)(6) witness and lower-level employee who had participated in cited communications).

1    Publishers must show—and have not—that Mr. Amodei possesses unique, first-hand, non-
2    repetitive knowledge, and that they have exhausted less-intrusive discovery methods.
3    Accordingly, the Court should enter a protective order barring Publishers from taking Mr.
4    Amodei's deposition unless and until they can make the requisite showing.  *See, e.g.*, *Groupion,*
5    *LLC v. Groupon, Inc.*, 2012 WL 359699, at *3 (N.D. Cal. Feb. 2, 2012) (barring depositions of
6    Senior VPs where plaintiff did not make apex showings).

Dated: September 30, 2025

Respectfully submitted,

By: */s/ Michelle Gomez-Reichman*

**OPPENHEIM + ZEBRAK, LLP**
Matthew J. Oppenheim
Nicholas C. Hailey
Corey Miller
Audrey L. Adu-Appiah
(admitted *pro hac vice*)
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
corey@oandzlaw.com
aadu-appiah@oandzlaw.com

Jennifer Pariser
Andrew Guerra
Bret Matera
Timothy Chung
Michelle Gomez-Reichman
(admitted *pro hac vice*)
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
jpariser@oandzlaw.com
andrew@oandzlaw.com
tchung@oandzlaw.com
bmatera@oandzlaw.com
mgomez-reichman@oandzlaw.com

*Attorneys for Plaintiffs*

**COBLENTZ PATCH DUFFY & BASS LLP**
Jeffrey G. Knowles (SBN 129754)
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 391-4800
ef-jgk@cpdb.com

**COWAN, LIEBOWITZ & LATMAN, P.C.**
Richard S. Mandel
Jonathan Z. King
Richard Dannay
(admitted *pro hac vice*)
114 West 47th Street
New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

Respectfully submitted,

By: /s/ Joseph Wetzel

**LATHAM & WATKINS LLP**
Joseph R. Wetzel (SBN 238008)
joe.wetzel@lw.com
Andrew M. Gass (SBN 259694)
andrew.gass@lw.com
Brittany N. Lovejoy (SBN 286813)
britt.lovejoy@lw.com
505 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: +1.415.391.0600

Sarang V. Damle
(admitted *pro hac vice*)
sy.damle@lw.com
Sara Sampoli (SBN 344505)
sara.sampoli@lw.com
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Telephone: +1.202.637.2200

Allison L. Stillman
(admitted *pro hac vice*)
alli.stillman@lw.com
1271 Avenue of the Americas
New York, New York 10020
Telephone: +1.212.906.1747

By: /s/ Sonal Mehta

**WILMER CUTLER PICKERING HALE AND DORR LLP**
Sonal N. Mehta (SBN 222086)
sonal.mehta@wilmerhale.com
Allison Bingxue Que (SBN 324044)
allison.que@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
(650) 858-6000
Fax: (650) 858-6100

Ari Holtzblatt (SBN 354631)
ari.holtzblatt@wilmerhale.com
Robin C. Burrell (admitted *pro hac vice*)
robin.burrell@wilmerhale.com
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6964

Louis W. Tompros (admitted *pro hac vice*)
louis.tompros@wilmerhale.com
Disha R. Patel
Disha.Patel@wilmerhale.com
60 State Street
Boston, MA 02109
(617) 526-6886

Joseph Taylor Gooch (SBN 294282)
taylor.gooch@wilmerhale.com
50 California Street
Suite 3600
San Francisco, CA 94111
(628) 235-1002

*Attorneys for Defendant*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SIGNATURE ATTESTATION**

Pursuant to Civil L.R. 5-1(i)(3), I hereby attest that concurrence in the filing of this document was obtained from all other signatories of this document. I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 30, 2025                              */s/ Michelle Gomez-Reichman*
                                                              Michelle Gomez-Reichman