[Counsel on signature page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., ET AL.,<br><br>Plaintiffs,<br><br>vs.<br><br>ANTHROPIC PBC,<br><br>Defendant. | Case No. 5:24-cv-03811-EKL-SVK<br><br>**JOINT DISCOVERY DISPUTE STATEMENT REGARDING PUBLISHERS' RESPONSES TO RFP NOS. 54-55, 59-60**<br><br>**FILED UNDER SEAL**<br><br>**HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY PORTIONS HIGHLIGHTED IN GREY**<br><br>Judge Eumi K. Lee<br>Magistrate Judge Susan van Keulen |

Pursuant to Section 8 of the Court's Civil Standing Order, and L.R. 37-1 and 37-2, the Parties respectfully submit this Joint Discovery Dispute Statement to seek the Court's intervention in resolving disputes regarding (1) Publishers' refusal to provide updated financial information, which currently runs only through December 2023 (ABKCO) or early-mid 2024 (UMPG, Capitol, Concord); and (2) Publishers' refusal to produce royalty reports in response to Anthropic's Requests for Production ("RFP") Nos. 54-55 and 59-60. The Parties' joint chart is attached as Ex. A. The Parties met and conferred to try to resolve these disputes by email on October 29 and 31, and also via videoconference on November 3, 2025. However, the Parties have been unable to reach agreement on the issues below. Fact discovery closed on November 12. ECF No. 489. As a compromise, Anthropic is willing to accept an Excel spreadsheet production of data representing monthly song-level and lyric-specific revenue and royalties (including those paid to songwriters) through end of Q3 2025 for the Works-in-Suit. Anthropic requests that this production be made by Wednesday, November 26 given the upcoming expert reports deadline on December 19. As a compromise, Publishers have offered to produce (1) updated financial documents through end of 2025 Q3 or the most recent quarter for which reporting is available showing quarterly revenues and major revenue streams for each Publisher; and (2) financial reports reflecting revenues received on a Work-by-Work basis and broken down by revenue type (e.g., performance, print, mechanical) through end of 2025 Q3 or the most recent quarter for which reporting is available. If Publishers are required to produce anything beyond these two categories of information, Publishers request a production deadline no earlier than January 9.

## I. Anthropic's Position

In a litigation about the value of lyrics to the Asserted Works, Publishers refuse to provide existing revenue and royalty information ***specific to the lyrics*** of the Asserted Works. Publishers' existing financial documents run only through December 2023 (ABKCO) or early-mid 2024 (UMPG, Capitol, Concord). Updated financial information, including existing song-level and lyric-specific royalty information, is plainly relevant to Publisher's copyright infringement claims, and it is responsive to Anthropic's RFP Nos. 54-55 and 59-60, which generally seek financial

statements, forecasts, projections, revenue and royalty payment documents.[1] Moreover, given the rapidly evolving industry of generative artificial intelligence, and Publishers' own interest in partnering with companies developing artificial intelligence products (which they contend Anthropic to be hindering), Anthropic is entitled to updated financial information.[2] Indeed, it would be fundamentally unfair to allow Publishers to claim that Anthropic is preventing them from monetizing their song lyrics while limiting Anthropic to financial information that is not specific to the lyrics of the Asserted Works and is outdated by 1-2 years. The "top-line revenue documents" Publishers offer to produce as a compromise are insufficient. A "top-line" number for UMPG's licenses, for example, is of little use to Anthropic when that number reflects royalties received [redacted] Kokakis Tr. 91:19-92:4. Similarly, only producing "song-level" information as Publishers offer to do is insufficient because songs are made up of more than just lyrics, so any song-level revenue would be attributed to more than just the lyrics. Publishers' position is especially egregious considering ***they have the lyric-specific information Anthropic is seeking because they already produced it once***. Publishers do not legitimately dispute this, nor do they dispute that this information can be produced by updating the originally produced reports they ran from their financial databases. They simply refuse to do so, again confirming that their approach to discovery depends entirely on what the evidence reveals: cooperation when documents support their claims, resistance when they do not. Publishers have unfortunately reverted to their prior practice of refusing to fulfill basic discovery obligations, requiring Anthropic to file multiple dispute statements on issues that should not require court intervention.

