1  [Counsel on signature page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> ANTHROPIC PBC, <br><br> Defendant. | Case Number: 5:24-cv-03811-EKL-SVK <br><br> **JOINT DISCOVERY DISPUTE STATEMENT REGARDING ANTHROPIC'S PRODUCTION OF GUARDRAIL INFORMATION** <br><br> **FILED UNDER SEAL** <br><br> **HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY PORTIONS HIGHLIGHTED IN YELLOW** <br><br> Judge Eumi K. Lee <br> Magistrate Judge Susan van Keulen |

Pursuant to Section 8 of the Court's Civil Standing Order, and L.R. 37-1 and 37-2, the Parties respectfully submit this Joint Discovery Dispute Statement seeking the Court's intervention in resolving a dispute regarding Anthropic's failure to produce information relating to its copyright guardrails. The Parties' joint chart is attached as Exhibit 4. The Parties' lead counsel met and conferred to try to resolve this dispute via videoconference on November 12, 2025 and by email and are at impasse. The fact discovery deadline has passed. ECF No. 416. The parties have already proposed various compromises in an effort to resolve this matter, as discussed below, but unfortunately cannot reach agreement.

I. **Publishers' Position:** Anthropic agreed to produce responsive discovery but subsequently improperly conditioned its production on Publishers' executing a needless stipulation.

This dispute is simple. Publishers propounded certain document requests and Anthropic agreed to make the information available for inspection. Publishers made *three* separate inspections but each time the information was not available. After the Parties conferred, Anthropic agreed to produce the material—but only if Publishers would agree in a new stipulation to "reaffirm" their obligations under the Protective Order in this case (ECF 293). Publishers assured Anthropic of their continued intent to abide by the Protective Order, but Anthropic has refused to provide the discovery to which Publishers are entitled absent this unneeded stipulation. Of course, the only reason this matter is still an issue is because Anthropic has failed to abide by its discovery obligations for months.

A. **Anthropic agreed to produce the lyrics it uses in its guardrails but never did.**

After Publishers filed suit in this case, Anthropic claims it implemented new Claude "guardrails" to prevent Claude from outputting copyrighted lyrics. To do this, Anthropic asserts it created the ▓▓▓▓▓▓▓▓▓▓▓▓▓ which contains the lyrics to ▓▓▓ songs. Anthropic claims it programmed CCS to compare potential Claude outputs against this database of lyrics and prevent outputs that included some designated amount of overlap. Anthropic described the operation of ▓▓ in its response to Publishers' Interrogatory 12: "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

1  ███████████████████████████████
2  ███████████████████████████████
3  ███████████████████████████████
4  ███████████

5  Using this same terminology, Publishers issued RFP 89 requesting "[d]ocuments sufficient
6  to show the contents of ████████████████████████████████████████████████████
7  ████████████████████████████████████████" (emphasis added). Publishers'
8  Third Set of RFPs, January 27, 2025. Anthropic made various objections to this Request but did
9  not dispute its relevance nor and agreed to produce for inspection documents "sufficient to show
10 the contents of ████████████████████████████." Anthropic's Amended Responses and
11 Objections to Plaintiffs' Third Set of RFPs dated March 27, 2025.

12 Publishers inspected Anthropic's training data and source code from September 9–11,
13 2025. Anthropic failed to make ████████ available during this inspection. The Parties
14 scheduled a second inspection for October 2-3. In advance of that inspection, Publishers' counsel
15 wrote to confirm that "[a]ll *databases of copyrighted content* that were used as reference sets in
16 ████████████████████████" would be available (emphasis added). Anthropic
17 responded that it "intends to make [these materials] available in the inspection environment."
18 J. Grubow Sept. 30, 2025 email. However, again this material was not made available.

19 Immediately thereafter, the Parties conferred on this issue. Because the content of ███ is
20 large, Anthropic initially *offered to produce a list of the songs contained in* ███ rather than
21 provide the full dataset for inspection. Publishers declined that offer and explained they needed to
22 see the ████████████████ as they appear in the dataset but did not need to inspect the entire
23 dataset beyond the lyrics file. Anthropic confirmed it would provide *the lyrics*. After the call,
24 Anthropic stated it would provide the full ███ dataset for inspection. *See* D. Patel Oct. 8, 2025
25 email ("Anthropic is willing to produce the entire hash corpus for review in the inspection
26 environment.").

