[Counsel on signature page]

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN JOSE DIVISION

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., ET AL., <br><br> Plaintiffs, <br><br> vs. <br><br> ANTHROPIC PBC, <br><br> Defendant. | Case No. 5:24-cv-03811-EKL-SVK <br><br> **JOINT DISCOVERY DISPUTE STATEMENT REGARDING PUBLISHERS' INVESTIGATION** <br><br> Judge Eumi K. Lee <br> Magistrate Judge Susan van Keulen |

Pursuant to Section 8 of the Court's Civil Standing Order, and L.R. 37-1 and 37-2, the Parties respectfully submit this Joint Discovery Dispute Statement to seek the Court's intervention in resolving a dispute regarding Publishers' use of Claude to collect evidence in this case. *See* Ex.A-D. The Parties' joint chart is attached as Ex.F. The Parties' lead counsel met and conferred to try to resolve this dispute via videoconference on November 12, 2025, and by email. However, the Parties have been unable to reach agreement on the issues below. Fact discovery closed on November 12, 2025. ECF 467. Anthropic does not believe there is a viable compromise available because it has already exhausted more targeted attempts to obtain the information necessary to mount a proper defense. Publishers disagree that any more discovery into their investigative prompts and outputs is warranted or necessary for Anthropic to mount its defense, and Publishers cannot offer any further compromise given that the Court has already rejected this discovery in two previous orders, *see* ECF No. 377 at 2-4; ECF No. 478 at 4-6.

I. **Anthropic's Position: Publishers Have Waived Privilege With Respect To All Prompts/Outputs From Their Investigation And Must Disclose Them Under the Sword And Shield Doctrine**

Recent developments have shown that Publishers intend to make selective disclosures from their investigation to paint a highly misleading picture about Anthropic's purported willfulness. Publishers have cherry-picked evidence about guardrails evasion and claimed ▓▓▓▓▓ occurred, while refusing to produce highly relevant evidence about the significant effort it took them to generate these outputs using atypical prompts—evidence that would greatly undermine, if not disprove, their contentions and sworn testimony. The sword and shield doctrine exists to prevent exactly this kind of abuse. Publishers could have opted not to rely on evidence from, or testimony about, their investigation and thus avoided having to disclose work product altogether. But, instead, they affirmatively chose to put their investigation at issue. Because Publishers' contentions can only be properly tested and rebutted with a granular understanding of their undisclosed prompts and outputs, Anthropic, Judge Lee, and the fact-finder are entitled to the full picture. Otherwise, this case will be decided on a skewed record that will taint the outcome of these proceedings. This issue is consequential both because it is central to this case and because its resolution by this Court and via any future appellate review will impact future AI-related litigation

1 around prompts and outputs. Anthropic therefore respectfully renews its request to compel
2 Publishers to produce all prompts and outputs from their investigation. *See* ECF 328 at 2.

3 Since this Court's May 23 order denying Anthropic's initial request without prejudice, ECF
4 377 at 4, Anthropic has attempted to acquire sufficient information about Publishers' investigation
5 through targeted means, including narrower interrogatories aimed at obtaining descriptive
6 statistics regarding Publishers' investigation. *See* ECF 478. But two recent developments require
7 Anthropic to renew its initial request for undisclosed prompts and outputs from Publishers and
8 their agents. *First,* on November 3, 2025, Michael Candore, Publishers' investigator, was deposed.
9 Publishers designated Mr. Candore's firm, BCGuardian, and individuals at the firm with
10 knowledge of the relevant issues, as witnesses Publishers "may use to support [their] claims" on
11 "the collection of evidence of Anthropic's exploitation of Publishers' copyrighted works." Pls'
12 Init. Discs. at 2, 3-4. Mr. Candore's testimony confirms, just as Anthropic has long predicted, that
13 Publishers intend to selectively use their investigation to support several allegations in this case.

