UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ANTHROPIC PBC,<br><br>Defendant. | Case No. 24-cv-03811-EKL (SVK)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S RENEWED REQUEST FOR DISCOVERY OF PUBLISHERS' INVESTIGATIVE PROMPTS AND OUTPUTS**<br><br>Re: Dkt. No. 503 |

This dispute is the third in a line of disputes in which Defendant Anthropic PBC ("Anthropic") seeks to discover information relating to the prompts and outputs of Plaintiffs' ("Publishers") investigations in support of this action. *See* Dkt. 503; *see also* Dkt. 377 ("First Order"); Dkt. 478 ("Second Order"). Following a hearing on December 16, 2025, (*see* Dkt. 543, ("Hrg. Tr."), and having considered the Parties' submissions and arguments, the history of this dispute and the relevant law, the Court now **GRANTS IN PART and DENIES IN PART** Anthropic's request.

I.   **BACKGROUND**

As explained in the Court's prior orders, Publishers conducted a pre-suit investigation into potential infringement by Anthropic and relied upon certain prompts and outputs from their investigation in support of their allegations of infringement. *See* Dkt. 1; Dkt. 337-2 (Ex. B); Dkt. 369 at 1-2. All of the relied-upon prompts and outputs from this pre-suit investigation were produced, (*see* Dkt. 377 at 2 (citing Dkt. 369 at 2-3)), but the unrelied-upon or "negative" prompts and outputs[1] were not produced. Publishers clarified during the hearing in this matter that a *post-*

---

[1] In this case, an unrelied-upon or negative prompt/output would be one that did not elicit one of the Works-in-Suit.

suit investigation was also conducted, the focus of which was upon the effectiveness of Anthropic's guardrails for Claude rather than Publishers' affirmative allegations. Hrg. Tr. at 27:1-6, 28:6-10. In the Court's First Order, it denied-without-prejudice Anthropic's request because it was "unclear what evidence Publishers will rely on to prove the 'ease of use' … allegations." Dkt. 377 at 4. In its Second Order, in connection with Anthropic's request regarding Publishers' testing of the efficacy of Anthropic's guardrails (at the time, directed to the pre-suit investigation and the 5-million-record sample of prompt-output pairs in this case), the Court found a narrow waiver of attorney work-product and ordered disclosure of certain facts, specifically statistics, surrounding Publishers' investigation. Dkt. 478 at 4-6. The Court found that Publishers had put the effectiveness of Anthropic's guardrails at issue and therefore under the sword-and-shield doctrine / fairness principle Anthropic "must in fairness be permitted to discover and present evidence as to the number of times its guardrails did *not* fail." Dkt. 478 at 5.

The question remains whether Publishers have put some or all of their investigations at issue such that the negative prompts and outputs must be produced. The Court addresses this issue in three parts—pre-suit investigation, post-suit investigation and the 5-million-record sample—due to the distinct facts surrounding the extent of Publishers' waiver as to each part.[2]

## II.   LEGAL STANDARD

For all three parts, the legal standard is the same. Federal Rule of Civil Procedure 26 protects disclosure of documents and tangible things "prepared in anticipation of litigation or for trial." Fed. R. Civ. P. 26(b)(3)(A); *see In re Grand Jury Subpoena (Mark Torf/Torf Env't Mgmt.)*, 357 F.3d 900, 906 (9th Cir. 2004). This includes attorney work product, which may be either fact work product or opinion work product. "[O]pinion work product" includes "an attorney's mental impressions, conclusions, opinions, or legal theories developed in anticipation of litigation." *Republic of Ecuador v. Mackay*, 742 F.3d 860, 869 n.3 (9th Cir. 2014); *see* Fed. R. Civ. P. 26(b)(3)(B). It "is virtually undiscoverable." *Id*.

---

[2] Post-suit investigation is addressed in Section III.A., below. Pre-suit investigation is addressed in Section III.B., below. The 5-million-record sample was addressed in the Second Order and, following further discussion at the hearing, is further clarified in Section III.C., below.

2

However, "[t]he privilege derived from the work-product doctrine is not absolute. Like other qualified privileges, it may be waived." *United States v. Sanmina Corp.*, 968 F.3d 1107, 1119 (9th Cir. 2020). "Similar to the waiver of the attorney-client privilege, a litigant can waive work-product protection to the extent that he reveals or places the work product at issue during the course of litigation." *Id.* In other words, under the "fairness principle," a party cannot "us[e] the privilege as both a shield and a sword." *Id.* at 1117 (explaining the fairness principle in context of attorney-client privilege). More particularly, opinion work product is discoverable only "'when mental impressions are at issue in a case and the need for the materials is compelling.'" *Id.* at 1125 (citing *Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992)).

