1  [Counsel on signature page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> ANTHROPIC PBC, <br><br> Defendant. | Case Number: 5:24-cv-03811-EKL-SVK <br><br> **JOINT DISCOVERY DISPUTE STATEMENT REGARDING PUBLISHERS' RENEWED REQUEST FOR DEPOSITION OF DARIO AMODEI** <br><br> Judge Eumi K. Lee <br> Magistrate Judge Susan van Keulen |

**Public Redacted Version**
**Pursuant to Order of the Court [560] Dated December 30, 2025**

Pursuant to Section 8 of the Court's Civil Standing Order, and L.R. 37-1 and 37-2, Plaintiffs ("Publishers") and Defendant Anthropic PBC ("Anthropic") respectfully submit this Joint Discovery Dispute Statement. The Parties seek the Court's intervention in addressing Publishers' renewed request to take the 30(b)(1) deposition of Anthropic's founder and Chief Executive Officer, Dario Amodei, and Anthropic's objection to the deposition. The Parties' lead counsel met and conferred to try to resolve this dispute via videoconference on Sept. 23 and Dec. 2, 2025, and by email. The Parties have been unable to resolve the issues below. Fact discovery closed on Nov. 12, 2025. ECF No. 489. In terms of compromise, Publishers cannot withdraw their request for Dr. Amodei's deposition given his unique knowledge, but Publishers have offered to accommodate Dr. Amodei's schedule by taking the deposition during evening or weekend hours if needed. Given Dr. Amodei's lack of unique knowledge regarding the issues in this case and the heavy burden of an apex deposition, Anthropic does not believe a viable compromise is available.

**I.  Publishers' Position: The depositions of Anthropic's senior leaders confirm Dr. Amodei possesses unique knowledge of critical facts requiring his deposition.**

Publishers renew their request to depose Anthropic's founder and CEO Dario Amodei pursuant to Rule 30(b)(1).[1] Depositions of Anthropic's other senior leaders have made clear that (1) Dr. Amodei possesses "unique first-hand, non-repetitive knowledge of the facts at issue in the case," and (2) this information is not available by any less intrusive means. *In re Google Litig.*, 2011 WL 4985279, at *2 (N.D. Cal. Oct. 19, 2011). Thus, Dr. Amodei must be made available.

When Publishers previously moved to take the deposition of Dr. Amodei, *see* ECF No. 447 at 1–6, the Court found that "Publishers have demonstrated that [Dr.] Amodei has been an active participant in Anthropic's development of its AI tools," ECF No. 460 at 2. However, the Court went on to find that "there may well be other founders and members of senior management, whose depositions have been noticed, who can attest to the same facts" as Dr. Amodei. *Id.* The Court subsequently denied Publishers' request for Dr. Amodei's deposition "without prejudice to renewal after the completion of the scheduled depositions of other senior managers." *Id.*

---

[1] While the deadline to file joint discovery dispute statements was Nov. 19, this dispute statement is timely because Publishers could not re-raise this dispute before deposing Anthropic founders Benjamin Mann and Jared Kaplan on Nov. 21. Publishers took these deposition after the close of fact discovery due to the witnesses' unavoidable conflicts.

Publishers have now completed those scheduled depositions of Anthropic's other founders and senior management, including in particular the depositions of (1) Anthropic founder and President (and Dr. Amodei's sister) Daniela Amodei, (2) founder and Chief Science Officer Jared Kaplan, and (3) founder Benjamin Mann. These depositions confirmed Dr. Amodei was intimately involved in the design, training, and development of Anthropic's AI models as well as its core data acquisition and copyright strategies. But, critically, these other Anthropic leaders have been unable (or unwilling) to testify to key information solely within Dr. Amodei's knowledge. Anthropic cannot continue to evade Dr. Amodei's obligation to appear for a deposition simply on the basis of his senior position. He is a percipient witness with unique firsthand knowledge of many critical facts relevant to the case. Publishers are entitled to take his full deposition. The severe time limit Anthropic proposes would unfairly prevent Publishers from adequately addressing these key facts.

