# Exhibit 9



**HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY**

# Transcript of Deep Ganguli, Ph.D.

**Date:** November 6, 2025
**Case:** Concord Music Group -v- Anthropic

**Planet Depos**
**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com
**www.planetdepos.com**
Michigan #8598 | Nevada #089F | New Mexico #566

HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY

Transcript of Deep Ganguli, Ph.D.
Conducted on November 6, 2025

1 (1 to 4)

---

**1**

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

----------------------------------------

)
CONCORD MUSIC GROUP, INC., ET AL., )
)
           Plaintiffs,    ) Case Number
    v.                    ) 5:24-cv-03811-EKL
                          ) SVK
                          )
ANTHROPIC PBC,            )
                          )
           Defendant.     )
----------------------------------)----

HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY

VIDEOCONFERENCED and VIDEO-RECORDED

30(b)(1) DEPOSITION of

Anthropic PBC, by and through its Designated

Representative,

DEEP GANGULI, Ph.D.

San Francisco, California 94111

Thursday, November 6, 2025

Reported Stenographically by:
MARY J. GOFF
CSR No. 13427
WA CSR No. 21030779
Job No. 60706930b1
PAGES 1-302

---

**2**

HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY

VIDEOCONFERENCED and VIDEO-RECORDED DEPOSITION of

DEEP GANGULI, Ph.D., Volume I, taken on behalf of

Plaintiff Publishers, Oppenheim + Zebrak, LLP, at

WilmerHale, 50 California Street, Suite 3600,

San Francisco, California 94111, beginning at

12:43 p.m. and ending at 8:13 p.m., on Friday,

November 6, 2025, before MARY J. GOFF, California

Certified Shorthand Reporter No. 13427 and WA CSR

No. 21030779.

---

**3**

APPEARANCES:

For Plaintiff Publishers

    Oppenheim + Zebrak, LLP

    BY: NICHOLAS C. HAILEY

        MICHELLE GOMEZ-REICHMAN

    Attorneys at Law

    4530 Wisconsin Avenue, NW

    5th Floor

    Washington, DC 20016

    202-480-2999

    nick@oandzlaw.com

    michelle@oandzlaw.com

For Defendant Anthropic PBC

    WilmerHale

    BY: TAYLOR GOOCH

    Attorney at Law

    50 California Street

    Suite 3600

    San Francisco, California 94111

    taylor.gooch@wilmerhale.com

    628-235-1026

ALSO PRESENT:  Ian Chen, In-house counsel Anthropic
Becky Maz, Esquire, WilmerHale (remote DC)

Videographer:  Philip Astor

---

**4**

INDEX

WITNESS                                EXAMINATION

DEEP GANGULI, Ph.D.

Volume I

                    ATTORNEY HAILEY          7, 294
                    ATTORNEY GOOCH           289

NUMBER            DESCRIPTION              PAGE

30(b)(1)

Exhibit 15  Plaintiffs' Notice of Deposition      7
            to Deep Ganguli Pursuant to Federal
            Rule of Civil Procedure 30(b)(6)

Exhibit 16  Defendant Anthropic PBC's             8
            Second Amended Initial
            Disclosures Pursuant to
            Fed Rule of Civ Procedure

Exhibit 17  Deep Ganguli LinkedIn Profile        15

Exhibit 18  About Stanford HAI                   43

Exhibit 19  Anthropic Deep Ganguli Info Page     51
            Pages 1-8

Exhibit 20  Anthropic Societal Impacts page      76

Exhibit 21  Assistant, 2023-10-01                98
            ANTH_SAMPLE000000246

Exhibit 22  Predictability and Surprise in      108
            Large Generative Models
            1747

# Pages 93-96

HIGHLY CONFIDENTIAL–ATTORNEYS' EYES ONLY

Transcript of Deep Ganguli, Ph.D.

Conducted on November 6, 2025

24 (93 to 96)

93

A  I think that there's a couple reasons. The one that I'm the most familiar with is that it's a reference to the size of the models as estimated in terms of the number of parameters.

So in -- Opus is our biggest model, whereas Haiku is our smallest model. And "opus" is typically a larger thing than a "haiku." And a "sonnet" is somewhere in the middle. And that's sort of, like, the model sizes and their kind of capabilities also sort of follow that.

