# Exhibit 10



**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

# Transcript of Daniela Amodei

**Date:** November 12, 2025
**Case:** Concord Music Group -v- Anthropic

**Planet Depos**
**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com
**www.planetdepos.com**
Michigan #8598 | Nevada #089F | New Mexico #566

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Daniela Amodei
Conducted on November 12, 2025

1 (1 to 4)

---

**1**

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

--------------------------------
                                )
CONCORD MUSIC GROUP, INC., ET AL., )
                                )
          Plaintiffs,           ) Case Number
     v.                         ) 5:24-cv-03811-EKL
                                ) SVK
ANTHROPIC PBC,                  )
                                )
               Defendant.       )
--------------------------------)----


     HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY

       VIDEOCONFERENCED and VIDEO-RECORDED

            30(b)(1) DEPOSITION of

              DANIELA AMODEI

        San Francisco, California 94111

         Wednesday, November 12, 2025




Reported Stenographically by:
MARY J. GOFF
CSR No. 13427
WA CSR No. 21030779
Job No. 606060
PAGES 1-372

---

**2**

     HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY

VIDEOCONFERENCED and VIDEO-RECORDED DEPOSITION of

DANIELA AMODEI, Volume I, taken on behalf of

Plaintiff Publishers, Oppenheim + Zebrak, LLP, at

WilmerHale, 50 California Street, Suite 3600,

San Francisco, California 94111, beginning at

9:07 a.m. and ending at 6:11 p.m., on Wednesday,

November 12, 2025, before MARY J. GOFF, California

Certified Shorthand Reporter No. 13427 and WA CSR

No. 21030779.

---

**3**

APPEARANCES:

For Plaintiff Publishers

     Oppenheim + Zebrak, LLP

     BY:  NICHOLAS C. HAILEY

          TIMOTHY CHUNG

     Attorneys at Law

     4530 Wisconsin Avenue, NW

     5th Floor

     Washington, DC 20016

     202-480-2999

     nick@oandzlaw.com

     tchung@oandzlaw.com


For Defendant Anthropic PBC

     WilmerHale

     BY:  SONAL MEHTA

     Attorney at Law

     2600 El Camino Real

     Suite 400

     Palo Alto, California 94306

     sonal.mehta@wilmerhale.com

     628-235-1026

ALSO PRESENT:  Natalie Naugle, In-house counsel
Anthropic

Videographer:  Philip Astor

---

**4**

                    INDEX

WITNESS                              EXAMINATION

DANIELA AMODEI

Volume I


               ATTORNEY HAILEY          8
               ATTORNEY MEHTA          --


NUMBER          DESCRIPTION            PAGE

Exhibit 165  Plaintiffs' Amended Notice of     13
             Deposition to Daniela Amodei
             Pursuant to Federal Rule of
             Civil Procedure 30(b)(1)

Exhibit 166  Daniela Amodei LinkedIn profile   26

Exhibit 167  All Company Meeting, 6-30-21      73
             Anthropic_0000012254

Exhibit 168  To Do on Wednesday               106
             83-page doc
             Anthropic_00000478271-353

Exhibit 169  Anthropic Plan and Outline       120
             Anthropic_00000444967-986

Exhibit 170  Brainstorm on What Anthropic     140
             Might Release Externally
             This Year
             Anthropic_0000458427-428

---

# Pages 65-68

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Daniela Amodei

17 (65 to 68)

Conducted on November 12, 2025

---

65

percent sure -- that she, like, recorded herself playing it at some point on the piano. But I'm not entirely sure. I would have to check my email records.

Q   Okay. So you discussed this with your instructor by email?

A   She sent me an email about it to the whole former class who she had contact information for. Again, this was when I was in high school, so more than 20 years ago now.

Q   But the -- she sent the email more recently?

A   Yes.

Q   Approximately when do you remember receiving that email?

A   Within the past 10 years.

Q   And was she -- was she asking your permission to use your musical composition in this CD?

A   I don't remember.

Q   And you believe you could search for and locate that email in your -- in your records, correct?

A   I believe so, yeah.

Q   Okay.

---

66

ATTORNEY HAILEY:  So, Counsel, we will request that you work with the witness to identify that email and produce it, please.

(Request for documents.)

ATTORNEY MEHTA:  From her personal email?

ATTORNEY HAILEY:  Yes, given the -- given the testimony, we'll request that it be produced.

ATTORNEY MEHTA:  Okay.  You can make your request.

THE DEPONENT:  Could I possibly ask for a bathroom break?

