# Exhibit 14



**Planet Depos**
*We Make It Happen*™

## HIGHLY CONFIDENTIAL
## ATTORNEYS' EYES ONLY

# Transcript of Thomas B. Brown, Jr.

**Date:** January 26, 2026
**Case:** Concord Music Group -v- Anthropic

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

**Page 1**

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

---------------------------------

CONCORD MUSIC GROUP, INC., ET AL., )
                                   )
                                   )
                                   )
         Plaintiffs,               )
    v.                             ) Case Number
                                   ) 5:24-cv-03811-EKL
                                   ) SVK
ANTHROPIC PBC,                     )
                                   )
                                   )
         Defendant.                )
---------------------------------)

HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY

VIDEOCONFERENCED and VIDEO-RECORDED

30(b)(1) DEPOSITION OF

THOMAS B. BROWN, JR.

San Francisco, California 94111

Monday, January 26, 2026

Reported Stenographically by:
MARY J. GOFF
CSR No. 13427
WA CSR No. 21030779
Job No. 616917
PAGES 1-355

**Page 2**

HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY

VIDEOCONFERENCED and VIDEO-RECORDED

30(b)(1) DEPOSITION of

THOMAS B. BROWN, JR., Volume I, taken on behalf of

Plaintiff Music Publishers, Oppenheim   Zebrak, LLP,

at WilmerHale, 50 California Street, Suite 3600,

San Francisco, California 94111, beginning at

9:18 a.m. and ending at 6:01 p.m., on Monday,

January 26, 2026, before MARY J. GOFF, California

Certified Shorthand Reporter No. 13427 and WA CSR

No. 21030779.

**Page 3**

APPEARANCES:

For Plaintiffs Concord Music Group, et al.

    Oppenheim   Zebrak, LLP

    BY:  NICHOLAS C. HAILEY

        BRET MATERA (remote)

    Attorneys at Law

    4530 Wisconsin Avenue, NW

    5th Floor

    Washington, DC 20016

    202-480-2999

    nick@oandzlaw.com

    bmatera@oandzlaw.com

For Defendant Anthropic PBC

    WilmerHale

    BY:  SONAL MEHTA

        ELLEN STEPHANO (remote Boston)

    Attorneys at Law

    2600 El Camino Real

    Suite 400

    Palo Alto, California 94306

    sonal.mehta@wilmerhale.com

    628-235-1026

ALSO PRESENT:  Natalie Naugle, in-house counsel Anthropic
Videographer:  Philip Astor

**Page 4**

INDEX

WITNESS                                    EXAMINATION

THOMAS B. BROWN, JR.

Volume I

                ATTORNEY HAILEY            8
                ATTORNEY MEHTA            --

NUMBER          DESCRIPTION               PAGE

Exhibit 259  Plaintiffs' Notice of Deposition    10
             to Tom Brown Pursuant to Federal
             Rule of Civil Procedure 30(b)(1)

Exhibit 260  Tom Brown's LinkedIn Profile    11

Exhibit 261  Tom Brown X post                27
             Listening to this singing

Exhibit 262  Jukebox                         30

Exhibit 263  9-9-2023 email from Tehal       73
             Anthropic_0000011373

Exhibit 264  Anthropic Overview              73
             Sept 2023
             Anthropic_0000011376-406

Exhibit 265  HIPI                            88
             Anthropic_0000216904-909

Exhibit 266  Tom Brown Spotify Account       101

# Pages 45-48

**45**

continue to develop the models.

Q   Do you agree that AI models such as CLAUDE have the potential to make human labor obsolete?

ATTORNEY MEHTA:  Form.

A   Again, I think I'm -- I'm not the economist, so yeah, I think I don't have -- I don't have an expert opinion on that.

Q   (BY ATTORNEY HAILEY) You don't have a view one way or the other as to whether AI models have a potential to make human labor obsolete?

ATTORNEY MEHTA:  Form.

A   Yeah, I think -- again, I think that it really depends on how we act as a society.  I think that obsolete seems probably extreme, but I do expect that AIs will continue to get better at a larger and larger fraction of tasks.

Q   (BY ATTORNEY HAILEY) And AI models such as CLAUDE have the potential to lead to mass job displacement --

ATTORNEY MEHTA:  Objection --

Q   (BY ATTORNEY HAILEY) -- is that correct?

ATTORNEY MEHTA:  -- objection to the form.

