[Counsel on signature page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

|  |  |
|---|---|
| CONCORD MUSIC GROUP, INC., ET AL., <br><br> Plaintiffs, <br><br> vs. <br><br> ANTHROPIC PBC, <br><br> Defendant. | Case No. 5:24-cv-03811-EKL-SVK <br><br> **JOINT DISCOVERY DISPUTE STATEMENT REGARDING ANTHROPIC'S REQUEST FOR DEPOSITION OF PLAINTIFF'S EXPERT MICHAEL SMITH** <br><br> Judge Eumi K. Lee <br> Magistrate Judge Susan van Keulen |

Pursuant to Section 8 of the Court's Civil Standing Order, and L.R. 37-1 and 37-2, the Parties respectfully submit this Joint Discovery Dispute Statement to seek the Court's intervention in resolving a dispute regarding Anthropic's request to re-depose Publishers' expert witness Dr. Michael Smith. Counsel for the Parties with authority to negotiate and compromise met and conferred to try to resolve this dispute via videoconference on March 17, 2026 and March 24, 2026, and by email. However, the Parties have been unable to reach agreement on the issues below. Fact discovery closed on November 12, 2025 (ECF 467), expert discovery closed on March 9, 2026, *Daubert* briefs are due March 31, 2026, and trial is set for January 25, 2027. ECF Nos. 467, 587. Publishers served a Second Supplement to the December 19, 2025 Expert Opinion of Michael Smith on March 9, 2026 ("Second Supplement") and produced additional documents on February 16 and 27 and March 16, 17, and 20, 2026. Anthropic respectfully requests the Court compel Publishers to make Smith available for another 3-hour deposition and, if granted, extend the time for Anthropic to file any *Daubert* motion related to Smith's opinions to 7-days following the deposition. As the deadline for *Daubert* motions is March 31, 2026, Anthropic respectfully requests the Court issue its ruling prior to that date. Publishers respectfully request that Anthropic's request be denied in its entirety but that, to the extent Anthropic is permitted to re-depose Dr. Smith, it should be limited to thirty minutes and only to the material in the Second Supplement. Publishers oppose extending any *Daubert* deadlines which, in any event, only Judge Lee can grant.

## I.    <u>Anthropic's Position</u>: Anthropic May Re-Depose Smith On Untimely Disclosures

In what has become a pattern of repeated obstruction and delay, on the final day of expert discovery and *14 days after* Anthropic deposed Smith, Publishers served a Second Supplemental report. The supplement discloses new analyses that could and should have been offered in one of Smith's four earlier reports and certainly before his deposition. At the same time, months after fact discovery closed and Smith was deposed, Publishers made serial productions of documents responsive to Anthropic's discovery requests and directly relevant to the opinions in Smith's report. The untimely disclosures now feature prominently in Publishers' motion for summary judgment, specifically as to fair use factor four (Dkt. 594 at 33-34). But Publishers' conduct precluded Anthropic from fully and fairly testing this evidence and Smith's opinions about it.

These late disclosures are nothing new—throughout discovery Publishers have withheld or disclaimed reliance on information, only to later rely on it. Anthropic sought to address this latest prejudice without troubling the Court and made the straightforward request that Smith be made available for a 3-hour remote deposition before the March 31 deadline for *Daubert* motions. Publishers would only agree to 30 (and later, 60) minutes. That is insufficient given the breadth of their late-breaking disclosures and Anthropic's need to address the issues with Smith. Anthropic respectfully requests that this Court compel Publishers to make Smith available for another 3-hour deposition, and, if granted, to extend the time to file any *Daubert* motion related to Smith's opinions to 7-days after the deposition. ECF 587 (*Daubert* motions filed by March 31, 2026).

### A.     Smith's Second Supplement Warrants A Short Deposition

The Court's scheduling order set the following deadlines for service of expert disclosures: (1) opening expert disclosures by December 19, 2025, (2) rebuttal reports by January 23, 2026, (3) reply reports by February 13, 2026, and (4) depositions by March 9, 2026. ECF 489. Smith served reports on each deadline and a First Supplemental Report on February 4, 2026. Anthropic deposed Smith on February 23, 2026. Despite having already served four reports and having already sat for his deposition, Publishers served a Second Supplemental Report for Smith at 10:00 P.M. on March 9, 2025, hours before the technical close of all expert discovery.

