# EXHIBIT A

Benjamin S. Akley (State Bar No. 278506)
bakley@pryorcashman.com
**PRYOR CASHMAN LLP**
1901 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
(310) 683-6900

Frank P. Scibilia (admitted *pro hac vice*)
fscibilia@pryorcashman.com
Joshua Weigensberg (admitted *pro hac vice*)
jweigensberg@pryorcashman.com
Nathaniel Kazlow (*pro hac vice* admission pending)
nkazlow@pryorcashman.com
**PRYOR CASHMAN LLP**
7 Times Square, 40th Floor
New York, NY 10036
(212) 421-4100

*Counsel for the below-identified Amici*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ANTHROPIC PBC,<br><br>Defendant. | Case Number: 5:24-cv-03811-EKL-SVK<br>Hon. Eumi K. Lee<br><br>**BRIEF OF THE RECORDING INDUSTRY ASSOCIATION OF AMERICA, NATIONAL MUSIC PUBLISHERS' ASSOCIATION, AMERICAN ASSOCIATION OF INDEPENDENT MUSIC, SOUNDEXCHANGE, INC., SONGWRITERS OF NORTH AMERICA, BLACK MUSIC ACTION COALITION, MUSIC ARTISTS COALITION, AND ARTIST RIGHTS ALLIANCE AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................................................ii

INTERESTS OF *AMICI CURIAE* ......................................................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................................................2

ARGUMENT ........................................................................................................................................3

    I.    ANTHROPIC'S COPYING IS NOT FAIR USE BECAUSE IT GENERATES WORKS THAT SUBSTITUTE IN THE MARKET FOR THOSE IT COPIED IN "TRAINING" ................................................................3

    II.    ANTHROPIC'S COPYING IS NOT FAIR USE BECAUSE IT IMPACTS AN EXISTING LICENSING MARKET FOR USE OF LYRICAL WORKS FOR "TRAINING" ........................................................................8

        A.  A Workable Market for Licensing Music For AI "Training" Already Exists ..........................................................................................................................9

        B.  Requiring Anthropic to License Will Not Arrest AI Development .................................12

        C.  The Existence of the Market Removes "The Danger of Circularity" .............................13

CONCLUSION ....................................................................................................................................15

# TABLE OF AUTHORITIES

**PAGE(s)**

## CASES

*American Geophysical Union v. Texaco Inc.*,
60 F.3d 913 (2d Cir. 1994) ................................................................................................. 14

*Andy Warhol Found. For the Visual Arts v. Goldsmith ("Warhol")*,
598 U.S. 508 (2023) ....................................................................................................*passim*

*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014) ................................................................................................. 15

*Bartz v. Anthropic PBC*,
787 F. Supp. 3d 1007 (N.D. Cal. 2025) ................................................................................ 8

Anthropic's Motion for Summary Judgment, *Bartz v. Anthropic PBC*,
No. 3:24-CV-05417-WHA (N.D. Cal. Mar. 27, 2025), Dkt. 122 ..................................... 14

*Basic Books, Inc. v. Kinko's Graphics Corp.*,
758 F. Supp. 1522 (S.D.N.Y. 1991) ..................................................................................... 9

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
448 F.3d 605 (2d Cir. 2006) ............................................................................................... 14

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) ........................................................................................................ 4, 9

*Fox News Network, LLC v. TVEyes, Inc.*,
883 F.3d 169 (2d Cir. 2018) ............................................................................................... 14

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021) ............................................................................................................... 15

*Harper & Row Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985) ........................................................................................................ 2, 4

*Infinity Broadcast Corp. v. Kirkwood*,
150 F.3d 104 (2d Cir. 1998) ................................................................................................. 5

*Kadrey v. Meta Platforms, Inc.*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025) ..........................................................................*passim*

Meta's Motion for Partial Summary Judgment, *Kadrey v. Meta Platforms, Inc.*,
No. 3:23-cv-03417-VC-TSH (N.D. Cal. Mar. 28, 2025), Dkt. 501 ................................. 15

*McGucken v. Pub Ocean Ltd.*,
42 F.4th 1149 (9th Cir. 2022) ............................................................................................... 4

*Peter Letterese & Assocs., Inc. v. World Institute of Scientology Enters.*,
    533 F.3d 1287 (11th Cir. 2008) .................................................................................. 5

*Ringgold v. Black Ent. Television, Inc.*,
    126 F.3d 70 (2d Cir. 1997) ...................................................................................... 14

*Sega Enters. Ltd. v. Accolade, Inc.*,
    977 F.2d 1510 (9th Cir. 1992) ................................................................................... 8

*Seltzer v. Green Day, Inc.*,
    725 F.3d 1170 (9th Cir. 2013) ................................................................................. 14

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
    742 F.3d 17 (2d Cir. 2014) ...................................................................................... 15

*Thomson Reuters Enter. Ctr. GMBH v. Ross Intel. Inc.*,
    765 F.Supp.3d 382 (D. Del. 2025) ............................................................................ 8

*Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*,
    953 F.3d 638 (9th Cir. 2020) ................................................................................... 14

**STATUTES AND RULES**

17 U.S.C. § 102 ............................................................................................................... 7

17 U.S.C. § 106(4) ........................................................................................................... 7

17 U.S.C. § 107(4) ........................................................................................................ 4, 8

17 U.S.C. § 112 ............................................................................................................... 2

17 U.S.C. § 114 ............................................................................................................... 2

**OTHER AUTHORITIES**

4 Nimmer, Nimmer on Copyright, § 13.05[A][4] (2026) .............................................. 14

Edward Lee, *Copyright Dilution Under Constitutional Scrutiny*, 25 Chi.-Kent J. Intell.
    Prop. 1 (2026) ........................................................................................................... 7

Matthew Sag, *Fairness and Fair Use in Generative AI*, 92 Fordham L. Rev. 1887
    (2024) ....................................................................................................................... 7

**WEBSITES**

ANTHROPIC, *Microsoft, NVIDIA, and Anthropic announce strategic partnerships* (Nov
    18, 2025), available at:
    https://www.anthropic.com/news/microsoft-nvidia-anthropic-announce-strategic-
    partnerships ............................................................................................................. 12

