# EXHIBIT A

Jacqueline C. Charlesworth (SBN 326742)
JCharlesworth@fkks.com
Ruby A. Strassman (SBN 346601)
RStrassman@fkks.com
FRANKFURT KURNIT KLEIN + SELZ PC
2029 Century Park East, Suite 2500N
Los Angeles, California 90067
Telephone:     (310) 579-9600
Facsimile:     (310) 579-9650

*Attorneys for Amici Curiae Association of
American Publishers, News/Media Alliance,
International Association of Scientific, Technical
& Medical Publishers, and Authors Guild*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., ET AL.,<br><br>    Plaintiffs,<br><br>    v.<br><br>ANTHROPIC PBC,<br><br>    Defendant. | Case No. 5:24-cv-03811-EKL<br><br>**BRIEF OF *AMICI CURIAE* ASSOCIATION OF AMERICAN PUBLISHERS, NEWS/MEDIA ALLIANCE, INTERNATIONAL ASSOCIATION OF SCIENTIFIC, TECHNICAL & MEDICAL PUBLISHERS, AND AUTHORS GUILD IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |

BRIEF OF AMICI CURIAE AAP, N/MA, STM, AND AUTHORS GUILD IN SUPPORT OF PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT

Frankfurt Kurnit Klein+Selz PC
2029 Century Park East, Suite 2500N
Los Angeles, California 90067
P (310) 579-9600

## TABLE OF CONTENTS

STATEMENT OF AMICI CURIAE ..................................................................................................... 1

SUMMARY OF ARGUMENT ......................................................................................................... 2

ARGUMENT ..................................................................................................................................... 5

I.   Unauthorized AI Uses Interfere with Copyright Owners' Ability to Invest in and Realize Value from Original Works of Authorship ........................................................................... 5

  A.   Publishers Invest Heavily in Producing High-Quality Textual Works ............................... 5

  B.   AI Companies Require Valuable, High-Quality Works for Training .................................... 6

  C.   Unauthorized Ingestion and Storage of Copyrighted Works Cannot Be Excused as Transformative ..................................................................................................................... 7

  D.   There Is a Robust Market for Licensing AI Data ................................................................. 9

II.  Using Copyrighted Works to Train LLMs Without a License Is Incompatible with Fair Use 11

  A.   Anthropic's Unlicensed Use of Copyrighted Works Usurps Publishers' and Authors' Direct and Derivative Markets ............................................................................................ 11

  B.   Healthy Licensing Markets Advance the Goals of Copyright ............................................ 14

Frankfurt Kurnit Klein+Selz PC
2029 Century Park East, Suite 2500N
Los Angeles, California 90067
P (310) 579-9600

Case No. 5:24-cv-03811-EKL

BRIEF OF AMICI CURIAE AAP, N/MA, STM, AND AUTHORS GUILD IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Frankfurt Kurnit Klein+Selz PC
2029 Century Park East, Suite 2500N
Los Angeles, California 90067
P (310) 579-9600

## TABLE OF AUTHORITIES

**Page(s)**

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 8 ................................................................................................ 3, 5

**Cases**

*American Geophysical Union v. Texaco, Inc.*,
    60 F.3d 913 (2d Cir. 1994) ..................................................................................... 13

*Andy Warhol Foundation for the Visual Arts v. Goldsmith*,
    598 U.S. 508 (2023) ..................................................................... 4, 5, 9, 11, 13

*Associated Press v. Meltwater U.S. Holdings, Inc.*,
    931 F. Supp. 2d 537 (S.D.N.Y. 2013) ...................................................................... 6

*Bartz v. Anthropic PBC*,
    787 F. Supp. 3d 1007 (N.D. Cal. 2025) ............................................................. 4, 13

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994) ....................................................................... 4, 11, 13, 14

*Dr. Seuss Enters., L.P. v. ComicMix LLC*,
    983 F.3d 443 (9th Cir. 2020) ................................................................................ 14

*Fox News Network LLC v. TVEyes, Inc.*,
    883 F.3d 169 (2d Cir. 2018) ........................................................................... 11, 14

*Harper & Row*, *Publishers, Inc. v. Nation Enters.*,
    471 U.S. 539 (1985) .......................................................................................... 4, 11

*Kadrey v. Meta Platforms, Inc.*,
    788 F. Supp. 3d 1026 (N.D. Cal. 2025) ....................................... 3, 4, 8, 9, 12, 13

**Statutes**

17 U.S.C. § 106(2) ........................................................................................................... 11

17 U.S.C. § 107(4) ........................................................................................... 4, 11, 13, 14

**Other Authorities**

A. Feder Cooper, et al., *Estimating Near-Verbatim Extraction Risk in Language Models with Decoding-Constrained Beam Search*, arXiv (Mar. 26, 2026) ............................ 8

Ahmed Ahmed, et al., *Extracting Books from Production Language Models*, arXiv (Jan. 6, 2026) ....................................................................................................... 8

     Case No. 5:24-cv-03811-EKL

BRIEF OF AMICI CURIAE AAP, N/MA, STM, AND AUTHORS GUILD IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Frankfurt Kurnit Klein + Selz PC
2029 Century Park East, Suite 2500N
Los Angeles, California 90067
P (310) 579-9600

*AI Training Dataset Market Report 2025: Market to Reach $18.47 Billion by 2034 from $2.62 Billion in 2024, E-Commerce Expansion and LLM Adoption, Depsite Talent Shortage Risks,* Globe Newswire (May 12, 2025) .......................................... 12

*Anthropic Raises $30 Billion in Series G Funding at $380 Billion Post-money Valuation*, Anthropic (Feb. 12, 2026) ................................................................................ 3

Association of American Publishers, Comment on Artificial Intelligence and Copyright (Oct. 30, 2023),  ........................................................................................ 7

Billboard on the Record, *How Suno AI Is Disrupting the Music Industry w/ Mikey Shulman* (Spotify Podcast, Mar. 11, 2026) ............................................................... 14

Jim Shimabukuro, *AI Memorization: Implications from 2026 and Beyond*, ETC Journal (Jan. 10, 2026) ............................................................................................. 7

Melissa De Witte, *Stanford Scholars Are Helping Journalists Do Investigative Journalism Through Data*, Stanford Rep. (Oct. 15, 2018) ......................................... 6

News/Media Alliance, *White Paper: How the Pervasive Copying of Expressive Works to Train and Fuel Generative Artificial Intelligence Systems Is Copyright Infringement and Not a Fair Use* (2023) ................................................. 7

Peter Osnos, *These Journalists Spent Two Years and $750,000 Covering One Story*, The Atlantic (Oct. 2, 2013) ............................................................................ 6

Rick Merritt, *What Is Retrieval-Augmented Generation, aka RAG?* (Jan. 31, 2025) ............................................................................................................ 8

Terrence Hart, *Bartz, Kadrey, and the Market for AI Training*, Copyhype (July 10, 2025) .......................................................................................................... 14

*The Cost of a Journalism Story*, My News Desk (Sept. 6, 2018) ................................... 6

Xinyue Liu, et al., *Alignment Whack-a-Mole: Finetuning Activates Verbatim Recall of Copyrighted Books in Large Language Models*, arXiv (Mar. 21, 2026) ............................. 8

Yunfan Gao, et al., *Retrieval-Augmented Generation for Large Language Models: A Survey*, Shanghai Inst. for Intel. Autonomous Sys. (Mar. 27, 2024) .................................... 8

BRIEF OF AMICI CURIAE AAP, N/MA, STM, AND AUTHORS GUILD IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**STATEMENT OF AMICI CURIAE**

*Amici curiae* Association of American Publishers, Inc. ("AAP"), the News/Media Alliance ("N/MA"), the International Association of Scientific, Technical & Medical Publishers ("STM"), and the Authors Guild are trade associations whose publisher and author members license works to AI companies to train and operate generative AI systems. *Amici* have a strong interest in the matter before the Court because a determination of fair use in this case could disrupt a vital market for authors and publishers of textual works, on the one hand, and developers seeking high-quality content to build and enable more sophisticated AI products, on the other.[1]

AAP is a not-for-profit organization that represents approximately 120 book, journal, and education publishers in the United States on matters of law and policy, advocating for outcomes that incentivize the publication of creative expression, professional content, and learning solutions. AAP's members have a direct and compelling interest in the efficacy, administration, and enforcement of federal copyright laws, including the correct application of the fair use doctrine to further the purpose of copyright. They invest in and make available to the public a wide range of works, including literature, scholarship, professional content, and scientific journals. Just as the long-term public interest is served by protecting the exclusive rights of copyright owners, the long-term potential of AI technology will only be realized by preserving the marketable rights that enable authors, publishers, and AI developers to engage in mutually beneficial commercial transactions.

