**PUBLIC REDACTED VERSION**

SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

TAYLOR GOOCH (SBN 294282)
taylor.gooch@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
50 California St.
San Francisco, CA 94111
Telephone: (628) 235-1000

JARED V. GRUBOW (*Pro Hac Vice)*
jared.grubow@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
250 Greenwich St
New York, NY 10007
Telephone: (212) 230-8800

LOUIS W. TOMPROS (*Pro Hac Vice*)
louis.tompros@wilmerhale.com
DISHA PATEL (*Pro Hac Vice*)
disha.patel@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

ARI HOLTZBLATT (SBN 354361)
ari.holtzblatt@wilmerhale.com
ROBIN C. BURRELL (*Pro Hac Vice*)
robin.burrell@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
2100 Pennsylvania Ave, NW
Washington, DC 20037
Telephone: (202) 663-6000

*Attorneys for Defendant*
**ANTHROPIC PBC**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> ANTHROPIC PBC, <br><br> Defendant. | Case No. 5:24-cv-03811-EKL-SVK <br><br> **DEFENDANT'S NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY AND OPINIONS OF MICHAEL D. SMITH** <br><br> Hearing Date: July 15, 2026 <br> Time: 10:00 AM <br> Judge: Hon. Eumi K. Lee |

**PUBLIC REDACTED VERSION**

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on July 15, 2026 at 10:00 AM, Defendant Anthropic PBC will move the Court for an order granting Anthropic's Motion to Exclude the Expert Testimony and Opinions of Publishers' putative expert Dr. Michael D. Smith. Anthropic's motion is based on this Notice of Motion, the supporting Memorandum of Points and Authorities, and the Declaration of Robin C. Burrell filed herewith, along with the accompanying exhibits. In accordance with VIII.A of Judge Lee's Civil Standing Order, the undersigned counsel certifies that Anthropic's counsel met and conferred with Plaintiffs' counsel on March 24, 2026.

Pursuant to FRE 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Anthropic requests that the Court exclude ¶¶ 15-19 and ¶¶ 60-191 of the Opening Expert Report of Dr. Michael D. Smith (Ex. 1) ("Opening Report"), ¶¶ 94-99, 141, and 148 of Smith's Rebuttal Expert Report (Ex. 2) ("Rebuttal Report"), ¶¶ 7-9 17-90, 93-95, and 124-136 of Smith's Reply Expert Report (Ex. 3) ("Reply Report"), and ¶¶ 4-12 of Smith's Second Supplemental Report (Ex. 4).[1]

**MEMORANDUM OF POINTS AND AUTHORITIES**

In a recent earnings call, Universal Music Group (the parent of two plaintiff-Publishers who collectively assert 448 of 499 works in suit) told investors that there is "no indication that AI royalty dilution is a material issue for UMG from a revenue perspective." Ex. 5 (Mar. 5, 2026 UMG Q4 FY 2025 Earnings Call Tr.), 23:37. According to UMG, "empirical data demonstrat[ed] [that AI posed an] insignificant and comprehensively mitigated risk," and that "the impact AI will have on our business will be ***overwhelmingly net positive***." *Id*. Citing the earnings call and the data they had presented to investors, UMG executives explained that the "case for AI dilution risks has been massively over-extrapolated from a few anecdotes," and that the risk of dilution from AI "slop" is "almost entirely mitigated right now" based on "a lack of consumer interest and our ability to put protection into our deals." Ex. 6 (Mar. 9, 2026 Remarks of UMG Executive VP and Chief Digital Officer M. Nash at the BNP Paribas Exane TMT Conference).

---

[1] Unless otherwise noted, 'Ex.' citations reference exhibits to the Robin C. Burrell Declaration filed herewith, emphasis is added, and objections are omitted for deposition citations.

**PUBLIC REDACTED VERSION**

Despite these unqualified admissions, Publishers offer the contradictory testimony of Michael Smith to support their contention that Anthropic has caused Publishers harm and is diluting the market for Publishers' works. Smith is no stranger to this Court. Publishers relied on him at the preliminary injunction stage to offer the same opinions he offers now. At that stage, the Court found that Smith's testimony did "not demonstrate how using the Works to train Claude is affecting—let alone diminishing—the value of any of the Works." Dkt. 321 at 10-11. The Court also found that Smith failed to show that Claude "is harming Publishers' negotiating position." *Id*. During the 20 months of discovery since, AI has become more central to nearly every aspect of the global economy, as reflected in a surge of empirical research. Yet Smith's opinions that AI is diminishing or diluting the market for Publishers' works or otherwise harming Publishers remain just as (if not more) "conclusory and speculative" as when the Court first considered them. *Id*.

