**PUBLIC REDACTED VERSION**

SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

TAYLOR GOOCH (SBN 294282)
taylor.gooch@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
50 California Street
San Francisco, CA 94111
Telephone: (628) 235-1000

JARED V. GRUBOW (*Pro Hac Vice)*
jared.grubow@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

LOUIS W. TOMPROS (*Pro Hac Vice*)
louis.tompros@wilmerhale.com
DISHA PATEL (*Pro Hac Vice*)
disha.patel@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

ARI HOLTZBLATT (SBN 354361)
ari.holtzblatt@wilmerhale.com
ROBIN C. BURRELL (*Pro Hac Vice*)
robin.burrell@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2100 Pennsylvania Ave, NW
Washington, DC 20037
Telephone: (202) 663-6000

*Attorneys for Defendant*
**ANTHROPIC PBC**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>ANTHROPIC PBC,<br><br>Defendant. | Case No. 5:24-cv-03811-EKL-SVK<br><br>**ANTHROPIC PBC'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PUBLISHERS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Hearing Date: July 15, 2026<br>Time: 10:00 AM<br>Judge: Hon. Eumi K. Lee |

**PUBLIC REDACTED VERSION**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................4

      A.     Anthropic And Its Mission.................................................................................4

      B.     Claude's Purposes And Uses .............................................................................5

      C.     Claude's Design And Training ...........................................................................5

      D.     Anthropic's Defenses To Prevent Users From Misusing Claude ......................6

      E.     Publishers Bring Suit ........................................................................................7

ARGUMENT .........................................................................................................................8

      I.     Anthropic's Use Of Lyrics As Inputs To Train Claude Is Fair Use
           And There Is A Genuine Question As To Whether Non-Verbatim Outputs
           Are Fair Use ......................................................................................................8

           A.     The Use Of Lyrics As Inputs Is Fair Use As A Matter Of Law ............9

           B.     There Is A Material Factual Dispute As To Whether Non-Verbatim
                 Outputs That Reference Publishers' Claimed Lyrics Are Protected
                 By Fair Use .......................................................................................22

      II.    Anthropic Is Entitled To Summary Judgment On Publishers'
           Output Claims ..................................................................................................23

           A.     Anthropic Cannot Be Held Directly Liable As A Matter Of Law .......24

           B.     Publishers' Secondary Liability Claims Fail As A Matter Of Law .....29

      III.   Publishers' DMCA Claim Fails As A Matter Of Law....................................33

      IV.   Publishers Are Not Entitled To Summary Judgment On Their *Direct*
           Infringement Claim For The 499 Songs At Issue ...........................................36

CONCLUSION....................................................................................................................38

**PUBLIC REDACTED VERSION**

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
562 F.3d 630 (4th Cir. 2009) ..............................................................8, 11, 15, 22

*Ambrosetti v. Oregon Cath. Press*,
151 F.4th 1211 (9th Cir. 2025) ...................................................................36

*American Broad. Cos., Inc. v. Aereo, Inc.*,
573 U.S. 431 (2014)...................................................................24

*Andersen v. Stability AI Ltd.*,
744 F. Supp. 3d 956 (N.D. Cal. 2024) ...................................................34

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023).................................................................. *passim*

*Annabooks, LLC v. Issuu, Inc.*,
2020 WL 6873646 (N.D. Cal. Sept. 24, 2020) ...................................................32

*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014).................................................................. *passim*

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015).................................................................. *passim*

*Barcamerica Int'l USA Trust v. Tyfield Imps.*,
289 F.3d 589 (9th Cir. 2002) ...................................................................30

*Bartz v. Anthropic PBC*,
787 F. Supp. 3d 1007 (N.D. Cal. 2025) .................................................. *passim*

*Bell v. Moawad Grp., LLC*,
326 F. Supp. 3d 918 (D. Ariz. 2018) ...................................................13, 14

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
448 F.3d 605 (2d Cir. 2006)...................................................................15

*Bittaker v. Woodford*,
331 F.3d 715 (9th Cir. 2003) (en banc) ...................................................30

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994).................................................................. *passim*

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
536 F.3d 121 (2d Cir. 2008).................................................................. *passim*

*Columbia Pictures Indus., Inc. v. Fung*,
710 F.3d 1020 (9th Cir. 2013) ........................................................................31

*Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*,
259 F.3d 1186 (9th Cir. 2001) ........................................................................30

*CoStar Grp., Inc. v. LoopNet, Inc.*,
373 F.3d 544 (4th Cir. 2004) ..........................................................................24

*Cox Commc'ns, Inc. v. Sony Music Ent.*,
146 S. Ct. 959 (2026)............................................................................. *passim*

*Dolls Kill, Inc. v. Zoetop Bus. Co.*,
2022 WL 16961477 (C.D. Cal. Aug. 25, 2022)..............................................34

*Ellison v. Robertson*,
357 F.3d 1072 (9th Cir. 2004) ........................................................................33

*Erickson Prods., Inc. v. Kast*,
921 F.3d 822 (9th Cir. 2019) ..........................................................................32

*Falkner v. General Motors LLC*,
393 F. Supp. 3d 927 (C.D. Cal. 2018) ........................................................33, 34

*Fogerty v. Fantasy, Inc.*,
510 U.S. 517 (1994)........................................................................................16

*Fox Broad. Co., Inc. v. Dish Network L.L.C.*,
747 F.3d 1060 (9th Cir. 2014) ........................................................................25

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021)...................................................................................8, 12, 18

*Herbert Rosenthal Jewelry Corp. v. Kalpakian*,
446 F.2d 738 (9th Cir. 1971) ..........................................................................16

*Hunley v. Instagram, LLC*,
73 F.4th 1060 (9th Cir. 2023) ...............................................................24, 25, 28

*Kadrey v. Meta Platforms, Inc.*,
2025 WL 1786418 (N.D. Cal. June 27, 2025)................................................35

*Kadrey v. Meta Platforms, Inc.*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025) ........................................................ *passim*

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*,
591 F. Supp. 2d 1098 (N.D. Cal. 2008) ........................................................33

*Mattel, Inc. v. Walking Mountain Prods.*,
353 F.3d 792 (9th Cir. 2003) ..........................................................................13

*Metro-Goldwyn-Meyer Studios Inc. v. Grokster, Ltd.*,
        545 U.S. 913 (2005)................................................................24, 29, 31, 32

*Perfect 10, Inc. v. Amazon.com, Inc.*,
        508 F.3d 1146 (9th Cir. 2007) ............................................................. *passim*

*Perfect 10, Inc. v. Giganews, Inc.*,
        847 F.3d 657 (9th Cir. 2017) .................................................................24

*Red Label Music Publ'g, Inc. v. Chila Prods.*,
        388 F. Supp. 3d 975 (N.D. Ill. 2019) ..........................................................17, 18

*Richmond v. Weiner*,
        353 F.2d 41 (9th Cir. 1965) .................................................................30

*Sega Enters. Ltd. v. Accolade, Inc.*,
        977 F.2d 1510 (9th Cir. 1992) .................................................................2, 8, 17

*Seltzer v. Green Day, Inc.*,
        725 F.3d 1170 (9th Cir. 2013) ...............................................................14, 15, 16

*Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*,
        952 F.3d 1051 (9th Cir. 2020) .................................................................36, 37

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
        464 U.S. 417 (1984).................................................................2, 22, 30

*Splunk Inc. v. Cribl, Inc.*,
        2025 WL 3768665 (N.D. Cal. Dec. 31, 2025).................................................17

*Stevens v. Corelogic, Inc.*,
        899 F.3d 666 (9th Cir. 2018) .................................................................34, 35, 36

*Thaler v. Perlmutter*,
        130 F.4th 1039 (D.C. Cir. 2025).................................................................22

*Thomson Reuters Enter. Ctr. v. Ross Intel. Inc.*,
        765 F. Supp. 3d 382 (D. Del. 2025).................................................................12, 13

*Tremblay v. OpenAI, Inc.*,
        716 F. Supp. 3d 772 (N.D. Cal. 2024) .................................................................33

*Tresona Multimedia v. Burbank High Sch. Vocal Music Ass'n*,
        953 F.3d 638 (9th Cir. 2020) .................................................................2, 16

*Twitter, Inc. v. Taamneh*,
        598 U.S. 471 (2023).................................................................29

*Universal City Studios, Inc. v. Sony Corp. of Am.*,
        480 F. Supp. 429 (C.D. Cal. 1979) .................................................................13, 14

PUBLIC REDACTED VERSION

*VHT, Inc. v. Zillow Grp., Inc.*,
    918 F.3d 723 (9th Cir. 2019) ......................................................................... *passim*

*White v. West Publ'g Corp.*,
    29 F. Supp. 3d 396 (S.D.N.Y. 2014)..............................................................19

**STATUTES, RULES, AND REGULATIONS**

17 U.S.C. § 107 ............................................................................................. *passim*

17 U.S.C. § 1201 *et seq.*, Digital Millennium Copyright Act ("DMCA")........................... *passim*

U.S. Const. art. I, § 8, cl. 8 .............................................................................2, 8

**OTHER AUTHORITIES**

4 Nimmer on Copyright § 12A.10[B][1][a]........................................................33

Edward Lee, *Copyright Dilution Under Constitutional Scrutiny*,
    25 Chi.-Kent J. Intell. Prop. 1 (2026) ...........................................................16

3 *Patry on Copyright* § 9:5.50 (Mar. 2026 Update).......................................24

4 *Patry on Copyright* § 10.155.40 (Mar. 2026 Update)................................16

Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990) ...................15, 16

**PUBLIC REDACTED VERSION**

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on July 15, 2026 at 10:00 AM, Defendant Anthropic PBC will and hereby does move the Court for an order granting Anthropic's Motion for Summary Judgment. Anthropic's motion is based on this Notice of Motion, the supporting Memorandum, and the Declaration of Robin Burrell filed herewith. Counsel for Anthropic met and conferred with Publishers' counsel regarding the bases for this motion on April 13, 2026.

Anthropic requests that the Court grant Anthropic summary judgment on each of Publishers' claims and deny Publishers' Motion for Partial Summary Judgment in full.

## MEMORANDUM OF POINTS AND AUTHORITIES

Anthropic's use of lyrics to Publishers' 499 songs (along with billions of other copyrighted works) to train Claude is "transformative" fair use. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 531 (2023). Anthropic trains Claude on written text—much like a human learns from "read[ing] and re-read[ing] books," poems, stories, lyrics, and other materials and then "internaliz[ing]" the themes, substance, and style of these materials. *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1021 (N.D. Cal. 2025). This training endows Claude with capabilities that stretch far beyond the text on which Claude was trained: it can reason, explain, code, and create. The result "adds something new, with a further purpose or different character" than the original work. *Warhol*, 598 U.S. at 533; *accord Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 579 (1994). Musicians write lyrics for artistic expression. Anthropic uses that same material to help Claude understand human language and enable progress and productivity in science, business, and education.

The only two courts to consider the issue have both held that using copyrighted text to train a generative AI model, like Claude, is "among the most transformative [uses] many of us will see in our lifetimes." *Bartz*, 787 F. Supp. 3d at 1033; *see also Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1035-36 (N.D. Cal. 2025). Claude can assist people with projects from the miraculous to the mundane. It can help identify and fix cybersecurity vulnerabilities before they are exploited, accelerate groundbreaking drug discoveries, process prior authorizations more quickly to speed up patient care, and plan a family vacation or design a chore schedule. Artists too can use Claude for tasks as varied as helping create entirely original works or managing the administrative

aspects of a music career. *See, e.g.*, Ex. 145 (Meek Mill X (Apr. 12, 2026)).

Claude, in short, is the kind of "new idea[]" that the Copyright Act not only allows, but "encourages" as a "necessary counterbalance" to prevent "'stifl[ing] the very creativity which that law is designed to foster.'" *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1166 (9th Cir. 2007) (quoting *Campbell*, 510 U.S. at 577). Allowing copyright holders to veto such a transformative technology would ignore the Supreme Court's mandate that the primary objective of copyright is not to reward the author, but to serve the public. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984). And it would frustrate, rather than fulfill, the constitutional command to "promote the Progress of Science and useful Arts." U.S. Const. art. I, § 8, cl. 8.

