# EXHIBIT A

**SCHAERR JAFFE LLP**
Donald M. Falk (SBN150256)
dfalk@schaerr-jaffe.com
One Embarcadero Center, Suite 1200
San Francisco, CA 94111
Telephone: (415) 562-4942

*Counsel for Amici Curiae Copyright Law Professors*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., *et al.*,<br><br>                             Plaintiffs,<br><br>v.<br><br>ANTHROPIC PBC,<br><br>                             Defendant. | Case No. 5:24-cv-03811-EKL-SVK<br><br>**BRIEF OF *AMICI CURIAE* COPYRIGHT LAW PROFESSORS IN SUPPORT OF DEFENDANT ANTHROPIC'S MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date: July 15, 2026<br>Time: 10:00 a.m.<br>Judge: Hon. Eumi K. Lee |

**TABLE OF CONTENTS**

**Page**

STATEMENT OF INTEREST OF AMICI CURIAE ................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................ 1

ARGUMENT .............................................................................................................................. 3

I.   TRAINING AI MODELS BY SCALING IS HIGHLY TRANSFORMATIVE ..................... 3

   A.  The History of AI Research Shows Decades of Failures and Long-Felt Need ...................... 3

   B.  Training by Scaling Serves the Highly Transformative Purpose of Developing Better AI Models to Promote Progress in the United States ............................................................. 5

   C.  The Use of AI for Knowledge and Creation Promotes Progress ............................................ 7

II.  GENRES AND NON-INFRINGING EXPRESSION CANNOT CONSTITUTE MARKET HARM AS SO-CALLED "DILUTION" ............................................................................. 8

   A.  The Copyright Clause Prohibits Liability Based on Copying Unprotected Elements Such as Genres ............................................................................................................................ 9

     1.  Authors Cannot Claim Genres as "Their Writings" ................................................. 9

     2.  Supreme Court Precedents Bar Liability Via "Dilution" ...................................... 10

   B.  Denying Fair Use Based on Dilution Violates the First Amendment ................................... 11

     1.  Non-Infringing Expression Is Protected Speech. .......................................... 11

     2.  "Dilution" Is Content Discrimination Based on Genres .......................................... 12

     3.  "Dilution" Is Speaker-Based Discrimination ................................................ 13

III. ALLEGED INFRINGING OUTPUTS ARE SEPARATE USES UNDER *WARHOL* .......... 14

   A.  Use-by-Use Analysis under *Warhol* ............................................................................... 14

   B.  Developing a Technology Capable of Substantial Non-Infringing Uses Is Different from Downstream Uses Under the *Sony* Safe Harbor ............................................................. 15

CONCLUSION ....................................................................................................................... 15

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Andy Warhol Foundation v. Goldsmith*, 598 U.S. 508 (2023) ................................................. passim

*Authors Guild v. Google, Inc.,* 804 F.3d 202 (2d Cir. 2015) ....................................................... 7, 11

*Baker v. Selden*, 101 U.S. 99 (1879).................................................................................................. 9

*Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007 (N.D. Cal. 2025) ......................................... passim

*Brown v. Entm't. Merchs. Ass'n.*, 564 U.S. 786 (2011) ................................................................ 14

*Buckley v. Valeo*, 424 U.S. 1 (1976) ............................................................................................... 13

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ........................................................... 12

*Citizens United v. FEC*, 558 U.S. 310 (2010).......................................................................... 13, 14

*Cohen v. California*, 403 U.S. 15 (1971)................................................................................... 11, 14

*Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*, 447 U.S. 530 (1980)....... 12

*Cox Commc'ns., Inc. v. Sony Music Entm't*, 146 S. Ct. 959 (2026) ............................................. 15

*Eldred v. Ashcroft*, 537 U.S. 186 (2003)....................................................................................... 13

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) ............................................. 9, 10

*Golan v. Holder*, 565 U.S. 302 (2012)...................................................................................... 7, 11

*Google LLC v. Oracle America, Inc.*, 593 U.S. 1 (2021) ....................................................... 3, 6, 7

*Gray v. Hudson*, 28 F.4th 87 (9th Cir. 2022) .................................................................................. 9

*Kadrey v. Meta*, 788 F. Supp. 3d 1026 (N.D. Cal. 2025) ...................................................... passim

*McCullen v. Coakley*, 573 U.S. 464 (2014) .................................................................................. 12

*Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984)........................................................................................................... 14

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) ............................. 15

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)................................................................. 11

*Perry v. Sindermann*, 408 U.S. 593 (1972) .................................................................................. 12

*Peters v. West*, 692 F.3d 629 (7th Cir. 2012) ................................................................................. 9

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ............................................................................. 12

*Rentmeester v. Nike, Inc.,* 883 F.3d 1111 (9th Cir. 2018) ........................................................... 14

*Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1991) .......................................... 2, 6

*Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*,
    502 U.S. 105 (1991) ................................................................................................... 12

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ................................................................. 8

*Skidmore as Trustee for Randy Craig Wolfe Trust v. Led Zeppelin*, 952 F.3d 1051
    (9th Cir. 2020) (en banc) ........................................................................................ 9, 10

*Sony Comput. Entm't., Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000) ............................ 6

*Sony Corp. v. Universal City Studios*, 464 U.S. 417 (1984) ............................................... 15

*Speiser v. Randall*, 357 U.S. 513 (1958) ......................................................................... 12

*Thaler v. Perlmutter*, 130 F.4th 1039 (D.C. Cir. 2025) ................................................ 7, 8

*Tinker v. Des Moines Ind. Commun. Sch. Dist.*, 393 U.S. 503 (1969) ........................................ 11

*United States v. Metcalf*, 156 F.4th 871 (9th Cir. 2025) ................................................ 3, 9

