**CONSTANTINE CANNON LLP**
Seth D. Greenstein (*Admitted pro hac vice*)
sgreenstein@constantinecannon.com
1001 Pennsylvania Ave. NW, 1300N
Washington, D.C. 20004
Telephone: 202-204-3400

Dan Noel (SBN 339078)
dnoel@constantinecannon.com
50 California Street, Suite 1500
San Francisco, California 94111
Telephone: 415-639-4001

*Attorneys for Amici Curiae*
*Chamber of Progress and Engine Advocacy*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., et al.,<br><br>*Plaintiffs,*<br><br>v.<br><br>ANTHROPIC PBC,<br><br>*Defendant.* | Case No. 5:24-cv-03811-EKL-SVK<br><br>**BRIEF AMICI CURIAE OF CHAMBER OF PROGRESS AND ENGINE ADVOCACY IN SUPPORT OF ANTHROPIC PBC MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Hearing Date:  July 15, 2026<br>Time:  10:00 AM<br>Judge:  Hon. Eumi K. Lee |

BRIEF OF AMICI CURIAE CHAMBER OF PROGRESS AND ENGINE ADVOCACY
Case No. 5:24-cv-03811-EKL-SVK

**TABLE OF CONTENTS**

INTEREST OF THE AMICI CURIAE ................................................................................1

ARGUMENT .........................................................................................................................2

I.      COPYRIGHT LAW DOES NOT PROTECT AGAINST "DILUTION" OF A
        MARKET FOR COPYRIGHTED WORKS. ..........................................................2

        A.      The Goal of the Constitution's IP Clause and the Copyright Act is to Promote
                the Public Interest. ....................................................................................2

        B.      Plaintiff's Dilution Theory Works Against the Public Interest by Untethering
                Copyright from its Textual Limits. .............................................................3

II.     TRAINING AND OUTPUT OF AI SYSTEMS ARE TRANSFORMATIVE AND
        MEET THE FAIR USE TEST. ...............................................................................5

        A.      AI System Training Is Transformative. .......................................................6

        B.      AI System Output Is Transformative. ..........................................................7

III.    PLAINTIFFS AND THEIR AMICI IMPROPERLY CONFLATE THE DISTINCT
        FIRST AND FOURTH FACTOR INQUIRIES. .....................................................8

IV.     MARKET EFFECT UNDER THE FOURTH FAIR USE FACTOR DOES NOT
        OUTWEIGH THE TRANSFORMATIVE PURPOSE AND CHARACTER OF AI
        SYSTEMS UNDER THE FIRST FACTOR. ........................................................11

V.      JUDICIAL EMBRACE OF DILUTION USURPS CONGRESSIONAL
        AUTHORITY. .......................................................................................................12

CONCLUSION ...................................................................................................................15

BRIEF OF AMICI CURIAE CHAMBER OF PROGRESS AND ENGINE ADVOCACY
Case No. 5:24-cv-03811-EKL-SVK

## TABLE OF AUTHORITIES

**Cases**                                                                                              **Page(s)**

*A.V. ex rel. Vanderhye v. iParadigms, LLC,*
   562 F.3d 630 (4th Cir. 2009) ..............................................................................................5

*Am. Geophysical Union v. Texaco, Inc.,*
   60 F.3d 913 (2d Cir. 1994)................................................................................................11

*Am. Soc'y for Testing & Materials v. Public.Resource.Org., Inc.,*
   82 F.4th 1262 (D.C. Cir. 2023) ..........................................................................................9

*Am. Soc'y for Testing & Materials v. UpCodes, Inc.,*
   2026 WL 935309 (3d Cir. Apr. 7, 2026) ............................................................................9

*Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith,*
   598 U.S. 508 (2023)........................................................................................................9, 10

*Authors Guild v. Google, Inc.,*
   804 F.3d 202 (2d Cir. 2015)................................................................................................5

*Authors Guild, Inc. v. HathiTrust,*
   755 F.3d 87 (2d Cir. 2014)..................................................................................................5

*Bartz v. Anthropic PBC,*
   787 F. Supp. 3d 1007 (N.D. Cal. 2025) ...................................................................... passim

*Cambridge University Press v. Patton,*
   769 F.3d 1232 (11th Cir. 2014) ........................................................................................11

*Campbell v. Acuff-Rose Music, Inc.,*
   510 U.S. 569 (1994)..................................................................................................8, 9, 10

*Dastar Corp. v. Twentieth Century Fox Film Corp.,*
   539 U.S. 23 (2003)............................................................................................................14

*Fox Broad. Co. v. Dish Network, LLC,*
   747 F.3d 1060 (9th Cir. 2014) ............................................................................................8

*Fox Television Stations, Inc. v. Aereokiller, LLC,*
   851 F.3d 1002 (9th Cir. 2017) ..........................................................................................13

*Google LLC v. Oracle Am., Inc.,*
   593 U.S. 1 (2021)............................................................................................................ passim

*Inhale, Inc. v. Starbuzz Tobacco, Inc.,*
   755 F.3d 1038 (9th Cir. 2014) ..........................................................................................13

*Kadrey v. Meta Platforms, Inc.*,
  788 F. Supp. 3d 1026 (N.D. Cal. 2025)...................................................................................13

*Kirtsaeng v. John Wiley & Sons*,
  568 U.S. 519 (2013)......................................................................................................................4

