# Exhibit A

Corynne McSherry (SBN 221504)
corynne@eff.org
Mitchell L. Stoltz (SBN 291302)
mitch@eff.org
Victoria Noble (SBN 337290)
tori@eff.org
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
Facsimile: (415) 436-9993

Attorneys for *Amicus Curiae* ELECTRONIC
FRONTIER FOUNDATION

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| CONCORD MUSIC GROUP, INC. ET AL, ) | No. 5:24-cv-03811-EKL-SVK |
| ) | |
| Plaintiffs, ) | ***AMICUS CURIAE* BRIEF OF THE ELECTRONIC FRONTIER FOUNDATION IN SUPPORT OF DEFENDANT ANTHROPIC PBC'S MOTION FOR SUMMARY JUDGMENT** |
| v. ) | |
| ANTHROPIC PBC, ) | |
| ) | |
| Defendant. ) | Judge Eumi K. Lee |
| ) | Magistrate Judge Susan van Keulen |

## **TABLE OF CONTENTS**

INTEREST OF AMICUS CURIAE ........................................................................................ 1

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

I.    GENERATIVE AI TRAINING AND USE SERVES THE PURPOSES OF COPYRIGHT. 2

    A.    The Purpose of Copyright Law, Including Section 107, Is Not Confined to Fostering the Creation of Copyrightable "Products of Human Authorship." ........................................ 3

    B.    Generative AI Tools *Are* Powerful Engines for Human Creative Expression. ................ 4

II.    "MARKET DILUTION" IS NOT A COGNIZABLE COPYRIGHT HARM. ...................... 8

CONCLUSION .................................................................................................................. 14

AMICUS CURIAE BRIEF OF
THE ELECTRONIC FRONTIER FOUNDATION

# TABLE OF AUTHORITIES

**Cases**

*A.V. ex rel. Vanderhye v. iParadigms, LLC,*
  562 F.3d 630 (4th Cir. 2009) ................................................................................................ 3

*Aalmuhammed v. Lee,*
  202 F.3d 1227 (9th Cir. 2000) .............................................................................................. 6

*Andy Warhol Found.,*
  598 U.S. 508 (2023) .............................................................................................................. 9

*Authors Guild v. Google, Inc.,*
  804 F.3d 202 (2d Cir. 2015) ............................................................................................ 3, 10

*Bartz v. Anthropic*
  787 F.3d 1007 (N.D. Cal 2025) ........................................................................................ 4, 11

*Burrow-Giles Lithographic Co. v. Sarony,*
  111 U.S. 53 (1884) ................................................................................................................ 5

*Campbell v. Acuff-Rose Music, Inc.,*
  510 U.S. 569 (1994) .................................................................................................. 3, 4, 8, 9

*Feist Publications, Inc. v. Rural Tel. Serv. Co.,*
  499 U.S. 340 (1991) .............................................................................................................. 8

*Google LLC v. Oracle,*
  593 U.S. 1 (2021) .............................................................................................................. 4, 11

*Kadrey v. Meta Platforms, Inc.,*
  788 F. Supp. 3d 1026 (N.D. Cal. 2025) ............................................................................ 2, 11

*Kelly v. Arriba Soft Corp.,*
  336 F.3d 811 (9th Cir. 2003) ................................................................................................. 3

*Los Angeles News Serv. v. CBS Broad., Inc.,*
  305 F.3d 924 (9th Cir.) .......................................................................................................... 9

*Perfect 10, Inc. v. Amazon.com, Inc.,*
  508 F.3d 1146 (9th Cir. 2007) ............................................................................................... 3

*Silvers v. Sony Pictures Ent., Inc,*
  402 F.3d 881 (9th Cir. 2005) ................................................................................................ 10

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
  464 U.S. 417 (1984) ................................................................................................ 3, 7, 8, 10

*Yonay v. Paramount Pictures Corp.,*
  163 F.4th 685 (9th Cir. 2026) ............................................................................................ 8, 9

**Statutes**

17 U.S.C. § 102 ............................................................................................................ 8

**Other Authorities**

4 NIMMER ON COPYRIGHT § 13.05[A][4] ....................................................................... 11

4 PATRY ON COPYRIGHT § 10:152 ............................................................................... 11

4 PATRY ON COPYRIGHT § 10:155.40 ........................................................................... 8

Abrar Al-Heeti, *From Novelty to Necessity: How AI Could Open Up a World of Accessibility for Everyone*, CNET, (Sept. 12, 2024) ............................................................. 8

