**OPPENHEIM + ZEBRAK, LLP**
Matthew J. Oppenheim
Nicholas C. Hailey
Jeffrey M. Gould
Corey Miller
Keith Howell
(admitted *pro hac vice*)
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
jeff@oandzlaw.com
corey@oandzlaw.com
khowell@oandzlaw.com

Alexander Kaplan
Jennifer Pariser
Andrew Guerra
Bret Matera
Timothy Chung
Michelle Gomez-Reichman
(admitted *pro hac vice*)
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
alex@oandzlaw.com
jpariser@oandzlaw.com
andrew@oandzlaw.com
bmatera@oandzlaw.com
tchung@oandzlaw.com
mgomez-reichman@oandzlaw.com

**COBLENTZ PATCH DUFFY & BASS LLP**
Jeffrey G. Knowles (SBN 129754)
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 391-4800
ef-jgk@cpdb.com

**COWAN, LIEBOWITZ & LATMAN, P.C.**
Richard S. Mandel
Jonathan Z. King
Richard Dannay
(admitted *pro hac vice*)
114 West 47th Street
New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., ET AL., | Case Number: 5:24-cv-03811-EKL-SVK |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY AND OPINIONS OF DR. MICHAEL D. SMITH** |
| v. | |
| ANTHROPIC PBC, | **REDACTED** |
| Defendant. | |
| | Judge Eumi K. Lee |
| | Magistrate Judge Susan van Keulen |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................2

LEGAL STANDARD.............................................................................................................2

ARGUMENT ..........................................................................................................................3

I.      Dr. Smith reliably opines that Anthropic's copying harms Publishers...................3

    A.      Dr. Smith supports his opinions with extensive evidence and analysis.........................................................................................................3

    B.      An expert need not conduct empirical analysis to be reliable. ...................4

    C.      Not citing specific examples is not a basis to exclude an expert's opinion. .....................................................................................................7

    D.      Failure to consider additional evidence is not a basis for exclusion. ...........8

II.     Dr. Smith does not opine about Anthropic's subjective state of mind. .................10

CONCLUSION.....................................................................................................................10

## **INTRODUCTION**

Anthropic's illegal copying of Publishers' copyrighted lyrics inflicts enormous harm on Publishers. Publishers have offered the expert opinions of Dr. Michael D. Smith to explain how Anthropic's illegal conduct dilutes, disrupts, and subverts the actual and potential markets for Publishers' copyrighted works. Dr. Smith is a professor of information technology and public policy at Carnegie Mellon University and a leading scholar on the economics of digital media markets and the effects of technological change on creative industries. He has testified before the United States Senate Judiciary Subcommittee on Intellectual Property regarding the mass ingestion of copyrighted works for AI training, and the United States Copyright Office chose him to help draft a major report on the impact of artificial intelligence on intellectual property rights.

Anthropic has moved, ECF No. 680 ("Motion" or "Mot."), to exclude essentially ***all*** of Dr. Smith's opinions without any legitimate basis under the Federal Rules of Evidence. Anthropic does not dispute Dr. Smith's qualifications, nor the relevance of his opinions. Anthropic attacks only the reliability of Dr. Smith's opinions on four grounds: (1) that his opinions are speculative and unsupported by evidence; (2) that he did not conduct a quantitative empirical analysis; (3) that he did not identify specific examples of the harms he discusses; and (4) that he did not consider purportedly contrary evidence. *See* Mot. 3–10.

None of these attacks succeed. Dr. Smith extensively supports his opinions with record evidence and analysis based on widely accepted economic principles. Neither Rule 702 nor the law of fair use require him to conduct a quantitative analysis or identify supporting specific examples, especially when Dr. Smith explained why such analysis is impossible. The purportedly contrary evidence Anthropic claims that Dr. Smith ignored did not even exist when he served his primary report, was not part of the discovery record, and was also not considered by Anthropic's experts; in any event, failure to consider contrary evidence is not a basis for exclusion.

