**REDACTED PUBLIC VERSION**

SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

TAYLOR GOOCH (SBN 294282)
taylor.gooch@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
50 California Street
San Francisco, CA 94111
Telephone: (628) 235-1000

JARED V. GRUBOW (*Pro Hac Vice)*
jared.grubow@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

LOUIS W. TOMPROS (*Pro Hac Vice*)
louis.tompros@wilmerhale.com
DISHA PATEL (*Pro Hac Vice*)
disha.patel@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

ARI HOLTZBLATT (SBN 354361)
ari.holtzblatt@wilmerhale.com
ROBIN C. BURRELL (*Pro Hac Vice*)
robin.burrell@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2100 Pennsylvania Ave, NW
Washington, DC 20037
Telephone: (202) 663-6000

*Attorneys for Defendant*
**ANTHROPIC PBC**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> ANTHROPIC PBC, <br><br> Defendant. | Case No. 5:24-cv-03811-EKL-SVK <br><br> **ANTHROPIC'S OPPOSITION TO PUBLISHERS' MOTION TO EXCLUDE EXPERT TESTIMONY OF COLIN STOKES** <br><br> Hearing Date: October 21, 2026 <br> Time: 10:00 a.m. <br> Judge: Hon. Eumi K. Lee |

**REDACTED PUBLIC VERSION**

**INTRODUCTION**

Colin Stokes is an undisputed expert in music composition. Over the course of Mr. Stokes's decades-long career, he has served as a composer, cellist, and music technologist all while developing a deep knowledge of music theory and history. That knowledge and experience is directly relevant to a central issue in this case: Anthropic's fair use defense.

If this Court does not simply grant Anthropic's pending motion for summary judgment, a jury will have to decide how much of Publishers' musical compositions Anthropic used to train Claude (fair use factor three) and whether that use harmed the market for Publishers' compositions (fair use factor four). *See* 17 U.S.C. § 107(3)-(4). Mr. Stokes's opinions speak to both issues. First, he has opined that lyrics (the only portion of the asserted works that Claude uses) are a subset of a musical composition—not its equivalent. *E.g.*, Dkt. 660-1, Stokes Rpt. ("Rpt."), ¶¶ 17, 53. Second, Mr. Stokes has opined that generative AI tools like Claude enhance, rather than harm, the musical marketplace (consistent with what Universal Music Group, the parent company of two Plaintiff-Publishers who collectively assert 448 of 499 works in suit, has told their investors, Ex. 1, UMG Earnings Call, 23:37, *e.g.*, Rpt., ¶ 17, 55, 65; Ex. 2, Colin Stokes Dep. (3/6/26), 153:2-22.[1]

Despite moving to exclude Mr. Stokes's opinions "in their entirety," Mot. at 1, Publishers devote the bulk of their brief to a largely rhetorical "Background" section, *id.* 2-5. That section denigrates Mr. Stokes's enthusiasm for his profession and comments on the unremarkable fact that his reply report repeats some of the themes from his opening report. Publishers' "bare assertion[s] in the fact section" of their motion, however, do not advance or preserve for reply any specific legal arguments. *See Christian Legal Society v. Wu*, 626 F.3d 483, 486 (9th Cir. 2010). The few arguments that Publishers actually make (at 7-10) go essentially to relevance and are not the proper subject for *Daubert*.

Ultimately, Publishers will be free at trial to cross-examine Mr. Stokes on the scope of his knowledge and experience. But neither *Daubert* nor the Federal Rules of Evidence permit

---

[1] Unless otherwise noted, 'Mot.' refers to Publishers' motion (Dkt. 660); 'Ex.' citations refer to exhibits to the Declaration of Robin Burrell submitted herewith; emphasis is added; and internal citations, quotations, and objections are omitted throughout.

**REDACTED PUBLIC VERSION**

Publishers to exclude Mr. Stokes's testimony simply because they do not agree with his view of the world.

