**REDACTED PUBLIC VERSION**

SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

TAYLOR GOOCH (SBN 294282)
taylor.gooch@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
50 California Street
San Francisco, CA 94111
Telephone: (628) 235-1000

JARED V. GRUBOW (*Pro Hac Vice)*
jared.grubow@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

LOUIS W. TOMPROS (*Pro Hac Vice*)
louis.tompros@wilmerhale.com
DISHA PATEL (*Pro Hac Vice*)
disha.patel@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

ARI HOLTZBLATT (SBN 354361)
ari.holtzblatt@wilmerhale.com
ROBIN C. BURRELL (*Pro Hac Vice*)
robin.burrell@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2100 Pennsylvania Ave, NW
Washington, DC 20037
Telephone: (202) 663-6000

*Attorneys for Defendant*
**ANTHROPIC PBC**

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., ET AL.,<br><br>               Plaintiffs,<br><br>   v.<br><br>ANTHROPIC PBC,<br><br>               Defendant. | Case No. 5:24-cv-03811-EKL-SVK<br><br>**ANTHROPIC'S OPPOSITION TO PUBLISHERS' MOTION TO PARTIALLY EXCLUDE EXPERT TESTIMONY OF ETHAN LUSTIG**<br><br>Hearing Date: October 21, 2026<br>Time: 10:00 a.m.<br>Judge: Hon. Eumi K. Lee |

**REDACTED PUBLIC VERSION**

**INTRODUCTION**

Dr. Ethan Lustig is a forensic musicologist. His expertise is in the specialized field of comparing music for signs of copying. While he has served as an expert in high-profile copyright cases, he also teaches subjects including music theory and lyric writing in his day job as a professor.

As relevant here, Dr. Lustig responds to the opinions of three of Publishers' experts—a linguist (Dr. Robert Leonard) and two computer scientists (Dr. Ben Zhao and Dr. Shawn Shan)—all of whom opined on music without having any musical background whatsoever. Dr. Lustig used his expertise to correct the linguist's approach for comparing lyrics to Claude outputs. Dkt. 658-2, Lustig Rebuttal Report ("Rebuttal"), §§ III, IV. Dr. Lustig also rebutted the computer scientists' opinions that lyrics are a "unique" type of text, explaining that all songs written in English share a certain level of similarity. Dkt. 658-3, Lustig Reply Report ("Reply"), § IV.

Publishers' *Daubert* challenges largely repeat one underlying argument: Because Dr. Lustig is not a linguist, he cannot conduct a lyrical analysis. *See e.g.*, Mot. 4, 5, 8.[1] But this case concerns *song lyrics*. That Publishers chose to proffer an expert in linguistics to opine on song lyrics does not mean that *only* linguists are qualified. Publishers cannot insulate their expert from criticism simply by proffering someone with marginally relevant expertise.

In reality, Publishers themselves expressly acknowledged in another filing that "an expert in musicology" is qualified to opine on "music lyrics." Dkt. 656 at 9 (criticizing Dr. Bray for providing an opinion that would purportedly "require 'an expert in music lyrics'" when "as Dr. Bray acknowledged, he is not an expert in musicology or song lyrics"). And Publishers tellingly do not identify a single case where a court has barred a musicologist from testifying about musical lyrics.

Ultimately, Publishers' disagreements with Dr. Lustig's substantive conclusions are at best grounds for cross-examination, not exclusion. Publishers' motion should be denied.

---

[1] Unless otherwise noted, 'Mot.' refers to Publishers' motion (Dkt. 658); 'Ex.' citations refer to exhibits to the Declaration of Robin Burrell submitted herewith; emphasis is added; and internal citations, quotations, and objections are omitted throughout.

REDACTED PUBLIC VERSION

## BACKGROUND

Dr. Lustig holds three degrees in music theory, including a Ph.D. from the Eastman School of Music. Rebuttal ¶ 1. He is primarily a university professor who specializes in comparing and analyzing musical passages. *Id*. His work has been featured in *Rolling Stone* and he has been a consulting expert in numerous copyright cases since 2020 involving performing artists ranging from Bad Bunny to Mary J. Blige. *Id.* ¶ 1, App'x 1 at 3-4; Ex. 1, Ethan Lustig Dep. (3/4/26) 12:24-14:3.

