**<u>REDACTED PUBLIC VERSION</u>**

SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

TAYLOR GOOCH (SBN 294282)
taylor.gooch@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
50 California Street
San Francisco, CA 94111
Telephone: (628) 235-1000

JARED V. GRUBOW (*Pro Hac Vice)*
jared.grubow@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

LOUIS W. TOMPROS (*Pro Hac Vice*)
louis.tompros@wilmerhale.com
DISHA PATEL (*Pro Hac Vice*)
disha.patel@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

ARI HOLTZBLATT (SBN 354361)
ari.holtzblatt@wilmerhale.com
ROBIN C. BURRELL (*Pro Hac Vice*)
robin.burrell@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2100 Pennsylvania Ave, NW
Washington, DC 20037
Telephone: (202) 663-6000

*Attorneys for Defendant*
**ANTHROPIC PBC**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

CONCORD MUSIC GROUP, INC., ET AL.,

Plaintiffs,

v.

ANTHROPIC PBC,

Defendant.

Case No. 5:24-cv-03811-EKL-SVK

**ANTHROPIC'S OPPOSITION TO PLAINTIFFS' MOTION TO PARTIALLY EXCLUDE THE OPINIONS OF JULIE DAVIS**

Hearing Date: October 21, 2026
Time: 10:00 AM
Judge: Hon. Eumi K. Lee

**REDACTED PUBLIC VERSION**

Julie Davis is a Certified Public Accountant with decades of experience evaluating and testifying about intellectual property damages. Here, Ms. Davis analyzed financial data to assess Anthropic's revenues and profits, Publishers' purported financial harm, and the proportionality of Publishers' claimed statutory damages to actual damages and profits. This type of expert damages testimony is routinely admitted in intellectual property cases.

Publishers nonetheless seek to exclude Ms. Davis's testimony as "lay" testimony. But their characterization of Ms. Davis's opinions is wrong. Ms. Davis provided detailed analysis that calculated and apportioned Anthropic's revenues and profits, evaluated damages related to Publishers' purported Digital Millenium Copyright Act (DMCA) claim, and evaluated whether Publishers' financial data supported their claim that there had been harm to the market for licensing the lyrics of the Asserted Works. Publishers' motion appears driven not by legitimate *Daubert* considerations, but by Publishers' decision not to engage their own expert to compute damages. Throughout discovery, Publishers refused to provide *any* Rule 26 damages computation, insisting repeatedly to the Court that disclosure of any damages computation or methodology was "premature" because "the process of ***calculating damages will require expert analysis*** to complete." Dkt. 430 at 6. After using the need for expert analysis as a shield in discovery, Publishers then elected to forego any expert analysis, and simply used a lawyer-drafted interrogatory response to calculate statutory damages. Publishers now double down on their gamesmanship, seeking to exclude ***all*** expert financial testimony. Mot. 5.[1]

Publishers' strategic decision to use a lawyer-written discovery response to tally statutory damages—one untethered from the considerations that inform statutory damages, including "a plausible relationship to [Publishers'] actual damages"—cannot limit Anthropic from providing expert testimony on the range of possible damages in this case. *Michael Grecco Prods., Inc. v. Enthusiast Gaming, Inc., No.* 2020 WL 7227199, at *10 (N.D. Cal. Dec. 8, 2020). The financial information produced by both parties in this case is complex and requires expert analysis to sort out. That analysis is indisputably helpful to the jury and properly the province of a financial expert. Ms.

---

[1] Unless otherwise noted, 'Mot.' refers to Publishers' motion (Dkt. 657); 'Ex.' citations refer to the Declaration of Robin Burrell submitted herewith; emphasis is added; and internal citations, quotations, and objections are omitted throughout.

Davis has done precisely this "expert analysis" (as she has done in many cases before); her opinions are unquestionably admissible.

## BACKGROUND

Ms. Davis is a financial consultant and CPA with nearly fifty years of experience. *See* Dkt. 657-2 at 1 ("Rpt."). She has conducted complex studies of damages and intellectual property portfolios, including analysis of lost sales, lost profits, incremental profits, and licensing regimes. *Id.* And she has provided testimony in more than 80 jury trials, including in some of the most significant IP disputes of this era. Publishers do not challenge Ms. Davis's qualifications to offer the opinions at issue, nor could they.

