**REDACTED PUBLIC VERSION**

SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

TAYLOR GOOCH (SBN 294282)
taylor.gooch@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
50 California St.
San Francisco, CA 94111
Telephone: (628) 235-1000

JARED V. GRUBOW (*Pro Hac Vice)*
jared.grubow@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
250 Greenwich St
New York, NY 10007
Telephone: (212) 230-8800

LOUIS W. TOMPROS (*Pro Hac Vice*)
louis.tompros@wilmerhale.com
DISHA PATEL (*Pro Hac Vice*)
disha.patel@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

ARI HOLTZBLATT (SBN 354361)
ari.holtzblatt@wilmerhale.com
ROBIN C. BURRELL (*Pro Hac Vice*)
robin.burrell@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2100 Pennsylvania Ave, NW
Washington, DC 20037
Telephone: (202) 663-6000

*Attorneys for Defendant*
**ANTHROPIC PBC**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., ET AL.,<br><br>               Plaintiffs,<br><br>   v.<br><br>ANTHROPIC PBC,<br><br>               Defendant. | Case No. 5:24-cv-03811-EKL-SVK<br><br>**ANTHROPIC'S OPPOSITION TO PUBLISHERS' MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. RUSS ALTMAN**<br><br>Hearing Date: October 21, 2026<br>Time: 10:00 AM<br>Judge: Hon. Eumi K. Lee |

**REDACTED PUBLIC VERSION**

## INTRODUCTION

Publishers seek to exclude the expert testimony of Dr. Russ Altman, a Stanford professor who draws upon his decades of experience researching and experimenting with AI tools and LLMs to opine on the transformative capabilities and beneficial contributions that LLMs like Claude provide.

Dr. Altman's expertise on the practical capabilities of AI has been recognized by numerous organizations and the U.S. Senate. Publishers cannot seriously contest those qualifications, so instead they resort to misdirection—first by arguing that Dr. Altman's opinions about Claude's transformative and beneficial uses are somehow irrelevant to legal inquiries into transformativeness and public benefits, then by adopting an inappropriately narrow view of Dr. Altman's expertise, and finally by distorting his methodology and applying the wrong legal standard to it. Throughout, Publishers make arguments courts have repeatedly said go to weight, not admissibility.

The Court should deny Publishers' motion. Dr. Altman's analysis is unquestionably relevant. As fair use precedent makes clear, when a transformative technology is at issue, ***all*** the capabilities of the technology are relevant—not just those tied to the works at issue. Dr. Altman's general knowledge and expertise about LLM capabilities also qualify him to explain how those capabilities manifest across various contexts. And Dr. Altman appropriately supported his opinions, in part, with examples embodied in Anthropic and customer documents that he considered with his firsthand experience and specialized knowledge.

## BACKGROUND

Dr. Altman is a professor of bioengineering, genetics, medicine, biomedical data science, and (by courtesy) computer science at Stanford University, where he has taught for over 30 years. Dkt. 654-1, Altman Rpt., ¶ 7 ("Rpt.").[1] Dr. Altman's research and teaching focus on the application of computational tools like AI in medicine and science. *Id.* ¶ 9.

Dr. Altman holds positions with numerous AI-focused organizations. Rpt. ¶ 7. He is an Associate Director of the Stanford Institute for Human-Centered AI (HAI), Faculty Director of the 100 Year Study of Artificial Intelligence, Chair of the AI at Stanford Advisory Committee to the

---

[1] Unless otherwise noted, 'Mot.' refers to Publishers' motion (Dkt. 654); 'Ex.' citations refer to exhibits to the Declaration of Robin Burrell submitted herewith; emphasis is added; and internal citations, quotations, and objections are omitted throughout.

**REDACTED PUBLIC VERSION**

University Provost, and a member of the American Association for Artificial Intelligence. *Id.* He serves as an AI consultant to multiple organizations, including Weave.io, a company that uses AI to generate regulatory submissions to the FDA. *Id.* And he has testified before the U.S. Senate Committee on Health, Education, Labor & Pensions about beneficial applications of AI in patient care and drug discovery. *Id.*

