**REDACTED PUBLIC VERSION**

SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

TAYLOR GOOCH (SBN 294282)
taylor.gooch@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
50 California Street
San Francisco, CA 94111
Telephone: (628) 235-1000

JARED V. GRUBOW (*Pro Hac Vice)*
jared.grubow@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

LOUIS W. TOMPROS (*Pro Hac Vice*)
louis.tompros@wilmerhale.com
DISHA PATEL (*Pro Hac Vice*)
disha.patel@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

ARI HOLTZBLATT (SBN 354361)
ari.holtzblatt@wilmerhale.com
ROBIN C. BURRELL (*Pro Hac Vice*)
robin.burrell@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2100 Pennsylvania Ave, NW
Washington, DC 20037
Telephone: (202) 663-6000

*Attorneys for Defendant*
**ANTHROPIC PBC**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., ET AL., <br><br>                Plaintiffs, <br><br>     v. <br><br> ANTHROPIC PBC, <br><br>                Defendant. | Case No. 5:24-cv-03811-EKL-SVK <br><br> **ANTHROPIC'S OPPOSITION TO PLAINTIFFS' MOTION TO PARTIALLY EXCLUDE THE OPINIONS OF DR. JEFFREY BILMES** <br><br> Hearing Date: October 21, 2026 <br> Time: 10:00 AM <br> Judge: Hon. Eumi K. Lee |

**REDACTED PUBLIC VERSION**

## INTRODUCTION

Dr. Jeffrey Bilmes is an undisputed expert in the field of artificial intelligence, expertise that will be vital to helping the jury understand the technology at issue in this pathmarking case at the intersection of large language models ("LLMs") and copyright law. Publishers do not challenge the admissibility of the vast majority of Dr. Bilmes's opinions, which range from technical descriptions of how Anthropic and other AI companies gather and process training data to analyses of the effectiveness of Anthropic's anti-copyright-infringement guardrails. Nor do Publishers meaningfully contest that those opinions about Claude's development, functionality, and design are rooted in Dr. Bilmes's decades of experience and close review of the record evidence.

Instead, Publishers' motion spotlights a handful of passages from the hundreds of pages in Dr. Bilmes's reports and the transcript from his seven-hour deposition, picking nits in the apparent hope that those will cast doubt on the rest of Dr. Bilmes's work. Even those selective challenges are unavailing. In several places, Publishers either target opinions that Dr. Bilmes has never actually provided or simply misstate the law. The remainder of Publishers' complaints rely on critiquing isolated sentences or footnotes in Dr. Bilmes's reports while ignoring both (1) the broader context that confirms his opinions are admissible and (2) that their *own* technical experts often use the same approach.

Ultimately, each of Publishers' critiques go to the weight afforded to Dr. Bilmes's testimony and not its admissibility. Because *Daubert* bars this Court from accepting Publishers' invitation to weigh in on "the correctness of [Dr. Blimes's] conclusions," *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1047-50 (9th Cir. 2025), this Court should deny Publishers' motion.

## BACKGROUND

Dr. Bilmes is a tenured Professor of Electrical and Computer Engineering at the University of Washington, where he has worked for over a quarter century.[1] Dkt. 655-2, Bilmes Report ("Rpt."), ¶ 5. He has particular experience in the areas of artificial intelligence, natural language processing, and computer science. *Id.*, ¶ 4. He is also a prolific writer who has authored over 370

---

[1] Unless otherwise noted, 'Mot.' refers to Publishers' motion (Dkt. 655); 'Ex.' citations refer to the Declaration of Robin Burrell submitted herewith; emphasis is added; and internal citations, quotations, and objections are omitted throughout.

**REDACTED PUBLIC VERSION**

peer-reviewed papers on those topics and many others. *Id.*, ¶ 7.

Dr. Bilmes's reports disclosed opinions on numerous issues central to Publishers' case, including the general training process for LLMs, how the lyrics to the 499 works in suit impacted Claude's training, and whether Anthropic's guardrails have reduced the likelihood that user-generated outputs will reproduce purportedly copyrighted material. *E.g.*, *id.*, ¶¶ 2, 13, 20-21. Publishers do not challenge the admissibility of any of these opinions.

