**REDACTED PUBLIC VERSION**

SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

TAYLOR GOOCH (SBN 294282)
taylor.gooch@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
50 California Street
San Francisco, CA 94111
Telephone: (628) 235-1000

JARED V. GRUBOW (*Pro Hac Vice)*
jared.grubow@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

LOUIS W. TOMPROS (*Pro Hac Vice*)
louis.tompros@wilmerhale.com
DISHA PATEL (*Pro Hac Vice*)
disha.patel@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

ARI HOLTZBLATT (SBN 354361)
ari.holtzblatt@wilmerhale.com
ROBIN C. BURRELL (*Pro Hac Vice*)
robin.burrell@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2100 Pennsylvania Ave, NW
Washington, DC 20037
Telephone: (202) 663-6000

*Attorneys for Defendant*
**ANTHROPIC PBC**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| CONCORD MUSIC GROUP, INC., ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>ANTHROPIC PBC,<br><br>Defendant. | Case No. 5:24-cv-03811-EKL-SVK<br><br>**ANTHROPIC'S OPPOSITION TO PLAINTIFFS' MOTION TO PARTIALLY EXCLUDE OPINIONS OF DR. ANDREW BRAY**<br><br>Hearing Date: October 21, 2026<br>Time: 10:00 AM<br>Judge: Hon. Eumi K. Lee |

**REDACTED PUBLIC VERSION**

Dr. Andrew Bray is a data scientist and statistician at UC Berkeley. He teaches and has published extensively on statistics, statistical computing, and the design and analysis of experiments. Dr. Bray used his knowledge of large datasets and statistical methods to develop a rigorous and transparent regular expression ("regex") methodology to evaluate the ***millions*** of prompt and output records produced in this case.

Central to Publishers' claims is their contention that people frequently use Claude to search for lyrics. Financial analyst Joshua Dennis, one of Publishers' experts, purported to opine on that issue relying solely on a cherry-picked subsample of records that Publishers' counsel selected. By contrast, Dr. Bray is the ***only*** expert in the case that undertook an evaluation of the full 5 million prompt and output records produced by Anthropic in the case, rather than some unrepresentative subsample. Dr. Bray's evaluation, informed by his substantial statistical expertise, will help the jury understand what the 5 million record sample says about how people actually use Claude.

Publishers' motion principally seeks to exclude Dr. Bray's regex methodology because regex has not been used in a prior court case to assess the frequency of song or lyric-related prompts and outputs in large language model-generated records. But that is hardly surprising given the novelty of cases involving LLM technology. (And given that, across the 100+ AI copyright cases filed across the country, the only lawsuits asserting claims relating to lyrics are those pending before this Court.) What matters is that the use of regex methodology is well-established in computer science. And courts routinely accept the application of an established methodology to new technologies.

In fact, Publishers' own computer science expert, Dr. Ben Zhao, expressly opined that the use of regex methodology would be ██████████████████████████████ ████████████████████ Ex. 3, Expert Report of Ben Zhao ¶ 153.[1] Publishers only changed their tune on the reliability of regex once they saw Dr. Bray's results.

Publishers' remaining criticisms all go squarely to the weight of Dr. Bray's testimony, not its admissibility.

---

[1] Unless otherwise noted, 'Mot.' refers to Publishers' motion (Dkt. 656); 'Ex.' citations refer to exhibits to the Burrell Declaration submitted herewith; emphasis is added; and internal citations, quotations, and objections are omitted throughout.

**BACKGROUND**

Dr. Bray is an Associate Professor of Statistics at the University of California Berkeley. Dkt. 656-2, Bray Rpt. ("Rpt."), Exhibit A (CV). His research and teaching focus on statistical computing and data science, including courses on experimental design and analysis. *Id.* Dr. Bray has published widely, including in the *Journal of Open Source Software*, *Proceedings of the International Conference on Machine Learning*, and the *Journal of Statistics Education*. Rpt., ¶ 9. He has extensive experience designing statistical analyses of complex datasets, including the use of regexes in those analyses.

