## <u>REDACTED PUBLIC VERSION</u>

SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

TAYLOR GOOCH (SBN 294282)
taylor.gooch@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
50 California St.
San Francisco, CA 94111
Telephone: (628) 235-1000

JARED V. GRUBOW (*Pro Hac Vice)*
jared.grubow@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
250 Greenwich St
New York, NY 10007
Telephone: (212) 230-8800

LOUIS W. TOMPROS (*Pro Hac Vice*)
louis.tompros@wilmerhale.com
DISHA PATEL (*Pro Hac Vice*)
disha.patel@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

ARI HOLTZBLATT (SBN 354361)
ari.holtzblatt@wilmerhale.com
ROBIN C. BURRELL (*Pro Hac Vice*)
robin.burrell@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2100 Pennsylvania Ave, NW
Washington, DC 20037
Telephone: (202) 663-6000

*Attorneys for Defendant*
**ANTHROPIC PBC**

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

CONCORD MUSIC GROUP, INC., ET AL.,

               Plaintiffs,

   v.

ANTHROPIC PBC,

               Defendant.

Case No. 5:24-cv-03811-EKL-SVK

**ANTHROPIC'S OPPOSITION TO PUBLISHERS' MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. ABHISHEK NAGARAJ**

Hearing Date: October 21, 2026
Time: 10:00 AM
Judge: Hon. Eumi K. Lee

**REDACTED PUBLIC VERSION**

**INTRODUCTION**

Dr. Abhishek Nagaraj is an authority in the field of innovation and economics. He currently serves as a professor at U.C. Berkeley's Haas School Of Business and as the co-director of a research initiative known as the Data Innovation and AI Lab. Dkt. 659-2, Nagaraj Rpt. ("Rpt.") ¶ 1.

Dr. Nagaraj was asked to provide an economic opinion that relates to Anthropic's fair use defense. Among other things, the statutory fair use factors require consideration of "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). As relevant to this motion, Dr. Nagaraj opined that the relevant market is the market to assemble all of the data needed to train a Large Language Model (LLM) and that such a market does not exist and is unlikely to form. Rpt., ¶¶ 26-51. He also concluded that even if the relevant market were merely the market to license copyrighted song lyrics to train an LLM, that market also does not exist and is unlikely to form. Rpt., ¶¶ 52-71. Finally, Dr. Nagaraj submitted a rebuttal report refuting the opinions of Publishers' economics expert that (1) AI technology would negatively impact the music industry and (2) Publishers have and will suffer meaningful harm because the market for their lyrics was diluted by AI-generated original songs. Dkt. 659-3, Nagaraj Rebuttal ("Rebuttal") ¶¶ 50-93.

Publishers primarily object to Dr. Nagaraj's opinions on relevance grounds, Mot. 2-4, 8-10, asserting for example that Dr. Nagaraj's market opinions are necessarily irrelevant because they were not limited *solely* to "the 'potential market for or value of' *Publishers' lyrics*." But the cases Publishers rely upon do not directly address the issue presented here (i.e., the legal limits of the scope of the market). In reality, the factor-four case law that does has not set such hard-and-fast limits, *see, e.g.*, *In re Mosaic LLM Litig.*, 2025 WL 2294910, at *4 (N.D. Cal. Aug. 8, 2025) (noting that the scope of the relevant market "in the context of generative AI" is "an unsettled area of law"), and fair use in general eschews such "bright-line rules," *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994). Publishers' remaining relevance arguments target classic rebuttal testimony, which was made relevant by the positions staked out by Publishers' own expert (Dr. Michael Smith).

Publishers also (at 4-8) attack Dr. Nagaraj's methodology, largely because (in their view) his opinions fail to adequately account for several of their arguments. But those arguments conflict with well-established law on issues such as market definition and the scope of fair-use factor four

and—regardless—are effectively a challenge to Dr. Nagaraj's substantive conclusions. If the case proceeds to trial, those challenges go to credibility, which must be decided by a jury.[1]

## BACKGROUND

Dr. Nagaraj is a U.C. Berkeley professor whose research focuses on "innovation, entrepreneurship, and the digital economy." Rpt., ¶¶ 1-2. He also serves as a Research Associate at the National Bureau of Economic Research. *Id.* ¶ 1. His published work examines the interplay between "digital technologies and copyright"—scholarship that has led to a number of grants, including from MIT. *Id.* ¶¶ 2-3. Of particular relevance here, Dr. Nagaraj has also served as a contributing author in the U.S. Copyright Office's publication, *Identifying the Economic Implications of Artificial Intelligence for Copyright Policy. Id.* ¶ 2

