**OPPENHEIM + ZEBRAK, LLP**
Matthew J. Oppenheim
Nicholas C. Hailey
Jeffrey M. Gould
Corey Miller
Keith Howell
(admitted *pro hac vice*)
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
jeff@oandzlaw.com
corey@oandzlaw.com
khowell@oandzlaw.com

Alexander Kaplan
Jennifer Pariser
Andrew Guerra
Bret Matera
Timothy Chung
Michelle Gomez-Reichman
(admitted *pro hac vice*)
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
alex@oandzlaw.com
jpariser@oandzlaw.com
andrew@oandzlaw.com
bmatera@oandzlaw.com
tchung@oandzlaw.com
mgomez-reichman@oandzlaw.com

**COBLENTZ PATCH DUFFY & BASS LLP**
Jeffrey G. Knowles (SBN 129754)
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 391-4800
ef-jgk@cpdb.com

**COWAN, LIEBOWITZ & LATMAN, P.C.**
Richard S. Mandel
Jonathan Z. King
Richard Dannay
(admitted *pro hac vice*)
114 West 47th Street
New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

CONCORD MUSIC GROUP, INC., ET AL.,

Plaintiffs,

v.

ANTHROPIC PBC,

Defendant.

Case Number: 5:24-cv-03811-EKL-SVK

**PLAINTIFFS' OPPOSITION TO ANTHROPIC'S MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

**REDACTED**

Judge Eumi K. Lee
Magistrate Judge Susan van Keulen

Hearing Date: October 21, 2026, 10:00 am
Courtroom: 7

## TABLE OF CONTENTS

INTRODUCTION ........ 1
ARGUMENT ........ 3
I. Anthropic cannot manufacture nonexistent disputes to evade summary judgment. ........ 3
II. Publishers are entitled to summary judgment on *prima facie* direct infringement. ........ 5
A. Deposit copies are not necessary to show Anthropic's copying. ........ 6
B. Anthropic exercises volition over the output that its AI models generate. ........ 8
III. Publishers are entitled to summary judgment on Anthropic's fair use defense. ........ 11
A. Anthropic's mass copying is antithetical to the purpose of copyright. ........ 12
B. All four statutory fair-use factors strongly favor Publishers. ........ 12
1. The purpose and character of Anthropic's use precludes fair use. ........ 12
2. Publishers' Works are undoubtedly at the core of copyright protection. ........ 19
3. Anthropic does not dispute copying Publishers' lyrics wholesale. ........ 19
4. Anthropic's use harms the market for and value of Publishers' Works. ........ 20
IV. Anthropic should be denied summary judgment as to Publishers' CMI claims. ........ 27
CONCLUSION ........ 28

# TABLE OF AUTHORITIES

**Cases**

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
562 F.3d 630 (4th Cir. 2009) .......... 17, 18

*A&M Recs. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) .......... 24

*Am. Broad. Companies v. Aereo, Inc.*,
573 U.S. 431 (2014) .......... 9

*Am. Title Ins. Co. v. Lacelaw Corp.*,
861 F.2d 224 (9th Cir. 1988) .......... 4

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) .......... *passim*

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015) .......... 17

*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014) .......... 17

*Barkley & Assocs. v. Quizlet, Inc.*,
2025 WL 2946993 (C.D. Cal. Sept. 11, 2025) .......... 10, 19

*Bartz v. Anthropic PBC*,
787 F. Supp. 3d 1007 (N.D. Cal. 2025) .......... *passim*

*Bell v. Wilmott Storage Servs.*,
12 F.4th 1065 (9th Cir. 2021) .......... 10

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) .......... *passim*

*Carlson v. Century Sur.*,
606 F. App'x 882 (9th Cir. 2015) .......... 5

*Cartoon Network LP v. CSC Holdings, Inc.*,
536 F.3d 121 (2d Cir. 2008) .......... 9

*Corona v. Novartis Pharmaceuticals Corp.*,
2012 WL 13418947 (C.D. Cal. June 12, 2012) .......... 5

*CoStar Grp. v. Commercial Real Est.*,
2025 WL 2647269 (C.D. Cal. June 25, 2025) .......... 28

*Cox Commc'ns, Inc. v. Sony Music Ent.*,
146 S. Ct. 959 (2026) .......... 8

*De Fontbrune v. Wofsy*,
39 F.4th 1214 (9th Cir. 2022) .......... 24

*Disney Enterprises, Inc. v. Minimax*,
2026 WL 1476670 (C.D. Cal. May 22, 2026) .......... 10

*Dr. Seuss Enters., L.P. v. ComicMix*,
983 F.3d 443 (9th Cir. 2020) .......... 11, 19, 21, 26

*EMI Christian Music Grp. v. MP3tunes, LLC*,
844 F.3d 79 (2d Cir. 2016) .......... 10

*F. W. Woolworth Co. v. Contemp. Arts*,
344 U.S. 228 (1952) .......... 21

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2020) .......... 19, 24, 27

*Hachette Book Grp., Inc. v. Internet Archive*,
115 F.4th 163 (2d Cir. 2024) .......... 21

*Harper & Row Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985) .......... 2, 19, 21

*ICONICS, Inc. v. Massaro*,
192 F. Supp. 3d 254 (D. Mass. 2016) .......... 28

*Kadrey v. Meta Platforms, Inc.*,
2025 WL 744032 (N.D. Cal. Mar. 7, 2025) .......... 28

*Kadrey v. Meta Platforms, Inc.*,
2024 WL 5008065 (N.D. Cal. Dec. 6, 2024) .......... 7

*Kadrey v. Meta Platforms, Inc.*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025) .......... *passim*

*Kirk Kara Corp. v. W. Stone & Metal*,
2020 WL 5991503 (C.D. Cal. Aug. 14, 2020) .......... 8

*Kohistani v. Scott*,
2026 WL 2185717 (N.D. Cal. July 29, 2026) .......... 22

*Leadsinger, Inc. v. BMG Music Publ'g*,
512 F.3d 522 (9th Cir. 2008) .......... 18, 19

*Los Angeles News Serv. v. KCAL-TV Channel 9*,
108 F.3d 1119 (9th Cir. 1997) .......... 18

*McGucken v. Pub Ocean Ltd.*,
42 F.4th 1149 (9th Cir. 2022) .......... 19, 20, 21

*Monge v. Maya Mags., Inc.*,
688 F.3d 1164 (9th Cir. 2012) .......... 19, 20, 26

*Nat'l Fire Prot. Ass'n v. UpCodes, Inc.*,
753 F. Supp. 3d 933 (C.D. Cal. 2024) .......... 18

*Norse v. Henry Holt & Co.*,
991 F.2d 563 (9th Cir. 1993) .......... 7

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) .......... 17

*Range Rd. Music, Inc. v. E. Coast Foods, Inc.*,
668 F.3d 1148 (9th Cir. 2012) .......... 7

*Real World Media v. Daily Caller, Inc.*,
744 F. Supp. 3d 24 (D.D.C. 2024) .......... 28

*Romanova v. Amilus*,
138 F.4th 104 (2d Cir. 2025) .......... 13, 16

*Ross-Nash v. Almond*,
2020 WL 6947691 (D. Nev. Oct. 28, 2020) .......... 7

*S.E.C. v. Seaboard Corp.*,
677 F.2d 1297 (9th Cir. 1982) .......... 28

*Schneider v. YouTube*,
649 F. Supp. 3d 872 (N.D. Cal. 2023) .......... 28

*Sega Enters. Ltd. v. Accolade, Inc.*,
977 F.2d 1510 (9th Cir. 1992) .......... 24

*Seltzer v. Green Day, Inc.*,
725 F.3d 1170 (9th Cir. 2013) .......... 25

*Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*,
952 F.3d 1051 (9th Cir. 2020) .......... 7

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984) .......... 21

*Thaler v. Perlmutter*,
687 F. Supp. 3d 140 (D.D.C. 2023) .......... 12, 24

*Thomson Reuters Enter. Ctr. v. Ross Intel. Inc.*,
765 F. Supp. 3d 382 (D. Del. 2025) .......... 17

*UMG Recordings, Inc. v. Grande Commc'ns Networks*,
118 F.4th 697 (5th Cir. 2024) .......... 7

*VHT, Inc. v. Zillow Grp., Inc.*,
918 F.3d 723 (9th Cir. 2019) .......... 9, 18, 21, 26

**Statutes**

17 U.S.C. § 101 .......... 7, 15

17 U.S.C. § 102 .......... 7

17 U.S.C. § 107 .......... 11, 14, 19, 20

8 Del. Gen. Corp. L. § 362 .......... 3

**Other Authorities**

U.S. COPYRIGHT OFFICE, CIRCULAR 6: OBTAINING ACCESS TO AND COPIES OF COPYRIGHT OFFICE RECORDS AND DEPOSITS (2019) .......... 7

U.S. COPYRIGHT OFFICE, *Copyright and Artificial Intelligence, Part 3: Generative AI Training (Pre-Publication Version)* (May 2025) .......... 15, 22, 25

**Rules**

Fed. R. Civ. P. 36(b) .......... 6

Fed. R. Civ. P. 56(c)(1)(A) .......... 3

## INTRODUCTION

"Steal a little and they throw you in jail, steal a lot and they make you king." BOB DYLAN, *Sweetheart Like You* (1983). Bob Dylan's timeless lyrics could have been written about Anthropic.

Anthropic cannot dispute the basic facts of its infringement. There is no real question that it systematically copied Publishers' lyrics in their entirety to train its Claude AI models, and that those models have produced verbatim copies of those lyrics, synthetic derivatives, and "new" AI lyrics that displace the human-written lyrics that enabled their generation. That is infringement.

