**PUBLIC REDACTED VERSION**

SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

TAYLOR GOOCH (SBN 294282)
taylor.gooch@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
50 California St.
San Francisco, CA 94111
Telephone: (628) 235-1000

JARED V. GRUBOW (*Pro Hac Vice)*
jared.grubow@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
250 Greenwich St
New York, NY 10007
Telephone: (212) 230-8800

LOUIS W. TOMPROS (*Pro Hac Vice*)
louis.tompros@wilmerhale.com
DISHA PATEL (*Pro Hac Vice*)
disha.patel@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

ARI HOLTZBLATT (SBN 354361)
ari.holtzblatt@wilmerhale.com
ROBIN C. BURRELL (*Pro Hac Vice*)
robin.burrell@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
2100 Pennsylvania Ave, NW
Washington, DC 20037
Telephone: (202) 663-6000

*Attorneys for Defendant*
**ANTHROPIC PBC**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

CONCORD MUSIC GROUP, INC., ET AL.,

Plaintiffs,

v.

ANTHROPIC PBC,

Defendant.

Case No. 5:24-cv-03811-EKL-SVK

**ANTHROPIC'S REPLY IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY AND OPINIONS OF MICHAEL D. SMITH**

Hearing Date: October 21, 2026
Time: 10:00 AM
Judge: Hon. Eumi K. Lee

## INTRODUCTION

When an expert declines to use accepted methodologies and instead chooses to parrot attorney conclusions, exclusion is the appropriate remedy. That happened here: Publishers' expert Dr. Michael D. Smith began (and largely ended) with the results Publishers needed, rather than conducting the analyses that experts in copyright cases typically use to evaluate harm or market dilution. He did no empirical work and never attempted to quantify any of the claimed injuries. Mot. 6-10. He failed to draw any connection between economic theory and the facts of this case. *Id.* at 5-6. He did not even identify a single example of the harms he insists are "significant and real." *Id.* at 6-7. Rather, he quotes documents then announces conclusions, without any explanation of how the former support the latter. *Id.* at 4-6. Such *ipse dixit* is unreliable and inadmissible under *Daubert*.

Because Smith's reports do not apply any methodology, Publishers' opposition rewrites them. Across ten pages they quote his actual reports only a handful of times, instead describing work he never performed "supported" by references that contain nothing resembling the rigor the opposition imagines. But the relevant question is whether Smith's opinions are reliable, not the versions Publishers now spin of them. Nor does the discretion afforded to experts in deciding how to support their opinions (Opp. 4-10) excuse Smith's lack of work. The choices he made were not between established methods or among evidence supporting his opinions. He declined to use any methodology, failed to consider publicly available evidence directly contradicting his conclusions, and could not connect what evidence he did cite to his opinions. An expert can of course decide to use one reliable method rather than another, and need not analyze every conceivable piece of evidence. But what Smith did, applying no discernible methodology at all, is something else entirely. The Court should grant the motion.

## ARGUMENT

### I. Smith's Harm Opinion Is Speculative

#### A. Speculative Testimony Is Inadmissible

Publishers are wrong that Smith's testimony being "speculative" presents a question of "weight." Opp. 3. *Daubert* itself held that Rule 702 requires expert testimony to be based on "more than subjective belief or unsupported speculation." 509 U.S. 579, 590 (1993). The Ninth Circuit has

**PUBLIC REDACTED VERSION**

since held expressly that "speculative testimony is inherently unreliable" and therefore inadmissible. *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014). Publishers' citation of a single unpublished opinion does not change the law. Smith's speculative analysis requires exclusion, not cross-examination.

