**PUBLIC REDACTED VERSION**

SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

TAYLOR GOOCH (SBN 294282)
taylor.gooch@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
50 California St.
San Francisco, CA 94111
Telephone: (628) 235-1000

ALEX W. MILLER (*Pro Hac Vice*)
alex.miller@wilmerhale.com
JARED V. GRUBOW (*Pro Hac Vice*)
jared.grubow@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
250 Greenwich St
New York, NY 10007
Telephone: (212) 230-8800

LOUIS W. TOMPROS (*Pro Hac Vice*)
louis.tompros@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

ARI HOLTZBLATT (SBN 354361)
ari.holtzblatt@wilmerhale.com
ROBIN C. BURRELL (*Pro Hac Vice*)
robin.burrell@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
2100 Pennsylvania Ave, NW
Washington, DC 20037
Telephone: (202) 663-6000

*Attorneys for Defendant*
**ANTHROPIC PBC**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

CONCORD MUSIC GROUP, INC., ET AL.,

Plaintiffs,

v.

ANTHROPIC PBC,

Defendant.

Case No. 5:24-cv-03811-EKL-SVK

**ANTHROPIC'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Hearing Date: October 21, 2026
Time: 10:00 AM
Judge: Hon. Eumi K. Lee

**PUBLIC REDACTED VERSION**

**TABLE OF CONTENTS**


INTRODUCTION ....1

ARGUMENT ....3

I. TRAINING CLAUDE WITH LYRICS IS FAIR USE AS A MATTER OF LAW ....3

A. *Warhol* Requires Assessing Training And Outputs As Separate Uses ....3

B. Every Fair Use Factor Favors Summary Judgment For Anthropic ....4

1. Training An LLM Is A Transformative Use Of Training Data ....4

2. The Wide Accessibility Of Publishers' Lyrics Online Favors Fair Use ....7

3. Copying Data That Inevitably Includes Lyrics Is Reasonably Necessary To Training A General-Purpose LLM ....8

4. The Lack Of Harm To Any Cognizable Market Favors Fair Use ....9

C. Training LLMs Furthers The Goals Of Copyright ....14

II. PUBLISHERS' OUTPUT CLAIM FAILS AS A MATTER OF LAW ....15

III. PUBLISHERS' DMCA CLAIM FAILS AS A MATTER OF LAW ....19

IV. ANTHROPIC'S RSS COMPLIES WITH THIS COURT'S RULES ....20

CONCLUSION ....22

**PUBLIC REDACTED VERSION**

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*American Title Ins. Co. v. Lacelaw Corp.*,
861 F.2d 224 (9th Cir. 1988) ....................21

*Amazon.com Servs., LLC v. Perplexity AI, Inc.*,
184 F.4th 1083 (9th Cir. 2026) ....................16

*American Broadcasting Cos., Inc. v. Aereo, Inc.*,
573 U.S. 431 (2014)....................16

*Andy Warhol Foundation for the Visual Arts v. Goldsmith*,
598 U.S. 508 (2023).................... *passim*

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015)....................3, 8, 10, 11, 14

*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014)....................3, 12

*Barkley & Associates v. Quizlet, Inc.*,
2025 WL 2946993 (C.D. Cal. Sept. 11, 2025) ....................17

*Barkley & Associates v. Quizlet, Inc.*,
2026 WL 2367650 (C.D. Cal. July 14, 2026)....................17

*Bartz v. Anthropic PBC*,
787 F. Supp. 3d 1007 (N.D. Cal. 2025) ....................2, 4, 5, 7, 8, 9

*Bell v. Wilmott Storage Services, LLC*,
12 F.4th 1065 (9th Cir. 2021) ....................17

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994)....................6, 7, 8, 10, 12

*Cartoon Network LP v. CSC Holdings, Inc.*,
536 F.3d 121 (2d Cir. 2008)....................2, 15, 16

*Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.*,
150 F.3d 132 (2d Cir. 1998)....................12

*Corona v. Novartis Pharmaceuticals Corp.*,
2012 WL 13418947 (C.D. Cal. June 12, 2012) ....................22

*CoStar Group, Inc. v. LoopNet, Inc.*,
373 F.3d 544 (4th Cir. 2004) ....................18

*Cox Communications, Inc. v. Sony Music Entertainment*,
146 S. Ct. 959 (2026)....................15

*Disney Enterprises, Inc. v. Minimax*, 2026 WL 1476670 (C.D. Cal. May 22, 2026) ....17

*Dolls Kill, Inc. v. Zoetop Business Co.*, 2022 WL 16961477 (C.D. Cal. Aug. 25, 2022)....19

*Dr. Seuss Enterprises L.P. v. ComicMix LLC*, 983 F.3d 443 (9th Cir. 2020) ....7

*EMI Christian Music Group, Inc. v. MP3Tunes, LLC*, 844 F.3d 79 (2d Cir. 2016)....18, 19

*Fox Broadcasting Co., Inc. v. Dish Network L.L.C.*, 747 F.3d 1060 (9th Cir. 2014) ....15, 17

*Google LLC v. Oracle America, Inc.*, 593 U.S. 1 (2021)....4, 6

*Hunley v. Instagram, LLC*, 73 F.4th 1060 (9th Cir. 2023) ....15

*Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026 (N.D. Cal. 2025) ....4, 5, 6, 7, 12

*Leadsinger, Inc. v. BMG Music Publishing*, 512 F.3d 522 (9th Cir. 2008) ....8

*New York Times Co. v. Microsoft Corp.*, 777 F. Supp. 3d 283 (S.D.N.Y. 2025)....8

*Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657 (9th Cir. 2017) ....15, 17

*Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992) ....8, 10

*Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848 (9th Cir. 1995) ....21

*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984)....14, 15

*Stevens v. CoreLogic*, 899 F.3d 666 (9th Cir. 2018) ....19

*Thaler v. Perlmutter*, 130 F.4th 1039 (D.C. Cir. 2025)....14

*Thomson Reuters Enterprise Centre v. Ross Intelligence Inc.*, 765 F. Supp. 3d 382 (D. Del. 2025)....4, 5

*Tresóna Multimedia LLC v. Burbank High School Vocal Music Association*, 953 F.3d 638 (9th Cir. 2020) ....12

**PUBLIC REDACTED VERSION**

*VHT, Inc. v. Zillow Group, Inc.*,
918 F.3d 723 (9th Cir. 2019) ....... 2, 15, 16, 17, 18

*White v. West Publishing Corp.*,
29 F. Supp. 3d 396 (S.D.N.Y. 2014) ....... 5

*Whyte Monkee Productions, LLC v. Netflix, Inc.*,
174 F.4th 761 (10th Cir. 2026) ....... 12

**STATUTES, RULES, AND REGULATIONS**

17 U.S.C. § 102(b) ....... 10

17 U.S.C. § 107 ....... 14

17 U.S.C. § 1202 ....... 19

Fed. R. Evid. 801 ....... 11

U.S. Const. art. I, § 8, cl. 8 ....... 10, 14

**OTHER AUTHORITIES**

4 *Patry on Copyright* § 10:139.30 ....... 7, 8

4 *Patry on Copyright* § 10.155.40 ....... 10

*Concord Music Group, Inc. v. Anthropic PBC*,
No. 26-cv-00880, Dkt. 93 (N.D. Cal. May 21, 2026) ....... 13

*In re OpenAI, Inc. Copyright Infringement Litigation*,
No. 25-3483, Dkt. 316 (S.D.N.Y. Sept. 1, 2026) ....... 3, 9, 10, 14

Lee, *Copyright Dilution Under Constitutional Scrutiny*,
25 Chi.-Kent J. Intell. Prop. 1 (2026) ....... 10

## INTRODUCTION

The undisputed record and the governing law in this case lead to the same conclusion: Anthropic is entitled to summary judgment. With no answer to binding precedent or the actual facts, Publishers contort both. The Court should reject these distortions and grant Anthropic's motion.

