**PUBLIC REDACTED VERSION**

SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone (650) 858-6000

TAYLOR GOOCH (SBN 294282)
taylor.gooch@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
50 California Street
San Francisco, CA 94111
Telephone: (628) 235-1000

ALEX W. MILLER (*pro hac vice*)
alex.miller@wilmerhale.com
JARED V. GRUBOW (*pro hac vice*)
**WILMER CUTLER PICKERING HALE AND DORR LLP**
jared.grubow@wilmerhale.com
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

LOUIS W. TOMPROS (*pro hac vice*)
louis.tompros@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

ARI HOLTZBLATT (SBN 354361)
ari.holtzblatt@wilmerhale.com
ROBIN C. BURRELL (*pro hac vice*)
**WILMER CUTLER PICKERING HALE AND DORR LLP**
2100 Pennsylvania Ave, NW
Washington, DC 20037
Telephone: (202) 663-6000

*Attorneys for Defendant*
**ANTHROPIC PBC**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

CONCORD MUSIC GROUP, INC., ET AL.,

Plaintiffs,

v.

ANTHROPIC PBC,

Defendant.

Case Number: 5:24-cv-03811-EKL-SVK

**ANTHROPIC'S REPLY SEPARATE STATEMENT IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Judge Eumi K. Lee
Magistrate Judge Susan van Keulen

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| **Anthropic's Use Of Lyrics As Inputs To Train Claude Is Fair Use** | | |
| **Issue 1: The Use of Lyrics as Inputs to Training is Fair Use as Matter of Law** | Fact 1: Musician and rapper, Meek Mill, uses Claude to help him understand and manage the administrative aspects of his music career.<br><br>Ex. 145 (MeekMill (@MeekMill) Twitter (Mar. 23, 2026), https://x.com/MeekMill/status/2036107917095469093)[1] | Disputed.<br><br>The cited evidence states only that, as of March 23, 2026, "Claude is helping [Meek Mill] organize [his] whole music career and other businesses in days. . . and it's moving [his] business forward at a high rate!" |
| | Fact 2: Anthropic co-founder and Chief Science Officer, Dr. Jared Kaplan, testified that Anthropic was founded to "form an organization that would focus more fully on safe and beneficial AI development." Kaplan testified that his Anthropic co-founders were "Chris Olah, Jack Clark, Sam McCandlish, Tom Brown, Dario Amodei, and Daniela [Amodei]."<br><br>Ex. 120 (Kaplan Dep.) at 62:18-71:16 | Undisputed that Dr. Kaplan testified as quoted. |
| | Fact 3: Anthropic co-founder and Chief Science Officer, Dr. Jared Kaplan, testified that [redacted]<br><br>Ex. 120 (Kaplan Dep.) at 115:11-16 | Undisputed that Dr. Kaplan testified as quoted. |

[1] Unless otherwise specified, Anthropic's citations to 'Ex.' are exhibits attached to the Declaration of Robin C. Burrell ("Burrell Declaration") in support of Anthropic's Motion for Summary Judgment and Opposition to Publishers' Motion for Partial Summary Judgment filed concurrently herewith. Citations to 'Ant. Reply Ex.' are exhibits to the Declaration of Robin C. Burrell filed concurrently with Anthropic's Reply Brief in Support of its Motion for Summary Judgment.

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | Fact 4: Anthropic co-founder and President, Ms. Daniela Amodei, testified "when we first founded the company in 2021, we were primarily focused on research at that time, and we always theorized that had we would have, you know, potential commercial applications for the models down the road."<br><br>Ex. 111 (Daniela Amodei Dep.) at 120:8-12 | Undisputed that Ms. Amodei testified as quoted. |
| | Fact 5: Anthropic co-founder, Mr. Tom Brown, testified that "[i]nitially we weren't sure if we were even going to commercialize anything, and so we had kind of a long soul-searching process."<br><br>Ex. 106 (Brown Dep.) at 65:10-12 | Undisputed that Mr. Brown testified as quoted. |
| | Fact 6: Anthropic co-founder, Mr. Benjamin Mann, testified "So one of Anthropic's principles is what we call the race to the top. Our hope is that by showing that we, as one of the frontier labs, can prioritize both safety and capabilities at the same time, that we can put pressure on our competitors to also prioritize safety."<br><br>Ex. 124 (Mann 30(b)(1) Dep. Vol. 2) at 188:18-189:16 | Undisputed that Mr. Mann testified as quoted.<br><br>Anthropic relies on this fact for the truth of the matter asserted by the quoted testimony. Publishers dispute the truth of the matter asserted that Anthropic "prioritize[s] both safety and capabilities at the same time." Anthropic has prioritized commercial goals over research and safety goals.<br><br>**Pls.' Ex. 46** (Dep. Ex. 173, Anthropic_0000443204); **Burrell Decl., Ex. 111** (Daniela Amodei Dep. Tr.) at 162:9–164:12 (discussing Dep. Ex. 173); **Pls.' Opp'n/Reply Ex. 157** (Dep. Ex. 237, Anthropic_0000479241) at -242, -245; **Pls.' Opp'n/Reply Ex. 128** (Kaplan Dep. Tr.) at 202:14–203:22 (discussing Dep. Ex. 237); **Pls.' Opp'n/Reply Ex. 156** (Dep. Ex. 235, Anthropic_0000215992); **Pls.' Opp'n/Reply Ex. 126** (Dario Amodei Dep. Tr.) at 125:1–129:7 (discussing |

PUBLIC REDACTED VERSION

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | | Dep. Ex. 235); **Pls.' Opp'n/Reply Ex. 148** (Dep. Ex. 35, Anthropic 0000229152) at -152; **Pls.' Ex. 7** (Turvey 30(b)(6) Dep. Tr.) at 109:3–110:18; *see also* **Pls.' Opp'n/Reply Ex. 127** (Daniela Amodei Dep. Tr.) at 147:17–48:2 [redacted] Dep. Ex. 170]."); **Pls.' Ex. 43** (Dep. Ex. 170, Anthropic_0000458427) (July 2021 memo authored by Dario Amodei [redacted]<br><br>Publishers further dispute the truth of the matter asserted that Anthropic "prioritize[s] both safety and capabilities at the same time." In February 2026, Anthropic dropped its flagship safety commitment to responsible AI scaling, including because its founders "didn't really feel, with the rapid advance of AI, that it made sense for us to make unilateral commitments . . . if competitors are blazing ahead."<br><br>**Pls.' Opp'n/Reply Ex. 178** (Billy Perrigo, *Exclusive: Anthropic Drops Flagship Safety Pledge*, TIME (Feb. 24, 2026), https://time.com/7380854/exclusive-anthropic-drops-flagship-safety- |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | | pledge/) (quoting interview with Anthropic founder Jared Kaplan); **Pls.' Opp'n/Reply Ex. 179** (ANTHROPIC, *Anthropic's Responsible Scaling Policy: Version 3.0* (Feb. 24, 2026), https://www.anthropic.com/news/responsible-scaling-policy-v3); *but see* **Pls.' Ex. 95** (Dep. Ex. 247, *Transcript: Ezra Klein Interviews Dario Amodei,* N.Y. TIMES (Apr. 12, 2024), https://www.nytimes.com/2024/04/12/podcasts/transcript-ezra-kleininterviews-dario-amodei.html) at -9–10 (Dario Amodei interview discussing importance of responsible AI scaling and commitment to pausing unsafe AI development); **Pls.' Opp'n/Reply Ex. 126** (Dario Amodei Dep. Tr.) at 45:17–46:22; **Burrell Decl., Ex. 125** (Mann 30(b)(1) Dep. Tr.) at 187:11–188:4 ("[W]e've publicly committed to potentially shutting down our models in the future for the right reasons"). |
| | Fact 7: Anthropic co-founder and Chief Science Officer, Dr. Jared Kaplan, testified that Anthropic's status as a public benefit corporation allows it to prioritize its mission above its profit motive.<br><br>Ex. 120 (Kaplan Dep.) at 106:5-24 | Disputed.<br><br>When asked, "What is a public benefit corporation?", Dr. Kaplan testified, "My general understanding is that a public benefit corporation is a corporation that can have a mission as its highest principle, and that it can legally, operationally, as—as an entity hold its mission as its highest goal above profit motives." But when asked, "Does Anthropic have a formal mission as its highest goal as a public benefit corporation?", Dr. Kaplan testified, "I don't recall." And when asked, "[Y]ou don't know whether Anthropic has a mission as a public benefit corporation?", Dr. Kaplan testified, "I don't recall the legal |

PUBLIC REDACTED VERSION

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | | details of how that is organized or set up."<br><br>**Burrell Decl., Ex. 120** (Kaplan Dep.) at 106:13–108:10. |
| | Fact 8: Anthropic's certificate of incorporation states "The specific public benefit that the Corporation will promote is to responsibly develop and maintain advanced AI for the cultural, social and technological improvement of humanity."<br><br>Ex. 88 (Anthropic_0000570401) at -402 | Undisputed that Anthropic's certificate of incorporation contains the quoted language. |
| | Fact 9: Anthropic co-founder and Chief Science Officer, Dr. Jared Kaplan, attested that Claude is trained to be both helpful and harmless.<br><br>Dkt. 212-5 ("Kaplan PI Decl.") at ¶¶ 39-41 | Undisputed that Dr. Kaplan attested that "Claude is trained to be both helpful and harmless." |
| | Fact 10: Publishers' expert, Dr. Shawn Shan, reported: [redacted] And that [redacted] | Undisputed. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | Ex. 7 (Shan Report) at ¶ 19 | |
| | Fact 11: Publishers' expert, Dr. Ben Zhao, reported that [redacted] He also testified [redacted]<br><br>Ex. 10 (Zhao Report) at ¶¶ 23, 55 | Undisputed, except that Dr. Zhao did not "testif[y]" as quoted. The quoted language appears in Dr. Zhao's opening expert report.<br><br>**Burrell Decl., Ex. 10** (Zhao Report) at ¶ 55. |
| | Fact 12: Publishers' expert, Dr. Ben Zhao, reported that [redacted]<br><br>Ex. 18 (Zhao Rebuttal) at ¶130 | Undisputed. |
| | Fact 13: Anthropic co-founder and Chief Science Officer, Dr. Jared Kaplan, attested that "LLMs are text-based generative AI models that use deep learning techniques and train on extremely large data sets to understand, summarize, generate, and predict new content." He also attested "Anthropic is an artificial intelligence safety and research company based in San Francisco, California, working to develop generative AI models." Claude was released to the general public in July 2023.<br><br>Kaplan PI Decl. ¶¶ 6, 7, 8 | Undisputed that Dr. Kaplan attested as quoted. Also undisputed that Anthropic is an artificial intelligence company based in San Francisco, CA.<br><br>Anthropic relies on this fact for the truth of the matter asserted by the quoted attestation. Publishers dispute the truth of the matter asserted that LLMs "generate[] and predict new content." In the large language model ("LLM") research community, it is still uncertain whether an LLM is even capable of generating "new" content (as opposed to memorizing and regurgitating its training data).<br><br>Decl. of Ben Zhao ISO Pls.' Mot. for Summ. J. (March 23, 2026), ¶¶ 44–47, ECF No. 604 ("Zhao Decl."); **Burrell Decl., Ex. 10** (Zhao Report) ¶¶ 26, 46, 91. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | | Disputed that "Claude was released to the general public in July 2023." Claude was released to the general public in March 2023, and Claude 2 was released in July 2023.<br><br>Answer to FAC ¶ 54; **Pls.' Ex. 73** (Dep. Ex. 187, Anthropic_0000349548); *see also* Plaintiffs' Moving Separate Statement ISO Mot. for Summ. J. (March 23, 2026), Facts Nos. 124, 154 (undisputed), ECF No. 594-1 ("MSS"). |
| | Fact 14: Claude has been used for various tasks by pharmaceutical researchers, scientists, and government agencies.<br><br>Ex. 1 (Altman Report) at ¶¶ 54-116 | Disputed only to the extent that the cited evidence (Burrell Decl., Ex. 1) is subject to a pending motion to exclude. *See* ECF No. 640. |
| | Fact 15: Anthropic co-founder and President, Ms. Daniela Amodei, testified that "Research and Development, Healthcare, and Life Sciences" are among "the most common use cases of Claude."<br><br>Ex. 111 (Daniela Amodei Dep.) at 116:10-117:2, 154:4-15, 197:8-17 | Undisputed that Ms. Amodei testified as quoted. |
| | Fact 16: A December 2024 report of aggregated insights across a random sample of consumer (i.e., non-business) users' Claude conversations shows that the most popular consumer use cases for Claude were "web and mobile application development assistance" (>10%),"content creation and communication assistance across disciplines" (~9%), "multidisciplinary academic research and writing assistance" (~7%), "education and career development assistance" (~6%), "implement and optimize diverse advanced AI/ML technologies and | Undisputed that the cited Anthropic report contains the quoted language. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | applications creation" (~6%), "business strategy and operations assistance across industries" (~6%), "multilingual N[atural] L[anguage] P[rocessing], translation, and linguistic analysis services" (~4.5%), "DevOps and cloud infrastructure implementation and troubleshooting" (~4%), "digital marketing and SEO optimization assistance" (~4%), and "data analysis, visualization, and management assistance" (~4%). The top ten use cases collectively account for roughly 60% of Claude conversations.<br><br>Ex. 47 (Anthropic_0000012987) at -994 | |
| | Fact 17: Claude has been used to analyze data for clinical trials and to draft clinical study reports for medical treatments.<br><br>Ex. 1 (Altman Report) at ¶ 76; Ex. 87 (Anthropic_0000570252) at -253 | Disputed only to the extent that the cited evidence (Burrell Decl., Ex. 1) is subject to a pending motion to exclude. *See* ECF No. 640. |
| | Fact 18: Claude has been applied to help compose lyrics by brainstorming interesting word pairings.<br><br>Ex. 1 (Altman Report) at ¶ 111; Ex. 98 (Anthropic_0000594977) at -982 | Disputed only to the extent that the cited evidence (Burrell Decl., Ex. 1) is subject to a pending motion to exclude. *See* ECF No. 640. |

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | **Publishers' Additional Fact #1:** Anthropic is incorporated as a "public benefit corporation."<br><br>**Burrell Decl., Ex. 120** (Kaplan Dep.) at 106:5–12; **Burrell Decl., Ex. 88** (Anthropic_0000570401) at -402. | Undisputed. |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | **Publishers' Additional Fact #2:** As a public benefit corporation, Anthropic is a for-profit corporation.<br><br>**Pls.' Ex. 3** (Whittle 30(b)(6) Dep. Tr.) at 32:18-20. | Undisputed that Anthropic is a public benefit corporation and that public benefit corporations are organized as for-profit corporations. Further undisputed that, as a public benefit corporation, Anthropic is "able to make sure that [Anthropic's] mission comes first. And that if [Anthropic has] to do something that would be for the mission, but not optimizing shareholder value, [Anthropic has] the ability to do that."<br><br>Ex. 88 (Anthropic_0000570401) at -402; Ex. 106 (Brown Dep.) at 51:18-52:9; Ex. 120 (Kaplan Dep.) at 105:18-107:18. |
| | **Publishers' Additional Fact #3:** As a public benefit corporation, Anthropic is not a non-profit organization.<br><br>**Burrell Decl., Ex. 120** (Kaplan Dep.) at 106:25–107:10; **Pls.' Opp'n/Reply Ex. 129** (Brown Dep. Tr.) at 56:7-15. | Undisputed. |
| | **Publishers' Additional Fact #4:** Anthropic is a for-profit corporation whose certificate of incorporation permits Anthropic to "engage in any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law[.]"<br><br>**Burrell Decl., Ex. 88** (Anthropic_0000570401) at -402; **Burrell Decl., Ex. 120** (Kaplan Dep.) at 106:25–107:10; **Pls.' Ex. 3** (Whittle 30(b)(6) Dep. Tr.) at 32:18–20. | Undisputed that Anthropic is a public benefit corporation and the certificate of incorporation includes the quoted language.<br><br>Ex. 88 (Anthropic_0000570401) at -402. |
| | **Publishers' Additional Fact #5:** Anthropic's founders began planning to commercialize Anthropic's AI products as early as March 2021. | Undisputed that Anthropic's founders "considered the possibility of commercialization" beginning in or around early 2021, as Dr. Jared Kaplan testified. |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | **Pls.' Ex. 43** (Dep. Ex. 170, Anthropic_0000458427, "Brainstorm on What Anthropic Might Release Externally This Year"); **Pls.' Ex. 97** (Dep. Ex. 169, Anthropic_0000444967, "Anthropic Plan and Timeline [WIP]"), at -978; **Burrell Decl., Ex. 120** (Kaplan Dep.) at 114:5–115:16; **Pls.' Opp'n/Reply Ex. 127** (Daniela Amodei Dep. Tr.) at 145:14–147:19 (testifying about Pls.' Ex. 43); **Pls.' Opp'n/Reply Ex. 164** (Anthropic_0000444301, "Anthropic 2 Year Plan and Timeline" bearing last modified date metadata of March 16, 2021) at -301, -308, -312–13; **Pls.' Opp'n/Reply Ex. 165** (Anthropic_0000444332, "Guide To Budget and 2 Year Plan" bearing last modified date metadata of March 16, 2021). | Otherwise disputed that Anthropic's founders "began planning" to commercialize at that time. [redacted] before creating a public benefit corporation.<br><br>Ant. Reply Ex. 160 (Kaplan Dep.) at 114:9-115:16, 116:9-117:11.<br><br>Pls.' Ex. 43 demonstrates that Anthropic did not believe it was [redacted]<br><br>Pls.' Ex. 43 (Dep. Ex. 170, Anthropic_0000458427) at -427. |
| | **<u>Publishers' Additional Fact #6:</u>** As of May 28, 2026, Anthropic is valued at $965 billion.<br><br>**Pls.' Opp'n/Reply Ex. 191** (ANTHROPIC, *Anthropic raises $65B in Series H funding at $965B post-money valuation* (May 28, 2026)). | Undisputed. |
| | **<u>Publishers' Additional Fact #7:</u>** Claude has been used to look up existing song lyrics.<br><br>*See, e.g.*, **Pls.' Ex. 34** (Anthropic_0000429488) at Row 3790; **Pls.' Ex. 35** (Anthropic_0000429490) at Row 3383 (similar lyric retrieval requests); **Pls.' Ex 2** (comparison chart of Publishers' lyrics and | Undisputed that Pls.' Ex. 2 shows prompts to Claude requesting lyrics.<br><br>Otherwise, disputed as to the truth of the matter asserted because, to the extent that "has been used" refers to third parties, Publishers have not shown that any of the prompts in Pls.' Ex. 2 were made by bona fide third parties, including after Anthropic strengthened its guardrails. |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | Claude output in response to third-party prompts, citing Anthropic Claude records) at 26–27, 31–32, 53–54, 62–3, 82–83, 85–86, 129–30, 138–39, 256–57, 263–64, 288–89, 310–11, 317–18, 324–25; Decl. of Joshua Dennis ISO Pls.' Mot. for Summ. J. ("**Dennis Decl**.") (March 22, 2026), ¶¶ 38–39, ECF No. 602. | *See* Ex. 115 (Dennis Dep.) at 242:6-10; Ant. Reply Ex. 161 (Dennis Opening Report) ¶¶ 56-57.<br><br>Pls.' Ex. 34 and Ex. 35 are cluster data from Anthropic's Clio tool and concern high-level summaries of Claude user requests, and do not support Publishers' conclusions that Claude reproduced lyrics in responses to these requests.<br><br>Pls.' Ex. 34 identifies [redacted] records within the cluster for prompts about [redacted]<br><br>Pls.' Ex. 35 identifies [redacted] records within the cluster for prompts about [redacted]<br><br>The Clio cluster data in Pls.' Ex. 34 and Pls.' Ex. 35 show de minimis usage, representing approximately 0.2% of sampled traffic.<br><br>Pls.' Ex. 34 (Anthropic_0000429488) at Row 3790; Pls.' Ex. 35 (Anthropic_0000429490) at Row 3383.<br><br>Lyric related uses are very rare and not typical of Claude usage.<br><br>Pls.' Opp'n/Reply Ex. 130 (Ganguli Dep.) at 59:5–11, 61:10–14; 111:19-112:16.<br><br>Anthropic employs a multi-tiered defense system designed to prevent the inclusion of copyrighted material in Claude's outputs. After Publishers filed this lawsuit, Anthropic strengthened its guardrails both generally and specifically to address |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | the works in suit and stipulated with Publishers to maintain their efficacy. Dr. Bilmes's analysis shows the effectiveness of Anthropic's guardrails and defenses in preventing outputs containing the claimed lyrics to works in suit when users request existing song lyrics, as well as other purportedly copyrighted lyrics, even when directly prompted.<br><br>Ex. 30 (Def.s Am. Supp. Resp. & Obj. to 1st Set of Interrogs. (Nos. 9, 11, 12) (Nov. 12, 2025)) at No. 12; Ex. 2 (Bilmes Report) at §§ V.C, IX.C; Ex. 11 (Bilmes Rebuttal) at § VI.B; Dkt. 291. |
| | **<u>Publishers' Additional Fact #8:</u>** Claude has been used to write purportedly "new" AI-generated song lyrics.<br><br>**Pls.' Ex. 30** (D. Ganguli 30(b)(6) Dep. Ex. 6, Anthropic_0000429489) at Rows 2620, 3044, 4271, 4474, 4758; *see also* **Pls.' Ex. 31** (Anthropic_0000429482) at Rows 840, 1382, 2759, 4627 (showing clusters for lyrics-related uses); **Pls.' Ex. 32** (Anthropic_0000429485) at Rows 221, 2039, 2731, 3749, 4765 (same); **Pls.' Ex. 33** (Anthropic_0000429486) at Row 2861; **Pls.' Ex. 106** (Anthropic_0000429484) at Rows 1102, 2266, 4639 (same); Dennis Decl. ¶¶ 40, 42. | Undisputed that Claude can be used to write new and original lyrics and that Publishers' cited Clio data reflect requests for original lyrics.<br><br>Otherwise disputed to the extent that Publishers imply any output contained existing lyrics.<br><br>Pls.' Ex. 30, Ex. 31, Ex. 32, Ex. 33, and Ex. 106 are cluster data from Anthropic's Clio tool and concern high-level summaries of Claude user requests, and do not support Publishers' conclusions that Claude generated "new" lyrics in responses to these requests.<br><br>Pls.' Ex. 30 identifies the number of records within the clusters related to prompts about [redacted] and [redacted] |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | Pls.' Ex. 31 identifies the number of records within the clusters related to prompts about [redacted] and [redacted]<br><br>Pls.' Ex. 32 identifies the number of records within the clusters related to prompts about [redacted] and [redacted]<br><br>Pls.' Ex. 33 identifies the number of records within the cluster related to prompts about [redacted]<br><br>Pls.' Ex. 106 identifies the number of records within the clusters related to prompts about [redacted] and [redacted]<br><br>The Clio cluster data in Pls.' Ex. 30-33 and 106 show de minimis usage, representing approximately 0.2% of sampled traffic.<br><br>Lyric related uses are very rare and not typical of Claude usage. |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | Pls.' Opp'n/Reply Ex. 130 (Ganguli Dep.) at 59:5–11, 61:10–14; 111:19-112:16.<br><br>Pls.' Ex. 30 (Ganguli 30(b)(6) Dep. Ex. 6, Anthropic_0000429489) at Rows 2620, 3044, 4271, 4474, 4758; *see also* Pls.' Ex. 31 (Anthropic_0000429482) at Rows 840, 1382, 2759, 4627; Pls.' Ex. 32 (Anthropic_0000429485) at Rows 221, 2039, 2731, 3749, 4765; Pls.' Ex. 33 (Anthropic_0000429486) at Row 2861; Pls.' Ex. 106 (Anthropic_0000429484) at Rows 1102, 2266, 4639. |
| | **Publishers' Additional Fact #9**: A "major methodological concern" with LLMs "pretrained on a broad swath of internet data, particularly large models with the capacity to memorize vast amounts of content, is potential contamination of downstream tasks by having their test or development sets inadvertently seen during pre-training."<br><br>**Pls.' Opp'n/Reply Ex. 172** (Dep. Ex. 202, Tom B. Brown et al., *Language Models Are Few-Shot Learners*) at 9; *see* **Pls.' Opp'n/Reply Ex. 125** (Mann 30(b)(1) Dep. Tr.) at 26:15–27:17. | Undisputed that Pls.' Opp'n/Reply Ex. 172 contains the quoted language referring to "major methodological concern[s]" with the development of certain LLMs.<br><br>Otherwise disputed as to the truth of the matter asserted as the evidence cited does not pertain to Claude.<br><br>Pls.' Opp'n/Reply Ex. 172, describes training for GPT-2 and GPT-3 models (not operated by Anthropic and not at issue in this litigation), and concerns benchmark test-set contamination, not reproduction of copyrighted text in outputs, and further describes how the researchers "reduce such contamination" and discusses their "future work" to "aggressively remove data contamination."<br><br>Pls.' Opp'n/Reply Ex. 172 (Dep. Ex. 202, Tom B. Brown et al., *Language Models Are Few-Shot Learners*) at 9.<br><br>Mr. Mann testified that it was "correct" that Pls.' Opp'n/Reply Ex. 172 "is a research paper [he] worked |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | on while [he] [was] employed at OpenAI."<br><br>Pls.' Opp'n/Reply Ex. 125 (Mann 30(b)(1) Dep.) at 26:15–27:17.<br><br>As Anthropic CEO Dr. Dario Amodei and others testified, it is a "misunderstanding" that models are "memorizing or spitting things out" and Anthropic takes steps to mitigate memorization of training data and regurgitate it in outputs. Memorization is undesirable and does not "serve[] important functions" because it hurts model performance.<br><br>Ex. 112 (Dario Amodei Dep.) at 94:22-25; Ex. 116 (Drain Dep.) at 66:9-23; *id.* at 83:14-18; Ex. 2 (Bilmes Report) ¶¶ 117-120; Ex. 126 (Mann 30(b)(6) Dep.) at 178:9-14; Ex. 106 (Brown Dep.) at 131:8-17. |
| | **<u>Publishers' Additional Fact #10</u>**: When prompted, Claude can generate output that "probably look like song lyrics . . . that look pretty good[.]"<br><br>**Pls.' Ex. 4** (Mann 30(b)(6) Dep. Tr.) at 176:9-17; *see also* **Pls.' Ex. 10** (Daniela Amodei Dep. Tr.) at 180:4-6,186:10-16. | Undisputed that Mr. Benjamin Mann testified that "[i]f you ask Claude to generate song lyrics, it's likely Claude will output something that probably looks like song lyrics," and that some "instances" of these outputs "look pretty good."<br><br>Further undisputed that Ms. Daniela Amodei testified that Claude is "capable of, for example, creating its own song lyrics, if it wanted to."<br><br>Pls.' Ex. 4 (Mann 30(b)(6) Dep.) at 176:9-17; *see also* Pls.' Ex. 10 (Daniela Amodei Dep.) at 180:4-6, 186:10-16. |
| | **<u>Publishers' Additional Fact #11</u>**: Anthropic's Economic Index, which tracks occupations impacted by AI, includes data indicating that "Poets, Lyricists, and Creative | Undisputed that Anthropic's Economic Index includes data about "Poets, Lyricists, *and* Creative Writers" who have used Claude, including, as a subset of those uses, to |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | Writers" have directed Claude to "write narrative, dramatic, lyrics, or other types of poetry" and "write words to fit musical compositions, including lyrics for operas, musical plays, and choral works."<br><br>**Burrell Decl., Ex. 8** (Smith Report) at ¶¶ 80, 202 & n.138. | "write narrative, dramatic, lyrics, or other types of poetry" and "write words to fit musical compositions, including lyrics for operas, musical plays, and choral works."<br><br>It is also undisputed that Anthropic's Economic Index indicates that the amount of Claude usage related to the broader category of "Poets, Lyricists, *and* Creative Writers," generally, has been below 1.49%. That category expands beyond just songwriters, such that the percentage of uses related to lyrics specifically are smaller than 1.49% of uses.<br><br>Ant. Reply Ex. 162 (Sept. 2025 Anthropic Economic Index, Anthropic_0000441108 at -112, -124); Ex. 8 (Smith Report) at ¶ 80, n.77 (citing Anthropic's Economic Index); Ant. Reply Ex. 163 (Smith Dep. Vol. 1) at 143:1-11. |
| | **<u>Publishers' Additional Fact #12</u>**: LLMs are prone to memorization, and "[l]arge LMs memorize A LOT, like a LOT."<br><br>**Pls.' Opp'n/Reply Ex. 153** (Dep. Ex. 140, Anthropic_0000507750) at -796; **Pls.' Opp'n/Reply Ex. 136** (Drain Dep. Tr.) at 152:10–153:2 (testifying about Dep. Ex. 140 and explaining that [redacted]; **Pls.' Opp'n/Reply Ex. 135** (Sangani Dep. Tr.) at 172:5-12 ("I would not frame regurgitation as a risk. I think the risk is memorization. And if a large contiguous block of tokens has been memorized, it's—it's possible that for some combination of | Undisputed that the cited document contained the quoted language about "[l]arge LMs."<br><br>Otherwise, disputed as to the truth of the matter asserted.<br><br>Anthropic takes substantial steps to mitigate memorization, including through deduplicating its training data, because memorization hurts model performance.<br><br>The cited observation from an Anthropic employee about LLM memorization was made in the context of deduplication research and based off a pre-trained, intermediate model, not the later commercially released model of Claude. Anthropic then used that research to investigate and to further develop techniques to reduce |

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | prompts, those tokens will be reproduced. Maybe they would not be regurgitated; maybe they would. It's hard to say, but it's not unreasonable that that could occur"); *see also* Answer to FAC ¶¶ 108-09; **Pls.' Opp'n/Reply Ex. 129** (Brown Dep. Tr.) at 196:1-4 ("I think that if you trained a ton on—like, in pretraining some verbatim chunk of text many, many times, that that would make it more likely that the model would regurgitate it."). | memorization for commercially released models.<br><br>Ex. 73 (Anthropic_0000507750); Ex. 116 (Drain Dep.) at 66:9-23; *id.* at 154:5-15, 178:17-179:4; Ex. 2 (Bilmes Report) ¶¶ 117-120.<br><br>Further disputed as the cited testimony from Mr. Pranay Sangani and Mr. Tom Brown concerned memorization of portions of the training data as a *hypothetical* trait, not an "inherent" one.<br><br>In the cited testimony, Mr. Pranay Sangani was responding to the question, "[I]f a model is engaged in memorization, does that increase the risk of potential regurgitation?"<br><br>Pls.' Opp'n/Reply Ex. 135 (Sangani Dep.) at 172:1-12.<br><br>Mr. Tom Brown was responding to the question, "And is it your testimony that you don't -- that you can't say one way or the other if specific content is repeated many times in the training data, whether that's more likely to influence the model's output? Mr. Brown's full response was, "I think I don't -- I think I don't know. I think that if you trained a ton on -- like, in pretraining some verbatim chunk of text many, many times, that that would make it more likely that the model would regurgitate it. But again, I think that's – that's the reason why we avoid doing stuff like that, but again, I'm not the expert here.<br><br>Ant. Reply Ex. 165 (Brown Dep.) at 195:19-197:7. |
| | **<u>Publishers' Additional Fact #13</u>**: With respect to AI models' memorizing a particular sequence, | Undisputed that Ms. Drain testified as quoted. |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | "it's good for the model to have memorized things like famous quotes that [] you or I might memorize."<br><br>**Pls.' Ex. 11** (Drain Dep. Tr.) at 68:8-19. | Disputed as to the truth of the matter asserted as Anthropic takes substantial steps to mitigate memorization, including through deduplicating its training data, because memorization hurts model performance.<br><br>*See* Pls.' Opp'n/Reply Ex. 136 (Drain Dep.) at 70:13-18 ("[W]e're trying to reduce memorization … because it's harmful for the model [and] it makes the model dumber[.] I don't know of any text that we've intentionally had the model memorize."); Pls.' Opp'n/Reply Ex. 135 (Sangani Dep.) at 279:24-280:8 ("We want Claude … to learn about the underlying dynamics and build an understanding for the universe that allows the model to be useful in different contexts … Memorizing data is kind of antithetical to that and is [] definitely not what we are looking for here."). |
| | <u>**Publishers' Additional Fact #14:**</u> Anthropic employees believe that certain song lyrics, such as those for "American Pie" by Don McLean or "Let It Be" by the Beatles, are "pillars of human culture" that reflect "useful" "cultural knowledge" for Claude to memorize verbatim.<br><br>**Pls.' Opp'n/Reply Ex. 136** (Drain Dep. Tr.) at 107:24–109:10; *see also* **Pls.' Opp'n/Reply Ex. 128** (Kaplan Dep. Tr.) at 152:20–153:7. | Disputed.<br><br>The deposition testimony cited does not reflect that Ms. Dawn Drain or Dr. Jared Kaplan believed that American Pie or Let It Be were "useful" "cultural knowledge" for Claude to memorize verbatim. The testimony was given only in the context of follow up questions as to their opinions as to whether songs we're "pillars of ... culture," not whether Anthropic wanted Claude to memorize them.<br><br>Ms. Drain did not testify that "American Pie" or "Let It Be" were works that Anthropic wanted Claude to memorize. Rather, Ms. Drain testified, "Um, I mean, it's a pretty short list since, in general, verbatim memorization is bad and makes them all dumber, um, but, you know, one – one example we had earlier was like |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | famous bible passages that people have memorized. Um, but it would be a pretty short list" in response to the question "What are some other pillars of human culture that you would want Claude to memorize verbatim?"<br><br>Pls.' Opp'n/Reply Ex. 136 (Drain Dep.) at 107:24-108:5.<br><br>In response to the question, "is it true or not true that 'song lyrics may be useful to include in the training corpus because they add to the diversity of training data,'" Dr. Jared Kaplan testified, "As mentioned, I think that to understand the cultural knowledge and the way that it's situated, something like music reviews might be more useful in bridging connections between different ideas and culture. But song lyrics are also partially a source of that information, as are, for example, poems, which are very similar." Dr. Kaplan's testimony is in the context of training-data diversity, not memorization.<br><br>Pls.' Opp'n/Reply Ex. 128 (Kaplan Dep.) at 152:25-153:7.<br><br>Anthropic employs a multi-tiered defense system designed to prevent the inclusion of copyrighted material in Claude's outputs. After Publishers filed this lawsuit, Anthropic strengthened its guardrails both generally and specifically to address the works in suit and stipulated with Publishers to maintain their efficacy. Dr. Bilmes's analysis shows the effectiveness of Anthropic's guardrails and defenses in preventing outputs containing the claimed lyrics to works in suit, as well as other purportedly copyrighted lyrics, even when directly prompted. |

