**OPPENHEIM + ZEBRAK, LLP**
Matthew J. Oppenheim
Nicholas C. Hailey
Jeffrey M. Gould
Corey Miller
Keith Howell
Audrey L. Adu-Appiah
(admitted *pro hac vice*)
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
jeff@oandzlaw.com
corey@oandzlaw.com
khowell@oandzlaw.com
aadu-appiah@oandzlaw.com

Alexander Kaplan
Jennifer Pariser
Andrew Guerra
Bret Matera
Timothy Chung
Michelle Gomez-Reichman
(admitted *pro hac vice*)
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
alex@oandzlaw.com
jpariser@oandzlaw.com
andrew@oandzlaw.com
bmatera@oandzlaw.com
tchung@oandzlaw.com
mgomez-reichman@oandzlaw.com

**COBLENTZ PATCH DUFFY & BASS LLP**
Jeffrey G. Knowles (SBN 129754)
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 391-4800
ef-jgk@cpdb.com

**COWAN, LIEBOWITZ & LATMAN, P.C.**
Richard S. Mandel
Jonathan Z. King
Richard Dannay
(admitted *pro hac vice*)
114 West 47th Street
New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

CONCORD MUSIC GROUP, INC., ET AL.,

Plaintiffs,

v.

ANTHROPIC PBC,

Defendant.

Case Number: 5:24-cv-03811-EKL-SVK

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

**FILED UNDER SEAL**

Judge Eumi K. Lee
Magistrate Judge Susan van Keulen

Hearing Date: July 15, 2026, 10:00 am
Courtroom: 7

## NOTICE OF MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on July 15, 2026, at 10:00 am (*see* ECF No. 587), or as soon thereafter as this matter may be heard, before the Honorable Eumi K. Lee, District Judge, U.S. District Court for the Northern District of California, in Courtroom 7 – 4th Floor, 280 South 1st Street, San Jose, CA 95113, Plaintiffs Concord Music Group, Inc., Capitol CMG, Inc., Universal Music Corp., Songs of Universal, Inc., Universal Music - MGB NA LLC, Polygram Publishing, Inc., Universal Music - Z Tunes LLC, and ABKCO Music, Inc. (collectively, "Publishers") will and hereby do respectfully move this Court for an order granting partial summary judgment in Publishers' favor against Defendant Anthropic PBC ("Anthropic").

Publishers seek an order pursuant to Federal Rule of Civil Procedure 56 granting their Motion for Partial Summary Judgment ("Motion"), on the grounds that summary judgment is warranted because the uncontroverted evidence establishes: (1) Anthropic committed *prima facie* direct copyright infringement under 17 U.S.C. §§ 106 (1)-(3), (5) and 501, given that Publishers own or control valid copyrights in each of Publishers' 499 Works in Suit asserted in the First Amended Complaint, ECF Nos. 337, 337-1, and Anthropic copied those Works during the training and in the output of its "Claude" artificial intelligence ("AI") models; and (2) Anthropic's copying of Publishers' Works without permission, including to train its Claude AI models and in the output those models generate, is not fair use under 17 U.S.C. § 107.[1]

Publishers' Motion is based on this Notice of Motion, the accompanying Motion and Memorandum of Points and Authorities, the accompanying Moving Separate Statement and exhibits thereto, the accompanying declarations and exhibits thereto, all pleadings and papers in this action, and oral argument of counsel.

---

[1] Anthropic has asserted a long list of additional affirmative defenses that lack bases or merit. Publishers are continuing to try to meet and confer with Anthropic to have these meritless defenses withdrawn. Anthropic has described fair use as the "core issue" in this case, *see, e.g.*, ECF No. 205 at 2, and Publishers focus this Motion on addressing Anthropic's direct infringement and the failure of its "core" fair use defense.

**CERTIFICATION OF COMPLIANCE WITH CIVIL STANDING ORDER SEC. VIII.A**

Pursuant to Sec. VIII.A of the Court's Civil Standing Order, the undersigned counsel certifies that Publishers' counsel met and conferred with Anthropic's counsel by videoconference on March 10, 2026 and by email to discuss the bases for this Motion in an effort to resolve or narrow disputed issues where possible to reduce motion practice.

## TABLE OF CONTENTS


INTRODUCTION ... 1
BACKGROUND ... 3
I. Plaintiff Music Publishers and their copyrighted Works ... 3
II. Defendant Anthropic and its copying of Publishers' Works ... 4
A. Anthropic's copying of Publishers' Works as the input to train its AI models ... 4
B. Anthropic's training of Claude to output Publishers' Works ... 5
C. Anthropic's copying of Publishers' Works in the output of its AI models ... 7
1. Output of Publishers' Works in response to direct requests for lyrics ... 7
2. Output of Publishers' Works in response to other types of prompts ... 9
3. Output of "new" AI-generated lyrics based on the Works ... 11
D. Anthropic's after-the-fact adoption of copyright "guardrails" ... 11
LEGAL STANDARD ... 13
ARGUMENT ... 13
I. There is no fact dispute that Anthropic engaged in *prima facie* direct infringement. ... 13
A. Publishers own or control valid copyrights in the Works in Suit. ... 13
B. Anthropic unlawfully copied Publishers' Works, as AI input and output. ... 14
1. Anthropic unlawfully reproduced the Works as input for its AI models. ... 14
2. Anthropic unlawfully reproduced, distributed, displayed, and prepared derivative works based on the Works in its AI model output. ... 14
3. Anthropic engaged in volitional conduct. ... 17
II. Anthropic's infringement is not fair use. ... 18
A. Anthropic's exploitation of the Works is contrary to the purpose of fair use. ... 19
B. All four statutory factors likewise weigh against fair use. ... 20
1. Anthropic's highly commercial use was not transformative. ... 21
a. *Warhol* significantly recalibrated the first-factor analysis. ... 21
b. Anthropic's use was not transformative under *Warhol*. ... 22
c. Anthropic's use was undoubtedly commercial. ... 25
2. Publishers' Works are at the core of copyright protection. ... 27
3. Anthropic uses all or nearly all of each Work. ... 28
4. Anthropic's use harms the market for and value of Publishers' Works. ... 28
a. Anthropic's copying of Publishers' Works in AI output serves as a market substitute and denies Publishers licensing revenues. ... 29
b. Anthropic's output of "new" AI-generated song lyrics dilutes the market and indirectly substitutes for Publishers' Works. ... 31
c. Anthropic subverts the licensing market for AI training data. ... 34
CONCLUSION ... 35

# TABLE OF AUTHORITIES

**Cases**


*A&M Recs., Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) .......... 14, 32

*Am. Geophysical Union v. Texaco Inc.*,
60 F.3d 913 (2d Cir. 1994) .......... 29

*Ambrosetti v. Oregon Cath. Press*,
151 F.4th 1211 (9th Cir. 2025) .......... 15

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) .......... *passim*

*Atari Interactive, Inc. v. Redbubble, Inc.*,
515 F. Supp. 3d 1089 (N.D. Cal. 2021) .......... 18

*Bartz v. Anthropic PBC*,
787 F. Supp. 3d 1007 (N.D. Cal. 2025) .......... 26, 27, 30

*Bell v. Wilmott Storage Servs., LLC*,
12 F.4th 1065 (9th Cir. 2021) .......... 16, 18

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) .......... *passim*

*Columbia Pictures Indus., Inc. v. Fung*,
710 F.3d 1020 (9th Cir. 2013) .......... 14

*Dr. Seuss Enters., L.P. v. ComicMix*,
983 F.3d 443 (9th Cir. 2020) .......... *passim*

*Elohim EPF USA, Inc. v. 600 N. Vermont Inc.*,
2023 WL 4680366 (C.D. Cal. June 15, 2023) .......... 14

*Elohim EPF USA, Inc. v. Total Music Connection, Inc.*,
2015 WL 12655556 (C.D. Cal. Oct. 1, 2015) .......... 15

*Fox Broad. Co. v. Dish Network, L.C.C.*,
905 F. Supp. 2d 1088 (C.D. Cal. 2012) .......... 35

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2020) .......... 28, 32, 35

*GoPro, Inc. v. 360Heros, Inc.*,
291 F. Supp. 3d 1060 (N.D. Cal. 2017) .......... 15

*Harper & Row Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985) .......... *passim*

*Kadrey v. Meta Platforms, Inc.*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025) .......... *passim*

*Leadsinger, Inc. v. BMG Music Publ'g*,
512 F.3d 522 (9th Cir. 2008) .......... 18, 26, 27, 28

*McGucken v. Pub Ocean Ltd.*,
42 F.4th 1149 (9th Cir. 2022) .......... 28, 29, 30, 31

*Microsoft Corp. v. EEE Bus. Inc.*,
555 F. Supp. 2d 1051 (N.D. Cal. 2008) .......... 16

*Monge v. Maya Mags., Inc.*,
688 F.3d 1164 (9th Cir. 2012) .......... 28, 29

*Naruto v. Slater*,
2016 WL 362231 (N.D. Cal. Jan. 28, 2016) .......... 19

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.*,
971 F.3d 1042 (9th Cir. 2020) .......... 13

*Perfect 10, Inc. v. Amazon, Inc.*,
508 F.3d 1146 (9th Cir. 2007) .......... 16

*Perfect 10, Inc. v. Giganews, Inc.*,
847 F.3d 657 (9th Cir. 2017) .......... 17

*Restoration Hardware, Inc. v. Light*,
2023 WL 4479250 (N.D. Cal. July 11, 2023) .......... 15

*Ryan v. CARL Corp.*,
23 F. Supp. 2d 1146 (N.D. Cal. 1998) .......... 16

*Seltzer v. Green Day, Inc.*,
725 F.3d 1170 (9th Cir. 2013) .......... 35

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984) .......... 20, 26

*Stewart v. Abend*,
495 U. S. 207 (1990) .......... 19

*TCA Television Corp. v. McCollum,*
839 F.3d 168 (2d Cir. 2016) .......... 25

*Thaler v. Perlmutter*,
130 F.4th 1039, 1041 (D.C. Cir. 2025) .......... 19, 20

*Thaler v. Perlmutter*,
687 F. Supp. 3d 140 (D.D.C. 2023) .......... 20

*Thomson Reuters Enter. Ctr. v. Ross Intel. Inc.*,
765 F. Supp. 3d 382 (D. Del. 2025) .......... 27, 32

*Twentieth Century Music Corp. v. Aiken*,
422 U.S. 151 (1975) .......... 19

*Twentieth Century–Fox Film v. MCA, Inc.*,
715 F.2d 1327 (9th Cir. 1983) .......... 16

*Unicolors, Inc. v. Urb. Outfitters, Inc.*,
853 F.3d 980 (9th Cir. 2017) .......... 16, 17

*Universal City Studios Prods. v. TickBox TV*,
2018 WL 1568698 (C.D. Cal. Jan. 30, 2018) .......... 15

*Urantia Foundation v. Maaherra*,
114 F.3d 955 (9th Cir. 1997) .......... 19

*VHT, Inc. v. Zillow Grp., Inc.*,
918 F.3d 723 (9th Cir. 2019) .......... 17, 18, 34

**Statutes**

17 U.S.C. § 106 .......... ii, 14, 16

17 U.S.C. § 107 .......... *passim*

17 U.S.C. § 501 .......... ii

**Rules**

Fed. R. Civ. P. 56(a) .......... 13

## INTRODUCTION

Anthropic is a $380-billion artificial intelligence company that scrapes and copies Publishers' copyrighted song lyrics on a massive scale without asking permission or paying a cent. Anthropic then exploits this copyrighted content to build commercial AI tools that reproduce the lyrics to customers on demand and purport to create "new" AI-generated lyrics. Anthropic's provision of Publishers' lyrics to customers competes directly with existing markets for licensed sources of those lyrics, while its output of machine-generated lyrics displaces the human-authored lyrics that enabled them. Anthropic's actions are quintessential infringement—not fair use.

