# Exhibit 13

Planet Depos
We Make It Happen™

**HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**

# Transcript of Dario Amodei, Ph.D.

**Date:** January 8, 2026
**Case:** Concord Music Group -v- Anthropic

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

---------------------------------------

CONCORD MUSIC GROUP, INC., ET AL., )
Plaintiffs, ) Case Number
v. ) 5:24-cv-03811-EKL
) SVK
ANTHROPIC PBC, )
Defendant. )

----------------------------------)----

HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY

VIDEOCONFERENCED and VIDEO-RECORDED
DEPOSITION of
DARIO AMODEI, Ph.D.
San Francisco, California 94111
Thursday, January 8, 2026

Reported Stenographically by:
MARY J. GOFF
CSR No. 13427
WA CSR No. 21030779
Job No. 614290
PAGES 1-158



HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY

VIDEOCONFERENCED and VIDEO-RECORDED DEPOSITION of DARIO AMODEI, Ph.D., Volume I, taken on behalf of Plaintiff Publishers, Oppenheim + Zebrak, LLP, at WilmerHale, 50 California Street, Suite 3600, San Francisco, California 94111, beginning at 1:44 p.m. and ending at 4:30 p.m., on Thursday, January 8, 2026, before MARY J. GOFF, California Certified Shorthand Reporter No. 13427 and WA CSR No. 21030779.



APPEARANCES:

For Plaintiff Publishers
Oppenheim + Zebrak, LLP
BY: NICHOLAS C. HAILEY
Attorneys at Law
4530 Wisconsin Avenue, NW
5th Floor
Washington, DC 20016
202-480-2999
nick@oandzlaw.com

For Defendant Anthropic PBC
WilmerHale
BY: SONAL MEHTA
Attorneys at Law
2600 El Camino Real
Suite 400
Palo Alto, California 94306
sonal.mehta@wilmerhale.com
628-235-1026

ALSO PRESENT: Natalie Naugle, Brian Israel, In-house counsel Anthropic
Ellen Stephano, Esquire, WilmerHale (remote Boston)

Videographer: Addison McNaughton



INDEX


| WITNESS | | EXAMINATION |
|---|---|---|
| DARIO AMODEI, Ph.D. | | |
| Volume I | | |
| | ATTORNEY HAILEY | 6 |
| | ATTORNEY MEHTA | -- |

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 246 | 1-29-24 Slack message Anthropic_0000605700-785 | 9 |
| Exhibit 247 | Transcript: Ezra Klein Pages 1-18 | 45 |
| Exhibit 248 | Exhibit 40 Anthropic_0000462964-968 | 89 |
| Exhibit 249 | Anthropic Plan for 2023 Anthropic_0000463241-255 | 108 |
| Exhibit 250 | Why Anthropic CEO Dario Amodei Spends So Much Time Warning of AI's Potential Dangers | 136 |
| Exhibit 251 | AI Misalignment Risk Anthropic_0000478585 | 142 |

PREMARKED EXHIBITS:

| | | |
|---|---|---|
| Exhibit 235 | 1-8-2023 email Anthropic Plan | 123 |

# Pages 13-16

**A Okay.**

Q Do you see the Slack conversation in the middle of page 738 beginning with the message from Andy Stewart on February 29, 2024, at 12:02 p.m.?

**A Yes, I do.**

Q And he writes:

Here's another bad one with image only as prompt. Screenshot of text. This was first try with TLB.

Do I read that correctly?

**A I do see it. There's a screenshot. But I -- the -- either the screenshot doesn't show anything or the screenshot is blank. There seems to be some error here.**

Q And that was the way that the document was produced to us by Anthropic, and we can come back to that if there are questions. But --

**A Okay.**

Q -- please turn to page 740.

**A Okay.**

Q And do you see there are two messages on that page from Dario?

**A That is correct.**

Q And that refers to you, Mr. Amodei,



correct?

