# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

```
---------------------------------------
________________________              )
CONCORD MUSIC GROUP, INC., ET AL.,    )
                                      )
                                      )
               Plaintiffs,            ) Case Number
    v.                                ) 5:24-cv-03811-EKL
                                      ) SVK
                                      )
ANTHROPIC PBC,                        )
                                      )
                Defendant.            )
----------------------------------)----
```

HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY

VIDEOCONFERENCED and VIDEO-RECORDED
DEPOSITION of
DARIO AMODEI, Ph.D.
San Francisco, California 94111
Thursday, January 8, 2026

Reported Stenographically by:
MARY J. GOFF
CSR No. 13427
WA CSR No. 21030779
Job No. 614290
PAGES 1-158



HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY

VIDEOCONFERENCED and VIDEO-RECORDED DEPOSITION of DARIO AMODEI, Ph.D., Volume I, taken on behalf of Plaintiff Publishers, Oppenheim + Zebrak, LLP, at WilmerHale, 50 California Street, Suite 3600, San Francisco, California 94111, beginning at 1:44 p.m. and ending at 4:30 p.m., on Thursday, January 8, 2026, before MARY J. GOFF, California Certified Shorthand Reporter No. 13427 and WA CSR No. 21030779.



APPEARANCES:

For Plaintiff Publishers
Oppenheim + Zebrak, LLP
BY: NICHOLAS C. HAILEY
Attorneys at Law
4530 Wisconsin Avenue, NW
5th Floor
Washington, DC 20016
202-480-2999
nick@oandzlaw.com

For Defendant Anthropic PBC
WilmerHale
BY: SONAL MEHTA
Attorneys at Law
2600 El Camino Real
Suite 400
Palo Alto, California 94306
sonal.mehta@wilmerhale.com
628-235-1026

ALSO PRESENT: Natalie Naugle, Brian Israel, In-house counsel Anthropic
Ellen Stephano, Esquire, WilmerHale (remote Boston)

Videographer: Addison McNaughton



INDEX


| WITNESS | | EXAMINATION |
|---|---|---|
| DARIO AMODEI, Ph.D. | | |
| Volume I | | |
| | ATTORNEY HAILEY | 6 |
| | ATTORNEY MEHTA | -- |

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 246 | 1-29-24 Slack message Anthropic_0000605700-785 | 9 |
| Exhibit 247 | Transcript: Ezra Klein Pages 1-18 | 45 |
| Exhibit 248 | Exhibit 40 Anthropic_0000462964-968 | 89 |
| Exhibit 249 | Anthropic Plan for 2023 Anthropic_0000463241-255 | 108 |
| Exhibit 250 | Why Anthropic CEO Dario Amodei Spends So Much Time Warning of AI's Potential Dangers | 136 |
| Exhibit 251 | AI Misalignment Risk Anthropic_0000478585 | 142 |

PREMARKED EXHIBITS:

| | | |
|---|---|---|
| Exhibit 235 | 1-8-2023 email Anthropic Plan | 123 |

San Francisco, California
Thursday, January 8, 2026
1:44 p.m.

THE VIDEOGRAPHER: Here begins Media Number 1 in the videotaped conception of Dr. Dario Amodei, in the matter of Concord Music Group Inc., et al., versus Anthropic PBC, in the United States District Court, Northern District of California, San Jose Division. The Case Number is 24-CV-03811-EKL (SVK).

Today's date is January 8, 2025, and the time ton the video monitor -- sorry -- January 8, 2026, and the time on the video monitor is 1:44 p.m.

The videographer today is Addison McNaughton, representing Planet Depos. And this video deposition is taking place at 50 California Street, Suite 3600, in San Francisco, California 94111.

Would counsel please voice identify themselves and state whom they represent.

ATTORNEY HAILEY: This is Nick Hailey, with the law firm of Oppenheim + Zebrak, on behalf of the Music Publisher Plaintiffs. I'm joined with my colleague by zoom, Tim Chung.