---

[1] RFP No. 54 seeks "All of Your monthly, quarterly, and annual financial statements, including income statements, balance sheets, profit and loss statements, and any other financial disclosures that You are required to maintain and/or submit under state or federal law from January 2015 to the Present." RFP No. 55 seeks "All financial budgets, forecasts, assessments, estimates, predictions, or projections from January 2015 to the Present." RFP No. 59 seeks "Documents sufficient to show the total revenue or royalties earned from each Asserted Work on Lyric Display Platforms." RFP No. 60 seeks "Documents sufficient to show the per-use royalty paid to You for uses of each Asserted Work on Lyric Display Platforms."

[2] Anthropic notes that it supplemented its production with updated financial information as recently as September 27, 2025 and October 10, 2025.

The Federal Rules do not allow for such a refusal. To the contrary, in fact, they impose an affirmative duty on Publishers, ***even absent a request from Anthropic***, to supplement their production at "appropriate intervals during the discovery period" and even "as []trial … approaches." *See* Fed. R. Civ. P. 26(e)(1)(A) (imposing continuing duty to supplement "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing"); *see also* Fed. R. Civ. P. 26, Advisory Committee's Notes to 1933 Amendments (requiring supplementation "as each new item of information is learned" and "at appropriate intervals during the discovery period, and with special promptness as the trial date approaches"). The Federal Rules ensure that a party does not develop a misleading record by producing only incomplete or outdated information. Publishers cannot and have not pointed to any authority absolving them of this affirmative duty under the Federal Rules. Publishers instead ask Anthropic to accept updated top-level and song-level data, but to rely on lyric-specific data that is outdated by ***at least one year,*** and in some cases by almost ***two years***. Moreover, it is not even unclear whether Publishers have produced complete revenue information for Publisher CCMG. Kokakis Tr. 305:11-19; 310:7-13. In addition to providing outdated information, Publishers have also produced much of their financials in unworkable, PDF format with improper redactions, forcing Anthropic to try and decipher hundreds of pages of illegible numbers.

Anthropic's requests are not unreasonable—in fact, Anthropic's requests for updated song-level and lyric-specific information and royalty reports, including those received from licensees and those paid to songwriters, are highly relevant to both damages and the fourth factor of copyright fair use, "the effect of the use upon the potential market for or value of the copyrighted work." *See* 17 U.S.C.A. § 107(4). To defend against Publishers' claim that Anthropic's conduct has caused a "displacement of Publishers' revenue from other licensed uses" including "with lyric websites and lyric aggregators," Anthropic must be able to review Publishers' updated song-level and lyric-specific revenue and royalty report information. *See* Pls.' Second Am. Initial Disclosures 4, 9 (Oct. 28, 2025) (claiming Publishers have "suffered actual damages in the form of…lost

licensing income related to the reproduction, distribution, display and preparation of derivative works based on Publishers' works"); *see also Apple Inc. v. Samsung Elecs. Co.*, 2013 WL 1563253, at *6 (N.D. Cal. Apr. 12, 2013) (granting Defendant's motion to compel pricing information because it had "ability … to aid [Defendant] in at least its defense against [Plaintiff's] damages claims").

Moreover, Publishers' witnesses continue to testify about the very data that they are refusing to produce. *See* Berschback Tr. 216:25-217:11 (Concord's designee testified [redacted]); Coleman Tr. 193:9-195:10 (ABKCO's designee testified that [redacted] Despite that testimony, Concord has refused to produce lyric-specific information and royalty reports for 2024 and 2025, so Anthropic has no way to test Mr. Berschback's sworn testimony about Concord's [redacted]. And without lyric-specific information, including royalty reports from licensees, neither Party's experts can assess the supposed impact on the potential market for lyrics for the specific asserted copyrighted works at issue. It is particularly important for Anthropic to have financial information beyond 2023 and even 2024, because as Publishers are well-aware, Anthropic implemented and enhanced certain guardrails in Claude to prevent the generation of allegedly copyrighted content in 2023 and 2024. Anthropic's experts must be afforded the opportunity to evaluate what impact these guardrails had on Publishers' revenue, if any, and consequently, what that revenue data indicates about the merits of Publishers' claims.