27 However, during Publishers' third inspection on October 29, Anthropic made available
28 only a table containing hash values for the songs in the ███ database. A hash value is an encrypted

alphanumerical representation of particular content. Because two pieces of content with the same hash value will almost certainly be the same content, hash values can be used to determine when two pieces of content (such as a potential Claude output and copyrighted song lyrics) are exact copies of each other. But, crucially, because a hash value itself is just a string of letters and numbers, a hash value alone does not reveal anything about the content that produced it. As Anthropic well knows, the table of hash values Anthropic made available is useless for identifying the songs and lyrics it included in its ▇ corpus—the whole point of RFP 89 and which Anthropic agreed to provide. Anthropic has still not identified the songs it included in its ▇ database.

Publishers promptly raised this issue again with Anthropic's counsel. While Publishers maintain they are entitled to the lyrics for ▇▇▇, they offered to compromise by accepting production (rather than inspection) of the lyrics for just the 499 Works in Suit, along with all associated metadata, and by accepting Anthropic's previous offer to produce a list of the other songs in ▇. Anthropic responded it complied with RFP 89 by making the hash values available for inspection and that it would not produce anything further unless Publishers stipulate that the materials sought "are HIGHLY CONFIDENTIAL under the Protective Order" and that these materials "shall be used 'in connection with this case only for prosecuting, defending, or attempting to settle this litigation … [and] shall not be used for any other purpose' including to advance any future claims." J. Grubow Nov. 6, 2025 email (quoting ECF No. 292). Publishers responded that they would continue to abide by the requirement of the Protective Order but would not further stipulate regarding use of discovery produced in this litigation.

**B. The lyrics Anthropic included in its guardrails are relevant and responsive.**

The songs Anthropic added to its guardrails after Publishers filed this case are clearly relevant and, until the instant dispute, Anthropic never contended otherwise. With respect to the lyrics for the 499 Works in Suit, the particular text Anthropic used to design its system to avoid ▇▇▇ The identities of the remaining ▇▇▇ dataset are also highly relevant. In an attempt to rebut Publishers' willfulness allegations, Anthropic injected the issue of these ▇ songs into the case by asserting that it deployed a new bespoke guardrail system containing

the lyrics to these songs. Anthropic cannot claim that its adoption of this system shows it took the problem of copyright infringement seriously while at the same time blocking discovery into which songs the system included.

Publishers are entitled to test the efficacy of Anthropic's guardrails, and the identity of the works on which this guardrail is based is essential to its effectiveness. Tens of millions of new songs are released every year. That Anthropic chose only ▮ songs to include in its guardrails, and the particular songs it chose, bear on the issues in this case. Whether Anthropic choose the songs it deemed most – or least -- likely to be infringed, or a random sample, or works from just the artists and publishers at issue in the case, or just hastily grabbed a pre-existing list from a third-party, has great relevance to Anthropic's willfulness, knowledge and good faith. The information regarding this set of lyrics is crucial to discerning Anthropic's intent with respect to its guardrails.

These songs are also obviously responsive to Publishers' RFP 89. Anthropic's claim that, by requesting the "hash corpus," Publishers requested only the encrypted hash values, and not the songs themselves, is the kind of too-clever-by-half sophistry that has no place in good-faith discovery efforts. First, it is simply wrong: Publishers requested, not just the "hash corpus," but "the contents of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." Second, Anthropic itself uses the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and not just their encrypted hash values. For example, in its interrogatory responses, Anthropic has stated that on a particular date ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." Anthropic Suppl. R&Os to Pls.' 1st Set of Rogs (No. 12) at 12 (Nov. 6, 2024). In neither case did Anthropic state that it added the *hash values* for the lyrics to the hash corpus; Anthropic simply stated ▮▮▮▮▮▮. Finally, Anthropic's apparent position that the encrypted hash values are relevant while the unencrypted songs those hash values represent are not makes no sense at all.

C. **Anthropic cannot withhold the lyrics it uses in its guardrails on the basis that the information could be relevant in a future litigation.**

Anthropic waived its current objection by previously agreeing to produce the ▮ lyrics

1   without any additional stipulation. Having so agreed, Anthropic cannot weeks later refuse to
2   produce those lyrics without an additional stipulation. Anthropic has not raised any issue regarding
3   the confidentiality of the information sought. As both the Court and Anthropic are well aware,
4   there is already a Protective Order in the case.