14 This is textbook waiver. When a party "elect[s] to present the[ir] investigator as a witness,"
15 and "make[s] testimonial use of [investigatory] materials," it "waive[s] … privilege with respect
16 to matters covered in his testimony." *United States v. Nobles*, 422 U.S. 225, 239-240 & n.14
17 (1975). This includes undisclosed aspects of an investigation where the party "present[s] …
18 investigation [results] … as evidence" and makes a "tactical decision to disclose only favorable
19 protected material," *U.S. Airline Pilots Ass'n v. Pension Ben. Guar. Corp.*, 274 F.R.D. 28, 30, 32-
20 33 (D.D.C. 2011), while denying "its adversary access to additional materials that could provide
21 an important context for [a] proper understanding" of the matters disclosed, 8 Wright & Miller,
22 Federal Practice and Procedure § 2016.2. Even if any prompts and outputs reflect Publishers' legal
23 strategy, Publishers have put that strategy at issue for the reasons discussed below. *See id.* § 2026
24 ("opinion work product" is "discover[able]" where the "strategy and mental impressions of
25 defendant's agents [a]re 'directly at issue'" (citing *Holmgren v. State Farm Mut. Auto. Ins. Co.*,
26 976 F.2d 573, 577 (9th Cir. 1992)). As an initial matter, Mr. Candore's testimony confirmed that
27 Publishers will attempt to use their investigators' prompts and outputs to establish how third parties
28 use Claude for purposes of their secondary liability claims. He testified that ███████████

1 ▮▮▮
2 ▮▮▮ Candore
3 Tr.72. This testimony waives privilege twice over: First, Mr. Candore's sworn statement that ▮
4 ▮▮▮ puts all those prompts at issue, and Anthropic is
5 entitled to test that claim by reviewing them. Second, as Anthropic has explained before Judge
6 Lee, *see* ECF 485, investigator-generated reproductions cannot as a matter of law be the predicate
7 act of infringement for secondary liability,[1] and indeed Mr. Candore testified that ▮
8 ▮▮▮ Candore Tr.70-71. This demonstrates
9 Anthropic's need for usernames to distinguish true third parties from Publishers and their agents.
10     More broadly, Mr. Candore explained that ▮
11 ▮▮▮ Candore Tr.90
12 (emphasis added). He then repeatedly ▮▮▮
13 ▮▮▮
14 ▮▮▮
15 ▮▮▮ Candore Tr.90, 121, 127, 143, 188 (emphases added).
16 These *comparative* assertions show Publishers intend to use testimony that puts their full
17 investigation, including *Publishers'* and *counsel's* activity before engaging BCGuardian, at issue.
18     The depositions Anthropic has taken of Publishers' witnesses have confirmed their attempt
19 to use their investigation as both a sword and a shield. ABCKO's representative, Alisa Coleman,
20 submitted sworn declarations in this case explaining that she prompted Claude for, and received,
21 song lyrics. ECF 43 ¶20; ECF 185 ¶20. But she revealed in her deposition that ▮
22 ▮▮▮
23 ▮—critical context that a jury should have when weighing her previous testimony. Coleman
24 Tr.207-208. Capitol CMG's representative, Kent Draughon, similarly relied upon lyrics
25 reproduction in his declarations, ECF 45 ¶19; ECF 186 ¶19, but admitted at his deposition that ▮
26 ▮▮▮, Draughon Tr.264.
27 ▮▮▮ *Id.* at

---

[1] *See, e.g., Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir. 2007); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 n.2 (9th Cir. 2001); 3 Nimmer on Copyright § 12.04[D][1].