## III.   DISCUSSION

As an initial matter, as the Court held in its prior orders, "the prompts and related settings used by Publishers in their [] investigation[s] are attorney work-product." Dkt. 478 at 4 (citing Dkt. 377 at 3 and *Tremblay v. OpenAI, Inc.*, No. 23-cv-03223-AMO, 2024 WL 3748003, at *2-*3 (N.D. Cal. Aug. 8, 2024). The prompts and related settings themselves are opinion work-product because they reflect "queries crafted by counsel and contain counsel's mental impressions and opinions about how to interrogate [an AI agent]." Dkt. 377 at 3 (quoting *Tremblay*, 2024 WL 3748003, at *2-*3). The facts surrounding these queries—*e.g.*, "numbers of prompts and responses"—are "at best[] fact work-product" because they do not convey the "'mental impressions, conclusions, opinions or legal theories' of attorneys." Dkt. 478 at 4-5 (quoting *Sanmina*, 968 F.3d at 1125). In either case, the only question here is whether Publishers have waived the privilege protection under the fairness principle and, if so, the extent of such a waiver.

### A.   Post-Suit Investigation into the Effectiveness of Anthropic's Guardrails

Generally, when a party "present[s] [an] investigation to this Court as evidence, … it may not [then] use the work-product privilege to 'deny its adversary access to additional materials that could provide an important context for proper understanding'" of the evidence. *US Airline Pilots Ass'n v. Pension Ben. Guar. Corp.*, 274 F.R.D. 28, 32 (D.D.C. 2011). As the Court noted in its Second Order, Publishers have placed the effectiveness of Anthropic's guardrails (the subject of Publishers' post-suit investigation) at issue. *See* Dkt. 478 at 4-5. Moreover, the Court now

3

determines that Publishers have placed the *post-suit investigation itself* at issue.

Publishers have acknowledged that they intend to call Michael Candore, their investigator, as well as certain client witnesses, to testify that at a time after the implementation of Anthropic's guardrails, they were able to run certain prompts and receive allegedly infringing results. Hrg. Tr. at 27:1-19. In response to questions from the Court, Publishers have also acknowledged that they intend for Mr. Candore to testify that his prompts were of the kind that anyone *could* do (emphasis by Publishers' counsel at the hearing), if not going so far as testifying they were "typical." *Id.* at 28:11-24 ("'These are prompts that anyone could do,' based on the simplicity and straightforwardness of the prompt. There [is] not claim about typic[ality], representativeness, anything like that."). Both examples of proffered testimony place the investigation at issue and waive privilege over it at least to some extent. In particular, such testimony necessarily raises issues of *how* Mr. Candore (or other witnesses) elicited the allegedly infringing results. For example: What did the successful prompts (*i.e.*, that evaded guardrails) look like compared to unsuccessful prompts? Did Publishers' agents have to engage in "jailbreaking" (*i.e.*, the practice of using adversarial prompts calculated to circumvent an AI agent's guardrails), and if so to what extent, for successful prompts? Were such prompts in fact ones that any user "could" submit and, if so, "would" submit (*i.e.*, going to typicality)?

The Court is mindful, however, of the bedrock principle that "a waiver must be closely tailored … to the needs of the opposing party and limited to what is necessary to rectify any unfair advantage gained." Dkt. 478 at 5 (quotation marks omitted) (citing *Sanmina*, 968 F.3d at 1124). At the hearing, Publishers expanded on their argument that Anthropic had no *need* that for Publishers' specific post-suit prompts and outputs because they will be able to offer "better," more statistically sound evidence as to how effective their guardrails were. Dkt. 543 at 48:18-49:15; *see also* Dkt. 503 at 10. The Court is not persuaded that this is sufficient. As Anthropic's counsel argued, if Mr. Candore (or another investigator or client-witness) takes the stand and asserts that he was able to elicit infringing results from Claude notwithstanding the guardrails, Anthropic must be able to effectively cross-examine him. Yet absent some waiver over work-product, Anthropic will not be able to do so. *E.g.*, Hrg. Tr. at 35:21-36:10.