Publishers' earlier motion described how Dr. Amodei personally touched almost every issue relevant to this case in unique ways given his background and position, and incorporate those assertions here. ECF No. 447 at 3–5. Since then, Anthropic was ordered to produce documents from Dr. Amodei's custodial files, further revealing his unique knowledge and involvement in matters going to the heart of this case. Among other things, Dr. Amodei personally authored a series of crucial early planning documents setting Anthropic's strategy with respect to AI development, commercialization, and licensing decisions. The depositions taken to date have shown that only Dr. Amodei can speak to the meaning and intention of these key documents.

For example, Dr. Amodei personally authored an "Anthropic Plan for 2023" on Dec. 30, 2022, detailing his plans for the company for that year. Dep. Exs. 177, 236.[2] Critically, Dr. Amodei described in that document ███████████████████████████████████ for Anthropic's AI models—a plan the company ultimately abandoned in favor of a pursuing a mass campaign of training on *unlicensed* data, in violation of Publishers' copyrights:

███████████████████████████████████████████████████████

---

[2] In light of this Court's Standing Order, Publishers have not appended deposition exhibits, but believe they provide important and necessary context to the instant dispute. Publishers would be happy to submit them upon request.

[REDACTED]

*Id.* at 5. He also detailed his commercial vision for 2023: [REDACTED] *Id.* at 13.

That Dr. Amodei understood the importance of licensing pretraining data at this early date, but ultimately chose to forego such licensing and train AI models without any such licenses, goes directly to Anthropic's knowledge and willfulness. His focus on building Anthropic [REDACTED] reveals his motivation for proceeding this way.

Only Dr. Amodei can speak to exactly what he meant in authoring this key document. For example, Daniela Amodei repeatedly disclaimed knowledge of this memo during her deposition—emphasizing that she did not know what her brother Dr. Amodei intended here, [REDACTED] Ex. 1 (D. Amodei Dep. Tr.) at 213:2–19; 215:9–219:17. Likewise, Dr. Kaplan testified in part that he was "[REDACTED]" what Dr. Amodei was saying in the document, while admitting that it was [REDACTED] Ex. 2 (J. Kaplan Dep. Tr.) at 178:19–179:1.

Separately, Dr. Amodei personally emphasized in Jan. 2023 in comments relating to this internal planning document that "[REDACTED]" Dep. Ex. 235 (emphasis added). That Anthropic's most senior executive understood at this time that his company could—and should—be licensing training data, but dismissed doing so as a "legal/practice/business slog," goes directly to willfulness. Publishers are entitled to question Dr. Amodei directly about his statements. By contrast, Dr. Kaplan, when asked what Dr. Amodei meant in these statements, testified "I don't know" and "I don't have anything to add to the sentence written there." Ex. 2 at 185:1–20.

Additionally, Dr. Amodei personally authored a second internal planning memo titled "Brainstorm on What Anthropic Might Release Externally This Year" in July 2021, explicitly

1 discussing whether Anthropic could "████████████████████████████████████
2 ████████████████████████████████," adding ████████████████████████████
3 ████████████████████████████████████ Dep. Ex. 170 (emphasis added). That
4 Anthropic's CEO understood the company's models had a "████████" problem and
5 "████████████████████████████" at this early date, but launched Anthropic's AI models
6 commercially without addressing those core flaws, bears on knowledge and willfulness. Publishers
7 must be able to question Dr. Amodei on this document, particularly given that Daniela Amodei
8 (despite being a custodian of the document) repeatedly disclaimed knowledge of these issues and
9 deferred to Dr. Amodei as the author. Ex. 1 at 144:1–6; 145:19–146:148:2; 149:3–150:3.

10      A third internal memo Dr. Amodei personally authored, "Anthropic Plan and Timeline
11 [WIP]" from Mar. 2021, speaks to key issues, including the CEO's plans on specific AI training
12 data (including "The Pile" dataset addressed by Publishers' Complaint), Claude's intended use
13 cases (e.g., ████████████████████████████), early commercialization plans, and potentially
14 making Anthropic's training data open-source (and Anthropic's ultimate decision to conceal those
15 datasets). Dep. Ex. 169. Again, Daniela Amodei was unable to answer questions about this crucial
16 document or her brother's intention in writing it, repeatedly disclaiming knowledge (despite
17 having commented on the document at the time). Ex. 1 at 126:25–127:8; 130:9–134:4.