I also think -- from a marketing distinction, I think it just resonated with our marketing team.

Q  Do you know why Anthropic chose terms relating to poetry or lyrics in that -- for that?

A  No, I do not actually know the answer to that.

Q  What is an "AI assistant"?

Let me first ask you this: CLAUDE is an AI assistant, correct?

A  Um-hum.

Q  So what is an AI assistant in that context?

A  In this context -- I want to go back to the distinction that -- between sort of a pretrained

94

model like GPT-3 and a fine-tuned model like ChatGPT or CLAUDE.

So in -- in a pretrained model, they're a little bit hard to use. They're -- they're sort of like text completion models in which you give an input string and then it sort of generates the next parts of that string. I would not call that an AI assistant.

The -- then we fine-tuned that model to be more natural to interact with. We train it to follow instructions. We train it to be helpful. We train it to be honest. We train it to be harmless.

And the output of that, kind of what we call post -- or sorry -- fine-tuning is what yields the interface -- or sorry -- the model that we think of more as an assistant, which is it is there to kind of help you do tasks and follow your instructions while -- so being helpful while also being harmless.

Q  So CLAUDE, as we know today, is the product of pretraining, plus fine-tuning?

ATTORNEY GOOCH: Objection.

THE DEPONENT: Sorry?

ATTORNEY GOOCH: Oh. I was just saying "objection."

95

A  I think there's a bit more to it than that.

So it's tempting to think about CLAUDE in terms of a model, but there's also a system under play.

So for example, we have talked a lot about kind of guardrails. So when you go to CLAUDE.AI and you're working with that, there -- yes, there is a model, but there's also guardrails in place with that model.

So if you put it all together, you know, there's the -- there's -- you know, CLAUDE, the model that we often also refer to the whole system as CLAUDE as well.

Q  Okay. In the "Societal Impacts of AI" video that is on the Anthropic Home page in Exhibit 20, you refer to AI as:

A new alien-like form of intelligence.

Do you remember saying that?

A  I do.

96

Q  Is that -- is that a true statement, that "AI is like a new alien-like form of intelligence"?

A  When I say the word "alien" in this context, what I mean is like I view it to be an intelligence.

And when I say "alien," I mean it to be something not -- just kind of new and novel to us. Right.

These systems, as I -- as I sort of mentioned earlier, as a neuroscientist and as an AI person, sort of exhibit a form of intelligence. This is close to the type of intelligence that we have.

But it's not exactly the same for all of the reasons in which stated previously where AI -- and artificial intelligence is often also quite different than natural intelligence, and so that's how I would clarify my usage of the term "alien" in that context.

Q  Okay. Do you agree that CLAUDE is an AI without human limitations?

ATTORNEY GOOCH: Objection, vague.

A  I don't know if you're referring to -- can you give me some more context?

Q  (BY ATTORNEY HAILEY) Sure. Well, yeah.

# Pages 141-144

HIGHLY CONFIDENTIAL–ATTORNEYS' EYES ONLY

Transcript of Deep Ganguli, Ph.D.

36 (141 to 144)

Conducted on November 6, 2025

**141**

Q   (BY ATTORNEY HAILEY) And one of those things could be learning about song lyrics?

ATTORNEY GOOCH:  Objection, asked and answered; misstates the record; calls for speculation.

A   I -- you know, I have seen people use CLAUDE to -- to analyze song lyrics, so that -- by definition, that means they can be learning about the song lyrics, sure.

Q   (BY ATTORNEY HAILEY) Okay.  And they could -- they could learn something new about song lyrics to specific songs; is that -- is that right? Is that your testimony?

ATTORNEY GOOCH:  Misstates prior testimony.

A   I think people can use CLAUDE to learn things about documents, yeah.

Q   (BY ATTORNEY HAILEY) Okay.  I asked about song lyrics, and you responded about documents. Did you misspeak or do you need me to repeat my question?

A   Sorry.  I understand your question.  So I'm going to stick to what I know.  Like, I -- this sentence says "learn something new." That's very general.  And then it leads to

**142**

a lot of speculative things like "learning about 20th Century Uruguayan history."

I have no -- never seen any evidence of that in my own research at Anthropic that people are actually using CLAUDE to learn about Uruguayan history.