ATTORNEY MEHTA:  Actually, now is probably a good time for a break.  We --

ATTORNEY HAILEY:  It's a good time.  We can go off the record.

THE VIDEOGRAPHER:  We are going off the record at 10:19 a.m.

(A break was taken from 10:19 a.m. to 10:32 a.m.)

THE VIDEOGRAPHER:  We are back on the record at 10:32 a.m.

Q   (BY ATTORNEY HAILEY) Welcome back, Ms. Amodei.

You are a founder and the president of Anthropic, correct?

---

67

A   Yes.

Q   When were you named president of Anthropic?

A   I believe when we were incorporated.

Q   When was that?

A   I don't know the exact date, but I would guess like February of 2021.

Q   How was it decided that you would be the president of Anthropic?

A   I'm not entirely sure I remember the exact discussion, but I believe we talked broadly about Dario's duties and my duties and decided that CEO was the right role for him and president was the right role for me.

Q   And when you say "we talked," is that referring to you and your brother or others?

A   The cofounding team.

Q   And just to confirm, when you say "the cofounding team," who are you referring to?

A   Myself, Dario, Jack Clark, Tom Brown, Sam McCandlish, Jared Kaplan, and Chris Olah.

Q   So seven founders total?

A   Yes.

Q   And what are your roles and job responsibilities as Anthropic's president?

---

68

A   I am primarily responsible for hiring and managing the senior leadership team at Anthropic and helping to engage particularly on the business side with customers.

Sometimes I speak on behalf of the company.

Q   Who are Anthropic's customers?

A   We serve about 300,000 businesses, I believe, and we also have a consumer product.

Q   Approximately how many consumer product users or customers do you have?

A   I, unfortunately, don't know off the top of my head.

Q   What's your best estimate?

[REDACTED]

Q   What other roles and responsibilities do you have at Anthropic's president?

A   I weigh in on a number of decisions related to the normal course of business at Anthropic.

Q   What kinds of decisions?

A   I'll try and think of something maybe that I have done in the past week since -- since it's a little hard to -- to answer in the abstract.

---

# Pages 117-120

117

to enhance their business, their operations, their technology.

Q   CLAUDE is Anthropic's sole product, correct?

A   This sounds a little funny, but CLAUDE actually means a few different things.

So CLAUDE is the name that we use for the public-facing models that we deploy, but there are several different versions of CLAUDE that we have deployed over the past several years ago.

And there are also several different versions of CLAUDE that are available to customers today.

Q   And you referred to that as -- as -- CLAUDE as a "suite of products," correct?

A   Yes.

Q   Are there any other products that Anthropic has?

A   I don't think so.

Q   What are Anthropic's top priorities?

A   Can you be a little bit more specific? Do you mean for customers? Do you mean like internally for what we, you know, develop for employees?

Q   I'm just asking you: As the president of the company, what is your understanding that the

118

company's top priorities are?

A   Today?

Q   Yes.

A   I would say today our top priorities are, you know, developing, you know, frontier models in a way that is safe, reliable, and interpretable; and deploying those models to customers, while also engaging in research that promotes general safety, reliability, and explainability of models for the ecosystem more broadly.

Q   You have used the term "frontier model."

What does that mean?

A   I'm not a technical expert, but my definition of a frontier model would be a model at the kind of cutting edge of ability.

Q   You have -- you have described Anthropic now a couple of times as an "AI safety company."

What does that mean?

A   I don't actually believe I have used that specific phrase in my testimony, have I?

Q   Let me -- let me ask you again.

You have -- is it true or not that Anthropic refers to itself as an AI safety and research company?

A   I believe we have referred to ourselves

119

that way in the past, yes.

Q   Does Anthropic no longer consider itself an AI safety and research company?

A   I believe we have, like, changed our formal tagline a couple of times in marketing materials, but -- but I believe the intention behind what Anthropic's goals are has not changed.

Q   So has -- Anthropic framing itself as an AI safety and research company, is that -- that's a marketing description?

A   I -- I wouldn't put it that way.

I would say Anthropic has always endeavored to create models that are safe and good for our customers to use while remaining at the frontier of model development.

THE DEPONENT: I'm so sorry. Could I actually just request a quick bathroom break?

ATTORNEY HAILEY: We -- we -- now is a fine time to take a break, so we can go off the record.

THE DEPONENT: Thank you.

THE VIDEOGRAPHER: We are going off the record at 11:44 a.m.

(A break was taken from 11:44 a.m. to 12:00 p.m.)

120

THE VIDEOGRAPHER: We are back on the record at 12:00 p.m.

Q   (BY ATTORNEY HAILEY) Welcome back, Ms. Amodei.