A   I would say, yeah, again, the -- it seems like with -- in the same way that many large technologies or the Industrial Revolution has

**46**

resulted in job displacement for people, I think LLMs are likely to do a similar thing, and that's something that we have publicly talked about.

Q   (BY ATTORNEY HAILEY) And that includes displacing jobs in the music industry; is that right?

ATTORNEY MEHTA:  Objection to the form.

A   I haven't thought about the -- that particular area in particular.  Again, it seems like something like -- the Industrial Revolution had a large positive effect for the world overall, but had many displacement effects in various different industries as it -- as it occurred.

Q   (BY ATTORNEY HAILEY) AI models such as CLAUDE have the potential to displace the jobs of human songwriters?  Do you agree?

ATTORNEY MEHTA:  Objection to the form. Asked and answered.

A   I -- I can say the same thing again, if that's useful for you.

Q   (BY ATTORNEY HAILEY) I would like you to answer the question, please, sir.

A   Okay.  I think --

ATTORNEY MEHTA:  Same objections.

A   -- I think, again, as -- as with the

**47**

Industrial Revolution, which was -- I think all of us would agree would be -- was beneficial for humanity looking back on it, but also had induced a lot of job displacement throughout many different industries, it seems likely to me that we'll see the same thing with AI.

Again, I'm not an economist, though, so this is just my speculation.

Q   (BY ATTORNEY HAILEY) But you're a founder of Anthropic and one of the senior executives at the company, right?

ATTORNEY MEHTA:  Form.

A   That's correct.

Q   (BY ATTORNEY HAILEY) And as part of your work, I imagine you have spent a lot of time thinking about the risks of the technology that you're developing, correct?

ATTORNEY MEHTA:  Form.

A   Some of my time.  I trust -- I trust the rest of our team a lot for that.  And I read what they write, but that's not my area of expertise.

Q   (BY ATTORNEY HAILEY) What does it mean to be the chief compute officer of Anthropic?

A   My teams are responsible for making sure that we have the right amount of usable compute to

**48**

stay on the frontier of model capabilities.

Q   Does that mean having the right amount of usable compute to keep up with your competitors in the AI industry?

A   That's -- that's one aspect of what informs what the right amount is.

Q   And who are your competitors in the AI industry?

Q   And it's important that you keep up -- it's -- strike that.

It's important to Anthropic's business

ATTORNEY MEHTA:  Objection to the form.

A   Yeah, I think that we want CLAUDE to be the best model for people who want to do work, particularly coding work.  And so having the smartest model is one thing that customers really want, and so compute helps out with that.

Q   (BY ATTORNEY HAILEY) Is it important to Anthropic's business that you keep up with your

ATTORNEY MEHTA:  Objection, asked and

# Pages 109-112

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Thomas B. Brown, Jr.
Conducted on January 26, 2026

28 (109 to 112)

**109**

counterfactually would have, like, gone to hire coaches.

Q   (BY ATTORNEY HAILEY) So you used the word "coaching" a lot in that response.

What do you mean by "coaching"?

A   Like asking the model if -- like, if I'm trying to write a song, like, I don't know -- yeah, like: What are the patterns that various, like, artists will use?  Like, what are the different rhyming schemes that exist?

Or asking for feedback on something that I'm trying to write.

Q   You agree that CLAUDE can just generate lyrics when prompted to --

ATTORNEY MEHTA:  Form.

Q   (BY ATTORNEY HAILEY) -- correct?

A   CLAUDE -- CLAUDE -- yeah, CLAUDE can -- CLAUDE can write its own songs.

Q   And how is CLAUDE capable of writing -- of generating AI-generated song lyrics?

ATTORNEY MEHTA:  Form.

A   I think we -- I think we don't know how CLAUDE is able to write song lyrics in the same way that we don't really know how humans are able to, like, create new song lyrics.

**110**

Q   (BY ATTORNEY HAILEY) If CLAUDE was trained on computer code alone, could it generate song lyrics?

ATTORNEY MEHTA:  Form.

A   I think if you trained it on enough computer code alone, it would be able to generate song lyrics.

Q   (BY ATTORNEY HAILEY) What's that based on?

A   This is my speculation.  I don't know.

Q   Do you have any idea how many people have asked for CLAUDE for help in writing song lyrics, Mr. Brown?

ATTORNEY MEHTA:  Form.

A   I don't know.