To be sure, experts may supplement their reports under Rule 26(e), but such supplementation is limited to "correcting inaccuracies[] or filling the interstices of an incomplete report based on information ***that was not available*** at the time of the initial disclosure." *Krause v. County of Mohave*, 459 F. Supp. 3d 1258, 1269 (D. Ariz. 2020) (emphasis added, internal citations omitted). There is no *right* to supplement to discuss evidence that was already available— Publishers cannot "create a loophole through which a party who submits partial expert witness disclosures … can add to them to [their] advantage" as Smith has done here by strategically supplementing after his deposition. *Luke v. Fam. Care & Urgent Med. Clinics*, 323 F. App'x 496, 500 (9th Cir. 2009). Smith's supplement goes beyond the scope of Rule 26(e). It relies almost entirely on information that was available to Smith before his deposition. Anthropic is entitled to a short supplemental deposition to test those opinions.

*First*, Smith claims that the basis for his untimely supplemental report is his "aware[ness] of certain data and research, publicly published and authored by Anthropic" since his February 13, 2026 report. Second Supplement ¶ 3. But nearly all of the data and research Smith characterizes as "new" were available to him long before the deadline for his Reply Report and subsequent deposition. For example, Smith now relies on three datasets to support his opinions about purported harm and market dilution: the Anthropic Interviewer data set, which contains interview data from "creatives" "about their views on AI," and two other data sets containing usage metrics for Anthropic's interfaces. Each of these data sets were available (and disclosed) to Smith to rely on before he was deposed. Anthropic publicly announced the Anthropic Interviewer tool data on December 4, 2025.[1] Anthropic's expert, Dr. Russ Altman, discussed the data in his opening report which Anthropic produced on December 23, 2025. Altman Opening Report ¶¶ 109, 111, n.151-153, 156-159; *see also* Anthropic_0000594977, Anthropic_0000593843. The other two datasets from Anthropic's Economic Index report have been publicly available since January 15, 2026,[2] and Anthropic's expert, Ms. Julie Davis, discussed them in her February 13 Report. Yet Smith apparently did not consider them and did not disclose any reliance on them before his deposition, making it impossible for Anthropic to cross-examine Smith during the expert discovery period. Only *one* research paper referenced in Smith's supplement post-dates his deposition, and that paper is based in part on Anthropic's already produced data. *See* Second Supplement ¶¶ 7-9 (disclosing reliance on new publicly released data announced by Anthropic on March 5[3]).

*Second*, Smith's Second Supplement also relies on an undisclosed, non-public study from Publishers' technical expert, Dr. Ben Zhao. Publishers concede the study was completed by at least February 5, more than two weeks before Smith was deposed. While Dr. Zhao served three reports, including on February 13, 2026, and was deposed on February 20, the study was not disclosed

---

[1] "Introducing Anthropic Interviewer: What 1,250 professionals told us about working with AI," December 4, 2025, https://www.anthropic.com/research/anthropic-interviewer.

[2] "Anthropic Economic Index—Understanding AI's effects on the economy," January 15, 2026, https://www.anthropic.com/economic-index#us-usage; *see also* https://huggingface.co/datasets/Anthropic/EconomicIndex/tree/main/release_2026_01_15.

[3] *See* "Labor market impacts of AI: A new measure and early evidence," March 5, 2026, https://www.anthropic.com/research/labor-market-impacts.

until twelve days after Dr. Zhao's deposition, when Publishers introduced it as an exhibit during the March 4, 2026 deposition of Anthropic's expert, Dr. Abhishek Nagaraj. When asked why Publishers had not produced the study earlier, (i.e., in connection with Dr. Zhao's reports or deposition), Publishers' counsel said it was "not relevant to any of the opinions [Dr. Zhao] provides in this case." Nagaraj Dep. at 230:2-231:21. Despite disclaiming relevance, Smith now relies directly on Dr. Zhao's undisclosed and non-public study. Publishers questioned Anthropic's expert about the study and now rely on it, but refuse to allow Anthropic to do the same.[4]

Anthropic is not seeking a "re-do" on its deposition. It is seeking to test Mr. Smith's new opinions and evidence. Publishers do not dispute Anthropic has not had the chance to question Smith (or Zhao) on the Zhao study. While Anthropic probed Smith's reliance on the literature cited in his other reports, *see, e.g.*, Smith Dep. 137:13-140:14, Smith could only reference an unpublished paper from "a doctoral student" and orthogonal studies about preference for AI generated text to support his opinions that people  prefer "AI-generated songs over human-made songs." *Id.* Yet he now relies on the Zhao study Anthropic has not been allowed to test for the very same premise. Likewise, the Interviewer data is unlike any data in Smith's earlier reports; Anthropic could not have tested Smith's reliance on that category of data. With respect to the data relating to economic impact, Anthropic tested Smith's opinions related to the original Economic Index data for nearly 10 minutes despite it being referenced in only 2 paragraphs of Smith's 240 pages of reports. The more recent data Smith now adds, is featured centrally in Publishers' summary judgment argument, yet Anthropic has not had an opportunity to test that reliance.