ANTHROPIC, *Anthropic raises $30 billion in Series G funding at $380 billion post-money valuation* (Feb 12, 2026), available at: https://www.anthropic.com/news/anthropic-raises-30-billion-series-g-funding-380-billion-post-money-valuation ...................................................................................................... 12

THE ASSOCIATED PRESS, *ChatGPT-maker OpenAI signs deal with AP to license news stories* (July 13, 2023) available at: https://apnews.com/article/openai-chatgpt-associated-press-ap-f86f84c5bcc2f3b98074b38521f5f75a ......................................................................................... 11

THE ATLANTIC, *The Atlantic announces product and content partnership with OpenAI* (May 29, 2024), available at: https://www.theatlantic.com/press-releases/archive/2024/05/atlantic-product-content-partnership-openai/678529/ ...................................................................................... 11

BILLBOARD, *How Many AI Artists Have Debuted On Billboard's Charts?* (Nov. 4, 2025), available at: https://www.billboard.com/lists/ai-artists-on-billboard-charts/ ................................... 6

BILLBOARD, *Suno Creates An Entire Spotify Catalog's Worth Of Music Every Two Weeks, Says Investor Pitch Deck For $250M Fundraise* (Nov. 24, 2025), available at: https://www.billboard.com/pro/suno-creates-spotify-catalog-music-two-weeks-pitch-deck/ ........................................................................................................................................ 6

CISAC, *Global economic study shows human creators' future at risk from generative AI* (Dec. 4, 2024), available at: https://www.cisac.org/Newsroom/news-releases/global-economic-study-shows-human-creators-future-risk-generative-ai ...................................................................... 6

DEEZER NEWSROOM, *Deezer: 28% of all music delivered to streaming is now fully AI-generated* (Sept. 11, 2025), available at: https://newsroom-deezer.com/2025/09/28-fully-ai-generated-music/ ........................................... 5

DEEZER NEWSROOM, *Deezer/Ipsos survey: 97% of people can't tell the difference between fully AI-generated and human made music* (Nov. 12, 2025), available at: https://newsroom-deezer.com/2025/11/deezer-ipsos-survey-ai-music/ ........................................ 5

FINANCIAL TIMES, *Apple Music strikes new multiyear deals with major record labels* (Mar. 12, 2020), available at: https://www.ft.com/content/2b57fc8c-ef3b-40f5-83a5-2373ff203bfb?syn-25a6b1a6=1 .............. 11

FORTUNE BUSINESS INSIGHTS, *AI Training Dataset Market Size, Share & Industry Analysis* (Mar. 9, 2026), available at: https://www.fortunebusinessinsights.com/ai-training-dataset-market-109241 ............................. 11

LYRICFIND, *Publishing With LyricFind*, available at: https://www.lyricfind.com/publishing ...................................................................... 11

MERLIN, *Merlin and Udio Partner to Advance AI for Independent Music* (Jan. 20, 2026), available at: https://merlinnetwork.org/merlin-and-udio-partner-to-advance-ai-for-independent-music/ ......... 10

MUSIC BUSINESS WORLDWIDE, *Exclusive: Kobalt's AI Deal With Suno Rival ElevenLabs Guarantees Publishing 'Parity' With Recorded Music* (Aug. 5, 2025), available at: https://www.musicbusinessworldwide.com/kobalts-ai-suno-most-favored-nation/ ...................... 10

MUSIC BUSINESS WORLDWIDE, *Major Music Publishers Ink AI licensing Deals With Lyrics and Music Data Company Musixmatch* (Oct. 15, 2025), available at: https://www.musicbusinessworldwide.com/major-music-publishers-ink-ai-licensing-deals-with-lyrics-and-music-data-company-musixmatch/ ........................................... 10

MUSIC BUSINESS WORLDWIDE, *UMG, Sony and Warner Strike Licensing Deals With New AI Music Platform KLAY* (Nov. 20, 2025), available at: https://www.musicbusinessworldwide.com/umg-sony-and-warner-strike-licensing-deals-with-new-ai-music-platform-klay/ .................................................................................. 10

MUSIXMATCH, *Musixmatch Business Solutions*, available at: https://about.musixmatch.com/business/overview ..................................................... 11

THE NEW YORK TIMES, *The Times and Amazon Announce an A.I. Licensing Deal* (May 29, 2025), available at: https://www.nytimes.com/2025/05/29/business/media/new-york-times-amazon-ai-licensing.html ............................................................................................................... 11

REGULATIONS.GOV, *Anthropic Submission to USCO NoI on Artificial Intelligence and Copyright* (Oct. 30, 2023), available at: https://www.regulations.gov/comment/COLC-2023-0006-9021 ................................................. 13

REUTERS, Katie Paul & Anna Tong, *Inside Big Tech's Underground Race to Buy AI Training Data* (Apr. 5, 2024), available at: https://www.reuters.com/technology/inside-big-techs-underground-race-buy-ai-training-data-2024-04-05/ ............................................................................................... 11

ROLLING STONE, *A ChatGPT for Music Is Here. Inside Suno, the Startup Changing Everything* (Mar. 17, 2024), available at: https://www.rollingstone.com/music/music-features/suno-ai-chatgpt-for-music-1234982307/ ............................................................................................................... 5

SPOTIFY, *Spotify Strengthens AI Protections for Artists, Songwriters, and Producers* (Sept. 25, 2025), available at: https://newsroom.spotify.com/2025-09-25/spotify-strengthens-ai-protections/ ............................ 5

SPOTIFY, *Universal Music Group and Spotify Strike a New Multiyear Agreement* (Jan. 26, 2025), available at: https://newsroom.spotify.com/2025-01-26/universal-music-group-spotify-expansion/ ................ 11

SPOTIFY, *Warner Music Group and Spotify Announce a New Multiyear Agreement* (Feb. 6, 2025), available at: https://newsroom.spotify.com/2025-02-06/warner-music-group-spotify-agreement/ .................. 11

TECHCRUNCH, Ingrid Lunden, *Anthropic is expanding to Europe and raising more money* (May 13, 2024), available at: https://techcrunch.com/2024/05/13/anthropic-is-expanding-to-europe-and-raising-more-money/ ................................................................................................................. 12

TIME, *TIME and OpenAI Announce Strategic Content Partnership* (June 27, 2024), available at: https://time.com/6992955/time-and-openai-announce-strategic-content-partnership/ .................. 11