N/MA is a nonprofit organization representing over 2,200 publishers in the United States, ranging from the largest news and magazine publishers in the country to hyperlocal newspapers, and from digital-only outlets to papers that have printed news since the nation's founding. Its members invest in the investigation, reporting, and publication of news stories and analysis that are foundational to an informed citizenry and democratic governance. As the leading voice for the industry, N/MA advocates for laws and policies that allow high-quality journalism to thrive,

---

[1] No party or its counsel authored this brief in whole or in part or contributed money intended to fund the preparation or submission of this brief.

BRIEF OF AMICI CURIAE AAP, N/MA, STM, AND AUTHORS GUILD IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Frankfurt Kurnit Klein + Selz PC
2029 Century Park East, Suite 2500N
Los Angeles, California 90067
P (310) 579-9600

including a balanced interpretation of the fair use exception to copyright.

STM is the leading global trade association for academic and professional publishers. STM members represent learned societies, university presses, and private companies of all sizes in the academic and professional publishing industry.  Its members collectively publish over 60 percent of all English language journal articles and tens of thousands of monographs and reference works.  STM members' works include many thousands, if not millions, of the scientific articles, academic textbooks, and professional reference books implicated by AI training ingestion.  STM has been actively representing the interests of its members as they relate to AI issues, and champions a vision of truthful, responsible, and reliable AI systems that use STM members' copyrighted content in AI training only with authorization, compensation, and attribution.

The Authors Guild, founded in 1912, is a national non-profit association of over 17,000 professional, published writers of all genres including periodicals and other composite works.  The Authors Guild counts among its members the full spectrum of American authors, including novelists, historians, biographers, academicians, journalists, and other writers of nonfiction and fiction.  The Authors Guild works to promote the rights and professional interests of authors in various areas, including copyright, freedom of expression, and fair pay.  Many Authors Guild members earn their livelihoods through their writing.  Their work covers important issues in history, biography, science, politics, medicine, business, and other areas; they are frequent contributors to the most influential and well-respected publications in every field.  The Authors Guild's members are the creators on the front line, fighting to enforce their constitutional rights under copyright to reap financial benefits from their labors.

## SUMMARY OF ARGUMENT

The central question in this case is whether a for-profit multibillion-dollar company should be able to systematically copy human-authored works without permission and use those works to train AI models to generate content that displaces the works so taken.  The answer is no. Regardless of how sophisticated the copying technology may be, copyright law does not permit copiers to generate substitutional works for commercial gain.  *Amici* AAP, N/MA, STM, and Authors Guild urge this Court to reject defendant Anthropic PBC's claims of fair use under the

Frankfurt Kurnit Klein+Selz PC
2029 Century Park East, Suite 2500N
Los Angeles, California 90067
P (310) 579-9600

Frankfurt Kurnit Klein + Selz PC
2029 Century Park East, Suite 2500N
Los Angeles, California 90067
P (310) 579-9600

banner of AI exceptionalism and recognize Anthropic's exploitative behavior for what it is: infringement on a massive scale.

Anthropic, a company currently valued at 380 billion dollars,[2] asks this Court to excuse as a fair use massive, commercially motivated copying of song lyrics to enable its large language model ("LLM") Claude to generate substitutional works—including nearly identical lyrics—a ruling that would have disastrous consequences for the music plaintiffs in this action and the songwriters whose works they invest in and publish.  Even beyond the confines of this case, such a ruling could also eviscerate a vital market for authors and publishers of books, news and magazines, scholarly articles, and other textual works who license those works to AI companies to train and operate their LLMs.

When copyrighted material is taken and used without permission to train AI systems to generate competing works, it robs authors of the rightful proceeds of those works and their incentive to create, and undermines publishers' ability to invest in and disseminate original works of authorship—whether song lyrics, novels, specialized journals, or news articles.[3]  As the Framers understood, copyright protection is essential to ensuring that human authors are motivated to produce the books, newspapers, and other texts that are foundational to a healthy democracy and human progress.  *See* U.S. Const. art. I, § 8, cl. 8 (copyright clause).  Indeed, generative AI would not and could not exist without the ingenuity of human authors.

It is an essential principle of copyright that one may not appropriate and use another's copyrighted work for a commercial purpose that usurps a market belonging to the copyright owner—including a market to license the reproduction and use of works to train and operate generative AI systems.  As shown below, Anthropic's peers have obtained licenses to use textual

---

[2] *Anthropic Raises $30 Billion in Series G Funding at $380 Billion Post-money Valuation*, Anthropic (Feb. 12, 2026), https://tinyurl.com/27mh3sw3.

[3] *See Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1060 (N.D. Cal. 2025) (explaining that fair use is a fact-specific doctrine and inquiry that must be answered flexibly "in light of the purpose of copyright and fair use: protecting the incentive to create by preventing copiers from creating works that substitute for the originals in the marketplace").

Frankfurt Kurnit Klein+Selz pc
2029 Century Park East, Suite 2500N
Los Angeles, California 90067
P (310) 579-9600

works to develop and operate AI systems.[4]  Anthropic, however, seems committed to being a holdout by refusing to share with human authors any of the enormous value it reaps from the exploitation of their works.

Anthropic's unauthorized, for-profit use of copyrighted works does not qualify as a fair use because, *inter alia*, it violates the fourth factor of the test set forth in section 107 of the Copyright Act by undermining a significant market for rightsholders.  Factor four, the primary consideration in evaluating fair use, asks courts to assess "the effect of the use upon the potential market for or value of the copyrighted work," including whether "unrestricted and widespread conduct of the sort engaged in by the defendant" is harmful to copyright owners' rightful markets.  17 U.S.C. § 107(4); *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994); *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985) (instructing that the fourth factor is "undoubtedly the single most important element of fair use"); *Andy Warhol Foundation for the Visual Arts v. Goldsmith*, 598 U.S. 508, 555 (2023) (same).  Here there can be no question that Anthropic's copying undercuts such markets.

Regardless of whether one considers the unauthorized mass reproduction of copyrighted works to capitalize on their human authorship to be "transformative"—and *amici* do not—such copying cannot overcome the critical fourth fair use factor because its purpose and effect is to displace markets that belong to the owners of those works.  These include not only markets for substitutional content, but the valuable market for licensing of AI training materials.  Notably, in declining to fully consider harm to the AI training market, the decisions in *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026 (N.D. Cal. 2025) and *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007 (N.D. Cal. 2025), failed to abide by the Copyright Act and the Supreme Court's clear directive to weigh potential harm to copyright owners' derivative markets.  *See* 17 U.S.C. § 107(4); *Harper & Row*, 471 U.S. at 568 (fourth factor inquiry "must take account not only of harm to the original, but also of harm to the market for derivative works"); *Campbell*, 510 U.S. at 593

---

[4] *See* below chart and Appendix A.