In his more recent expert reports and deposition, Smith again declared with certainty that Publishers have experienced harm due to Anthropic's alleged use of the 499 works in suit and that Publishers will continue to experience harm in the future. According to Smith, there is no room for doubt that these effects are "███████████." Ex. 1, ¶ 188. But Smith admitted that he has not quantified any of this harm, past or future. He conducted no empirical analysis and offered no economic theory that supports his conclusions. In many instances, he cannot even identify *one example* of the type of harm he concluded exists.

Smith excused these failures by asserting that these effects are "███████████" because of the rapidly developing nature of AI. Not so. The future may be uncertain; the past is not. Smith's assignment was to identify and measure past harm. He did not do that, nor did he try. Instead, he parroted the litigation-driven assertion that there has been past harm *without even considering* evidence that led Publishers' executives to tell their shareholders the exact opposite. As for future harm, AI is far from the first emerging technology to be subject to economic analysis. If Smith believes that the future impact of Anthropic's conduct is hopelessly indeterminate, then he should not be offering an opinion about it. But the answer is not to permit him to cloak his *ipse dixit* conclusions under the guise of expert analysis. The Court should exclude his opinions about Publishers' supposed harms under Federal Rule of Evidence 702 (b), (c), and (d).

**PUBLIC REDACTED VERSION**

## BACKGROUND

Publishers retained Smith to testify about the "█████████████████████████████████████████████████████████████████████████████████████████████" Ex. 1, ¶ 11. Smith opined on myriad harms Publishers have purportedly already suffered. He also opined on future harm to the music industry caused by AI. Specifically, Smith claimed: (1) Anthropic's outputs "dilute" and "disrupt" the market for Publishers' works; (2) Anthropic's purported use of lyrics to train Claude has deprived Publishers of licensing revenue; and (3) Anthropic has harmed Publishers' ability to license its work in the future. Not one of these opinions is grounded in evidence or empiricism. On March 9, 2026, hours before expert discovery closed, Smith served a second supplemental report describing additional materials that purportedly "reinforce" and "comport with" his opinion. Ex. 4. ¶¶ 6, 11. Judge van Keulen found that this "production post-deposition justifie[d] a further deposition." Dkt. 632 at 1.

## LEGAL STANDARD

The party offering expert testimony bears the burden of admissibility. *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1048-50 (9th Cir. 2025). Expert opinions are "'inherently unreliable' if they do not rest on a sufficient factual foundation and are 'speculative.'" *Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956 (N.D. Cal. 2025).

## ARGUMENT

### I.    SMITH'S OPINION THAT PUBLISHERS SUFFERED HARM IS SPECULATIVE

"Rule 702 demands that expert testimony relate to scientific, technical or other specialized knowledge, which does not include unsubstantiated speculation and subjective beliefs." *Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997). "Nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). But that is all Smith offered here.

#### A.    Smith Offered No Non-Speculative Opinion On "Market Dilution"

Smith concluded that Claude ████████████████████████████████ █████████████████████████████" by generating "█████████████████████████████." Ex. 1, § V.A & ¶ 60.

To do so, Smith relied on his own "▮▮▮▮▮" of Anthropic's conduct to "▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" *Id.*, ¶ 61. But Smith did not explain how his analogy applies to novel and original lyrics that purportedly compete against (rather than substitute for) Publishers' lyrics. Analogizing to such disanalogous conduct cannot substitute for *evidence.*

Smith also cited statements from Anthropic about the possible future capabilities of AI. Ex. 1, ¶¶ 79-84. But these big-picture statements do not demonstrate that Claude has actually generated (or ever will generate) song lyrics that dilute the market for Publishers' lyrics. Smith admitted that he did not "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" from competition with AI-generated songs. Ex. 7 (Smith 2/23 Tr.), 115:21-116:3. In fact, Smith conceded that he did not perform any empirical analysis about the displacement of songwriters. *Id.* at 150:12-151:1. He said he did not have "▮▮▮▮▮▮▮▮▮▮" and that it was not "▮▮▮▮▮▮▮▮." *Id.* at 116:2-3. But Smith never explained why he did not seek out the data, even though he believes ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 116:8-9.