Because Publishers cannot seriously contest that training is transformative, they largely rely on the fourth statutory factor, which weighs harm to the rightsholder. But Publishers cannot manufacture harm by claiming lost revenue from LLM training: Courts have long recognized that the transformative use of a copyrighted work does not, by definition, require a license. *See, e.g.*, *Tresona Multimedia v. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638, 652 (9th Cir. 2020).

And Publishers' claim that they will (purportedly) face competition from people using Claude to create original lyrics is legally irrelevant. The fair use inquiry is anchored on "the problem of substitution"—not competition. *Warhol*, 598 U.S. at 528. It asks if the defendant used an "original work to achieve a purpose that is the same as, or highly similar to, that of the original work," *id.*, not whether a transformative use "facilitat[ed] the entry of a new competitor," *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523 (9th Cir. 1992), such as a musician writing original lyrics.

Publishers fare no better in seeking to hold Anthropic liable for the vanishingly small number of instances where someone asked or manipulated Claude to reproduce lyrics and Claude actually complied. Publishers attempt to shoehorn this outputs-focused theory into the framework of direct liability. But Ninth Circuit case law limits direct liability to the entity that "instigated" the copying—here, the person who prompted Claude—and channels claims against others (such as Anthropic) into a secondary liability framework. *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 731-732 (9th Cir. 2019); *see also Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 130-133 (2d Cir. 2008). Making Anthropic directly liable for a third party's efforts to circumvent

copyright law would create perverse incentives for content owners to manufacture infringement (as Publishers' agents repeatedly did here). It would also fail to distinguish between companies that actively but imperfectly seek to avoid infringement and those that aggressively promote it.

Nor can Publishers succeed under the proper secondary liability framework.[1] Publishers fail to show that any of the prompts that generated the few purportedly infringing outputs were submitted by bona fide third parties as opposed to Publishers' agents. But as a matter of law, rightsholders cannot infringe their own copyrights. And there is no evidence suggesting Anthropic took steps to encourage its users to infringe Publishers' purported copyrights or tailored Claude for infringement. To the contrary, Anthropic has long had guardrails protecting against reproduction of copyrighted text, and it further strengthened those guardrails ███████████████████████ ██████ as soon as it learned of Publishers' machinations. Publishers also cannot prevail under a vicarious liability theory. Nothing in the record shows that Anthropic benefitted financially from the specific third-party prompts that yielded Publishers' lyrics. And for good reason: It makes no sense for a user to pay Anthropic for a Claude account and then work to jailbreak its guardrails to obtain song lyrics that are available for free on the internet.

Finally, Publishers' Digital Millennium Copyright Act (DMCA) claim fails as a matter of law. The DMCA is narrowly tailored to bar the removal of copyright management information (CMI) where the removal is done to enable or conceal infringement. Even after almost two years of discovery, Publishers have not identified a single work in suit from which Anthropic removed CMI. Nor have they shown that Anthropic did so with the double scienter the DMCA requires.

The points above resolve this case in Anthropic's favor. But even if the Court disagrees,

---

[1] On the evening before the filing deadline for this brief, Publishers informed Anthropic that after two and a half years of litigation, they "do not intend to proceed" on their claims for contributory and vicarious infringement. Anthropic requested that Publishers stipulate to judgment with prejudice on these claims so that Anthropic would not need to brief them. Publishers initially refused. Then, the morning of this filing, Publishers agreed to a dismissal with prejudice, but refused to agree to entry of judgment which will ensure that Anthropic is not subjected to serial litigation on these issues. Anthropic thus seeks judgment on both claims. The night of Anthropic's filing, Publishers filed a "Notice of Voluntarily Dismissal" which acknowledges that Publishers do not have the ability to unilaterally dismiss their claims at this stage. Dkt. 685. Anthropic will continue to confer with Publishers and notify the Court if the parties resolve these claims.

ANTHROPIC'S MOT. FOR                     - 3 -                Case No. 5:24-cv-03811-EKL-SVK
SUMMARY JUDGMENT

**PUBLIC REDACTED VERSION**

judgment should not be granted to Publishers on any of the three issues they identify.

*First*, as to the fair use of Claude's training, Publishers do not meaningfully dispute that training on lyrics (and other copyrighted text) is transformative. And even if Publishers' theories of market harm were legally viable (they are not), Publishers have not met their burden to show undisputed market harm. Indeed, just last month, Universal Music Group (UMG)—the parent of two Publishers who collectively assert 448 of the 499 works in suit—admitted that "we're seeing no indication that AI royalty dilution is a material issue for UMG from a revenue perspective." Ex. 136 (UMG Earnings Call), 23:37 (Mar. 5, 2026).

*Second*, as to the fair use of outputs, the record shows that many of Publishers' supposedly "verbatim" reproductions are in fact instances of commentary, parody, criticism, or novel creations. Whether those outputs are fair use is a fact-heavy question best left for the jury.

*Third*, there is a material factual dispute as to whether Anthropic engaged in "copying" under all Publishers' direct infringement theories because Publishers fail to establish the precise, authoritative language of the copyrighted lyrics for each of the works.[2]

## BACKGROUND

### A. Anthropic And Its Mission

Anthropic is an AI safety and research company. It was founded by a group of seven scientists, engineers, and AI safety and policy experts with the goal of building AI that acts safely and ethically. MSS #2. Anthropic began as a research company, not a commercial business. MSS #3-5. But as AI began to develop in the commercial sphere, Anthropic's founders eventually determined that the best way to show that AI safety and commercial success were compatible was to participate in the commercial market and attempt to spark a race to the top for safe commercial AI. MSS #6. Reflecting these founding principles, Anthropic is incorporated as a public benefit corporation, which allows it to balance financial returns with the responsible development and

---

[2] Unless otherwise noted (1) "Ex." citations reference exhibits to the Burrell Declaration filed herewith; (2) "MSS" citations are to Anthropic's moving separate statement of undisputed facts and "RSS" citations are to Anthropic's responsive separate statement; (3) "Ad.F" citations reference additional material facts in Anthropic's RSS; (4) emphasis is added; (5) objections are omitted from any deposition quotes; and (6) internal quotation marks and citations are omitted.

**PUBLIC REDACTED VERSION**

maintenance of AI for the long-term benefit of humanity. MSS #7-8.

Anthropic furthers its mission by building AI models that serve humanity in a helpful, honest, and harmless way. MSS #9. For example, Anthropic pioneered a technique called "Constitutional AI," which provides a set of ethical principles and behavioral guidelines to follow. Anthropic trains its models to adhere to these guidelines, including through ███████████ ███████████████████████████████████. MSS #110. This approach helps both enhance safety and instill values, such as respect for intellectual property rights. MSS #138-139.

### B.    Claude's Purposes And Uses

Anthropic develops large language models, or LLMs, a term that refers to AI systems trained to both understand language and generate new text. MSS #10-13. Anthropic first released its commercial AI service, Claude, to the general public in July 2023. MSS #13.

As Publishers' own expert acknowledged, LLMs like Claude have ███████ uses. MSS #144-145. Anthropic's research has found that people most commonly use Claude to help write computer code or accomplish other business tasks, like analyzing data or drafting professional emails. MSS #16. Claude has also been used for a wide range of other tasks—by pharmaceutical researchers to accelerate clinical trials, by scientists to further conservation, and by government agencies for everything from national security to summarizing vast archival records. MSS #14-15.

### C.    Claude's Design And Training

LLMs like Claude start as a "neural network," a kind of synthetic brain fed an enormous amount of text called a "training corpus." MSS #19-20. Engineers created Claude by repeatedly analyzing the training corpus to build a map of how humans use language and understand concepts. MSS #10, 21-22, 32-33. Claude's analysis of the explicit and implicit connections within the text of its training corpus are translated into statistical representations within the model, which are used to respond to user prompts based on repeated predictions of what word should come next. MSS #10, 19, 24, 33.

LLMs like Claude require a massive amount of unique, useful data from diverse sources to learn to reason, generalize, and produce useful outputs. For example, the Claude models at issue in this case were trained on trillions of words—more than twice the amount of words in every book

ever written. MSS #22, 65-67, 71. Anthropic obtained this data from public web pages and other publicly available data, among other sources. MSS #59-60. Song lyrics were in Claude's training corpus because such lyrics are freely available on the internet. MSS #68-69.

### D. Anthropic's Defenses To Prevent Users From Misusing Claude

Anthropic implements a multi-layered approach to prevent misuse of Claude. These defenses complement one another so that Anthropic can better mitigate unwanted behavior. MSS #102. At the outset, Anthropic uses a variety of pre-training techniques to remove low quality and potentially dangerous materials and transform raw data into a format that can be used for training. This includes substantial efforts to deduplicate raw training materials to reduce the likelihood of regurgitation. MSS #103-106.

On top of these pre-training techniques, Anthropic has applied a new and intentionally holistic approach referred to as "Constitutional AI," which embeds models with a constitution or set of core operating principles. For example, Claude's Constitution directs the model to choose responses that are "less existentially risky for the human race" and that "discourage[] and oppose[] torture, slavery, cruelty, and inhuman or degrading treatment." Ex. 45. And, as most relevant here, it directs the model to avoid ███████████████████████ Ex. 30 (11/12/25 Anthropic's Suppl. R&Os to 1st Set of ROGs) at 12; *see also* MSS #107, 111. To further reduce the risk of infringement by users, Anthropic also uses a ████████ ████████████████████████████████████████ ██████████████████████ MSS #110.

As a further line of defense, Anthropic developed two technical systems to detect and stop the generation of copyrighted content in response to user prompts. MSS #111-112. The first of these two "guardrails" is known as "Prompt Shield." Prompt Shield ████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████. MSS #113-115. The second set of guardrails is known as the ████████████████ or ████████████████ ██████ MSS #116, 118-119. If ███████████████

████████████████████████████████████████████████ it stops the output. MSS #118-119.

On top of all of these safeguards, Anthropic's "Usage Policy" (fka "Acceptable Use Policy") requires users to agree to abide by Anthropic's terms, which expressly prohibit using Claude to "[i]nfringe, misappropriate, or violate the intellectual property rights of a third party." MSS #120.

**E.      Publishers Bring Suit**

Anthropic first learned that Publishers' purported lyrics had been reproduced in Claude outputs when Publishers filed their complaint in October 2023. MSS #121. Publishers admit ██ ████████████████████████████████████████████████████. MSS #122-125. Once Anthropic received notice, it took immediate action that included strengthening existing guardrails and implementing new ones. MSS #121.

Even before these new measures were implemented, people rarely prompted Claude for copyrighted lyrics—and even more rarely obtained them. In the sample of 5 million prompts and outputs produced during discovery from a six-month period pre- and post-suit, ***over 83%*** of the prompts that resulted in reproduction of lyrics to the works in suit were generated by Publishers themselves or their agents and often in an attempt to circumvent Claude's guardrails or simply trick them. MSS #126-130. Many of the remaining 17% of prompts that resulted in outputs with lyrics to the works in suit are entirely consistent with fair use. For example, one user ████████████ ████████████████████████████████████. MSS #147. Another user ████████████ ████████████████████████████████. MSS #148.

It is undisputed that Claude no longer produces full verbatim lyrics to Publishers' claimed works—except for where (1) a user attempts to circumvent Claude's restrictions (through "jailbreaking") or (2) a user accesses Claude's functionality through a limited number of third-party applications where Anthropic ██████████████████████████████████████████. MSS #131-134. A test of Anthropic's current models █████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████. MSS #154. Even in the rare instances where Claude did respond to a user request by reproducing some lyrics, Claude typically did so in the context of refusing to provide all the

**PUBLIC REDACTED VERSION**

lyrics. For example, when prompted for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Claude responded:

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

MSS #155.