*Yonay v. Paramount Pictures Corp.*, 163 F.4th 685 (9th Cir. 2026) ................................. 2, 10, 14

**CONSTITUTIONAL PROVISIONS**

U.S. CONST. amend. I .............................................................................................. 11

U.S. CONST. art. I, § 8, cl. 8 ............................................................................... 2, 7, 9, 10

**STATUTES**

17 U.S.C. § 102(b) .................................................................................................. 9, 11

17 U.S.C. § 107 ........................................................................................................ 5

**OTHER AUTHORITIES**

*2 AI winters and 1 hot AI summer*, ENTEFY (Jul. 31, 2023) .......................................... 3

4 PATRY ON COPYRIGHT § 10.155.40 (2026) ......................................................... 11, 12

2023 YEAR-END REPORT ON THE FEDERAL JUDICIARY 5 .......................................... 1

Julie Bort, *Anthropic's Claude popularity with paying consumers is skyrocketing*,
    TECHCRUNCH (Mar. 28, 2026) .................................................................................. 6

Michael Brenndoerfer, *Chinchilla Scaling Laws: Compute-Optimal Training and Resource
    Allocation for Large Language Models*, MICHAEL BRENNDOERFER (Jul. 15, 2025) ................ 5

Kari Briski, *How Scaling Laws Drive Smarter, More Powerful AI*,
    NVIDIA BLOG (Feb. 12, 2025) .................................................................................. 5

*ChatGPT, the generative AI chatbot, is released,* HISTORY ........................................ 6

iv

Kat Eschner, *John Philip Sousa Feared 'The Menace of Mechanical Music,'* SMITHSONIAN MAG. (Nov. 6, 2017) .................................................................................................................14

Brent D. Griffiths, *Chief Justice John Roberts says in the age of AI 'it's going to be really tough for young lawyers,'* AOL (Mar. 19, 2026) ......................................................... 3

Jordan Hoffmann et al., *Training Compute-Optimal Large Language Models,* ARXIV (2022) ..... 5

Jared Kaplan et al., *Scaling Laws for Neural Language Models*, ARXIV (2020) ........................... 4

Alex Krizhevsky, Ilya Sutskever & Geoffrey Hinton, *ImageNet Classification and Deep Convolutional Neural Networks* (2012) ..................................................................... 4

Yann LeCun, Yoshua Bengio & Geoffrey Hinton, *Deep Learning*, 521 NATURE 436 (2015) .................................................................................................................... 4

Edward Lee, *Copyright Dilution Under Constitutional Scrutiny*, 25 CHI.-KENT J. INTELL. PROP. 1 (2026) .................................................................................................. 13, 14

Edward Lee, *Fair Use and the Origin of AI Training*, 63 HOU. L. REV. 105 (2025) .......... 7, 13, 14

Timothy B. Lee, *Why the deep learning boom caught almost everyone by surprise,* UNDERSTSANDING AI (Nov. 5, 2024) .................................................................. 5

Mark A. Lemley & Bryan Casey, *Fair Learning*, 99 TEX. L. REV. 743 (2021) ........................... 7

Timothy J. McFarlin, *Infringing Uses, Not Works*, 76 S.C. L. REV. 103 (2024) .......................... 15

CADE METZ, GENIUS MAKERS 26 (2021) ............................................................................... 3, 4

Motion Picture Assn'n, Inc., *Comment Letter on Notice of Inquiry and Request for Comments* (Nov. 1, 2023) ......................................................................................... 8

NEIL POSTMAN, TECHNOPOLY (Vintage Books ed. 1993) ............................................................ 13

Rajat Raina, Anand Madhavan & Andrew Y. Ng, *Large-scale Deep Unsupervised Learning Using Graphics Processors*, Proceedings of the 26th Int'l Conf. on Machine Learning, Montreal, Canada, 2009 ................................................................................. 4

Cole Stryker, *What are large language models (LLMs)?*, IBM ..................................................... 7

*Universal Music Group N.V. (UNVGY) Presents at BNP Paribas Exane TMT Conference Transcript*, SEEKING ALPHA (Mar. 11, 2026) ................................................................. 12

U.S. COPYRIGHT OFF., AUTHORS, ATTRIBUTION, AND INTEGRITY (Apr. 2019) ........................... 15

U.S. COPYRIGHT OFF., COPYRIGHT & A.I. PART 3: GENERATIVE AI TRAINING (prepublication version May 2025) .............................................................................................. 15

## STATEMENT OF INTEREST OF AMICI CURIAE

Amici Copyright Law Professors Edward Lee and Rebecca Tushnet are scholars whose research and teaching has focused on copyright law, and who have written, taught, and spoken extensively on topics in copyright and the First Amendment. Amici have no direct interest in the outcome of this litigation. They share a professional interest in seeing copyright law applied in ways that serve the broader public interest in the United States, consistent with the Copyright Clause's goal of promoting the progress of science. Because of their experience with the issues raised by this case, Amici are uniquely positioned to provide the Court with a perspective that reflects the broader public interest in copyright's fair use doctrine.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

Here, as in *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1033 (N.D. Cal. 2025), "[t]he technology at issue [i]s among the most transformative many of us will see in our lifetimes." That counsels great care in deciding whether to apply novel, untested "dilution" theories that might unduly impair technological development or expand copyright beyond limit. Even assuming Anthropic's large language models (LLMs) memorized all works on which they were trained, Judge Alsup concluded that "the 'purpose and character' of using works to train LLMs was transformative — spectacularly so." *Id.* at 1018, 1021. Anthropic's training in *Bartz* is the same training at issue here, and the same conclusion is warranted: "using copyrighted works to train LLMs to generate new text was quintessentially transformative" and a fair use. *Id.* at 1022.