*Lexmark Int'l v. Static Control Components. Inc.*,
  387 F.3d 522 (6th Cir. 2004) ....................................................................................................4, 6

*McGucken v. Pub Ocean, Ltd.*,
  42 F.4th 1149 (9th Cir. 2022) ..................................................................................................11

*Perfect 10 v. Giganews*,
  847 F.3d 657 (9th Cir. 2017) .......................................................................................................7

*Romanova v. Amilus, Inc.*,
  138 F.4th 104 (2d Cir. 2025) .......................................................................................................9

*Sega Enters. Ltd. v. Accolade, Inc.*,
  977 F.2d 1510 (9th Cir. 1992) ..................................................................................................4, 6

*Silvers v. Sony Pictures Ent., Inc.*,
  402 F.3d 881 (9th Cir. 2005) .....................................................................................................12

*Sony Computer Ent. Inc. v. Connectix Corp.*,
  203 F.3d 596 (9th Cir. 2000) .......................................................................................................6

*Sony Corp. of America v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984)........................................................................................................3, 12, 13

*Thaler v. Perlmutter*,
  130 F.4th 1039 (D.C. Cir. 2025)................................................................................................13

*Tremblay v. OpenAI, Inc.*,
  742 F. Supp. 3d 1054 (N.D. Cal. 2024) .......................................................................................4

*Tresona Multimedia LLC v. Burbank High School Vocal Music Ass'n*,
  953 F.3d 638 (9th Cir. 2020) .....................................................................................................11

*Twentieth Century Music Corp.* v. *Aiken,*
  422 U.S. 151 (1975).......................................................................................................................3

*VHT Inc. v. Zillow Group, Inc.*,
  918 F.3d 723 (9th Cir. 2019) .......................................................................................................7

*Wheaton v. Peters,*
  33 U.S. 591 (1834).......................................................................................................................12

iii

**Constitutional Provisions and Statutes**

U.S. Const. art. I, § 8, cl. 8 ...................................................................................................2

15 U.S.C. § 1125(c) ...............................................................................................................14

17 U.S.C. § 102(b) .................................................................................................................6

17 U.S.C. § 106 ......................................................................................................................3

17 U.S.C. § 107 ..............................................................................................................3, 4, 11, 12

17 U.S.C. § 501(a) .................................................................................................................3

17 U.S.C. § 701(b)(1), (b)(4) ................................................................................................13

**Other Authorities**

4 Patry on Copyright § 10:152 (Mar. 2026 Update) ............................................................11

4 Patry on Copyright § 10:155.40 (Mar. 2026 Update) .......................................................13

4 Nimmer on Copyright § 13F.08 (2025) ............................................................................12

Copyright Labeling and Ethical AI Reporting (CLEAR) Act,
S. 3813, 119th Cong. (2026) ...........................................................................................12

Foundation Model Transparency Act of 2026,
H.R. 8094, 119th Cong. (2026) .......................................................................................13

Clark Asay, et al., An Evidence-Based Approach to Fair Use,
60 Ga. L. Rev. 203 (2026) ..............................................................................................12

Rochelle C. Dreyfuss, Expressive Genericity: Trademarks as Language in the Pepsi Generation,
65 Notre Dame L. Rev. 397 (1990) ................................................................................ 12

Edward Lee, Copyright Dilution Under Constitutional Scrutiny,
25 Chicago-Kent J. of Intell. Prop. 1 (2026)...................................................................2

Mark A. Lemley, Should a Licensing Market Require Licensing?,
70 L. & Contemp. Probs. 185 (2007)...............................................................................11

Richard A. Posner, When Is Parody Fair Use?,
21 J. Legal Stud. 67 (1992)...............................................................................................9

Matthew Sag, Copyright's Jagged Frontier,
Duke L. J. (forthcoming 2026) .......................................................................................11

Theresa Schliep, Copyright Head Touts 6,000 Registrations Of Human-AI Works,
Law360 (Apr. 22, 2026)....................................................................................................8

Universal Music Group N.V. (UNVGY) Q4 2025 Earnings Call Transcript,
Seeking Alpha (Mar. 6, 2026)......................................................................................................14

U.S. Copyright Office, Copyright and Artificial Intelligence Part 3: Generative AI Training (May
2025 pre-publication version) .....................................................................................................13

**Legislative History**

H.R. Rep. No. 60-2222 (1909).......................................................................................................2

v

# INTEREST OF THE AMICI CURIAE[1]

Chamber of Progress is a tech-industry coalition devoted to a progressive society and economy. Chamber of Progress backs public policies that will build a fairer, more inclusive country in which the tech industry operates responsibly and fairly, and in which all people benefit from technological leaps. Chamber of Progress seeks to protect Internet freedom and free speech, to promote innovation and economic growth, and to empower consumers. Many of Chamber of Progress' partners currently use, develop, and provide generative AI products and services.

Engine Advocacy is a nonprofit technology policy, research, and advocacy organization dedicated to bridging the gap between startups and policymakers. Engine works with government officials and a community of thousands of high-technology, growth-oriented startups nationwide to support innovation and entrepreneurship through research, policy analysis, and advocacy. Engine's community of startups includes companies developing and deploying AI across all industries and sectors.