Amineh Ahmadi Nejad, et al., *Art, Activism, and AI: Generating Visual Narratives of Injustice through Research-Creation with a Feminist Lens* ............................................ 6

Andrew Chow, *How AI is Transforming Music*, Time (December 4, 2023) ................... 6

Ashim Mahara, *Cybersecurity Data Extraction from Common Crawl* (March 2025) ................ 13

Christoph Schuhmann, et al., "LAION-5B: An Open Large-Scale Dataset for Training Generation Image-Text Models," (Oct. 16, 2022) .................................................. 12

*Generative AI Raises Competition Concerns,* Federal Trade Commissionn (June 29, 2023) ...... 12

Gloria Lu, *The World's Smartest Artificial Intelligence Just Made Its First Magazine Cover*, Cosmopolitan, (June 21, 2022). ....................................................................... 6

James Love, *We Need Smart Intellectual Property Laws for Artificial Intelligence*, SCIENTIFIC AMERICAN (August 7, 2023) ................................................................... 14

Jordan G. Teicher, *When Photography Wasn't Art*, JSTOR DAILY, Feb. 6, 2016) ................................................................................................. 11

Katrina Geddes, *Engineering Semiotic Democracy* FIU L. R. (Forthcoming) ........................... 5, 7

Ken Shulman, *The Creative Future of Generative AI*, MASSACHUSETTS INSTITUTE OF TECHNOLOGY CENTER FOR ART, SCIENCE, AND TECHNOLOGY (Nov. 16, 2023). ...................... 6

Lea Bishop, *Digital Dialectic: Why Every "AI-Generated" Work Has a Human Author,* 20 FIU L. Rev. 861 (2026) ............................................................................................. 7

Livia Gershon, *Did Photography Really Kill Portrait Painting?* JSTOR DAILY (Sept. 13, 2022) ............................................................................................ 11

Michael D. Murray, *Tools Do Not Create: Human Authorship in the Use of Generative Artificial Intelligence*, 15 J.L. TECH. & INTERNET 76 (2024) ........................................... 7

Nate Anderson, *100 years of Big Content Fearing Technology*, Ars Technica, Oct 9, 2011 ......... 4

PUBLICATIONS OFFICE OF THE EUROPEAN UNION, *The Synergy Between Open Data And AI: A Two-Way Relationship* (Oct. 21, 2024) ................................................................................ 12

Sean Flynn, *Examples of Text and Data Mining Research Using Copyrighted Materials,* Kluwer Copyright Blog*,* Mar. 6, 2023 ............................................................................................ 4

Stefan Baack, *A Critical Analysis of the Largest Source for Generative AI Training Data: Common Crawl*, ASSN. FOR COMPUTING MACHINERY (Feb. 6, 2024) ................................ 12, 13

Stefan Baack, *Training Data for the Price of a Sandwich*, Mozilla / (Feb. 6, 2024) ................... 13

U.S. Copyright Office Registers Thousands of Human-AI Collaborative Works Amid Legal Challenges .............................................................................................................................. 7

Will Crowe, *Artistic Expression for People with Disability: AI to Foster Creativity*, OCCUPATIONAL THERAPY AUSTRALIA, https://otaus.com.au/news/artistic-expression-for-people-with-disability-ai-to-foster-creativity (June 6, 2025) .................................................. 7

AMICUS CURIAE BRIEF OF
THE ELECTRONIC FRONTIER FOUNDATION

**INTEREST OF AMICUS CURIAE[1]**

EFF is a member-supported, nonprofit civil liberties organization that has worked for more than 30 years to protect free expression, access to knowledge, and innovation. EFF, its more than 30,000 members, and the community of technology users they represent have a strong interest in a copyright system that promotes the progress of science by balancing copyright incentives with countervailing constitutional interests. Consistent with this mission, EFF has participated, as counsel or amicus curiae, in multiple copyright cases pertaining to new technologies; provides free legal counseling on copyright issues; and advocates for balanced copyright policy in legislative and regulatory arenas. EFF brings a critical and underrepresented perspective to its amicus advocacy work by keeping the public interest at the forefront and highlighting how judicial decisions may impact people other than commercial stakeholders or the immediate parties to a dispute.