Finally, Anthropic's claim that Dr. Smith impermissibly opines on its state of mind also fails. He does no such thing. He appropriately evaluates the economic incentives facing Anthropic and cites witness statements confirming that Anthropic acted in accordance with those incentives.

The Court should deny Anthropic's Motion in its entirety.

## BACKGROUND

Dr. Michael D. Smith is the J. Erik Jonsson Professor of Information Technology and Public Policy and Co-Director of the Initiative for Digital Entertainment Analytics at Carnegie Mellon University, where he has served since 2000. ECF 680-2 ¶ 2 (hereinafter the "Report" or "Rpt."). He researches the economics of digital media markets and has published articles in many leading peer-reviewed journals. *Id.* ¶¶ 1–2, 6 & Appx. 1. Dr. Smith has authored multiple books on technological change in the creative industries, and he has produced a substantial body of scholarship on digital piracy and content markets. *Id.* ¶ 3. Dr. Smith's expertise has been recognized through editorial roles at top journals, testimony before the U.S. Senate, and selection by the U.S. Copyright Office to contribute to a major report on AI and copyright policy. *Id.* ¶ 4.

On December 19, 2025, Dr. Smith served his initial report in this case. Rpt. at 1. In it, Dr. Smith explains in detail how Anthropic's use of copyrighted song lyrics to train its Claude models harms Publishers and their songwriters, including by diluting Publishers' revenue from streaming platforms with competing market substitutes, *id.* ¶¶ 60–98, subverting licensing markets, *id.* ¶¶ 99–167, and diminishing the overall value of Publishers' works and future incentives for artists to create. *Id.* ¶¶ 168–91. Dr. Smith issued a rebuttal report, ECF No. 680-3 ("Rebuttal"), and a reply report, ECF No. 680-4 ("Reply"), and supplemented his previous reports to identify new evidence Anthropic published four days before discovery closed. ECF No. 680-5.

## LEGAL STANDARD

Expert testimony is admissible under Federal Rule of Evidence 702 if it is both relevant and reliable. *See Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589 (1993); *see also Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). Rule 702 applies to all proposed expert testimony, including nonscientific "technical analysis" and other "specialized knowledge," *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–48 (1999). "The rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Adv. Comm. Notes (2000). Under Rule 702, reliability encompasses whether an expert's testimony has "a reliable basis in the knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565 (citation omitted). Importantly, "the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his

methodology." *Id.* at 564. Accordingly, "[l]ack of certainty is not, for a qualified expert, the same thing as guesswork," *id.* at 565, and "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* at 564.

## ARGUMENT

### I.    Dr. Smith reliably opines that Anthropic's copying harms Publishers.

#### A.  Dr. Smith supports his opinions with extensive evidence and analysis.

Dr. Smith's opinions readily meet the Ninth Circuit's reliability standard. Anthropic's contention that Dr. Smith's opinions are "speculative" speaks, at most, to the *weight* of his opinions, not their reliability. *United States v. Rangel*, 823 F. App'x 466, 470 (9th Cir. 2020) ("[C]haracterization of the expert's opinions as 'speculative' bears on the weight of the testimony, not on its admissibility.").

Dr. Smith supports his analysis of how Anthropic's Claude dilutes and disrupts the "actual and potential markets for Publishers' copyrighted works with market substitutes," Rpt. ¶ 15, with comprehensive and meticulous citations to record evidence and analysis of widely accepted economic principles. *See id.* ¶¶ 60–98. Relying on the nascent academic literature regarding generative AI, real-world examples, sworn testimony from Anthropic executives, and another expert's analysis of five million Claude-user interactions produced in this case, Dr. Smith first shows that generative AI (including Claude) can produce "new" lyrics that are market substitutes for human-created lyrics in music. *See id.* ¶¶ 65–91. Next, he reviews specific contracts in evidence showing how streaming platforms compensate Publishers through pro-rata royalty pools. *Id.* ¶¶ 92–94. Synthesizing this evidence, Dr. Smith concludes that songs with AI-generated lyrics uploaded to streaming platforms compete with Publishers' works by reducing the percentage of total streams attributable to those works, which thereby reduces Publishers' pro-rata share of the royalty pool. *Id.* ¶¶ 95–98. The U.S. Copyright Office agrees, having concluded that "[r]oyalty pools can also be diluted" as a result of training Generative AI on copyrighted works. *See id.* n.82.