**BACKGROUND**

Mr. Stokes's musical career spans more than two decades. He has worked with well-known artists as a performer, producer, arranger, and engineer on albums and singles. Rpt., ¶¶ 1-2, 7. He is also a scholar of music and music technology. He holds a master's from Juilliard and has successfully defended his doctoral dissertation, examining how producers and engineers manipulate vocals "to reinforce or change the meaning of the lyrics" to songs. Rpt., ¶¶ 1-6; Ex. 2, 11:22-12:15. Today, he teaches courses covering the "elements of a music composition" to students who have often not previously considered the multi-faceted nature of a musical piece. Ex. 2, 66:6-23.

Through his academic work, Mr. Stokes has developed specialized knowledge of music theory, music history, and the structure of musical compositions. Ex. 2, 112:4-14; 113:2-18; 114:8-116-2. He is not only well-versed "in analyzing how lyrics and music interact," *id*. at 29:12-21, but he has also "stud[ied] music history for decades." *Id*. at 30:4-31:12. And, perhaps most notably for purposes of this case, Mr. Stokes has extensive knowledge of music technology and the use of generative AI tools in music composition. Rpt., ¶ 4.

**ARGUMENT**

Under *Daubert*, the Court's role is "to ensure that the [proffered] testimony is both relevant and reliable." *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1047 (9th Cir. 2025). As Publishers (at 6) point out, expert testimony is "reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). It is "'relevant if the knowledge underlying it has a valid connection to the pertinent inquiry.'" *Id.* "Challenges that go to the weight of the evidence," as well as "credibility determinations," are for the jury, *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022).

While Anthropic's three *Daubert* motions are narrowly tailored to this standard, each of Publishers' *seven* motions (one for every expert Anthropic disclosed) asks this Court to turn *Daubert* into a shotgun—one that blasts away any opinion Publishers find inconvenient to their positions.

ANTHROPIC'S OPP. TO MOT.                    - 2 -                    Case No. 5:24-cv-03811-EKL-SVK
TO EXCLUDE COLIN STOKES

**REDACTED PUBLIC VERSION**

Anthropic respectfully submits that this Court should reject Publishers' indiscriminate approach as inconsistent with the law, basic evidentiary principles, and common sense.

## I.    MR. STOKES'S OPINIONS REGARDING THE ROLE OF LYRICS IN A MUSICAL COMPOSITION ARE RELEVANT AND RELIABLE

### A.    Mr. Stokes's Opinions Are Relevant

Mr. Stokes's opinions about the relationship between lyrics and the other elements of a musical composition are directly relevant to this case because they will help the jury evaluate the facts underlying Anthropic's fair use defense.

The third fair use factor asks if "'the amount and substantiality of the portion used in relation to the copyrighted work as a whole'" "[is] reasonable in relation to the purpose of the copying." *Campbell v. Acuff-Rose Music*, 510 U.S. 569, 586 (1994). This issue of "'how much of the copyrighted work was copied'" is a "factual question[]" for the jury. *Google LLC v. Oracle America, Inc.*, 593 U.S. 1, 24 (2021) (internal quotation marks omitted). Here, the purportedly copyrighted works at issue are musical compositions, not standalone lyrics. Dkt. 337, ¶ 40. Accordingly, to assess the third factor, the jury must understand how lyrics relate to an overall musical composition. Mr. Stokes's opinions on that factual issue "logically advance[] a material aspect of [Anthropic's] case." *In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d 1102, 1127 (N.D. Cal. 2018) (quoting *Daubert v. Merrell Dow Pharma., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995)).

Publishers' two attacks on the relevance of Mr. Stokes's opinions are unavailing. *First*, Publishers wrongly argue (at 7-8) that the jury is "amply suited" to understand the interplay between lyrics and the other elements of a musical composition without expert testimony. Put simply, Publishers are seeking to keep potentially helpful information from the jury simply because (they claim) the jury might be able to figure it out if left to their own devices. Publishers cite no legal authority suggesting probative evidence should be excluded simply because the jury might already know something relevant on the same general topic. Regardless, Publishers are simply wrong that Mr. Stokes's expertise is common knowledge. Concord Music Group's *own 30(b)(6) witness* on the issue of the musical compositions (Mr. Berschback) conceded even he lacked the knowledge "to definitively say what all goes into the expression of the basic elements" of a musical composition.