## ARGUMENT

Under *Daubert*, the Court's role is "to ensure that the [proffered] testimony is both relevant and reliable." *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1047 (9th Cir. 2025). Expert testimony is "reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). It is "'relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *Id.* "'Challenges that go to the weight of the evidence,'" as well as "'credibility determinations,'" are for the jury, *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022), and rebuttal testimony may be offered to "explain[], repel[], counteract[], or disprove[]" an opposing expert's analysis," *Laatz v. Zazzle, Inc.*, 2025 WL 3205586, at *14 (N.D. Cal. Nov. 17, 2025) (citation omitted).

While Anthropic's three *Daubert* motions are narrowly tailored to this standard, each of Publishers' *seven* motions (targeted at every expert Anthropic disclosed) asks this Court to turn *Daubert* into a shotgun—one that blasts away any opinion Publishers find inconvenient to their positions. Anthropic respectfully submits that this Court should reject Publishers' indiscriminate approach as inconsistent with the law, basic evidentiary principles, and common sense.[2]

---

[2] As an example of the parties' different approaches to conservation of judicial resources, Anthropic will agree not to offer Dr. Lustig's opinion about "parodic intent," *compare* Rebuttal ¶ 36 *with* Mot. 9-10, even though Anthropic strongly disagrees with Publishers' arguments.

## I.    DR. LUSTIG IS QUALIFIED TO MODIFY DR. LEONARD'S LYRIC ANALYSIS METHODOLOGY

### A.    Summary Of Dr. Lustig's Opinions In Response To Dr. Leonard

Publishers' expert Dr. Leonard is a generalist linguist who has never offered an expert opinion in a case involving lyrics. Ex. 2, Robert Leonard Dep. (2/27/26) 19:24-20:11. He was retained by Publishers to provide an analysis of the overlap between the alleged lyrics from the 499 songs at issue and certain Claude outputs. Ex. 3, Leonard Rpt. ¶¶ 30-31.[3] Dr. Leonard's report divided the data he reviewed into six categories: █████████████████████ ██████████████████████ *Id.* ¶ 35.

Dr. Lustig's rebuttal report identified significant issues with several of Dr. Leonard's categorizations and, using those categories as a baseline, modified them to better fit how an expert in music analyzes similarities between lyrics. Rebuttal §§ III, IV.

For example, Dr. Lustig combined Dr. Leonard's █████████████ categories into a single category ("different") because the two categories both refer to "lyrics that are non-similar between the two datasets." Rebuttal ¶¶ 9-10. By color-coding two categories for dissimilar lyrics, but only one category for purported ██████ copying, Dr. Leonard's approach "visually downplays the weight of the non-similar lyrics." *Id.* ¶ 9. The two images below illustrate this distinction when applied to the same alleged input from LyricFind. The one on the left uses Dr. Leonard's coding (green for ██████, red for ██████, and blue for ██████) while the one on the right uses Dr. Lustig's modified approach (green for verbatim, red for different): Rebuttal ¶ 9.



And I spent a lot of time
The trip we made to Hollywood
Is etched upon my mind
After all the things we've done and seen
You find another man

---

[3] Because Dr. Lustig is responding to Dr. Leonard's work, Dr. Lustig followed Dr. Leonard's approach of using the lyrics that appear on the "LyricFind" website rather than those that can be heard or which are shown in the deposit copies of the copyrighted musical works. As Anthropic has explained, Publishers erred by relying on LyricFind. Dkt. 687 at 37-38.

Dr. Lustig also broadened Dr. Leonard's ███████████ category and renamed it "long-range verbatim." Rebuttal ¶ 14. Dr. Leonard defined ██████████ as ████████ ████████████████████████████████████████████ ████████████████████████████ Ex. 3, ¶ 35. As modified, the "long-range verbatim" category better accounts for the way songs are usually structured. It includes instances where the same words or passages appear in both Publishers' claimed lyrics and Claude's output but are more than four lines apart—the "typical minimum unit for a stanza" or a section like a "Verse, Chorus, Pre-Chorus" in a song. Rebuttal ¶ 14.