During discovery, Publishers refused to disclose any damages computation or methodology, insisting that it would "require expert analysis." Dkt. 430 at 6. The Court accepted that representation and allowed that "[i]t may be that actual computation of certain categories of actual or statutory damages must await expert reports." Dkt. 434 at 3. But Publishers did not provide any computation of damages in their opening expert disclosure. Instead, in January 2026, two months after the close of fact discovery and a month ***after*** opening reports, Publishers served an interrogatory response providing their first computation of damages, seeking "the maximum statutory damages of $74,850,000" (sum of 499 works in suit multiplied by $150,000) for their claims arising under the Copyright Act and "maximum statutory damages of $45,225,000" for their Digital Millenium Copyright Act (DMCA) claim (sum of the 1,309 alleged violations multiplied by $25,000). Ex. 2, (Pls.' Resp. & Objs. to Def.'s Interrog. No. 2 (01/15/26)). Notably, Publishers still presented no calculation of actual damages. Instead, this late-served interrogatory response purported to reserve the right to seek "actual damages," including "lost licensing income," "the loss of the underlying value of and demand for Publishers' works," "and harm to the market for Publishers' works and market dilution in the form of market substitutes that will compete with Publishers' musical compositions in the market." *Id.* at 8.  It also claimed that Publishers "intend to demonstrate Anthropic's profits attributable to the unauthorized use of their works," but offered no calculation. *Id.* at 10. Even to this day, Publishers have not provided *any* evidence or calculation of damages apart from their January 2026 interrogatory response, which simply multiplied the number

**REDACTED PUBLIC VERSION**

of works in suit by the maximum statutory damages amount.

Ms. Davis is the only expert in this case to have analyzed damages at all. Across her opening, rebuttal, and reply reports, she explains why Publishers have not proven any damages—and Publishers have offered no expert calculation of their own. In calculating statutory damages, the jury may be asked to consider, among other things, "1. the revenue lost by the copyright holder as a result of the infringement; 2. The profits earned by the defendant as a result of the infringement." Ex. 3, 2 (9th Cir. Model Jury Instruction 17.37). Ms. Davis's analysis directly addresses those issues.

First, Ms. Davis provided an apportionment analysis to determine which gross revenues could arguably be attributed to the accused infringement. Ms. Davis considered apportionment related to both Publishers' claim that Anthropic infringes Publishers' works in training its large language model and their claim that Anthropic infringes through its models' output of copies of Publishers' works. Ms. Davis provided an alternative apportionment analysis based on avoided costs by calculating the cost of obtaining and destructively ingesting each of Publishers' works through the purchase of sheet music. Next, Ms. Davis analyzed the Publishers' revenue data to determine whether that data supported their claim that there had been harm to the licensing market, as Publishers define it. Finally, eight days after Publishers first disclosed their counsel's computation of statutory damages, Ms. Davis analyzed the proportionality of those claimed statutory damages and provided an alternate calculation of statutory damages.

Each of Publishers' four arguments for exclusion rests on the same flawed assumption: that if Publishers have decided to present their alleged damages through lawyer argument, Anthropic must do the same. But each of the opinions Ms. Davis offers is helpful to the jury, is based on reliable methodologies that Ms. Davis developed based on her decades of experience, and is of the type of intellectual property damages analysis that is routinely admitted. Her analysis involved time-intensive analysis and assessment of revenue data and licensing agreements that go far beyond what Publishers dismissively deem "basic arithmetic."

**ARGUMENT**

Under Daubert, the Court's role is "to ensure that the [proffered] testimony is both relevant and reliable." *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1047 (9th Cir. 2025). Expert testimony is

"reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). The Court excludes expert testimony under Rule 702(b) if it is not "based on sufficient facts or data." *Engilis*, 151 F.4th at 1055. "Challenges that go to the weight of the evidence," as well as "credibility determinations," are for the jury. *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022).

While Anthropic's three *Daubert* motions are tailored to this standard, each of Publishers' *seven* motions (one for every expert Anthropic disclosed) ask this Court to turn the *Daubert* standard into a shotgun—one that blasts away any opinion Publishers find inconvenient to their merits positions. Anthropic respectfully submits that this Court should reject Publishers' indiscriminate approach as inconsistent with the law, basic evidentiary principles, and common sense.