Dr. Altman's expert reports evaluate the transformative and beneficial capabilities of LLMs, including Claude. Rpt. ¶ 2. Drawing on his familiarity with LLM capabilities through his work in biomedicine, healthcare, scientific research, the public sector, and education, Dr. Altman analyzes how LLMs can impact a variety of domains. *Id.* Based on his analysis, Dr. Altman opines that because LLMs "enable[] organizations to process large volumes of unstructured information, automate repetitive tasks, and develop new insights," *id.* ¶ 27, they have "demonstrated significant public benefits across several domains," *id.* ¶ 19. In particular, Dr. Altman concludes that these capabilities have enabled Claude and other LLMs to "deliver[] measurable benefits in scientific discovery," *id.* ¶¶ 58-85; "improv[e] educational outcomes," *id.* ¶¶ 86-96; help "address large scale challenges" as "a scientific assistant in public and civic domains" by "providing technical capabilities to inform real-time decision making," *id.* ¶¶ 97-104; "provide value in creative sectors," like art and writing, by "improv[ing] and accelerat[ing] ideation, storyboarding, and content development," *id.* ¶¶ 105-116; and "lower[] the technical barriers to entry for new ventures" by allowing "smaller teams to do more with less," *id.* ¶¶119-121. Dr. Altman supports his analysis with real-world examples (including published research, case studies, and documented real-world deployments) that highlight the broader capabilities with which he is familiar. *Id.* ¶ 2.

## ARGUMENT

Under *Daubert*, the Court's role is "to ensure that the [proffered] testimony is both relevant and reliable." *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1047 (9th Cir. 2025). Expert testimony is "reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). It is "'relevant if the knowledge underlying it has a valid connection to the pertinent inquiry.'" *Id.* "'Challenges that go to the weight of the evidence,'" as well as "'credibility

**REDACTED PUBLIC VERSION**

determinations,'" are for the jury. *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022).

While Anthropic's three *Daubert* motions are tightly focused on this standard, each of Publishers' *seven* motions ask this Court to turn the *Daubert* standard into a shotgun—one that blasts away any opinion Publishers find inconvenient to their merits positions. Anthropic respectfully submits that this Court should reject Publishers' indiscriminate approach as inconsistent with the law, basic evidentiary principles, and common sense.

## I.   DR. ALTMAN'S OPINIONS ABOUT CLAUDE'S TRANSFORMATIVE, BENEFICIAL APPLICATIONS ARE RELEVANT

Dr. Altman brings to bear his extensive experience with the practical capabilities of LLMs and Claude to help the jury understand Claude's transformativeness and benefits. Publishers do not dispute that transformativeness and public benefits are relevant to the fair use inquiry. Instead, they assert (at 3) that the "benefits of Claude Dr. Altman identifies are not relevant to fair use because there is no … connection between any of those benefits and Anthropic's copying of Publishers' song lyrics." That is wrong, both as a legal and factual matter.

Legally, the Ninth Circuit has made clear that when the secondary use at issue is the copying of multiple works to create a new technological tool, **all** the benefits of that tool are relevant, not just benefits traceable to the specific works in the case. Thus, in *Sega Enterprises Ltd. v. Accolade, Inc.*, the court explained that "[p]ublic benefit[s] need not be direct." 977 F.2d 1510, 1523 (9th Cir. 1992). And in *Perfect 10, Inc. v. Amazon.com, Inc.*, a case about the inclusion of a specific set of images as thumbnails in Google Search results, the court considered the transformativeness and public benefits of Google's image search as a whole, not simply the benefits tied to including the specific images at issue. 508 F.3d 1146, 1157, 1166 (9th Cir. 2007).

Factually, Publishers misrepresent the undisputed record, which demonstrates that Publishers' lyrics are relevant to *all* Claude capabilities. Publishers' own expert Shawn Shan concedes this, explaining: "each individual training piece ha[s] some impact to the model weights," and "during [output] generation time, the model weights directly impact[] what information was getting generated." Ex. 1, Deposition of Shawn Shan, 226:9-229:18. Or, as Anthropic's expert Jeffrey Bilmes puts it, "every piece of data has some effect on the model's behavior." Ex. 2,

ANTHROPIC'S OPP. TO MOT.                    - 3 -                    Case No. 5:24-cv-03811-EKL-SVK
TO EXCLUDE RUSS ALTMAN

<u>REDACTED PUBLIC VERSION</u>

Deposition of Jeffrey Bilmes, 180:16-20.

Publishers' out-of-context quotations only reinforce this point: the volume of data required to train Claude means no particular training file has a significant impact on the trained model, but each contributes to Claude's broad and general capabilities. Publishers misleadingly point to Dr. Bilmes's conclusion that ███████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ███████████████████████

Nor does it matter whether Anthropic viewed lyrics as ██████████ or ███████████████ to training. Mot. 4. Fair use does not turn on whether lyrics are indispensable; fair use factor three asks only whether lyrics are "reasonably necessary." *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1030 (N.D. Cal. 2025). In any event, whether lyrics are strictly necessary in theory is irrelevant. Claude *did* train on lyrics and produced outputs based on the entirety of its training corpus.