Dr. Bilmes also provided opinions that directly contradict Publishers' theory of the case. For example, in response to Publishers' assertion that Anthropic intended for Claude to reproduce song lyrics, Dr. Bilmes detailed how ███████████████████████████████ ████████████████████████████████████ *Id.*, § V.A.a.1. Dr. Bilmes also relied on his analysis of Anthropic's training data and guardrail source code to refute Publishers' claims that ███████████████████████████████████ ████████████████████████████████ *See generally id.*, §§ VI, VII, IX. Publishers deposed Dr. Bilmes on these opinions (and many others) for 7 hours on March 6, 2026.

**ARGUMENT**

Under *Daubert*, the Court's role is "to ensure that the [proffered] testimony is both relevant and reliable." *Engilis*, 151 F.4th at 1047 (alteration in original). Expert testimony is "reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). It is "relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *Id.* "Challenges that go to the weight of the evidence," as well as "credibility determinations," are for the jury. *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022).

While Anthropic's three *Daubert* motions are narrowly tailored to this standard, each of Publishers' *seven* motions (one for every expert Anthropic disclosed) ask this Court to turn the *Daubert* standard into a shotgun—one that blasts away any opinion Publishers find inconvenient to their merits positions. Anthropic submits this Court should reject Publishers' indiscriminate approach as inconsistent with the law, basic evidentiary principles, and common sense.

**REDACTED PUBLIC VERSION**

## I. DR. BILMES RELIABLY AND CORRECTLY OPINED THAT ANTHROPIC'S DEDUPLICATION TECHNIQUES MITIGATE THE RISK THAT CLAUDE WILL MEMORIZE TRAINING TEXT

Publishers' copyright claims turn on whether Anthropic has infringed 499 of Publishers' purported songs either (1) by including the lyrics in Claude's training data or (2) because a tiny subset of users were able to query Claude for those lyrics. Dkt. 728 ¶¶ 60-63, 75-90. For the jury to resolve Publishers' claims, the jury must understand how LLMs in general—and Claude models specifically—are trained and function. Dr. Bilmes's opening report devotes over a hundred pages to providing that vital background information, all rooted in his "experience in Artificial Intelligence, Natural Language Processing, and Computer Science" and his "review of" myriad documents ranging from academic publications to Anthropic's computer source code. Rpt., ¶ 4 & App'x G. As to "how Anthropic's Claude models work in particular," Dr. Bilmes relied on his "review of Anthropic's documents, witness testimony, and source code." *Id.*, ¶ 99.

Publishers challenge just one aspect of Dr. Bilmes's exhaustive explanation of Claude's functioning—his opinions that Anthropic applies ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (including the lyrics of Publishers' claimed songs). Mot. 3-6. Publishers' arguments are meritless.

*First*, Publishers wrongly contend that Dr. Bilmes's deduplication opinions are unreliable because he merely "parrot[ed]" statements from Anthropic employees without applying his own expertise. Mot. 5. Dr. Bilmes formed his opinions based on his technical expertise combined with his review of a variety of underlying sources—academic literature, internal Anthropic technical documents, deposition testimony from Anthropic employees, and a verified interrogatory response describing Anthropic's data cleaning and deduplication practices. *See* Rpt., ¶¶ 115-121. His opinions were "based on [his] experience in machine learning and artificial intelligence over many decades and having experienced what it takes in order to produce one of these models." Ex. 1, Jeffrey Bilmes Dep. (03/06/26), 131:8-132:16; *e.g.*, *id.*, 105:20-107:22; 140:23-142:6. Expert testimony based on such sources and experience is "sufficiently well founded" to pass muster under *Daubert*. *E.g.*, *Camenisch v. Umpqua Bank*, 763 F. Supp. 3d 871, 884 (N.D. Cal. 2025) (permitting opinion based on "employees' testimony and internal correspondence" and the expert's "familiarity

with banking"). Dr. Bilmes's well-grounded opinions stand in stark contrast to those of Publishers' experts, which purport to divine the intent, motive, or state of mind of Anthropic's employees and executives based on the experts' lay interpretation of non-technical evidence. *E.g.*, Dkt. 663 at 5-6.