In discovery, pursuant to this Court's order, Anthropic produced a sample of 5 million prompt and output records over a six-month period from September 22, 2023 through March 22, 2024 (the "5 million P/Os"). Rpt., ¶ 16. The Court stated Anthropic could not contest that the 5 million P/Os were "statistically significant representation of the broader 6-month dataset." Dkt. 318 at 2. Dr. Bray is the only expert in this case that has analyzed those millions of records using statistical methods. He created regexes (which are "formalized descriptions of patterns in text") to analyze the 5 million P/Os and address five research questions: (1) the percentage of prompts seeking any amount or form of lyric regurgitation, (2) the percentage of those prompts seeking lyrics to the works-in-suit, (3) the percentage of outputs providing any amount or form of lyric regurgitation, (4) the percentage of those outputs providing lyrics to the works-in-suit, and (5) whether those results changed over time given the implementation and expansion of Claude's guardrails. Rpt., ¶¶ 32-33.

Dr. Bray first undertook certain standard data cleaning steps, including the exclusion of duplicate files and non-English files.[2] Dr. Bray then hand-reviewed files in the 5 million P/Os to identify different manners in which a user could seek lyric regurgitation and Claude could output lyrics to uncover variations (e.g., a user may ask "[w]hat are the lyrics to [a song]"). Rpt., ¶¶ 97-98. Dr. Bray created a draft set of regexes, which he then refined both by manually reviewing false positives and false negatives (and adjusting the regexes to minimize both), and by using Claude to

---

[2] As Publishers state in their motion, Dr. Bray re-ran his analyses in connection with his reply report after uncovering a vendor language classification error. Ex. 1, Reply Expert Report of Andrew Bray ¶ 11. As he explained, there was no material impact on his results.

**REDACTED PUBLIC VERSION**

evaluate a subsample of 46,000 files to propose additional refinements to the regexes. Rpt., ¶¶ 105-108. When he was satisfied that further refinements could not capture more false negatives without capturing a greater number of false positives, he finalized his regexes and ran them across the 5 million P/Os.

Dr. Bray found that (1) 0.047% of prompts sought any amount or form of lyric regurgitation, (2) 0.006% of the prompts sought lyrics to the works-in-suit, (3) 0.014% of outputs provided any amount or form of lyric regurgitation, (4) 0.0049% of outputs provided lyrics to the works-in-suit, and (5) none of the outputs to providing lyrics to the works-in-suit occurred after ███████████ ████████████████ certain of Claude's guardrails were implemented and expanded. Ex. 1, ¶¶ 63-65. Of the 138 prompts seeking lyrics to the works in suit, at least 115, or 83.33% of those prompts were submitted by Publishers' one known investigator. Ex. 1, ¶ 63.

## ARGUMENT

Under *Daubert*, the Court's role is "to ensure that the [proffered] testimony is both relevant and reliable." *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1047 (9th Cir. 2025). Expert testimony is "reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). "Scientific evidence is reliable if the principles and methodology used by an expert are grounded in the methods of science." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017). "Challenges that go to the weight of the evidence," as well as "credibility determinations," are for the jury. *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022).

While Anthropic's three *Daubert* motions are narrowly tailored to this standard, each of Publishers' *seven* motions (one for every expert Anthropic disclosed) ask this Court to turn the *Daubert* standard into a shotgun—one that blasts away any opinion Publishers find inconvenient to their merits positions. Anthropic submits this Court should reject Publishers' indiscriminate approach as inconsistent with the law, basic evidentiary principles, and common sense.

## I.    DR. BRAY'S REGULAR EXPRESSION METHOD IS RELIABLE

### A.    Regular Expressions Are A Well-Accepted And Reliable Methodology

**REDACTED PUBLIC VERSION**

Publishers' argument that regular expression analysis is unreliable is simply wrong.

*First*, Publishers incorrectly claim that regex analysis is unsupported within the scientific community (going so far as to claim that it is *per se* unreliable). But there is substantial scholarly support for and a long history of using regexes within the fields of computer science and statistics. Regexes "have long been known in the computer science realm as algorithms defining patterns in text." *Validity, Inc. v. Project Bordeaux, Inc.,* 2023 WL 6200287, at *6 (D. Del. Sept. 22, 2023) (citing literature in considering motion to dismiss patent infringement action). And regexes have been a critical tool in natural language processing to develop a corpora of text as part of the development of artificial intelligence. Brian S. Haney, *AI Patents: A Data Driven Approach*, 19 Chi.-Kent J. Intell. Prop. 407, 447 (2020).