Dr. Nagaraj was asked to provide two sets of opinions. In his opening report, he evaluated three potential markets for Publishers' copyrighted songs. Rpt., ¶ 8. He concluded that (1) "a market for all of the data needed to train a general-purpose LLM . . . did not exist" at the time of the purported infringement and was "unlikely to exist in the future," (2) "a market [did not exist] for the use of song lyrics to train general-purpose LLMs," and was "unlikely to exist in the future," and (3) "Anthropic's alleged display of lyrics in certain outputs [did not] harm[] Plaintiffs" in "the existing market for the online display of lyrics." Rpt., ¶¶ 9-14. Publishers do not challenge Dr. Nagaraj's third affirmative opinion.

Dr. Nagaraj's rebuttal report addressed the "reliability and accuracy" of the "economic assumptions and conclusions" made by Dr. Michael Smith (an economics expert), Dr. Ben Zhao (a computer scientist), and Mr. Joshua Dennis (a financial consultant). Rebuttal, ¶¶ 4, 5-14. Publishers do not challenge the vast majority of Dr. Nagaraj's 88-page rebuttal report.

## ARGUMENT

Under *Daubert*, the Court's role is "to ensure that the [proffered] testimony is both relevant and reliable." *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1047 (9th Cir. 2025). Expert testimony is "reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the

[1] Unless otherwise noted, 'Mot.' refers to Publishers' motion (Dkt. 659); 'Ex.' citations refer to exhibits to the Declaration of Robin Burrell submitted herewith; emphasis is added; and internal citations, quotations, and objections are omitted throughout.

**REDACTED PUBLIC VERSION**

relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). It is "relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *Id.* "Challenges that go to the weight of the evidence," as well as "credibility determinations," are for the jury, *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022), and rebuttal testimony may be offered to "explain[], repel[], counteract[] or disprove[]" an opposing expert's analysis. *Laatz v. Zazzle, Inc.*, 2025 WL 3205586, at *14 (N.D. Cal. Nov. 17, 2025).

While Anthropic's three *Daubert* motions are narrowly tailored to this standard, each of Publishers' *seven* motions (targeted at every expert Anthropic disclosed) ask this Court to turn the *Daubert* standard into a shotgun—one that blasts away any opinion Publishers find inconvenient to their merits positions. Anthropic respectfully submits that this Court should reject Publishers' indiscriminate approach as inconsistent with the law, basic evidentiary principles, and common sense.

## I.     DR. NAGARAJ'S OPINIONS ABOUT THE MARKET FOR DATA NEEDED TO TRAIN A GENERAL PURPOSE LLM ARE RELEVANT AND RELIABLE

Dr. Nagaraj's opening report "focus[ed] on" the "market to assemble all of the data needed to train a general-purpose LLM" because "it is the most relevant market for LLM developers, who need to be able to acquire a large enough set of training data to train a capable general-purpose AI model." Rpt. ¶ 34. Dr. Nagaraj explained that no such market exists or is likely to form because (1) the number of potential rights holders is enormous and highly distributed, and (2) the incremental value of any individual work is marginal. Rpt., ¶¶ 33, 43; *see also, e.g.*, *White v. W. Publ'g Corp.*, 29 F. Supp. 3d 396, 397-98, 400 (S.D.N.Y. 2014) (finding no market due to high transaction costs where works made up small fraction of database).

Publishers contend that Dr. Nagaraj's opinions about the general market for LLM training data are irrelevant because, according to them, the fair use inquiry is limited to the "'potential market for or value of' *Publishers' lyrics*." Mot. 2-4 (emphasis in original). As Dr. Nagaraj explained, however, a market for licensing just song lyrics (let alone the lyrics to just Publishers' songs) would not provide the kind of "massive quantities and varieties of data [an LLM company] needs." Rpt., ¶ 52. For example, the lyrics to the 499 songs at issue here would constitute just ▮▮▮▮▮▮ of the

**REDACTED PUBLIC VERSION**

amount of text needed to train a version of Anthropic's LLM (Claude 3) discussed in Dr. Nagaraj's report. *Id.* ¶ 55. Accordingly, no LLM developer would need to license lyrics alone without a broader market for the vast quantity of all diverse data needed to build a high-performing general purpose LLM. Rpt., ¶¶ 33, 34; Rebuttal, ¶¶ 102-103.