Nor does Anthropic justify its mass copying of Publishers' lyrics in AI training as fair use. Quite the opposite, Anthropic continues to insist it has ***no*** particular need for Publishers' lyrics at all—an admission that is fatal to its fair use defense. Where Anthropic has "no independent justification, let alone a compelling one, for copying" Publishers' lyrics, its fair use defense must fail. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 547 (2023).

Rather than justify its copying of Publishers' lyrics as the law requires, Anthropic instead tries to dodge the question by reframing this case as about anything ***but*** its copying of those lyrics. Anthropic invokes its copying of "billions of other copyrighted works" that are not Publishers' lyrics, lists Claude uses that are "wholly unrelated" to lyrics, and opines on purported benefits of AI that have nothing to do with lyrics. None of those issues bear on Anthropic's fair use defense.

Anthropic cannot argue with a straight face that it copied the lyrics to "A Change is Gonna Come," "What a Wonderful World," and "American Pie" to train Claude to write computer code, conduct clinical drug research, or remove lead cables from Lake Tahoe. AI technology is not alchemy. Publishers' lyrics are not "transformed" as input to generate that output. The reason Anthropic copies Publishers' lyrics in training is for Claude to output verbatim copies, AI derivatives, and machine-generated lyric substitutes. That is not a transformative use.

Anthropic also fails to carry its burden of showing no market harm. It ignores the undeniable harm AI-generated songs cause by congesting streaming platforms and music charts, displacing the human-written works that enabled their creation. And by fixating on actual damages, it disregards black-letter law that Publishers "need only show that if the challenged use should become widespread, it would adversely affect the potential market for the copyrighted work."

*Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 568 (1985).

The *Bartz* and *Kadrey* rulings underscore why Anthropic's mass copying of Publishers' lyrics here is ***not*** fair use. While those defendants justified their copying by arguing that the copyrighted books at issue were uniquely valuable to AI training, Anthropic denies that Publishers' lyrics have any training value at all. Where those courts premised their transformativeness rulings on the absence of infringing AI output, the record here is replete with such output. And while those cases may have lacked sufficient market harm evidence, Publishers have presented the exact evidence of market dilution *Kadrey* outlined and the market substitution *Bartz* found missing.

Anthropic warps the law by suggesting its mass theft of Publishers' lyrics somehow promotes the goals of copyright, just as Napster did when trying to defend its mass infringement. Like a parasite that kills its host, Anthropic feeds on Publishers' copyrighted lyrics to fuel its production of uncopyrightable AI imitations, while destroying the incentive to create the human-written lyrics that enabled them. Anthropic CEO Dario Amodei foretells that AI models will "eventually automate everything"—rendering the human-created artistry on which they were built "obsolete." MSS ##215-16. That is the antithesis of fair use.

If the Court rules for Publishers, Anthropic can seek a license for Publishers' lyrics or, if those lyrics are as valueless to AI training as it insists, simply stop using them. Either way, it will not dent Anthropic's trillion-dollar AI business, which dwarfs the income of the music publishing industry. Anthropic cries wolf that granting Publishers' motion will "veto" AI more broadly. That is "nonsense." *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1058 (N.D. Cal. 2025).

By contrast, Anthropic asks this Court to become the first to hold that it is fair use for an AI company to train on copyrighted works even where the AI company admits it does not need those works and where it uses those works to produce harmful AI output. That extraordinary ruling would empower Anthropic to continue exploiting copyrighted content indiscriminately, leaving creators powerless to stop AI companies from using their creations to destroy their livelihoods.[1]

[1] "Mot." refers to Pls.' Motion for Partial Summary Judgment (ECF No. 594); "MSS" refers to Pls.' Moving Separate Statement (ECF No. 594-1); "Def. RSS" refers to Defs.' Responsive Separate Statement (ECF No. 686-2) and "Def. Ad.F" to additional facts therein; "Reply SS" refers

## ARGUMENT

**I. Anthropic cannot manufacture nonexistent disputes to evade summary judgment.**

At the outset, Anthropic's RSS is rife with violations of the Federal Rules of Civil Procedure and this Court's Standing Order. These violations clog the summary judgment record and impede Publishers' and the Court's ability to determine where genuine disputes exist.

The Federal Rules require Anthropic to pinpoint each fact in Publishers' MSS that "is genuinely disputed" by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). The Court's Standing Order (Secs. IX & VIII.G) makes clear Anthropic must cite "evidence in the record establishing the dispute," attest all evidence cited "fairly and accurately supports or disputes the facts as asserted," and ensure factual statements are "completely accurate."

Anthropic's RSS violates those rules with abandon. Anthropic invents false and frivolous disputes, re-litigates its prior binding admissions, purports to "dispute" facts without identifying any contrary evidence in the record, and injects improper argument and objections, all in an attempt to muddy the record and evade summary judgment. *See also* ECF Nos. 731 and 731-2.[2]

For example, Anthropic baselessly disputes the fact that it "is a for-profit" company, MSS #149, which bears on the commercial nature of its use and weighs against fair use. *See Warhol*, 598 U.S. at 532-33. Anthropic's claimed "dispute" blatantly contradicts its 30(b)(6) witness's testimony ***admitting*** it is a for-profit: "Q. Is Anthropic [a] for-profit company? A. It is." MSS #149 (citing ECF No. 595-3, Whittle 30(b)(6) Dep. Tr. 32:18-20). It also ignores testimony by two of its founders that it is "not a nonprofit." Ad.F #3. Nor can Anthropic hide behind its incorporation as a "public benefit corporation," when the relevant law defines a "public benefit corporation" as "a for-profit corporation." 8 Del. Gen. Corp. L. § 362. Anthropic's refusal to admit even the basic fact of its for-profit status is emblematic of its broader disregard of the Court's RSS rules.

Anthropic separately exploits its RSS to improperly re-litigate its prior binding admissions.

---

to Pls.' Reply Separate Statement; "Def." refers to Defs.' Motion for Summary Judgment and Opposition (ECF No. 693); "Def. MSS" refers to Defs.' Moving Separate Statement (ECF No. 686-1); "RSS" refers to Pls.' Responsive Separate Statement and "Ad.F" to Pls.' additional facts therein. Unless otherwise indicated, internal quotation marks and citations are omitted.

[2] Anthropic also fails to cite several of its affirmative facts (Def. MSS #37 and Def. Ad.F ##6-9) anywhere in its brief. Pursuant to the Court's Standing Order, uncited facts are not considered.

A matter admitted in response to a request for admission is "conclusively established." Fed. R. Civ. P. 36(b). Anthropic, despite admitting in response to numerous RFAs that it copied Publishers' lyrics in training, MSS #6, now disputes Publishers' Fact #6 quoting that RFA response verbatim. Def. RSS #6. Likewise, admissions in an answer are "conclusively binding on the party who made them." *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988). Anthropic, despite admitting in its Answer that its founder Tom Brown prompted Claude pre-launch for lyrics to Work in Suit "Desolation Row" by Bob Dylan, ECF No. 483 ¶ 113 ("Anthropic admits that Tom Brown prompted Claude in the quoted manner."), now denies that very same fact. Def. RSS #114. Making matters worse, the evidence it cites does not even support its denial. It points the finger at Mr. Brown's father, but Mr. Brown testified he himself prompted Claude. Ad.F #38. Nor can Anthropic dispute Fact #114 by claiming Claude did not output lyrics, when that is both irrelevant and wrong: the fact addresses Mr. Brown's prompting, not any output ([redacted]), and, in any event, Mr. Brown testified "I don't really remember clearly" the model's output. *Id.*

Anthropic also spuriously claims Publishers' facts are "disputed" without citing evidence to show a dispute. Publishers' Fact #70 states, "Anthropic selected the data it used to train Claude," which goes to its volition. While Anthropic claims that fact is "disputed," its response addresses a ***different*** fact (denying it selected "specific copyrighted works"), while conceding it ***did*** "'select[] training data' for Claude." Def. RSS #70; *see* RSS #98 (undisputed). Publishers' Fact #184 states, "Claude can produce AI-generated lyrics far faster than any human, generating output of between '60 to a hundred words per second,'" which goes to market harm caused by these AI-generated competing substitutes. Anthropic's purported "dispute" fails to address the fact asserted (*i.e.*, Claude produces lyrics faster than humans). Instead, it improperly argues "[t]he speed with which Claude can generate textual outputs does not bear on whether Claude can or does output lyrics," Def. RSS #184, which is especially head-scratching, given Anthropic elsewhere ***admits*** Claude can and does output such AI-generated lyrics, *id.* ##181, 185 (undisputed); *see* Ad.F ##8, 10. In over 100 instances, Anthropic "disputes" something other than the asserted fact, leveraging its RSS to confuse the record. *See* Def. RSS ##2, 8-10, 13-14, 26, 33-42, 44-45, 47-50, 72, 77-78, 83, 85-86, 90, 93, 95-113, 116-120, 122-123, 126-132, 136, 139, 142, 144, 149, 152-153, 157, 164,

166-167, 169, 171-173, 178-180, 183, 189-191, 195-199, 201-204, 206, 211, 213-218.

Anthropic also jams its RSS with improper argument and evidentiary objections, violating the Standing Order's mandate that the RSS "shall not include argument" or "objections to evidence" and "shall not be used to circumvent the page limits." Anthropic "disputes" Publishers' Fact #45—which states that "[redacted]," showing the under-inclusiveness of the infringing outputs in the record—by improperly (1) arguing it had "no obligation" to preserve, (2) objecting to the evidence, and (3) ignoring that it admits the ***exact same fact*** in its prior response. Def. RSS #45; *id.* #44 (stating same fact in response). Similar violations abound. *See id.* ##2, 4-11, 14-15, 17, 19, 21, 26, 33-39, 41-42, 54, 64, 66-68, 74-77, 81-82, 85-86, 90, 92-93, 107, 129-132, 136, 142, 144, 149, 162, 164-167, 169, 171-173, 178-180, 183-184, 192-193, 195-204, 206, 211, 217-218.