### B. Publishers Rewrite Smith's Reports To Supply Analysis He Never Did

Publishers concede that Smith applied none of the methods typically used to evaluate economic harms and market dilution in copyright cases. They admit that he made the "decision not to conduct empirical analyses." Opp. 4. He chose not to "quantify[] Publishers' actual damages." *Id.* He never "proffer[ed] a specific damages figure." *Id.* at 5. He failed to even "identify supporting specific examples." *Id.* at 1. He could have at least ***attempted*** to—Anthropic's experts did, as is standard in copyright infringement cases. Mot. 7. And although Publishers criticize Anthropic's experts, Opp. 6, they cannot dispute that Anthropic's experts' opinions demonstrate the ***availability*** of established methods. The issue here is thus not "two credible experts disagree[ing]." *Id.* Instead, the work of others shows that Smith could have used established methods, but did not. Mot. 7.

Without any methodology to defend, Publishers are left to rewrite Smith's conclusions and add analysis he never did. Take the "[redacted]" Smith said he could draw to LLMs when assessing potential market dilution, which he then used to frame his opinion: "[redacted]" Ex. 1 ¶61.[1] Smith never explained how or why that "[redacted]" analogy would apply to competition between Publishers' lyrics and new, original ones. Mot. 4. So the opposition ignores it, describing Smith's "market dilution" opinion as though his starting point never existed. Opp. 3. Publishers then say that this opinion consists of "comprehensive and meticulous citations to record evidence and analysis of widely accepted economic principles." *Id.* For that supposed analysis, Publishers cite to paragraphs 60 through 98 of Smith's opening report. But they (understandably) never quote Smith's own reasoning: It consists of dozens of paragraphs summarizing materials that do not address the Works-in-Suit and rarely address Claude, punctuated by Smith's pronouncement that any "[redacted]" Ex. 1 ¶98. Missing from Smith's "comprehensive and meticulous" work is any explanation of ***how***

[1] Unless noted, "Ex." refers to exhibits to Dkts. 680, 681, emphasis is added, and internal citations and quotations are omitted.

**PUBLIC REDACTED VERSION**

the cited materials substantiate the alleged harms. That result is unsurprising. Smith admits those harms are unquantifiable, conceded he could identify no actual examples of injuries to songwriters, and agrees that AI might be earning artists ***more*** money. Ex. 7 at 109:20-110:9, 131:17-21.

Publishers take similar liberties with Smith's royalty-pool analysis. They describe him as "[s]ynthesizing" numerous sources to conclude that "songs with AI-generated lyrics … reduce[] Publishers' pro-rata share." Opp. 3. But the paragraphs Publishers cite for this supposed synthesis consist of nothing like that. The first admits that Smith cannot, in fact, "[redacted]" Ex. 1 ¶95. The second is two sentences asserting that guardrails "[redacted]" *Id.* ¶96. The third claims without citation that Anthropic has the "[redacted]" to "[redacted]" *Id.* ¶97. And the fourth is what a [redacted], including from "[redacted]" rather than just lyrics. *Id.* ¶98. These paragraphs involve no analysis, beyond perhaps the math of multiplying irrelevant revenue numbers by unexplained percentages. They certainly do not rely on the "comprehensive and meticulous citations" Publishers say Smith used. Opp. 3. That leaves Smith's opinions "connected to existing data only by the *ipse dixit* of the expert," and inadmissible. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

A final example: Publishers describe paragraphs 162 through 167 as Smith "explain[ing] how Anthropic displaces licensed uses of Publishers' lyrics on lyric-display websites by providing unlicensed access to those lyrics, thereby depriving Publishers of revenue." Opp. 4. The paragraphs themselves contain no such explanation. Smith first offers the tautology that Publishers do not receive a license payment when lyrics are displayed without a license. Ex. 1 ¶162. He then summarizes existing contracts without commentary. *Id.* ¶¶163-165. He next deploys the same tautology, this time using the words "[redacted]" and "[redacted]" *id.* ¶166, before admitting that "[redacted]" the amount of any lost license payments, *id.* ¶167. Those six paragraphs—most of which summarize documents or admit what Smith cannot do—are the extent to which Smith "explains" his opinion on displacement. Opp. 4. He concededly did not conduct any analysis that could have substantiated that opinion, like checking web traffic to lyric display websites or surveying customers. Ex. 7 at 299:20-300:12; Dkt. 687-99 at 301:16-302:7.