Start with the undisputed record. Anthropic built a general-purpose LLM that can reason, code, and perform countless other tasks. Ant. ReSS #16-17. Training an LLM with those capabilities required Anthropic to collect vast amounts of diverse text. *Id.* #19, 22, 67, 69, 70, 71. To obtain that material, Anthropic needed essentially all the text publicly available on the internet. *Id.* #72-74. Anthropic did not specifically seek out lyrics, which are a tiny fraction of the hundreds of billions of words it collected. *Id.* #67-70. But that effort necessarily swept up lyrics publicly displayed for free online. *Id.* #72-74. Collecting them was therefore "reasonably necessary to achieve" Anthropic's "new purpose" of training a general-purpose LLM. *Andy Warhol Found. for the Visual Arts v. Goldsmith*, 598 U.S. 508, 532 (2023).

Publishers' alternative account ignores the undisputed evidence. According to Publishers, Anthropic spent years and billions of dollars to develop a lyric regurgitation machine. Pub. Opp. 11-12. But no one needs an LLM to find lyrics: they are readily accessible for free online. Ant. ReSS #52-53. And Publishers concede Anthropic has extensive guardrails to ***prevent Claude from outputting lyrics.*** *Id.* #112, 116-119. The notion that Anthropic specifically sought out lyrics for training also makes no sense. Pub. Opp. 14-15, 18. Undisputed expert testimony shows the impact of any individual piece of training data on an LLM is marginal. Ant. Mot. 19. What matters is having a large and diverse set of materials. *Id.* Lyrics were collected only as a byproduct of assembling that set. Ant. ReSS #72-74. Publishers' theories of harm are similarly baseless, and their experts repeatedly conceded they had no evidence to support them. Ant. Mot. 19-21. This is unsurprising. Universal Music Group publicly admitted generative AI—including LLMs—is not causing competitive harm to music publishing. *Id.* at 21. And unrebutted expert analysis shows both that Claude has not reduced interest in online lyrics and that Anthropic's current guardrails are extremely effective. *Id.*

Publishers get the law on fair use just as wrong. Their primary argument is that use in training

**PUBLIC REDACTED VERSION**

and use in outputs must be assessed together to decide whether Anthropic's training was fair use. On that theory, Publishers assert that the purpose of training must have been lyric reproduction because users have been able to prompt Claude to regurgitate lyrics. *Warhol* bars that conflation of separate uses in training and outputs. It instead requires "an analysis of the specific 'use' of a copyrighted work that is alleged to be 'an infringement.'" 598 U.S. at 533. Because training and outputs are separate uses, each gets its own fair use analysis. Publishers then claim that Anthropic must prove every piece of training data was strictly necessary to Claude's transformative capabilities. But "reasonably necessary does not mean strictly necessary." *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1030 (N.D. Cal. 2025). And as explained, gathering training data that swept in lyrics was reasonably necessary to training Claude.

Publishers' arguments on their output claim also rewrite precedent. They say that Claude's guardrails mean that Anthropic, not users, causes all Claude's outputs. But "actively design[ing] its system to avoid and eliminate copyright infringement" does not mean Anthropic "engage[d] in volitional conduct necessary to support a finding of direct liability." *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 733 (9th Cir. 2019). Instead, users craft the prompts that lead to the (undisputedly rare) alleged infringement in outputs. That means Anthropic's role is not "sufficiently proximate to the copying to displace the customer as the person who 'makes' the copies." *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121, 132 (2d Cir. 2008).

Publishers' remaining arguments are no more connected to the law or record. Publishers barely address their DMCA claim. It fails as a matter of law because the statute requires that CMI be removed from a complete work and for the purpose of facilitating infringement. Publishers have no evidence proving either element. Publishers then manufacture a dispute about Anthropic's response to their statement of material facts. But Anthropic corrected the one-word error they focus on, nearly a month before Publishers filed their opposition.

The Court should grant Anthropic's motion for summary judgment.[1]

[1] Unless noted, emphasis has been added and internal quotation marks omitted. "Pub. Mot." refers to Dkt. 612. "Ant. Mot." refers to the combined motion and opposition filed at Dkt. 694. "Pub. Opp." refers to the combined opposition and reply filed at Dkt. 759. "Pub. MSS" (Dkt. 612-1) and "Ant. MSS" (Dkt. 687-1) refer to the moving separate statements. "Pub. RSS" (759-1) and "Ant. RSS" (Dkt. 687-2) refer to the responsive separate statements. "Pub. ReSS" (Dkt. 759-2) and "Ant.

PUBLIC REDACTED VERSION

## ARGUMENT

### I. TRAINING CLAUDE WITH LYRICS IS FAIR USE AS A MATTER OF LAW

#### A. *Warhol* Requires Assessing Training And Outputs As Separate Uses

Publishers' fair use arguments turn entirely on conflating use in training and use in outputs. Pub. Opp. 11-27. But *Warhol* requires a separate fair use analysis for each "specific use of a copyrighted work that is alleged to be an infringement" because "[t]he same copying may be fair when used for one purpose but not another." 598 U.S. at 533; *accord id.* at 557-58 (Gorsuch, J., concurring) ("If, for example, the Foundation had sought to display Mr. Warhol's image of Prince in a nonprofit museum or a for-profit book commenting on 20th-century art, the purpose and character of that use might well point to fair use."). Here, Publishers' complaint advances two distinct theories of infringement based on two different "uses": (1) "copying of Publishers' lyrics to train [Anthropic's] AI models" and (2) "copying of Publishers' lyrics in Claude output[s]." Pub. Mot. 18-19; First Am. Compl. ¶¶ 60, 77. That means fair use in training and fair use in outputs must be analyzed separately. As the Department of Justice put it, "because of the required use-by-use analysis, the development of a sophisticated tool that can understand patterns and make predictions in response to user inputs must be distinguished from how persons might hypothetically or anomalously use that tool to generate certain outputs." *In re OpenAI, Inc. Copyright Infringement Litig.*, No. 25-3483, Dkt. 316 at 11 (S.D.N.Y. Sept. 1, 2026) ("U.S. Br.").

Every relevant authority requires the same use-by-use analysis, precluding Publishers' conflation of training and outputs. *Google Books*, for example, did a separate fair use analysis for a search tool and a "snippet view" function, even though both used the same set of copies. *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214-18 (2d Cir. 2015) ("*Google Books*"). *HathiTrust* likewise subjected each of the "three uses of the digital copies" at issue to a separate fair use analysis. *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 91, 97-104 (2d Cir. 2014). *Bartz* analyzed whether "using works to train LLMs" was fair use, then separately addressed ***other*** supposed uses of the copyrighted works (like the alleged building of a library) despite those purported uses arising from the same

ReSS" (filed with this brief) refer to the reply separate statements. Citations to 'Ex.' are exhibits attached to the Burrell Declarations filed at Dkt. 686-3 or with this brief.

alleged copying. 787 F. Supp. 3d at 1021-22. "Each use of a work must be analyzed objectively," because "the same copy can be used one way, then another, each with a different result" under the fair use doctrine. *Id.* at 1026. Applied here, these decisions require Anthropic's training to be evaluated on its own terms.