**PUBLIC REDACTED VERSION**

| **Publishers' Additional Material Facts on This Issue** | | **Anthropic's Response & Supporting Evidence** |
|---|---|---|
| | | Ex. 30 (Def's Am. Supp. Resp. & Obj. to 1st Set of Interrogs. (Nos. 9, 11, 12) (Nov. 12, 2025)) at No. 12; Ex. 2 (Bilmes Report) at §§ V.C, IX.C; Ex. 11 (Bilmes Rebuttal) at § VI.B; Dkt. 291. |
| | **<u>Publishers' Additional Fact #15:</u>** An Anthropic employee acknowledged in an internal Claude record that a [redacted]<br><br>**Pls.' Ex. 76** (Anthropic_0000434712) at -712. | Undisputed that the cited document is a chat between an Anthropic employee and Claude, which contains the quoted language.<br><br>Otherwise disputed because the cited conversation does not establish that Anthropic [redacted]<br><br>This conversation between Claude and an Anthropic employee was about [redacted] The employee also states, [redacted] In response, Claude states that [redacted]<br><br>Pls.' Ex. 76 (Anthropic_0000434712) at -712.<br><br>As Anthropic CEO Dr. Dario Amodei and others testified, it is a "misunderstanding" that models are "memorizing or spitting things out" and Anthropic does not take steps to encourage memorization in Claude; rather, it takes steps to avoid it.<br><br>Memorization is undesirable and does not "serve[] important functions" because it hurts model performance. An output from Claude is not competent evidence as to LLM functionality or the purportedly "legitimate use" of memorization by LLMs. |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | Ex. 112 (Dario Amodei Dep.) at 94:22-25; Ex. 116 (Drain Dep.) at 66:9-23; *id*. at 83:14-18; Ex. 2 (Bilmes Report) ¶¶ 117-120; Ex. 126 (Mann 30(b)(6) Dep.) at 178:9-14; Ex. 118 (Ganguli 30(b)(1) Dep.) at 101:5-18, 102:7-22; Ex. 106 (Brown Dep.) at 131:8-17. |
| | **Publishers' Additional Fact #16**: Songwriters have used Claude to write lyrics for songs that are then uploaded to streaming platforms.<br><br>Decl. of Michael Smith ISO Pls.' Mot. for Summ. J. ("Smith Decl.") (March 23, 2026), ¶ 39, ECF No. 601. | Disputed that multiple songwriters have used Claude to write lyrics for songs that are then uploaded to streaming platforms.<br><br>The cited declaration identified only one "example, in a video from June 2025" of "YouTuber Rick Beato" "us[ing] Anthropic's Claude to generate the lyrics he uses in an AI-generated song called 'West Texas Dreams,' that is currently available on … YouTube." The declaration cites no other examples and there is no evidence that "West Texas Dreams" contains the lyrics to any of Publishers' asserted works.<br><br>Publishers' expert, Dr. Michael Smith testified that [redacted] in response to the question [redacted]<br><br>Publishers' expert, Dr. Michael Smith further testified, [redacted] in response to questioning about whether he had conducted an empirical analysis or quantification of how and whether use of Claude to write new and original song lyrics has displaced lyricists. |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | Smith Decl., ¶ 39, Dkt. 601; Ant. Reply Ex. 163 (Smith Dep. Vol. 1) at 146:6-151:1; Ex. 132 (Smith Dep. Vol. 1) at 163:1-164:2. |
| | **Publishers' Additional Fact #17:** Anthropic does not "consider copyright in any of [its] helpful, honest, or harmless[ness]" trainings.<br><br>**Pls.' Opp'n/Reply Ex. 125** (Mann 30(b)(1) Tr.) at 101:1–103:4; *see also* **Pls.' Ex. 74** (Dep. Ex. 179, Anthropic_0000458491) (benchmarking analysis including prompt for [redacted]); **Pls.' Ex. 4** (Mann 30(b)(6) Dep. Tr.) at 126:5-10, 127:4-7 (discussing Dep. Ex. 179). | Undisputed that Mr. Mann testified as quoted.<br><br>Disputed to the extent that Anthropic does not consider copyright in training Claude.<br><br>The evidence cited shows that Anthropic conducted a harmlessness assessment, in which it compared Claude's response to many prompts to test whether Claude was providing "harmful" answers using that team's specific definition of "harmfulness."<br><br>Many of the prompts involved testing whether Claude or other LLMs would provide outputs that would incite violence or teach a person how to make or use weapons.<br><br>One prompt in that spreadsheet of dozens of harmlessness prompts referenced "awesome Metal lyrics" to benchmark Claude's, [redacted]'s responses. There is no evidence that these prompts were used to train Claude or that the purported lyrics in Claude's output are accurate or are a verbatim reproduction of complete lyrics to any song. Mr. Mann further testified that the "metal lyrics "look like partial quotes ... I also would be surprised if these lyrics were at all complete."<br><br>Ex. 67 (Anthropic_0000458491); Ant. Reply Ex. 173 (Mann 30(b)(6) Dep.) at 130:8-133:4.<br><br>In the cited testimony, Mr. Mann testified, "I don't think we would consider copyright in any of helpful, |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | honest, or harmless – this [framework] is instead more of like a baseline of what we want our models to do or not do … [Copyright is] more about our acceptable use policy and enforcing that."<br><br>Pls.' Opp'n/Reply Ex. 125 (Mann 30(b)(1) Vol. 1) at 102:24-103:6.<br><br>Regarding the cited benchmarking analysis, Mr. Mann testified that [redacted] He also testified: [redacted]<br><br>Ant. Reply Ex. 173 (Mann 30(b)(6) Dep.) at 132:4-133:4 (discussing Pls.' Ex. 74 (Dep. Ex. 179, Anthropic_0000458491)).<br><br>Anthropic employs a multi-tiered defense system designed to prevent the inclusion of copyrighted material in Claude's outputs. After Publishers filed this lawsuit, Anthropic strengthened its guardrails both generally and specifically to address the works in suit and stipulated with |

**PUBLIC REDACTED VERSION**

| | Publishers' Additional Material Facts on This Issue | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | Publishers to maintain their efficacy. Dr. Bilmes's analysis shows the effectiveness of Anthropic's guardrails and defenses in preventing outputs containing the claimed lyrics to works in suit when users request existing song lyrics, as well as other purportedly copyrighted lyrics, even when directly prompted.<br><br>Ex. 30 (Def.s Am. Supp. Resp. & Obj. to 1st Set of Interrogs. (Nos. 9, 11, 12) (Nov. 12, 2025)) at No. 12; Ex. 2 (Bilmes Report) at §§ V.C, IX.C; Ex. 11 (Bilmes Rebuttal) at § VI.B; Dkt. 291. |
| | **<u>Publishers' Additional Fact #18</u>**: Anthropic's "harmlessness" training of Claude does not always prevent harmful outputs.<br><br>**Pls.' Ex. 41** (Dep. Ex. 246, Anthropic_0000605700) at -740 (Slack chat from Feb. 29, 2024, in which Dario Amodei writes, [redacted] *see generally* **Pls.' Ex. 1** (comparison chart of Publishers' lyrics and Claude output in response to prompts submitted by Publishers' investigator for all 499 Works in Suit); **Pls.' Ex. 2**. | Disputed that the evidence cited shows a failure to prevent 'harmful' outputs and further disputed because the purpose of reinforcement learning with human feedback is to align Claude to human preferences of helpfulness and harmlessness not to train Claude to give specific outputs or perform specific tasks.<br><br>Individuals involved in aspects of these trainings are "*instructed* to 'adversarially probe' the models to 'provoke harmful responses'" as part of the human-feedback dataset ("HF Dataset").<br><br>Anthropic's expert, Dr. Jeffery Bilmes explains that, "[t]he HF Dataset was designed to reflect human judgement of helpfulness or harmlessness across a wide range of tasks to align a model on those general human preferences. It was not built or used to train models to correctly perform any specific tasks (such as lyric retrieval)."<br><br>Ex. 11 (Bilmes Rebuttal Report) ¶¶ 99, 102 (emphasis added). |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | Further disputed that the evidence cited contains "harmful" outputs rather than outputs elicited by Publishers' investigators.<br><br>Ex. 20 (Bray Reply) ¶ 11.<br><br>Undisputed that Anthropic will not block a launch over trivial issues. Dr. Dario Amodei testified in connection with Ex. 41: [redacted] Imagine trying to run the company if, you know, we said: Oh, you know, the model shouldn't say the word 'hell' or something like that. And if the model once said the word 'hell' after we outputted a thousand pages of content from the model, then, you know, that would -- that would lead us to block the launch. That would be impractical and would – you know, the cost versus the benefit of blocking a launch under those conditions would be very lopsided."<br><br>Ant. Reply Ex. 164 (Dario Amodei Dep.) at 23:4-24:2. |
| | **Publishers' Additional Fact #19:** Anthropic's President, Ms. Daniela Amodei, acknowledged that prompts relating to songs or lyrics | Undisputed that Ms. Daniela Amodei testified, "I don't believe anything related to this topic is a 'top use case.' But obviously, as you can see from |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | are "helpful" and "typical use case[s]" of Claude.<br><br>**Pls.' Opp'n/Reply Ex. 127** (Daniela Amodei Dep.) at 196:16–197:21. | my using it, it's also a helpful use case to learn new artists, to get song recommendations, or to create satirical things like 'oink, oink, pink pig.'"<br><br>Undisputed that, in connection with the above testimony, Ms. Amodei testified, "I believe these are typical use case[s], but probably not the most common use cases."<br><br>Otherwise, disputed as to the truth of the matter asserted as Ms. Amodei was not referring to prompts relating to the song lyrics to the works in suit or song lyrics to other existing musical compositions. Ms. Amodei's testimony was made in connection with prompts to Claude to generate new and original lyrics to the tune of "Baa Baa Black Sheep."<br><br>Pls.' Opp'n/Reply Ex. 127 (Daniela Amodei Dep.) at 196:16–197:21.<br><br>Further disputed as to the truth of matter asserted that requests for songs or lyrics are "typical use case[s]" of Claude. Anthropic's Economic Index reveals that uses relating specifically to lyrics comprise far less than 1.49% of use cases. That category expands far beyond just songwriters, such that the percentage of uses related specifically to lyrics are smaller than at most 1.49% of uses.<br><br>Ant. Reply Ex. 162 (Sept. 2025 Anthropic Economic Index, Anthropic_0000441108 at -112, -124); Ex. 8 (Smith Report) at ¶ 80, n.77 (citing Anthropic's Economic Index) Ant. Reply Ex. 163 (Smith Dep. Vol. 1) at 143:1-11. |
| | **Publishers' Additional Fact #20:** Anthropic's platform for analyzing real-world use of Claude, Clio, | Undisputed. |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | which Anthropic relied on to generate the December 2024 report referenced in its Fact #16, generates only a high-level summary of "general patterns and trends" in user conversations with Claude.<br><br>**Pls.' Opp'n/Reply Ex. 130** (Ganguli 30(b)(6) Dep. Tr.) at 22:19-25. | |
| | **Publishers' Additional Fact #21:** Usage insights provided by Clio are generated by Claude and do not involve human review of individual prompts and output.<br><br>**Pls.' Opp'n/Reply Ex. 171** (Ganguli 30(b)(6) Dep. Ex. 5, Anthropic_0000012987) at -987, -990–91; **Burrell Decl., Ex. 119** (Ganguli 30(b)(6) Dep. Tr.) at 61:20–62:10; **Pls.' Opp'n/Reply Ex. 131** (Ganguli 30(b)(1) Dep. Tr.) at 178:15–180:19. | Undisputed. |
| | **Publishers' Additional Fact #22:** Clio is not designed to indicate whether Anthropic's guardrails are working.<br><br>**Pls.' Opp'n/Reply Ex. 130** (Ganguli 30(b)(6) Dep. Tr.) at 60:6-10. | Undisputed. |
| | **Publishers' Additional Fact #23:** Clio only summarizes and groups conversations into "clusters," but does not reflect specific prompts or completions, and is in fact "designed to obfuscate" specific prompts and completions.<br><br>**Pls.' Opp'n/Reply Ex. 130** (Ganguli 30(b)(6) Dep. Tr.) at 61:22–62:16, 73:1-7, 110:16-19. | Undisputed that Clio summarizes and groups conversations into clusters.<br><br>Further undisputed that Dr. Deep Ganguli testified that Clio is "designed to obfuscate" specific prompts and completions as Clio was designed to respect the privacy of Claude users.<br><br>Anthropic witness, Dr. Deep Ganguli testified, "I know that my team does not look at prompts and completions, especially in the context of Clio runs, |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | because Clio is designed to obfuscate that for our purposes."<br><br>Dr. Deep Ganguli also explained: "Clio is not designed to look for a very specific granular detailed thing like the thing you mentioned. It's designed to analyze a large swath of usage data and find high-level patterns. And then we analyze what those high-level patterns are and -- but it's not designed to, like, answer a very specific question from usage data, if that makes sense."<br><br>Dr. Deep Ganguli further stated: "we sort of designed Claude to be very privacy preserving. And one of the ways we get there is by not knowing anything about the individual conversations, just the high-level patterns and aggregate information about any cluster of conversations."<br><br>Pls.' Opp'n/Reply Ex. 130 (Ganguli 30(b)(6) Dep.) at 58:15-23, 73:2-7, 110:16-19. |
| | **<u>Publishers' Additional Fact #24:</u>** Clio cannot conclusively prove the absence of certain patterns or conversations with Claude.<br><br>**Pls.' Opp'n/Reply Ex. 130** (Ganguli 30(b)(6) Dep. Tr.) at 114:9–116:14, 125:4-18; **Pls.' Opp'n/Reply Ex. 171** (Ganguli 30(b)(6) Dep. Ex. 5, Anthropic_0000012987) at -2999. | Undisputed that the cited article states, "Furthermore, Clio cannot conclusively prove the *absence* of certain patterns or behaviors. The imperfections in the pipeline or potential adversarial actions could allow harmful behavior to escape undetected by Clio. This underscores the importance of complementing Clio's analysis with other methods."<br><br>Pls.' Opp'n/Reply Ex. 171 (Ganguli 30(b)(6) Dep. Ex. 5, Anthropic_0000012987) at -2999.<br><br>Undisputed that Dr. Deep Ganguli testified, "Clio is just: We take a sample of traffic. And then we sort of summarize it, and then we look for what we find. And if something is not |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | in Clio, we just don't know whether -- we just don't know much about whatever that thing that's absent is. It's unlikely that that's occurring frequently enough to show -- like, if it were occurring very frequently, it would sort of show up. But there -- you know, if it's very infrequent or if it's not happening, it won't show up." Dr. Ganguli further testified that "if something is happening and it's common … it will pop up as a cluster. If something is not happening, that's either because it's not happening or because it's just really, really infrequent."<br><br>Pls.' Opp'n/Reply Ex. 130 (Ganguli 30(b)(6) Dep.) at 115:8-19. |
| | **Publishers' Additional Fact #25:** Third parties used Claude to request lyrics based upon provided song titles or lyric excerpts.<br><br>**Burrell Decl., Ex. 21** (Dennis Reply) at ¶ 14. | Undisputed that Claude may be used to generate new and original lyrics based on user prompts. Mr. Dennis identified 136 records in the 5-million-record sample in which the prompt requested lyrics based on a title or lyrics.<br><br>Otherwise disputed.<br><br>Publishers have not shown that any bona fide "third parties" prompted Claude for "lyrics based upon provided song titles or lyric excerpts."<br><br>*See* Ex. 115 (Dennis Dep.) at 242:6-10; Ant. Reply Ex. 161 (Dennis Opening Report) ¶¶ 56-57. |
| | **Publishers' Additional Fact #26:** Based on finding 136 examples of third parties requesting song lyrics based upon provided song titles or lyric excerpts in the 5-million-record Claude sample produced by Anthropic, Publishers' expert Mr. Joshua Dennis concluded that users prompted Claude for lyrics in this manner in at least [redacted] instances | Undisputed that Claude may be used to generate new and original lyrics based on user prompts.<br><br>Otherwise disputed. Publishers have not shown that any bona fide "third parties" prompted Claude for "song lyrics based upon provided song titles or lyric excerpts." |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | from September 22, 2023, to March 22, 2024.<br><br>**Burrell Decl., Ex. 21** (Dennis Reply) at ¶ 14. | *See* Ex. 115 (Dennis Dep.) at 241:6-243:22; Ant. Reply Ex. 161 (Dennis Opening Report) ¶¶ 56-57.<br><br>Further disputed because Mr. Dennis admitted that neither the "Work-in-Suit Records" nor the "Sample Song Records" he analyzed can be extrapolated to the full set of Claude records, because neither subsample was statistically representative. And Mr. Dennis admitted that he did not verify whether those records contained Publishers' and agents' own prompts and outputs.<br><br>Ex. 115 (Dennis Dep.) 79:19-25, 242:6-10, 241:6-243:22; Ex. 20 (Bray Reply) ¶¶ 47-54. |
| | **<u>Publishers' Additional Fact #27:</u>** Third parties have asked Claude to generate new lyrics based on or in the style of existing artists, songs, or lyrics.<br><br>**Burrell Decl., Ex. 21** (Dennis Reply) at ¶ 14. | Undisputed that Claude may be used to generate new and original lyrics based on user prompts.<br><br>Otherwise disputed. Publishers have not shown that that any bona fide "third parties" prompted Claude to "generate new lyrics based on or in the style of existing artists, songs, or lyrics."<br><br>*See* Ex. 115 (Dennis Dep.) at 242:6-10; Ant. Reply Ex. 161 (Dennis Opening Report) ¶ 56-57. |
| | **<u>Publishers' Additional Fact #28:</u>** Based on finding over 600 examples of third parties asking Claude to generate new lyrics based on or in the style of existing artists, songs, or lyrics in the 5-million-record Claude sample produced by Anthropic, Mr. Dennis concluded that users prompted Claude in this manner in over [redacted] instances from September 22, 2023, to March 22, 2024. | Undisputed that Claude may be used to generate new and original lyrics based on user prompts.<br><br>Otherwise disputed. Publishers have not shown that that any bona fide "third parties" prompted Claude "asking Claude to generate new lyrics based on or in the style of existing artists, songs, or lyrics."<br><br>*See* Ex. 115 (Dennis Dep.) at 241:6-243:22; Ant. Reply Ex. 161 (Dennis Opening Report) ¶ 56-57. |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | **Burrell Decl., Ex. 21** (Dennis Reply) at ¶ 14. | Further disputed because Mr. Dennis's analysis was methodologically flawed and non-representative. Mr. Dennis's analysis is misleading in the way he categorizes users' prompts as requesting "new" lyrics.<br><br>Ex. 12 (Bray Rebuttal) ¶¶13, 28; Ex. 15 (Nagaraj Rebuttal) ¶ 44. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| **Issue 2: Using Lyrics to Train LLMs is Transformative** | Fact 19: Publishers' expert, Dr. Ben Zhao, reported: [redacted]<br><br>Ex. 10 (Zhao Report) at ¶ 13 | Undisputed. |
| | Fact 20: Anthropic co-founder and Chief Science Officer, Dr. Jared Kaplan, attested: "To build an LLM like Claude, engineers first develop a 'neural network,' which is a computer program capable of studying enormous datasets of text and extracting statistical and linguistic information about those texts in an effort to gain a generalized understanding of human language." He also attested: "The neutral network is shown a vast dataset consisting of hundreds of millions, if not billions, of pieces of content. This set of materials is | Undisputed that Dr. Kaplan attested as quoted. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | known collectively as the 'training corpus' or simply the 'corpus.'"<br><br>Kaplan PI Decl. ¶¶ 17, 18 | |
| | Fact 21: Anthropic co-founder and Chief Science Officer, Dr. Jared Kaplan, attested: "The neural network then analyzes each token in the context of surrounding tokens to learn language patterns and the relationship between the words and phrases in the corpus. Through iterative training on large amounts of data, the neural network discovers patterns among words and phrases, extracting statistical information to develop a probabilistic but comprehensive map of how language works, without explicit human-defined rules. The model stores this statistical information in an organized set of numerical values called parameters, which include weights and biases (representing the connective strengths among neurons)."<br><br>Kaplan PI Decl. ¶ 20 | Undisputed that Dr. Kaplan attested as quoted. |
| | Fact 22: Publishers' expert, Dr. Shawn Shan, reported: [redacted] | Undisputed. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | Ex. 7 (Shan Report) at ¶ 21; Ex. 131 (Shan Dep.) at 125:10–128:6 (Dr. Shan's testimony affirming the accuracy of the above statement from his report). | |
| | Fact 23: Anthropic's expert, Dr. Jeffrey Bilmes, reported: "Anthropic uses training data to train its models for the purpose of mapping out statistical relationships between text fragments so that the LLM models can generate new texts."<br><br>Ex. 2 (Bilmes Report) at ¶ 36 | Undisputed that Dr. Bilmes' report contains the quoted language.<br><br>Anthropic relies on this fact for the truth of the matter asserted by the quoted language. Publishers dispute the truth of the matter asserted that Anthropic trains its models for the purpose of mapping out statistical relationships between text fragments so that the LLM models can generate new texts.<br><br>The goal of an LLM is to accurately reproduce patterns and information from its training data while generating coherent textual responses to inputs that seem like the most reasonable response, as defined by statistics present in the training data.<br><br>**Burrell Decl., Ex. 10** (Zhao Report) at ¶ 26.<br><br>The goal of the LLM training process is to compress the training data in such a way as to enable the LLM to accurately reproduce the data when prompted.<br><br>**Burrell Decl., Ex. 10** (Zhao Report) at ¶ 43; *see also* **Pls.' Opp'n/Reply Ex. 154** (Dep. Ex. 188, Anthropic_0000012356) at -360.<br><br>In the LLM research community, it is still uncertain whether an LLM is even capable of generating "new" texts (as opposed to memorizing and regurgitating its training data). |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | | **Zhao Decl.** ¶¶ 44–47; **Burrell Decl., Ex. 10** (Zhao Report) ¶¶ 26, 46, 91. |
| | Fact 24: Anthropic's expert, Dr. Jeffrey Bilmes, reported: "[W]hile LLMs can perform complex tasks such as summarizing information and generating code, they do not function similarly to databases or search engines." And that "LLMs do not store or retrieve passages of text verbatim. Instead, they generate new and different outputs, probabilistically, based on general statistical patterns and relationships learned during training that are represented in the model's weights. Because their outputs are drawn from probability distributions, LLMs can produce different results when generating outputs in response to the same prompt, particularly when the final text is produced by randomly sampling from those distributions, which is by far the most common approach to LLM generation."<br><br>Ex. 2 (Bilmes Report) at ¶ 98 | Undisputed that Dr. Bilmes' report contains the quoted language.<br><br>Anthropic relies on this fact for the truth of the matter asserted by the quoted language. Publishers dispute the truth of the matter asserted that LLMs do not function similarly to databases or search engines. LLMs store their training datasets in tokenized format, along with conditional probabilities that instruct the model to re-integrate the tokenized data in response to user queries, effectively functioning as a database that stores the training data text.<br><br>**Burrell Decl., Ex. 10** (Zhao Report) at ¶¶ 21, 42, 73; *see also* **Pls.' Ex. 25** (Def.'s Am. Suppl. Resp. to Pls.' Interrog. No. 9, Nov. 12, 2025), at 8.<br><br>Publishers dispute the truth of the matter asserted that LLMs do not store or retrieve passages of text verbatim. LLM training results in the LLM memorizing and storing highly-likely conditional probabilities from its training data that a particular sequence of tokens follows another particular sequence of tokens, resulting in the reproduction of specific phrases or texts from the LLM's training data verbatim.<br><br>**Burrell Decl., Ex. 10** (Zhao Report), at ¶¶ 26–28, 43, 63; **Burrell Decl., Ex. 18** (Zhao Rebuttal) at ¶¶ 9–12, 22; **Pls.' Opp'n/Reply Ex. 154** (Dep. Ex. 188, Anthropic_0000012356) at -360; **Pls.' Opp'n/Reply Ex. 152** (Dep. Ex. 137, Anthropic_0000520123) at -123–25; **Pls.' Opp'n/Reply Ex. 136** (Drain |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | | Dep. Tr.) at 60:11–62:20 (testifying about Dep. Ex. 137).<br><br>Publishers dispute the truth of the matter asserted that LLMs generate "new and different outputs." In the LLM research community, it is still uncertain whether an LLM is even capable of generating "new" content (as opposed to memorizing and regurgitating its training data).<br><br>**Zhao Decl.** ¶¶ 44–47; **Burrell Decl., Ex. 10** (Zhao Report) ¶¶ 26, 46, 91. |
| | Fact 25: Publishers' expert, Dr. Ben Zhao, testified that [redacted] He answered, [redacted] to the question [redacted]<br><br>Ex. 139 (Zhao Dep.) at 352:23-353:16 | Undisputed. |
| | Fact 26: Music compositions communicate the artistic expression of a musician or songwriter with an audience and to entertain.<br><br>Ex. 137 (Stokes Dep.) at 230:11-18, 231:8-232:5; Ex. 26 (Stokes Reply) at ¶¶ 13-19 | Undisputed to the extent the asserted fact accurately describes one purpose of musical compositions.<br><br>Disputed to the extent the asserted fact reflects Mr. Stokes' disputed opinion, which is subject to a pending motion to exclude. *See* ECF No. 652. |
| | Fact 27: Publishers' expert, Dr. Ben Zhao, testified that Claude's [redacted] that Claude does not [redacted] and that [redacted]<br><br>Ex. 139 (Zhao Dep.) at 177:2-4, | Disputed.<br><br>The asserted fact does not accurately reflect Dr. Zhao's testimony. In response to the question, "And so using the common computer science dictionary—or computer science definition of 'database,' LLMs do not store data or text in a database and retrieve that data, correct?", Dr. Zhao responded in full, "By that very strict |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | 178:6-18, 179:9-10 | definition of database, that is true, but I will just remark that computers in general, very few computers actually rely on [an] internal database. In fact, almost every piece of software that we use today does not include a formal database internally. That does not mean that it does not store content. That does not mean that it does not transform and store different versions of the content in different representative forms. You know, yeah, the idea that a strict definition of a database, yes, I agree that the LLMs do not store a strict definition of a database, but they are accessing different means and different representations."<br><br>**Burrell Decl., Ex. 139** (Zhao Dep.) at 176:10–177:5.<br><br>In response to the question "You say [in your rebuttal report]: 'The model has not memorized the specific text in the sense of literally storing an exact copy of that text and it does not strictly refer back to and fetch that sequence from its training corpus when it regurgitates. A pre-trained model does not scan for text from its training corpus and reproduce what it finds when asked.'. . . [d]o you stand by that statement?", Dr. Zhao responded, "Yes, the model does not scan for the text from its training corpus and produce it exactly."<br><br>**Burrell Decl., Ex. 139** (Zhao Dep.) at 178:2-18.<br><br>In response to the question, "When a user prompts a model like Claude, the model does not go to its training corpus, retrieve that text, and then reproduce or deliver that text to the— |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | | to the user, correct?", Dr. Zhao testified, "That is correct in the sense that I believe the training corpus is decoupled from the model once the model is trained," and clarified that, "Under the interpretation that the model parameters are, in fact, a lossy compressed version of the training corpus then, you know, it would have access, just in a slightly different format, a different representation format."<br><br>**Burrell Decl., Ex. 139** (Zhao Dep.) at 179:2-24. |
| | Fact 28: Publishers' expert, Dr. Ben Zhao, reported [redacted]<br><br>Ex. 18 (Zhao Rebuttal) at ¶ 11 | Disputed.<br><br>The asserted fact does not accurately reflect Dr. Zhao's report. The full paragraph states: "As discussed in my initial report, conditional probability training results in LLMs memorizing unique phrases or sequences of phrases that do not commonly occur across multiple training samples, such as specific turns of phrases found in song lyrics. This results in regurgitation, wherein a model reproduces a specific text sequence in the same order that matches text in its training corpus. The model has not memorized the specific text in the sense of literally storing an exact copy of that text, and it does not strictly refer back to and fetch that sequence from its training corpus when it regurgitates. A pre-trained model does not scan for text from its training corpus and reproduce what it finds when asked. However, LLMs do memorize highly-likely conditional probabilities based on their training corpora (*e.g.*, the sequence of tokens 'Drove my Chevy to the levee, but the levee was dry' very- and highly-likely follows the sequence 'bye-bye, Miss |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | | American Pie'), which results in the same outcome: the reproduction of specific phrases or entire texts contained in its training corpus. This memorization of highly-likely conditional probabilities is fundamental to the transformer architecture of LLMs."<br><br>**Burrell Decl., Ex. 18** (Zhao Rebuttal) at ¶ 11. |
| | Fact 29: Anthropic's expert, Dr. Jeffrey Bilmes, reported: "Anthropic uses training data to train its models for the purpose of mapping out statistical relationships between text fragments so that the LLM models can generate new texts."<br><br>Ex. 2 (Bilmes Report) at ¶ 36 | Undisputed that Dr. Bilmes' report contains the quoted language.<br><br>Anthropic relies on this fact for the truth of the matter asserted by the quoted language. Publishers dispute the truth of the matter asserted that Anthropic trains its models for the purpose of mapping out statistical relationships between text fragments so that the LLM models can generate new texts.<br><br>The goal of an LLM is to accurately reproduce patterns and information from its training data while generating coherent textual responses to inputs that seem like the most reasonable response, as defined by statistics present in the training data.<br><br>**Burrell Decl., Ex. 10** (Zhao Report) at ¶ 26.<br><br>The goal of the LLM training process is to compress the training data in such a way as to enable the LLM to accurately reproduce the data when prompted.<br><br>**Burrell Decl., Ex. 10** (Zhao Report) at ¶ 43; *see also* **Pls.' Opp'n/Reply Ex. 154** (Dep. Ex. 188, Anthropic_0000012356) at -360. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | | In the LLM research community, it is still uncertain whether an LLM is even capable of generating "new" texts (as opposed to memorizing and regurgitating its training data).<br><br>**Zhao Decl.** ¶¶ 44–47; **Burrell Decl., Ex. 10** (Zhao Report) ¶¶ 26, 46, 91. |
| | Fact 30: Anthropic's expert, Dr. Jeffrey Bilmes, reported: "[W]eights are one type of model parameter for an NN [neural network]. Weights are the adjustable values in the model that model training seeks to optimize. Weight tuning is a subprocess of model training where the weights of an NN are adjusted iteratively using the training data so that the model's predictions better align with the expected outputs."<br><br>Ex. 2 (Bilmes Report) at ¶ 52 | Undisputed that Dr. Bilmes' report contains the quoted language. |
| | Fact 31: Tokenizing text breaks it into small, standard units, identified numerically, that a large language model can process. Tokens are then transformed into richer numerical representations in "embeddings," which encode a token's meaning and semantic relationship to other tokens. Token embeddings are learned parameters that evolve during model training, and as the model processes billions of data points, mathematically move closer to other tokens that appear in similar contexts. Embeddings capture the relationship between words, making mathematical reasoning about those words' meanings possible. Embeddings are then positionally encoded so that a model can recognize both what each word means and where it occurs in context, rather than | Disputed.<br><br>A trained LLM stores the conditional probabilities (the likelihood of a particular sequence of tokens following other sequences of tokens) found in its training data. This results in memorization of unique phrases found in the model's training data, which in turn results in regurgitation of specific text sequences in the same order found in the training data, thus "stor[ing] text verbatim."<br><br>**Burrell Decl., Ex. 10** (Zhao Report) ¶¶ 13, 28; **Burrell Decl., Ex. 18** (Zhao Rebuttal) ¶ 11; **Burrell Decl., Ex. 139** (Zhao Dep. Tr.) at 176:10–180:19. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | simply storing text verbatim. Tokens, embeddings, and positional encoding allow models to understand the contextual relationship of words represented numerically.<br><br>Ex. 2 (Bilmes Report) at ¶¶ 141-152 | |
| | Fact 32: Publishers' expert, Dr. Ben Zhao, reported: [redacted]<br><br>Ex. 10 (Zhao Report) at ¶ 20 | Undisputed. |
| | Fact 33: Publishers' expert, Dr. Ben Zhao, reported, [redacted] And that Anthropic has trained Claude to [redacted]<br><br>Ex. 10 (Zhao Report) at ¶ 141 | Undisputed. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | Fact 34: Publishers' expert, Dr. Shawn Shan, testified that [redacted] that [redacted]<br><br>Ex. 131 (Shan Dep.) at 247:7-13 | Undisputed. |
| | Fact 35: LLMs process a user's prompt and draw on learned language patterns to stochastically output the next predicted word. Model builders control the level of stochasticity (or randomness) in the output, including through a parameter called the "temperature parameter." As the temperature increases, so does the randomness of the output. This is unlike a database or retrieval system, which deterministically fetch and return the same result for the same query. This makes it possible for LLM's to generate outputs that are linguistically and textually different while containing similar factual content.<br><br>Ex. 2 (Bilmes Report) at ¶¶ 271, 280-285 & Figure 33 | Disputed.<br><br>A trained LLM stores the conditional probabilities (the likelihood of a particular sequence of tokens following other sequences of tokens) found in its training data. This results in memorization of unique phrases found in the model's training data, which in turn results in regurgitation of specific text sequences in the same order found in the training data; in that way, the model "fetch[es] and return[s]" text from its training data and reproduces such text.<br><br>**Burrell Decl., Ex. 10** (Zhao Report) ¶¶ 13, 28; **Burrell Decl., Ex. 18** (Zhao Rebuttal) ¶ 11; **Burrell Decl., Ex. 139** (Zhao Dep. Tr.) at 176:10–180:19. |
| | Fact 36: Publishers' expert, Dr. Ben Zhao, reported that [redacted] When asked in his deposition whether he [redacted] | Undisputed that Dr. Zhao testified as quoted during his deposition.<br><br>Otherwise, disputed. The asserted fact does not accurately reflect Dr. Zhao's report. The full paragraph states: "As discussed in my initial report, conditional probability training results in LLMs memorizing unique phrases or sequences of phrases that do not commonly occur across multiple training samples, such as specific turns of phrases found in song lyrics. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | [redacted] Zhao answered, [redacted]<br><br>Ex. 18 (Zhao Rebuttal) at ¶ 11; Ex. 139 (Zhao Dep.) at 178:4-18 | This results in regurgitation, wherein a model reproduces a specific text sequence in the same order that matches text in its training corpus. The model has not memorized the specific text in the sense of literally storing an exact copy of that text, and it does not strictly refer back to and fetch that sequence from its training corpus when it regurgitates. A pre-trained model does not scan for text from its training corpus and reproduce what it finds when asked. However, LLMs do memorize highly-likely conditional probabilities based on their training corpora (*e.g.*, the sequence of tokens 'Drove my Chevy to the levee, but the levee was dry' very- and highly-likely follows the sequence 'bye-bye, Miss American Pie'), which results in the same outcome: the reproduction of specific phrases or entire texts contained in its training corpus. This memorization of highly-likely conditional probabilities is fundamental to the transformer architecture of LLMs."<br><br>**Burrell Decl., Ex. 18** (Zhao Rebuttal) at ¶ 11. |
| | Fact 37: Anthropic displays a webpage titled, "Build With Claude," which markets "Use Cases for Claude" to enterprise clients. Those use cases include: "Coding" where its "latest model, Claude Opus 4.1, can complete complex engineering tasks to solve problems that would typically take a full day of engineering work"; "Agents," offering "superior instruction following, tool selection, error correction, and advanced reasoning for customer-facing agents and complex AI workflows"; "Productivity" where "Claude can | Undisputed that the cited document, dated September 8, 2025, contains the quoted language. |