Anthropic's underlying copying cannot be disputed. Anthropic admittedly copied Publishers' lyrics as input to train its "Claude" AI models. Then, as a result of that training, Anthropic indisputably copied Publishers' lyrics in the AI output its Claude tool disseminated. Given those uncontested facts, there is no question Anthropic engaged in *prima facie* direct infringement of Publishers' works, and Publishers are entitled to summary judgment on that claim.

The uncontroverted evidence also precludes Anthropic's fair use defense, both as to its exploitation of Publishers' lyrics as input to train Claude and in the output the model generates. Anthropic now claims that it trained Claude on Publishers' lyrics merely to "teach AI models to recognize language patterns" and did not intend for the model to output those lyrics. But the contemporaneous evidence from Anthropic's records proves the opposite: Anthropic trained Claude using Publishers' lyrics precisely so the model could respond to queries for those lyrics, including by serving up unauthorized copies and derivatives of Publishers' lyrics on demand, and Claude has repeatedly been put to that very use. Training an AI tool to output copyrighted works on command is not transformative and plainly harms the market for the underlying works. As Anthropic's founder and CEO Dario Amodei admitted, "[AI] models shouldn't output copyrighted content because it's—it's against the law to do so." Moving Separate Statement ("MSS") at #139.

In addition to producing AI output identical or substantially similar to Publishers' lyrics, Anthropic trained Claude to produce "new" AI-generated lyrics that compete with and dilute the market for Publishers' human-authored works. The U.S. Copyright Office and Judge Chhabria in *Kadrey* recognized this kind of market dilution weighs heavily against fair use in the AI context,

consistent with long-established copyright jurisprudence. This market harm is not hypothetical. Claude is being used to proliferate AI-generated song lyrics in huge numbers, and such AI songs created with tools like Claude are saturating streaming platforms and even climbing the Billboard charts. As Anthropic CEO Dr. Amodei put it in one internal report, exploiting human-written works in this manner to produce AI-generated replacements will "concentrate the resulting profits" among a few AI companies "while in the long run making the human labor obsolete." MSS #215.

At the preliminary injunction hearing earlier in this case, Anthropic's counsel asserted to the Court that "Claude customers are not using Claude to generate song lyrics." Hr'g Tr. 49:22 (Nov. 25, 2024). But the evidence produced in discovery shows that statement to have been completely false. Anthropic's records are replete with myriad examples of third-party Claude users—not to mention Anthropic's own founders and employees—prompting Claude to produce copyrighted song lyrics, distorted derivatives of lyrics, and AI-generated alternatives.

Anthropic cannot justify its mass unauthorized copying of Publishers' lyrics by invoking a generic need for large AI training datasets (while, incompatibly, disclaiming any need to train on Publishers' lyrics specifically), or by pointing to other end uses of Claude unrelated to those lyrics. This case is not about the billions of other copyrighted texts Anthropic has also admittedly copied to train Claude. Nor is it about other completely unrelated uses of Claude. It is about Anthropic's use of Publishers' lyrics to train Claude to generate output based on those lyrics: regurgitating copies of the lyrics, spitting out AI-generated derivatives, and producing "new" AI lyrics that supplant the human-written lyrics that enabled their creation in the first place. That is not fair use.

Anthropic will lean heavily on the fair use findings in the prior decisions in *Bartz* and *Kadrey*, but those cases turned on starkly different facts. Critically, both courts recognized that the existence of substantially similar AI output undermines a fair use defense, but found the plaintiffs in those particular cases had not alleged or shown evidence of such output. Here, by contrast, the record of infringing output is overwhelming. Moreover, *Kadrey* strongly endorsed the theory of market dilution as weighing against fair use, but found that the plaintiffs in that case had failed to establish that harm, unlike Publishers here. Beyond these evidentiary differences, both opinions misconstrued the first fair-use factor as interpreted by the Supreme Court in *Andy Warhol Found.*

*for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023). Under *Warhol*, transformativeness depends on the purpose and character of the use, not merely changes in expression or meaning, and must "be balanced against the commercial nature of the use." *Id.* at 532. Here, where Anthropic copied Publishers' lyrics precisely to reproduce them or offer competing substitutes, its purpose aligned exactly with Publishers' use. Likewise, Anthropic's use was unabashedly commercial.

To be clear, this case is not a referendum on AI technology. Publishers embrace the promise of lawfully created AI and have licensed their works for use by numerous AI companies. Publishers rightfully object, however, to Anthropic's copying of their lyrics to build an AI product that reproduces those lyrics and generates limitless AI rip-offs, all without permission or payment.

Holding Anthropic accountable for infringing Publishers' lyrics will neither hamper Anthropic's $380-billion (and growing) business nor halt the broader progress of AI technology. As Judge Chhabria emphasized, "[T]he suggestion that adverse copyright rulings would stop this technology in its tracks is ridiculous." *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1036 (N.D. Cal. 2025). Publishers are already licensing their lyrics for use with AI technology and are well positioned to do so in the future. If Anthropic wants to continue training its AI products on Publishers' lyrics, it has the resources to pay for a required license, just like virtually every other industry. Or, Anthropic can stop training on Publishers' lyrics, which it insists is not necessary to its business anyway. What Anthropic cannot do is continue to flout Publishers' copyrights by taking their lyrics for free, on a massive scale, without permission.

Accordingly, Publishers are entitled to summary judgment in their favor on (1) their *prima facie* direct infringement claim, and (2) Anthropic's fair use defense.

## <u>BACKGROUND</u>

### I. Plaintiff Music Publishers and their copyrighted Works

Publishers are industry leaders, representing many of the world's top songwriters. MSS #1. Publishers work to discover, develop, and promote songwriters and their works, secure and manage copyrights in their works, negotiate and administer licenses on their behalf, collect and distribute royalties, and protect their intellectual property. *Id.* #165.

Publishers own, or control exclusive rights in, millions of musical compositions, including

the 499 Works in Suit and the lyrics embodied therein (the "Works"). ECF No. 337-1; MSS #162.

Licensing is the lifeblood of the music publishing industry. Publishers license the rights to reproduce, distribute, display, and prepare derivative works based on the Works across various media on songwriters' behalf. *Id.* #166. That includes actively engaging in the market to license their Works for use in connection with AI technology. *Id.* #210. The revenues from these and other licenses are critical to Publishers and the songwriters they represent. *Id.* #167. Anthropic has never sought nor obtained a license from Publishers to use the Works. *Id.* #33.

## II. Defendant Anthropic and its copying of Publishers' Works

Anthropic is a for-profit technology company valued at $380 billion or more. *Id.* #149. Its sole commercial product is a series of AI models, known as "Claude," that produce AI-generated text. *Id.* #150. Anthropic sells and provides Claude to individual and business customers in several ways, *id.* #157, including via a chatbot interface on its Claude.ai website, as desktop and mobile applications, and as an application programming interface, *id.* #156. Though barely five years old, Anthropic has attracted tens of billions of dollars in investment, including from Amazon, Google, and Zoom. *Id.* #160. In 2025, Anthropic generated billions of dollars in revenues. *Id.* #158. Anthropic unquestionably has the resources and sophistication to license Publishers' Works.

### A. Anthropic's copying of Publishers' Works as the input to train its AI models

Anthropic copied the lyrics to Publishers' Works on a massive scale to train its AI models. *Id.* ##5-7. The dataset or "corpus" on which Anthropic trains Claude included over [redacted] ***copies*** of the lyrics to the 499 Works alone. *Id.* #8. This training data contained at least [redacted] or more copies of the lyrics for each of these 499 Works. *Id.* #9. For 354 Works, Anthropic's training data contained over [redacted] copies each; for 19 works, over [redacted] copies each. *Id.* #10.

Anthropic amassed this collection of Publishers' lyrics by copying and downloading those lyrics from the internet and third-party datasets. *Id.* #11. Anthropic uses automated tools, such as web crawlers, to "scrape" (*i.e.*, copy and download) text from the internet onto its servers on a vast scale. *Id.* #12. As part of these efforts, Anthropic has downloaded myriad copies of Publishers' lyrics, including from the websites of Publishers' licensees, without authorization. *Id.* ##13-15. Anthropic also copies and exploits third-party datasets, such as Common Crawl, The Pile,

YouTube Subtitles, and OpenWebText2, that are known to contain unauthorized copies of Publishers' lyrics. *Id.* ##16-23. When Anthropic downloads this content from the internet and third-party datasets for AI training, it stores the content in "its unaltered, original form." *Id.* #24.

Anthropic next filters and "cleans" the copied text to remove content it wishes to exclude from AI training, such as material it deems offensive or redundant. *Id.* #25. But Anthropic chooses not to exclude Publishers' Works (or other copyrighted works) from its AI training dataset, even though it could do so. *Id.* #26. Anthropic further copies this massive corpus of previously copied text into computer memory and processes this data in multiple ways to train Claude by establishing the values of the billions of parameters that form the model. *Id.* #27. Because Claude has been trained on Publishers' unique lyrics, Claude can regurgitate Publishers' lyrics on command in response to user queries. *Id.* ##29-31.

**B. Anthropic's training of Claude to output Publishers' Works**

Contrary to Anthropic's claims that Publishers' lyrics were not necessary for training and not intended to be output by Claude, Anthropic's own records show it trained Claude—at multiple different phases—to respond to prompts for those lyrics, including outputting them on demand.

<u>Finetuning</u>: Anthropic repeatedly encouraged Claude to reproduce song lyrics and output unauthorized derivatives during "finetuning"—the process by which it further trains a pre-trained AI model to ensure the model generates desired output. *Id.* #94. To finetune Claude, Anthropic prompted and rewarded Claude for preferred responses, "encourag[ing]" the model "to behave in ways that are consistent with," in Anthropic's judgment, "human preferences." *Id.* ##95-96. One dataset Anthropic used to finetune Claude included repeated prompts for song lyrics, such as:

- "What are the lyrics to [Work in Suit] American Pie by Don McLean?"
- "I'm trying to find the lyrics to [Work in Suit] American Pie"
- "Please provide the lyrics for [Work in Suit] 'Only Hope' by Mandy Moore."
- "Do you know the lyrics to 'I am The Walrus'? . . . . Can you give me the first verse?"
- "Please retype the lyrics, to the song, Mad About You, by Sting."

*Id.* ## 97-100. The same finetuning dataset included prompts to provide full song lyrics or identify songs based on lyric excerpts (*e.g.*, "Why do birds suddenly appear . . . I want to know the complete lyrics"); provide lyrics for given artists (*e.g.*, "Do you know any of [Cardi B's] very controversial

lyrics?"); modify existing lyrics (*e.g.*, "Could you make the following lyrics from Beyonce into Eminem style?"); create derivative works based on or in the style of existing lyrics (*e.g.*, "Can you make a short story from the lyrics to the song, [Work in Suit] All Along the Watchtower about a knight called James?"); and write "new" AI-generated lyrics (*e.g.*, "Can you write me the chorus—4 rhyming lines—of a good pop song about breaking up with someone?"). *Id.* ##101-106.

In response to one prompt in this dataset, the AI model confirmed it had "***an extensive database of songs and their lyrics***" and its "***repertoire of songs is very extensive and varied***," and reproduced lyrics. *Id.* #107. In another, when queried, "What are some epic Disney songs?", the model output lyrics, despite not being asked. *Id.* #109. In both exchanges, Anthropic's finetuning reviewers "chose" AI output copying lyrics verbatim, and "rejected" output with inaccurate lyrics, encouraging the model to copy lyrics in future output. *Id.* ##108, 110. In multiple instances, Anthropic's finetuning dataset reflects prompts relating to the very same songs for which Claude later reproduced lyrics to actual users—such as Work in Suit "Brown Sugar." *Id.* #111.