**A I believe so, yes.**

Q So you recognize this as a Slack conversation between you, Mr. Stewart, and various other Anthropic employees from February 29, 2024?

**A That's right.**

Q And this conversation appears to be discussing Anthropic's internal testing of CLAUDE and certain output generated by CLAUDE during that testing; is that correct?

**A This looks it like from the document. It looks like that we're testing a -- we're -- a model -- bashing a model before launch, correct.**

Q And what does that -- what does that mean, "bashing the model"?

**A That means that we experiment with -- you know, we -- we train a model. A model can do all sorts of things.**

**We don't know ahead of time, you know, what all the behaviors of the models are going to be, so a bunch of people at the company get together and they interact with the model to see what it can do.**

Q So you're -- you're interacting with a version of CLAUDE here before you launch that to the



public in order to test out the output of the model?

**A In order to test the output of the model, correct.**

Q And do you recall what specific issues you were testing in terms of output of CLAUDE here in this conversation?

**A I -- I do not recall the specific issues particularly with -- given that these screenshots aren't visible.**

Q If you turn back to page 739 --

**A That's right.**

Q -- do you see the second message from Jared Kaplan at the top of the page at 12:06 p.m.?

**A Yes.**

Q Mr. -- Dr. Kaplan writes:

Yes, I think this is -- actually isn't all that problematic in the scheme of things. CLAUDE 2.0 will make lists of naughty words, too, without MM.

Do you see that?

**A Yes. "MM," I believe, would be multimodal. So providing images in and -- and producing words out.**

Q And CLAUDE 2.0 is referring to a publicly



available version of CLAUDE as of February of 2024?

**A That's --**

ATTORNEY MEHTA: Objection --

**A -- right.**

ATTORNEY MEHTA: -- to form.

THE DEPONENT: Sorry.

ATTORNEY MEHTA: That's okay. You can answer.

Q (BY ATTORNEY HAILEY) And then a few messages below that you see an Anthropic employee named Diane writes:

[redacted]

Did I read that correctly?

**A You read that correctly, yes.**

Q Does -- do those messages clarify to you that the issues you're discussing here are output with graphic language and racial slurs?

ATTORNEY MEHTA: Objection to the form.

**A No, I wouldn't -- I wouldn't say that.**

**I would say that the first message shows**

# Pages 37-40

A You're confusing me.
Q Mr. Amodei, you don't dispute that Anthropic has copied Plaintiffs' song lyrics from the Internet and included those lyrics in the training data to train its AI models?
A Again, you can -- you can get that information from data that was turned over and from other witnesses.
I don't, myself, look at the training data, so I don't directly know that one way or another. You can -- you can confirm that if it's true from someone else.
Q (BY ATTORNEY HAILEY) I want to turn back to Exhibit 246, which you still have in front of you, Mr. Amodei.
A Okay.
Q Do you see the Slack message from you from 12:15 p.m., on February 29, 2024?
A That's right.
Q You write:
[redacted]



[redacted]
Did I read that correctly?
A You read that correctly.
Q And it's true, as you say in this document, that Anthropic's models are unpredictable?
A All AI models are unpredictable. They're statistically-based systems.
Q Including Anthropic's CLAUDE models?
A That is correct.
Q And it's true, as you say in this Slack message, that "any model that Anthropic launches will have dozens of problems in terms of the type of output that the model generates"?
A That is correct. I would refer back to, however, to the idea that there's a wide range of problems in models. There's very small problems.
For example, the idea that, you know, if the model said the word "hell" once, that doesn't



mean that we should block the launch -- the launch of the model for all the benefits that it would have all the way across the world.
The word "problems" can -- can refer to things that are extremely minor, things that on reflection are not really problems at all, or it can refer to large problems.
Q And is one of those problems outputting copyrighted material?
ATTORNEY MEHTA: Objection, asked and answered.
A Well, in this particular document -- I actually think in the context of this document, this was referring to general types of, you know, like offensive -- offensive information or information on how to do bad things.
I actually think this comment was narrowly scoped to that.
Q (BY ATTORNEY HAILEY) Let me ask you: Setting aside this specific conversation, is it a problem if Anthropic's AI models output copyrighted material?
A Again, it is -- you know, Anthropic's model should not outright copyrighted material subject to the bounds of fair use.