ATTORNEY MEHTA: Good afternoon, Sonal



Mehta, from WilmerHale, on behalf of Anthropic. With me today are Natalie Naugle and Brian Israel, who are in-house Counsel at Anthropic.

THE VIDEOGRAPHER: The court reporter today is Mary Goff, representing Planet Depos, the witness will now be sworn.

THE COURT STENOGRAPHER: My name is Mary Goff. I am a California Certified Shorthand Reporter, CSR Number 13427. Today's proceedings are being captured by stenographic means.

DARIO AMODEI, Ph.D.

Being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

ATTORNEY MEHTA: You can put your hand down.

THE DEPONENT: Okay.

EXAMINATION

BY ATTORNEY HAILEY:

Q Good afternoon. Name is Nick Hailey. I represent the Plaintiff, Music Publishers, in this case.

Can you go ahead and please state your name and home address for the record?

**A Are you speaking to me?**



Q Yes.

**A Can I state my name and home address for the record?**

ATTORNEY MEHTA: And I'm actually just going to -- for security reasons, I don't think you need his home address. I am --

**A I -- I, in fact -- no. I, in fact, don't even know it. Dario Amodei is my name.**

Q (BY ATTORNEY HAILEY) And what city do you live in?

**A I live in Woodside.**

Q And you -- your testimony is you don't know your home address?

ATTORNEY MEHTA: You can answer the question.

**A I don't -- I don't remember it. That's right.**

Q (BY ATTORNEY HAILEY) And do you prefer Mr. Amodei or Dr. Amodei?

**A Mr. Amodei is fine.**

Q And, Mr. Amodei, you understand you're under oath today, correct?

**A That is correct.**

Q And we have very limited time for the deposition today and a lot of ground to cover, so



it's important that you listen carefully to the questions that I ask and that you answer those questions directly and succinctly.

Do you understand that?

**A Yes.**

Q And if you do not understand a question, please ask me to clarify. Otherwise, if you answer my question, I will assume that you understood it.

Is that understood?

ATTORNEY MEHTA: Form.

You can answer.

**A Yes.**

Q (BY ATTORNEY HAILEY) Is there any reason why you cannot give full, complete, and accurate testimony today?

**A I mean, to the best of my ability, sure.**

Q Mr. Amodei, you're Anthropic's CEO and a founder of the company, correct?

**A That is correct.**

Q Who are Anthropic's competitors in the AI industry?

**A Who are Anthropic's competitors in the AI industry? You know, that's a subjective question.**

**It depends on who you -- who you list as**

133

asked and answered multiple times.
Counsel, you're also getting into territory you know you're not allowed to get into based on the court's order. And we have a limited amount of time, so I suggest you move on.
ATTORNEY HAILEY: Counsel, the speaking objections are improper. We'll raise this with the court.
**A I -- I believe you already -- I believe you already asked this question, and I don't have anything to add to my answer.**
Q (BY ATTORNEY HAILEY) Mr. Amodei, I do need an answer to that question. I'm going to ask it one more time.
If you could find information on the Internet and download it, you didn't pay for it; is that right?
**A My --**
ATTORNEY MEHTA: Asked and answered.
**A -- my view is that information that is freely and legally available on the Internet in an analogy to the way that humans consume information and use it to produce their own ideas, if information is freely and legally available on the Internet, then that information can be ingested by**

134

**AI models similar to how a human can absorb AI models into their brain and use it -- and use it to generate their own ideas.**
**That is our contention.**
Q (BY ATTORNEY HAILEY) And when you say that "the information is freely and legally available on the Internet," that's just your own view as to whether it's legal or not to use it for AI training?
ATTORNEY MEHTA: I'm going to instruct you not to answer with respect to any advice you had from counsel. You can answer with respect to your own view as to whether --
**A That's right.**
ATTORNEY MEHTA: -- it's appropriate.
**A That's right. Again -- again, I'll say -- I'll say again my own view is that -- you know, there's this analogy to humans. Right.**
**As I have said many times, I have a background as a neuroscientist. I have thought about artificial neural nets. I have thought about natural neural nets. Humans learn by absorbing information. They take inspiration from many different sources of information, and then they generate their own ideas.**
**My view is that AI models should work in**