Publishers assert two frivolous objections to supplementing their financial productions: they assert that discovery is about to close and production would be too burdensome. *First*, "discovery is about to close" is not a valid objection, especially where the delay is entirely of Publishers' own making. They can hardly point to their ongoing failure to supplement as an excuse to for not having to supplement at all. *See* Fed. R. Civ. P. 26, Advisory Committee's Notes to 1933 Amendments; *see also Gamevice, Inc. v. Nintendo Co.*, 2019 WL 5565942, at *2 (N.D. Cal. Oct. 29, 2019) (granting defendant's motion to compel updated financial information from plaintiff ***after*** fact discovery had ended, because fact discovery cutoff does not terminate obligation to

supplement under Rule 26(e)). As in *Gamevice*, Publishers never took the position (until the end of fact discovery when Anthropic raised this dispute) that they would produce financial information only through a specific date. They simply agreed to produce documents through the "present." *Id*. at *3 (finding Plaintiff's attempt to claim it suddenly viewed discovery requests as being limited to information through a specific date as an "unfair bait and switch" that "threatens prejudice to [Defendant] at trial because it would cause [Defendant's] damages calculations to be significantly out of date"). For example, UMPG's "production of financial data through [June 2024] affirmatively indicated to [Anthropic] that [Publishers] did not think the discovery requests were limited to information through [March 22, 2024] and no later." *Id*. at *2. *Second*, Publishers baldly assert burden, but make no effort to substantiate that claim. Nor could they, as Publishers have ***already produced*** earlier versions of the requested information once and they have not offered a reasonable explanation for why supplementation would be any different. And Publishers do not deny that they receive royalty reports (which their licensees are obligated to provide on a quarterly basis pursuant to their underlying agreements) and track songwriter payments (*see e.g.*, CONCORD_0000000810)—which may provide much of the lyric-specific information Anthropic is seeking. But, Publishers refuse to produce even those pre-existing documents for the more recent time periods. Anthropic is only seeking information that is already routinely maintained in the ordinary course of Publishers' business, which Publishers' witnesses have acknowledged under oath. *See e.g.,* Draughon Tr. 73:7-14; 155:19-157:5; 166:24-168:20 ([redacted] Berschback Tr. 183:16-184:13 [redacted]); Kokakis Tr. 243:19-24 ([redacted]

Publishers' continued efforts to build a one-sided record with discovery by withholding information from Anthropic should not be tolerated. Anthropic thus respectfully requests that this Court compel Publishers to (1) supplement their financial production, including with song-level and lyric-specific information until the present in an Excel spreadsheet format to ensure it is

workable for Anthropic's experts, and (2) produce royalty reports, all by Wednesday, November 26 given the upcoming expert report deadline of December 19.

## II. Publishers' Position

Despite having access to Publishers' production of comprehensive financial documents for nearly a year, Anthropic revives long-dormant disputes and seeks to compel Publishers to create ***and*** recreate financial spreadsheets for all 499 Works in Suit—an exceptionally burdensome undertaking. This is inappropriate and untimely. Such impropriety is magnified by the marginal relevance of such documents to any claims or defenses at issue. Nor should Publishers be forced to bear the costs of Anthropic's lack of diligence in reviewing documents it has long possessed. Even so, in an effort to compromise, Publishers offered to provide updated financials responsive to Anthropic's RFPs, (1) reflecting total company revenues and their various high-level sources, and (2) financial reports for each work-in-suit reflecting revenues received broken down by revenue type (e.g., performance, print, mechanical), which include revenues received from "lyrics-specific" uses. These supplements are sufficient to show the harm Publishers have suffered to their revenues from Anthropic's infringement and impact of the infringement on revenues from certain licensing sources. Anthropic refused, demanding additional discovery it had long abandoned.