5         Nor can Anthropic withhold responsive and relevant discovery in this litigation solely on
6   the basis that the responsive information might be relevant to some future litigation. Revealing a
7   guilty conscience, Anthropic apparently believes Publishers may use the contents of the ▇
8   dataset in a future lawsuit against it and wishes to forestall Publishers' ability to do so ahead of
9   time. But "[p]rivacy of proprietary information, not immunity from suit, [i]s the legitimate purpose
10  of the protective order." *In re Dual-Deck Video Cassette Recorder Antitrust Litigation.*, 10 F.3d
11  693, 696 (9th Cir. 1993) (reversing finding of contempt for violation of protective order when
12  party filed second lawsuit without disclosing any confidential information). It goes without saying
13  that Publishers will, of course, protect the confidentiality of any information properly designated
14  under the Protective Order in this case. But Anthropic's concern is not confidentiality but
15  liability—and Anthropic cannot pervert the Protective Order into a liability shield.

16        Unable to explain why the discovery sought is unjustified, Anthropic resorts to erroneously
17  and inappropriately attacking Publishers' counsel. Anthropic has no basis to claim that Publishers'
18  counsel breached its obligations under the Protective Order in *Bartz* at any time. Notably, at no
19  point has Anthropic moved for sanctions or sought any other relief for any such alleged breach.
20  More significantly, Anthropic has never even suggested that Publishers' counsel has to date
21  breached its obligations under the Protective Order in this case and merely raised alarm that this
22  might happen. The Court should ignore Anthropic's unbecoming attempts to shield itself from
23  liability by casting baseless aspersions on Publishers' counsel's integrity. Should Publishers seek
24  to use any protected information in a later suit, Publishers can move for an exception to the
25  Protective Order, Anthropic can oppose that motion, and the Court can rule on the specific facts
26  presented—a remedy Anthropic's demanded stipulation would foreclose. Similarly, Anthropic
27  reserves its right to challenge Publishers' use of protected information in the future, which the
28  Court than consider in the context of the specific use at issue. What is clearly ***not*** proper is

Anthropic's attempt to challenge Publishers' hypothetical future use of information—which Publishers have not even received—based on Anthropic's own fear that the information is incriminating.

II. **Anthropic's Position**

This dispute is, indeed, simple. There are lyrics to ▮▮ songs represented as hash values in the ▮▮ (called the hash corpus), including those that represent lyrics to the 499 Works-in-Suit here. Anthropic made the entire hash corpus available to Publishers because that is what they asked for. When Publishers changed tack (at the very end of discovery) and said what they actually wanted was the raw text files, Anthropic offered to make the dataset containing the text for the lyrics related to the 499 Works-In Suit available for Publishers to inspect. Publishers refused that offer, insisting that Anthropic provide the identity of the ***other*** ▮▮ songs, i.e., songs that are ***not*** at issue in this case. But the specific identity of those songs has no relevance to this case. Rather, the requested discovery appears to be a transparent attempt by Publishers and their counsel Oppenheim + Zebrak ("O+Z") to obtain confidential materials from Anthropic in this litigation to amass evidence for a different, future suit. Publishers have already indicated their plans for a future suit, stating in the reply to their motion to amend that "denying the Motion would compel Publishers to file their new claims in a separate action." ECF 426 at 2. But whatever future case they may wish to bring, the Protective Order entered by this Court in this case prohibits them from using any confidential materials produced by Anthropic in this case to inform those future claims.

In light of the patent irrelevance here of the identity of the ▮▮ works, but in the interest of compromise, Anthropic asked O+Z to confirm that they would not use this list of works to bring separate litigation. Tellingly, Publishers repeatedly refused, and their portion of this dispute statement all but admits that improper purpose. What is more, this is not the first time O+Z has advanced the view that it may permissibly use confidential materials from one case in another: Only a couple months ago, O+Z defended their ability to use confidential material produced in *Bartz v. Anthropic* (where O+Z has appeared on behalf of a different group of publishers and where the protective order contains materially identical language) to litigate this case. O+Z's pattern of disregarding this clear protective order language must end. Anthropic will be filing a motion that

seeks to eliminate their confusion about their obligations. Anthropic respectfully requests that the Court deny Publishers' request for the list of ▓▓ songs as irrelevant or order that Publishers and O+Z not use the list to develop claims for future suits as a precondition to receiving the list.