1  264-267. But Anthropic is entitled to know the *extent* to which Publishers' undisclosed prompt-
2  output records undermine or refute their selective disclosures and current sworn testimony.[2]
3         Mr. Candore insisted ███████████████████████████████████████
4  Candore Tr. 72. But he also revealed ██████████████████████████████
5  ████████████████████████████████████████████████████████████████████
6  ███████████████████████████████. Candore Tr.210, 216, 224, 229, 239. In
7  particular, Mr. Candore testified that ███████████████████████████████
8  ████████████████████████████████████████████████████████████████████
9  ████████████████████████████████████████████████████████████████████
10 █████████████████████████████████████ Candore Tr.223-224. Mr.
11 Candore testified that █████████████████████████████████████████████
12 ████████████████████████████████████████████████████████████████████
13 ████████████████████████. Candore Tr.242-249. Plaintiffs have disclosed only such
14 prompts and outputs where they were ultimately able to press Claude to produce an allegedly
15 infringing output, while hiding their failed attempts. Anthropic's witnesses have testified that this
16 style of prompt is a "jailbreak" attempt "designed to circumvent" Claude's guardrails—given the
17 response structure and "unusual" request for unique output—and that it would have taken "a fairly
18 significant amount of work" for Publishers to "work[] through" how to "evade" the guardrails this
19 way. Rao. Tr.153-154. Thus, it is highly likely that Publishers and their counsel used adversarial
20 experiments to circumvent the guardrails and then fed that jailbreak to BCGuardian to generate
21 the prompts they rely on. Publishers seek to rely on the greeting card output to show that Claude
22 produced song lyrics even after Anthropic improved its guardrails; but that evidence is highly
23 misleading without the full context of Publishers' failed experiments, which would powerfully cast
24 doubt on their claims that the guardrails are ineffective and ████████████████████
25 Anthropic, and the fact-finder, are entitled to the failed prompts to evaluate these questions.

---

[2] Publishers suggest that Anthropic's reliance on the testimony of Mr. Candore, Ms. Coleman, and Mr. Draughon "circumvent[s]" the Court's orders. But in the same breath, they acknowledge they permitted these questions—invoking privilege where they wanted to shield the information but allowing the witnesses to answer where they did not. That is unsurprising because these witnesses were all identified on Publishers' initial disclosures and have all submitted declarations in this case because Publishers are seeking to rely on those aspects of their investigation that they believe support their contentions.

1   Mr. Candore's deposition also revealed that the failed prompts Publishers have shielded
2   from discovery contain important context that undermines earlier testimony from his declaration.
3   ECF 96. Paragraph 10 of that declaration described a situation where Claude's copyright guardrails
4   kicked in, but Claude nevertheless reproduced full lyrics. At his deposition, Mr. Candore revealed
5   █████████████████████████████████████████████████████████████████████████████████
6   █████████████████████████████████████████████████████████████████████████████, but
7   counsel did not submit those failed prompts to the Court. Candore Tr. 190-195. Publishers cannot
8   suggest that paragraph 10 was a normal occurrence, while hiding evidence that it was anything
9   but. To properly rebut this claim, Anthropic requires evidence of the *extent* to which Publishers'
10  claim is misleading by showing all instances this style prompt failed. Other selective disclosures
11  in Publishers' investigation declarations (ECF 49, 96) may be similarly rebuttable, and Anthropic
12  is entitled to the means to test them. But because of the granularity of these assertions—which
13  relate to specific prompt formats, Claude interfaces, and time periods—Anthropic can only do so
14  with the level of detail afforded by full disclosure of all failed prompts and outputs.

15   *Second*, the attempts by the Court and parties to resolve this through narrower discovery—
16  i.e., the statistics that the Court's October 12 order required Publishers to produce—have proved
17  insufficient and only raised new questions that Anthropic is entitled to have answered. Publishers
18  have now responded to the Court's order, and the numbers they provided—6,852 (Rog 3(a)), 6,473
19  (Rog 3(b)), and 3,182 (Rog 4)—appear to be inconsistent. *See* Ex.E. The sum of Rog 3(b) and Rog
20  4—the numerators, respectively, for the proportion of times Publishers received and did not
21  receive lyrics—should equal Rog 3(a). But that is not the case with Publishers' responses, as 6,473
22  plus 3,182 is not 6,852. Publishers have since explained that they have interpreted the term "song
23  lyrics" in a way that obscures the true number of failures in these statistics to Anthropic's
24  defense—including because they apparently counted entirely original "lyrics" that Claude
25  invented, for which there can be no claim to copyright protection. And because the Court's order
26  for statistics from the 5 million and 15,000 prompt samples also used the phrase "song lyrics,"
27  Publishers' erroneous interpretation has artificially inflated the number of successful prompts it
28  reports in those samples too. Publishers' response below, which admits their figures are