4

In sum, Publishers have placed this topic and investigation at issue and the need for effective cross-examination defines how far the waiver extends. Given the representations that Publishers have now made, the Court **GRANTS** Anthropic's request for the production of all (*i.e.*, negative as well as positive) prompts and outputs submitted by investigators and client-witnesses during the post-suit investigation. This includes prompts that were originally drafted by attorneys and then given to investigators or client-witnesses to use in their investigations. By contrast, because Publishers' counsel will not themselves testify, the Court **DENIES** Anthropic's request for production of attorney prompts or other queries crafted by counsel that were **not** given to and used by Publishers' investigators or client-witnesses.[3]

### B.   Pre-Suit Investigation into Publishers' Allegations

As to Publishers' pre-suit investigation, according to Publishers' representations, any testimony relating thereto (and the prompts and outputs themselves) will be used to support liability arising from one of the Works-in-Suit appearing as output and to demonstrate the "ease-of-use" of Claude for infringement and thus Anthropic's "willfulness," as alleged.[4] *See* Hrg. Tr. at 27:1-2, 27:20-28:5. Publishers are correct that such allegations will turn principally on the facts surrounding Publishers' investigation and not on the characteristics of the investigation (*i.e.*, the specific queries or how they were generated) themselves. In other words, *unlike* with the issue of Anthropic's guardrails, the Court agrees that questions going to the substance of Publishers' investigation (*e.g.*, were Publishers required to engage in jailbreaking to achieve their results? To

---

[3] Anthropic's argument that it cannot craft an effective cross-examination of the investigators or client-witnesses absent the prompts and outputs of non-testifying counsel is not persuasive. An attorney's prompts and outputs that were never made available to a testifying are tangentially relevant and other lines of cross-examination are available, so there is no compelling need for such opinion work product. *Sanmina*, 968 F.3d at 1124-25.

[4] While there is some overlap and similarity to "willfulness," "ease of use" and "effectiveness of guardrails" (Dkt. 478 at 7 n. 3), as the Court explained at the hearing, these concepts are distinct. "Willfulness," *i.e.*, whether Anthropic's alleged infringement was willful, is the ultimate issue. "Ease of use," *i.e.*, how easy it is to input a query that elicits infringing lyrics, is one factor that may inform willfulness. Similarly, ineffective guardrails would make it easier to use Anthropic's Claude for infringement, while effective guardrails would make it more difficult; thus the effectiveness of guardrails is another factor that may inform willfulness. These concepts, however, are not so intimately connected that placing one at issue automatically extends the waiver to all three concepts.

what extent?) will be of limited value as compared to the fact that any query led to positive results. Indeed, to specifically address "ease of use," the Court previously crafted a narrow protocol to quantify the number of attempts per positive results as well as the ratio of successful and unsuccessful prompts. Dkt. 478 at 5-6; *see also, supra*, § III.C (addressing adjustments to the production of such quantitative facts surrounding Publishers' investigation).[5]

Thus, Anthropic will be able to conduct an effective cross-examination based on the statistics of Publishers' pre-suit investigation without resorting to the mental impressions of counsel. When such an option is available, the Court declines to find a broader waiver. Accordingly, Anthropic's requests for production of all prompts and outputs from Publishers' pre-suit investigation are **DENIED** – particularly in light of the Court's ruling in Section III.C., below.

### C. For the 5-Million-Record Sample, Waiver Does Not Support Anthropic's Renewed Request for Publishers' Investigators' Usernames and Emails; Rather, the Court Clarifies its Second Order

Finally, the Joint Statement seeks to require Publishers to respond to "Interrogatory no. 1" in addition to certain Requests for Production (RFPs). *See* Dkt. 503-7 (Anthropic's Propose Order). Thus, as discussed briefly at the hearing, the Joint Statement serves to renew Anthropic's request for Publishers' investigators' and other agents' usernames and emails which was denied in the Court's Second Order. Dkt. 503-1 at 7; Dkt. 543 at 39:4-16.[6] Specifically, Anthropic complains that "the attempts by the Court and parties to resolve this through narrower discovery—i.e., the statistics that the Court's October 12 order required Publishers to produce—have proved insufficient[.]" Dkt. 503 at 6.

As the Court discussed at the hearing, this issue might be moot if the Court granted all of Anthropic's relief with regard to the pre-suit and post-suit investigations. However, because Court has declined to order the production of Publisher's counsel's prompts and outputs for the post-suit investigation and has denied and production related to the pre-suit investigation, the issue is not moot. For the reasons that follow, the Court now modifies the relief granted in its Second Order.

---

[5] *See* Section III.C., below, addressing adjustments to the production of quantitative facts.
[6] This request arose in the context of the 5-million-record sample, but as the Court subsequently acknowledged, the reasoning in the Court's Second Order applied equally to the statistics of the pre-suit investigation. *See* Dkt. 490. It applies equally to the post-suit investigation.