18      There are many other examples of key documents showing Dr. Amodei's personal
19 involvement in core relevant decisions about which other witnesses are not competent to testify.[3]

20      What's more, Anthropic founder Mr. Mann revealed during his deposition that he had
21 recently discussed Dr. Amodei's views as to whether Anthropic's "usage of copyrighted materials"
22 is "considered fair use" with him. Ex. 3 (B. Mann 30(b)(6) Dep. Tr.) at 109:24–110:8. Publishers
23 must be able to question Dr. Amodei *directly* about his views—not filtered as hearsay through the
24 mouthpiece of a 30(b)(6) witness. Further, consistent with this documentary record, Mr. Mann

---

[3] *See also, e.g.*, Dep. Ex. 182 at 3 ██████████████████████████████████████████
████████████████████████████████ a risk Dr. Amodei personally minimized
given that "████████████████████████████████████████████████████████"); Dep. Ex.
180 (████████████████ held by senior Anthropic leaders, about which Daniela Amodei disclaimed
knowledge, Ex. 1 at 255:13–256:23, but which reflect that Dr. Amodei discussed ████████████
████████—which Anthropic ultimately did not do).

1  confirmed during his deposition Dr. Amodei's involvement in key areas necessary to explore at
2  Dr. Amodei's deposition. Among other things, Mr. Mann testified that, "when we first started the
3  company and we were building our very first models, [Dr. Amodei] was quite involved in the
4  research process"; he played a role in discussing and approving specific training datasets; and he
5  was later "pretty closely involved with our [commercial] product plans." Ex. 4 (B. Mann 30(b)(1)
6  Dep. Tr.) at 32:15–22; Ex. 3 at 82:13–83:12.

By contrast, Anthropic argues the wrong standard. The question is ***not*** whether Dr. Amodei was "the key decision-maker with respect to the matters at issue." It is whether he has "unique first-hand, non-repetitive knowledge of the facts at issue." *In re Google*, 2011 WL 4985279, at *2. The record is clear Dr. Amodei has unique knowledge on numerous critical issues bearing directly on Anthropic's liability, which is not available by less intrusive means. Against this record, Anthropic cannot meet its "heavy" burden of preventing Dr. Amodei's deposition. *In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2014 WL 939287, at *2 (N.D. Cal. March 6, 2014). Indeed, "[i]t is very unusual for a court to prohibit the taking of a deposition altogether and absent extraordinary circumstances, such an order would likely be in error." *Celerity, Inc. v. Ultra Clean Holding, Inc.*, 2007 WL 205067, at *3 (N.D. Cal. Jan. 25, 2007) (quotation omitted).

Anthropic's exhaustion arguments also fail. An apex witness like Dr. Amodei cannot evade a deposition by preparing a 30(b)(6) witness to answer questions about topics uniquely within the apex witness's knowledge. If that were the rule, an apex deposition would never be appropriate. Nor does such a rule make any sense here, given Dr. Amodei's own "unique first-hand, non-repetitive knowledge." Publishers are entitled to obtain testimony on that unique knowledge directly from Dr. Amodei, with the opportunity for further cross-examination—not filtered, repackaged, and distorted through second-hand testimony by a 30(b)(6) witness. Where a witness has unique first-hand knowledge, a 30(b)(6) deposition is no replacement for a 30(b)(1) deposition.

Dr. Amodei must appear for a deposition here, just as he was recently ordered to do in a like copyright infringement case against OpenAI. Am. Minute Entry (Mar. 4, 2025), *In re Motion to Compel Compliance with Non-Party Subpoenas*, 3:25-mc-80017-AMO (N.D. Cal.), ECF No. 28. In *Bartz v. Anthropic*, Anthropic conceded Dr. Amodei's unique firsthand knowledge of key

issues by disclosing him as a Rule 26(a)(1) witness, and he was scheduled to be deposed in that copyright action before Anthropic settled the case for $1.5 billion a few days before his deposition. Other courts in this Circuit have ordered depositions of high-ranking executives similarly involved in details and decision-making pertaining to relevant issues. *See, e.g.*, *Kadrey v. Meta Platforms, Inc.*, 2024 WL 4293910, at *1 (N.D. Cal. Sept. 24, 2024) (requiring CEO Mark Zuckerberg to sit for deposition as he had "specific involvement in [Meta's] AI initiatives").