In the context of your question "learning about songs," I have seen clusters related to analyzing the meaning behind songs, writing new songs, and so it's -- it's a -- not a typical use case.

Q   Okay.  Another use case is "translate." Do you see that, "translate languages"?

A   Translate languages:
        While CLAUDE is best at
    English due to its training data,
    CLAUDE knows more than a dozen
    languages and can translate between
    them to varying degrees of success.
        Some languages CLAUDE is
    especially good at other than
    English are Portuguese, French, and
    German.
    This is very consistent with my
understanding of CLAUDE's translation ability and at

**143**

a high level some of the languages it's good at.

Q   And one thing users can use CLAUDE to translate for is to translate song lyrics?

ATTORNEY GOOCH:  Objection, calls for speculation.

A   It can translate -- you know, yeah, it can be used to -- to translate between anything and -- anything else, so that can include song lyrics.

Q   (BY ATTORNEY HAILEY) And none of these categories on this -- strike that.

None of these suggested use cases on this Anthropic web page specifically exclude lyric-related uses?

ATTORNEY GOOCH:  Objection, calls for speculation.

A   So I'm looking at:
        Analyzing images, translating
    languages, act as a debate or
    brainstorming partner, write code,
    summarize text, learn something
    new, write across different formats
    and styles.
        I mean, this is a broad range of -- of
things with some illustrative examples.  So -- and then this doesn't mention anything about "song

**144**

lyrics" whatsoever, which again, based on my understanding of how people typically use CLAUDE, it's primarily to write code.

I have seen CLIO clusters of people trying to analyze or interpret song lyrics, and I know that there's guardrails in place for using CLAUDE to actually generate song lyrics.

And I would say for the -- for the coding side, those are -- that's by far the most typical use case.  And the -- when I look at this, those are the -- kind of the biggest clusters that pop up by far.

Q   (BY ATTORNEY HAILEY) Can users use CLAUDE in the same way as they would use Google or another Internet search engine if they wanted to?

A   They are very different technologies. We -- CLAUDE is meant to be an AI assistant that helps you actually do work.  Google is a search engine that returns documents that match a query.

So at the same time Google has a language translation feature.  This document says CLAUDE can also do that.  So there's some nuance here.  There's some things you can kind of do with both, and there's some things you can't.

Like, for example, "act as a debate or

# Pages 221-228

HIGHLY CONFIDENTIAL–ATTORNEYS' EYES ONLY

Transcript of Deep Ganguli, Ph.D.
Conducted on November 6, 2025

56 (221 to 224)

221

Q  You're aware that CLAUDE can generate output from its training data -- strike that.

You're aware that CLAUDE can generate output regurgitating its training data even if it's not specifically asked to do so?

ATTORNEY GOOCH:  Objection, calls for speculation.

A  I -- I do not know the answer to that question.  I did not study the problem of regurgitation.

Q  (BY ATTORNEY HAILEY) When you have used CLAUDE, has CLAUDE ever generated output copying song lyrics?

A  No.

Q  Let's -- can we share Exhibit 24A, please?  It's the electronic version of this one.  24A.

Do you have Exhibit 24A on your screen, Mr. Ganguli?

A  I do.

Q  And just to confirm, this -- we previously discussed this document, but let me just ask you again to confirm.

This is the article titled "In The Darkroom:  Deep Ganguli and Alan Michael Parker, Part Two, Interviews by Sara Sams."  It's dated

222

March 12, 2024, correct?

A  This is correct.

And I will additionally add that this particular article I did not review carefully prior to its publication.

Q  Okay.  You can review it now, but again, this is the second part of the article detailing your interview with Sara Sams and Alan Michael Parker from -- that we were discussing earlier, correct?

A  That is correct.

Q  Okay.  And let me direct you to the page in a moment.  If you can turn to page 5 of the document, please.

A  Yes.

Q  Do you just see generally on page 5 it's discussion about metaphors and asking CLAUDE to generate metaphors?

A  Is this the -- is this the -- does the top of this page says:

Deep, I have not tried this, so what would you suggest I try?

Q  Yes.

A  And the line about "metaphors" is uttered by whom, me or --

223

Q  It's -- I'm just -- it's throughout.  You can see it starting with the second line on that page from Alan Michael Parker talking about:

I would be curious to know what that operation would reveal. I would be curious to know what kind of metaphors or similes we would get if you were to ask the machine.