Is it true that Anthropic began thinking about commercializing its AI products from the time of the company's founding in 2021?

A   I -- I would say when we first founded the company in 2021, we were primarily focused on research at that time, and we always theorized that had we would have, you know, potential commercial applications for the models down the road.

Q   Ms. Amodei, I'm showing you a document that we have marked as Exhibit 169 to your deposition.

(Exhibit 169 was marked for identification and is attached to the transcript.)

Q   (BY ATTORNEY HAILEY) It bears the Bates Number Anthropic 444967.

A   Could I just take a minute to familiarize myself with the document?

Q   You may. And I will just note that the time is 12:02 p.m.

ATTORNEY MEHTA: Counsel, there's a time stamp on the transcript. I don't know what purpose

# Pages 141-144

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Transcript of Daniela Amodei

Conducted on November 12, 2025

36 (141 to 144)

---

141

Q   (BY ATTORNEY HAILEY) Do you recognize this document, Ms. Amodei?

A   I'll need a few minute to familiarize myself with it, if that's okay.

Q   I will just note for the record that it's a two-page document. And that time is 12:25 p.m.

A   Okay. Thank you.

Q   Do you recognize this document, Ms. Amodei?

A   Honestly, no.

Q   It's titled "Brainstorm on What Anthropic Might Release Externally This Year," correct?

A   Correct.

Q   Do you know who authored this document?

A   I don't.

Q   We're showing you what we have marked as Exhibit 171.

(Exhibit 171 was marked for identification and is attached to the transcript.)

Q   (BY ATTORNEY HAILEY) It's another document produced by Anthropic bearing the Bates stamp Anthropic 458477.

A   Great. I have reviewed it. Thank you.

Q   Do you see -- this is an email from Dario ▮▮▮▮▮,

---

142

2021, correct?

A   Yes.

▮▮▮▮▮ address?

A   Correct.

Q   Do you see the "Subject" of this email is:
    Documents shared with you,
    "Brainstorm on What Anthropic Might
    Release Externally This Year"?

A   I do.

Q   And that's the same title as the document we were just looking at, correct?

A   Yes.

Q   Okay. And if -- sorry. If you go back to Exhibit 171, please. Stick with -- stick with 171, please.

ATTORNEY MEHTA:  She's -- I don't think she's looking at the document you -- she's looking at the two-page document.

Which one do you want her to look at, since you guys control what she's able to see?

ATTORNEY HAILEY:  The witness can scroll through the documents. You're just suggesting -- you're just noting that we can -- that we're --

ATTORNEY MEHTA:  Yeah, I just was telling

---

143

you that you had the wrong document on the screen. I'm trying to be helpful.

Q   (BY ATTORNEY HAILEY) So does this clarify for you, Ms. Amodei, that the prior document we were looking at, "Brainstorm on What Anthropic Might Release Externally This Year," was authored by Dario Amodei?

A   Yes.

Q   And you can see based on Exhibit 171 that you're looking at that he shared that document with you on July 11, 2021 for comments?

A   It looks like he did share it with me, yes.

▮▮▮▮▮ invited you to edit the following document, "Brainstorm on What Anthropic Might Release Externally This Year," correct?

A   Yes.

Q   Okay. So let's turn back to Exhibit 170. Again, this is the document titled "Brainstorm on What Anthropic Might Release Externally This Year."

We just saw that this was authored by Dario Amodei and from July 2021, correct?

A   Correct.

---

144

Q   So this is another internal Anthropic planning document from the early days of the company, correct?

A   I didn't author document, but it looks like it was a brainstorm of things that Dario was thinking about.

Q   And you reviewed this document when he shared it with you, correct?

A   I actually don't know that. It looks from the date stamp like it was in my final week before maternity leave, so I would have been probably 38 weeks pregnant.

I -- I'm -- I'm sure I, like, could have looked at this document, but I don't have a recollection of reviewing this particular document.

Q   I'm showing you what we have marked as Exhibit 172.

(Exhibit 172 was marked for identification and is attached to the transcript.)

Q   (BY ATTORNEY HAILEY) It's a document produced by Anthropic Bates-stamped Anthropic 479021.

And I just want to be clear. Ms. Amodei, I'm not going to ask you about anything about this document specifically other than to note that you

---

# Pages 177-180

**177**

beyond what we have discussed?

A   I receive standard health benefits and -- and other similar employee benefits.

Q   Any nonmonetary perks like a company car? A private jet? Anything else?

A   No.

Q   Ms. Amodei, do you agree that in order for CLAUDE to be able to respond to prompts about song lyrics, it needs to be trained on song lyrics?