Q   (BY ATTORNEY HAILEY) Do you have any idea how many people have prompted CLAUDE to simply write song lyrics?

ATTORNEY MEHTA:  Form.

A   I also don't know.

Q   (BY ATTORNEY HAILEY) Have you ever downloaded music from the Internet, Mr. Brown?

ATTORNEY MEHTA:  You can answer that question.  There's a court order, so you can answer that "Yes" or "No," and then we'll see if there's follow-up questions, which might be inappropriate.

**111**

A   Yes.

ATTORNEY HAILEY:  And I will object to the instruction, which is improper.

Q   (BY ATTORNEY HAILEY) Why did you download music, Mr. Brown?

ATTORNEY MEHTA:  Again, you can answer that as phrased.

A   I think I -- yeah, I downloaded music as a kid to get access to music that I wanted to listen to.

Q   (BY ATTORNEY HAILEY) Did you pay for the music that you downloaded?

ATTORNEY MEHTA:  I'm going to instruct the witness not to answer.  That question violates the court's order.

ATTORNEY HAILEY:  So that's misstating and misreading the court's order.  And it's improper to instruct the witness not to answer.  It's inconsistent with the order.

So if the witness does not answer the question, we will keep this deposition open so that we can get an answer to that question.

Q   (BY ATTORNEY HAILEY) So that we have a clear record, I will ask the question again.

Mr. Brown, when you downloaded music as a

**112**

kid, did you pay for the music that you downloaded?

ATTORNEY MEHTA:  I instruct the witness not to answer on the basis of the court's order.

(Instruction not to answer.)

A   I'm not going to answer.

Q   (BY ATTORNEY HAILEY) When did you -- when have you downloaded music from the Internet, Mr. Brown?

ATTORNEY MEHTA:  Objection, asked and answered.  You can answer the --

A   I --

ATTORNEY MEHTA:  -- specific wording of that question.

A   -- when I was a kid.

Q   (BY ATTORNEY HAILEY) Can you give me any more specificity than that?

A   The early 2000s.

Q   What music did you download in the early 2000s?

ATTORNEY MEHTA:  Again --

A   I --

ATTORNEY MEHTA:  -- the same caution.

You can answer it as phrased.

A   -- yeah, I don't -- I don't recall.  I don't really remember.

# Pages 129-132

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Thomas B. Brown, Jr.
Conducted on January 26, 2026
33 (129 to 132)

129

ATTORNEY MEHTA: Objection, form. Asked and answered a half a dozen times at this point.

A   I asked CLAUDE to coach me on writing my own songs.

Q   (BY ATTORNEY HAILEY) Has CLAUDE ever generated output copying song lyrics in response to one of your prompts even when you didn't ask it to?

A   Never, like, outputting, like, a whole song. I think sometimes it's given me, like, little snippets to, like, illustrate a point.

Q   What -- what examples are you thinking of?

A   I think -- I forget how long ago, but I was asking about, like -- like: How does -- I think I was asking about, like: How does, like Adele write her songs and, like, what form they might have?

And it gave me like some A, A, B, B examples. And so that would be a thing where like in order to illustrate, like, the A, A, B, B examples, I think it probably used, like, a little snippet of one song.

Q   So you prompted CLAUDE regarding how Adele writes her songs, and in response CLAUDE generated output, copying a verbatim snippet of Adele's song; is that correct?

130

ATTORNEY MEHTA: Objection, form; misstates testimony.

A   Yeah, I think that's not -- that's not quite right. I was asking for coaching on like: If my wife likes this artist, like, what is some style that they use?

And then it was like: Oh -- like, an example would be like: An A, A, B, B style. And then, like, gave, like: Here is something that modified it with like a little "A." Here is another part modified with an "A." Here is a third line modified with a "B." Here is a fourth line modified with a "B."

And then I could look through the, like, A, A, B, B example in order to get an understanding of what it was talking about.

Q   And that output included verbatim copying of a snippet of Adele's lyrics?

ATTORNEY MEHTA: Objection to the form. Misstates the testimony; asked and answered.

A   I think it wasn't verbatim, because it had the A, A, B, B example, which was the main thing that it was trying to describe to me.

Q   (BY ATTORNEY HAILEY) But apart from having A -- the Letters A, A, B, B, CLAUDE generated output

131

verbatim copying that portion of Adele's lyrics?

ATTORNEY MEHTA: Objection to the form. Misstates the testimony; asked and answered.