Smith claims the new information "reinforce[s]" his opinions about market dilution, Second Supplement ¶ 6, but an expert cannot use a supplement to "seek to 'strengthen' or 'deepen' opinions expressed in the original report." *Carl Zeiss X-Ray Microscopy, Inc. v. Sigray, Inc.*, 2025 WL 980830, at *2 (N.D. Cal. Apr. 1, 2025). Publishers' attempt to supplement Smith's report after his deposition—based overwhelmingly on information available to Mr. Smith *before* his deposition—deprives Anthropic of its right to cross-examine Smith about information he now

---

[4] Dr. Zhao should not be permitted to reference or rely on the study, after having withheld it from Anthropic before his deposition and after Publishers' counsel attempted to excuse that withholding by asserting that the study is not relevant to Dr. Zhao's opinions in the case.

claims is relevant to his opinions. Given Publishers' unjustified delay, Anthropic is entitled to a short three-hour supplemental deposition. *Id.* (granting leave for supplemental deposition).

**B.    Publishers' Belated Productions Also Warrant A Supplemental Deposition**

Days after Smith's deposition, Publishers produced multiple licensing agreements directly related to those discussed in his reports. In his opening report, Smith extensively analyzed licensing agreements with ███████████████████████ as a basis for his opinion that there is "████████████████████████████████████████ ███" Smith Opening Report ¶¶ 32, 40-41, 93, 163. Yet, on February 27, after Smith's February 23 deposition, Publishers produced *15 additional* UMPG licensing agreements, each executed either before the fact discovery deadline or in December 2025, prior to the close of expert discovery. *See* UMPG_0000025665-822. These included amendments to the very ███████ ███ agreements assessed by Mr. Smith and a new agreement with █████ he claims support his opinions. *See id.* Publishers provided no good-faith explanation for withholding the discovery, and when pressed for an answer, Publishers' responded flippantly: "We could keep talking about it. It's been fun." Anthropic should have been able to examine Publishers' fact witnesses about these agreements, but at a minimum must now be permitted to examine Smith about them given his reliance on them. Publishers' belated production obstructed Anthropic from doing so.

\*    \*    \*

While the typical sanction for prejudice from untimely disclosure is exclusion, Anthropic does not request that here. Instead, it asks only for a brief supplemental deposition to allow Anthropic to appropriately test Smith's supplemental opinions and the evidence he cites in support thereof, as well as to probe Smith's opinions in view of documents that should have been—but were not—produced in discovery. *See Davidson v. Apple, Inc.*, 2019 WL 1230438, at \*2-3 (N.D. Cal. Mar. 15, 2019) (ordering 4-hour deposition on newly disclosed test results); *Ellena v. Standard Ins. Co.*, 2013 WL 6698632, at \*3 (N.D. Cal. Dec. 19, 2013); *Cottonwood*, 2025 WL 2555818, at \*4 (re-opening two expert depositions, one for 2 hours to address untimely report, and one for 30 minutes for belated disclosure of *one* 2006 EPA report).

**I.    Publishers' Position**: **Dr. Smith's Second Supplement does not justify a new deposition.**

### a. The Second Supplement does not offer any new opinions or analysis.

Dr. Smith's Second Supplement is extremely limited in scope. Dr. Smith previously timely submitted four reports (an opening report, a rebuttal report, a reply report, and a first supplement) totaling 240 pages (not including appendices). Dr. Smith's Second Supplement, by contrast, is only five pages long, comprising only 11 substantive paragraphs. The Second Supplement does not disclose any new opinions or perform any new analysis or calculations. It only discloses that, "[s]ince the service of my Reply Report on February 13, 2026, *I have become aware of* certain data and research, publicly published and authored by Anthropic, and which is relevant to my expert opinions." Second Supplement ¶ 3 (emphasis added). It then describes those materials:

- A dataset called "Anthropic Interviewer" that shows conversations Claude conducted with various individuals and professionals regarding their use of Claude, including conversations with songwriters and musicians who describe their use of Claude and generative AI in their work, including writing lyrics; *id.* ¶ 4;

- Datasets Anthropic published on January 15, 2026 that show aggregated Claude usage metrics based on a sample of user data from one week in November 2025, which include "clusters" of usage data demonstrating that Claude users have used Claude for song-related use cases, including identifying specific songs and writing, editing, or generating song lyrics; *id.* ¶ 5;

- A report Anthropic published on March 5, 2026, titled "Labor market impacts of AI: A new measure and early evidence[;]" *id.* ¶ 7

- An unpublished academic article titled, "Characterizing Detectability and Impact of AI-generated Music on Streaming Platforms." (the "Detectability Study") *Id* ¶ 14.

The only one of these materials Dr. Smith discusses for more than one paragraph is the March 5, 2026 report. Here, Dr. Smith devotes a few paragraphs to simply summarizing the report's findings (the report itself is 17 pages). *Id.* ¶¶ 7–11. The Second Supplement then concludes that these materials reinforce opinions Dr. Smith has previously offered. *Id.* ¶ 12.

Not only does Dr. Smith's disclosure of his awareness of these materials not represent new opinions or analysis, but these new materials are also not new *types* of data from Dr. Smith's previous reports. Notably, the first three of these datasets are all data Anthropic has published

about how Claude is used, and in his earlier reports Dr. Smith discussed other similar data Anthropic has published as part of its Economic Index. *See* Report ¶¶ 80, 202 (observing that "Anthropic itself tracks Claude's usage for lyric generation and modification in its Economic Index, finding that lyricists, poets, and other creative writers are responsible for almost 1% of all Claude inquires (over the sampled period)"). The Detectability Study just supplements the scholarly literature Dr. Smith already discussed in the subsection of his report titled, "Academic Analysis and Public Reporting Demonstrate How Large Language Models Create Market Substitutes for Songs." *See* Report § V.A.1, ¶¶ 65–78. Supplementing on this basis was entirely proper. *Carl Zeiss X-Ray Microscopy, Inc. v. Sigray, Inc.*, 2025 WL 980830, at *3 (N.D. Cal. Apr. 1, 2025 (holding supplements proper and required by Rule 26(e) where "[t]he supplemental reports will merely extend the same logic in the experts' original reports" to new information).

**b. At Dr. Smith's deposition, Anthropic chose not to explore the issues implicated by the Second Supplement.**

On February 24, 2026 Anthropic deposed Dr. Smith for more than seven hours on the record. During those seven hours, Anthropic asked only *four* questions directly about Dr. Smith reliance on Anthropic's Claude usage data—the same type of data in the Second Supplement:

- Q Right. But you understand -- right. But that category [in Anthropic's Claude usage data] expands far beyond just songwriters, doesn't it? A I do understand that. Smith Tr. 143:8–11.

- Q And then you go on to talk about the Economic Index, which finds that lyricists, poets, and other creative writers are responsible for almost 1 percent of all Claude inquiries over the sampled period. Do you see that? A Yeah. I said this is not surprising given that. *Id*. at 329:19–330:1.

- Q Then Number 2 the Anthropic Economic Index report you list here; is that right? A That is correct. *Id*. at 331:16–18.

- Q And by that data, you mean Mr. Dennis's report and the Economic Index? A That is correct. *Id*. at 333:18–23.

Similarly, Anthropic spent only a few minutes asking questions about the academic literature Dr. Smith relied on to conclude that LLMs create market substitutes for songs.

**c. Anthropic mischaracterizes the record regarding the Detectability Study.**

Publishers did not earlier disclose the Detectability Study, of which Publishers' technical expert Dr. Ben Zhao is one of six co-authors, because it did not exist earlier. The study—which even now exists only in preprint (*i.e.* draft) form—has not yet been published anywhere, and was only completed and submitted for publication on February 5, 2026. Publishers did not learn it existed until after all reports had been served. Dr. Zhao's CV, served with his original report in December 2025, did not include the Detectability Study because it had not yet been completed.