U.S. COPYRIGHT OFFICE, *Copyright and Artificial Intelligence Part 3: Generative AI Training (Prepublication Version)* (May 2025) ("Office AI Report"), available at: https://www.copyright.gov/ai/Copyright-and-Artificial-Intelligence-Part-3-Generative-AI-Training-Report-Pre-Publication-Version.pdf...............................................................*passim*

UNIVERSAL MUSIC GROUP, *Universal Music Group and Amazon Music Expand Global Relationship* (Dec. 23, 2024), available at: https://www.universalmusic.com/universal-music-group-and-amazon-music-expand-global-relationship/................................................................................................................ 11

UNIVERSAL MUSIC GROUP, *Universal Music Group and Stability AI Announce Strategic Alliance To Co-Develop Professional AI Music Creation Tools* (Oct. 30, 2025), available at: https://www.universalmusic.com/universal-music-group-and-stability-ai-announce-strategic-alliance-to-co-develop-professional-ai-music-creation-tools/........................................ 10

UNIVERSAL MUSIC GROUP, *Universal Music Group and Udio Announce Udio's First Strategic Agreements For New Licensed AI Music Creation Platform* (Oct. 29, 2025), available at: https://www.universalmusic.com/universal-music-group-and-udio-announce-udios-first-strategic-agreements-for-new-licensed-ai-music-creation-platform/ ................................... 10

VOX MEDIA, *Vox Media and OpenAI Form Strategic Content and Product Partnership* (May 29, 2024), available at: https://www.voxmedia.com/2024/5/29/24166483/vox-media-openai-strategic-content-and-product-partnership/ ................................................................................... 11

WARNER MUSIC GROUP, *Warner Music Group and Stability AI Join Forces to Build the Next Generation of Responsible AI Tools For Music Creation* (Nov. 19, 2025), available at: https://www.wmg.com/news/warner-music-group-and-stability-ai-join-forces-to-build-the-next-generation-of-responsible-ai-tools-for-music-creation ......................................... 10

WARNER MUSIC GROUP, *Warner Music Group and Udio Collaborate to Build A New Licensed Music Creation Service* (Nov. 19, 2025), available at: https://www.wmg.com/news/warner-music-group-and-udio-collaborate-to-build-a-new-licensed-music-creation-service ............................................................................................ 10

## INTERESTS OF *AMICI CURIAE*[1]

*Amici curiae* ("Amici") are trade groups representing and serving the creators behind much of this country's most valuable music.  Many have previously submitted comments to the U.S. Copyright Office on artificial intelligence ("AI") issues, and many are members of the Human Artistry Campaign.

RIAA is a nonprofit trade organization that supports and promotes the creative and financial vitality of recorded music and the people and companies that create it. RIAA's several hundred members—ranging from major American music companies with global reach to artist-owned labels and small businesses—make up this country's most vibrant music community. They create, manufacture and/or distribute sound recordings representing the majority of all legitimate recorded music consumption in the U.S. and own copyrights and/or other exclusive rights in sound recordings embodying the performances of some of the most popular and successful recording artists of all time. RIAA has been actively involved in representing the interests of its members relating to AI issues.

NMPA is the principal trade association representing the U.S. music publishing and songwriting industry. Its membership includes publishers of all sizes, from "major" publishers to independently owned and operated publishers, representing musical works of all genres. Compositions owned or controlled by NMPA's hundreds of members collectively account for the vast majority of musical compositions licensed for commercial use in the U.S.  NMPA has been actively engaged in the conversation around generative AI and its relationship with, and impact on, the creative economy.

A2IM is a not-for-profit organization that exists to support and strengthen the independent recorded music sector and the value of recorded music copyrights. A2IM represents the interests of hundreds of independently owned American small and medium-sized music labels in the marketplace, in the media, and on Capitol Hill. Billboard Magazine identified the independent music label sector as over 40% of the music industry's global recorded music revenue in 2020 based on copyright ownership.

SoundExchange is a nonprofit collective management organization that offers a broad range of

---

[1] No counsel for any party authored this brief in whole or in part, and no entity or person other than Amici, their members, or their counsel made any monetary contribution intended to fund the preparation or submission of this brief. Certain of the plaintiff music publishers in this lawsuit are among the members (or affiliates of such members) of Amici NMPA and RIAA, each of whom also represents the interests of hundreds of other companies in the music industry.

services for music creators. Its core purpose is to administer the statutory sound recording license set forth in 17 U.S.C. §§ 112 and 114. It represents the interests of recording artists and sound recording copyright owners equally, providing a vital source of income and support for recording artists and the companies that represent them in enriching our culture and legacy of world class recorded music.

SONA is an organization formed by and for professional songwriters, advocating on their behalf before legislative bodies, administrative agencies, and courts. SONA is an open and diverse community that unites enthusiastic music creators and thoughtful business leaders to create a unified voice to protect the rights of songwriters and their artistic expression and compensation. Regarding AI, SONA represented its members by participating in the recent U.S. Copyright Office Listening Sessions and continues to advocate for and educate songwriters about AI developments.

BMAC works to create a unified force of action for racial equity and justice within the music industry and to improve communities and drive systemic change. BMAC advocates on behalf of Black artists, songwriters, producers, managers, agents, executives, and lawyers to create access, equity and opportunity for Black artists and industry professionals. Regarding AI, BMAC participated in the U.S. Copyright Office's Listening Sessions. In its ongoing fight for economic justice, AI is at the forefront of BMAC's agenda.

MAC was founded by music creators and industry leaders to advocate on pressing topics that impact music creators. MAC represents artists' and songwriters' interests without compromise. MAC believes artists should have the opportunity to decide how best to protect the fate of their music, and that the advancement of AI can be a benefit to music creators and music lovers, but only if properly regulated so that artists' interests are protected.

ARA is a non-profit organization co-founded and run by dedicated artists that fights for the rights of working musicians in the modern music economy.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The fourth fair use factor—"undoubtedly the single most important element of fair use," *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985); *Andy Warhol Found. For the Visual Arts v. Goldsmith ("Warhol")*, 598 U.S. 508, 555 (2023)—concerns the effect that unlicensed copying of protected works will have on the market or "the potential market for or value of" those

works. Amici, as representatives of the creators and licensors of the majority of human-created music in the U.S., are uniquely situated to discuss the harm to the market for and value of their music caused by the rampant copying of expressive musical content (including lyrics) by Anthropic and other generative artificial intelligence ("AI") companies, and so this brief focuses on the fourth factor.