("[T[he licensing of derivatives is an important economic incentive to the creation of originals.").

A healthy and incentivized licensing market advances the goals of copyright by permitting AI companies like Anthropic to access and use high-quality materials to train better, more sophisticated AI models while protecting rightsholders from uncompensated exploitation. Other AI developers, such as Suno, understand that licensing arrangements are not one-sided deals solely for the benefit of rightsholders, but instead valuable partnerships that allow AI companies to access curated content and innovate with copyright owner consent.

*Amici* urge this Court to reject Anthropic's claim of fair use and uphold the core principle of the Supreme Court's recent ruling in *Warhol* that the unauthorized appropriation of a copyrighted work to compete with a copyright owner's own market is incompatible with fair use.

**ARGUMENT**

**I.    Unauthorized AI Uses Interfere with Copyright Owners' Ability to Invest in and Realize Value from Original Works of Authorship**

Although this case arises out of the music world, Anthropic's assertion that its unlicensed use of the plaintiffs' copyrighted song lyrics to train Claude should be exonerated could have significantly broader ramifications, including for authors and publishers of books, news, scholarship, and other textual works. *Amici*'s members' production of reliable, original news content, literature, scholarship, and other textual works is dependent upon their ability to recoup their investment in quality journalism and authorship. Without copyright protection—and the ability to earn revenue—there would be no sustainable business model for the creation and distribution of creative works.

**A.    Publishers Invest Heavily in Producing High-Quality Textual Works**

Copyright encourages the creation, commercialization, and dissemination of new works to the public, thereby fulfilling the Framers' goal of promoting the "progress of science and the useful arts." U.S. Const. art. I, § 8, cl. 8. Publishers of textual works, including literature, scholarship, and scientific journals, devote significant resources in bringing authors' works to market, investing in copyediting, fact-checking, contextualizing, tagging, linking metadata, peer review and editorial support, while at the same time taking the risk that a given work may not

Frankfurt Kurnit Klein+Selz PC
2029 Century Park East, Suite 2500N
Los Angeles, California 90067
P (310) 579-9600

yield enough revenue to cover these costs. This risk is greatly magnified by the freeriding tactics of companies like Anthropic who copy human-authored works to generate substitutional content.

Publishers of books invest in authors, advancing funds to support the writing process and providing ongoing editorial support, which can span years. In addition, book publishers bear the up-front costs of producing the physical and electronic copies for distribution to the public. Once the books are in the marketplace, publishers are responsible for tracking and paying royalties to the authors of those works, requiring sophisticated IT systems. None of this would be possible without the protections of copyright.

Quality journalism is likewise expensive: news publishers invest in editorial, operational, security, and legal support for their reporters. New organizations employ professional journalists to produce investigative reporting, lifestyle, business, and opinion coverage, among other types of content, while delivering an accurate stream of breaking news covering local, national, and global events.[5] Copyright protection plays an integral role in supporting quality journalism and publishing. "Investigating and writing about newsworthy events occurring around the globe is an expensive undertaking and enforcement of the copyright laws permits [news organizations] to earn the revenue that underwrites the work." *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 553 (S.D.N.Y. 2013).

**B.      AI Companies Require Valuable, High-Quality Works for Training**

Because the works published by *amici*'s members are of high-quality they are especially

---

[5] *See*, *e.g.*, Melissa De Witte, *Stanford Scholars Are Helping Journalists Do Investigative Journalism Through Data*, Stanford Rep. (Oct. 15, 2018), https://tinyurl.com/NMAStanfordRep ("[I]t can cost newsrooms up to $300,000 and six months of a reporter's time to do a deep dive into public interest issues like crime and corruption. In one case, it cost a newsroom $487,000 to produce an investigative series on local police shootings." (emphasis omitted)); *The Cost of a Journalism Story*, My News Desk (Sept. 6, 2018), https://tinyurl.com/NMAMyNewsDesk (estimating the cost of detailed or investigative news story at $400 to $12,000, general news story at $100 to $4,500, and filler story at $50 to $300 each); Peter Osnos, *These Journalists Spent Two Years and $750,000 Covering One Story*, The Atlantic (Oct. 2, 2013), https://tinyurl.com/NMAAtlantic ("We conservatively estimate the cost of this coverage [of the dangers of acetaminophen] at $750,000; it could be more. This covers the reporters, news applications and web developers, editors, video production, social media and PR, travel, legal review, … etc.").

BRIEF OF AMICI CURIAE AAP, N/MA, STM, AND AUTHORS GUILD IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Frankfurt Kurnit Klein+Selz PC

2029 Century Park East, Suite 2500N
Los Angeles, California 90067
P (310) 579-9600

Frankfurt Kurnit Klein+Selz PC
2029 Century Park East, Suite 2500N
Los Angeles, California 90067
P (310) 579-9600

valuable for the training of generative AI systems.  As the AAP explains:

> Professionally edited books, rich in prose, provide high quality expression for long range context modeling research and cohesive storytelling, and models trained on these materials produce higher quality outputs than models trained on social media posts, or the limited character musings embodied in what used to be called "tweets."  Likewise, well-edited and peer-reviewed textbooks, educational materials, and scientific and scholarly publications are indispensable to training AI models to perform better at tasks in specific knowledge domains, and indispensable to developing trustworthy AI technologies.[6]

The same is true of news content:  "[News] [p]ublisher content is a major category of expressive information contained in the datasets used to build the LLMs.  News and media reports ranks third among all categories of sources in Google's C4 data set, and half of the top ten represented sites overall are news outlets."[7]

Authors' and publishers' investment in creating high-value textual works is severely threatened when AI companies appropriate vast quantities of copyrighted works without permission or compensation.

**C.     Unauthorized Ingestion and Storage of Copyrighted Works Cannot Be Excused as Transformative**

Contrary to AI companies' claims that their copying is transformative because copied works are *not* retained in their LLMs,[8] a recent study by Stanford and Yale researchers confirms that textual works do not disappear once ingested into the models, but instead are memorized by

---

[6] Association of American Publishers, Comment on Artificial Intelligence and Copyright (Docket No. 2023-6) (Oct. 30, 2023), https://www.regulations.gov/comment/COLC-2023-0006-9070 (internal quotations and citations omitted).

[7] News/Media Alliance, *White Paper: How the Pervasive Copying of Expressive Works to Train and Fuel Generative Artificial Intelligence Systems Is Copyright Infringement and Not a Fair Use* (2023), https://tinyurl.com/2ky9ht4d.

[8] Jim Shimabukuro, *AI Memorization: Implications for 2026 and Beyond*, ETC Journal (Jan. 10, 2026), https://tinyurl.com/5dcbr2dy ("AI companies assured the U.S. Copyright Office that their models don't store copies of training information.  OpenAI told regulators that models do not store copies of the information they learn from, while Google similarly claimed there is no copy of training data present in the model itself.  These statements, made under the authority of regulatory filings, now appear difficult to reconcile with empirical findings.").

the system and can be reproduced as output.[9]  The findings of this study mirror those of others concluding that AI systems are not simply "learning" statistical information about works, but storing the works themselves.[10]  In short, memorization of copyrighted texts by LLMs like Anthropic's Claude is far more significant "than previously understood."[11]

There is nothing transformative about making and storing copies of textual works.  Nor is there anything transformative about using those copies to generate substantially similar content; it's just more copying.