Smith also failed to identify a single lost opportunity by any songwriter due to AI, let alone Anthropic's Claude. Ex. 7, 109:20-110:9. (▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). He could not even rule out the possibility that AI could serve as a net positive for songwriters. *Id.* at 131:17-21 (▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮).

In his late supplemental report, Smith pointed to Anthropic documents exploring the potential impact of AI on different industries. Ex. 4 ¶¶ 4-5. But Smith later admitted that those documents speak (at most) to potential impact in the arts and media industries generally, not songwriters or lyricists specifically. Ex. 8 (Smith 4/9 Tr.), 411:13-25; 416:10-417:10. And he acknowledged that these same documents show that songwriters use AI to help them, while admitting that he did not find a single example of displacement. *Id.* at 395:24-396:6. He could not

**PUBLIC REDACTED VERSION**

even identify an example of a user using Claude or AI specifically for the task of writing lyrics. *Id.* at 404:16-405:4. Again, Smith claimed this was not his job. *Id.* at 423:1-14. But Smith is providing an *expert opinion* in this case. Even if not so instructed by counsel, Rule 702 makes it his "charge" to apply a reliable methodology to support his conclusions. He did not.

Those failures would themselves warrant exclusion, but Smith's analysis suffers from an even more astounding problem: his failure to consider Publishers' own evidence and statements on the very issues on which he opined. UMG itself has represented to its investors that it has collected data and conducted analyses that demonstrate that "the most prominent AI content barely registers" on its radar and that it sees "no indication that AI royalty dilution is a material issue for UMG from a revenue perspective." Ex. 5, 23:37. In addressing "the perception of risk of AI revenue dilution, and the thoughtful measures we've taken to neutralize any negative impact," UMG's EVP and Chief Digital Officer Michael Nash explained that "misunderstandings have resulted from anecdotal press reports that AI-generated content has somehow overtaken the charts" but that "nothing could be further from the truth." *Id.* at 20:18, 21:12. And as to royalty revenues, he described the steps UMG has taken to mitigate risks including "anti-AI dilution provisions" that "generally mean that pure-AI-generated content, similar to other non-music-content, is removed from the calculation" of the share. *Id.* at 22:44. In short, UMG reached *the exact opposite* conclusion as Smith, finding not only that "empirical data demonstrat[ed] [that AI posed an] insignificant and comprehensively mitigated risk," but that "the impact AI will have on our business will be *overwhelmingly net positive*." *Id.*

Smith also relied upon third-party studies about the impact of AI to support his conclusions about dilution and disruption. Ex. 1, ¶¶ 68-78. Not one of these studies demonstrates or even addresses harm to *Publishers'* works. For example, one study finds that readers preferred OpenAI's GPT4o's emulation of famous authors more than MFA students' emulations. *Id.* ¶¶ 68-71. But that says nothing about whether people prefer songs with lyrics that have been generated by Claude over Publishers' works. Another study he relies on heavily shows that over 60,000 AI-generated songs are uploaded daily to a French streaming platform, Deezer. Ex. 3, ¶ 30. But Smith provided no evidence that any of those uploaded songs contained lyrics generated by Claude. Or that a single consumer actually streamed any of those AI-generated songs, let alone that Publishers' 499 works

in suit received fewer listens as a result. Nor could he: UMG told investors that "85% of AI streams" on Deezer "were identified as fraud and then excluded from royalty pool allocation." Ex. 5, 21:56. In his deposition last week, Smith admitted he had never seen this evidence and that counsel for Publishers had not provided it to him. Ex. 8, 453:7-24. After that, Publishers instructed him not to answer any additional questions about it. *Id.* at 455:2-3.

For these reasons, the Court should exclude Opening Report ¶¶ 15 and 60-98, Reply Report ¶¶ 17-70, and Second Supplemental Report ¶¶ 4-12.

**B.    Smith Provides No Non-Speculative Opinion On Past Harm To Licensing**

Smith opined that Anthropic's use of Publishers' 499 works in suit has caused Publishers financial harm by hindering their ability to license those works. In support, Smith cited hypothetical licenses between Publishers and Anthropic. He also addressed inapposite licenses between Publishers and third parties, including lyric aggregator websites and other types of AI companies. Smith then asserted that Anthropic's "████████████████████████████ ████" harms Publishers in two ways. Ex. 1, ¶ 157. First, he claimed that Anthropic's conduct drives other AI companies to "████████████" to adopt Anthropic's "████████████ ██████" *Id.*, ¶ 159. That in turn "████████████████████████████████████." *Id.* Second, Smith claimed that Anthropic "████████████████████████████████ ████████████████████████████" *Id.*, ¶ 179.