## ARGUMENT

**I.  ANTHROPIC'S USE OF LYRICS AS INPUTS TO TRAIN CLAUDE IS FAIR USE AND THERE IS A GENUINE QUESTION AS TO WHETHER NON-VERBATIM OUTPUTS ARE FAIR USE**

Publishers assert that Anthropic has infringed by using their purportedly copyrighted lyrics in two distinct ways: (1) as an input to the training process for Claude and (2) as a rare output in response to user prompts. *E.g.*, First Am. Compl. ("FAC") ¶¶ 60, 77. As to the first theory, the use of copyrighted text to train LLMs is fair use as a matter of law—as two courts in this district have already rightly held. *See Bartz*, 787 F. Supp. 3d at 1033; *Kadrey*, 788 F. Supp. 3d at 1036. *Bartz* and *Kadrey* are consistent with a long line of precedent holding that copying of information to develop new digital technologies with uses distinct from the original works is fair use as a matter of law. *See, e.g.*, *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214-25 (2d Cir. 2015) ("*Google Books*"); *Perfect 10*, 508 F.3d at 1163-68; *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 638-45 (4th Cir. 2009); *Sega Enters.*, 977 F.2d at 1523; *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 26-40 (2021). The undisputed record in this case compels the same conclusion.

To be clear, Anthropic is not seeking summary judgment on fair use for Publishers' second infringement theory based on rare outputs from Claude that reference Publishers' claimed lyrics. Fair use requires "an analysis of the specific 'use' of a copyrighted work that is alleged to be 'an infringement.'" *Warhol*, 598 U.S. at 533. The record on Publishers' infringing-outputs theory is factually complex, as many of the specific outputs Publishers challenge are not verbatim recitations of the 499 songs' lyrics and instead constitute parody, commentary, or other types of expression

protected by fair use. Ultimately, it is not necessary to reach that question to fully resolve this case because Publishers' output theory fails for the reasons in Part II. But if this case goes to trial, the fact-intensive question of whether particular outputs are fair use is for the jury in the first instance.

### A.    The Use Of Lyrics As Inputs Is Fair Use As A Matter Of Law

Copyright law is grounded in the constitutional principle of "promot[ing] the [p]rogress of [s]cience and useful [a]rts." U.S. Const. art. I, § 8, cl. 8. It is hard to imagine a better way to advance that purpose than to affirm that fair use protects access to the trillions of words of text needed to train an LLM. LLMs are perhaps the biggest technological advancement of the century precisely because they turbocharge human ingenuity. People rely on Claude to do everything from writing computer code to proposing policy solutions for aging populations in an efficient and effective manner. MSS #16. Researchers have used Claude to analyze massive clinical trial datasets and help draft clinical study reports as they transform basic science into tangible medical treatments. MSS #17. And composers use Claude to brainstorm new songs by generating lists of interesting word pairings. MSS #18. Claude's applications are limited only by the expanse of human imagination.

A holding that LLM training on copyrighted material is not fair use would threaten these applications and a galaxy of others—"stifl[ing] the very creativity which [the] law is designed to foster," *Campbell*, 510 U.S. at 577. The law requires no such thing. Courts evaluate fair use based on four non-exhaustive factors: (1) "the purpose and character of the use;" (2) "the nature of the copyrighted work;" (3) "the amount and substantiality of the portion used in relation to the copyrighted work as a whole;" and (4) "the effect of the use upon the potential market" for the copyrighted work. 17 U.S.C. § 107. All four factors support Anthropic.

### 1.    The First Factor Favors Fair Use: Training LLMs Is Transformative

The first fair use factor asks whether the alleged copier's use of a work is "transformative"— that is, whether it "adds something new, with a further purpose or different character." *Warhol*, 598 U.S. at 528-29. A transformative use avoids "the problem of substitution," *i.e.*, the "use of an original work to achieve a purpose that is the same as, or highly similar to, that of the original work." *Id.* The only two courts to consider this factor when applied to LLM inputs have both rightly held that using copyrighted material to train an LLM is transformative—and in fact may be "among the

most transformative many of us will see in our lifetimes." *Bartz*, 787 F. Supp. 3d at 1021, 1033; *see also Kadrey*, 788 F. Supp. at 1044, 1047 ("no serious question" use was "highly transformative").

Anthropic's use of freely available lyrics from the internet to train Claude is no different. Anthropic uses text collected from the internet to train Claude to understand the interrelationships between words and concepts in human language. MSS #10, 19, 22-24, 26. No musician writes lyrics to train a large language model. Rather, musicians compose music for artistic expression: to entertain, to inspire, to grieve, or to hope. MSS #25-26. Anthropic's use of lyrics to train Claude unquestionably "adds something new, with a further purpose or different character." *Warhol*, 598 U.S. at 528-29.

Claude's design and function confirm that the use of copyrighted lyrics for training is transformational. Publishers' expert conceded that Claude's ████████████████████ ████████████████████ that Anthropic does not have Claude ████████████ ████████ and that ████████████████████████████ Ex. 139 (Pltfs. Exp. Zhao Dep.), 177:2-4, 178:6-18, 179:9-10; MSS #27-28, 36. Instead, Anthropic designed Claude to use the text to build a statistical map of how humans use language and understand concepts and the connections across words and concepts. *See supra* p. 5; MSS #10, 19, 22, 29-31. In this map, statistical relationships between words and concepts become numerical weights, representing the likelihood that a word is associated with all other words and concepts. MSS #19, 32-33. When a user prompts Claude, it generates a response by drawing on these statistical patterns to predict which word should come next in the sequence to appropriately respond to the user prompt. *Id*. Because this process relies on probabilities, and is not deterministic like a database query, repeating the same prompt even at the same moment in time will frequently generate different responses. MSS #34-35. In short, Anthropic trained Claude to draw upon its analysis of the relationships between words and concepts to generate intelligent and unique outputs in response to user requests. MSS #10, 24, 36.

Claude's transformative training creates a flexible, general-purpose model that can be used in myriad beneficial ways—the vast majority of which are wholly unrelated to lyrics or music. *Supra* p. 5. Although this case focuses on Anthropic's consumer chatbot interface, Claude.ai, Anthropic's

**PUBLIC REDACTED VERSION**

primary business is to deploy Claude as an AI agent to business and enterprise customers to help them increase their operational productivity and efficiency. MSS #41-43. Claude's most common agentic use case is code-writing for software engineering, and newer models are capable of autonomously completing complex coding tasks that might take a full day of human work with little human prompting or oversight. MSS #38-40. But Claude is also commonly used for original-content creation, academic research, communications and writing assistance, business strategy development and execution, and data analysis. MSS #16.

Even in the rare occurrences involving song lyrics, Claude's outputs result from a transformative use of its training data. When Anthropic co-founder Tom Brown asked Claude for its ██████████████████ it replied with an analysis of the song ██████ explaining that the song ████████████████████████████████████████████ and ██████████████ ████████████████████████████████████████████ ██████████████████ Ex. 92 (original alteration). Other examples abound. MSS #44, 46-50.

Courts have repeatedly found fair use in far less transformative circumstances. *Perfect 10* held that Google's copying and display of millions of copyrighted thumbnail images as part of search engine results was "highly transformative" because "a search engine provides an entirely new use for the original work"—"improving access to information" versus "artistic expression." 508 F.3d at 1165. *Authors Guild, Inc. v. HathiTrust* held that digitizing millions of copyrighted books to provide information about the frequency and locations of words within those works was transformative. 755 F.3d 87, 91, 97-98 (2d Cir. 2014). *Google Books* found transformativeness in the creation of a searchable database of books that displayed snippets from the underlying works. 804 F.3d at 217. And *A.V. ex rel. Vanderhye v. iParadigms, LLC* concluded that it was a transformative use to scan copyrighted material to produce plagiarism-detection software. 562 F.3d at 638-40. If these uses (which include simply re-displaying the same content) are transformative, then surely using text to build a model that maps human language is too.

Publishers offer four meritless responses. *First*, Publishers argue (at 3, 22) that "the transformativeness inquiry is limited to Anthropic's use of Publishers' lyrics specifically and the

purpose of that particular use," which they claim is "precisely to reproduce" the lyrics to the 499 works. Wrong on both counts. The focus and import of the fair use analysis sweeps far broader than lyrics to 499 works. Anthropic collected and used lyrics in precisely the same way that it collected and used millions of other copyrighted texts that are freely available on the internet, and all of that information *together* was used to train Claude. As Publishers' own experts acknowledged, every piece of data that an LLM is trained on ███████████ on the LLM's reasoning. Ex. 131 (Pltfs. Exp. Shan Dep.), 226:9-229:18; Ad.F #20. Publishers themselves argue (at 18) that training on lyrics helps Claude produce new and original "AI generated song lyrics." Put simply, all of the training inputs—including lyrics to the works in suit—contribute collectively to Claude's capabilities.

To the extent Publishers' argument is that Anthropic's objective was to design a tool that would reproduce lyrics to these 499 songs, that assertion is illogical and legally irrelevant. Anthropic had no incentive to build the world's most complex and expensive regurgitator of lyrics to these 499 songs, or songs in general, when song lyrics are freely available online. Ad.F #21. Regardless, under *Warhol*, it does not matter if Anthropic intended to build a lyric reproduction machine (it did not). *See* 598 U.S. at 544-45. What matters is that Anthropic trained a revolutionary assistant with Publishers' lyrics—a purpose entirely distinct from Publishers' original use. *Id.*

*Second*, Publishers wrongly suggest (at 25-26) that Claude's commercial uses undermine Anthropic's position. "Commercialism isn't dispositive of the first factor and tends to be less important when the secondary use is highly transformative." *Kadrey*, 788 F. Supp. 3d at 1046; *see Bartz*, 787 F. Supp. 3d at 1024. In *Google LLC v. Oracle America, Inc.*, for example, Google's commercial use of copyrighted code was "not dispositive of the first factor" because the technology Google developed using the code was "inherently transformative." 593 U.S. at 32. Likewise, in *Campbell v. Acuff-Rose Music, Inc.*, the Court explained that "the more transformative [a] new [use], the less will be the significance of other factors, like commercialism." 510 U.S. at 579. Because Anthropic's use is highly transformative, its commercial nature should not change the analysis. *See Kadrey*, 788 F. Supp. 3d at 1046.

*Third*, Publishers incorrectly claim (at 21-22) that *Warhol* and *Thomson Reuters* require their preferred result. Far from "signal[ing] a sea change in the first-factor analysis," as Publishers claim

(at 21), *Warhol* reaffirmed that the key inquiry is whether the use in question has "a further purpose or different character" than the copyrighted work and thus is "transformative." 598 U.S. at 509. It also reiterated that "commerciality" of a use is not dispositive but instead must be weighed against the degree of transformation. *Id.* at 510. In *Warhol*, the purposes of the original and secondary works were the same—both were "portraits of Prince used to depict Prince in magazine stories about Prince" and were thus direct market substitutes for one another. 598 U.S. at 526; *see also id.* at 545-47. Likewise in *Thomson Reuters*, the defendant copied works from one legal research tool to make another legal research tool—again, an identical purpose to that of the original work. *Thomson Reuters Enter. Ctr. v. Ross Intel. Inc.*, 765 F. Supp. 3d 382, 399 (D. Del. 2025). Here, using lyrics as part of a vast collection of text to train an LLM to understand human language is a fundamentally different purpose than the original. *See supra* pp. 9-10; Ad.F #22.

*Fourth*, Publishers erroneously contend (at 26) that *Kadrey* and *Bartz* would have reached a different result as to inputs if those cases had involved infringing outputs. Neither case says that. At most, the cases stand only for the unremarkable proposition that the plaintiffs there could have brought **additional** infringement claims if there had been any verbatim reproduction in outputs. *See Bartz*, 787 F. Supp. 3d at 1031 (explaining that plaintiffs did not bring output-infringement claims but could "in the future should such facts develop"). Because *Warhol* requires the fair use analysis to turn on the "specific use" alleged, 598 U.S. at 549, any fair use defense asserted in response to output-based infringement claims would have to be analyzed independently from—and thus would not have affected Anthropic's defenses to—the input-based claims. *Supra* p. 8.