The history of artificial intelligence (AI) research confirms the *Bartz* court's finding of the highly transformative nature of training AI models. It has led to rapid advances in AI, which Chief Justice John Roberts aptly described as "the latest technological frontier." 2023 YEAR-END REPORT ON THE FEDERAL JUDICIARY 5. But the United States did not reach this frontier overnight. It took decades of failures before AI researchers at universities figured out AI models can be developed through an approach called *scaling.* Scaling exponentially the amount of content used

---

[1] No party or party's counsel authored this brief in whole or in part, or contributed money that was intended to fund preparing or submitting this brief. No person other than amici or their counsel contributed money that was intended to fund preparing or submitting this brief.

1

to train the AI models spurred rapid advances in AI. During training, AI models figure out statistical relationships, assigning weights to discrete elements in the vast universe of training materials in a process of deep learning. This key insight propelled AI advances first at universities and then even further at companies, making the United States the world leader in AI.

As in *Bartz*, this Court should also reject Plaintiffs' assertion of putative market harm based on an unprecedented theory of copyright "dilution," that is, mere competition from non-infringing outputs not substantially similar to Plaintiffs' 499 works but simply in the same genre. *See Bartz*, 787 F. Supp. 3d at 1021-22, 1031-32. No one can own entire genres. The First Amendment favors, not stifles, competition in the marketplace of ideas among non-infringing works of expression. To the extent Plaintiffs allege infringing outputs from an AI model no doubt capable of substantial non-infringing uses (*see id.* at 1032-33), those outputs are analyzed as separate uses under the Supreme Court's use-by-use analysis as *Bartz* recognized. *Andy Warhol Foundation v. Goldsmith*, 598 U.S. 508, 533 (2023); *Bartz*, 787 F. Supp. 3d at 1020. And, because Plaintiffs now seek to dismiss with prejudice both of their secondary liability claims (Dkt. 685), the alleged infringing outputs of Claude *users* cannot be imputed to Anthropic if the claims are dismissed.

Plaintiffs deny AI training is fair use. But they do so only by both ignoring the important transformative purpose of scaling to develop better AI models and radically expanding their copyrights under a new theory of "dilution" to encompass entire genres of songs. But copyright law *favors* competition from new, non-infringing works that copy no protected elements. *See Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523 (9th Cir. 1991); *Bartz*, 787 F. Supp. 3d at 1032. Unprotected elements in works are free for all to use, even if a subsequent work affects the market for the original. *See, e.g.*, *Yonay v. Paramount Pictures Corp.*, 163 F.4th 685, 698 (9th Cir. 2026). From the idea-expression dichotomy to the test of infringement to *cognizable* market harm in fair use analysis, copyright holders cannot assert rights in unprotected elements under any theory.

Stretching copyright to encompass genres via "dilution" is unconstitutional. Under the Copyright Clause, Plaintiffs' copyright extends only to "*their* respective writings"—not entire genres or non-infringing works of others. U.S. CONST. art. I, § 8, cl. 8. And to penalize as "dilution" the non-infringing expression of people who used AI only to create non-infringing works of their

own, such as the Chief Justice's son in creating a song, constitutes content-based and speaker-based discrimination in violation of the First Amendment. *See* Brent D. Griffiths, *Chief Justice John Roberts says in the age of AI 'it's going to be really tough for young lawyers*,' AOL (Mar. 19, 2026), https://tinyurl.com/5n7y7ds8. The First Amendment forbids copyright law from discriminating against one class of creators simply because they used AI. And the canon of constitutional avoidance compels the rejection of "dilution," a term not even mentioned in the Copyright Act. *See United States v. Metcalf*, 156 F.4th 871, 881-82 (9th Cir. 2025).

## ARGUMENT

## I.   TRAINING AI MODELS BY SCALING IS HIGHLY TRANSFORMATIVE

Anthropic trained its AI models using an approach known as scaling that was first recognized by AI researchers at universities and then applied by AI companies to advance the state of the art. After decades of failures to develop any AI at all, researchers figured out what they called "scaling laws": that exponentially increasing the amount of materials used in training, along with the computing power and model size, would lead to more advanced AI models. Scaling was a major scientific breakthrough especially for LLMs. Anthropic is but one of many AI researchers that have used or are using scaling to accelerate the advances in AI development in the United States. By dramatically improving the development and functionality of AI, which the U.S. government has deemed vital to national security, training via scaling serves a highly transformative purpose "consistent with that creative 'progress' that is the basic constitutional objective of copyright itself." *Google LLC v. Oracle America, Inc.*, 593 U.S. 1, 30 (2021).

### A.   The History of AI Research Shows Decades of Failures and Long-Felt Need

The history of AI development is littered with failures, dating back to the 1950s, that included two "AI winters" when funding for AI research dried up and interest waned. *See 2 AI winters and 1 hot AI summer*, ENTEFY (Jul. 31, 2023), https://tinyurl.com/hpw4s2hk. Researchers were split over how they could develop a successful AI model. The symbolic camp took the view that AI models should be developed by human instructions, much like computer programming. CADE METZ, GENIUS MAKERS 26 (2021). The connectionist school took the contrary view: AI models can mimic the human brain in so-called neural networks and learn patterns from training data on their own. *Id.* at

3

25-26. Because its approach was more unorthodox at the time, the connectionist school faced tremendous skepticism. Early on, Geoffrey Hinton, who was pursuing the connectionist approach, faced derision from other scientists that "[n]eural networks have been disproved." *Id.* at 34.