Innovative AI technologies are transforming our society in ways that could not have been predicted even two years ago. It therefore is imperative that laws governing the use of AI be applied carefully, with due regard for the rights of the public as well as stakeholders. The amici urge the Court to apply copyright statutes and jurisprudence governing infringement and fair use consistent with the text of the Copyright Act and the constitutional purpose of copyright to advance public interests. In so doing, the Court should reject Plaintiffs' interpretation of the fair use doctrine and their atextual and extreme proposed "market dilution" theory.

---

[1] No counsel for a party in this lawsuit authored this brief in whole or in part, and no party or counsel for a party or any person other than *Amici*, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief. Defendant is not a partner of the Chamber of Progress or Engine Advocacy.

1

BRIEF OF AMICI CURIAE CHAMBER OF PROGRESS AND ENGINE ADVOCACY
Case No. 5:24-cv-03811-EKL-SVK

## ARGUMENT

### I.   COPYRIGHT LAW DOES NOT PROTECT AGAINST "DILUTION" OF A MARKET FOR COPYRIGHTED WORKS.

Plaintiffs' unprecedented dilution theory (as expanded upon by its amici) has no basis in the Constitution, the Copyright Act, or longstanding copyright and fair use jurisprudence. Indeed, it is affirmatively inconsistent with all three.

The "bargain" inherent in copyright is to promote the creation of works to advance science and the useful arts, by granting authors specifically defined and limited exclusive rights over their own work. Engrafting market dilution onto the fair use analysis upends this bargain. It grants authors rights over the works of others, turning copyright into a competition law—more accurately, an *anti*-competition law. Rather than increasing the availability of works for the public good, Plaintiffs' dilution theory would limit the availability of competitive works and stifle the very progress that the Framers and Congress designed copyright law to secure.

### A.   The Goal of the Constitution's IP Clause and the Copyright Act is to Promote the Public Interest.

The constitutional goal of copyright is "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8 (the "IP Clause"). The IP Clause thus confines Congress's power to grant authors exclusive rights "only in '*their respective writings.'* Dilution, however, extends copyright to entire genres and categories of works. . . ." Edward Lee, *Copyright Dilution Under Constitutional Scrutiny*, 25 Chicago-Kent J. of Intell. Prop. 1, 15 (2026). Allowing authors to extend their exclusive rights to limit expression and ideas of others—including non-infringing works created by AI prompts—contravenes these constitutional limits.

Congress adopted in the Copyright Act several means to serve the public good by making writings and discoveries available for the benefit of humankind. Consistent with the IP Clause, Congress gave authors defined exclusive rights to their own works for limited times. "The enactment of copyright legislation by Congress under the terms of the Constitution is not based upon any natural right that the author has in his writings... but upon the ground that the welfare of

2

BRIEF OF AMICI CURIAE CHAMBER OF PROGRESS AND ENGINE ADVOCACY
Case No. 5:24-cv-03811-EKL-SVK

the public will be served and progress of science and useful arts will be promoted by securing to authors for limited periods the exclusive rights to their writings."  H.R. Rep. No. 60-2222, at 7 (1909).  "Copyright statutes and case law have made clear that copyright has practical objectives. *It grants an author an exclusive right to produce his work (sometimes for a hundred years or more), not as a special reward, but in order to encourage the production of works that others might reproduce more cheaply.*" *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 16 (2021) (emphasis added).  Thus, the genius of the intellectual property clause is its foundation in the public interest: that America's progress is best served by making more works available for public education, analysis, and enjoyment.

As the Supreme Court repeatedly has made clear, the authors' right to control and receive remuneration from public uses of their works is a means, not the sole—not even the primary—end.  "The monopoly privileges that Congress may authorize are neither unlimited nor primarily designed to provide a special private benefit. Rather, the limited grant is a means by which an important public purpose may be achieved."  *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984).  "[P]rivate motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts." *Twentieth Century Music Corp.* v. *Aiken,* 422 U.S. 151, 156 (1975) (citations omitted).

**B.      Plaintiff's Dilution Theory Works Against the Public Interest by Untethering Copyright from its Textual Limits.**

The text of the Copyright Act likewise refutes any attempt by Plaintiffs and their amici to impose infringement liability or allege marketplace harm against an entire category of works.  Each of the enumerated Section 106 exclusive rights attaches to "the copyrighted work"—literally, that each of the six rights exists and must be applied individually, on a work-by-work basis.  17 U.S.C. § 106(1)-(6).  Moreover, the Act expressly requires infringement to be shown on a work-by-work basis.  *See* 17 U.S.C. § 501(a) (focusing on "the exclusive rights of *the* copyright owner" and "*the* author" (emphasis added)).  Thus, none of the Section 106 rights guarantees any author or any class of authors a collective right to exploit a market for copyrighted works generally, or the copyrighted

BRIEF OF AMICI CURIAE CHAMBER OF PROGRESS AND ENGINE ADVOCACY
Case No. 5:24-cv-03811-EKL-SVK

works of others.  Nor does Section 106 enable a copyright owner or group of owners to prevent competition from *non*-infringing uses, including public domain and non-copyrightable works, and fair uses of copyright-protected works.