**INTRODUCTION**

It's 1975. Earth, Wind, and Fire rule the airwaves, *Jaws* is on every theater screen, *All In the Family* is must-see TV, and Sony starts selling the first videotape recorder, or VTR. Finally, as one ad puts it, "you don't have to miss Kojak because you're watching Columbo (or vice versa)." Major rightsholders run to Congress and the courts, claiming that this new technology is "to the American film producer and the American public as the Boston strangler is to the woman home alone." After years of litigation, the Supreme Court ultimately rules in Sony's favor, noting that where copyright law has not kept up with technological developments, courts should be careful not to expand copyright protections on their own. That ruling unleashes decades of technological

---

[1] No party or party's counsel authored this brief in whole or in part, or contributed money that was intended to fund preparing or submitting this brief. No person other than amicus or their counsel contributed money that was intended to fund preparing or submitting this brief.

innovation, including unexpected effects like the emergence of a vibrant video rental market. What doesn't it do? Destroy the movie and television industry.

Plaintiffs' approach to the fair use analysis asks this Court to do precisely what *Sony* counsels against: embrace a brand-new theory of copyright, based in substantial part on hyperbole and speculation about the displacement of "human artistic creativity." This Court should decline. Like the VTR, large language models like Claude are general purpose tools, used by humans to do a broad variety of things far beyond generating lyrics. The effects of this particular technological innovation will doubtless be far-reaching, disruptive, and potentially harmful for some—but copyright law is not the way to address those harms. Indeed, accepting Plaintiffs' approach, particularly the licensing model they and their amici insist is the path forward, risks cutting off many of the real benefits AI models offer by ensuring that technological development stays in the hands of the very few companies that can afford to make those deals, subject to veto by the relatively few copyright-holders with the practical means to offer them.

## ARGUMENT

### I. GENERATIVE AI TRAINING AND USE SERVES THE PURPOSES OF COPYRIGHT.

By facilitating users' creation of expressive works, generative AI aligns with copyright law's constitutional purpose: to serve as an engine for new creativity. Plaintiffs fundamentally misconstrue both copyright law and empirical reality to pretend otherwise. Copyright law as a whole—including the fair use doctrine—exists to promote the development and availability of both expressive and non-expressive innovation, not a particular kind of "human creation" done "the old-fashioned way." Plfs' Br., 31 (quoting *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1035 (N.D. Cal. 2025)). And Plaintiffs' fundamental premise—that AI models merely generate "digital facsimiles of human authorship…at the push of a button"—ignores the millions

of users choosing and pushing those buttons. *Cf.* Plfs' Br., 20.

**A.    The Purpose of Copyright Law, Including Section 107, Is Not Confined to Fostering the Creation of Copyrightable "Products of Human Authorship."**

Plaintiffs' claim, Plfs' Br., 19, that the purpose of copyright is solely to protect "human creation" offers an improperly cramped view of copyright law. To be sure, the purpose of copyright may be to stimulate "artistic creativity for the public good." *Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417 (1984). But that is not the same as "to stimulate the creation of particular kinds of new copyrightable works," particularly given decades of case law, particularly in the Ninth Circuit, applying fair use protections to a broad swath of non-expressive uses. *Perfect 10, Inc. v. Amazon.com, Inc*., 508 F.3d 1146, 1165-66 (9th Cir. 2007) (incorporating images into electronic reference tool had immense public benefits); *see also Kelly v. Arriba Soft Corp*., 336 F.3d 811, 818-19 (9th Cir. 2003) (improving access to information on the internet); *Authors Guild v. Google, Inc.*, 804 F.3d 202, 209, 216-18 (2d Cir. 2015) (identifying books of interest). *A.V. ex rel. Vanderhye v. iParadigms*, *LLC*, 562 F.3d 630, 640 (4th Cir. 2009) (plagiarism detection software).

These holdings reflect, as they must, a determination that those uses also served the purposes of copyright, whether or not they were tied to the creation of new copyrightable works. *See Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 578 (1994) (fair use requires courts to examine four statutory factors and weigh them together "in light of the purposes of copyright.") The decisions also recognize that in the face of "technological change," courts "must be circumspect in construing the scope of rights created by" the Copyright Act. *Sony,* 464 U.S. at 431-32.