Dr. Smith likewise reliably analyzes how Anthropic impairs Publishers' ability to license their lyrics as AI training data. *Id.* ¶¶ 100–56. First, drawing from the Copyright Office's economic

report on AI,[1] he identifies preconditions necessary for an AI licensing market to form, *id.* ¶ 101, which preconditions Anthropic's expert, Dr. Abhishek Nagaraj, endorses. *See* ECF No. 651-2 ¶ 100. Dr. Smith then cites record evidence that an extensive licensing market for AI training data already exists in which Publishers actively participate. Rpt. ¶¶ 51–52, 120–36. Finally, Dr. Smith explains that Anthropic's copying harms that licensing market by undermining Publishers' practical ability to restrict access to their works by scraping and downloading of third-party datasets and by raising transaction costs for licensing parties by refusing to disclose whether it uses an inquiring rightsholder's protected content. *Id.* ¶¶ 137–56. Far from speculating, Dr. Smith roots his analysis in sound economic principles Anthropic's expert endorses and citations to the record.

For other harms, Dr. Smith again grounds his opinions with academic literature and record evidence. He explains how Anthropic displaces licensed uses of Publishers' lyrics on lyric-display websites by providing unlicensed access to those lyrics, thereby depriving Publishers of revenue. *Id.* ¶¶ 162–67. Similarly, he explains how Anthropic's unlicensed copying prevents Publishers from imposing contractual safeguards on use of their works (present in other contracts), such as by restricting Claude users from generating offensive and reputationally damaging derivatives. *Id.* ¶¶ 168–76. And he relies on extensive literature to explain how Anthropic's removal of copyright management information shrinks market supply and reduces future output by stripping recognition from publishers and songwriters. *Id.* ¶¶ 177–91; *see also* Reply Rpt. ¶¶ 134–36.

### B.  An expert need not conduct empirical analysis to be reliable.

Dr. Smith's decision not to conduct empirical analyses that would depend on unknowable variables does not make his opinions unreliable. Anthropic faults Dr. Smith for not quantifying Publishers' actual damages with "empirical analysis," *see* Mot. 4, 6, but Dr. Smith made clear that, while the harm flowing from Anthropic's infringing conduct is significant, it is also difficult (if not impossible) to quantify because the necessary data to conduct such analysis does not exist. *See* Rpt. ¶¶ 64, 67, 95, 98, 129, 157–61, 167, 176, 188, 191. There is no data showing which tracks on

---

[1] *See* U.S. COPYRIGHT OFFICE, *Identifying the Economic Implications of Artificial Intelligence for Copyright Policy* (February 12, 2025) (https://copyright.gov/newsnet/2025/1062.html?loclr=eanco). Notably, Anthropic's expert Dr. Nagaraj also contributed to this paper.

streaming services contain AI-generated lyrics, let alone lyrics generated by Claude. *Id.* ¶ 95 & n.83; Reply Rpt. ¶ 42. While *some* streaming services can identify *some* AI-generated *recordings*, *see* Reply Rpt. ¶ 43, that capability does not extend to identifying AI-generated *lyrics*; a human-created recording with AI-generated lyrics would not be identified as an AI-generated track. *Id.* ¶ 42. Even if streaming services could identify specific lyrics as AI-generated (which they cannot), it would still be impossible to identify the AI model responsible for generating those lyrics, as Anthropic's Dr. Nagaraj agrees. *See* Rpt. ¶ 95; Reply Rpt. ¶ 42 (explaining impossibility of determining origin of AI-generated lyrics); Decl. of B. Matera, Ex. A at 214:23–215:16. To that end, Dr. Smith does not proffer a specific damages figure in this case *because* quantification would be too inherently speculative. *See Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1229 (9th Cir. 1998) (reversing exclusion of expert testimony despite lack of empirical support for expert's opinion where expert explained that relevant empirical studies "would be almost impossible to perform").