**REDACTED PUBLIC VERSION**

Ex. 3, Duff Berschback Dep. (10/10/25), 23:4-25; Ex. 4, Ant.'s Rule 30(b)(6) Dep. Notice to Concord (8/8/25), at Topic 3. And Mr. Stokes has testified that many of his students "haven't considered these specific components of musical composition" like rhythm or melody before studying them in his class. Ex. 2, 66:6-23. Mr. Stokes's expert testimony is thus particularly important, as it explains "an issue [that] appears to be within the parameters of a layperson's common sense, but in actuality, is beyond their knowledge." *United States v. Finley*, 301 F.3d 1000, 1013 (9th Cir. 2002).

*Second*, Publishers contend (at 8) that Mr. Stokes's references to the "relative emotional 'value'" of lyrics will not be "helpful" to the fair use inquiry and thus must be excluded. Publishers' argument, however, asks this Court to adopt evidentiary tunnel vision. Mr. Stokes does not refer to the emotional or expressive nature of lyrics in the abstract. Rather, this opinion is part of his broader explanation about the role that various elements of a musical composition play in the ear of a listener. In his words, lyrics "derive much of their value and expression from their setting within the rest of the musical composition and take on particular meaning when paired with melody, harmony, instrumentation, and other compositional elements." Rpt., ¶ 17. This analysis is thus directly relevant to the factor three question about the "amount and substantiality" of the song lyrics that Claude uses as training data when compared to the musical composition as a whole.

## B.     Mr. Stokes's Opinions Are Reliable

Mr. Stokes's opinions about how lyrics and non-lyrical elements function within a musical work are reliable because the "'knowledge underlying [them] has a reliable basis in the knowledge and experience of the relevant discipline.'" *Engilis*, 151 F.4th at 1047. Specifically, Mr. Stokes's opinions are "grounded in the principles and methods of music theory" and rely on citations to peer-reviewed literature, among many other sources. Rpt., ¶ 19; *see* Ex. 2, 83:19-84:22 (similar). In addition, Mr. Stokes has extensive academic and professional experience analyzing musical compositions. Rpt., App'x A; Ex. 2, 11:22-12:22.

Publishers tellingly do not dispute Mr. Stokes's knowledge or experience. Rather, they argue (at 8) that Mr. Stokes's opinions are *automatically* unreliable because he purportedly did not identify the particular "methodology or metrics" that he was applying. But because Mr. Stokes is "not a

**REDACTED PUBLIC VERSION**

scientist," Ex. 2, 84:17-22, the "reliability" of his testimony "depends heavily on [his] knowledge and experience" "rather than the methodology or theory behind it." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004). As discussed, the depth of Mr. Stokes's "knowledge and experience" in the field of music theory is undisputed.

Publishers also contend that Mr. Stokes's opinions are unreliable because they are too "'subjective'" to "meaningfully challenge." Mot. 8 (quoting *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1046 (9th Cir. 2014)). But this argument once again wrongly asks this Court to apply the *Daubert* standard for "scientific" testimony to non-scientific testimony. *City of Pomona* instructs courts how to determine whether "a *scientific technique*" is reliable, holding that "there must be evidence in the record indicating the methodology 'can be or has been tested.'" 750 F.3d at 1046 (emphasis added). But as just discussed, *Hangarter* sets a different standard for non-scientific opinions, explaining that, "unlike scientific or technical testimony, the reliability of [the expert's] testimony [is] not contingent upon a particular methodology or technical framework," but rather on the expert's "knowledge and experience." 373 F.3d at 1018. Opinions from music industry experts fall squarely under the *Hangarter* test. *See S10 Ent. & Media LLC v. Samsung Elecs.*, 2023 WL 4317051, at *3 (C.D. Cal. Feb. 1, 2023) (applying *Hangarter* to opinions from a professor at Berklee College of Music with over 30 years in the music industry).