Dr. Lustig's analysis also eliminated the ██████████ category, which Dr. Leonard described as capturing differences in ████████████████████████ between the copyrighted lyrics and Claude's outputs. Ex. 3, ¶ 35; Rebuttal ¶¶ 11-12. Dr. Lustig explained that the category was fundamentally "unnecessary" because lyrics are "heard rather than read." Rebuttal ¶ 11; Ex. 1, 56:7-13. For example, a listener cannot distinguish between the lyrics "I'm" and "Im" (or "Word" and "word") in the same way a reader would for non-lyric text. Rebuttal ¶ 11.

Dr. Lustig then performed his own (qualitative) overlap analysis using four categories: "Local Verbatim, Long-Range Verbatim, … Near-Verbatim," or "Different." Rebuttal ¶¶ 21, 29; *see id.* ¶ 26 (applying modified categories to 45 prompt and output pairings).

### B.    Publishers' Arguments Go To Weight, Not Admissibility

Publishers do not dispute that Dr. Lustig is qualified to "assess[] similarity between two pieces of music." Mot. 4. Instead, they attempt to draw the thinnest line in the sand imaginable, arguing Dr. Lustig's opinions are inadmissible because he is not qualified to critique a "linguistics-based" analysis of musical lyrics. Mot. 4. Publishers' arguments fail for two reasons.

*First*, Publishers take the unsustainable position (at 3-5) that Dr. Lustig (undisputedly an expert in music) is automatically unqualified to testify about Dr. Leonard's approach to *musical* lyrics because Dr. Lustig is not a linguist. Publishers cannot prevent Anthropic's expert forensic musicologist from criticizing their arguments about musical lyrics simply by presenting an expert on the study of language rather than music. It is entirely "proper" for a rebuttal expert to

"explain[], repel[], counteract[] or disprove[]" an opposing expert's analysis "even if the rebuttal expert's specific field of expertise is different from the original expert's." *Laatz*, 2025 WL 3205586 at *14. The "relevant inquiry is not, as Plaintiff[s] suggest[], whether [the rebuttal expert's] qualifications are sufficiently analogous" but "whether [Dr. Lustig's] opinions would be responsive to Dr. [Leonard's]." *Id.* For the same basic reason, Publishers' argument (at 4) that Dr. Lustig employed a different methodology than he used in his prior lyrics case also fails—his analysis is "a response to Leonard's[.]" Ex. 1, 38:8-18.

Here, Publishers provide no meaningful explanation for why an expert in comparing musical compositions cannot reliably critique lyrics, which are an element of those compositions. In fact, the jury may determine that the appropriate comparison is by a musicologist and ***not*** a linguist, and may decide to credit Dr. Lustig's methodology over Dr. Leonard's. *Cf. HP Tuners, LLC v. Cannata,* 2023 WL 1071782, at *5 (D. Nev. Jan. 27, 2023) (whether one methodology is "better or worse than another" is a matter for "cross-examination and presentation of contrary evidence").

This is especially true because Publishers themselves put broader music theory at issue in this case by alleging the infringement of copyright in 499 "musical compositions." Dkt. 337, ¶¶ 4, 40-50. Publishers have never even ██████████████████████████████ alone. *See e.g.*, Ex. 4, Kent Draughon Dep. (11/5/25) 50:13-17; Ex. 5, Alisa Coleman Dep. (10/29/25) 54:3-24; Ex. 6, David Kokakis Dep. (11/11/25) 85:9-87:14. Moreover, musicologists frequently serve as experts assessing the similarity between lyrical texts. *See, e.g.*, *Batts v. Adams*, 2011 WL 13217923, at *6 (C.D. Cal. Feb. 8, 2011) (expert musicologist concluding that two musical works "d[id] not share any … lyrical similarities."); *Connor Bowen v. Paisley*, 2016 WL 4480165, at *6 (M.D. Tenn. Aug. 25, 2016) (noting expert musicologist analyzed similarities and "structural, harmonic, rhythmic, melodic, and lyrical dissimilarities."). Notably, at least one court has refused to disqualify a musicologist simply because they are not "literary expert[s]." *Hall v. Swift*, 2021 WL 6104160, at *5 (C.D. Cal. Dec. 9, 2021).