## I.    MS. DAVIS'S APPORTIONMENT OPINIONS ARE ROOTED IN EXPERTISE AND ARE NOT "BASIC ARITHMETIC"

Publishers' dismissive claims that Ms. Davis's apportionment calculations are nothing more than "basic arithmetic" are misplaced. To begin, all of Ms. Davis's opinions and calculations are relevant to the assessment of potential Copyright Act damages. To recover an alleged infringer's profits under § 504(b), a copyright plaintiff must present evidence of gross revenue (and a causal nexus between the infringement and revenue if the profit is indirect), and the defendant can respond with evidence of expenses and the elements of profit attributable to the alleged infringement. *Oracle Am., Inc. v. Google Inc.*, 2016 WL 2342365, at *4 (N.D. Cal. May 3, 2016). And, where, as here, a copyright plaintiff has claimed statutory damages, "the profits earned by the defendant as a result of the infringement" is a relevant factor for the jury's consideration in assessing the amount of damages. Ex. 3.

Because Publishers continue to maintain their claim to Anthropic's profits under § 504(b), and because Publishers have expressly claimed statutory damages, Ms. Davis provided three apportionment calculations directed to Anthropic's profits: (1) an analysis using evidence of the number of training tokens associated with the Asserted Works, (2) an avoided cost analysis based on the purchase and ingestion of sheet music to train Anthropic's models, and (3) an analysis of

profits associated with allegedly infringing outputs. Publishers challenge the first and third analyses as "basic arithmetic" that does not require specialized knowledge.[2]

Publishers' challenge misstates the law. Publishers rely almost entirely on *Waymo LLC v. Uber Technologies, Inc.*, 2017 WL 5148390 (N.D. Cal. Nov. 6, 2017). There, the Court excluded a damages expert opining on unjust enrichment and reasonable royalty because the expert "did not apply any coherent principle, methodology, theory, or technique." *Id.* at \*2. For example, in purporting to quantify incremental future profits, the expert parroted a chart in an internal slide deck from the defendants. *Id.* at \*2-3. The *Waymo* court found that the slide actually "***contradicted*** [the expert's] conclusion" on future profits. *Id.* at \*4.

None of the problems that the *Waymo* court identified are remotely applicable to Ms. Davis's analysis. Indeed, it appears that Publishers simply searched for a decision that excluded a financial expert's opinion and then cited it in support of their argument, even though the facts could not be more distinguishable. Unlike the opinion that was excluded in *Waymo*, Ms. Davis performed the apportionment analyses herself and formed conclusions that are based on the record evidence. In apportioning profits attributable to alleged infringement in training, Ms. Davis analyzed the number of tokens generated from the song lyrics to the asserted works, assessed the record evidence regarding the total tokens used to train the Claude models at issue, and calculated the percentage of total training tokens associated with the asserted works. Rpt., 43. Ms. Davis then tested that conclusion against the record evidence regarding the value of the song lyrics to the corpus of training data used to train the model, *id*. at 44, and assessed whether any of Anthropic's profits could be apportioned to the alleged infringing conduct using that apportionment percentage, *id.* This is hardly "basic arithmetic" and in any event, questions about the use of those tokens are properly the subject of cross-examination, not a basis for exclusion.

Likewise, in analyzing profits attributable to alleged infringement by Claude outputs, Ms. Davis analyzed evidence and calculated percentages of Claude outputs that could be tied to the alleged infringement. *Id.* at 46. Then (as with her input analysis), she assessed what portion of

---

[2] Publishers' levy a wholly different challenge to the second calculation, Ms. Davis's destructive scanning analysis, which is addressed *infra* Section IV.

**REDACTED PUBLIC VERSION**

alleged profits could be apportioned to that conduct based on that apportionment percentage.