Publishers also misrepresent Dr. Altman's testimony about the effect of lyrics on various uses of Claude. Dr. Altman's role was not to quantify the effect of lyrics. Other experts and witnesses discuss how lyrics impact Claude's output, and conclude that all training inputs affect all outputs. Ex. 1 at 226:9-229:18; Ex. 2 at 180:16-20. Beyond that, the record shows it is impossible to quantify the precise impact of any single piece of data, Ex. 2 at 177:23-25, 178:20-24, and so Dr. Altman appropriately replied that he had not done so. Ex. 4, Deposition of Russ Altman, 104:10-15. But inability to precisely quantify impact does not make non-lyric outputs legally irrelevant where both sides' experts agree that all training data (including lyrics) impact LLMs' capabilities.

Publishers are also wrong (at 4-5) that Dr. Altman's examples are irrelevant "because they have nothing to do with the role of fair use in encouraging new creative expression." Courts have repeatedly found secondary uses that produce no new creative expression to be transformative— like the "time-shifted" TV broadcast recordings in *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 442, 449-50 (1984); or the search engine results in *Perfect 10*, 508 F.3d at 1163-68. Similarly, neither *Google* nor *Sega* conclude that *only* creative public benefits are relevant to

fair use. In fact, *Google* indicates otherwise, casting creative expression as just one "example" of relevant public benefits, and reiterating: "Nor do we say … these questions are the only questions a court might ask." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 35-36 (2021).

In any event, the Court need not tarry long over Publishers' puzzling contention (at 5) that facilitating pharmaceutical research, expanding access to educational tools, and supporting conservation efforts have nothing to do with the goals of the Copyright Act. The Copyright Act's own examples of fair use include "teaching," "scholarship" and "research." 17 U.S.C. § 107.

Finally, the Court should decide relevance questions in the context of motions *in limine* before trial, not a *Daubert* preceding summary judgment. Publishers' motion here is particularly premature given their approach to this case: they devoted significant time in depositions asking about non-music AI risks like the probability that it will wipe out humanity. *E.g.*, Ex. 5, Deposition of Dario Amodei, 135:18-152:9; Ex. 6, Deposition of Deep Ganguli, 77:3-85:23; Ex. 7, Deposition of Pranay Sangani, 45:18-47:3. And their expert Ben Zhao recites a parade of horribles far removed from music, including use of AI in misinformation campaigns, cyber attacks, bioweapons, and nuclear bombs. Ex. 8, Expert Report of Ben Zhao, ¶¶ 156-168. Anthropic is of course entitled to submit responsive evidence, *see* Fed. R. Civ. P. 26(a)(2)(D). The Court should reject Publishers' attempt to once again prevent Anthropic from developing rebuttal evidence on issues they have repeatedly raised in this litigation. *See, e.g.*, Dkt. 661 (Anthropic's Mot. to Exclude Zhao) at 9.

## II. DR. ALTMAN'S GENERAL EXPERTISE ON THE PRACTICAL CAPABILITIES OF LLMS QUALIFIES HIM TO OPINE ON CLAUDE'S BENEFICIAL APPLICATIONS

Dr. Altman's extensive qualifications enable him to opine on Claude's practical applications in the topic areas discussed in his report. "To be qualified, the expert must have sufficient 'knowledge, skill, experience, training, or education' to offer the opinion." *In re Roundup Prods. Liability Litig.*, 390 F. Supp. 3d 1102, 1111 (N.D. Cal. 2018) (quoting Fed. R. Evid. 702). "So long as the expert's testimony is 'within the reasonable confines of his subject area,' a lack of particularized expertise generally goes to the weight of the testimony, not its admissibility." *Id.* at 1111-12.

Publishers concede (at 5) that Dr. Altman has "expertise in medical and biological research and higher education." They therefore do not contest that he is qualified to opine on the practical

**REDACTED PUBLIC VERSION**

benefits of Claude in those sectors, and do not seek to exclude those opinions. Instead, they identify five topics for which he supposedly lacks expertise to form an opinion: K-12 education, public interest and conservation, business, creative sectors, and AI safety. Publishers' unduly narrow view of expertise is not supported by the case law. As Dr. Altman's report demonstrates, ample knowledge and experience support his opinions on all five topics.