Publishers' reliance (at 5-6) on *Cisco Systems Inc. v. Arista Networks, Inc.*, 2016 WL 11752975 (N.D. Cal. Nov. 16, 2016) and *Lin v. Solta Medical, Inc.*, 2024 WL 5199905 (N.D. Cal. Dec. 23, 2024) is thus misplaced because—unlike in those cases—Dr. Bilmes applied his expertise in AI to case-specific evidence to reach independent conclusions about deduplication. In *Cisco*, in contrast, the expert's opinion was excluded because he failed to "apply his personal experience and knowledge to add any substantive analysis." 2016 WL 11752975 at *5. And in *Lin*, the court *allowed* an expert to opine that a doctor used a particular brand of laser or copycat device when the plaintiff was burned based only on the expert's "extensive experience" and review of "photographs following her treatment and burns." 2024 WL 5199905 at *9. The court merely excluded the expert's opinion that the device used was "genuine," in part, because she credited wholesale the doctor's belief as to genuineness and because she failed to analyze any case-specific information. *Id.* at *10-11.

*Second*, Publishers erroneously contend (at 4) that Dr. Bilmes's deduplication opinions must be excluded because he did not conduct a sufficiently searching review of Anthropic's deduplication processes. But the Ninth Circuit has never imposed such a demanding standard. Rather, expert testimony is reliable so long as "the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014). Indeed, there is "nothing [that] requires that an expert conduct independent testing in every case," particularly when—as here—the expert reviews internal "records and interpret[s] them based on his knowledge, experience, training and education." *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 363-64 (N.D. Cal. 2018); *see also Elosu*, 26 F.4th at 1020 (district court errs when, at the *Daubert* stage, it "weigh[s] the evidence o[f] record" and "demand[s] corroboration" for the expert's "ultimate conclusions").

More broadly, Publishers cannot credibly argue that an expert must review source code or run specific tests to clear *City of Pomona*'s relatively low bar when their own experts did nothing of the sort. For example, Dr. Zhao (one of Publishers' two technical experts) did not ███████

ANTHROPIC'S OPP. TO MOT. TO                    - 4 -                    Case No. 5:24-cv-03811-EKL-SVK
EXCLUDE JEFFREY BILMES

█████████████████████████████████ yet Publishers still believed his methodology was sufficiently reliable for him to provide opinions on matters like the effectiveness of Anthropic's deduplication efforts. Ex. 2, Ben Zhao Dep. (02/20/26), 124:11-125:6; Ex. 4, Expert Report of Ben Zhao, ¶ 63; Ex. 5, Rebuttal Report of Ben Zhao, ¶¶ 92-95, 100-101; Ex. 6, Reply Report of Ben Zhao, ¶¶ 23, 99-100. Similarly, Dr. Shan (Publishers' other technical expert) opined that ███████████████████████████████████████████ ███████████████████████ Ex. 7, Shawn Shan Dep. (03/03/26), 176:20-178:7, 184:2-12, 303:8-24; Ex. 10, Reply Report of Shawn Shan, ¶ 17.

Publishers relatedly argue (at 4) that Dr. Bilmes lacks a reasoned basis for his purported opinion that █████████████████████████████████████████ Dr. Bilmes's reports do not offer such an opinion and Anthropic does not intend to present such an argument at trial. Publishers' argument instead turns solely on their citation to statements Dr. Bilmes "offered for the first time at deposition," Mot. 4—i.e., statements elicited by Publishers. Publishers cannot invite testimony from Dr. Bilmes that goes beyond the scope of his reports, mischaracterize it as an affirmative opinion, and then argue all opinions disclosed in his reports on that issue are unreliable. *Cf. In re High-Tech Emp. Antitrust Litig.*, 2014 WL 1351040, at *23 (N.D. Cal. Apr. 4, 2014) (rejecting *Daubert* challenge "hing[ing] on a misleading characterization" of opinion).