Publishers selectively quote certain academic literature to argue that regexes are unreliable because writing regexes can be "challenging." Mot. 4. But in **the very next sentence** of the paper that Publishers cite, it goes on to say "[i]t is relatively easy to improve the precision of an initial regular expression by identifying false positives." Ex. 4, Anthropic_0000619850. This is precisely what Dr. Bray did. The paper that the Publishers cite then goes on to present a method to use regexes that have "high precision," and it tests that method empirically (finding it effective). *Id.*; *see also* Ex. 5, Anthropic_0000619269 at -308 (explaining effectiveness of "wildcard pattern matching through the use of regular expressions"). Moreover, courts regularly admit and credit expert testimony employing regex analysis. For example, in *Norman v. Trans Union, LLC*, the Court approvingly cited an expert's use of regex analysis in analyzing credit dispute letters in concluding that Plaintiffs had met their burden of proof. 669 F. Supp. 3d 351, 382 (E.D. Pa. 2023); *see also Validity, Inc.*, 20023 WL 6200287, at *6. In fact, ***Publishers do not identify a single instance in which a court has excluded regular expression methodology at* Daubert**.

*Second*, Publishers contend that regexes are unreliable in this specific case because they have not been used to "identify lyric-related prompts and outputs" of an LLM. Mot. 5. But **Publishers' own expert**, Dr. Zhao, argued that regexes should be used for exactly that purpose. He opined in his opening report about techniques to ██████████████████████████

████████████████████████████████████████████████████████████████████████

Ex. 3, ¶ 153.

Of course, even if the application of regex analysis to the specific task of identifying song lyrics in LLM prompts and outputs is new, that does not render it unreliable under *Daubert*. To the contrary, courts consistently hold that an expert's "application of an accepted methodology to a new set of facts" is permissible. *In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2012 WL 4904412, at *5 (C.D. Cal. Sept. 20, 2012). In *In re Toyota*, the court rejected the argument that an expert's study should be excluded because the "precise issue" covered "ha[d] not been addressed in the published literature." *Id.* That the expert used a "novel application" of an established methodology did "not make [her] analysis unreliable." *Id.* "[T]he mere fact that [an] experts' analysis is being conducted regarding a set of facts in a new market or industry does not alter or undermine the generally accepted nature of their methodological techniques." *Le v. Zuffa, LLC*, 2023 WL 5085064, at *8 (D. Nev. Aug. 9, 2023).

Publishers also wrongly suggest that Dr. Bray is required to have identified "peer reviewed publications discussing using regular expressions to identify requests for lyrics." Mot. 4. The specificity of the literature Publishers would demand is far beyond what *Daubert* requires. As described above, use of regex analysis to categorize text is reliable and accepted in the scientific literature and provides a solid foundation for Dr. Bray's application of this methodology to the facts here. Publishers cite no authority for the illogical proposition that an expert may only apply a particular methodology to a particular set of facts only if that methodology has been applied to those specific facts before in a peer-reviewed setting. Moreover, while peer review and publication is one consideration that may "bear on the analysis" of whether a methodology is reliable, "not every [*Daubert*] factor is relevant to reliability in every case and . . . the significance of each factor is case-dependent." *Murray v. S. Route Mar. SA*, 870 F.3d 915, 924 (9th Cir. 2017). Requiring peer-reviewed literature that addresses the specific application of the methodology would effectively prevent experts from ever using established methods to opine on new technologies. Publishers surely cannot believe that such literature is required—their own expert, Mr. Dennis, presents no peer-reviewed study to support the reliability of his method of counting subsets of records cherry-picked by counsel. In circumstances like this, "[p]eer reviewed scientific literature may be

unavailable because the issue may be too particular [or] new . . . to be in the literature." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010).

Publishers' other critiques of Dr. Bray's regex analysis go to its weight, not its admissibility. For example, publishers argue that regex analysis is a "poor choice" for lyrics. Mot 4. In addition to directly contradicting their own expert's opinion, Publisher's "poor choice" argument is a paradigmatic challenge to the "correctness" of the methodology's fit, something that the courts have held is off-limits in the *Daubert* inquiry. *HP Tuners, LLC v. Cannata*, 2023 WL 1071782, at *5 (D. Nev. Jan. 27, 2023) (explaining that whether one methodology is "better or worse than another" is a matter for "cross-examination and presentation of contrary evidence"). Publishers' (inaccurate) contention that Dr. Bray made "arbitrary choices," Mot. at 5, are just the sort of disputes that are ripe for cross examination—not a motion to exclude. Disputes as to "faults in [an expert's] use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998).