While Publishers protest (at 3) that this approach is contrary to the "plain language" of the fourth statutory fair use factor, the scope of the relevant market is an "unsettled area of law" in fair use—particularly in the "context of generative AI." *Mosaic*, 2025 WL 2294910, at *4. Publishers' citations to *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1179 (9th Cir. 2013) and *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 32 (2d. Cir. 2021) do not support their rigid rule, as neither case opined on the proper scope of the market when discussing harm from market substitution for the original work.

And even beyond the specific facts of this case, the fair use doctrine cannot be simplified down to "bright-line rules." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994). Each fact pattern requires the same kind of "case-by-case" analysis, *id.*, that Dr. Nagaraj performed here. His testimony about why the broader market for LLM training data is the right one (and is not likely to form) thus has a "valid connection to the pertinent inquiry," *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010), because it presents the jury with an evidentiary tool to help make the "factual determination[]" as to market harm. *See Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 24-25 (2021). Such market definition testimony is particularly vital because "[t]ypically, jurors are consumers and not marketing professionals" and require the assistance of an "economist" to address "[w]hether or not a market can potentially form for goods or services." *Hayden v. 2k Games, Inc.*, 2022 WL 3097382, at *3 (N.D. Ohio. Aug. 4, 2022). Publishers' request for this Court to engage in evidentiary tunnel-vision and deprive the jury of relevant, helpful expert testimony is unsupported by the law or common sense.

Publishers also wrongly argue (at 4-6) that Dr. Nagaraj's market definition must be excluded as unreliable. Publishers fail to identify the kind of "serious methodological flaws" that *Daubert* requires for exclusion. *See Teradata Corp. v. SAP SE*, 124 F.4th 555, 566 (9th Cir. 2024). The *Teradata* decision—which dealt with the analogous context of defining a market for purposes of an

ANTHROPIC'S OPP. TO MOT.                     - 4 -                     Case No. 5:24-cv-03811-EKL-SVK
TO EXCLUDE DR. NAGARAJ

**REDACTED PUBLIC VERSION**

antitrust claim—is instructive. There, the Ninth Circuit held that the district court abused its discretion by excluding an expert who "defined the relevant markets primarily based on a qualitative analysis" of "business documents and other evidence" because, the Ninth Circuit explained, that expert had "employed reasonable methodologies in defining the relevant markets." *Id.* at 566. *Teradata* rejected the assertion that the plaintiff's expert's opinion was unreliable—either because it defined the relevant market "too imprecise[ly]" or because the expert "fail[ed] to explain how he arrived at his more precise definition of 'large enterprises.'" *Id.* at 567. The moving party's arguments ignored that defining a market is "an inexact science" and some "fuzziness [is] inherent in any attempt" because "the relevant competitive market is not ordinarily susceptible to a 'metes and bounds' definition." *Id.* at 567-68.

*Teradata's* logic applies here. Similar to the *Teradata* expert, Dr. Nagaraj's market definition was premised on a qualitative economic assessment of the business models of the parties to this case and the nature of digital licensing. Rpt., ¶¶ 15-25. And Publishers' criticism (at 4-5) of Dr. Nagaraj's supposed failure to provide a "precise definition of a general-purpose LLM" simply repeats the type of imprecision and lack of explanation arguments that *Teradata* repudiated. Put simply, the definition of a "general-purpose LLM" is "a sufficiently intuitive concept that even if" Dr. Nagaraj's definition "was somewhat arbitrary, [a court] cannot say that his failure to explain the choice cast doubt on the reliability of his methodology." *Teradata*, 124 F.4th at 567-568.

Publishers' related argument (at 4-5) that Dr. Nagaraj's definition of a general-purpose LLM was internally inconsistent (because he stated that a general-purpose LLM requires ███████ ████████████ while also "admitt[ing] that OpenAI's GPT-3 model is a general purpose LLM that . . . was successfully trained on only 300 billion tokens") misstates the testimony. In reality, Dr. Nagaraj testified that GPT-3 was merely a "research model" that was "not economically valuable" and one that could only "do okay" when "you take 300 billion tokens *and add additional information* such as in-context learning." Ex. 1, 46:2-47:6. In any event, any purported "[i]nconsistencies" in Dr. Nagaraj's opinion go to weight, not admissibility. *Teradata*, 124 F.4th at 568.