Anthropic "cannot manufacture a dispute on summary judgment, *ipse dixit*, by refusing to concede the truth of a fact without adducing some evidentiary support for its position." *Carlson v. Century Sur.*, 606 F. App'x 882, 884 (9th Cir. 2015). Nor can it evade briefing limits by converting its RSS into a supplementary brief. Publishers detailed these violations in a letter to Anthropic, ECF No. 731-2, met and conferred, and requested Anthropic correct them. Anthropic refused.

Accordingly, all the facts that Anthropic has improperly disputed in violation of the rules should be deemed admitted under Sec. IX of the Court's Standing Order. *See also, e.g.*, *Corona v. Novartis Pharmaceuticals Corp.*, 2012 WL 13418947, at *2 nn.28-29 (C.D. Cal. June 12, 2012).

## II. Publishers are entitled to summary judgment on *prima facie* direct infringement.

Publishers are entitled to summary judgment on their direct infringement claim, given the lack of any genuine dispute as to the ownership or copying elements of that claim. Mot. 13-18.

First, Publishers have established ownership by showing timely copyright registration and chain of title for all 499 Works in Suit. *Id.* 13-14. Anthropic does not actually dispute any of those underlying facts. *See generally* Def.; Def. RSS ##1-4. Anthropic cannot invent a "dispute" as to ownership by ignoring the asserted facts and instead asserting non-responsive argument and commentary, in violation of the Court's rules. *See* Def. RSS ##2, 4.

Second, Anthropic cannot thwart summary judgment by manufacturing a dispute as to its

copying of Publishers' lyrics. As for training, Anthropic admitted "at least one Claude model was trained on a dataset containing the lyrics to at least one hundred (100) of Publishers' Works [in Suit]," MSS #6 (citing ECF No. 595-21, Def.'s Am. Resp. to Pls.' RFA 20), which "conclusively established" that fact. Fed. R. Civ. P. 36(b). Anthropic's motion also concedes "it is undisputed" that "Publishers' lyrics . . . were swept up and included in Claude's vast training corpus." Def. 14-15; *see* Def. MSS #74 ("[redacted]"). Likewise, there is no real dispute Anthropic reproduced Publishers' lyrics in output. Anthropic admits that by explicitly identifying in its output the lyrics it has copied, *e.g.,* MSS #34, and those lyrics are instantly recognizable. The evidence of infringing output is overwhelming: Publishers' investigation identified Claude output copying lyrics to ***every single one*** of the 499 Works in Suit, often multiple times over, MSS ##34-35, and Anthropic's Claude records reveal hundreds of instances in which third-party users—plus its own employees—requested and received copies of Publishers' lyrics in output, *id.* ##36-43, 51-58, 60-63, 65, 113-14, 130-32. Anthropic quibbles over the precise number of copies it made of Publishers' lyrics in its training corpus, or the frequency of output copying those lyrics, but that does not alter its liability.

Against this record, Anthropic's thin challenges to Publishers' direct infringement claim are easily dispatched. First, Anthropic cannot walk back its admissions that it copied Publishers' lyrics by conjuring some imagined uncertainty as to the content of those lyrics in the absence of deposit copies. There is no genuine dispute as to the lyrics to "Mama Said," "Sweet Caroline," or "Uptown Funk," which millions can recite from memory. Second, Anthropic cannot evade direct liability for the infringing output its AI models generate. Where Anthropic "invented Claude and continue[s] to improve Claude every day," Def. 22, it has volition over the output it produces.

**A. Deposit copies are not necessary to show Anthropic's copying.**

The undisputed evidence that Anthropic copied Publishers' lyrics eliminates any need for deposit copies. The only possible relevance of deposit copies would be as a "benchmark" for a substantial similarity analysis. Def. 37. But the Ninth Circuit has made clear that "[a] showing of 'substantial similarity' is irrelevant in a case like this one, in which the [plaintiffs] produced evidence that the [alleged infringements] entailed direct copying of copyrighted works." *Range*

*Rd. Music, Inc. v. E. Coast Foods, Inc.*, 668 F.3d 1148, 1154 (9th Cir. 2012). This is not a case where the defendant created a purportedly new work resembling the plaintiff's work and there is some question whether the defendant copied protectable elements of the plaintiff's work. Because there is no question Anthropic copied Publishers' lyrics in their entirety, deposit copies would be superfluous. *See, e.g.*, *UMG Recordings, Inc. v. Grande Commc'ns Networks*, 118 F.4th 697, 710 (5th Cir. 2024) (declining to require deposit copies where parties had not "meaningfully disputed whether the defendants' alleged copies were substantially similar to the plaintiffs' alleged works"); *Norse v. Henry Holt & Co.*, 991 F.2d 563, 566 (9th Cir. 1993) (observing "the substantial similarity analysis is inapposite to the copying issue because [defendants] admit that they in fact copied [the works at issue]"); *Ross-Nash v. Almond*, 2020 WL 6947691, at *1 (D. Nev. Oct. 28, 2020).

Anthropic's claim that "the scope of the copyright is limited by the deposit copy," Def. 36, misstates the law. *Skidmore* held only that the scope of copyright for an ***unpublished work*** registered under the ***1909 Copyright Act*** is "limited by the deposit copy." *Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1062-63 (9th Cir. 2020). For a ***published work*** registered under the 1909 Act, and for both published and unpublished works registered under the ***1976 Copyright Act***, the scope of protection is determined by a copy of the work itself, not a deposit copy. *Id.*; 17 U.S.C. §§ 101, 102. Here, at most sixteen of Publishers' 499 Works in Suit were solely registered as unpublished works under the 1909 Act, *see* MSS #3, and for nearly all that were so registered, Publishers ***have*** provided deposit copies, Reply SS Def. Ad.F. #3-4. Additional deposit copies are unnecessary to determine the scope of protection for the Works in Suit. *See, e.g.*, *Kadrey v. Meta Platforms, Inc.*, 2024 WL 5008065, at *2 (N.D. Cal. Dec. 6, 2024) (rejecting argument relying on *Skidmore* that deposit copies define scope of copyright and must be produced where "nearly all of the [works] at issue" were created after the 1976 Copyright Act).

Critically, neither the Copyright Office nor the Library of Congress preserves all deposit copies. *See, e.g.*, U.S. COPYRIGHT OFFICE, *Circular 6: Obtaining Access to and Copies of Copyright Office Records and Deposits* 3 (2019) (Copyright Office "does not retain all works deposited for copyright registration"). As a result, Publishers could not obtain deposit copies for all Works. Chung Decl. at ¶¶ 3-9, ECF No. 595. Requiring Publishers to produce deposit copies

would effectively bar infringement claims whenever the Copyright Office has not retained deposit copies. Nothing in the Copyright Act imposes such a draconian requirement. Had Congress intended to limit rightsholders' ability to sue in that way, it would have done so expressly.

Even if there were any question as to the content of Publishers' lyrics (which there is not), Publishers ***have*** provided "benchmarks" proving those lyrics. Publishers produced copies of all lyrics—as deposit copies, copies from LyricFind, or both—and sworn testimony that the LyricFind lyrics are materially accurate. MSS #4; Reply SS Def. Ad.F. ##3-4. The LyricFind lyrics are not mere "proxies," but are the lyrics of the registered Works, reflecting the lyrics embodied in the sound recordings typically submitted as deposit copies. MSS #4; Reply SS Def. Ad.F. ##6-10.

Anthropic never explains how any of the rare, minor discrepancies it claims to identify between copies of lyrics would affect its liability. The omission of a stanza or the difference in a single line from the version Anthropic copied does not excuse its copying of other protected portions. Even if the Court applies the substantial similarity test, "a copyrighted [work] need not be copied 'in its entirety' to be infringed under the substantial similarity standard—the infringer need only copy a 'substantial portion' of the copyrighted work." *Kirk Kara Corp. v. W. Stone & Metal*, 2020 WL 5991503, at *4 (C.D. Cal. Aug. 14, 2020). Publishers have shown substantial copying for all 499 Works in Suit in Anthropic's training and the resulting output (including for the 13 Works for which Publishers acquired and produced deposit copies). MSS ##5-10, 34, 66.

**B. Anthropic exercises volition over the output that its AI models generate.**

Given that Anthropic indisputably controls the output that its AI models generate, it cannot duck direct liability for that infringing output by foisting the blame onto its users. Mot. 17-18.

As an initial matter, nowhere does the Copyright Act expressly require volition. The Supreme Court recently instructed courts not to read additional doctrines into copyright law beyond the statute's text. *Cox Commc'ns, Inc. v. Sony Music Ent.*, 146 S. Ct. 959, 967-68 (2026). To the extent courts previously used volition to distinguish between direct and secondary liability, they relied on a theory of secondary liability that the Supreme Court has since narrowed. *Id.*

In any event, Anthropic plainly exercises volition. Volition "does not really mean an act of willing or choosing," but simply that "proximate causation historically underlines copyright

infringement liability." *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 731 (9th Cir. 2019). In determining volition, "the distinction between active and passive participation" is "central." *Id.* at 732. Here, Anthropic unquestionably meets that standard by playing an "active" role at every stage.