Publishers cannot fill the "analytical gap between the data and the opinion proffered" with attorney argument. *Joiner*, 522 U.S. at 146. Asserting that Smith "explains how" does not make it so, Opp. 3-5, and Smith connects the record and his opinions only through *ipse dixit*, Mot. 3-9.

### C. Discretion Over Methods And Evidence Does Not Excuse *Ipse Dixit*

Publishers' opposition brief then turns to arguments Anthropic never made. Start with Publishers' cases (at 4-5) supposedly justifying Smith's failure to perform any empirical analysis. Most held that a particular form of analysis was not required because the expert had already applied some ***other*** accepted methodology. In *Tevra Brands LLC v. Bayer HealthCare LLC*, 2024 WL 2261946, at *5-6 (N.D. Cal. May 16, 2024), for example, the court held that a quantitative study was not required because the expert did reliable qualitative analysis. *Teradata Corp. v. SAP SE*, 124 F.4th 555, 571 (9th Cir. 2024), found the same. These cases show only that when multiple accepted methodologies could be applied, an expert has discretion to choose. None accept the failure to perform any reliable analysis at all, the issue here. Publishers' fair-use decisions are also inapposite—regardless of whether Publishers must "empirically establish" harm, Opp. 5, Smith's opinions must be grounded in a reliable methodology. Empirical analysis would have been one way to accomplish that. Smith did not even bother asking for the relevant data. Mot. 7.

Anthropic has also never claimed that Smith was required to provide specific examples of harm. Opp. 7-8. Instead, his failure to cite ***even a single example*** of harm helps demonstrate that his opinions are based on *ipse dixit* rather than evidence. And although Publishers claim this lack of specifics can be excused "in a field characterized by uncertainty," Opp. 7, Smith asserts that harms exist ***now***—like the creation of "offensive and reputationally damaging works," Mot. 9. But he still cannot identify any examples. Mot. 9. Nor does the lack of evidence reflect "decisions about what data to use." Opp. 7. It proves the lack of foundation for Smith's opinions in the first place.

Smith's failure to address evidence directly contradicting his opinions fares no better. What Publishers dismiss as "certain remarks" by UMPG's parent company UMG (at 8) discussed "empirical data" demonstrating that UMPG's royalties have suffered no harm from AI, Mot. 5. This evidence is uniquely probative: It involves the exact royalty pool Smith purports to analyze and addresses the Deezer study about AI-generated music on streaming services he relied on, then

reaches the opposite conclusion. *Compare* Ex. 6, at 12-13 (UMG statement discussing Deezer study and observing "very, very little content consumption" of AI-generated songs) *with* Ex. 7, at 118:22-119:2 (testifying that the "Deezer data" is the only data he has "about the level of AI displacement"). Whatever leeway experts have to choose data, UMG itself conducted empirical analysis on the very subjects Smith claimed he could not. That undermines the reliability of his testimony. And when an expert "simply cannot make a reliable analysis" without data he failed to consider, exclusion is warranted. *TYR Sport, Inc. v. Warnaco Swimwear, Inc.*, 709 F. Supp. 2d 821, 834 (C.D. Cal. 2010). Nor does the timing and corporate entity making these remarks somehow render them irrelevant. UMG's March 5 statements occurred four days before Smith filed his last report. Mot. 1, 3. In fact, Smith claimed that belated report was necessary to address ***other*** information made publicly available for the first time on March 5. Ex. 4 ¶7. And the legal relationship between UMG and UMPG is irrelevant, because the data Smith ignored is public. UNIVERSAL MUSIC GROUP, *Fourth Quarter & Full Year Ended December 31, 2025*, https://assets.ctfassets.net/e66ejtqbaazg/2RBdhgLUMheK0MyX5kh3Hx/27c1c660be65b71c25a47c51c7b35a79/UMG_Slides_4Q25_FINAL.pdf.[2]