### B. Every Fair Use Factor Favors Summary Judgment For Anthropic

#### 1. Training An LLM Is A Transformative Use Of Training Data

Publishers cannot meaningfully dispute that training LLMs on text to create a statistical model of human language is a transformative use. Instead, they largely argue that alleged infringement in outputs infects any earlier use of their lyrics. Pub. Opp. 11-12, 15. That is legally wrong. *Supra* pp.3-4. The relevant question is whether copying lyrics ***to train*** Claude "adds something new" to the works, "with a further purpose or different character." *Warhol*, 598 U.S. at 528-29. Just as in *Kadrey*, it does. The "purpose" of Anthropic's "copying was to train its LLMs" to understand the relationships between words and concepts in human language. *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1044 (N.D. Cal. 2025); Ant. ReSS #10, 19, 22-24. "The purpose of the plaintiffs' [works], by contrast, is to be" sung or listened to "for entertainment." *Kadrey*, 788 F. Supp. 3d at 1044; Ant. ReSS #25-26. *Google LLC v. Oracle America, Inc.*, 593 U.S. 1 (2021), similarly supports that training is a transformative use. That decision involved copying code "precisely." *Id.* at 30-31. But the use was transformative because the copying enabled "programmers who had learned an existing system [to] put their basic skills to use in a new one." *Id.* at 31. If creating a new programming environment using existing code is transformative, creating a statistical language map from existing text certainly is.

Publishers' cases do not contradict this result. *Bartz* and *Kadrey* did not hold, as Publishers claim, that infringing outputs "fundamentally change[] the transformativeness analysis" for training. Pub. Opp. 16. Those cases recognize only that their plaintiffs ***could*** have brought ***separate*** claims for infringement in outputs (as Publishers did) and that those claims would require a separate fair use analysis. Ant. Mot. 13. *Warhol*'s use-by-use requirement precludes any other reading. *Thomson Reuters* also does not weigh against fair use. Publishers concede (at 17) that case concerned a "non-generative" legal research tool. *Thomson Reuters Enter. Ctr. v. Ross Intel. Inc.*, 765 F. Supp. 3d

PUBLIC REDACTED VERSION

382, 398 (D. Del. 2025). The purpose of that tool was to reproduce full copies of judicial opinions—not to build a statistical map of human language or generate original text. *Id.* As *Bartz* held in distinguishing *Thomson Reuters*, the closer analogue to Claude "would be an AI tool trained—using court opinions, and briefs, law review articles, and the like—to receive legal prompts and respond with fresh legal writing." 787 F. Supp. 3d at 1022. "[O]n facts much like those," a different court found fair use. *Id.* (citing *White v. W. Pub. Corp.*, 29 F. Supp. 3d 396, 400 (S.D.N.Y. 2014)).

In any event, considering Claude's outputs would only confirm the model is transformative. Publishers focus only on outputs with alleged regurgitation of lyrics. But if outputs are relevant, ***all*** outputs must be considered. As Publishers' expert concedes, [redacted]. Ex. 131 (Shan Dep.), 226:9-227:16; Ant. ReSS Ad.F #37. Because LLMs "can be used to generate diverse text and perform a wide range of functions," LLMs serve different purposes than the works on which they were trained. *Kadrey*, 788 F. Supp. 3d at 1044. People use Claude to help with coding, research, writing, and innumerable other tasks. Ant. ReSS #16, 38-43. People do not use musical compositions for any of these purposes. And when people do interact with Claude in ways more closely related to music, those outputs are also transformative rather than regurgitation. Users can prompt Claude to help write original lyrics in the style of a spouse's favorite singer as a Valentine's Day gift, offer song recommendations, or discuss songs' meanings. Ant. ReSS #44, 48, 50. Each of those interactions serves a different purpose than the original musical compositions themselves.

Publishers' claim (at 14) that Anthropic intended to train Claude to output lyrics is factually and legally wrong. Publishers have no evidence Anthropic wanted Claude to regurgitate lyrics. Witnesses instead testified lyric reproduction "***isn't*** an intended output of Anthropic's models." Ant. ReSS #143; *id.* #121. Anthropic has long prohibited using Claude to infringe intellectual property rights and expended significant resources implementing guardrails that prevent reproducing lyrics. *Id.* #102-107, 110-120. Scattered prompting by a few individuals, such as to probe a model's capabilities, is not evidence of ***the company's*** intent. Pub. Opp. 14. And regardless, the "subjective intent of the user" does not "determine the purpose of the use." *Warhol*, 598 U.S. at 544. Assessing "the purpose and character of a use" is "an objective inquiry into what use was made, *i.e.*, what the

user does with the original work." *Id.* at 545. What particular individuals may have hoped or intended for Claude cannot create a triable issue. Pub. Opp. 14.

Publishers' arguments about the commercial nature of Anthropic's use are legally baseless and internally contradictory. Publishers ignore (at 18-19) that commercial use is "not dispositive of the first factor." *Oracle*, 593 U.S. at 32. Instead, "the more transformative [a] new [use], the less will be the significance of other factors like commercialism." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994). LLM training is a "highly transformative" use. *Kadrey*, 788 F. Supp. 3d at 1046. So although "the profit [Anthropic] stands to gain from its development of a product trained on the plaintiffs' works is relevant to the fair use analysis overall, it does not tilt the first factor in the plaintiffs' favor." *Id.* In any event, Publishers' arguments require attributing Anthropic's [redacted] and "near-trillion-dollar valuation" all to training on Publishers' lyrics. Pub. Opp. 18. But Publishers' own positions are inconsistent with this. They acknowledge, for example, that lyrics have relatively low value to Anthropic. *Id.* at 13. They assert that training on lyrics matters only to the extent that Claude generates lyrics in outputs, an undisputedly rare event. *Id.* at 14-15. And they claim that there is "not a shred of credible record evidence linking Anthropic's copying of Publishers' lyrics as training input with any of the allegedly transformative outputs Anthropic invokes." *Id.* at 16. Publishers cannot maintain that Anthropic's financial success requires their works while asserting that none of the reasons for that success relate to lyrics.

Finally, Publishers (at 13) twist *Warhol* to claim that Anthropic failed to justify copying lyrics in training. But according to the Supreme Court, "a use that has a distinct purpose is justified because it furthers the goal of copyright." *Warhol*, 598 U.S. at 531. That is the case here—the purpose of training an LLM is undisputedly distinct from the purpose of writing a song. *Supra* p.4. That distinction alone precludes Publishers' justification argument as a matter of law. But even when "an original work and copying use share the same or highly similar purposes," "a use may be justified because copying is reasonably necessary to achieve the user's new purpose." *Warhol*, 598 U.S. at 532. That is (again) the case here. Copying lyrics is reasonably necessary to train an LLM because assembling a sufficient volume of text will sweep in lyrics. Ant. Mot. 14-15; *infra* pp.8-9.

Because the actual standard does not support their claims, Publishers attempt to reinvent it.

**PUBLIC REDACTED VERSION**

They claim that Claude's transformative uses cannot be justified unless they are specifically traceable to the particular lyrics copied in training. Pub. Opp. 16-17. No authority supports such a narrow view of fair use. *Google Books*, for example, did not require Google to show that any particular book was necessary to build its search functions. Publishers' contrary rule would contravene *Warhol*'s holding that copying need only be "reasonably necessary" to the new use, 598 U.S. at 532, and *Campbell*'s instruction that fair use "is not to be simplified with bright-line rules," 510 U.S. at 577. Because of the way LLMs learn, moreover, traceability ***cannot*** be proven. Requiring it would mean training could ***never*** constitute fair use. Just as human understanding of language is built on the words and phrases ingested in a lifetime, so too is Claude's. Ant. ReSS Ad.F #110. In training, song lyrics are analyzed alongside billions of other words to build a statistical map of human language, which Claude then draws upon to answer user prompts. Ant. Mot. 5; Ant. ReSS #10, 19, 22, 24, 29-36. Publishers' own expert concedes that [redacted] and [redacted] Ex. 131 (Shan Dep.), 226:9-227:16; Ant. ReSS Ad.F #37. ***All*** words in the training corpus (including lyrics) thus make Claude's transformative capabilities possible. That is true even though no capability—whether writing a song or analyzing a clinical study—can be traced to any individual piece of training data. *Bartz* and *Kadrey* thus both held that the inability to tie specific transformative uses to the allegedly copied works cannot preclude fair use. *Bartz*, 787 F. Supp. 3d at 1030-31; *Kadrey*, 788 F. Supp. 3d at 1048.