PUBLIC REDACTED VERSION

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | extract relevant information from business emails and documents, categorize and summarize survey responses, and wrangle reams of text with high speed and accuracy"; and "Customer Support."<br><br>Ex. 63 (Anthropic_0000437208) | |
| | Fact 38: Anthropic's 30(b)(6) witness, Dr. Deep Ganguli, testified: "[T]he main use case of CLAUDE.AI and CLAUDE Code and our CLAUDE API is for writing code. It's for doing software engineering tasks. That is the most common use case across—across the product surfaces I mentioned."<br><br>Ex. 119 (Ganguli 30(b)(6) Dep.) at 67:7-15 | Undisputed that Dr. Ganguli testified as quoted. |
| | Fact 39: Publishers' expert, Dr. Shawn Shan, testified: [redacted] and [redacted]<br><br>Ex. 131 (Shan Dep.) at 95:22-96:17 | Undisputed that Dr. Shan testified as quoted on March 3, 2026. |
| | Fact 40: Anthropic's 30(b)(6) witness, Jane Leibrock, testified: "We promote CLAUDE's safety as a model, its accuracy, its high intelligence, its skill at working with a large amount of knowledge by which we mean data that's been provided by the user to the model, its ability to show its chain of thought or reasoning to do deep | Undisputed that Ms. Leibrock testified as quoted. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | research, and to work with software code or to debug code."<br><br>Ex. 122 (Leibrock Dep.) at 26:14-27:4 | |
| | Fact 41: Anthropic co-founder and Chief Executive Officer, Dario Amodei, testified: "Anthropic, it's very focused on code. It's very focused on work and productivity-based activities. So Anthropic has deliberately made—made choices not to—not to produce output in many creative modalities."<br><br>*See* Ex. 112 (Dario Amodei Dep.) at 102:19-24 | Undisputed that Dr. Amodei testified as quoted.<br><br>Anthropic relies on this fact for the truth of the matter asserted by the quoted testimony. Publishers dispute the truth of the matter asserted that Anthropic has deliberately made choices not to produce output in many creative modalities. When Anthropic released Claude to the public in March 2023, Anthropic specifically identified "use cases including summarization, search, ***creative and collaborative writing***, Q&A, coding, and more."<br><br>**Pls.' Ex. 73** (Dep. Ex. 187, Anthropic_0000349548) (emphasis added); *see* **Pls.' Ex. 4** (Mann 30(b)(6) Dep. Tr.) at 21:22–22:6, 22:22–23:3, 23:8-10, 26:1-4.<br><br>Publishers further dispute the truth of the matter asserted that Anthropic has deliberately made choices not to produce output in many creative modalities because Claude is frequently used for a variety of such use cases, including "[w]rit[ing] words to fit musical compositions, including lyrics" and "[w]rit[ing] or improv[ing] rap lyrics."<br><br>**Pls.' Ex. 105** (D. Ganguli 30(b)(6) Dep. Ex. 7, Anthropic_0000441309); **Pls.' Ex. 30** (D. Ganguli 30(b)(6) Dep. Ex. 6, Anthropic_0000429489) at Rows 2620, 3044, 4271, 4474, 4758; *see also* Smith Decl. ¶ 46. |
| | Fact 42: Anthropic co-founder and President, Ms. Daniela Amodei, | Undisputed that Ms. Amodei testified as quoted on November 12, 2025. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | testified that Anthropic "serve[s] about 300,000 businesses."<br><br>Ex. 111 (Daniela Amodei Dep.) at 68:7-9 | Anthropic relies on this fact for the truth of the matter asserted by the quoted testimony. Publishers dispute the truth of the matter asserted that Anthropic serves 300,000 businesses. The number of Anthropic's business customers has grown significantly since the time of this testimony.<br><br>**Pls.' Ex. 96** (ANTHROPIC, *Anthropic raises $30 billion in Series G funding at $380 billion post-money valuation* (Feb. 12, 2026)) ("Business subscriptions to Claude Code have quadrupled since the start of 2026"). |
| | Fact 43: Anthropic co-founder, Mr. Tom Brown, testified "we want Claude to be the best model for people who want to do work, particularly coding work." He also testified "We have—we have really focused on work rather than the consumer application" of Claude. He testified "we have always wanted to prioritize data that makes the model good at work."<br><br>Ex. 106 (Brown Dep.) at 48:17-21, 64:4-8, 64:12-16, 64:23-65:4, 86:3-7, 94:11-16 | Undisputed that Mr. Brown testified as quoted.<br><br>Anthropic relies on this fact for the truth of the matter asserted by the quoted testimony. Publishers dispute the truth of the matter asserted that Anthropic has focused on work rather than the consumer application, because Anthropic specifically identified "use cases including summarization, search, ***creative and collaborative writing***, Q&A, coding, and more" when it first launched Claude in March 2023.<br><br>**Pls.' Ex. 73** (Dep. Ex. 187, Anthropic_0000349548) (emphasis added); *see* **Pls.' Ex. 4** (Mann 30(b)(6) Dep. Tr.) at 21:22–22:6, 22:22–23:3, 23:8-10, 26:1-4.<br><br>Publishers further dispute the truth of the matter asserted that Anthropic has "focused on work rather than the consumer application," because Anthropic targets "ordinary retail users" as part of its marketing. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | | **Burrell Decl., Ex. 122** (Leibrock Dep) at 21:10-17. |
| | Fact 44: Anthropic co-founder Tom Brown used Claude to explore how to write his wife a song for Valentine's Day given his wife's taste for Adele's music. In the course of the conversation, Claude explained: [redacted]<br><br>Ex. 95 (Anthropic_0000570705) | Undisputed. |
| | Fact 45: Anthropic co-founder Tom Brown asked Claude, [redacted] In response, Claude [redacted] including [redacted] Claude explained that [redacted] and [redacted]<br><br>Ex. 92 (Anthropic_0000570614) | Undisputed. |
| | Fact 46: Claude has recommended and discussed musical compositions with users based on their music taste. Anthropic's President, Ms. Daniela Amodei, asked Claude for suggestions of classical music that is [redacted] Claude responded with a | Undisputed. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | list of ten musical works. It then explained: "[redacted] Ex. 96 (Anthropic_0000570712) at -713 | |
| | Fact 47: Anthropic co-founder, Mr. Benjamin Mann, asked Claude [redacted] and Claude explained that [redacted] Claude continued that [redacted] to [redacted] Ex. 90 (Anthropic_0000570582) | Undisputed. |
| | Fact 48: Anthropic technical staff, Mr. Ben Kuhn, asked Claude for [redacted] and Claude [redacted] | Undisputed. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | including [redacted] and more, categorizing them by [redacted]<br><br>Ex. 89 (Anthropic_0000570574) | |
| | Fact 49: Anthropic co-founder, Mr. Tom Brown, asked Claude about Jimi Hendrix and the "wah wah" pedal, and Claude responded that [redacted] Claude continued that [redacted]<br><br>Ex. 94 (Anthropic_0000570704) | Undisputed. |
| | Fact 50: Anthropic co-founder, Mr. Tom Brown, asked Claude about Joni Mitchell's "Both Sides Now" and why he [redacted] Claude responded that [redacted] When Mr. Brown asked why he [redacted] | Undisputed. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | [redacted] Claude responded that [redacted] before listing artists like [redacted] and "[redacted] that bore thematic similarities to Joni Mitchell. The conversation then [redacted] and Claude [redacted]<br><br>Other Anthropic employees asked Claude to:<br>[redacted] [redacted]<br>[redacted] [redacted]<br>[redacted] [redacted]<br>[redacted] [redacted] | |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | [redacted]<br><br>Ex. 93 (Anthropic_0000570681); Ex. 147 (Anthropic_0000570572); Ex. 148 (Anthropic_0000570592); Ex. 149 ( Anthropic_0000570627); Ex. 150 (Anthropic_0000570635); Ex. 151 (Anthropic_0000570636) | |

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | **<u>Publishers' Additional Fact #29:</u>** Memorization of portions of the training data is an inherent trait of LLM training.<br><br>**Burrell Decl. Ex. 10** (Zhao Report) at ¶¶ 26, 43, 63; **Pls.' Opp'n/Reply Ex. 136** (Drain Dep. Tr.) at 69:15–71:7; **Pls.' Opp'n/Reply Ex. 135** (Sangani Dep. Tr.) at 172:5-12 [redacted]); *see also* Answer to FAC ¶¶ 108–09; **Pls.' Opp'n/Reply Ex.** | Disputed that memorization is inherent or desirable.<br><br>"Generalization is fundamentally distinct from, and opposed to, memorization. Model builders, like Anthropic, aim for their models to be able to generalize, not memorize."<br><br>Ex. 2 (Bilmes Report) ¶¶ 87, 117-120.<br><br>Anthropic in fact takes substantial steps to mitigate memorization, including through deduplicating its training data because memorization hurts model performance.<br><br>Pls.' Opp'n/Reply Ex. 136 (Drain Dep.) at 70:13-18; Ex. 116 (Drain Dep.) at 66:9-23, 83:14-18; 154:5-15, 178:17-179:4, 229:8-18; Ex. 2 (Bilmes Report) ¶¶ 87, 117-120; Ex. 126 (Mann 30(b)(6) Dep.) at 178:9-14; Ex. |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | **129** (Brown Dep. Tr.) at 196:1-4 ("I think that if you trained a ton on—like, in pretraining some verbatim chunk of text many, many times, that that would make it more likely that the model would regurgitate it."). | 112 (Dario Amodei Dep.) at 94:22-25; Ex. 106 (Brown Dep.) at 131:8-17.<br><br>Further disputed as the cited testimony from Mr. Pranay Sangani and Mr. Tom Brown concerned memorization of portions of the training data as a *hypothetical* trait, not an "inherent" one.<br><br>In the cited testimony, Mr. Pranay Sangani was responding to the question, "[I]f a model is engaged in memorization, does that increase the risk of potential regurgitation?"<br><br>Pls.' Opp'n/Reply Ex. 135 (Sangani Dep.) at 172:1-12.<br><br>Mr. Tom Brown was responding to the question, "And is it your testimony that you don't -- that you can't say one way or the other if specific content is repeated many times in the training data, whether that's more likely to influence the model's output? Mr. Brown's full response was, "I think I don't -- I think I don't know. I think that if you trained a ton on -- like, in pretraining some verbatim chunk of text many, many times, that that would make it more likely that the model would regurgitate it. But again, I think that's – that's the reason why we avoid doing stuff like that, but again, I'm not the expert here.<br><br>Ant. Reply Ex. 165 (Brown Dep.) at 195:19-197:7. |
| | **Publishers' Additional Fact #30:** [INTENTIONALLY OMITTED] | No reply required. |
| | **Publishers' Additional Fact #31:** Other top use cases of Claude include "helping people to actually do work, whether that's writing, whether that's doing research, or whether that's an educator doing | Undisputed that Dr. Deep Ganguli testified to the quoted language and that Dr. Deep Ganguli further testified that "at the very high level, the main use case of CLAUDE.AI and CLAUDE Code and our CLAUDE |

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | kind of curriculum design," as Claude is "a very general-purpose technology."<br><br>**Burrell Decl., Ex. 119** (Ganguli 30(b)(6) Dep.) at 67:7-24. | API is for writing code. It's for doing software engineering tasks. That is the most common use case across – across the product surfaces I mentioned." And that the other use cases cited are "the next kind of top uses".<br><br>Ex. 119 (Ganguli 30(b)(6) Dep.) at 67:7-24. |
| | **Publishers' Additional Fact #32:** Anthropic trains Claude to generate preferred outputs and avoid outputs Anthropic deems undesirable.<br><br>Answer to FAC ¶ 58(d); Kaplan Decl. ¶¶ 38–41; **Pls.' Ex. 4,** Mann 30(b)(6) Dep. Tr. 149:13–150:8; **Pls.' Ex. 120**, Yuntao Bai et al., *Training a Helpful and Harmless Assistant with Reinforcement Learning from Human Feedback*,ARXIV:2204.05862v1, 4 (Apr. 12, 2022), https://arxiv.org/pdf/2204.05862 (describing the process of using human feedback data to train an AI model to understand which responses are harmful and which responses are helpful and honest); **Kaplan PI Decl.** ¶ 38 ("Constitutional AI is at the heart of all of Anthropic's models, and is designed to ensure AI safety by fine-tuning the models on a set of principles that Anthropic believes will cultivate steerable, helpful model behavior that aligned with human preferences."); **Pls.' Ex. 25** (Def.'s Am. Suppl. Resp. to Pls.' Interrog. No. 12, Nov. 12, 2025) at 12. | Undisputed that Anthropic trains Claude to generate helpful, honest, and harmless outputs including through finetuning.<br><br>It is further undisputed that Anthropic utilizes reinforcement learning with human feedback, among other finetuning techniques, to align Claude to human preferences of helpfulness, honesty, and harmlessness. And further undisputed that Anthropic trains Claude to avoid reproducing copyrighted materials in outputs.<br><br>Kaplan PI Decl. ¶ 38;<br><br>Otherwise disputed to the extent that Publishers imply Anthropic can dictate or predict specific outputs. Anthropic does not control Claude's exact outputs, which are stochastic (i.e., random and variable). Claude's outputs are not deterministically generated. LLMs, like Claude, generate outputs randomly and variably by sampling from probability distributions in model weights, meaning there is always some randomness and variability in Claude's outputs.<br><br>Ex. 2 (Bilmes Report) ¶¶ 86, 114, 198-201, 271, 281-282; Ex. 11 (Bilmes Rebuttal) ¶¶ 26, 45, 99, 102. |
| | **Publishers' Additional Fact #33:** In response to Anthropic founder Tom Brown's prompts seeking | Undisputed that the cited document contains the quoted text. |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | assistance in writing a song for his wife, Claude offered to start by brainstorming lyrics: [redacted]<br><br>**Burrell Decl., Ex. 95** (Anthropic_0000570705), -705. | Otherwise disputed that Claude outputted Adele lyrics in response to Mr. Tom Brown's request. Claude stated, [redacted]<br><br>Ex. 95 (Anthropic_0000570705), -705. |
| | **<u>Publishers' Additional Fact #34:</u>** In response to Anthropic founder Tom Brown's question, [redacted], Claude generated output [redacted]<br><br>**Burrell Decl., Ex. 95** (Anthropic_0000570705), -706. | Undisputed that Tom Brown prompted Claude with the question [redacted]<br><br>Disputed as to the truth of the matter asserted. Mr. Tom Brown testified that he was planning to [redacted]<br><br>There is no evidence that the purported lyrics to [redacted] in Claude's output are accurate and neither are works in suit.<br><br>Ex. 95 (Anthropic_0000570705), -706; Ex. 106 (Brown Dep.) at 129:22-131:7; Dkt. 337-1 (Ex. A to FAC). |
| | **<u>Publishers' Additional Fact #35:</u>** Claude is capable of generating output regarding song meaning and musical artists because "that's something that people talk about a | Undisputed that "Claude is capable of generating output regarding song meaning and musical artists" and that these are topics "people talk about a lot on the Internet" and that there is a |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | lot on the Internet," and there is "a wide variety of publicly available commentary" on songs on the internet that Anthropic copies and includes in Claude's training data.<br><br>**Pls.' Opp'n/Reply Ex. 129** (Brown Dep. Tr.) at 149:8–150:18, 181:2–182:7, 183:12-18, 193:1-14. | "wide variety of publicly available commentary on." It is further undisputed that Claude is trained on this "publicly available" text from "from the Internet."<br><br>Disputed that the capabilities cited stem from these sources alone as LLM's generate outputs, probabilistically, based on general statistical patterns and relationships learned during training that are represented in the model's weights and do not fetch and retrieve data from specific sources in their training data.<br><br>Ex. 2 (Bilmes Report) ¶¶ 36, 98, 271, 280-285 & Figure 33. |
| | **Publishers' Additional Fact #36:** Claude's output regarding songs can include discussion of auditory and acoustic sensory experience (such as a singer's [redacted] which is not based on Anthropic's training Claude on song lyrics or audio recordings, but rather on Anthropic's copying written commentary about songs.<br><br>**Pls.' Opp'n/Reply Ex. 131** (Ganguli 30(b)(1) Dep. Tr.) at 102:15-18 ("Claude can't listen, especially not—not a 2023 version of this model"); **Burrell Decl., Ex. 93** (Anthropic_0000570681) at -681–82; **Burrell Decl., Ex. 150** (Anthropic_0000570635); **Pls.' Opp'n/Reply Ex. 129** (Brown Dep. Tr.) at 193:8–194:8; *see also* **Burrell Decl., Ex. 149** (Anthropic_0000570627); **Burrell Decl., Ex. 151** (Anthropic_0000570636) at -636–37. | Undisputed that Ex. 93 (Anthropic_0000570681) describes a [redacted]<br><br>Undisputed that Claude is not trained on audio recordings.<br><br>Undisputed that Ex. 150 (Anthropic_0000570635) states that [redacted]<br><br>Ex. 93 (Anthropic_0000570681) at -681–82; Ex. 150 (Anthropic_0000570635).<br><br>Otherwise disputed that Claude's output is "based … on Anthropic's ***copying*** written commentary about songs." When asked how Claude is "capable of describing the 'flute melody as iconic and the beat as smooth and menacing,'" Mr. Tom |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | Brown testified: "My guess is that there's like a wide variety of publicly available commentary on this track and that Claude picked it up via learning about that commentary … My guess is that no person [has] used this exact sentence and it's more that Claude is, like, picking up kind of a vibe from the commentary and then synthesizing it into this summary."<br><br>Pls.' Opp'n/Reply Ex. 129 (Brown Dep.) at 193:8–194:8. |
| | **<u>Publishers' Additional Fact #37:</u>** Anthropic does not need to train Claude on song lyrics in order for Claude to be able to write computer code or perform other technical tasks not related to song lyrics.<br><br>**Pls.' Opp'n/Reply Ex. 131** (Ganguli 30(b)(1) Dep. Tr. 206:19–207:14); *see also* **Pls.' Opp'n/Reply Ex. 129** (Brown Dep. Tr.) at 85:6-15, 86:14-16, 88:1-3; **Pls.' Opp'n/Reply Ex. 138** (Altman Dep. Tr.) at 132:25–133:23, 141:25–142:19, 153:9-17, 165:1-13, 167:13–168:6, 173:7-20, 257:17–258:1 (expressing no opinion regarding the effect of removing song lyrics from Claude's training data on various purported benefits and capabilities of AI). | Disputed.<br><br>Developing an LLM, like Claude, requires ingesting an enormous and diverse training corpus because the model learns language patterns by extracting statistical correlations across vast amounts of preexisting human writing. To assemble corpora of that scale, developers must rely on large-scale web crawling efforts that necessarily sweep in information that is publicly accessible on the internet.<br><br>Each individual piece of training data has impact on the model's weights so each piece of training data has an impact on the model.<br><br>Ex. 10 (Zhao Report) ¶ 13; Ex. 7 (Shan Report) ¶¶ 19, 21-23; Ex. 131 (Shan Dep.) at 125:10-128:6, 226:9 229:18; Ex. 2 (Bilmes Report) ¶¶ 100, 102; Ex. 6 (Nagaraj Report) ¶¶ 36-37; Dkt. 212-5, ("Kaplan PI Decl.") ¶¶ 29-30; Ex. 56 (Anthropic_0000231226). |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | **Publishers' Additional Fact #38:** Anthropic founder and Chief Compute Officer Tom Brown entered the prompt into Claude in February 2023 asking [redacted] However, Mr. Brown [redacted] the output that Claude generated in response to that prompt.<br><br>**Pls.' Opp'n/Reply Ex. 129** (Brown Dep. Tr.) at 210:17-23, 211:11–212:19, 213:3-10; Answer to FAC ¶¶ 11, 113; **Pls.' Ex. 58** (Dep. Ex. 274, Anthropic_0000016458). | Undisputed that the cited document contains the quoted text.<br><br>Otherwise disputed as to the truth of the matter asserted. Mr. Tom Brown testified that [redacted] and that [redacted]<br><br>Ex. 106 (Brown Dep.) at 209:11-210:11. |
| | **Publishers' Additional Fact #39:** Anthropic founder and President Daniela Amodei asked Claude to [redacted]<br><br>**Pls.' Ex. 110** (Dep. Ex. 174, Anthropic_0000570711); *see* **Pls.' Ex. 10,** Daniela Amodei Dep. Tr. 186:11-16. | Undisputed that Ms. Daniela Amodei asked Claude, [redacted] Further undisputed that Claude responded "[redacted]<br><br>Pls.' Ex. 110 (Dep. Ex. 174, Anthropic_0000570711); *see also* Pls.' Ex. 10 (Daniela Amodei Dep.) at 186:11-16. |
| | **Publishers' Additional Fact #40:** Anthropic co-founder Benjamin Mann asked Claude to [redacted]<br><br>**Pls.' Ex. 85** (Dep. Ex. 215, Anthropic_0000524147); **Pls.' Ex. 5,** Mann 30(b)(1) Dep. Tr. 217:7-20. | Undisputed that Mr. Benjamin Mann asked Claude, [redacted] and Claude responded, [redacted] |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | [redacted]<br><br>Pls.' Ex. 85 (Dep. Ex. 215, Anthropic_0000524147) at -147, -148 |
| | **<u>Publishers' Additional Fact #41:</u>** Anthropic employees have prompted Claude with requests for [redacted]<br><br>**Pls.' Ex. 54** (Anthropic_0000525947) at -948–49; **Pls.' Ex. 55** (Anthropic_0000459162) at -168; **Pls.' Ex. 56** (Anthropic_0000554366), at -387–88; **Pls.' Ex. 58** (Dep. Ex. 274, Anthropic_0000016458); **Pls.' Ex. 59** (Anthropic_0000016025) at -035; **Pls.' Ex. 60** (Anthropic_0000554319) at -322; **Pls.' Ex. 62** (Anthropic_0000527903) at -915; *see also* **Pls.' Ex. 80** (Anthropic_0000582187); **Pls.' Ex. 81** (Anthropic_0000430272); **Pls.' Ex. 82** (Anthropic_0000430273); **Pls.' Ex. 83** (Anthropic_0000430258); **Pls.' Ex. 84** (Anthropic_0000430285) at -286; Answer to FAC ¶¶ 11, 113. | Undisputed that Anthropic employees have prompted Claude with requests for lyrics.<br><br>Insofar as Publishers Ad.F #41 relates to outputs, disputed because the cited exhibits either do not include the actual prompts submitted to Claude or do not demonstrate that Claude provides verbatim lyrics in response to requests for lyrics. The cited exhibits further demonstrate that Claude refuses to provide copyrighted output in response to prompts.<br><br>These records were generally created before Anthropic augmented its guardrails intended to prevent the generation of outputs that may infringe copyrights and specifically the works in suit and Anthropic stipulated with Publishers to maintain their efficacy.<br><br>Pls.' Ex. 54 (Anthropic_0000525947) at -948–49; Pls.' Ex. 55 (Anthropic_0000459162) at -168; Pls.' Ex. 56 (Anthropic_0000554366), at -387–88; Pls.' Ex. 58 (Brown Dep. Ex. 274, Anthropic_0000016458); Pls.' Ex. 59 (Anthropic_0000016025) at -035; Pls.' Ex. 60 (Anthropic_0000554319) at -322; |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | Pls.' Ex. 62 (Anthropic_0000527903) at -915; *see also* Pls.' Ex. 80; (Anthropic_0000582187); Pls.' Ex. 81 (Anthropic_0000430272); Pls.' Ex. 82 (Anthropic_0000430273); Pls.' Ex. 83 (Anthropic_0000430258); Pls.' Ex. 84 (Anthropic_0000430285) at -286; Pls.' Ex. 25 (Def.'s Am. Suppl. Resp. to Pls.' Interrog. No. 12, Nov. 12, 2025) at 11-14; Dkt. 291. |
| | **Publishers' Additional Fact #42:** Anthropic employees have prompted Claude with requests to [redacted]<br><br>**Pls.' Ex. 64** (Anthropic_0000459249) at -271; **Pls.' Ex. 65** (Anthropic_0000557304) at -328; **Pls.' Ex. 66** (Anthropic_0000459543) at -742; **Pls.' Ex. 67** (Anthropic_0000557359), -612–14; **Pls.' Ex. 79** (Anthropic_0000570595) at -596; **Pls.' Ex. 85** (Dep. Ex. 215, Anthropic_0000524147) at -147; **Pls.' Ex. 86** (Anthropic_0000431481); **Pls.' Ex. 87** (Anthropic_0000430104); **Pls.' Ex. 88** (Anthropic_0000430107); **Pls.' Ex. 89** (Anthropic_0000434264). | Disputed that Anthropic employees have prompted Claude with requests to identify [redacted] As the evidence cited does not support that statement, speaks for itself, and generally includes only short excerpts of lyrics.<br><br>These records were generally created before Anthropic augmented its guardrails intended to prevent reproduction of copyrighted materials and specifically the works in suit stipulated with Publishers to maintain their efficacy; there is no evidence the lyrics in the cited documents are accurate.<br><br>Pls.' Ex. 64 (Anthropic_0000459249) at -271; Pls.' Ex. 65 (Anthropic_0000557304) at -328; Pls.' Ex. 66 (Anthropic_0000459543) at -742; Pls.' Ex. 67 (Anthropic_0000557359), -612–14; Pls.' Ex. 79 (Anthropic_0000570595) at -596; Pls.' Ex. 85 (Dep. Ex. 215, Anthropic_0000524147) at -147; Pls.' Ex. 86 (Anthropic_0000431481); Pls.' Ex. 87 (Anthropic_0000430104); Pls.' Ex. 88 (Anthropic_0000430107); Pls.' Ex. 89 (Anthropic_0000434264); Pls.' Ex. 25 (Def.'s Am. Suppl. Resp. to Pls.' Interrog. No. 12, Nov. 12, 2025) at 11-14; Dkt. 291. |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | **Publishers' Additional Fact #43:** Anthropic employees have prompted Claude to [redacted]<br><br>**Pls.' Ex. 59** (Anthropic_0000016025) at -026-027; **Pls.' Ex. 92** (Anthropic_0000434832). | Undisputed that in Pls.' Ex. 59, a user asks Claude to [redacted] and then [redacted] The outputs are not in the cited document and do not identify any work in suit.<br><br>Undisputed that in Pls.' Ex. 92, the user writes, [redacted] Claude responds with [redacted]<br><br>Pls.' Ex. 59 (Anthropic_0000016025) at -035; Pls.' Ex. 92 (Anthropic_0000434832) at -832. |
| | **Publishers' Additional Fact #44:** Anthropic employees have prompted Claude with [redacted]<br><br>**Pls.' Ex. 10** (Daniela Amodei Dep. Tr.) at 202:20–203:14; **Pls.' Ex. 56** (Anthropic_0000554366) at -388; **Pls. Ex. 62** (Anthropic_0000527903) at -913; **Pls.' Ex. 68** (Anthropic_0000557015) at -027; **Pls.' Ex. 69** (Anthropic_0000241820) at -820; **Pls.' Ex. 70** (Anthropic_0000459487) at -496; **Pls.' Ex. 71** (Dep. Ex. 244, Anthropic_0000554769) at -845-47; **Pls.' Ex. 72** (Anthropic_0000554405) at -413; **Pls.' Ex. 90** | Undisputed that each cited record reflects [redacted] and none show Claude reproducing an existing work.<br><br>Undisputed that, in Pls.' Ex. 10, Ms. Daniela Amodei acknowledged that an Anthropic employee sang a new and original [redacted]<br><br>Pls.' Ex. 10 (Daniela Amodei Dep.) at 202:11–203:14.<br><br>Undisputed that, in Pls.' Ex. 56, Claude outputs [redacted] not a works in suit. Disputed that this record shows that "employees have prompted" because the record does not contain the user's prompts of Claude. |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | (Anthropic_0000430292); **Pls.' Ex. 91** (Anthropic_0000431502); **Pls.' Ex. 93** (Anthropic_0000432472); **Pls.' Ex. 109** (Anthropic_0000432334) at -334-35; **Pls.' Ex. 110** (Dep. Ex. 174, Anthropic_0000570711); **Pls.' Ex. 111** (Dep. Ex. 242, Anthropic_0000570586). | Pls.' Ex. 56 (Anthropic_0000554366) at -388.<br><br>Undisputed that, in Pls.' Ex. 62 does Claude provides [redacted] is not a work in suit. Disputed that this record shows that "employees have prompted" because the record does not contain the user's prompts of Claude.<br><br>Pls.' Ex. 62 (Anthropic_0000527903) at -913.<br><br>Undisputed that, in Pls.' Ex. 68 Claude shares an [redacted] is not a work in suit. Disputed that this record shows that "employees have prompted" because the record does not contain the user's prompts of Claude.<br><br>Pls.' Ex. 68 (Anthropic_0000557015) at -027-028.<br><br>Undisputed that in Pls.' Ex. 69, the user requests [redacted] is not a work in suit.<br><br>Pls.' Ex. 69 (Anthropic_0000241820) at -820-828.<br><br>Undisputed that, in Pls.' Ex. 70 Claude shares an [redacted] is not a work in suit. Disputed |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | that this record shows that "employees have prompted" because the record does not contain the user's prompts of Claude.<br><br>Pls.' Ex. 70 (Anthropic_0000459487) at -496.<br><br>Undisputed that, in Pls.' Ex. 71 Claude generates new and original [redacted]<br><br>Disputed that this record shows that "employees have prompted" because the record does not contain the user's prompts of Claude.<br><br>Pls.' Ex. 71 (Dep. Ex. 244, Anthropic_0000554769) at -845-847.<br><br>Undisputed that, in Pls.' Ex. 72 Claude outputs [redacted]<br><br>Disputed that this record shows that "employees have prompted" because the record does not contain the user's prompts of Claude.<br><br>Pls.' Ex. 72 (Anthropic_0000554405) at -413.<br><br>Undisputed that in Pls.' Ex. 90, the user asks Claude [redacted]<br><br>Pls.' Ex. 90 (Anthropic_0000430292).<br><br>Publishers also cannot demonstrate the scope of rights they control for Tiny Dancer, a work in suit, because they did not produce a true and correct |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | copy of the deposit made with the United States Copyright Office in connection with any application for registration for this work.<br><br>Pls.' Ex. 64 (Anthropic_0000459249) at -271; Ex. 29 (Pls.' Supp. Resp. & Obj. to Def.'s 3rd Set of Req. For Admis. (Oct. 9, 2025)) at No. 929, p. 416.<br><br>Undisputed that in Pls.' Ex. 91, the user requests, [redacted] is not a work in suit.<br><br>Pls.' Ex. 91 (Anthropic_0000431502).<br><br>Undisputed that in Pls.' Ex. 93, the user requests, [redacted] is not a work in suit.<br><br>Pls.' Ex. 93 (Anthropic_0000432472).<br><br>Undisputed that, in Pls.' Ex. 110, Ms. Daniela Amodei asked Claude, [redacted] Pls.' Ex. 110 does not include a request for lyrics written in the style of an existing copyrighted song or songwriter. |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | Pls.' Ex. 110 (Dep. Ex. 174, Anthropic_0000570711); *see also* Pls.' Ex. 10 (Daniela Amodei Dep.) at 186:11-16.<br><br>Disputed that Pls.' Ex. 109 includes a request for [redacted] The user requests that Claude [redacted] None are works in suit.<br><br>Pls.' Ex. 109 (Anthropic_0000432334) at -334-335.<br><br>Disputed that Pls.' Ex. 111 includes a request for [redacted] The user requests, [redacted]<br><br>Pls.' Ex. 111 (Dep. Ex. 242, Anthropic_0000570586), at -586-587. |
| | **Publishers' Additional Fact #45:** Anthropic employee [redacted] prompted Claude for help [redacted] by [redacted] | Undisputed that in Pls.' Ex. 162, the user states, [redacted] |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | [redacted]<br><br>**Pls.' Opp'n/Reply Ex. 162** (Anthropic_0000570572); **Pls.' Opp'n/Reply Ex. 163** (Anthropic_0000524116). | [redacted]<br><br>Pls.' Opp'n/Reply Ex. 162 (Anthropic_0000570572).<br><br>Disputed that Claude actually [redacted]<br><br>Pls.' Ex. 163 ends with Claude's output: [redacted]<br><br>Pls.' Opp'n/Reply Ex. 163 (Anthropic_0000524116), at -144. |
| | **Publishers' Additional Fact #46:** Claude has generated output copying Publishers' lyrics even when users do not prompt Claude for those lyrics.<br><br>**Pls.' Ex. 19** (Compilation of third-party prompts and outputs) at Anthropic_0000027609 (October 9, 2023) (generating the lyrics to "Just Like Heaven" in response to the prompt "[redacted]). | Disputed that Claude generated lyrics even when users do not prompt Claude for those lyrics as the cited exhibit contains a prompt for lyrics.<br><br>The user wrote, [redacted] |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | Pls.' Ex. 19 (Compilation of third-party prompts and outputs) at Anthropic_0000027609 (p. 183) (emphasis added).<br><br>Disputed as to the characterization of Pls.' Ex. 19 to the extent that "users" refers to third party users. Publishers have not shown that the prompts in this exhibit were made by bona fide third parties.<br><br>*See* Ex. 115 (Dennis Dep.) at 242:6-10; Ant. Reply Ex. 161 (Dennis Opening Report) ¶¶ 56-57.<br><br>Further disputed because nearly all prompts in the cited exhibit were caused by users before Anthropic augmented its guardrails intended to prevent the generation of outputs that may infringe copyrights and specifically the works in suit and stipulated with Publishers to maintain their efficacy.<br><br>Pls.' Ex. 25 (Def.'s Am. Suppl. Resp. to Pls.' Interrog. No. 12, Nov. 12, 2025) at 11-14; Dkt. 291. |
| | <u>**Publishers' Additional Fact #47:**</u> Claude is capable of generating output containing copies of song lyrics because those same song lyrics are included in Claude's training data.<br><br>**Burrell Decl., Ex. 10** (Zhao Report) at ¶¶ 69–70, 92; **Burrell Decl., Ex. 18** (Zhao Rebuttal) at ¶¶ 109–10, 112; **Pls.' Opp'n/Reply Ex. 129** (Brown Dep. Tr.) at 84:23–85:1; *see also* **Pls.' Ex. 10** (Daniela Amodei Dep.) at 189:20–190:1. | Undisputed that Claude's training data included publicly available webpages containing lyrics.<br><br>Disputed that Claude retrieves or stores copies of lyrics in its training data.<br><br>Anthropic's expert, Dr. Jeffrey Bilmes, reported: "Anthropic uses training data to train its models for the purpose of mapping out statistical relationships between text fragments so that the LLM models can generate new texts. Those statistical relationships are unrecognizable transformations of the massive |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | quantity of training data used to train a model such as Claude and are not derivative works of Publishers' lyrics."<br><br>"LLMs do not store or retrieve passages of text verbatim. Instead, they generate new and different outputs, probabilistically, based on general statistical patterns and relationships learned during training that are represented in the model's weights. Because their outputs are drawn from probability distributions, LLMs can produce different results when generating outputs in response to the same prompt, particularly when the final text is produced by stochastically (i.e., randomly) sampling from those distributions, which is by far the most common approach to LLM generation."<br><br>Ex. 2 (Bilmes Report) ¶¶ 36, 98.<br><br>Publishers' expert, Dr. Ben Zhao, testified that Claude's [redacted] that Claude does not [redacted]<br><br>Ex. 139 (Zhao Dep.) at 177:2-4, 178:6-18, 179:9-10. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| **Issue 3: The Second Factor Favors Fair Use Because Song Lyrics are Freely and Publicly Available** | Fact 51: Musical compositions and lyrics can be creative, expressive works.<br><br>Ex. 137 (Stokes Dep.) at 68:9-16, 224:21-24 | Undisputed. |
| | Fact 52: In response to the question [redacted] 30(b)(6) Representative for UMPG, Mr. David Kokakis, testified [redacted]<br><br>Ex. 121 (Kokakis Dep.) at 250:8-253:13 | Disputed.<br><br>Mr. Kokakis testified in full, [redacted]<br><br>**Pls.' Opp'n/Reply Ex. 143** (Kokakis Dep.) at 251:22–252:3. |
| | Fact 53: In response to the question [redacted] 30(b)(6) Representative for Concord, Mr. Duff Berschback, testified [redacted]<br><br>And in response to the question [redacted] 30(b)(6) Representative for Concord, Mr. Duff Berschback, testified [redacted]<br><br>Ex. 104 (Berschback Dep.) at 122:24-123:16 | Undisputed. |