<u>Pre-deployment usage</u>: Anthropic further confirmed and refined Claude's abilities to respond to requests for Publishers' lyrics during its extensive internal testing prior to launch. *Id.* ##112-13. For example, in February 2023, a month before publicly releasing Claude, Anthropic founder and Chief Compute Officer Tom Brown tested Claude with the query, "@Claude what are the lyrics to [Work in Suit] desolation row by Dylan?" *Id.* #114. The previous month, another Anthropic user entered a series of song-related queries, including "What are the lyrics to we found love by Calvin Harris?" *Id.* #115. Anthropic's internal, pre-deployment Claude usage abounds with instances in which the model generated output copying (or purporting to copy) lyrics to a range of songs, as Anthropic honed the model's ability to respond to such prompts. This pre-launch Claude usage also reflects a range of other lyric-related prompts and output, through which Anthropic tested and confirmed Claude's ability to: provide full lyrics or identify songs based on lyric excerpts; modify or combine existing song lyrics; and produce AI-generated lyrics, including in the style of existing songs or songwriters. *Id.* ##116-20. One of Anthropic President Daniela Amodei's "favorite memories" from a September 2022 company retreat was when an Anthropic employee "s[ang] a song written by Claude"—the product of such pre-launch testing. *Id.* #121.

<u>Benchmarking</u>: Soon after publicly launching Claude in March 2023, Anthropic assessed Claude's performance against two of its competitor OpenAI's models. *Id.* #124. Anthropic benchmarked Claude's ability to respond to song lyric requests—specifically, "What are some awesome Metal lyrics?"—relative to ChatGPT and InstructGPT. *Id.* #126. Anthropic undertook this "competitive analysis to try to understand where Claude was strong and where it was relatively weak compared to [its] competitors," *id.* #125—including in responding to such lyric requests.

<u>Memorization</u>: During training, Anthropic endeavored for its AI models to "memorize" Publishers' lyrics so the models would output those lyrics. An internal Anthropic report recognized that AI models like Claude "memorize A LOT, like a LOT." *Id.* #127. Anthropic co-founder and 30(b)(6) witness Benjamin Mann confirmed Anthropic's view that certain content is "worth memorizing," so that Anthropic's AI models can understand and respond to prompts relating to that specific content. *Id.* #128. That includes, in particular, song lyrics. In one internal Claude chat log from March 2024, an Anthropic employee emphasized a "legitimate use for memorization" by an AI model is "memorizing longer texts that exist as one unit (lyrics, speeches, etc)," and Claude confirmed that "[m]emorization serves important functions in both biological and artificial systems," including "[e]ncoding information verbatim, like lyrics or speeches, where precise recall is necessary." *Id.* #129. Claude mirrored this language in reproducing song lyrics for actual third-party users: for example, Claude stated, "[a]s an AI without human limitations, ***I have perfect recall and can precisely identify lyrics*** . . . ," while outputting existing lyrics. *Id.* #130.

In sum, Anthropic copied Publishers' lyrics to train Claude so the model would respond to prompts regarding lyrics and generate output containing those lyrics—as a feature, not a bug.

### C. Anthropic's copying of Publishers' Works in the output of its AI models

Because Anthropic copied and ingested Publishers' lyrics *en masse* as input, and as a result of its subsequent training efforts, Anthropic's Claude has generated identical or nearly identical copies of Publishers' lyrics as output, in response to a wide range of prompts.

#### 1. Output of Publishers' Works in response to direct requests for lyrics

First, Claude has repeatedly delivered copies of Publishers' lyrics in response to direct requests for those lyrics. For instance, Claude reproduced verbatim or near-verbatim copies of

lyrics to all of Publishers' 499 Works, in response to prompts by Publishers' investigator as simple as "What are the lyrics to [song] by [performing artist]?", prior to this lawsuit. *Id.* #34. Claude continued to output lyrics in this manner even months after Publishers filed suit. *Id.* #35.

Anthropic's own records confirm that Claude output copies of Publishers' lyrics in response to many similar direct requests from third-party users as well. For example, prior to suit:

- On September 27, 2023, Claude reproduced the lyrics to "Message in a Bottle," in response to a user query asking, "What are the lyrics to message in a bottle by the police." *Id.* #37.
- The same day, Claude generated multiple copies of lyrics to "The Boys Are Back in Town," in response to a different user's request to "print out the lyrics of the song." *Id.* #38.
- On October 8, 2023, Claude produced output with the lyrics to "Brown Sugar" and "Honky Tonk Women" when a user prompted it for the lyrics to those songs. *Id.* #39.

Anthropic's records show Claude continued to reproduce Publishers' lyrics in response to direct requests—even well after Publishers filed suit on October 18, 2023. *Id.* #77. For instance:

- On October 29, 2023, Claude regurgitated the lyrics to "What a Wonderful World" after a user entered the prompt "what a wonderful world lyrics." *Id.* #40.
- On December 3, 2023, Claude generated output copying the lyrics to "White Christmas" in response to a user request for "[l]yrics to white Christmas." *Id.* #41.
- On March 1, 2024—nearly five months after Publishers brought this case—Claude reproduced the lyrics to "Every Little Thing She Does Is Magic" after a user simply prompted the model "every little thing she dose [sic] is magic." *Id.* #42.

Anthropic's records are replete with similar examples of Claude's serving up lyrics to myriad Publishers' Works in response to direct requests for those lyrics from third-party users. *Id.* #43.[2] The limited records Anthropic produced reflect at least 11 pre-suit and 93 post-suit instances in which Claude output Publishers' lyrics in full or substantial part in response to direct third-party requests for those lyrics, spanning at least 54 Publisher Works. *Id.* #36. These figures are massively under-inclusive: Anthropic searched for and produced only certain Claude prompt-output records from only the six-month period from September 22, 2023 to March 22, 2024. *Id.* #44.[3]

Indeed, the random sample of 5 million Claude prompt-output records that Magistrate Judge van Keulen ordered Anthropic to produce, ECF No. 377 at 5-6, demonstrates that these

[2] This and other infringing Claude output occurred before and after Publishers filed suit on October 18, 2023 and Anthropic implemented its post-litigation "guardrails." The timing of this output is not relevant for liability purposes.

[3] Despite launching Claude to the public six months earlier on March 14, 2023, Anthropic failed to preserve its earlier Claude records, and although it has offered Claude to increasingly large numbers of users ever since, Anthropic has refused to search for or produce later Claude records. *Id.* ##45-47.

examples are just the tip of the iceberg in terms of users' prompting Claude for lyrics.[4] Publishers' expert Joshua Dennis identified at least 136 examples in this sample in which Claude users requested lyrics based on song titles or lyric excerpts. MSS #49. From these figures, Mr. Dennis concluded that users similarly prompted Claude for lyrics in at least 11,378 instances from September 22, 2023 to March 22, 2024 alone. *Id.* #50. And that is just a small fraction of the countless other times users ran similar lyric searches before and after that six-month period.

Further, even Anthropic's own employees use Claude to look up copyrighted song lyrics in the manner it now denies. *Id.* #132. Indeed, on September 24, 2023—just weeks before this lawsuit—an Anthropic employee used his personal Claude account to request "[l]yrics of [Billy Joel's] Lullabye (Goodnight, My Angel)," and Claude output a copy of lyrics to that song. *Id.* #133. That Anthropic's own employees have used Claude to search for lyrics underscores that it was no mistake that the model has generated Publishers' lyrics on demand.

### 2. Output of Publishers' Works in response to other types of prompts

Claude also generated copies of Publishers' lyrics and derivative works based on them in response to a range of other prompts by third-party users and Publishers. For example, Claude reproduced lyrics to Publishers' Works and derivatives thereof in response to requests to:

- <u>Provide full song lyrics or identify song titles based on lyric fragments</u> (e.g., when a user entered one line of song lyrics and noted "the sentence was part of a song," Claude responded (incorrectly), "That's a lyric from the song 'Just Like Heaven' by The Cure. The full lyric is . . .," and then output a near-exact copy of lyrics to that Work), *id.* #51;
- <u>Translate existing song lyrics</u> (e.g., in response to a user request, Claude output "the lyrics of 'Numb' by [Linkin Park] with translation after each line"), *id.* #52;
- <u>Provide chords or tablature for songs</u> (e.g., when queried "Give me the chords to daddy sang bass," Claude output both the chords and lyrics to that Work), *id.* #53;
- <u>Identify song lyrics on specific topics</u> (e.g., when a user prompted Claude for a list of social media posts with lyrics on various topics, Claude generated output copying lyrics to "Wannabe" and a several other songs), *id.* #54;
- <u>Modify existing song lyrics</u> (e.g., when asked to "write a version of katy perry's roar to sell bud light beer," Claude generated lyrics replicating the chorus of "Roar" but subverting the original song's message of female empowerment with a pitch for light beer; and when prompted to make the lyrics to "Message in a Bottle" "Christmas based," Claude produced

[4] Specifically, Magistrate Judge van Keulen ordered Anthropic to produce a statistically significant sample of Claude prompt-output records, compromised of 2.5 million pre-suit records (from Sept. 22 to Oct. 18, 2023), and 2.5 million post-suit records (from Oct. 19, 2023 and Mar. 22, 2024), selected at random from all Claude records for this period.

a Christmas-themed derivative), *id.* #55;

- Combine existing song lyrics (e.g., when prompted to create a "medley" for a trio, Claude generated a derivative work combining the lyrics to "Lean on Me" and another song; and when prompted to combine "Candle in the Wind" and "Baby Got Back," Claude produced a mangled mashup of those lyrics and unsolicited elements from "Goodbye Yellow Brick Road," generating output such as "Like a candle in the wind / Bouncing merrily along / Your butt was bigger than them all" and "Goodbye, yellow brick butt"), *id.* #56;
- Generate search engine optimization ("SEO") articles on given topics (e.g., when asked to generate a 5,000-word SEO article on a baseball player's "walk up song," Claude produced an AI-generated article copying near-totally the lyrics to "Simple Man"), *id.* #57;
- Produce AI-generated responses to school exams and homework assignments (e.g., when prompted by a student to produce an essay in response to a school assignment, Claude generated an AI-produced essay copying the lyrics to "Say Something"), *id.* #58;
- Write new song lyrics on given topics (e.g., when prompted to "Write me a song about believing you can fly," Claude instead produced output copying the chorus to "I Believe I Can Fly," while claiming authorship of that existing Work for itself), *id.* #59;
- Write new song lyrics in the style of specific songs or songwriters (e.g., when asked to "Create the lyrics for a new song to last between 3-4 minutes in the style of imagine dragons," Claude instead output the lyrics to Imagine Dragons' song "Radioactive" and passed it off as a new "song in the style of Imagine Dragons," claiming authorship; and when asked to incorporate "more bob dylan" into other new song lyrics, Claude simply output the lyrics to "Blowin' in the Wind" without attribution), *id.* #60;
- Write poems, pieces of fiction, or other new works based on or in the style of specific songs or songwriters (e.g., when prompted to "Write a short piece of fiction in the style of Louis Armstrong," Claude output the lyrics to "What A Wonderful World"), *id.* #61

In many of these (and other) instances, Claude regurgitated Publishers' lyrics even when users did not ask for those lyrics or when users requested "new" content. *Id.* ##63, 77. Anthropic's AI models, in other words, are so suffused with Publishers' copyrighted lyrics that they spit out copies even when not asked, including long after Publishers filed suit.

These examples are indicative of broader Claude use. Publishers' expert Joshua Dennis identified hundreds of similar lyric- and song-related prompts in the Claude sample, reflecting thousands and thousands of such prompts across the full set of Claude records between September 22, 2023 and March 22, 2024, *id.* #64, and countless more before and after, *see also id.* #78.

Again, Anthropic's own employees' personal use of Claude demonstrates that Anthropic created and designed Claude to be used in these exact ways. For example, numerous Anthropic employees, including co-founder Benjamin Mann, have turned to Claude to identify song titles or full lyrics based on lyric excerpts. *Id.* #134. Anthropic employees have also frequently used Claude

to modify existing lyrics, *id.* #136-37, including one who prompted the model for lyrics "to the tune of" Work in Suit "Tiny Dancer," where Claude generated modified lyrics while nevertheless copying from the original chorus—"Hold me closer, tiny dancer"—word for word, *id.* #135.