Q And what do you mean by "subject to the bounds of fair use" in the context of that answer?
ATTORNEY MEHTA: The same caution with respect to: You can share your personal views, independent of any advice of --
A Yeah --
ATTORNEY MEHTA: -- counsel.
A -- so this is -- this is not based on -- this is not based on any advice of -- this is not based on any advice of counsel.
But when we're talking about LLM outputs, you know, that is -- LLM training is obviously a very different issue. But LLM outputs is -- is just about -- you know, is just about -- is just about outputting information.
So in the normal context of copying or outputting information, there are a bunch of exceptions around the idea of fair use. And -- and you know, it's my understanding that in this context, those exceptions would -- would certainly apply.
Now, maybe there are some things that are different about LLM outputs as well and perhaps other exceptions might apply, but certainly the exceptions related to fair use would apply, as they

# Pages 57-60

57

Q Why shouldn't models be verbatim outputting copyrighted content?
**A Again, I would -- I would say, again, as I have in answers to the question when I was asked it previously, that, you know, if -- if -- given the full form to expand and -- and add all nuance, as it is often not possible to do in the context of -- of a podcast interview, I would restate the statement as: I think everyone agrees the models shouldn't be verbatim outputting copyrighted content subject to the -- the exemptions to fair use that -- that apply to reproducing content in general.**
Q And why is that?
**A Why is that? My view -- you know, again, that is -- that is my understanding of copyright law. Again, not colored by anything that I have learned from counsel, but that's my understanding of copyright law.**
Q So if copyright law didn't prohibit that, would you want CLAUDE's models to verbatim output copyrighted content?
**A I mean -- you know, you're asking -- you're asking me this kind of very strange hypothetical. You know, if there have never been copyright law, like all kinds of actors in the -- in**

58

**the economy would behave very differently. There would be something else instead of copyright law.**
**It -- you know, it's very hard to answer hypothetical questions. You're going to have to be more specific.**
Q Well, my question to you, sir, was why you had that view.
And your response was: It's your understanding that copyright law --
**A Correct.**
Q -- not colored by anything that I have learned from counsel, that's your understanding of copyright --
**A That's correct.**
Q -- law.
**A That's correct.**
Q So apart from your understanding of copyright law, is there any other reason why models shouldn't be verbatim outputting copyrighted content?
**A Again, I think -- I think that's a sufficient reason.**
Q I'm asking you: Are there any other reasons?
**A Sure. I mean, there are lots of reasons**

59

**why -- why laws are made in the -- I -- I don't understand what you're asking me.**
Q I'm not asking you about why the laws are made.
I'm asking you: Are there any other reasons why models shouldn't be outputting copyrighted content?
**A Models shouldn't be -- models shouldn't output copyrighted content because it's -- it's against the law to do so.**
Q You're aware, Mr. Amodei, that some CLAUDE users have prompted CLAUDE to output copyrighted content?
ATTORNEY MEHTA: If you have information of that independent of what you have learned through communications with counsel, you can answer.
**A Again, all of my -- all of my communications about this lawsuit or similar lawsuits were -- were about -- you know, were -- were under privilege. You know, I -- you know, I don't examine or look at individual CLAUDE conversations.**
Q (BY ATTORNEY HAILEY) So sitting here today as CEO of the company, you can't tell me whether some CLAUDE users have prompted CLAUDE to spit out