135

**the same way. If there's information that is not freely -- freely and legally available on the Internet, then AI -- then humans have to pay for it. Therefore, AI models should have to pay for a copy of it -- a copy of it as well.**
**If the information can just be read by a human without -- without breaking any laws -- I'm not talking about laws relating to copyright. I'm just talking about can I actually view the information without violating any laws.**
**If a human can view it without violating any laws, then an AI model can view it and absorb it without violating any laws. That is my -- again, without reference to any -- any advice of -- of lawyers, that -- that was my commonsense view of the situation based on these unexplored legal issues many years ago.**
Q (BY ATTORNEY HAILEY) Mr. Amodei, you agree that AI models like CLAUDE have both potential benefits and risks, correct?
**A That's -- that's correct. I think that's absolutely central to the -- to the -- to the views at Anthropic, that this technology can have great benefits and be transformative for society and that it also has risks. And that -- that Anthropic**

136

**exists to try and manage the benefits and the risks, correct.**
Q And I want to focus on the risks --
**A Correct.**
Q -- of AI technology for a moment.
You have called AI "the greatest risk humanity has ever faced"; is that correct?
**A I don't -- I don't remember that quote. It's possible I could say that. I think it's the greatest benefit humanity has faced and also the greatest risk humanity has faced, yes.**
(Exhibit 250 was marked for identification and is attached to the transcript.)
Q (BY ATTORNEY HAILEY) I'm showing you what I have marked as Exhibit 250.
**A Okay.**
Q It's an article that I printed off of CBSNews.com titled "Why Anthropic CEO, Dario Amodei, Spends So Much Time Warning of AI's Potential Dangers," dated November 16, 2025 --
**A Yes. This --**
Q -- by Anderson Cooper.
**A -- this looks like it was associated with a 60 Minutes interview. That's right.**
Q And you gave an interview to Anderson

137

Cooper as part of a 60 Minutes segment about Anthropic in November 2025, correct?
**A That is -- that is correct.**
Q And this article, Exhibit 250, appears to be a transcript of that 60 Minutes segment, correct?
**A Yeah. I mean, I -- you know, I wouldn't be able to say for sure whether it's accurate. Transcripts can have -- can have error in them. But yeah, this looks like a transcript.**
Q Would you turn to page 2 for me, please.
**A Page -- page 2.**
Q Do you see at the top --
**A That's right.**
Q Do you see at the top -- towards the top of the page, Anderson Cooper says:
"You have said AI could wipe out half of all entry-level, white-collar jobs and spike unemployment to 10 percent to 20 percent in the next one to five years."
And you respond, "Yes."
**A Yes.**
Q And that's a true statement, that AI could wipe out half of all entry-level, white-collar jobs

138

and spike unemployment to 10 percent to 20 percent in the next one to five years?
**A Well --**
ATTORNEY MEHTA: Form.
**A -- to be clear -- yeah, to be clear, that's a -- that's a depiction about a possible future.**
**So I'm not saying that that will happen. No one can know for sure that that will happen. I'm saying that there's a risk that that could happen, and I'm warning about that risk so we can decrease the likelihood that that happens.**
**That's my view.**
Q (BY ATTORNEY HAILEY) And that's what you told Anderson Cooper in this 60 Minutes interview, correct?
**A Correct.**
Q And that includes affecting jobs in the music and songwriting industries, correct?
ATTORNEY MEHTA: Objection to the form.
**A You know, I -- it's very hard to predict macroeconomically exactly, you know, which jobs will -- which jobs will be affected. It's very hard to predict the economy ahead of time, so I tend to think in broad terms.**

139

**I don't think about one particular job category. I generally think about AI as a technology that is great and wonderous in terms of, you know, being able to process information and think of new ideas and, you know, generate scientific knowledge and cures for medical information.**
**But precisely because it's able to do those things, it could create disruption to the job market similar to how previous technologies in the past have, but larger than previous technologies in the past have.**
**You know, I -- I don't think -- it's hard enough to predict the overall macroeconomic effect. I don't think I can predict which industries it will have an effect on and -- and how much it'll have an effect on those industries. That's too granular a level of prediction for me to be able to do. I'm not even sure of the broad prediction.**
**I'm just -- I'm just making it because I'm worried about it, and people should know that I consider it a possibility.**
Q Okay. But it's certainly not your testimony that AI will not affect the music and songwriting industries, correct?