Contrary to Anthropic's contention, Publishers are not "refusing to fulfill basic discovery obligations." While Publishers do not believe that their existing financial productions are materially deficient or incomplete such that they are required to supplement under Fed. R. Civ. P. 26, Publishers are offering to provide certain updated financials through the end of 2025 Q3. This, despite Publishers only agreeing (and Anthropic accepting, until now) to produce these documents through the "present," defined as March 22, 2024. *See* Plaintiffs' Objections and Responses to Defendant's Second Set of RFPs, April 22, 2024, Objection to Instruction No. 3 (defining "present" as March 22, 2024). With regards to RFPs 59 and 60 specifically, what Anthropic is seeking is not "supplementation." As Anthropic knows, Publishers never agreed to provide songwriter royalty reports for several reasons, including the significant burden such an undertaking would require and the negligible relevance of such information. The parties met and conferred on this issue over a year ago—a dispute that Anthropic thereafter abandoned until its new attorneys

revived it just prior to the end of the *extended* fact discovery period. Anthropic now falsely mischaracterizes its new demand as a request for "supplemental" documents.

Even if Anthropic's new demands were timely, its request should be denied as unduly burdensome and disproportionate to the needs of the case. This is not a question of producing existing documents. Anthropic's lyric- and song-specific requests require compiling and creating financial reports, which is extremely burdensome to Publishers because of the nearly 500 songs at issue and will require several weeks to complete, far longer than by November 26, which is simply impossible. Publishers should not be forced to expend substantial effort to provide additional information of limited utility over discovery requests long resolved.

**A. Publishers have already offered to produce the relevant information.**

Publishers' compromise provides Anthropic all the information it needs to present its defense, including so-called "lyric-specific" information, a term that greatly mischaracterizes what is in Publishers' records. The right to use lyrics is typically granted with an assortment of other rights in Publishers' licenses. Accordingly, nearly all, if not all, of Publishers' licenses that grant the use of lyrics do not result in so-called "lyrics-specific" revenues separate from all revenues received under those agreements. Publishers' revenue figures reflect the same.

The updated total revenue documents Publishers offered to produce reflect revenue received from licensing, which necessarily includes lyrics-inclusive licenses. The changes over time as shown in the updated financial documents, both in total revenue and major channels of revenue, are sufficient to reflect the impacts to Publishers' revenues from lost licensing and the effects of Anthropic's infringement. The top-line revenue documents Publishers have offered to supplement likewise incorporate royalty payments as revenues received from various channels. *See, e.g.,* CONCORD_0000000810. So too do the more specific Work-by-Work revenue reports, which identify the revenues generated by each song by revenue source. Between the updated financial statements reflecting Publishers' total revenues and high-level sources of those revenues and the more specific Work-by-Work revenue documents, Publishers have offered to produce what Anthropic alleges it needs—the dispute should end here.

**B. The *additional* and *irrelevant* records Anthropic seeks would be unduly burdensome to collect and produce.**

While Publishers offered to supplement their financial statements in response to RFPs 54–55, the ***new*** and ***additional*** documentation Anthropic seeks in RFPs 59–60 would be extremely burdensome to produce and are irrelevant to the issues in this litigation. ***First,*** Anthropic fails to recognize the nuance of Publishers' testimony regarding Work-by-Work royalty information. Publishers' representatives testified that [redacted] D. Berschback Dep. Tr. 183:18–184:13; K. Draughon Rough Dep. Tr. 143:20–144:8. This is far different from maintaining this data in a format that is simply ready to be produced, and Publishers' corporate testimony cannot be read to suggest otherwise. For example, CCMG's representative explained that [redacted] K. Draughon Rough Dep. Tr. 143:20–144:25; 152:3–8. Crafting such individualized queries for each of the 499 Works in Suit at this late stage would require significant time and effort. Indeed, generating Work-by-Work revenue documents the first time around took several weeks of significant effort to query, retrieve, format, and produce. This was a substantial and highly burdensome effort Publishers undertook, despite the fact that "a party responding to document requests has no obligation to create documents for the requesting party." *Shinedling v. Sunbeam Prods. Inc.*, 2013 WL 12171959, at *7 (C.D. Cal. Oct. 25, 2013) (quotation omitted). Anthropic now asks Publishers to do this again—after fact discovery has ended—but now also for documents Publishers ***never agreed to produce in the first place***.