### A. Anthropic Produced The Materials Publishers Requested

Publishers' statement is rife with inaccuracies and mischaracterization of what Anthropic agreed to produce. Publishers consistently and repeatedly—through its discovery requests, written correspondence, and oral communication—requested the **hash corpus**, as Publishers' statement above (using the term "hash" 26 times and never identifying any specific request for the raw lyric files) confirms. Publishers' RFP 89 does not seek the raw lyric files ▓▓▓▓▓▓, but rather "the contents of … the hash corpus." Anthropic has never taken the position that all hash values are relevant to this litigation, yet Anthropic provided Publishers with the hash corpus they asked for, and never agreed to provide more.[1] A hash corpus literally means a body of hash values. And these hash values represent ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Publishers now complain that hash values are an "encrypted alphanumerical representation" of content, but that is the definition of what they requested when they asked for the "hash corpus." Only *after* concluding their inspections did Publishers (for the first time) ask for "the complete raw text data used to generate the hashes for the songs." J. Pariser Email (Oct. 31, 2025). But that is not the information requested in the RFP Publishers served.

### B. The Identity Of The ▓▓ Songs Is Not Relevant

Publishers now request the specific song titles and artist names for the ▓▓ works added to the ▓▓, which is a guardrails system used to prevent the regurgitation of copyrighted materials that had been in place long before Publishers filed suit. The specific song titles and artist names for *other* works are plainly irrelevant to the 499 Works-in-Suit and are cumulative of discovery already produced. Publishers opaquely claim this information somehow bears on "the issues in this case" because Anthropic added "only ▓▓ songs" to the ▓▓ even though "[t]ens of millions of new songs are released every year." But even that argument turns on the number and

---

[1] Publishers misleadingly alter an email (at 2) to suggest that Anthropic agreed to provide "All *databases of copyrighted content*" used in CCS. It did not. Anthropic's responded it "intend[ed] to make the materials *noted in the first two bullets* available in the inspection environment"—the first bullet of which was the hash corpus.

1  not the identity of the ▇ songs. Anthropic has explained that *how* those ▇ other works
2  were selected is both irrelevant to Anthropic's response to the allegations regarding the 499
3  Works-in-Suit and is also privileged and work product information. *Why* more than ▇ works
4  were not selected is also privileged, and, to the extent there was any nonprivileged reason,
5  Publishers asked and received responses to their questions in their 30(b)(6) deposition of Dr. Vinay
6  Rao. *See, e.g.*, Rao Tr. 92:11-93:6 ▇
7  ▇"). Anthropic has
8  produced the entire hash corpus, and code demonstrating how the ▇ works are used in the
9  guardrails and Publishers had ample opportunity in the inspection environment and through their
10 pre- and post-suit investigations to test the efficacy of Anthropic's guardrails; anything else is
11 irrelevant, privileged, and cumulative. That Publishers continue to pursue this irrelevant
12 information when they have confined themselves to the 499 Works-In-Suit underscores that their
13 reason for seeking this confidential information is to improperly gin up new claims.

14 **C. Neither Publishers Nor O+Z May Use The List To Develop Future Claims**

15        Despite the lack of relevance to the claims in *this* suit, and to avoid burdening the Court,
16 Anthropic proposed a path forward by which it would produce the song titles and artist names
17 Publishers requested so long as Publishers would stipulate that they would only use that
18 information *in this case*. Tellingly, Publishers refused. They defend in this dispute statement that
19 "Publishers may use the contents of the ▇ dataset in a future lawsuit against [Anthropic]" based
20 on a disingenuous reading of *In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 10
21 F.3d 693 (9th Cir. 1993). That statement is deeply troubling and improper for two reasons.

22        First, Publishers' request for the identity of non-works-in-suit is a fishing expedition to
23 develop new claims. "Fishing expeditions to discover new claims, however, are not permitted."
24 *Bryant v. Mattel, Inc.*, 2007 WL 5432959, at *3 (C.D. Cal. Apr. 19, 2007); *see also Teradyne, Inc.*
25 *v. Astronics Test Sys., Inc.*, 2022 WL 18397125, at *6 (C.D. Cal. Dec. 22, 2022) (denying
26 discovery "seeking evidence of potential copyright infringement not currently at issue" because
27 "the Court need not allow Plaintiff to engage in a fishing expedition for new causes of action").