unilluminating, just demonstrates the unfairness of forcing Anthropic to rely on high-level counts and Publishers' characterizations, rather than being able to analyze the specific prompts and outputs themselves. Moreover, Interrogatories 3 and 4, which asked only for pre-suit statistics, do not cover all relevant time periods and so do not provide a full picture of Publishers' investigation, in contrast to Anthropic's original document requests and Interrogatories 6 and 7, which covered the investigation's full scope. Obtaining post-suit information is critical now that Mr. Candore has testified that ████████████████, which had not previously been disclosed to Anthropic in Publishers' prior discovery responses or investigation-related declarations.

II. **Publishers' Position**: Anthropic's Rehashed Attempt To Invade Publishers' Opinion Work Product Offers Nothing New And Should Again Be Denied.

This is the ***third*** time Anthropic has sought to improperly invade Publishers' work product protection over the prompts and outputs Publishers collected during their legal investigation. Anthropic offers no reason why the Court should depart from its multiple prior rulings that Publishers' undisclosed prompts and outputs are protected attorney opinion work product immune from disclosure. *See* ECF No. 478 (recognizing that "the prompts . . . used by Publishers in their pre-suit investigation are attorney work-product" (citing ECF No. 377 and *Tremblay v. OpenAI, Inc.*, 2024 WL 3748003, at *2-3 (N.D. Cal. Aug. 8, 2024))). Anthropic's claimed reliance on "recent developments" misstates the record and offers nothing new to justify its improper demand.

Instead, Anthropic recycles the same previously rejected argument that Publishers' disclosure of some but not all prompts and outputs works a broad subject-matter waiver of their entire legal investigation. That is wrong. Anthropic acknowledges above that "Publishers' counsel closely directed the strategy of [the] investigation, including the style of prompt to use," and yet ignores that the undisclosed prompts and outputs from that investigation constitute *opinion* work product, to which subject-matter waiver does not apply.[3] As in *Tremblay*, Publishers' prompts "were queries crafted by counsel and contain counsel's mental impressions and opinions about how to interrogate [Claude], in an effort to vindicate Plaintiffs' copyrights against the alleged infringements." 2024 WL 3748003, at *2. Opinion work product includes "an attorney's mental

---

[3] *See, e.g., Tremblay*, 2024 WL 3748003, at *3 ("[A]pplying subject matter waiver here is inapposite to Ninth Circuit law related to waiver of opinion work product."); *Wisk Aero v. Archer Aviation*, 2023 WL 4029892, at *9 (N.D. Cal. June 14, 2023) (subject matter waiver did not extend to opinion work product).

impressions" and is "virtually undiscoverable," *Republic of Ecuador v. Mackay*, 742 F.3d 860, 869 n.3 (9th Cir. 2014) (citations omitted); *see* Fed. R. Civ. P. 26(b)(3)(B). Indeed, "opinion work product is discoverable *only* when *mental impressions* are at issue in a case and the need for the material is compelling." *United States v. Sanmina Corp.*, 968 F.3d 1107, 1125 (9th Cir. 2024) (emphasis added).[4] They are not here. And unsurprisingly, Anthropic has not satisfied either required element to meet this heavy burden.[5]

While the Court previously found a "limited and narrow waiver" by Publishers' disclosure of certain prompts and outputs, it determined not to "veer[] too close to the line" of opinion work product. ECF No. 478 at 5-6. Publishers have already produced extensive discovery on their investigation, including all Claude prompt-output evidence from the investigation on which they intend to rely—totaling approximately 5,000 prompt-output records. The Court granted Anthropic ***additional*** discovery based on Anthropic's sword-and-shield argument—in the form of Court-ordered interrogatory responses stating the number of prompts Publishers entered and outputs they received (and did not receive) as part of their investigation. In doing so, the Court carefully limited this discovery to "only facts," and "***not*** [the] mental impressions, conclusions, opinions or legal theories" of attorneys that might allow Anthropic to reverse engineer Publishers' protected work product in the form of prompts and outputs that Publishers have not produced and do not intend to rely on. ECF No. 478 at 4-5 (emphasis added). Anthropic ignores that entirely.