1   As the Court explained at the hearing, Publishers have construed the Court's prior order
2   too narrowly. The core of the Court's ruling, before ordering specific relief, was this:

> the Court finds that a limited and narrow waiver has occurred under the fairness principle: because Publishers intend to present evidence that in their own (or their agents') experience Anthropic's guardrails failed at least some number of times, **Anthropic must in fairness be permitted to discover and present evidence as to the number of times its guardrails did *not* fail. In other words, if Publishers are supplying the numerator, Anthropic is entitled to discover the denominator.** Accordingly, the Court **GRANTS** Anthropic's request as to Interrogatory nos. 3 and 4.

Dkt. 478 at 5 (emphasis added). The Court's ruling assumed results were either positive or negative based on other AI cases and the framing to-date in this case. *See, e.g.*, *Tremblay*, 2024 WL 3748003, at *2-*3 (discussing positive and negative investigative results, *i.e.*, successful and unsuccessful prompts). However, as evidenced by the Parties' dispute, there is also a class of disputed results: lyrics that Anthropic terms "original 'lyrics' that Claude invented, for which there can be no claim to copyright protection," or in Publishers' terms "hallucinated song lyrics [that] are not 'failures' in this context" because they are either close enough to be considered copying or reflect Anthropic's "use of Publishers' song lyrics to train Claude to generate 'new' song[s]." Dkt. 503 at 6 (Anthropic's position) and 10-11 (Publishers' position).

While Publishers' misunderstanding may have been genuine, by focusing exclusively on the last sentence addressing Interrogatory nos. 3 and 4, (*see* Second Order at 5 (the Court's grant of Anthropic's requests as to Interrogatory nos. 3 and 4)), Publishers failed to recognize the gravamen of the fairness principle and what it requires.

Accordingly, for the reasons set forth in Dkt. 478 at 4-6 and as discussed at the hearing, (*see* Dkt. 543 at 49:17-52:20), as well as because such statistics are necessary to allow Anthropic to sufficiently test Publishers' ease-of-use allegations and are relevant to the issue of the effectiveness of Anthropic's guardrails, the Court now **ORDERS** that Publishers shall provide the following, more granular statistics:

    1. For the 5-million-record sample:

        a. The total number of Publishers' prompt-output pairs contained in the 5-million-record sample;

7

      b. The number of Publishers' prompts therein that resulted in verbatim reproduction of lyrics of any of the Works-in-Suit ("positive results");

      c. The number of Publishers' prompts therein that resulted in partial reproduction of lyrics of any of the Works-in-Suit sufficient that Publishers contend such reproduction constitutes infringement, including cases either where *only* a portion of the lyrics were provided or where the entire lyrics were provided but certain parts included AI hallucinations (Publishers' contention) or lyrics written by Claude (Anthropic's contention) ("disputed results");

      d. The number of Publishers' prompts therein that resulted in successful invocation of Anthropic's guardrails ("negative guardrail results"); and

      e. The number of Publishers' prompts therein that that resulted in other concededly non-infringing answers, *i.e.*, non-sequitur or otherwise irrelevant answers or answers which reproduced a concededly de minimis amount of a Work-in-Suit ("other negative results").

2. For the pre-suit investigation:

      a. The total number of prompts submitted by Publishers in the course of their pre-suit investigation;

      b. The number of prompts therein yielding positive results;

      c. The number of prompts therein yielding disputed results;

      d. The number of prompts therein yielding negative guardrail results; and

      e. The number of prompts therein yielding other negative results.

3. For the post-suit investigation:

      a. The total number of prompts submitted by Publishers in the course of their post-suit investigation;

      b. The number of prompts therein yielding positive results;

      c. The number of prompts therein yielding disputed results;

      d. The number of prompts therein yielding negative guardrail results; and

      e. The number of prompts therein yielding other negative results.

Items (b)-(e) of each group above (the "numerators") must sum to item (a) (the denominator). The Court acknowledges that there is some subjectivity in the categories, in particular with regard to category (c) (disputed results). That is unavoidable. Nonetheless, this approach balances Anthropic's need for information against Publishers' remaining attorney-client privilege in their investigations.

Publishers shall interpret these categories in good faith to accomplish the underlying goal of the Court's order – "Anthropic is entitled to discover the denominator." *See* Dkt. 478 at 5. To the extent Publishers determine that additional granularity is required, they shall provide results for such additional categories as needed and provide a written explanation of such additional categories to Anthropic. Production of these results is due **no later than January 9, 2026**.

**SO ORDERED.**

Dated: December 18, 2025

SUSAN VAN KEULEN
United States Magistrate Judge