## II.     Anthropic's Position

Publishers fail to meet the apex doctrine's threshold requirements to justify their request to depose Anthropic's CEO, Dr. Dario Amodei. *See Affinity Labs of Texas v. Apple, Inc.*, 2011 WL 1753982, at *15 (N.D. Cal. May 9, 2011). Publishers' renewed request identifies no new evidence of Dr. Amodei's unique knowledge, invoking the same documents as their earlier, failed request. *See* ECF 444 at 3-4. And now, the extensive discovery in this case confirms that Dr. Amodei should not sit for deposition. Publishers have identified ***zero*** business decisions relevant to this case that Dr. Amodei alone made and ***zero*** Rule 30(b)(6) topics that Dr. Amodei alone could address—indeed, multiple witnesses testified that Dr. Amodei is not involved in day-to-day decision-making regarding the issues in this case. The only new argument Publishers muster is a highly misleading deposition record purporting to show uniqueness and exhaustion of less intrusive means. But Publishers blatantly ***manufactured*** that record by selectively asking the least appropriate witnesses to address these topics and avoiding the most appropriate witness. Ben Mann, Anthropic's primary 30(b)(6) witness, testified that he spoke to Dr. Amodei to educate himself on the company's knowledge on the very topics and documents on which Publishers now claim to need Dr. Amodei's testimony. But Publishers purposefully chose not to ask Mr. Mann a ***single question*** about those issues. It is clear from their questioning of Mr. Mann and others that Publishers' goal all along was to press for Dr. Amodei's deposition, not to seek relevant discovery. That is not exhaustion of less intrusive means—it is strategic avoidance of such means.

### A.     Dr. Amodei Does Not Possess Unique Knowledge Relevant To This Case

In their first attempt to depose Dr. Amodei—which this Court denied—Publishers claimed an urgent need for Dr. Amodei's testimony because only he could purportedly testify about "key

1  decisions" and "active[] involv[ment]" in Anthropic's model development, web-scraping, and data
2  acquisition strategies. ECF 447 at 3-4. Those assertions are now conspicuously absent. After
3  deposing several of Anthropic's co-founders, including its President Daniela Amodei and Chief
4  Science Officer Jared Kaplan, along with several other senior employees and subject matter
5  experts, Publishers cannot identify a *single* relevant corporate decision about which Dr. Amodei
6  possesses unique knowledge. Indeed, Publishers noticed a sweeping 30(b)(6) deposition spanning
7  *64 topics* including the exact topics about which they now purport to need Dr. Amodei's testimony:
8  model design and training (Topic 4), dataset composition and acquisition (Topic 5), and guardrails
9  (Topic 32). *See* ECF 447 at 9-10. Publishers have taken those depositions and did not move for
10 further testimony on a single topic. Nor have they identified a single instance where a witness
11 testified that Dr. Amodei had unique knowledge about a relevant issue in this case.
12       To the contrary, Publishers' attempts to manufacture a record that Dr. Amodei was the key
13 decision-maker with respect to the matters at issue in this case resoundingly failed. The deposition
14 of Ms. Amodei is illustrative.
15 
16                              Amodei Tr. 95:20-96:7.
17            , Ms. Amodei identified Anthropic employees Ben Mann, Tom Turvey, Dr. Kaplan,
18 and Vinay Rao (all of whom Publishers deposed), and Tom Brown (whose deposition Publishers
19 will take in January). *Id.* at 218:4-11, 219:9-13, 297:1-10. When asked who made decisions about
20 which datasets to use in training Claude, Ms. Amodei identified Dr. Kaplan, Mr. Mann, and Dr.
21 Rao. *Id.* at 303:21-304:5. For decisions about scraping, she identified Dr. Kaplan and Mr. Mann.
22 *Id.* at 224:13-21. And Ms. Amodei testified that it was Dr. Rao, not Dr. Amodei, who was in charge
23 of guardrails and safeguards, which Dr. Rao confirmed. *Id.* at 99:4-16; Rao 30(b)(1) Tr. 20:3-
24 21:10. For no topic was Dr. Amodei ever identified by Ms. Amodei *or any another witness* as the
25 key decision-maker or sole knowledgeable witness.
26       And so, Publishers point to testimony that Dr. Amodei was "involved" or "played a role"
27 in various discussions and processes. *Supra* p.5. That is entirely insufficient. All CEOs are
28 "involved" in a wide range of company discussions, and that alone cannot establish that the CEO