Do you see that?

A  Yes, I do see that.  Before that, it says:

Have you asked language systems and models to produce metaphors?

And I said:

I have not tried this, so what would you suggest I try and why?

Q  Yes.  So can you scroll down -- do you see there is -- there's a -- sort of paragraph-length quote from you where you say:

Yeah, his name is or its name is CLAUDE.

Do you see that?

A  Yeah.

Q  And then below that Alan Michael Parker

224

says:

Well, I think there are a couple of ways to approach asking CLAUDE about metaphor, try and make a metaphor, or make a metaphor for love.

Did I read that correctly?

A  You did.

Q  And then you respond:

I'll do.  Make ten metaphors for love.  Let's see.  Okay.

So you can see that you're -- you're having this conversation with Alan Michael Parker and you're actually prompting CLAUDE in realtime?

A  I can see that.

Q  And do you remember doing this as a part of this interview?

A  I do remember this.

Q  Okay.  And then it looks like you quote the CLAUDE output below that.

Do you see that?

A  I do see this.  I -- what I'm kind of reacting to is that -- what I don't understand is that -- I must have said this out loud.  And then the software transcribed that, and then Sara may



**225**

have edited it.

So I -- the attribution here, although it says "CLAUDE," I'm not entirely sure what -- if anything was lost in that process. I don't know that part.

Q Yeah. You say above that: "Okay. I think these are similar, colon" and then there's a quote from the CLAUDE -- it's -- you can tell from the context that you're quoting the CLAUDE output?

ATTORNEY GOOCH: Objection.

THE DEPONENT: Sorry. What did you say?

ATTORNEY GOOCH: I just said "objection."

A Like I said, at this point in the interview I probably read out loud what CLAUDE was saying, and then Sara roughly kind of edited it.

Q (BY ATTORNEY HAILEY) Okay. That's how I understand it as well. So let me -- let me read the full response. It says "Deep."

So that's quoting you, correct, Mr. Ganguli?

A That's right.

Q "I'll do. Make ten metaphors for love. Let's see. Okay. I think these are similar."

And then you quote CLAUDE. And CLAUDE is clearly saying:

**226**

Love is a journey, not a destination. Love is a battlefield. Love is a delicate flower. Love is a wildfire. Love is the sea, deep and complex. Love is the sun, creating work and life.

And then you continue: Can your students do better?

And then Alan Michael Parker responds after that.

Do you see that?

A Um-hum.

Q So I wanted to ask you about the second metaphor that CLAUDE generated above, "love is a battlefield."

Do -- do you recognize that phrase?

A I do not.

Q You don't know where that phrase comes from?

A I do not.

Q Are you familiar with the Pat Benatar song "Love is a Battlefield"?

A I am not --

Q Okay.

A -- yeah.

**227**

Q Have you ever heard the phrase "Love is a Battlefield" before?

A I have not. It's possible it's been uttered, but I don't recognize that as the title of a song, no.

Q You can take that down.

Q I think, Mr. Ganguli, we have talked that you -- you don't play -- you -- you don't currently and you haven't previously played a role with respect to training CLAUDE; is that right?

A That is correct.

Q So you -- you don't know about Anthropic's efforts to collect and compile training data?

A I do not.

**228**

Q Do you know whether Anthropic has entered into any licensing agreements with rightsholders for AI training data?

ATTORNEY GOOCH: Objection, calls for speculation.

A I -- no, I'm not -- I really don't know.

Q (BY ATTORNEY HAILEY) You're not familiar with Anthropic's licensing efforts one way or the other?

A It's not the part of the business or the research that I focus on, no.

Q Do you know anything about the diligence that Anthropic does on the datasets it uses for training?

A I do not. That's outside of my expertise and role.

Q Do you know whether copyrighted song lyrics are included in CLAUDE's training data?

A I do not.

Q Do you know whether other copyrighted works are included in Anthropic's training data?

A I do not know.

Q What role have you played with respect to pretraining CLAUDE?

A Zero role.

# Pages 281-284



Q   (BY ATTORNEY HAILEY) Okay.  And we can do that in a moment, but --

ATTORNEY GOOCH:  I will just note I don't plan to give extra time.