A   I'm sorry.  Could you repeat the question?

Q   Do you agree that in order for CLAUDE to be able to respond to prompts about song lyrics, it needs to be trained on song lyrics?

A   I'm actually not sure.  I think CLAUDE would need to have some con -- framework for the concept of song lyrics to be able to respond to, like, particular questions about song lyrics, yes.

Q   And by "framework for the concept of song lyrics," that means it needs to be trained on song lyrics?

ATTORNEY MEHTA:  Objection to the form; asked and answered.

A   I believe I already answered this question.  I would just repeat my previous testimony.

**178**

Q   (BY ATTORNEY HAILEY) So when your counsel objects, that's -- the -- counsel is making objections for the record.

If your counsel instructs you not to answer, that's -- you can decide whether or not to follow your counsel's instruction.

But otherwise, the objections are just for the record, and they don't change your obligation to respond to the question.

We agreed at the beginning of the deposition that you would listen -- listen carefully to my questions and do your best to respond to them.

Do you remember agreeing to that?

A   I do.

Q   Okay.  So referring back to earlier unknown responses doesn't tell me exactly what your response is to the question I'm asking, so I'm going to ask the question again, and I would ask for you to do your best to respond to the question.

Can you do that for me?

A   Yes.

Q   My question is:  When you refer to the framework for the concept of song lyrics, that means the model needs to be trained on song lyrics, correct?

**179**

ATTORNEY MEHTA:  Objection to the form.

A   I believe, although I'm not a technical expert, that CLAUDE is trained on a wide variety of publicly available information and purchased information, which could include, for example, song lyrics, if they were listed on a website.

Q   (BY ATTORNEY HAILEY) So that wasn't my question.

My question was:  Do you recall referring into your previous answer to "the framework for the concept of song lyrics"?

Do -- do you refer the name -- do you recall referring to that?

A   Yes.

Q   And my question was what you meant by that.

When you say "framework for the concept of song lyrics," you were talking about song lyrics, right?

A   Um-hum.

Q   Thank you.

ATTORNEY MEHTA:  I'm sorry.  That -- you might want a verbal answer.

ATTORNEY HAILEY:  I didn't see the record.

Q   (BY ATTORNEY HAILEY) Ms. Amodei, when you

**180**

say "framework for the concept of song lyrics," you were talking about song lyrics, correct?

ATTORNEY MEHTA:  Form.

A   Yes.  I think what I mean is CLAUDE is capable of, for example, creating its own song lyrics, if it wanted to.

Q   (BY ATTORNEY HAILEY) Okay.  So we need to -- you previously testified that you -- that CLAUDE would need to have some framework for the concept of song lyrics in order to be able to respond to particular questions about song lyrics.

Do you recall giving that testimony?

A   Yes.

Q   My question is:  When you referred to CLAUDE getting a "framework for the concept of song lyrics," that refers to CLAUDE being trained on song lyrics; is that right?

ATTORNEY MEHTA:  Form.

A   That could be one way that CLAUDE could sort of understand the concept of song lyrics.

# Pages 185-196

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Daniela Amodei

47 (185 to 188)

Conducted on November 12, 2025

185

with your counsel.

The question pending when you took a break was: Ms. Amodei, are you aware that Anthropic employees have used CLAUDE to request lyrics to specific songs?

ATTORNEY MEHTA: And I object to that on the basis I previously objected, and I caution the witness not to share any conversations that you had with counsel.

A   No, outside of a conversation I had with a lawyer.

Q   (BY ATTORNEY HAILEY) Are you aware that ▮▮▮▮▮▮▮▮▮▮

ATTORNEY MEHTA: Objection. Same objections as before and same caution to the witness.

A   No, outside of any conversation that might have been -- that would have been privileged.

Q   (BY ATTORNEY HAILEY) Are you aware that Anthropic has produced various CLAUDE prompt and output records from Anthropic employee accounts with ▮▮▮▮▮▮▮▮

A   No, outside of conversations with counsel.

Q   I assume you haven't reviewed any of the

186

Anthropic employee CLAUDE prompt and output records that have been produced as part of this case?

A   The only one I have reviewed was one that I prompted, and it was not -- and it was not a copyrighted song.

Q   Okay. So that's a good -- that brings me to my next question.

Have you ever used CLAUDE yourself for uses relating to songs or lyrics?

A   Yes, I believe in two instances.

The first was I asked CLAUDE to generate an original work with the structure of "Baa Baa Black Sheep", but about a pig for my son who was, I believe, around two or two and a half at the time.