A   Again, that -- that doesn't seem like that's verbatim. It was the lines and then modified in order to give me an example of what an A, A, B, B format would look like.

Q   (BY ATTORNEY HAILEY) So we have discussed, Mr. Brown, that you don't believe that Anthropic's CLAUDE models should regurgitate their training data as output; is that right?

ATTORNEY MEHTA: Objection, asked and answered.

A   I think to the degree that it's possible, we want to avoid having the models regurgitate their information, and that's why we put in place many different layers of safeguards to prevent that.

Q   (BY ATTORNEY HAILEY) Is it your testimony that it's not possible to completely prevent regurgitation of training data as output?

ATTORNEY MEHTA: Objection, form; speculation.

A   I think that there's a -- I think that there's interesting -- or I think that there's -- it is not always clear what is something that is, like,

132

regurgitation versus something that is, like, a new transformative use, and so I think we try our best to get that correct all the time.

And like, I think a correct example would be like the example I gave you where it's trying to teach me about a certain songwriting style in the context of a certain artist, and so it gives me a couple different little lines annotated A, A, B, B.

My guess is -- my hope is that we always get it 100 percent right. It's not my area of expertise, so I don't know if it -- it always is 100 percent accurate.

Q   (BY ATTORNEY HAILEY) You're not an expert in intellectual property law, correct, Mr. Brown?

A   That -- that is correct. I'm not an --

Q   You --

A   -- expert.

Q   -- don't know the law under copyright as to what qualifies as a transformative use, correct?

ATTORNEY MEHTA: I'm going to caution you not to disclose advice of counsel. If you have opinions on that that are independent of any advice of counsel, you -- you can share those. You can answer those.

A   Yeah, I'm not an expert in that, so this

# Pages 149-152

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Thomas B. Brown, Jr.
Conducted on January 26, 2026

38 (149 to 152)

149

like, see publicly available information about artists, and that includes like a large amount of other information besides lyrics.

Q (BY ATTORNEY HAILEY) CLAUDE is -- this CLAUDE output is discussing Adele and Japanese House's lyrics specifically?

A Yeah.

Q It's your testimony that CLAUDE generated this output without ever -- without ever having seen the lyrics for these artists; is that your testimony?

ATTORNEY MEHTA: Objection to the form.

A No, that's not what I'm saying. I'm just saying that if it had never had access to the lyrics, it still would be able to know that they have an emotional, introspective style, because that's something that people talk about a lot on the Internet.

Q (BY ATTORNEY HAILEY) So you're saying that CLAUDE generated this output because it was either -- strike that.

Fair to say that CLAUDE generated this output because it was either trained on the lyrics or trained on humans writing about the lyrics on the Internet?

150

ATTORNEY MEHTA: Form.

A I think I don't know, but that -- that would be my most likely guess.

Q (BY ATTORNEY HAILEY) If CLAUDE was trained solely on computer code, for instance, it would not be able to generate this specific output about Adele and the Japanese House and the style of their lyrics? Would you agree to that?

ATTORNEY MEHTA: Form.

A I don't know. I think that would be an interesting exercise. I think it's possible that the model would be able to pick up enough information from a wide enough breadth of computer code to still draw these inferences, but I'm not sure.

Q (BY ATTORNEY HAILEY) Can you explain to me how the model would under -- would take computer code and turn that into output regarding the lyrical styles of Adele and Japanese House?

A I think -- so again, this one, I don't know. And I think -- and I think probably I would say probably not, but I think it's possible that if you had enough computer code, it would include computer code that's related to music production or the music industry or like fans of various artists,

151

et cetera, that would give it the requisite information that it would need there.

Q Can you turn to the second page of this exhibit? Do you see your prompt at the top where you -- where you ask CLAUDE:

A I see that.

Q CLAUDE responds:

Did I read that correctly?

A You read that correctly.

Q And CLAUDE is -- CLAUDE is able to generate that response discussing Adele's lyrics and the style of those lyrics because it was either trained on the lyrics themselves or human discussions of those lyrics?

A That's not obvious to me, but I think that's likely -- that's likely correct.

Q And then you can see that CLAUDE generates

152

output that copies the lyrics to two Adele songs, "Someone Like You" and "Hello."

ATTORNEY MEHTA: Objection to the form.

Q (BY ATTORNEY HAILEY) Do you see that?