Anthropic's misguided assertion that Publishers have "disclaimed relevance" of the Detectability Study confuses Dr. Zhao and Dr. Smith. Publishers disclaimed relevance of the Detectability Study to *Dr. Zhao's opinions*, not to the case as a whole. Dr. Zhao is Publishers' technical expert; Dr. Smith is Publishers' economics expert. Dr. Smith, *not* Dr. Zhao, is offering opinions in this case regarding the impact of AI-generated music on streaming platforms (a subject of the Detectability Study). The Detectability Study is irrelevant to the opinions Dr. Zhao offers, which concern the technical operation of LLMs. That Dr. Zhao has—entirely separately from this case—conducted research on AI-generated music is merely coincidental. In that capacity, Dr. Zhao is no different from, for example, Tuhin Chakrabarty, a professor of computer science at Stony Brook University whose scholarly research on the detectability of AI-generated content Dr. Smith also cites. *See* Report ¶¶ 68–71, n.57. Anthropic did not depose Professor Chakrabarty, and asked Dr. Smith only three questions about Professor Chakrabarty's research that Dr. Smith cites.

## II.     Anthropic's request to re-depose Dr. Smith improperly seeks a mulligan.

The Second Supplement creates no basis to re-depose Dr. Smith. There is no need for a second deposition to cover similar types of materials to those previously disclosed on which Anthropic invested a grand total of four questions during a seven-hour deposition. Anthropic's request is better understood as an improper attempt to leverage the Second Supplement as an excuse to redo its previous deposition and examine Dr. Smith on issues Anthropic deliberately chose not to previously explore. That Publishers' summary judgment motion relies on Anthropic's Claude usage data also referenced in the Second Supplement is also no basis to re-depose Dr. Smith: crucially, Publishers' motion does not rely on any opinions *from Dr. Smith* about that data.

Anthropic's caselaw is inapposite. In *Krause v. Cnty. of Mohave*, the untimely opinion

"was a significant, material change from [the expert's] prior opinions." 459 F. Supp. 3d 1258, 1268–69 (D. Ariz. 2020). Not so here. *See also Davidson v. Apple, Inc.*, 2019 WL 1230438, at \*2–\*3 (N.D. Cal. Mar. 15, 2019) (experts had "prepared several additional experts reports that include new opinions and a new survey" and had "disclose[d] new laboratory tests and test results"); *Ellena v. Standard Ins. Co.*, 2013 WL 6698632, at \*3 (N.D. Cal. Dec. 19, 2013) (expert served a revised damages analysis based on a different set of data and consented to an additional deposition);

**III.   Publishers' recently produced licenses do not justify a new deposition.**

The additional licenses Publishers recently produced cannot justify re-deposing Dr. Smith because Dr. Smith has not relied on those licenses for any of his opinions. Upon becoming aware of those documents' existence, Publishers promptly produced them in accordance with their obligations under Rule 26(e) because those documents are arguably responsive to Anthropic's requests for production. Anthropic then repeatedly badgered Publishers' counsel for several days seeking discovery on discovery. But those licenses simply have nothing to do with Dr. Smith, who is not even aware of those documents, let alone relied on them to form any opinions.

Anthropic also airs imagined grievances regarding Publishers' supposed history of disclaiming reliance on information; this mud-slinging is neither accurate nor relevant to this dispute. In any event, Publishers' summary judgment motion does *not* rely on the recently produced licenses, and therefore cannot be a basis for re-opening Dr. Smith's deposition.

Anthropic has also not identified anything specific about the recently produced licenses that justifies a new deposition. In his initial report, Dr. Smith cited to and discussed dozens of Publishers' licenses similar to those Publishers recently produced. *See* Report ¶¶ 36–46, 92–94, 120–136, 162–165. Anthropic has not cited anything in the recently produced licenses substantially different from those previously produced on which Dr. Smith relied that requires additional testimony. Anthropic's failure is no surprise, because the recently produced licenses are just more of the same. As Anthropic acknowledges, *see supra* at 5, the recently produced licenses include either amendments to the licenses Dr. Smith did consider or subsequent agreements with licensees where Dr. Smith reviewed earlier agreements with those same licensees.

In any event, Anthropic's claim *now* that it needs to depose Dr. Smith about the details of

Publishers' recently produced licenses is simply not credible in light of Dr. Smith's previous deposition. At that deposition, Anthropic did not show Dr. Smith *a single one* of Publishers' licenses—not one. Anthropic spent only a few minutes on Publishers' licenses on which Dr. Smith relied that are similar to those recently produced and asked only general questions about those licenses, such as whether those licenses were catalog-wide. *See* Smith Tr. 68:11–73:17. Having shown no interest in examining Dr. Smith on Publishers' licenses Dr. Smith *did* rely on, Anthropic cannot now be heard to claim it needs to depose him about Publishers' licenses he did *not* rely on.