Unlicensed copying of copyrighted lyrics, sound recordings, sheet music, and other musical content to develop generative AI has enormously damaging effects on the music industry. It floods the market with songs that substitute for and divert royalties away from the very works copied by AI developers to power their products. A consideration of the harm caused by such substitution, including from works that are not substantially similar to the works copied by AI developers in their entirety but that could not have been generated but for such copying, is squarely within the ambit of the Copyright Act and the fourth factor. Such unauthorized copying also threatens to destroy an already existing and growing market for licensing copyrighted works for use in AI "training." Contrary to Anthropic's (and other AI companies') assertions, licensing is feasible and is occurring. Arguments that rampant copying negatively impacts an existing licensing market are not "circular."

## **ARGUMENT**

### I.    **ANTHROPIC'S COPYING IS NOT FAIR USE BECAUSE IT GENERATES WORKS THAT SUBSTITUTE IN THE MARKET FOR THOSE IT COPIED IN "TRAINING"**

Anthropic's Claude is capable of causing enormous harm to creative industries because it is designed to generate works that substitute in the market for the copyrighted works Anthropic copied in its so-called "training" of Claude. In fact, "training" is a euphemism for making many copies of many copyrighted works in an AI model for the purpose of causing the model to be able to generate content, including expressive content that competes with the copied content.[2] Like many other large language models, Claude can generate a virtually unlimited amount of content of the exact same type Anthropic copied into Claude, in its entirety and without a license. Claude and other AI systems can generate lyrics for thousands of songs in the span of time that it takes a human author to write the lyrics

---

[2] Anthropic's anthropomorphizing of Claude is fraught; AI models are not the human mind but are machines, often sold as commercial products, that create copies of protected expression in the course of "training" and that continually store those copies (as demonstrated whenever they reproduce their "training" materials in output).

to just one song. Those AI-generated lyrics can and do reach listeners' ears. The substitutional harm to human-authored, copyright-protected lyrics is very real, and it is severe.

Such substitutional harm is to be considered under the fair use test's fourth factor, which looks to "the effect of the use upon the potential market for or value of the copyrighted work," 17 U.S.C. § 107(4). The statute does not limit in any fashion the market "effect" from the use—in this case, the massive copying—that courts should consider under this factor. *See id.*; U.S. COPYRIGHT OFFICE, *Copyright and Artificial Intelligence Part 3: Generative AI Training (Prepublication Version)* (May 2025) ("Office AI Report") at 65 ("The statute on its face encompasses any 'effect' upon the potential market."). Nor does it limit consideration of the harm to the market for or value of the copied works to harm solely from works output from the model that are substantially similar to those that were copied.

Supreme Court precedent instructs that courts are to pay particular attention to the risk that a defendant's exploitation of the plaintiff's work will harm the plaintiff by making substitutes for the plaintiff's work available in the market. "[S]ubstitution," the Court explains, is "copyright's bête noire." *Warhol*, 598 U.S. at 528. Accordingly, the fourth factor looks to whether the conduct of the defendant, if "unrestricted and widespread," would have a "substantially adverse impact on the potential market for or the value of" the works that were copied, including in the form of substitution or "displacement" of the plaintiffs' works. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590-92 (1994) (distinguishing between "potentially remediable displacement and unremediable disparagement").[3]

Thus, myriad courts have considered whether a defendant's copying results in the creation of competing works, risking market harm to plaintiff by usurping demand for the copied works. *See e.g.*, *Harper & Row Publishers, Inc.*, 471 U.S. at 566-67 ("[f]air use, when properly applied, is limited to copying by others which does not materially impair the marketability of the work which is copied"); *McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149, 1164 (9th Cir. 2022) (finding that defendant's article served as "a ready market substitute for McGucken's photos and the articles that would license them");

---

[3] The "harm" to a plaintiff's work resulting from a subsequent work that parodies or criticizes the plaintiff's work can also reduce demand, but such harm is concededly not cognizable under the fourth factor. But generative AI does not involve "disparagement" or a similar type of harm because it does not comment on the protected works in any way. That is, the AI developer is not engaging in the kind of protected expression, such as parody and criticism, that the fair use test generally would allow.

*Peter Letterese & Assocs., Inc. v. World Institute of Scientology Enters.*, 533 F.3d 1287, 1315 (11th Cir. 2008) ("[T]he adverse effect with which fair use is primarily concerned is that of market substitution."); *Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104, 110 (2d Cir. 1998) (fourth factor is "concerned with secondary uses that, by offering a substitute for the original, usurp a market that properly belongs to the copyright-holder").

Generative AI's ability to manufacture a staggering number of substitutes in the market for the expressive works that it has copied is unprecedented. For example, on the streaming services where many consumers get their music, there are already millions of AI-generated songs. One such service reported last year that tens of thousands of AI-generated songs were being uploaded to that service every single day. *See* DEEZER NEWSROOM, *Deezer: 28% of all music delivered to streaming is now fully AI-generated* (Sept. 11, 2025) ("Deezer, the global music experiences platform, is receiving over 30,000 fully AI-generated tracks every day — accounting for more than 28% of the total daily delivery."). Last September, Spotify disclosed that it had removed millions of "spammy" tracks in response to the proliferation of AI-generated content on the platform, which Spotify acknowledges "can dilute the royalty pool and impact attention for artists playing by the rules." *See* SPOTIFY, *Spotify Strengthens AI Protections for Artists, Songwriters, and Producers* (Sept. 25, 2025). And there is evidence that these trends are only getting worse for creators, as the number of competing fully AI-generated tracks on these services—which tracks could not have been created but for the copyrighted recordings that were copied into the AI platform—are multiplying exponentially and may soon dwarf the number of tracks created through the creative efforts of human composers and performers. *See* DEEZER NEWSROOM, *Deezer/Ipsos survey: 97% of people can't tell the difference between fully AI-generated and human made music* (Nov. 12, 2025) ("Deezer, is receiving over 50,000 fully AI-generated tracks every day – accounting for more than 34% of the total daily delivery.").