Still more, LLMs often depend on retrieval-augmented generation ("RAG") to supplement their capabilities.  To the extent a model is unable to rely on its training data to answer a user query—*e.g.*, because it pertains to an event that postdates its training process—it can access and scrape content from a third-party site using RAG technology to construct a response.[12]  A model may copy journalistic content, for example, from a publisher's website to fulfill a user request, in which case the user does not need to visit the website containing the source article; as the *Kadrey*

[9] Ahmed Ahmed, et al., *Extracting Books from Production Language Models*, arXiv (Jan. 6, 2026), https://arxiv.org/pdf/2601.02671 (noting that, in context of generative AI, memorization refers to data that has "been encoded in a model's weights during training, and often also refers to whether those data can be extracted (near-)verbatim in that model's outputs.").

[10] *See*, *e.g.*, A. Feder Cooper, et al., *Estimating Near-Verbatim Extraction Risk in Language Models with Decoding-Constrained Beam Search*, arXiv (Mar. 26, 2026) (preprint), https://arxiv.org/pdf/2603.24917 (AI memorization tests that include near-verbatim copies significantly increases the frequency of identifying extraction/memorization of copyrighted content); Xinyue Liu, et al., *Alignment Whack-a-Mole: Finetuning Activates Verbatim Recall of Copyrighted Books in Large Language Models*, arXiv (Mar. 21, 2026) (preprint), https://arxiv.org/pdf/2603.20957v2 ("Taken together, our results demonstrate that frontier models store copies of books in a compressed format inside their weights [] and safety alignment, as currently implemented, does not prevent the regurgitation of copyrighted content…").

[11] *Ahmed* at 3.

[12] *See*, *e.g.*, Rick Merritt, *What Is Retrieval-Augmented Generation, aka RAG?*, NVIDIA (Jan. 31, 2025), https://tinyurl.com/NMANvidia ("[RAG] is a technique for enhancing the accuracy and reliability of generative AI models with information fetched from specific and relevant data sources.  In other words, it fills a gap in how LLMs work."); Yunfan Gao, et al., *Retrieval-Augmented Generation for Large Language Models: A Survey*, Shanghai Inst. for Intel. Autonomous Sys. 1, 2 (Mar. 27, 2024), https://tinyurl.com/NMAGaoetal (describing question about recent news "a typical application of RAG.").

BRIEF OF AMICI CURIAE AAP, N/MA, STM, AND AUTHORS GUILD IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

court acknowledged, "certain types of works (like news articles)" may be especially vulnerable to "indirect competition" from AI outputs. 788 F. Supp. 3d at 1060. Regardless of any claimed transformativeness, a substitutional use that supplants the copyright owner's market—"copyright's bête noire"—is incompatible with fair use. *Warhol*, 598 U.S. at 528.

### D. There Is a Robust Market for Licensing AI Data

Allowing AI companies like Anthropic to appropriate textual works without compensation under the guise of fair use, and enabling them to divert users away from legitimate sources— including book retailers, subscription-based services, and ad-supported sites that generate revenue for publishers—will severely undermine the increasingly significant market for licensed uses in which publishers and AI companies alike are actively engaged.

Many companies in the generative AI space, including OpenAI, Microsoft, Google, Meta, Amazon, Perplexity, and Mistral, have entered into licensing agreements with publisher members of *amici* to access and use the works necessary to build and operate their systems. The chart below lists AI licensing deals for textual works of which *amici* are aware or that have been publicly reported:[13]

**AI Licensing Deals for Textual Works**
**(As Publicly Announced and/or Reported by *amici*'s Members)[14]**

| Licensee | Publishers |
|---|---|
| Amazon | The Associated Press; Business Insider; Condé Nast; Defined.ai (aggregator); Forbes; Hearst; The New York Times; Politico; Reach PLC; Reuters; TIME; USA Today Co; Vox Media; The Washington Post; and reports of various unnamed publishers |
| Bria | Various news publishing partners via News/Media Alliance (offering opt-in license to its members) |
| Dow Jones (for Factiva products and solutions) | Over 8,000 publishing partners, including Adweek; The Associated Press; The Atlantic; AWP Finanznachrichten; Barron's; Beijing Review; Dow Jones Newswires; EFE; Exame; Fast Company; Financial News; The Globe and Mail; Hong Kong Economic Times; IBD; MarketWatch; McClatchy Media; The National; News Corp Australia; News UK; Newsquest Media Group; Private Equity News; USA Today Co; The Wall Street Journal; The Washington Post |

---

[13] Undoubtedly there are many more licensing deals that are confidential or still in the pipeline.

[14] Supporting citations for this chart are set forth available in Appendix A.

Case No. 5:24-cv-03811-EKL

BRIEF OF AMICI CURIAE AAP, N/MA, STM, AND AUTHORS GUILD IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Frankfurt Kurnit Klein+Selz pc

2029 Century Park East, Suite 2500N
Los Angeles, California 90067
P (310) 579-9600

| Licensee | Publishers |
|---|---|
| Google | The Associated Press; The Atlantic; Defined.ai (aggregator); Der Spiegel; The Economist; El País; Financial Times; Folha de S. Paulo; The Guardian; Infobae; Kompas; Reddit; Stack Overflow; The Times of India; The Washington Examiner; The Washington Post; and reports of various unnamed publishers |
| LexisNexis | The Associated Press; Benzinga; USA Today Co |
| Meta | CNN; The Daily Caller; Fox News and Fox Sports; Le Monde; News Corp; People Inc.; Reuters; USA Today Co and USA Today Network; The Washington Examiner |
| Microsoft | The Associated Press; Axel Springer; Business Insider; Condé Nast; Financial Times; HarperCollins; Hearst; Informa; People Inc.; Reuters; Semafor; Taylor & Francis; USA Today Co; Vox Media |
| Mistral | Agence France-Presse |
| OpenAI | The Associated Press; The Atlantic; Axel Springer; Axios; Condé Nast; Financial Times; Free Law Project; Future; GEDI; Guardian Media Group; Hearst; Le Monde; News Corp; People Inc.; Prisa Media; Schibsted Media Group; TIME; Vox Media; The Washington Post |
| OpenEvidence | JAMA Network; NEJM Group; Wiley |
| Particle News | Agence France-Press; The Atlantic; Fortune; The Observer; Reuters; The Street; TIME |
| Perplexity | AccuWeather; Adweek; Blavity; CNN; Condé Nast; Der Speigel; DPReview; Entrepreneur; Fortune; Gannett; Gear Patrol; The Independent; Le Figaro; Le Monde; Lee Enterprises; The Los Angeles Times; Media Lab; Mexico News Daily; Minkabu the Infonoid; NewsPicks; Pris Media; RTL Germany; The Texas Tribune; TIME; USA Today Co; The Washington Post; Wiley; World History Encyclopedia; Yelp |
| Pi School | Wiley |
| Potato | Wiley |
| ProRata.ai | Over 1000 publishers, including via News/Media Alliance (offering opt-in license to its members); Adweek; The Atlantic; Arena Group; Atlas Obscura; Axel Springer; Boston Globe Media; Buzzfeed; Cherry Road Media; DMG Media Group; DPCMO; EFE; Fast Company; Financial Times; FiscalNote; Fortune; Frommer's; Future; Gear Patrol; Graham Holdings Company; Guardian Media Group; Healthline; Hello!; IBT Media; Industry Drive; Johns Hopkins University Press; Lee Enterprises; Man of Many; Map Happy; Mediahuis; Mumsnet; The Nation; The New Republic; Newsday; Newstex; The Philadelphia Inquirer; PRISA Media; Pro Football Network; Prospect; Reach PLC; Reader's Digest; Recurrent Ventures; Skift; Sky Media Group; Snopes; StyleBlueprint; TIME; TipRanks; Vox Media; Washingtonian; Worth; 270 Media |

As illustrated above, it is clear that the AI licensing market is an important secondary market benefiting both rightsholders and AI companies by enabling developers to continue to innovate with the benefit of high-quality, curated materials to facilitate training and RAG uses, while fairly compensating copyright owners for use of their works.