Smith provided no evidence to support his claims. He admitted he did not do anything to quantify those supposed economic harms. Ex. 7, 13:16-21 (████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████). Smith could not even provide a single example of Publishers having lost licensing revenue or negotiation leverage. Nowhere in Smith's 86-page Opening Report (or any other report) did he identify a lost licensing deal or a license that was renegotiated on less favorable terms. And Smith confirmed that he did not know of any such loss. *Id.* at 274:16-24 (████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████).

Instead, Smith took the remarkable position that the economic harm Publishers have already suffered is both "███████" and yet "███████████████." Ex. 1, ¶ 161; Ex. 6, 13:16-21. Indeed, he claimed past harm is "████████" to quantify. *See* Ex. 1, ¶ 167. But past harm is historical fact and thus measurable with widely accepted tools. Two of Anthropic's experts (economist Dr. Abhishek Nagaraj and CPA Ms. Julie Davis) conducted quantitative analyses to evaluate Publishers' claim that they were harmed. Nagaraj conducted two analyses: (1) a regression to assess whether there had been a decline in web traffic to lyrics display websites and Google searches for lyrics after the release of Claude, and (2) an economic analysis to determine whether there had been an impact on Publishers' revenue after Claude's release. *See* Ex. 9 (Nagaraj Opening Rep.), ¶¶ 91-143. Davis meanwhile analyzed Publishers' revenue data to determine whether there had been impact to the market for the 499 WIS. *See* Ex. 11 (Davis Opening Rep.), pp. 48-53.

This is the sort of methodological rigor required of an economic expert opining on harm. Indeed, experts regularly calculate past harm in copyright infringement cases. *See, e.g.*, *Polar Bear Prods. Inc. v. Timex Corp.*, 384 F.3d 700, 709 (9th Cir. 2004) (affirming award of actual damages of lost licensing fees in light of expert testimony from a CPA "who calculated a reasonable production and license fee by determining the[] fair market value" of the allegedly infringed film); *Mackie v. Rieser*, 296 F.3d 909, 917 (9th Cir. 2002) (explaining that in copyright infringement cases, one can calculate "the extent to which the market value of a copyrighted work has been injured or destroyed" by asking "what a willing buyer would have been reasonably required to pay to a willing seller for the owner's work") (cleaned up). That rigor is staggeringly absent here.

Smith cannot credibly excuse that failure by citing a lack of data when UMG relied on "empirical data" in its statements to shareholders. Smith conceded that he did not *even ask* for the data needed to calculate past licensing harm. He could have requested Publishers' revenue attributable to lyrics for the 499 WIS to analyze whether and how those revenues have been impacted by the rise of AI. He didn't. Ex. 7, 170:19-171:9. He could have requested Publishers provide information about their royalty pools to see if AI had caused the significant harms he asserts. *Id*. at 110:24-112:24. He didn't. Any lack of data is thus entirely of Smith's (or at least Publishers')

**PUBLIC REDACTED VERSION**

own making.[2] *See R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 257, 274 (S.D.N.Y. 2010) (excluding plaintiff's damages expert's opinion based, in part, on the expert's reliance on "minimal data" when it was "plainly not the case that no additional data would have been relevant to a determination of plaintiff's lost profits"). Incredibly, when asked why he did not ask for this data, he claimed that it was irrelevant to his analysis. Ex. 7, 118:12-17 ( ███████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ). That is precisely the problem: Smith viewed his charge as asserting bare conclusions of harm, not applying reliable principles or methodologies to the available facts. The Court should exclude Opening Report ¶¶ 99-167 and 177-83; Rebuttal Report ¶¶ 94-99 and 148; and Reply Report ¶¶ 71-90.

### C.   Smith Provides No Non-Speculative Opinion Of Future Harm To Licensing

Smith also provided no evidence of reasonably likely future harm. Smith concluded, for example, that there will be a ███████████████ resulting from Anthropic's alleged use of copyrighted works to train Claude, even though the "████████████████████████████ ███████████████████████████████" Ex. 1, ¶¶ 65-66; *see also id.*, ¶ 97. Yet Smith employed no methodology to determine such future harm. He acknowledged he has not done any empirical analysis to assess the theoretical displacement by AI on songwriters or lyrics production. Ex. 8, 418:6-13. And in his reports, he described how one *could* calculate future lost licensing revenue, but failed to **actually do so**. Ex. 1, ¶ 98.