**2.      The Second Factor Favors Fair Use Because Publishers Make Their Claimed Song Lyrics Broadly Available To The Public For Free**

The second fair use factor looks to "the nature of the copyrighted work." 17 U.S.C. § 107(2). This factor "typically has not been terribly significant in the overall fair use balancing." *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 803 (9th Cir. 2003). Anthropic does not dispute that musical compositions are expressive works and that some (although not all) lyrics are creative. MSS #51. Here, however, the second factor favors Anthropic because broad, public dissemination of a copyrighted work weighs in favor of a finding of fair use. *See, e.g.*, *Universal City Studios, Inc. v.*

*Sony Corp. of Am.*, 480 F. Supp. 429, 453 (C.D. Cal. 1979) (second factor favored fair use because plaintiffs chose to have their works broadcast to the public for free); *Bell v. Moawad Grp., LLC*, 326 F. Supp. 3d 918, 927 (D. Ariz. 2018) (second factor favored fair use where plaintiff authorized his work to be widely available on the internet). It is undisputed that Publishers' claimed lyrics are made widely available to the public for free on third-party websites. MSS #52-53.

### 3.      Anthropic Only Uses The Portion Of The Works Reasonably Necessary To Achieve Its Transformative Purpose

The third factor asks whether "'the amount and substantiality of the portion used in relation to the copyrighted work as a whole'" are "reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586 (quoting 17 U.S.C. § 107(3)). If the defendant "takes no more than is necessary for his intended use," this factor "will not weigh against an alleged infringer, even when he copies the whole work." *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1178 (9th Cir. 2013).

To begin, Anthropic used only a portion of Publishers' works. It is undisputed that Publishers have not separately copyrighted the lyrics to their musical compositions, but instead copyrighted only the entire musical compositions. MSS #54-58. Anthropic used just the lyrics text for its training corpus. *See* FAC ¶ 6; MSS #61-64.

In all events, courts have found even wholesale copying reasonably necessary where the works are used for a transformative purpose. *See, e.g.*, *Bartz*, 787 F. Supp. 3d at 1030; *Kadrey*, 788 F. Supp. 3d at 1050. In *Bartz*, the court found that Anthropic's wholesale copying of books for LLM training was reasonably necessary, explaining that because "the volume of text required to train an LLM is monumental," "using so many works was reasonably necessary," and so "using any one work for *actually training* LLMs was about as reasonable as the next." 787 F. Supp. 3d at 1030.

Here too, Anthropic's use of Publishers' claimed lyrics was reasonably necessary to train a transformational general-purpose LLM. Publishers do not dispute that building a general-purpose LLM requires training on hundreds of billions or trillions of words of text—which for recent models exceeds twice the combined number of words in every book ever written. MSS #19, 22, 67. Nor do they dispute that to assemble this volume of data, Anthropic (like other LLM developers) widely collected text from public web sources. MSS #69-71. And it is undisputed that because Publishers'

lyrics are broadly available for free on many websites, those lyrics were swept up and included in Claude's vast training corpus along with other public web data. MSS #72-74.

Publishers' sole response (at 25) is that Anthropic has "no need" for the lyrics from the 499 specific songs at issue in this case. But Judge Alsup correctly rejected that logic in *Bartz*, explaining that "'reasonably necessary' does not mean 'strictly necessary.'" 787 F. Supp. 3d at 1030. No particular work is strictly necessary to build an LLM. Ad.F. #1. Rather, an AI developer needs to acquire a sufficiently massive and diverse mix of text. Ad.F. #2; *see supra* p. 5. Because that amount is reasonably necessary to train an LLM, all the works within that corpus are reasonably necessary to that goal. *See Bartz*, 787 F. Supp. 3d at 1030.

**4.      The Fourth Factor Favors Fair Use Because Anthropic's Use of Lyrics To Train LLMs Does Not Harm Any Cognizable Market**

The fourth factor considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor "focuses on actual or potential market substitution" between "[the] original work and secondary use." *Warhol*, 598 U.S. at 536 n.12; *see HathiTrust*, 755 F.3d at 99. It "protects against a republication which offers the copyrighted work in a secondary packaging, where potential customers, having read the secondary work, will no longer be inclined to purchase again something they have already read." *iParadigms*, 562 F.3d at 643. Where—as here—the allegedly infringing use does not replace sales of the original work, this factor weighs in favor of fair use. *Seltzer*, 725 F.3d at 1179.

*a.      Because Training Claude With Lyrics Does Not Substitute For Publishers' Uses Of Them, Factor Four Supports A Finding of Fair Use As A Matter of Law*

Anthropic's highly transformative use of vast amounts of text, including lyrics, to train a general-purpose LLM to understand human language does not create a substitute in the market for Publishers' claimed works. Publishers claim (at 34-35) they are harmed because Anthropic did not pay to license their works, but that argument proves too much. "By definition every fair use involves some loss of royalty revenue because the secondary user has not paid royalties." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614 (2d Cir. 2006) (quoting Pierre N. Leval,

**PUBLIC REDACTED VERSION**

*Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1124 (1990)).

Factor four requires a far more nuanced analysis. "[A]ny economic 'harm' caused by transformative uses" does not "count" for factor four purposes because, by definition, transformative uses "do not serve as substitutes for the original work." *HathiTrust*, 755 F.3d at 99; *see also Tresona*, 953 F.3d at 651-52. Indeed, as Judge Chhabria explained, crediting Publishers' theory would make the fourth factor circular. Treating unpaid license fees as fourth-factor harm would assume the answer to the fair use question and would let the copyright owner prevail in every case, because "'the theoretical market for licensing'" exists in "[i]n every fair use case." *Kadrey*, 788 F. Supp. 3d at 1052 (quoting *Tresona*, 953 F.3d at 652). Put differently, the "only market harms that count are the ones that are caused because the secondary use serves as a substitute for the original, not when the secondary use is transformative." *HathiTrust*, 755 F.3d at 99; *see also Seltzer*, 725 F.3d at 1179.

Publishers also argue (*e.g.*, at 31-34) market harm based on new and original lyrics created in response to user prompts, claiming those "competing" lyrics "dilute and disrupt" the market for Publishers' asserted works. But competition from entirely novel works is irrelevant to the fair use question. This "erroneous" approach has never been endorsed by the Supreme Court, the Ninth Circuit, or any other appellate court. *See* 4 *Patry on Copyright* § 10.155.40 (Mar. 2026 update). Factor four considers only market harms derived from reproductions of a "*protected aspect*" of a copyrighted work. *Google Books*, 804 F.3d at 224. Because, by definition, new and original lyrics do not reproduce any protected aspect, competition created by those novel works cannot establish market harm. Edward Lee, *Copyright Dilution Under Constitutional Scrutiny*, 25 Chi.-Kent J. Intell. Prop. 1, 2, 18 (2026). To hold otherwise would be tantamount to granting Publishers monopoly rights over an entire genre or style, radically upending the careful balance that copyright law strikes between competition and protection. Lee, *supra*, at 2; *Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446 F.2d 738, 742 (9th Cir. 1971). Under copyright law, an expansion in the number of original works is a benefit—not a market harm. *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 524 (1994).

The Ninth Circuit has accordingly concluded that factor four favors the defendant even where the defendant's transformative use of the work "facilitat[ed] the entry of a new competitor"

and therefore "undoubtedly 'affected'" competition in the market for the plaintiff's works. *Sega Enters.*, 977 F.2d at 1523-24. A copyright owner's "attempt[s] to monopolize the market by making it impossible for others to compete run[] counter to the statutory purpose of promoting creative expression." *Id.* And the Supreme Court itself has long recognized that secondary works that reduce demand for an original work—*e.g.*, through criticism or parody—do not create a cognizable harm. *See Campbell*, 510 U.S. at 591-92. Put simply, the Copyright Act "seeks to advance original works of authorship, not to protect authors against competition." *Bartz*, 787 F. Supp. 3d 1032.

Publishers also argue (at 29) that rare (~0.01%) Claude outputs that reproduce portions of their lyrics harm the existing market for licensing the right to display those lyrics online. This theory targets the "use" of lyrics in Claude outputs responding to user requests—not the use of lyrics as inputs to training. It is thus irrelevant to whether Anthropic should be granted summary judgment on fair use for training. *Supra* p. 8. As *Warhol* explained, fair use must be considered on a use-by-use basis. 598 U.S. at 533. Hanging the Prince portrait in a museum would have been analyzed differently than using the photograph on the cover of a magazine. *See id.* at 557-58 (Gorsuch, J., concurring). This remains true even when the uses at issue are different features of the same technological system. *See, e.g.*, *HathiTrust*, 755 F.3d at 87 (separately analyzing (1) search function returning page and frequency results and (2) full-text access for patrons with print disabilities); *Google Books*, 804 F.3d at 202 (separately analyzing (1) search function that identified books containing terms and (2) "snippet view" function displaying excerpts of text); *Splunk Inc. v. Cribl, Inc.*, 2025 WL 3768665, at *2, *4 (N.D. Cal. Dec. 31, 2025) (separately analyzing four different secondary uses). Publishers do not get to build a fair use Frankenstein by mixing and matching different uses and then asserting that supposed harm from one undermines fair use for the other.

In any event, even if the Court considers Anthropic's training on inputs and generation of outputs as one single use, Anthropic's highly transformative use of training data to build Claude and Claude's vast number of novel, transformative outputs outweigh as a matter of law the minimal marketplace harms Publishers assert from the miniscule fraction of outputs that include verbatim lyrics to the works in suit. *Google Books*, for example, concluded the defendants were entitled to summary judgment on fair use despite the possibility that "snippet function" could "cause *some* loss

of sales" of the plaintiff's works because that theoretical market harm was not "meaningful or significant." 804 F.3d at 223-25. And *Red Label Music Publishing, Inc. v. Chila Productions* found that the defendant's transformative use of snippets of plaintiff's music video in a documentary was fair use, despite damage to the licensing market for the clips. 388 F. Supp. 3d 975, 986-89 (N.D. Ill. 2019). The fair use showing here is much stronger. Publishers' own expert identified only ▮ outputs containing lyrics out of a sample of ▮▮▮▮▮▮▮ MSS #75. Only 2 outputs after ▮▮▮▮▮▮▮ (when Anthropic strengthened its guardrails in response to this lawsuit) were related to the works in suit, both of which are only lyric fragments. MSS #76. And within the set of prompts that sought reproduction, 83.33% belonged to Publishers' **known** investigator; and more might belong to the undisclosed accounts of Publishers' other agents. MSS #77. In short, even if these supposed "harms" were relevant, there is no evidence that they are meaningful or significant. Anthropic's undeniably transformative use of text to train LLMs and the numerous transformative novel outputs Claude is capable of producing because of that training confirm that, even under Publishers' theory, Anthropic is entitled to judgment of fair use as a matter of law.

Although the Court can resolve the fourth factor in Anthropic's favor without reaching it, the undisputed "public benefits the copying will likely produce" also support fair use. *Oracle*, 593 U.S. at 35; *see Perfect 10*, 508 F.3d at 1166. Publishers' experts and witnesses repeatedly acknowledge that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮," Ex. 121 (Pltfs. Wit. Kokakis Dep.), 337:10-11, and that "▮▮▮▮▮▮▮ including "▮▮▮▮▮ have "▮▮▮▮" that are "▮▮▮▮▮," Ex. 139 (Pltfs. Exp. Zhao Dep.), 399:23-400:2, 401:5-8; *see* MSS #80-82. UMG agrees: AI presents "significant opportunities" for "new products and services" such that "the impact AI will have on [their] business will be overwhelmingly net positive." Ex. 136 (UMG Earnings Call), 23:37.

To take a few examples, Claude has significantly accelerated the research process of the Tahoe Lead Removal Project, helping the group achieve the removal of six miles of lead-clad cables. MSS #84. Pfizer and Novo Nordisk have integrated Claude into their core research infrastructure and thereby saved thousands of hours navigating time-consuming research tasks and producing clinical report data, speeding up the discovery and approval process for new drugs. MSS #85-86.

**PUBLIC REDACTED VERSION**

And the European Parliament used Claude to improve access to 2.1 million archived government records dating back to 1952. MSS #87. Finding fair use here would therefore foster innovation, expand access to knowledge, and create powerful tools for human creativity—precisely the outcomes copyright law was designed to encourage.