But, starting around 2009, researchers in neural networks started to make significant advances. In 2009, a group of Stanford University researchers advised in a paper: "*scaling up* existing DBN [deep belief network] and sparse coding models to use more parameters, or more training data, might produce very significant performance benefits." Rajat Raina, Anand Madhavan & Andrew Y. Ng, *Large-scale Deep Unsupervised Learning Using Graphics Processors*, Proceedings of the 26th Int'l Conf. on Machine Learning, Montreal, Canada, 2009, at 1, https://tinyurl.com/58vcrrkc (emphasis added). Then, in the seminal "AlexNet paper," now one of the most cited papers in AI research, Hinton and his collaborators at the University of Toronto reached the same conclusion: "[R]esults can be improved simply by waiting for faster GPUs and bigger datasets to become available." Alex Krizhevsky, Ilya Sutskever & Geoffrey Hinton, *ImageNet Classification and Deep Convolutional Neural Networks*, at 2 (2012), https://tinyurl.com/ys26t2a3.

In 2015, Yann LeCun, Yoshua Bengio, and Hinton explained this progress in "deep learning," and AI's promise for various applications in DNA research, drug molecule development, and particle accelerators. *See* Yann LeCun, Yoshua Bengio & Geoffrey Hinton, *Deep Learning*, 521 NATURE 436, 436 (2015), https://tinyurl.com/4bm9d858. "Perhaps more surprisingly," AI started to excel at "various tasks in natural language understanding." *Id.* LeCun, Bengio, and Hinton predicted new AI models "will only accelerate this progress." *Id.* AI training "can easily take advantage of increases in the amount of available computation and data." *Id.*

Their prediction proved accurate. Over the next decade, the natural language capabilities of AI have been profound. AI researchers, now often at AI labs or companies, "accelerate[d] this progress" even further. In 2020, researchers at OpenAI published a foundational AI paper that empirically showed that the performance of LLMs followed a proportional improvement (under what is called a power law) as the size of the model, datasets, or compute used for training increases. Jared Kaplan et al., *Scaling Laws for Neural Language Models*, ARXIV 4-5 (2020), https://tinyurl.com/42zb4d25. In 2022, disagreeing with the suggestion in *Scaling Laws* that an

4

increase in model size without comparable increase in training data might be sufficient (*id.* at 16, 19), researchers at DeepMind tested 400 language models using various sizes of training datasets consisting of "5 to 500 billion tokens" and concluded the "compute-optimal training" should increase model size and training data "in approximately equal proportions." Jordan Hoffmann et al., *Training Compute-Optimal Large Language Models,* ARXIV 1, 7 (2022), https://tinyurl.com/yc53may8. In short, LLMs were being "significantly under-trained," with too little data. *Id.* at 1.

The researchers' recommendation is now called the "Chinchilla Scaling Laws," which significantly influenced how LLMs were trained through scaling proportionally to achieve optimal results. *See* Michael Brenndoerfer, *Chinchilla Scaling Laws: Compute-Optimal Training and Resource Allocation for Large Language Models*, MICHAEL BRENNDOERFER (Jul. 15, 2025), https://tinyurl.com/2taj4mhe. Why scaling works and whether it will hit a ceiling are both not fully known. But "'[s]caling laws' have been on a remarkable run" in advancing AI development over the past decade. Timothy B. Lee, *Why the deep learning boom caught almost everyone by surprise,* UNDERSTANDING AI (Nov. 5, 2024),  https://tinyurl.com/3jaykrwc.

**B.      Training by Scaling Serves the Highly Transformative Purpose of Developing Better AI Models to Promote Progress in the United States**

Scaling illuminates Anthropic's highly transformative purpose in using copyrighted works to train its LLMs, which are capable of manifold substantial non-infringing uses. In analyzing Factor 1 of fair use, courts examine whether the defendant's use "has a further purpose or different character" than the original, meaning it is "transformative." *Warhol*, 598 U.S. at 528; 17 U.S.C. § 107. Anthropic's purpose was to train its LLMs by scaling the amount of training data with model size, an approach recognized by AI researchers as important to create, develop, and improve LLMs and advance the state of the art. *See* Hoffman et al., at 1 (scaling amount of training data necessary for "compute-optimal training"); Kari Briski, *How Scaling Laws Drive Smarter, More Powerful AI*, NVIDIA BLOG (Feb. 12, 2025), https://tinyurl.com/yw2cr9zu (By scaling, "developers could expect predictable improvements in model intelligence and accuracy.") (citing Hoffman et al.). "Anthropic used copies of Authors' copyrighted works to iteratively map statistical relationships between every text-fragment and every sequence of text-fragments so that a completed LLM could receive new text

5

inputs and return new text outputs as if it were a human reading prompts and writing responses." *Bartz*, 787 F. Supp. at 1021. During training, LLMs assign "weights," or numerical values, to tiny portions called "tokens" in the vast universe of datasets on which it was trained, enabling the AI model to respond to human prompts including to create new works. *See* Cole Stryker, *What are large language models (LLMs)?*, IBM, https://tinyurl.com/mr388jan. In sum, "Anthropic's LLMs trained upon works not to race ahead and replicate or supplant them — but to turn a hard corner and create something different." *Bartz*, 787 F. Supp. 3d at 1022.

To borrow the words of the Supreme Court in *Google v. Oracle*, Anthropic's "purpose was to create a different task-related system for a different computing environment … and to create a platform … that would help achieve and popularize that objective." *Oracle*, 593 U.S. at 34. Before ChatGPT's launch in late 2022, LLMs were not widely available for public use. *ChatGPT, the generative AI chatbot, is released*, HISTORY, https://tinyurl.com/yxeaxncx. With Claude, Anthropic helped to introduce these innovative AI tools in the United States. Because of Claude's functionality, users of Claude are rapidly increasing. *See* Julie Bort, *Anthropic's Claude popularity with paying consumers is skyrocketing*, TECHCRUNCH (Mar. 28, 2026), https://tinyurl.com/3mdvrvyb.