Section 106 begins by subordinating the copyright owner's rights to a series of defined limitations that preserve public interests.  See 17 U.S.C. § 106 ("Subject to sections 107 through 122").  The first of these, Section 107 (the "Limitation[] on exclusive rights: Fair use"), articulates the balancing test by which fair uses cabin a copyright owner's exclusive rights in individual works.  17 U.S.C. § 107.  The text of Section 107 further emphasizes that fair use and each of the fair use factors must also be assessed on an individual work-by-work basis and not *en masse*.  The body of Section 107 focuses the four factor analysis on "fair use of *a copyrighted work*" and "the use made of a work in any particular case." *Id*. (emphasis added).  The first factor looks to the purpose and character of the use made of that work. *Id*. § 107(1).  Factor two concerns "the nature of *the copyrighted work*." *Id*. § 107(2) (emphasis added).  Factor three compares the use "in relation to *the copyrighted work as a whole*."  *Id*. § 107(3) (emphasis added). The fourth factor requires consideration of "the effect of the use upon the potential market for or value of *the copyrighted work*."  *Id*. § 107(4) (emphasis added).  By asserting harm to a market for an entire category of works rather than, as the statute requires, the specific, allegedly-infringed individual works, Plaintiffs' atextual "market dilution" theory blows past the express limits of the Copyright Act.

According to the Plaintiffs and their amici, if too many works compete for public attention, those who represent copyright owner interests will find it harder to earn their share of the royalty pie.  But even if Plaintiffs could back up their claim of "an explosion of competing works," dilution of a market for similar, non-infringed works is "not the kind of competitive or creative displacement that concerns the Copyright Act."  *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1032 (N.D. Cal. 2025). Plaintiffs' market competition problems are not the Constitution's concern, *progress* is: "The Act seeks to advance original works of authorship, not to protect authors against competition." *Id*. (citing *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523-24 (9th Cir. 1992) (holding intermediate copying to ascertain non-copyrightable ideas and facts as fair use); *cf.*

4

BRIEF OF AMICI CURIAE CHAMBER OF PROGRESS AND ENGINE ADVOCACY
Case No. 5:24-cv-03811-EKL-SVK

*Tremblay v. OpenAI, Inc.*, 742 F. Supp. 3d 1054, 1058-59 (N.D. Cal. 2024) (rejecting plaintiffs' claim that alleged infringement of their copyrighted books "distort[s] the legal marketplace in which Plaintiffs and Class members compete."); *see also, Kirtsaeng v. John Wiley & Sons*, 568 U.S. 519, 552-53 (2013) (rejecting asserted copyright right to divide or price discriminate between markets); *cf. Lexmark Int'l v. Static Control Components. Inc.*, 387 F.3d 522, 553 (6th Cir. 2004) (Merritt, J., concurring) ("[g]iving authors monopolies over manufactured goods as well as over their creative expressions will clearly not 'promote the Progress of Science and the useful Arts,' but rather would stifle progress by stamping out competition from manufacturers who may be able to design better or less expensive replacement parts. . . .").

Where both copyrightable works created by authors and noncopyrightable works created by AI systems promote that goal, the Constitution and the public interest are equally well served. But taken to its (il)logical end, the dilution argument made here by Plaintiffs and their amici explicitly asks the court to prevent AI from creating competitors not just to lyrics, but also to music, visual arts, software code, and all forms of literature—an absurd and unconstitutional result.

## II.    TRAINING AND OUTPUT OF AI SYSTEMS ARE TRANSFORMATIVE AND MEET THE FAIR USE TEST.

Under the first factor of the statutory fair use analysis, uses of the non-expressive elements of copyrighted works have a strong claim to transformativeness, even where the allegedly infringing work was created by extensive verbatim copying. *See, e.g., Google v. Oracle*, 593 U.S. at 29-32 (verbatim copying of user-facing APIs transformative to allow programmers to work on a different computing platform); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 97 (2d Cir. 2014) (copying millions of literary works to create a searchable database enabled transformative uses such as statistical analyses); *Authors Guild v. Google, Inc.*, 804 F.3d 202, 207, 217-18 (2d Cir. 2015) (scanning millions of books and providing an index and snippets transformative for research purposes); *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639-40 (4th Cir. 2009) (compiling searchable database of essays to detect student plagiarism transformative).

### A.    AI System Training Is Transformative.

The court in *Bartz v. Anthropic* found transformative use of works that were purchased, scanned, and used in training Anthropic's LLMs—"spectacularly so."  787 F. Supp. 3d at 1021. Judge Alsup analogized the tokenization performed in the training process to the human learning that occurs through reading (e.g., rules of grammar, the process of composition, and analyses of style), or studying design principles for "user-friendly" programming and interfaces, or divining music theory or typical chord progressions. *Id.* at 1021-22.  "Like any reader aspiring to be a writer, Anthropic's LLMs trained upon works not to race ahead and replicate or supplant them — but to turn a hard corner and create something different. If this training process reasonably required making copies within the LLM or otherwise, those copies were engaged in a transformative use." *Id.* at 1022.

These principles apply to the craft of writing lyrics and the style of particular songwriters as much as any other type of literary works.  Just as aspiring songwriters listen to or read lyrics in context to understand the principles of structure, rhythm, meter, length, rhyme, story arc, subject matter, and commercial appeal, an LLM must access song lyrics to be able to predict these non-protectable elements.  These analyses, whether performed by humans or AI, consume copyrighted works so as to derive facts, ideas, processes, and systems that are specifically *excluded* from the scope of copyright protection.  *See* 17 U.S.C. § 102(b).  Moreover, the training process produces models using weights and tokens that do not contain copyrightable expression, and are not substantially similar to it. The result of AI training processes by definition is non-infringing and, hence, no fair use analysis is needed.