Further, *Warhol* did not signal a "sea change" in the fair use analysis. *Cf.* Plfs' Br., 21. To the contrary, the Court expressly reaffirmed landmark fair use cases like *Campbell* and *Google v.*

3
AMICUS CURIAE BRIEF OF
THE ELECTRONIC FRONTIER FOUNDATION

*Oracle.* In 2026, as in 1996, a transformative use is simply one that that "adds something new and important." *Google LLC v. Oracle,* 593 U.S. 1, 29 (2021), citing *Campbell* at 579; *see also Bartz v. Anthropic* 787 F.3d 1007, 1021 (N.D. Cal 2025) ("using copyrighted works to train LLMs to generate new text was quintessentially transformative . . . Anthropic's LLMs trained upon works not to race ahead and replicate or supplant them — but to turn a hard corner and create something different.") Accordingly, there is no need to "closely scrutinize" pre-*Warhol* decisions and undermine the legal certainty that has supported technological innovation for decades, including socially beneficial uses of machine learning, such as facilitating academic literature reviews, enabling medical discovery, identifying and tracking misinformation, reducing bias in language translation tools.[2]

**B.    Generative AI Tools *Are* Powerful Engines for Human Creative Expression.**

Plaintiffs and amici also misconstrue users' role in the creation of new works with the assistance of AI, denigrating those works as mere "imitations of human expression" that will "smother the human creativity" of others. Plfs' Br., 20.

AI is hardly the first technology to engender claims like these. The camera is a paradigmatic example. *See generally* Nate Anderson, *100 years of Big Content Fearing Technology*, Ars Technica, Oct 9, 2011 (describing 1906 essay from composer John Philip Sousa "decrying the latest piratical threat to his livelihood, to the entire body politic, and to "musical taste" itself": the player piano and the gramophone) Before 1909, the U.S. Copyright Office wouldn't register

---

[2] Sean Flynn, *Examples of Text and Data Mining Research Using Copyrighted Materials,* Kluwer Copyright Blog*, Mar. 6, 2023, available at* https://legalblogs.wolterskluwer.com/copyright-blog/examples-of-text-and-data-mining-research-using-copyrighted-materials/#:~:text=One%20of%20the%20most%20common,academic%20journals%20and%20other%20sources.

24-cv-03811-EKL-SVK

AMICUS CURIAE BRIEF OF
THE ELECTRONIC FRONTIER FOUNDATION

copyrights in photographs, on the theory that cameras "created" them, not humans. Over time, of course, lawmakers realized that photography could be deeply creative. *See Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 58–60 (1884) (photograph was "an original work of art" authored by human plaintiff, not a "mere mechanical reproduction"). Indeed, the advent of instant cameras and eventually the smartphone democratized human creativity by making it possible for more people to create images. In addition, photography led to unexpected developments, like photojournalism that documented real life conditions, political and social movements, and so on. *See* Katrina Geddes, *Engineering Semiotic Democracy* FIU L. R. (Forthcoming). [3]

The same dynamic is already underway with AI. Plaintiffs portray AI-generated works as orthogonal to "***human*** authorship," Plfs' Br., 19. But "AI-generated works" are more commonly "AI-*assisted* works":

> AI-generated works do not spontaneously spring into existence. A human user must possess an idea, express that idea in one or more prompts, and continue prompting the AI system until it produces the desired result. There is still a discursive, relational, dialogic exchange taking place between creator and audience, just with the assistance of a machinic intermediary. In this sense, AI-generated expression is still a dialogue between humans, just through the medium of AI.

Geddes at 31-32. And that expression can be highly creative. To take a just a few examples:

- Boston-based artist Nettrice Gaskins uses AI to create Afro-futurist art, including a portrait of Octavia Butler now on display at the San Francisco Airport as part of the "Women of Afro-futurism" exhibition.[4]

- Indian artists Prateek Arora and Varun Gupta use generative AI to reimagine Western science fiction. *See* Geddes at 31-32.