More generally, the premise of Anthropic's argument is wrong: Rule 702 does not require empirical analysis or quantification for an economic expert's opinion to be admissible. *See e.g.*, *Benefit Cosms. LLC v. e.l.f. Cosms., Inc.*, 2024 WL 3558848, at *3 (N.D. Cal. July 25, 2024) ("Experts are not required to support their conclusions with empirical data."); *Tevra Brands LLC v. Bayer HealthCare LLC*, 2024 WL 2261946, at *5 (N.D. Cal. May 16, 2024) ("Courts in this district and others have often admitted expert testimony on market definition where the expert did not conduct an econometric study."); *Fujifilm Corp. v. Motorola Mobility LLC*, 2015 WL 1737951, at *3 (N.D. Cal. Apr. 8, 2015) ("[T]here is no per se requirement that all expert testimony be supported by empirical data."). The Ninth Circuit recently held that "qualitative analysis of the deposition testimony and documentary record" is a sufficiently reliable basis to admit an economist's opinion, even where the expert did not "quantitatively analyze" the issue. *Teradata Corp. v. SAP SE*, 124 F.4th 555, 570–72 (9th Cir. 2024) (internal quotation marks omitted).

Similarly, fair use has never required a plaintiff to empirically establish the harm caused by a defendant's use. The market harm factor can weigh against fair use even where "the record reflects little direct evidence of actual market harm caused by [the defendant's use]." *McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149, 1163 (9th Cir. 2022); *Dr. Seuss Enters., L.P. v. ComicMix LLC*,

983 F.3d 443, 461 (9th Cir. 2020) (holding that defendant's use "usurps [the plaintiff's work's] potential market" without relying on empirical analysis); *Monge v. Maya Mags., Inc.*, 688 F.3d 1164, 1182 (9th Cir. 2012) (holding market harm factor weighed against fair use despite no quantification of lost sales). Rather than empirical analysis, courts "routinely rely on [] logical inferences where appropriate in assessing the fourth fair use factor." *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 193 (2d Cir. 2024) (holding no fair use even where plaintiffs "have not provided empirical data to support" market harm). Dr. Smith appropriately applies his expertise to ground the relevant logical inferences in economic principles and record evidence.

Further, by offering statutory damages as an alternative to actual damages, *see* 17 U.S.C. § 504(c), the Copyright Act acknowledges that in some copyright cases "the rules of law render difficult or impossible proof of damages." *F. W. Woolworth Co. v. Contemp. Arts*, 344 U.S. 228, 231 (1952). Excluding Publishers' expert for explaining why calculating actual damages is impossible would defeat the purpose of statutory damages and effectively make fair use impossible to oppose where the copyright owner seeks only statutory damages.

The fact that Anthropic's experts, Dr. Nagaraj and Ms. Julie Davis, attempted to quantify market harm does not affect the reliability of Dr. Smith's opinions. Mot. 7. One expert's opinion has no bearing on the admissibility of another expert's opinion. *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1237–38 (9th Cir. 2017) ("That defendants may be able to offer other equally qualified [] opinion . . . does not support the idea that *Daubert* should bar the admission of [the plaintiffs' experts]."). "Where two credible experts disagree, it is the job of the fact finder, not the trial court, to determine which source is more credible and reliable." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014). In any case, Dr. Smith explains why Dr. Nagaraj's analysis is flawed, *see* Rebuttal ¶¶ 100–41, and Publishers have moved to exclude Ms. Davis's review of Publishers' revenues as lacking any actual analysis, ECF No. 646 at 5–7.