Publishers' argument (at 9 & n.2) that Mr. Stokes "inappropriately generalizes" his conclusions from a small set of examples fares no better. For example, Mr. Stokes's opinions about lyrics are not limited to the specific works in suit mentioned in his report. Rather, he discussed those 25 compositions, alongside other examples and scholarship, to illustrate his broader point that "lyrics alone are not sufficient to convey the same expression as the overall musical composition." Rpt., ¶¶ 17, 47. By the same token, Mr. Stokes's mentions of a handful of Claude interactions in his reply report are merely illustrative of the different ways in which Claude can be used "as a thought-starter and brainstorming partner for users interested in composition and songwriting." Dkt. 660-2, Stokes Reply, ¶ 20. When an expert has "extensive experience" in his field, there is nothing unreliable about "examples [that] are used as illustrations for his overall argument"—particularly

when those examples are "both illustrative of and based upon his relevant expertise." *Nat'l Fire Protect. Ass'n, Inc. v. UpCodes, Inc.*, 2023 WL 6194385, at \*3 (C.D. Cal. Sept. 7, 2023).

Finally, Publishers' assertion (at 8-9) that Mr. Stokes's opinions about music theory are "bogus" is meritless. Music theory is a discipline "based on centuries of … the analysis of Western music." Ex. 2, 87:9-88:4. Scholars like Mr. Stokes have "assigned over common practice specific meanings … to certain musical tropes or musical patterns, melodies, phrases, forms, [and] larger structures in music." *Id.* These common practices serve as a "baseline" that experts can use to analyze how composers structure their works and draw conclusions about the works' "emotional and narrative impact." *Id*. at 70:9-71:14. Contrary to their assertion (at 9), Publishers are not "prejudice[d]" by Mr. Stokes's opinions regarding the emotional and narrative impact of musical compositions. Indeed, Publishers easily could have called their own expert in music theory to address the same basic common practices in response to Mr. Stokes—they simply chose not to do so.

## II.    STOKES'S OPINIONS ABOUT HISTORICAL ADVANCES IN MUSIC TECHNOLOGY ARE RELEVANT AND APPROPRIATE

Mr. Stokes's testimony about the music industry's historical adaptation to new technologies is plainly relevant. Publishers themselves have asserted that the extent to which generative AI will enhance or diminish human creativity should be considered under the fourth fair use factor, which requires the jury to answer the "factual question[]" of "whether there was harm to the actual or potential markets for the copyrighted work." *Google*, 593 U.S. at 24. For example, Publishers' motion for summary judgment argues that Publishers should prevail on fair use because generative AI will "disincentivize future potential songwriters from creating new works." Dkt. 612 at 34 (quoting Moving Sep. Statement #205). More broadly, Publishers' experts and fact witnesses alike have repeatedly opined on █████████████████████████████████████████ ████ *E.g.*, Ex. 5, Expert Report of Michael D. Smith, ¶ 64; *see also* Ex. 6, Ben Zhao Dep. (2/20/26), 400:8-17 ("there's little dispute that these reports [of harm from generative AI] are real, that these harms are together today present today, not hypothetical, not speculative"); Ex. 7, David Kokakis Dep. (11/11/25), 339:15-340:1 (UMPG's corporate representative testifying that ████████████

**REDACTED PUBLIC VERSION**

██████████████████████ and ████████████████████████████████

████████████

Having taken a position on the broader impacts of generative AI, Publishers cannot reasonably bar Anthropic from refuting Publishers' views through Mr. Stokes's testimony. *E.g.*, *Montana Med. Ass'n v. Knudsen*, 2022 WL 10521245, at *3 (D. Mont. Oct. 18, 2022) (an expert's opinions were "relevant because … they concern[ed] [a] pertinent issue" in the case); *Hall v. Eads*, 2018 WL 9782165, at *3 (D. Ariz. July 25, 2018) (similar). At the very least, Anthropic is entitled to respond to those opinions now that Publishers have opened the door. *U.S. v. Sepulveda-Barraza*, 645 F.3d 1066, 1070 (9th Cir. 2011).

For example, Mr. Stokes explains that Publishers' "catastrophic prediction" is "speculative" because similar concerns have been invoked whenever "musicians and artists faced new technology." Rpt., ¶ 55. He also opines that generative AI tools "offer major benefits to creators in the music space," and provides numerous illustrations of situations where such tools have "transform[ed] composers' and songwriters' creative processes[.]" *Id.* ¶ 17; *see id.*, ¶¶ 66-83, ¶¶ 91-94. For example, LLMs like Claude can "help artists brainstorm ideas, work on melodies or chord progressions, collaboratively develop lyrics, or assist with many other aspects of music composition." *Id.* ¶ 68.