*Second*, Publishers (at 4-5) criticize discrete aspects of Dr. Lustig's modified categories, primarily relying on their own expert's reply report. But one expert's disagreement with another is

not grounds for exclusion under *Daubert*. "[C]onflicting expert testimony" is "best settled by a battle of the experts before the fact finder, not by judicial fiat." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014). Ultimately, "[i]t will be for the jury to decide [which expert's] methodology is the proper one to use[.]" *People v. Kinder Morgan Energy Partners, L.P.*, 159 F. Supp. 3d 1182, 1190 (S.D. Cal. 2016).

Publishers' specific objections to Dr. Lustig's conclusions (at 4-5) prove the point. Each critique is lifted from Dr. Leonard's Reply Report and reflects methodological disagreement rather than a reliability issue. For example, Publishers argue that Dr. Lustig should have retained ████████ as a category because a song's use of "nonstandard spellings and colloquial or informal style" can be significant. Mot. 5 (citing Ex. 7, Leonard Reply ¶¶17-18). But as explained, Dr. Lustig has opined that ████████ is immaterial for song lyrics because they are meant to be "heard rather than read," Rebuttal ¶ 11. Publishers also contend that Dr. Lustig's decision to eliminate the ████████ category ignores "repetition due to song structure," Mot. 5 (citing Ex. 7, ¶¶19-20). But Dr. Lustig's "long-range verbatim" category was created precisely to capture structural repetition. Rebuttal ¶ 14. Finally, Publishers argue Dr. Lustig combined Leonard's ████████ categories to "obscure evidence of copying" Mot. 5 (citing Ex. 7, ¶¶ 30-33). But that charge rests on a single ████████ ████████, which Dr. Lustig—despite using his own modified methodology— nonetheless concluded was "mostly similar" to the relevant output. Rebuttal App'x 4 at 1 (Ex. 8, Anthropic_0000040992) Whether Dr. Lustig's methodology is superior to Dr. Leonard's is ultimately a matter reserved for the jury. *City of Pomona*, 750 F.3d at 1049.

## II.   DR. LUSTIG'S SIMILARITY CALCULATIONS ARE RELIABLE AND HELPFUL

### A.   Summary Of Dr. Lustig's Opinions In Response To Dr. Leonard

After correcting Dr. Leonard's categories, Dr. Lustig used those categories to calculate a quantitative "similarity value" between the claimed lyrics and Claude's outputs. Rebuttal ¶¶ 27, 33, App'x 2 & 4. He first broke down each set of lyrics and outputs into syllables to provide a "more balanced measure" for assessing similarity because "[w]ord counts can be misleading because some words are much longer than others." *Id.* ¶ 28. He then counted the number of

syllables in each set, labeling the "Local Verbatim, Long-Range Verbatim, and Near-Verbatim" categories as "similar" and the remainder as "different." *Id*. ¶ 29.

As a final step, Dr. Lustig calculated the similarity value for each set of outputs/lyrics with the following formula, which he noted is "in line with the existing research literature":

$$\text{similarity value} = \frac{(n \text{ of similar syllables in LyricFind}) + (n \text{ of similar syllables in Claude})}{(\text{total } n \text{ of syllables in LyricFind}) + (\text{total } n \text{ of syllables in Claude})}$$

*Id*. ¶ 30 & n.19 (citing Ex. 9, Savage et al., *Quantitative Evaluation of Music Copyright Infringement,* Proceedings of the 8th International Workshop on Folk Music Analysis (June 2018)). Dr. Lustig found that more than 82% of the outputs he considered were "strongly different from the allegedly infringed lyrics." *Id*. ¶¶ 8, 34.

### B.     Publishers' Arguments Again Go To Weight, Not Admissibility

Publishers (at 5-7) raise similar challenges to Dr. Lustig's similarity opinions that they raised to his categories opinions. Those arguments fail for the same basic reasons already discussed.

*First*, Publishers are wrong (at 5) that Dr. Lustig "lacks expertise" to critique Dr. Leonard's categories-based approach merely because he is an expert in musicology and not linguistics, *see supra* pp. 4-5.