A damages expert's opinions "do not boil down to simple math" where the expert's review of the relevant material was "a complicated and time-intensive endeavor." *United States v. Pac. Health Corp.*, 2018 WL 1026361, at *5 (C.D. Cal. Feb. 20, 2018). That was certainly the case here. Ms. Davis used her expertise to develop reliable methods to review the data and draw from it an assessment of the apportionment of profits, broke those calculations down step-by-step in a way that is useful to the factfinder, and then tested those conclusions against record evidence. That analysis took "***between 125 and 150 hours***." Ex. 1, 38:7-18 (Davis Dep. (02/19/26)). Ms. Davis's analysis stands in stark contrast to Publishers' damages disclosure, which literally offers counsel's multiplication of one number by another. Even if the court were to find "each step" of Ms. Davis's analysis "relatively straightforward,"—as is the case for most arithmetic, taken stepwise—her analysis should not be excluded because its "end result … certainly helps the jury assess a reasonable damages figure." *Lin v. Solta Med., Inc.*, 2024 WL 5199905, at *6 (N.D. Cal. Dec. 23, 2024).

Nor does Ms. Davis's reliance on inputs from Anthropic's fact witness and other experts somehow render her opinions improper "lay testimony." To the contrary, such expert testimony is routinely admitted. For example, in *United States ex rel. Jordan v. Northrop Grumman Corp.*, the government sought to exclude the damages calculations of an accountant expert related to plaintiff's False Claims Act claim for improper reliance on other' experts and because it was not based on specialized knowledge. 2003 WL 27366224, at *6 (C.D. Cal. Jan. 6, 2003). But the court rightly held that the damages expert's reliance on another expert's conclusion regarding the compliance of a quality program was appropriate given her "role as a damages expert, rather than a liability expert" and "[wa]s not a bar to her testimony." *Id.* And even though the calculations were not complicated, the court found that, "as an accountant," the expert had "specialized knowledge" and the testimony would "assist the trier of fact in determining the amount of damages." *Id.* at *7.

## II.     MS. DAVIS DID NOT OFFER A MARKET DEFINITION OPINION

Publishers next move to exclude Ms. Davis's opinion on market harm by attacking an opinion she does not assert. Publishers claim Ms. Davis "opine[d] on the market for a copyrighted work." Mot. 5. But Ms. Davis specifically explained that she was ***not*** offering her own opinion on

the definition of the relevant market. Instead, she "analyzed the Plaintiffs' financial data to determine whether it supported their ***own*** claim that there has been harm to the market for licensing the lyrics of the Asserted Works." Dkt. 657-4 at 8 ("Reply"). Indeed, Ms. Davis assumed Publishers' market (as ***they*** defined it) was the relevant one and considered whether there was harm in the market Publishers identified. Her methodology was to conduct an accounting analysis of the lyric revenues produced by the four Plaintiff Publishers and assess whether those revenues had increased, decreased, or experienced no change since the launch of Claude.

Contrary to Publishers' claim that her review involved no "elaboration or analysis," Mot. 6, Ms. Davis analyzed the variance in lyric revenue data by quarter, broke down the different sources of revenue, and analyzed trends over time, considering factors such as the outsized influence of a particular song on revenues. Rpt., 49-52. It is squarely within the province of a damages expert to analyze "historical revenue figures" to estimate damage or harm. *Williams v. Apple, Inc.*, 338 F.R.D. 629, 655 (N.D. Cal. 2021). Publishers' assertion that her analysis is a "[h]ollow regurgitation of Publishers' revenues" is belied by her detailed analyses. Mot. 7.

Nor is Publishers' contention that Ms. Davis failed to consider alternatives a proper basis to exclude her testimony. *First*, they are factually wrong. Publishers state Ms. Davis failed to consider explanations like the effect of "lyric-licensing agreements." Mot. 6. But in her reports, Ms. Davis expressly explained that "Publishers have not identified any lost licensing deal or any licensing arrangement that Publishers have had to renegotiate on less favorable terms," and analyzes UMPG's most recent renewal with Google, which she concluded resulted in an ***increase*** to the historical license payment for lyrics." Reply, 9. *Second*, even if Ms. Davis had failed to consider other explanations, where an expert does not "'adequately rule out' alternative causes," "th[at] is a credibility determination that goes the weight of [the expert's] opinions, not their admissibility." *Rosales v. Rollag*, 2024 WL 4290758, at *5 (D. Ariz. Sept. 25, 2024).