As an initial matter, Publishers misconstrue the nature of Dr. Altman's expertise. He is not simply an expert in "medical and biological research and higher education." Mot. 5. Rather, Dr. Altman has extensive knowledge about the practical applications of AI and LLMs. That is the focus of his expertise, and that expertise in AI is undeniable. He has first-hand experience working with LLMs like Claude through his scientific research and teaching, and he has written about AI-related topics for 30 years. His expertise has been recognized by the U.S. Senate, which invited him to testify on AI's benefits. And he has acquired broad familiarity with LLM capabilities through his work as Associate Director of HAI, Chair of Stanford's AI task force, an AI consultant, and a technology podcast host, among other roles. *See Capital Records, Inc. v. MP3tunes, LLC*, 2014 WL 503959, at *9 (S.D.N.Y. Jan. 29, 2014) (qualifying expert with 25 years of experience consulting, writing, lecturing, and hosting interview podcast about the music industry, despite no personal experience negotiating free music downloads, the specific topic of his opinion). This experience informs each of his opinions and will help the jury assess Claude's transformativeness and benefits.

Of course, Dr. Altman has particular areas on which his AI work focuses. But courts do not require particularized expertise for every subspecialty an expert discusses, so long as the expert has relevant, general experience he can bring to bear in reaching an opinion. Thus, the court in *In re Roundup Products* found a biostatistician who focused on toxicology and mechanistic studies qualified to "examine the epidemiological literature" and render an opinion on an epidemiology topic, even though "epidemiology [wa]s not his core area." 390 F. Supp. 3d at 1131. And courts have found experts qualified to draw on general expertise to opine on particularized subjects, even when they admit they have no experience with the specific application at issue. *See, e.g., United States v. Garcia*, 7 F.3d 885, 889-90 (9th Cir. 1993); *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 82 (2d Cir. 1997). In those circumstances, "lack of particularized expertise goes to the weight accorded

[to the expert's] testimony, not to the admissibility of [the] opinion." *Garcia*, 7 F.3d at 890.

Here, Dr. Altman reached his opinions about Claude's benefits by applying generalizable observations about LLM capabilities derived from his particular experience with LLMs. Rpt. ¶¶ 2, 27. For that reason, Publishers' citation to *Gunaratna v. Dennis Gross Cosmetology LLC*, 2023 WL 2628620, at *10 (C.D. Cal. Mar. 15, 2023), is inapt. This is not a situation where an expert in one field seeks to opine on a separate field in which he has no relevant training. Here, Dr. Altman has *overarching* expertise and experience regarding the practical capabilities of LLMs, allowing him to apply this general knowledge to a variety of contexts.

In any event, even on Publishers' narrow view of expertise, Dr. Altman has sufficient experience to support his opinions. Like the biostatistician who could render an epidemiology opinion, *In re Roundup*, 390 F. Supp. 3d at 1131, Dr. Altman's acknowledged expertise in the use of AI in higher education (at 5) gives him ample ability to review the relevant education literature and conclude that LLMs like Claude are transforming K-12 education. The law does not require Dr. Altman to have particularized experience with K-12 teaching for his opinion to assist the jury.

There is also no serious question that Dr. Altman's use of LLMs in his *scientific research*, *see* Rpt. ¶ 56, permits him to observe that Claude "offers a template for addressing large scale challenges through accelerated research and structured data synthesis" and therefore conclude that Claude has beneficial uses as a *scientific* assistant in public and civic domains. *Id.* ¶¶ 97, 104.

And although Publishers attack (at 6) Dr. Altman's ability to opine regarding Claude's effect on barriers to entry for new businesses because he is "not an economist," his opinion is based on his "experience speaking with company leaders in executive education settings or in [his] private technical consulting on AI in this space," Rpt. ¶ 121. That experience, combined with his general knowledge of LLMs' practical capabilities, is sufficiently specialized to help the jury.

The same goes for Claude's creative applications. Publishers protest (at 7) that Dr. Altman is not an "artist," "writer," or "content creator." Not only is that false, it applies the wrong standard. As with all his opinions, Dr. Altman grounds his conclusions about the practical effect of LLMs in creative sectors on his general knowledge of LLM capabilities, *see, e.g.*, Rpt. ¶ 108. That is sufficient under Rule 702. But here Dr. Altman's experience goes even further: he has direct experience with

**REDACTED PUBLIC VERSION**

creative applications of AI through a symposium on the subject that he organized at Stanford HAI, *id.* ¶ 106, and he has used Claude to help write original songs for his band, *id.* ¶ 112. Moreover, the notion that Dr. Altman, who has authored or coauthored nearly 500 articles and edited over 30 books (*id.* ¶¶ 9, 108), cannot opine on Claude's benefits in writing beggars belief.