## II. DR. BILMES RELIABLY AND CORRECTLY OPINED THAT PUBLISHERS' CLAIMED LYRICS ARE AVAILABLE ON PUBLICLY ACCESSIBLE WEBPAGES

One of Publishers' copyright claims alleges that Anthropic designed Claude to output song lyrics by intentionally including such lyrics in Claude's training data. Dkt. 728 ¶¶ 107-115. Dr. Bilmes's reports rebut this argument, explaining that the lyrics appeared in Claude's training data because they are prevalent on public webpages visited by Anthropic's web crawler. Rpt., § VII. As part of this analysis, Dr. Bilmes considered the Robot Exclusion Protocol, a published Internet Standard first developed in 1994 that provides rules websites can employ (via something called a robots.txt file) to signal that a bot or AI agent should not access their content. *Id.*, ¶¶ 301 & n.564, 439 & n.714; Dkt. 655-4, Bilmes Reply ("Reply"), ¶ 73 & n.269. Because the Protocol is the industry-recognized standard "widely used to manage content access," Ex. 3, Zhao Dep. Ex. 3, §

REDACTED PUBLIC VERSION

2.2; *see* Reply, ¶ 73 & n.269; Ex. 5, ¶ 74, Dr. Bilmes relied on it to analyze whether the visited websites were permissibly accessible to the crawler. Rpt., ¶¶ 301-310; Reply, ¶¶ 72-75. Specifically, Dr. Bilmes reviewed whether the website owner had included a directive in the "robots.txt file" that disallowed Anthropic's crawler access or failed to implement a robots.txt file at all. Rpt., ¶¶ 444-448. Dr. Bilmes's work revealed that ███████████████████████████████████████ ██████████████████████████████████████████████████████████████████ . *Id.*, ¶¶ 304-309.

Publishers' challenges to Dr. Bilmes's careful analysis are unavailing. *First*, Publishers accuse Dr. Bilmes (at 6-7) of being "misleading" and making a "legally irrelevant" argument by purportedly opining that Anthropic had the *legal* right to train Claude on the text of the websites at issue. As Publishers concede in the next breath, however, Dr. Bilmes has expressly disclaimed that position. Mot. 6. Dr. Bilmes's reply report could not be clearer that his "analysis only addresses, and was only intended to address" "whether technical access was restricted under [the Protocol] at the time of the crawling." Reply, ¶ 77. While Publishers speculate that the jury might be confused by Dr. Bilmes's references to terms like "permission" or "permitted," they do not cite a single case that has excluded comparable testimony under *Daubert*. And for good reason—any theoretical confusion could be cleared up by a single cross-examination question.

*Second*, Publishers argue in passing (at 6-7) that Dr. Bilmes's methodology is *per se* unreliable because he provided no explanation for ████████████████████████ ██████████████████████████████████ But Dr. Bilmes's reply report explained his logic in detail. *E.g.*, Reply ¶¶ 73-77. Dr. Bilmes relied on the industry-standard Robots Exclusion Protocol, which treats website content as inaccessible to a crawler *only* if it has a robots.txt file with a "Disallow" instruction. *Id.*, ¶¶ 73, 75. In other words, a crawler following the Protocol will treat a website whose robots.txt file lacks that "Disallow" instruction or a website with no robots.txt file at all the same way—in either situation, the website permits the crawler's access. Rpt., ¶¶ 445, 447-448. Even Publishers' experts concede that the Protocol ████████████████████████████ ████████████████████████████████ Ex. 5, ¶ 74; Ex. 8, Expert Report of Shawn Shan, ¶ 23 n.12; Ex. 9, Rebuttal Report of Shawn Shan, ¶ 19.