### B.    Dr. Bray's Analysis Is Within His Expertise

Publishers also assert that Dr. Bray's regex analysis and opinions should be excluded because he allegedly lacks the requisite experience and knowledge. Specifically, Publishers fault Dr. Bray for not being a musicologist[3] or linguist and having never "worked for a generative AI company." Mot. 4. Their criticism of Dr. Bray's expertise suffers from the same flaw as their critique of his methodology: they simply disagree that Dr. Bray can apply a methodology within his expertise to the particular type of record produced in this case.

***First***, Publishers' argument ignores Dr. Bray's extensive relevant experience. Rule 702 requires that a testifying expert be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The Ninth Circuit has emphasized that the rule "contemplates a broad conception of expert qualifications." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004). "[A]s long as an expert stays within the reasonable confines of his subject area," any alleged lack of specialization goes only to the weight—not admissibility—of expert

---

[3] Notably, in a separate motion, Publishers challenge the expertise of Anthropic's musicologist expert, Dr. Ethan Lustig, because he ***is*** a musicologist, and not (among other things) a statistician. *See* Dkt. 658. But consistency has not been Publishers' strong suit.

**REDACTED PUBLIC VERSION**

testimony. *Avila v. Willits Env't Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011).

Dr. Bray's opinions and analysis easily fall within the "reasonable confines of his subject area": statistics and data science. Dr. Bray received advanced degrees in statistics from a preeminent research and educational institution and has published extensive scholarship on a range of relevant topics, including statistics and analysis of large datasets. Dr. Bray has used regex analysis previously in his scholarship. Ex. 2, Andrew Bray Dep. (02/24/26) 15:20-17:10. Dr. Bray used this experience and expertise here: he selected and applied an accepted methodology, regex analysis, to analyze a very large dataset. Dr. Bray's statistical expertise is a skillset that will assist the jury in understanding the 5 million P/Os.

**Second,** courts consistently reject the formalistic conception of expert qualifications that Publishers assert here. For example, in *In re Macbook Keyboard Litigation*, the court concluded that an expert was sufficiently qualified to testify as to the cause of failure in keyboard design even though he had no experience performing failure analysis on keyboards or laptops and had never served as an expert related to those products. 2021 WL 1250378, at *6 (N.D. Cal. Apr. 5, 2021). Because the expert had extensive academic and research experience in "materials science, mechanical engineering, and failure analysis," he needed "not have specific experience with keyboards in order to offer expert testimony on the . . . cause of failure of the butterfly keyboards in this case." *Id.* The court emphasized that "Rule 702 imposes no requirement that experts have personal experience in an area to offer admissible testimony relating to that area." *Id.* It is appropriate for a statistician to apply an accepted methodology to a set of records, even if that set of records relates to lyrics. Based on Publishers' logic, only a statistician-musicologist (which of course neither party has identified) would pass muster here. That undeniably absurd result is not supported by the law.

Finally, Publishers point to *In re: Baby Food Products Liability Litigation,* 2026 WL 559857, at *2 (N.D. Cal. Feb. 27, 2026) to make the head-scratching argument that Dr. Bray's analysis is unreliable because it was conducted for the purpose of litigation. But this is of course true of any scientific analysis conducted using specific data produced as part of a lawsuit. An expert's opinions are not inadmissible simply because those opinions "were not developed

REDACTED PUBLIC VERSION

independently of litigation and ha[ve] not been published." *Wendell*, 858 F.3d at 1235. The data set Dr. Bray analyzed was necessarily produced for litigation (in response to Publishers' requests), but unlike the data subset analyzed by Publishers' expert, it was not cherry-picked by litigation counsel.

### C.   Lack Of An Error Rate Does Not Render A Methodology *Per Se* Unreliable

That there is no error rate for the type of regex analysis Dr. Bray performed likewise does not render it inadmissible. Publishers "cite no authority establishing that [parties] have a 'burden' of establishing [an expert's] rate of error or that a study that does not include a calculated 'rate of error' is per se inadmissible." *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1099 (D. Colo. 2006). While a methodology's "known or potential error rate" was noted as a potential factor by the court in *Daubert*, as discussed *supra*, "[t]hese factors are illustrative, and they are not all applicable in each case." *Wendell*, 858 F.3d at 1232.