Publishers' remaining, more granular arguments for exclusion are meritless. *First*, Publishers call Dr. Nagaraj's market definition "circular[]" since he purportedly concludes that the

relevant market cannot develop because the data needed to train a general-purpose LLM is more than can be licensed. Mot. 5. But this argument misstates Dr. Nagaraj's position, which is the pragmatic conclusion that the transaction costs of negotiating with millions of copyright holders would stop such a market from developing in the first place. Rpt., ¶¶ 38-52. There is nothing "tautological" about Dr. Nagaraj drawing such a reasonable conclusion from two simple facts: (1) general-purpose LLMs require trillions of words in order to be adequately trained and (2) there is simply no practical way to acquire that amount of text as a buyer.

*Second*, Publishers contend (at 5-6) that Dr. Nagaraj's opinion about the relevant market is unreliable because it does not adequately address the possibilities that an LLM developer might purchase small data-sets to fill gaps in its training data or the fact that developers of specialized LLMs focused on song generation might have a particular interest in lyrics. As an initial matter, the notion that Dr. Nagaraj's opinions must be excluded if they do not account for every single factual wrinkle is unsupported by the law. Claims that an expert engaged in "oversimplification" or failed to account for particular information are tested on cross-examination rather than at the *Daubert* stage. *E.g.*, *Johnson v. Nissan N. Am., Inc.*, 2022 WL 2869528, at *7 (N.D. Cal. July 21, 2022); *see also Victorino v. FCA US LLC*, 2018 WL 2767300, at *3 (S.D. Cal. June 7, 2018).

In any event, Dr. Nagaraj's report expressly discusses both points. First, he explained that "the value of gap-filling or last-mile data is itself conditional on a pre-existing dataset of sufficient size to train a general-purpose LLM." Rpt., ¶ 73. Put differently, licensing deals for relatively small amounts of data only make sense if the negotiating LLM developer has already amassed the tremendous amount and variety of data needed to nearly fully train the model. *Id.* Second, Dr. Nagaraj noted that "single-purpose AI audio tools" have "meaningful differences in functionality, use cases, and competitive dynamics" than a general-purpose LLM like Anthropic and use different inputs (e.g., "not just lyrics text, but also audio"). Ex. 2, ¶¶ 35-39.

*Third*, Publishers (at 6) argue that Dr. Nagaraj's opinions are inconsistent with his prior writings, which they claim recognized the existence of a market for licensing content for training LLMs. But Dr. Nagaraj again addressed this precise point at his deposition, explaining he had used the term "licensing market" in the relevant paper as a "shorthand" for three specific licensing

deals—not to refer to a specific market that included Publishers' copyrighted works. Ex. 1, 136:23-137:2; *see also* Ex. 2, ¶¶ 87-88 (similar). And again, even if there were an inconsistency between Dr. Nagaraj's testimony and his prior written work (he explained there is not), *Daubert* does not permit a court to "exclude opinions merely because they" may be used to try and impeach the expert. *Alaska*, 738 F.3d at 969.

## II. DR. NAGARAJ'S OPINIONS ABOUT THE PURPORTED MARKET FOR LICENSING LYRICS TO TRAIN GENERAL-PURPOSE LLMS ARE REASONABLE AND RELIABLE

Dr. Nagaraj also considered, in the alternative, whether a market for licensing lyrics only to train general-purpose LLMs exists or could exist in the future. Rpt., ¶¶ 52-71. Dr. Nagaraj concluded that no such market exists or is likely to form because the value of lyrics in general-purpose LLM training is "minimal" and the costs of identifying lyric copyright holders and making deals for their works were at least moderately high. *Id*. ¶¶ 64-71. The ensuing transaction costs would likely exceed the value of any potential deal. *Id.*

Publishers (at 6-7) primarily argue that Dr. Nagaraj's opinion is unreliable because it has the purportedly "absurd result" that Anthropic can use copyrighted works as training data without having to pay. But it is well-established that—for purposes of factor four—courts consider "*only* traditional, reasonable, or likely to be developed markets." *Sofa Ent., Inc. v. Dodger Prods.*, 782 F. Supp. 2d 898, 909 (C.D. Cal. 2010), *aff'd*, 709 F.3d 1273 (9th Cir. 2013). And at least one other court confronted with a similar issue has concluded that a market cannot exist—and thus no market harm is cognizable—when "the transactions costs in licensing [copyrighted] works would be prohibitively high." *White*, 29 F. Supp. 3d at 400. Indeed, Publishers' own expert agrees that "transaction costs must be sufficiently low for a licensing market to arise." Ex. 3, ¶ 114.