Anthropic does not argue it lacks volition when it selects and copies Publishers' lyrics as input to train Claude in the first instance. In the non-volitional-conduct cases cited by Anthropic, third parties—not the defendants—"select[ed] and upload[ed]" the material to be copied. *VHT*, 918 F.3d at 733; *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121, 131 (2d Cir. 2008) (defendant lacked volition where user selected copyrighted content to be recorded). Unlike those passive defendants, Anthropic here selects and copies Publishers' lyrics to train its models. RSS ##61-62, 98 (undisputed); Ad.F #78; *see VHT*, 918 F.3d at 736 (holding volition where defendant "selected and tagged" copyrighted works for website display). Training Claude on Publishers' lyrics enables it to respond to lyric-related queries and output copies and derivatives of those lyrics, thereby "instigat[ing]" the copying. *VHT*, 918 F.3d at 732; *see* MSS #73; Ad.F. ##47, 79.

Anthropic likewise cannot deny volition over the output its AI models ultimately generate. That users may enter initial requests does not inoculate Anthropic from direct liability for the output it designed Claude to produce. *See Am. Broad. Companies v. Aereo, Inc.*, 573 U.S. 431, 443 (2014) (holding defendant liable for direct infringement even where its "system remains inert until a subscriber indicates that she wants to watch a program" and "[o]nly at that moment, in automatic response to the subscriber's request, does [the] system . . . transmit the requested program").

Further, Claude does not just "automatically" execute user commands. In fact, Anthropic argues Claude is "unlike a database or retrieval system." Def. MSS #35. Rather, Anthropic directs and controls how Claude generates output in response to user requests, in multiple ways. During development, Anthropic trains and finetunes its models to generate output in the manner it desires. MSS #94; RSS ##88, 138-39 (undisputed); Ad.F #32. After models are released, it continues to control their output. Before [redacted]. Ad.F. #82. Then, Anthropic [redacted]. *See* MSS ##80, 84 (undisputed); Def. MSS #35 (Anthropic

"control[s]" "stochasticity" of "output"). Claude generates different outputs even in response to identical user prompts. Def. 10. In short, Anthropic, not any user, ultimately determines and controls Claude's output. That is the definition of volition. *See also* Ad.F ##77, 80, 83.

Anthropic's "guardrails" prove its volition. Anthropic claims to override user prompts and control output via guardrails: its "Constitution directs the model to choose [certain] responses" and "avoid" others, Def. 6; "Prompt Shield" "[redacted], *id.*; RSS #113-14 (undisputed); Ad.F #81; and "[redacted]" "performs checks throughout the generation process" and "reject[s]" output before displaying it to users, RSS #118 (undisputed). Whether guardrails are intended to prevent infringement, or effective, is irrelevant to volition: "Whether [Anthropic] intended to infringe [] copyright is ultimately immaterial—the innocent intent of the defendant constitutes no defense to liability." *Bell v. Wilmott Storage Servs.*, 12 F.4th 1065, 1082 (9th Cir. 2021); *see* Ad.F ##17-18, 85-90.

Anthropic cannot shift the blame to users for output they do not control. Time after time, Claude generates output copying Publishers' and others' lyrics ***even when users do not ask.*** MSS #63; *see id.* ##53, 59-62, 74-78; Ad.F #33-34, 46. Anthropic tries to rewrite those user prompts now, claiming they did request lyrics. But they obviously did not. *Id.* When Anthropic produces "a copyrighted item that a user did not request," it is self-evident that Anthropic—not the user—is responsible. *EMI Christian Music Grp. v. MP3tunes, LLC*, 844 F.3d 79, 96 (2d Cir. 2016).

Numerous courts have held conduct like Anthropic's "plainly volitional." *Bell*, 12 F.4th at 1081-82 (holding volition where defendant "hosted [copyright content] on its servers in a manner that was accessible to the public"). That includes district courts in this Circuit addressing similar copyright infringement claims against AI companies like Anthropic. *Disney Enterprises, Inc. v. Minimax*, 2026 WL 1476670, at *6 (C.D. Cal. May 22, 2026) (denying motion to dismiss where defendants' alleged volition included "train[ing] their AI using [p]laintiffs' copyrighted content," not "merely operating a website on which users are able to independently upload infringing content"); *Barkley & Assocs. v. Quizlet, Inc.*, 2025 WL 2946993, at *1-4 (C.D. Cal. Sept. 11, 2025) (denying motion to dismiss where defendant allegedly "directly copied [copyrighted works] to develop and train" AI product that output "derivative content that closely mimics [those] original

works," "directly participat[ing] in creating and distributing infringing material").

Accordingly, Publishers are entitled to summary judgment on their *prima facie* direct infringement claim. At a minimum, disputed facts preclude summary judgment for Anthropic.

**III. Publishers are entitled to summary judgment on Anthropic's fair use defense.**

Anthropic's mass infringement of Publishers' lyrics is not fair use as a matter of law. Where Anthropic fails to meet its "unequivocal[]" burden of proving fair use, its attacks on Publishers' arguments are immaterial. *Dr. Seuss Enters., L.P. v. ComicMix*, 983 F.3d 443, 459 (9th Cir. 2020).

At the outset, Anthropic concedes its verbatim copying of Publishers' lyrics in AI output is not fair use. *See* Def. 22-23 ("Anthropic does not assert a fair use defense to any actual 'verbatim . . . cop[y] of lyrics' [in output]."). Given the overwhelming record of Claude's regurgitating verbatim lyrics to each of Publishers' 499 Works in Suit, *e.g.*, MSS ##34-35, 66-68, Publishers are entitled to summary judgment as to that infringing output without even addressing fair use.

Relatedly, Anthropic cannot evade summary judgment by vaguely asserting a handful of outputs may qualify as fair use, then shrugging that the record is "factually complex." Def. 8, 22-23. Without demonstrating how each infringing output identified by Publishers is purportedly fair use, Anthropic fails to meet its burden of proving its defense against the extensive record of its infringement. *See , e.g.*, *Warhol*, 598 U.S. at 533 ("[F]air use . . . requires an analysis of the specific 'use' of a copyrighted work that is alleged to be 'an infringement.'" (citing 17 U.S.C. § 107)).

The remaining question before the Court—and the critical issue for Publishers—is whether it is fair use for Anthropic to systematically copy Publishers' lyrics as AI input to generate harmful lyric-based output. Anthropic would have the Court believe *Bartz* and *Kadrey* broadly held that "use of copyrighted text to train LLMs is fair use as a matter of law," Def. 8, but Anthropic severely mischaracterizes those decisions. Indeed, *Kadrey* stressed that it did "not stand for the proposition that Meta's use of copyrighted materials to train its language models is lawful," emphasizing instead that the unauthorized use of copyrighted works for AI training will "in most cases" be "illegal." 788 F. Supp. 3d at 1034-37. That is hardly the glowing endorsement Anthropic trumpets.

Contrary to Anthropic's claims, the law is clear that its mass copying of Publishers' lyrics to train its AI models to generate unauthorized copies, distorted derivatives, and market substitutes

is anathema to the purpose of copyright and that all four statutory factors weigh against fair use.

**A. Anthropic's mass copying is antithetical to the purpose of copyright.**

Anthropic's defense profoundly misunderstands copyright's purpose. Copyright "seeks to advance original works of authorship," as Anthropic admits. Def. 17 (quoting *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1032 (N.D. Cal. 2025)). That principle is embedded in the key judicial interpretations of fair use. *Warhol* teaches that fair use balances "encourag[ing] creativity" and "promoting broad public availability of literature, music, and the other arts." 598 U.S. at 526. Or, in the AI context, "[w]hat copyright law cares about, above all else, is preserving the incentive for human beings to create artistic and scientific works." *Kadrey*, 788 F. Supp. 3d at 1034.

Anthropic's mass ingestion of Publishers' copyrighted lyrics so that its AI models can regurgitate and imitate them is antithetical to these goals. Claude does not respond to copyright's "incentives" to create—only to Anthropic's programming. Likewise, Claude cannot "create" copyrighted works—only AI-generated facsimiles. *See, e.g.*, *Thaler v. Perlmutter*, 687 F. Supp. 3d 140, 146 (D.D.C. 2023) ("[C]opyright law protects only works of human creation."), *aff'd*, 130 F.4th 1039 (D.C. Cir. 2025). In other words, whereas copyright law is intended to encourage humans to create "literature, music, and the other arts," while ensuring that the public can benefit from that creation, Anthropic does the exact opposite. *Warhol*, 598 U.S. at 526. As Judge Chhabria observed, "training generative AI models with copyrighted works . . . dramatically undermine[s] the market for those [human] works, and thus dramatically undermine[s] the incentive for human beings to create things the old-fashioned way." *Kadrey*, 788 F. Supp. 3d at 1035.

**B. All four statutory fair-use factors strongly favor Publishers.**

**1. The purpose and character of Anthropic's use precludes fair use.**

The Supreme Court's seminal *Warhol* decision instructs that the first fair-use factor "relates to the justification for the use," and "considers whether the use of a copyrighted work has a further purpose or different character, which is a matter of degree" (referred to as transformativeness), and which "must be balanced against the commercial nature of the use." 598 U.S. at 531, 532. Here, Anthropic fails to justify its mass copying of Publishers' lyrics, distorts the transformativeness analysis, and disregards the commercial nature of its use altogether. *See* Mot. 21-27.

**a. Anthropic fails to justify its copying of Publishers' lyrics.**

Anthropic's brief entirely "disregards [the Supreme] Court's repeated emphasis on justification." *Warhol*, 598 U.S. at 549. "[F]air use is an affirmative defense, and [Anthropic] bears the burden to justify its taking of [Publishers'] work." *Id.* at 547 n. 21. But ***nowhere*** does Anthropic (or its *amici*) "justif[y]" its copying of Publishers' lyrics as "reasonably necessary to achieve" any transformative use, as *Warhol* demands. *Id.* at 532. That is fatal to Anthropic's fair use defense. *Romanova v. Amilus*, 138 F.4th 104, 119 (2d Cir. 2025) (reversing fair use ruling for "fail[ing] to heed *Campbell*'s insistence, later reiterated in *Warhol*, that there must be justification").