## II. SMITH IMPROPERLY OPINES ON ANTHROPIC'S STATE OF MIND

Publishers' lead case (at 10) agrees that experts "cannot opine as to specific subjective states of mind of the defendants." *In re HIV Antitrust Litig.*, 2023 WL 3089820, at *3 (N.D. Cal. Mar. 7, 2023). So instead, Publishers claim that Smith will only "analyz[e] Anthropic's economic incentives," then testify "that Anthropic acted in accordance" with them. Opp. 10. But Smith actually said something different. He wants to testify to "[redacted]" "[redacted]" what "[redacted]" and the supposed reasons why "[redacted]" certain transactions. Ex. 1 ¶¶146-53. Those are transparently opinions about Anthropic's state of mind, and not permissible expert testimony.

## CONCLUSION

The Court should grant the motion.

[2] Ironically, the UMG document Publishers cite (at 9) to distinguish UMG and UMPG itself draws the straight line between the two by taking credit for this lawsuit. *Universal Music Group Annual Report 2025* at 45 ("We are also protecting creators' rights in the AI environment through litigation. For example, UMPG, alongside two other music publishers, filed a copyright infringement lawsuit against Anthropic for their large-scale, wholesale copying of copyrighted lyrics….").

**PUBLIC REDACTED VERSION**

Date: August 18, 2026

*/s/ Sonal N. Mehta*

SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

LOUIS W. TOMPROS (*Pro Hac Vice*)
louis.tompros@wilmerhale.com
DISHA PATEL (*Pro Hac Vice*)
disha.patel@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6220

ARI HOLTZBLATT (SBN 354361)
ari.holtzblatt@wilmerhale.com
ROBIN C. BURRELL (*Pro Hac Vice*)
robin.burrell@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
2100 Pennsylvania Ave, NW
Washington, DC 20037
Telephone: (202) 663-6000

TAYLOR GOOCH (SBN 294282)
taylor.gooch@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
50 California St.
San Francisco, CA 94111
Telephone: (628) 235-1000

JARED V. GRUBOW (*Pro Hac Vice)*
jared.grubow@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
250 Greenwich St
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Defendant*
**ANTHROPIC PBC**

**PUBLIC REDACTED VERSION**

**CERTIFICATE OF SERVICE**

I hereby certify that on August 18, 2026, I did cause this motion to be served on the following listed below and in the manner so indicated.

**By Electronic Mail**

OPPENHEIM + ZEBRAK, LLP
Matthew J. Oppenheim (*Pro Hac Vice*)
Nicholas C. Hailey (*Pro Hac Vice*)
Audrey Adu-Appiah (*Pro Hac Vice*)
Corey Miller (*Pro Hac Vice*)
Jeffrey M. Gould (*Pro Hac Vice*)
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
aadu-appiah@oandzlaw.com
corey@oandzlaw.com
jeff@oandzlaw.com

Jennifer Pariser (*Pro Hac Vice*)
Andrew Guerra (*Pro Hac Vice*)
Timothy Chung (*Pro Hac Vice*)
Michelle Gomez-Reichman (*Pro Hac Vice*)
Bret Matera (*Pro Hac Vice*)
Alexander Kaplan (*Pro Hac Vice*)
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
jpariser@oandzlaw.com
andrew@oandzlaw.com
tchung@oandzlaw.com
mgomez-reichman@oandzlaw.com
bmatera@oandzlaw.com
alex@oandzlaw.com

COBLENTZ PATCH DUFFY & BASS LLP
Jeffrey G. Knowles
Christopher J. Weiner
Bina Patel
Thomas A. Harvey
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 772-5795
Ef-jgk@cpdb.com
cwiener@coblentzlaw.com
bpatel@coblentzlaw.com
Ef-Tah@cpdb.com

COWAN, LEIBOWITZ & LATMAN, P.C.
Richard S. Mandel (*Pro Hac Vice*)
Jonathan Z. King (*Pro Hac Vice*)
Richard Dannay (*Pro Hac Vice*)
114 West 47th Street
New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

Dated: August 18, 2026

By: */s/ Robin C. Burrell*
Robin C. Burrell