**2. The Wide Accessibility Of Publishers' Lyrics Online Favors Fair Use**

Publishers know their lyrics have been broadly disseminated on the internet where anyone can read and view them without charge. Ant. Mot. 13; Ant. ReSS #52-53; Ant. ReSS Ad.F #49. That favors fair use. *Id.* Unable to contest that dispositive fact, Publishers overread *Seuss* to mean that publication is irrelevant. Pub. Opp. 19. But *Seuss* held only that it is "not necessarily true" that publication compels a finding of fair use, quoting *Patry on Copyright*'s statement that publication does not make the scope of fair use broader "per se." *Dr. Seuss Enters. L.P. v. ComicMix LLC*, 983 F.3d 443, 456 (9th Cir. 2020). Both *Seuss* and *Patry* leave open that broad dissemination may favor fair use, such as where there is an "intention to permit liberal use," 4 *Patry on Copyright*

§ 10:139.30. That applies here. Publishers' lyrics have not merely been published. Publishers have displayed a clear "intention to permit liberal use" of their lyrics by providing them to websites that require no payment to read and download them. That distinguishes these circumstances from cases involving content gated behind paywalls. *E.g.*, *New York Times Co. v. Microsoft Corp.*, 777 F. Supp. 3d 283, 298 (S.D.N.Y. 2025).

**3. Copying Data That Inevitably Includes Lyrics Is Reasonably Necessary To Training A General-Purpose LLM**

The third fair use factor asks whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole" are "reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586. Publishers are wrong as a matter of law about both "the amount and substantiality of the portion used" in training and whether that use was "reasonable."

Begin with Publishers' false claim (at 19-20) that Anthropic copied "entire works." There is no dispute that Publishers hold copyrights only to entire musical compositions. Lyrics are just a part of a composition. Anthropic thus copied only a "portion" of Publishers' works. Publishers' discussion of *Leadsinger* (at 19) omits dispositive context. That decision involved an alleged infringer that already possessed a license for the copyrighted musical compositions, with the issue on appeal being whether that license also included the right to display lyrics and, if not, whether doing so alongside the licensed songs constituted fair use. *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 525-26 (9th Cir. 2008). The parties and court never addressed whether lyrics are only a portion of a copyrighted musical composition under fair use factor three.

But in any case, "that an entire work was copied does not … preclude a finding of fair use." *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1526 (9th Cir. 1992). That is particularly true when, as here, "not only is the copying of the totality of the original reasonably appropriate to [Anthropic's] transformative purpose, it is literally necessary to achieve that purpose." *Google Books*, 804 F.3d at 221; *supra* pp.1, 7. Publishers ignore this standard. They instead insist that Anthropic must show that specific transformative uses required specific pieces of training data. That is not the law. "[R]easonably necessary does not mean strictly necessary." *Bartz*, 787 F. Supp. 3d at 1030. As in *Bartz*, Publishers "do not contest that the volume of text required to train an LLM is

monumental." *Id.* And "[b]ecause using so many works was reasonably necessary, using any one work for actually training LLMs was about as reasonable as the next." *Id.* Publishers are wrong (at 20) that *Bartz* turned on the unique training value of books. The court expressly found that Anthropic "could have used some other books ***or no books at all*** for training its LLMs." *Bartz*, 787 F. Supp. 3d at 1030. So too here. Whether Anthropic could have used other lyrics or no lyrics at all, the process by which an LLM must be trained made its copying—even of the full lyrics to Publishers' works—reasonably necessary. Publishers' rule would preclude the training of LLMs entirely. No individual piece of training data will ***ever*** be strictly necessary.

The resulting relatively low value of lyrics as training data is irrelevant under the proper legal standard. Again, the question is not whether lyrics were strictly necessary to training Claude. The only legally relevant consideration is whether it was reasonably necessary for Anthropic to collect lyrics in the first place. *Supra* pp.2, 7. The evidence uniformly demonstrates it was. Ant. Mot. 14-15. Publishers' assertion (at 2, 13) that Anthropic could have removed or licensed lyrics is similarly irrelevant and wrong. The same could have been said in *Bartz* or *Kadrey*. Here, moreover, undisputed facts demonstrate that it would have been prohibitively difficult and costly to remove lyrics from the training data and impossible to license sufficient material to develop Claude. Pub. ReSS #26; Ant. ReSS Ad.F #54, 55, 67.

Finally, Publishers ignore that their rule could not be restricted to lyrics. Their theory of strict necessity means that every LLM developer would have to remove or license every piece of copyrighted material swept into the training corpus, because no individual piece of data is necessary to develop a model. Creating an LLM would then be impossible no matter a developer's financial resources. Pub. Opp. 2. The transaction costs of identifying the rights holders and then negotiating even a single license can be enormous. Ant. Mot. 19; Lee & Tushnet Br. (Dkt. 698-1) at 7 ("To require licensing of this sheer amount from online sources would make scaling impossible."). Publishers' rule would therefore end generative AI. *See* U.S. Br. at 3.

**4. The Lack Of Harm To Any Cognizable Market Favors Fair Use**

Publishers assert (at 20) three theories of market harm, each precluded by precedent and the undisputed record.

***Novel Lyrics Market.*** Competitive harm from any new and original lyrics Claude produces is irrelevant to fair use in training under *Warhol*. "[T]raining does not reveal anything to the public at all—it simply creates a copy of a protected work in order to teach an LLM to recognize relationships between data and adapt to new information." U.S. Br. at 14. As a result, "[t]he potential for future outputs that might cause market harm is simply not relevant to evaluating an LLM training use under the required use-by-use analysis." *Id*.

Competitive harm from novel lyrics is also not legally cognizable. No appellate court has ever endorsed this theory of harm. Copyright protection extends only to "Authors['] … respective Writings." U.S. Const. art. I, § 8, cl. 8. As a result, infringement occurs only if new works reproduce specific existing expression. 17 U.S.C. § 102(b); CCIA et al. Br. (Dkt. 711-1) at 11-12. Competition from new, original works is not infringement. The Supreme Court has also addressed transformative works that reduce demand for an earlier work, like parody and criticism. *Campbell*, 510 U.S. at 591-92. It has long held such works do not cause cognizable market harm. *Id.* Instead, competition from new works that "use[] the copied material for new, transformative purposes" will "serve[] copyright's goal of enriching public knowledge." *Warhol*, 598 U.S. at 531 (quoting *Google Books*, 804 F.3d at 214). The Ninth Circuit has similarly held that market harm cannot be shown from "facilitating the entry of a new competitor" whose new product is "not substantially similar" to a copied work. *Sega*, 977 F.2d at 1523-24.

Consider two examples under Publishers' theory. An art student walks through an art gallery and sketches paintings in her notebook to learn about composition, lighting, and technique. She then creates new and original works based on what she learned from the sketches, and displays them at her own art show. That is undeniably fair use. If the student's new works explode in popularity and pull interest away from the copied works, no unlawful "substitution" occurs. Pub. Opp. 23. The Copyright Act instead encourages that competition. *See* 4 *Patry on Copyright* § 10.155.40; Lee, *Copyright Dilution Under Constitutional Scrutiny*, 25 Chi.-Kent J. Intell. Prop. 1, 2, 18 (2026). The same would be true if a musician visited Genius.com, printed Publishers' freely available lyrics from their web browser, studied them to learn about lyrical structure, phrasing, and linguistic and conceptual relationships, and then drew upon that knowledge to write new, original lyrics for his

**PUBLIC REDACTED VERSION**

band. Publishers have no authority for a contrary, LLM-specific rule.