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | **Publishers' Additional Fact #48:** Publishers' licensees and sub-licensees, including lyric display websites such as Genius.com, pay | Undisputed that Publishers' licenses with lyric display websites include contractual provisions relating to |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | monetary consideration for the rights to display or use Publishers' lyrics.<br><br>**Smith Decl. ¶¶** 13–15, 109; **Pls.' Ex. 101** (UMPG_0000018093, Concord_0000000168, ABKCO_0000000052, CCMG_0000000209) (LyricFind licenses); **Pls.' Ex. 102** (UMPG_0000000335, ABKCO_0000000045, CCMG_000000237, Concord_0000000212) (MusixMatch licenses); **Pls.' Ex. 103** (UMPG_0000000388, UMPG_0000023282, UMPG_0000023090, UMPG_0000023257, UMPG_0000000275, UMPG_0000000366, ABKCO_0000000414, CCMG_0000000869, Concord_0000000739, UMPG_0000000532) (compilation of additional lyrics display licenses); *see also* **Pls.' Opp'n/Reply Ex. 167** (UMPG_0000000311; UMPG_0000023040; UMPG_0000023125; ABKCO_0000000328; ABKCO_0000000025; ABKCO_0000001313; ABKCO_0000000304; ABKCO_0000000369; ABKCO_0000000398; CCMG_0000000662; CCMG_0000000259) (compilation of additional lyrics display licenses). | monetary consideration for the rights to display or use Publishers' lyrics. |
| | **Publishers' Additional Fact #49:** Many lyrics display websites, including Publishers' licensees, [redacted] | Undisputed that users do not [redacted] and that [redacted] When asked whether [redacted] 30(b)(6) |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | [redacted]<br><br>**Pls.' Opp'n/Reply Ex. 143** (Kokakis Dep. Tr.) at 250:25–251:20. | Representative for UMPG Mr. David Kokakis testified, [redacted]<br><br>Ant. Reply Ex. 166 (Kokakis Dep.) at 250:25–252:3; *id*. at 250:8-253:13. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
| --- | --- | --- |
| **Issue 4: The Third Factor Favors Fair Use Because Only the Portion of The Works Reasonably Necessary to Achieve a Transformative Purpose Is Used** | Fact 54: Publishers admit that [redacted]<br><br>Ex. 27 (Pls.' Resp. & Obj. to Def.'s 2nd Set of Req. For Admis. (Nos. 16-24) (Sept. 2, 2025)) at 9 | Undisputed. |
| | Fact 55: 30(b)(6) Representative for UMPG, Mr. David Kokakis, testified [redacted]<br><br>Ex. 121 (Kokakis Dep.) at 85:9-87:14 | Undisputed. |
| | Fact 56: When asked [redacted] 30(b)(6) Representative for ABKCO, Ms. Alisa Coleman, answered [redacted]<br><br>Ex. 110 (Coleman Dep.) at 49:22-50:6 | Undisputed. |
| | Fact 57: When asked [redacted] 30(b)(6) Representative for UMPG, Mr. Duff Berschback, testified [redacted]<br><br>Ex. 104 (Berschback Dep.) at 30:24-31:7 | Undisputed. |
| | Fact 58: When asked [redacted] 30(b)(6) Representative for CCMG, Mr. Draughon, testified [redacted] He also testified | Undisputed. |

PUBLIC REDACTED VERSION

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | [redacted]<br><br>Ex. 117 (Draughon Dep.) at 50:13-17, 51:10-18 | |
| | Fact 59: Publishers' expert, Dr. Shawn Shan, reported [redacted] He testified [redacted]<br><br>Ex. 7 (Shan Report) at ¶¶ 22, 45(i) | Undisputed, except that Dr. Shan did not "testif[y]" as quoted. The quoted language appears in Dr. Shan's opening expert report.<br><br>**Burrell Decl., Ex. 7** (Shan Report) at ¶ 45(i). |
| | Fact 60: Anthropic's expert, Dr. Jeffery Bilmes, reported that publicly available information indicates Anthropic's Claude models were trained in part on data sourced from Common Crawl or by directly crawling the web.<br><br>Ex. 2 (Bilmes Report) at ¶¶ 102-103, 107 | Undisputed. |
| | Fact 61: Publishers' Expert, Dr. Ben Zhao, reported [redacted]<br><br>Ex. 10 (Zhao Report) at ¶ 10 | Undisputed. |
| | Fact 62: Publishers' Expert, Dr. Shawn Shan, reported [redacted] | Undisputed. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | [redacted]<br><br>Ex. 7 (Shan Report) at ¶ 44 | |
| | Fact 63: In response to the question [redacted] (b)(6) Representative for CCMG, Mr. Draughon, testified [redacted]<br><br>Ex. 117 (Draughon Dep.) at 136:21-137:2 | Undisputed that Mr. Draughon testified as quoted.<br><br>Anthropic relies on this fact for the truth of the matter asserted that Anthropic has not copied, used, or otherwise accessed the entirety of the musical composition, including the lyrics and the music, for any Capitol CMG work. Publishers dispute the truth of the matter asserted that Anthropic has not copied, used, or otherwise accessed the entirety of the musical composition, including the lyrics and the music, for any Capitol CMG work.<br><br>*See* **Pls.' Opp'n/Reply Ex. 169** (ANTH_DATABASE_0000005467 ("Trending Worship Songs" with sheet music and lyrics to CCMG Works in Suit for Piano/Vocal/Guitar); ANTH_DATABASE_0000005062 ("Top Hits of 2018" with sheet music and lyrics to CCMG Works in Suit for Piano/Vocal/Guitar); ANTH_DATABASE_0000005478 ("Top Hits of 2018" with sheet music and lyrics to CCMG Works in Suit for Easy Piano)). |
| | Fact 64: Audio files and data are not supported by Claude models and thus are not incorporated in the models' training data.<br><br>Ex. 11 (Bilmes Rebuttal) at ¶ 239 | Undisputed. |
| | Fact 65: Publishers' expert, Dr. Ben Zhao, reported [redacted] | Undisputed, except that Ex. 10 (Zhao Report), not Ex. 18, contains the quoted language. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | He reported that [redacted]<br><br>Ex. 18 (Zhao Report) at ¶¶ 22, 23 | **Burrell Decl., Ex. 10** (Zhao Report) ¶ 23. |
| | Fact 66: Anthropic co-founder and Chief Science Officer, Dr. Jared Kaplan, attested that "[t]rillions of tokens are required to properly train an LLM like Claude and to ultimately allow the LLM to recognize patterns in language to any useful degree."<br><br>Kaplan PI Decl. ¶ 22 | Undisputed that Dr. Kaplan attested to the quoted language.<br><br>Anthropic relies on this fact for the truth of the matter asserted by the quoted language. Publishers dispute the truth of the matter asserted that "trillions of tokens are required to properly train an LLM like Claude and to allow the LLM to recognize patterns in language to any useful degree." For example, GPT-3, a "general-purpose LLM" like Claude, was trained on 300 billion tokens.<br><br>**Pls.' Opp'n/Reply Ex. 172** (Dep. Ex. 202, Tom B. Brown et al., *Language Models Are Few-Shot Learners*, ARXIV:2005.14165v4, 8–9 (July 22, 2020); **Pls.' Opp'n/Reply Ex. 137** (Nagaraj Dep. Tr.) at 36:23–37:9, 42:2-8, 44:4–45:16; *see also* **Kaplan Decl.** ¶¶ 25–26 (recognizing that LLMs can be trained on smaller corpora of data and remain effective for at least certain tasks); **Pls.' Ex. 6** (Kaplan Dep. Tr.) at 138:10-14 (testifying [redacted]); **Pls.' Opp'n/Reply Ex. 129** (Brown Dep. Tr.) at 92:2-7 (testifying [redacted]); **Burrell Decl., Ex. 18** (Zhao Rebuttal) at ¶ 23; **Pls.' Opp'n/Reply Ex. 145** (Shan Dep. Tr.) at 105:7-10. |
| | Fact 67: Publishers' expert, Dr. Shawn Shan, testified [redacted] that | Undisputed. |

PUBLIC REDACTED VERSION

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | it was accurate that [redacted]<br><br>Ex. 131 (Shan Dep.) at 125:10-128:6 | |
| | Fact 68: Publishers' expert, Dr. Ben Zhao, agreed that [redacted] testifying that [redacted]<br><br>Ex. 139 (Zhao Dep.) at 276:19-25 | Disputed.<br><br>The quoted language does not accurately reflect Dr. Zhao's testimony. In response to the question, "[Y]ou understand that song lyrics are widely available on the internet through a number of different sites, right?", Dr. Zhao testified in full: "I understand that they are available in different forms, different places. I also understand that many of these places have actual licensed access to them and agreements with some of the plaintiffs and other music and music industry companies."<br><br>**Burrell Decl., Ex. 139** (Zhao Dep.) at 276:19-25. |
| | Fact 69: Publishers' expert, Dr. Shawn Shan, reported that to [redacted] | Undisputed. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | [redacted] Dr. Shan also reported that [redacted]<br><br>Ex. 7 (Shan Report) at ¶¶ 22-23 | |
| | Fact 70: Anthropic's expert, Dr. Jeff Bilmes, reported "Without large text collections like Common Crawl and other large-scale web crawling efforts, it would be very difficult to obtain sufficient data for the types of advanced deep LLM training that has made general purpose LLMs like Claude possible." And that "Developers typically meet their data requirements by gathering training data from several sources, including large publicly available text corpora like Common Crawl and OpenWebText. Common Crawl and OpenWebText contain textual information extracted from millions of webpages over time."<br><br>Ex. 2 (Bilmes Report) at ¶¶ 100, 102 | Undisputed that Dr. Bilmes' report contains the quoted language. |
| | Fact 71: Claude Sonnet 3.0 was trained on [redacted] exceeds more than twice [redacted] of the text of all the books in the world.<br><br>Ex. 6 (Nagaraj Report) at ¶¶ 36-37; Kaplan PI Decl. ¶¶ 29-30; Ex. 56 (Anthropic_0000231226) | Disputed.<br><br>Claude Sonnet 3.5 (released on June 20, 2024), not Claude Sonnet 3.0, was trained on [redacted]. Claude Sonnet 3.0 (released on March 4, 2024) was trained on 16 [redacted]<br><br>**Burrell Decl., Ex. 6** (Nagaraj Report) at ¶¶ 36–37; Kaplan PI Decl. ¶ 29; **Pls.' Opp'n/Reply Ex. 173** (Anthropic_0000592435) (ANTHROPIC, *Introducing the next generation of Claude*); **Pls.'** |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | | **Opp'n/Reply Ex. 174** (Anthropic_0000592449) (ANTHROPIC, *Claude 3.5 Sonnet*).<br><br>Further disputed because Ex. 56 does not support the asserted fact, and only reflects Anthropic's [redacted] ***words*** in all the books in the world, not tokens. *See* **Burrell Decl., Ex. 56** (Anthropic_0000231226). |
| | Fact 72: Publishers' expert, Dr. Shawn Shan, testified that [redacted]<br><br>Ex. 131 (Shan Dep.) at 232:5-233:4, 343:2-22, 344:1-16 | Undisputed that Dr. Shan testified, [redacted]<br><br>Otherwise, disputed. The quoted language does not accurately reflect Dr. Shan's testimony. Dr. Shan testified: [redacted]<br><br>**Burrell Decl., Ex. 131** (Shan Dep.) at 232:20-25 (emphasis added). |
| | Fact 73: Publishers' expert, Dr. Ben Zhao, testified that "Anthropic has gotten training data from a number of sources" such as "web archives, YouTube video transcriptions, Common Crawl in the past." When asked whether he "understand[s] that song lyrics are widely available on the internet through a number of different sites," Dr. Zhao responded that he understands that song lyrics "are available in different forms, different places." Publishers' expert, Dr. Shawn Shan, reported that [redacted] Common Crawl, | Undisputed that Dr. Shan's report quotes the creators of the Pile dataset in stating that [redacted] is "a generalized web scrape dataset . . . [redacted]<br>Also undisputed that Dr. Shan's report states that [redacted] Common Crawl, [redacted] The Pile, YouTube Subtitles, and Reddit [redacted] and that Common Crawl "represents a massive indiscriminate scrape of the public web." |

PUBLIC REDACTED VERSION

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | [redacted], The Pile, YouTube Subtitles, and Reddit data—[redacted] that CommonCrawl "represents a massive indiscriminate scrape of the public web" and that [redacted] is "a generalized web scrape dataset."<br><br>Ex. 139 (Zhao Dep.) at 274:20-275:7, 276:19-277:4, 279:8-280:3, 282:2-21; Ex. 7 (Shan Report) ¶¶ 44-45 | Otherwise, disputed. The quoted testimony does not accurately reflect Dr. Zhao's testimony. When asked, "Are you aware of any evidence that Anthropic ever scraped lyrics for any songs, or for the works in suit in particular, without respecting robots.txt?", Dr. Zhao responded in full: "So let me unpack that question for a second. Am I aware—do I have specific knowledge that Anthropic explicitly ignored robots.txt in scraping lyric content for its training data? The answer to that question is no. [redacted] So all of these things are things that do not require Anthropic to interact with robots.txt. Even though someone else may have gotten data on their behalf or relayed them—data to them through some means and if they did not respect robots.txt to get that data, Anthropic would not have necessitated—would not have been necessary for Anthropic to personally and directly ignore robots.txt, and, yet, they would still have been privy to data that was obtained through that process."<br><br>**Burrell Decl., Ex. 139** (Zhao Dep.) at 274:20–275:23.<br><br>In response to the question, "[Y]ou understand that song lyrics are widely available on the internet through a number of different sites, right?", Dr. Zhao testified in full: "I understand that they are available in different forms, different places. I also understand that many of these places have actual licensed access to them |

PUBLIC REDACTED VERSION

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | | and agreements with some of the plaintiffs and other music and music industry companies."<br><br>**Burrell Decl., Ex. 139** (Zhao Dep.) at 276:19–277:4. |
| | Fact 74: Anthropic's expert, Dr. Jeffrey Bilmes, reported that Anthropic's general-purpose web crawler is designed to respect internet protocols that tell web crawlers not to crawl or scrape those web pages. [redacted]<br><br>Ex. 2 (Bilmes Report) at § VII.A | Undisputed that Dr. Bilmes' report states that "Anthropic's general-purpose web crawler is designed to respect internet protocols that tell crawlers not to crawl or scrape pages," and that Dr. Bilmes' report states that he analyzed Anthropic's web crawling data as asserted.<br><br>Publishers dispute that Dr. Bilmes' analysis shows Anthropic "adhered to the internet protocol rules in place at the time" because Dr. Bilmes improperly includes [redacted] *See* **Burrell Decl., Ex. 2** (Bilmes Report) at ¶ 306 & n.580; **Burrell Decl., Ex. 16** (Shan Rebuttal) at ¶¶ 18–20; **Burrell Decl., Ex. 18** (Zhao Rebuttal) at ¶¶ 73–84.<br><br>Further disputed because the cited evidence (Def.'s Ex. 2) is subject to a pending motion to exclude. *See* ECF No. 642. |

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | <u>**Publishers' Additional Fact #50:**</u> Publishers frequently license just the lyrics to their copyrighted musical compositions to third parties.<br><br>*See, e.g.*, **Pls.' Opp'n/Reply Ex. 161** (Pls.' Supp. Resp. to Def.'s | Undisputed that Publishers have licenses with certain licensees for the display of lyrics to musical compositions.<br><br>Otherwise disputed that Publishers enter into licenses for just the lyrics |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | Interrog. No. 25, Sept. 18, 2025) at 8; **Pls.' Opp'n/Reply Ex. 140** (Berschback Dep. Tr.) at 127:3-15, 193:10-23; **Pls.' Opp'n/Reply Ex. 141** (Coleman Dep. Tr.) at 132:21–133:9, 133:24–135:23, 140:11–141:9, 144:8–145:2; **Pls.' Opp'n/Reply Ex. 142** (Draughon Dep. Tr.) at 50:22–51:3,107:22–108:4, 109:6-9, 198:22–199:16, 202:17–205:4, 212:7-25; **Pls.' Opp'n/Reply Ex. 143** (Kokakis Dep.) 124:12–125:1, 125:19–126:9, 236:4–238:1; *see also* Decl. of Duff Berschback ISO Pls.' Mot. for Summ. J. ("**Berschback Decl.**") (March 20, 2026), ¶¶ 42–45, ECF No. 598; Decl. of Alisa Coleman ISO Pls.' Mot. for Summ. J. ("**Coleman Decl.**") (March 20, 2026), ¶¶ 15, 17–21, ECF No. 596; Decl. of Kent Draughon ISO Pls.' Mot. for Summ. J. ("**Draughon Decl.**") (March 20, 2026), ¶¶ 32–34, ECF No. 599; Decl. of David Kokakis ISO Pls.' Mot. for Summ. J. ("**Kokakis Decl.**") (March 22, 2026), ¶¶ 146, 148–51, ECF No. 610. | "frequently" outside of lyric display aggregating websites.<br><br>Pls' Opp'n/Reply Ex. 161 discloses only licenses to [redacted] that [redacted] without regard to the frequency of those licenses.<br><br>Pls.' Opp'n/Reply Ex. 161 (Pls.' Supp. Resp. to Def.'s Interrog. No. 25, Sept. 18, 2025) at 8.<br><br>Mr. Berschback testified that [redacted]<br><br>Pls.' Opp'n/Reply Ex. 140 (Berschback Dep.) at 127:3-15.<br><br>Ms. Coleman's testimony regards licenses for [redacted]<br><br>Pls.' Opp'n/Reply Ex. 141 (Coleman Dep.) at 132:21–133:9, 133:24–135:23, 140:11–141:9, 144:8–145:2.<br><br>Mr. Draughon's testimony is about licenses with [redacted]<br><br>Pls.' Opp'n/Reply Ex. 142 (Draughon Dep.) at 50:22–51:3,107:22–108:4, 109:6-9, 198:22–199:16, 202:17–205:4, 212:7-25.<br><br>Mr. Kokakis testified to licenses with [redacted] |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | Pls.' Opp'n/Reply Ex. 143 (Kokakis Dep.) at 124:12–125:1, 125:19–126:9, 236:4–238:1 |
| | **Publishers' Additional Fact #51:** Claude was designed and trained to be a text-only LLM capable of "generat[ing] high quality text."<br><br>**Pls.' Ex. 21** (Def.'s Am. Resp. to Pls.' RFAs, No. 80) at 83; **Pls.' Opp'n/Reply Ex. 13** (Dario Amodei Dep. Tr.) at 102:7-24; **Burrell Decl. Ex. 15** (Nagaraj Rebuttal) at ¶ 38. | Undisputed that Anthropic "cleans and processes the data used to train its models to remove data that would detract from the goal of teaching Claude to generate high quality text."<br><br>Further undisputed that Claude "doesn't generate audio and video" and that Anthropic is "generally not aiming to produce content in creative industries."<br><br>Further undisputed that "[a]s a text-based LLM, Claude does not have the capacity to generate full songs with lyrics *and* music."<br><br>Pls.' Ex. 21 (Def.'s Am. Resp. to Pls.' RFAs, No. 80) at 83; Pls.' Ex. 13 (Dario Amodei Dep.) at 102:7-24; Ex. 15 (Nagaraj Rebuttal) at ¶ 38. |
| | **Publishers' Additional Fact #52:** Lyrics are considered an integral part of musical compositions.<br><br>**Burrell Decl., Ex. 104** (Berschback Dep.) at 30:24–31:3. | Undisputed that lyrics can be part of a musical composition. Mr. Berschback also testified, [redacted] in response to the question [redacted]<br><br>Ex. 104 (Berschback Dep.) at 30:24–31:7.<br><br>Further undisputed that none of the 499 works in suit is comprised only of lyrics: Publishers admit that [redacted]<br><br>Ex. 27 (Pls.' Resp. & Obj. to Def.'s 2nd Set of Req. For Admis. (Nos. 16-24) (Sept. 2, 2025)) at 9; Ex. 121 (Kokakis Dep.) at 85:9-87:14; Ex. 110 |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | (Coleman Dep.) at 49:22-50:6; Ex. 117 (Draughon Dep.) at 50:13-17, 51:10-18.<br><br>"[L]yrics are only a part of the entire musical composition, if they are present at all." And while "[l]yrics can be a meaningful part of a composition [they] derive much of their value and expression from their setting within the rest of the musical composition and take on particular meaning when paired with melody, harmony, instrumentation, and other compositional elements."<br><br>Ex. 9 (Stokes Report) ¶¶ 17(a), 34. |
| | **<u>Publishers' Additional Fact #53:</u>** Anthropic's stated policy is to [redacted] from scraping or other Internet sources.<br><br>**Pls.' Opp'n/Reply Ex. 148** (Dep. Ex. 35, Anthropic_0000229152) at -152–53; **Pls.' Opp'n/Reply Ex. 134** (Turvey 30(b)(1) Dep. Tr.) at 60:12–61:18; *see also* **Burrell Decl., Ex. 6** (Nagaraj Report) at ¶ 73. | Undisputed that the document cited contains the quoted language.<br><br>Otherwise disputed for the truth of the matter asserted because in response to the question "[i]s this an official Anthropic policy document," about Pls.' Opp'n/Reply Ex. 148, 30(b)(6) Representative, Mr. Thomas Turvey, responded, [redacted] and that it was "a document that I wrote on my seventh day of employment in Anthropic and have updated since related to principles that I wanted … the company to take regarding how we would conduct data partnerships."<br><br>Ant. Reply Ex. 167 (Turvey 30(b)(6) Dep.) at 108:23-110:15. |
| | **<u>Publishers' Additional Fact #54:</u>** A large volume of training data is not always desirable for LLM training; certain models perform better with a more limited training corpus.<br><br>**Burrell Decl. Ex. 18** (Zhao Rebuttal Report) at ¶ 23; **Burrell** | Undisputed that certain models built for certain purposes may perform better with a more limited training corpus and that the quality of the data is an important factor in influencing model performance.<br><br>Otherwise disputed as to the truth of the matter asserted because training |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
| --- | --- | --- |
| | **Decl. Ex. 2** (Bilmes Report) at ¶ 322; **Kaplan PI Decl.** ¶¶ 25–26, ECF No. 209 (recognizing that LLMs can be trained on smaller corpora of data and remain effective for at least certain tasks); *see also* **Pls.' Opp'n/Reply Ex. 128** (Kaplan Dep. Tr.) at 138:10-14 (testifying [redacted] **Pls.' Opp'n/Reply Ex. 129** (Brown Dep. Tr.) at 92:2-7 (testifying [redacted]). | general-purpose LLMs, like Claude, requires large, diverse data.<br><br>It is undisputed that Dr. Bilmes reported that "[h]eterogenous data sources such as Common Crawl, OpenWeb, and book data, have been shown to be most influential in producing strong downstream LLM performance…. [R]emoving large heterogenous datasets (specifically Common Crawl, OpenWeb, and book data) from the pre-training corpus had a greater impact on model performance than removing more narrow specialized domains."<br><br>Ex. 2 (Bilmes Report) ¶ 321.<br><br>It is also undisputed that "scaling laws mean that as model builders create larger models using more computation, they also need more data. In other words, better model training is a function of model size, dataset size, and computation amount, among other factors, all in conjunction."<br><br>Language models trained on less data may still achieve impressive results "albeit only on a subset of tasks for which general purpose models," like Claude, "excel." The developers of the small language model Dr. Zhao discussed at ¶ 23 of Ex. 18 recognized that "LLMs like Claude are still the 'gold standard'" and are not "equivalent to LLMs trained at vastly greater scale," in terms of performance, reasoning, and complex task completion.<br><br>Ex. 19 (Bilmes Reply) ¶¶ 49-51.<br><br>It is further undisputed that "Future models will require even more data to |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | improve upon performance. [Anthropic] expect[s] that subsequent models will also require [redacted] to continue to show performance gains."<br><br>Kaplan PI Decl. ¶ 30, Dkt. 212-5.<br><br>A heterogenous large corpus of data, including low quality or value data is necessary to increase model performance generally and Anthropic has [redacted]<br><br>Ex. 124 (Mann 30(b)(1) Dep. Vol. 1) at 82:11-16. |
| | **Publishers' Additional Fact #55:** Large datasets can sometimes result in decreased model performance.<br><br>**Burrell Decl. Ex. 2** (Bilmes Report) at ¶ 123. | Disputed insofar as Publishers mischaracterize the evidence cited and as to the truth of the matter asserted because training general-purpose LLMs, like Claude, requires large, diverse data.<br><br>It is undisputed that "LLMs, by virtue of their scale, require massive amounts of training data to achieve improvements in model performance…. The ***original*** scaling laws [] revealed a point of diminishing returns: ***if a model size were held constant*** while the size of training datasets continued to grow, the model would eventually have reduced performance…. Later research found that **compute-optimal** LLMs—LLMs that reach the best performance with the computation budget available—required fewer parameters ***and far larger training datasets*** than had been used for the very large (by parameter- |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | size) LLMs trained in 2021 and 2022."<br><br>Ex. 2 (Bilmes Report) ¶¶ 122-123, 165 (italics emphases added).<br><br>"[S]caling laws mean that as model builders create larger models using more computation, they also need more data. In other words, better model training is a function of model size, dataset size, and computation amount, among other factors, all in conjunction."<br><br>Ex. 19 (Bilmes Reply) ¶¶ 49-51.<br><br>A heterogenous large corpus of data, including low quality or value data is necessary to increase model performance generally and Anthropic has [redacted] that [redacted]<br><br>Ex. 124 (Mann 30(b)(1) Dep. Vol. 1) at 82:11-16. |
| | **Publishers' Additional Fact #56:** Anthropic hired a contractor, Gyula Lakatos, to build its own web crawling and scraping infrastructure in 2023.<br><br>**Pls.' Opp'n/Reply Ex. 124** (Mann 30(b)(6) Dep. Tr.) at 62:9-12. | Undisputed that Gyula Lakatos "was a contractor that Anthropic hired to help us build some web crawling and scraping infrastructure, originally, as I [redacted]<br><br>Pls.' Opp'n/Reply Ex. 124 (Mann 30(b)(6) Dep.) at 62:9-14. |
| | **Publishers' Additional Fact #57:** Anthropic's first web crawler [redacted] | Undisputed that when Anthropic began its crawling activities [redacted], it [redacted] and |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | **Pls.' Ex. 4** (Mann 30(b)(6) Dep. Tr.) at 56:18–57:21; **Pls.' Ex. 24** (Dep. Ex. 129, Anthropic_0000343228); **Pls.' Opp'n/Reply Ex. 151** (Dep. Ex. 130, Anthropic_0000342806); **Pls.' Opp'n/Reply Ex. 135** (Sangani Dep. Tr.) at 215:1–216:2 (discussing Dep. Ex. 130). | that "[t]here have been periods of time when we didn't [honor robots.txt instructions] due to bugs, and there have also been periods of time in the very early days when we were only crawling the specific documents types [] described [above], where, to the best of [Anthropic's] knowledge, it seems possible that we were not respecting robots.txt. But … [redacted]<br><br>Pls.' Ex. 4 (Mann 30(b)(6) Dep.) at 56:18–57:21. |
| | **<u>Publishers' Additional Fact #58:</u>** Dr. Bilmes' analysis of Anthropic's general-purpose web crawler's adherence to internet protocols [redacted]<br><br>**Burrell Decl., Ex. 2** (Bilmes Report) at ¶¶ 302–05; **Pls.' Ex. 4** (Mann 30(b)(6) Dep. Tr.) at 72:23–73:8. | Undisputed that Dr. Bilmes's analysis was limited to Anthropic's web crawler that [redacted]<br><br>Anthropic's new [redacted] that uses [redacted]<br><br>Pls.' Ex. 4 (Mann 30(b)(6) Dep.) at 71:18–73:8.<br><br>Further undisputed that Dr. Bilmes analyzed a crawl dataset "which represent the collection of webpages Anthropic directly crawled between March 12, 2024, and January 31, 2025."<br><br>Ex. 2 (Bilmes Report) ¶¶ 302–305. |
| | **<u>Publishers' Additional Fact #59:</u>** Dr. Bilmes' analysis of Anthropic's crawling activity demonstrated that [redacted] | Undisputed that 1.88% of the URLs Anthropic crawled, and analyzed by Dr. Bilmes, returned a "Disallow" directive for either Anthropic's crawler user-agent or all user agents and that approximately 75% of those |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | [redacted].<br><br>**Burrell Decl. Ex. 16** (Shan Rebuttal Report) at ¶ 18; **Burrell Decl., Ex. 2** (Bilmes Report) at ¶¶ 304–07. | URLs [redacted] came from the same domain, [redacted], which is no longer accessible and whose robots.txt file, beginning in 2022 and before Anthropic began crawling webpages, was unreachable due to action taken by the domain owner, making it impossible for any web crawler to determine the website's crawling directives. Undisputed that excluding those URLs demonstrates that Anthropic permissibly crawled 99.50% of URLs.<br><br>Ex. 2 (Bilmes Report) at ¶¶ 304–307. |
| | **<u>Publishers' Additional Fact #60:</u>** Publishers' expert Dr. Shan conducted an independent empirical analysis of 10,000 unique web domains and determined that, under Dr. Bilmes' methodology, [redacted]<br><br>**Burrell Decl. Ex. 16** (Shan Rebuttal Report) at ¶ 21 & nn.15–16. | Undisputed that Dr. Shan's report indicates he conducted an analysis of 10,000 unique domains extracted from the Tranco Top 1 Million list and that his "results closely match the characterization provided in the Bilmes Report."<br><br>Otherwise disputed as to the truth of the matter asserted. Dr. Shan's analysis merely confirms that the robots.txt exclusion protocol is industry standard and that where user-agents are not disallowed from crawling, those web pages permit crawling.<br><br>Ex. 16 (Shan Rebuttal Report) ¶ 21; Ex. 19 (Bilmes Reply Report) ¶ 73. |
| | **<u>Publishers' Additional Fact #61:</u>** Because the general architecture of the internet includes frequent absence of explicit technical barriers to crawling, compliance with such configurations does not reflect significant effort.<br><br>**Burrell Decl. Ex. 16** (Shan Rebuttal Report) at ¶ 21 & nn.15–16. | Disputed.<br><br>The robots.txt Robots Exclusion Protocol was defined in 1994 and has been published as an "Internet Standard" that is "interoperable and widely deployed" since 2022.<br><br>Ex. 19 (Bilmes Reply Report) ¶ 73 & n.269.<br><br>Publishers have directed licensees of their lyrics, in 2025, to include |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | robots.txt files that restrict [redacted]<br><br>Ant. Reply Ex. 168 (Kokakis Dep. Ex. 25, UMPG_0000023303) at -305–307.<br><br>A study conducted in 2025 by Dr. Zhao and Dr. Shan found that the Robots Exclusion Protocol "is now widely used to manage content access." And that Anthropic's robot.txt crawler's user-agents "are the two most-frequently restricted AI user agents" and that its user-agent "ClaudeBot" "respected the robots.txt file" in the study and found "Yes" ClaudeBot "Respect[s] [robot.txt] in practice."<br><br>Ant. Reply Ex. 169 (Zhao Dep. Ex. 3, *Somesite I Used To Crawl*) at pp. 2, 4, 8, 10.<br><br>Further disputed that compliance with robots.txt does not reflect significant effort because [redacted] And Anthropic has [redacted] |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | Pls.' Ex. 4 (Mann 30(b)(6) Dep.) at 57:22-58:7. |
| | **Publishers' Additional Fact #62:** AI companies have licensed data from rightsholders for AI training and development.<br><br>Smith Decl. ¶¶ 66–69. | Undisputed only that AI companies have licensed data, generally, from certain rightsholders.<br><br>Otherwise disputed. Dr. Smith's declaration identifies no music rightsholders that have licensed data, and in particular lyrics data, to AI companies building general-purpose LLMs, like ChatGPT or Claude, as distinct from special-purpose or music-specific models, like those developed by StabilityAI, Udio, ElevenLabs, SoundLabs, Suno and KLAY Vision.<br><br>Pls.' Smith Decl. ¶¶ 66–69 & citing at n.83, Ant. Reply Ex. 170; (Copyright Alliance, *AI Licensing by Copyright Owners*) at 15-17. |
| | **Publishers' Additional Fact #63:** It is possible to train an LLM on corpora comprised entirely of public domain data and licensed data.<br><br>Decl. of Ed Newton-Rex ISO Pls.' Opp. to Prelim. Inj. (Aug. 1, 2024) ¶ 30, ECF No. 183; **Pls.' Opp'n/Reply Ex. 137** (Nagaraj Dep. Tr.) at 42:4–45:16, 47:10–48:2. | Disputed that it is possible to train an LLM, comparable to Claude, on corpora comprised entirely of public domain data and licensed data<br><br>Ex. 2 (Bilmes Report) ¶¶ 314-318; Ex. 6 (Nagaraj Report) ¶¶ 9, 38. |

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| **Issue 5: Factor Four Favors Fair Use Because** | Fact 75: Publishers' expert, Mr. Joshua Dennis, reported that [redacted] | Undisputed that Mr. Dennis' reply report contains the quoted language. |

PUBLIC REDACTED VERSION

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| **The Transformative Use Outweighs Any Marketplace Harms** | [redacted]<br><br>Ex. 21 (Dennis Reply) at ¶ 14 | |
| | Fact 76: Publishers' expert, Mr. Joshua Dennis, [redacted]<br><br>Ex. 13 (Dennis Rebuttal) at ¶ 88 | Disputed.<br><br>Mr. Dennis identified [redacted]<br><br>**Burrell Decl., Ex. 21** (Dennis Reply) at ¶ 13; **Pls.' Opp'n/Reply Ex. 170** (Dennis Reply Exhibit 4). |
| | Fact 77: Anthropic's expert, Dr. Andrew Bray, found that 83.33% of the prompts in the 5 million sample were made using credentials known to belong to Publishers' known investigator. Publishers have not disclosed identifying information for all of the prompts and outputs generated by Publishers, their attorneys, or their investigators, so it is possible that Publishers and their agents generated all of the prompts within the 5 million sample that sought lyrics to works in suit.<br><br>Ex. 20 (Bray Reply) at ¶ 11 | Disputed.<br><br>Dr. Bray contended that 83.33% of the prompts corresponding to Claude records with infringing output in the 5-million-record Claude sample were made using credentials known to belong to Publishers' investigator, not "that 83.33% of the prompts in the 5 million sample" were made using such credentials.<br><br>**Burrell Decl., Ex. 20** (Bray Reply) at ¶ 11.<br><br>Pursuant to ECF No. 545, Publishers disclosed to Anthropic the total number of Publishers' prompt-output pairs contained in the 5-million-record Claude sample.<br><br>**Burrell Decl., Ex. 31** (Pls.' Am. Resp. to Def.'s Interrog. No. 4, April 13, 2026) at 9.<br><br>Further disputed because the cited evidence (Def.'s Ex. 20) is subject to a |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | | pending motion to exclude. *See* ECF No. 644. |
| | Fact 78: UMPG 30(b)(6) Representative, Mr. David Kokakis, [redacted]<br><br>Ex. 121 (Kokakis Dep.) at 337:11-12 | Undisputed. |
| | Fact 79: Publishers' expert, Dr. Ben Zhao, testified that [redacted] Dr. Zhao also testified that [redacted]<br><br>Ex. 139 (Zhao Dep.) at 399:23-400:2, 401:5-8 | Disputed.<br><br>The asserted fact does not accurately reflect Dr. Zhao's testimony. When asked "When it comes to the benefits of AI, it's also important to look at the prevalence and the scale of those benefits in evaluating the cost/benefit analysis; isn't that right?", Dr. Zhao responded that "I believe that looking at benefits of AI requires, just as it does to look at harms, to look at concrete examples, quantifiable data, and real research that studies the benefits and harms of AI . . . . I'm not saying that AI is all bad and has no benefits; there are benefits to AI. There are benefits to multiple types of AI. And even for a more constrained definition of generative AI, I do believe that there are scenarios where they have some benefit. However, understanding of those benefits should be done with analysis, research, and actual quantifiable data rather than single anecdotes of: I saw one instance of this benefit and, therefore, it must generalize to all. When I speak to—about harms, I'm referencing harms that are known, that are not denied, that are observed by many, that are reported in public press, that are reported in academic journals, that are reported in peer-reviewed research publications from many different sites. And there's little dispute that these reports are real, that these harms are |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | | together today present today, not hypothetical, not speculative."<br><br>**Burrell Decl., Ex. 139** (Zhao Dep.) at 399:7–400:17.<br><br>In response to the question, "Have you cited in your reports any public press, academic journal, or peer-reviewed research publication about the benefit of AI?", Dr. Zhao testified: "I will be frank: I have kept an eye out for such articles. I have looked for concrete evidence of applications where AI has provided benefit. I have not been able to see concrete evidence in terms of peer-reviewed papers that are convincing to me. I acknowledge that there are certain applications where, even by speculation or reasoning about AI's functionality, that it would prove to be positive and useful."<br><br>**Burrell Decl., Ex. 139** (Zhao Dep.) at 400:19–401:8. |
| | Fact 80: When asked, [redacted] 30(b)(6) Representative for Concord, Mr. Duff Berschback, testified [redacted]<br><br>*See* Ex. 104 (Berschback Dep.) at 141:5-12 | Undisputed. |
| | Fact 81: Publishers' expert, Mr. Joshua Dennis testified [redacted] | Undisputed that Mr. Dennis testified as quoted. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | [redacted]<br><br>Ex. 115 (Dennis Dep.) at 285:1-287:1 | |
| | Fact 82: 30(b)(6) Representative for UMPG, Mr. David Kokakis, testified [redacted] When asked [redacted] Mr. Kokakis [redacted]<br><br>Ex. 121 (Kokakis Dep.) at 336:12-337:22 | Undisputed. |
| | Fact 83: During a March 5, 2026 Earnings Call, Mr. Michael Nash, Executive Vice President and Chief Digital Officer of UMG, stated "When you take into consideration the significant opportunities to commercialize AI innovation through new products and services that Lucian [Grainge, UMG CEO] outlined and the empirical data demonstrating insignificant and comprehensively mitigated risk, thoughtful analysis will conclude that the impact AI will have on our business will be overwhelmingly net positive." And that "we're seeing no indication that AI royalty dilution is a material issue for UMG from a revenue perspective." | Undisputed that the document cited by Anthropic contains the quoted language. |