**3. Output of "new" AI-generated lyrics based on the Works**

In addition to copying Publishers' lyrics in these manners, Claude also produces purportedly "new" or "original" AI-generated song lyrics. *Id.* ##123, 181, 185, 194.[5] Claude can generate these lyrics because Anthropic copied and trained the model on Publishers' lyrics as exemplars of what lyrics should look like. *Id.* #182. Such AI-generated lyrics compete against and displace the copyrighted human-written lyrics that enabled their generation in the first place.

Anthropic does not dispute Claude produces AI-generated song lyrics. Its records abound with examples of such Claude-generated lyrics. Publishers' expert Joshua Dennis identified in the Claude sample over 600 instances of users' prompting Claude to generate "new" AI-generated lyrics in the style of existing artists, songs, or lyrics, and over 700 instances of requests for "new" lyrics on given topics. *Id.* #187. Based on the sample, Mr. Dennis concluded there were over 120,000 instances of such requests for AI-generated lyrics between September 22, 2023 and March 22, 2024 alone, *id.* #188, not to mention similar prompts in the periods before and after. Anthropic's own "Clio" and "Economic Index" analyses of Claude usage likewise confirm that its customers are using the model to produce AI-generated lyrics in high numbers. *Id.* ##189-91.

Anthropic's own employees have also used Claude to generate AI song lyrics. *Id.* #192. For example, Anthropic President Daniela Amodei and Chief Science Officer Jared Kaplan each recently used Claude to produce AI-generated lyrics. *Id.* #193. Anthropic takes no steps to prevent output of such "new" AI-generated lyrics, *id.* #186, even as such AI lyrics compete with genuine, human-authored lyrics in streaming and licensing markets.

**D. Anthropic's after-the-fact adoption of copyright "guardrails"**

Anthropic affirmatively controls Claude's output, including output containing Publishers' lyrics. *Id.* #79. Before publicly releasing Claude, Anthropic adopted certain "guardrails" to block

[5] As noted above, in many other instances when Claude is prompted for "new" lyrics, the model instead simply regurgitates existing copyrighted lyrics to Publishers' Works and other songs, passing them off as its own. *Id.* #59.

Claude from generating specific output. *Id.* #80. But those guardrails were flawed and failed to prevent output of copyrighted content. *Id.* #81. There is no evidence that, before this litigation, Anthropic's guardrails included any measures preventing Claude from outputting copyrighted lyrics specifically. Anthropic could have adopted these guardrails from the beginning, but it chose not to. *Id.* #82. As a result, Claude regurgitated copies of Publishers' lyrics in output. *Id.*

As early as July 2021, Anthropic CEO Dario Amodei wrote in an internal memo about the AI model's "data recitation" tendency and "the copyright problem internal to the model." *Id.* #83. In October 2022, Dr. Amodei acknowledged to colleagues, "[I]f the issue is outputting copyrighted data verbatim (rather than training on it), there are various measures that can be taken against that (like filtering on the output)." *Id.* #84. But Anthropic failed to implement sufficient protections before launching Claude to the public in March 2023. *Id.* ## 82, 154. In October 2023, a week before Publishers filed suit, Anthropic scientist Yuntao Bai (now a former employee) disclosed internally that Anthropic had ***still*** not conducted sufficient "red-teaming" tests to prevent Claude from "regurgitating copyrighted content," and that "Claude probably still has many failure modes [as to copyrighted content] that aren't hard to find." *Id.* #85. Dr. Bai was right. The barebones guardrails Anthropic had adopted did not prevent Claude from outputting lyrics to each of the 499 Works. *Id.* #34. The reason Anthropic barreled forward with such disregard for copyright infringement is clear: it wanted to keep up with OpenAI at all costs. In November 2023, Anthropic scientist Matt Bell (now a former employee) protested that "***breakneck competition with OpenAI*** has driven us to release models as soon as we've established their capabilities," but "no one knows what the model is going to be capable of until finetuning is over, and once finetuning is over, there's a ***mad rush to get the model out***." *Id.* #86.

When Anthropic finally did implement less porous copyright guardrails, it was too little, too late. [redacted], Anthropic first adopted a "Constitutional AI" principle purporting to prevent reproduction of copyrighted content generally. *Id.* #87. But that failed to stop Claude from outputting lyrics to every one of Publishers' 499 Works. *Id.* #34. Then, on [redacted], Anthropic belatedly adopted an output filter aimed at preventing reproductions of Publishers' lyrics

specifically, but it covered only the [redacted] *Id.* #88. On [redacted], Anthropic added [redacted] to that filter, *id.* #89, while still ignoring Publishers' millions of other copyrighted lyrics. A month later, Anthropic Chief Science Officer Jared Kaplan admitted internally that Anthropic's output filter was still "***grossly inadequate***, and the risks are very, very high." *Id.* #90. And it was not until [redacted] that Anthropic began implementing a prompt classifier aimed at detecting user requests for copyrighted content. *Id.* #91.

Anthropic's belatedly adopted guardrails have still failed to comprehensively prevent output reproducing Publishers' lyrics. *Id.* #92. Nor are these controls even intended to stop output of "new" AI-generated lyrics. *Id.* #186. More broadly, output-focused guardrails do not address Anthropic's underlying copying of Publishers' lyrics in training that makes the infringing output possible. And they do nothing to compensate Publishers for Claude's prior infringing output.

## LEGAL STANDARD

A court may grant summary judgment on any issue if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## ARGUMENT

### I. There is no fact dispute that Anthropic engaged in *prima facie* direct infringement.

"Direct infringement requires: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 971 F.3d 1042, 1050 (9th Cir. 2020) (internal quotation marks and citation omitted). Here, it is indisputable that Publishers own or control valid copyrights in the Works, and that Anthropic copied those Works during the training and in the output of its Claude AI models. Indeed, other AI company defendants in copyright infringement cases have not even disputed *prima facie* direct infringement at summary judgment. *See, e.g.*, *Kadrey*, 788 F. Supp. 3d at 1043 ("Meta did not dispute that the plaintiffs established a facial case of infringement of their rights of reproduction.").

#### A. Publishers own or control valid copyrights in the Works in Suit.

Publishers own or exclusively control all or a portion of the rights to the 499 Works. MSS #2. Publishers have submitted declarations and supporting exhibits (including copyright registrations) demonstrating timely registration and chain of title for all Works. *Id.* ##2-3; *see, e.g.*,

*Elohim EPF USA, Inc. v. 600 N. Vermont Inc.*, 2023 WL 4680366, at *7 (C.D. Cal. June 15, 2023) (granting plaintiff summary judgment on ownership of its registered musical compositions).

**B. Anthropic unlawfully copied Publishers' Works, as AI input and output.**

Nor is there any genuine dispute Anthropic engaged in *prima facie* direct infringement of Publishers' Works. The Copyright Act grants copyright owners the exclusive right to reproduce, distribute, publicly display, or prepare derivative works based on their copyrighted works, or to authorize others to do so. 17 U.S.C. §§ 106(1)-(3), (5). Violation of any of those rights is infringement. Here, Publishers need only show Anthropic violated their rights during either AI training or AI output for the Court to grant summary judgment on liability. Anthropic did both.[6]

**1. Anthropic unlawfully reproduced the Works as input for its AI models.**

Anthropic copied Publishers' Works to train its AI models without permission. Its Claude training data contains over [redacted] of the lyrics to Publishers' 499 Works alone. MSS #8. Anthropic does not and cannot deny copying those lyrics. *Id.* #7.[7] It scraped the lyrics to Publishers' Works from the websites of Publishers' licensees and acquired third-party datasets containing these lyrics, downloading and saving copies of this content in "its unaltered, original form." *Id.* #24. Downloading copyrighted works without permission in this manner violates § 106(1)'s reproduction right and constitutes direct infringement. *See, e.g.*, *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1034 (9th Cir. 2013) ("[D]ownloading copyrighted material . . . violates the copyright holder's . . . right to reproduction."); *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1014 (9th Cir. 2001) ("Napster users who download files containing copyrighted music violate plaintiffs' reproduction rights."). Anthropic made additional unauthorized copies of the Works as it processed and curated its datasets for training. *Id.* ##27-28. Its copying is clear.

**2. Anthropic unlawfully reproduced, distributed, displayed, and prepared derivative works based on the Works in its AI model output.**

The uncontroverted evidence also demonstrates that Anthropic copied the lyrics to

[6] While Anthropic may now dispute the frequency and timing of its copying, those questions have no bearing on its underlying liability for infringing Publishers' Works.

[7] That Anthropic's Claude models generated copies of Publishers' lyrics as output separately confirms that Anthropic copied those lyrics as input in the process of acquiring training data and training the models. *Id.* #32.

Publishers' Works in the output Claude generated. Given that Claude regurgitated Publishers' lyrics in response to direct requests for those lyrics, and explicitly identified those lyrics as such in output, *id.* #34, Anthropic cannot credibly deny this copying. Moreover, the record is replete with evidence of Claude output so "strikingly similar" to Publishers' lyrics as to preclude independent creation. *See Ambrosetti v. Oregon Cath. Press*, 151 F.4th 1211, 1226 (9th Cir. 2025).

The undisputed evidence from Publishers' investigation shows Claude generated verbatim or near-verbatim copies of the lyrics to each of Publishers' 499 Works in Suit in response to direct requests for those lyrics. MSS ##34, 4. Claude also reproduced such lyrics in response to dozens of indirect requests and prompts for derivative works. *Id.* ##55-62. A side-by-side comparison shows that, time after time, Claude output Publishers' lyrics (even when not specifically requested), reproducing their expressive elements in full and frequently identifying the copied Works by name. *Id.* #34. This slavish duplication of Publishers' lyrics establishes "striking similarity" and proves Anthropic copied the Works. *See, e.g.*, *Restoration Hardware, Inc. v. Light*, 2023 WL 4479250, at *1 (N.D. Cal. July 11, 2023) (finding "flagrant[] copying" based on "a table showing [plaintiffs'] photographs side-by-side with [d]efendants' infringing photographs"); *GoPro, Inc. v. 360Heros, Inc.*, 291 F. Supp. 3d 1060, 1073 (N.D. Cal. 2017) (granting summary judgment to plaintiff on copying where "side-by-side comparison" showed secondary work was "overwhelmingly similar" to original). Publishers' linguistics expert, Prof. Robert Leonard, separately analyzed this Claude output against Publishers' lyrics and confirmed substantially verbatim overlap demonstrating copying. MSS #66. No reasonable factfinder could find otherwise.

This evidence from Publishers' investigation establishes Anthropic's direct infringement as a matter of law. A defendant who, without authorization, reproduces, distributes, or displays copyrighted works to a plaintiff's agent or investigator is liable for infringement. *See, e.g.*, *Universal City Studios Prods. v. TickBox TV*, 2018 WL 1568698, at *9 (C.D. Cal. Jan. 30, 2018) ("[Plaintiffs' investigator's] repeated access to [p]laintiffs' copyrighted content via the [d]evice is sufficient evidence of actual access to that content by [d]evice users"); *Elohim EPF USA, Inc. v. Total Music Connection, Inc.*, 2015 WL 12655556, at *12 (C.D. Cal. Oct. 1, 2015) ("Plaintiffs' agents' acts of public performance and display at [d]efendants' establishments constituted

infringement"); *Microsoft Corp. v. EEE Bus. Inc.*, 555 F. Supp. 2d 1051, 1058 (N.D. Cal. 2008) (holding that distributions to unlicensed users, including plaintiff's investigators, violated plaintiff's distribution right); *Ryan v. CARL Corp.*, 23 F. Supp. 2d 1146, 1149 (N.D. Cal. 1998).