60

copyrighted content, apart from conversations --
**A CLAUDE --**
Q -- you have had with lawyers?
**A -- CLAUDE -- CLAUDE users do a lot of things. It's -- it's, you know, very possible, indeed probable that across the millions of users that have used CLAUDE, you know, some users may have -- may have asked CLAUDE to output copyrighted content.**
**But I'm just -- I'm just being very precise here. I don't look at individual conversations myself, so strictly speaking, I don't -- I don't know of any specific user who has asked CLAUDE for information about copyrighted content.**
Q Well, when you tested and developed the models internally, you -- you and Anthropic employees prompted the models to output copyrighted content; is that right?
**A I think the people who were developing the safeguards against copyrighted content asked the models to output copyrighted content.**
**I cannot recall -- or at least I cannot recall an instance where I, myself, undertook this task, but certainly other employees at Anthropic made such tasks.**

# Pages 81-84

Q Do you agree that sometimes CLAUDE users ask for new or original song lyrics or lyrics in the style of an existing song or songwriter?

**A Look, I don't -- don't have detailed knowledge, but certainly something you could ask CLAUDE to do is -- you know, I could ask CLAUDE to write a poem or I could ask CLAUDE -- I could ask CLAUDE to write a poem or I could ask CLAUDE to write a -- I could ask CLAUDE to write a song.**

**That's certainly something that the models are capable of doing. And because it's not an existing copyrighted song, CLAUDE would allow a model to do that. CLAUDE would allow the user to do that, I would hypothesize.**

Q And you agree that if a user -- a CLAUDE user used CLAUDE to write a new song, that song could compete against existing copyrighted songs?

**A Well, if it were only the lyrics of a song, CLAUDE -- CLAUDE doesn't generate audio for a song. So you know, CLAUDE could write poetry that -- you know, that -- that, you know, it -- you know, someone could read instead of existing poetry. I -- you know, you can't listen to a song if CLAUDE only generates the lyrics.**

Q My question was about lyrics. Do you



agree, sir, that -- strike that. You agree that CLAUDE users can ask CLAUDE to generate new songs that may com -- strike that again.

Mr. Amodei, you agree that CLAUDE users can ask CLAUDE to generate new song lyrics that may compete against existing copyrighted song lyrics?

ATTORNEY MEHTA: Objection to the form.

**A I'm -- I'm not sure -- I'm not sure what it means for song lyrics to compete.**

**You know, music is listened to. You asked me these questions about whether I have ever been inspired by music. Music is inspiring because it's listened to.**

**I can understand what you're asking -- if you ask CLAUDE to generate a song and that song included CLAUDE lyrics, then listening to that song would -- would -- you know, you could listen to that song instead of -- instead of -- instead of what was written by -- instead of -- instead of what was written by someone else.**

**But -- but what exactly would you be doing? Just reading the song lyrics? Without -- without a tune to go along with it, it wouldn't be a song.**

Q Sir, you understand there's a whole



industry of songwriters who, as their profession, write lyrics to songs?

ATTORNEY MEHTA: Objection to the form.

You can answer, if you know.

**A Yeah, so I -- I don't have a sense of how the music industry -- yeah, I -- yeah, I don't actually have a sense of how the music industry works.**

Q (BY ATTORNEY HAILEY) Does Anthropic compensate music publishers or songwriters at all?

**A If -- so I don't know specifically. But we license a number of types of content. This includes content that is not freely available.**

**So for example, you know, we have licensed a number of books that were not freely available. We paid the publishers of those books for that content. If any of those books included music lyrics or song lyrics, then we would have published -- we would have compensated whoever -- whoever wrote that book, which presumably would have been -- or would have been com -- would have been compensated by, you know, whoever wrote -- wrote those music lyrics.**

**So I -- I -- so I know for a fact that we bought material like books. I don't know one way or**



**the other whether we bought material that includes song lyrics.**

Q And the reason you paid for those books is because you couldn't find them on the Internet; is that right?

**A No. I want to be clear. The reason we paid for those books is that they were not freely available on the Internet.**

**It's -- it's, of course, in many ways possible to obtain books that are not free -- that are not freely available on the Internet, but we choose not to do that.**

**We choose to buy the books and obtain them legally.**

Q And you understand, Mr. Amodei, that just because something is -- can be accessed on the Internet doesn't mean it's free to be used for whatever purposes you want?