140

ATTORNEY MEHTA: Objection to the form.
**A It -- you know, I don't think there's any industry where we can say AI will definitely not affect it. Although, I also don't think there's any industry where we can say we're sure AI definitely will affect it. I think we're generally uncertain.**
Q (BY ATTORNEY HAILEY) Can you turn to page 8 for me, please?
**A I can.**
Q Do you see in the middle of the page 8 where Anderson Cooper says "that doesn't sound"?
**A Let's see. I see it, yes.**
Q And then if you skip down a few lines, you can see you say:
Because AI is a new technology, just like it's going to go wrong on its own, it's also going to be misused by -- you know, by criminals and malicious state actors.
Did I read that correctly?
**A Oh, sorry. I'm -- I think you -- I think you lost me. Where -- could you tell me where that is?**
Q Do you see where Anderson Cooper says

141

"that doesn't sound good" in the middle of the page?
A Yes.
Q Then skip down three lines.
A Oh. Skip down three lines. Okay.
Q You say:
"Because AI is a new technology, just like it's going to go wrong on its own, it's also going to be misused by -- you know, by criminals and malicious state actors."
A Correct.
Q What do you mean when you say "AI will go wrong on its own"?
A "Because AI is a new technology, just like it's going to go wrong on its own, it's going to be misused by criminals and malicious state actors."
So here I believe I'm referring to a distinction between two types of risks. One risk is that the autonomous behavior of an AI system may be threatening to humans. So this is the risk that -- that an AI system may autonomously behave in ways that are dangerous to humans.
For example, a robot might physically injure a human being or -- or an AI system, in the

142

example I give to Anderson Cooper, might -- because it -- you know because our process of controlling the training of the AI system is not precise, the -- the AI system may blackmail someone or exfiltrate -- or exfiltrate information or, you know, may interact with a user in a -- in a manipulative fashion or, you know, in the long run could -- could be kind of a -- you know, a grand threat to the security of human -- of human civilization.
That's what I mean by AI going wrong on its own. And that's contrasted to the idea that AI would be misused by humans. So there are two dangers here. There is the danger of the AI system itself and there's the danger of humans misusing the Ai system.
I believe that's what I meant there.
(Exhibit 251 was marked for identification and is attached to the transcript.)
Q (BY ATTORNEY HAILEY) Mr. Amodei, I'm showing you what I have marked as Exhibit 251 to your deposition.
A Okay.
Q It's a document bearing the Bates Number Anthropic 478585.
Do you recognize this document?

143

A I do not -- hold on. I do not specifically recognize this document, no.
Q You can see that it's a memo you wrote, titled "AI Misalignment Risk: How to Improve Our Research Agenda," by Dario Amodei, dated October 20, 2022?
Do you see that?
A Yes.
Q And I want to start at the top of the first page, page 585.
A Okay.
Q You write in the first sentence:
"I think that existential risk from AI misalignment is real and that we should worry about it a lot."
Did I --
A That's right.
Q -- did I read that correctly?
A That's right.
Q Under "Summary," you write:
"I'm very worried about AI risk. I think it is the greatest risk humanity has ever faced. My very imprecise estimate is that

144

there's a 25 percent chance that AI leads to a very bad outcome."
Did I read that correctly?
A Yes.
Q At the time you wrote this document, you believed that AI was the greatest risk humanity has ever faced?
A That is correct.
Q And is that still your belief today, sir?
A Yeah, I believe AI is the greatest risk humanity has ever faced and the greatest benefit humanity has ever faced.
Q And if you could turn to the next page, page 586, please. Do you see the first bullet in the middle of the page?
A Yes.
Q You write:
"The current trajectory of AI development makes me think that there's a 20 to 30 percent chance that AGI will lead to the destruction or permanent stunting of humanity, as AGI seems more powerful/dangerous than nuclear weapons.