To be clear, Publishers have never denied they do receive royalty reports. As Publishers have explained countless times to Anthropic, Publishers do receive royalty information regarding works in their catalog; however, extracting this information specifically on a work-by-work basis would incur significant costs in time and expense and requires Publishers to create new documents to fulfill Anthropic's requests. Moreover, the marginal value of such information is far outweighed by the significant burden of collection and production. Again, as Publishers have explained to Anthropic—any impact on royalties over time would be reflected in revenues in the financial documents Publishers are offering to produce. Granting Anthropic's belated request at this late hour would require Publishers to create, again, new documents not maintained in the ordinary

course and at great cost and effort.

***Second,*** on top of the initial burden to even create Work-by-Work reports, many of the documents Anthropic seeks would then need to be reviewed further to incorporate redactions applied to individual rows, cells, and figures. One of Publishers' licensees and direct competitor to Anthropic, non-party Meta, had consented to production of its license agreements with each of the Publishers only on the condition that all related financial details be redacted in production. As Publishers have repeatedly explained to Anthropic, production of the Meta agreements and related financial information require Meta's consent. Publishers had and have no ability to reject this condition. Anthropic accepted production on this condition. *See* A. Guerra Email to Anthropic (Feb. 16, 2024). While Publishers do not intend to rely on any redacted information, Publishers must still review each financial document produced regarding the 499 Works for Meta's financial information and redact it in order to comply with Publishers' contractual obligations. That process will require line-by-line review of hundreds of financial reports. As Publishers have also explained to Anthropic, this is an incredibly onerous process that will take ***additional*** weeks of work. This burden is wholly disproportionate to the marginal relevance these documents have.

The burden on Publishers is not lessened by Anthropic's proposed compromise, which asks Publishers to provide new documents not previously agreed-to, collected, or produced; providing data representing monthly royalties for each of the 499 Works in Suit through Q3 will similarly require individualized, potentially custom queries into each Publisher's databases, as well as line-by-line reviews and redactions. Such an undertaking will again require significant time and effort disproportionate to the potential relevance these figures have to this action. In any event, due to the extreme burden of collecting, creating, reviewing, and producing this information on a work-by-work basis, Anthropic's request for production of such information by November 26 is categorically impossible, and Publishers would likely need until beyond the end of the year to compile and produce everything Anthropic seeks, especially given holiday office closures.

***Third***, the additional documents Publishers have not previously agreed to produce are wholly irrelevant. Anthropic does not articulate why songwriter royalty reports, separate from the revenue documents that incorporate royalty payments from licensees, are specifically relevant or

necessary to support either Publishers' claims or Anthropic's defenses—because they are not. Nor does Anthropic raise salient points about why the royalties ***Publishers*** pay to their songwriters have any relevance or marginal value to the issues in this litigation. Anthropic has and will have updated revenue figures. No further details are needed in order to calculate financial harms to Publishers. Seeking detailed, sensitive royalty information for songwriters is greatly disproportionate to the utter lack of relevance of that information to this case.

**C. Anthropic's has failed to diligently seek the irrelevant documents it now asks Publishers to produce.**

At bottom, this dispute has arisen due to Anthropic's failure to timely pursue what it now seeks, and looking to revive long-dead disputes. When Anthropic first propounded these RFPs in March 2024, Publishers informed Anthropic during a May 4, 2024 meet and confer that providing certain documents on a Work-by-Work basis responsive to RFPs 59–60 would be exceedingly burdensome, but agreed to provide such documents, where feasible. Publishers then produced responsive documents and understood this issue to be resolved. Indeed, Anthropic did not again raise the issue for ***nearly a year after*** Publishers ***completed*** their production of documents.