28        Second, the Protective Order prohibits exactly what Publishers apparently plan to do. But

that prohibition is apparently insufficient because, as described below, this is not the first time that O+Z has interpreted this protective order language to allow them to use confidential materials produced in one case to litigate another. That means that Publishers and/or O+Z may be violating the Protective Order *right now* by using Anthropic's confidential information to investigate claims for a future suit. So, Anthropic reasonably requires additional assurances that Publishers and O+Z will not use the contents of the ▮ dataset to generate or support claims in a future lawsuit. Publishers do not challenge Anthropic's designation of these materials as highly confidential materials. *See* J. Pariser Email (Nov. 7, 2025). Under the Protective Order in this case, such confidential materials are "Protected Materials," for which the Protective Order provides: "A Receiving Party may use Protected Material that is disclosed or produced … in connection with this case only for prosecuting, defending, or attempting to settle *this* litigation … [and] **shall not be used for any other purpose**…." ECF 292 at 11-12. This language is modeled on the Northern District of California's Model Protective Order.

It is hard to think of a clearer way to say that Protected Material in this case cannot be used to prosecute, defend, or settle *other* litigation. Indeed, courts have consistently interpreted the model language as prohibiting the use of confidential information learned through discovery to advance new claims in other litigation. *See Silicon Genesis Corp. v. EV Grp. E. Thallner GmbH*, 2023 WL 6882749, at *2-3 (N.D. Cal. Oct. 18, 2023) (the Model Protective Order's "plain language … precludes the use outside this litigation of confidential material produced in this litigation," and "unambiguously forb[ade]" "using the [producing party's] confidential material produced in this litigation to launch a foreign action."); *Del Campo v. Am. Corrective Counseling Servs., Inc.*, 2007 WL 1848660, at *5 (N.D. Cal. June 27, 2007) ("us[ing] [a] document" from the case "in connection with another case" violated same language); *LifeScan Scotland, Ltd. v. Shasta Techs., LLC*, 2013 WL 4604746, at *2 (N.D. Cal. Aug. 28, 2013) (using "AEO Material to identify defendants' distributors and send them the cease and desist letters" violated same language); *On Command Video Corp. v. LodgeNet Ent. Corp.*, 976 F. Supp. 917, 922 (N.D. Cal. 1997) ("using [confidential] information to file a separate lawsuit … violated the plain terms" of similar order). Any other interpretation would render this material provision meaningless.

*Dual-Deck* is not to the contrary. The *Dual-Deck* protective order was entirely different from the model language and the language in this case's Protective Order, as it precluded use of "All information produced in discovery"—not just confidential information—a literal reading of which "would be absurd." *Id.*; *see Silicon Genesis*, 2023 WL 6882749, at *3 (distinguishing *Dual-Deck* on this ground). Moreover, *Dual-Deck* involved whether a party committing "three technical violations" of a protective order could be held in contempt, or if the use was in "substantial compliance" with a reasonable reading of the protective order. 10 F.3d at 695. But the question here is the correct reading of the Protective Order going forward, not whether O+Z can hide behind a "substantial compliance" defense to justify past violations. In any event, any future use of the ▇▇▇ works to prepare another suit would not be a mere "technical violation."

Even more troublingly, O+Z's approach here is not a one-off event. After O+Z appeared in the *Bartz* litigation, O+Z sent an email to Anthropic's counsel in this case stating: "We've become aware that Anthropic is using the pirated LibGen and PiLiMi torrented files as part of the guardrails to which Anthropic stipulated in this litigation." N. Hailey Email (Sept. 4, 2025). When pressed, O+Z admitted that it had learned this information—which it was leveraging in *this* case— from "the *Bartz* summary judgment briefing" that was "filed under seal in that case." *See* N. Hailey Ltr. (Sept. 12, 2025). O+Z defended doing so by misconstruing *Dual-Deck* as "holding that the use of information gained by an attorney under a protective order in one case may appropriately be used by the same attorney to develop a strategy applicable to a second action," just as they do here. *Id.* Publishers' Counsel's open admission that it interprets the language in this Protective Order (and the near identical one in *Bartz*) to allow them to use confidential materials to develop new claims is extremely concerning.