With the discovery already provided, Anthropic has more than enough information to make the arguments to the jury it raises above. For instance, Anthropic has information to argue the "significant effort it took [Publishers] to generate these outputs" and the ratio of prompts that did

---

[4] *See also Upjohn Co. v. United States*, 449 U.S. 383, 401 (1981).
[5] Anthropic's reliance on *United States v. Nobles*, 422 U.S. 225, 239-240 & n.14 (1975) to argue for complete subject-matter waiver is misplaced. *Nobles* was a criminal case having nothing to do with opinion work product or attorney mental impressions. Rather, an investigator testified at trial, based on his undisclosed notes of percipient fact interviews, that earlier eyewitness identifications were "considerably less clear" than at trial. *Id.* at 231. Recognizing that "[a]t its core, the work-product doctrine shelters the mental processes of the attorney," and none was at issue, the court compelled production of the investigator's factual report in the "interests of society and the accused in obtaining a fair and accurate resolution" of the criminal proceeding. *Id.* at 238. That is not even close to this case. Mr. Candore has not interviewed any Anthropic witnesses, he has no written report of their prior inconsistent statements with which to impeach them, and the "very integrity of the judicial system and public confidence in the [criminal justice] system" are not at issue, among other critical differences. *Id.* at 231.

not result in the requested lyric outputs, including due to guardrails. It can tell its story that Mr. Candore's cited example of an output asserting guardrails and also providing lyrics was the only instance of that he recalls and the guardrails blocked infringing outputs other times pre-suit.

Nor do the alleged "recent developments" Anthropic cites justify more discovery or present anything new at all. *First*, Publishers have been clear from day one that their investigator prompts were "submitted to Claude in the same way that any user could," including, for example, in the form "what are the lyrics to [composition title] by [performing artist]" or "write me a song about the death of buddy holly." ECF No. 49 at ¶¶ 7-8. Yet, according to Anthropic, Mr. Candore's testimony that his prompts were ███████████████████████████████████████████ ███████████████████████████████████ is new. Nope. That's old news that tracks BCGuardian's two-year-old declaration and is apparent from prompts that Publishers long ago produced. Anthropic's claim that this testimony "puts all those prompts at issue" is bizarre and wrong. Anthropic can look at the 5,000 prompt-output pairs Publishers produced and see for itself if they are like third-party user prompts.

*Second*, Anthropic is wrong in claiming that distributions, displays, or reproductions to investigators cannot ground secondary infringement claims.[6] This Court has already rejected that argument. ECF No. 478 at 6. Anthropic's sole basis for its mistaken theory is a cramped reading of a case that did not address investigator-generated evidence at all, and merely referenced secondary infringement in a footnote as generically requiring "direct infringement by a third party." *See, e.g., A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001). Nor, in any event, is Anthropic's theory on investigator downloads a recent development, *see* 10/10/25 Hr'g Tr. at 102-03 (arguing only "true third-party [infringement] is going to be relevant to the question of secondary liability"), or a basis for further production of Publishers' legal investigation. Rather, it is a belated, baseless motion to reconsider that should be rejected.

---

[6] *See e.g., Microsoft Corp. v. Rivera*, 2019 WL 1641349, at *3 (C.D. Cal. Apr. 16, 2019) (plaintiff "sufficiently pleaded a meritorious copyright infringement claim" and "meritorious claim for contributory copyright infringement" where infringing copies were "sold and delivered to [plaintiff's] investigator"); *Microsoft Corp. v. EEE Bus. Inc.*, 555 F.Supp.2d at 1058–60 (N.D. Cal. 2008) (holding defendant liable for direct and contributory infringement based on sales to plaintiffs' investigators); *Arista Recs. LLC v. Usenet.com, Inc.*, 633 F.Supp.2d 124, 149 (S.D.N.Y. 2009) (holding on summary judgment that plaintiffs established "threshold of [defendants'] users' direct infringement for their claims of secondary liability" where plaintiffs set forth evidence of their investigators' downloads from the defendants' system.).