possesses unique knowledge of specific topics at issue. Any other reading would render the apex standard meaningless. *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co.*, 282 F.R.D. 259, 266 (N.D. Cal. 2012) (general directions by business executive do not establish "unique" knowledge); *BAE Sys. San Diego Ship Repair Inc. v. United States*, 670 F. Supp. 3d 1064, 1070 (S.D. Cal. 2023) ("deposition is improper" if apex "official is removed from the daily subjects of the litigation").

**B.    Publishers Intentionally Failed to Exhaust Less Intrusive Means Of Discovery**

Nor can Publishers justify their request using a handful of statements from Dr. Amodei in documents circulated to others internally, especially where Publishers strategically avoided asking Anthropic's relevant 30(b)(6) witness and others about these documents or statements. *Supra* pp.2-5. Publishers attempt to frame their argument around cherry-picked quotes from various witnesses who did not have familiarity with the documents, but the test is not whether every single witness could testify knowledgeably, but whether the *relevant* witness could. On that front, it is striking that the witness Publishers chose to ask about these documents at length was Ms. Amodei, who was not a 30(b)(6) deponent and—critically—repeatedly testified that unlike the other witnesses Publishers deposed, including Mr. Mann and Dr. Kaplan, she does not have a technical background and is not an expert on Anthropic's technology (i.e., the subject of the statements at issue). *See* Amodei Tr. 118:13, 179:2-3, 181:7-182:1, 221:6-11, 222:17-20, 224:8-21, 225:20-23, 268:7-9.

Meanwhile, Publishers intentionally chose ***not*** to ask Mr. Mann ***a single question*** about any document they highlight here, even though Mr. Mann was Anthropic's 30(b)(6) deponent with respect to the topics related to Dr. Amodei's statements, and even though Mr. Mann testified that he had spoken to Dr. Amodei to prepare for his 30(b)(6) deposition. Specifically, early during his deposition (which spanned two days), Mr. Mann testified that he had conversed with Dr. Amodei in preparation, Mann Tr. 16:3-13, yet Publishers did not ask Mr. Mann a single question about the facts he educated himself on, what documents he discussed with Dr. Amodei, or the company's knowledge of the topics at issue here. Later, Mr. Mann was asked about fair use and conveyed that he had spoken with Dr. Amodei about his personal, nonprivileged views on fair use to prepare to testify for the company. *Id.* at 109:24-25. Even then, Publishers did not ask Mr. Mann about his conversation with Dr. Amodei. If Publishers genuinely wanted to understand the documents they

identified, they had every opportunity to explore them with Anthropic's corporate designee.

Publishers also misrepresent Dr. Kaplan's testimony about the "Plan for Anthropic for 2023" document. *Supra* p.3. When Publishers' counsel asked, "███████████████████████████████████████████," Dr. Kaplan responded, "███████████████████████████████████████████████████████████████████████████████████" Kaplan Tr. 178:16-23. Thus, far from disclaiming knowledge about the document as Publishers suggest, Dr. Kaplan's testimony conveyed ***disagreement*** with Publishers' characterization of its importance and context. And critically, this very document is one on which Mr. Mann educated himself for his 30(b)(6) testimony by speaking with Dr. Amodei. Publishers would have known that—and could have asked Mr. Mann about Dr. Amodei's statements—if they had bothered to explore these topics during Mr. Mann's 30(b)(6) deposition. Instead they chose not to.[4]

Parties cannot claim to have exhausted less intrusive means when they opted not to seek the desired testimony from witnesses who could provide it. Otherwise, litigants would do what Publishers have done here: make calculated decisions about which questions to ask of which witnesses to craft a record to support an apex deposition rather than make genuine attempts to seek discovery. Permitting that sort of abuse would fundamentally undermine the important protection of the apex doctrine. *See Celerity, Inc. v. Ultra Clean Holding, Inc.*, 2007 WL 205067, at *3 (N.D. Cal. Jan. 25, 2007) (apex depositions "create[] tremendous potential for abuse or harassment").