And CLAUDE produced a song titled "Oink, Oink, Pink Pig."

The second time I asked CLAUDE for something related to music or songs, I described the type of classical music that I had been enjoying listening to recently.

And I had asked CLAUDE for recommendations about other artists who I might not have heard of who could produce music of the type that I was enjoying.

Q   So I'm going to get to those in a minute,

187

but my first question is: How do you know that those are the only two times you have prompted CLAUDE relating to songs or lyrics?

A   I don't definitely know that, but I believe it -- that would have been discussed in a privileged conversation.

Q   Did you search your CLAUDE account for prompts or outputs relating to songs or lyrics?

A   I don't believe I personally did that, no.

Q   Do you know how your CLAUDE account was searched in order to identify songs or lyric-related prompts?

A   I -- I don't know.

Q   So we're showing you what we have marked as Exhibit 174 to your deposition.

(Exhibit 174 was marked for identification and is attached to the transcript.)

Q   (BY ATTORNEY HAILEY) It bears the Bates Number Anthropic 570711.

Do you have it on our screen?

A   I do.

Q   Do you recognize this?

A   I do, yes.

Q   This is the CLAUDE -- well, Ms. Amodei, you tell me what this is, please.

188

A   I believe I asked CLAUDE:

Can you write lyrics about a pig to the children's song of "Baa Baa Black Sheep" for me to sing to my toddler?

Q   So this is a record of a conversation that you had with CLAUDE on November 15, 2024, correct?

A   I -- I don't see a date stamp on here, but I would believe that's right.

Q   And I will represent to you that the metadata that Anthropic -- that your lawyers included when they produced this indicates that this record is November 15, 2024.

A   Yes.

Q   Any reason to doubt that?

A   I -- I don't think so, no.

Q   And the reference to "human" -- and just so we can orient ourselves with this record, the reference to "human," that's, in this case, you, correct?

A   Um-hum.

Q   And the reference to "assistant," that's the CLAUDE.AI model, correct?

A   Correct.

Q   And based on the date, November 15, 2024,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Daniela Amodei

48 (189 to 192)

Conducted on November 12, 2025

---

do you know what CLAUDE model that would have been?

A   I don't off the top of my head.  I would have to check.

Q   And you asked CLAUDE:
Can you write lyrics about a pig to the children's song of "Baa Baa Black Sheep" for me to sing to my toddler --

A   Yes --

Q   -- correct?

A   -- that's correct.

Q   And CLAUDE responded by generating output containing lyrics, correct?

A   Correct.
Would you like me to sing them?

Q   That's okay.  We can --

A   They're very cute.

Q   -- you can save that for a break, if you would like.
Ms. Amodei, you agree that CLAUDE can generate this output with these lyrics because it was trained using training data -- training data that included song lyrics?

ATTORNEY MEHTA:  Objection to the form.

A   I actually don't know for certain, but it's a fair assumption, yes.

Q   (BY ATTORNEY HAILEY) So let's -- we're showing you another CLAUDE -- another exhibit.
(Exhibit 175 was marked for identification and is attached to the transcript.)

Q   (BY ATTORNEY HAILEY) Exhibit 175.  It's a document bearing the Bates Number Anthropic 570714.
Do you recognize this document?

A   Yes.

Q   And what is this?

A   This is a question that I asked CLAUDE, it looks like, trying to identify a song that I heard somewhere.

Q   So this is a record of another conversation you had with CLAUDE, correct?

A   Yes.

Q   And I'll represent to you that the metadata that your lawyers produced with this indicates that this one is from November 22, 2024?

A   I would believe that, sure.

Q   Again, "human" refers to you, and "assistant" refers to CLAUDE, correct?

A   Correct.

Q   And you prompt CLAUDE:
Is there a remix of the song wings by birdy sung by a male singer that's very soulful?  Who is the singer/artist?
Did I read that correctly?

A   Yes.

Q   So you're asking CLAUDE information about an existing song; is that right?

A   It's a song that I heard that I interpreted to be based on that, but I wasn't sure.

Q   So you're asking CLAUDE for information about an existing song that you heard?

ATTORNEY MEHTA:  Objection to the form.

A   I heard a song.  I had a guess about what it was, and I was trying to, it looks like, identify who the singer or artist might be likely because I wanted to stream that song or find a way to listen to that song or learn who the artist was.

Q   (BY ATTORNEY HAILEY) Why didn't you just use Google or another Internet search engine to look that information up?

A   I'm not 100 percent sure of my recollection, but I actually believe I did Google it first.

Q   Do you recall what the Google results were?