A Yeah, I don't think it was copying them. I think it was giving examples of the rhyming schemes that Adele uses.

Q CLAUDE is generating output with the lyrics to the song "Someone Like You" and "Hello," correct?

ATTORNEY MEHTA: Form; asked and answered.

A Again, I think that CLAUDE is coaching me here by giving examples of the rhyming schema.

Q (BY ATTORNEY HAILEY) Is it -- is it your testimony that those are not the lyrics to Adele's songs "Someone Like You" and "Hello"?

ATTORNEY MEHTA: Form.

A Again, I think that CLAUDE is giving me examples of the rhyming schemes in -- in response to my question about the -- the rhyming schemes.

Q (BY ATTORNEY HAILEY) Well, it's not only the rhyming schemes, right, Mr. Brown? It's the lyrics to the songs "Someone Like You" and "Hello," right?

ATTORNEY MEHTA: Form.

# Pages 205-212

Case 5:24-cv-03811-EKL   Document 595-14   Filed 03/23/26   Page 13 of 20

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Thomas B. Brown, Jr.
Conducted on January 26, 2026                    52 (205 to 208)

205

ATTORNEY MEHTA: Asked and answered; argumentative.

A   That's my guess. Again, I'm not tracking that.

ATTORNEY MEHTA: Asked and answered; argumentative.

A   I don't know. I would just be speculating. It's not something I'm tracking.

Q   (BY ATTORNEY HAILEY) Mr. Brown, do you recall testing CLAUDE by prompting the model prior to launching the model to the public?

A   Yes, I vaguely remember us having a little Slack channel to test that early on.

Q   And when you say "us," you're referring to you and your colleagues at Anthropic?

A   That's right.

Q   Why did you test CLAUDE internally prior to launching it to the public?

A   I think we wanted to make sure that when we released it, it was safe for folks to use.

206

Q   Was one of the reasons you tested CLAUDE, to test its capabilities to respond to certain types of prompts?

A   Yeah. Yeah, we definitely wanted to test its responses to many different types of prompts.

Q   You wanted to confirm that it could respond to certain prompts?

A   That was one thing that we certainly cared about. And I think we wanted to test the quality. We also wanted to test the guardrails that we were putting in place even early on.

Q   So another one of the reasons you wanted to test for harmful or undesired outputs, correct?

A   That's right.

Q   Did you test, prior to launching CLAUDE to the public, its capability to regurgitate or output copyrighted content?

ATTORNEY MEHTA: Objection to the form.

A   I think I wasn't responsible for that testing, but I believe that people did do that testing.

Q   (BY ATTORNEY HAILEY) Who did that testing?

A   I don't remember.

Q   And it's your testimony that you weren't involved in that testing -- in that testing?

207

A   I don't -- yeah, I think I was not.

Q   Do you recall doing a CLAUDE demo with your family prior to releasing the model to the public in early 2023?

A   Vaguely.

Q   Why did you do that demo?

A   I think I, like, wanted them to have a chance to -- to try it out, and I thought that that could be -- that could be fun and interesting.

Q   To show the model's capabilities to respond to certain texts and prompts?

A   Yeah. And then I remember them not being very impressed with it at that time, unfortunately.

Q   And when you say "they," who are you referring to?

A   My dad, who I think I was showing it to on my phone; and then my sister-in-law, who I think was in the Slack channel.

Q   What's your sister-in-law's name?

A   Charlotte. She's a doctor in the UK.

Q   I'm showing you what I have marked as Exhibit 274 to your deposition.

(Exhibit 274 was marked for identification and is attached to the transcript.)

Q   (BY ATTORNEY HAILEY) It's a document

208

produced by Anthropic, bearing the Bates Number ANTHROPIC 16458.

A   Yep, I see this.

Q   Do you recognize this document?

A   Very vaguely.

Q   And what is this?

A   I think that this is a conversation with the CLAUDE Slack bot early prototype, but it looks like it's missing CLAUDE's responses.

Q   And I will represent to you that this is the way this was produced to us by Anthropic as part of this litigation. We have not revoked the responses from this record.

So these Slack messages are all dated February 5, 2023, correct?

A   Yes.

Q   And that's about a month before CLAUDE was first released to the public, correct?

A   That's right.

Q   And the username at the top of the page "NotTomBrown," that's you, correct?

A   That's me.

Q   And then I believe you just testified that the user referred to as "Charlotte" is your sister-in-law, correct?