**IV.    Anthropic's request for a three-hour deposition is disproportionate.**

Anthropic's request for a three-hour deposition is entirely disproportionate to the scope of the Second Supplement. Anthropic had only seven hours to depose Dr. Smith regarding his 240 pages of reports during which, as Anthropic admits, it spent barely more than ten minutes on these issues at his first deposition; its claim now that it needs three hours to cover five pages of material is not reasonable. Even if Anthropic is permitted to re-depose Dr. Smith—and, for the reasons explained above, there is no basis to do—Anthropic should be limited to thirty minutes and only to the material in the Second Supplement. *See Cottonwood Env't L. Ctr. v. Big Sky Water & Sewer Dist.*, 2025 WL 2555818, at *7 (D. Mont. Sept. 5, 2025) (permitting expert depositions to be reopened for thirty minutes to address issues raised in late-served report).

| | |
|---|---|
| Date: March 29, 2026 | Respectfully submitted, |
| By:  */s/ Corey Miller* | By:  */s/ Sonal N. Mehta* |
| **OPPENHEIM + ZEBRAK, LLP** | **WILMER CUTLER PICKERING HALE AND DORR LLP** |
| Matthew J. Oppenheim<br>Nicholas C. Hailey<br>Jeffrey M. Gould<br>Corey Miller<br>Keith Howell<br>Audrey L. Adu-Appiah<br>(admitted *pro hac vice*)<br>4530 Wisconsin Ave., NW, 5th Floor<br>Washington, DC 20016<br>Telephone: (202) 480-2999<br>matt@oandzlaw.com<br>nick@oandzlaw.com<br>jeff@oandzlaw.com | SONAL N. MEHTA (SBN 222086)<br>sonal.mehta@wilmerhale.com<br>2600 El Camino Real, Suite 400<br>Palo Alto, CA 94306<br>Telephone: (650) 858-6000<br><br>LOUIS W. TOMPROS (*Pro Hac Vice*)<br>Louis.Tompros@wilmerhale.com<br>DISHA PATEL (*Pro Hac Vice*)<br>disha.patel@wilmerhale.com<br>60 State Street<br>Boston, MA 02109 |

corey@oandzlaw.com
khowell@oandzlaw.com
aadu-appiah@oandzlaw.com

Alexander Kaplan
Jennifer Pariser
Andrew Guerra
Bret Matera
Timothy Chung
Michelle Gomez-Reichman
(admitted *pro hac vice*)
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
alex@oandzlaw.com
jpariser@oandzlaw.com
andrew@oandzlaw.com
bmatera@oandzlaw.com
tchung@oandzlaw.com
mgomez-reichman@oandzlaw.com


**COBLENTZ PATCH DUFFY & BASS LLP**
Jeffrey G. Knowles (SBN 129754)
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 391-4800
ef-jgk@cpdb.com


**COWAN, LIEBOWITZ & LATMAN, P.C.**
Richard S. Mandel
Jonathan Z. King
Richard Dannay
(admitted pro hac vice)
114 West 47th Street
New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

*Attorneys for Plaintiffs*

Telephone: (617) 526-6220

ARI HOLTZBLATT (SBN 354361)
Ari.Holtzblatt@wilmerhale.com
ROBIN C. BURRELL (*pro hac vice*)
robin.burrell@wilmerhale.com
2100 Pennsylvania Ave, NW
Washington, DC 20037
Telephone: (202) 663-6000

TAYLOR GOOCH (SBN 294282)
taylor.gooch@wilmerhale.com
50 California St.
San Francisco, CA 94111
Telephone: (628) 235-1000

JARED V. GRUBOW (*Pro Hac Vice*)
jared.grubow@wilmerhale.com
250 Greenwich St
New York, NY 10007
Telephone: (212) 230-8800


*Attorneys for Defendant*
**ANTHROPIC PBC**

**SIGNATURE ATTESTATION PURSUANT TO CIVIL L.R. 5-1(h)**

Pursuant to Civil L.R. 5-1(h), I hereby attest that concurrence in the filing of the document was obtained from the document's signatories. I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 29, 2026                                     _/s/ Sonal N. Mehta_
                                                          Sonal N. Mehta