Lyric-generation is often part of the process of generating songs using AI. Indeed, there are products on the market that deploy text-generating AI to manufacture lyrics as part of the generation of an accompanying sound recording, *see* ROLLING STONE, *A ChatGPT for Music Is Here. Inside Suno, the Startup Changing Everything* (Mar. 17, 2024), and these products are believed to generate millions

of songs <u>every day</u>. *See* BILLBOARD, *Suno Creates An Entire Spotify Catalog's Worth Of Music Every Two Weeks, Says Investor Pitch Deck For $250M Fundraise* (Nov. 24, 2025).

These AI-generated songs are 1-to-1 market substitutes for copyright-protected songs. In fact, it has been said that it is becoming "increasingly difficult to tell who or what is powered by AI." BILLBOARD, *How Many AI Artists Have Debuted On Billboard's Charts?* (Nov. 4, 2025). Substitution and market dilution from AI-generated works can occur, as one example, in the context of interactive music streaming royalties. Such services calculate royalty "pools" which are then allocated to copyright owners on the basis of a copyright owner's percentage share of total "plays" of songs on the service. If the percentage share of total plays of a copyright owner's songs decreases due to plays of AI-generated songs that cannot be identified as AI-generated, the human creator receives less money. *See* Office AI Report at 65 (observing that "royalty pools can also be diluted").

The financial impact from market substitution is expected to be significant. One study estimates that generative AI may reduce revenues for creators by 24% in just the next two years. CISAC, *Global economic study shows human creators' future at risk from generative AI* (Dec. 4, 2024).

Consideration of the harm from such market substitution is firmly within the ambit of copyright's fair use analysis. It is a natural extension of the principles set forth in the jurisprudence discussed above, adapted to emerging technology. In fact, in his summary judgment decision in *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1055 (N.D. Cal. 2025), Judge Chhabria expressly recognized the harm that generative AI systems' copying can have on the potential market for the copied works by "flood[ing] the market with competing works":

> [AI] involves a technology that can generate literally millions of secondary works, with a miniscule fraction of the time and creativity used to create the original works it was trained on. No other use – whether it's the creation of a single secondary work or the creation of other digital tools – has anything near the potential to flood the market with competing works the way that LLM training does.

One of the striking aspects of generative AI's ability to inflict harm on markets for creative works is that it can do so even if its outputs do not replicate the protected works used to train it. Judge Chhabria recognized this as well in the *Kadrey* decision:

> [L]ess similar outputs, such as books on the same topics or in the same genres, can still compete for sales with the books in the training data. And by taking sales from those

books, or by flooding stores and online marketplaces so that some of those books don't get noticed and purchased, those outputs would reduce the incentive for authors to create—the harm that copyright aims to prevent.

*Id.* at 1054. The Copyright Office agrees. It too rejected the notion that the fourth factor, with its focus on substitution, somehow does not reach generative AI's exploitation of copyrighted works (*e.g.*, for "training") when its "output" is not substantially similar to the works that it copied as "inputs":

The speed and scale at which AI systems generate content pose a serious risk of diluting markets for works of the same kind as in their training data. That means more competition for sales of an author's works and more difficulty for audiences in finding them. If thousands of AI-generated romance novels are put on the market, fewer of the human-authored romance novels that the AI was trained on are likely to be sold. . . . Market harm can also stem from AI models' generation of material stylistically similar to works in their training data.

Office AI Report at 65. As Judge Chhabria observed, while it may be "easier to conclude" that market harm exists where a generative AI system "is capable of regurgitating those books or generating substantially similar text," the market harm from non-identical output is also very real, and very much the type of harm that the fourth factor addresses. *Kadrey*, 788 F. Supp. 3d at 1054.

Some critics of these conclusions argue that there is a line to be drawn in the market harm analysis between substitution from works that are substantially similar to a plaintiff's works, and substitution from works that were generated with an AI system that reproduces the plaintiff's works in "training" but not in output. The latter situation, they claim, is a form of "competition" that is not a proper part of a copyright analysis.[4] That is incorrect. The Copyright Act extends to the reproduction of original, protected expression such as song lyrics. 17 U.S.C. §§ 102, 106(4). Developers seek out and reproduce that protected expression in "training" AI models and, in fact, copy the underlined entirety of the works in doing so, including all of those works' expressive elements. And they do so precisely because they recognize the value of these expressive elements in generating competing expressive works. Thus, even if the AI model does not <u>again</u> reproduce the protected expression in output, the act of copying

---

[4] *See* Edward Lee, *Copyright Dilution Under Constitutional Scrutiny*, 25 Chi.-Kent J. Intell. Prop. 1, 6 (2026); *see also* Matthew Sag, *Fairness and Fair Use in Generative AI*, 92 Fordham L. Rev. 1887, 1919 (2024). Note that both authors base their arguments on the erroneous assertion that what generative AI takes from the works it copies in training is non-expressive and/or unprotectable. Professor Lee also incorrectly focuses on so-called "speech" of the end user, downplaying the massive copying by the AI developer.

lyrics and other expression through training a model alone is *prima facie* copyright infringement, which places the developers' conduct plainly within the ambit of the Copyright Act. The fair use argument that developers raise is a <u>defense</u> to that infringement, and the fair use inquiry expressly requires examination of whether the conduct of the sort engaged in by the defendant, if "unrestricted and widespread," could harm the market for the plaintiff's works including by substituting for them. *Id.* § 107(4). Market harm and substitution are competitive inquiries, and Amici contend that the risk of harm to the market for plaintiffs' works from substitution is clear.

In *Bartz v. Anthropic PBC*, Judge Alsup, citing *Sega Enters. Ltd v. Accolade, Inc.*, found that generative AI systems' production of "alternative" writings does not "concern[] the Copyright Act," as in the Judge's view it would be "no different than . . . [if] training schoolchildren to write well . . . result[ed] in an explosion of competing works." 787 F. Supp. 3d 1007, 1032 (N.D. Cal. 2025). With regard to that analogy, Amici respectfully submit there are significant differences. As Judge Chhabria observed, "when it comes to market effects, using books to teach children to write is not remotely like using books to create a product that a single individual could employ to generate countless competing works with a miniscule fraction of the time and creativity it would otherwise take." *Kadrey*, 788 F. Supp. 3d at 1036. And in *Sega Enters. Ltd. v. Accolade, Inc.*, the nature of the copying was different in kind. There, the plaintiff's creative content (*e.g.*, the audiovisual aspects of its video game software) was not copied—only computer code was used—and the purpose of such copying was to understand ideas and functional concepts to achieve technical operability with the plaintiff's hardware. *See generally*, 977 F.2d 1510 (9th Cir. 1992). As the court said in *Thomson Reuters Enter. Ctr. GMBH v. Ross Intel. Inc.*, 765 F.Supp.3d 382, 398 (D. Del. 2025), a case involving AI "training," analogies to intermediate copying decisions like *Sega* are "inapt" because "[f]irst and foremost, those cases are all about copying computer code." Those facts bear little resemblance to copying highly expressive song lyrics to create a product that will, in turn, generate an unlimited supply of competing works of the same nature.