10                                    Case No. 5:24-cv-03811-EKL

Anthropic's choice to wantonly scrape online and third-party sources for copyrighted works to train its Claude LLM—rather than obtain authorization and compensate rightsholders like its peers—undermines a critical licensing market that allows publishers of textual works to invest in the creation and distribution of new works and continued distribution of previously published works, including archival materials.

## II. Using Copyrighted Works to Train LLMs Without a License Is Incompatible with Fair Use

### A. Anthropic's Unlicensed Use of Copyrighted Works Usurps Publishers' and Authors' Direct and Derivative Markets

As the Supreme Court has instructed, the fourth fair use factor—the effect of the use upon the potential market for or value of the copyrighted work—is "undoubtedly the single most important element of fair use." *Harper & Row*, 471 U.S. at 566; *Warhol*, 598 U.S. at 555 (same). Notably, it is not just existing markets that must be considered under the fourth factor, but also "potential" markets. 17 U.S.C. § 107(4) (requiring courts to evaluate "the effect of the use upon the potential market for or value of the copyrighted work"); *Campbell*, 510 U.S. at 590 (calling for courts to consider "not only the extent of the market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant…would result in a substantially adverse impact") (internal quotations omitted); *Harper & Row*, 471 U.S. at 568 (explaining courts "must take account not only of harm to the original but also of harm to the market for derivative works").

AI uses that exploit copyrighted works to produce substitutional content are incompatible with fair use. An AI service that copies news content or books to spit out competing summaries or abridgements, for example, is plainly infringing. *See Fox News Network LLC v. TVEyes, Inc.*, 883 F.3d 169, 180-81 (2d Cir. 2018) (service allowing users to search for and watch broadcast news clips was not a fair use because it "usurped a function for which [the copyright owner] is entitled to demand compensation under a licensing arrangement"). With respect to derivative licensing markets, the Supreme Court pointedly observed in *Warhol* that "an overbroad concept of transformative use" that encroaches on copyright owners' markets for derivative uses could

Frankfurt Kurnit Klein+Selz PC
2029 Century Park East, Suite 2500N
Los Angeles, California 90067
P (310) 579-9600

"swallow" the copyright owner's exclusive right to create derivative works—a right specifically enumerated in the Copyright Act.  598 U.S. at 511-12, 529; 17 U.S.C. § 106(2).

Anthropic and other AI developers who appropriate copyrighted works to train and operate their systems without permission are indisputably harming multiple direct and derivative markets that rightfully belong to the owners of those works.  These include (1) markets for consumer enjoyment of output that that replicates training materials (for example, verbatim or near-verbatim copies of lyrics or other textual content); (2) markets for licensing of AI systems that repackage copyrighted works (for example, providers of RAG-based news services and book summaries); and (3) markets for copyrighted materials to train and operate AI systems, including "fine-tuning" of systems to improve their performance or focus on particular industries.

Regardless of whether Anthropic's copying is deemed transformative (which would fly in the face of obvious memorization of works by Claude), a finding of fair use in this case could eviscerate copyright owners' right to exploit established, valuable markets for their works, including the AI training and RAG markets.  As the *Kadrey* court put it: "No matter how transformative LLM training may be, it's hard to imagine that it can be fair use to use copyrighted books to develop a tool to make billions or trillions of dollars while enabling the creation of a potentially endless stream of competing works that could significantly harm the market for those books."  788 F. Supp. 3d at 1059.[15]

Although relatively recent, the AI training market can no longer be considered potential.  As amply illustrated above, it is flourishing and already generating billions of dollars in revenue.[16] The mere fact that a licensing market has developed in response to new technology does not

---

[15] Due to an insufficient factual record, the *Kadrey* court did not reach the merits of this issue.  *See* 788 F. Supp. 3d at 1067-68.

[16] *See* Globe Newswire, *AI Training Dataset Market Report 2025: Market to Reach $18.47 Billion by 2034 from $2.62 Billion in 2024, E-Commerce Expansion and LLM Adoption, Despite Talent Shortage Risks* (May 12, 2025), https://tinyurl.com/5dr9hjm9 ("The global AI training dataset market reached a value of nearly $2.62 billion in 2024, having grown at a compound annual growth rate (CAGR) of 21.97% since 2019.  The market is expected to grow from $2.62 billion in 2024 to $7.3 billion in 2029 at a rate of 22.71%.  The market is then expected to grow at a CAGR of 20.38% from 2029 and reach $18.47 billion in 2034.").

Frankfurt Kurnit Klein+Selz PC
2029 Century Park East, Suite 2500N
Los Angeles, California 90067
P (310) 579-9600

Frankfurt Kurnit Klein+Selz PC

2029 Century Park East, Suite 2500N
Los Angeles, California 90067
P (310) 579-9600

negate its validity under the fourth fair use factor.  In *American Geophysical Union v. Texaco, Inc.*, 60 F.3d 913 (2d Cir. 1994), for example, the Second Circuit recognized that unlicensed photocopying of journal articles by Texaco caused market harm even though the market had only recently emerged in response to the proliferation of photocopying machines.  *Id.* at 930-31.

Neither *Bartz* nor *Kadrey* sanctioned unrestricted copying to train LLMs.[17]  *Bartz* expressly condemned the use of pirated copies, determining it was *not* a fair use for Anthropic to use such copies to build a training library, and describing such conduct as "irredeemably infringing even if the pirated copies are immediately used for the transformative use [*i.e*, training] and immediately discarded."  787 F. Supp. 3d at 1025.  And, as noted, the *Kadrey* court expressed significant concern about potential market harm resulting from the unauthorized exploitation of copyrighted works by AI systems to generate competing works.  *See* 788 F. Supp. 3d at 1059.

Significantly for the case at hand, when *Bartz* and *Kadrey* were litigated, the training market was less developed than it is today; perhaps accordingly, both courts gave short shrift to the plaintiffs' claims of direct competition in the market for training data.  *See*, *e.g., id.* at 1060.  Furthermore, although the *Kadrey* court commented that recognizing the AI training market as one that copyright owners are entitled to exploit could render the fourth factor analysis as "circular," it is equally circular to deem that market *not* cognizable simply because it is new.  To do so would improperly deprive copyright owners of the benefits of any emerging market.  Such an approach is inconsistent with the Copyright Act's express directive to courts to consider the harm of defendant's conduct to *potential* markets and markets that will be negatively impacted if the unlicensed conduct at issue is unrestricted and widespread.  17 U.S.C. § 107(4); *Campbell*, 510 U.S. at 590.

As discussed above, *Warhol* warns against an overly broad interpretation of transformativeness that undermines copyright owners' legitimate markets.  598 U.S. at 511-12, 529.  Even if—despite AI systems' memorization of works and consequent generation of

---

[17] Although *Bartz* and *Kadrey* are distinguishable from the present case, *amici* believe the fair use analysis in both was flawed.

substitutional content—training uses could be considered transformative, the obvious harm to the market for training data would outweigh any such finding. *See, e.g.*, *Fox News*, 883 F.3d at 180-81 (even though defendant's new clip service was somewhat transformative, because it usurped the plaintiff's market, it was not a fair use).