Regarding reduced bargaining power, Smith entertained a supposed domino effect, stating that "████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████," and ████████████████████████████████████████████████████████████████████████████ ██████████ which "██████████████████████████████████████████████████" Ex. 1, ¶ 159. But he cited no economic principles or facts to support his conjecture. Such blanket assertions based on "unsubstantiated speculation and subjective beliefs" must be excluded. *Diviero*, 114 F.3d at 853.

---

[2] The absence of that data is not a neutral evidentiary gap; it is a choice by Publishers and their counsel.

Smith protested that Publishers' future market harms are impossible to quantify despite claiming that he could "███████████████" what the market will "███████." Ex. 7, 126:20-21. But the uncertainty of future harm is reason to demand more analysis, not less. The "burden of proving future injury is commensurately greater than that for damages already incurred, for the future always harbors unknowns." *Gentil v. Wingfield GmbH*, 2021 WL 4979427, at *7 (N.D. Cal. Mar. 2, 2021). (cleaned up). In any case, potential future harm is not impossible to quantify. Smith did not even try. He could have, for example, calculated lost profits from future sales. *See, e.g.*, *Little Genie Prods. LLC v. PHSI Inc.*, 2014 WL 3050326, at *7 (W.D. Wash. July 2, 2014) (discussing future lost profits in copyright cases). Or he could have calculated anticipated lost licensing royalties based on future licenses for the WIS. He did neither—nor anything else.

The Court should exclude Opening Report ¶¶ 16-17, 19, 99-167, 177-83, and 189-91; Rebuttal Report ¶¶ 94-99 and 141; and Reply Report ¶¶ 7-9, 71-90, 93-95 and 130-33.

### D.    Smith Offered No Evidence For The Other Harms He Asserts.

Smith also offered no non-speculative basis for the other harms he claims. First, Smith claimed that Anthropic's conduct enabled the creation of offensive and reputationally damaging works. *See* Ex. 1, ¶¶ 168-76. But he provided no evidence of any harmful derivative work attributable to Claude and he confirmed he was aware of none. *See* Ex. 7, 297:12-21 (████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ███████████████████████████). He also did not explain how to differentiate between reputational harms supposedly caused by Claude and harms caused by offensive or damaging works created by humans or any other AI tool.

Second, Smith contends that Anthropic's conduct disincentivizes artists from creating new works, but again provides no concrete examples. *See* Ex. 1, ¶ 191 (blankly asserting that "███████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████"). Smith simply theorized that Anthropic's alleged removal of CMI results in a "███████████," which reduces the incentive for artists to create. *Id*. ¶¶ 184-88. Unsurprisingly, he could not identify a single artist

impacted by the removal of CMI. Ex. 7, 316:5-324:2. And he acknowledged, as he must, that the human drive for creativity creates intrinsic incentives to create. *Id*. at 311:12-20.

The Court should exclude Smith's opinions in ¶¶ 17-18, 168-76, and 184-91 of his Opening Report; and ¶¶ 124-29 and 134-36 of his Reply.

## II.    SMITH CANNOT OPINE ON ANTHROPIC'S STATE OF MIND

Expert testimony about a party's knowledge or state of mind "ha[s] no basis in any relevant body of knowledge or expertise." *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1321 (S.D. Cal. 2020). Smith's report asserts that Anthropic chose to web-scrape, rather than license, because Anthropic was "at least partly motivated by competition with other large AI companies." Ex. 1, ¶ 152. During his deposition Smith admitted he did not know Anthropic's motivation for scraping. Ex. 7, 258:24-260:25. On questioning from Publishers' counsel, Smith retreated from this acknowledgment and claimed to indeed be offering opinions about Anthropic's "███████████████," and asserted that Anthropic was "███████████████ ███████." *Id*. at 353:3-8. For Smith, that race "███████████████████ ███████████████████████████████." *Id*. Then on re-cross, Smith admitted his opinions were based exclusively on his reading of Anthropic documents: "███████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████" *Id*. at 360:16-22. Drawing conclusions about Anthropic's state of mind from evidence is the exclusive province of the jury. That is why courts exclude expert testimony on subjects the factfinder can readily understand on their own, *United States v. Fuentes-Cariaga*, 209 F.3d 1140, 1142 n.3 (9th Cir. 2000), or that "subsitut[es] the expert's judgment for the jury's," *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 2018 WL 6511146, at *3 (N.D. Cal. Dec. 11, 2018). Anthropic requests that the Court exclude Opening Report ¶¶ 146-53.