### b.   At Minimum, The Record On Factor Four Bars Summary Judgment For Publishers

Because none of Publishers' theories of market harm is legally cognizable, factor four favors Anthropic as a matter of law. But even if Publishers' theories were viable (they are not), genuine fact disputes certainly preclude granting Publishers summary judgment.[3]

**i. No Market For Licensing Training Data.** Even if lost licensing revenue for transformative uses could be considered a relevant "harm," Anthropic's economic expert Dr. Abhishek Nagaraj demonstrated that no market exists or is likely to form to license training data for general-purpose LLMs. Dr. Nagaraj explained that no LLM developer would license lyrics specifically without a market for the vast quantity of other diverse data needed to build a high-performing general-purpose LLM. Ad.F #23. And he explained that no market for general training data exists or is likely to form because (1) the number of potential rights holders is enormous and highly distributed, and (2) the incremental value of any individual work is marginal. Ad.F #24; *see also White v. West Publ'g Corp.*, 29 F. Supp. 3d 396, 397-98, 400 (S.D.N.Y. 2014) (finding no market due to high transaction costs where works made up small fraction of database). Indeed, Publishers have offered no evidence that these high transaction costs could be overcome so as to permit formation of any general market for training data. Ad.F #25.

Even accepting the possibility of a market for only lyrics, Dr. Nagaraj explained that no market for using lyrics to train general-purpose LLMs exists, or is likely to form, because lyrics are of such low training value that even moderately high transaction costs (as exist here) prevent licensing. Ad.F #26. Moreover, the volume of text provided by lyrics is also exceptionally low. The works here would amount to around ███████ of text needed to train Claude—and the full

---

[3] Publishers' factor four showing relies heavily on their expert, Michael Smith. Anthropic has moved to exclude Smith's conclusions. *See* Dkt. 680. Should the Court grant Anthropic's motion, Publishers' factor four showing would collapse, even under their (mis)understanding of the law.

catalog of Publishers' songs would make up only around ████. Ad.F #27.

Indeed, Publishers admit ████████████████████████████████████████ ████████████████. Ad.F #28-29. That admission alone—combined with Publishers' failure to demonstrate any functioning market for training data generally—supports summary judgment for Anthropic. But at a minimum, there is a genuine factual dispute about whether any actual or potential market exists to license lyrics to train a general-purpose LLM. *See Bartz*, 787 F. Supp. 3d at 1032 (noting genuine dispute over formation of a market before finding the issue legally irrelevant).

Publishers' counterarguments simply underscore why *they* are not entitled to summary judgment. Publishers claim (at 34) that "copyright owners have already entered into hundreds of agreements with AI developers to license their content in connection with AI models." But Dr. Nagaraj explained that these arrangements look nothing like this case. Some ████████████ ████████████████████████████ and thus encompass a larger scope of rights than just training. Ad.F #30.

Others are "last mile" or "gap filling" transactions that cover a narrow set of unique data that is particularly valuable to the model's training. Ad.F #31. The only thing these transactions demonstrate is that—after an AI developer has already amassed trillions of words of text—the developer may discover gaps related to certain highly significant and valuable data. Ad.F #31. There was nothing uniquely valuable about Publishers' lyrics relative to other training data. Ad.F #32-35. And in all events, one-off scenarios say nothing about the existence of a market for acquiring trillions of words in the first instance.

Publishers also stress (at 34) they have entered into licensing deals with two music-generation AI companies. But those deals occurred in a different market serving different needs and involving different products: Udio and Klay are single-purpose music-generation LLMs that do not compete with general-purpose LLMs like Anthropic, Ad.F #36-37, and the deals also ████████ ████████████████████████ Ad.F #36. They are thus irrelevant to the licensing market at issue, again creating—at a minimum—a genuine dispute of material fact.

**ii. No Competitive Harm.** As discussed, Publishers' competition-from-new-works theory of harm is not cognizable. *Supra* p. 16. And in any event, the facts do not support it. Just last month,

the Chief Digital Officer of UMG (parent of two Publishers who collectively assert 448 of the songs at issue) rejected Publishers' theory on the company's earnings call, explaining instead that AI will generate *benefits*: "We're seeing no indication that AI royalty dilution is a material issue for UMG from a revenue perspective … [T]houghtful analysis will conclude that the impact AI will have on our business will be overwhelmingly net positive." Ex. 136 (UMG Earnings Call), 23:37. Consistent with that statement, Publishers' own economic expert could not identify a single songwriter that has ███████████████████████████████████████ Ex. 132 (Pltfs. Exp. Smith Dep. (Vol. 1)), 109:20-110:9, nor could he quantify any ████████████████████████████████████████ ███████████████████, *id*. at 115:21-116:3. And Dr. Nagaraj's analysis confirms what Publishers' experts could not find: There is no competitive harm from AI. Dr. Nagaraj's regression analysis showed no impact from Claude on Publishers' revenues, even though every version of Claude in the past three years could generate new, novel lyrics. Ad.F #38. He also opined that there is no evidence AI-generated content will harm Publishers specifically or the music industry as a whole. Ad.F #39. To the contrary, positive impacts are more likely—for example, songwriters using AI to increase their productivity and generate new song ideas. Ad.F #40. Even if Publishers' theory of harm were to be accepted, Publishers' admissions and lack of evidence should support summary judgment **for Anthropic**. At minimum, it would preclude summary judgment for Publishers.

      **iii. No Harm To Market For Licensing Lyrics For Display.** Publishers argue (at 29) that the display of "Publishers' lyrics in AI output substitutes for those lyrics" and thus harms their ability to license their lyrics to websites like AZlyrics.com or Genius.com. As discussed above, this evidence is not relevant to Publishers' training claims and in any event cannot outweigh Anthropic's highly transformative purpose. *Supra* pp. 17-18. But even if the Court considers this issue, Publishers' theory finds no support in the record. Publishers' expert could not identify a single lost licensing deal or licensing negotiation in which Publishers had reduced bargaining power as a result of AI or AI training, let alone Claude specifically. Ad.F #41. On the flip side, Dr. Nagaraj conducted regression analyses and found that Claude usage has not reduced visits to lyric display websites or Google searches for lyrics to the works at issue. Ad.F #42. And Anthropic's damages expert found no evidence that ██████████████████████████████████████████. Ad.F #43.

While the existence of this market is not disputed, Publishers have offered no evidence of any negative "effect of the use" on the market—failing the relevant legal test. *See* 17 U.S.C. § 107(4).

**5.      Claude And Its Outputs Are The Result of Expressive Human Activity**

Knowing they fight an uphill battle on fair use, Publishers resort to fabricating a new requirement from whole cloth, insisting (at 19-20) that the fair use inquiry turns on whether the use is made by a human or machine, or whether the use is itself expressive. But humans at Anthropic invented Claude and continue to improve Claude every day. And humans prompt Claude for assistance with countless projects, including creative ones. On both ends, it is the action of humans that matters. Claude is nothing but a tool for humans.

In any case, the fair use statute simply contains no "human" or "expressive" activity requirement. 17 U.S.C. § 107. Nor does the case law. The Supreme Court has held, for example, that recording television shows so they could be watched later was fair use, even though such "time-shifting" was not expressive and was carried out by a machine (the Betamax). *Sony Corp. of Am.*, 464 U.S. at 442, 449-50; *see also supra* p. 11 (discussing *Perfect 10*, *Google Books*, *HaithiTrust*, and *iParadigms*). Publishers' lone purported counter authority—*Thaler v. Perlmutter*, 130 F.4th 1039, 1041 (D.C. Cir. 2025)—does not even address fair use. That case considered an entirely distinct question governed by a different statutory provision: whether a copyright may be registered for a work of art if a machine is listed as the work's sole author. *Id.* at 1041. At bottom, nothing in the law categorically excludes AI activity, or human works created with the help of AI, from fair use's protection.

**B.      There Is A Material Factual Dispute As To Whether Non-Verbatim Outputs That Reference Publishers' Claimed Lyrics Are Protected By Fair Use**

This Court need not reach the separate question of whether specific outputs generated at a user's request are fair use. Publishers cannot prevail on direct liability for their output-based theory because Publishers cannot establish Anthropic engaged in volitional conduct. *Infra* pp. 24-29. Nor can Publishers prevail on secondary liability. *Infra* pp. 29-33.

If this Court does reach the issue of whether specific outputs are subject to a fair use defense, it should not grant Publishers' motion in full. To be sure, Anthropic does not assert a fair use defense

**PUBLIC REDACTED VERSION**

to any actual "verbatim … cop[y] of lyrics," which Publishers claim (at 14-15) exist for each song at issue. But many examples that Publishers identify are not verbatim outputs, or anything close. For instance, the output that Publishers rely upon for their claim that Claude reproduced the song "Wannabe" by the Spice Girls merely displays ██████████████████████████ (the line: "Yo, I'll tell you what I want, what I really, really want")—and apparently did so as commentary, in response to an innocuous request for examples of ████████████████ Chung Decl. Ex. 2 (Dkt. 611-1) at 307-09. Publishers also assert there can be no fair use, as a matter of law, for outputs quoting short excerpts of lyrics (1) to explain a reference in a pun, *id*. at 37; (2) when analyzing whether ████████████████████████ *id*. at 255-56; (3) when asked ████████████ ████████████ *id*. at 49-50, and (4) when answering whether a ████████████ ████████████████ , *id*. at 288-89. Publishers even point to an output that provides ████████████████████████████████ . *Id*. at 144-45.

Publishers cannot meet their burden because a reasonable fact finder could—and Anthropic submits, would—conclude that each of these outputs is fair use. After all, the Copyright Act specifically identifies "criticism," "comment," and "teaching" as examples of fair use. 17 U.S.C. § 107. And the Supreme Court has recognized that "parody, like other comment or criticism, may claim fair use under § 107." *Campbell*, 510 U.S. at 579. Ultimately, whether any particular output of this sort constitutes fair use turns on context-dependent "case-by-case analysis," *id*. at 569— precisely the kind of context Publishers have failed to provide. Because there is, at the very least, a genuine fact dispute as to fair use, Publishers are not entitled to summary judgment on them.

## II.   ANTHROPIC IS ENTITLED TO SUMMARY JUDGMENT ON PUBLISHERS' OUTPUT CLAIMS

Publishers' copyright claims premised on the distinct use of their purported lyrics in outputs also fail as a matter of law. *First*, Anthropic cannot be held directly liable for any outputs reciting Publishers' claimed lyrics because, as a matter of law, Anthropic did not act volitionally in producing those outputs. Rather, it was users (mostly, if not always, Publishers themselves) who directly caused the purportedly infringing outputs.

*Second*, Publishers have not and cannot establish secondary liability as a matter of law. Secondary liability requires an infringement by a bona fide third party because Publishers and their

agents cannot infringe their own works. Here, Publishers have failed to show that any of the prompts that generated the purportedly infringing responses were submitted by bona fide third parties. In any event, *Cox Communications, Inc. v. Sony Music Entertainment*, 146 S. Ct. 959 (2026), is fatal to Publishers' contributory liability claim because there is no evidence that Anthropic took steps to encourage users to generate infringing outputs and because Claude has substantial noninfringing uses. And Publishers cannot establish vicarious liability because, despite Publishers' allegations to the contrary, they have not adduced any evidence that the possibility of infringement served as a draw for Anthropic's customers, or that Anthropic profited from purportedly infringing outputs.

### A.    Anthropic Cannot Be Held Directly Liable As A Matter Of Law

Copyright law carefully distinguishes between two forms of infringement: direct and secondary. The former applies when the defendant is "the *direct cause* of the infringement." *VHT, Inc.*, 918 F.3d at 731-32. When the defendant is not the direct cause, secondary liability applies under two circumstances. Contributory infringement occurs when the defendant "actively encourages" infringement by others "through specific acts" or "provide[s] [a] service [] tailored to [] infringement." *Cox*, 146 S. Ct. at 967. And vicarious infringement occurs when the defendant "profit[s] from direct infringement while declining to exercise a right to stop or limit it." *Metro-Goldwyn-Meyer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005).

Secondary liability does not "excuse defendants from accountability," but merely "channel[s] the claims against them into the correct analytical track." *Am. Broad. Cos., Inc. v. Aereo, Inc.*, 573 U.S. 431, 455 (2014) (Scalia, J., dissenting); *see Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 667 (9th Cir. 2017) (noting Justice Scalia's dissent is consistent with Ninth Circuit volitional conduct law). The distinction ensures that direct infringement is limited to those who are "sufficiently close … to the illegal copying" that it can be said they have "trespassed on the exclusive domain of the copyright owner." *VHT, Inc.*, 918 F.3d at 732 (quoting *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004)). Secondary liability, by contrast, permits courts to distinguish between good actors that invest in effective copyright protections and bad actors that actively encourage infringement. *See Grokster*, 545 U.S. at 926.