Anthropic's use of copyrighted works to train general, multi-purpose LLMs is consistent with other fair use uses of copyrighted works to develop new technologies for the public's benefit. For example, Accolade made many "intermediate" copies of Sega's operating system to identify the *unprotected* elements necessary for Accolade to make competing video games that can be played on Sega consoles. *Sega*, 977 F.2d at 1522-23. "It is precisely this growth in creative expression, based on the dissemination of other creative works and the unprotected ideas contained in those works, that the Copyright Act was intended to promote." *Id.* at 1523.The Ninth Circuit clarified that fair use affords flexibility to experiment with different methods to identify the unprotected elements to develop a software program that would enable people to play Sony games on a regular computer instead of Sony's PlayStation. *Sony Comput. Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 603-05 (9th Cir. 2000). Although the defendant's software might result in "some economic loss by Sony" from sales of the defendant's program, Sony had no right to monopolize "the market for devices that play games Sony produces." *Id.* at 607. Copyright ultimately serves the public good. *Id.* at 603.

6

The Second Circuit similarly held that Google's copying and storing of millions of copyrighted books served the "highly transformative purpose" of enabling within-book searches and "new forms of research, known as 'text mining' and 'data mining.'" *Authors Guild v. Google, Inc.*, 804 F.3d 202, 209-10, 216-17 (2d Cir. 2015). Google Books' "snippet view" of small passages from relevant copyrighted books served this transformative purpose, even though users might not acquire the books, thereby resulting in "*some* loss of sales." *Id.* at 219, 224. But cognizable harm is limited to losses from "*the protected aspect* of the author's works," not facts. *Id.* at 224. And in *Oracle*, the Supreme Court held that Google's use of Java declaring code in a new smartphone operating system was transformative to develop "a highly creative and innovative tool." *Oracle*, 539 U.S. at 30. These cases recognize developing new computing tools that facilitate people's knowledge and creation of non-infringing expression serves a transformative purpose. *See* Edward Lee, *Fair Use and the Origin of AI Training*, 63 HOU. L. REV. 105, 131-39 (2025). And the public benefits from this innovation.

To improve LLMs' state of the art, Anthropic needed to *scale* training materials. "[A]ll agree Anthropic needed billions of words to train any given LLMs." *Bartz*, 787 F. Supp. 3d at 1030. To require licensing of this sheer amount from online sources would make scaling impossible. *See* Mark A. Lemley & Bryan Casey, *Fair Learning*, 99 TEX. L. REV. 743, 748 (2021) ("no plausible option" to license all training works). And it could hamstring AI development in the United States.

### C.    The Use of AI for Knowledge and Creation Promotes Progress

Plaintiffs are wrong to contend that Anthropic's LLMs are "contrary to the purpose of fair use" because the LLMs putatively lack "human creative expression." Pl. Br. 19. First, the Copyright Clause is meant "[t]o promote the progress of science." U.S. CONST. art. I, § 8, cl. 8. This phrase "refers broadly to 'the creation and spread of knowledge and learning.'" *Golan v. Holder*, 565 U.S. 302, 324 (2012). As the Supreme Court explained, "the Copyright Clause does not demand that each copyright provision, examined discretely, operate to induce new works." *Id.* More important, Plaintiffs' argument rests on the fallacy that outputs from AI generators lack human creativity. The case it cites (Pl. Br. 19-20) only decided authorship for one work that was autonomously generated by AI where no human author was asserted. *Thaler v. Perlmutter*, 130 F.4th 1039, 1044-45 (D.C. Cir. 2025). But the D.C. Circuit recognized that human authorship *can* occur for "work[s] … made by or

7

with the assistance of artificial intelligence," citing the Copyright Office's "registration of works made by human authors who use artificial intelligence." *Id.* at 1049. And the D.C. Circuit declined to decide the test for examining authorship when people use AI to assist them to create new works. *Id.* at 1049-50. While Claude might not respond to copyright incentives (Pl. Br. 20), professional creators using Claude and other AI tools, including Hollywood movie studios, no doubt do. *See, e.g.*, Motion Picture Ass'n, Inc., *Comment Letter on Notice of Inquiry and Request for Comments* 2, 37– 54 (Nov. 1, 2023), https://tinyurl.com/mwd4mz4w (movies assisted by AI tools).

## II. GENRES AND NON-INFRINGING EXPRESSION CANNOT CONSTITUTE MARKET HARM AS SO-CALLED "DILUTION"

Plaintiffs ask this Court to become the first federal court to reject a fair use defense by applying an unprecedented new theory of market harm called "dilution" or "copyright dilution." Although Plaintiffs assert that copyright dilution is "consistent with long-established copyright jurisprudence" (Pl. Br. 2), their argument rests on two recent and nonprecedential authorities: (1) dicta in *Kadrey v. Meta*, 788 F. Supp. 3d 1026, 1052 (N.D. Cal. 2025), in which the parties did not even brief the "dilution" theory and the court unsurprisingly found the plaintiffs' lack of evidence rendered that theory too speculative; and (2) a short statement in a nonfinal, prepublication Copyright Office report with no legal force. U.S. COPYRIGHT OFF., COPYRIGHT & A.I. PART 3: GENERATIVE AI TRAINING 64-66 (prepublication version May 2025), https://tinyurl.com/bdcwd6nc; *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024) (no deference to agency interpretation of the law).[2] Both acknowledged that "dilution" was a new theory—or, as the Office conceded, "uncharted territory." *Id.* at 65; *Kadrey*, 788 F. Supp. at 1055. But dilution is not just uncharted, it is unconstitutional. To treat works that copy no protected elements of Plaintiffs' 499 works as causing cognizable harm simply because they are in the same genre violates the Copyright Clause and the

---

[2] The Copyright Office's terse explanation does not qualify even as persuasive authority under *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944). The Office did not discuss the requirement of "cognizable" market harm under fair use precedents. *See infra* p. 11. Nor did the Office acknowledge the serious constitutional issues raised by dilution, in sharp contrast to its report on moral rights that admonished: "[A]ny changes to the law must comport with the First Amendment, fair use, and constitutional requirement of limited copyright terms." U.S. COPYRIGHT OFF., AUTHORS, ATTRIBUTION, AND INTEGRITY 28-32 (Apr. 2019), https://tinyurl.com/39pfjjas.