If the processes necessary to acquire unprotectable elements require the use of intermediate copying, courts, including the Ninth Circuit, already have answered that such copying would be fair use.  *See Google v. Oracle*, 593 U.S. at 22 (citing *Sega v. Accolade,* 977 F.3d at 1521-27 (finding "wholesale copying" to develop a competing product was fair use); *Sony Computer Ent. Inc. v. Connectix Corp.*, 203 F.3d 596, 603-08 (9th Cir. 2000) (holding intermediate copying and use of Sony PlayStation BIOS to facilitate lawful reverse engineering of unprotectable ideas and facts was

BRIEF OF AMICI CURIAE CHAMBER OF PROGRESS AND ENGINE ADVOCACY
Case No. 5:24-cv-03811-EKL-SVK

fair use)*; Lexmark v. Static Control,* 387 F.3d at 543-45 (holding copying to ensure software compatibility is a fair use)).

### B.    AI System Output Is Transformative.

In *Google v. Oracle* and each of the above-referenced cases cited therein, the courts affirmed a finding of fair use *even where the copying and analyses led to products that directly competed against the copyright owners' works.* By analogy, outputs of Claude and other AI systems that may compete against the output of Plaintiffs and their amici can equally be fair uses here.

Unquestionably, user prompts to an AI system like Claude can result in outputs that are not substantially similar to the ingested copyrightable expression.  These outputs by definition would not infringe any copyrighted work.  Where there is no infringement, no fair use analysis is needed.

One can readily envision how paradigmatic fair uses listed in Section 107—criticism, comment, teaching, scholarship, and research—can be advanced by user prompts to AI models whose training sets needed to include song lyrics. As one example, enter the following prompt into Anthropic's Claude, Google's Gemini, Open AI's ChatGPT, or Microsoft's CoPilot:

> *Write an essay of about 500 words analyzing the changes in Taylor Swift's lyrics from her early recordings to the albums she has released over the last five years, including the subjects of her songs, the complexity of the lyrics, differences in the most commonly appearing words, the meter of each line, and the structure of the stanzas and chorus.*

Each system produces a unique essay typifying the criticism, comment, or research expressly encouraged by copyright law and the fair use factors.  These outputs likely would not have been possible unless each AI training set had included all of Taylor Swift's lyrics and had access to other commentaries on her work.  Barring AI systems from ingesting song lyrics (or other aesthetic or factual information contained in literary works) would equally prevent production of such fair use analyses, and unlawfully extend copyright owners' exclusive rights to control speech protected under the First Amendment.

Further, the "adversarial prompting" intended to elicit infringing material, of the type submitted by Plaintiffs in this case, should not control the determination of liability of AI systems

7

BRIEF OF AMICI CURIAE CHAMBER OF PROGRESS AND ENGINE ADVOCACY
Case No. 5:24-cv-03811-EKL-SVK

generally—particularly where the owners of the systems engage in substantial efforts, such as output filtering, to avoid regurgitation of input material. *See* Matthew Sag, *Copyright's Jagged Frontier*, Duke L. J. (forthcoming 2026) (manuscript at 35-51), https://ssrn.com/abstract=6319379. Courts in this circuit recognize the role of user volitional conduct in infringement cases, and that "proximate causation underlines copyright infringement liability." *Perfect 10 v. Giganews*, 847 F.3d 657, 666 (9th Cir. 2017) (finding no direct infringement by storage and transmission of copyrighted materials uploaded by users); *see also VHT Inc. v. Zillow Group, Inc.*, 918 F.3d 723. 731-32 (9th Cir. 2019) (finding no direct infringement where Zillow listings included third party content with unlicensed photographs); *Fox Broad. Co. v. Dish Network, LLC*, 747 F.3d 1060, 1067-68 (9th Cir. 2014) (finding no direct infringement where system automatically recorded copyrighted video in response to user direction).

Outputs from Claude do not inherently infringe any works, including Plaintiffs'. In fact, the Register of Copyrights recently reported that it had registered more than 6,000 copyrighted works created with a combination of AI- and human-generated materials. *See* Theresa Schliep, *Copyright Head Touts 6,000 Registrations Of Human-AI Works*, Law360 (Apr. 22, 2026). Therefore, when considering fair use and the effect on the actual or potential market for the allegedly-infringed copyrighted works, courts must also consider the role of user volition in creating prompts intended to assist in generating copyrightable works as well as non-infringing content.

## III.    PLAINTIFFS AND THEIR AMICI IMPROPERLY CONFLATE THE DISTINCT FIRST AND FOURTH FACTOR INQUIRIES.

The first factor, which considers the purpose and character of the allegedly-infringing use, must be assessed independently to determine how the use may contribute to and promote the public interests that copyright is ultimately designed to protect. The Publishers' attempt to carve out an exception for song lyrics improperly conflates the nature and purpose of the use with the fourth factor, which focuses on the potential effect on the value of or market for the work. Although all four factors must be considered holistically, each must be addressed individually in a manner that retains their independent significance. *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 578

8

(1994). Accordingly, the potential market effect of a use is not dispositive of whether a use is transformative and, on balance, a fair use.