---

[3] Available at SSRN: https://ssrn.com/abstract=4865510 or http://dx.doi.org/10.2139/ssrn.4865510

[4] https://www.sfomuseum.org/sites/default/files/2025-12/Extended-Labels-Women-of-Afrofuturism-251219.pdf

- Philadelphia-based artist Alex Smith uses generative AI to reimagine Afrofuturism with queer, plus-sized Black superheroes. Id.

- Ana Miljački, a professor of architecture at MIT, used generative AI to create a "non-liner documentary" film on Yugoslav World War II memorials and the values they embodied.[5]

- A team of editors, AI researchers, and a digital artist created used an AI image generator to design a cover of *Cosmopolitan* magazine.[6]

- A research-creation project used AI generated visual art to both amplify the voices of activists in the Iran Woman Life Freedom Movement and evaluate AI's role in sociopolitical advocacy through art.[7]

- AI company Bronze works with musicians like Disclosure and Jai Paul to create songs that never sound the same when played back twice, with the goal of challenging audience conceptions of what music could be.[8]

These creators are all "authors," as surely as Dorothea Lange, Marcel Duchamp, or Georgia O'Keefe. *Aalmuhammed v. Lee*, 202 F.3d 1227, 1233 (9th Cir. 2000) (defining an "author" as the person "who superintended the whole work, the 'master mind'"). The Copyright Office recognizes

---

[5] Ken Shulman, *The Creative Future of Generative AI*, MASSACHUSETTS INSTITUTE OF TECHNOLOGY CENTER FOR ART, SCIENCE, AND TECHNOLOGY, https://arts.mit.edu/mit-generative-ai-art/ (Nov. 16, 2023).

[6] Gloria Lu, *The World's Smartest Artificial Intelligence Just Made Its First Magazine Cover*, Cosmopolitan, https://www.cosmopolitan.com/lifestyle/a40314356/dall-e-2-artificial-intelligence-cover/ (June 21, 2022).

[7] Amineh Ahmadi Nejad, et al., *Art, Activism, and AI: Generating Visual Narratives of Injustice through Research-Creation with a Feminist Lens*, https://computationalcreativity.net/iccc23/papers/ICCC-2023_paper_115.pdf.

[8] Andrew Chow, *How AI is Transforming Music*, Time,; https://time.com/6340294/ai-transform-music-2023/ (December 4, 2023)

as much, having registered more than 6000 works like these.[9]

Given this range of experimentation, courts should be reluctant to decide in advance what tools do and do not foster "human creativity." *See generally* Lea Bishop, *Digital Dialectic: Why Every "AI-Generated" Work Has a Human Author,* 20 FIU L. Rev. 861 (2026); Michael D. Murray, *Tools Do Not Create: Human Authorship in the Use of Generative Artificial Intelligence*, 15 J.L. TECH. & INTERNET 76, 76 (2024) ("An artist working with a generative AI tool is no different from an artist working with a digital or analog camera or with Photoshop or another image editing and image rendering tool.")[10]

What is more, AI tools can support artistic creation and information access by people with disabilities, for whom traditional artistic forms and sources of information are often inaccessible. These important tools are not "plainly infringing" as amici contend. Br. of Amici Assn. of Am. Publishers, et al., 11 (hereinafter "AAP Br.").. To the contrary, these accessibility uses are paradigmatic fair use. *Sony Corp. of Am.,* 464 U.S. at 455. For example, AI image generators allow people with motor impairments to create images by describing their creative ideas through prompts entered using voice-to-text software, rather than using traditional tools like pens or paintbrushes, which may be difficult to grasp or manipulate.[11] And the AI-generated summaries that some amici seek to prevent from "competing" with their content, AAP Br., 11, are an important source of information for blind and low vision users, because they are often more accessible than many

---

[9] U.S. Copyright Office Registers Thousands of Human-AI Collaborative Works Amid Legal Challenges https://legalnewsfeed.com/2026/04/21/u-s-copyright-office-adapts-rules-for-ai-generated-works-registering-over-6000-new-pieces/

[10] Indeed, some of the so-called "guardrails" AI companies have adopted precisely to fend off lawsuits like this one may be actually impeding the purposes of copyright by inhibiting fair uses and misleading the public as to the proper boundaries of fair use. *See* Geddes at 6-8.