Anthropic cites no case excluding an opinion like Dr. Smith's in a fair use or statutory damages case. Indeed, courts regularly admit such opinions. *See, e.g.*, *A&M Recs., Inc. v. Napster, Inc.*, 2000 WL 1170106, at *6 (N.D. Cal. Aug. 10, 2000) (admitting fair use market harm expert who "examined depositions and documents produced in . . . this litigation, as well as outside studies

and media reports" and whose "conclusions were drawn from consideration of [defendant's] internal documents"), *aff'd* 239 F.3d 1004, 1017 (9th Cir. 2001). The cases Anthropic cites in which plaintiffs sought actual damages, *see* Mot. 7–8, establish only that, in some cases, actual damages can be calculated. None address the admissibility of an opinion on market harm for fair use nor require excluding an opinion that actual damages cannot be estimated in a particular case.

Anthropic's contention that Dr. Smith was required to quantify future harm goes even further awry. Anthropic confuses proving lost future profits as part of actual damages—which are not at issue for this Motion—with rebutting the market harm factor of a fair use defense. The Supreme Court has held that "[a]ctual present harm need not be shown . . . . Nor is it necessary to show with certainty that future harm will result. What is necessary is a showing by a preponderance of the evidence that some meaningful likelihood of future harm exists." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984). The Ninth Circuit has similarly held that, "[t]o defeat a fair use defense, 'one need only show that if the challenged use should become widespread, it would adversely affect the *potential* market for the copyrighted work.'" *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 744 (9th Cir. 2019) (quoting *Harper & Row Publishers*, 471 U.S. at 568). Calculating lost profits from future sales or lost licensing is not required. The one case Anthropic quotes concerned the pleading standard for punitive damages and has no relevance here. *See Gentil v. Wingfield GmbH*, 2021 WL 4979427, at *7 (N.D. Cal. Mar. 2, 2021).

### C.  Not citing specific examples is not a basis to exclude an expert's opinion.

Anthropic's contention that Dr. Smith did not identify more specific examples of the harms he identifies in his Report is no basis for exclusion. *See* Mot. 4, 6, 9–10. "An expert's inability to cite direct evidence for a given hypothesis does not make the testimony inadmissible speculation." *Moribe v. Am. Water Heater Co.*, 2024 WL 708562, at *2 (D. Haw. Feb. 21, 2024). A court "err[s] by demanding concrete . . . evidence in a field characterized by uncertainty," as here. *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1028 (9th Cir. 2022) (quotation marks omitted) (reversing exclusion of expert); *see also Panchenko v. Comenity Cap. Bank*, 2025 WL 2372597, at *4 (N.D. Cal. Aug. 13, 2025) (Lee, J.) ("In most cases, experts' decisions about what data to use in their analysis bear on the weight, not the admissibility, of expert testimony.") (citation modified).

Anthropic is simply wrong to argue that, where Dr. Smith did not cite specific examples, he "provided no evidence of reasonably likely future harm." Mot. 8. Dr. Smith explains in detail the mechanisms by which future harm is likely to occur. *See, e.g.*, Rpt. ¶¶ 65–98. Among others, he cites testimony from Anthropic executives touting Claude's songwriting capabilities, *id*. ¶¶ 80–83, and predicting that, "in the next five years, it's not only possible but quite probable that we will have superintelligent AI that is capable of doing most of the kinds of work that people do," *id.* ¶ 79, which, based on Anthropic's labor market tracking, includes "Lyricists." *Id.* ¶ 80. Such testimony corroborates Dr. Smith's conclusion that Anthropic's infringing conduct "carr[ies] a potential existential threat to the Publishers' industry as a whole." *Id*. ¶ 15; *see also id.* ¶ 84. Nor does it make sense that an expert must identify *existing* examples of future *potential* harm.