And Mr. Stokes discusses the long, productive relationship between musicians and machines—a historical record that corroborates his broader opinion that a technological leap is a net positive for the music industry. *E.g.*, Rpt., ¶¶ 17, 55, 65. For example, despite warnings that the player piano was "becoming a 'substitute for human skill, intelligence and soul,'" that technology "increase[d] access to music recordings in private homes" and "coexisted with some of the most important pianists and composers of the Western classical canon." *Id.* ¶ 58.

Publishers' arguments for why such testimony should be excluded once again betray their evidentiary tunnel vision—they simply ignore the direct linkages between Mr. Stokes's opinions and their own positions. Publishers (at 9-10) primarily try to diminish and belittle Mr. Stokes by suggesting his opinions are limited to fanciful topics like "Aelian [sic] Harps" and "Ancient Greek Instruments." These historical examples are a small part of Mr. Stokes's reports and are cited in

**REDACTED PUBLIC VERSION**

service of a much broader opinion about the productive relationship between musicians and technology. *See supra* pp. 6-7. And it is fundamental that "[e]xpert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010).

Publishers also (at 10) contend that Mr. Stokes's discussion of "AI technologies that produce music, sounds, and images" is irrelevant because Claude does none of those things. But Publishers' own motion for summary judgment warns against the supposed dangers of "AI-generated music" as part of the fair use factor four argument. Dkt. 612 at 34; *see also supra* pp. 6-7.

Finally, Publishers (at 9-10) make the remarkable assertion that Mr. Stokes's opinions about musicians adapting to technological change must be excluded under Rule 403. But that rule only permits exclusion of testimony when (as relevant here) its probative value is "substantially outweighed" by the danger of "*unfair* prejudice." Fed. R. Evid. 403. And Publishers fail to articulate (at 9) any reason why Mr. Stokes's opinions create the danger of *unfair* prejudice simply because he purportedly "suggest[s] that the music industry is habitually predisposed to resist technology."

To be clear, Publishers are wrong—Mr. Stokes is himself a part of the music industry and his reports go out of their way to praise the ingenuity of music-makers who embraced technological developments throughout history. *E.g.*, Rpt. ¶¶ 60, 63-64. But even if Publishers had accurately characterized Mr. Stokes's position, the fact that they dislike or disagree with his opinions does not render those opinions inadmissible. After all, "'[r]elevant evidence is inherently prejudicial.'" *See United States v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000). If Publishers believe Mr. Stokes is wrong, they are free to raise their concerns on cross-examination. What they cannot do is use *Daubert* as a tool to prevent the jury from hearing those reasonable and reliable opinions at all.

**CONCLUSION**

For the foregoing reasons, the Court should deny Publishers' motion.

**REDACTED PUBLIC VERSION**

Date: July 27, 2026

/s/ Sonal N. Mehta

LOUIS W. TOMPROS (*Pro Hac Vice*)
louis.tompros@wilmerhale.com
DISHA PATEL (*Pro Hac Vice*)
disha.patel@wilmerhale.com
**WILMER CUTLER PICKERING**
**HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6220

ARI HOLTZBLATT (SBN 354361)
ari.holtzblatt@wilmerhale.com
ROBIN C. BURRELL (*Pro Hac Vice*)
robin.burrell@wilmerhale.com
**WILMER CUTLER PICKERING**
**HALE AND DORR LLP**
2100 Pennsylvania Ave, NW
Washington, DC 20037
Telephone: (202) 663-6000

SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
**WILMER CUTLER PICKERING**
**HALE AND DORR LLP**
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

TAYLOR GOOCH (SBN 294282)
taylor.gooch@wilmerhale.com
**WILMER CUTLER PICKERING**
**HALE AND DORR LLP**
50 California Street
San Francisco, CA 94111
Telephone: (628) 235-1000

JARED V. GRUBOW (*Pro Hac Vice*)
jared.grubow@wilmerhale.com
**WILMER CUTLER PICKERING**
**HALE AND DORR LLP**
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Defendant*
**ANTHROPIC PBC**