*Second*, Publishers (at 6) contend that Dr. Lustig's opinions are unreliable or at least "inapplicable" because they are overly focused on "*musical* similarity" rather than "*lyrical* similarity." But Publishers do not identify any source—not even their own expert—who is willing to slice the bologna that thin when it comes to threshold admissibility determinations. In fact, Publishers themselves alleged that the relevant works were "musical compositions" (not lyrics), *supra* p. 5, and Publishers' *Daubert* briefing treats "an expert in musicology" as a synonym for "an expert in music lyrics," Dkt. 656 at 9.

Publishers relatedly try to distinguish the *Quantitative Evaluation* paper that Dr. Lustig cited because it involved a comparison of "*melodic* sequences" rather than "lyrical sequences," Mot. 6 (emphasis in original). But they provide no reason why this distinction should matter. Dr. Lustig applied his broad expertise in matters including "music theory and music cognition" in all

ANTHROPIC'S OPP. TO MOT.               - 7 -               Case No. 5:24-cv-03811-EKL-SVK
TO EXCLUDE ETHAN LUSTIG

of his opinions, Rebuttal ¶ 5, and both melody and lyrics are individual components of a broader musical composition, *see, e.g.*, *Swirsky v. Carey*, 376 F.3d 841, 849 (9th Cir. 2004).

*Third*, Publishers (at 6-7) contend that Dr. Lustig's opinions will "not assist" the jury in understanding the relationship between lyrics and outputs. But whether two works are substantially similar is an integral part of the infringement analysis and is "measured by considering the qualitative and quantitative significance" of the alleged copying "in relation to the plaintiff's work as a whole." *Newton v. Diamond*, 388 F.3d 1189, 1195 (9th Cir. 2004) (discussing test for substantial similarity). Dr. Lustig's opinions on that issue "logically advance[] a material aspect of [Anthropic's] case." *In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d 1102, 1127 (N.D. Cal. 2018) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995)).

Publishers also implicitly suggest (at 6-7) that their expert's opinions are more useful than Dr. Lustig's. But whether Dr. Leonard more fully accounts for issues like ▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ is precisely the kind of granular, merits-based argument that has no place in the *Daubert* inquiry's focus on reliability and relevance. It is for the jury to resolve the ultimate question of whether "the ordinary, reasonable person would find the total concept and feel of the works to be substantially similar" to the specific work claimed to be infringed. *Williams v. Gaye*, 895 F.3d 1106, 1119 (9th Cir. 2018).

*Finally*, Publishers (at 7) suggest that Dr. Lustig's opinions violate the Ninth Circuit's *Swirsky* decision by focusing only on a syllable-by-syllable comparison of the outputs and the copyrighted works without "consider[ing] the elements of the song in combination." Dr. Lustig's category modifications *do* account for other musical elements, such as "pitch, rhythm, harmony, and how those words fit within the overall musical structure." *See, e.g.*, Rebuttal ¶¶ 14, 17-20, 24. In any event, Dr. Leonard's own opinions cannot stand under Publishers' test because he takes the same "bean-counting" approach (at 7) of considering only lyrics and not the other elements of a musical composition. Ex. 3, ¶ 30. Publishers cannot reasonably complain about Dr. Lustig's methodology while proffering Dr. Leonard's.

REDACTED PUBLIC VERSION

## III.  DR. LUSTIG'S BASELINE SIMILARITY ANALYSIS IS RELIABLE AND HELPFUL

### A.  Summary Of Dr. Lustig's Opinions In Response To Dr. Zhao and Dr. Shan

In addition to rebutting Dr. Leonard's analysis, Dr. Lustig filed a separate report (labeled for procedural reasons as a "reply") that responded to opinions offered by Publishers' technical experts. Reply ¶ 12. Specifically, Dr. Zhao, who is neither a linguist nor a musicologist, asserted in his report that ████████████████████████████████████████ ████████████ Ex. 10, Zhao Rebuttal ¶ 103. Dr. Shan, a computer scientist who is also neither a linguist nor a musicologist, similarly suggested that a musical group's lyrics could ████ ████████ Ex. 11, Shan Rebuttal ¶ 40.