## III.    MS. DAVIS'S STATUTORY DAMAGES OPINIONS ARE TIMELY, RELEVANT, AND RELIABLE[3]

Ms. Davis clearly disclosed her methodology for analyzing Publishers' statutory damages

---

[3] Although Publishers' "Statement of Relief" requests that the Court exclude opinions and testimony

**REDACTED PUBLIC VERSION**

claim and relevant damages considerations in this case. Again, in assessing statutory damages, the jury will be asked to consider, "1. the revenue lost by the copyright holder as a result of the infringement; 2. The profits earned by the defendant as a result of the infringement." 9th Cir. Model Jury Instruction 17.37. Because Publishers never put forward an actual damages or disgorgement of profits calculation, Ms. Davis began by providing opinions about methods from which actual damages and lost profits could theoretically be calculated. She then compared actual damages and lost profits to Publishers' claimed statutory damages, and concluded that the claimed statutory damages would be orders of magnitude above each metric. Dkt. 657-3 at 28 ("Rebuttal"). For example, assuming the apportioned gross profits were ███ (which Ms. Davis calculated by apportioning training data for the asserted works), Ms. Davis calculated that the claimed statutory damages would be ████████████████. This is a relevant consideration: "a statutory damages award must bear a plausible relationship to [a] Plaintiff's actual damages," *Michael Grecco Prods.,* 2020 WL 7227199, at *10, "and 'should not provide copyright owners a windfall.'" *Atari Interactive, Inc. v. Redbubble, Inc*., 546 F. Supp. 3d 883, 888–89 (N.D. Cal. 2021). Publishers' decision not to offer any testimony or evidence on actual damages or lost profits (presumably because they knew they were miniscule), cannot mean that Anthropic is barred from having its own expert compare potential statutory damages and actual damages and lost profits.

Publishers also seek to exclude Ms. Davis's opinion for failing to consider "all of the relevant statutory damages factors." But the only authority they cite, the Ninth Circuit Model Jury Instructions, makes clear that the jury "may" consider the listed factors; none are not mandatory (even for the jury), much less all. Publishers point to nothing requiring an expert to consider *every* factor to render her opinion on *some* of those factors reliable and admissible.

Nor will Ms. Davis tell the jury "how" to weigh the statutory factors. Ms. Davis merely states the proportion between claimed statutory damages and actual damages and profits—an accounting fact plainly relevant to the assessment of statutory damages. Publishers cite *Sony Music Entertainment v. Cox Communications, Inc.*, 2019 WL 9088257, at *2 (E.D. Va. Nov. 19, 2019),

---

relating to "any recoverable statutory damages or the factors to be considered therein" (Mot. 1), the Motion does not even address Ms. Davis's alternate statutory damages calculations, so at the very least, the request for relief should be denied as to opinions Publishers have not actually challenged.

ANTHROPIC'S OPP. TO MOT.    - 8 -    Case No. 5:24-cv-03811-EKL-SVK
TO EXCLUDE JULIE DAVIS

for the proposition that courts "exclude attempts by experts to opine on an appropriate amount of statutory damages." Mot. 8-9. But in that case, the court explicitly ***allowed*** the expert to testify within the statutory damages framework, including to critique a profitability analysis. *Sony Music Enter.*, 2019 WL 9088257, at *2. The court excluded only opinions as to whether certain damages "should be characterized as a 'windfall'" because "[t]hose are questions for the jury." *Id.* Here, Ms. Davis will not offer any such characterizations: rather she will provide her analysis of the proportion between two numbers. The jury may decide if—based on those numbers—statutory damages would result in a windfall. Publishers point to no authority precluding such a comparison.