Finally, Dr. Altman has significant experience with AI risks, safety, and regulation. He has written extensively and served on task forces focused on the issue. Rpt. ¶¶ 21, 32 & n.46. He is the coauthor of an influential paper on foundational AI models that broadly discusses AI risks and potential mitigations. Dkt. 654-3, Altman Reply, ¶ 22 n.22. And he teaches a boot camp for members of Congress on the latest developments, benefits, and risks of AI. *Id.* ¶ 31. Publishers do not dispute (at 7) that Dr. Altman has "expertise in AI safety" as to "the deployment of AI systems in the medical and bioengineering contexts in which he specializes." Instead, they claim (at 7) he lacks expertise to opine that "[l]eading AI companies, including Anthropic, have adopted safety-by-design principles and model alignment strategies into their design process." First of all, that is not an opinion: it is one piece of factual evidence that supports his conclusion that "LLMs offer significant promise for healthcare delivery and medical research" because deploying technology in those industries requires "thoughtful design, appropriate safety features, and rigorous testing." Rpt. ¶ 46. And to the extent Publishers argue that Dr. Altman cannot draw on his expertise to opine on AI risks in certain areas, they commit the same error that was rejected in *Garcia* and *Stagl*: lack of specific experience in the face of relevant, general expertise goes to weight, not admissibility. *Supra* p. 6.

Moreover, Dr. Altman's acknowledged (at 5,7) expertise in medicine provides ample basis for him to draw on the medical field's historical adaptation to the risks of x-rays as an analogy to AI risk mitigation. Dkt. 654-2, Altman Rebuttal, ¶ 26. Experts may base their opinion on knowledge that is common in their field, *Reed v. Lieurance*, 863 F.3d 1196, 1208 (9th Cir. 2017), including the field's historical development, without being a historian, *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prods. Liability Litig.*, 546 F. Supp. 3d 666, 678 (S.D. Ohio 2021).

### III.    DR. ALTMAN RELIABLY APPLIES HIS SPECIALIZED KNOWLEDGE

Without any serious basis for excluding Dr. Altman's opinions on relevance or expertise grounds, Publishers resort to distorting his methodology. On their telling, Dr. Altman cannot opine

**REDACTED PUBLIC VERSION**

that Claude has beneficial applications because he relied on the contents of Anthropic documents and customer documents, without independently verifying them. That argument is twice flawed. *First*, Publishers conflate Dr. Altman's opinions with a portion of the evidence he relies on to support those opinions. Contrary to what Publishers suggest, Dr. Altman appropriately reached general conclusions about Claude's capabilities in certain domains, and based each of those opinions both on his personal knowledge and experience with LLMs and his analysis of Anthropic case studies in light of that knowledge and experience. *Second*, Publishers apply the wrong methodological standard for experience-based expert testimony. There is no requirement that such experts independently verify their sources. That concern goes to weight, not admissibility.

*First*, Publishers misrepresent Dr. Altman's report. They claim (at 8-10) that each example of a particular use of AI is a separate "opinion." Not so. Each of those examples is just that—an example based on a piece of *evidence* that Dr. Altman drew on, along with other evidence, to support more general conclusions about Claude's beneficial applications in particular domains. Dr. Altman reached these conclusions by drawing on his knowledge and firsthand experience with LLMs and Claude as a researcher, professor, and leader of Stanford HAI to make general observations about LLM capabilities. *See* Rpt. ¶¶ 37-53. He then employed those experiences and observations to "analyze[] the underlying material referenced in … case studies" of Claude usage, ultimately concluding that those studies "align[ed] with the documented evidence and [his] own experience." *Id.* ¶ 54.

Of course, Dr. Altman buttressed his opinions with documents and witness testimony, as any expert would need to do to opine on Claude's applications. But that methodology is entirely proper: an expert may review a party's "records and interpret them based on his knowledge, experience, training, and education." *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 364 (N.D. Cal. 2018); *see JH Kelly, LLC v. AECOM Tech. Servs., Inc.*, 605 F. Supp. 3d 1295, 1312 (N.D. Cal. 2022). Publishers' discussion of "Bluenote" (at 9) is a perfect illustration. That case study supports a general conclusion about Claude's potential to streamline regulatory processes. Rpt. ¶¶ 67, 70. Dr. Altman supports that conclusion not just with the Bluenote study but also his own experience, concluding that "this level of efficiency gain is plausible" based on "my firsthand experience navigating the complexities of regulatory filings and compliance reporting in my collaboration with

**REDACTED PUBLIC VERSION**

the FDA on generic drug evaluations." *Id.* ¶ 68.