## III.    DR. BILMES RELIABLY AND CORRECTLY OPINED THAT TEXT USED TO TRAIN CLAUDE IS USED IN A NOVEL WAY THAT DIFFERS FROM ITS ORIGINAL PURPOSE

One of Anthropic's chief defenses is that training Claude on purportedly copyrighted material is protected by fair use. Dkt. 483 at 36. Fair use requires consideration of at least four factors, including "the purpose and character of the use." *McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149, 1157 (9th Cir. 2022). One "consider[ation]" is whether the use is "transformative"—i.e., it "adds something new and important." *Google v. Oracle*, 593 U.S. 1, 29-30 (2021).

Relying on his expertise in the field of AI and his review of the evidence about Claude's development and training, Dr. Bilmes opined that the use of Publishers' claimed lyrics as training data served the purpose of teaching Clause to "map[] out statistical relationships between text fragments." *E.g.*, Rpt., ¶ 36. Dr. Bilmes then explained that Claude relies on those relationships to perform generalized tasks like "generating text for drafting emails and blog posts, summarizing text of long articles and research reports, generating code to help developers build applications, and performing sentiment analysis to understand consumer feedback." *Id.*, ¶ 289; *see also id.*, § VI.

Publishers primarily contend (at 7-8) that Dr. Bilmes's report presents an improper legal opinion. This argument is doubly flawed. *First*, Publishers do not cite a single case that has squarely held the transformativeness inquiry is a pure question of law. To the contrary, the Supreme Court has stated that "fair use" is a mixed question that "may, of course, involve determination of subsidiary factual questions" and it expressly considered evidence "[t]he jury heard" in considering whether the use at issue was transformative. *Google*, 593 U.S. at 24, 29-32. The ultimate legal question is the broader issue of "whether those facts showed a fair use." *Id*. at 23-24. This Court should grant Anthropic's motion for summary judgment on fair use on Publishers' training data claims, Dkt. 694; but if it finds a material fact dispute, the logic of Publishers' position would also require excluding *their own expert's* testimony on transformativeness, *see* Ex. 5, ¶¶ 61-72.

*Second*, even if transformativeness was a pure question of law, "[a]n opinion is not objectionable just because it embraces an ultimate issue." *United States v. Diaz*, 876 F.3d 1194, 1196 (9th Cir. 2017) (alteration in original). Experts may "use legal terminology from the applicable law in expressing their opinions," so long as they do "not explain the law to the jury or tell the jury

how to apply the law to the facts of the case." *Pelican Int'l, Inc. v. Hobie Cat Co.*, 655 F. Supp. 3d 1002, 1031 (S.D. Cal. 2023); *accord Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1059 (9th Cir. 2008) ("[A] district court does not abuse its discretion in allowing experts to use legal terminology."). Indeed, "sometimes [it is] impossible for an expert to render his or her opinion on a subject without resorting to language that recurs in the applicable legal standard." *United States v. Andujo*, 2021 WL 5860900, at *1 (9th Cir. Dec. 10, 2021).

Dr. Bilmes has expressly stated he is not providing an opinion on whether using lyrics as training data satisfies the "particular legal definition of transformativeness." Ex. 1, 169:6-10. The bulk of the relevant section of Dr. Bilmes's reports merely address the vanilla factual question of whether LLMs' use of text for training is meaningfully different from the original purpose of the text. *E.g.*, Rpt., ¶¶ 287-288, 291-294. While his reports use the term "transformative" a handful of times (e.g., in articulating his understanding of the legal test that he was provided as an assumption for his analysis), Dr. Bilmes has clarified he was primarily using that word in a more "general sense"—consistent with how it is used in the "machine learning community." *E.g.*, Ex. 1, 170:25-174:25; *see* Reply, ¶¶ 61-64 (cataloguing non-legal uses of "transformative" in the LLM community). The Ninth Circuit has blessed precisely this use of legal terminology in an expert's opinion—i.e., where "the vernacular that is available to express" a factual point "is limited" and the term used does not have a "separate, distinct, and specialized meaning" in law than it has in other fields. *Diaz*, 876 F.3d at 1198 & n.3. Finally, any conceivable confusion about the scope of Dr. Bilmes's testimony can be remedied by a single cross-examination question.