Rather, the Ninth Circuit has observed that in some cases an "error rate [is] a poor measure of reliability." *Murray*, 870 F.3d at 924. This is such a case. First, Dr. Bray clearly described the steps he used to reduce false positives and false negatives, including manual review and refinements using an analysis of a subsample of 5 million P/Os records with Claude. Rpt., ¶¶ 105-107. As Dr. Bray explained during his deposition, the advantage to his model was that it was "very transparent" and "replicable." Ex. 2, 65:22-66:12. Notably, Publishers own expert could have refined Dr. Bray's regexes and/or generate alternatives, but chose not to. And while Publishers now argue that the supposed error rate is somehow too high, they ignore an undisputable fact that supports the accuracy of Dr. Bray's analysis: his regexes correctly identified the records in the 5 million P/Os that are at the heart of Publishers' own contentions, 115 records seeking lyrics to the works-in-suit from Publishers' own investigator. Moreover, Dr. Bray explained that calculating an error rate for regex analysis here would not make sense, because there is no measure of what a "ground truth would be, particularly at scale in order to estimate that false negative rate, [which] would give . . . a "misleading sense of[] certainty." Ex. 2, 64:6-15. Instead, drawing from his experience and expertise, he built a classifier with false negatives and false positives, and he refined the regexes until those false negatives and false positives were proportional. Ex. 2, 72:1-25. In their motion, Publishers identify an equal number of what they contend are false positives and false negatives—

ANTHROPIC'S OPP. TO MOT.                    - 8 -              Case No. 5:24-cv-03811-EKL-SVK
TO EXCLUDE ANDREW BRAY

<u>REDACTED PUBLIC VERSION</u>

precisely the balance Dr. Bray aimed for. Mot. 6-8. And Publishers, "using the same data and methods [would] be able to replicate the results," but chose not to. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1047 (9th Cir. 2014).

If Publishers wish to challenge Dr. Bray's analysis based on specific false positives or false negatives, or his conclusions about the impossibility of calculating an error rate for an analysis of this type, they are free to do so on cross-examination. But several courts in the Ninth Circuit have admitted expert analysis notwithstanding the lack of an error rate, concluding that the issue constituted a methodological critique that was a "bas[i]s for cross-examination at trial, not exclusion." *See, e.g. In re Univ. of S. Cal. Tuition & Fees COVID-19 Refund Litig.*, 695 F. Supp. 3d 1128, 1149 (C.D. Cal. 2023). Where a party "has any doubts regarding [the expert's] calculations" based on error rate, "then it may cross examine [the expert] at trial." *Zetz v. Bos. Sci. Corp.*, 644 F. Supp. 3d 684, 711 (E.D. Cal. 2022).

Publishers cite only a single case—*Gabbard v. Linn-Benton Housing Authority*, 219 F. Supp. 2d 1130, 1134 (D. Or. 2002)—to support their contention that the lack of an error rate precludes admissibility. That case is manifestly different. In *Gabbard*, the court found unreliable an expert's concededly "informal" techniques for diagnosing the plaintiff with a medical condition called "MCS" that was "outside the 'mainstream' of medical practice." *Id.* at 1138. While the court did take issue with the lack of an error rate, the more fundamental point was that neither plaintiffs, nor their experts, had reliably established that MCS was "truly a valid medical condition" with which one could be diagnosed. *Id.* at 1135. In other words, the court in *Gabbard* properly "act[ed] as a 'gatekeeper' to exclude junk science," *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1197 (9th Cir. 2014), and "unreliable nonsense opinions," *Alaska Rent-A-Car, Inc.*, 738 F.3d at 969. Regexes are not "junk science"—as Publishers' own expert concedes. *See* Ex. 3, ¶153.