In any event, the premise of the fair use doctrine is that a defendant should not be required to pay for the use of a copyrighted work when that use is for a transformative purpose. *E.g.*, *Tresona Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638, 652 (9th Cir. 2020). There is thus nothing anomalous about an expert concluding that a copyright holder may not be compensated if their work is copied for a purpose that is a fair use. The work is still protected by copyright law as a general matter. But fair use precludes compensation in this particular instance.

**REDACTED PUBLIC VERSION**

Publishers further contend (at 7-8) that Dr. Nagaraj's opinions are unreliable because they are based on the starting assumption that Anthropic will not be required to pay for any copyrighted materials that it can "scrape" from the Internet. But the two paragraphs from Dr. Nagaraj's report that Publishers cite are making the altogether different point that music data has a uniquely low value to companies like Anthropic when compared to other types of text. Rpt., ¶¶ 58-59. That is the case even when comparing music to other data that (in Publishers' words) is available "for free on the internet," Mot. at 7. For example, Dr. Nagaraj found that ███████████████ ████████████████████████████████████████████████████████████ ███████████████████████ Rpt., ¶¶ 58-59. Indeed, Anthropic co-founder Benjamin Mann testified that Anthropic did not "view it as important to include lyrics," Ex. 4, 114:8-9, and Anthropic's Chief Science Officer, Jared Kaplan, testified that "Anthropic doesn't have any particular interest in song lyrics" for training, Ex. 5, 291:21-22.

Moreover, contrary to Publishers' suggestion (at 7-8), Dr. Nagaraj's broader opinions regarding the lack of a market for Publishers' lyrics are not limited to internal Anthropic materials. He relied on numerous outside sources, such as Publishers' own catalogs, academic scholarship, and conversations with other experts in this case (i.e., non-Anthropic employees) about the value of lyrics. Rpt., ¶¶ 53-71.

Finally, Publishers (at 8) argue Dr. Nagaraj's opinions are contradicted by the fact that Anthropic has on at least one occasion ████████████████████████████ ████████████████████████ what would be needed to train a general-purpose LLM. *Cf.* Rpt., ¶ 56 ████████████████████ ████████████████████ In any event, Publishers concede in the next breath ██████████████ was for the purpose of ██████████████████████ ████████████████████ Mot. 8—i.e., *not* for use as training data. And Publishers ignore that Dr. Nagaraj explained why this very licensing agreement did not affect his opinion because "Anthropic could rationally decide that lyrics are of high value for a purpose like ██████████████████ Ex. 2, ¶ 64.

**REDACTED PUBLIC VERSION**

### III.   DR. NAGARAJ'S RESPONSES TO PUBLISHERS' ECONOMICS EXPERT ARE APPROPRIATE REBUTTAL TESTIMONY

Publishers' economics expert (Dr. Smith) "assume[d]" that Anthropic is liable for copyright infringement and provided opinions on the harm that Publishers will suffer as a result—including dilution of the market for Publishers' lyrics. Ex. 3, ¶¶ 13 & 64 n.54. Dr. Smith also predicted that the labor market and music industry as a whole would be harmed by AI, including because artists and publishers would be displaced by and competing with new songs that are influenced by prior human work. *Id.* ¶¶ 60-98.

As relevant here, Dr. Nagaraj's rebuttal report reacted to Dr. Smith's points in two ways. First, he explained how AI could potentially benefit both the public in general and music publishers in particular. Rebuttal, ¶¶ 50-82. Second, he responded to Dr. Smith's claims of market dilution by noting that—"from an economic point of view"—they rested on the unduly expansive view of intellectual property rights. Rebuttal, ¶¶ 83-93.