In *Bartz* and *Kadrey*, defendants justified their copying for AI training by arguing that "books," the copyrighted works at issue, were "especially valuable training data." *Kadrey*, 788 F. Supp. 3d at 1039; *see Bartz*, 787 F. Supp. 3d at 1015. Here, by contrast, Anthropic insists "lyrics are of such low training value" that it has no particular need for them at all. Def. 19. Anthropic co-founder (Def. MSS #6) and 30(b)(6) witness Benjamin Mann testified "we [don't] view it as important to include lyrics" in Claude's training data and the only reason Anthropic does not remove them is that it is not worth the hassle; its co-founder and Chief Science Officer Jared Kaplan affirmed Anthropic has "no interest" in Publishers' lyrics specifically and that similar types of works "are considered fungible for purposes of the model"; and its economics expert opined "[redacted]" for AI training and Anthropic "[redacted]" MSS ##143, 146, 148 (undisputed); Def. RSS #26. Anthropic's motion doubles down, representing "there was nothing uniquely valuable about Publishers' lyrics relative to other training data." Def. 20; *see also, e.g.*, Def. Ad.F #26 ("Anthropic 'typically[] doesn't have any particular interest in song lyrics'"), *id.* #33 ("[redacted]"); *id.* #1 (undisputed).

Thus, Anthropic cannot show that copying Publishers' lyrics is necessary for AI training. *Warhol*, 598 U.S. at 532; *Bartz*, 787 F. Supp. 3d at 1028 (rejecting transformativeness where "[n]ot every copy was even necessary" for training). Nor can it show, like "[p]arody needs to mimic an original to make its point," *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580-81 (1994), that it needs to copy Publishers' lyrics to train Claude to produce "wholly unrelated" output. Def. 10.

Its bald claim that "all the works within [its training] corpus are reasonably necessary," Def. 15, is no justification—especially when its witnesses have disavowed any need for Publishers' lyrics. *See supra* 13. Where no justification is offered "except for Anthropic's pocketbook and convenience," its fair use defense must fail. *Bartz*, 787 F. Supp. 3d at 1033; *see also* Ad.F #54-55.

**b. Anthropic's copying of Publishers' lyrics is not transformative.**

Rather than defend its copying of Publishers' lyrics as transformative, Anthropic diverts the fair-use analysis to its use of ***other*** works for ***different*** purposes. But that cannot establish that Anthropic's use of Publishers' lyrics, specifically, is transformative. *Warhol* makes clear (and Anthropic concedes, Def. 8) that "[t]he fair use provision, and the first factor in particular, requires an analysis of the specific 'use' of a copyrighted work that is alleged to be an 'infringement.'" 598 U.S. at 533 (citing 17 U.S.C. § 107). Here, the specific challenged use is "Anthropic's unauthorized copying of [Publishers'] lyrics to train AI models that regurgitate those lyrics, spit out AI-generated derivatives, and output synthetic lyrics that compete with Publishers." Mot. 22.

Anthropic indisputably trained Claude to generate this harmful lyric-based output. Its own records emphasize the importance that its AI models "[redacted]" MSS #129.[3] What Anthropic describes as its "human feedback data used to finetune Claude," MSS #97, contains dozens of finetuning prompts for copies of existing lyrics, AI-generated derivatives, and "new" AI lyrics, MSS ##100-11. Similarly, Anthropic's "competitive analysis" benchmarked [redacted] relative to competitors. MSS ##124-26. Its own founders, executives, and other employees repeatedly used Claude to generate these exact types of harmful lyric-related output, in both pre-deployment testing, MSS ##112-21, and real-world personal use, MSS ##132-36, 192-93.

Nor can Anthropic deny that its admitted copying of Publishers' lyrics in training enables its AI models to generate this harmful output based on those lyrics. It is self-evident that Claude can produce output copying Publishers' lyrics verbatim only because Anthropic included copies

[3] Because Anthropic has touted Claude's abilities and sought to affirmatively rely on Claude records itself, *see, e.g.,* Def. 7-8, 11, 22-23, it cannot turn around and dismiss these and other admissions in its own Claude records as "hallucination[s]" or "not competent evidence," *see* Def. RSS ##107, 129-131, 183. Such evidentiary objections in its RSS also violate the Court's rules.

of those same lyrics in Claude's training corpus. MSS ##31-32, 73, 182; Ad.F. ##47, 79. Claude does not produce word-for-word copies of those lyrics by chance, like the proverbial monkeys typing Shakespeare. It derives its output from the text on which Anthropic trains it. *See* MSS #30 (undisputed). Similarly, Claude can produce synthetic derivatives of Publishers' lyrics only because Anthropic copied those lyrics into Claude's training data. Claude cannot, for instance, output translations of Publishers' lyrics, *see* MSS #52—paradigmatic derivative works, 17 U.S.C. § 101—unless Anthropic first copies the lyrics into its training data. Claude's generation of "new" AI song lyrics likewise relies on Anthropic's training it on human-written lyrics. When Claude is asked to write "a song about the death of Buddy Holly," it simply outputs the lyrics to "American Pie," MSS #59; and when it is asked for help in writing a "[redacted]," it simply regurgitates the lyrics to "Blowin' in the Wind," MSS #60. More broadly, Claude can output "new" AI lyrics only because Anthropic trained it on existing lyrics, as Anthropic admits: "For the model to be able to respond sensibly to queries about rap music . . . it must have been shown examples of texts that approximate those concepts." ECF No. 207 at 5.

When the first-factor analysis properly focuses on the challenged use—copying Publishers' lyrics to train Claude to generate this harmful lyric-based output—Anthropic's transformativeness claims collapse. By training Claude to spit out verbatim copies of Publishers' lyrics—as reflected in hundreds of outputs, for every Work in Suit, *see* MSS ##34-36, 65-68—Anthropic "merely supersede[s] the objects of the original creation," *Campbell*, 510 U.S. at 579. When Anthropic "train[s] a model to generate outputs that are substantially similar to copyrighted works in the dataset," "it is hard to see the use as transformative." U.S. COPYRIGHT OFFICE, *Copyright and Artificial Intelligence, Part 3: Generative AI Training (Pre-Publication Version)*, 46 (May 2025) ("C.O. Report"). Likewise, by training Claude to produce derivative outputs that modify or combine Publishers' lyrics with other text—output that is extensively documented, *e.g.*, MSS ##55-56—Anthropic unlawfully "swallow[s]" Publishers' derivative-works right. *Warhol*, 598 U.S. at 541. And by training Claude on Publishers' lyrics to produce "new" AI-generated lyrics—a use that is undisputed, MSS ##181, 185 (undisputed)—Anthropic "supplant[s]" the human-written lyrics that enabled them. *Warhol*, 598 U.S. at 528. Synthetic lyrics that imitate the

expressive features of existing lyrics serve the same purpose. *See id.*; Ad.F ##19, 31, 39-40, 44.

Unable to defend its use of Publishers' lyrics as transformative, Anthropic instead misapplies the transformativeness analysis in two critical ways:

First, Anthropic tries to restrict the transformativeness inquiry to its use of Publishers' lyrics in training only, ignoring the AI output that is the intended and inevitable result of that training. But Anthropic's admitted purpose in training Claude is "to both understand language ***and generate new text***." Def. 5 (emphasis added); Def. MSS #23; Ad.F #51. Its copying of Publishers' lyrics in training cannot be considered entirely in a vacuum from the output that training enables.

*Bartz* and *Kadrey* highlight how Anthropic's harmful Claude output undercuts its claim to transformativeness in training. Both decisions emphasized that infringing output, while absent in those cases, fundamentally changes the transformativeness analysis. Judge Alsup stated in *Bartz* that, "[h]ere, if the outputs seen by users had been infringing, [plaintiffs] would have a different case." 787 F. Supp. 3d at 1021. Likewise, Judge Chhabria premised his *Kadrey* transformativeness holding on the fact that the AI model did "not produce more than 50 words of any of the plaintiffs' books," 788 F. Supp. 3d at 1045, and cited Judge Leval's *Romanova* decision, which recognized that fair use is "in most cases limited to circumstances in which the benefit was provided without allowing public access to the copy," 138 F.4th at 115-18 (collecting cases). This case, by contrast, presents an overwhelming record of the exact types of harmful AI output absent in those cases.

Second, it is Anthropic that tries to "build a fair use Frankenstein by mixing and matching" its copying of "billions of other copyrighted works" and end uses "wholly unrelated" to Publishers' lyrics. Def. 1, 10, 17. But "this case does not concern those other texts" Anthropic copied without permission for AI training. *Bartz*, 787 F. Supp. 3d at 1033. Just as *Bartz* and *Kadrey* addressed the specific copyrighted books at issue in those cases, the inquiry here must focus on Anthropic's use of Publishers' Works in Suit specifically. The vast scale of its broader infringement is no defense.

Nor is this case about Claude's ability to "write computer code," "accelerate clinical trials," or remove lead cables from Lake Tahoe. Def. 5, 18. There is not a shred of credible record evidence linking Anthropic's copying of Publishers' lyrics as training input with any of the allegedly transformative outputs Anthropic invokes. Publishers' lyrics are not "transformed" to generate

these AI outputs that Anthropic admits are "wholly unrelated to lyrics or music." Def. 10. That every piece of training data might have some infinitesimal effect on the model's behavior cannot on its own sufficiently connect Anthropic's use of Publishers' lyrics to any of these other uses.