Publishers, moreover, have no evidence to support this theory of harm even if it were cognizable. Publishers say the harm derives from lost "interest in streaming songs with Publishers' lyrics." Pub. Opp. 22-23. But it is undisputed that Claude does not generate songs. Publishers never explain how Claude's ability to generate a wide range of text could itself compete with the streaming of sound recordings. Even for Claude-generated lyrical text, Anthropic's expert analysis shows no competitive harm to the streaming of Publishers' recordings. Ant. ReSS Ad.F #69-71. Publishers' expert on this issue, Michael Smith, fails to rebut that analysis. He admits that he offers no empirical analysis that shows harm to songwriters or Publishers from new and original Claude outputs. *Id.* Ad.F #68, 70. Nor is there any meaningful potential for harm in the future. Universal Music Group's Chief Digital Officer publicly announced that there is "no indication that royalty dilution" from competition by AI-generated works "is a material issue for UMG from a revenue perspective." Ex. 136 (UMG Earnings Call) at p. 5, 20:18-23:37. He explained that AI is likely to have "an overwhelmingly net positive" impact on music publishing going forward. *Id.* Publishers try (at 24-25) to disclaim these statements. But Universal Music Group relied on the same data as Publishers' expert and reached the opposite conclusion. Ex. 136 at p. 5, 20:18-21:56; Ant. ReSS Ad.F #64.[2]

Publishers must do more than speculate that the use could "cause some loss of sales" of their works. *Google Books*, 804 F.3d at 224. "[T]he possibility, or even the probability or certainty, of some loss of sales does not suffice to make the copy an effectively competing substitute that would tilt the weighty fourth factor in favor of the rights holder." *Id.* That makes sense—broad assertions of potential harm are possible in any case concerning novel technologies like LLMs. That is why they are insufficient. Instead, a plaintiff must prove the potential market harm is "meaningful or significant." *Id.* Publishers' expert's admissions alone show they cannot meet that standard, leaving nothing for the jury to decide on this issue.

***Licensing Market***. Publishers' licensing-market-for-AI-training theory is not legally

[2] Publishers briefly assert the UMG statements are hearsay. Pub. Opp. 25. They offer no authority or citation. *Id.* Statements by a UMG executive about a party's revenue on an official earnings call are admissible. *See, e.g.*, Fed. R. Evid. 801(d)(2)(C) (statements not hearsay when "made by a person whom the party authorized to make a statement on the subject").

**PUBLIC REDACTED VERSION**

cognizable. Publishers cannot avoid precedent holding that "any economic harm caused by transformative uses" does not "count" for factor four. *HathiTrust*, 755 F.3d at 99; *Tresóna Multimedia LLC v. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638, 651-52 (9th Cir. 2020) (same). Because Anthropic's training of general-purpose LLMs is transformative, lost opportunities to license works for that training are not cognizable. Any other result is circular. "'[T]he theoretical market for licensing'" exists "[i]n every fair use case." *Kadrey*, 788 F. Supp. 3d at 1052 (quoting *Tresóna*, 953 F.3d at 652); *accord* Chamber of Progress et al. Br. (Dkt. 701-1) at 12 ("The argument that a potential or actual licensing market defeats fair use creates an unprincipled circularity, subjugating public rights to commercial gain."). As a result, there is no cognizable harm to the hypothetical licensing market for AI training data as a matter of law.

Even if this theory were legally viable, it would fail on the facts. Publishers did not offer any evidence or testimony to contradict the analysis of Anthropic's economic expert, Dr. Abhishek Nagaraj, who testified that no market could ever develop to license sufficient data to train a general-purpose LLM. Ant. ReSS Ad.F #67. Other copyright scholars agree there is "no plausible option" to license all training works. Lee & Tushnet Br. (Dkt. 698-1) at 7. And while Publishers maintain that a market could theoretically form to license song lyrics to train general-purpose LLMs, they still cannot identify a single such deal. Publishers' attempts to license lyrics for training are legally irrelevant. "[C]opyright owners may not preempt exploitation of transformative markets … by actually developing or licensing others to develop those markets." *Castle Rock Ent., Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 145 n.11 (2d Cir. 1998). Evidence of "willingness to pay" is similarly inapposite. *Whyte Monkee Prods., LLC v. Netflix, Inc.*, 174 F.4th 761, 805 (10th Cir. 2026). Any such payments "may simply have been made in a[n] … effort to avoid … litigation," *Campbell*, 510 U.S. at 585 n.18.

Publishers' other supposed licenses are irrelevant too. They first cite (at 26) licensing deals with ***music-generation*** AI tools, which develop different products than Anthropic and face entirely different economic incentives. In any event, those agreements are consistent with Dr. Nagaraj's conclusion that the value of text ***lyrics*** to Anthropic for its LLM training purposes is far outweighed by the transaction costs of negotiating lyrics licenses. Ant. ReSS Ad.F #67. Publishers largely

concede these are distinct circumstances, arguing that lyrics are "valueless" to Anthropic. Pub. Opp. 2. Anthropic's access agreements for [redacted] have no bearing on whether a market for general-purpose LLM training data does or could exist. The scope and use of the data involved are undisputedly not comparable.

***Lyric Display Market.*** Publishers' final argument is that using lyrics to train Claude has harmed, or will harm, the online lyrics display market. Precedent and the record preclude that theory.

First, this theory of harm improperly turns on the effect of outputs. *Warhol* requires outputs and training to be assessed as separate uses. *Supra* p.3. Training an LLM does not generate any user-facing output. It undisputedly produces a statistical map of the relationships between words and phrases. Ant. ReSS #10, 21-22, 32-33. That map does not compete in any actual or potential market for displaying Publishers' lyrics. Ant. Mot. 15.

Even if *Warhol* permitted outputs to be considered, the record demonstrates no possible harm. Unrebutted testimony shows that Claude usage has not reduced visits to lyric display websites or Google searches for lyrics to Publishers' works. Ant. ReSS Ad.F #69. That makes sense, given that those sources are both free and easily accessible. Nor did Claude [redacted] *Id.* Publishers' hypotheses (at 22) about the effect of Claude outputs on the lyrics display market are not evidence. They cannot create a dispute of fact against Anthropic's experts' concrete, contrary analyses.

Publishers try to excuse that failure of proof by claiming they do not have to prove "actual present harm" to avoid summary judgment. Pub. Opp. 20-21. But even under Publishers' read of the law, they still have to demonstrate "that if the challenged use should become widespread, it would adversely affect the potential market for the copyrighted work." *Id.* at 20. They have not done so. Publishers have not even established that Claude is capable of producing allegedly infringing outputs of their lyrics going forward. Ant. ReSS Ad.F #87. Indeed, Publishers' subsequent complaints fail to allege a single example. *E.g.*, *Concord Music Group, Inc. v. Anthropic PBC*, Case No. 26-cv-00880, Dkt. 93 (N.D. Cal. May 21, 2026). And an unrebutted test of Anthropic's current models designed to elicit Publishers' lyrics showed ***zero*** complete outputs of the works in suit, with nearly 95% of responses reproducing five or fewer consecutive words from any of their works and

no responses containing more than 25% of a work's lyrics. Ant. ReSS #154; Ant. Mot. 7. Models that do not produce the allegedly harmful outputs cannot cause harm. Publishers' reference (at 22) to the effect of derivative works produced by Claude is a non sequitur; Publishers nowhere explain how derivatives of their works compete for the attention of people seeking the actual lyrics to songs. So as with the other purported markets, Publishers cannot show the "meaningful or significant" harm necessary to avoid summary judgment. *Google Books*, 804 F.3d at 224.