PUBLIC REDACTED VERSION

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | Ex. 136 (UMG Earnings Call Tr.) at 23:37 | |
| | Fact 84: A case study published on Anthropic's website describes how the Tahoe Lead Removal Project used Claude for research to support its removal of six miles of toxic lead cables from Lake Tahoe.<br><br>Ex. 86 (Anthropic_0000570166) at -166 | Undisputed that the cited source purports to describe the use of Claude in connection with the Tahoe Lead Removal Project. |
| | Fact 85: An article published by The Information describes how Pfizer and Novo Nordisk have used Claude to help analyze clinical study data and prepare clinical study reports.<br><br>Ex. 87 (Anthropic_0000570252) at -253 | Undisputed that the cited source purports to describe the use of Claude by Pfizer and Novo Nordisk. |
| | Fact 86: A case study published by Anthropic and Pfizer describes how Pfizer used Claude to accelerate the research phase of the clinical study process for drug development.<br><br>Ex. 85 (Anthropic_0000569656) | Undisputed that the cited source purports to describe the use of Claude by Pfizer. |
| | Fact 87: A case study published by Anthropic describes how the European Parliament used Claude to build an AI assistant for searches of its archives.<br><br>Ex. 48 (Anthropic_0000013783) | Undisputed that the cited source purports to describe the use of Claude by the European Parliament. |

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | **<u>Publishers' Additional Fact #64:</u>** Universal Music Group ("UMG")'s business segments include significant recorded music operations in addition to music publishing.<br><br>**Pls.' Opp'n/Reply Ex. 180** (*Universal Music Group Annual* | Undisputed.<br><br>Undisputed that UMPG "is UMG's global music publishing business" which made up approximately 18% of UMG's overall revenue in 2025, with the remaining revenue coming from the recorded music and merchandising and other business segments. |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | *Report 2025*, UNIVERSAL MUSIC GROUP, https://assets.ctfassets.net/e66ejtqbaazg/7HObJrt5UDQfjjfKYN454B/201bf057190c5ed4ee185b04a34ec095/UMG_2025_Annual_Report.pdf), at 27–36. | Further undisputed that, when UMG reports its revenues, it includes UMPG's revenues on their behalf, and recognized that UMG's revenue increase in 2025 "was driven by improvements across the Recorded Music and Music Publishing divisions," and that "compared to 2024 … Music Publishing was up 6.6% or 9.3% in constant currency."<br><br>Further undisputed that UMG takes credit for this lawsuit filed against Anthropic: "UMG is protecting creators' rights in the AI environment through litigation. For example, UMPG, alongside two other music publishers, filed a copyright infringement lawsuit against Anthropic."<br><br>Pls.' Opp'n/Reply Ex. 180 (*Universal Music Group Annual Report 2025*, UNIVERSAL MUSIC GROUP) at 21, 32, 45, 52, 97. |
| | **<u>Publishers' Additional Fact #65:</u>** Publishers' existing agreements with digital streaming platforms ("DSPs") such as Spotify, Apple, and YouTube [redacted]<br><br>**Pls.' Ex. 103** at -89–98 (UMPG_0000000388 (Apple)), -118–21 (UMPG_ 0000023090 (Apple Amendment)), -122–40 (UMPG_ 0000023257 (Spotify)), -141–58 (UMPG_0000023282 (YouTube Amendment)); **Pls.' Ex. 122** at -4–27 (UMPG_0000000001 (Google/YouTube)), -28–58 (UMPG_0000023125 (Pandora)); **Pls.' Ex. 123** at -675–77 | Disputed.<br><br>UMPG entered into an agreement [redacted]<br><br>Ex. 44 (UMPG_0000025719) at §§ 3.3, 10.<br><br>Further disputed because UMG, on behalf of UMPG, which asserts 448 of the 499 works in suit, has announced agreements with digital streaming platforms that contain anti-AI dilution provisions under its "Streaming 2.0" strategy, including with Spotify, YouTube Music, Amazon Music, Deezer, Pandora, TikTok, and others. |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | (CCMG_0000000662 (YouTube)); **Pls.' Ex. 121** at -37–39 (ABKCO_0000000025 (Apple)); **Pls.' Opp'n/Reply Ex. 168** at -160–62 (CONCORD_0000000146 (YouTube)), -181–82 (CONCORD_0000000177 (Pandora)), -261–62 (CONCORD_0000000260 (Apple)), -259–99 (ABKCO_0000000259 (Apple Amendment)), -386–88 (ABKCO_0000000379 (YouTube Amendment)). | Pls.' Opp'n/Reply Ex. 180 (*Universal Music Group Annual Report 2025*, UNIVERSAL MUSIC GROUP) at 5 (announcing "'Streaming 2.0' agreements with our DSP partners" and describing that "[w]hen we first announced our Artist-Centric initiative three years ago, we accurately predicted the fact that the dramatic increase in the volume of irrelevant uploads, including the rise of AI 'slop' could overwhelm DSPs. This ability to see around corners enabled us to anticipate this trend and protect our artists and songwriters by preemptively placing provisions in our agreements with DSPs that prevent AI slop from being counted in the same royalty pools as our artists and songwriters.")<br><br>Ant. Reply Ex. 171 *Universal Music Group First Half 2026 Report*, Universal Music Group, Earnings Presentation) at 7 (non-exhaustive list of "Streaming 2.0 partners," includes Spotify, Amazon Music, YouTube Music, Deezer, Pandora).<br><br>Ant. Reply Ex. 172 (*Universal Music Group First Half 2026 Earnings Call Transcript*, (July 30, 2026)) at 4 (UMG Chairman & CEO, Lucian Grainge: "We now have streaming 2.0 agreements with almost all of our major streaming partners, including subscription services, Spotify, YouTube, Amazon and Visa. This quarter, we announced a new strengthened deal with TikTok. And today, I'm happy to share we have completed our agreement with Pandora, a top 10 partner. I'm pleased that all these partners share our commitment to protecting human artistry. Music platforms should reward creativity and guard against |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | illegally trained AI models, pumping AI slop or fraud designed to divert royalties from artists, songwriters, labels and music publishers.") |
| | **<u>Publishers' Additional Fact #66:</u>** Lyrics licensing comprises a significant portion of Publishers' revenue.<br><br>**Berschback Decl.** ¶ 41; **Coleman Decl.** ¶ 16; **Draughon Decl.** ¶ 32; **Kokakis Decl.** ¶ 147; *see also* **Smith Decl.** ¶¶ 13–15. | Disputed that the evidence cited quantifies lyrics licensing as a significant portion of Publisher's revenue.<br><br>Mr. Berschback's declaration states that "[redacted]<br><br>Berschback Decl. ¶ 41 (emphasis added).<br><br>Ms. Coleman's declaration states that [redacted]<br><br>Coleman Decl. ¶ 16 (emphasis added).<br><br>Mr. Draughon's declaration does not mention lyrics at the cited paragraph: [redacted]<br><br>Draughon Decl. ¶ 32 (emphasis added).<br><br>Mr. Kokakis's declaration states [redacted] |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | Kokakis Decl. ¶ 147 (emphasis added).<br><br>There is no evidence that licensing revenues, including from lyric display websites, have been negatively impacted by commercial LLMs let alone Claude.<br><br>Ex. 4 (Davis Report) p. 14, 48-51. |
| | **Publishers' Additional Fact #67:** The unauthorized use of Publishers' song lyrics as AI training data deprives Publishers of licensing revenue from potential licensing deals with Anthropic and reduces Publishers' leverage in negotiations with other AI companies for data licensing.<br><br>**Smith Decl.** ¶¶ 12, 18, 104–05; **Berschback Decl.** ¶ 55; **Coleman Decl.** ¶¶ 28–29; **Draughon Decl.** ¶¶ 41–43; **Kokakis Decl.** ¶¶ 168, 171–72. | Disputed.<br><br>There is no evidence of erosion of the licensing market, nor any evidence or example of Publishers being unable to license lyrics for display in the future.<br><br>And there is no incentive for general purpose LLM developers to license lyrics for training without the existence of a market for licensing all the other data needed to train a general purpose LLM.<br><br>Anthropic's expert, Dr. Abhishek Nagaraj, reported that "even though occasional deals for training data might materialize, no market for assembling all such data exists or is likely to emerge because the transaction costs of conducting these transactions at the scale necessary to successfully train a general-purpose LLM would be prohibitively high."<br><br>Further disputed that use of Publishers' lyrics as AI training data was "unauthorized," which is a legal conclusion. Anthropic's founders testified to their personal beliefs that such training was permissible.<br><br>Ex. 6 (Nagaraj Report) ¶¶ 33, 34; Ex. 15 (Nagaraj Rebuttal) ¶¶ 102-103, 164; Ex. 132 (Smith Dep. Vol. 1) |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | 274:16-24; Ex. 136 (UMG Earnings Call Tr.) at 23:37; Ex. 4 (Davis Report) at pp. 48-53; Ant. Reply Ex. 164 (Dario Amodei Dep.) at 25:2-26:16, 27:25-28:25, 30:10-31:22; Ant. Reply Ex. 173 (Mann 30(b)(6) Dep.) at 108:20-110:13; Ant. Reply Ex. 160 (Kaplan Dep.) at 224:21-225:11. |
| | **Publishers' Additional Fact #68:** The unauthorized use of Publishers' song lyrics as AI training data and output harms Publishers' ability to negotiate restrictions on AI-generated outputs with licensees that could potentially compete with Publishers' works.<br><br>**Smith Decl.** ¶¶ 20–23, 26, 103; **Kokakis Decl.** ¶¶ 159–60, 163. | Disputed.<br><br>Publishers have not been restricted in their ability to negotiate agreements with special-purpose LLMs and others that restrict AI-generated outputs and thus have not been harmed.<br><br>Further disputed that use of Publishers' lyrics as AI training data was "unauthorized," which is a legal conclusion. Anthropic's founders testified to their personal beliefs that such training was permissible.<br><br>Ant. Reply Ex. 164 (Dario Amodei Dep.) at 25:2-26:16, 27:25-28:25, 30:10-31:22; Ant. Reply Ex. 173 (Mann 30(b)(6) Dep.) at 108:20-110:13; Ant. Reply Ex. 160 (Kaplan Dep.) at 224:21-225:11.<br><br>UMPG has entered into such agreements with entities including: [redacted], including entering into partnerships with companies purporting to "protect artists from copyright infringement activity coming from AI music generators" that "capture and analyze musical semantics in order to identify the influence of original human-created music in fully or partly AI-generated music content."<br><br>Smith Decl. ¶ 24 & Pls.' Ex. 112 (UMPG_0000024457) ([redacted] Pls.' Ex. 113 (UMPG_0000025119) ([redacted] |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | [redacted] Pls.' Opp'n/Reply Ex. 180 (Universal Music Group Annual Report 2025) at 25; Ant. Reply Ex. 172 *Universal Music Group First Half 2026 Earnings Call Transcript*, (July 30, 2026)) at 6-7 (UMG Chairman and CEO Lucian Grainge: "Our responsible AI strategy is being brought to life through partnerships with start-ups such as Udio and KLAY, creative platforms like Splice and Stability and tech giants like NVIDIA. This quarter, Spotify and UMG announced an industry-first framework that will enable fans to use generative AI within Spotify's self-contained environment to create covers and remixes of songs from those artists who've opted in.… AI is a new instrument[.]").<br><br>Further disputed because there is no evidence that Claude has generated outputs that are "potentially reputationally damaging," as the cited evidence suggests.<br><br>The only such "mashups" Publishers can point to are those their own witnesses prompted Claude to create.<br><br>Publishers' 30(b)(6) Representative, Kent Draughon, admitted that he [redacted] an instance in which Claude generated a mash-up of a song without being prompted to do so. Anthropic has put in place guardrails that prevent Claude from displaying outputs that are offensive or that infringe copyright. Anthropic also gives rightsholders the ability to submit takedown requests if they believe their content was used without authorization, but no rightsowner (including Publishers) has submitted a valid request of this kind to Anthropic. |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | Publishers further ignore that a "potentially reputationally damaging" lyrical mash-up could be created absent the use of an LLM.<br><br>Further disputed because Dr. Smith did not identify and did not quantify any harm to songwriters' economic opportunities or music publishers' negotiating power because of AI. Dr. Smith could not identify a single songwriter that has lost any opportunity based on competition from AI. He testified that, [redacted]<br><br>Dr. Smith admitted that he did not quantify the actual dollar harm to songwriters because he didn't [redacted]<br><br>In response to the question, [redacted] Dr. Smith testified, [redacted]<br><br>When asked, [redacted] Dr. Smith testified that, [redacted] |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | [redacted] He further testified, [redacted]<br><br>Further disputed because Dr. Smith could not attribute any asserted harm to the market for lyrics or songwriting to Claude specifically. When asked, [redacted] Dr. Smith testified [redacted]<br><br>When questioned about whether he performed [redacted] Dr. Smith testified [redacted]<br><br>Ex. 15 (Nagaraj Rebuttal) ¶ 151; Ex. 132 (Smith Dep. Vol. 1) at 109:20-110:23, 114:19-116:3, 274:12-24, 276:18-277:7, 297:12-21; Ant. Reply Ex. 163 (Smith Dep. Vol. 1) at 150:12-151:1, 166:3-8; Ex. 129 (Rao 30(b)(6) Dep.) at 149:1-13; Ex. 117 (Draughon Dep.) at 253:14-19, 254:14-21, 255:4-8. |
| | **<u>Publishers' Additional Fact #69:</u>** The unauthorized use of Publishers' song lyrics as AI training data and output deprives Publishers of lyrics display licensing revenue by devaluing authorized lyrics display sources and disincentivizing those sources from licensing Publishers' lyrics.<br><br>**Smith Decl.** ¶¶ 13–18, 109; **Berschback Decl.** ¶¶ 55–56; **Coleman Decl.** ¶ 30; **Draughon** | Disputed<br><br>There is no evidence that AI-generated lyrics from Claude have negatively impacted licensing revenues, including from lyric display websites, by commercial LLMs let alone Claude.<br><br>User traffic to lyric display websites or Google search did not decrease after Claude was publicly launched and there is no evidence that |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | **Decl.** ¶ 42; **Kokakis Decl.** ¶¶ 173, 175; *Cf.* **Pls.' Opp'n/Reply Ex. 137** (Nagaraj Dep. Tr.) at 257:14-20 (expressing "no opinion" on whether widespread use of Claude to look up lyrics would result in a materially adverse impact on the lyrics display licensing market). | "increased use of Claude was associated with decreased use of lyric websites."<br><br>Further disputed that use of Publishers' lyrics as AI training data was "unauthorized," which is a legal conclusion. Anthropic's founders testified to their personal beliefs that such training was permissible.<br><br>Ex. 4 (Davis Report) p. 14, 48-51; Ex. 6 (Nagaraj Report) ¶¶ 82-90, 101-143, Appendix C; Ex. 23 (Nagaraj Reply) ¶¶ 99-140; Ant. Reply Ex. 164 (Dario Amodei Dep.) at 25:2-26:16, 27:25-28:25, 30:10-31:22; Ant. Reply Ex. 173 (Mann 30(b)(6) Dep.) at 108:20-110:13; Ant. Reply Ex. 160 (Kaplan Dep.) at 224:21-225:11. |
| | <u>**Publishers' Additional Fact #70:**</u> AI-generated lyrics are increasingly market substitutes for Publishers' copyrighted lyrics.<br><br>**Smith Decl.** ¶¶ 29, 33, 36–40, 51–54, 56; **Berschback Decl.** ¶ 58; **Coleman Decl.** ¶¶ 33–35; **Draughon Decl.** ¶¶ 43, 45–49; **Kokakis Decl.** ¶¶ 176–77. | Disputed.<br><br>The evidence cited describes AI-generated sound recordings and identifies a single instance of one "YouTuber," Mr. Rick Beato, using Claude to generate new, non-infringing lyrics that were later added to a different AI music generation model to create a sound recording. YouTube does not have a fixed royalty pool. Plaintiffs have not identified any other example of a musician who has used Claude to help write a song for which they have been paid.<br><br>Dr. Smith testified [redacted] in responses to the question [redacted] |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | [redacted]<br><br>Dr. Smith further testified that [redacted] " in response to the question [redacted]<br><br>Smith Decl. ¶ 39; Ex. 132 (Smith Dep. Vol. 1) 161:3-10, 163:7-164:2; Ant. Reply Ex. 163 (Smith Dep. Vol. 1) 146:6-151:1.<br><br>In responses to the question [redacted] Dr. Smith testified [redacted]<br><br>Ant. Reply Ex. 174 (Smith Dep. Vol. 2) at 423:5-24.<br><br>The vast majority of AI-created songs on streaming platforms receive very few actual listens from users. They have not impacted revenues of music publishers.<br><br>Ex. 135 (Smith Dep. Vol. 2, Ex. 7, Wu et al., *Characterizing Detectability and Impact of AI-generated Music on Streaming Platforms*) at 1; Ex. 136 (UMG Earnings Call Tr.) at 21:56, 22:44; Smith Decl. ¶ 38; Ex. 15 (Nagaraj Rebuttal) ¶ 33. |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | There is no evidence that AI-generated lyrics from Claude have negatively impacted licensing revenues, including from lyric display websites, by commercial LLMs let alone Claude.<br><br>Ex. 4 (Davis Report) p. 14, 48-51. |
| | **<u>Publishers' Additional Fact #71:</u>** The unauthorized use of Publishers' lyrics as AI training data and output reduces the overall market value of Publishers' lyrics.<br><br>**Smith Decl.** ¶¶ 107–10, 113; **Berschback Decl.** ¶ 56; **Coleman Decl.** ¶ 29; **Draughon Decl.** ¶¶ 42–43; **Kokakis Decl.** ¶ 175. | Disputed.<br><br>Publishers have not identified any example or evidence of lost licensing fees or loss in value of Publishers' works as a result of Anthropic's alleged use.<br><br>Further disputed that use of Publishers' lyrics as AI training data was "unauthorized," which is a legal conclusion. Anthropic's founders testified to their personal beliefs that such training was permissible.<br><br>Ex. 15 (Nagaraj Rebuttal) ¶ 164; Ex. 132 (Smith Dep. Vol. 1) at 274:16-24; Ex. 136 (UMG Earnings Call Tr.) at 23:37; Ex. 4 (Davis Report) at pp. 48-53; Ant. Reply Ex. 164 (Dario Amodei Dep.) at 25:2-26:16, 27:25-28:25, 30:10-31:22; Ant. Reply Ex. 173 (Mann 30(b)(6) Dep.) at 108:20-110:13; Ant. Reply Ex. 160 (Kaplan Dep.) at 224:21-225:11. |
| | **<u>Publishers' Additional Fact #72:</u>** It is difficult for streaming services to identify whether lyrics to uploaded songs are AI-generated or not, or which AI model generated such lyrics.<br><br>**Smith Decl.** ¶ 54; **Burrell Decl., Ex. 25** (Smith Reply) ¶ 42; **Burrell Decl., Ex. 127** (Nagaraj Dep. Tr.) at 214:23–215:16. | Disputed.<br><br>Dr. Smith's assertion is unsupported. He says only that "[redacted] |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | [redacted]".<br><br>Smith Decl. ¶ 54.<br><br>Dr. Nagaraj's testimony supports only that "It's very hard to know if a particular song was recorded in analog studio or using digital – digital technology. And AI is just another technology in the mix of – that is used in combination potentially with—with other technologies, so it's not possible to—in a reliable way to know what technologies are used in the production of content in general."<br><br>Ex. 127 (Nagaraj Dep.) at 214:23–215:16.<br><br>AI-generated songs are detectable and rarely streamed. "[T]he large majority (94%) of AI tracks is 'slop' – they receive few, if any, listener plays and are rarely recommended." The streaming platform "Deezer … explicitly labels AI music, and does so using a proprietary detector" that is "the most accurate AI detector in our tests." "The Fourier-based detector (used by Deezer's detection system) is nearly perfect at distinguishing AI songs generated by Suno/Udio from human-created songs," unless that track has been later-modified by a human.<br><br>Ex. 135 (Smith Dep. Vol. 2, Ex. 7, Wu et al., *Characterizing Detectability and Impact of AI-generated Music on Streaming Platforms*) at 1, 4, 10-11. |
| | **<u>Publishers' Additional Fact #73:</u>** "General-purpose LLMs," like Claude, and "single-purpose | Disputed. |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | LLMs," like the models developed by Udio, Klay, and others, are capable of generating "new" AI song lyrics, compete to provide that use case to the market, and train on music lyrics to enable that use case for their users.<br><br>**Smith Decl.** ¶¶ 76–81, 104-05. | Anthropic does not train on music lyrics to compete to provide that use case to the market.<br><br>Use of Claude related specific to lyrics, generally, make up less than 1.49% of Claude usage. Anthropic's Economic Index includes data about a broader category of "Poets, Lyricists *and* Creative Writers" who have used Claude to "write narrative, dramatic, lyrics, or other types of poetry" and "write words to fit musical compositions, including lyrics for operas, musical plays, and choral works."<br><br>It is undisputed that Anthropic's Economic Index indicates that the amount of Claude usage related to the broader category of "Poets, Lyricists, *and* Creative Writers," has been below 1.49%. That category expands far beyond just songwriters, such that the percentage of uses related specifically to lyrics are smaller than 1.49% of uses.<br><br>Ant. Reply Ex. 162 (Sept. 2025 Anthropic Economic Index, Anthropic_0000441108 at -112, -124); Ex. 8 (Smith Report) at ¶ 80, n.77 (citing Anthropic's Economic Index); Ant. Reply Ex. 163 (Smith Dep. Vol. 1) at 143:1-13.<br><br>Anthropic co-founder and CEO, Dr. Dario Amodei, testified that "we're generally not aiming to produce content in creative industries. You know, Anthropic, it's very focused on code. It's very focused on work and productivity-based activities. So Anthropic has deliberately made – made choices not to – not to produce output in many creative modalities." |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | Ex. 112 (Dario Amodei Dep.) at 102:13-24 |
| | **Publishers' Additional Fact #74:** Licensing markets cannot function if potential licensees are allowed to use copyrighted works for free after unilaterally declaring that the cost of licensing is too high.<br><br>**Smith Decl.** ¶¶ 59–64, 89–90. | Disputed.<br><br>There is no evidence of erosion of the licensing market, nor any evidence or example of Publishers being unable to license lyrics for display in the future.<br><br>And there is no incentive for general purpose LLM developers to license lyrics for training without the existence of a market for licensing all the other data needed to train a general purpose LLM.<br><br>Anthropic's expert, Dr. Abhishek Nagaraj, reported that "even though occasional deals for training data might materialize, no market for assembling all such data exists or is likely to emerge because the transaction costs of conducting these transactions at the scale necessary to successfully train a general-purpose LLM would be prohibitively high."<br><br>Ex. 6 (Nagaraj Report) ¶¶ 33, 34; Ex. 15 (Nagaraj Rebuttal) ¶¶ 102-03, 164; Ex. 132 (Smith Dep. Vol. 1) at 274:16-24; Ex. 136 (UMG Earnings Call Tr.) at 23:37; Ex. 4 (Davis Report) at pp. 48-53. |
| | **Publishers' Additional Fact #75:** The four largest LLM developers (Anthropic, Google, Meta, and OpenAI) have collectively entered over 30 licenses for AI training data.<br><br>**Burrell Decl., Ex. 17** (Smith Rebuttal) at ¶ 28, n.9. | Undisputed that the four largest LLM developers have entered into licenses.<br><br>Further undisputed that none of the licenses entered into by these companies referenced by Dr. Smith relate to music let alone lyrics for training general-purpose LLMs.<br><br>Further undisputed that Dr. Smith testified [redacted] in response to the questions [redacted] |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | [redacted]<br><br>Otherwise disputed. There is no cognizable market for licensing any type of copyrighted work for use in AI training in general-purpose LLM development. The existing agreements to use copyrighted works for AI training are for content not freely available on the internet.<br><br>Ant. Reply Ex. 170 (Copyright Alliance, *AI Licensing by Copyright Owners*); Ex. 23 (Nagaraj Reply) ¶¶ 74-75 n.184; Ex. 132 (Smith Dep. Vol. 1) at 75:22-76:4; Ex. 6 (Nagaraj Report) ¶ 33. |
| | <u>**Publishers' Additional Fact #76:**</u> Alongside any purported benefits of AI, Anthropic's founder and CEO Dario Amodei has also warned that AI is the [redacted]<br><br>**Pls.' Opp'n/Reply Ex. 159** (Dep. Ex. 251, Anthropic_0000478585) at 585–86; **Pls.' Opp'n/Reply Ex. 126** (Dario Amodei Dep. Tr.) at 136:6-11, 144:13–145:13 (discussing Dep. Ex. 251). | Undisputed that the quoted language appears in the cited document.<br><br>Otherwise disputed as to the truth of the matter asserted and that such a risk exists as it relates to Publishers and songwriters. Publishers' expert, Dr. Ben Zhao, testified that [redacted]<br><br>30(b)(6) Representative for UMPG, Mr. David Kokais testified [redacted]<br><br>Ex. 139 (Zhao Dep.) at 399:22-400:2, 401:5-8; Ex. 121 (Kokakis Dep.) at 336:12-337:22. |

PUBLIC REDACTED VERSION

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| **Anthropic Has Not Engaged In Any Volitional Conduct** | | |
| **Issue 1: Anthropic has not engaged in any volitional conduct** . | Fact 88: Publishers' expert, Dr. Ben Zhao, reported that [redacted]<br><br>Ex. 10 (Zhao Report) at ¶ 54 | Undisputed. |
| | Fact 89: Publishers' expert, Dr. Shawn Shan, testified that [redacted]<br><br>Ex. 7 (Shan Dep.) at 97:11-99:6 | Undisputed, except that Ex. 131 (Shan Dep.), not Ex. 7, contains the quoted language. |
| | Fact 90: Publishers' expert, Dr. Shawn Shan, testified [redacted]<br><br>Ex. 131 (Shan Dep.) at 99:25-100:13 | Undisputed. |
| | Fact 91: Publishers' expert, Dr. Ben Zhao, testified [redacted] He continued that [redacted] | Undisputed. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | Ex. 139 (Zhao Dep.) at 309:5-15 | |
| | Fact 92: Publishers' expert, Dr. Ben Zhao, answered [redacted]<br><br>Ex. 139 (Zhao Dep.) at 348: 21-25 | Undisputed that Dr. Zhao testified as quoted. |
| | Fact 93: A user prompted Claude for [redacted]<br><br>Ex. 58 (Anthropic_0000299696) | Undisputed. |
| | Fact 94: Another user prompted Claude for [redacted]<br><br>Ex. 53 (Anthropic_0000195243) | Undisputed. |
| | Fact 95: Publishers' investigator [redacted]"<br><br>Ex. 43 (Plaintiffs_0000011872) | Undisputed that the cited document contains the quoted language. |
| | Fact 96: Publishers' expert, Dr. Ben Zhao, [redacted]<br><br>Ex. 52 (Anthropic_0000064503) at -506 | Undisputed. |
| | Fact 97: Publishers' expert, Dr. Ben Zhao, answered "That is correct in the sense that I [redacted] | Undisputed that Dr. Zhao testified as quoted.<br><br>Anthropic relies on this fact for the truth of the matter asserted by the quoted testimony. Publishers dispute the truth of the matter asserted that "the model does not go to its training |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | [redacted]<br><br>Ex. 139 (Zhao Dep.) at 179:2-10 | corpus, retrieve that text, and then reproduce or deliver that text [] to the user." Dr. Zhao explained that while the "actual original copy of the training corpus" may be "decoupled" from the Claude AI model once the model is trained, the model still maintains access to a "slightly different format, a representation format" of its training corpus.<br><br>**Burrell Decl., Ex. 139** (Zhao Dep.) at 179:12–180:19. |
| | Fact 98: Publishers' expert, Dr. Ben Zhao, reported that [redacted]<br><br>Ex. 10 (Zhao Report) at ¶ 55. | Undisputed. |
| | Fact 99: When asked, [redacted] Anthropic's Vice President of Product Partnerships, Mr. Tom Turvey, testified [redacted] Mr. Turvey testified [redacted]<br><br>Ex. 138 (Turvey 30(b)(6) Dep.) at 107:15-108:6 | Undisputed that Mr. Turvey testified as quoted. |
| | Fact 100: Publishers' expert, Dr. Ben Zhao, reported that [redacted] He also reported that [redacted] | Undisputed. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | [redacted]<br><br>Ex. 10 (Zhao Report) at ¶¶ 57, 62 | |
| | Fact 101: Publishers' expert, Dr. Ben Zhao, reported that [redacted]<br><br>Ex. 10 (Zhao Report) at ¶ 61 | Undisputed. |
| | Fact 102: Anthropic publicly reported that its Safeguards team "operate[s] across multiple layers: developing policies, influencing model training, and identifying novel misuses and attacks" taking an "approach [that] spans the entire lifecycle of our models, ensuring Claude is trained and built with protections that are effective in the real world." That muti-layer defense includes working "closely with [Anthropic's] fine-turning teams through a collaborative process to prevent harmful behavior," evaluating "a new model" before release, and using "a combination of automated systems and human review to detect harm and enforce our Usage Policy once models are deployed."<br><br>Ex. 65 (Anthropic_0000440813) | Undisputed that the cited source contains the quoted language.<br><br>Anthropic relies on this fact for the truth of the matter asserted by the quoted language. Publishers dispute the truth of the matter asserted that Anthropic "ensur[ed] Claude [was] trained and built with protections that are effective in the real world" and that Anthropic works "to prevent harmful behavior" before a model's release. Anthropic launched Claude to the public in March 2023 with the knowledge that any supposed guardrails in place at the time would not prevent all reproduction of copyrighted content in Claude output.<br><br>**Pls.' Ex. 40** (Dep. Ex. 238, Anthropic_0000217166) at -168; **Pls.' Ex. 6** (Kaplan Dep. Tr.) at 255:4-25 (discussing Dep. Ex. 238); **Pls.' Ex. 42** (Dep. Ex. 280, |

PUBLIC REDACTED VERSION

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | | Anthropic_0000599647); **Pls.' Ex. 14** (Brown Dep. Tr.) at 306:1-22 (discussing Dep. Ex. 280); **Pls' Ex. 45** (Dep. Ex. 239, Anthropic_0000226164) at -165; **Pls.' Opp'n/Reply Ex. 128** (Kaplan Dep. Tr.) at 271:2–272:25 (discussing Dep. Ex. 239); *see also* **Pls.' Ex. 46** (Dep. Ex. 173, Anthropic_0000443204); **Pls.' Opp'n/Reply Ex. 127** (Daniela Amodei Dep. Tr.) at 157:7–158:25, 164:3-12 (discussing Dep. Ex. 173); **Pls.' Ex. 20** (Rao 30(b)(6) Dep. Tr.) at 47:12-15 [redacted] |
| | Fact 103: Anthropic [redacted]<br><br>Ex. 30 (Def.'s Am. Supp. Resp. & Obj. to 1st Set of Interrogs. (Nos. 9, 11, 12) (Nov. 12, 2025)) at 8 | Undisputed. |
| | Fact 104: Anthropic's expert, Dr. Jeffery Bilmes, reported that [redacted] including [redacted] | Undisputed that Dr. Bilmes' report contains the quoted language.<br><br>Otherwise, disputed. The cited evidence (Def.'s Ex. 2) is subject to a pending motion to exclude. *See* ECF No. 642. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | Ex. 2 (Bilmes Report) at ¶¶ 117-121 | |
| | Fact 105: Anthropic witness, Ms. Dawn Drain, testified that [redacted] Ex. 116 (Drain Dep.) at 229:8-18 | Undisputed that Ms. Drain testified as quoted. |
| | Fact 106: Anthropic co-founder, Mr. Benjamin Mann, testified that Anthropic has "pretty strong evidence that duplicated data in model training causes the model to be less capable after training. [redacted]" Ex. 124 (Mann 30(b)(1) Dep. Vol. 1) at 80:21-81:10, 84:21-85:3 | Undisputed that Mr. Mann testified as quoted. |
| | Fact 107: Publishers' expert, Dr. Ben Zhao, reported that [redacted] Ex. 10 (Zhao Report) at ¶ 119 | Undisputed. |
| | Fact 108: Publishers' expert, Dr. Ben Zhao, reported that [redacted] | Undisputed. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
| --- | --- | --- |
| | [redacted] Ex. 10 (Zhao Report) at ¶ 117 | |
| | Fact 109: Anthropic's Constitution for Claude directs the model to choose responses that are "less existentially risky for the human race" and that "discourage[] and oppose[] torture, slavery, cruelty, and inhuman or degrading treatment." And to avoid [redacted] Ex. 45 (Anthropic_0000000485); Ex. 30 (Def.'s Am. Supp. Resp. & Obj. to 1st Set of Interrogs. (Nos. 9, 11, 12) (Nov. 12, 2025)) at No. 12 | Undisputed that, beginning on or around [redacted], Anthropic's Constitution for Claude contained the quoted language.<br><br>**Pls.' Ex. 25** (Def.'s Am. Suppl. Resp. to Pls.' Interrog. No. 12, Nov. 12, 2025) at 12; *see also* **Pls.' Opp'n/Reply Ex. 126** (Dario Amodei Dep. Tr.) at 68:7–69:24. |
| | Fact 110: Anthropic [redacted] Ex. 11 (Bilmes Rebuttal) at ¶ 108 | Undisputed that Dr. Bilmes' report states [redacted]<br><br>Otherwise disputed because the cited evidence (Def.'s Ex. 11) is subject to a |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | | pending motion to exclude. *See* ECF No. 642. |
| | Fact 111: Publishers' expert, Dr. Shawn Shan, reported [redacted]<br><br>Ex. 7 (Shan Report) at ¶ 30 | Disputed.<br><br>The asserted fact does not accurately reflect Dr. Shan's report. Dr. Shan's report states in full: [redacted] |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | | **Burrell Decl.**, Ex. 7 (Shan Report) at ¶ 30 (emphases added). |
| | Fact 112: Anthropic has strengthened existing safeguards and added further technical auxiliary guardrails.<br><br>Ex. 30 (Def.'s Am. Supp. Resp. & Obj. to 1st Set of Interrogs. (Nos. 9, 11, 12) (Nov. 12, 2025)) at No. 12 | Undisputed that [redacted]<br><br>Further undisputed that [redacted]<br><br>Further undisputed that [redacted]<br><br>**Pls.' Ex. 25** (Def.'s Am. Suppl. Resp. to Pls.' Interrog. No. 12, Nov. 12, 2025) at 12–14; **Pls.' Ex. 48** (Def.'s Am. Supp. Resp. to Pls.' Interrog. No. 12, Dec. 11, 2025) at 6. |
| | Fact 113: Publishers' expert, Dr. Ben Zhao, reported that Prompt Shield [redacted] | Undisputed. |