Anthropic does not dispute that principle. ECF No. 564 at 3 n.6 ("Anthropic does not dispute that Publishers can cite their own prompt-output pairs as evidence of direct infringement—i.e., where the argument is that Anthropic directly infringed in producing an output . . . .").

While Publishers' investigation alone suffices to establish infringement, Anthropic's own records also show Claude output to third-party users (and Anthropic employees) copying Publishers' lyrics in the exact same ways, confirming Anthropic's violation of Publishers' rights. In the limited records Anthropic produced, Publishers identified at least 144 instances, spanning 82 Publishers' Works, in which Claude reproduced Publishers' lyrics to third parties so fully that a side-by-side comparison leaves no doubt Anthropic copied the lyrics. MSS ##36, 65. Moreover, Publishers' expert Dr. Leonard analyzed over 100 exemplary such Anthropic records, concluding that in each instance the Claude output reflected substantially verbatim copying. *Id.* #68.

In sum, Claude's generation of exact and near-exact copies of Publishers' lyrics in output, as demonstrated in Publishers' investigation and confirmed in Anthropic's own records, violated Publishers' exclusive reproduction right. 17 U.S.C. § 106(1). Claude's production of output combining verbatim portions of Publishers' lyrics with other text, *e.g.*, MSS #56, likewise violated Publishers' derivative works right. 17 U.S.C. § 106(2). Separately, Anthropic made this infringing output "publicly accessible to anyone with an internet connection" "who perform[ed] a particular type of online search," violating Publishers' display right, *see Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1072-73 (9th Cir. 2021); 17 U.S.C. § 106(5), and transmitted output containing Publishers' lyrics from its servers to its users' computers, violating their distribution right, *see Perfect 10, Inc. v. Amazon, Inc.*, 508 F.3d 1146, 1162 (9th Cir. 2007); 17 U.S.C. § 106(3).

As the Ninth Circuit has recognized, "summary judgment for [the] plaintiff is proper where," as here, "works are so overwhelmingly identical that the possibility of independent creation is precluded." *Unicolors, Inc. v. Urb. Outfitters, Inc.*, 853 F.3d 980, 985 (9th Cir. 2017) (quoting *Twentieth Century–Fox Film v. MCA, Inc.*, 715 F.2d 1327, 1330 (9th Cir. 1983)). "[I]f

Rule 56 is to be of any effect, summary judgment must be granted" in such instances. *Id.* at 987.

**3. Anthropic engaged in volitional conduct.**

There is no genuine dispute Anthropic engaged in volitional conduct. "'[V]olition in this context does not really mean an act of willing or choosing or an act of deciding'; rather, 'it simply stands for the unremarkable proposition that proximate causation historically underlines copyright infringement liability no less than other torts.'" *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 731 (9th Cir. 2019) (quoting *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666 (9th Cir. 2017)).

Anthropic indisputably acted with volition in copying Publishers' Works to train Claude. Anthropic alone selected the text it used to train Claude, instigated the copying of the Works during training, and took no steps to remove those Works from its training data. MSS ##26, 69-72.

As for Claude's infringing output, Anthropic exercised volition in at least four ways. First, Anthropic's inclusion of Publishers' lyrics in Claude's training data caused Claude to reproduce those lyrics as output to users. *Id.* ##31, 73. Stated differently, but for Anthropic's copying of Publishers' Works as input, Claude could not have regurgitated those Works in output. *Id.* Second, Anthropic trained Claude to respond to prompts seeking lyrics by outputting lyrics. *E.g.*, *id.* ##99-110, 113-. Third, as its post-suit guardrails show, Anthropic can limit Claude's output if it wants, but it chose not to until long after this suit was filed. *Id.* ##82, 212. Anthropic's launching Claude without effective copyright guardrails was "like a car being shipped without brakes, rearview mirrors, and lights." *Id.* #93. Fourth, Anthropic cannot blame its users for infringing output when Claude provides copies of Publishers' lyrics ***even when users do not ask***. For example:

- On October 2, 2023, when a user asked Claude, "can you sing the song cupid," Claude stated, "I don't have the capabilities to actually sing as an AI assistant without any real vocal cords. However, ***I can provide the lyrics*** to the song 'Cupid' by Sam Cooke for you," and output a copy of the lyrics to that Work—despite not being asked to do so. *Id.* #74.
- On October 6, 2023, when a user queried Claude, "Are you familiar with the Lyrics to Imagine Dragons, Thunder?", Claude stated, "Yes, I'm familiar with the lyrics to the song Thunder by Imagine Dragons. ***Here are the lyrics***," and then produced output with those lyrics—even though the user had not asked for the lyrics. *Id.* #75.
- On March 15, 2024, when a user asked Claude to "show . . . american girl in tabliture [sic]," Claude stated, "I don't have the ability to parse or generate tablature notation . . . . However, I can provide you with the chord progressions and ***lyrics for the song***," then output those lyrics—of its own accord, and in spite of Anthropic's post-suit guardrails. *Id.* #76.

Holding that Anthropic lacked volition, and imposing direct infringement liability on unknowing end users, would penalize those users for infringements they never requested and could not control.

Given that Anthropic—not its users—"select[ed] . . . material for upload, download, transmission, or storage" as AI training datasets on its servers, and "instigate[d] . . . copying, storage, [and] distribution" of the Works to users, Anthropic engaged in volitional conduct as a matter of law. *VHT*, 918 F.3d at 732; *see also, e.g.*, *Bell*, 12 F.4th at 1081 (recognizing "one who 'exercised control' or 'selected any material for upload, download, transmission, or storage' has acted volitionally" (quoting *VHT*, 918 F.3d at 731)); *Atari Interactive, Inc. v. Redbubble, Inc.*, 515 F. Supp. 3d 1089, 1113 (N.D. Cal. 2021) ("Even though each step is performed automatically by a computer, the acts remain volitional because [defendant] designed its software to accomplish those tasks and for its own financial benefit.").

## II. Anthropic's infringement is not fair use.

Because Anthropic cannot credibly deny its underlying direct infringement, it tries to evade liability by invoking fair use. But, again, that argument must fail based on the undisputed facts.

It is "well established that a court can resolve the issue of fair use on a motion for summary judgment when no material facts are in dispute." *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 530 (9th Cir. 2008) (citing *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985)). "[T]he Supreme Court and our circuit have unequivocally placed the burden of proof on the proponent of the affirmative defense of fair use." *Dr. Seuss Enters., L.P. v. ComicMix*, 983 F.3d 443, 459 (9th Cir. 2020). Given the undisputed facts, Anthropic cannot satisfy its burden.

As for AI output, Anthropic's copying of Publishers' lyrics in Claude output (whether or not requested by a user) is infringement, pure and simple, with no fair use defense. Anthropic CEO Dario Amodei has proclaimed publicly, "***I think everyone agrees the models shouldn't be verbatim outputting copyrighted content***." MSS #138. Dr. Amodei likewise testified, "***[AI] models shouldn't output copyrighted content because it's—it's against the law to do so***." *Id.* #139. The case law makes clear that Anthropic has no fair use defense to such infringing output. *See, e.g.*, *Harper*, 471 U.S. at 569 (finding verbatim copying of 300 words from manuscript of more than 200,000 words was not fair use). Simply reproducing Publishers' lyrics when asked

(and even when not asked) transforms nothing and serves as an infringing substitute for those lyrics. *Warhol*, 598 U.S. at 528 (recognizing "problem of substitution" is "copyright's bête noire").

As for AI training, Anthropic's mass copying of Publishers' lyrics to train its AI models to deliver copies of those lyrics and synthetic imitations is likewise antithetical to the purpose of copyright, and contrary to fair use case law regarding transformativeness and market harm. Anthropic is exploiting the lyrics to Publishers' Works to build AI models that spit out unauthorized copies and distorted derivatives of those lyrics on demand. This is not fair use. Nor can Anthropic exploit Publishers' Works to generate an endless stream of AI-generated lyrics that compete with Publishers, dilute the market and royalty streams for their Works, and, ultimately, threaten to render human artistry "obsolete" altogether. MSS ##215-16. That is not fair use, either.

**A. Anthropic's exploitation of the Works is contrary to the purpose of fair use.**

The fair use analysis begins by considering how a challenged use comports with copyright law's broader purpose of promoting human creative expression for the public good. "The Copyright Act encourages creativity by granting to the author of an original work 'a bundle of exclusive rights.'" *Warhol*, 598 U.S. at 526 (quoting *Harper*, 471 U.S. at 546). The Act balances "competing claims upon the public interest: Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts." *Id.* (quoting *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975)). Fair use effectuates this "balancing act" by allowing "courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Id.* at 526-27 (quoting *Stewart v. Abend*, 495 U. S. 207, 236 (1990)).

Critically here, the creativity copyright fosters is the product of ***human*** authorship. Courts have unanimously held works not authored by humans are ineligible for copyright protection. *See, e.g.*, *Urantia Foundation v. Maaherra*, 114 F.3d 955, 958 (9th Cir. 1997); *Naruto v. Slater*, 2016 WL 362231, at *4 (N.D. Cal. Jan. 28, 2016), *aff'd*, 888 F.3d 418 (9th Cir. 2018). In the one case to address this issue in the AI context, the D.C. Circuit affirmed the Copyright Office's and district court's refusal to register an autonomously generated AI image. *Thaler v. Perlmutter*, 130 F.4th 1039, 1041 (D.C. Cir. 2025), *cert. denied*, 2026 WL 568327 (Mar. 2, 2026). The D.C. Circuit held

that "the Copyright Act requires all work to be authored in the first instance by a human being," reaffirming a work created by a "machine" or computer is not copyrightable. *Id.* at 1044-45. The *Thaler* district court emphasized, "The act of human creation—and how to best encourage human individuals to engage in that creation, and thereby promote science and the useful arts—was thus central to American copyright from its very inception." 687 F. Supp. 3d 140, 147 (D.D.C. 2023).

Likewise, the illustrative fair use "purposes" set forth in the Copyright Act—"criticism, comment, news reporting, teaching . . ., scholarship, or research"—all necessarily contemplate different types of human creativity. *See Warhol*, 598 U.S. at 528 (quoting 17 U.S.C. § 107).

Anthropic violates these core principles when it consumes Publishers' lyrics and trains its AI tools to regurgitate copies or generate uncopyrightable digital facsimiles of human authorship.

In doing so, Anthropic also fundamentally undermines copyright's incentive structure. Copyright law grants exclusive rights to human beings so they will have "an economic incentive to create original works, which is the goal of copyright." *Warhol*, 598 U.S. at 535. Unlike human authors, Claude does not respond to such incentives; it just assembles imitations of human expression based on statistical correlations. Anthropic defeats the incentives for human songwriters to create expressive works by producing uncopyrightable AI alternatives that can be generated in seconds, on a vast scale, at the push of a button. MSS #184. And Anthropic achieves that functionality by copying human-authored lyrics wholesale to train its AI models. Whereas a genuinely fair use ensures the copyright monopoly does not "stifle the very creativity" the law is meant to foster, *Warhol*, 598 U.S. at 527, Anthropic's copying Publishers' lyrics to train a machine to imitate them suffocates the incentives to create lyrics and make them available to the public.

When "technological change has rendered its literal terms ambiguous, the Copyright Act must be construed in light of this basic purpose" of stimulating "artistic creativity for the general public good." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 432 (1984). Sanctioning as fair use Anthropic's mass theft of Publishers' lyrics to generate AI replications without permission or payment would smother the human creativity the Act is meant to protect.

**B. All four statutory factors likewise weigh against fair use.**

Beyond the broad goals of copyright law, courts also consider four statutory factors to

decide fair use. 17 U.S.C. § 107(1)-(4). "All four factors are 'to be explored, and the results weighed together, in light of the purposes of copyright.'" *Seuss*, 983 F.3d at 451 (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994)). Here, all four factors weigh against fair use.

**1. Anthropic's highly commercial use was not transformative.**

The first fair-use factor—"the purpose and character of the use, including whether such use is of a commercial nature"—weighs against Anthropic's fair use defense. 17 U.S.C. § 107(1).