**A Again, I would -- I would -- I would go back -- if we're talking about training, I would go back to this -- this same analogy with the human brain, which is that, you know, if -- if a human is legally able to read something for free, then, you know, my view, again, based on -- you know, over the last few years these legal issues are being worked**

# Pages 89-104

89

**brainstorming documents was about a wild idea about how the macroeconomy could be changed in -- in the era of AI.**
Q I'm showing you what I have marked as Exhibit 248 to your deposition.
(Exhibit 248 was marked for identification and is attached to the transcript.)
**A Yes. Yes, I believe this is that document.**
Q (BY ATTORNEY HAILEY) It's a document produced by Anthropic bearing the Bates Number Anthropic 462964.
**A That is correct.**
Q And this is the document you were just referring to, Mr. Amodei?
**A Correct.**
Q It's an internal Anthropic memo that you wrote in July 2021, titled "An Economic Model for Compensating Data Producers --
**A That --**
Q -- correct?
**A -- is correct.**
Q So let's start on the first page of this memo --
**A That's correct.**

90

Q -- page ending in 965.
Are you with me?
**A That's correct.**
Q You start this memo by writing:
One of the controversies over Copilot related to, but distinct from, concerns about the model spitting out copyrighted data is a feeling that large corporations (Microsoft and OpenAI) are exploiting the open-source work of developers and using it to extract concentrated profits.
The same could be said about GPT-3 being trained partially on fan fiction books or for that matter about models being trained on human feedback for which workers are paid near minimum wage. I think this is a real and important concern, especially when considered as part of an overall trend for AI progress to concentrate wealth and increase inequality and in the long run automate labor.

91

Have I read that correctly so far?
**A You have read that correctly so far, yes.**
Q And just for some context, Copilot is Microsoft AI -- Microsoft's AI product, and GPT-3 is an OpenAI model, correct?
**A I think this is a reference to GitHub Copilot, which is a GitHub product. Although GitHub is a subsidiary of Microsoft, yes.**
Q Okay. So both of those are AI products, correct?
**A Correct.**
Q And you write in this internal memo that there are concerns about AI models spitting out copyrighted data, correct?
**A Let's see. About the models spitting out copyrighted data, yes.**
Q And that's similar to what you said in your interview with Ezra Klein of The New York Times that we were discussing earlier, that models shouldn't be spitting out copyrighted data, correct?
**A Yeah, here -- here I just said that there were concerns. I was -- I was just stating, you know, the -- the concerns that were raised in the controversy over Copilot.**
Q And you separately write about concerns

92

that large corporations that develop AI models are "exploiting" other people's work "using it to extract concentrated profits"; is that correct?
**A Trained on -- let me just read it. Sorry. Which -- which line are you pointing me to?**
Q It's the third line where you reference "large corporations exploiting" --
**A A feeling. Yeah, there's -- there's a feeling. So -- so I'm -- I'm summarizing a sentiment. The sentiment around this controversy, yes.**
Q You're summarizing the sentiment that large corporations that develop AI models are exploiting other people's work to extract concentrated profits?
**A Yeah, I'm saying -- I'm saying that -- that this is a feeling. This is something people are concerned about. That's right.**
Q You were concerned about this at that time, right?
**A I think I was concerned about broader macroeconomic issues, as the -- as the memo makes clear. I'm happy to talk about those macroeconomic issues.**
Q And we'll get -- we'll get to that in a

93

minute.
A That's right.
Q And just continuing here and where we have been reading, you say that:
"This is a real and important concern, especially when considered as part of an overall trend for AI progress to concentrate wealth, increase inequality, and in the long run automate labor," correct?
A Correct, yes.
Q And that was a true statement when you wrote it, correct?
A So I don't remember the details of this memo, but yeah, I -- I wrote this -- this memo.
Q You continue:
"Zooming very far out, what is happening macroeconomically is that distributed human labor is being used to train AI models by large centralized actors who concentrate the resulting profits, while in the long run making the human labor obsolete."
Did I read that correctly?