And looking back on The Cold War period, 20 to 30 percent seems like a reasonable guess for the probability of nuclear weapons causing a huge setback to civilization during that period.
AGI may be more risky because it is a less stable technology.
Did I read that correctly?
**A That's correct.**
Q And when you say "AGI" you're referring to Artificial General Intelligence, correct?
**A Correct.**
Q So you say in this Anthropic memo that you believe there's a 20 to 30 percent chance that AGI will lead to the destruction or permanent stunting of humanity, right?
**A I -- I want to be specific here. I said that on the current trajectory. In other words, in the beginning -- in the way that companies other than us are currently behaving.**
**Anthropic, that probability is not a fixed amount. It's not like we're pressing a button and saying: Oh, we pressed this button, and there's a 20 -- 20 to 30 percent chance that -- that humanity**



**is destroyed.**
**Anthropic exists to try to change that trajectory, to try and change the development of AI in -- in a direction that reduces or eliminates the risks and increases the benefit.**
**The whole purpose of Anthropic's mission is to identify the risks and act in such a way that reduces those risks, to develop the technology in a different and alternative way.**
Q Anthropic is developing AI models just like your competitors, OpenAI and Google and others, correct?
ATTORNEY MEHTA: Form.
**A No. No. False. False. It's actually false.**
**Anthropic is not developing AI models that are just like its competitors. Anthropic measures its models for misalignment risk. And as of the most recent models, Anthropic models perform substantially better than other models on misalignment risk.**
**Anthropic is substantially more transparent, as in the Anderson Cooper interview that you described, in being honest about these -- these -- being honest about the risks of these**



**models in disclosing the risks of these models.**
**Anthropic has also advocated for regulation, for legislation, forcing companies to disclose the risk of these models and take safety measures against the risk of these models.**
**Now, that's actually a very costly action. Talking about the risk of AI models is an incredibly costly action. Because when you talk about the risks of AI models, people then blame you for this risk.**
**In fact, lawyers will even try to use the fact that you have talked about these risks to -- to try and catch you in "gotchas" and say: Oh, yeah, I -- I can -- I can exploit this. Because -- because you said that there was a risk, because you were honest about this risk, a lawyer can use this to try and say: Oh, you're -- you're a bad person because this risk exists.**
**But even though lawyers do that -- even though lawyers do that, I am still willing to talk about these risks, because it's so important to society to do it.**
Q Is it your testimony under oath, Mr. Amodei, that Anthropic's CLAUDE.AI models are risk free?



**A No. No, model can be risk free. The situation is similar to self-driving cars. There's no such thing as a risk-free self-driving car.**
**What there is is self-driving cars that are much safer than human drivers. Self-driving cars can be much more dangerous than human drivers. They can be equally dangerous or they can be safer.**
**Because the world is unpredictable -- for example, a duck could run in front of the road or there could be snow or there could be a hailstone or -- or another driver could crash into the car, creating risk that's completely exogenous and not related to the self-driving car.**
**So in the real messy world, there's no such thing as being risk free. It's impossible to be risk free. What we aim for is -- is to reduce risk over and over again to add more nines to the level of reliability.**
**There's no such thing as a risk-free world. Anthropic aims to reduce risk as much as possible. That is all that is physically possible. It is not physically possible to reduce risk to zero.**
Q Turn to page 587, please, Mr. Amodei. Do you see the paragraph beginning "in closing"?