Through its new counsel, Anthropic now exhumes a long-settled dispute at the eleventh hour and seeks to force Publishers to create documents that do not already exist for marginal, if any, relevance, despite knowing the significant burden such a request would impose on Publishers. Anthropic did not raise the current dispute until October 20, less than a month before the close of fact discovery. Had Anthropic raised its complaints regarding the sufficiency of Publishers' productions in a timely manner, Publishers would have been much better positioned to work with Anthropic to find a reasonable solution and production timeline. Indeed, at any time in the eleven months since Publishers initially produced revenue documents, Anthropic could have requested what it now seeks. Instead, Anthropic sat on its hands until a ***mere two weeks before the close of (the extended) fact discovery period*** and while the parties were immersed in depositions, completely foreclosing any possibility of a timely production. Anthropic does not get to relitigate already-settled discovery issues simply because it has changed counsel halfway through litigation, and Publishers should not be forced to undergo significant time and expense to create new records at this late hour because of Anthropic's lack of diligence. Anthropic's request should be denied.

Date: November 19, 2025

By: *Timothy Chung*

**OPPENHEIM + ZEBRAK, LLP**

Matthew J. Oppenheim
Nicholas C. Hailey
Jeffrey M. Gould
Corey Miller
Audrey L. Adu-Appiah
(admitted pro hac vice)
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
jeff@oandzlaw.com
corey@oandzlaw.com
aadu-appiah@oandzlaw.com

Alexander Kaplan
Jennifer Pariser
Andrew Guerra
Bret Matera
Timothy Chung
Michelle Gomez-Reichman
(admitted pro hac vice)
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
alex@oandzlaw.com
jpariser@oandzlaw.com
andrew@oandzlaw.com
bmatera@oandzlaw.com
tchung@oandzlaw.com
mgomez-reichman@oandzlaw.com

**COBLENTZ PATCH DUFFY & BASS LLP**
Jeffrey G. Knowles (SBN 129754)
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 391-4800
ef-jgk@cpdb.com

**COWAN, LIEBOWITZ & LATMAN, P.C.**
Richard S. Mandel
Jonathan Z. King
Richard Dannay
(admitted pro hac vice)
114 West 47th Street

Respectfully submitted,

By: *Louis Tompros*

**WILMER CUTLER PICKERING HALE AND DORR LLP**

SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
ALLISON BINGXUE QUE (SBN 324044)
allison.que@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

LOUIS W. TOMPROS (*Pro Hac Vice*)
louis.tompros@wilmerhale.com
DISHA PATEL (*Pro Hac Vice*)
disha.patel@wilmerhale.com
60 State Street
Boston, MA 02109
Telephone: (617) 526-6220

ARI HOLTZBLATT (SBN 354361)
ari.holtzblatt@wilmerhale.com
ROBIN C. BURRELL (*Pro Hac Vice*)
robin.burrell@wilmerhale.com
2100 Pennsylvania Ave, NW
Washington, DC 20006
Telephone: (202) 663-6000

TAYLOR GOOCH (SBN 294282)
taylor.gooch@wilmerhale.com
KYLE EDWARDS HAUGH (SBN 323952)
kyle.haugh@wilmerhale.com
50 California St.
San Francisco, CA 94111
Telephone: (628) 235-1000

*Attorneys for Defendant*
**ANTHROPIC PBC**

New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

*Attorneys for Plaintiffs*

**SIGNATURE ATTESTATION PURSUANT TO CIVIL L.R. 5-1(h)**

Pursuant to Civil L.R. 5-1(h), I hereby attest that concurrence in the filing of the document was obtained from the document's signatories. I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 19, 2025

/s/*Louis Tompros*

Louis Tompros