Given O+Z's consistent and candid view that they interpret the Protective Order to allow them to use confidential materials obtained in one case to develop claims for another, Anthropic will be moving to confirm the meaning of the Protective Order, to put this broader practice to an end. For this dispute, Anthropic respectfully requests that the Court either deny Publishers' request for the list of ▇▇▇ songs as irrelevant or order that Publishers and O+Z not use any list Anthropic is required to produce to develop claims for future suits.

| | | |
|---|---|---|
| 1 | Dated: November 19, 2025 | Respectfully submitted, |
| 2 | By: /s/ Timothy Chung | By: /s/ Joseph R. Wetzel |
| 3 | **OPPENHEIM + ZEBRAK, LLP**<br>Matthew J. Oppenheim | **LATHAM & WATKINS LLP**<br>Joseph R. Wetzel (SBN 238008) |

Dated: November 19, 2025

By: /s/ Timothy Chung
**OPPENHEIM + ZEBRAK, LLP**
Matthew J. Oppenheim
Nicholas C. Hailey
Jeffrey M. Gould
Corey Miller
Audrey L. Adu-Appiah
(admitted pro hac vice)
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
jeff@oandzlaw.com
corey@oandzlaw.com
aadu-appiah@oandzlaw.com

Alexander Kaplan
Jennifer Pariser
Andrew Guerra
Bret Matera
Timothy Chung
Michelle Gomez-Reichman
(admitted pro hac vice)
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
alex@oandzlaw.com
jpariser@oandzlaw.com
andrew@oandzlaw.com
bmatera@oandzlaw.com
tchung@oandzlaw.com
mgomez-reichman@oandzlaw.com

**COBLENTZ PATCH DUFFY & BASS LLP**
Jeffrey G. Knowles (SBN 129754)
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 391-4800
ef-jgk@cpdb.com

**COWAN, LIEBOWITZ & LATMAN, P.C.**
Richard S. Mandel
Jonathan Z. King
Richard Dannay
(admitted *pro hac vice*)
114 West 47th Street
New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

*Attorneys for Plaintiffs*

Respectfully submitted,

By: /s/ Joseph R. Wetzel
**LATHAM & WATKINS LLP**
Joseph R. Wetzel (SBN 238008)
joe.wetzel@lw.com
Andrew M. Gass (SBN 259694)
andrew.gass@lw.com
Brittany N. Lovejoy (SBN 286813)
britt.lovejoy@lw.com
505 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: +1.415.391.0600

Sarang V. Damle
(admitted *pro hac vice*)
sy.damle@lw.com
Sara Sampoli (SBN 344505)
sara.sampoli@lw.com
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Telephone: +1.202.637.2200

Allison L. Stillman
(admitted *pro hac vice*)
alli.stillman@lw.com
1271 Avenue of the Americas
New York, New York 10020
Telephone: +1.212.906.1747

*Attorneys for Defendant*

Respectfully submitted,

By: */s/ Sonal N. Mehta*
**WILMER CUTLER PICKERING HALE AND DORR LLP**
Sonal N. Mehta (SBN 222086)
sonal.mehta@wilmerhale.com
Allison Bingxue Que (SBN 324044)
allison.que@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
(650) 858-6000
Fax: (650) 858-6100

Ari Holtzblatt (SBN 354631)
ari.holtzblatt@wilmerhale.com
Robin C. Burrell (admitted *pro hac vice*)
robin.burrell@wilmerhale.com
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6964

Louis W. Tompros (admitted *pro hac vice*)
louis.tompros@wilmerhale.com
60 State Street
Boston, MA 02109
(617) 526-6886

Joseph Taylor Gooch (SBN 294282)
taylor.gooch@wilmerhale.com
50 California Street
Suite 3600
San Francisco, CA 94111
(628) 235-1002

*Attorneys for Defendant*

**SIGNATURE ATTESTATION**

Pursuant to Civil L.R. 5-1(i)(3), I hereby attest that concurrence in the filing of this document was obtained from all other signatories of this document. I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 19, 2025                                  /s/ Timothy Chung
                                                          Timothy Chung