*Third*, Anthropic's claim, based on deposition testimony of Mr. Candore and two publisher witnesses, that Publishers have affirmatively offered comparative assertions on the frequency or ratio of Claude's infringing outputs is misleading and unsupported. The Court has repeatedly made clear that Anthropic was not entitled to explore these issues at deposition because it would "only invite an inviolate crossing" of "the border between the Publishers' waiver and remaining work-product protections," creating an undue "risk of disclosure of Publishers' opinion work product." ECF Nos. 478 at 6; 490 at 1. Publishers' counsel permitted limited questioning in an attempt to address Anthropic's concerns and avoid further disputes, but now Anthropic seeks to use the testimony to circumvent the Court's orders and demand discovery that the Court has multiple times denied. It's the definition of chutzpah. Responses on cross-exam are not affirmative proffers.

*Fourth*, Anthropic claims it needs all Publisher prompts and outputs based on speculation that Mr. Candore used adversarial prompts known as "jailbreaking" to circumvent Anthropic's guardrails in requesting greeting cards with song lyrics in November 2024. This is wrong on multiple counts, and Anthropic's claimed ignorance of these prompts is disproven by Publishers' production of those prompts long ago. Nor did Mr. Candore remotely admit ▮▮▮▮▮ ▮▮▮▮▮ as Anthropic contends above. He testified that ▮▮▮▮▮ ▮▮▮▮▮ Candore Tr. 72. In any event, Anthropic already has access to the ***full universe of all user prompts and outputs*** for that period,.

Anthropic also mischaracterizes Publishers' interrogatory responses in claiming to need more discovery. Publishers responded to Anthropic's interrogatories in detail and consistent with the language of the interrogatories and the Court's orders. *See* ECF Nos. 478, 490. That Anthropic is unsatisfied with the answers Publishers provided—because of the language Anthropic used in drafting its interrogatories—is no basis to pierce Publishers' work product protection.

Specifically, Anthropic's contention that "[t]he sum of Rog 3(b) and Rog 4 . . . should add up to Rog 3(a)" is inconsistent with the questions asked. Interrogatory 4 asks about prompts "that resulted in the *requested* song lyrics" (emphasis added), while Interrogatory 3 asks about "song lyrics" generally. Anthropic mistakenly assumes that in every instance Claude either responded by reproducing the requested song lyrics specifically, responding with a guardrail and fully

denying the user's request, or providing hallucinated song lyrics. Anthropic is wrong, including because Claude also responds by providing lyrics to different songs. *See, e.g.*, ECF 96 ¶ 9.

More broadly, Anthropic complains that Publishers interpret "song lyrics" in a way that "obscures the true number of failures," apparently upset that "song lyrics" naturally include hallucinated song lyrics. Of course, Claude's hallucinated song lyrics are not "failures" in this context. Claude's use of Publishers' song lyrics to train Claude to generate "new" song lyrics that compete with Publishers' songs is one of the many ways that Anthropic's infringement harms Publishers. Nor do outputs containing hallucinated song lyrics reflect an attempt by Anthropic to avoid copying and displaying copyrighted lyrics for legal reasons, as guardrails might.

Further, Anthropic's arguments about hallucinated song lyrics are unsupported by the text of the Interrogatories. "Song lyrics" is undefined in Anthropic's interrogatories. Publishers interpreted the phrase "song lyrics" in its ordinary meaning—including because Claude held out its apparently hallucinated responses as song lyrics. Anthropic's complaints that Claude's hallucinated song lyrics should have been excluded because "there can be no claim to copyright protection" in them is untethered to any language in the interrogatories themselves. Had Anthropic wanted different interrogatory responses, it should have written different interrogatories.