### C. Publishers' Cases Highlight The Impropriety Of Dr. Amodei's Deposition

The cases upon which Publishers rely only serve to highlight that Dr. Amodei's testimony is not proper here. ***First***, that Anthropic had agreed to make Dr. Amodei available for a deposition in *Bartz* has no bearing on whether his deposition is proper here. The apex inquiry is both case and context specific. *See Affinity Labs*, 2011 WL 1753982, at *15. As this Court has repeatedly recognized, this case's claims and allegations significantly differ from those in *Bartz*. *See* ECF 239; ECF 473 at 26; ECF 484-4 at 34-35, ECF 468; ECF 473.

---

[4] Publishers cite no authority for their obviously incorrect claim that duplicative apex testimony is proper even if a 30(b)(6) witness can testify regarding the same facts on the company's behalf.

***Second***, Dr. Amodei's non-party deposition in a case involving his former employer, OpenAI, does not bear on the propriety of his deposition as an apex party witness in this case. Dr. Amodei was found to have relevant, personal knowledge of the specific matters at issue in the OpenAI litigation. *See In re Motion to Compel Compliance with Non-Party Subpoenas,* 3:25-mc-80017-AMO (N.D. Cal.), ECF No. 17 at 2. And importantly, Dr. Amodei was a non-party in that case. Here, one of the animating principles of the doctrine—the concern that litigants may use depositions to harass an opposing party—is acute. 2007 WL 205067, at *3.

***Third***, Meta CEO Mark Zuckerberg's deposition in *Kadrey* also highlights the impropriety of Dr. Amodei's deposition. Mr. Zuckerberg's deposition was permitted ***only*** after the plaintiff made an "evidentiary showing" that he was "the principal decision maker" and had "direct[ly] supervis[ed]" the issues relevant to that case. 2024 WL 4293910, at *1. Publishers have not pointed to ***any*** evidence demonstrating that Dr. Amodei even approaches being the principal decision maker or direct supervisor of any work relevant to the issues in this case. Rather, the sworn testimony consistently demonstrates the exact opposite: Mr. Mann testified that not "all management chains at Anthropic end in Dr. Amodei." Mann Tr. 90:15-20. Mr. Turvey similarly explained that "[t]here is not one individual" who "manages Anthropic's day-to-day operations," "[t]here are multiple executives that manage their own teams," and "a variety of executives" have "ultimate decision-making authority at Anthropic." Turvey Tr. 31:6-32:11.

In sum, the Court should deny this request. Dr. Amodei lacks any unique knowledge relevant to this litigation and Publishers have not established otherwise, nor have they pursued available less burdensome means of obtaining the information they claim to seek. But if the Court is inclined to require Dr. Amodei to sit for a deposition in this case, it should limit the deposition to no more than two hours on the record. *See Apple Inc.*, 282 F.R.D. at 265 (limiting deposition to two hours because "unrestricted deposition time and subject matter" was inappropriate for "apex" witness). A limitation is critical here: Dr. Amodei has a round-the-clock schedule filled with pressing issues, and Publishers have spent significant time in other depositions asking witnesses extensive questions about irrelevant details of their prior employment, personal finances, and other personal subjects, or about documents and subjects the witness testified they knew nothing about.