A   I believe -- although, again, this over a year ago, so I might be wrong.  I believe I was trying to track down a song that I had heard somewhere.
I described what I thought the lyrics of the song were, but it wasn't by the female artist who wrote it.  I was trying to find the song so I could listen to it.  I used Spotify.
And when I didn't get Google Search results, I asked CLAUDE.

Q   And CLAUDE responds that it's "aware of Birdy's song "Wings."
Do you see that?

A   Yes.

Q   And CLAUDE is aware of that song because it's included somewhere in other -- in CLAUDE's training data, correct?

ATTORNEY MEHTA:  Objection to the form; assumes facts not in evidence; and calls for speculation.

A   I actually don't know.

Q   (BY ATTORNEY HAILEY) So you don't know how CLAUDE is aware of that particular song?

A   No.

Q   You can see that CLAUDE references its

**193**

"knowledge cutoff."

Do you see that?

A   I do.

Q   And that's the date that its training data goes up through, correct?

A   Let me just read this. That would be my best guess, yes.

Q   So CLAUDE is saying that it:

"May not be aware of all remixes or covers of this song from after its training data cutoff," correct?

A   Correct.

Q   So based on that, CLAUDE is aware of that song because the song is included in its training data?

ATTORNEY MEHTA:  Objection, misstates -- I'm sorry.

Assumes facts not in evidence; calls for speculation; asked and answered.

A   I believe I already answered that question by saying "I don't know."

Q   (BY ATTORNEY HAILEY) Okay.  I noticed that you asked CLAUDE the same question twice here.

Do you see that?

**194**

A   Yes.

Q   Why did you do that?

A   I'm not entirely certain, but my best

[REDACTED]

Q   So your testimony is you think that you didn't actually enter the prompt twice? That's an error by CLAUDE?

A   I don't remember, so I'm not certain.

But the fact that it's the exact same question and that it's, like, worded exactly the same way makes my suspect that's what it could have been.

Q   Do you ever repeat prompts to CLAUDE to see if CLAUDE would give you a different answer or a better answer?

A   In general, when I repeat prompts to CLAUDE, if I feel like it didn't quite give the

**195**

right answer or maybe it -- I thought it might know something else, I'll usually change a little bit of the wording or the substance because it will just be more likely to result in another response.

It's possible I asked the exact same question twice. But given the timing, my guess is that it might have been an error, but I don't know.

(Exhibit 176 was marked for identification and is attached to the transcript.)

Q   (BY ATTORNEY HAILEY) I'm showing you what's been marked as Exhibit 176 to your deposition.  This is an Anthropic document with the Bates Number Anthropic 570712.

Do you recognize this document?

ATTORNEY MEHTA:  Can you put it into the chat?  I don't think that has come through yet. Thank you.

A   Yes, I recognize this document.

Q   (BY ATTORNEY HAILEY) This is a record of another conversation you had with CLAUDE, correct?

A   Yes.

Q   And I'll represent to you from the metadata from the production that this one is from October 13, 2024?

A   Yes.

**196**

Q   And the record reflects that you prompted CLAUDE:

What are some classical works I should listen to that are sophisticated, full of feeling, and heartfelt?

Did I read that correctly?

A   Yes.

Q   So you're asking CLAUDE to recommend -- recommend musical works to you; is that right?

A   Correct.

Q   And then CLAUDE responds by recommending a number of different musical works in response to your request?

A   Yes.

Q   So we have seen at least three different instances -- Exhibits 174, 175, and 176 -- in which you entered prompts into CLAUDE relating to songs or lyrics, and CLAUDE responded to those prompts; is that correct?

A   Yes.

Q   Are these typical uses of CLAUDE?

A   I believe these are typical use case, but probably not the most common use cases.

Q   But these -- these are typical use cases?

# Pages 201-204

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Daniela Amodei

51 (201 to 204)

Conducted on November 12, 2025

201

metadata that was produced with this document indicates that the file name is "Daniela Off-Site Talk, Confidential."

Does that refresh your recollection as to what this document is?

A   I believe my recollection of this document is what I already stated.

Q   Okay. So let's turn to Slide 35, please. And you can just -- you can just type the number into the window there. Actually, it might be -- let's see. Yeah, let's start there.

So you see the slide has the caption "Our First Whole-Company Off-Site"?

A   Yes.

Q   And those are pictures of Anthropic employees at this whole-company off-site meeting in mid-2023?

A   I -- yes. Or I'm sorry. I believe -- can you repeat the question?

Q   I misspoke.

If you scroll up, if pause there, you can see based on the timeline this is from -- these are photos from Anthropic's first whole-company off-site that took place in September 2022?