209

A   That's right.

Q   And I think -- well, just to confirm, you recall that Anthropic deployed a version of CLAUDE in Slack for the company to test prior to launching CLAUDE to the public, correct?

A   That's right.

Q   And this record here is you and your sister-in-law, Charlotte, prompting CLAUDE in Slack prior to releasing the model to the public?

ATTORNEY MEHTA:  Form.

A   I think, yeah, this is -- this is me playing around with my family like seeing what stuff the model could or could not do.

Q   (BY ATTORNEY HAILEY) So do you know why the CLAUDE responses are not reflected in this record?

A   I don't know.

Q   You recall that when you prompted CLAUDE in February 2023, CLAUDE did respond to these prompts, correct?

A   Yes, it did respond.  I think it -- I think it refused the lyrics to the "Desolation Row" one because I remember that was a question my dad asked.  And then I think he was not impressed with -- with CLAUDE at the time.

210

Q   So let me -- let's -- before we get ahead of ourselves, let's -- let's start with -- the first entry on this record is from you, February 5, 2023, at 12:40 p.m., correct?

A   So this was, I think, me sitting with my dad and him asking me -- I was him:  Like, what are some questions to -- like, to try out for the model?  And he suggested this one, the, like, "Desolation Row" by Dylan thing.
And then I think CLAUDE refused, which is why we then asked these other questions.

Q   Is your dad a Bob Dylan fan?

A   He is.

Q   Do you know why he picked the lyrics to Desolation Row" in particular?

A   I have no idea.

[redacted]

A   Yeah, my dad was curious about this question, asked it, in addition to many other questions as well.

Q   And CLAUDE's response to that prompt is not reflected in this record that Anthropic has

211

produced, correct?

ATTORNEY MEHTA:  Form.

A   That's what it looks like.  It looks like -- it looks like we don't have any of the responses from CLAUDE here.

Q   (BY ATTORNEY HAILEY) What is your recollection as to what CLAUDE responded to that prompt?

A   I think CLAUDE refused to answer that, and my dad was a little bit frustrated.

[redacted]

A   I don't -- I don't remember exactly what it responded with.  I think it responded with some sort of refusal.

Q   But you're not sure?

A   I'm not 100 percent sure.  I think -- the thing I definitely remember is my dad, like, thinking that CLAUDE was not very good.

Q   It's possible that CLAUDE responded with some lyrics to the song or hallucinated lyrics or some other response that caused your dad to not be very impressed?

ATTORNEY MEHTA:  Objection, form; asked

212

and answered; misstates the testimony.

A   I think that's possible.  I'm -- to be honest, I'm not 100 percent, but I -- I think -- I think it refused.

Q   (BY ATTORNEY HAILEY) And when you say "refused," are you referring to a refusal, a guardrail response, or something else?

A   I don't remember.  I think it would be either -- either one of those.  So it would be either the model saying "I can't help you with that" or saying "I can't help you with that" in a slightly more human-like way.

Q   But again, you don't remember for sure what the model responded or whether it responded?

ATTORNEY MEHTA:  Form.

A   I don't -- I don't -- I don't really remember clearly, because there were a lot -- a lot of things that I was talking with CLAUDE about at that time.

Q   (BY ATTORNEY HAILEY) And there's no way for us tell for sure because we don't have a record of the response, right?

ATTORNEY MEHTA:  Objection to the form.

A   Yeah, I think -- I think definitely it -- it -- it looks like we don't have all of the -- all

Case 5:24-cv-03811-EKL    Document 595-14    Filed 03/23/26    Page 15 of 20

# Pages 241-244

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Thomas B. Brown, Jr.
Conducted on January 26, 2026

61 (241 to 244)

call like one-shotting code where the model can write a fully functional piece of software without having to iterate on it many times, whereas humans in general can't do that in a single improvised session.

Q (BY ATTORNEY HAILEY) So the example you

I think like improvised, fully functional software would be another example that I probably had in my head here, but didn't write down.

Q (BY ATTORNEY HAILEY) And there are many other examples of tasks in which CLAUDE can perform better than the best human? Would you agree to that?

ATTORNEY MEHTA: Form.

A Yeah, I think there's -- there's many places where CLAUDE and other large language models are superhuman.

Q (BY ATTORNEY HAILEY) What types of writing tasks is CLAUDE superhuman at, to use your words?