## II.    ANTHROPIC'S COPYING IS NOT FAIR USE BECAUSE IT IMPACTS AN EXISTING LICENSING MARKET FOR USE OF LYRICAL WORKS FOR "TRAINING"

The fourth factor "requires courts to consider . . . 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the

potential market' for the original." *Campbell*, 510 U.S. at 590 (citing Nimmer § 13.05[A][4]). The Copyright Office has recognized that "a licensing market need not be long-standing or exhaustive . . . to be cognizable." Office AI Report at 67, n.381 (citing *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 929 n.16, 930 (2d Cir. 1994)).

There is already in the music industry a market for the licensing of copyrighted works for AI "training" that is expected to continue to grow given the value that AI developers place on incorporating such expressive content into their models. This industry also already has in place an infrastructure for identification, consent, and payment of royalties, as technology companies routinely enter into licenses with labels and publishers covering vast catalogs of music content. In fact, many of the same companies involved in and that raise fair use arguments concerning AI "training," including Google, Meta and Amazon (a significant investor in Anthropic), are already large-scale music licensees in other aspects of their business. Against the backdrop of the industry's existing licensing marketplace, AI developers' copying of lyrics for "training" without consent or compensation is both inexcusable and harmful.

### A.    A Workable Market for Licensing Music For AI "Training" Already Exists

AI companies have argued that no market for licensing copyrighted works as "training data" exists or is likely to develop, and claim that it is difficult, if not impossible to identify and license works from copyright owners at scale. Office AI Report at 69 n.396 (citing, *inter alia*, Anthropic Initial Comments at 9; OpenAI Initial Comments at 13). Putting aside that there is no such thing as "fair use by reason of necessity," *see, e.g.*, *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1535 (S.D.N.Y. 1991) (rejecting fair use argument that requiring licenses to reproduce excerpts of books in course packs would "halt the educational process"), this is not an accurate picture of licensing at least in the music industry as industry participants (and the Copyright Office) have explained. Office AI Report at 68 n.388 (citing A2IM-RIAA Joint Initial Comments at 23, 25 ("[T]he recorded music industry has all the necessary systems and infrastructure already in place to make obtaining advance consent demonstrably feasible."); *id.* at 67 n.384 (citing NMPA Initial Comments at 19 ("The market is not merely a 'potential' or theoretical market the existence or feasibility of which is open to debate; it is an actual market, with great potential for growth. Music companies are currently licensing works for use in training AI models.").); *id.* at 70 (Copyright Office concluding that "markets [for licensing

copyrighted works for AI "training"] exist or are 'reasonable' or 'likely to be developed,'" particularly with respect to music content).

Major players in the music marketplace have already announced several groundbreaking agreements to license their copyrighted works to "train" music-focused AI systems, demonstrating that licensing is feasible across content types and market participants. Universal Music Group and Warner Music Group have entered into agreements with Stability AI, a "multi modal" generative AI company, and Udio, an AI music generator, to develop AI music creation tools "trained" on licensed music. UNIVERSAL MUSIC GROUP, *Universal Music Group and Stability AI Announce Strategic Alliance To Co-Develop Professional AI Music Creation Tools* (Oct. 30, 2025); WARNER MUSIC GROUP, *Warner Music Group and Stability AI Join Forces to Build the Next Generation of Responsible AI Tools For Music Creation* (Nov. 19, 2025); UNIVERSAL MUSIC GROUP, *Universal Music Group and Udio Announce Udio's First Strategic Agreements For New Licensed AI Music Creation Platform* (Oct. 29, 2025); WARNER MUSIC GROUP, *Warner Music Group and Udio Collaborate to Build A New Licensed Music Creation Service* (Nov. 19, 2025). Merlin Network, a music licensing partner for independent record labels and distributors, has reached a similar agreement with Udio. MERLIN, *Merlin and Udio Partner to Advance AI for Independent Music* (Jan. 20, 2026). KLAY Vision Inc. has entered into AI licensing deals with UMG, WMG, and Sony Music Entertainment to develop an AI music platform "trained entirely on licensed music." MUSIC BUSINESS WORLDWIDE, *UMG, Sony and Warner Strike Licensing Deals With New AI Music Platform KLAY* (Nov. 20, 2025). Music publisher Kobalt entered into a "landmark licensing agreement" with ElevenLabs for its new AI music platform, which will be "trained on cleared catalog from Kobalt." MUSIC BUSINESS WORLDWIDE, *Exclusive: Kobalt's AI Deal With Suno Rival ElevenLabs Guarantees Publishing 'Parity' With Recorded Music* (Aug. 5, 2025). Lyrics have also been licensed: Musixmatch has signed lyric licensing deals with Sony Music Publishing, Universal Music Publishing Group, and Warner Chappell Music to "ensure the writers of today and tomorrow are compensated for their creative works . . . in the dynamic, AI-powered world that is rapidly emerging." MUSIC BUSINESS WORLDWIDE, *Major Music Publishers Ink AI licensing Deals With Lyrics and Music Data Company Musixmatch* (Oct. 15, 2025).