As *Campbell* instructs, in assessing fair use, courts are to consider whether the market in question is one that creators of original works would in general develop or license others to develop. *Campbell*, 510 U.S. at 592; *accord Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 460 (9th Cir. 2020) (same). Given the widespread adoption of AI-related products throughout virtually all aspects of society, it is clear that the training market for AI systems that depend upon copyrighted works for their very existence is one in which copyright owners would naturally participate—and are participating. A ruling in this case that condoned mass-scale scraping of copyrighted works to train and operate AI systems and RAG technology would obliterate a crucial licensing market—precisely the type of harm that copyright law is designed to protect. 17 U.S.C. § 107(4); *Campbell*, 510 U.S. at 592.

### B.    Healthy Licensing Markets Advance the Goals of Copyright

When AI developers participate in the licensing market, it is mutually beneficial for both the AI companies and rightsholders. As the CEO and co-founder of Suno recently explained in discussing his company's licensing deal with Warner Music Group: "I think about this much more as a partnership, about being able to build products that we can't build on our own."[18] Healthy licensing markets advance the core objectives of copyright law by encouraging both the creation and dissemination of expressive works while facilitating efficient and sustainable technological innovation.[19]

Healthy markets also ensure the availability of high-quality training data, which benefits the entire AI ecosystem. When authors, publishers, and other rightsholders can license their

---

[18] Billboard on the Record, *How Suno AI Is Disrupting the Music Industry w/ Mikey Shulman* (Spotify Podcast, Mar. 11, 2026).

[19] Terrence Hart, *Bartz, Kadrey, and the Market for AI Training*, Copyhype (July 10, 2025), https://tinyurl.com/y8wxhtnk.

BRIEF OF AMICI CURIAE AAP, N/MA, STM, AND AUTHORS GUILD IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Frankfurt Kurnit Klein+Selz PC
2029 Century Park East, Suite 2500N
Los Angeles, California 90067
P (310) 579-9600

works, they are incentivized to assemble and deliver relevant content in efficient formats. AI companies, in turn, gain reliable access to sophisticated and curated datasets, improving the performance of their AI models.

Licensing markets also promote competition and legal certainty. By providing AI developers a path to lawfully obtain access to high-quality datasets, barriers to entry are lowered, enabling a broader range of companies to compete in the development of generative AI without the threat of litigation. Moreover, licensing arrangements define permissible uses, prospectively addressing the boundaries of developers' use with greater certainty, which promotes investment and innovation on both sides of the market.

AI companies seek high-quality textual materials to exploit their expression and generate competing works for commercial purposes. A healthy licensing regime allows authors and publishers to share in the economic rewards of the AI systems that rely on their works to exist and function. Licensing provides an ongoing revenue stream to support the continued creation and dissemination of books, journalism, scholarship, music, and other forms of expressive content. The public benefits not only from new works of human authorship but the availability of trustworthy sources to train and improve AI systems in the future.

**CONCLUSION**

*Amici* respectfully submit that this Court reject Anthropic's affirmative defense of fair use and grant Plaintiffs' Motion for Partial Summary Judgment.

DATED:  March 30, 2026                    FRANKFURT KURNIT KLEIN + SELZ PC

By:      */s/ Jacqueline C. Charlesworth*
Jacqueline C. Charlesworth
Ruby A. Strassman
*Attorneys for Amici Curiae Association of American Publishers, News/Media Alliance, International Association of Scientific, Technical & Medical Publishers, and Authors Guild*

Frankfurt Kurnit Klein+Selz PC
2029 Century Park East, Suite 2500N
Los Angeles, California 90067
P (310) 579-9600

## APPENDIX A: SOURCES FOR AI LICENSING DEALS CHART

**Amazon Sources:**

Charlotte Tobitt, *Who's Suing AI and Who's Signing: Encyclopedia Britannica and Merriam-Webster Sue OpenAI Following Perplexity Lawsuit*, PressGazette (Mar. 24, 2026), https://pressgazette.co.uk/platforms/news-publisher-ai-deals-lawsuits-openai-google/#h-reach; Jessica Davies, *Condé Nast and Hearst Strike Amazon AI Licensing Deals for Rufus*, Digiday (July 10, 2025), https://digiday.com/media/conde-nast-and-hearst-strike-amazon-ai-licensing-deals-for-rufus/; Michael M. Grynbaum and Cade Metz, The New York Times (May 29, 2025), https://www.nytimes.com/2025/05/29/business/media/new-york-times-amazon-ai-licensing.html; Ray Schultz, *Condé Nast and Other Publishers To Leverage Amazon's New Alexa+*, MediaPost (Feb. 26, 2025), https://www.mediapost.com/publications/article/403742/conde-nast-and-other-publishers-to-leverage-amazon.html.

**Bria Sources:**

Press Release, *News/Media Alliance Partners with Bria AI to Launch Industry-Leading AI Licensing Agreement*, News/Media Alliance (Mar. 23, 2026), https://www.newsmediaalliance.org/ai-licensing-partnership-bria-announcement/.

**Dow Jones Sources:**

Press Release, *Dow Jones Factiva Surpasses 8,000 Licensed Sources for GenAI Use*, Dow Jones (Jan. 20, 2026), https://www.dowjones.com/press-room/dow-jones-factiva-surpasses-8000-licensed-sources-for-genai-use/; Press Release, *Down Jones Launches Factiva Smart Summary* Dow Jones (Nov. 13, 2024), https://www.dowjones.com/press-room/dow-jones-launches-factiva-smart-summary/; Trishla Ostwal, *Dow Jones Wins AI Licensing Deals with More Than 4,000 News Media Outlets Like the AP*, AdWeek (Nov. 12, 2024), https://www.adweek.com/media/dow-jones-lands-more-than-4000-ai-licensing-deals-with-news-outlets-like-the-ap/.

**Google Sources:**

Charlotte Tobitt, *Google Promises 'More Focused Deals' with News Publishers as FT Joins AI Pilot*, PressGazette (Feb. 16, 2026), https://pressgazette.co.uk/platforms/google-search-features-deals-ai-financial-times/; Robby Stein and Jaffer Zaidi, *Supporting the Web with New Features and Partnerships*, Google (Dec. 10, 2025), https://blog.google/products-and-platforms/products/search/tools-partnerships-web-ecosystem/; Sarah Perez, *NotebookLM Adds Featured Notebooks from The Economist, The Atlantic, and Others*, TechCruch (July 14, 2025), https://techcrunch.com/2025/07/14/notebooklm-adds-featured-notebooks-from-the-economist-the-atlantic-and-others/; Matt O'Brien, *Google Signs Deal with AP to Deliver Up-to-Date News Through Its Gemini AI Chatbot*, The Associated Press (Jan. 15, 2025) https://apnews.com/article/google-gemini-ai-associated-press-ap-0b57bcf8c80dd406daa9ba916adacfaf; Press Release, *Stack Overflow and OpenAI Partner to Strengthen the World's Most Popular Large Language Models*, Stack Overflow (May 6, 2024), https://stackoverflow.co/company/press/archive/openai-partnership; Kyle Orland, *Reddit Cashers in on AI Gold Rush with $203m in LLM Training License Fees*, ARS Technica (Feb. 23, 2024), https://arstechnica.com/ai/2024/02/reddit-has-already-booked-203m-in-revenue-licensing-data-for-ai-training/.

BRIEF OF AMICI CURIAE AAP, N/MA, STM, AND AUTHORS GUILD IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**LexisNexis Sources:**

Esther Shittu, *LexisNexis Launches Commercial Version of AI Research Tool*, TechTarget (July 17, 2024), https://www.techtarget.com/searchenterpriseai/news/366594022/LexisNexis-launches-commercial-version-of-AI-research-tool.