## CONCLUSION

The Court should therefore exclude ¶¶ 15-19 and ¶¶ 60-191 of Smith's Opening Report; ¶¶ 94-99, 141, and 148 of Smith's Rebuttal Report; and ¶¶ 7-9 17-90, 93-95, and 124-136 of Smith's Reply Report; and ¶¶ 4-12 of Smith's Second Supplemental Report—and any related testimony.

**PUBLIC REDACTED VERSION**

Date: April 14, 2026                    /s/ Sonal N. Mehta

SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

LOUIS W. TOMPROS (*Pro Hac Vice*)
louis.tompros@wilmerhale.com
DISHA PATEL (*Pro Hac Vice*)
disha.patel@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6220

ARI HOLTZBLATT (SBN 354361)
ari.holtzblatt@wilmerhale.com
ROBIN C. BURRELL (*Pro Hac Vice*)
robin.burrell@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2100 Pennsylvania Ave, NW
Washington, DC 20037
Telephone: (202) 663-6000

TAYLOR GOOCH (SBN 294282)
taylor.gooch@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
50 California St.
San Francisco, CA 94111
Telephone: (628) 235-1000

JARED V. GRUBOW (*Pro Hac Vice)*
jared.grubow@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
250 Greenwich St
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Defendant*
**ANTHROPIC PBC**

ANTHROPIC'S MOT. TO
EXCLUDE MICHAEL SMITH                    - 11 -                    Case No. 5:24-cv-03811-EKL-SVK

**PUBLIC REDACTED VERSION**

**CERTIFICATE OF SERVICE**

I hereby certify that on April 14, 2026, I did cause this motion to be served on the following listed below and in the manner so indicated.

**By Electronic Mail**

| | |
|---|---|
| OPPENHEIM + ZEBRAK, LLP | COBLENTZ PATCH DUFFY & BASS LLP |
| Matthew J. Oppenheim (*Pro Hac Vice*) | Jeffrey G. Knowles |
| Nicholas C. Hailey (*Pro Hac Vice*) | Christopher J. Weiner |
| Audrey Adu-Appiah (*Pro Hac Vice*) | Bina Patel |
| Corey Miller (*Pro Hac Vice*) | Thomas A. Harvey |
| Jeffrey M. Gould (*Pro Hac Vice*) | One Montgomery Street, Suite 3000 |
| 4530 Wisconsin Avenue, NW, 5th Floor | San Francisco, CA 94104 |
| Washington, DC 20016 | Telephone: (415) 772-5795 |
| Telephone: (202) 480-2999 | Ef-jgk@cpdb.com |
| matt@oandzlaw.com | cwiener@coblentzlaw.com |
| nick@oandzlaw.com | bpatel@coblentzlaw.com |
| aadu-appiah@oandzlaw.com | Ef-Tah@cpdb.com |
| corey@oandzlaw.com | |
| jeff@oandzlaw.com | |
| | |
| Jennifer Pariser (*Pro Hac Vice*) | COWN, LEIBOWITZ & LATMAN, P.C. |
| Andrew Guerra (*Pro Hac Vice*) | Richard S. Mandel (*Pro Hac Vice*) |
| Timothy Chung (*Pro Hac Vice*) | Jonathan Z. King (*Pro Hac Vice*) |
| Michelle Gomez-Reichman (*Pro Hac Vice*) | Richard Dannay (*Pro Hac Vice*) |
| Bret Matera (*Pro Hac Vice*) | 114 West 47th Street |
| Alexander Kaplan (*Pro Hac Vice*) | New York, NY 10036-1525 |
| 461 5th Avenue, 19th Floor | Telephone: (212) 790-9200 |
| New York, NY 10017 | rsm@cll.com |
| Telephone: (212) 951-1156 | jzk@cll.com |
| jpariser@oandzlaw.com | rxd@cll.com |
| andrew@oandzlaw.com | |
| tchung@oandzlaw.com | |
| mgomez-reichman@oandzlaw.com | |
| bmatera@oandzlaw.com | |
| alex@oandzlaw.com | |

Dated: April 14, 2026                    By:    */s/ Robin Burrell*
                                                        Robin Burrell