The line between direct and secondary liability is operationalized through the "volitional

conduct" requirement, which serves as "the Copyright Act's version of proximate cause." *Hunley v. Instagram, LLC*, 73 F.4th 1060, 1074-75 (9th Cir. 2023); 3 *Patry on Copyright* § 9:5.50 (Mar. 2026 update). The Second Circuit's decision in *Cartoon Network* demonstrates how the volitional conduct requirement applies to automated systems. *Cartoon Network*, 536 F.3d at 130-33.

Cartoon Network held that Cablevision, which provided a remote DVR system through which users could select a TV program to record, did not engage in volitional conduct because the end users were the ones "who actually press[ed] the button" to cause an infringing copy to be made. *Id*. at 131. The users "order[ed] th[e] system to produce a copy of a specific program" and the system "automatically obey[ed]." *Id*. Cablevision's "significant control over the content" available for its users to copy made no difference because Cablevision's control extended only to "the channels of programming available to a customer," and not to the specific programs that its users selected for recording. *Id*. at 132. By holding that automated systems such as Cablevision's could not face direct liability, *Cartoon Network* did not suggest that those systems were entirely off the hook. Instead, the court explained that in appropriate cases, "the doctrine of contributory liability stands ready to provide adequate protection to copyrighted works." *Id*.

Ninth Circuit case law follows the same basic principle. Just as *Cartoon Network* asks "who actually presses the button," 536 F.3d at 131, the Ninth Circuit asks who actually "cause[s] the copying," *Fox Broad. Co., Inc. v. Dish Network L.L.C.*, 747 F.3d 1060, 1067 (9th Cir. 2014). Specifically, the Ninth Circuit looks to who "instigate[s]" the copying and who "selects" the copyrighted content that is copied. *VHT, Inc.*, 918 F.3d at 732. If the users "selected" the specific works that were copied and "instigated" the copying process, the copying is attributable to the users and not the system that "responds automatically to users' input." *Id*. at 737.

Under the *Cartoon Network/VHT* standard, Anthropic has not engaged in any volitional conduct. Claude's users, not Anthropic, "cause the copying" alleged. *Fox Broad.*, 747 F.3d at 1067. It is undisputed that Claude produces outputs automatically in response to user requests: users ███ ███████ and "████████████████████████████████████████ Ex. 10 (Pltfs. Exp. Zhao Rpt.), ¶ 54; MSS #91-92. As Publishers' technical expert admits, the user himself ████ ██████████████████████████ Ex. 131 (Pltfs. Exp. Shan Dep.), 97:11-99:6. Anthropic does

not "███████████████████████████████████." *Id*. at 99:25-100:13. Users are therefore the ones who "actually press[] the button" or "instigate[]" copies to be made. *Cartoon Network*, 536 F.3d at 131; *VHT, Inc.*, 918 F.3d at 734.

Prompts and outputs in the record further demonstrate that it was the user who asked for or "instigate[d]" the lyric-related output. *VHT, Inc.*, 918 F.3d at 734. It was a user who decided to ask Claude for ███████████████████████████████ ███████████████████████████), MSS #93, and another user who sought ███████ ███████████████████████████████ MSS #94. It was Publishers' own investigator who asked Claude for song lyrics and requested that it "███████████████████████████" for the express purpose of trying to jailbreak the system to output "███████████████████████," MSS #95. Indeed, Publishers' expert appears to have resorted to trying to trick Claude into bypassing its guardrails by claiming to be Anthropic's CEO. MSS #96. As these examples illustrate, the user—not Anthropic— is engaged in the volitional conduct that Publishers claim led to infringing outputs.[4]

The "inclusion of Publishers' [claimed] lyrics in Claude's training data" does not establish that Anthropic was the cause of any infringing outputs. Mot. 17. It remains Claude's users—not Anthropic—who directly cause Claude to generate particular outputs. As Publishers' expert acknowledged, there are no "copies" of works in Claude models: Claude does not "███████ ███████████" used in training or "███████████████████████ ███████" when it responds to user prompts. Ex. 18 (Pltfs. Exp. Zhao Rebut.), ¶ 11; MSS #36, 97. That alone distinguishes Claude from systems that face direct liability for storing copyrighted works and transmitting them to users. *E.g.*, *Perfect 10*, 508 F.3d at 1160. Unlike the technology at issue in *Perfect 10* (which involved storing and reproducing thumbnail images of copyrighted images), Claude does not retrieve existing information from a database. Rather, Anthropic has trained Claude to output new, contextually relevant text in response to user requests. MSS #33.

---

[4] Publishers (at 16) put undue weight on Anthropic's acknowledgement that "Publishers can cite their own prompt-output pairs as evidence of direct infringement." The remainder of the sentence (omitted by Publishers) explains, "Anthropic can defend against" Publishers' direct infringement claim "on the merits." Dkt. 564 at 3 n.6. Anthropic does exactly that here.

**PUBLIC REDACTED VERSION**

It is also undisputed that Anthropic did not select specific copyrighted works to include in Claude's training data. Just as Cablevision "aggregate[d]" TV programming from "a wide variety" of channels, *Cartoon Network*, 563 F.3d at 124, Anthropic aggregated ███████████████ ██████████████████████████████████████████" for Claude. Ex. 10 (Pltfs. Exp. Zhao Rpt.), ¶ 55; *see also* MSS #99. Those datasets included publicly available text from the Internet and free, open repositories of web crawl data, which happened to sweep in the purportedly copyrighted works at issue due to their ubiquity across the internet. MSS #100. Anthropic no more "selected" these lyrics by training Claude on webpages than a DVR provider (like Cablevision) "selects" a *Law & Order* rerun by giving its users access to NBC, USA, and TNT.

In fact, the record demonstrates Anthropic did just the opposite. It is undisputed that Anthropic put into place several systems to "████████████" copyright infringement through a multi-layered system of defenses. Ex. 10 (Pltfs. Exp. Zhao Rpt.), ¶¶ 120, 126. Well before this lawsuit, Anthropic took steps to reduce the likelihood that Claude might reproduce copyrighted material in response to user prompts. As Publishers' own expert acknowledges, Anthropic ███ █████████████████████████████████████████████████, MSS #101, to reduce the risk of regurgitation of texts from Claude's training corpus, which "███████████ ███," *id*. Anthropic also pioneered Constitutional AI, a state of the art safety and ethics alignment technique Anthropic uses before a Claude model becomes public, and which embeds a ██████ ███████████████████████████████████████████. MSS #108. And Anthropic introduced a ██████████████████████████████████████. MSS #110.

Publishers also concede that Anthropic has strengthened its safeguards over time. MSS #111-112. Anthropic's Prompt Shield detects when a user's prompt is likely to cause Claude to generate reproductions of copyrighted content and ████████████████████████████ ████████████████████ MSS #113-115. Anthropic's █████████████████ checks ████████████████████████████████████████. MSS #117, 119; *supra* p. 6. And Anthropic's Usage Policy expressly secures users' agreement to use Claude in a way that respects copyrights. MSS #120. Because Anthropic "actively designed its system to avoid and eliminate copyright infringement," it has not "engage[d] in volitional conduct necessary to

support a finding of direct liability." *VHT, Inc.*, 918 F.3d at 733.

Publishers claim that Anthropic "exercised volition" in the creation of infringing Claude outputs in three other ways, all of which fail as a matter of law. *First*, Publishers assert (at 17) that there would be no infringing outputs "but for Anthropic's copying of Publishers' Works as input." Direct liability requires **proximate cause**, not just but-for cause. *See Hunley*, 73 F.4th at 1074-75. A system like Claude that "responds automatically to users' input" does not engage in volitional conduct, *VHT, Inc.*, 918 F.3d at 738, because its role is not "sufficiently proximate to the copying to displace the customer as the person who 'makes' the copies," *Cartoon Network*, 536 F.3d at 132.

*Second*, Publishers assert (at 17) that Anthropic engaged in volitional conduct by "train[ing] Claude to respond to prompts seeking lyrics by outputting lyrics." But the dataset Publishers cite was used to train models that are entirely separate from Claude, called preference or reward models. Ad.F #18; RSS #99-110. There is no record evidence that Anthropic taught Claude to perform specific tasks, let alone regurgitate copyrighted song lyrics using this dataset. Quite the contrary. Anthropic taught Claude **not to output copyrighted material**, including through its Constitutional AI principles and ███████████████████████████. *Supra* pp. 5-6. No reasonable jury could find that a handful of prompts, out of a dataset of over 169,000 conversations used to train an intermediate model what it means to be "helpful," amounted to volitional behavior. Ad.F #19.

Regardless, even if there were evidence in the record that Anthropic trained Claude that regurgitation of copyrighted materials is the helpful response (there is not), it would not help Publishers. That is because "designing, housing, and maintaining a system" to provide helpful responses to user prompts does not establish volitional conduct. *Cartoon Network*, 536 F.3d at 131. It remains the user who acts volitionally by "ordering that system to produce a copy of a specific" lyric, *id*., as Claude's training allows it to "respond[] automatically to users' input … without intervening conduct" by Anthropic, *VHT, Inc.*, 918 F.3d at 738.

*Third*, Publishers erroneously assert (at 17) that Claude outputs Publishers' claimed lyrics "even when users do not ask." The only support for this argument is a handful of user prompts that, under any reasonable interpretation, asked Claude for lyrics. In one example, the user identified a song and asked if Claude "████████." Chung Decl., Ex. 36 (Dkt. 611-34). In another, the user

asked if Claude is "█████████████" to a song. *Id.*, Ex. 37 (Dkt. 611-35). Publishers cannot seriously contend that these prompts were not asking Claude for lyrics. The only thing these examples show is that there are a variety of ways to make such a request. No matter what phrasing someone uses, the user is the proximate cause of these outputs.

## B.   Publishers' Secondary Liability Claims Fail As A Matter Of Law

The point of secondary liability is to punish only those who "consciously and culpably participat[e]" in the unlawful acts of another. *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 506 (2023). The doctrine seeks to identify bad actors—those who pursue a "patently illegal objective" to "cause and profit from third-party acts of copyright infringement," *Grokster*, 545 U.S. at 941. Ordinary service providers like Anthropic—who do not want their services to be used for infringement but might not always be able to prevent it—are not liable. *See Cox*, 146 S. Ct. at 967-68.

Publishers appear to recognize they cannot establish either of their secondary claims. After *Cox* narrowed the standard for contributory infringement, Publishers dropped that claim against Anthropic in *Concord II*. *Compare* No. 26-cv-880 (N.D. Cal.), Dkt. 1 at 39, *with* No. 26-cv-880, Dkt. 75 at 41. And yet, they maintained it here. A week before this filing, Anthropic conferred with Publishers and asked if they would drop their claim. Publishers stood by it. Anthropic followed up by email. Ex. 146 (4/13 Email). Publishers did not respond. Then, the evening before this filing, Publishers announced they would be dropping their contributory and vicarious infringement claims "in light of a number of [unspecified] factors." Ex. 152 (4/19 Email Chain). After nearly two and half years of hard-fought litigation on these claims, Anthropic asked Publishers to stipulate to entry of judgment *with prejudice* so Anthropic would not need to brief them here. *Id.* Publishers initially refused. *Id.* Then the morning of this filing, Publishers agreed to dismissal with prejudice but refused to agree to entry of judgment on the claims or to stipulate that they would not seek to litigate the same issues in future cases. And finally, the night of Anthropic's filing, Publishers filed a "Notice of Voluntarily Dismissal" which acknowledges (in a footnote) that Publishers do not have the ability to unilaterally dismiss their claims at this stage and must confer with Anthropic. Dkt. 685. Publishers should not be allowed to abandon their claims to avoid an adverse judgment while holding open the possibility of asserting these same (meritless) issues again in *Concord II* or some other future case.