First Amendment. The canon of constitutional avoidance compels the rejection of this "uncharted" theory of dilution nowhere mentioned in the Copyright Act. *See Metcalf*, 156 F.4th at 881-82.

### A.    The Copyright Clause Prohibits Liability Based on Copying Unprotected Elements Such as Genres

#### 1.    Authors Cannot Claim Genres as "Their Writings"

The Copyright Clause's text sets forth a clear limit on the scope of copyright: authors may be granted copyrights only in "their respective writings." U.S. CONST. art. I, § 8, cl. 8. The Supreme Court clarified that the "writings of authors" must satisfy the constitutional requirement of originality. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 346 (1991). No one may claim copyright in facts or ideas because they are not original expression of authors. *Id.* at 349-50. A fundamental principle of copyright law is that everyone can "build freely upon the ideas and information conveyed by a work." *Id.* Unprotected elements of works are free for all to copy.

The same exclusion of unprotected elements applies to genres and general music styles (e.g., ballads, rap, pop, country music). Genres and general music styles are not original to any author. They are unprotected elements—just ideas or methods for structuring a common format of music. *See* 17 U.S.C. § 102(b). As the Seventh Circuit explained:

> Copyright protects actual expression, not methods of expression. 17 U.S.C. § 102(b); *Baker v. Selden*, 101 U.S. 99, 104 (1879). Just as a photographer cannot claim copyright in the use of a particular aperture and exposure setting on a given lens, no poet can claim copyright protection in the form of a sonnet or a limerick. Similarly, [Plaintiff] Vince P cannot claim copyright over a tercet [in his rap song].

*Peters v. West*, 692 F.3d 629, 636 (7th Cir. 2012). The en banc Ninth Circuit held that copyright cannot extend to "commonplace elements that are firmly rooted in the genre's tradition." *Skidmore as Trustee for Randy Craig Wolfe Trust v. Led Zeppelin*, 952 F.3d 1051, 1069 (9th Cir. 2020) (en banc) (internal citation omitted). Genres are "building blocks [that] belong in the public domain and cannot be exclusively appropriated by any particular author." *Id.*; *see Gray v. Hudson*, 28 F.4th 87, 97-100 (9th Cir. 2022) (genre, scenes a faire, and common music elements are not protectable).

Applying this same exclusion to book genres, Judge Alsup rejected the *Bartz* plaintiffs' argument for dilution because genre constituted nothing more than an idea or method of operation. *Bartz*, 787 F. Supp. 3d at 1021-22. In a word, the plaintiffs' dilution theory was "unthinkable" for

9

copyright law to accept. *Id.* at 1021. Although dicta in *Kadrey* suggested that dilution may be recognized for non-infringing AI-generated outputs of the same genre with sufficient proof, the *Kadrey* court did not have the benefit of full briefing on a new theory that the plaintiffs had not meaningfully pursued. *Kadrey*, 788 F. Supp. 3d at 1036, 1060. *Bartz*'s rejection of dilution is correct. No one can own genres as "their respective writings." U.S. CONST. art. I, § 8, cl. 8.

### 2.    Supreme Court Precedents Bar Liability Via "Dilution"

Copyright law adheres to this constitutional limit on the scope of copyright by consistently recognizing in various doctrines that unprotected elements are off-limits to copyright. The Supreme Court has repeatedly held that the Constitution confines copyright protection to "those components of a work that are original to the author," not to the unprotectable elements of works such as their ideas or the facts contained in them. *Feist*, 499 U.S. at 345-46, 348; *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003) (idea-expression distinction is a "built-in" constitutional safeguard); *see Warhol*, 598 U.S. at 550 (copyright law's "escape valves" include "the idea–expression distinction; the general rule that facts may not receive protection; the requirement of originality; the legal standard for actionable copying; and … fair use").

The Ninth Circuit's recent decision in *Yonay v. Paramount Pictures* is instructive. The movie studio made the movie *Top Gun* based on its license from Ehud Yonay, the author of a factual magazine article about the Top Gun aviator program. 163 F.4th at 690. Later, Yonay's heirs terminated the license to Paramount Pictures, which still made a sequel called *Mavericks*. *Id.* at 691. Yonay's heirs sued because Paramount did not obtain a license. But the Ninth Circuit upheld the grant of summary judgment to Paramount Pictures. *Id.* at 690. The Ninth Circuit emphasized: "To show unlawful appropriation, plaintiffs must therefore demonstrate that the works in question share 'substantial similarity in *protectable* expression,' not merely in facts, ideas, or concepts." *Id.* (quoting *Skidmore*, 952 F.3d at 1064). But Yonay's heirs asserted similarities between *Maverick* and the article only "at such a high level of abstraction that the similarities do not involve protected expression." *Id.* at 693. In sum, "what is protected is not similar, and what is similar is not protected." *Id.*

That same conclusion applies here. Non-infringing lyrics do not copy protected expression. And what is similar—genre—is not protected. Dilution is "without any precedent and is an erroneous

10

position given it is not only contrary to the statute but is not based on there being any infringement at the output stage." 4 PATRY ON COPYRIGHT § 10.155.40 (2026). Adhering to the constitutional limit of copyright, courts must examine *cognizable* market harms stemming from the use of "*the protected aspect* of the author's work." *Authors Guild*, 804 F.3d at 224 (emphasis in original); *see Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 591-92 (1994) (market harm from fair use parodies are not "cognizable under the Copyright Act," even if it "kills demand for the original"). Because genres are unprotected elements, their use cannot be cognizable harm, let alone the basis for infringement.