In *Campbell,* the Supreme Court reaffirmed *Sony*'s instruction to sensitively balance the public and private interests implicated by fair use, and rejected a "hard evidentiary presumption" drawn from either the commercial or not-for-profit character of a work. *Id.* at 584-85. Although the commercial or non-profit purpose of the copyright  is relevant under factor one, it is "not dispositive. It is to be weighed against the degree to which the use has a further purpose or different character." *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 510 (2023) ("*AWF*"). As Judge Leval recently observed, these Supreme Court cases "stress[ed] the importance of a transformative purpose as justification for the copying—that the copying transmit a message that differs from the message communicated by the original." *Romanova v. Amilus, Inc.*, 138 F.4th 104, 118 (2d Cir. 2025) (cataloguing cases justifying fair use copying to furnish the public with information about the works or their authors or of general public interest, or to provide a different or public service relating to the copyrighted work). "There may well be other effective justifications. Like the rest of the fair use analysis, whether a justification is sufficient 'calls for case-by-case analysis' and 'is not to be simplified with bright-line rules.'" *Id.* (quoting *Campbell*, 510 U.S. at 577).

Thus, commerciality under the first factor is not dispositive, as the transformative purposes of the use may outweigh actual market harm.  For example, the Third Circuit recently held transformative a company's offering, as a "freemium" inducement to commercial sales, of technical industry standards incorporated by reference into statutes and regulations, even though the standards-setting organizations themselves fund their operations by selling and licensing the standards documents. *Am. Soc'y for Testing & Materials v. UpCodes, Inc.*, 2026 WL 935309, at *5-8 (3d Cir. Apr. 7, 2026); *see also*, *Am. Soc'y for Testing & Materials v. Public.Resource.Org., Inc.*, 82 F.4th 1262, 1267-68 (D.C. Cir. 2023) (finding transformative a not-for-profit organization's similar publication of technical standards incorporated in law).  Uses such as parody and criticism may diminish, or even destroy, the market for the original, but nevertheless have a strong claim

9

under the first factor. *See, e.g., Campbell*, 510 U.S. at 591-93 (finding commercial parody may be a fair use); Richard A. Posner, When Is Parody Fair Use?, 21 J. Legal Stud. 67, 73 (1992) (noting, "it may be in the private interest of the copyright owner, but not in the social interest, to suppress criticism of the work.").

The Supreme Court described "transformativeness" as a use that "alter[s] the first [work] with new expression, meaning, or message. *Campbell*, 510 U.S. at 579. Over the last five years, the Supreme Court twice has considered the "transformativeness" inquiry under the first factor: in *Google v. Oracle* and *AWF*. Although Google copied large portions of the Java API code for the same reason that Java's original developer had created it—to benefit its preferred commercial platform—the Court nevertheless found Google's use "was consistent with that creative 'progress' that is the basic constitutional objective of copyright itself." *Google v. Oracle*, 593 U.S. at 29-30 (citation omitted). This, the Court held, met the definition of "transformative": "a copying use that adds something new and important." *Id.* at 28 (citing *Campbell*, 510 U.S. at 579).

While Plaintiffs and their amici suggest *AWF* signaled a sea change in the law, the Court's holdings reaffirmed existing principles and applied the statutory text to a novel fact pattern: "fair use is a 'flexible' concept, and 'its application may well vary depending on context.'" 598 U.S. at 527 (quoting *Google v. Oracle*, 593 U.S. at 20). The Court expressed no opinion as to the grounds on which the district and circuit courts had decided the case; namely, whether the creation, display, or sale of the Warhol paintings incorporating the Goldsmith photographs of Prince were fair uses.[2] *AWF*, 598 U.S. at 511. Instead, consistent with the text of the first factor requiring an analysis of the purpose for which the copyrighted work is being used, the Court focused on the purpose of the use at issue: AWF's commercial licensing of Warhol's painting based on Goldsmith's photograph for a Prince memorial edition magazine cover. *Id.* at 526-27. Regardless of whether Warhol's

---

[2] Given that the Court in *Google v. Oracle* indirectly referenced Warhol's "soup cans" as commentary, and that several Justices noted at the *AWF* oral argument and in dissent Warhol's purposeful iconoclastic use of imagery, one may surmise that the Court would have found the creation of the Orange Prince painting, or its display in a museum gallery, or even a display of the image in an article about Warhol's work, to be fair use. *See AWF*, 598 U.S. at 522 (Gorsuch, J., concurring).

10

BRIEF OF AMICI CURIAE CHAMBER OF PROGRESS AND ENGINE ADVOCACY
Case No. 5:24-cv-03811-EKL-SVK

purpose in creating the Orange Prince was transformative, the Court held that the Foundation's commercial use displaced the licensing of the photograph from Goldsmith. *Id.* at 527.

*Bartz v. Anthropic* applied the *AWF* framework by separately evaluating each alleged use of Plaintiffs' copyrighted works. Use of the works to train LLMs to receive text inputs and generate new text responses was "quintessentially transformative." 787 F. Supp. 3d at 1022. "Anthropic used copies of Authors' copyrighted works to iteratively map statistical relationships between every text-fragment and every sequence of text-fragments so that a completed LLM could receive new text inputs and return new text outputs as if it were a human reading prompts and writing responses." *Id.* at 1021. Nothing in the court's analysis turned on or was limited to specific types of fiction or non-fiction literary works authored by the plaintiffs. There is no reason why the same transformative uses to train and generate outputs from Anthropic's generative AI systems would not apply to the copyrighted song lyrics at issue here.