[11] Will Crowe, *Artistic Expression for People with Disability: AI to Foster Creativity*, OCCUPATIONAL THERAPY AUSTRALIA, https://otaus.com.au/news/artistic-expression-for-people-with-disability-ai-to-foster-creativity (June 6, 2025).

websites and traditional web search tools.[12]

## II.    "MARKET DILUTION" IS NOT A COGNIZABLE COPYRIGHT HARM.

Plaintiffs and their amici ask this Court to depart from well-established fair use principles and adopt a novel "market dilution" theory, which would insulate copyright holders from hypothetical competition from non-infringing works created with the help of AI tools like Claude. Plfs' Br., 31–34; AAP Br., 12; RIAA Br., 4–5. This theory contravenes 300-year-old copyright principles and would impede future creative expression. *See* 4 PATRY ON COPYRIGHT § 10:155.40.

The fourth fair use factor considers the "extent" of any harm to the markets for the original or derivative works caused by the "particular actions of the alleged infringer," or that would result if the conduct at issue became "unrestricted and widespread." *Id*. In assessing those effects, it looks only at harms that are "cognizable under the Copyright Act," *i.e.,* uses of a work that "usurp a market that properly belongs to the copyright holder" and flow from protectible elements of a work. *Infinity Broad. Corp.*, 150 F.3d at 110; *Campbell*, 510 U.S. at 592–93, 593 n.24.

Other forms of harm, no matter how significant, like competition from AI-generated works that allegedly "dilute" broadly defined markets for entire classes of works, play no role in the analysis because copyright protects only an author's original expression. *Feist Publications, Inc. v. Rural Tel. Serv. Co*., 499 U.S. 340, 349–50 (1991); *see also Sony Corp. of Am*., 464 U.S. at 432. (Copyright protection "has never accorded the copyright owner complete control over all possible uses of his work."). No author may copyright ideas, facts, concepts, styles, or tropes reflected in their work. 17 U.S.C. § 102(b); *Yonay v. Paramount Pictures Corp*., 163 F.4th 685, 692 (9th Cir. 2026). With this fundamental limitation, copyright law not only allows "but *encourages* others to

---

[12] Abrar Al-Heeti, *From Novelty to Necessity: How AI Could Open Up a World of Accessibility for Everyone*, CNET, https://www.cnet.com/tech/mobile/ai-is-turning-phones-into-smarter-accessibility-tools-and-its-just-getting-started/ (Sept. 12, 2024).

24-cv-03811-EKL-SVK      AMICUS CURIAE BRIEF OF
THE ELECTRONIC FRONTIER FOUNDATION

build freely" on existing works. In addition, as a matter of law, a use is only considered harmful under the Copyright Act if it shares "substantial amounts of the original expression." *Yonay*, 163 F.4th at 690.

Moreover, factor four excludes transformative uses of that original expression. *Campbell*, 510 U.S. at 593–94. Thus, while harm to markets for derivative uses of original song lyrics—like making a "rap version" of the same lyrics—may be considered, any market harm caused by a secondary use of its unprotectible elements—such as a new song inspired by the love story underpinning the original or imitating its musical style—must be excluded. *Campbell*, 510 U.S. at 593–94. And if the secondary work uses only a small portion of the original—such as a few lines of its lyrics—only the harm attributable to the "uncompensated use" of the short fragment of the original may be considered—not any and all harm caused by "merely an additional use in an already saturated market" for licenses to use the work in its entirety. *Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 942 (9th Cir.), *opinion amended on denial of reh'g*, 313 F.3d 1093 (9th Cir. 2002) (use of three-second video clip would not harm market for licenses to rebroadcast the original footage in its entirety).

Plaintiffs also postulate that every "AI-generated" song uploaded to streaming services like Spotify diverts would-be listeners from "human-written" songs, reducing Plaintiffs' proportional share of the royalties that Spotify pays to rightsholders each year. Plfs' Mot., 33. Setting aside the incorrect assumption that such music cannot be "human written" *supra* at I.B, there are several problems with this argument.

First, it confuses the statutory focus of the fair use inquiry: "the specific use alleged to be infringing." *Andy Warhol Found.*, 598 U.S. at 549. Here, that use is *Anthropic*'s copying of Plaintiffs' song lyrics to build Claude, a general-purpose AI text-generator. Instead of focusing on

the market effects of *Anthropic*'s use of song lyrics to build an AI model—a use that certainly serves a different purpose than Plaintiffs' songs originally did—Plaintiffs jump ahead to *third parties'* potential uses of Claude to create new songs. Uses of the defendant's secondary work by third parties have no part in the fair use analysis. *See Sony Corp. of Am.*, 464 U.S. at 434.