### D. Failure to consider additional evidence is not a basis for exclusion.

The fact that Dr. Smith did not consider certain remarks from (nonparty) Universal Music Group ("UMG") executive Michael Nash does not require exclusion. First, the law is well settled that an expert's failure to consider a particular piece of evidence is not grounds for exclusion. *SPS Techs., LLC v. Briles Aerospace, Inc.*, 2021 WL 4913509, at *3 (C.D. Cal. Sept. 8, 2021) ("Arguments that an expert's testimony is based on facts contrary to the actual record are more appropriate for impeachment than inadmissibility.") (citation modified); *see also Surgical Instrument Serv. Co., Inc. v. Intuitive Surgical, Inc.*, 2024 WL 1975456, at *10 (N.D. Cal. Mar. 31, 2024) ("There is no rule that an expert must consider and discuss all evidence on the record in order to proffer admissible testimony."). An expert's reliability turns on whether the data on which the expert relied sufficiently supports their opinion, not on whether the expert should have considered more or different data. *See Elosu*, 26 F.4th at 1025–26 ("[Rule 702] requires foundation, not corroboration. . . . [It] does not license a court . . . to select between competing versions of the evidence[.]"). This distinguishes the one out-of-circuit case Anthropic cites, where the limited data on which a damages expert relied did not support his conclusions. *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 274 (S.D.N.Y. 2010).

Second, Dr. Smith did not consider Nash's comments for the obvious reason that those comments were made after Dr. Smith served his reports. *See* ECF No. 680-6. Obviously, it cannot

be an error requiring exclusion to fail to consider evidence that did not exist.[2] Moreover, the information that Nash relied on to make his comments is not part of the evidentiary record in this case, and neither side's experts considered that information.

Third, Anthropic disingenuously characterizes Nash's comments as "Publishers' own evidence and statements." Mot. 5. As Anthropic knows, this is false: UMG is not a party to this case, and Nash is not an employee of Universal Music Publishing Group ("UMPG") or any other Plaintiff Publishers. *Universal Music Group Annual Report 2025*, UNIVERSAL MUSIC GROUP, https://assets.ctfassets.net/e66ejtqbaazg/7HObJrt5UDQfjjfKYN454B/201bf057190c5ed4ee185b 04a34ec095/UMG_2025_Annual_Report.pdf, at 27, 46. And the information Nash relied on in making his comments is not within UMPG's possession, custody, or control. *PlayUp, Inc. v. Mintas*, 2022 WL 4112243, at *2 (D. Nev. June 30, 2022) (holding that subsidiary does not have legal right to obtain documents on demand from corporate parent). When Anthropic requested other discovery from UMPG regarding UMG, UMPG properly objected that UMG is a separate and distinct entity. Anthropic never subpoenaed UMG. Anthropic cannot complain that Dr. Smith did not consider information Anthropic made no effort to obtain itself.

Fourth, Nash's hearsay comments are not nearly as significant as Anthropic suggests. Because the market harm inquiry focuses on potential, not just actual, harm, *see supra*, UMG's present estimate of "AI revenue dilution," is of limited relevance. UMG's estimate does not address the potential harm from widespread use of Claude to generate competing market substitutes for Publishers' lyrics. Moreover, UMG's businesses extend beyond music publishing to include substantial recorded music operations with distinct models and royalty structures. Nash's hearsay about generative AI's impact on UMG's broader revenues therefore has limited relevance to whether Anthropic's copying harms the market for Publishers' lyrics.

Finally, if failure to consider Nash's comments makes Dr. Smith's market harm opinion

---

[2] Dr. Smith was not aware of Nash's comments until Anthropic improperly raised them at his second deposition. Mot. Ex. 8 at 453:7–24. Magistrate Judge van Keulen's order limited the scope of that deposition to specified topics that did not include Nash's comments. ECF No. 632. Brazenly defying the Court's order, Anthropic ambushed Dr. Smith with questions about Nash's comments, which Publishers' counsel properly instructed Dr. Smith not to answer.