In response to those opinions, Dr. Lustig conducted a statistical analysis to determine the extent to which two randomly paired sets of English song lyrics are similar. Reply ¶ 12. To establish this "baseline similarity" number, Dr. Lustig used an online tool called *Random Song Generator* to identify 30 random pairs of English language songs. Reply ¶ 13 & n.15. While Dr. Lustig acknowledged the limitations of the underlying website (it did not provide a truly "random" sampling of English songs because "it generates highly popular artists, with a tendency towards current releases"), he explained it was "the best tool available at the time" and "offered many pairings of songs from truly opposing genres that stress-test the model." *Id*.

Dr. Lustig then analyzed the pairs of lyrics using the categories and similarities opinions already discussed. *See supra* pp. 3-4, 6-8. He ultimately concluded that English language lyrics will have an average similarity score of around 6.0% with a range between 0.4% and 18.9%. Reply. ¶ 14. These similarities are due to the "common properties of the English language, of lyric writing, [or] genre constraints." *Id*.

### B.  Dr. Lustig's Opinions Were Proper Rebuttal

Publishers remarkably do not even mention that Dr. Lustig's analysis was a direct response to their own experts. Once Publishers' experts opened the door to whether lyrics are unique pieces of text, it was well within Dr. Lustig's purview to "explain[], repel[], counteract[] or disprove[]" that analysis. *Laatz*, 2025 WL 3205586, at *14. Here, Dr. Lustig used the "best tool available" to show why Publishers' experts were wrong, explained his (reasonable) reasoning at every step of

**REDACTED PUBLIC VERSION**

the way, and rooted his broader analysis in his "formal education, academic research … professional industry experience … , pedagogical experience … and [his] professional experience as a forensic musicologist." Reply ¶ 4. That is exactly what *Daubert* requires.

Publishers' arguments to the contrary are meritless. *First*, Publishers again (at 8) challenge Dr. Lustig's underlying categories and similarity opinions. Those arguments fail for the reasons discussed above. *Supra* pp. 4-8.

*Second*, Publishers contend (at 8) that Dr. Lustig's baseline-similarity opinions should be rejected because his approach is supposedly "completely unorthodox." But again, Dr. Lustig was responding to Dr. Zhao's unorthodox and ungrounded statements about musical lyrics' purported ███████████ *See* Reply ¶ 11. Publishers cannot reasonably complain that Dr. Lustig was forced to develop an innovative approach to meaningfully respond. *Cf. Huawei Techs., Co., Ltd. v. Samsung Elecs. Co., Ltd.*, 340 F. Supp. 3d 934, 996 (N.D. Cal. 2018) (noting that "[t]he proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party"). Had Dr. Lustig matched Dr. Zhao's approach by disagreeing without providing any underlying reasoning, Publishers doubtlessly would have still sought to exclude Dr. Lustig's opinion as insufficiently explained.

*Finally*, Publishers contend (at 8-9) that Dr. Lustig's baseline similarity opinion is not reliable because the *Random Song Generator* is "not [] truly random." While Publishers are free to raise that point on cross-examination, it hardly renders Dr. Lustig's analysis inadmissible. Dr. Lustig raised this issue himself and expressly disclosed that no perfect tool existed for generating random songs, but that the *Random Song Generator* was sufficiently random to disprove Dr. Zhao's and Dr. Shan's opinions on lyrical uniqueness. *See supra* p. 9; *accord* Ex. 1, 112:12-114:25. Publishers' experts opened the door to precisely this kind of analysis. Dr. Lustig merely accepted their invitation.

**CONCLUSION**

For the foregoing reasons, the Court should deny Publishers' motion.

**REDACTED PUBLIC VERSION**

Date: July 27, 2026                    /s/ Sonal N. Mehta

LOUIS W. TOMPROS (*Pro Hac Vice*)
louis.tompros@wilmerhale.com
DISHA PATEL (*Pro Hac Vice*)
disha.patel@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6220

ARI HOLTZBLATT (SBN 354361)
ari.holtzblatt@wilmerhale.com
ROBIN C. BURRELL (*Pro Hac Vice*)
robin.burrell@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2100 Pennsylvania Ave, NW
Washington, DC 20037
Telephone: (202) 663-6000

SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

TAYLOR GOOCH (SBN 294282)
taylor.gooch@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
50 California Street
San Francisco, CA 94111
Telephone: (628) 235-1000

JARED V. GRUBOW (*Pro Hac Vice*)
jared.grubow@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Defendant*
**ANTHROPIC PBC**