As to timeliness, Publishers' position is nonsensical. Ms. Davis's January 23, 2026 Rebuttal Report opinion on proportionality was offered just ***eight days*** after Publishers provided their first damages calculation. Throughout discovery, Publishers refused to provide a calculation of damages, repeatedly representing to this Court that they could not provide damages disclosures because "the process of calculating damages will require expert analysis to complete." Dkt. 430 at 6. The Court accepted those representations and ordered Publishers to supplement within seven days of the close of fact discovery, and contemplated additional analysis by experts. Publishers' Court-ordered supplement had no computation of actual or statutory damages; instead, Publishers simply tallied the "***potential*** maximum exposure under a statutory damages regime"—something that could have been disclosed much earlier. Ex. 4, 9 (Pls.' 2nd Am. Initial Disclosures (10/28/25)). And despite their insistence that expert analysis was required, Publishers elected not to provide any expert disclosure calculating any damages. A month after expert disclosures, Publishers instead served a supplemental interrogatory response claiming—for the first time—that they were "entitled to up to $74,850,000 in statutory damages" for the Copyright Act claims and $45,225,000 for the DMCA claims. Ex. 2. Eight days later, Ms. Davis disclosed her proportionality opinion. Ms. Davis's opinion is plainly timely.

IV.    **THERE IS NO BASIS FOR EXCLUDING MS. DAVIS'S CALCULATIONS BASED ON DESTRUCTIVE SCANNING**

As an alternative apportionment analysis, Ms. Davis assessed the costs Anthropic avoided by engaging in the allegedly infringing activity. Specifically, she calculated the hypothetical cost to

**REDACTED PUBLIC VERSION**

Anthropic of purchasing sheet music, which Anthropic could have then used to ingest each song into its training data. Rpt., 44-45. Those calculations show that Anthropic would have expected to spend approximately $5,000 to acquire the sheet music for the Asserted Works. *Id.* That analysis is relevant to remedies available under 17 U.S.C. § 504 because one measure of "actual damages" is "the amount a willing buyer would have been reasonably required to pay a willing seller at the time of the infringement for the actual use made by the infringer of the plaintiffs' work." *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1087 (9th Cir. 2014). Without disputing the propriety of the avoided cost method or Ms. Davis's calculation, Publishers complain that Ms. Davis should be precluded from offering that opinion, because they dispute the legal proposition that destructive scanning is fair use. Mot. 10.

To begin with, that Ms. Davis assumed, for purposes of her analysis, the legality of destructive scanning is not a *Daubert* issue. Publishers are incorrect that Anthropic would need to "prove that Ms. Davis's assumption is correct" for Ms. Davis to offer testimony about avoided costs. Mot. 10. Publishers' complaint goes to the weight of Ms. Davis's testimony, not its admissibility: "To the extent expert opinions are based on a flawed assumption, that can be brought out in cross examination." *In re HIV Antitrust Litig.*, 2023 WL 3090619, at *16 (N.D. Cal. Mar. 13, 2023). And Publishers chose not to ask a single question about that assumption or calculation during Ms. Davis's 6-hour deposition. In all events, there is no meaningful dispute in the law that destructive scanning is fair use. The Second Circuit in *Authors Guild v. Google, Inc.*, affirmed more than a decade ago that it was fair use to scan millions of books to enable new functionalities. 804 F.3d 202, 217 (2d Cir. 2015). And in *Bartz v. Anthropic PBC*, the Court found that purchasing and scanning physical books for the purpose of training an LLM, where the purchased print copy was destroyed, constituted fair use. 787 F. Supp. 3d 1007, 1033 (N.D. Cal. 2025). Publishers' citation to *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163 (2d Cir. 2024) is inapposite. *Hachette* did not involve destructive scanning for LLM training. Rather, the Court considered an internet library that allowed "original works [to] be copied and disseminated for free." *Id.* at 195.

**CONCLUSION**

The Court should deny Publishers' motion.

**REDACTED PUBLIC VERSION**

Date: July 27, 2026

LOUIS W. TOMPROS (*Pro Hac Vice*)
louis.tompros@wilmerhale.com
DISHA PATEL (*Pro Hac Vice*)
disha.patel@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6220

ARI HOLTZBLATT (SBN 354361)
ari.holtzblatt@wilmerhale.com
ROBIN C. BURRELL (*Pro Hac Vice*)
robin.burrell@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2100 Pennsylvania Ave, NW
Washington, DC 20037
Telephone: (202) 663-6000

*/s/ Sonal N. Mehta*
SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

TAYLOR GOOCH (SBN 294282)
taylor.gooch@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
50 California St.
San Francisco, CA 94111
Telephone: (628) 235-1000

JARED V. GRUBOW (*Pro Hac Vice*)
jared.grubow@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
250 Greenwich St
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Defendant*
**ANTHROPIC PBC**