*Second*, Publishers fault Dr. Altman (at 8) for not independently testing some of the underlying evidence he relied on, along with other evidence, to support his conclusions. But that criticism misstates the relevant standard for expert testimony like Dr. Altman's, which involves employing his experience and expertise to interpret the underlying record in a way that will help the jury. *See JH Kelly*, 605 F. Supp. 3d at 1313-14. There is no requirement that such experts independently verify their sources. *See In re Arris*, 327 F.R.D. at 363-64.

As the Ninth Circuit has repeatedly explained, the usual "*Daubert* factors … simply are not applicable to" experience-based testimony, the reliability of which "depends heavily on the *knowledge and experience* of the expert, rather than the methodology or theory behind it." *Hangarter v. Provident Life and Accident Ins. Co.*, 373 F.3d 998, 1017-18 (9th Cir. 2004). In these circumstances, the district court's role is to "prob[e] the extent of [the expert's] knowledge and experience" to determine whether the expert's "experience, training, and education provide[] a sufficient foundation for reliability for his testimony." *Id.* Concerns that this kind of expert testimony "is not supported by any independent evaluation or analysis … are more appropriately addressed through cross-examination and competing evidence." *JH Kelly*, 605 F. Supp. 3d at 1313-14.

For that reason, *Rearden, LLC v. Walt Disney Pictures*, 152 F.4th 1058 (9th Cir. 2025), is of no help to Publishers. *Rearden* criticized a damages expert's methodology for performing a *technical* analysis, *id.* at 1077-78—it has no bearing on the kind of non-technical analysis discussed in *Hangarter* and at issue here. Similarly, *Department of Toxic Substances Control v. Technichem, Inc.*, 2016 WL 1029463 (N.D. Cal. Mar. 15, 2016), is not analogous. The court there excluded an expert's *technical* analysis of soil contamination sources because of a host of flaws: the testimony was based on "speculation," "[k]ey factual errors," and an investigation that was "cursory and unscientific," in addition to simply repeating information in sources. *Id.* at *1. That this methodology is inappropriate for a technical analysis has no bearing on Dr. Altman's reliance on examples as partial support for opinions grounded in his pre-existing experience and knowledge.

## CONCLUSION

For the foregoing reasons, the Court should deny Publishers' motion.

**REDACTED PUBLIC VERSION**

Date: July 27, 2026

/s/ Sonal N. Mehta

LOUIS W. TOMPROS (*Pro Hac Vice*)
louis.tompros@wilmerhale.com
DISHA PATEL (*Pro Hac Vice*)
disha.patel@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6220

ARI HOLTZBLATT (SBN 354361)
ari.holtzblatt@wilmerhale.com
ROBIN C. BURRELL (*Pro Hac Vice*)
robin.burrell@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2100 Pennsylvania Ave, NW
Washington, DC 20037
Telephone: (202) 663-6000

SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

TAYLOR GOOCH (SBN 294282)
taylor.gooch@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
50 California St.
San Francisco, CA 94111
Telephone: (628) 235-1000

JARED V. GRUBOW (*Pro Hac Vice*)
jared.grubow@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
250 Greenwich St
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Defendant*
**ANTHROPIC PBC**

**REDACTED PUBLIC VERSION**

**CERTIFICATE REGARDING USE OF GENERATIVE AI**

Pursuant to this Court's Standing Order Regarding the Use of Generative AI Tools in Court filings, *see* Standing Order VIII(H), the undersigned notifies the Court that one expert report served by Anthropic in this case and attached to the Burrell Declaration in support of Anthropic's Opposition to Publisher's Motion to Exclude Expert Testimony of Dr. Russ Altman, includes "AI-generated content." *See* Burrell Decl., Ex. 3 (Bilmes Report). Dr. Bilmes's use of generative AI tools in connection with his opinions in this case is disclosed in that report. The undersigned has verified Dr. Bilmes's use of generative AI as part of the methodology and certifies that Dr. Bilmes has "maintain[ed] records of all prompts or inquiries submitted to any generative AI tools." *See* Standing Order VIII(H).

Dated: July 27, 2026

By: */s/ Sonal. N. Mehta*
Sonal N. Mehta