Publishers also contend (at 9) that Dr. Bilmes does not know enough about music to opine on whether Claude uses Publishers' lyrics for a different purpose than Publishers themselves. Publishers do not, however, identify a single paragraph in Dr. Bilmes's report that should be excluded on this ground. And for good reason—as an AI expert, Dr. Bilmes is uniquely well-qualified to explain why "the purpose and use of Claude's training data … is not to reproduce that source material, but rather, to allow Claude to generate entirely novel results." *E.g.*, Rpt., ¶ 298.

In any event, Dr. Bilmes expressly relies on Mr. Colin Stokes—Anthropic's music expert—for foundational information on the purpose of song lyrics. Reply, ¶ 183. It is "common in technical

fields" for expert opinions to be based "in part on what a different expert believes" when that second expert has "knowledge not possessed by the first expert." *E.g.*, *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, 978 F. Supp. 2d 1053, 1066 (C.D. Cal. 2013). In contrast, Publishers' own technical expert opined on the ███████████ ████████████████████████████████████████████████████ ███████████████████ *See* Ex. 5, ¶ 71; Ex. 2, 116:3-7.

Finally, Publishers wrongly contend (at 9) that Dr. Bilmes's opinions about Claude's use of text should be excluded because the opinions are "nothing more than [Dr. Bilmes's] summary" of depositions and documents. This argument is simply another version of Publishers' assertion that Dr. Bilmes cannot provide an expert opinion on a technical matter without first examining specific source code or technological features. As explained, that is not the law—the *Daubert* inquiry "requires foundation, not corroboration." *Elosu*, 26 F.4th at 1025; *supra* pp. 3-4.

Regardless, even a brief glance at the paragraphs cited by Publishers (paragraphs 290-300 of Dr. Bilmes's opening report) establish that Dr. Bilmes applied his unique expertise at every step. Paragraphs 291-294 cross-reference and apply Dr. Bilmes's lengthy discussion of the underlying technology in Sections IV and V of his report to explain how LLMs "transform[] text into abstract, statistical representations." And Paragraphs 290 and 295-300 provide Dr. Bilmes's "[u]ltimate[] opinion" on why LLM's novel use of text is significant—again, drawing on his prior opinions from Section V. That Dr. Bilmes *also* provided lengthy footnote citations to support his opinions is merely a sign that he has diligently considered the issues—not that his opinions parrot the cited materials.

## IV.    DR. BILMES PROPERLY RELIED ON CONVERSATIONS WITH AN ANTHROPIC WITNESS

Publishers (at 9-10) object on hearsay grounds to about 20 footnote citations (across over 500 pages of reports), all of which reference a few short conversations Dr. Bilmes had with Anthropic employee Benjamin Mann to confirm discrete technical details about Claude's workings. *See* Ex. 1, 33:21-34:9 (Dr. Bilmes spoke to Mr. Mann "two or three" times for ten minutes or less). Publishers do not dispute Anthropic properly disclosed Mr. Mann in its Initial Disclosures or that they had the opportunity to depose him in his personal *and* Rule 30(b)(6) capacities on myriad technical topics. Moreover, Publishers concede an expert may rely on hearsay statements in forming their opinions.

REDACTED PUBLIC VERSION

Mot. 10; *accord Yonay v. Paramount Pictures Corp.*, 163 F.4th 685, 700 (9th Cir. 2026).