## II.    DR. BRAY DOES NOT OFFER LEGAL CONCLUSIONS

Publishers also argue that Dr. Bray's opinion that his regex analysis shows that there were no outputs providing lyrics to the works-in-suit after expansion of Anthropic's guardrails should be excluded as "disguised legal argument." Mot. 9-10. But Dr. Bray does not draw any legal conclusions. During his deposition, he repeatedly made clear that he has "no particular legal

expertise, so [his] opinion is confined to the reports here and the characteristics of the datasets that were provided." Ex. 2, 204:9-18. The opinion that Publishers now seek to exclude is squarely a factual statistical presentation: Dr. Bray determined that, within the sample of records he assessed, "there were no outputs providing lyrics to the Works-in-Suit after ███████████ ████ certain guardrails were "implemented and expanded." Rpt., ¶ 40. Dr. Bray offers no opinions about whether the guardrails are "effective," or the legal import of guardrails. Publishers' critique is especially rich given that their own expert purports to do exactly that: analyze a nonrepresentative subset of the 5M records curated by counsel to opine baselessly that Anthropic's ████████ █████████████████████████████ Ex. 6, Expert Report of Joshua Dennis ¶15.

Publishers also claim that Dr. Bray's analysis of "lyric regurgitation" must be excluded because it is confusing to the jury. They are wrong again, for several reasons. *First*, Dr. Bray discloses each phrase that comprises his regexes to capture "lyric regurgitation." Publishers are free to cross-examine Dr. Bray on the components of his regex. A "challenge to the data or input underlying [the expert's] formula calculations is subject to cross-examination at trial, and not exclusion." *Victorino v. FCA US LLC*, 2018 WL 2767300, at *3 (S.D. Cal. June 7, 2018).

*Second*, Publishers attack an opinion Dr. Bray does not offer. They claim that Dr. Bray offers an opinion that "copying lyrics for '*other purposes*' is not 'regurgitation.'" Mot. 10. But Dr. Bray does not use the phrase "other purposes" in any of his reports nor did he use it in his deposition. Rather, Dr. Bray offered a simple factual explanation for the two prompts Mr. Dennis identified that, according to publishers, ███████████████████████████████████ ████████████████ *Id*. In his reply report, Dr. Bray showed the full prompt and output and explained why his regex analysis treated the prompt accurately. Ex. 1, ¶¶ 53-55. For example, Dr. Bray explained that a prompt seeking the *meaning* to the song ████████ was properly characterized because it was seeking the meaning of a song, with an output using only short snips of lyrics in explanation; it did not seek or obtain regurgitation. That explanation in no way represents a legal opinion on the ultimate question of infringement as Publishers suggest.

## CONCLUSION

The Court should deny Publishers' motion.

**REDACTED PUBLIC VERSION**

Date: July 27, 2026

LOUIS W. TOMPROS (*Pro Hac Vice*)
louis.tompros@wilmerhale.com
DISHA PATEL (*Pro Hac Vice*)
disha.patel@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6220

ARI HOLTZBLATT (SBN 354361)
ari.holtzblatt@wilmerhale.com
ROBIN C. BURRELL (*Pro Hac Vice*)
robin.burrell@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2100 Pennsylvania Ave, NW
Washington, DC 20037
Telephone: (202) 663-6000

*/s/ Sonal N. Mehta*
SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

TAYLOR GOOCH (SBN 294282)
taylor.gooch@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
50 California Street
San Francisco, CA 94111
Telephone: (628) 235-1000

JARED V. GRUBOW (*Pro Hac Vice*)
jared.grubow@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Defendant*
**ANTHROPIC PBC**

**REDACTED PUBLIC VERSION**

**CERTIFICATE REGARDING USE OF GENERATIVE AI**

Pursuant to this Court's Standing Order Regarding the Use of Generative AI Tools in Court filings, *see* Standing Order VIII(H), the undersigned notifies the Court that two expert reports cited in support of Anthropic's Opposition to Publisher's Motion to Partially Exclude Expert Testimony of Dr. Andrew Bray include "AI-generated content." *See* Dkt. 656-2 (Bray Report); Burrell Decl. Ex. 1 (Bray Reply). Dr. Bray's use of generative AI tools in connection with his opinions in this case is disclosed in those reports. The undersigned has verified Dr. Bray's use of generative AI as part of his methodology and certifies that Dr. Bray has "maintain[ed] records of all prompts or inquiries submitted to any generative AI tools." *See* Standing Order VIII(H).

Dated: July 27, 2026                    By:    */s/ Sonal N. Mehta*
                                                Sonal N. Mehta