Publishers contend (at 9-10) that Dr. Nagaraj's first opinion (about the benefits of AI) is irrelevant because it does not directly address benefits springing from using the "specific[]" lyrics used in Anthropic's training data. But Publishers do not identify any case that has excluded an expert's opinion on similar grounds. To the contrary, the Ninth Circuit has made clear that when the secondary use at issue is the copying of multiple works to create a new technological tool, all the benefits of that tool are relevant, not just benefits traceable to the specific works in the case. *E.g.*, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1166 (9th Cir. 2007).

In addition, excluding Dr. Nagaraj's testimony would be particularly inappropriate in this case because it is undisputed that every bit of training data fed into Claude affects Claude's capabilities. *See* Anthropic's Mot. for Summ. J. 12 (Apr. 22, 2026), Dkt. 694. In other words, Anthropic's use of Publishers' lyrics do in fact provide broad benefits to the public and the music industry in that Claude's responses on myriad issues—ranging from scientific breakthroughs to farming techniques—are informed by the implicit and explicit connections that Claude has been able to draw based on those lyrics and the rest of its training data. *Id.* at 5, 9-12, 18-19; *see also* Ex. 2, ¶ 61.

**REDACTED PUBLIC VERSION**

Publishers' other relevancy arguments (at 9-10) are even less persuasive. While Publishers quibble that Dr. Nagaraj's opinion discusses AI in general rather than Claude in particular, Dr. Smith's broad statements about the effects of AI have made such opinions relevant. To take just a few examples, Dr. Smith discussed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 3, ¶ 73, predicted that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ *id.* ¶ 79, and generally asserted that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ *id.* ¶ 94. Put simply, Dr. Smith's opinion that AI is uniformly bad for the economy made it necessary for Dr. Nagaraj to explain why it is not. *See* Ex. 1, 240:21-241:02. Rebuttal testimony is proper in precisely this situation, when it is used to "contradict, impeach or defuse the impact of the evidence offered by an adverse party." *Huawei Techs. Co. v. Samsung Elecs. Co.*, 340 F. Supp. 3d 934, 995-96 (N.D. Cal. 2018). It would at least be premature for the Court to exclude Dr. Nagaraj's rebuttal testimony without first seeing the case that Publishers present at trial. Publishers are wrong (at 10) that *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001) bars consideration of the market benefits of a use under factor four. That case simply held that increased sales of a work "would not tip the fair use analysis *conclusively* in favor of defendant." *Id*. at 1018.

Finally, Publishers challenge (at 8-9) Dr. Nagaraj's opinions about the effects of competition from AI-generated songs as legally irrelevant. Again, this is classic rebuttal testimony. Dr. Smith took the position that Publishers will suffer harm when Claude responds to requests for original songs because Claude's outputs dilute the market for Publishers' songs. Ex. 3, ¶¶ 60-98. In response, Dr. Nagaraj explained that Dr. Smith's concept of harm failed to account for the "well-accepted economic insights about intellectual property"—i.e., those that recognize the "serious costs" of extending IP rights so far. Rebuttal, ¶¶ 87, 91. Dr. Nagaraj has expressly disclaimed that he is presenting a legal opinion. *Id.* ¶ 83. Rather, his opinions go to the wholly responsive point of whether Publishers can be said to suffer any meaningful dilutive harm "from an economic point of view." *Id.*

## CONCLUSION

For the foregoing reasons, the Court should deny Publishers' motion.

**REDACTED PUBLIC VERSION**

Date: July 27, 2026

LOUIS W. TOMPROS (*Pro Hac Vice*)
louis.tompros@wilmerhale.com
DISHA PATEL (*Pro Hac Vice*)
disha.patel@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6220

ARI HOLTZBLATT (SBN 354361)
ari.holtzblatt@wilmerhale.com
ROBIN C. BURRELL (*Pro Hac Vice*)
robin.burrell@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2100 Pennsylvania Ave, NW
Washington, DC 20037
Telephone: (202) 663-6000

*/s/ Sonal N. Mehta*
SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

TAYLOR GOOCH (SBN 294282)
taylor.gooch@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
50 California St.
San Francisco, CA 94111
Telephone: (628) 235-1000

JARED V. GRUBOW (*Pro Hac Vice*)
jared.grubow@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
250 Greenwich St
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Defendant*
**ANTHROPIC PBC**