The lone example of lyric-related output Anthropic argues is "a transformative use of its training data," *id.* at 11, is obviously not a use of Publishers' lyrics at all. The Claude output cited by Anthropic refers to "[redacted]" *Id.* But that statement is not based on the written text of Publishers' lyrics. Nor is it derived from a sound recording, as it is undisputed Claude is not trained on audio. RSS ##64, 166-67 (undisputed). Instead, Claude is parroting human-written commentary about the song from its training data, and passing that off as its own. Ad.F ##35-36. That is not a transformative use of Publishers' lyrics. *See also id.* #45.

While *Bartz* and *Kadrey* each highlight why Anthropic's use of Publishers' lyrics here is not transformative, they are also not the "only two courts to consider the issue," as Anthropic contends. Def. 1. *Thomson Reuters* specifically rejected transformativeness in the context of AI training. *Thomson Reuters Enter. Ctr. v. Ross Intel. Inc.*, 765 F. Supp. 3d 382 (D. Del. 2025), *motion to certify appeal granted*, 2025 WL 1488015 (D. Del. May 23, 2025). In particular, *Thomson Reuters* held that copying copyrighted headnotes to train a "competing [non-generative AI] legal research tool" was "not transformative." *Id.* at 398-99. The court reached that conclusion even where the defendant's AI tool did not actually output the copied headnotes to users, and instead only "spit[] back relevant judicial opinions that have already been written." *Id.* at 398.

By contrast, the other cases Anthropic cites do not support its transformativeness claims because they involved copying for completely different purposes than here. *Perfect 10, HathiTrust,* and *Google Books* involved the defendants' development of search engines, increasing access to the plaintiffs' copyrighted works without, as Anthropic does, supplanting those works. 508 F.3d 1146, 1165 (9th Cir. 2007); 755 F.3d 87, 97 (2d Cir. 2014); 804 F.3d 202, 216-17 (2d Cir. 2015). *iParadigms* addressed the defendant's creation of plagiarism-detection software, not competing substitutes. 562 F.3d 630, 638 (4th Cir. 2009). None of these cases endorsed "simply re-displaying the same [copyrighted] content," Def. 11, or producing market substitutes, like Anthropic does here. Indeed, *iParadigms* emphasized that copyright "protects ***against*** a republication which offers

the copyrighted work in a secondary packaging." 562 F.3d at 643 (emphasis added). And, importantly, these cases all pre-date *Warhol*'s significant recalibration of transformativeness.

**c. Anthropic's highly commercial use further undermines fair use.**

Separately, *Warhol* elevated the importance of commerciality, stressing that the degree of transformativeness "must be balanced against the commercial nature of the use." 598 U.S. at 532; *see VHT*, 918 F.3d at 742 (emphasizing that courts "cannot ignore" commerciality). Despite the centrality of Anthropic's commercial use to the first-factor analysis, Anthropic barely mentions it.

There can be no legitimate dispute that Anthropic's use of Publishers' lyrics to build a $965-billion-dollar AI empire is highly commercial. MSS ##150, 154-56, 158-61 (undisputed); Ad.F ##1-6. "The undisputed commercial character" of Anthropic's use, while not alone dispositive, "tends to weigh against a finding of fair use." *Warhol*, 598 U.S. at 537; *see also Nat'l Fire Prot. Ass'n v. UpCodes, Inc.*, 753 F. Supp. 3d 933, 961 (C.D. Cal. 2024) ("indisputably commercial" character of use "weighs strongly against" fair use). Anthropic's frivolous denial of its for-profit status betrays that its highly commercial use offsets any claimed transformativeness.

In reinvigorating commerciality, *Warhol* stressed the importance of ensuring "an economic incentive to create original works, which is the goal of copyright." 598 U.S. at 535. That requires considering whether a commercial defendant "may knowingly have exploited a purloined work for free that could have been obtained for a fee," *Los Angeles News Serv. v. KCAL-TV Channel 9*, 108 F.3d 1119, 1122 (9th Cir. 1997), which weighs against fair use, or whether requiring a paid-for license would undermine a non-commercial defendant's use, which favors fair use. Anthropic unquestionably has the resources to compensate Publishers for exploiting their Works but simply prefers not to pay. That refusal undermines copyright's incentive structure and is "presumptively" unfair. *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 530 (9th Cir. 2008).

Even if Anthropic's use was transformative to some degree, the massively commercial nature of that use would still tilt the first factor against fair use. Anthropic has released its Claude models trained on Publishers' lyrics to millions of customers, generating [redacted] of dollars in revenues and surging to a near-***trillion***-dollar valuation. MSS ##158-61 (undisputed); Ad.F #6. The unprecedented scale of this commercial use outweighs any claimed transformativeness. *See*

*Monge v. Maya Mags., Inc.*, 688 F.3d 1164, 1183 (9th Cir. 2012) (where "minimal transformation . . . is amply outweighed by [] commercial use," first factor "does not support" fair use).

**2. Publishers' Works are undoubtedly at the core of copyright protection.**

The second fair-use factor, "the nature of the copyrighted work," clearly favors Publishers. 17 U.S.C. § 107(2). "[S]ong lyrics fall within the core of copyright protection." *Leadsinger*, 512 F.3d at 531-32; MSS #163 & RSS #51 (undisputed). In minimizing this factor, Anthropic ignores Supreme Court precedent emphasizing "[t]he nature of the interest at stake is highly relevant to whether a given use is fair," *Harper*, 471 U.S. at 553; "fair use is more difficult to establish" when expressive works are copied, *Campbell*, 510 U.S. at 586; and "copyright's protection may be stronger" for expressive works, *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 20 (2020).

Anthropic is legally and factually wrong that dissemination of Publishers' lyrics on the internet favors fair use. The Ninth Circuit has emphasized that "neither *Harper* [] nor any principle of fair use counsels that the publication of the copyrighted work weighs in favor of fair use." *Seuss*, 983 F.3d at 456. Moreover, Publishers do not make their lyrics available on the internet "for free." Def. 13. Rather, the evidence makes clear that Publishers require third-party websites to pay for licenses to display their lyrics (among other licensed uses). Ad.F ##48-49; MSS #169; *id.* ##170, 212 (undisputed); Def. MSS #155 (identifying "licensed lyrics websites like Genius, AZLyrics").

**3. Anthropic does not dispute copying Publishers' lyrics wholesale.**

The third fair-use factor, "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," also favors Publishers. 17 U.S.C. § 107(3). Anthropic does not dispute copying Publishers' "lyrics text" in full, Def. 14, and it does so both as AI training input and as AI-generated output. Its "total" copying plainly weighs against fair use. *McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149, 1162 (9th Cir. 2022); *see also Barkley*, 2025 WL 2946993, at *6.

Where Anthropic admits copying Publishers' "lyrics text for its training corpus," Def. 14, it cannot twist this factor by arguing it did not also copy the music embodied in Publishers' musical compositions. In *Leadsinger*, the Ninth Circuit had no trouble ruling that the use of "copyrighted lyrics in their entirety" "militate[d] against a finding of fair use," even where the rightsholder owned copyrights to the musical compositions as a whole. 512 F.3d at 531. In any event, Anthropic

plainly copied the "heart" of the Works. *McGucken*, 42 F.4th at 1162; *see also* Ad.F ##50, 52.

Nor can Anthropic prove, as it must, that it copied no "more than was necessary" from Publishers' Works or that "alternatives were not available." *McGucken*, 42 F.4th at 1162-63. Nowhere does Anthropic explain why it needed to copy the full lyrics to Publishers' Works, specifically, to train its AI models, or why the "billions of other copyrighted works" it admittedly copied for training were not viable alternatives. Def. 1. To the contrary, Anthropic has repeatedly disclaimed ***any*** need to train on Publishers' lyrics specifically. *See supra* 13. Where Anthropic unequivocally admits that its "purpose could have been served" by relying on "other sources rather than copyrighted" lyrics owned by Publishers, the third factor "weighs decisively against fair use." *Monge*, 688 F.3d at 1179-80; *see also, e.g.*, *McGucken*, 42 F.4th at 1162-63 (third factor weighed against fair use where defendant "failed to put forward any evidence that other photographs or visual aids were unavailable or an inadequate substitute for [plaintiff's copyrighted] photos").

*Bartz* is a useful contrast. There, Anthropic's copying of plaintiffs' copyrighted books was held "reasonably necessary" because those books were the "strongest examples of writing" and "most highly" valuable training data. *Bartz*, 787 F. Supp. 3d at 1017, 1030. Here, Anthropic claims "[redacted]" Def. Ad.F #33. *Bartz* also premised its third-factor analysis on the lack of infringing output: because Anthropic copied those books in training only and "no output to the public was even alleged to be infringing," Anthropic copied no more than necessary. 787 F. Supp. 3d at 1030-31. Here, the opposite is true.

**4. Anthropic's use harms the market for and value of Publishers' Works.**

Anthropic's unauthorized copying of Publishers' lyrics for AI training harms "the potential market for or value of" Publishers' Works, 17 U.S.C. § 107(4), in at least three markets: the online lyrics display market, Mot. 28-31, the streaming market for Publishers' Works, *id.* at 31-34, and the licensing market for AI training data, *id.* at 34-35; *see* Ad.F ##66-71. Because Anthropic cannot establish a lack of harm in these three markets, it fails to "carry[] [its] burden of demonstrating fair use," and Publishers are entitled to summary judgment. *Campbell*, 510 U.S. at 590.

Anthropic premises its market harm arguments on two broad misconceptions of the law.