**C. Training LLMs Furthers The Goals Of Copyright**

Publishers are wrong (at 12) that training an LLM cannot further copyright's goals. The purpose of copyright law is to "promote the Progress of *Science* and useful Arts," U.S. Const. art. I, § 8, cl. 8, not purely human creations. The fair use statute thus has no "human" or "expressive" activity requirement. *See* 17 U.S.C. § 107; EFF Br. (Dkt. 706-1) at 2-3 ("Copyright law as a whole—including the fair use doctrine—exists to promote the development and availability of both expressive and non-expressive innovation."). Courts routinely hold activities to be fair use even when carried out by a machine without added expression. *E.g.*, *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 449-50, 455 (1984) (holding that "time shifting" enabled by Betamax machines recording television shows was fair use); *Google Books*, 804 F.3d at 217. Publishers also cannot dispute that humans use Claude to further ***human*** projects, including creative and scientific ones. EFF Br. (Dkt. 706-1) at 4-6 (listing examples). So as with "[n]early every major technological disruption" there may be "predictions from incumbent rightsholders that the new technology would destroy creativity." CCIA et al. Br. (Dkt. 711-1) at 4. But AI will result "not in less speech, but in more—more creators, more works, more competition, and broader public access to creative expression." *Id.* That promotes the goals of copyright law, which "is not just (or even primarily) about protecting financial incentives for original authorship." U.S. Br. at 17. "Instead, 'the ultimate, primary intended beneficiary is the public.'" *Id.* (quoting *Google Books*, 804 F.3d at 212).

Publishers' central authority, *Thaler*, stands for a legal rule that is not relevant here. It held only that a machine cannot be listed as the sole "author" of a work for purposes of acquiring a copyright registration. *Thaler v. Perlmutter*, 130 F.4th 1039, 1041 (D.C. Cir. 2025). But fair use is agnostic to whether a later secondary use might itself be copyrightable. For example, the machine-

created recordings in *Sony* were not copyrightable, yet they were a fair use. 464 U.S. at 455.

## II. PUBLISHERS' OUTPUT CLAIM FAILS AS A MATTER OF LAW

Publishers disregard (at 8) binding precedent holding that direct infringement requires volitional conduct. *E.g.*, *Hunley v. Instagram, LLC*, 73 F.4th 1060, 1074-75 (9th Cir. 2023); *VHT*, 918 F.3d at 731-32; *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 667 (9th Cir. 2017). Contrary to Publishers' argument, the Supreme Court did not silently overrule those authorities in *Cox Communications, Inc. v. Sony Music Entertainment*, 146 S. Ct. 959 (2026). *Cox* does not discuss volitional conduct in declining to expand secondary liability. *Id.* at 967. And it never addresses direct liability, the only theory raised here. *Id.*

Under the governing law, volitional conduct exists only when the defendant is "the ***direct cause*** of the infringement." *VHT*, 918 F.3d at 731-32. Courts look to who actually "instigate[s]" the copying, "selects" the specific copyrighted content that is copied, *id.* at 732, or "cause[s] the copying," *Fox Broad. Co., Inc. v. Dish Network L.L.C.*, 747 F.3d 1060, 1067 (9th Cir. 2014). When a system "creates the copy only in response to the user's command," its operator does not engage in volitional conduct. *Id.* The user does. *Id.* Volitional conduct thus distinguishes "between active and passive participation." *VHT*, 918 F.3d at 732. Operating a system that users can ask to reproduce copyrighted material despite the system's "copyright-protective" design is not volitional conduct. *Id.* at 732-33. Nor is "designing, housing, and maintaining" such a system. *Cartoon Network*, 536 F.3d at 131.

As a matter of law, the appearance of Publishers' lyrics in outputs does not reflect volitional conduct by Anthropic. Users alone decide what to ask Claude. Ant. ReSS #88-92. The model then draws on its map of human language patterns to generate a new and unique response based on the contents of the specific user prompt. *Id.* #21, 32-34. Anthropic processes those prompts and any output through multi-layered defenses that reduce the potential for copyright infringement. *Id.* #107, 110-120. Any infringing output thus results from users' requests, and exists only in spite of those efforts. Actively working to reduce the risk of infringement by third parties is not volitional conduct that establishes infringement. Publishers cannot dispute these facts or precedent, so distort both.

*First*, Publishers cannot demonstrate that Anthropic (rather than the user) chooses material

**PUBLIC REDACTED VERSION**

reproduced in infringing outputs. Publishers suggest that if Anthropic "enable[d]" Claude to "respond to lyric-related queries," it "instigat[ed]" any copying of copyrighted materials in outputs. Pub. Opp. 9. Precedent bars that theory. The operator of a system that "responds automatically to users' input" does not "'instigat[e]' user copying." *VHT*, 918 F.3d at 738. Here, the content of a user's prompt triggers whether an output could even potentially include lyrics.

Publishers are wrong (at 9) that Anthropic causes infringement in outputs by "select[ing]" copyrighted content to include in Claude's training data. *Cartoon Network* shows why. There, remote DVR operator Cablevision made "channels of programming available" by "aggregat[ing] television programming from a wide variety of 'content providers.'" 536 F.3d at 124, 132. The claimed infringement was viewers copying programs off those channels. *Id.* at 132. The court found that Cablevision's delivery of the later-copied content to viewers was not volitional conduct. *Id.* Instead, the users who selected the programs to record were the direct cause of the infringement. *Id.* Claude users similarly cause any display of copyrighted material in outputs by choosing the content of their prompts. Ant. ReSS #88-92; *infra* pp.18-19. Anthropic, like Cablevision, only offers a service that responds automatically to those requests. And if Cablevision did not select copyrighted material for its users by aggregating channels of content, then Anthropic plainly did not select any copyrighted material appearing in outputs by training Claude on an enormous volume of text available on the internet. That application of *Cartoon Network* is consistent with the Ninth Circuit's recent recognition that decisions about how to use an AI tool are attributable to users, not the tool's designer. *See Amazon.com Servs., LLC v. Perplexity AI, Inc.*, 184 F.4th 1083, 1090-92 (9th Cir. 2026). That remains true whether the user directs the AI tool to access a computer system (as in *Perplexity*) or to reproduce copyrighted material (as alleged here).

Publishers' cases (at 9-11) do not hold otherwise. *American Broadcasting Cos., Inc. v. Aereo, Inc.* found that the operator of a TV streaming system was directly liable for "performing" works under the Copyright Act. 573 U.S. 431, 442-43 (2014). The decision turned on Congress having specifically amended the Copyright Act to make cable TV systems directly liable for performing the works they transmitted. *Id.* at 443-44. Aereo's streaming technology bore an "overwhelming likeness" to those cable systems. *Id.* This "limited holding" did not suggest that a system's

**PUBLIC REDACTED VERSION**

"automatic response" to a user's request is sufficient to establish direct infringement. *Id.* at 443. The Ninth Circuit has confirmed that *Aereo* left the volitional conduct requirement "intact," including for systems accused of "automatically copying, storing, and transmitting materials" at a user's instigation. *Giganews*, 847 F.3d at 667-68. *Bell v. Wilmott Storage Services, LLC*, held that a company acted volitionally when it stored copyrighted material "on its servers in a manner that was accessible to the public." 12 F.4th 1065, 1073, 1081 (9th Cir. 2021). Here, Publishers' expert [redacted] Ant. ReSS #36, 97. And Anthropic undisputedly takes extensive efforts to ***preclude*** the reproduction of copyrighted material to users. Publishers cite the court's denial of Quizlet's motion to dismiss in *Barkley & Associates v. Quizlet, Inc.*, 2025 WL 2946993, at *4 (C.D. Cal. Sept. 11, 2025), but ignore that the same court later *granted* summary judgment for Quizlet on volitional-conduct grounds, 2026 WL 2367650, at *5-6 (C.D. Cal. July 14, 2026). There, like here, the user alone engaged in volitional conduct because any infringing outputs were made "at the user's command." *Id.* at *6. Publishers also cite *Disney Enterprises, Inc. v. Minimax*, where the court denied a motion to dismiss based on allegations the defendant "specifically advertised" its AI model's "ability to reproduce Plaintiffs'" copyrighted works. 2026 WL 1476670, at *6 (C.D. Cal. May 22, 2026). The record confirms that Anthropic does not encourage users to ask for copyrighted material at all. Nor has it "specifically" (or even generally) advertised any such capability.