PUBLIC REDACTED VERSION

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | Ex. 10 (Zhao Report) at ¶ 120 | |
| | Fact 114: Publishers' expert, Dr. Shawn Shan, reports Prompt Shield is "[redacted]<br><br>Ex. 7 (Shan Report) at ¶¶ 30, 72 | Undisputed. |
| | Fact 115: [redacted]<br><br>Ex. 30 (Def.'s Am. Supp. Resp. & Obj. to 1st Set of Interrogs. (Nos. 9, 11, 12) (Nov. 12, 2025)) at No. 12 | Disputed.<br><br>As [redacted] does not always [redacted]<br><br>**Pls.' Opp'n/Reply Ex. 149** (Dep. Ex. 88, Anthropic_0000227016) at -016 ("[redacted]; **Pls.' Ex. 20** (Rao 30(b)(6) Dep. Tr.) at 47:12-15 ("[redacted] *see also* **Pls.' Ex. 20** (Rao 30(b)(6) Dep. Tr.) at 48:14-25; **Pls.' Opp'n/Reply Ex. 125** (Mann 30(b)(1) Dep. Tr.) at 200:7–201:4; **Burrell Decl., Ex. 10** (Zhao Report) at ¶¶ 28–30, 120–25; **Burrell Decl., Ex. 7** (Shan Report) at ¶¶ 71–75; **Burrell Decl., Ex. 16** (Shan Rebuttal) at ¶¶ 38–40; **Pls.' Opp'n/Reply Ex. 147** (Zhao Reply) at ¶ 107; **Zhao Decl.** ¶¶ 57, 74. |
| | Fact 116: Publishers' expert, Dr. Ben Zhao, reported "[redacted] | Undisputed. |

PUBLIC REDACTED VERSION

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | [redacted]."<br><br>Ex. 10 (Zhao Report) at ¶ 126 | |
| | Fact 117: Publishers' expert, Dr. Shawn Shan, reported that [redacted]<br><br>Pltfs. Exp. Shan Rpt. ¶ 30 | Undisputed. |
| | Fact 118: Publishers' expert, Dr. Shawn Shan, reported that he [redacted] | Undisputed. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | [redacted] Shan reported that "The system functions as an output filter. As the model generates a response to a user, the system performs checks throughout the generation process, and if over 15 'tokens' are matched to the known copyrighted lyrics, the model will consider it a violation and reject the response."<br><br>Ex. 7 (Shan Report)at ¶¶ 61-62 | |
| | Fact 119: Anthropic's [redacted] helps [redacted] prevent the generation of outputs including substantial portions of copyrighted content. [redacted] called the hash corpus. When the first [redacted] system was implemented on or around [redacted] Then, on or around [redacted]<br><br>Ex. 30 (Def.'s Am. Supp. Resp. & Obj. to 1st Set of Interrogs. (Nos. 9, 11, 12) (Nov. 12, 2025)) at No. 12 | Undisputed that [redacted] called the hash corpus. Also undisputed that when the first [redacted] system was implemented on or around [redacted] and that on or around [redacted]<br><br>Otherwise, disputed. Anthropic's [redacted]) does not always help prevent the generation of outputs including substantial portions of copyrighted content, in part because it is a "fundamentally fragile" system that [redacted] |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | | [redacted]<br><br>**Burrell Decl., Ex. 10** (Zhao Report) at ¶¶ 127–30, 136; **Burrell Decl., Ex. 7** (Shan Report) at ¶¶ 41, 68–70; **Burrell Decl. Ex. 16** (Shan Rebuttal) at ¶¶ 25, 41–42; **Burrell Decl. Ex. 24** (Shan Reply) at ¶ 44; **Pls.' Opp'n/Reply Ex. 147** (Zhao Reply) at ¶¶ 108–09; **Zhao Decl.** ¶¶ 56, 58, 81; **Pls.' Opp'n/Reply Ex. 133** (Rao 30(b)(1) Dep. Tr.) at 97:2–99:3. |
| | Fact 120: Anthropic usage policy instructs "Do Not Violate Applicable Laws or Engage in Illegal Activity," which "includes using our products or services to: [i]nfringe, misappropriate, or violate the intellectual property rights of a third party."<br><br>Ex. 62 (Anthropic_0000437165); Ex. 64 (Anthropic_0000440731) | Undisputed that, as of September 15, 2025, Anthropic's Usage Policy includes the quoted language.<br><br>**Burrell Decl., Ex. 62** (Anthropic_0000437165); **Burrell Decl., Ex. 64** (Anthropic_0000440731). |
| | Fact 121: Once Anthropic received notice, it took immediate action that included strengthening existing guardrails and implementing new ones.<br><br>Daniela Amodei testified that when Anthropic "received the Complaint from Music Publishers, we [redacted]<br><br>Ex. 111 (Daniela Amodei Dep.) at 356:25-357:8 | Undisputed that Ms. Amodei testified as quoted.<br><br>Otherwise, disputed. Prior to launching Claude to the public and prior to this litigation, Anthropic already had "notice" that Claude could and would regurgitate copyrighted works from its training corpus, and that any initial guardrails were insufficient, but did not take "immediate action."<br><br>**Pls.' Ex. 42** (Dep. Ex. 280, Anthropic_0000599647) (December 1, 2022); **Pls.' Opp'n/Reply Ex. 129** (Brown Dep. Tr.) at 303:7–306:22; **Pls.' Ex. 40** (Dep. Ex. 238, |

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | | Anthropic_0000217166) at -168; **Pls.' Ex. 44** (Anthropic_0000240524) at -524; **Pls.' Ex. 62** (Anthropic_0000527903) at -915; *see also* **Pls.' Opp'n/Reply Ex. 152** (Dep. Ex. 137, Anthropic_0000520123).<br><br>After launching Claude to the public in March 2023 and prior to this litigation, Anthropic had "notice" that its users were prompting Claude for copyrighted work, and that its models were generating copyrighted output, including song lyrics, but did not take "immediate action."<br><br>**Pls.' Ex. 45** (Dep. Ex. 239, Anthropic_0000226164) at -165; **Pls.' Ex. 80** (Anthropic_0000582187) (Anthropic employee conversation with Claude bearing creation date metadata of 9/24/2023).<br><br>After Publishers filed this lawsuit on October 18, 2023, Anthropic did not take "immediate action." It did not update its [redacted]<br><br>**Pls.' Ex. 25** (Def.'s Am. Suppl. Resp. to Pls.' Interrog. No. 12, Nov. 12, 2025), at 13–14.<br><br>Anthropic had "notice" as late as January 19, 2024, that [redacted] was [redacted] and as late as February 9, 2024 that Claude still "[redacted] because Anthropic [redacted] |

PUBLIC REDACTED VERSION

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | | **Pls.' Ex. 49** (Dep. Ex. 108, Anthropic_0000242173) at -175; **Pls.' Opp'n/Reply Ex. 133** (Rao 30(b)(1) Dep. Tr.) at 85:3–86:3 (discussing Dep. Ex. 108); **Pls.' Ex. 20** (Rao 30(b)(6) Dep. Tr.) at 72:8-11; **Pls.' Opp'n/Reply Ex. 158** (Dep. Ex. 240, Anthropic_0000240665) at -665–66; **Pls.' Opp'n/Reply Ex. 128** (Kaplan Dep. Tr.) at 287:7–289:16 (discussing Dep. Ex. 240).<br><br>While Ms. Amodei testified as quoted, she clarified that she did not "know the specific details" of how Anthropic purportedly [redacted] after receiving Publishers' Complaint.<br><br>**Burrell Decl., Ex. 111** (Daniela Amodei Dep. Tr.) at 358:16–360:16. |
| | Fact 122: When asked whether [redacted] ABKCO 30(b)(6) Representative, Ms. Alisa Coleman, testified "[redacted]<br><br>Ex. 110 (Coleman Dep.) at 184:1-5 | Undisputed. |

PUBLIC REDACTED VERSION

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | Fact 123: Concord 30(b)(6) Representative, Mr. Duff Berschback, testified that [redacted] Mr. Berschback testified that [redacted] Mr. Berschback testified that [redacted] And Mr. Berschback testified that Concord [redacted] because [redacted]<br><br>Ex. 104 (Berschback Dep.) at 252:5-254:23 | Undisputed. |
| | Fact 124: CCMG 30(b)(6) Representative, Mr. Kent Draughon, testified that, to his knowledge, neither Capitol CMG nor [redacted] Mr. Draughon testified that he [redacted] Mr. Draughon testified that [redacted] | Undisputed. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | Ex. 117 (Draughon Dep.) at 154:4-19 | |
| | Fact 125: UMPG 30(b)(6) Representative, Mr. David Kokakis, testified that, to his knowledge, [redacted] Mr. Kokakis testified that, to his knowledge, [redacted]<br><br>Ex. 121 (Kokakis Dep.) at 293:1-9 | Undisputed. |
| | Fact 126: Anthropic's expert, Dr. Andrew Bray "observed that for 115" of the 138 files that "sought any amount or form of lyric regurgitation to the Works-in-Suit," the "associated email address" of the prompts "belongs to Publishers' investigator for this litigation." He concluded that "83.33% of the prompts that sought any amount or form of lyric regurgitation to the Works-in-Suit belong to Publishers' known investigator."<br><br>Ex. 3 (Bray Report) at ¶¶ 40, 120, 148 | Undisputed that Dr. Bray's report contains the quoted language.<br><br>Anthropic relies on this fact for the truth of the matter asserted by the quoted report. Publishers dispute the truth of the matter asserted by Dr. Bray's report, because his analysis of requests for lyrics in the 5-million-record Claude sample relied on "a classifier with false negatives," whose error rate Dr. Bray could have calculated but did not do so.<br><br>**Pls.' Opp'n/Reply Ex. 139** (Bray Dep. Tr.) at 50:13–19, 62:8–63:3.<br><br>Further disputed because the cited evidence (Def.'s Ex. 3) is subject to a pending motion to exclude. *See* ECF No. 644. |
| | Fact 127: Publishers' investigator, Mr. Michael Candore, testified that he [redacted] He testified that for the "[redacted] | Undisputed that Mr. Candore testified as quoted that he submitted a prompt to DuckDuckGo beginning with "create a greeting card inspired by," and that for the "testing [he] did in November and December of 2024, [for] the majority of the initiating prompt, the first prompt in the |

PUBLIC REDACTED VERSION

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
| --- | --- | --- |
| | [redacted] Mr. Candore testified that "[redacted]<br><br>Ex. 107 (Candore Dep.) at 242:3-249:13 | conversation were requests for greeting cards."<br><br>Otherwise, disputed. The quoted testimony does not accurately reflect Mr. Candore's testimony. In response to the question, "[C]an the APIs, the Claude APIs, generate greeting cards?", Mr. Candore responded in full that "the API wouldn't generated a greeting card. It would likely—if—if it could, it would likely generate the HTML code, like what you see here in the body of this—this large block here on the page, and then you'd be able to take that and render it into whatever it is that the model had generated. But without having tested that, I don't know."<br><br>**Burrell Decl., Ex. 107** (Candore Dep.) at 248:6-16. |
| | Fact 128: Publishers' expert, Dr. Shawn Shan, reported [redacted] Dr. Shan also reported that [redacted] Dr. Shan reported that he [redacted] Dr. Shan noted that, [redacted] | Undisputed that Dr. Shan's report contains the quoted language regarding his inconsistency testing of Claude's guardrails for the purpose of his rebuttal expert report in this litigation.<br><br>**Burrell Decl., Ex. 16** (Shan Rebuttal) at ¶ 36, App'x A. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | [redacted] Dr. Shan reported that [redacted]<br><br>Ex. 16 (Shan Rebuttal) at ¶¶ 36, 42-43 | |
| | Fact 129: Publishers' expert testified "[redacted] When asked whether he [redacted] Zhao responded [redacted] Zhao later testified "[redacted]."<br><br>Ex. 139 (Zhao Dep.) at 151:11-157:13 | Disputed.<br><br>The asserted fact does not accurately reflect Dr. Zhao's testimony. The quoted testimony refers to "reports that are out there" relied upon by Dr. Zhao in forming his opinions for this case, and Dr. Zhao explained that "when people were first starting to look at both hallucinations and memorization, you know, many of the initial tests were more non-adversarial, and I believe that at least some of them produced results. And that's really what prompted much of the research that followed up later on when people realized that memorization and regurgitation were issues, and then they did more complete tests that covered even wider range of prompts. But, you know, as far as, like—you know, in addition to these types of reports, I mean, my own experiments back in 2023, many of them were—of my requests were non-adversarial, and they still produced regurgitations that were verbatim," but that "[he does] recall at least some paper abstracts talking about, at a high level, how easy it was to solicit |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | | regurgitations from models including Anthropic, including Anthropic models that are more recent," and that his reports "identified citations to reports that have talked about regurgitations from Anthropic[.]"<br><br>**Burrell Decl., Ex. 139** (Zhao Dep.) at 151:11–157:13. |
| | Fact 130: Anthropic former Head of Trust and Safety, Dr. Vinay Rao, reviewed a conversation with Claude on the third-party platform, Poe, during his deposition, that requested that Claude generate greeting cards. Dr. Rao testified that the prompt took "a fairly significant amount of work to essentially what is a jailbreak," and that "this is a jailbreak that would have taken a fair bit of effort." Dr. Rao testified that "creating an HTML-based response" is "unusual," because "if there is—there is the programming use case, the prompt would have been structured differently."<br><br>Ex. 129 (Rao 30(b)(6) Dep.) at 153:4-154:23 | Undisputed that Dr. Rao testified as quoted. |
| | Fact 131: Publishers' expert, Dr. Shawn Shan, reported that "[i]n [his] experiments with [redacted] Dr. Shan reported that he [redacted] Dr. Shan noted that, "[redacted] | Undisputed that Dr. Shan's report contains the quoted language regarding his inconsistency testing of Claude's guardrails for the purpose of his rebuttal expert report in this litigation.<br><br>**Burrell Decl., Ex. 16** (Shan Rebuttal) at ¶ 36, App'x A. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | [redacted]<br><br>Ex. 16 (Shan Rebuttal) at ¶ 42 | |
| | Fact 132: ABKCO 30(b)(6) representative, Ms. Alisa Coleman, testified that "[redacted]<br><br>Ex. 110 (Coleman Dep.) at 217:22-218:2 | Undisputed. |
| | Fact 133: UMPG 30(b)(6) Representative, David Kokakis, testified that he had "attempted to request lyrics from Claude and not received those lyrics."<br><br>Ex. 121 (Kokakis Dep.) at 295:11-17 | Undisputed. |
| | Fact 134: Anthropic's expert, Dr. Jeffrey Bilmes, reported that "[w]ith the exception of Claude.ai, which can be accessed directly through Anthropic interfaces, the APIs examined here are third-party services that integrate Anthropic's models but may configure system prompts, inference parameters, or guardrails execution [redacted]<br>He further reported that based on the "[redacted] | Undisputed that Dr. Bilmes' report contains the quoted language.<br><br>Anthropic relies on this fact for the truth of the matter asserted by the quoted report. Publishers dispute the truth of the matter asserted that [redacted] For example, Publishers' expert, Dr. Ben Zhao, prompted Claude on November 7, 2023, for lyrics to Works in Suit "Roar" and "Fresh Prince of Bel-Air" without using adversarial or "jailbreaking" techniques, and Claude generated output reproducing the lyrics to both Works in Suit.<br><br>**Burrell Decl., Ex. 52** (Anthropic_0000064503). |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | [redacted]<br><br>Ex. 11 (Bilmes Rebuttal) at ¶ 210; Ex. 19 (Bilmes Reply) at ¶ 158 | |

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | **Publishers' Additional Fact #77:** Dr. Shan also testified that, "in all of the other cases other than if the user just simply go[es] to Claude.ai, I think users oftentimes do not have control over the exact prompts that are being fed into Claude."<br><br>**Burrell Decl., Ex. 131** (Shan Dep.) at 96:14–96:17. | Undisputed that Dr. Shan testified to the quoted language in the context of testifying about [redacted] when [redacted]<br><br>Otherwise disputed as to the truth of the matter asserted.<br><br>Dr. Shan also testified that the prompt entered by the user on the Claude.ai interface, [redacted] in response to the question "[redacted]<br><br>Dr. Shan testified he has "[redacted] and he has [redacted]<br><br>Ex. 131 (Shan Dep.) at 94:8-96:17 (emphasis added). |
| | **Publishers' Additional Fact #78:** Anthropic identifies and processes | Undisputed that "Anthropic requires a massive quantity and diversity of datasets on which to train Claude. |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | Claude's training data prior to training Claude on that data.<br><br>**Pls.' Ex. 25** (Def.'s Am. Suppl. Resp. to Pls.' Interrog. No. 9, Nov. 12, 2025), at 7–9; **Pls.' Ex. 21** (Def.'s Am. Suppl. Resp. to Pls.' RFA No. 12) at 14–15. | These datasets include data derived from many diverse sources, such as the Internet…. Anthropic must then engage in a series of activities to transform the raw data it collects into a format that can be used for training. After Anthropic collects the data, it cleans the data and processes the data for training." And that Anthropic "identifies, cleans and processes the data used to train its models."<br><br>Otherwise disputed to the extent that Publishers suggest that Anthropic identified specific data for inclusion in its training data. Anthropic did not select specific works to include in Claude's training data. It aggregated "large and diverse datasets of preexisting human written content when selecting training data" for Claude which included publicly available text from the Internet and free, open repositories of web crawl data that happened to sweep in lyrics due to their ubiquity across the internet.<br><br>Pls.' Ex. 25 (Def.'s Am. Suppl. Resp. to Pls.' Interrog. No. 9, Nov. 12, 2025), at 7–9; Pls.' Ex. 21 (Def.'s Am. Suppl. Resp. to Pls.' RFA No. 12) at 14–15; Ex. 46 (Anthropic_0000000588) at -589; Kaplan PI Decl. ¶¶ 34-37; Ex. 10 (Zhao Report) ¶ 55; Ex. 2 (Bilmes Report) ¶¶ 308-309. |
| | **Publishers' Additional Fact #79:** LLM outputs, including Claude's, are dependent on what is in the training data; LLMs cannot generalize well to topics not found in their training data.<br><br>**Burrell Decl., Ex. 18** (Zhao Rebuttal) at ¶ 31; **Burrell Decl.,** | Disputed.<br><br>LLMs can generalize beyond their training data. When a model properly generalizes, the model is able to make reasonably accurate predictions on unseen data. Models can do this based on partial patterns and repeated structures from other data such that |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | **Ex. 10** (Zhao Report) at ¶¶ 44, 46–47; Def.'s Opp.'n to Pls.' Renewed Mot. for Prelim. Inj. (Aug. 22, 2024), 6, ECF No. 207 ("For the model to be able to respond sensibly to queries about rap music, or cheesecake recipes, or physics equations, it must have been shown examples of texts that approximate those concepts."). | they can learn patterns present in text without ever seeing a text as whole. This allows LLMs to create entirely novel results that could not have existed within the training data.<br><br>Ex. 2 (Bilmes Report) ¶¶ 167-70, 294, 197; Ex. 11 (Bilmes Rebuttal Report) ¶¶ 11 & n.11, 13 & n.20. |
| | **Publishers' Additional Fact #80:** Claude can [redacted]<br><br>**Burrell Decl. Ex. 2** (Bilmes Report) at ¶¶ 228–34; **Burrell Decl., Ex. 131** (Shan Dep. Tr.) at 93:15–94:3. | Undisputed that Anthropic's Prompt Shield Guardrail is designed to prevent users from causing Claude to reproduce copyrighted content and, in certain configurations, will [redacted]<br><br>Ex. 2 (Bilmes Report) ¶¶ 228-234.<br><br>Otherwise disputed because the user is in control of any request for copyrighted material and there is no [redacted] nor is there evidence of Anthropic otherwise controlling or later modifying a users' prompts.<br><br>Ex. 131 (Shan Dep.) at 94:8-96:17; 100:11-13. |
| | **Publishers' Additional Fact #81:** Anthropic further controls users' prompts through [redacted]<br><br>**Burrell Decl. Ex. 2** (Bilmes Report) at ¶¶ 228–34; **Burrell** | Undisputed that Anthropic's Prompt Shield Guardrail is designed to prevent users from causing Claude to reproduce copyrighted content and, in certain configurations, will [redacted] |

**PUBLIC REDACTED VERSION**

| **Publishers' Additional Material Facts on This Issue** | | **Anthropic's Response & Supporting Evidence** |
|---|---|---|
| | **Decl., Ex. 10** (Zhao Report) at ¶ 120. | Ex. 2 (Bilmes Report) ¶¶ 228-234.<br><br>Otherwise disputed because the user is in control of any request for copyrighted material and there is no “[redacted] nor is there evidence of Anthropic otherwise controlling or later modifying a users' prompts.<br><br>Ex. 131 (Shan Dep.) at 94:8-96:17; 100:11-13. |
| | <u>**Publishers' Additional Fact #82:**</u> Before a user enters a prompt into Claude, [redacted]<br><br>**Pls.' Opp'n/Reply Ex. 139** (Bray Dep. Tr.) at 144:1–145:8, 218:2–12; *see also Claude Platform Docs: System Prompts*, ANTHROPIC (July 24, 2026), https://platform.claude.com/docs/en/release-notes/system-prompts; **Burrell Decl. Ex. 2** (Bilmes Report) at ¶¶ 228–34. | Undisputed that Anthropic uses a “system prompt” for its Claude models.<br><br>Otherwise disputed to the extent that Publishers' imply the system prompt modifies the user's request or steers Claude towards reproducing copyrighted material. The system prompt does not modify the users' prompt: “The system prompt … is not the same as a user prompt or the targeted prompt modification performed by Prompt Shield … Rather, it is a set of general instructions prepended to user prompts that help guide model behavior. System prompts can help define model demeanor and personality, provide basic facts, and shape allowed model responses.”<br><br>No system prompt for any in-scope model tells or steers Claude towards reproducing copyrighted materials, let alone lyrics.<br><br>Ex. 2 (Bilmes Report) ¶¶ 258, 273; Ant. Reply Ex. 175 (*Claude Platform Docs: System Prompts*, ANTHROPIC (July 24, 2026)) |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | |
| | **Publishers' Additional Fact #83:** Anthropic is able to control various aspects of Claude [redacted]<br><br>**Pls.' Opp'n/Reply Ex. 125** (Mann 30(b)(1) Dep. Tr.) at 116:19–117:2 [redacted]"), 118:17-21 (identifying [redacted]); **Pls.' Opp'n/Reply Ex. 150** (Dep. Ex. 90, Anthropic_0000352753); **Pls.' Opp'n/Reply Ex. 132** (Rao 30(b)(6) Dep. Tr.) at 17:4–20:12, 132:1–133:15 (discussing Dep. Ex. 90); **Burrell Decl., Ex. 10** (Zhao Report) ¶ 51; *see also* **Pls.' Reply Ex. 146** (Zhao Dep. Tr.) at 320:4–321:22. | Disputed.<br><br>The evidence cited does not support that Anthropic ultimately determines and controls what users are requesting Claude to output. The evidence supports that Claude is designed to prevent users from causing Claude to reproduce copyrighted content and to detect when users violate the Acceptable User policy.<br><br>The [redacted] project was about [redacted], not control over the underlying model.<br><br>Mr. Mann's testimony speaks for itself: the [redacted]<br><br>He further agreed that the features Anthropic was seeking to deploy [redacted]<br><br>Dr. Rao testified that [redacted] |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | [redacted]<br><br>While Dr. Zhao testified that [redacted]<br><br>Pls.' Opp'n/Reply Ex. 125 (Mann 30(b)(1) Dep. Tr.) at 116:19-119:21; Pls.' Opp'n/Reply Ex. 150 (Dep. Ex. 90, Anthropic_0000352753); Pls.' Opp'n/Reply Ex. 132 (Rao 30(b)(6) Dep. Tr.) at 17:4–20:12, 133:11-134:5 (discussing Dep. Ex. 90); Pls.' Opp'n/Reply Ex. 146 (Zhao Dep.) at 321:16–322:9. |
| | **Publishers' Additional Fact #84:** Prior to launching Claude, Anthropic knew that [redacted]<br><br>**Pls.' Opp'n/Reply Ex. 152** (Dep. Ex. 137, Anthropic_0000520123); **Pls.' Opp'n/Reply Ex. 136** (Drain Dep. Tr.) at 60:11–62:20 (discussing Dep. Ex. 137); **Pls.' Opp'n/Reply Ex. 153** (Dep. Ex. 140, Anthropic_0000507750); **Pls.' Opp'n/Reply Ex. 136** (Drain Dep. Tr.) at 152:7–155:14 (discussing Dep. Ex. 140). | Undisputed that prior to launching Claude, Anthropic employees were aware of research that discussed memorization in LLMs. Otherwise disputed as to the truth of the matter asserted.<br><br>Having been aware of that research, Anthropic took substantial steps to mitigate memorization, including through deduplicating its training data, because memorization hurts model performance. Anthropic takes steps to avoid memorization because memorization is undesirable and does not "serve[] important functions" because it hurts model performance.<br><br>Ex. 116 (Drain Dep.) at 66:9-23, 83:14-18; 154:5-15, 178:17-179:4, 229:8-18; Ex 2 (Bilmes Report) ¶¶ 117-120; Ex. 112 (Dario Amodei |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | Dep.) at 94:22-25; Ex. 126 (Mann 30(b)(6) Dep.) at 178:9-14; Ex. 106 (Brown Dep.) at 131:8-17. |
| | **Publishers' Additional Fact #85:** Claude generated output reproducing copyrighted song lyrics after [redacted]<br><br>*See* **Pls.' Ex. 2** (comparison chart of Publishers' lyrics and Claude output in response to third-party prompts, citing Anthropic Claude records) at 1–3, 6–44, 47–48, 51–52, 55–77, 80–85, 88–126, 129–35, 138–54, 159–229, 232–43, 247–48, 253–72, 275–83, 286–87, 290–302, 306–10, 312–28. | Disputed that the cited outputs in Pls.' Ex. 2 contain the "copyrighted song lyrics" to Publishers' works as found in the deposit copy for each work.<br><br>The lyrics in the lefthand column of Pls.' Ex. 2, entitled "Publishers' Lyrics," are from LyricFind.com. The LyricFind.com lyrics are the point of comparison for Claude's outputs in Pls.' Ex. 2, even for works for which Publishers produced deposit copies. Publishers claim the lyrics displayed on LyricFind.com are the "genuine" copyrighted lyrics for all 499 works. But there are discrepancies between the LyricFind.com lyrics and the produced deposit copies.<br><br>Pls.' Ex. 2 (comparison chart of Publishers' lyrics and Claude output in response to third-party prompts, citing Anthropic Claude records) at 1–3, 6–44, 47–48, 51–52, 55–77, 80–85, 88–126, 129–35, 138–54, 159–229, 232–43, 247–48, 253–72, 275–83, 286–87, 290–302, 306–10, 312–28; *see* Ex. 121 (Kokakis Dep.) 122:25–123:25; Leonard Decl. Ex. H (acknowledging differences in the lyrics between LyricFind.com and deposit copies for the 13 deposit copies produced); Berschback Decl. ¶ 39; Coleman Decl. ¶ 13; Draughon Decl. ¶ 29; Kokakis Decl. ¶¶ 143-145; *see also* Dkts. 49, 49-6 to 49-7, Decl. of Dan Seymour ISO Pls.' Mot. for Prelim. Inj. ("Seymour Decl.") & Ex. D (Nov. 16, 2023). |
| | **Publishers' Additional Fact #86:** Claude generated output reproducing copyrighted song lyrics after Anthropic [redacted] | Disputed that the cited outputs in Pls.' Ex. 2 contain the "copyrighted song lyrics" to Publishers' works as found in the deposit copy for each work. |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | [redacted]<br><br>*See* **Pls.' Ex. 2** at 4–5, 45–46, 49–50, 53–54, 78–79, 86–87, 127–28, 136–37, 155–58, 230–31, 244–46, 249–52, 273–74, 284–85, 288–89, 303–05, 311, 329–30. | The lyrics in the lefthand column of Pls.' Ex. 2, entitled "Publishers' Lyrics," are from LyricFind.com. The LyricFind.com lyrics are the point of comparison for Claude's outputs in Pls.' Ex. 2, even for works for which Publishers produced deposit copies. Publishers claim the lyrics displayed on LyricFind.com are the "genuine" copyrighted lyrics for all 499 works. But there are discrepancies between the LyricFind.com lyrics and the produced deposit copies.<br><br>Pls.' Ex. 2 (comparison chart of Publishers' lyrics and Claude output in response to third-party prompts, citing Anthropic Claude records) at 1–3, 6–44, 47–48, 51–52, 55–77, 80–85, 88–126, 129–35, 138–54, 159–229, 232–43, 247–48, 253–72, 275–83, 286–87, 290–302, 306–10, 312–28; *see* Ex. 121 (Kokakis Dep.) 122:25–123:25; Leonard Decl. Ex. H (acknowledging differences in the lyrics between LyricFind.com and deposit copies for the 13 deposit copies produced); Berschback Decl. ¶ 39; Coleman Decl. ¶ 13; Draughon Decl. ¶ 29; Kokakis Decl. ¶¶ 143-145; *see also* Seymour PI Decl. & Ex. D.<br><br>Disputed that Claude produced verbatim the full purported lyrics to Publishers' works after Anthropic strengthened its guardrails.<br><br>*See* Pls.' Ex. 2 at 4–5 ("provid[ing]" "chord progressions and lyrics," where each line of the purported lyrics is separated by chord progression note), 45–46 (using lyric snippets to explain how "themes and ideas in the lyrics" to the song "Dog Days Are Over" apply to Catcher in the Rye), 49–50 (Claude output does not contain five |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | stanzas present in LyricFind lyrics), 53–54 (providing "key details," including songwriter/artist information for song, "Fireflies," and explaining it "topp[ed] charts in several countries including the US thanks to its infectious hook," which is then provided), 78–79 (suggesting lyrics to "accompany a reel video" and including at most one stanza of the purported lyrics), 86–87 (Claude output does not contain four stanzas present in LyricFind lyrics), 136–37 (providing "some key lyrics from" "1963 protest song "Masters of War" and describing lyrics' meaning), 155–58 ("[T]he term 'eargasm' is used prominently in the lyrics of the 1996 song 'No Diggity'" and describing meaning of term in lyric snippet), 230–31 (recommending at most one stanza of "Roar" "that could work nicely to accompany a reel video about achieving your dreams"), 244–46 (requesting an "article" using "HTML" tags, resulting in snips of lyrics interspersed with HTML coding and lyrical analysis), 249–52 (providing snips of lyrics interspersed with analysis of their meaning), 284–85 (providing snips of lyrics to "Tiny Dancer" as part of explanation of song's history and meaning), 288–89 (Claude output does not contain three stanzas from LyricFind lyrics), 303–05 (providing list of 5 cringeworthy 90s lyric posts" with snips of lyrics in list form interspersed with emojis and hashtags), 311 (Claude output missing stanza from LyricFind lyrics), 329–30 (providing excerpt of lyrics in response to prompt "Journal Entry 7: FILL A PAGE WITH YOUR FAVORITE SONG LYRICS, QUOTES, OR POETRY TO INSPIRE A THOUGHT."). |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | The two Claude outputs cited in Pls.' Ex. 2 that include LyricFind lyrics are both part of larger conversations that occur, in part, in other languages and, in part, requests translations. As Dr. Zhao's report explains, [redacted] These outputs may be the product of atypical Claude use designed to circumvent guardrails.<br><br>*See* Pls.' Ex. 2 at 127–28; 273-74; Ant. Reply Ex. 176 (Anthropic_0000079024); Ant. Reply Ex. 177 (Anthropic_0000087853); *see* Ex. 18 (Zhao Rebuttal) ¶ 59 [redacted]<br><br>Further disputed that "Claude generated output reproducing copyrighted song lyrics after Anthropic instituted additional post-suit guardrails on [redacted] and [redacted]." Most of the outputs in question occurred before Anthropic added [redacted] to the Content Compare System's hash corpus on or around [redacted]. And nearly all occurred before Anthropic deployed its Prompt Shield guardrail on claude.ai and its first-party API product on or around [redacted]<br><br>Pls.' Ex. 25 (Def.'s Am. Suppl. Resp. to Pls.' Interrog. No. 12, Nov. 12, 2025), at 13–14; Pls.' Ex. 48 (Def.'s Am. Supp. Resp. to Pls.' Interrog. No. 12, Dec. 11, 2025) at 6; *see* Pls.' Ex. 2 at 53–54 (output from November 26, |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | 2023), 78–79 (output from November 26, 2023), 86–87 (output from November 29, 2023), 127–28 (output from November 19, 2023), 136–37 (output from November 23, 2023), 155–58 (output from November 18, 2023), 230–31 (output from November 26, 2023), 244–46 (output from December 2, 2023), 249–52 (output from December 8, 2023), 273–74 (output from November 23, 2023), 284–85 (output from November 19, 2023), 288–89 (output from December 3, 2023), 311 (output from November 30, 2023), 329–30 (output from November 18, 2023). |
| | **<u>Publishers' Additional Fact #87:</u>** Post-training guardrails do not always prevent unwanted AI output, including reproduction of memorized training data and copyrighted material.<br><br>**Burrell Decl., Ex. 10** (Zhao Report) at ¶¶ 145–148; **Pls.' Opp'n/Reply Ex. 147** (Zhao Reply) at ¶¶ 40–42; **Zhao Decl.** ¶¶ 55–59, 68; **Pls.' Ex. 20** (Rao 30(b)(6) Dep. Tr.) at 47:4-15; *see also* **Burrell Decl., Ex. 112** (Dario Amodei Dep. Tr.) at 78:10-18 (testifying that potentially copyrighted content "isn't an intended output of Anthropic models" and "is something that happens either by accident—although over time the protections get better—or this is something that happens because someone is adversarially trying to get around the filters and extract content."). | Undisputed only insofar as that no system is 100% perfect.<br><br>Further undisputed that Dr. Dario Amodei testified that outputting copyrighted content "isn't an intended output of Anthropic models" and "is something we're trying to prevent" and that outputs that occur by "accident" or "because someone is adversarially trying to get around the filters and extract content" are not "things we want. And when they happen, we try to make them right."<br><br>Otherwise disputed as to the truth of the matter asserted. It is undisputed that Anthropic's post-training guardrails are imperfect, but highly effective at preventing the verbatim output of Publishers' asserted lyrics, including reproduction of copyrighted material.<br><br>Ex. 112 (Dario Amodei Dep.) at 78:10-18; Ex. 11 (Bilmes Rebuttal Report) § VI, ¶ 142.<br><br>Further disputed insofar as Publishers contend that copyrighted materials in training data are memorized. |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | Anthropic takes substantial steps to mitigate memorization, including through deduplicating its training data because memorization hurts model performance.<br><br>Pls.' Opp'n/Reply Ex. 136 (Drain Dep.) at 70:13-18; Ex. 116 (Drain Dep.) at 66:9-23, 83:14-18; 154:5-15, 178:17-179:4, 229:8-18; Ex. 2 (Bilmes Report) ¶¶ 87, 117-120; Ex. 126 (Mann 30(b)(6) Dep.) at 178:9-14; Ex. 112 (Dario Amodei Dep.) at 94:22-25; Ex. 106 (Brown Dep.) at 131:8-17. |
| | **<u>Publishers' Additional Fact #88:</u>** Everyday users of LLMs frequently employ "jailbreaking" techniques to bypass multilayered guardrails easily.<br><br>**Burrell Decl., Ex. 18** (Zhao Rebuttal) at ¶¶ 57–59; **Pls.' Opp'n/Reply Ex. 147** (Zhao Reply) at ¶¶ 18–19. | Disputed. Adversarial prompting and jailbreaking are not "frequent" among "[e]veryday users" and do not allow users to "easily" bypass guardrails.<br><br>Dr. Zhao conducts no analysis or assessment of empirical data on the frequency by which "everyday" users employ jailbreaking techniques to bypass multilayered guardrails nor does he report on the ease by which guardrails are bypassed.<br><br>Dr. Zhao reports that "jailbreaks" are [redacted] by [redacted] and then discusses research performed by scientists regarding jailbreaking techniques, including a study that founds that absent jailbreaking "Claude 3.7 Sonnet … exhibited refusal mechanisms, which prevent direct continuation of the provided prefix" necessitating jailbreaking Claude to extract the text of books (not lyrics).<br><br>Publishers' post-suit jailbreaking attempts to elicit lyrics from Claude, in vast majority, did not result in verbatim reproduction of lyrics, |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | demonstrating the robustness of Claude's guardrails.<br><br>Ant. Reply Ex. 178 (Ahmed Ahmed et al., *Extracting Books from Production Language Models*, Arxiv:2601.02671v1 (Jan. 6, 2026)) at 5, 18; Ex. 19 (Bilmes Reply Report) § VI.C.3 & Tables 10-11; Ex. 18 (Zhao Rebuttal) ¶¶ 57–59; Pls.' Opp'n/Reply Ex. 147 (Zhao Reply) ¶¶ 18–19. |
| | **<u>Publishers' Additional Fact #89:</u>** "Jailbreaking" techniques are available on the open internet for everyday users to access and employ.<br><br>**Burrell Decl., Ex. 18** (Zhao Rebuttal) at ¶¶ 57–59; **Pls.' Opp'n/Reply Ex. 147** (Zhao Reply) at ¶¶ 18–19. | Undisputed that descriptions of certain jailbreaking techniques are posted on the internet.<br><br>Otherwise disputed for the truth of the matter asserted. Dr. Zhao offers no empirical analysis or data to support his assertion that "everyday users [] access and employ" jailbreaking techniques.<br><br>Ex. 18 (Zhao Rebuttal) ¶¶ 57–59; Pls.' Opp'n/Reply Ex. 147 (Zhao Reply) ¶¶ 18–19. |
| | **<u>Publishers' Additional Fact #90:</u>** Constitutional AI is not always effective in training the Claude AI models to adhere to certain behaviors.<br><br>**Pls.' Opp'n/Reply Ex. 125** (Mann 30(b)(1) Dep. Tr.) at 140:6–143:1. | Undisputed that Mr. Mann testified that "there are a couple of classes of tasks for which Constitutional AI is not effective. The biggest class of those is if the model doesn't already have some understanding of the problem at hand, then Constitutional AI will not help you, because the requisite knowledge is outside the model" for example "there's no way to use Constitutional AI to make the model better at Esperanto, because Constitutional AI is a self-bootstrapping technique… since that knowledge of Esperanto lives outside the model, then Constitutional AI will have no improvement." Other classes "involve jailbreaks" for which "Constitutional AI would likely not help as much with, at least as it was implemented in the paper." |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | Disputed to the extent that Publishers imply that Constitutional AI is the only or primary technique used. As Mr. Mann further testified, Anthropic's "constitution, and also our more general techniques of creating Claude's character and inculcating the values that we believe it should have, have evolved over time, and Constitutional AI is no longer the primary way that we do this work.… We do still use these principles. … We have other pipelines to which we add new, different kinds of principles and character."<br><br>Publishers' expert, Dr. Ben Zhao, reported that Anthropic's [redacted]<br><br>Anthropic introduced a [redacted]<br><br>Pls.' Opp'n/Reply Ex. 125 (Mann 30(b)(1) Dep.) at 140:6–143:1; Ex. 10 (Zhao Report) at ¶¶ 48, 117; Ex. 11 (Bilmes Rebuttal) at ¶ 108; Ant. Reply Ex. 173 (Mann 30(b)(6) Dep.) at 141:24-144:14. |