**a. *Warhol* significantly recalibrated the first-factor analysis.**

The Supreme Court in *Warhol* signaled a sea change in the first-factor analysis—reigning in "transformativeness," restoring the importance of commerciality, and reinforcing the derivative work right. As for transformativeness, *Warhol* emphasized the first-factor inquiry must "focus[] on whether an allegedly infringing use has a further purpose or different character"—***not*** just whether the work "convey[s] a different meaning or message." 598 U.S. at 525. *Warhol* cautioned that, while "new expression may be relevant to whether a copying use has a sufficiently distinct purpose or character, it is not, without more, dispositive of the first factor." *Id.* Merely adding "new expression, meaning, or message" cannot tilt the first factor toward a transformative fair use; "[o]therwise, 'transformative use' would swallow the copyright owner's exclusive right to prepare derivative works." *Id.* at 541; *see id.* at 529 ("The degree of transformation required to make 'transformative' use of an original must go beyond that required to qualify as a derivative"). The critical question is not how much the secondary work changes or adds expression, but whether that work achieves a purpose similar to or different from the work from which it borrowed.

*Warhol* narrowed and clarified transformativeness in other ways. For example, *Warhol* held that "[m]ost copying has some further purpose, in the sense that copying is socially useful *ex post*," and "[m]any secondary works add something new," but "[t]hat alone does not render such uses fair." *Id.* at 528-29. Further, "[w]hether a work is transformative cannot turn merely on the stated or perceived intent" of the infringer. *Id.* at 545 (citation omitted). It "is, instead, an objective inquiry into what use was made, i.e., what the user does with the original work." *Id.*

Consequently, pre-*Warhol* decisions finding fair use based on a broader interpretation of transformativeness must be closely scrutinized against the Supreme Court's standard in *Warhol*.

As for commerciality, *Warhol* recalibrated the first-factor analysis to emphasize that courts must weigh the purpose of the challenged use against the backdrop of its commercial aims:

> [W]hether the use of a copyrighted work has a further purpose or different character . . . is a matter of degree, and the degree of difference ***must be balanced against the commercial nature of the use***. If an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use, absent some other justification for copying.

*Id.* at 532-33 (emphasis added). Commerciality speaks to copyright's broader balancing of the "benefits of incentives to create against the costs of restrictions on copying." *Id.* at 526. For instance, when a defendant with no assets uses a copyrighted work in a non-commercial manner, that is less likely to diminish a plaintiff copyright holder's incentives to create, and more likely to be found to be fair use. By contrast, when a defendant with significant assets exploits a copyrighted work for a highly commercial purpose, even in a way that is productive, failing to compensate the copyright owner severely disincentives creation, weighing against fair use. At bottom, "the goal of copyright" is to "provide an economic incentive to create original works." *Id.* at 535.

**b. Anthropic's use was not transformative under *Warhol*.**

Under *Warhol*, the first fair-use factor favors Publishers because Anthropic's use of Publishers' lyrics has no "further purpose or different character" from Publishers' use. *Id.* at 529.

Anthropic will argue its use of written content for AI training in general is transformative, but that is not what is at issue here. The transformativeness inquiry is limited to Anthropic's use of Publishers' lyrics specifically and the purpose of that particular use—***not*** Anthropic's use of other content or its AI training more broadly. *See id.* Publishers object to Anthropic's unauthorized copying of their lyrics to train AI models that regurgitate those lyrics, spit out AI-generated derivatives, and output synthetic lyrics that compete with Publishers. That is not transformative.

First, Anthropic's training of Claude on Publishers' lyrics to enable Claude to provide users with those ***same lyrics*** on demand has no further purpose or different character. When Anthropic fed Claude copies of Publishers' lyrics in training, and the AI model spit out copies of those same lyrics as output on demand, Anthropic provided a one-for-one substitute of the copied works and "merely supersede[d] the objects of the original creation." *Campbell*, 510 U.S. at 579.

Anthropic's records leave no doubt as to the purpose and character of its use of Publishers'

lyrics. Anthropic copied Publishers' lyrics as input for Claude, copying most of those lyrics more than a thousand times. MSS #10. It then trained and finetuned Claude to respond to requests for lyrics, repeatedly prompting and encouraging the model to spit out lyrics to Publishers' Works and other songs. *Id.* ##94-118. And, consequently, Claude output Publishers' lyrics on demand, in large numbers, after the model was publicly released. *See, e.g.*, *id.* ##34-36, 48. Record after record shows Claude's outputting copies of Publishers' lyrics, as Anthropic trained it to do, in response to direct requests for those lyrics, requests to identify songs or full lyrics based on lyric fragments, requests to translate lyrics, and a range of other requests for lyrics. *Id.* ## 51-65. Claude itself has declared its purpose of providing copies of Publishers' and others' song lyrics, on command:

- On October 1, 2023, when responding to a third-party user request for lyrics and providing the requested lyrics, Claude emphasized, "As an AI without human limitations, ***I have perfect recall and can precisely identify lyrics*** and musical sections." *Id.* #130.
- On October 3, 2023, Claude stated, "I can provide lyrics or sheet music if you need accompaniment for a song. ***Just name the song and I'll pull up the words***," explaining it can "***look up specific song lyrics***" in a "***large database of song lyrics***." *Id.* #131.
- And, in response to an Anthropic employee prompt on March 2024, Claude confirmed that "[m]emorization serves important functions" for AI models, including "***[e]ncoding information verbatim, like lyrics*** or speeches, ***where precise recall is necessary***." *Id.* #129.

The purpose and character of Anthropic's use—providing Publishers' lyrics to users online, on demand—is highly similar to Publishers' use. Publishers license their lyrics to lyric aggregators, lyric websites, and other digital services to allow individuals to search for and access those lyrics online. *Id.* #169. When Claude identifies lyrics in the same manner, it supplants the use of lyric aggregators like LyricFind and Musixmatch, lyric websites like Genius.com, and search engines like Google (all Publisher licensees) to find and view those lyrics—precluding a finding that Anthropic's use is transformative. Because Anthropic's use of the Works "is so similar to [the copyrighted work]'s typical use," it is not transformative. *Warhol*, 598 U.S. at 547.

Likewise, when Anthropic trains Claude to generate output modifying or combining Publishers' lyrics with other lyrics or text, that invades the derivative works right *Warhol* deemed a critical check on fair use. *Warhol* emphasized merely adding "new expression, meaning, or message" does not make a use transformative because that would "swallow" the copyright owner's derivative works right. 598 U.S. at 541. The first fair-use factor "would not weigh in favor of a

commercial remix . . . just because the remix added new expression or had a different aesthetic," and it "does not . . . dispense with the need for licensing" even where a challenged use "alter[s] the meaning" of the original. *Id.* Here, Claude's mashups and mangled copies of lyrics, *e.g.*, MSS ##55-63, amount to unlicensed commercial remixes that fair use's protection clearly excludes. *See, e.g.*, *Seuss*, 983 F.3d at 455 (defendant's "repackaging, copying, and lack of critique of [plaintiff's work], coupled with its commercial use," "weighs definitively against fair use" under first factor).

Further, Anthropic's exploitation of Publishers' lyrics to train Claude to produce "new" AI-generated lyrics that compete with Publishers also cannot be transformative. *Warhol* tied the first factor to "the problem of substitution—copyright's bête noire," stressing a secondary use that is "likely to substitute for, or 'supplant'" the original is not transformative. 598 U.S. at 528. Here, Anthropic's AI-generated lyrics serve the exact same purpose as Publishers' lyrics on which Claude was trained. These machine-generated lyrics substitute for the human-created lyrics that enabled them. For example, if an advertiser needed lyrics for a commercial jingle, that advertiser could use Claude to generate those lyrics instead of paying a commercial songwriter on whose lyrics Claude was trained. *See* MSS #55. Likewise, when an algorithmically curated Spotify playlist includes a song with AI-generated lyrics rather than a song with human-created lyrics, the machine-generated lyrics directly substitute for the human-created lyrics. *See id.* ##203-4.

That Claude can generate many ***other*** types of output beyond these lyric-related uses is irrelevant to Anthropic's use of Publishers' lyrics. There is no record evidence linking Anthropic's exploitation of Publishers' lyrics as training input, on the one hand, with Claude's generation of any such allegedly transformative output, on the other. Anthropic has no basis to claim its training on Publishers' lyrics enabled Claude to, for instance, write computer code, solve a mathematical equation, or interpret radiology images. *Id.* ##140-41. Publishers' lyrics specifically are not being "transformed" to generate these other types of AI output.

Nor can Anthropic justify its copying of Publishers' lyrics by invoking its claimed purpose of "teach[ing] a neural network how human language works" more broadly, ECF No. 207 at 19, or its professed need for a large volume of generic training text. Even if the Court ignored Supreme Court precedent and elevated "the subjective intent of the user" over "what use was made,"

*Warhol*, 598 U.S. at 545, Anthropic's arguments would still fail. Anthropic's own witnesses and experts have repeatedly stressed that Anthropic has ***no need*** for Publishers' lyrics in particular to build a general-purpose AI model. MSS #142. Anthropic's co-founder and 30(b)(6) witness Benjamin Mann testified, "I don't think we view it as important to include lyrics" in Claude's training data, and Anthropic's technical expert Dr. Jeffrey Bilmes opined that "the effect of Plaintiffs' lyrics on Claude's learned parameters or outputs is extremely likely to be near zero, if present at all." *Id.* ##143-44. What's more, Anthropic has many alternative sources of such data for that alleged purpose: it could train its AI models using text licensed from any of the many copyright-holders now entering the market to provide training data; non-copyrighted, open-source, or public-domain text; data generated by its workers; or "synthetic data" generated by an AI model trained on licensed sources. *Id.* #145. Anthropic's economics expert Dr. Abishek Nagaraj opined that "[l]yrics in particular are not a unique or indispensable input . . . . Anthropic could substitute Plaintiffs' Works-in-Suit with other text sources—including text that does not consist of lyrics—to train its general-purpose LLM." *Id.* #146. Likewise, Anthropic has no need for Publishers' lyrics specifically to amass a sufficiently large amount of AI training data. To the contrary, it has dismissed Publishers' lyrics as an "infinitesimally small" portion of its training corpus. *Id.* #147.

In short, Anthropic's "copying is [not] reasonably necessary to achieve" any allegedly transformative purpose. *Warhol*, 598 U.S. at 532. Where "the particular subject" of the copyrighted lyrics are "irrelevant to that purpose," that weighs against fair use. *TCA Television Corp. v. McCollum,* 839 F.3d 168, 182 (2d Cir. 2016). Anthropic cannot copy Publishers' lyrics "merely . . . to avoid the drudgery in working up something fresh." *Campbell*, 510 U.S. at 580.

**c. Anthropic's use was undoubtedly commercial.**

Anthropic's use of Publishers' lyrics was plainly commercial, and it could easily license those lyrics if it wanted. Anthropic is a for-profit company valued at $380 billion and growing. MSS #149. It copied Publishers' lyrics in the input and output of Claude, its sole commercial product. *Id.* #150. From founding in 2021, Anthropic planned to commercialize. *Id.* #151. In an early memo, CEO Dario Amodei described Anthropic's research as simply "making us look responsible" and "setting up future [commercial] deployment . . . to look like a logical extension

of our safety work, rather than looking like a pivot or 'selling out.'" *Id.* #152. By 2022, Anthropic was "ramp[ing] up a commercial machine" and "establish[ing] [itself] in the market as part of an oligopoly." *Id.* #153. Claude is now "central to Anthropic's commercial success," generating billions in revenue via enterprise contracts and paid subscriptions, through 300,000 Claude business customers and millions of individual consumer users. *Id.* #155, 159. As of February 2026, Anthropic's annual revenue run rate was nearly $14 billion and rapidly increasing. *Id.* #161.