94

A Yes.
Q And that's a true statement?
A Sure.
Q And when you say "make human labor obsolete," that would include the labor of human writers, correct?
A Yeah, so I want to give a -- I want to give a broad sense here.
AI is advancing very quickly. I do have concerns macroeconomically about AI getting very good at what it's doing in -- in a way that causes it to be as good as humans at a very wide range of tasks.
But I would say certainly from the perspective of now, because it's clearer with the way the technology has developed, but I think it was even somewhat true in this case and it's compatible with this memo -- although it's not stated -- it's not stated with this memo, you know, I think this is an issue that relates to things that are much broader than just content.
I think there's a misunderstanding that the way AI models are trained is inex -- is kind of inextricably tied to content as if the models are just memorizing or spitting things out. But let me

95

give you a thought experiment.
Recently in the last couple of years AI models have gotten very good at mathematics. However, they have gotten very good at mathematics without actually training on the work of mathematicians. The reason for this is that math is about trial and error. It's about solving problems. And you can verify that your answers were correct without the need for any human involvement and without the need for any human data.
So models are and -- or if they are not already, will soon get to the point where models are better than human mathematicians at doing math.
This -- this you know, could, in fact, change the labor market for mathematicians. I guess the small labor market of mathematicians are a very, you know, narrow task. But -- but the point here is that the AI models are producing something that -- that, you know, is better than humans at what it does without having trained on data that comes from humans. And so certainly from the perspective of now -- and I can point to places where it's present -- present in the memo.
My concern is -- is not so much about content and the value of content. It's about the

96

fact that AI is -- is an artifact in the world. It's -- it's a technology. The methods for building it are very simple. I was there at the invention of many of them. But you know, they're -- they're very simple. Many people have thought of them.
And these -- these models are creating an incredible amount of productivity, but at the same time we have to think about the affect that they have on human labor in general. Again, not because they trained on a particular -- particular content, but because intrinsically the technology is capable of this.
So I guess what I would say is now -- and to some extent in the memo -- I think of this as about broader macroeconomic issues. I think the relevant issues are about things like tax policy. I think the relevant issues are about things like, you know, how we should structure our society around work.
Those are big problems. We have been alert to those problems since almost the beginning of Anthropic, and you know, I think -- I think this memo was an early attempt to grapple with those problems.
Q So, Mr. Amodei, I want to remind you: One

of the first things I asked you at the beginning of this deposition was to please listen carefully to my question and do your best to answer succinctly and directly.

Do you remember saying that you understood that?

**A Yes. I -- I believe I'm giving context to your question.**

Q And do you remember what my question was that you just responded to?

**A You -- you -- you were asking something about zooming out very far macroeconomically distributed human labor, and so that -- that prompted me to -- to talk about the motivations for this document.**

Q So my question to you -- and I will repeat it, and I ask that you answer the question that I ask.

My question was: When you say in this memo "make human labor obsolete," that would include the labor of human writers?

ATTORNEY MEHTA: Objection to the form.

He asked -- answered the question. Asked and answered. And your commentary is inappropriate, Counsel.



**A Yeah, I have -- I have elaborated at length in my -- in my answer to this question, and I don't believe I have anything to add at this time.**

Q (BY ATTORNEY HAILEY) When you say "make human labor obsolete," that would include the human labor of songwriters; is that correct?

ATTORNEY MEHTA: Objection to the form.

**A I -- yeah, right. I'm generally concerned about a wide variety of -- I'm generally concerned about a wide variety of activities that AI models can do.**

**I think this is a very broad macroeconomic issue that includes everyone and, you know, not one actor in particular. Although, you know, I -- you know, I think we should -- we should think about -- we should think about everyone, including songwriters, but this isn't about any one stakeholder in particular.**

**This is about technology that can eventually automate everything.**

Q (BY ATTORNEY HAILEY) And you referenced in your answer that you gave before, "math"?