149

**A Yes.**
Q You write:
"In closing, it's worth saying that a 25 to 30 percent risk of destroying humanity is obviously the greatest risk humanity has ever faced."
Did I read that correctly?
**A Correct.**
Q Is that still your view today, that there's a 25 to 30 percent risk that AI models destroy humanity, and that's the greatest risk humanity has ever faced?
**A Yeah, I have -- you know, there are things that have made me more optimistic and there are things that have made me more pessimistic.**
**Some of the things that have made me more pessimistic is I think there's been a turn in the public sphere away from acknowledgment of AI risks. And I think political -- the prevailing political ideology has gone in a -- in a direction that doesn't acknowledge these risks. And you know, I think that's bad and makes things worse.**
**Things that have made me more optimistic are the safety methods that Anthropic has developed.**

150

**Anthropic has managed to develop methods for steering and controlling the -- you know, the autonomous -- the autonomous risks and dangers of AI systems that, frankly, I think the -- you know, the technology has -- for steering and controlling AI systems has advanced further than I thought it would be.**
**I also think the science of interpretability which looks inside AI models to understand the way in which they work has advanced substantially further than I thought it would. So many of Anthropic's actions have reduced risk.**
**I -- unfortunately, I think that many actions that have happened in the outside world outside our control have increased risks.**
**Now, we try to do what we can even around actions in the outside world. Even things that happen in the outside world that don't relate to Anthropic itself, we try to reduce risk there.**
**We have advocated for AI regulation. We have advocated for sensible policies on -- on AI risk and often paid high political costs for doing so.**
**We have often been attacked by government -- government officials for advocating**

151

**for policies that they don't favor, for advocating in favor of AI regulation. But again, we're willing to do this even -- even associated -- even the costs associated with this.**
**Because of these bad -- bad turns in the external political environment, I continue to be worried about the risk. But I think Anthropic has primarily contributed to reducing the risk.**
Q When you say that there's a 25 to 30 percent risk of AI technology destroying humanity, you're not saying that's just a risk with the AI technology developed by other AI companies? That includes the AI technology that Anthropic is developing, correct?
**A Again, as I -- as I stated before, my view is that the existence of Anthropic in the ecosystem has reduced risks. It has not increased risks.**
**Risks are lower in -- risks are lower in a world where Anthropic has -- exists where Anthropic has developed the safety technologies that it has developed and in some cases published or disclosed those safety technologies, has identified AI -- has identified and publicly disclosed AI dangers that other AI companies have not necessarily publicly identified or disclosed.**

152

**And Anthropic has advocated for regulation of AI systems to a much greater extent than -- than other companies have done. And it has done all of this with its position and its reputation as a frontier developer of AI systems.**
**So -- so my view is that this risk -- this risk exists independent of Anthropic. And Anthropic's net effect on the world is to reduce this risk, not to increase it.**
ATTORNEY MEHTA: Counsel, you are at time. I'll let you ask one last question.
ATTORNEY HAILEY: Well, we will take a few more minutes given the witness's answers, given the interruptions. So we'll take just a few more minutes.
ATTORNEY MEHTA: There's a court order that says you get two hours and 30 minutes. You're over time. I'll give you one more question, and then we're done.
ATTORNEY HAILEY: Well, I'll proceed with my question. But again, I disagree. We have had a lot of time today with interruptions. We have had a lot of time with nonresponsive answers from the witness.
So we do believe we're entitled to at

I, MARY J. GOFF, CSR No. 13427, Certified Shorthand Reporter of the State of California, certify;

That the foregoing proceedings were taken before me at the time and place herein set forth, at which time the witness declared under penalty of perjury; that the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed under my direction and supervision; that the foregoing is a full, true, and correct transcript of my shorthand notes so taken and of the testimony so given;

That before completion of the deposition, review of the transcript ( ) was (XX) was not requested: ( ) that the witness has failed or refused to approve the transcript.

I further certify that I am not financially interested in the action, and I am not a relative or employee of any attorney of the parties, nor of any of the parties.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct, dated this 9th day of January, 2026.

Mary J. Goff
MARY J. GOFF



ERRATA SHEET
PLANET DEPOS
451 Hungerford Drive, Suite 400
Rockville, Maryland 20850
888-433-3767

CASE: Concord v. Anthropic

| PAGE | LINE | FROM | TO |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

______________________________
DARIO AMODEI, Ph.D.

Subscribed and sworn to before me this _____ day of _____________, 2026.

______________________________________
Notary Public