Finally, Anthropic's interpretation of "song lyrics," and that Claude outputs lyrics other than to the song requested in the prompt, sets up an untenable conflict. To answer Anthropic's interrogatories as it apparently now wants, Publishers would be required to compare unknown song lyrics in a Claude output to the millions of copyrighted song lyrics that Anthropic may have used to train Claude. Such a task would be incredibly burdensome, if not impossible. Besides, Publishers have no database of all copyrighted song lyrics Anthropic used. Even if they did, performing such a comparison would be far more burdensome than the relevance of the results.

Anthropic's rehashed attempt to invade Publishers' protected work product would cause Publishers' great prejudice, including by forcing them to disclose their attorneys' mental impressions and case strategy as to evidence on which they do not rely and works on which they have not sued. Anthropic's improper request should be denied again.

| | |
|---|---|
| Date: November 19, 2025 | Respectfully submitted, |
| By: _Michelle Gomez-Reichman_ | By: _Sonal N. Mehta_ |
| **OPPENHEIM + ZEBRAK, LLP** | **WILMER CUTLER PICKERING HALE AND DORR LLP** |
| Matthew J. Oppenheim<br>Nicholas C. Hailey<br>Jeffrey M. Gould<br>Corey Miller<br>Audrey L. Adu-Appiah<br>(admitted pro hac vice)<br>4530 Wisconsin Ave., NW, 5th Floor<br>Washington, DC 20016<br>Telephone: (202) 480-2999<br>matt@oandzlaw.com<br>nick@oandzlaw.com<br>jeff@oandzlaw.com<br>corey@oandzlaw.comaadu-appiah@oandzlaw.com | SONAL N. MEHTA (SBN 222086)<br>sonal.mehta@wilmerhale.com<br>2600 El Camino Real, Suite 400<br>Palo Alto, CA 94306<br>Telephone: (650) 858-6000<br><br>Louis W. Tompros (*Pro Hac Vice*)<br>Louis.Tompros@Wilmerhale.Com<br>60 State Street<br>Boston, MA 02109<br>Telephone: (617) 526-6220 |
| Alexander Kaplan<br>Jennifer Pariser<br>Andrew Guerra<br>Bret Matera<br>Timothy Chung<br>Michelle Gomex-Reichman<br>(admitted pro hac vice)<br>461 5th Avenue, 19th Floor<br>New York, NY 10017<br>Telephone: (212) 951-1156<br>alex@oandzlaw.com<br>jpariser@oandzlaw.com<br>andrew@oandzlaw.com<br>bmatera@oandzlaw.com<br>tchung@oandzlaw.com<br>mgomez-reichman@oandzlaw.com | ARI HOLTZBLATT (SBN 354361)<br>Ari.Holtzblatt@wilmerhale.com<br>ROBIN C. BURRELL (*pro hac vice*)<br>robin.burrell@wilmerhale.com<br>2100 Pennsylvania Ave, NW<br>Washington, DC 20006<br>Telephone: (202) 663-6000<br><br>TAYLOR GOOCH (SBN 294282)<br>taylor.gooch@wilmerhale.com<br>50 California St.<br>San Francisco, CA 94111<br>Telephone: (628) 235-1000<br><br>*Attorneys for Defendant*<br>**ANTHROPIC PBC** |
| **COBLENTZ PATCH DUFFY & BASS LLP**<br>Jeffrey G. Knowles (SBN 129754)<br>One Montgomery Street, Suite 3000<br>San Francisco, CA 94104<br>Telephone: (415) 391-4800<br>ef-jgk@cpdb.com | |
| **COWAN, LIEBOWITZ & LATMAN, P.C.**<br>Richard S. Mandel<br>Jonathan Z. King<br>Richard Dannay<br>(admitted pro hac vice) | |

114 West 47th Street
New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

*Attorneys for Plaintiffs*

## SIGNATURE ATTESTATION PURSUANT TO CIVIL L.R. 5-1(h)

Pursuant to Civil L.R. 5-1(h), I hereby attest that concurrence in the filing of the document was obtained from the document's signatories. I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 19, 2025          /s/ *Sonal N. Mehta*
                                  Sonal N. Mehta