| | | |
|---|---|---|
| 1 | Dated: December 12, 2025 | Respectfully submitted, |
| 2 | By: */s/ Nicholas Hailey* | |
| 3 | **OPPENHEIM + ZEBRAK, LLP** | **COBLENTZ PATCH DUFFY & BASS LLP** |
| | Matthew J. Oppenheim | Jeffrey G. Knowles (SBN 129754) |
| 4 | Nicholas C. Hailey | One Montgomery Street, Suite 3000 |
| | Jeffrey M. Gould | San Francisco, CA 94104 |
| 5 | Corey Miller | Telephone: (415) 391-4800 |
| | Audrey L. Adu-Appiah | ef-jgk@cpdb.com |
| 6 | (admitted *pro hac vice*) | |
| 7 | 4530 Wisconsin Ave., NW, 5th Floor | **COWAN, LIEBOWITZ & LATMAN, P.C.** |
| | Washington, DC 20016 | Richard S. Mandel |
| 8 | Telephone: (202) 480-2999 | Jonathan Z. King |
| | matt@oandzlaw.com | Richard Dannay |
| 9 | nick@oandzlaw.com | (admitted *pro hac vice*) |
| | jeff@oandzlaw.com | 114 West 47th Street |
| 10 | corey@oandzlaw.com | New York, NY 10036-1525 |
| | aadu-appiah@oandzlaw.com | Telephone: (212) 790-9200 |
| 11 | | rsm@cll.com |
| | Alexander Kaplan | jzk@cll.com |
| 12 | Jennifer Pariser | rxd@cll.com |
| | Andrew Guerra | |
| 13 | Bret Matera | |
| 14 | Timothy Chung | |
| | Michelle Gomez-Reichman | |
| 15 | (admitted *pro hac vice*) | |
| | 461 5th Avenue, 19th Floor | |
| 16 | New York, NY 10017 | |
| 17 | Telephone: (212) 951-1156 | |
| | alex@oandzlaw.com | |
| 18 | jpariser@oandzlaw.com | |
| | andrew@oandzlaw.com | |
| 19 | tchung@oandzlaw.com | |
| | bmatera@oandzlaw.com | |
| 20 | mgomez-reichman@oandzlaw.com | |
| 21 | *Attorneys for Plaintiffs* | |

11

Case No. 5:24-cv-03811-EKL-SVK
JOINT DISCOVERY DISPUTE STATEMENT REGARDING RENEWED REQUEST FOR DEPOSITION OF DARIO AMODEI

Respectfully submitted,

By: */s/ Sonal N. Mehta*

| | |
|---|---|
| **LATHAM & WATKINS LLP**<br>Joseph R. Wetzel (SBN 238008)<br>joe.wetzel@lw.com<br>Andrew M. Gass (SBN 259694)<br>andrew.gass@lw.com<br>Brittany N. Lovejoy (SBN 286813)<br>britt.lovejoy@lw.com<br>505 Montgomery Street, Suite 2000<br>San Francisco, California 94111<br>Telephone: +1.415.391.0600<br><br>Sarang V. Damle<br>(admitted *pro hac vice*)<br>sy.damle@lw.com<br>Sara Sampoli (SBN 344505)<br>sara.sampoli@lw.com<br>555 Eleventh Street NW, Suite 1000<br>Washington, DC 20004<br>Telephone: +1.202.637.2200<br><br>Allison L. Stillman<br>(admitted *pro hac vice*)<br>alli.stillman@lw.com<br>1271 Avenue of the Americas<br>New York, New York 10020<br>Telephone: +1.212.906.1747 | **WILMER CUTLER PICKERING HALE AND DORR LLP**<br>Sonal N. Mehta (SBN 222086)<br>sonal.mehta@wilmerhale.com<br>Allison Bingxue Que (SBN 324044)<br>allison.que@wilmerhale.com<br>2600 El Camino Real, Suite 400<br>Palo Alto, CA 94306<br>(650) 858-6000<br>Fax: (650) 858-6100<br><br>Ari Holtzblatt (SBN 354631)<br>ari.holtzblatt@wilmerhale.com<br>Robin C. Burrell (admitted *pro hac vice*)<br>robin.burrell@wilmerhale.com<br>2100 Pennsylvania Avenue NW<br>Washington, DC 20037<br>(202) 663-6964<br><br>Louis W. Tompros (admitted *pro hac vice*)<br>louis.tompros@wilmerhale.com<br>Disha R. Patel<br>Disha.Patel@wilmerhale.com<br>60 State Street<br>Boston, MA 02109<br>(617) 526-6886<br><br>Joseph Taylor Gooch (SBN 294282)<br>taylor.gooch@wilmerhale.com<br>50 California Street<br>Suite 3600<br>San Francisco, CA 94111<br>(628) 235-1002<br><br>*Attorneys for Defendant* |

**SIGNATURE ATTESTATION**

Pursuant to Civil L.R. 5-1(i)(3), I hereby attest that concurrence in the filing of this document was obtained from all other signatories of this document. I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 12, 2025                              */s/ Michelle Gomez-Reichman*
                                                      Michelle Gomez-Reichman