A   Yes. That's correct.

202

Q   Okay. And you can see from the comments that that -- that was just shy of a year ago, which brings us to the second whole -- whole-company off-site?

A   Yes.

Q   Okay. Do you see the bullet at the bottom that lists "My Favorite Memories"?

A   Yes.

Q   The first bullet under "My Favorite Memories" reads:

Catherine singing a song written by CLAUDE accompanied on the ukulele to notes written by CLAUDE about our off-site. It was quite odd harmonizing, but we were proud of CLAUDE?

A   Yes.

Q   Did I read that correctly?

A   Yes.

Q   Who is Catherine?

A   Catherine Wilson.

Q   Is that an Anthropic employees?

A   Yes.

Q   What was her title? Do you remember?

A   Member of technical staff.

203

Q   And is this -- is this one of your favorite memories from the September 2022 company off-site?

A   It was.

Q   And you recall Catherine singing a song written by CLAUDE accompanied on the ukulele and notes write by CLAUDE?

A   I do.

Q   You say that "Catherine sang the song," so she sang the lyrics that CLAUDE had written?

A   She did.

Q   And then she performed that song for the whole company as of September 20 -- 22nd, correct?

A   September of 2022, yes.

Q   And you say that you "were all proud of CLAUDE that it could write a song at this time"?

A   Correct.

Q   And that was one of your favorite memories from this meeting?

ATTORNEY MEHTA:  Objection to the form.

A   Yes, this was a -- this was a part of a sort of fun employee bonding activity that we did together.

Q   (BY ATTORNEY HAILEY) The second bullet refers to someone named "Robin."

204

Who is Robin?

A   Robin Larson.

Q   Is that another Anthropic employees?

A   Yes.

Q   What's Robin's title?

A   I believe at the time it also would have been member of technical staff.

Q   And this bullet says:

Robin also singing some angsty CLAUDE songs. Similarly interesting note choices.

Did I read that correctly?

A   Yes.

Q   So Robin is another Anthropic employee who also used CLAUDE to write multiple songs?

ATTORNEY MEHTA:  Objection to the form.

A   Robin is another Anthropic employee who asked CLAUDE, yes, to draft -- to draft some -- some -- some songs.

Q   (BY ATTORNEY HAILEY) And Robin sang those songs for the whole company at this company off-site?

A   Yes, I believe so.

Q   The third bullet says:

My husband and I performing a

# Pages 225-228

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Daniela Amodei
Conducted on November 12, 2025

57 (225 to 228)

scraping?

ATTORNEY MEHTA: Sorry, Counsel. She was going to say something, and I think you cut her off, so I don't if you had --

Q (BY ATTORNEY HAILEY) Oh, I apologize, Ms. Amodei.

A No problem.

Q I thought you were done.

A No problem.

I'm just asking about a break time. I'm just getting a little fatigued over here.

Q Sure. So since I --

A -- I'm happy to answer.

Q -- let me ask my question --

A Yeah.

Q -- and then we can take a break.

So my question was: Has Anthropic at all times respected robots.txt and similar signals that instruct against scraping?

A I do not know the specifics of our technical work in that area. My understanding is yes, but you would have to talk to one of my technical colleagues, because I don't know.

ATTORNEY HAILEY: Okay. Let's take a break.

A Thank you.

THE VIDEOGRAPHER: We are going off the record at 14:43 p.m.

(A break was taken from 2:43 p.m. to 2:56 p.m.)

THE VIDEOGRAPHER: We are back on the record at 14:56 p.m.

Q (BY ATTORNEY HAILEY) Welcome back, Ms. Amodei. We were talking about Exhibit 177 before the break. Just a couple more questions on that document.

Can you turn to page 12 for me, please?

A Yep.

Q Do you see on the bottom of the page [redacted]

A Let me review. Yep.

Q So in this internal Anthropic document, the first goal Mr. Amodei lists for 2023 is that: [redacted]

Did I read that correctly?

A Yes.

ATTORNEY HAILEY: Okay. You can pull that

down. And let's go back to Exhibit 170, please.

Q (BY ATTORNEY HAILEY) Ms. Amodei, we're pulling back up Exhibit 170, which is the document titled "Brainstorm on What Anthropic Might Release Externally This Year" from July 2021 that Mr. Amodei drafted that we have been discussing.

Do you see that?

A I do.

Q Okay. And you recall -- we have discussed this document a number of times now, correct?

A Can you remind me what the date on this is, please?

Q The date on the metadata that was produced to us by your lawyers indicates that it was last modified on -- on July 13, 2021.