ATTORNEY MEHTA: Objection to the form.

A I think like things that need to be very complex and are improvised seems to be some examples.

So like, improvised, rhyming acrostic poetry is one. Improvised code that needs to work on the first time is another that has ended up being much more relevant to the work that we do now.

Q (BY ATTORNEY HAILEY) Can CLAUDE generate text output at superhuman speed?

ATTORNEY MEHTA: Objection to the form.

A CLAUDE writes faster than a human. I think that -- that hasn't ended up being the most important thing, but that is -- that is something that CLAUDE can do.

Q (BY ATTORNEY HAILEY) We talked a moment ago about how CLAUDE can read ten thousand words a minute.

How fast can CLAUDE generate text?

ATTORNEY MEHTA: Objection to the form. Assumes facts not in evidence; calls for speculation; and misstates the testimony.

A I think different models can write at different speeds. I think most -- most models can write faster than a person can read.

Q (BY ATTORNEY HAILEY) How -- do you know -- the current models, how fast can they generate -- how many words can they generate a minute?

A I think it's probably somewhere around 60 to a hundred words per minute, but I don't know off the top of my head. Or sorry. 60 to a hundred words per second. So 60 times faster than that per minute.

Q Okay. So just so we have a clear transcript, current CLAUDE models can generate approximately 60 to a hundred words per second, correct?

A Yeah. So maybe call it -- call it between 30 and a hundred. I think it depends on what model it is.

Q And CLAUDE's writing ability isn't limited to the specific example you identified here,

ATTORNEY MEHTA: Form.

A Sorry. You're asking if CLAUDE can do more than just improvised, rhyming acrostic poetry?

Q (BY ATTORNEY HAILEY) Yes.

A Yes. Yeah, CLAUDE do more than -- than just that.

Q CLAUDE can generate poems and CLAUDE can generate song lyrics, correct?

ATTORNEY MEHTA: Objection to the form.

A Yeah, CLAUDE -- CLAUDE can do many other things. I think the things that we have focused on the most have really been CLAUDE doing, like, productive knowledge work that, like, a person in a -- like a company might do. Like software engineering is the canonical example.

Q (BY ATTORNEY HAILEY) You used the term "superhuman" earlier.

What did you mean by that?

A By "superhuman," I meant in the same way -- in this text I say "better than the best human in their training distribution."

Like, I think that if you had CLAUDE try to -- if you had a very good person at writing improvised, rhyming acrostic poetry, I think that CLAUDE would be able to more reliably write those poems than a very good person.

Q Is CLAUDE superhuman at writing song lyrics?

ATTORNEY MEHTA: Objection to the form; calls for speculation.

A I don't know.

Q (BY ATTORNEY HAILEY) CLAUDE can certainly

# Pages 305-308

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Thomas B. Brown, Jr.
Conducted on January 26, 2026



305

ATTORNEY MEHTA:  Counsel, do you have the underlying document?

ATTORNEY HAILEY:  Counsel, I would ask that you not interrupt.

ATTORNEY MEHTA:  I'm asking you a question.

ATTORNEY HAILEY:  This document has not been produced to us, as far as I know, so I'm asking about the document in front of me, and I --

ATTORNEY MEHTA:  That's fine.  I'm --

ATTORNEY HAILEY:  -- ask that you please stop interrupting.

ATTORNEY MEHTA:  -- I'm asking my question.  You have answered it.  Move on with your questions.

A   I am not sure.

Q   (BY ATTORNEY HAILEY) You write:

Do you see that?

A   I see that.

306

Q   What did you mean by that?

ATTORNEY MEHTA:  Objection, foundation.

A   It seems -- so I don't -- I don't really remember this.  It seems like Ben had a document,

Q   (BY ATTORNEY HAILEY) And you can see from the face of this document that the document you're

ATTORNEY MEHTA:  Objection to the form.  Asked and answered; foundation.

A   That -- that's how I would interpret this.

307

ATTORNEY MEHTA:  Objection, form.

A   I think I didn't know.  Again, this just me kind of doing a driveby on a thing that wasn't my area of expertise.

Q   (BY ATTORNEY HAILEY) In the comment that you made in this document shared with Mr. Mann, you

Q   (BY ATTORNEY HAILEY) You're offering your view, correct, as a senior executive at Anthropic?

ATTORNEY MEHTA:  Is that a question?

308

ATTORNEY HAILEY:  Yes.