Music content is also regularly licensed to major technology companies for other digital uses. Companies operating on-demand music streaming services, including Spotify, Apple, and Amazon, have negotiated and entered into licenses for tens of millions of sound recordings. *See, e.g.*, SPOTIFY, *Warner Music Group and Spotify Announce a New Multiyear Agreement* (Feb. 6, 2025); SPOTIFY, *Universal Music Group and Spotify Strike a New Multiyear Agreement* (Jan. 26, 2025); FINANCIAL TIMES, *Apple Music strikes new multiyear deals with major record labels* (Mar. 12, 2020); UNIVERSAL MUSIC GROUP, *Universal Music Group and Amazon Music Expand Global Relationship* (Dec. 23, 2024). Digital lyrics services have also licensed the lyrics to millions of songs—the same type of works that Anthropic copied but decided not to license in the instant case. MUSIXMATCH, *Musixmatch Business Solutions*; LYRICFIND, *Publishing With LyricFind*.

Outside the music industry, AI companies have similarly found it workable and desirable to license textual works from major publications and online platforms for AI "training." OpenAI has entered into licensing deals with numerous news outlets and platforms, including the Associated Press, Vox Media, Time, and The Atlantic. THE ASSOCIATED PRESS, *ChatGPT-maker OpenAI signs deal with AP to license news stories* (July 13, 2023); VOX MEDIA, *Vox Media and OpenAI Form Strategic Content and Product Partnership* (May 29, 2024); TIME, *TIME and OpenAI Announce Strategic Content Partnership* (June 27, 2024); THE ATLANTIC, *The Atlantic announces product and content partnership with OpenAI* (May 29, 2024). Amazon has agreed to license editorial content from the New York Times to use in "training" Amazon's AI platforms. THE NEW YORK TIMES, *The Times and Amazon Announce an A.I. Licensing Deal* (May 29, 2025).

The market for licensing copyrighted works to AI companies as "training" data is already highly lucrative. Researchers estimate it to be valued at over $3 billion and anticipate that the market could exceed $30 billion by 2034. REUTERS, Katie Paul & Anna Tong, *Inside Big Tech's Underground Race to Buy AI Training Data* (Apr. 5, 2024) (some researchers have "put the market at roughly $2.5 billion now and forecast it could grow close to $30 billion within a decade."); FORTUNE BUSINESS INSIGHTS, *AI Training Dataset Market Size, Share & Industry Analysis* (Mar. 9, 2026) ("According to Fortune Business Insights, the AI training dataset market is projected to reach USD 23.18 billion by 2034. . . . In 2025, the market value stood at USD 3.59 billion."). The rapid emergence and growth of this

Amicus Brief in Support of Plaintiffs' Motion for Partial Summary Judgment

licensing market disproves the (often self-serving) claim by AI developers that this market does not and supposedly cannot exist. As the Copyright Office has recognized, "licensing markets are available to meet AI training needs," and thus "unlicensed uses"—including Anthropic's unsanctioned AI "training" on Plaintiffs' lyrics here—are "disfavored under the fourth factor." Office AI Report at 70.

### B.    Requiring Anthropic to License Will Not Arrest AI Development

Anthropic and other AI companies are wrong to paint copyright law as a purported impediment to invention. As the Supreme Court recognized in *Warhol*, "payments like these are incentives for artists to create original works in the first place." 598 U.S. at 549. Courts that have already considered a fair use defense to unlicensed AI "training" acknowledge that an adverse ruling would not halt the wheel of technological progress but requires only that the AI company pay the artists for a license for such use. *Kadrey*, 788 F. Supp. 3d at 1038 ("The consequence will often be that the defendant needs to pay the copyright owner for a license that grants them permission to do whatever they were doing.").

Anthropic is currently raising money at a $380 billion valuation. ANTHROPIC, *Anthropic raises $30 billion in Series G funding at $380 billion post-money valuation* (Feb 12, 2026). It has already enjoyed significant investment from Microsoft, Nvidia, Google, and Amazon—some of the largest companies in the world who are also major players in AI. ANTHROPIC, *Microsoft, NVIDIA, and Anthropic announce strategic partnerships* (Nov 18, 2025); TECHCRUNCH, Ingrid Lunden, *Anthropic is expanding to Europe and raising more money* (May 13, 2024). Anthropic indisputably has the means to compensate copyright owners for its use of their works (as well as to secure the resources necessary to undertake the requisite licensing), and doing so will further incentivize human creation; there is no countervailing public policy reason to excuse Anthropic from having to pay to use protected lyrics.[5] *Cf. Warhol*, 598 U.S. at 549 ("It will not impoverish our world to require AWF to pay Goldsmith a fraction of the proceeds from its reuse of her copyrighted work."). With trillion-dollar companies footing the bill in the AI arms race and a robust licensing infrastructure already in place in the music industry (which can serve as a model for other industries), transaction costs are no legitimate obstacle

---

[5] In their brief in support of Plaintiffs' Motion for a Preliminary Injunction, Amici exposed as a false choice the notion that the law must pick between compliance with copyright law and technological progress by examining the similar rhetoric of mass infringers of old like Napster and Grokster.  *See* Dkt. 193-1 at 8-9.

to licensing. These companies "will only be forced to stop" their unlicensed training on copyrighted works "if they're unwilling . . . to pay for the right to do it." *Kadrey*, 788 F. Supp. 3d at 1038.

Contrary to Anthropic's warnings, it is not true that "a regime that always requires licensing . . . would, at a minimum, effectively lock up access to the vast majority of works[.]" REGULATIONS.GOV, *Anthropic Submission to USCO NoI on Artificial Intelligence and Copyright* at 9 (Oct. 30, 2023). Major record labels and music streaming services have historically negotiated and entered into licenses for millions of sound recordings, demonstrating the feasibility of doing so when commercially necessary. That some works may be difficult to license does not mean that all works should be copied and used for free. Requiring Anthropic to also enter into license agreements—or to forgo copying the works it cannot or will not license—will neither slow industrial advancement nor will it seriously harm Anthropic in its stated mission to build reliable AI systems.

**C.      The Existence of the Market Removes "The Danger of Circularity"**

While, as shown above, there is indisputably an existing market for licensing copyrighted works for copying in AI "training," proponents of fair use attempting to avoid liability commonly argue that this licensing market is "not one that the plaintiffs are legally entitled to monopolize," because "in every fair use case, the 'plaintiff suffers a loss of a potential market if that potential [market] is defined as the theoretical market for licensing' the use at issue in the case." *See Kadrey* 788 F. Supp. 3d at 1052, quoting *Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638, 652 (9th Cir. 2020). Thus, some courts have concluded that, in order to prevent the fourth factor analysis from becoming "circular" and favoring the copyright holder in every case, any harm from the loss of fees paid to license a work for a transformative purpose is not cognizable. *See id*. But this framing ignores that the market for licensing works for AI "training" is not "theoretical" but real. It presumes that the use of expressive works for training AI systems is *per se* transformative, without the inquiry into the purpose of that use that is required by *Warhol*. And it elevates that presumption to a dispositive fair use conclusion, bypassing the requisite fourth factor analysis altogether, contrary to *Warhol*.