**Meta Sources:**

Alexandra Bruell, *News Corp, Meta in AI Content Licensing Deal Worth Up to $50 Million a Year*, The Wall Street Journal (Mar. 3, 2026), https://www.wsj.com/business/media/news-corp-meta-in-ai-content-licensing-deal-worth-up-to-50-million-a-year-d4fbf244; *Bringing More Real-Time News and Content to Meta AI*, Meta (Dec. 5, 2025), https://about.fb.com/news/2025/12/bringing-more-real-time-news-and-content-to-meta-ai/; Sara Fischer, *Exclusive: Meta Strikes Multiple AI Deals with News Publishers*, Axios (Dec. 5, 2025), https://www.axios.com/2025/12/05/meta-ai-deals-news-publishers; Sara Fischer, *Scoop: Meta Strike Multi-year AI Deal with Reuters*, Axios (Oct. 25, 2024), https://www.axios.com/2024/10/25/meta-reuters-ai-news-facebook-instagram.

**Microsoft Sources:**

Tim Frank, *Building Toward a Sustainable Content Economy for the Agentic Web*, Microsoft Advertising (Feb. 3, 2026), https://about.ads.microsoft.com/en/blog/post/february-2026/building-toward-a-sustainable-content-economy-for-the-agentic-web; Mark Stenberg, *Condé Nast Names New Chief Product and Technology Officer, Joins Microsoft AI Licensing Pilot*, Adweek (Dec. 4, 2025), https://www.adweek.com/media/conde-nast-vasanth-williams-chief-product-technology-officer-microsoft-ai-licensing-pilot/; Barbara Peng, *Announcing Our New AI Partnership with Microsoft*, Business Insider (Nov. 21, 2025), https://www.businessinsider.com/announcing-our-new-ai-partnership-with-microsoft-2025-11; Jessica Davis and Sara Guaglione, *Media Briefing: Associated Press Deal Cements Microsoft's Quiet Rise in AI Licensing*, Digiday (Nov. 6, 2025), https://digiday.com/media/media-briefing-associated-press-deal-cements-microsofts-quiet-rise-in-ai-licensing/; Sarah Perez, *People Inc. Forges AI Licensing Deal with Microsoft as Google Traffic Drops*, TechCrunch (Nov. 4, 2025), https://techcrunch.com/2025/11/04/people-inc-forges-ai-licensing-deal-with-microsoft-as-google-traffic-drops/; *Gannet Announces Third Quarter 2025 Results, New AI Licensing Deal with Microsoft & Updated Business Outlook*, Yahoo Finance (Oct. 30, 2025), https://finance.yahoo.com/news/gannett-announces-third-quarter-2025-120000313.html; Hannah Miller and Dina Bass, *Microsoft Signs AI-Learning Deal with News Corp.'s HarperCollins*, Bloomberg (Nov. 19, 2024), https://tinyurl.com/5hzrdz2w; Kyle Wiggers, *Microsoft Starts Paying Publishers for Content Surfaced by Copilot*, TechCrunch (Oct. 1, 2024), https://techcrunch.com/2024/10/01/microsoft-starts-paying-publishers-for-content-in-copilot/; Daniel Thomas, *Informa Strikes AI Deal with Microsoft*, Financial Times (May 8, 2024), https://www.ft.com/content/3ed7737e-3649-4afb-9071-caa13e7394d9; *Alex Springer and Microsoft Expand Partnership Across Advertising, AI, Content, and Azure Services*, Microsoft (Apr. 29, 2024), https://news.microsoft.com/source/2024/04/29/axel-springer-and-microsoft-expand-partnership-across-advertising-ai-content-and-azure-services/; *Microsoft Partners with Semafor AI Assisted News Content*, Reuters (Feb. 5, 2024), https://www.reuters.com/technology/microsoft-partners-with-semafor-ai-assisted-news-content-2024-02-05/.

Frankfurt Kurnit Klein + Selz PC

2029 Century Park East, Suite 2500N
Los Angeles, California 90067
P (310) 579-9600

BRIEF OF AMICI CURIAE AAP, N/MA, STM, AND AUTHORS GUILD IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**Frankfurt Kurnit Klein + Selz** PC
2029 Century Park East, Suite 2500N
Los Angeles, California 90067
P (310) 579-9600

**Mistral Sources:**

Romain Dillet, *Mistral Signs Deal with AFP to Offer Up-to-date Answers in Le Chat*, TechCrunch (Jan. 16, 2025), https://techcrunch.com/2025/01/16/mistral-signs-deal-with-afp-to-offer-up-to-date-answers-in-le-chat/.

**OpenAI Sources:**

Todd Spangler, *Jeff Bezos' Washington Post Inks OpenAI Licensing Deal for ChatGPT Search*, Variety (Apr. 22, 2025), https://variety.com/2025/digital/news/washington-post-openai-licensing-deal-1236374787/; Dominic Ponsford, *Guardian Signs Licensing Deal with ChatGPT Owner OpenAI*, PressGazette (Feb. 14, 2025), https://pressgazette.co.uk/publishers/guardian-openai/; Press Release, *Schibsted Media Partners with OpenAI*, Schibsted (Feb. 10, 2025), https://schibsted.com/news/schibsted-media-partners-with-openai/; Sara Fischer, *OpenAI to Fund Four New Axios Local Newsrooms*, Axios (Jan. 15, 2025), https://www.axios.com/2025/01/15/open-ai-axios-local-newsrooms-funding-deal; Emma Roth, *OpenAI Strikes Content Deal with Tom's Guide Owner Future*, The Verge (Dec. 5, 2024), https://www.theverge.com/2024/12/5/24313909/openai-content-deal-toms-guide-future; Winston Cho, *OpenAI Inks Deal with Hearst, Marking Another Major Media Partnership*, The Hollywood Reporter (Oct. 8, 2024), https://www.hollywoodreporter.com/business/business-news/openai-hearst-1236026980/; Press Release, *OpenAI and GEDI Partner for Italian News Content*, OpenAI (Sept. 26, 2024), https://openai.com/index/gedi/; *OpenAI Signs Multi-year Content Partnership Deal with Cond*é Nast, The Guardian (Aug. 20, 2024), https://www.theguardian.com/technology/article/2024/aug/20/conde-nast-open-ai-deal; Press Release, *Time and OpenAI Announce Strategic Content Partnership*, TIME (Jun. 27, 2024), https://time.com/6992955/time-and-openai-announce-strategic-content-partnership/; Press Release, *The Atlantic Announces Product and Content Partnership with OpenAI*, The Atlantic (May 29, 2024), https://www.theatlantic.com/press-releases/archive/2024/05/atlantic-product-content-partnership-openai/678529/; Sara Fischer, *Exclusive: The Atlantic, Vox Media Ink Licensing, Product Deals with Open AI*, Axios (May 29, 2024), https://www.axios.com/2024/05/29/atlantic-vox-media-openai-licensing-deal; Katie Robertson, *OpenAI Strikes a Deal to License News Corp Content*, The New York Times (May 22, 2024), https://www.nytimes.com/2024/05/22/business/media/openai-news-corp-content-deal.html; Sara Fischer, *OpenAI Inks Licensing Deal with Dotdash Meredith*, Axios (May 7, 2024), https://www.axios.com/2024/05/07/openai-dotdash-meredith-licensing-deal; Press Release, *Financial Times Announces Strategic Partnership with Open AI*, Financial Times (Apr. 29, 2024), https://aboutus.ft.com/press_release/openai; Louis Dreyfus and Jérôme Fenoglio, *Le Monde and OpenAI Sign Partnership Agreement on Artificial Intelligence*, Le Monde (Mar. 13, 2024), https://www.lemonde.fr/en/about-us/article/2024/03/13/le-monde-signs-artificial-intelligence-partnership-agreement-with-open-ai_6615418_115.html; Press Release, *Global News Partnerships: Le Monde and Prisa Media*, OpenAI (Mar. 13, 2024), https://openai.com/index/global-news-partnerships-le-monde-and-prisa-media/; Helen Coster, *Global News Publisher Axel Springer Partners with OpenAI in Landmark Deal*, Reuters (Dec. 13, 2023), https://www.reuters.com/business/media-telecom/global-news-publisher-axel-springer-partners-with-openai-landmark-deal-2023-12-13/; Press Release, *OpenAI Data Partnerships*, OpenAI (Nov. 9, 2023), https://openai.com/index/data-partnerships/; Sara Fischer, *Exclusive: AP Strikes News-sharing and Tech Deal with OpenAI*, Axios (Jul. 13, 2023), https://www.axios.com/2023/07/13/ap-openai-news-sharing-tech-deal.