**PUBLIC REDACTED VERSION**

After defending against these claims for years, Anthropic is entitled to finality. Anthropic will continue to confer with Publishers and notify the Court if the parties resolve these claims.

### 1.    There Is No Evidence Of Direct Infringement By True Third Parties

"Secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party," *Perfect 10, Inc.*, 508 F.3d at 1169, and a "copyright owner cannot infringe against his own copyright," *Richmond v. Weiner*, 353 F.2d 41, 42 (9th Cir. 1965). Thus, to prevail on their secondary liability claims, Publishers must establish that a bona fide third party generated the allegedly infringing output in question. Because the predicate act of direct infringement cannot have been committed by Publishers themselves, any outputs generated in response to queries by Publishers' employees or agents cannot be the basis for holding Anthropic secondarily liable. Anybody who is "authorized by the copyright owner to use the copyrighted work" is "not an infringer of the copyright." *Sony*, 464 U.S. at 433.

Here, Publishers assert (at 16) that they identified third-party outputs for only 82 works in suit. Any secondary liability claim premised on the remaining 417 compositions necessarily fails.

As for the remaining 82 works, Publishers—citing work product protection—have refused to produce evidence that would allow Anthropic to confirm whether in fact those outputs were generated by a bona fide third party. Publishers ask the Court (and Anthropic) to simply take their word that those outputs are not part of the nearly 10,000 prompts that Publishers submitted during their pre- and post-suit investigation. MSS #135. But those self-serving representations (at 16) "are not evidence and do not create issues of material fact." *Barcamerica Int'l USA Trust v. Tyfield Imps.*, Inc., 289 F.3d 589, 593 n.4 (9th Cir. 2002). "[P]arties in litigation may not abuse the privilege by asserting claims the opposing party cannot adequately dispute unless it has access to privileged materials." *Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003) (en banc). By withholding evidence that would allow Anthropic to assess Publishers' factual assertions, Publishers impermissibly use privilege "both as a sword and a shield." *Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1196 (9th Cir. 2001).[5]

---

[5] Since filing their motion, Publishers have admitted that one of the outputs characterized as an "undisputed" third-party output was generated by their own expert. Dkt 678; MSS #136. Publishers made this correction only after Anthropic identified the issue. *See* Dkt. 663 at 4-5; MSS #137.

ANTHROPIC'S MOT. FOR
SUMMARY JUDGMENT                    - 30 -                    Case No. 5:24-cv-03811-EKL-SVK

**2.      Publishers' Contributory Infringement Claim Fails As A Matter Of Law**

Under *Cox*, contributory infringement "can be shown only" in two ways: (1) if the defendant "actively encourages infringement through specific acts," or (2) if the provided service is "tailored to" infringement such that it is "not capable of substantial or commercially significant noninfringing uses." *Id*. at 967. Publishers fail to produce evidence of either.

**a.      There Is No Evidence That Anthropic Induced Infringement**

A defendant who "distributes a device" capable of infringement "is liable for the resulting acts of infringement by third parties" if the defendant does so "with the object of promoting [the device's] use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement." *Grokster*, 545 U.S. at 936-37. The plaintiff must show "active[] encourage[ment]" though "specific acts," *Cox*, 146 S. Ct. at 967; *see also Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1034 (9th Cir. 2013) (similar). Publishers cannot meet this high bar.

Publishers have pointed to no expression, let alone "clear expression," from Anthropic that its goal in training Claude was to promote or foster infringement by third parties. *Grokster*, 545 U.S. at 937. For example, there is no evidence that Anthropic has ever advertised Claude as a tool for infringement or instructed users how to infringe copyrights using Claude. *See id*. at 936; *Cox*, 146 S. Ct. at 967-68. To the contrary, Anthropic made massive investments to try to prevent copyright infringement and adopted a Usage Policy that expressly prohibits it. *See supra* pp. 5-6.

Nor do Publishers have any evidence that Anthropic engaged in "specific acts" to encourage infringement, *Cox*, 146 S. Ct. 967, or that it has taken "affirmative steps" to "foster infringement," *Grokster*, 545 U.S. at 937. Again, the undisputed record shows just the opposite: Anthropic implemented and improved guardrails and other techniques that reduce the likelihood that Claude might reproduce copyrighted material in response to user prompts—and continues to do so. *See supra* pp. 5-6. Those guardrails underscore the voluminous evidence in the record that Anthropic did not intend to permit infringing outputs or to foster copyright infringement. MSS #140-142. As Anthropic CEO Dario Amodei explained:

> [T]his isn't an intended output of Anthropic models. This is something we're trying to prevent. This is something that happens either by accident—although over time the … protections get better—or this is something that happens because someone is

adversarially trying to get around the filters and extract content. Neither of those things we want. And when they happen, we try to make them right.

Ex. 112 (Dario Amodei Dep.), 78:10-18. Publishers have identified zero evidence to the contrary.

### b.    *There Is No Evidence That Claude Is Tailored To Infringement*

Nor could any reasonable jury find that Claude is tailored to infringement. *Cox*, 146 S. Ct. at 967. "[A] service is tailored to infringement if it is not capable of 'substantial' or 'commercially significant' noninfringing uses." *Id*. Here, there is no dispute that Claude is "capable of substantial lawful use." *Grokster*, 545 U.S. at 933. As Publishers' own expert put it, "████████████ ████████████████████████" Claude is █████████████ Ex. 139 (Pltfs. Exp. Zhao Dep.), 307:7-11; MSS #146. Undisputed data show that Claude is most commonly used for substantial, noninfringing purposes. MSS #16. This is no surprise, given that Anthropic focuses on business and enterprise customers. MSS #149-151. Outputs even generally related to existing lyrics (like those discussing the meaning of lyrics) make up ████ of Claude's usage. *Supra* pp. 17-18; MSS #152. In short, user requests for lyrics are rare, and lyric-related outputs are even rarer.

### 3.    **Publishers Fail To Establish Vicarious Infringement**

Vicarious infringement requires the plaintiff to show "a causal relationship between the infringing activity and any financial benefit a defendant reaps." *Erickson Prods., Inc. v. Kast*, 921 F.3d 822, 829 (9th Cir. 2019). Publishers' complaint alleges that (1) Anthropic is paid "every time" "end users submit[] a request for Publishers' song lyrics," and it is "paid again every time its Claude API generates output copying and relying on those lyrics," and (2) the availability of Publishers' lyrics draws customers to use Claude. FAC ¶ 142; *id*. ¶ 146. Notwithstanding this Court's motion to dismiss opinion, Anthropic maintains that the mere fact that Anthropic earns revenue from the use of its services does not establish vicarious infringement. *See* Dkt. 205 at 16; *see, e.g., Annabooks, LLC v. Issuu, Inc.*, 2020 WL 6873646, at *4 (N.D. Cal. Sept. 24, 2020). Regardless, even after 20 months of discovery, Publishers have failed to support either allegation.

Publishers cannot show that any user paid for Claude on a per-use basis. Some Claude accounts are free, generating no financial benefit for Anthropic. MSS #156-157. And some Claude accounts are flat-fee accounts that charge a monthly fee independent of usage volume. MSS #158.

PUBLIC REDACTED VERSION

Publishers' experts identified ▮▮▮▮▮▮▮▮ that purportedly generated at least one infringing output each and together paid a total of ▮▮▮. MSS #159-161. But Publishers concede they cannot show that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮. MSS #162. "[F]lat periodic payments for service" are not sufficient to demonstrate a causal connection between any alleged infringement and the financial benefit. *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 591 F. Supp. 2d 1098, 1110 (N.D. Cal. 2008) (quoting *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004)). Publishers therefore have no evidence that Anthropic received a direct financial benefit from any specific allegedly infringing output.

Publishers likewise fail to identify any facts supporting their allegation that the availability of Publishers' purported lyrics "draw" customers to subscribe to paid Claude accounts. To prevail, Publishers "must show that 'customers either subscribed because of the available infringing material or canceled subscriptions because it was no longer available.'" *Louis Vuitton*, 591 F. Supp. 2d at 1110 (quoting *Ellison*, 357 F.3d at 1079). Publishers have produced no evidence—no interviews, surveys, or anything else—that so much as hints that a single user paid for Claude because of the perceived availability of lyrics. That makes sense given Anthropic's enterprise-focused business model and how infrequently Claude is used for music-related tasks. *See supra* pp. 7, 10-12, 17-18, 32. Because Publishers fail to offer "any evidence showing that [Anthropic] made more money when [it] allowed infringement to continue or less money when [it] did not," *Louis Vuitton*, 591 F. Supp. 2d at 1110, their vicarious liability theory cannot survive summary judgment.

## III.    PUBLISHERS' DMCA CLAIM FAILS AS A MATTER OF LAW

The DMCA is a targeted statute that protects against manipulation of CMI such as "the title, the author, [or] the copyright owner" that is "conveyed in connection with" an original work. *Tremblay v. OpenAI, Inc.*, 716 F. Supp. 3d 772, 778 (N.D. Cal. 2024). The DMCA prohibits specific acts of tampering with CMI—*i.e.*, removing CMI from a work or distributing a work knowing CMI was impermissibly removed. 17 U.S.C. § 1202(b)(1), (b)(3). Accordingly, the paradigmatic DMCA violation is intentionally "defacing or altering the title page of a book" while knowing that it will induce, enable, facilitate, or conceal infringement. *See Falkner v. General Motors LLC*, 393 F. Supp. 3d 927, 939 (C.D. Cal. 2018) (quoting 4 Nimmer on Copyright § 12A.10[B][1][a]).

The purpose of the DMCA is to heavily penalize those who make it easier for others to infringe or to conceal their own infringement. *See Stevens v. Corelogic, Inc.*, 899 F.3d 666, 674-75 (9th Cir. 2018). The DMCA thus imposes steep statutory damages of up to $25,000 per violation. 17 U.S.C. § 1203(c). To justify this level of punishment, Section 1202(b) of the DMCA includes an exceedingly demanding double-scienter standard: a person must have (1) "intentionally remove[d]" CMI, or "distribute[d]" copies of works knowing CMI was removed, and (2) done so while having reasonable grounds to know their conduct would "induce, enable, facilitate, or conceal" infringement. *Id*. § 1202(a)-(b). Publishers claim that Anthropic both intentionally removed CMI from their works in violation of Section 1202(b)(1) and distributed their works knowing CMI had been removed in violation of Section 1202(b)(3). Both claims fail for the same two reasons.

*First*, the DMCA only prohibits removal of CMI from, or distribution of, copyrighted works as a whole. *See* 17 U.S.C. § 1202(c) (CMI is information "conveyed in connection with" a "work"); *id*. § 1202(b)(3) (no person shall distribute "works" knowing CMI has been removed). After all, the statute was "intended to prevent the 'defac[ing] or deform[ing]' of protected works." *Falkner*, 383 F. Supp. 3d at 938-39. Courts evaluating DMCA claims thus require evidence that CMI was removed from a plaintiff's complete "product or original work." *See Dolls Kill, Inc. v. Zoetop Bus. Co.*, 2022 WL 16961477, at *3 (C.D. Cal. Aug. 25, 2022); *Andersen v. Stability AI Ltd.*, 744 F. Supp. 3d 956, 970 (N.D. Cal. 2024). Where a defendant never possessed the complete work to begin with, there is nothing from which CMI could have been "removed."

That principle is dispositive here. It is undisputed that Publishers' purportedly copyrighted works are "musical composition[s]," *supra* p. 14—not lyrics alone. It is also undisputed that Anthropic only ingested lyrics from the internet and that Claude is incapable of reproducing a copy of Publishers' full compositions. MSS #163-167. Anthropic never possessed the copyrighted "work" as a whole. The DMCA does not prohibit "merely omitting" CMI from lyrics extracted from a larger musical composition that the defendant never possessed. *Tremblay*, 716 F. Supp. 3d at 779.

*Second*, Publishers do not even try to show that Anthropic removed CMI, or distributed works that had been stripped of CMI, for any purpose other than fair use. Under Publishers' own theory, Anthropic removed CMI from their lyrics to train Claude. But Anthropic's copying of

Publishers' purported lyrics to train Claude is fair use. *Supra* pp. 8-23. That forecloses DMCA liability here. *See Kadrey v. Meta Platforms, Inc.*, 2025 WL 1786418, at *1 (N.D. Cal. June 27, 2025). The DMCA prohibits only the intentional removal of CMI with knowledge that "the removal will 'induce, enable, facilitate, or conceal infringement[.]'" *Id*. (17 U.S.C. § 1202(b)). Conduct that is fair use cannot satisfy the DMCA's double-scienter standard because "anything that is fair use 'is not an infringement of copyright.'" *Id*. (quoting 17 U.S.C. §107). Removal of CMI "in furtherance of a noninfringing fair use"—like Anthropic's alleged removal of CMI to train Claude—cannot simultaneously "further[] an act of infringement" in violation of the DMCA. *Id*.

Even if Publishers could overcome these legal defects, they have not and cannot produce sufficient evidence to create a genuine question of material fact to withstand summary judgment. To begin, Publishers have not put forward any evidence that Anthropic removed CMI from any one of the works at issue or distributed any work knowing CMI had been removed. They have not, for example, pointed to documents or testimony showing that Anthropic removed CMI from any specific work in suit. Nor have they pointed to evidence that Anthropic intentionally removed CMI knowing that it would facilitate an infringement. For instance, they put forward no evidence that Anthropic deleted a copyright notice from any work in suit as part of "pattern of conduct" or "modus operandi" of encouraging infringement by Claude users. *Stevens*, 899 F.3d at 674.

Lacking any **evidence**, Publishers rely instead on Dr. Shan's **conjecture** that Anthropic removed CMI. Dr. Shan theorizes that, because he observed CMI in training data and outputs without CMI, Anthropic must have removed CMI ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 24 (Pltfs. Exp. Shan Reply), ¶ 30; MSS #168-170. But Dr. Shan does not dispute that ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ *See* MSS #171-172. Dr. Shan did not ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. MSS #173. Dr. Shan did not even know whether ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. MSS #174-175. At most, his analysis confirmed only the presence of some CMI in some subset of training data at some stage of the process. MSS #176. That says nothing at all about whether Anthropic removed CMI from

**PUBLIC REDACTED VERSION**

Publishers' 499 works. Nor does it say anything about whether Anthropic did so "intentionally" and with "reasonable grounds to know that it will induce, enable, facilitate, or conceal an infringement." 17 U.S.C. § 1202(b)(1), (3). Dr. Shan also fails to demonstrate any unlawful distribution under the DMCA. His analysis does not even attempt to show Anthropic added copies of Publishers' purported lyrics to Claude's training data "knowing" they lacked CMI because that CMI had been removed, let alone "removed or altered without authority of the copyright owner." *Id*. § 1202(b)(3).

The Court allowed Publishers' DMCA claim to survive the motion-to-dismiss stage based on Publishers' allegations that Anthropic chose a tool called "Newspaper" to extract text from webpages used to train Claude because Newspaper effectively removed CMI. FAC ¶¶ 72-74. But even after 20 months of discovery, Publishers have not identified any evidence suggesting Anthropic actually used Newspaper to remove their CMI from any one of the 499 works in suit. In fact, the record demonstrates just the opposite. Publishers' own experts recognized that Newspaper extracts text from webpage headers and footers, not from the body of the webpage where Publishers' claimed lyrics (and related CMI) appear. MSS #177-179. The mere "general possibility" that Anthropic could have removed CMI, without any "affirmative evidence," is not enough to go to the jury. *See Stevens*, 899 F.3d at 673. And Publishers' scant "evidence" does not show that Anthropic was aware of the "possibility" that its conduct would "encourag[e] infringement"—let alone that Anthropic had reason to know of "identifiable infringements," as the DMCA requires. *Id*. at 674.

## IV. PUBLISHERS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THEIR *DIRECT* INFRINGEMENT CLAIM FOR THE 499 SONGS AT ISSUE

While this Court can resolve this case on the grounds addressed above, Publishers certainly should not be granted summary judgment on the "copying" element of their direct infringement claims. *Ambrosetti v. Oregon Cath. Press*, 151 F.4th 1211, 1218-19 (9th Cir. 2025).

Publishers (at 15) premise their direct infringement claim on the supposed "striking similarity" between the works in suit and the allegedly infringing copies. This theory requires Publishers to definitively establish the contents of the protected work. *See Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1063-64 (9th Cir. 2020). And because "the scope of the copyright is limited by the deposit copy," *id*. at 1063, only the content that appears in the

deposit copy is protected. But Publishers have failed to produce deposit copies for 486 works in suit. *See* Dkt. 595 ¶ 8; Ad.F #3. Without a definitive set of lyrics to the 486 works, there is no benchmark by which to measure the similarity of any purported copy of one of those songs, whether in the training data or in an output. *See Skidmore*, 952 F.3d at 1063-64.

Publishers are not even entitled to summary judgment for the 13 works for which they *have* produced deposit copies. Ad.F #4. Nowhere do Publishers compare purportedly infringing outputs to the lyrics in the produced deposit copies. Instead, they rely on comparisons of purportedly infringing outputs to lyrics from LyricFind.com. Mot. at 15-16; RSS #34, 36, 66, 68. Publishers represent that "[t]he lyrics to [the compositions] available on the lyric aggregator LyricFind.com are genuine and materially accurate." RSS #4. Yet Publishers admit that they have never actually compared LyricFind's lyrics for the works in suit to any deposit copies. Ad.F #5. Instead, they assert that LyricFind's lyrics should serve as a proxy for the purportedly copyrighted song lyrics based on declarations made with caveats like "███████████," Pltfs. Wit. Coleman Decl. ¶ 12 (Dkt. 613), ████████ identical, Pltfs. Wit. Draughon Decl. ¶ 27 (Dkt. 619), and ████████ ████ Pltfs. Wit. Kokakis Decl. ¶ 142 (Dkt. 620).

In any event, Publishers' "identical or nearly identical to the deposit copy" claim is unsupported. Their theory is that LyricFind's lyrics were generated from commercial sound recordings and that those recordings match the deposit copies that define their rights. *See* RSS #4; Ad.F #10. But they did not listen to the sound recordings, Ad.F #11, and they do not systematically maintain the deposit copies, Ad.F #12. And where Publishers did produce the audio, it is undisputed that the recordings do not always match LyricFind. Ad.F #13.

Publishers' claim that LyricFind is sufficiently authoritative is also undermined by material discrepancies between the few deposit copies Publishers have provided and the corresponding lyrics on LyricFind. Analysis performed by Publishers' linguistics expert, Dr. Leonard, confirms as much. *See* Dkt. 600-8. For example, a whole stanza to Sweet Home Alabama can be found on LyricFind but not in the deposit copy that Publishers' 30(b)(6) witness identified as corresponding to Publishers' claimed work. Ad.F #14. When asked to identify which version of the lyrics to Sweet Home Alabama was correct and protected by copyright, Mr. Kokakis bizarrely claimed "████" Ex.

ANTHROPIC'S MOT. FOR
SUMMARY JUDGMENT
- 37 -
Case No. 5:24-cv-03811-EKL-SVK

**PUBLIC REDACTED VERSION**

121 (Kokakis Dep.), 129:3-130:1; Ad.F #15. As another example, the deposit copy for Brown Sugar contains lyrics like, "scarred old slaver know he's doing alright," "all her girlfriends here sweet sixteen," and "Brown sugar, how come you taste so good." Ad.F #16. Brown Sugar's lyrics on LyricFind, however, state "Skydog slaver knows he's doin' all right," "all her boyfriends were sweet sixteen," and "Brown sugar, how come you dance so good, babe?" Ad.F #17.

Because Publishers failed to produce deposit copies for 486 works—and have not used the deposit copy as the benchmark for the remaining 13 works—Publishers have not established the "copying" element of their direct infringement claim beyond material factual dispute.

**CONCLUSION**

This case can and should be resolved at summary judgment. If the Court finds that (1) Publishers' training claims are barred by fair use, (2) Anthropic is not subject to direct or secondary liability for Publishers' user output claims, and (3) Anthropic has not intentionally removed CMI within the meaning of the DMCA as a matter of law, this case is over. At minimum, the Court should hold that genuine disputes of material fact preclude summary judgment in Publishers' favor.

**PUBLIC REDACTED VERSION**

Date: April 22, 2026                   */s/ Sonal N. Mehta*

SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

LOUIS W. TOMPROS (*Pro Hac Vice*)
louis.tompros@wilmerhale.com
DISHA PATEL (*Pro Hac Vice*)
disha.patel@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6220

ARI HOLTZBLATT (SBN 354361)
ari.holtzblatt@wilmerhale.com
ROBIN C. BURRELL (*Pro Hac Vice*)
robin.burrell@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2100 Pennsylvania Ave, NW
Washington, DC 20037
Telephone: (202) 663-6000

TAYLOR GOOCH (SBN 294282)
taylor.gooch@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
50 California Street
San Francisco, CA 94111
Telephone: (628) 235-1000

JARED V. GRUBOW (*Pro Hac Vice*)
jared.grubow@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Defendant*
**ANTHROPIC PBC**

ANTHROPIC'S MOT. FOR                - 39 -                Case No. 5:24-cv-03811-EKL-SVK
SUMMARY JUDGMENT

**PUBLIC REDACTED VERSION**

**CERTIFICATE REGARDING USE OF GENERATIVE AI**

Pursuant to this Court's Standing Order Regarding the Use of Generative AI Tools in Court filings, *see* Standing Order VIII(H), the undersigned notifies the Court that four expert reports served by Anthropic in this case and attached to the Burrell Declaration in support of Anthropic's Motion for Summary Judgment and Opposition to Publishers' Motion for Partial Summary Judgment, include "AI-generated content." *See* Burrell Decl., Ex. 3 (Bray Report), Ex. 20 (Bray Reply), Ex. 2 (Bilmes Report), Ex. 11 (Bilmes Rebuttal). Dr. Bray and Dr. Bilmes's use of generative AI tools in connection with their opinions in this case is disclosed in those reports. The undersigned has verified each expert's use of generative AI as part of the expert's methodology and certifies that Dr. Bray and Dr. Bilmes have "maintain[ed] records of all prompts or inquiries submitted to any generative AI tools." *See* Standing Order VIII(H).

Dated: April 22, 2026                    By:    */s/ Sonal. N. Mehta*
                                                 Sonal N. Mehta

**PUBLIC REDACTED VERSION**

**CERTIFICATE OF SERVICE**

I hereby certify that on April 22, 2026, I did cause this motion to be served on the following listed below and in the manner so indicated.

**By Electronic Mail**

OPPENHEIM + ZEBRAK, LLP
Matthew J. Oppenheim (*Pro Hac Vice*)
Nicholas C. Hailey (*Pro Hac Vice*)
Audrey Adu-Appiah (*Pro Hac Vice*)
Corey Miller (*Pro Hac Vice*)
Jeffrey M. Gould (*Pro Hac Vice*)
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
aadu-appiah@oandzlaw.com
corey@oandzlaw.com
jeff@oandzlaw.com

COBLENTZ PATCH DUFFY & BASS LLP
Jeffrey G. Knowles
Christopher J. Weiner
Bina Patel
Thomas A. Harvey
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 772-5795
Ef-jgk@cpdb.com
cwiener@coblentzlaw.com
bpatel@coblentzlaw.com
Ef-Tah@cpdb.com

Jennifer Pariser (*Pro Hac Vice*)
Andrew Guerra (*Pro Hac Vice*)
Timothy Chung (*Pro Hac Vice*)
Michelle Gomez-Reichman (*Pro Hac Vice*)
Bret Matera (*Pro Hac Vice*)
Alexander Kaplan (*Pro Hac Vice*)
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
jpariser@oandzlaw.com
andrew@oandzlaw.com
tchung@oandzlaw.com
mgomez-reichman@oandzlaw.com
bmatera@oandzlaw.com
alex@oandzlaw.com

COWN, LEIBOWITZ & LATMAN, P.C.
Richard S. Mandel (*Pro Hac Vice*)
Jonathan Z. King (*Pro Hac Vice*)
Richard Dannay (*Pro Hac Vice*)
114 West 47th Street
New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

Dated: April 22, 2026

By:    */s/ Robin C. Burrell*
         Robin C. Burrell