### B.    Denying Fair Use Based on Dilution Violates the First Amendment

Denying fair use based on "dilution" from non-infringing expression violates the First Amendment. U.S. CONST. amend. I. A court decision applying "dilution" to penalize lawful expression is state action. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964) (state action in court's application of common law rule of law for defamation liability).

#### 1.    Non-Infringing Expression Is Protected Speech

People who use Anthropic's LLMs to create non-infringing expression of their own are engaged in expressive activities protected by the First Amendment. As the Supreme Court recognized in drawing a limit on copyright's scope, "[t]he First Amendment securely protects the freedom *to make … one's own speech*." *Eldred*, 537 U.S. at 221 (emphasis added). Speech activities under the First Amendment are broad and do not depend on qualifying as works of authorship. *See, e.g., Cohen v. California*, 403 U.S. 15, 16 (1971) (wearing jacket with "Fuck the Draft"); *Tinker v. Des Moines Ind. Commun. Sch. Dist.*, 393 U.S. 503, 504 (1969) (wearing antiwar black armbands).

Under *Eldred*, First Amendment scrutiny of a copyright law is required when the "traditional contours of copyright law" have been "altered." *Eldred*, 537 U.S. at 221. Two traditional contours of copyright law that serve as "built-in First Amendment accommodations," *id.* at 219, are the idea-expression dichotomy and fair use. *Golan*, 565 U.S. at 328-29. Dilution radically alters—and undermines—both. Genres are ideas or concepts beyond copyright's scope. *Bartz*, 787 F. Supp. 3d at 1021-22 (citing 17 U.S.C. § 102(b)). Fair use has never treated wholly non-infringing expression as cognizable market harm. *See* 4 PATRY ON COPYRIGHT § 10.155.40. Dilution significantly alters both doctrines, necessitating First Amendment scrutiny. *Eldred*, 537 U.S. at 221.

11

### 2. "Dilution" Is Content Discrimination Based on Genres

Dilution discriminates based on content. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Plaintiffs' dilution theory is content-based because it "is directed only at works with a specified content," i.e., song lyrics. *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 116 (1991); Pl. Br. 32-33. Such discrimination includes denials of statutory exceptions based on content. *See Speiser v. Randall*, 357 U.S. 513, 518 (1958) ("To deny an exemption to claimants who engage in certain forms of speech is in effect to penalize them for such speech."); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Plaintiffs seek exactly that: denying fair use based on non-infringing lyrics people created using AI. Pl. Br. 31-34.

The asserted justification for adopting dilution falls far short. *Kadrey* rejected dilution because there was no evidence substantiating it, just "speculation." 788 F. Supp. at 1056. Plaintiffs here offer more of the same. They mention one YouTube video with 31,000 views and one study by Deezer's streaming service indicating an increase of AI-generated music. Pl. Br. 33-34. Yet Plaintiffs provide no financial data showing they suffered any economic loss. No wonder: Universal Music Group (UMG) Executive Vice President Michael Nash recently stated: "Based on a lot of analysis and reflection, we feel like the case for AI dilution risk has been massively over-extrapolated from a few anecdotes." *Universal Music Group N.V. (UNVGY) Presents at BNP Paribas Exane TMT Conference Transcript*, SEEKING ALPHA (Mar. 11, 2026), https://tinyurl.com/yvx3zj24; *id.* (AI music on Deezer "less than half of 1%" consumed and *excluded* from "royalty pool"). Because "there's no material dilution of [UMG's] revenues," he continued, dilution "is not something we're particularly worried about." *Id.* Nash's comments confirm dilution is unfounded. "Mere speculation of harm does not constitute a compelling state interest." *Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 543 (1980); 4 PATRY ON COPYRIGHT § 10.155.40 (dilution is "speculative").

Content-based restrictions must be "the least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014). But, if applied to deny fair use, dilution jeopardizes everyone's ability to use Claude to create any non-infringing lyrics. And an

12

injunction like the one Plaintiffs seek here—where the works at issue are non-infringing and the only similarity between works amounts to unprotectable genres—would be the most restrictive means possible, banning a whole category of speech (lyrics) from people's creative activities using Claude. And setting a dilution precedent here will no doubt affect many other types of works in other cases involving other LLMs alleged to be dilutive. *Cf.* Br. Amici Curiae Ass'n of Am. Pub. et al., at 3.

### 3.    "Dilution" Is Speaker-Based Discrimination

Dilution also violates the First Amendment by discriminating based on the class of speakers. Dilution divides human creators into two classes: (1) people who "create things the old-fashioned way," and (2) people who "prompt … AI models to produce … outputs." *Kadrey*, 788 F. Supp. at 1034-35. This division underlies Plaintiffs' theory: musicians who use Claude to create lyrics fall into the second class—non-infringing works are deemed harmful only for that class. Pl. Br. 33.

But this sort of speaker-based discrimination is unconstitutional. As the Supreme Court explained, "the Government may commit a constitutional wrong when by law it identifies certain preferred speakers." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010); *see Buckley v. Valeo*, 424 U.S. 1, 48-49 (1976) ("[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment…."). The law cannot penalize one group of creators to favor another group of creators, even though the former's works are non-infringing. *Cf. Citizens United*, 558 U.S. at 341 (law "may not … determine … what speech and speakers are worthy of consideration."). Dilution does so.

Dilution targets only people who adopted AI as a part of their creative expression, such as the music professionals in Anthropic's report singled out by Plaintiffs. Pl. Br. 33. This targeting of AI creators alone is unconstitutional. People's choices in adopting a new technology reflects their own perspective and ideological belief in the value of adopting the technology. New technologies compete with old ones—and this competition is a clash in ideologies and worldviews. NEIL POSTMAN, TECHNOPOLY 16 (Vintage Books ed. 1993). That is especially so with AI, given the public debate over using AI in any artistic expression. *See* Edward Lee, *Copyright Dilution Under Constitutional Scrutiny*, 25 CHI.-KENT J. INTELL. PROP. 1, 33-35 (2026). Many criticisms of AI—and outright vitriol against AI "slop"— were submitted to the Copyright Office's study that endorsed

13

dilution. *See* Lee, 63 HOU. L. REV. at 207-09 & n.561. John Philip Sousa once said the phonograph would destroy music; the painter Paul Delaroche exclaimed, of photography: "From today, painting is dead!"; musicians feared "software-based music production would replace human artists." *Id.* at 190; Kat Eschner, *John Philip Sousa Feared 'The Menace of Mechanical Music,'* SMITHSONIAN MAG. (Nov. 6, 2017), https://tinyurl.com/2tpj95b6. But the First Amendment protects the creativity new technologies enable. *Brown v. Entm't. Merchs. Ass'n.*, 564 U.S. 786, 790 (2011). The past fears of new technologies were unfounded. And "more speech, not less, is the governing rule" in the United States. *Citizens United*, 558 U.S. at 360.

Many non-infringing works that borrow unprotected elements might "dilute" the value of prior works. *See Yonay*, 163 F.4th at 694-96; *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1119 (9th Cir. 2018) (Nike's Michael Jordan photo copied unprotected elements from another photo). But that competition based on unprotected elements is what copyright law fosters. To penalize only the non-infringing works of AI creators—but no one else—discriminates based on the class of speakers. But "the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984). Some view AI creators as second class. But the law may not do so. Under the First Amendment, one person's slop is "another's lyric." *Cohen*, 403 U.S. at 25.

## III.    ALLEGED INFRINGING OUTPUTS ARE SEPARATE USES UNDER *WARHOL*

### A.    Use-by-Use Analysis under *Warhol*

Plaintiffs also allege infringing lyrics in outputs after Claude's public launch. Pl. Br. 7-11. If Anthropic's LLMs have implemented reasonable guardrails to avoid infringement, the outputs users later generate are separate uses under *Warhol*. *See Warhol*, 598 U.S. at 533 ("The fair use provision … requires an analysis of the specific 'use' of a copyrighted work that is alleged to be 'an infringement.'"); Lee, 63 HOU. L. REV. at 217 (cases of guardrails favoring fair use). Anthropic's training and creation of its LLMs is analogous to Andy Warhol's creation of the Prince artwork series in 1984. *Cf.* 598 U.S. at 515. Warhol's creation was a separate use of Lynne Goldsmith's photograph from the later uses of Warhol's works, such as art sales or public displays. *Id.* at 533-34. The only use at issue was the Andy Warhol Foundation's licensing of a Warhol work for a magazine cover in

14

2016. *Id.* This same use-by-use approach should apply here. *See* Timothy J. McFarlin, *Infringing Uses, Not Works*, 76 S.C. L. REV. 103, 124-26 (2024) (outputs by users are separate uses).

### B.   Developing a Technology Capable of Substantial Non-Infringing Uses Is Different from Downstream Uses Under the *Sony* Safe Harbor

The Supreme Court's recognition of the *Sony* safe harbor for the development of technologies capable of substantial non-infringing uses further supports the conclusion that developing a new technology (here, training LLMs) is a use different from its later downstream use by consumers.

Under the *Sony* safe harbor, developing a technology capable of substantial non-infringing uses cannot be the basis for secondary liability. *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 931-33 (2005) (explaining the safe harbor recognized by *Sony Corp. v. Universal City Studios*, 464 U.S. 417, 442 (1984)). Liability may be based on the technology only when the technology is "'good for nothing else' but infringement." *Id.* at 932. By contrast, a developer may go beyond development and intentionally induce its users to engage in infringement using the technology. *Id.* at 935-36. But liability for inducement is based on conduct different from the technology's development, such as advertising or promoting infringing uses. *Id.* at 936; *see Cox Commc'ns., Inc. v. Sony Music Entm't*, 146 S. Ct. 959, 967-68 (2026) (discussing *Grokster* and *Sony*).

Claude is a technology capable of substantial non-infringing uses under the *Sony* safe harbor. *See Bartz*, 787 F. Supp. 3d at 1032. If plaintiffs' request to dismiss their secondary liability claims (Dkt. 685) is granted, the alleged infringing outputs of users cannot be imputed to Anthropic. *See Cox Commc'ns.,* 146 S. Ct. at 967. They are separate uses by users—not by Anthropic.

### CONCLUSION

For the foregoing reasons, the Court should grant Anthropic's motion for summary judgment.

Dated: April 27, 2026                   Respectfully submitted,

**SCHAERR JAFFE LLP**
  */s/ Donald M. Falk*
Donald M. Falk (SBN150256)
dfalk@schaerr-jaffe.com
One Embarcadero Center, Suite 1200
San Francisco, CA 94111
Telephone: (415) 562-4942

*Counsel for Amici Curiae*
15