## IV.    MARKET EFFECT UNDER THE FOURTH FAIR USE FACTOR DOES NOT OUTWEIGH THE TRANSFORMATIVE PURPOSE AND CHARACTER OF AI SYSTEMS UNDER THE FIRST FACTOR.

The possibility or even the reality of a licensing program does not decide the fourth factor. Copyright owners have no Section 106 "exclusive right" to prevent fair uses or any other non-infringing uses of copyrighted works (or, for that matter, any uses of non-copyrighted works such as the public domain). "[F]air use of a copyrighted work . . . is not an infringement of copyright." *McGucken v. Pub Ocean, Ltd.*, 42 F.4th 1149, 1157 (9th Cir. 2022) (quoting 17 U.S.C. § 107). By definition, if a copyright owner has no Section 106 right to exclude or to claim infringement against fair uses, that copyright owner has no right to license those uses either. *See Cambridge University Press v. Patton*, 769 F.3d 1232, 1265 (11th Cir. 2014). "[T]he ability to license does not equate with negatively weighing the fourth factor against the defendant. Such an approach would eliminate much of what has always been regarded as fair use, or as noninfringement." 4 Patry on Copyright § 10:152 (Mar. 2026 Update).

11

The argument that a potential or actual licensing market defeats fair use creates an unprincipled circularity, subjugating public rights to commercial gain.  "Thus, were a court automatically to conclude in every case that potential licensing revenues were impermissibly impaired simply because the secondary user did not pay a fee for the right to engage in the use, the fourth fair use factor would always favor the copyright holder." *Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 930 n.17 (2d Cir. 1994); *Tresona Multimedia LLC v. Burbank High School Vocal Music Ass'n*,  953 F.3d 638, 652 (9th Cir. 2020) ("Nor does the decision by secondary users to pay, or not pay, establish whether fair use exists"). *See also* Mark A. Lemley, *Should a Licensing Market Require Licensing?*, 70 L. & Contemp. Probs. 185, 189-90 (2007) ("The 'lost licensing revenue' theory is ultimately circular. Whether a use is fair depends on whether the copyright owner loses anything from the use, but … whether the copyright owner loses anything from the use depends on whether the use is deemed fair; only if it is not a fair use would there be licensing revenue to lose."); Clark Asay, *et al.*, *An Evidence-Based Approach to Fair Use*, 60 Ga. L. Rev. 203, 216 (2026). ("courts in some cases succumb to a form of circular reasoning under factor four by finding that any uncompensated uses of the copyrighted work result in lost revenue and thus negative market effects, thereby eliding the very question factor four is meant to evaluate"); 4 Nimmer on Copyright § 13F.08 (2025) ("it is always a given that plaintiff suffers a loss of some *potential* market if that potential is defined as the theoretical market for licensing the very use at bar.")

Plaintiffs' licensing arguments thus amount to a presumptive "if value, then right" proposition which ignores the principled limits on a copyright owner's commercial interests imposed by the Constitution, the Supreme Court, and the collective application of all four Section 107 factors. *See* Rochelle C. Dreyfuss, *Expressive Genericity: Trademarks as Language in the Pepsi Generation*, 65 Notre Dame L. Rev. 397, 405 (1990).

## V.   JUDICIAL EMBRACE OF DILUTION USURPS CONGRESSIONAL AUTHORITY.

"Copyright … is a creature of statute, and the only rights that exist under copyright law are those granted by statute."  *Silvers v. Sony Pictures Ent., Inc.*, 402 F.3d 881, 883-84 (9th Cir. 2005),

citing *Wheaton v. Peters,* 33 U.S. 591, 663-64 (1834).  Particularly in cases involving innovative technologies, it is the duty of the courts to follow the Copyright Act, not rewrite it.

> Like so many other problems created by the interaction of copyright law with a new technology, '[t]here can be no really satisfactory solution to the problem presented here, until Congress acts.'  But in the absence of a congressional solution, courts cannot avoid difficult problems by refusing to apply the law. We must 'take the Copyright Act . . . as we find it,'  and 'do as little damage as possible to traditional copyright principles. . . until the Congress legislates.'

*Sony,* 464 U.S. at 500 (citations omitted).  Congress is only beginning to grapple with the effects of AI systems.  Several pending House and Senate bills attempt to address and balance AI's benefits from innovation against a variety of societal concerns.  None contemplates adding market dilution to the long-standing fair use framework.[3]

While Plaintiffs seek support from the discussion of dilution in *Kadrey v. Meta Platforms, Inc.*, Judge Chhabria expressly noted that his views were not informed by adequate evidentiary showings or legal briefing: "the plaintiffs' presentation is so weak that it does not move the needle, or even raise a dispute of fact sufficient to defeat summary judgment."  788 F. Supp. 3d 1026, 1051 (N.D. Cal. 2025) (granting partial summary judgment to defendant on fair use).  With respect, this Court instead should follow the Supreme Court's guidance:  "Sound policy, as well as history, supports our consistent deference to Congress when major technological innovations alter the market for copyrighted materials."  *Sony*, 464 U.S. at 431.  "Given the rapidly changing technological, economic, and business-related circumstances, we believe we should not answer more than is necessary to resolve the parties' dispute."  *Google v. Oracle,* 593 U.S. at 20.

Similarly, the pre-publication Copyright Office Study cited by Plaintiffs and their amici "acknowledge[s] this [dilution theory] is uncharted territory," venturing that liability should be imposed "*[e]ven when the output is not substantially similar to a specific underlying work*"—a

---

[3] *See, e.g.,* Copyright Labeling and Ethical AI Reporting ("CLEAR") Act, S. 3813, 119th Cong. (2026), to require notice to be provided to the Register of Copyrights with respect to copyrighted works used to train AI models; AI Foundation Model Transparency Act of 2026, H.R. 8094, 119th Cong. (2026), directing the Federal Trade Commission to establish requirements  to notify copyright owners and the public concerning training data and algorithm sources.

13

BRIEF OF AMICI CURIAE CHAMBER OF PROGRESS AND ENGINE ADVOCACY
Case No. 5:24-cv-03811-EKL-SVK

radical shift away from substantial similarity as the sine qua non of copyright infringement. U.S. Copyright Off., *Copyright and Artificial Intelligence Part 3: Generative AI Training* 65-66 (May 2025 pre-publication version) (emphasis added). Because the Copyright Office issued its report not to resolve questions of statutory interpretation, but rather pursuant to its statutory responsibility to "'[c]onduct studies' and '[a]dvise Congress on national and international issues relating to copyright," *id.* at 1 & n.2 (citing 17 U.S.C. § 701(b)(1), (b)(4)); *see also Thaler v. Perlmutter*, 130 F.4th 1039, 1042 (D.C. Cir. 2025), such Copyright Office statements may receive, at most, *Skidmore* deference. *See Fox Television Stations, Inc. v. Aereokiller, LLC*, 851 F.3d 1002, 1013-15 (9th Cir. 2017); *Inhale, Inc. v. Starbuzz Tobacco, Inc.*, 755 F.3d 1038, 1041-1042 (9th Cir. 2014). With respect, neither *Kadrey*'s near dictum nor two paragraphs in a non-final Copyright Office Study provides sufficient confidence to adopt an unproven, counter-textual application of the Copyright Act to new and rapidly changing AI technology. *See* 4 Patry on Copyright § 10:155.40 (Mar. 2026 Update).

If Congress wanted to enact a "dilution" concept for copyright law, it knows how to do it. Thirty years ago, in the exercise of its power under the Commerce Clause, Congress enacted a statutory dilution cause of action and remedy for famous trade and service marks. 15 U.S.C. § 1125(c). Because trademark law protects commercial investment and business interests in interstate commerce—not intellectual property rights, or the constitutional objective to promote creation and new expression—courts "have been 'careful to caution against misuse or over-extension' of trademark and related protections into areas traditionally occupied by patent or copyright." *Dastar Corp. v. Twentieth Century Fox Film Corp.,* 539 U.S. 23, 34 (2003) (citations omitted). For the same reasons, this court should reject Plaintiffs' invitation to rebalance the goals and incentives of copyright law.

Moreover, there is no need to do so. The motions can readily be resolved on the evidence, in light of the statutory text and existing, well-developed copyright case law and principles. Here, the evidence shows that AI technology will be harnessed by the music industry for their benefit as well as for the public. As plaintiff Universal Music Group, NV's Executive VP and Chief Digital

14

BRIEF OF AMICI CURIAE CHAMBER OF PROGRESS AND ENGINE ADVOCACY
Case No. 5:24-cv-03811-EKL-SVK

Officer recently told investors on its Q4 2025 Earnings Call, any market dilution concerns regarding AI-generated music on the charts arise from "a handful of anecdotes" and are completely overblown:  "The key takeaway is that consumers want AI driven by human intent or AI as an enhancement of and not as a replacement for human creativity. Plus, consumers are asking for transparency with respect to how AI is used in the creation of music. This research underscores our belief that AI isn't just an incremental revenue opportunity. It's going to introduce entirely new formats." *Universal Music Group N.V. (UNVGY) Q4 2025 Earnings Call Transcript*, Seeking Alpha (Mar. 6, 2026).

For all these reasons, this Court should resist the invitation to create new laws, based on unsupported and unproven presumptions, that could stifle the rapid and undeniably socially-beneficial development of AI systems.

## CONCLUSION

The Court should reject Plaintiffs' novel and speculative "market dilution" arguments, and continue to assess infringement, fair use, and market effects on a work-by-work basis as the Constitution, the statute, and copyright jurisprudence require.

Dated: April 27, 2026                          Respectfully submitted,

**CONSTANTINE CANNON LLP**

*/s/ Seth D. Greenstein*
Seth D. Greenstein (*Admitted pro hac vice*)
sgreenstein@constantinecannon.com
1001 Pennsylvania Ave. NW, 1300N
Washington, D.C. 20004
Telephone: 202-204-3400

Dan Noel (SBN 339078)
dnoel@constantinecannon.com
50 California Street, Suite 1500
San Francisco, California 94111
Telephone: 415-639-4001

*Attorneys for Amici Curiae*
*Chamber of Progress and Engine Advocacy*

15
BRIEF OF AMICI CURIAE CHAMBER OF PROGRESS AND ENGINE ADVOCACY
Case No. 5:24-cv-03811-EKL-SVK