Second, dissimilar works are not "substitutes," for purposes of fair use, because the analysis excludes harms that "occur in relation to interests that are not protected by copyright." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 224 (2d Cir. 2015). For example, the court in *Authors Guild* explained that a tool built by Google could provide facts communicated in "snippets" of a book displayed to a user, even though this could potentially eliminate the need to obtain the book. *Authors Guild*, 804 F.3d at 224. The potential for lost sales does not "change the taking of an unprotected fact into a copyright infringement." *Id*. at 224. And because the "snippets" provided by Google were deemed unlikely to satisfy the user's "interest *in the protected aspect* of the author's work," the snippets did not "provide a significant substitute for the purchase of the author's book." *Id.* at 224–25. So too with AI-generated songs that do not contain protected expression from an original song. Drawing upon unprotected stylistic elements in original works may satisfy a user's interest in listening to a similar-sounding original, but that does not mean the new songs usurp the market for the original.

Third, copyright law is a creature of statute. *Silvers v. Sony Pictures Ent., Inc*, 402 F.3d 881, 883 (9th Cir. 2005). The Constitution gives Congress the role of fashioning new rules to address new technologies, including deciding whether new rules are needed at all. *Sony Corp. of Am.*, 464 U.S. at 431. Consider again the advent of photography. Portrait artists feared the camera would replace the paintbrush, particularly since as cameras could produce thousands of images in

the time it would take a human to paint just one.[13] In practice, portraiture painting actually experienced a resurgence and provided artists with a new revenue source, by allowing them to capture and sell reproductions of their own artworks.[14] It is for Congress, not the courts, to determine whether generative AI will follow the same dynamic.

Nor does the existence of a limited licensing market for training data tilt Factor Four against fair use. The Supreme Court has cautioned against "the 'danger of circularity posed' by considering new licensing opportunities because 'it is a given in every fair use case that plaintiff suffers a loss of a potential market if that potential is defined as the theoretical market for licensing the very use at bar.'" *Google*, 593 U.S. at 38 (quoting 4 NIMMER ON COPYRIGHT § 13.05[A][4]).

Not surprisingly, Plaintiffs' circular argument has already been rejected by two federal courts. *See Kadrey*, 788 F. Supp. 3d at 1052 (finding that the existence of an AI training license market is "irrelevant," because "this market is not one that the plaintiffs are legally entitled to monopolize," and is thus "is not cognizable" under the fourth factor); *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1032 (N.D. Cal. 2025) (market for AI training data licenses "is not one the Copyright Act entitles Authors to exploit"). Nor can the circularity problem be avoided by characterizing some copyright holders' recent self-declared right to cash in on the "AI arms race" as "traditionally" licensed uses central to the core of plaintiff's copyright interests. 4 PATRY ON COPYRIGHT § 10:152; *contra* RIAA Br., 12.

Further, contrary to amici's claims, licensing agreements with "trillion-dollar companies" to train AI models will not promote the development of better technology or competition by small

---

[13] *See* Jordan G. Teicher, *When Photography Wasn't Art*, JSTOR DAILY, https://daily.jstor.org/when-photography-was-not-art/ (Feb. 6, 2016); Livia Gershon, *Did Photography Really Kill Portrait Painting?* JSTOR DAILY, https://daily.jstor.org/did-photography-really-kill-portrait-painting/ (Sept. 13, 2022).
[14] *Id.*

developers. RIAA Br., 12; AAP Br., 14–15. It's true that licenses may "promote…legal certainty" to the extent they allow incumbent AI companies to avoid Plaintiffs' and amici's own "threat[s] of litigation." But a requirement to license millions of works for training purposes would raise massive barriers to entry for smaller competitors.

This isn't a hypothetical concern. As the Federal Trade Commission recently explained, the "volume and quality of data required to pre-train a generative AI model from scratch may impact the ability of new players to enter the market," especially if rightsholders "leverage their control to dampen or distort competition in generative AI markets."[15] Indeed, until recently a lack of access to adequate training data was a major impediment to participation in many areas of generative AI research, limiting research progress.[16] To address this problem, nonprofits, researchers, and others constructed large datasets using data scraped from the open web— inevitably including copyrighted information—and made it available to the public.[17] These open datasets, like LAION and Common Crawl, allowed more researchers and startups to develop generative AI tools.

Democratizing participation in the field led to rapid technological progress.[18] A majority

[15] *Generative AI Raises Competition Concerns,* Federal Trade Commission, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/06/generative-ai-raises-competition-concerns (June 29, 2023).

[16] Christoph Schuhmann, et al., "LAION-5B: An Open Large-Scale Dataset for Training Generation Image-Text Models," https://arxiv.org/abs/2210.08402 (Oct. 16, 2022).

[17] *Id.;* Stefan Baack, *A Critical Analysis of the Largest Source for Generative AI Training Data: Common Crawl*, ASSN. FOR COMPUTING MACHINERY, https://www.mozillafoundation.org/en/research/library/generative-ai-training-data/common-crawl/ (Feb. 6, 2024).

[18] *Id. See also, e.g.*, PUBLICATIONS OFFICE OF THE EUROPEAN UNION, *The Synergy Between Open Data And AI: A Two-Way Relationship*, https://data.europa.eu/en/news-events/news/synergy-between-open-data-and-ai-two-way-relationship#:~:text=How%20open%20data%20increases%20accuracy,community%20to%20obtain%20new%20insight (Oct. 21, 2024).

of large language models, including GPT-3, the model that ChatGPT was originally built on, were trained on data from an large repository assembled by Common Crawl, a small nonprofit.[19] One study found that at least 64 percent of large language models ("LLMs") published between 2019 and 2023 were built using Common Crawl data, and that the availability of that data led to improved competition and transparency in LLM development.[20] Researchers have built on Common Crawl's work, creating specialized, high quality datasets that provided the foundation for important cybersecurity research[21] and scientific advancements.[22]

Shrinking the scope of fair use could derail this important progress. Licensing the immense quantity of works in databases like Common Crawl—which contains more than 9.5 petabytes of data from every corner of the internet—would be virtually impossible. It would require identifying and negotiating licenses with copyright owners for web pages of all kinds, many of which were scraped over a decade ago—and that's to say nothing of the cost of paying licensing fees for all of these works. The result would be a far less competitive, dynamic generative AI market.

Finally, a licensing requirement would also reduce the quality and usefulness of AI tools that do eventually make it to market. For example, excluding relevant scientific materials from training datasets over licensing disputes could compromise the quality of models used in hospitals and doctors' offices. *See* James Love, *We Need Smart Intellectual Property Laws for Artificial Intelligence*, SCIENTIFIC AMERICAN, https://www.scientificamerican.com/article/we-need-smart-

---

[19] Baack, *supra* Note 17.

[20] Stefan Baack, *Training Data for the Price of a Sandwich*, Mozilla, https://www.mozillafoundation.org/en/research/library/generative-ai-training-data/common-crawl/ (Feb. 6, 2024).

[21] Ashim Mahara, *Cybersecurity Data Extraction from Common Crawl*, https://arxiv.org/html/2602.22218v1 (March 2025).

[22] https://www.semanticscholar.org/paper/The-BigScience-ROOTS-Corpus:-A-1.6TB-Composite-Laurenccon-Saulnier/16c64f74ce0e6a59b0709c0d8e66596a5bc08ed6

intellectual-property-laws-for-artificial-intelligence/ (August 7, 2023) ("When AI is used in hospitals and in gene therapy, do you really want to exclude relevant information from the training database?")

**CONCLUSION**

For the above reasons, amicus urges the Court to grant Anthropic's Motion for Summary Judgment.

DATED: April 27, 2026                    Respectfully submitted,

                                         By:    /s/  *Corynne McSherry*
                                                Corynne McSherry

                                                Victoria Noble
                                                Mitchell L. Stoltz
                                                ELECTRONIC FRONTIER FOUNDATION
                                                815 Eddy Street
                                                San Francisco, CA  94109
                                                Telephone: (415) 436-9333
                                                Facsimile: (415) 436-9993

                                                *Attorneys for Amicus Curiae Electronic Frontier*
                                                *Foundation*