PLS.' OPP. TO DEF.'S MOT. TO EXCLUDE EXPERT TESTIMONY AND OPINIONS OF MICHAEL SMITH

unreliable, as Anthropic contends, the same logic must apply to Anthropic's own market harm expert, Dr. Nagaraj, who also failed to consider Nash's comments. *See generally* ECF No. 651-1.

**II.    Dr. Smith does not opine about Anthropic's subjective state of mind.**

Dr. Smith does not inappropriately opine on Anthropic's state of mind by analyzing Anthropic's economic incentives and citing statements from witnesses confirming that Anthropic acted in accordance with those incentives. *See* Mot. 10 (quoting Rpt. ¶ 152). As an economist, Dr. Smith is qualified to assess economic explanations for why Anthropic never tried to license Publishers' lyrics. Rpt. ¶ 146. He concludes that, "from an economic point of view, Anthropic would have been incentivized *not* to engage in licensing negotiations with rightsholders, including Publishers, given its strategy of acquiring the same content for free (via crawling/scraping)." *Id.* ¶ 153. Dr. Smith rejects other potential explanations, noting that Anthropic's reluctance to license from Publishers could not be for "a lack of need for such data," *id.* ¶ 147, nor "a lack of funds," *id.* ¶¶ 148–49; nor a lack of market information. *Id.* ¶ 150. Dr. Smith then confirms his assessment with reference to statements from Anthropic executives describing how they ███████████ ████████████████████████████████████, including because they faced ██████████████████████ a ████████████████████ ██████████ and an ████████████████ ██████████ *Id.* ¶¶ 151–52. Such an opinion does not impermissibly opine on state of mind. *In re HIV Antitrust Litig.*, 2023 WL 3089820, at *3 (N.D. Cal. Mar. 7, 2023) (allowing expert to opine on "what rational economic actors would do in the circumstances confronting Defendants"). Regardless, this type of "state of mind" objection is better ruled on at trial because "the context of the testimony and purposes for which it is offered are critical." *See id.* (quoting *In re Juul Labs, Inc.*, 2022 WL 1814440, at * 14 (N.D. Cal. June 2, 2022) (stating that "the knowledge of various defendants and witnesses . . . is likely relevant and admissible if there is a basis in the record for those experts to testify, *e.g.*, from their review of defendants' documents or deposition testimony")).

## CONCLUSION

For the foregoing reasons, Anthropic's Motion should be denied.

Dated: July 27, 2026

Respectfully submitted,

*/s/ Bret Matera*
**OPPENHEIM + ZEBRAK, LLP**
Matthew J. Oppenheim
Nicholas C. Hailey
Jeffrey M. Gould
Corey Miller
Keith Howell
(admitted *pro hac vice*)
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
jeff@oandzlaw.com
corey@oandzlaw.com
khowell@oandzlaw.com

Alexander Kaplan
Jennifer Pariser
Andrew Guerra
Bret Matera
Timothy Chung
Michelle Gomez-Reichman
(admitted *pro hac vice*)
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
alex@oandzlaw.com
jpariser@oandzlaw.com
andrew@oandzlaw.com
bmatera@oandzlaw.com
tchung@oandzlaw.com
mgomez-reichman@oandzlaw.com

**COBLENTZ PATCH DUFFY & BASS LLP**
Jeffrey G. Knowles (SBN 129754)
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 391-4800
ef-jgk@cpdb.com

**COWAN, LIEBOWITZ & LATMAN, P.C.**
Richard S. Mandel
Jonathan Z. King
Richard Dannay
(admitted *pro hac vice*)
114 West 47th Street
New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

*Attorneys for Plaintiffs*

**SIGNATURE ATTESTATION PURSUANT TO CIVIL L.R. 5-1(h)**

Pursuant to Civil L.R. 5-1(h), I hereby attest that concurrence in the filing of this document was obtained from the signatory of this document. I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 27, 2026

_/s/ Timothy Chung_

Timothy Chung