Publishers are wrong when they argue (at 10) that Dr. Bilmes went beyond the use of hearsay contemplated in cases like *Yonay* because he acted as a "conduit" for Mr. Mann's views. Most of the footnotes they attack deal with a similar scenario: Dr. Blimes asked Mr. Mann a targeted question on a minor factual issue that informed Dr. Bilmes's broader opinions. *See, e.g.*, Rpt., ¶ 234 & n.432 (confirming ███████████████████████████████████████ ██ ); Reply, ¶ 134 & n.372 (verifying that the "Claude 1 and 2 model families" "are no longer publicly available"). Indeed, three of the cited footnotes are word-for-word identical and simply provide a brief factual explanation for why several exemplar Claude outputs discussed in the report include a reference to both an "Assistant" and a "Helper." Dkt. 655-3, Bilmes Rebuttal ("Rebuttal"), ¶¶ 113 n.377, 115 n.379, 282 n.649. Publishers do not identify a single case holding that an expert's reliance on a witness to fill in small factual gaps requires exclusion of entire opinions. To the contrary, district courts in the Ninth Circuit have rejected *Daubert* challenges to similar testimony. *E.g.*, *Oracle Am., Inc. v. Google Inc.*, 2011 WL 5914033, at *1-2 (N.D. Cal. Nov. 28, 2011) (permitting an expert to rely on "interviews with Google's engineers" as long as the engineers "testif[ied] to the foundational facts with firsthand knowledge"); *V5 Techs., LLC v. Switch, Ltd.*, 501 F. Supp. 3d 960, 964-65 (D. Nev. 2020) (reasonable for an expert to rely on conversation with a sales representative for an air conditioning unit in developing his opinion that a unit was faulty).

Publishers' focus (at 10) on paragraphs 107-109 from Dr. Bilmes's rebuttal report—which address a specific Anthropic dataset—is particularly misplaced. Paragraph 109 makes no mention of Mr. Mann. And Paragraphs 107-108 merely show that Dr. Bilmes consulted with Mr. Mann to understand the background of how that one dataset—cited prominently in Publishers' expert's report—was actually used by Anthropic before providing an eight-page-long opinion on the dataset's significance. Rebuttal, ¶¶ 110-119. Publishers are wrong (at 10) that they "had [no] opportunity to investigate" Mr. Mann's views—they questioned him about that very dataset at his 11-hour deposition. Ex. 11, 30(b)(6) Benjamin Mann Dep. (11/20/25), 198:19-203:8.

## CONCLUSION

For these reasons, the Court should deny Publishers' motion to exclude.

**REDACTED PUBLIC VERSION**

Date: July 27, 2026

/s/ *Sonal N. Mehta*

LOUIS W. TOMPROS (*Pro Hac Vice*)
louis.tompros@wilmerhale.com
DISHA PATEL (*Pro Hac Vice*)
disha.patel@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6220

ARI HOLTZBLATT (SBN 354361)
ari.holtzblatt@wilmerhale.com
ROBIN C. BURRELL (*Pro Hac Vice*)
robin.burrell@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2100 Pennsylvania Ave, NW
Washington, DC 20037
Telephone: (202) 663-6000

SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

TAYLOR GOOCH (SBN 294282)
taylor.gooch@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
50 California Street
San Francisco, CA 94111
Telephone: (628) 235-1000

JARED V. GRUBOW (*Pro Hac Vice*)
jared.grubow@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Defendant*
**ANTHROPIC PBC**

**REDACTED PUBLIC VERSION**

## CERTIFICATE REGARDING USE OF GENERATIVE AI

Pursuant to this Court's Standing Order Regarding the Use of Generative AI Tools in Court filings, *see* Standing Order VIII(H), the undersigned notifies the Court that two expert reports cited in support of Anthropic's Opposition to Publishers' Motion to Partially Exclude the Opinions of Dr. Jeffrey Bilmes include "AI-generated content." *See* Dkt. 655-2 (Bilmes Report); Dkt. 655-3 (Bilmes Rebuttal). Dr. Bilmes's use of generative AI tools in connection with his opinions in this case is disclosed in those reports. The undersigned has verified Dr. Bilmes's use of generative AI as part of his methodology and certifies that Dr. Bilmes has "maintain[ed] records of all prompts or inquiries submitted to any generative AI tools." *See* Standing Order VIII(H).

Dated: July 27, 2026                              By:     */s/ Sonal N. Mehta*
                                                                  Sonal N. Mehta