First, Anthropic mistakenly focuses on the alleged lack of actual present harm—ignoring

the well-settled law that "[a]ctual present harm need not be shown." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984). While the evidence of actual present harm here is extensive, Anthropic's defense would fail even absent such evidence because, "[t]o defeat a fair use defense, one need only show that if the challenged use should become widespread, it would adversely affect the *potential* market for the copyrighted work." *VHT*, 918 F.3d at 744. Indeed, the Copyright Act provides for statutory damages in cases such as this one precisely "to give the owner of a copyright some recompense for injury done him . . . where the rules of law render difficult or impossible proof of damages." *F. W. Woolworth Co. v. Contemp. Arts*, 344 U.S. 228, 231 (1952). Accordingly, Anthropic's arguments that Publishers have not empirically demonstrated specific examples of actual harm, Def. 19-22, ignore that market harm can still weigh against fair use even where "the record reflects little direct evidence of actual market harm caused by [the defendant's use]." *McGucken*, 42 F.4th at 1163. Empirical analysis is unnecessary where, as here, "[t]he harm to the market for licensing [the work] would be immense" because the defendant's use is a "ready market substitute" for the work. *Id*. at 1163-64; *see also, e.g.*, *Seuss*, 983 F.3d at 461 (holding that defendant's use "usurps [the work's] potential market" without empirical analysis). Courts in such cases "routinely rely on [] logical inferences where appropriate in assessing the fourth fair use factor." *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 193 (2d Cir. 2024).

Second, Anthropic is wrong that a transformative use cannot cause cognizable market harm. To the contrary, a transformative use can still have harmful "effects . . . in protectible markets for derivative works." *Campbell*, 510 U.S. at 562. Collapsing market harm into transformativeness, as Anthropic advocates, would ignore that market harm "is undoubtedly the single most important element of fair use," *Harper*, 71 U.S. at 566, while transformativeness is "a matter of degree" weighed against the other factors, *Warhol*, 598 U.S. at 510. It would also contravene the Supreme Court's mandate that "[a]ll [four factors] are to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 578. As Judge Chhabria observed, "it's easy to imagine a situation in which a secondary use is highly transformative but the secondary user nonetheless loses on fair use because allowing people to engage in that kind of use would have too great an effect on the market for the original work." *Kadrey*, 788 F. Supp. 3d at 1050-51.

**a. Anthropic's training on Publishers' lyrics to output those lyrics harms the market for online lyrics display.**

When Anthropic's training results in "exact copies [or] infringing knockoffs of [Publishers'] works being provided to the public," market harm is clear. *Bartz*, 787 F. Supp. 3d at 1031. By training Claude to reproduce Publishers' lyrics to users on demand, Anthropic supplants websites authorized to do the same, harming both existing and potential lyric licensing markets. Mot. 29-31; MSS ##172-74; Ad.F ##68-69. In assessing market harm, Anthropic cannot just ignore infringing outputs that result from its training on Publishers' lyrics, particularly when it also invokes Claude outputs with no connection to those lyrics to argue its AI training is transformative.

Anthropic's attempt to dismiss market harm from infringing outputs as "rare," Def. 17, is both wrong and misses the point. Anthropic tries to downplay Claude's uses to look up lyrics. But its own records reveal it trained Claude for that purpose. Mot. 5-7, Ad.F #13-15. And many third-party users—plus Anthropic's founder and employees—have prompted Claude to output lyrics in just that way. MSS ##36-43, 113-14, 132-34; *id.* #115 (undisputed); Ad.F ##7, 20-26, 41-42. Moreover, there is no doubt, if using Claude to look up lyrics becomes unrestricted and widespread, it will undermine the existing market for licensed lyrics display. Mot. 29-31. Anthropic's expert does not dispute that obvious point; he simply had "no opinion." Ad.F #69.

Anthropic's opposition also does not address—let alone rebut—that its AI models harm the vital derivative-works market by producing output with unauthorized derivatives of Publishers' lyrics. *See* Mot. 30-31; Ad.F #43. Because it waived argument as to that market harm, summary judgment is warranted. *E.g.*, *Kohistani v. Scott*, 2026 WL 2185717, at *5 (N.D. Cal. July 29, 2026).

**b. Fair use must account for the immense harm from using copyrighted works to generate competing market substitutes.**

Even where Anthropic's outputs are not themselves infringing, its use of Publishers' lyrics to produce "new" AI-generated song lyrics that substitute in the market for Publishers' lyrics inevitably harms the market for those lyrics. *See, e.g.*, *Kadrey*, 788 F. Supp. 3d at 1055 ("[M]arket dilution will often cause plaintiffs to decisively win the fourth factor . . . ."); C.O. Report at 73 (recognizing AI output "can dilute the market for works similar to those found in [] training data").

Anthropic's generation of massive volumes of competing synthetic lyrics diverts consumer

interest in streaming songs with Publishers' lyrics and dilutes royalty pools to Publishers' detriment. *See* Mot. 33-34; Ad.F #70. Those competing substitutes "supersede[] the objects of the original and serve[] as a market replacement for it," imposing "cognizable market harm to the original[.]" *Campbell*, 510 U.S. at 591. The scale of this substitution is unprecedented. AI "can generate literally millions of secondary works, with a miniscule fraction of the time and creativity used to create the original works it was trained on." *Kadrey*, 788 F. Supp. 3d at 1055. Few courts have yet addressed this theory only because "no other use . . . has anything near the potential to flood the market with competing works" and threaten substitution on such a scale. *Id.* Taking that harm into account accords with long-established law. Mot. 31-32. "Courts can't stick their heads in the sand to an obvious way that a new technology might severely harm the incentive to create, just because the issue has not come up before." *Kadrey*, 788 F. Supp. 3d at 1055.

Here, there can be no doubt that Claude's generation of competing substitutes already harms the market for Publishers' works. *See* Ad.F ##11, 16, 27-28, 70. AI-generated music is spreading voraciously: one streaming service estimated that AI-generated music already accounted for three percent of all streams by January 2026 (up from 0.5% in November 2025), representing a 600 percent increase in just four months. MSS ##197-98. While this harm is undoubtedly significant, its full extent is impossible to pinpoint. Anthropic has not identified any source of data showing tracks on streaming services that contain AI-generated lyrics. While some streaming services can identify some AI-generated recordings, they cannot comprehensively identify all such AI-generated lyrics, let alone the models that generated those lyrics. Ad.F. #72.

Just as important, if Claude's use of Publishers' lyrics to generate competing AI lyrics becomes even more widespread, the harm will increase exponentially. Mot. 33-34; MSS #175. In attempting to deny the market harm Claude's generation of competing substitutes causes, Anthropic ignores this potential harm entirely. *See* Def. 20-21.

None of Anthropic's other arguments have any merit. Its contention that acknowledging the harm from market dilution extends copyright protection to unprotected expression conflates actionable infringement with cognizable market harm. Nor would recognizing the obvious substitutive harm Anthropic's copying causes grant Publishers a monopoly over a genre or style.

Anyone can create competing works in the same genre or style, but Anthropic cannot ***copy Publishers' Works*** to generate synthetic displacements. Anthropic's analogies to previous technologies like photography are inapt because none of those used copyrighted works as inputs.

Because copying Publishers' lyrics is not, by Anthropic's admission, a needed intermediate step to generating new AI lyrics, there is no danger of monopolization or threat to competition. Unlike *Google* or *Sega*, where use of the copyrighted computer code at issue was necessary to participate in the relevant market, denying fair use here would not empower Publishers to "alone [] hold the key" to the lyrics market. *Google*, 593 U.S. at 39; *see Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1526 (9th Cir. 1992) (denying fair use where use of code at issue "was necessary in order to understand the functional requirements for [product] compatibility").

Anthropic's argument that, "[u]nder copyright law, an expansion in the number of original works is a benefit," Def. 16, proves nothing. Finding fair use would always superficially expand the number of works by permitting both the defendant's and the plaintiff's works. Fair use demands more: it requires examining the effects of the defendant's copying on "preserving the incentive for human beings to create artistic and scientific works." *Kadrey*, 788 F. Supp. 3d at 1034. Here, moreover, Claude does not produce original works in the copyright sense, but rather uncopyrightable, statistical imitations of human works. *See, e.g.*, *Thaler*, 687 F. Supp. 3d at 146.

Anthropic's expert's attempt to assess Claude's historical impact on Publishers' revenues does not alter the analysis. The Ninth Circuit has held market harm can weigh against fair use even where a plaintiff's work's value ***increased***, as that "proves nothing about the effect on the market for licensing the [work]." *De Fontbrune v. Wofsy*, 39 F.4th 1214, 1226 (9th Cir. 2022). So too here.

While Anthropic argues AI's benefits to Publishers may offset the harm from dilution, "increased sales of copyrighted material attributable to unauthorized use should not deprive the copyright holder of the right to license the material." *A&M Recs. v. Napster, Inc.*, 239 F.3d 1004, 1018 (9th Cir. 2001). Even if positive effects like increased songwriter productivity counted, those effects are irrelevant because they do not result from Anthropic's copying of Publishers' lyrics.

Finally, the comments Anthropic cites from Michael Nash, Universal Music Group's ("UMG") Chief Digital Officer, do not create disputed fact issues. UMG is not a party here, Mr.

Nash is not an employee of any Publisher plaintiff, and his comments are plainly inadmissible hearsay. Further, Mr. Nash addressed only AI revenue dilution's ***current*** impact on UMG's sound recording business. He did not address the key inquiry here: the ***potential*** harm from widespread use of Claude to generate competing market substitutes for Publishers' lyrics. UMG's businesses also extend beyond music publishing to include substantial recorded music operations with distinct business models and royalty structures. Ad.F #64. For example, [redacted] Mr. Nash describes as protecting UMG's revenues. *Compare* ECF Nos. 595-121, -122, -123 *with* ECF No. 686-139 at 22:44; Ad.F. #65. In short, these comments have no bearing on the present case.

In the end, accepting Anthropic's arguments here would mean that a would-be songwriter could walk into a music bookstore, fill up a bag with books containing Publishers' musical compositions, and walk out without paying a cent—so long as the songwriter used those stolen works to learn to write and sell new songs. Fair use does not countenance such obvious theft.

**c. The AI training data licensing market is a reasonable market.**

Finally, Anthropic's unlicensed use of Publishers' Works for AI training threatens to destroy an existing and growing licensing market for such uses. *See* Mot. 34-35; Ad.F ##66-69.

A licensing market for generative AI training data is a reasonable market that creators, including Publishers, have sought to develop. MSS ##208-11; Ad.F #62-63; *see* C.O. Report at 85 ("[V]oluntary licensing of copyrighted works for use in AI training is increasingly taking place."). Cognizable market harm extends to markets that are "traditional, reasonable, or likely to be developed." *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1179 (9th Cir. 2013). AI companies and rightsholders have entered at least 200 AI training data licensing deals as of January 2026. MSS #210. The four largest LLM developers (Anthropic, Google, Meta, and OpenAI) have entered over 30 such licenses. Ad.F. #75. That these licenses sometimes include additional terms does not change that a training data licensing market exists. Given this use is one "creators of original works would in general develop or license others to develop," *Campbell*, 510 U.S. at 592, Anthropic is wrong to summarily dismiss the harm from lost AI training data licensing as "circular."

Publishers have repeatedly emphasized their willingness to discuss licensing with

Anthropic and other AI companies. MSS ##209, 211. Some Publishers have even licensed musical compositions as AI training data for so-called "single-purpose LLMs." MSS #211. Thus, "this is not a case where the copyist's work fills a market that the copyright owner will likely avoid." *Seuss,* 983 F.3d at 460. Anthropic fails to distinguish these "single-purpose LLMs" from Claude: both generate "new" AI song lyrics, compete for that use, and train on lyrics for that purpose. Ad.F. #73. The Ninth Circuit has rejected Anthropic's argument that Publishers have not licensed their works to a general-purpose LLM developer as "speculative because [defendant] never asked for a license or permission." *Seuss*, 983 F.3d at 461. When a plaintiff is "actively exploring" a market, harm exists even if that plaintiff has not concluded any licenses. *VHT*, 918 F.3d at 744.

Anthropic's claim that no market exists to license ***all*** data needed to train a general-purpose LLM is irrelevant and wrong. Anthropic could license Publishers' lyrics for AI training regardless of whether it licenses other data; in fact, [redacted]. MSS #212 (undisputed). The market to license Publishers' lyrics for AI training data exists regardless of whether some other market to license additional data to train an LLM also exists.

Accepting Anthropic's bold contention that no AI licensing market for lyrics exists, simply because it deems lyrics insufficiently valuable to justify the transaction costs, would destroy all licensing markets. No such markets could ever function if potential licensees could unilaterally pronounce the costs of licensing too high and then just use copyrighted works for free. Ad.F. #74; *see Monge*, 688 F.3d at 1182 (holding no fair use where "unrestricted and widespread reproduction of [defendant's] conduct . . . would also create incentives to pirate intellectual property").

Anthropic's admission that it [redacted], Ad.F. #53, both confirms the existence of a training data licensing market and underscores the root problem in Anthropic's argument. Just because Anthropic does not want to license Publishers' lyrics does not mean a licensing market for those lyrics does not exist; it just means Anthropic would rather steal those lyrics than pay for them.

**d. Anthropic's claimed "public benefits" are irrelevant.**

Anthropic cannot save itself by repeating its mantra that Claude's unrelated "public benefits" justify its massive copying of Publishers' lyrics. The fair-use analysis may "take into

account the public benefits the copying will likely produce," but any such benefits must flow from that copying to be relevant. *Google*, 593 U.S. at 35. That is fatal to Anthropic's argument.

Here, no evidence ties Anthropic's claimed benefits (all of which are based on inadmissible hearsay) to its copying of Publishers' lyrics. Anthropic cannot credibly claim that drug discovery, access to European Parliament records, or the Tahoe Lead Removal Project were achieved by copying Publishers' lyrics specifically. It has disavowed any need to train on those lyrics, *see supra* 13, and its expert on Claude's benefits could not say whether Claude would be less effective if not trained on those lyrics, Ad.F #37. Equally irrelevant are Publishers' acknowledgments of AI's beneficial applications, because none of those uses result from copying Publishers' Works.

Moreover, if the Court were to consider the purported benefits of Anthropic's AI models, it would also need to take into account the corresponding ***risks***. Anthropic's CEO Dario Amodei has warned that AI is "[redacted] Ad.F #76; estimated "[redacted]," *id.*; and predicted "AI could wipe out half of all entry-level, white-collar jobs and spike unemployment to 10 percent to 20 percent in the next one to five years," MSS #213.

However, this case is not a referendum on AI technology more broadly. There is no need for the Court to address Anthropic's arguments about Claude's public benefits (or its corresponding risks) to hold that Anthropic's unauthorized copying of Publishers' lyrics here is not fair use.

**IV. Anthropic should be denied summary judgment as to Publishers' CMI claims.**

Finally, Anthropic's scattershot attacks on Publishers' CMI claims disregard the extensive evidence of its CMI violations. These facts preclude summary judgment.

When Publishers license their copyrighted lyrics for online display, they require those lyrics to be accompanied by CMI, which identifies and protects their works against misuse. Ad.F. ##91-94. When Anthropic [redacted]. Ad.F. ##95-98; *see id.* ##56-61; RSS #100 (undisputed). Anthropic then intentionally stripped that CMI, [redacted]. Ad.F. ##99-106; *see* MSS #25 & RSS ##101, 103 (undisputed). Separately, it trained Claude using third-party datasets including Publishers' lyrics

from which it knew CMI had been removed. Ad.F. ##106-07; MSS ##18, 22-23 (undisputed); *id.* #19. As a result, Anthropic generated and distributed AI output copying lyrics to Publishers' 499 Works in Suit—knowing it lacked critical CMI. Ad.F. ##108-09; RSS #168-70 (undisputed).

Anthropic took these steps to conceal its own infringement. It knew it was training Claude on copyrighted content copied without permission, and it knew "output[ting] copyrighted content" was "against the law." Ad.F. ##110-11. Given Claude's known tendency to memorize and regurgitate repeated text like copyright notices and other CMI, [redacted]. Ad.F. ##9, 12, 29, 84, 101-02, 112. But rather than remove Publishers' copyrighted lyrics from its training data as it should have, it instead stripped Publishers' CMI to cover its tracks. *E.g.*, Ad.F #113; MSS ##59-61. In other words, Anthropic "removed CMI to try to prevent [the AI model] from outputting CMI and thus revealing that it was trained on copyrighted material," which "is clearly an identifiable (alleged) infringement." *Kadrey v. Meta Platforms, Inc.*, 2025 WL 744032, at *2 (N.D. Cal. Mar. 7, 2025).

These disputed facts preclude summary judgment. *See CoStar Grp. v. Commercial Real Est.*, 2025 WL 2647269, at *13 (C.D. Cal. June 25, 2025); *Schneider v. YouTube*, 649 F. Supp. 3d 872, 890 (N.D. Cal. 2023). "Where intent is a primary issue"—as it is here—"summary judgment is generally inappropriate." *S.E.C. v. Seaboard Corp.*, 677 F.2d 1297, 1298 (9th Cir. 1982).

Anthropic's legal arguments fail. It wrongly contends the DMCA bars CMI removal only from "works as a whole," Def. 34, but has no authority supporting that claim. The caselaw holds to the contrary. *ICONICS, Inc. v. Massaro*, 192 F. Supp. 3d 254, 272 (D. Mass. 2016) ("[T]he definition of CMI neither states nor implies that CMI can only exist with regard to the full version of a work."); *Real World Media v. Daily Caller, Inc.*, 744 F. Supp. 3d 24, 40-41 (D.D.C. 2024). Likewise, its claim that it cannot be liable because it removed Publishers' CMI for a fair use purpose both ignores that it removed that CMI to conceal its infringing AI output (which it does not even defend as fair use) and wrongly presumes its AI training is fair use (which it is not).

**CONCLUSION**

Publishers respectfully request that the Court grant their Motion for Partial Summary Judgment and deny Anthropic's Motion for Summary Judgment in full.

Dated: August 17, 2026

Respectfully submitted,

/s/ *Nicholas C. Hailey*
**OPPENHEIM + ZEBRAK, LLP**
Matthew J. Oppenheim
Nicholas C. Hailey
Jeffrey M. Gould
Corey Miller
Keith Howell
(admitted *pro hac vice*)
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
jeff@oandzlaw.com
corey@oandzlaw.com
khowell@oandzlaw.com

Alexander Kaplan
Jennifer Pariser
Andrew Guerra
Bret Matera
Timothy Chung
Michelle Gomez-Reichman
(admitted *pro hac vice*)
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
alex@oandzlaw.com
jpariser@oandzlaw.com
andrew@oandzlaw.com
bmatera@oandzlaw.com
tchung@oandzlaw.com
mgomez-reichman@oandzlaw.com

**COBLENTZ PATCH DUFFY & BASS LLP**
Jeffrey G. Knowles (SBN 129754)
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 391-4800
ef-jgk@cpdb.com

**COWAN, LIEBOWITZ & LATMAN, P.C.**
Richard S. Mandel
Jonathan Z. King
Richard Dannay
(admitted *pro hac vice*)
114 West 47th Street
New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

*Attorneys for Plaintiffs*