*Second*, Publishers assert that guardrails designed to avoid users' infringement prove that Anthropic alone determines Claude outputs. Pub. Opp. 10. As explained, such defenses cannot prove volitional conduct as a matter of law. It would make no sense for the law to punish an entity that takes steps to prevent third-party copying by holding that, in doing so, the company necessarily controls third-party activity. That would reward willful ignorance and stop companies from trying to protect copyrights. That is why binding authority establishes that the operator of a system like Claude that is trying to stop users from infringing is not the one that "instigate[s]" infringing outputs, *VHT*, 918 F.3d at 732, or directly "cause[s] the copying" at issue, *Fox Broad. Co.*, 747 F.3d at 1067.

Rather than engage with *VHT* or cases applying it, Publishers claim that "[w]hether guardrails are intended to prevent infringement, or effective, is irrelevant to volition." Pub. Opp. 10. That is

**PUBLIC REDACTED VERSION**

not the law. *VHT* could not be clearer: a firm, like Anthropic, that "actively design[s] its system to avoid and eliminate copyright infringement" does not "engage in volitional conduct necessary to support a finding of direct liability." 918 F.3d at 733. A copy shop owner who "has stationed a guard by the door to turn away customers who are attempting to duplicate clearly copyrighted works" does not "by this screening process become" the copier when someone evades the guard and copies those works. *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 556 (4th Cir. 2004). For the same reason, the operator of a system that performs a "gatekeeping function" to "*prevent*[] users" from reproducing copyrighted content does not engage in volitional conduct. *See id.* Any contrary rule would undermine copyright law by penalizing efforts to stop infringement. Publishers' claim that Anthropic "directs and controls ***how*** Claude generates output" suffers the same flaw. Pub. Opp. 9. Each of the steps that Publishers identify is part of Claude's copyright-protective features. *Id.*

*Finally*, Publishers are wrong that Anthropic engaged in volitional conduct because Claude reproduces lyrics "even when users do not ask." Pub. Opp. 10. Publishers' supposed examples just show users (who may in fact be Publishers' own investigators) prompting Claude to reproduce lyrics in a variety of ways: sometimes directly, sometimes indirectly, and often adversarially. Some show users specifically requesting lyrical outputs tied directly or by clear inference to specific songs or artists. *See, e.g.*, Pub. ReSS #59 ("Write me a song about COPACABANA"); *id.* #60 (requesting "song lyrics inspired by 'Roar'"); *id.* #62 ("[C]reate a greeting card that is uptown funky"); Ant. ReSS Ad.F #34 [redacted]; *id.* Ad.F #46 (asking Claude to [redacted] and explaining [redacted]. Others show users asking how to play a particular song, for Claude to [redacted] the song, if Claude is [redacted] to the song, or to "show" the song with annotations. Pub. ReSS #53, 74-77. Any copyrighted material reproduced in Claude's responses to these prompts was caused by the user, not Anthropic.

No authority supports Publishers' contrary position. The only case they cite, *EMI Christian Music Group, Inc. v. MP3Tunes, LLC*, involved a system that "was ***designed to retrieve*** one aspect of a copyrighted work (the album art) whenever a user uploaded another aspect of a copyrighted work (the song)." 844 F.3d 79, 96 (2d Cir. 2016). Claude bears no resemblance. It was designed to generate a wide range of context-specific responses based on human language patterns and includes

**PUBLIC REDACTED VERSION**

guardrails to reduce the risk of reproducing copyrighted material. *Supra* pp.1, 5. Claude does not "retrieve" copyrighted materials stored on other websites "whenever" a user enters a certain kind of prompt. *EMI Christian*, 844 F.3d at 96. Claude instead frequently generates ***different*** responses to the same user prompt. Ant. ReSS #34-35.

### III. PUBLISHERS' DMCA CLAIM FAILS AS A MATTER OF LAW

Publishers' DMCA claim fails for three reasons. First, the DMCA's text only prohibits conduct involving a copyrighted work as a whole. Lyrics are just a portion of Publishers' copyrighted musical compositions. Second, Publishers have no evidence that Anthropic removed CMI from specific copies of their works. Third, Publishers have no evidence Anthropic removed ***any*** CMI for a purpose other than fair use. Each defect independently warrants summary judgment.

On the statutory text, Publishers fail to address the California district court decisions holding that CMI must be removed from a plaintiff's complete "product or original work." *Dolls Kill, Inc. v. Zoetop Bus. Co.*, 2022 WL 16961477, at *3 (C.D. Cal. Aug. 25, 2022); Ant. Mot. 34. Instead, they cite two out-of-circuit cases and never explain how the reasoning of those decisions complies with the DMCA's plain language. The statute defines CMI as certain information "conveyed in connection with" a "***work***." 17 U.S.C. § 1202(c); *id.* § 1202(b)(3). Here, Publishers' copyrighted works are musical compositions, not lyrics alone. The focus on a whole work is also the only logical one. While it makes sense to roll credits at the end of an entire film (and require that they not be removed when the entire film is copied), it would be impractical to do so each time a clip is played.

On the facts, Publishers have "no affirmative evidence at all" showing Anthropic removed CMI from particular copies of their works. *Stevens v. CoreLogic*, 899 F.3d 666, 673 (9th Cir. 2018). They instead try to prove removal with two observations. First, Publishers assert there are copies of their lyrics with CMI in Claude's training data. Pub. Opp. 27-28. Second, they say excerpts of lyrics without CMI appeared in Claude outputs. *Id.* But Publishers cannot show the requisite causality to connect these observations. Ant. Mot. 35. They concede that every one of the 499 works at issue appeared without CMI on a publicly available webpage [redacted]. Ant. ReSS #172. Those webpages could be the source of any copies lacking CMI. Ant. ReSS Ad.F #109. Publishers bear the burden of proving otherwise. They did not.

**PUBLIC REDACTED VERSION**

On scienter, Publishers have no evidence that Anthropic removed CMI to conceal infringement. They primarily claim that Anthropic removed CMI because it was "worried the model would output CMI" and thereby "expose" that Publishers' lyrics were in Claude's training data. Pub. Opp. 28. But Anthropic never hid training Claude on an enormous volume of text that included lyrics freely available on the internet. Ant. ReSS #67, 73-74; Pub. ReSS Ad.F #34. In fact, Publishers claim the datasets Anthropic used to train Claude ***were known*** to include lyrics. Ant. ReSS #106-107; Pub. ReSS #16-19. The evidence Publishers cite shows only concerns that training on too much repetitive text (like CMI) might make LLMs less effective. Ant. ReSS Ad.F #9, 12, 29, 84, 101-102, 112. Publishers also have no evidence of the allegations this Court credited in denying Anthropic's motion to dismiss. They still cannot show that Anthropic [redacted]. Their own experts [redacted]. Ant. ReSS #177-179.

## IV. ANTHROPIC'S RSS COMPLIES WITH THIS COURT'S RULES

Anthropic's RSS properly disputes Publishers' asserted "facts." Publishers focus primarily on the mistaken inclusion of "nonprofit" in one response. *Supra* p.2. But Anthropic properly described itself as a public benefit corporation in numerous MSS and RSS entries, including in the exact sentence Publishers complain about. Ant. MSS #7, 8; Ant. RSS #149, 151. When Publishers brought the error to Anthropic's attention, Anthropic promptly acknowledged the mistake and corrected the record by filing an amended RSS—long before Publishers' brief was filed. Dkt. 727. None of Publishers' other complaints have merit. They certainly do not show a failure to comply with the Court's rules warranting the extraordinary sanction of counterfactual admissions.

Anthropic properly disputed facts that are, in fact, disputed. Consider a few examples. Publishers say Anthropic's RSS #114 wrongly "points the finger at Mr. Brown's father" for prompting Claude for lyrics. Pub. Opp. 4. But Publishers' own quotations show Mr. Brown testified that "this is me playing around with my family." Pub. ReSS #114. Publishers also omit Mr. Brown's clarification that his father thought to prompt Claude for the lyrics. *Id.* Anthropic was permitted to dispute Publishers' misleading characterization and provide that context. Publishers' Fact #70 states

**PUBLIC REDACTED VERSION**

that "Anthropic selected the data it used to train Claude." Anthropic's response appropriately disputes the expansive contention that Anthropic "selected" particular data. Anthropic in fact aggregated large, diverse datasets without "select[ing]" specific documents within them. *Id*. Or take Publishers' Fact #184, "Claude can produce AI-generated lyrics far faster than any human, generating output of between '60 to a hundred words per second.'" Anthropic disputes that supposed fact because the evidence Publishers cite says no such thing. Claude's ability to generate ***text*** at a certain rate has no bearing on whether Claude does or could generate "***lyrics***" faster than humans. Lyric-generation speed, not text-generation speed, is the "fact" Publishers claim is undisputed. Anthropic's agreement that Claude can produce new song lyrics is also irrelevant. Pub. Opp. 4. That again says nothing about lyric-writing ***speed***, whether absolute or relative to humans.

Publishers are also wrong (at 3-4) that Anthropic improperly withdrew "binding admissions." Publishers assert, for example, that Anthropic's dispute of Publishers' Fact #6 contradicts Anthropic's response to an RFA. Fact #6 states "Anthropic admits that 'at least one Claude model was trained on a dataset containing the lyrics to at least one hundred (100) of Publishers' Works listed at Dkt. 337-1.'" Publishers have not shown the scope of "Works listed at Dkt. 337-1" that are "Publishers'," or what the genuine lyrics are. So as Anthropic's response states, "Publishers cannot demonstrate the scope of rights they control." *Id*. The allegedly contradictory RFA did not admit that the lyrics of the works listed at Dkt. 337-1 are owned or controlled by Publishers or are genuine. Publishers similarly contend Anthropic's Answer required admitting Publishers' Fact #114. Publishers again ignore the basis of Anthropic's response—deposition testimony that was not available when the answer was filed. And even if Anthropic's responses *were* different from previous ones, parties can amend admissions after reassessing the facts, including in an "opposition to [a party's] motion for summary judgment." *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 860 (9th Cir. 1995). That makes sense. The purpose of discovery is to find the facts. When there are new or changed facts, parties should update their positions. Publishers' only authority is consistent with that rule. It recognizes that "[f]actual assertions in pleadings and pretrial orders, ***unless amended***, are considered judicial admissions conclusively binding on the party who made them." *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988). That decision itself found a party's

**PUBLIC REDACTED VERSION**

statement in a filing could be nonbinding when later testimony contradicted it. *Id.* at 227.

Publishers thus have no basis for their extraordinary request to deem more than one hundred facts admitted. Publishers address only a handful of these facts. And their sole case deemed facts admitted because the plaintiff "cite[d] no evidence indicating the existence of a material dispute." *Corona v. Novartis Pharms. Corp.*, 2012 WL 13418947, at *2 nn.28-29 (C.D. Cal. June 12, 2012). Here, all agree Anthropic cited evidence and gave reasoning for its disputes.

Even setting all that aside, Publishers' own MSS makes their request for draconian sanctions unwarranted. That document is rife with the kind of improper arguments, distortions of fact, and other issues that Publishers claim exist in Anthropic's RSS. Publishers' Fact #175, for example, offers only the (false) argument that "Anthropic's use of Publishers' lyrics … would destroy Publishers' ability to license lyrics for these uses in the future." Pub. ReSS #175. Publishers falsely claim in Fact #13 that [redacted] Pub. ReSS #13. And Publishers' Fact #71 misstates Ben Mann's 30(b)(6) testimony by omitting that [redacted] Pub. ReSS #71. Publishers' complaints about Anthropic's RSS thus describe their own MSS. Their decision to seek extreme sanctions invites the Court to compare the two. That comparison does not favor Publishers.

## CONCLUSION

The Court should grant Anthropic's motion for summary judgment.

**PUBLIC REDACTED VERSION**

Date: September 8, 2026

*/s/ Sonal N. Mehta*

SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
**WILMER CUTLER PICKERING**
**HALE AND DORR LLP**
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

LOUIS W. TOMPROS (*Pro Hac Vice*)
louis.tompros@wilmerhale.com
**WILMER CUTLER PICKERING**
**HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

ARI HOLTZBLATT (SBN 354361)
ari.holtzblatt@wilmerhale.com
ROBIN C. BURRELL (*Pro Hac Vice*)
robin.burrell@wilmerhale.com
**WILMER CUTLER PICKERING**
**HALE AND DORR LLP**
2100 Pennsylvania Ave, NW
Washington, DC 20037
Telephone: (202) 663-6000

TAYLOR GOOCH (SBN 294282)
taylor.gooch@wilmerhale.com
**WILMER CUTLER PICKERING**
**HALE AND DORR LLP**
50 California St.
San Francisco, CA 94111
Telephone: (628) 235-1000

ALEX W. MILLER (*Pro Hac Vice*)
alex.miller@wilmerhale.com
JARED V. GRUBOW (*Pro Hac Vice)*
jared.grubow@wilmerhale.com
**WILMER CUTLER PICKERING**
**HALE AND DORR LLP**
250 Greenwich St
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Defendant*
**ANTHROPIC PBC**

**PUBLIC REDACTED VERSION**

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2026, I did cause this motion to be served on the following listed below and in the manner so indicated.

**By Electronic Mail**

OPPENHEIM + ZEBRAK, LLP
Matthew J. Oppenheim (*Pro Hac Vice*)
Nicholas C. Hailey (*Pro Hac Vice*)
Audrey Adu-Appiah (*Pro Hac Vice*)
Corey Miller (*Pro Hac Vice*)
Jeffrey M. Gould (*Pro Hac Vice*)
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
aadu-appiah@oandzlaw.com
corey@oandzlaw.com
jeff@oandzlaw.com

Jennifer Pariser (*Pro Hac Vice*)
Andrew Guerra (*Pro Hac Vice*)
Timothy Chung (*Pro Hac Vice*)
Michelle Gomez-Reichman (*Pro Hac Vice*)
Bret Matera (*Pro Hac Vice*)
Alexander Kaplan (*Pro Hac Vice*)
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
jpariser@oandzlaw.com
andrew@oandzlaw.com
tchung@oandzlaw.com
mgomez-reichman@oandzlaw.com
bmatera@oandzlaw.com
alex@oandzlaw.com

COBLENTZ PATCH DUFFY & BASS LLP
Jeffrey G. Knowles
Christopher J. Wiener
Bina Patel
Thomas A. Harvey
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 772-5795
Ef-jgk@cpdb.com
cwiener@coblentzlaw.com
bpatel@coblentzlaw.com
Ef-Tah@cpdb.com

COWAN, LEIBOWITZ & LATMAN, P.C.
Richard S. Mandel (*Pro Hac Vice*)
Jonathan Z. King (*Pro Hac Vice*)
Richard Dannay (*Pro Hac Vice*)
114 West 47th Street
New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

Dated: September 8, 2026

By: */s/ Robin C. Burrell*
Robin C. Burrell