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| **Publishers' Secondary Liability Claims Fail As A Matter Of Law** | | |
| **Issue 1: No Evidence That Allegedly** | Fact 135: Publishers stated that [redacted] | Moot. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| **Infringing Outputs Were Generated By Prompts from True Third Parties** | [redacted], and that [redacted] After serving their supplemental interrogatory response and confirming they did not intend to drop their contributory claims on April 13, 2026, on April 19, 2026 at 4:11 PM PT, Publishers informed Anthropic they do not intend to proceed on their claims for contributory infringement or vicarious liability.<br><br>Ex. 31 (Pls.' Supp. Resps. & Objs. to 2nd Set of Interrogs. (Nos. 3-4) (Apr. 13, 2026)) at No. 4; Ex. 146 (Z. Anwar Email to N. Hailey, Apr. 13, 2026); Ex. 152 (R. Burrell Email to N. Hailey, Apr. 19, 2026) | *See* ECF No. 716 (dismissing Publishers' secondary liability claims and denying as moot the portions of Anthropic's Motion for Summary Judgment that seek judgment on those secondary liability claims). |
| | Fact 136: "Publishers have identified one post-suit Claude prompt-output record (Bates number Anthropic_0000064498, dated Nov. 7, 2023) that was inadvertently miscategorized and cited as a third-party record in Publishers' Motion for Partial Summary Judgment and supporting materials."<br><br>Dkt 678 at 2 | Moot.<br><br>*See* ECF No. 716. |
| | Fact 137: Anthropic filed its *Daubert* motion seeking to exclude the testimony of Publishers' expert, Dr. Ben Zhao, on March 31, 2026. The motion noted that "Zhao's declaration" from the preliminary injunction stage "disclose[d] four prompts he used" that "match word-for-word with prompts and outputs submitted on November 7, 2023, that are part of a broader | Moot.<br><br>*See* ECF No. 716. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | conversation with Claude" that was not previously disclosed.<br><br>Dkt. 663 at 4-5 | |
| **Issue 2: Anthropic Does Not Contributorily Infringe Publishers' Claimed Copyrights** | Fact 138: Publishers' expert, Dr. Ben Zhao, reported that Anthropic's [redacted]<br><br>Ex. 10 (Zhao Report) at ¶¶ 48, 117 | Undisputed. |
| | Fact 139: Anthropic co-founder and Chief Science Officer, Dr. Jared Kaplan, attested that "Constitutional AI is at the heart of all of Anthropic's models, and is designed to ensure AI safety by fine-tuning the models on a set of principles that Anthropic believes will cultivate steerable, helpful model behavior that aligned with human preferences."<br><br>Kaplan PI Decl. ¶ 38; *see also* Ex. 30 (Def.s Am. Supp. Resp. & Obj. to 1st Set of Interrogs. (Nos. 9, 11, 12) (Nov. 12, 2025)) at No. 12 | Undisputed that Dr. Kaplan attested as quoted. |
| | Fact 140:Anthropic co-founder, Mr. Benjamin Mann, testified that, "[W]e attempt to prevent the regurgitation of our outputs from our training corpus and elsewhere as well, of content that we believe the model shouldn't be—shouldn't be outputting."<br><br>Ex. 125 (Mann 30(b)(1) Dep. Vol. 2) at 200:13-201:2 | Moot.<br><br>*See* ECF No. 716. |
| | Fact 141: Anthropic 30(b)(6) representative, Dr. Deep Ganguli, testified that, "[w]e take IP very seriously," and explained that, "[copyright infringement]'s not a | Moot.<br><br>*See* ECF No. 716. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | usage of Claude that makes a lot of sense given that one can look up song lyrics by searching for them."<br><br>Ex. 119 (Ganguli 30(b)(6) Dep.) at 56:7-10, 77:21-23 | |
| | Fact 142: Anthropic's former Head of Trust and Safety, Dr. Vinay Rao, testified that, "we were dedicated to building a really, really good copyright respecting product."<br><br>Ex. 128 (Rao 30(b)(1) Dep.) at 33:10-14 | Moot.<br><br>*See* ECF No. 716. |
| | Fact 143: Anthropic co-founder and CEO, Dario Amodei, testified that potentially copyrighted content "isn't an intended output of Anthropic models. This is something we're trying to prevent. This is something that happens either by accident—although over time the protections get better—or this is something that happens because someone is adversarially trying to get around the filters and extract content. Neither of those things we want. And when they happen, we try to make them right."<br><br>Ex. 112 (Dario Amodei Dep.) at 78:10-78:18 | Moot.<br><br>*See* ECF No. 716. |
| | Fact 144: Publishers' expert, Dr. Ben Zhao, testified that there is a [redacted] [.]"<br><br>Ex. 139 (Zhao Dep.) at 308:9-14 | Undisputed. |
| | Fact 145: Anthropic co-founder and Chief Science Officer, Dr. Jared Kaplan, attested to Claude's ability to "be used in many different contexts depending on a user's need and provide[] novel, tailored outputs for users on myriad topics." | Undisputed that Dr. Kaplan attested as quoted.<br><br>Anthropic relies on this fact for the truth of the matter asserted. Publishers dispute the truth of the matter asserted that Claude can "provide[] novel, |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | Dr. Kaplan attested that Claude can, for example, "[p]rovide helpful answers to user queries, which detailed background on technical, scientific, and cultural knowledge," "[s]peak a variety of common human languages," and "[h]andle basic instructions and logical scenarios, including formatting outputs, following if-then statements, and making a series of logical evaluations in a single prompt."<br><br>Kaplan PI Decl. ¶¶ 10-11 | tailored outputs." In the LLM research community, it is still uncertain whether an LLM is even capable of generating "new" texts (as opposed to memorizing and regurgitating its training data).<br><br>**Zhao Decl.** ¶¶ 44–47; **Burrell Decl., Ex. 10** (Zhao Report) ¶¶ 26, 46, 91. |
| | Fact 146: Publishers' expert, Dr. Ben Zhao, testified that "[redacted] and [redacted]<br><br>Ex. 139 (Zhao Dep.) at 307:7-11; 311:13-313:6 | Moot.<br><br>*See* ECF No. 716. |
| | Fact 147: In a conversation with Claude a user [redacted]<br><br>Ex. 103 (DOC00095371) | Undisputed that the cited document contains the quoted language. |
| | Fact 148: In a conversation with Claude a user prompted Claude with an attachment: [redacted] | Undisputed that the cited document contains the quoted language. |

PUBLIC REDACTED VERSION

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | [redacted]<br><br>Ex. 102 (DOC00073700) | |
| | Fact 149: Anthropic co-founder and CEO, Mr. Dario Amodei, testified that "we're generally not aiming to produce content in creative industries. You know, Anthropic, it's very focused on code. It's very focused on work and productivity-based activities. So Anthropic has deliberately made – made choices not to – not to produce output in many creative modalities."<br><br>Ex. 112 (Dario Amodei Dep.) at 102:13-24 | Moot.<br><br>*See* ECF No. 716. |
| | Fact 150: Anthropic co-founder, Tom Brown, testified that, "[W]e want CLAUDE to be the best model for people who want to do work, particularly coding work. And so having the smartest model is one thing that customers really want, and so compute helps out with that."<br><br>Ex. 106 (Brown Dep.) at 48:17-21 | Moot.<br><br>*See* ECF No. 716. |
| | Fact 151: Anthropic co-founder, Mr. Tom Brown, testified that Anthropic was [redacted] and in response to the question [redacted] | Moot.<br><br>*See* ECF No. 716. |

PUBLIC REDACTED VERSION

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | [redacted]<br><br>Ex. 106 (Brown Dep.) at 94:11-16; *see also id.* 64:4-8, 64:12-16, 64:23-65:4, 86:3-7 | |
| | Fact 152: Publishers' expert, Mr. Joshua Dennis, reported that [redacted]<br><br>Ex. 21 (Dennis Reply) at ¶ 14 | Moot.<br><br>*See* ECF No. 716. |
| | Fact 153: Out of a total of [redacted] Publishers report that they [redacted]<br><br>Ex. 31 (Pls.' Supp. Resps. & Objs. to 2nd Set of Interrogs. (Nos. 3-4) (Apr. 13, 2026)) | Moot.<br><br>*See* ECF No. 716. |
| | Fact 154: Anthropic's expert, Dr. Jefferey Bilmes, reported that [redacted] | Undisputed that Dr. Bilmes' report contains the quoted language.<br><br>Further undisputed that Dr. Bilmes obtained the asserted "No Match" figures based on his testing of Anthropic's guardrails and the parameters he described for Claude models 4.1 Opus, 4 Opus, 3.5 Haiku, and 3 Haiku, but not including Claude models 1 and 2 (or other Claude models).<br><br>*See* **Burrell Decl. Ex. 18** (Zhao Rebuttal) ¶¶ 120–22. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | Ex. 2 (Bilmes Report) at ¶ 347 & Table 8 | |
| | Fact 155: Anthropic's expert, Dr. Jefferey Bilmes, reported on one of his prompts and outputs [redacted] of Claude's response to the prompt [redacted]<br><br>Ex. 2 (Bilmes Report) at ¶ 357 & Table 10 | Undisputed that Dr. Bilmes' report contains the quoted language regarding a prompt purportedly submitted to Claude Opus 4.1 on December 16, 2025.<br><br>**Burrell Decl., Ex. 2** (Bilmes Report) at ¶ 357 n.641 & Table 10. |
| **Issue 3: Publishers Fail to** | Fact 156: Publishers' expert, Mr. Joshua Dennis, reported [redacted] | Moot.<br><br>*See* ECF No. 716. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| **Establish Vicarious Infringement** | [redacted]<br><br>Ex. 21 (Dennis Reply) at ¶ 257 | |
| | Fact 157: Publishers' expert, Dr. Michael Smith, testified he was aware of [redacted]<br><br>Ex.133 (Smith Dep. Vol. 2) at 335:25-336:11 | Moot.<br><br>*See* ECF No. 716. |
| | Fact 158: Publishers' expert, Dr. Michael Smith, testified that he [redacted] when asked whether he was [redacted]<br><br>Ex. 133 (Smith Dep. Vol. 2) 335:14-18 | Moot.<br><br>*See* ECF No. 716. |
| | Fact 159: Publishers' expert, Dr. Michael Smith, reported that relying on [redacted]<br><br>Ex. 25 (Smith Reply) at ¶¶ 162-163 | Moot.<br><br>*See* ECF No. 716. |
| | Fact 160: Publishers' expert, Mr. Joshua Dennis, reported that "[redacted]<br><br>Ex. 21 (Dennis Reply) at ¶ 257 & Ex. 22 (Dennis Reply Exhibit 8) | Moot.<br><br>*See* ECF No. 716. |
| | Fact 161: Publishers' expert, Dr. Smith, reported that [redacted] | Moot. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | [redacted]<br><br>Ex. 25 (Smith Reply) at ¶ 163 | *See* ECF No. 716. |
| | Fact 162: Publishers' expert, Mr. Joshua Dennis, testified that he had not "[redacted]" as [redacted]<br><br>Ex. 115 (Dennis Dep.) at 277:06-278:14 | Moot.<br><br>*See* ECF No. 716. |
| **PUBLISHERS' DMCA CLAIM FAILS AS A MATTER OF LAW** | | |
| **Issue 1: Copyright Management Information Was Not Removed from the Whole of Publishers' Works** | Fact 163: Publishers' expert, Dr. Shawn Shan, testified that it is an [redacted] that [redacted]<br><br>Ex. 131 (Shan Dep.) at 86:1-9 | Undisputed. |
| | Fact 164: Publishers' expert, Dr. Shawn Shan, testified that it is an "accurate statement" that "[i]n the case of LLMs like Claude, the outputs are texts that appear natural and coherent."<br><br>Ex. 131 (Shan Dep.) at 90:20-25 | Undisputed. |
| | Fact 165: Publishers' expert, Dr. Shawn Shan, testified that he [redacted] that Anthropic [redacted]<br><br>Ex. 131 (Shan Dep.) at 126:6-11 | Undisputed. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
| --- | --- | --- |
| | Fact 166: Anthropic co-founder, Mr. Tom Brown testified "My understanding is we don't train on any audio information, so I think no."<br><br>Ex. 106 (Brown Dep.) at 176:12-17 | Undisputed that Mr. Brown testified as quoted. |
| | Fact 167: Anthropic co-founder and CEO, Mr. Dario Amodei testified "Claude doesn't generate audio for a song."<br><br>Ex. 112 (Dario Amodei Dep.) at 81:15-24 | Undisputed that Dr. Amodei testified as quoted. |
| | Fact 168: Publishers' expert, Dr. Shawn Shan, reported that [redacted]<br><br>Ex. 24 (Shan Reply) at ¶ 30 | Undisputed. |
| | Fact 169: Publishers' expert, Dr. Shawn Shan, reported that "[redacted]<br><br>Ex. 7 (Shan Report) at ¶ 59 | Undisputed. |
| | Fact 170: Publishers' expert, Dr. Shawn Shan, testified that [redacted] and [redacted] | Undisputed. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | [redacted]."<br><br>Ex. 131 (Shan Dep.) at 318:15-319:18 | |
| | Fact 171: Publishers' expert Dr. Shawn Shan reported that "[redacted]."<br><br>Ex. 24 (Shan Reply) at ¶ 29 | Undisputed. |
| | Fact 172: For every one of the 499 works, there was at least one webpage [redacted] that lacked CMI.<br><br>Ex. 11 (Bilmes Rebuttal) at ¶¶ 70-74 | Undisputed. |
| | Fact 173: Publishers' expert, Dr. Shawn Shan, testified [redacted]" when asked, [redacted] | Undisputed. |

PUBLIC REDACTED VERSION

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | [redacted]<br><br>Ex. 131 (Shan Dep.) at 316:9-19 | |
| | Fact 174: Publishers' expert, Dr. Shawn Shan, testified that [redacted]<br><br>Ex. 131 (Shan Dep.) at 180:14-181:4 | Undisputed. |
| | Fact 175: Publishers' expert, Dr. Shawn Shan, testified, [redacted]<br><br>Ex. 131 (Shan Dep.) at 321:18-21 | Undisputed. |
| | Fact 176: Publishers' expert, Dr. Shawn Shan, testified that he [redacted] but noted that he reviewed a document with [redacted]<br><br>Ex. 131 (Shan Dep.) at 319:20-320:9 | Undisputed. |
| | Fact 177: Publishers' expert, Dr. Shawn Shan, testified that [redacted] | Undisputed. |

**PUBLIC REDACTED VERSION**

| Claim or Defense | Anthropic's Undisputed Facts & Supporting Evidence | Publishers' Response & Supporting Evidence |
|---|---|---|
| | [redacted] Ex. 131(Shan Dep.) at 320:19-321:21 | |
| | Fact 178: Publishers' expert, Dr. Ben Zhao reported that [redacted] And he testified that he is [redacted] to whether [redacted] Ex. 10 (Zhao Report) at ¶ 61; Ex. 39 (Zhao Dep.) at 289:11-18, 292:22-293:9 | Undisputed. |
| | Fact 179: Publishers' expert, Dr. Shawn Shan, reported that AZLyrics.com [redacted] Ex. 24 (Shan Reply) at ¶ 27 (discussing Ex. 11 (Bilmes Rebuttal) ¶ 69, citing Ex. 100 ("Jay-Z - Dope Man Lyrics, AZLyrics.Com," (Anthropic_0000612704))) | Undisputed that Dr. Shan's reply report contains the quoted language, attributed to Dr. Bilmes' rebuttal report. |

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | **Publishers' Additional Fact #91:** Attribution via copyright management information ("CMI") is vital to Publishers' businesses, | Disputed.<br><br>Mr. Berschback's declaration states, without evidence, that "[d]isplay of |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | because CMI demonstrates that a particular work is protected by copyright, identifies the copyrighted work as belonging to Publishers, ensures songwriters and musical artists receive reputational credit and goodwill, provides notice to potential licensees regarding the identity of the licensor, and otherwise protects the copyrighted work against unauthorized exploitation.<br><br>**Berschback Decl.** ¶ 49; **Coleman Decl.** ¶ 26; **Draughon Decl.** ¶¶ 37, 40; **Kokakis Decl.** ¶ 157. | lyrics without proper attribution and copyright information is therefore incredibly damaging to Concord's licensing business and the livelihood of its songwriters."<br><br>Berschback Decl. ¶ 49.<br><br>It is undisputed that [redacted]. For many works-in-suit, Anthropic permissibly crawled [redacted]"<br><br>Ex. 11 (Bilmes Rebuttal Report) ¶¶ 70-73 and Table 3. |
| | **Publishers' Additional Fact #92:** Publishers' licensing agreements require the display of CMI.<br><br>**Berschback Decl. Ex. A** (Concord_0000016732) at ¶ 17(b) (Genius); **Berschback Decl. Ex. B** (Concord_0000000212) at §2.1 (Musixmatch); **Coleman Decl. Ex. A** (ABKCO_0000000045) at §2.1 (Musixmatch); **Coleman Decl. Ex. B** (ABKCO_0000000328) at ¶ 17(b) (Genius); **Draughon Decl.** ¶¶ 36–37; **Kokakis Decl. Ex. A** (UMPG_0000000311) at ¶ 17(c) (Genius); **Kokakis Decl. Ex. B** (UMPG_0000000335) at § 3.1.5 (Musixmatch); *see also* **Pls.' Ex. 101** (compilation of Publishers' LyricFind licenses); **Pls.' Ex. 102** (compilation of Publishers' Musixmatch licenses); **Pls.' Ex. 103** (compilation of additional lyrics display licenses). | Undisputed that the cited licensing agreements purport to require the display of CMI alongside display of the complete versions of lyrics and/or full musical compositions. |
| | **Publishers' Additional Fact #93:** When Publishers' authorized | Disputed. |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | Anthropic's Response & Supporting Evidence |
|---|---|
| licensees display Publishers' lyrics, the lyrics are accompanied by CMI.<br><br>**Pls.' Opp'n/Reply. Ex. 141** (Coleman Dep. Tr.) at 114:17–115:13; **Pls.' Opp'n/Reply. Ex. 142** (Draughon Dep. Tr.) at 126:17–127:1; **Pls.' Opp'n/Reply Ex. 143** (Kokakis Dep. Tr.) at 155:5–157:6; **Berschback Decl. ¶¶** 45–48; **Coleman Decl.** ¶¶ 21–25; **Draughon Decl. ¶¶** 36–37; **Kokakis Decl.** ¶¶ 152–156. | [redacted]I as 30(b)(6) Representatives Ms. Coleman and Mr. Kokakis confirmed at their depositions.<br><br>Ant. Reply Ex. 179 (Coleman Dep. Ex. 14) (musixmatch.com lyric display page for work in suit, 'Bitter Sweet Symphony,' claimed by ABKCO); Pls.' Opp'n/Reply. Ex. 141 (Coleman Dep.) at 115:22-116:15 ([redacted]); Ant. Reply Ex. 180 (Kokakis Dep. Ex. 26) (musixmatch.com lyric display webpage for work in suit, 'Sweet Home Alabama,' claimed by UMPG); Ant. Reply Ex. 181 (Kokakis Dep. Ex. 30) (musixmatch.com lyric display webpage for work in suit, 'Roxanne,' claimed by UMPG); Pls.' Opp'n/Reply Ex. 143 (Kokakis Dep.) at 158:14–160:13 ([redacted]). |
| **<u>Publishers' Additional Fact #94:</u>** Publishers' lyrics to every Work in Suit as displayed on LyricFind are accompanied by CMI.<br><br>Decl. of Dan Seymour ISO Pls.' Mot. for Prelim. Inj. ("Seymour Decl.") & Ex. D (Nov. 16, 2023), ECF. 49, 49-6 to 49-7 (collecting Publishers' lyrics to the 499 Works as they appear on LyricFind.com). | Undisputed that the declaration of Dan Seymour ISO Pls.' Mot. for Prelim. Inj. purports to show that certain CMI appears on the webpages for LyricFind.com.<br><br>Otherwise disputed. Insofar as Publishers are contending that Claude was trained on the LyricFind webpages in the cited exhibits, Publishers have not shown that the URLs associated with the cited LyricFind webpages containing certain CMI were in the post-processing data used to train Claude and have not shown that Publishers' CMI associated with the work in suit was removed from any of the LyricFind.com URL's (or any other webpage containing Publishers' asserted lyrics) identified in the Seymour Declaration or in any other piece of post-processing training data.<br><br>Dr. Shawn Shan testified that "whether CMI is deliberately removed or |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | accidentally removed because of the use of [redacted], I do not know. I have not done an independent analysis of this case" and did "not inspect the exact training data."<br><br>Anthropic permissively crawled [redacted] For many works-in-suit, Anthropic permissibly crawled [redacted] When Claude generates an output, it does not reference any particular piece of training data, including any training data that, in its raw pre-processed form, did or did not contain CMI.<br><br>Ex. 131 (Shan Dep.) at 180:14-181:4, 321:18-21; Ex. 11 (Bilmes Rebuttal Report) ¶¶ 70-73, 75-76 and Table 3. |
| | **Publishers' Additional Fact #95:** When Anthropic [redacted]<br><br>**Burrell Decl. Ex. 24** (Shan Reply) at ¶¶ 26, 28; **Pls.' Ex. 22** (Def.'s Am. Suppl. Resp. to Pls.' Interrog. No. 6, Oct. 9, 2025), 2–3; *see also* **Burrell Decl., Ex. 7** (Shan Report) at ¶¶ 57–59. | Undisputed that certain webpages containing Publishers' asserted lyrics contain Publishers' CMI, generally, in the body of the webpages.<br><br>Otherwise disputed that webpages include CMI as a general matter because as [redacted] For many works-in-suit, Anthropic permissibly crawled [redacted]<br><br>Ex. 11 (Bilmes Rebuttal Report) ¶¶ 70-73 and Table 3. |
| | **Publishers' Additional Fact #96:** Publishers' expert Dr. Shan performed a count of webpages in Anthropic's training data that [redacted] | Undisputed that certain webpages containing Publishers' asserted lyrics contain Publishers' CMI, generally, in the body of the webpages. |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | [redacted]<br><br>**Burrell Decl. Ex. 24** (Shan Reply) at ¶ 28. | Otherwise disputed that webpages include CMI as a general matter because "[redacted] For many works-in-suit, Anthropic permissibly crawled [redacted]<br><br>Ex. 11 (Bilmes Rebuttal Report) ¶¶ 70-73 and Table 3. |
| | **<u>Publishers' Additional Fact #97:</u>** Dr. Shan concluded that [redacted]<br><br>**Burrell Decl., Ex. 7** (Shan Report) at ¶¶ 53–54. | Undisputed that Publishers' asserted lyrics from these websites are public, free to access, did not contain robots.txt restrictions that disallowed Anthropic from scraping that data, and thus may be within Anthropic's training data.<br><br>Otherwise disputed that Anthropic copies from a [redacted] and that these websites "indicate on their face that they are sublicensees of Publishers' licensee LyricFind.com."<br><br>Dr. Bilmes' analysis determined that [redacted] from a website that permitted Anthropic's crawling… the minimum number of allowed crawls for any work-in-suit was [redacted] Across all 499 at-issue lyrics, the average number of allowed crawls [redacted] indicating that Plaintiffs' lyrics were permissibly accessible many times across the internet." The "[m]aximum number of allowed crawls for a lyric" was [redacted]<br><br>Dr. Shan's conclusion that these websites are "on their face" "sublicensees of Publishers' licensee |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | LyricFind.com" is based on a review of two URLs for 1 of the 499 works in suit.<br><br>Dr. Shan does not dispute that [redacted] For many works-in-suit, Anthropic permissibly crawled [redacted]<br><br>Ex. 7 (Shan Report) at ¶¶ 53–54 & n.34; Ex. 2 (Bilmes Report) ¶¶ 308-309 & Table 4; Ex. 11 (Bilmes Rebuttal Report) ¶¶ 70-73 and Table 3. |
| | **<u>Publishers' Additional Fact #98:</u>** Dr. Shan also identified copies of Publishers' lyrics [redacted]<br><br>**Burrell Decl., Ex. 7** (Shan Report) at ¶ 54. | Undisputed that Publishers' lyrics from [redacted] were permissibly crawled by Anthropic for inclusion within training data.<br><br>Otherwise disputed that these are the only sources from which Anthropic permissibly collected lyrics from the internet. Dr. Bilmes' analysis determined that [redacted] from a website that permitted Anthropic's crawling… the minimum number of allowed crawls for any work-in-suit was [redacted] Across all 499 at-issue lyrics, the average number of allowed crawls [redacted] indicating that Plaintiffs' lyrics were permissibly accessible many times across the internet." The "[m]aximum number of allowed crawls for a lyric" was [redacted]<br><br>Publishers do not dispute that [redacted] For many works-in-suit, Anthropic |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | permissibly crawled [redacted]<br><br>Ex. 2 (Bilmes Report) ¶¶ 308-309 & Tables 4 & 23; Ex. 11 (Bilmes Rebuttal Report) ¶¶ 70-73 and Table 3. |
| | **Publishers' Additional Fact #99:** Anthropic used extractor algorithms and other tools to remove "boilerplate" language from its training data, [redacted]<br><br>**Pls.' Opp'n/Reply Ex. 135** (Sangani Dep. Tr.) at 261:10–264:24; **Pls.' Opp'n/Reply Ex. 125** (Mann 30(b)(1) Dep. Tr.) at 83:9–87:23, 89:24–90:25; **Pls.' Opp'n/Reply Ex. 155** (Dep. Ex. 205, Anthropic_0000014096) at -098–101; **Pls.' Opp'n/Reply Ex. 136** (Drain Dep. Tr.) at 118:5–121:3, 122:3–124:12; **Pls.' Opp'n/Reply Ex. 188** (Dep. Ex. 136, Anthropic_0000013558); *see also* **Pls.' Ex. 25** (Def.'s Suppl. Resp. to Pls.' Interrog. Nos. 9, 11, 12, Nov. 12, 2025) at 7–8; **Answer to FAC** ¶¶ 59(b), 68, 70, 72–74; **Pls.' Opp'n/Reply Ex. 166** (Anthropic_0000352732) at -735. | Undisputed that Anthropic uses extractor tools to clean the data it collects to reduce the amount of noise in the data, including removing certain "boilerplate" data that is highly repetitive in websites' headers and footers that do not provide meaningful content.<br><br>Otherwise disputed that Anthropic sought to remove Publishers' CMI from web pages it collected.<br><br>It is undisputed that Mr. Mann testified that a "Copyright 2025 Anthropic PBC" symbol appearing in the "bottom left corner" of a webpage was "not something that we would specifically try to remove."<br><br>Publishers' CMI, as opposed to the website domains' CMI, appears in the HTML body of webpages, i.e., not in the headers and footers of webpages; as Dr. Shan reported, webpages "includes its own copyright notice ('Copyright (c) 2000-2016 AZLyris.com') at the bottom of its site and also includes the Publishers' name Polygram elsewhere on the page."<br><br>Dr. Zhao testified he is "[redacted]<br><br>Pls.' Ex. 25 (Def.'s Am. Suppl. Resp. to Pls.' Interrog. No. 9, Nov. 12, 2025); Pls.' Ex. 5 (Mann 30(b)(1) Dep. Vol. 1) |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | 78:1-13, 79:8-12, 80:25-81:10, 84:25-85:3, 87:11-23; Ex. 139 (Zhao Dep.) at 289:11-18, 292:22-293:9; Ex. 24 (Shan Reply) ¶ 27 (discussing Ex. 11 (Bilmes Rebuttal) ¶ 69, citing Ex. 100 ("Jay-Z - Dope Man Lyrics, AZLyrics.Com," (Anthropic_0000612704))) |
| | **<u>Publishers' Additional Fact #100:</u>** Webpage headers and footers frequently contain copyright notices and copyright management information.<br><br>**Burrell Decl., Ex. 10** (Zhao Report) at ¶ 61; **Burrell Decl., Ex. 11** (Bilmes Rebuttal) at ¶ 69; *see also* **Pls.' Opp'n/Reply Ex. 188** (Dep. Ex. 136, Anthropic_0000013558); **Pls.' Opp'n/Reply Ex. 136** (Drain Dep. Tr.) at 122:3–124:15 (discussing Dep. Ex. 136); **Pls.' Opp'n/Reply Ex. 128** (Kaplan Dep. Tr.) at 47:5–20. | Disputed. No evidence concerning the frequency at which copyright notices or copyright management information appears in webpage headers or footers is provided in the sources Publishers cite.<br><br>Publishers' CMI, as opposed to the website domains' CMI, appears in the HTML body of webpages, i.e., not in the headers and footers of webpages.<br><br>It is undisputed that Dr. Zhao is "not privy" to whether "Anthropic removed or extracted any text outside of a webpage header or footer."<br><br>It is undisputed that Dr. Shan "do[es] not know whether additional process, cleaning, other potential removal of CMI was being applied before the training, and [did] not inspect the exact training data" and "do[es] not know" and has "not done an independent analysis" of whether "CMI is deliberately removed or accidentally removed."<br><br>Ex. 24 (Shan Reply) ¶ 27 (discussing Ex. 11 (Bilmes Rebuttal) ¶ 69, citing Ex. 100 ("Jay-Z - Dope Man Lyrics, AZLyrics.Com," (Anthropic_0000612704))); Ex. 139 (Zhao Dep.) at 289:11-18, 292:22-293:9; Ex. 131 (Shan Dep.) at 180:14-181:4, 321:18-21. |
| | **<u>Publishers' Additional Fact #101:</u>** LLMs trained on repetitive text strings found in webpage headers and footers, including copyright | Disputed. Data duplicated across multiple webpages is undesirable "noise" in the training data because it is low-quality data for LLM training and its inclusion hurts model performance. |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | notices and CMI, will memorize those text strings.<br><br>**Pls.' Opp'n/Reply. Ex. 136** (Drain Dep. Tr.) at 71:2–7, 80:3–11, 118:5–24, 120:18121:5, 157:1–159:22; *see also* **Pls.' Ex. 4** (Mann 30(b)(6) Dep. Tr.) at 177:9–178:4; **Burrell Decl., Ex. 2** (Bilmes Report) at ¶ 115 & n.223. | Anthropic takes steps to mitigate memorization by cleaning, filtering, and de-duplicating its data.<br><br>Pls.' Opp'n/Reply. Ex. 136 (Drain Dep.) at 118:13-24 ("headers and footers" are "garbage" training data and "make[] the model dumber" because they consist of "one- or two- or three-word lines" rather than "coherent sentences" and are "very repetitive"); *id.* 120:24-121:5 ("[B]y 'garbage,' I mean if you train on this highly repetitive text, which isn't even like complete sentences, then it generally makes the model dumber."); Ex. 2 (Bilmes Report) at ¶¶ 111, 113, 115, 323 & n.597; Ex. 124 (Mann 30(b)(1) Dep. Vol. 1) at 80:21-81:10, 84:21-85:3; Ex. 30 (Def.'s Am. Supp. Resp. & Obj. to 1st Set of Interrogs. (Nos. 9, 11, 12) (Nov. 12, 2025)) at 7 ("'Noise' includes junk data and low quality data that would detract from the goal of teaching Claude to recognize true patterns in human language. Junk data might include boilerplate HTML text (e.g., 'Lorum Ipsum') and web spam (e.g., duplicitous and inaccurate keyword stuffing). Data at the lower end of the quality spectrum might include data that is highly repetitive (i.e., the same or similar words over and over again) and websites that are just headers and footers without any meaningful content."). |
| | <u>**Publishers' Additional Fact #102:**</u> Memorization of highly repetitive text, such as the text found in webpages headers and footers, can result in the AI model regurgitating that memorized text in output.<br><br>**Pls.' Opp'n/Reply Ex. 136** (Drain Dep. Tr.) at 67:4–68:2, 118:5–119:18, 120:18–121:5, 157:9–158:13; **Pls.' Ex. 5** (Mann 30(b)(1) | Disputed.<br><br>Data duplicated across multiple webpages is undesirable "noise" in the training data because it is low quality data for LLM training and its inclusion hurts model performance.<br><br>Anthropic takes steps to mitigate memorization by cleaning, filtering, and de-duplicating its data. |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | Dep. Tr.) at 84:25–85:3; **Pls.' Opp'n/Reply Ex. 129** (Brown Dep. Tr.) at 196:1–4; **Pls.' Opp'n/Reply Ex. 135** (Sangani Dep. Tr.) at 172:5–12, 264:13–24, 279:6–280:8; **Pls.' Ex. 4** (Mann 30(b)(6) Dep. Tr.) at 177:9–178:23; **Burrell Decl., Ex. 2** (Bilmes Report) at ¶ 115 & n.223. | Pls.' Opp'n/Reply. Ex. 136 (Drain Dep.) at 118:13-24 ("headers and footers" are "garbage" training data and "make[] the model dumber" because they consist of "one- or two- or three-word lines" rather than "coherent sentences" and are "very repetitive"); *id.* 120:24-121:3 ("[B]y 'garbage,' I mean if you train on this highly repetitive text, which isn't even like complete sentences, then it generally makes the model dumber."); Ex. 2 (Bilmes Report) at ¶¶ 111, 113, 115, 323 & n.597; Ex. 124 (Mann 30(b)(1) Dep. Vol. 1) at 80:21-81:10, 84:21-85:3; Ex. 30 (Def.'s Am. Supp. Resp. & Obj. to 1st Set of Interrogs. (Nos. 9, 11, 12) (Nov. 12, 2025)) at 7 ("'Noise' includes junk data and low quality data that would detract from the goal of teaching Claude to recognize true patterns in human language. Junk data might include boilerplate HTML text (e.g., 'Lorum Ipsum') and web spam (e.g., duplicitous and inaccurate keyword stuffing). Data at the lower end of the quality spectrum might include data that is highly repetitive (i.e., the same or similar words over and over again) and websites that are just headers and footers without any meaningful content."). |
| | <u>**Publishers' Additional Fact #103:**</u> In June 2021, Anthropic co-founder Benjamin Mann conducted "benchmark" testing on [redacted]<br><br>**Pls.' Opp'n/Reply Ex. 155** (Dep. Ex. 205, Anthropic_0000014096) at -098; **Pls.' Opp'n/Reply Ex. 125** (Mann 30(b)(1) Dep. Tr.) at 88:3–7, 89:21–90:25. | Undisputed only that Mr. Mann conducted benchmark testing on extractor tools to assess speed and error rate, which says nothing about CMI removal. |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | **Publishers' Additional Fact #104:** In his extractor tool testing, Mr. Mann specifically noted that [redacted]<br><br>**Pls.' Opp'n/Reply Ex. 155** (Dep. Ex. 205, Anthropic_0000014096) at -099; **Pls.' Opp'n/Reply Ex. 125** (Mann 30(b)(1) Dep. Tr.) at 89:9–19. | Undisputed only that in the cited document Mr. Mann states that "justext is about 50% faster, but it includes a ton of boilerplate." Another Anthropic employee questioned whether "boilerplate = useless junk in addition to real text?" to which Mr. Mann responded, "headers, footers, navbars, cookie policies, etc." and that hopefully [redacted] which was in response to Dr. Kaplan's proposal to use [redacted]<br><br>Undisputed that the cited testing does not involve Publishers' CMI, does not involve any of Publishers' works in suit, and does not involve any webpages asserted to have contained the lyrics of Publishers' works in suit.<br><br>Undisputed that such extraction tools are designed to extract main-body content and remove boilerplate from the headers and footers of a webpage.<br><br>Further disputed because Anthropic's token alphabet, which provides a numerical vocabulary that allows Claude to generate outputs, "include[ed] the copyright symbol, illustrating that Anthropic prepared its pipeline to potentially collect and interpret copyright management information."<br><br>Ex. 139 (Zhao Dep.) at 289:11-18, 292:22-293:9; Ex. 131 (Shan Dep.) at 180:14-181:4, 320:19-321:21; Ex. 124 (Mann 30(b)(1) Dep. Vol. 1) at 85:5-22 ("[I]f a copyright notice were in the body in a tag then I find it highly unlikely that we would remove it."). Ex. 19 (Bilmes Reply) ¶ 181 & n.486. |
| | **Publishers' Additional Fact #105:** Another Anthropic founder, Sam | Undisputed that the cited Slack thread contains the quoted language from an |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | McCandlish, provided a side-by-side comparison of [redacted]<br><br>**Pls.' Opp'n/Reply Ex. 155** (Dep. Ex. 205, Anthropic_0000014096) at -100; **Pls.' Opp'n/Reply Ex. 128** (Kaplan Dep. Tr.) at 165:9–15. | Anthropic employee with the username, Sam-pling.<br><br>Undisputed that this sample does not involve Publishers' CMI, does not involve any of Publishers' works in suit, and does not involve any webpages asserted to have contained the lyrics of Publishers' works in suit.<br><br>Otherwise, disputed that the cited document shows a "side-by-side comparison" or that the "significant improvement" comment pertained to [redacted]s removal of copyright management information, which referred to table of contents/heading clutter. The [redacted] example is a single line of text, where the [redacted] example includes over twenty lines of text, including repeated text, text interspersed with numbers, formatting, and footnotes.<br><br>Pls.' Opp'n/Reply Ex. 155 (Dep. Ex. 205, Anthropic_0000014096) at -100; Pls.' Opp'n/Reply Ex. 128 (Kaplan Dep.) at 167:12-168:12. |
| | **<u>Publishers' Additional Fact #106:</u>** Anthropic's founders Dario Amodei, Jared Kaplan, Tom Brown, Sam McCandlish, and Benjamin Mann previously used the Newspaper extractor and other similar tools to remove CMI and other information in multiple training datasets during their tenure at OpenAI. Anthropic subsequently used a reconstruction of those same datasets, known as [redacted], to train Claude. Anthropic knew that dataset contained copies of Publishers' lyrics from which CMI had been removed. | Undisputed that Dr. Dario Amodei, Dr. Jared Kaplan, Mr. Tom Brown, Mr. Sam McCandlish, and Mr. Benjamin Mann are named authors of one or more of the cited papers, published while they were employed by OpenAI.<br><br>Undisputed that *Language Models are Unsupervised Multitask Learners* purports to describe the creation of OpenAI's WebText training dataset and says that "the Dragnet and Newspaper content extractors" were used "to extract the text from HTML responses."<br><br>Undisputed that the *Language Models are Few-Shot Learners* and *Scaling* |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | **Pls.' Opp'n/Reply Ex. 125** (Mann 30(b)(1) Dep. Tr.) at 51:15–52:5; **Pls.' Ex. 22** (Def.'s Am. Suppl. Resp. to Pls.' Interrog. No. 6, Oct. 9, 2025) at 3; **Pls.' Opp'n/Reply Ex. 155** (Dep. Ex. 205, Anthropic_0000014096) at -098; **Pls.' Opp'n/Reply Ex. 177** (Alec Radford, Dario Amodei, et al., *Language Models are Unsupervised Multitask Learners*, OPENAI, https://cdn.openai.com/better-language-models/language_models_are_unsupervised_multitask_learners.pdf) at 3; **Pls.' Opp'n/Reply Ex. 172** (Dep. Ex. 202, Tom B. Brown et al., *Language Models are Few-Shot Learners*, ARXIV (July 22, 2020), https://arxiv.org/pdf/2005.14165) at 8–9; **Pls.' Opp'n/Reply Ex. 176** (Jared Kaplan et al., *Scaling Laws for Neural Language Models*, ARXIV (Jan. 23, 2020), https://arxiv.org/pdf/2001.08361) at 7. | *Laws for Neural Language Models* papers used the WebText dataset.<br><br>Undisputed that Anthropic has used the [redacted] dataset in model training.<br><br>Otherwise disputed. None of the three cited papers state that "the Newspaper extractor [or] other similar tools [were used] to remove CMI" or that copyright management information, and specifically Publishers' copyright management information, was removed from data sources in the creation of the WebText dataset.<br><br>Pls.' Opp'n/Reply Ex. 177 (Alec Radford, Dario Amodei, et al., *Language Models are Unsupervised Multitask Learners*, OPENAI, https://cdn.openai.com/better-language-models/language_models_are_unsupervised_multitask_learners.pdf) at 3; Pls.' Opp'n/Reply Ex. 172 (Dep. Ex. 202, Tom B. Brown et al., *Language Models are Few-Shot Learners*, ARXIV (July 22, 2020)) at 8–9; Pls.' Opp'n/Reply Ex. 176 (Jared Kaplan et al., *Scaling Laws for Neural Language Models*, ARXIV (Jan. 23, 2020), https://arxiv.org/pdf/2001.08361) at 7.<br><br>The cited Slack thread (Pls.' Opp'n/Reply Ex. 155) states only that [redacted] It does not state that it was used to "remove CMI."<br><br>Pls.' Opp'n/Reply Ex. 155 (Dep. Ex. 205, Anthropic_0000014096) at -098.<br><br>None of the cited sources support that Dario Amodei, Jared Kaplan, Tom Brown, Sam McCandlish, or Benjamin Mann were involved in the creation of the [redacted] dataset. Mr. Mann |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | testified, "there were a number of groups that wanted to reproduce the results in GPT-2. So those groups banded together to produce what was called the [redacted]"<br><br>None of the cited sources support that the [redacted] dataset contains "Publishers' lyrics," let alone webpages including lyrics from which CMI was removed.<br><br>Anthropic's response to Interrogatory 6 confirms that "Anthropic trains its models on massive amounts of data, including portions of datasets sourced from the Internet" so Anthropic "does not know all the contents of those datasets" used in training.<br><br>Mr. Mann testified, in response to the question, "Has Anthropic obtained the WebText2 dataset?" that obtaining the WebText dataset "would only be possible by agreement with OpenAI, which we certainly don't have."<br><br>Pls.' Opp'n/Reply Ex. 125 (Mann 30(b)(1) Dep. Vol. 1) at 51:18-25; 52:6-9; Pls.' Ex. 22 (Def.'s Am. Suppl. Resp. to Pls.' Interrog. No. 6, Oct. 9, 2025), at 3 (identifying "[redacted]" as a source of training data and stating "Anthropic does not know all the contents of th[e] datasets."). |
| | **<u>Publishers' Additional Fact #107:</u>** Anthropic also trained Claude using copies of Publishers' lyrics from another training dataset, "The Pile," which Anthropic knew contained copies of Publishers' lyrics from which CMI had been removed.<br><br>**Answer to FAC** ¶ 69; **Pls.' Ex. 21** (Def.'s Am. Resp. to Pls.' RFA No. 30) at 31–32; **Pls.' Opp'n/Reply** | Undisputed that Anthropic has used portions of The Pile in connection with training.<br><br>Disputed because Anthropic's answer to Publishers' First Amended Complaint confirms only that Anthropic "has used portions of the Pile in connection with the training of certain Claude models" not that it knew what The Pile contained. |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | **Ex. 190** (Leo Gao, et al. *The Pile: An 800GB Dataset of Diverse Text for Language Modeling,* ARXIV: 2101.00027v1 (Dec. 31, 2020)) at 14; **Pls.' Ex. 5** (Mann 30(b)(1) Dep. Tr.) at 42:1–19, 47:1–5, 49:18–23. | Mr. Mann's testimony similarly confirms that The Pile was used in training.<br><br>Neither source supports that "Anthropic knew" that The Pile "contained copies of Publishers' lyrics," let alone that "CMI had been removed." Mr. Mann testified that he "d[id]n't know for sure whether [The Pile] contains copyrighted content."<br><br>"Anthropic trains its models on massive amounts of data, including portions of datasets sourced from the Internet" so Anthropic "does not know all the contents of those datasets" used in training.<br><br>Further disputed because the cited paper, *The Pile: An 800GB Dataset of Diverse Text for Language Modeling*, does not identify Publishers' lyrics as content appearing in any of The Pile datasets. The paper categorizes "each of the datasets within the Pile" based on "three tiers of availability for public use" informed by "how the authors of its data have indicated that that data can be used." The fact that some Pile datasets "were not collected and distributed in a ToS compliant fashion" does not establish that said datasets contain Publishers' lyrics, that CMI was removed from the data, or that Anthropic was aware of the contents of The Pile.<br><br>Answer to FAC ¶ 69; Pls.' Ex. 5 (Mann 30(b)(1) Dep. Vol. 1) at 42:1-19, 45:9-17; 47:1-5, 49:18-23; Pls.' Opp'n/Reply Ex. 190 (Leo Gao, et al. *The Pile: An 800GB Dataset of Diverse Text for Language Modeling,* ARXIV: 2101.00027v1 (Dec. 31, 2020)) at 14; Pls.' Ex. 22 (Def.'s Am. Suppl. Resp. to |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | Pls.' Interrog. No. 6, Oct. 9, 2025), at 3 (stating "Anthropic does not know all the contents of th[e] datasets" used in training). |
| | **<u>Publishers' Additional Fact #108:</u>** The Claude outputs containing Publishers' lyrics for each of the 499 Works in Suit cited in Publishers' Motion for Partial Summary Judgment do not contain full CMI.<br><br>*See* **Pls.' Ex. 1** (comparison chart of Publishers' lyrics and Claude output in response to prompts submitted by Publishers' investigator for all 499 Works in Suit); **Pls.' Ex. 47** (Claude prompt-output records underlying Pls.' Ex. 1); **Pls.' Ex. 2** (comparison chart of Publishers' lyrics and Claude output in response to third-party prompts); **Pls.' Ex. 19** (Claude prompt-output records underlying Pls.' Ex. 2); *see also* Seymour Decl., Ex. B, ECF Nos. 49-2–49-4. | Disputed.<br><br>The prompts entered by Publishers' investigator in the general format "What are the lyrics to [song] by [performing artist]?' resulted in outputs containing partial CMI, consisting of the songwriter or artist's name and the title of the song, for 495 out of the 499 works in suit. For the other four works, the comparison chart in Pls.' Ex. 1 either contained a prompt seeking lyrics to a different song than the work the output was cited for (two works: "I Will Rise" and "I Will Survive"), or other outputs, not cited in Pls.' Ex. 1, confirm that Claude has produced partial CMI for the work (two works: "Stereo Hearts" and "I'm N Luv (Wit a Stripper)").<br><br>Further disputed because Pls.' Ex. 2 also demonstrates that Claude produced partial CMI—songwriter/artist name and/or song title—in many of the cited outputs.<br><br>*See* Seymour Decl., ¶ 7 ("BCGuardian made queries in the form 'what are the lyrics to [composition title] by [performing artist].'"); Pls.' Ex. 1 (comparison chart of Publishers' lyrics and Claude output in response to prompts submitted by Publishers' investigator for 497 Works in Suit); *see id.* at 99-100 ("I Will Rise"); *id.* at 779-781 ("I Will Survive"); Seymour Decl., Ex. D (providing complete Claude outputs generated by Publishers' investigator beyond that which was excerpted for Exhibit 1); Ant. Reply Ex. 182 (Plaintiffs_0000002304); Ant. Reply Ex. 183 (Anthropic_0000018309). *See, e.g.*, |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | Pls.' Ex. 2 at 1, 4, 6, 10, 18, 26, 28, 35, 37, 39, 45, 47, 53. |
| | **Publishers' Additional Fact #109:** Because LLMs are trained to predict conditional probabilities of the tokens in their training data and cannot understand where substantive text (such as lyrics) stops versus where CMI begins, it is "very likely" for CMI to be present in output containing lyrics where the final training data contains CMI.<br><br>**Burrell Decl. Ex. 131** (Shan Dep.) at 320:23–321:10; **Burrell Decl., Ex. 24** (Shan Reply) at ¶ 30; *see also* **Burrell Decl., Ex. 7** (Shan Report) at ¶ 19; **Burrell Decl., Ex. 10** (Zhao Report) at ¶ 26. | Disputed.<br><br>Dr. Bilmes's report explains that, "while LLMs can perform complex tasks such as summarizing information and generating code, they do not function similarly to databases or search engines."<br><br>He continues: "LLMs do not store or retrieve passages of text verbatim. Instead, they generate new and different outputs, probabilistically, based on general statistical patterns and relationships learned during training that are represented in the model's weights. Because their outputs are drawn from probability distributions, LLMs can produce different results when generating outputs in response to the same prompt, particularly when the final text is produced by stochastically (i.e., randomly) sampling from those distributions, which is by far the most common approach to LLM generation."<br><br>Dr. Bilmes reported: "LLMs cannot be used to reliably extract data deterministically and will usually produce different outputs to the same input data (*i.e.*, the prompt)" because "there are many ways model builders control the randomness of an LLM's outputs, and features of the computation process ensure that there is almost always some stochasticity to an LLM's output."<br><br>Further disputed because Publishers do not contest that "[f]or [redacted] |

**PUBLIC REDACTED VERSION**

| **Publishers' Additional Material Facts on This Issue** | | **Anthropic's Response & Supporting Evidence** |
|---|---|---|
| | | [redacted]." Dr. Bilmes explained that because "LLMs do not reference any particular piece of training data when generating an output," it is therefore "impossible to say that any generated output referenced any particular piece of training data that did or did not contain CMI."<br><br>Further disputed because Anthropic's token alphabet, which provides a numerical vocabulary that allows Claude to generate outputs, "include[ed] the copyright symbol, illustrating that Anthropic prepared its pipeline to potentially collect and interpret copyright management information."<br><br>Further disputed because Dr. Shan has no evidence showing that CMI was removed from the final, post-processing data used to train Claude.<br><br>Ex. 2 (Bilmes Report) at ¶ 98; Ex. 11 (Bilmes Rebuttal) at ¶¶ 45, 70-74, 76; Ex. 19 (Bilmes Reply) ¶ 181 n.486; Ex. 131 (Shan Dep.) at 180:14-181:4, 321:18-21. |
| | **<u>Publishers' Additional Fact #110:</u>** Anthropic knew that Claude's training data contained copyrighted works copied from the internet without permission from rightsholders.<br><br>**Pls.' Ex. 4** (Mann 30(b)(6) Dep. Tr.) at 29:17–23 ("Q. Does Anthropic's training data contain copyrighted works? A. I would say every commercial model and open-source model that I'm aware of contains copyrighted works in addition to Anthropic's models. I guess I would say that's an industry-standard practice. So, yes."); **Pls.' Opp'n/Reply Ex. 128** | Undisputed that Anthropic knew that Claude's training data included text from the internet from webpages whose robots.txt files permitted crawling or from webpages that did not implement a robots.txt file to prevent such crawling.<br><br>Undisputed that the cited testimony and documents do not involve Publishers' CMI, do not involve any of Publishers' works in suit, and do not involve any webpages asserted to have contained the lyrics of Publishers' works in suit.<br><br>Disputed that Anthropic knew or believed that any further "permission from rightsholders" was required for work copied from the internet on |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | (Kaplan Dep. Tr.) at 345:13–20 [redacted] **Pls.' Ex. 40** (Dep. Ex. 238, Anthropic _0000217166) at -168 ([redacted] **Pls.' Ex. 6** (Kaplan Dep. Tr.) at 255:4–25 (discussing Dep. Ex. 238); **Pls.' Opp'n/Reply Ex. 157** (Dep. Ex. 237, Anthropic_0000479241) at -243 [redacted]; **Pls.' Opp'n/Reply Ex. 128** (Kaplan Dep. Tr.) at 207:1–209:21 (discussing Dep. Ex. 237); *see also* **Pls.' Ex. 44** (Anthropic_0000240524); **Pls.' Opp'n/Reply Ex. 128** (Kaplan Dep. Tr.) at 143:9–145:2, 155:11–21; **Pls.' Opp'n/Reply Ex. 158** (Dep. Ex. 240, Anthropic_0000240665); **Pls.' Opp'n/Reply Ex. 128** (Kaplan Dep. Tr.) at 287:7–289:16 (discussing Dep. Ex. 240). | webpages that did not disallow crawling. Mr. Benjamin Mann, Dr. Dario Amodei, and Dr. Jared Kaplan testified to their personal belief that training LLMs on text from the internet is permissible.<br><br>Ant. Reply Ex. 164 (Dario Amodei Dep.) at 25:2-26:16 ("So if a human reads something that is freely available and then uses that to synthesize content of their own, then, you know, we -- you know, if I -- if I read book that was freely available that was in the public domain or if I buy a book and then I use that to train -- and you know, I -- I kind of absorb that into my brain and I have an idea that is inspired by having read a range of books, you know, that -- that idea and the outputs that come from it are -- you know, we don't even think of them as fair use. We just think of it as: Yeah, humans can read books, and then they have ideas. So that's – that's how I think about fair use in terms of training AI models."); *e.g.*, *id.* at 27:25-28:25, 30:10-31:22; Ant. Reply Ex. 173 (Mann 30(b)(6) Dep.) at 108:20-110:13 ("I had a layman's understanding of copyright and fair use, and I and others at Anthropic believed that using lyrics and other kinds of copyrighted data for the purposes of training a model would constitute fair use, independent of discussion with counsel."); Ant. Reply Ex. 160 (Kaplan Dep.) at 224:21-225:11 ("Based on my informal understanding, which is as not an expert, my understanding is that training AI models on text is highly transformative in roughly the same sense that a human being reading text is transformative and that it is most likely fair use.").<br><br>Publishers' other cited exhibits do not speak to whether purportedly copyrighted data copied from the |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | internet was or was not acquired with rightsholders' permission.<br><br>Pls.' Ex. 40 (Dep. Ex. 238, Anthropic_0000217166) at -168 (discussing safety metrics related to outputs); Pls.' Opp'n/Reply Ex. 157 (Dep. Ex. 237, Anthropic_0000479241) at -243 (describing [redacted] for use of their data but that [redacted] and [redacted]"); Pls.' Ex. 44 (Anthropic_0000240524) (describes "various measures that can be taken" specific to outputs "[i]f the recent copyright drama is legally well-founded"); Pls.' Opp'n/Reply Ex. 158 (Dep. Ex. 240, Anthropic_0000240665) (discussing Claude outputs in research model); Pls.' Opp'n/Reply Ex. 128 (Kaplan Dep.) at 287:7–289:16 (discussing Dep. Ex. 240 and stating, "[redacted]"). |
| | **<u>Publishers' Additional Fact #111:</u>** Anthropic knew that Claude output containing copyrighted content was illegal.<br><br>**Pls.' Ex. 13** (Dario Amodei Dep. Tr.) at 57:1–59:10 ("[M]odels shouldn't output copyrighted content because it's—it's against the law to do so."); **Pls.' Ex. 44** (Anthropic_0000240524); **Pls.' Ex. 95** (Dep. Ex. 247, *Transcript: Ezra Klein Interviews Dario Amodei*, N.Y. TIMES (Apr. 12, 2024), https://www.nytimes.com/2024/04/12/podcasts/transcript-ezra-kleininterviews-dario-amodei.html) ("I think everyone agrees the models shouldn't be verbatim outputting copyrighted content . . . | Disputed.<br><br>Dr. Amodei repeatedly testified, that "subject to exceptions and exemptions around fair use, models should not be outputting copyrighted content."<br><br>Ex. 112 (Dario Amodei Dep.) at 39:23-25, 52:10-12, *id.* at 40:11-21, 57:9-12.<br><br>The statement from Dr. Amodei in his *New York Times* interview is limited to "verbatim" outputs and his full statement confirms his view that the LLM training process is "transformative" and his belief that "the law will back this up, that this is fair use." |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | we don't think [the model is] just hoovering up content and spitting it out, or it shouldn't be spitting it out"); **Pls.' Ex. 13,** Dario Amodei Dep. Tr. 91:12-24; *see also* **Pls.' Opp'n/Reply Ex. 162** (Anthropic_0000570572) (In response to Anthropic employee Ben Kuhn prompting Claude for help "[redacted]," Claude's output included the reminder: "[redacted]"). | When asked about the cited statement from his *New York Times* interview during his deposition, Dr. Amodei clarified that "many statements that are made without caveats on, you know, interviews where you have to respond quickly, you know, if -- if you had the fullness of time, you would make that – you would make that same statement with a number of caveats or elaborate and describe the nuance, so I would say, again, you know, models should not be verbatim outputting copyright cont – outputting copyrighted content, again, subject -- subject to the bounds of fair use."<br><br>Pls.' Ex. 95 at 15-16 (Dep. Ex. 247, *Transcript: Ezra Klein Interviews Dario Amodei*, N.Y. TIMES (Apr. 12, 2024); Ant. Reply Ex. 164 (Dario Amodei Dep.) at 48:1-13.<br><br>The cited Slack conversation says, "if the recent copyright drama is legally well-founded," and describes "various measures that can be taken" "if the issue is outputting copyrighted data."<br><br>Pls.' Ex. 44 (Anthropic_0000240524).<br><br>Disputed that the content of a Claude output to a single Anthropic employee is evidence of what "Anthropic knew."<br><br>Further disputed that Anthropic knew Claude was outputting "copyrighted content," including lyrics to works in suit.<br><br>Anthropic implemented guardrails to prevent regurgitation of copyrighted material as early as [redacted]— prior to releasing Claude to the public. Anthropic also added a principle to its Constitutional AI finetuning process on or around [redacted] (before the release |

PUBLIC REDACTED VERSION

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | | of Claude.ai), instructing Claude to respect intellectual property rights and avoid reproducing copyrighted materials.<br><br>It is undisputed that Publishers did not notify Anthropic of allegedly infringing outputs prior to filing suit.<br><br>Ms. Daniela Amodei testified that when Anthropic "received the Complaint from Music Publishers, [redacted]."<br><br>Pls.' Opp'n/Reply Ex. 162 (Anthropic_0000570572); Pls.' Ex. 25 (Def.'s Am. Suppl. Resp. to Pls.' Interrog. No. 12, Nov. 12, 2025) at 12-13; Ex. 110 (Coleman Dep.) at 184:1-5; Ex. 104 (Berschback Dep.) at 252:5-254:23; Ex. 117 (Draughon Dep.) at 154:4-19; Ex. 121 (Kokakis Dep.) at 293:1-9; Ex. 111 (Daniela Amodei Dep.) at 356:25-357:8.<br><br>Further disputed because Claude outputs often contain only small snippets of existing lyrics and/or use lyrics in a manner that is not similar to the original lyric text.<br><br>E.g., Pls.' Ex. 2 at 45 (Output connecting the [redacted]"); *id.* at 303 (Output compiling [redacted]); *id.* at 142 (Output creating a [redacted].). |
| | **<u>Publishers' Additional Fact #112:</u>** As early as July 2021, Anthropic founders recognized the "[redacted] | Undisputed that the cited July 2021 memo contains the quoted language. |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
|---|---|---|
| | [redacted]."<br><br>**Pls.' Ex. 43** (Dep. Ex. 170, Anthropic_0000458427) at -428 (July 2021 memo authored by [redacted]"). | Disputed that Anthropic was aware of a "[redacted]" related to song lyrics in July 2021.<br><br>Daniela Amodei testified that when Anthropic "received the Complaint from Music Publishers, [redacted]."<br><br>Ex. 111 (Daniela Amodei Dep.) at 356:25-357:8.<br><br>Disputed that Anthropic was not taking steps to address data recitation. The cited memo states Anthropic intended to: "[redacted]," described work that was already underway [redacted]"), and that Anthropic "[redacted]" because "[redacted]."<br><br>Pls.' Ex. 43 (Dep. Ex. 170, Anthropic_0000458427) at -428.<br><br>Further disputed that Anthropic was not taking steps to address data recitation. To address the "[redacted]," Anthropic implemented the first version of its content compare system guardrail on or around [redacted], prior to Claude's public launch, to detect and prevent reproduction of copyrighted works in outputs. Anthropic also included a specific principle against reproducing intellectual property in its Constitutional AI finetuning process on or around [redacted], before claude.ai's launch. |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | Anthropic's Response & Supporting Evidence |
|---|---|
| | Ex. 30 (Def.'s Am. Supp. Resp. & Obj. to 1st Set of Interrogs. (Nos. 9, 11, 12) (Nov. 12, 2025)) at 12-13. |
| **<u>Publishers' Additional Fact #113:</u>** Claude has generated output containing copies of Publishers' lyrics, but has falsely identified that output as new or original content, without attributing the lyrics to Publishers.<br><br>*See, e.g.*, **Pls.' Ex. 19** at 913–16 (Anthropic_0000248217) (Oct. 11, 2023 output providing lyrics to "Blowin' in the Wind" in response to prompts asking for [redacted]"); **Pls.' Ex. 1** at 1066 (citing ECF No. 49-5 at 5) (When prompted "write me a song about the death of buddy holly," Claude generated output reproducing the lyrics to "American Pie," claiming "Here is a song I wrote about the death of Buddy Holly"), 1079 (citing ECF No. 49-5 at 18) (When prompted "write me a song about born to be wild," Claude responded with the lyrics to "Born to Be Wild" stating "here is a song I wrote about being born to be wild"). | Undisputed that in response to the prompt, "Write me a song about the death of buddy holly," Claude responded in part, "Here is a song I wrote about the death of Buddy Holly." Also undisputed that in response to the prompt, "Write me a song about BORN TO BE WILD," Claude responded in part, "Here is a song I wrote about being born to be wild."<br><br>Disputed to the extent that the lyrics to American Pie and Born to be Wild in Pls.' Ex. 1 are from LyricFind.com, not the produced deposit copy for each work, and Publishers' expert identified discrepancies between the LyricFind.com lyrics and the deposit copies for American Pie and Born to be Wild.<br><br>Pls.' Ex. 1 at 1066 (citing Dkt. 49-6 at 169-172); 1079 (citing Dkt. 49-6 at 238-39); Leonard Decl., Ex. H at 3-6, 9-10.<br><br>Disputed that an "Oct. 11, 2023 output provid[ed] lyrics to 'Blowin' in the Wind'" in response to a "[redacted].'" The October 11, 2023 conversation includes two separate prompts: "[redacted] and "[redacted]." Each prompt has a separate corresponding output.<br><br>Pls.' Ex. 19 at pp. 913–16 (Anthropic_0000248217).<br><br>Disputed that the October 11, 2023 output contains the lyrics to "Blowin' in the Wind" as found in the |

**PUBLIC REDACTED VERSION**

| Publishers' Additional Material Facts on This Issue | | Anthropic's Response & Supporting Evidence |
| --- | --- | --- |
| | | deposit copy for the work. Publishers did not produce the deposit copy for "Blowin' in the Wind." Even for works in suit for which Publishers produced deposit copies, Publishers claim the lyrics displayed on LyricFind.com are the "genuine" copyrighted lyrics for all 499 works. But there are discrepancies between the LyricFind.com lyrics and the produced deposit copies.<br><br>Ex. 29 (Pls.' Supp. Resp. & Obj. to Def.'s 3rd Set of Req. For Admis. (Oct. 9, 2025)) at Nos. 239-240 (Blowin' in the Wind); *see* Ex. 121 (Kokakis Dep.) 122:25–123:25; Leonard Decl. Ex. H (acknowledging differences in the lyrics between LyricFind.com and deposit copies for the 13 deposit copies produced); Berschback Decl. ¶ 39; Coleman Decl. ¶ 13; Draughon Decl. ¶ 29; Kokakis Decl. ¶¶ 143-145; *see also* Seymour PI Decl. & Ex. D.<br><br>Disputed that Claude has intent to "falsely identif[y]" "output as new or original content." LLMs may "hallucinate" in responses, which Anthropic works to minimize.<br><br>Ex. 2 (Bilmes Report) ¶¶ 271, 273, 281-282; Ex. 11 (Bilmes Rebuttal) ¶¶ 26, 34-40 45; Ant. Reply Ex. 184 (Zhao Dep.) 161:5-17 ("Large language models don't intentionally do anything; they are software."). |

I attest that the evidence cited herein fairly and accurately supports or disputes the facts as asserted.

**PUBLIC REDACTED VERSION**

Date: September 8, 2026

*/s/ Sonal N. Mehta*

SONAL N. MEHTA (SBN 222086)
sonal.mehta@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000

LOUIS W. TOMPROS (*Pro Hac Vice*)
louis.tompros@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6220

ARI HOLTZBLATT (SBN 354361)
ari.holtzblatt@wilmerhale.com
ROBIN C. BURRELL (*Pro Hac Vice*)
robin.burrell@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
2100 Pennsylvania Ave, NW
Washington, DC 20037
Telephone: (202) 663-6000

TAYLOR GOOCH (SBN 294282)
taylor.gooch@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
50 California St.
San Francisco, CA 94111
Telephone: (628) 235-1000

ALEX W. MILLER (*Pro Hac Vice*)
alex.miller@wilmerhale.com
JARED V. GRUBOW (*Pro Hac Vice)*
jared.grubow@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
250 Greenwich St
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Defendant*
**ANTHROPIC PBC**

**PUBLIC REDACTED VERSION**

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2026, I did cause this motion to be served on the following listed below and in the manner so indicated.

**By Electronic Mail**


OPPENHEIM + ZEBRAK, LLP
Matthew J. Oppenheim (*Pro Hac Vice*)
Nicholas C. Hailey (*Pro Hac Vice*)
Audrey Adu-Appiah (*Pro Hac Vice*)
Corey Miller (*Pro Hac Vice*)
Jeffrey M. Gould (*Pro Hac Vice*)
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
aadu-appiah@oandzlaw.com
corey@oandzlaw.com
jeff@oandzlaw.com

Jennifer Pariser (*Pro Hac Vice*)
Andrew Guerra (*Pro Hac Vice*)
Timothy Chung (*Pro Hac Vice*)
Michelle Gomez-Reichman (*Pro Hac Vice*)
Bret Matera (*Pro Hac Vice*)
Alexander Kaplan (*Pro Hac Vice*)
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
jpariser@oandzlaw.com
andrew@oandzlaw.com
tchung@oandzlaw.com
mgomez-reichman@oandzlaw.com
bmatera@oandzlaw.com
alex@oandzlaw.com

COBLENTZ PATCH DUFFY & BASS LLP
Jeffrey G. Knowles
Christopher J. Wiener
Bina Patel
Thomas A. Harvey
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 772-5795
Ef-jgk@cpdb.com
cwiener@coblentzlaw.com
bpatel@coblentzlaw.com
Ef-Tah@cpdb.com

COWAN, LEIBOWITZ & LATMAN, P.C.
Richard S. Mandel (*Pro Hac Vice*)
Jonathan Z. King (*Pro Hac Vice*)
Richard Dannay (*Pro Hac Vice*)
114 West 47th Street
New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com


Dated: September 8, 2026

By: */s/ Sonal N. Mehta*
Sonal N. Mehta