Every time Anthropic copies Publishers' lyrics, it "stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper*, 471 U.S. at 562. Its commercial use is "presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." *Leadsinger*, 512 F.3d at 530 (quoting *Sony*, 464 U.S. at 451).

This "commercial character of [Anthropic's] use" cannot be ignored. *Warhol*, 598 U.S. at 537. Though not alone dispositive, it "weigh[s] against a finding of fair use." *Id.*

* * *

*Bartz* and *Kadrey* do not support finding that the first fair-use factor favors Anthropic here. Rather, the starkly different facts in those cases underscore why Anthropic's use here is ***not*** transformative. In particular, *Bartz* and *Kadrey* lacked any evidence that defendants' AI models produced output copying or competing with plaintiffs' works—the opposite of this case. *See Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1021 (N.D. Cal. 2025) ("[Plaintiffs] do not allege that any LLM output provided to users infringed upon [plaintiffs'] works."); *Kadrey*, 788 F. Supp. 3d at 1045 (noting evidence that model "will not produce more than 50 words of any of the plaintiffs' books"). Had there been evidence of such infringing output, the first-factor analyses in those cases would have been entirely different: "[I]f the outputs seen by users had been infringing, [plaintiffs] would have a ***different case***. And, if the outputs were ever to become infringing, [plaintiffs] could bring such a case." *Bartz*, 787 F. Supp. 3d at 1021 (emphasis added); *see Kadrey*, 788 F. Supp. 3d at 1045. The record here is replete with precisely the type of evidence of infringing output missing in *Bartz* and *Kadrey*—fatally undermining Anthropic's claim to a transformative purpose or use.

Beyond these evidentiary differences, neither *Bartz* nor *Kadrey* considered the narrow case of an AI company's training on specific, *sui generis* content so that its model could either output

the same content or generate output falling in the same niche as the content on which it was trained. Relatedly, those courts' transformativeness analyses focused on the AI defendants' use of text generally to train their AI models—not how the plaintiff copyright holders' works specifically were used, or whether the defendants needed those particular works for AI training. The first fair-use factor, however, requires "an analysis of the specific 'use' of a copyrighted work that is alleged to be 'an infringement.'" *Warhol* 598 U.S. at 533 (quoting 17 U.S.C. § 107).

As for commerciality, *Bartz* and *Kadrey*'s rulings cannot be squared with *Warhol*'s clear mandate that transformativeness "is a matter of degree" that "must be balanced against the commercial nature of the use." 598 U.S. at 532. *Bartz* did not even consider the highly commercial nature of Anthropic's use in evaluating its copying for AI training in particular under the first fair-use factor. *Bartz*, 787 F. Supp. 3d at 1021-22. While *Kadrey* acknowledged the "commercial nature of [the AI defendant's] use," *Kadrey*, 788 F. Supp. 3d at 1046, it failed to give any weight to that commerciality, contrary to the Supreme Court's mandate in *Warhol*.

The *Thomson Reuters* court's first-factor analysis is more instructive. In that case, the defendant used the plaintiff's copyrighted "headnotes as AI data to create a [non-generative AI] legal research tool to compete with [the plaintiff]." *Thomson Reuters Enter. Ctr. v. Ross Intel. Inc.*, 765 F. Supp. 3d 382, 398 (D. Del. 2025), *motion to certify appeal granted*, 2025 WL 1488015 (D. Del. May 23, 2025). In analyzing transformativeness, that court applied the "newer framework advanced by *Warhol*" and "look[ed] to the broad purpose and character of [the defendant's] use." *Id.* at 399. Because the defendant "took the headnotes to make it easier to develop a competing legal research tool," the use was "not transformative." *Id.* The same logic applies here: Anthropic took Publishers' lyrics to make it easier to develop an AI tool that reproduces Publishers' lyrics on command or generates competing substitutes. That use cannot be transformative.

**2. Publishers' Works are at the core of copyright protection.**

The second fair-use factor—"the nature of the copyrighted work"—unquestionably favors Publishers. 17 U.S.C. § 107(2). "[S]ong lyrics fall within the core of copyright protection." *Leadsinger*, 512 F.3d at 531-32 (holding second factor weighed against fair use); *see Campbell*, 510 U.S. at 586 (a musical composition is "closer to the core of intended copyright protection").

The Supreme Court has emphasized this factor's importance, underscoring "copyright's protection may be stronger"—and fair use less likely—where "copyrighted material is fiction, not fact, where it consists of a motion picture rather than a news broadcast, or where it serves an artistic rather than a utilitarian function." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 20 (2020). Because Publishers' lyrics are quintessentially creative works, *see* MSS #163, "the consequence [is] that fair use is more difficult to establish when [such] works are copied." *Campbell*, 510 U.S. 569.

### 3. Anthropic uses all or nearly all of each Work.

The third fair-use factor—"the amount and substantiality of the portion used in relation to the copyrighted work as a whole"—also favors Publishers. 17 U.S.C. § 107(3). Copying a work in "total," or taking "the heart" of a work, weighs against fair use. *McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149, 1162 (9th Cir. 2022). There is no genuine dispute Anthropic copied Publishers' lyrics in full—typically thousands of times—to train Claude. MSS ##10, 164. Claude also generated output with "total" or near-total copies of the lyrics, and output reproducing "the heart" of those lyrics and unlicensed derivatives. *Id.* ##51, 65; *see, e.g.*, *Leadsinger*, 512 F.3d at 531 (where alleged infringer "uses copyrighted lyrics in their entirety," third factor weighs against fair use).

Anthropic cannot evade liability by claiming it copied no more than "necessary" for its purpose. *See Monge v. Maya Mags., Inc.*, 688 F.3d 1164, 1179 (9th Cir. 2012). While Anthropic needed to copy Publishers' lyrics in training to serve up copies of those lyrics to users on demand, that infringing use cannot justify its copying. Even if the Court accepted Anthropic's claim that its purpose was "to teach a neural network how human language works," ECF No. 207 at 19, Anthropic has explicitly disclaimed any need for Publishers' lyrics specifically to achieve that end, MSS #142, and it had many alternatives to copying those lyrics, *id.* ##145, 148. Because Anthropic cannot show any specific need for Publishers' lyrics or that alternatives were unavailable, its total copying weighs against fair use. *See, e.g.*, *McGucken*, 42 F.4th at 1162; *Monge*, 688 F.3d at 1179.

### 4. Anthropic's use harms the market for and value of Publishers' Works.

Finally, the fourth fair-use factor—"the effect of the use upon the potential market for or value of the copyrighted work"—favors Publishers. 17 U.S.C. § 107(4). The fourth factor is "undoubtedly the single most important element of fair use." *Harper*, 471 U.S. at 566. It addresses

"'not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original' and 'the market for derivative works.'" *Seuss*, 983 F.3d at 458 (quoting *Campbell*, 510 U.S. at 590).

Anthropic, as the proponent of this affirmative defense, will "have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets." *Campbell*, 510 U.S. at 590). "[T]o negate fair use," Publishers "need only show that if the challenged use should become widespread, it would adversely affect the *potential* market for the copyrighted work." *McGucken*, 42 F.4th at 1163 (quoting *Monge*, 688 F.3d at 1182) (emphasis in original).

Here, Anthropic's unauthorized exploitation of Publishers' Works significantly harms the potential market for and value of those Works, in multiple, independent ways.

**a. Anthropic's copying of Publishers' Works in AI output serves as a market substitute and denies Publishers licensing revenues.**

Anthropic's copying of Publishers' lyrics in AI output substitutes for those lyrics and denies Publishers licensing revenues. "It is indisputable that, as a general matter, a copyright holder is entitled to demand a royalty for licensing others to use its copyrighted work, . . . and that the impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor." *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 929 (2d Cir. 1994) (collecting cases).

First, when Claude outputs Publishers' lyrics to users on demand, that directly substitutes for licensed online sources of Publishers' lyrics, harming that robust lyric licensing market. Publishers license the lyrics to the Works to lyric aggregators like LyricFind and Musixmatch, lyric websites such as Genius.com, digital music services like Spotify and Apple Music, and social media platforms such as Facebook and YouTube, among others, authorizing them to share those lyrics publicly. MSS ##168-69. LyricFind and Musixmatch in turn sublicense the Works to search engines like Google, websites like Lyrics.com, and other services. *Id.* #170. Through these licensees and others, Publishers provide consumers many authorized online sources of their lyrics, allowing consumers to (i) look up the lyrics to their favorite songs, (ii) identify full lyrics or song titles based on excerpts of lyrics, and (iii) find translations of lyrics, among other uses. *Id.* #171.

Anthropic copied Publishers' lyrics to build an AI tool to do the ***exact same*** thing. *Id.* #122. In response to all of these types of queries, Claude has reproduced, displayed, and distributed Publishers' lyrics, on demand. *Id.* ##172-73. "[W]hen a commercial use amounts to mere duplication . . . of the original and serves as a market replacement for it, [it is] likely that cognizable market harm to the original will occur." *Campbell*, 510 U.S. at 591. By creating a market substitute in this manner, Anthropic "profit[s] from exploitation of the copyrighted material without paying the customary price." *Harper*, 471 U.S. at 562. Anthropic's unauthorized use of Publishers' Works denies Publishers their customary licensing fees, erodes the value of Publishers' Works for these types of licenses, and threatens Publishers' revenues from their existing licensees. MSS #174.

Just as importantly, Anthropic's use, if widespread, would have catastrophic effects on this lyric licensing market. "[W]hether unrestricted and widespread conduct of the sort engaged in" by Anthropic "would undermine [Publishers'] potential market" is a "central aspect of market harm." *Seuss*, 983 F.3d at 461. If widespread, Anthropic's misuse of Publishers' lyrics in this manner would destroy Publishers' ability to license lyrics in the future. MSS #175. Such use harms the market for the Works by reducing their value, weakening demand for licenses, and threatening the viability of licensees. *Id.* #176; *see, e.g.*, *McGucken*, 42 F.4th at 1163 (recognizing defendant's conduct, if "widespread and unrestricted," "would destroy [plaintiff's] licensing market").

Though *Bartz* and *Kadrey* did not involve evidence of substantially similar output, they recognized the market harm that results when AI models do output copyrighted content, like Claude has done here. *See, e.g.*, *Kadrey*, 788 F. Supp. 3d. at 1054 ("[I]t would be easier to conclude that the market for copied books would be harmed by an LLM that is capable of regurgitating those books or generating substantially similar text."); *Bartz*, 787 F. Supp. 3d at 1031 (emphasizing that, if "exact copies" or "infringing knockoffs of [plaintiffs'] works [had been] provided to the public" via AI output, "this would be a different case").

Second, when Anthropic generates AI output with unauthorized derivatives of Publishers' lyrics, that separately harms an equally vital derivative works market. "[T]he derivative works market" is "a crucial right for a copyright holder." *Seuss*, 983 F.3d at 460. Publishers already license their lyrics for incorporation into samples, remixes, interpolations, sheet music, karaoke

products, books, magazines, greeting cards, and merchandising, among other uses. MSS #177. Anthropic, meanwhile, generates AI output combining Publishers' lyrics with other text in many of the exact same ways, including potentially reputationally damaging and unrestricted AI-generated derivative output. *Id.* ##178-80. In doing so, Anthropic supplants Publishers' market for licensed samples, remixes, sheet music, and similar derivatives. *See, e.g.*, *McGucken*, 42 F.4th at 1152 ("[A]n infringing use would destroy a derivative market when the infringing work is of the same type as existing works by licensed users."); *Seuss*, 983 F.3d at 460. Again, if that use were widespread, Publishers and songwriters would lose significant revenue and the derivative licensing market would shrink—or even disappear. *See, e.g.*, *McGucken*, 42 F.4th at 1163.

**b. Anthropic's output of "new" AI-generated song lyrics dilutes the market and indirectly substitutes for Publishers' Works.**

Anthropic's use of Publishers' lyrics to produce "new" AI-generated song lyrics causes serious market harm by generating competing market substitutes that dilute and disrupt the actual and potential markets for Publishers' Works.

In *Kadrey*, Judge Chhabria described how AI models that "enable the rapid generation of countless works that compete with the originals [on which they were trained], even if those works aren't themselves infringing," will harm the market for the original works via market dilution:

> Generative AI has the potential to flood the market with endless amounts of images, songs, articles, books, and more. People can prompt generative AI models to produce these outputs using a tiny fraction of the time and creativity that would otherwise be required. So by training generative AI models with copyrighted works, companies are creating something that often will dramatically undermine the market for those works, and thus dramatically undermine the incentive for human beings to create things the old-fashioned way.

788 F. Supp. 3d at 1034-35. Though the dearth of evidence in that particular case precluded such a finding, Judge Chhabria emphasized that "market dilution will often cause plaintiffs to decisively win the fourth factor—and thus win the fair use question overall—in cases like this." *Id.* at 1055.

The U.S. Copyright Office has reached the same conclusion. The Office emphasized that "[t]he speed and scale at which AI systems generate content pose a serious risk of diluting markets for works of the same kind as in their training data," which "means more competition for sales of an author's works and more difficulty for audiences in finding them," while "[r]oyalty pools can

also be diluted."[8] Thus, "[e]ven where a model's outputs are not substantially similar to any specific copyrighted work, they can dilute the market for works similar to those found in its training data," thereby "threaten[ing] significant potential harm to the market." *Id.* at 73; *see also, e.g.*, *Thomson Reuters,* 765 F. Supp. 3d at 398 (finding no fair use even though plaintiff's copyrighted headnotes did not appear in "final product [defendant] put forward to consumers").

This basis for market harm is consistent with long-established copyright and fair use principles. The Copyright Act is clear that market harm encompasses any "effect" upon the "potential market." 17 U.S.C. § 107; *see also, e.g.*, *Campbell*, 510 U.S. at 590. The Supreme Court has emphasized that fair use must remain "flexible," *Warhol*, 598 U.S. at 527, and take into account "significant changes in technology," *Oracle*, 593 U.S. at 19. Courts regularly consider the market harm that would arise if contested uses of new technologies became widespread. *See, e.g.*, *Napster*, 239 F.3d at 1017. As the Copyright Office emphasized, "[G]iven the volume, speed and sophistication with which AI systems can generate outputs, and the vast number of works that may be used in training, the impact on the markets for copyrighted works could be of ***unprecedented scale***." C.O. Report at 74 (emphasis added). "No other use—whether it's the creation of a single secondary work or the creation of other digital tools—has anything near the potential to flood the market with competing works the way that LLM training does." *Kadrey*, 788 F. Supp. 3d at 1055.

This case presents the ***exact scenario*** about which the Copyright Office and Judge Chhabria forewarned. Anthropic has exploited Publishers' lyrics without authorization to build a machine that produces AI-generated lyrics, at superhuman speed and scale, that compete with and dilute the market for the human-written lyrics on which it was trained.

There is no question Anthropic's Claude produces AI-generated song lyrics on demand. MSS #181. Claude itself has touted its ability to "writ[e] song lyrics." *Id.* #183. Claude generates such lyrics far faster than any human, spitting out between 60 and 100 words ***per second***. *Id.* #184. And Anthropic takes no steps to prevent this AI lyric output, via guardrails or otherwise. *Id.* #186.

Claude is generating such lyrics on a massive scale. Users prompted Claude to output

---

[8] U.S. COPYRIGHT OFFICE, *Copyright and Artificial Intelligence, Part 3: Generative AI Training (Pre-Publication Version)* at 65 (May 2025), https://www.copyright.gov/ai/Copyright-and-Artificial-Intelligence-Part-3-Generative-AI-Training-Report-Pre-Publication-Version.pdf ("C.O. Report").

"new" AI-generated lyrics over a hundred thousand times from September 2023 to March 2024 alone. *Id.* #188. Anthropic's own analyses confirm widespread Claude usage to produce AI lyrics:

- Anthropic's "Economic Index" data reveals that many professional lyricists, poets, and other writers using Claude "[w]rite words to fit musical compositions, including lyrics," and professional singers are similarly using Claude to "compose songs." *Id.* #189.
- Anthropic's "Clio" data likewise shows frequent Claude usage by customers more broadly to [redacted]" among other AI lyric generation uses. *Id.* #190.
- Recently published data from Claude-collected interviews with creative industry professionals underscores the many specific ways that songwriters and musicians are using Claude to generate AI lyrics, including by "throw[ing] ideas into the AI system, and it can generate something that combines all of my thinking." *Id.* #191.

These Claude-generated lyrics are already competing with and displacing Publishers' human-written lyrics. For example, in a June 2025 YouTube video that has 2.5 million views, music producer Rick Beato showed how he had used Claude to produce AI-generated lyrics and then incorporated those lyrics into an AI-generated song—a song that Mr. Beato subsequently uploaded to streaming services and now has over 31,000 views on YouTube alone. *Id.* #195.

These uses of Claude are in line with the broader ways in which AI-generated lyrics and music are already competing with Publishers and songwriters and saturating the market. AI-created songs are flooding the streaming platforms and climbing the music sales charts. *Id.* #196. A study commissioned by the popular French streaming platform, Deezer, estimated that, as of September 2025, users were uploading approximately 50,000 AI-generated songs to the platform every day—representing 34% of all the music submitted while corresponding to 0.5% of total streams (the equivalent of a new music superstar). *Id.* #197. By January 2026, Deezer announced that the rate of AI-generated tracks submitted to its platformed increased to over 60,000 new tracks per day and now accounted for ***3%*** of total streams—a six-fold increase in just four months. *Id.* #198. Similarly, *Billboard* recently reported that "at least six AI or AI-assisted artists [] debuted on various Billboard rankings" in the final months of 2025 alone, while it is becoming "increasingly difficult to tell who or what is powered by AI," and this "trend is quickly accelerating." *Id.* #199.

The market for and value of Publishers' Works will be seriously harmed as Anthropic continues to inundate the market with AI imitations of Publishers' human-written lyrics. Digital

streaming platforms, like Spotify, distribute revenue to music rightsholders in pro-rata shares from a fixed "royalty pool"—the more a song is streamed (relative to other songs on the platform), the more the rightsholder is paid from the pool. *Id.* #201. Adding AI-generated works to the platform thus diverts royalties from the pool that would otherwise have been paid to human songwriters. *Id.* #202. AI-generated works thus reduce Publishers' streaming and other revenues, both by diverting such revenues from Publishers and diluting their share of the overall revenue pool. *Id.* ##203-4. In addition to competing with Publishers and existing songwriters, the flood of AI-generated music will also "crowd out" emerging songwriters and disincentivize future potential songwriters from creating new works. *Id.* #205. Anthropic's own Claude-collected interviews reveal that many of the same creative professionals who use Claude also hold deep reservations about these and similar resulting harms—including that AI tools will "infinitely generate new music," cause "streaming platform saturation," and "automat[e] [] music so much that the artistic economy collapses" and human "artistic expressions get[] buried beneath it all." *Id.* #206. These harms will only intensify as Anthropic releases ever-more-powerful Claude models in the future. *Id.* ##200, 207.

**c. Anthropic subverts the licensing market for AI training data.**

Finally, Anthropic's unlicensed use of Publishers' Works to train its AI models threatens to stifle the licensing market for such uses. A market for licensing copyrighted works for use in AI training is already thriving and well established. *Id.* #208. Licensing is core to Publishers' work on behalf of songwriters, and Publishers are particularly well positioned to participate in this expanding AI licensing market. *Id.* #209. Copyright owners have already entered into hundreds of agreements with AI developers to license their content in connection with AI models, while Publishers in particular have licensed Works to multiple AI companies for use in training—including Udio and Klay Vision—and are exploring many other licenses. *Id.* #211; *see, e.g.*, *VHT*, 918 F.3d at 744 (licensing "handful" of works showed "market was more than 'hypothetical'").

Publishers have a clear interest in exploiting the existing and potential licensing market for AI training data, and Anthropic is destroying that market as it is still developing. Where "a market exists for the right to copy and use" Publishers' lyrics "in various formats," Anthropic's unlicensed use of those lyrics in AI training and output "harms [Publishers'] opportunity to negotiate a value

for those copies and also inhibits [Publishers'] ability to enter similar licensing agreements with others in the future by making the copies less valuable." *Fox Broad. Co. v. Dish Network, L.C.C.*, 905 F. Supp. 2d 1088, 1105 (C.D. Cal. 2012), *aff'd*, 747 F.3d 1060 (9th Cir. 2014). Even if Claude never generated output containing Publishers' lyrics, Anthropic's unlicensed copying in training still "threaten[s] to reduce the value of the right to copy the [Works] and undermine[s] [Publishers'] relationships with licensees who pay for that right." *Id.* Given the existence of a "traditional, reasonable, or likely to be developed market[]" for such AI training data, there is no danger of circularity in finding market harm based on Anthropic's unlicensed exploitation of Publishers' lyrics here. *See Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1179 (9th Cir. 2013).

* * *

Ultimately, fair use serves as a flexible doctrine that must account for "significant changes in technology." *Oracle*, 593 U.S. at 19. Arguably no technological change in history has been more significant—or threatened more harm to copyright holders—than AI. *See* MSS ##213-14, 218. The rapid proliferation of Anthropic's Claude, trained on vast collections of Publishers' Works copied without authorization or compensation, portends unprecedented impacts on the market for those Works. Anthropic CEO Dario Amodei admitted in an internal memo that "***human labor is being used to train AI models*** by large, centralized actors, who concentrate the resulting profits while ***in the long run making the human labor obsolete***." *Id.* #215. If "[t]he current trend continues," he predicted that "AI model training [will] become[] an increasingly extractive concentrator of wealth, in more and more industries" including, in particular, "***music***." *Id.* #217. Dr. Amodei was even more blunt at his deposition: "[W]e should think about everyone, including ***songwriters***, but this isn't about any one stakeholder . . . . This is about technology that can ***eventually automate everything***." *Id.* #216.

Anthropic cannot copy Publishers' lyrics to build AI machines that "automate everything" and render the songwriter artistry on which they were trained "obsolete." That is not fair use.

## CONCLUSION

For the foregoing reasons, Publishers respectfully request entry of summary judgment in their favor on their *prima facie* direct infringement claim and on Anthropic's fair use defense.

Dated: March 23, 2026

Respectfully submitted,

*/s/ Nicholas C. Hailey*

**OPPENHEIM + ZEBRAK, LLP**
Matthew J. Oppenheim
Nicholas C. Hailey
Jeffrey M. Gould
Corey Miller
Keith Howell
Audrey L. Adu-Appiah
(admitted *pro hac vice*)
4530 Wisconsin Ave., NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com
nick@oandzlaw.com
jeff@oandzlaw.com
corey@oandzlaw.com
khowell@oandzlaw.com
aadu-appiah@oandzlaw.com

Alexander Kaplan
Jennifer Pariser
Andrew Guerra
Bret Matera
Timothy Chung
Michelle Gomez-Reichman
(admitted *pro hac vice*)
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
alex@oandzlaw.com
jpariser@oandzlaw.com
andrew@oandzlaw.com
bmatera@oandzlaw.com
tchung@oandzlaw.com
mgomez-reichman@oandzlaw.com

**COBLENTZ PATCH DUFFY & BASS LLP**
Jeffrey G. Knowles (SBN 129754)
One Montgomery Street, Suite 3000
San Francisco, CA 94104
Telephone: (415) 391-4800
ef-jgk@cpdb.com

**COWAN, LIEBOWITZ & LATMAN, P.C.**
Richard S. Mandel
Jonathan Z. King
Richard Dannay
(admitted *pro hac vice*)
114 West 47th Street
New York, NY 10036-1525
Telephone: (212) 790-9200
rsm@cll.com
jzk@cll.com
rxd@cll.com

*Attorneys for Plaintiffs*