**A That's right.**

Q You agree, Mr. Amodei, math is very different than art?



**A Sure. I mean, you know, I -- you know, I was -- I was a -- you know, I did -- did theoretical -- you know, I did theoretical physics as an undergrad. That involved a lot of math. A lot of people doing math would describe math as a form of art.**

Q Math is different than literature and music, correct?

**A I -- I don't know. I think of it in the same category of literature and music. I think of it is as inherent to -- to human creativity and as a source of beauty. I don't think of it as that different.**

Q Well, in any event, Anthropic is not abandoning its practice of training on human written content any time soon; is that right?

**A We train on some human written content. We also engage in training processes that are like the ones -- that are like the ones I describe.**

**So many of the skills CLAUDE has are trained based on trial and error and -- and -- and don't depend on human content.**

**There are different stages of training. And the different stages of training get -- get mixed together. But I think it's an accurate**



**statement that some of the skills that -- that CLAUDE gains are trained from trial and error and -- and don't depend or don't depend in the same way or to the same extent on human content. And some training -- the so-called pretraining stage still depends on, you know, freely and legally available human content. That's right.**

Q Trillions of words of human written content --

**A That's --**

Q -- correct?

**A -- correct.**

Q So going back to this memo, in the first bullet on page 965 -- sorry. Strike that.

Let's start with the last sentence of the first paragraph on page 965. You write:

It seems like the default trajectory is for one of the following things to happen.

Do you see that?

**A Yes.**

Q And then below that you list a number of possibilities, correct?

**A That's right.**

Q And the first possible outcome you list is

101

that:
"The current trend continues, and AI model training becomes an increasingly extractive concentrator of wealth and more and more industries like writing, music, video-making, learning of various human interactive skills, et cetera. Content creators grumble, and AI companies become more and more unpopular, but the trend of increasingly powerful models, increasing, automation, and increasing concentration of wealth continues."
**A That's right. I'm -- I'm generally -- I'm generally concerned about -- about this set of issues, about the concentration of wealth that comes from AI.**
**You know, I publicly warned about the issue of job loss from AI, so I have been very transparent with the world about this.**
**Anthropic has an economic index that we use to keep track of these economic trends to try and document and understand these trends.**

102

**And I have called for -- I have even called for macroeconomic policy and taxes on AI companies in order to address these issues.**
Q And you call out the music industry specifically here as -- as one of the at-risk industries, right?
**A I -- I -- I'm giving several -- I'm calling -- I'm giving several examples of -- of things that AI could learn to be good at.**
**By the way, you know, what I had in mind here was generating audio, which is something that Anthropic doesn't do.**
**One reason that Anthropic doesn't generate audio and video is that, you know, we're -- we're -- you know, we're not -- generally not aiming to -- you know, we're generally not aiming to produce content in -- we're generally not aiming to produce content in creative industries.**
**You know, Anthropic, it's very focused on code. It's very focused on work and productivity-based activities.**
**So Anthropic has deliberately made -- made choices not to -- not to produce output in many creative modalities.**
Q But in this internal memo from 2021, you

103

specifically called out more and more industries like writing and music.
Do you see that?
ATTORNEY MEHTA: Objection, misstates the document.
**A Sorry. Could you -- could you just -- could you just ask that in a complete sentence? I didn't fully understand.**
Q (BY ATTORNEY HAILEY) Sure.
You reference both writing and music in this internal memo, correct?
ATTORNEY MEHTA: Same objection.
**A "In more and more industries such as."**
**Yeah -- yeah, I give these as examples. Yes.**
Q (BY ATTORNEY HAILEY) Writing and music, correct?
**A That's correct, yes.**
Q Now, if you go down to the next full paragraph, you write:
None of these outcomes seem particularly good for most people. An alternative that may work better for everyone is to compensate data/content producers for picture

104

their labor; not at a flat rate, but with a fraction of the profits from the model produced.
Did I read that correctly?
**A That is -- that is correct.**
Q So you're proposing in this Anthropic memo, one possible model to compensate data/content producers for using their content for AI training; is that right?
**A No. Actually, that is not right. The way in which you stated the question makes it sound as if we are legally obligated to do so, as this -- as if this is a licensing agreement.**
**I did not have in mind a licensing agreement. I had in mind the idea that we would not be legally obligated to do any of this, but that we would -- we would choose to do it -- that, you know, we might consider to choose to do this because it was a good thing for society.**
**In other words, we did not believe that we were doing anything illegal. We believed that things can be perfectly legally, but bad for the distribution of wealth.**
**And so we were brainstorming possible ways to -- to address the results of a process that is**

# Pages 137-140

137

Cooper as part of a 60 Minutes segment about Anthropic in November 2025, correct?
A That is -- that is correct.
Q And this article, Exhibit 250, appears to be a transcript of that 60 Minutes segment, correct?
A Yeah. I mean, I -- you know, I wouldn't be able to say for sure whether it's accurate. Transcripts can have -- can have error in them. But yeah, this looks like a transcript.
Q Would you turn to page 2 for me, please.
A Page -- page 2.
Q Do you see at the top --
A That's right.
Q Do you see at the top -- towards the top of the page, Anderson Cooper says:
"You have said AI could wipe out half of all entry-level, white-collar jobs and spike unemployment to 10 percent to 20 percent in the next one to five years."
And you respond, "Yes."
A Yes.
Q And that's a true statement, that AI could wipe out half of all entry-level, white-collar jobs

138

and spike unemployment to 10 percent to 20 percent in the next one to five years?
A Well --
ATTORNEY MEHTA: Form.
A -- to be clear -- yeah, to be clear, that's a -- that's a depiction about a possible future.
So I'm not saying that that will happen. No one can know for sure that that will happen. I'm saying that there's a risk that that could happen, and I'm warning about that risk so we can decrease the likelihood that that happens.
That's my view.
Q (BY ATTORNEY HAILEY) And that's what you told Anderson Cooper in this 60 Minutes interview, correct?
A Correct.
Q And that includes affecting jobs in the music and songwriting industries, correct?
ATTORNEY MEHTA: Objection to the form.
A You know, I -- it's very hard to predict macroeconomically exactly, you know, which jobs will -- which jobs will be affected. It's very hard to predict the economy ahead of time, so I tend to think in broad terms.

139

I don't think about one particular job category. I generally think about AI as a technology that is great and wonderous in terms of, you know, being able to process information and think of new ideas and, you know, generate scientific knowledge and cures for medical information.
But precisely because it's able to do those things, it could create disruption to the job market similar to how previous technologies in the past have, but larger than previous technologies in the past have.
You know, I -- I don't think -- it's hard enough to predict the overall macroeconomic effect. I don't think I can predict which industries it will have an effect on and -- and how much it'll have an effect on those industries. That's too granular a level of prediction for me to be able to do. I'm not even sure of the broad prediction.
I'm just -- I'm just making it because I'm worried about it, and people should know that I consider it a possibility.
Q Okay. But it's certainly not your testimony that AI will not affect the music and songwriting industries, correct?

140

ATTORNEY MEHTA: Objection to the form.
A It -- you know, I don't think there's any industry where we can say AI will definitely not affect it. Although, I also don't think there's any industry where we can say we're sure AI definitely will affect it. I think we're generally uncertain.
Q (BY ATTORNEY HAILEY) Can you turn to page 8 for me, please?
A I can.
Q Do you see in the middle of the page 8 where Anderson Cooper says "that doesn't sound"?
A Let's see. I see it, yes.
Q And then if you skip down a few lines, you can see you say:
Because AI is a new technology, just like it's going to go wrong on its own, it's also going to be misused by -- you know, by criminals and malicious state actors.
Did I read that correctly?
A Oh, sorry. I'm -- I think you -- I think you lost me. Where -- could you tell me where that is?
Q Do you see where Anderson Cooper says