A Okay. Great. Thank you.

Q Can you turn to the top of page 2, please?

Do you see the bullet at the top that begins with the word "Showing"?

A Yes.

Q Mr. Amodei writes:

[redacted]

Did I read that correctly?

ATTORNEY MEHTA: Foundation.

A Yes.

Q (BY ATTORNEY HAILEY) He continues:

[redacted]

Did I read that correctly?

ATTORNEY MEHTA: Same objection.

A Yes.

Q (BY ATTORNEY HAILEY) So in 2021, [redacted]

ATTORNEY MEHTA: Same objection.

A I'm sorry. Is that a question?

Q (BY ATTORNEY HAILEY) Yes.

ATTORNEY MEHTA: Same objection.

A Could you repeat it?

Q (BY ATTORNEY HAILEY) In 2021, Mr. Amodei [redacted]

ATTORNEY MEHTA: Form; foundation.

A I'm not sure what Dario meant, because I didn't write the document. I don't know that I

# Pages 301-304

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Daniela Amodei

76 (301 to 304)

Conducted on November 12, 2025

---

**301**

Q (BY ATTORNEY HAILEY) Okay. And what was your prior response?

A My prior response was I don't remember the exact date or time frame. It was sometime during the course of my time at Anthropic in the past four to five years.

Q Do you know which came first? Do you know whether Anthropic started training on copyrighted materials first or you reached a layperson's belief that training on copyrighted materials was fair use? Which came first?

ATTORNEY MEHTA: Objection, asked and answered.

A I don't know.

Q (BY ATTORNEY HAILEY) So outside of discussions with lawyers, do you have any other basis for your belief that Anthropic's use of copyrighted materials to train CLAUDE is a fair use, other than what we have discussed?

ATTORNEY MEHTA: Objection, asked and answered.

A Nothing other than what we have already been discussing.

Q (BY ATTORNEY HAILEY) And you don't have any written documentation whatsoever to confirm your

---

**302**

layperson's understanding, correct?

ATTORNEY MEHTA: Objection, asked and answered.

A I think I would stand by what I said in my previous answer, which I believe is: I have, like, tens of thousands of emails, documents, exchanges. I cannot think of a particular individual document that would support that layperson's understanding off the top of my head.

Q (BY ATTORNEY HAILEY) What role have you played with respect to training Anthropic's CLAUDE.AI models?

ATTORNEY MEHTA: Objection, asked and answered.

A My job as president of the company is to help hire and manage and help those teams hire and manage individuals -- sorry -- hire and manage the senior leaders of the company who are responsible for a variety of different areas at Anthropic.

For example, overseeing the technical leaders of the company who actually do the day-to-day training of the models on their teams.

Q (BY ATTORNEY HAILEY) So I asked about your role specifically?

A Yes. My role is helping to hire, manage,

---

**303**

and oversee the senior leaders who are responsible for hiring and overseeing the individuals that are training the models or training the models themselves.

Q So you hire and oversee the people who train the models, but you don't have any direct involvement with training the models?

ATTORNEY MEHTA: Objection, asked and answered.

A I don't have a technical background, and so I don't have the requisite skill or ability to be able to do the technical work to train a model like CLAUDE, but it is my job to hire and manage the senior leaders of the company who do -- do that work.

Q (BY ATTORNEY HAILEY) So anthropic selects the datasets that it uses to train its AI models; is that correct?

ATTORNEY MEHTA: Objection to the form; asked and answered; foundation.

A I think what you might be asking is: Does Anthropic select datasets that go into the training of the CLAUDE models; is that right?

Q (BY ATTORNEY HAILEY) Yes.

ATTORNEY MEHTA: Same objections.

---

**304**

A Yes, I think if you had questions about whether those datasets were, my colleagues -- my technical colleagues -- Jared Kaplan, Ben Mann, Vinay Rao, potentially others -- would be able to answer those.

Q (BY ATTORNEY HAILEY) So I think my question was a little bit different.

And it's just: In a more general sense, it's Anthropic that makes the decision about what data it's going to use to train its AI models?

ATTORNEY MEHTA: Same objections.

A Yes. I think so, yes.

Q (BY ATTORNEY HAILEY) And what considerations does Anthropic take into account when identifying and selecting the training data that it uses?

ATTORNEY MEHTA: Objection, form; foundation.

A I don't know the specifics of that just because it's not in my purview to do that work directly.

But I think if you asked one of my colleagues -- for example, Jared Kaplan, Ben Mann, or other technically leaders -- they might be able to answer that with -- with higher fidelity than me.

---