ATTORNEY MEHTA:  Objection to the form.

A   Sorry.  What was the -- can you repeat the question?

Q   (BY ATTORNEY HAILEY) You're sharing your view with Mr. Mann as a senior executive at Anthropic?

ATTORNEY MEHTA:  Objection to the form.  Asked and answered; misstates the testimony.

A   I think I was sharing it more as like a, like, driveby commenter.

ATTORNEY MEHTA:  Objection, asked and answered; misstates the prior testimony; form.

A   I think I didn't know, and so I was giving kind of a driveby -- like sharing a driveby preference.

Q   (BY ATTORNEY HAILEY) What was the basis for this driveby preference?

A   I think it was not -- yeah, I think it was not very, like, well informed at all.

Q   Sitting here today, do you believe that

# Pages 345-348

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Thomas B. Brown, Jr.
Conducted on January 26, 2026

87 (345 to 348)

345

ATTORNEY HAILEY: The court order relates to Anthropic. I'm asking about what Mr. Brown did to the 2000s, 20 years before Anthropic even existed, Counsel.

ATTORNEY MEHTA: The court found that torrenting was irrelevant to this case and now you're trying to ask the witness about what he did when he was 13 years old, which could not be more irrelevant.

I'm instructing on that question because you won't carve out torrenting. If you want to ask the question by carving it out, I'll allow him to answer.

ATTORNEY HAILEY: I'm going to seek additional time given all these interruptions, Counsel.

ATTORNEY MEHTA: On the basis that you -- that I won't let him answer about what he did when he was 13 in violation of the court order? That's what you want additional time on?

Q (BY ATTORNEY HAILEY) Mr. Brown, do you know what torrenting is? Strike that.

ATTORNEY MEHTA: Glad you thought that over that, Nick.

ATTORNEY HAILEY: I'm glad that you think

346

this is funny, Counsel.

ATTORNEY MEHTA: I think --

ATTORNEY HAILEY: -- because I believe that this is anything but funny. Downloading music illegally without paying for it is anything but a laughing matter so...

ATTORNEY MEHTA: -- I think it's funny that what you did right there was intentionally run headlong into the court order, and I'm glad you thought better of it.

ATTORNEY HAILEY: Please don't speculate at -- or claim that you know what I'm intending to do. I'm trying to ask questions consistent with the court order, which is the opposite of what you are trying to do.

So please stop interrupting me. Let me complete my question.

ATTORNEY MEHTA: No, Counsel. I'm giving instructions to enforce the court order. And I told you could ask a question that carves out torrenting and you can get your question to your question.

Q (BY ATTORNEY HAILEY) Mr. Brown, you have testified that you have downloaded music without paying for it, correct?

ATTORNEY MEHTA: Objection, misstates the

347

testimony; asked and answered.

A I think as a -- as a kid I both bought music and got music without paying for it.

Q (BY ATTORNEY HAILEY) How much music did you download without paying for it?

A I don't remember.

Q Hundreds of songs?

A Probably.

Q Thousands of songs?

A Probably not.

Q Of the hundreds of songs that you downloaded without paying for it, did you download any of those from nontorrenting sites?

ATTORNEY MEHTA: Objection to the form. You can answer that.

A Yeah, I don't remember.

Q (BY ATTORNEY HAILEY) Let's go back to the risks of the AI technology that your company is developing.

We have talked about the risks of mass job displacement from the AI technology that your company is developing, correct?

A We have discussed that.

Q What are the other risks of the AI technology that your company is developing?

348

ATTORNEY MEHTA: Objection, asked and answered multiple times.

A Yeah, I think that I expect AI to have, like, tremendous potential for benefits similar to something like the Industrial Revolution.

I think also it has the potential for great harms with not only our ones that -- like the -- kind of the job displacement that we saw in the Industrial Revolution, but also kind of, I think, potential issues for misuse and for, like, misaligned AI causing trouble itself.

Q (BY ATTORNEY HAILEY) Let me be crystal clear. I'm not asking about any of the benefits of AI. I'm asking specifically about the risks of AI.

Those risks include bias and discrimination, correct?

ATTORNEY MEHTA: Objection to the form. Asked and answered.

A Yeah, I think that bias and discrimination is another potential downside, especially if they were, like -- like more than what we see already in society.

Q (BY ATTORNEY HAILEY) The risks of the AI technology that your company is developing includes cybersecurity threats, correct?