The *Kadrey* decision did not address the myriad cases in which the existence of an actual or potential market to license the use at issue sufficed to find market harm under the fourth factor, including cases considering now-familiar-but-once-revolutionary technologies, like photocopying. "It

Amicus Brief in Support of Plaintiffs' Motion for Partial Summary Judgment

is indisputable that, as a general matter, a copyright holder is entitled to demand a royalty for licensing others to use its copyrighted work, and that the impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor." *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 180 (2d Cir. 2018) (recognizing TVEyes was depriving Fox of potential licensing revenues and that Fox might wish to itself exploit the market). *Kadrey* also did not recognize the limited scope of the "circularity" issue. Courts have repeatedly stated that one can "avoid the vice of circularity" by considering "only traditional, reasonable, or likely to be developed markets"—as opposed to merely hypothetical or theoretical ones—when evaluating the effect of a use upon a potential market. *Ringgold v. Black Ent. Television, Inc.*, 126 F.3d 70, 81 (2d Cir. 1997).

In the *American Geophysical Union* case, which considered then-novel photocopying technology, the Second Circuit found that Texaco's unlicensed photocopying of articles caused market harm because publishers had licensed that use, even though that market was relatively new. 60 F.3d at 930. To address the "circularity" concern, it suggested that courts should not "automatically . . . conclude in every case that potential licensing revenues were impermissibly impaired simply because the secondary user did not pay a fee for the right to engage in the use." *Id.* at 929–31, 929 n.17. Therefore, a court evaluating fair use should not look to whether the use harmed a hypothetical or theoretical market, but instead whether it served as a substitute in a market that the copyright owner reasonably expected to exploit. *See* 4 Nimmer, Nimmer on Copyright, § 13.05[A][4] (2026).

Viewed in this context, the cases most often cited by AI companies in support of "circularity," *see, e.g.,* Anthropic's Motion for Summary Judgment at 18-19, *Bartz v. Anthropic PBC*, No. 3:24-CV-05417-WHA (N.D. Cal. Mar. 27, 2025), Dkt. 122, are inapposite, as they involved only speculative potential markets with no history of licensing—far from the marketplace for AI "training" licenses that has developed and is growing:

- In *Tresóna Multimedia, LLC*, 953 F.3d at 651, the Ninth Circuit found that no potential licensing market existed for the nonprofit, educational use of snippets of musical works in new student choral arrangements.

- In *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1179 (9th Cir. 2013), plaintiff conceded that the value of his work was unaffected by a band's brief display of his illustration in a collage during a live performance and presented no evidence regarding a licensing market for this type of use.

- In *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614 (2d Cir. 2006), the plaintiff failed to demonstrate any market for the use of reduced-sized versions of concert posters for informative purposes in biographies.

- In *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 742 F.3d 17, 35 (2d Cir. 2014), the plaintiff did not even know whether there existed a potential market for recordings of earnings calls convened by certain foreign companies, and only compiled this information to inform investors, not to earn licensing royalties.

- In *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 22, 38 (2021), the Supreme Court's decision was expressly limited to the specific type of computer code at issue in that case, and the Court carefully distinguished computer code from expressive works (like the copied lyrics at issue here). Moreover, the evidence showed that, "at a minimum, it would have been difficult for Sun to enter the smartphone market."

- In *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 100 (2d Cir. 2014), the court acknowledged that "[l]ost licensing revenue counts under Factor Four . . . when the use serves as a substitute for the original," but held that copying to create a search platform did not result in substitution.

These cases—none of which concerned an actual, non-hypothetical market for a purportedly "transformative" use—demonstrate that "circularity" fears fall away when the potential markets are limited to those that are "traditional, reasonable, or likely to develop." Such decisions show that even a transformative use is not necessarily fair if it results in the creation of substitutive works which impair the market for or value of the works copied. Here, Anthropic copies works in their entirety, including their protected expression, to generate new competing expressive works derived from the taken expression. Moreover, to the extent these pre-*Warhol* decisions—or Anthropic or any of its *amici*—suggest that a finding of transformativeness precludes consideration of fourth factor market harm, they incorrectly elevate a determination (currently just their own presumption) that a secondary work is transformative to one dispositive as to fair use, which is at odds with *Warhol*, which both narrowed what "transformative" means and clarified that a finding of "transformativeness" does not lead ineluctably to a conclusion that the use was fair. *See* 598 U.S. at 525-532.[6]

## CONCLUSION

For the foregoing reasons, Amici respectfully request that the Court grant Plaintiffs' motion.

---

[6] Other AI companies have set forth strawman arguments in favor of circularity, imagining an artist who copies copyrighted books to make confetti to assert that a copyright owner's monopoly "protects only their original expression, not any and all uses of their work." Meta's Motion for Partial Summary Judgment at 27-28, *Kadrey v. Meta Platforms, Inc.*, No. 3:23-cv-03417-VC-TSH (N.D. Cal. Mar. 28, 2025), Dkt. 501. These arguments overlook that, in making the confetti, no new book or lyrics have been created that could compete with the demand for or harm the value of the original work.

Dated: March 30, 2026                    Respectfully submitted,


**PRYOR CASHMAN LLP**

_s/ Benjamin S. Akley_
Benjamin S. Akley (State Bar No. 278506)
1901 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
(310) 683-6900
bakley@pryorcashman.com

Frank P. Scibilia (admitted _pro hac vice_)
Joshua Weigensberg (admitted _pro hac vice_)
Nathaniel Kazlow (_pro hac vice_ admission pending)
7 Times Square, 40th Floor
New York, NY 10036
(212) 421-4100
fscibilia@pryorcashman.com
jweigensberg@pryorcashman.com
nkazlow@pryorcashman.com

_Counsel for Amici_

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on March 30, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send Notices of Electronic Filing to all counsel of record.

*s/ Benjamin S. Akley*
Benjamin S. Akley