BRIEF OF AMICI CURIAE AAP, N/MA, STM, AND AUTHORS GUILD IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**OpenEvidence Sources:**

Press Release, *Wiley and OpenEvidence Partner to Deliver Trusted Research to Physicians at the Point of Care*, OpenEvidence (Mar. 3, 2026), https://www.openevidence.com/announcements/wiley-and-openevidence-partner-to-deliver-trusted-research-to-physicians-at-the-point-of-care; Press Release, *OpenEvidence and the JAMA Network Sign Strategic Content Agreement*, JAMA (June 5, 2025), https://media.jamanetwork.com/announcement/openevidence-and-the-jama-network-sign-strategic-content-agreement/; Press Release, *OpenEvidence and NEJM Group, Publisher of the New England Journal of Medicine, Sign Content Agreement*, NEJM Group (Feb. 19, 2025), https://www.openevidence.com/announcements/openevidence-and-nejm.

**Particle News Sources:**

Charlotte Tobitt, *The Observer Signs Deal to Appear on AI News Platform Particle*, PressGazette (Oct. 23, 2025), https://pressgazette.co.uk/news/the-observer-signs-deal-to-appear-on-ai-news-platform-particle/; Press Release, *Particle News to Bring Long Reads to Personalized Experience, and Announces Partnership with The Atlantic*, Particle News (July 1, 2025), https://www.einpresswire.com/article/827131429/particle-to-bring-long-reads-to-personalized-news-experience-and-announces-partnership-with-the-atlantic; Press Release, *Expanding Particle's Publisher and Visual Content Partnerships*, Particle News (Oct. 23, 2024), https://particlenews.medium.com/expanding-particles-publisher-and-visual-content-partnerships-ae153ea1c956.

**Perplexity Sources:**

Press Release, *Announcing Comet Plus Launch Partners*, Perplexity (Oct. 1, 2025), https://www.perplexity.ai/hub/blog/announcing-comet-plus-launch-partners; Press Release, *Welcoming Gannett to the Perplexity Publisher Program*, Perplexity (July 30, 2025), https://www.perplexity.ai/hub/blog/welcoming-gannett-to-the-perplexity-publisher-program; *AccuWeather and Perplexity Announce Strategic Partnership to Deliver Real-time, AI-powered Weather Insights and Alerts*, PR Newswire (June 26, 2025), https://www.prnewswire.com/news-releases/accuweather-and-perplexity-announce-strategic-partnership-to-deliver-real-time-ai-powered-weather-insights-and-alerts-302491665.html; Louis Dreyfus and Jérôme Fenoglio, *Artificial Intelligence: Le Monde Signs Partnership Agreement with Perplexity*, Le Monde (May 14, 2025), https://www.lemonde.fr/en/about-us/article/2025/05/14/artificial-intelligence-le-monde-signs-partnership-agreement-with-perplexity_6741262_115.html; Kyle Wiggers, *Perplexity Expands Its Publisher Program*, TechCrunch (Dec. 5, 2024), https://techcrunch.com/2024/12/05/perplexity-expands-its-publisher-program/; Kayleigh Barber, *Perplexity's New Rev-Share Publisher Program Is Live, but Not All Pubs Are Sold*, Digiday (Jul. 30, 2024), https://digiday.com/media/perplexitys-new-rev-share-publisher-program-is-live-but-not-all-pubs-are-sold/; Emillia David, *Perplexity Brings Yelp Data to Its Chatbot*, The Verge (Mar. 12, 2024), https://www.theverge.com/2024/3/12/24098728/perplexity-chatbot-yelp-suggestions-data-ai.

Frankfurt Kurnit Klein + Selz PC

2029 Century Park East, Suite 2500N
Los Angeles, California 90067
P (310) 579-9600

BRIEF OF AMICI CURIAE AAP, N/MA, STM, AND AUTHORS GUILD IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**Pi School Sources:**

Press Release, *Wiley Partners with Pi School to Enhance the European Space Agency's AI-Powered Earth Virtual Expert (EVE) Project*, Wiley (Mar. 13, 2025), https://tinyurl.com/3e42r74d.

**Potato Sources:**

Press Release, *Wiley Launches New Partnership Innovation Program to Deliver AI Advantages for Researchers and Practitioners*, Wiley (Oct. 17, 2024), https://tinyurl.com/mprwau5s.

**ProRata.ai Sources:**

Karen Rønde, *ProRata Partners with DPCMO to Launch the First Decentralized Sovereign AI Answer Engine*, DPCMO (Dec. 10, 2025), https://dpcmo.dk/prorata-partners-with-dpcmo-to-launch-the-first-decentralized-sovereign-ai-answer-engine/; *Man of Many Partners with ProRata.ai for Greater Publisher Rights in the AI Era*, Mumbrella (June 12, 2025), https://mumbrella.com.au/man-of-many-partners-with-prorata-ai-for-greater-publisher-rights-in-the-ai-era-877518; *ProRata AI Signs Partnerships with More Than 500 Publications, Giving Gist.ai One of the Largest Licensed Content Libraries In Generative AI Search*, BusinessWire (June 6, 2025), https://www.businesswire.com/news/home/20250606852177/en/ProRata-AI-Signs-Partnerships-With-More-Than-500-Publications-Giving-Gist.ai-One-of-the-Largest-Licensed-Content-Libraries-in-Generative-AI-Search; Sam Quigley, *News/Media Alliance Announces AI Licensing Partnership with ProRata*, News/Media Alliance (Mar. 26, 2025), https://www.newsmediaalliance.org/prorata-licensing-partnership/; *ProRata Announces Gist.ai, New AI Search Engine Based Entirely on High-Quality Licensed Content*, BusinessWire (Dec. 9, 2024), https://www.businesswire.com/news/home/20241209071998/en/ProRata-Announces-Gist.ai-New-AI-Search-Engine-Based-Entirely-on-High-Quality-Licensed-Content; *Major UK Media Organizations Join ProRata's Movement to Credit and Compensate Content Owners in the Age of Generative AI*, BusinessWire (Nov. 20, 2024), https://www.businesswire.com/news/home/20241119176784/en/Major-UK-Media-Organizations-Join-ProRata%E2%80%99s-Movement-to-Credit-and-Compensate-Content-Owners-in-the-Age-of-Generative-AI; Charlotte Tobitt, *FT, Atlantic, Axel Springer and Fortune Get Behind AI Start-up's Per-use Compensation Plan*, PressGazette (Aug. 7, 2024), https://pressgazette.co.uk/news/prorata-ai-publisher-deals-financial-times-axel-springer-fortune-atlantic/.

Frankfurt Kurnit Klein+Selz PC
2029 Century Park East, Suite 2500N
Los Angeles, California 90067
P (310) 579-9600

BRIEF OF AMICI CURIAE AAP, N/MA, STM, AND AUTHORS GUILD IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT