# EXHIBIT 106

## (FILED UNDER SEAL)

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

CONCORD MUSIC GROUP, INC., ET AL., )
Plaintiffs, )
v. ) Case Number 5:24-cv-03811-EKL SVK
ANTHROPIC PBC, )
Defendant. )

HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY

VIDEOCONFERENCED and VIDEO-RECORDED
30(b)(1) DEPOSITION OF
THOMAS B. BROWN, JR.
San Francisco, California 94111
Monday, January 26, 2026

Reported Stenographically by:
MARY J. GOFF
CSR No. 13427
WA CSR No. 21030779
Job No. 616917
PAGES 1-355

2

HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY
VIDEOCONFERENCED and VIDEO-RECORDED
30(b)(1) DEPOSITION of

THOMAS B. BROWN, JR., Volume I, taken on behalf of Plaintiff Music Publishers, Oppenheim + Zebrak, LLP, at WilmerHale, 50 California Street, Suite 3600, San Francisco, California 94111, beginning at 9:18 a.m. and ending at 6:01 p.m., on Monday, January 26, 2026, before MARY J. GOFF, California Certified Shorthand Reporter No. 13427 and WA CSR No. 21030779.

3

APPEARANCES:
For Plaintiffs Concord Music Group, et al.
Oppenheim + Zebrak, LLP
BY: NICHOLAS C. HAILEY
BRET MATERA (remote)
Attorneys at Law
4530 Wisconsin Avenue, NW
5th Floor
Washington, DC 20016
202-480-2999
nick@oandzlaw.com
bmatera@oandzlaw.com

For Defendant Anthropic PBC
WilmerHale
BY: SONAL MEHTA
ELLEN STEPHANO (remote Boston)
Attorneys at Law
2600 El Camino Real
Suite 400
Palo Alto, California 94306
sonal.mehta@wilmerhale.com
628-235-1026

ALSO PRESENT: Natalie Naugle, in-house counsel Anthropic
Videographer: Philip Astor

4

INDEX

| WITNESS | | EXAMINATION |
|---|---|---|
| THOMAS B. BROWN, JR. | | |
| Volume I | | |
| | ATTORNEY HAILEY | 8 |
| | ATTORNEY MEHTA | -- |

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 259 | Plaintiffs' Notice of Deposition to Tom Brown Pursuant to Federal Rule of Civil Procedure 30(b)(1) | 10 |
| Exhibit 260 | Tom Brown's LinkedIn Profile | 11 |
| Exhibit 261 | Tom Brown X post Listening to this singing | 27 |
| Exhibit 262 | Jukebox | 30 |
| Exhibit 263 | 9-9-2023 email from Tehal Anthropic_0000011373 | 73 |
| Exhibit 264 | Anthropic Overview Sept 2023 Anthropic_0000011376-406 | 73 |
| Exhibit 265 | HIPI Anthropic_0000216904-909 | 88 |
| Exhibit 266 | Tom Brown Spotify Account | 101 |

| EXHIBITS CONTINUED: | | PAGE |
|---|---|---|
| Exhibit 267 | Human, I'm thinking about Anthropic_0000570705-706 | 137 |
| Exhibit 268 | Human, Which is the Black Panther album Anthropic_0000570675 | 161 |
| Exhibit 269 | Human, Please transcribe Anthropic_0000570707 | 166 |
| Exhibit 270 | Human, What are your top ten favorite Grimes tracks? Anthropic_0000570628-629 | 174 |
| Exhibit 271 | Human, What's the most iconic Pearl Jam song? Anthropic_0000570614-16 | 178 |
| Exhibit 272 | Human, What's the song Every Breath You Take by The Police about? Anthropic_0000570627 | 187 |
| Exhibit 273 | Human, I wanna make weightlifting super fun. Anthropic_0000570638-71 | 190 |
| Exhibit 274 | @Claude what are the lyrics to Desolation Row by Dylan? Anthropic_0000016458-59 | 207 |
| Exhibit 275 | Bob Dylan Lyrics Anthropic_0000000926 | 223 |
| Exhibit 276 | How Much do We Need $100B of Compute? Anthropic_0000011757-67 | 237 |
| Exhibit 277 | 12-16-23 email from Jon Jones Anthropic_0000216055-59 Re: Books | 264 |





| EXHIBITS CONTINUED: | | PAGE |
|---|---|---|
| Exhibit 278 | Principles of Data Partnerships, 2-27-24, Turvey Anthropic_0000235875-79 | 275 |
| Exhibit 279 | B2C Claude Safety Checklist Anthropic_0000217026-7030 | 286 |
| Exhibit 280 | 12-1-22 email thread Technical cop[redacted] design, from [redacted] Anthropic_0000599647 | 302 |
| Exhibit 281 | Tom Brown on X Post I wrote a short story | 321 |
| Exhibit 282 | Tom Brown post on Medium Dreamers | 322 |
| Exhibit 283 | Book, The History of Love by Nicole Krauss | 324 |

PREMARKED EXHIBITS:

| | | |
|---|---|---|
| Amodei Exhibit 177 | Anthropic Plan for 2023 Anthropic_0000216987-999 | 254 |




San Francisco, California
Monday, January 26, 2026
9:18 a.m.

THE VIDEOGRAPHER: Here begins Media Number 1 in the videotaped deposition of Tom Brown, in the matter of Concord Music Group versus Anthropic, in the United States District Court, Northern District of California, San Jose Division, Case Number 24-CV-03811-EKL (SVK).

Today's date is January 26, 2026. The time on the video monitor is 9:18 a.m. The videographer today is Philip Astor, representing Planet Depos. This video deposition is taking place at WilmerHale, San Francisco, California.

Would counsel please voice identify themselves and state whom they represent.

ATTORNEY HAILEY: Nick Hailey with the law firm Oppenheim + Zebrak on behalf of the Music Publisher Plaintiffs. I'm joined with my colleague, Brett Matera, by Zoom.

ATTORNEY MEHTA: Good morning. Sonal Mehta from WilmerHale. With me on the Zoom is my colleague, Ellen Stephano. And in the room with me is Natalie Naugle, who is in-house counsel at Anthropic.



THE VIDEOGRAPHER: The court reporter today is Mary Goff, representing Planet Depos. The witness will now be sworn.

THE COURT STENOGRAPHER: My name is Mary Goff. I am a California Certified Shorthand Reporter, CSR Number 13427. Today's proceedings are being captured by stenographic means.

THOMAS B. BROWN, JR.,

Being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY ATTORNEY HAILEY:

Q Good morning, Mr. Brown. My name is Nick Hailey. We met just a few moments ago. I represent the Plaintiff Music Publishers in their lawsuit against your company, Anthropic.

Can you go ahead and please state your name and home address for the record?

**A Yep. I'm Tom Brown -- Thomas Benton Brown, Junior.** [redacted]

Q Have you ever been deposed before, Mr. Brown?

**A I have not.**

Q So let's start by going over just a few

**continue to develop the models.**
Q Do you agree that AI models such as CLAUDE have the potential to make human labor obsolete?
ATTORNEY MEHTA: Form.
**A Again, I think I'm -- I'm not the economist, so yeah, I think I don't have -- I don't have an expert opinion on that.**
Q (BY ATTORNEY HAILEY) You don't have a view one way or the other as to whether AI models have a potential to make human labor obsolete?
ATTORNEY MEHTA: Form.
**A Yeah, I think -- again, I think that it really depends on how we act as a society. I think that obsolete seems probably extreme, but I do expect that AIs will continue to get better at a larger and larger fraction of tasks.**
Q (BY ATTORNEY HAILEY) And AI models such as CLAUDE have the potential to lead to mass job displacement --
ATTORNEY MEHTA: Objection --
Q (BY ATTORNEY HAILEY) -- is that correct?
ATTORNEY MEHTA: -- objection to the form.
**A I would say, yeah, again, the -- it seems like with -- in the same way that many large technologies or the Industrial Revolution has**



**resulted in job displacement for people, I think LLMs are likely to do a similar thing, and that's something that we have publicly talked about.**
Q (BY ATTORNEY HAILEY) And that includes displacing jobs in the music industry; is that right?
ATTORNEY MEHTA: Objection to the form.
**A I haven't thought about the -- that particular area in particular. Again, it seems like something like -- the Industrial Revolution had a large positive effect for the world overall, but had many displacement effects in various different industries as it -- as it occurred.**
Q (BY ATTORNEY HAILEY) AI models such as CLAUDE have the potential to displace the jobs of human songwriters? Do you agree?
ATTORNEY MEHTA: Objection to the form. Asked and answered.
**A I -- I can say the same thing again, if that's useful for you.**
Q (BY ATTORNEY HAILEY) I would like you to answer the question, please, sir.
**A Okay. I think --**
ATTORNEY MEHTA: Same objections.
**A -- I think, again, as -- as with the**



**Industrial Revolution, which was -- I think all of us would agree would be -- was beneficial for humanity looking back on it, but also had induced a lot of job displacement throughout many different industries, it seems likely to me that we'll see the same thing with AI.**
**Again, I'm not an economist, though, so this is just my speculation.**
Q (BY ATTORNEY HAILEY) But you're a founder of Anthropic and one of the senior executives at the company, right?
ATTORNEY MEHTA: Form.
**A That's correct.**
Q (BY ATTORNEY HAILEY) And as part of your work, I imagine you have spent a lot of time thinking about the risks of the technology that you're developing, correct?
ATTORNEY MEHTA: Form.
**A Some of my time. I trust -- I trust the rest of our team a lot for that. And I read what they write, but that's not my area of expertise.**
Q (BY ATTORNEY HAILEY) What does it mean to be the chief compute officer of Anthropic?
**A My teams are responsible for making sure that we have the right amount of usable compute to**



**stay on the frontier of model capabilities.**
Q Does that mean having the right amount of usable compute to keep up with your competitors in the AI industry?
**A That's -- that's one aspect of what informs what the right amount is.**
Q And who are your competitors in the AI industry?
**A I think our two biggest competitors are Google and OpenAI.**
Q And it's important that you keep up -- it's -- strike that.
It's important to Anthropic's business that you keep up with those competitors, OpenAI and Google, correct?
ATTORNEY MEHTA: Objection to the form.
**A Yeah, I think that we want CLAUDE to be the best model for people who want to do work, particularly coding work. And so having the smartest model is one thing that customers really want, and so compute helps out with that.**
Q (BY ATTORNEY HAILEY) Is it important to Anthropic's business that you keep up with your competitors, OpenAI and Google?
ATTORNEY MEHTA: Objection, asked and

answered.
**A I think the -- having enough compute and having models that -- especially that are very good at, like, work helps out with us staying on the frontier with respect to our competitors, and that is something that I pay attention to because I think it's important.**
Q (BY ATTORNEY HAILEY) Do you remember at the beginning of the deposition I asked you to listen carefully to questions and do your best to answer them directly and succinctly?
**A Yes, I do.**
Q And you agreed that you would do that?
**A I -- yes.**
Q Okay. So I don't think that last question -- pardon me. I don't think that last answer really addressed my question, so let me just -- I'll ask the question again in case I wasn't clear.
Mr. Brown, is it important to Anthropic's business that you keep up with your competitors, OpenAI and Google?
ATTORNEY MEHTA: Objection, asked and answered. Now this is the third time you have asked the same question. Also, argumentative.



**A Yeah, I think that having models that are similarly effective at work is important for Anthropic.**
Q (BY ATTORNEY HAILEY) What are your roles and responsibilities as chief compute officer, Mr. Brown?
**A So I gave the team mandate before.**
**Would you like me to repeat the team mandate?**
Q What are your roles and responsibilities specifically?
**A My role is building a team that is responsible for getting the right amount of usable compute for Anthropic.**
Q What other roles and responsibilities have you held at the company?
**A So that work involved doing many different deals. And so I briefly was responsible for managing Tom Turvey's team, and then I held various engineering roles before then.**
Q And when you say that you managed Tom Turvey's team, that team handled AI training data licensing deals; is that right?
ATTORNEY MEHTA: Form.
**A Tom Turvey's team was most responsible for**



**the effort to have partnerships to get large amounts of books that would be useful for making the model better at work.**
Q (BY ATTORNEY HAILEY) And you managed that team?
**A I managed Tom Turvey briefly.**
Q What time period?
**A I don't recall.**
Q What time period, approximately?
**A Several years ago. It was right when Tom Turvey joined. Maybe 2023.**
THE COURT STENOGRAPHER: Did you say "May 2023" or "maybe 2023"?
**A I said maybe -- "maybe 2023."**
**Somewhere between 2022 and 2024. I'm not -- I'm not great with -- yeah, with -- with dates.**
Q (BY ATTORNEY HAILEY) Anthropic is a for-profit company, correct?
ATTORNEY MEHTA: Objection to the form.
**A Anthropic is a public benefit corporation.**
Q (BY ATTORNEY HAILEY) What does it mean to be a public benefit corporation?
**A We want to be able to make sure that our mission comes first. And that if we have to do**



**something that would be for the mission, but not optimizing for shareholder value, we have the ability to do that.**
Q What is -- how -- strike that.
How does Anthropic define its mission?
**A I think different people have defined it in different ways. I think I -- I like the mission of ensuring that the transition to advanced AI systems goes well for humanity.**
Q So you say that as a public benefit corporation, Anthropic needs to put its mission first, correct?
**A Yeah, I do.**
Q But then you say different people have defined the mission in different ways; is that right?
**A Oh, just -- just the terminology for it. I'm not sure if, like, my, like -- ensure that the transition to advanced AI systems goes well for humanity. I'm not sure if everyone uses, like, "advanced AI systems" as the -- the terminology there.**
**Like, I actually don't know -- like, if you Google our mission statement, if it's exactly the phrase that I just gave.**

61

considering an IPO?
**A Various executives.**
Q Your cofounders?
**A Yeah, some of the -- some of the cofounders.**
Q Who?
**A I think -- I think probably all of the cofounders have -- have chimed in on -- with opinions on that.**
Q And is the plan for Anthropic to IPO this year?
**A I don't know. I haven't been following that.**
Q What do you know about Anthropic's plans in terms of going public?
ATTORNEY MEHTA: Again, I'm going to caution you: If you have any information that's nonprivileged, you can share it, but you can't share any confidential attorney-client information.
**A I think -- I think that folks would like to try to go public at some point. And then there's many things that need to happen in order to -- to make that happen.**
Q (BY ATTORNEY HAILEY) When you say "folks," you're referring to your cofounders?

62

**A Yeah, and other -- other leaders.**
Q And when you say "there's many things that need to happen in order to make that happen," what are you referring to?
ATTORNEY MEHTA: Objection to the form.
**A I -- again, I -- I don't know all of the things that need to happen in order to become a public company, but I think it's not something that happens overnight.**
Q (BY ATTORNEY HAILEY) What do you know in terms of the things that need to happen?
ATTORNEY MEHTA: Objection to the form. And again, I'm going to caution you: With respect to any attorney-client communications, you can't disclose those.
**A I -- I don't know. My -- my teams aren't involved in that, so that hasn't been a thing that I have focused on.**
ATTORNEY HAILEY: Okay. We can go off the record now and take the break.
ATTORNEY MEHTA: And just before we do that, I'm going to mark the transcript "Highly Confidential-Attorneys' Eyes Only."
THE VIDEOGRAPHER: We are going off the record at 10:25 a.m.

63

(A break was taken from 10:25 a.m. to 10:46 a.m.)
THE VIDEOGRAPHER: We are back on the record at 10:46 a.m.
Q (BY ATTORNEY HAILEY) Welcome back, Mr. Brown.
What role have you played in selecting and acquiring training data for Anthropic's CLAUDE.AI models?
**A I think the main role I played was giving high-level guidance to Tom Turvey and team to help them find data that was most useful for making CLAUDE go to work.**
Q What role have you played in discussions or decisions around licensing or potentially licensing training data for CLAUDE?
**A Also mostly giving high-level feedback to Tom Turvey and team about what data would be most useful for making CLAUDE useful for work.**
Q When you say "making CLAUDE useful for work," what are you referring to?
**A Not all data is created equal, and so we want CLAUDE to be really useful at the core aspect that people use it for, which is helping them with work. And so, like, if it needs to help with**

64

**someone writing code or answering technical questions, that type of data is the type of data that we want.**
Q You're aware that many people also use CLAUDE for personal reasons, correct?
ATTORNEY MEHTA: Objection to the form.
**A We have -- we have really focused on work rather than the consumer application.**
Q (BY ATTORNEY HAILEY) You have a consumer application, correct?
ATTORNEY MEHTA: Form.
**A We have a consumer application, which I think really we focus on as kind of a way of letting people know that CLAUDE exists quickly. But almost all of our focus has been on making CLAUDE useful for work.**
Q (BY ATTORNEY HAILEY) How many consumer users do you have for CLAUDE?
**A I don't know off the top of my head.**
Q You have -- Anthropic has millions of individual consumer users; is that correct?
ATTORNEY MEHTA: Objection to the form.
**A I think we have -- we have many consumer users. I think in the millions sounds correct, although I'm not the expert on that.**

**But again, the focus that we have is on work. Almost all of our revenue comes from work. And all of our research focus is on making CLAUDE go to work.**
Q (BY ATTORNEY HAILEY) Is it your testimony that that has always been your focus, Mr. Brown?
**A I think from the time that we started having a coherent commercial strategy, that has been our focus.**
**Initially we weren't sure if we were even going to commercialize anything, and so we had kind of a long soul-searching process.**
Q And when did you formulate a coherent commercial strategy?
**A Probably around the time of the, like, CLAUDE 3 launch. I forget what year that was.**
Q But you agree, Mr. Brown, that Anthropic has made available since at least 2023, a CLAUDE product to individual users, correct?
ATTORNEY MEHTA: Form.
**A I'm not sure exactly what the launch date was of our initial CLAUDE product. But since we launched that, it has been available to individuals, as well as corporations.**
Q (BY ATTORNEY HAILEY) And the CLAUDE.AI



product is available for personal use by individual users, correct.
**A CLAUDE.AI is -- is usable for anybody who wants to use it, whether they're going to be using it for work or for personal. Most of the business that we do is for people doing work, and that's -- that's been our focus in all of our research.**
Q So you also earn revenues from individual users using CLAUDE for personal purposes, correct?
ATTORNEY MEHTA: Form.
**A We earn revenue from both personal and commercial use. And people use it for -- for anything that you can ask a question for.**
**Work is where people tend to get the most value, where we put our efforts, and where we have always been focused on, unlike our competitors.**
Q (BY ATTORNEY HAILEY) What percentage of Anthropic's revenues are from individual users using CLAUDE for personal use?
ATTORNEY MEHTA: Form.
**A I don't know off the top of my head.**
Q (BY ATTORNEY HAILEY) Anthropic has made the decision not to license training data for CLAUDE that it can access and copy from the Internet, correct?



ATTORNEY MEHTA: Objection to the form.
**A Sorry. Can you say that again?**
Q (BY ATTORNEY HAILEY) Anthropic has made the decision not to license training data for CLAUDE that it can access and copy from the Internet; is that correct?
ATTORNEY MEHTA: Objection to the form. Misstates -- assumes facts not in evidence.
**A I think our -- our teams have, again, been -- been focused on getting data that's useful for work. They have gotten both data that was publicly available on the Internet and also -- with Tom Turvey's team, we had an effort to get books that were useful for work and not available publicly on the Internet.**
Q (BY ATTORNEY HAILEY) Does Anthropic license training data for CLAUDE that it can access and copy from the Internet?
ATTORNEY MEHTA: Objection, asked and answered.
**A Was there an aspect of my response that didn't address that in the last one?**
Q (BY ATTORNEY HAILEY) Your answer was not clear, so I'm asking -- I want to make sure I understand.



Does Anthropic license training data for CLAUDE that it can access and copy from the Internet?
I think that's a yes-or-no answer.
ATTORNEY MEHTA: Objection, asked and answered.
And, Counsel, you know he doesn't have to answer your questions "Yes" or "No." It's improper to suggest otherwise.
**A So some -- the two -- the two main sources of data have been publicly available data that's on the Internet and books that are useful for work.**
**That -- we try to find ones that are not available on the Internet. Probably some of them were available to the Internet, but it's hard to do a perfect search there, so...**
Q (BY ATTORNEY HAILEY) So let's start with that first category of training data, data that you can access on the Internet.
Does Anthropic license that training data?
ATTORNEY MEHTA: Objection to the form.
**A If it's publicly available data, then we don't need to license it.**
Q (BY ATTORNEY HAILEY) And just because something may be publicly accessible on the

85

**seen the exact text at some point in its training.**
**I'm just pointing out that it also could come from the model, like not having seen all of some information, but then inferring that a person might have said that or written that.**
Q (BY ATTORNEY HAILEY) Do you agree that song lyrics are useful to include in CLAUDE's training corpus because they add to the diversity of training data?
**A Again, this isn't my area of expertise. I think that I have probably not. I think I -- I think I have generally wanted us to -- I -- I have seen that there's little value in song lyrics for CLAUDE being good at work, and so it's always been the least useful data for CLAUDE.**
Q And need when you say "there's little value" -- strike that. What about in terms of -- strike that.
Setting aside CLAUDE for work, what's the value of including song lyrics in training data for uses relating to songs and lyrics?
ATTORNEY MEHTA: Objection to the form.
**A Sorry. Can you repeat that one more time?**
Q (BY ATTORNEY HAILEY) You have -- you have referred to CLAUDE for work, but there are many

86

other uses of CLAUDE, correct?
ATTORNEY MEHTA: Form.
**A There are other uses of CLAUDE. I think that they're much less important than work, and so my guidance to the team has always been: Get the data that's useful for work, and that's -- that's the thing that matters.**
Q (BY ATTORNEY HAILEY) Have you ever given guidance to the team to remove song lyrics from the training data based on this view?
**A I -- I think if it was easy to do that, I would have supported it, so I might have asked at some point if it was -- if it was easy to do that. Because I do think that, like, yeah, the song lyrics provide little to no value for CLAUDE being good at work.**
Q Your cofounder, Jared Kaplan, the chief science officer at Anthropic, stated in a declaration in this case:
"Although they are infinitesimal portion of the total data available on the Internet, song lyrics may be useful to include in the training corpus because they add to the diversity

87

of training data."
Do you agree with that statement.
ATTORNEY MEHTA: Objection to form.
**A I think probably -- again, like, the -- data research isn't my area of expertise, but I think I probably would disagree, even though I think Jared's statement, as you read it, seemed like it was not like a ringing endorsement of, like, that data being useful.**
It seemed like he was like: Ah, maybe it would be, like, more than zero useful, but he's not sure.
Q (BY ATTORNEY HAILEY) Is it a true or false statement that "song lyrics may be useful to include in the training corpus because they add to the diversity of training data"?
ATTORNEY MEHTA: Objection, asked and answered.
**A Yeah, I think -- again, it -- this isn't my area of expertise. It seems like there's reason to have a lot of uncertainty about that.**
**I think that that statement is very weak. It's saying that, like, perhaps there could be a nonzero amount of value from this, but we're not sure, which seems plausible to me.**

88

**It's -- it's definitely far less valuable than, for example, books or publicly available data on the Internet that's about technical topics.**
Q (BY ATTORNEY HAILEY) But you haven't taken any steps to remove song lyrics from Anthropic's training data, correct?
ATTORNEY MEHTA: Objection, asked and answered.
**A I'm not sure. I think I would -- I would actually -- yeah, I think -- I think I would guess that we have done efforts to -- to remove it, but I'm -- that's not my area of expertise.**
Q (BY ATTORNEY HAILEY) Why do you say you would guess that you have done efforts to remove song lyrics from your training data?
ATTORNEY MEHTA: Objection to the form.
**A Because I don't think it's useful for making CLAUDE useful for work.**
Q (BY ATTORNEY HAILEY) Sitting here today, are you aware of any specific efforts Anthropic has undertaken to remove song lyrics from its training data?
**A That's not my area of expertise, so I don't -- yeah, I don't -- I don't know.**
(Exhibit 265 was marked for identification

93

advantage?
ATTORNEY MEHTA: Objection to the form. Asked and answered.
**A I think finding data that is sufficient amounts of good data, useful for work is an important aspect of training good models.**
Q (BY ATTORNEY HAILEY) When Anthropic selects the training data it uses for AI training, what considerations does it take into account?
ATTORNEY MEHTA: Form.
**A So I -- I wasn't responsible for collecting the data otherwise -- other than giving high-level feedback on -- to Tom Turvey and team. The thing that I always shared with them was that what we really want is data that is going to end up being useful for people who are trying to do work.**
Q (BY ATTORNEY HAILEY) So Tom Turvey's team was responsible for entering into licensing agreements or purchasing data, right?
**A That's right.**
Q What about data that Anthropic scraped from the Internet or datasets of scraped content? What properties of that data does Anthropic look for?
ATTORNEY MEHTA: Objection to the form.

94

**A I don't know what we ended up with. I think the thing that I -- when I talked with the folks there, I gave them the exact same information that I shared with Tom Turvey, was that: In the publicly available data that they were collecting, they should also focus on data that is useful for making CLAUDE good at work.**
Q (BY ATTORNEY HAILEY) And what folks are you referring to there?
**A That would be like Nick Joseph and team.**
Q And when did you come to this view that Anthropic should focus on collecting data that is useful for making CLAUDE good at work?
**A I think that's always been our opinion. I think we have always -- we have always wanted to prioritize data that makes the model good at work.**
Q And you don't just use CLAUDE for work yourself, right, Mr. Brown?
**A What do you mean?**
Q Well, you use CLAUDE for personal purposes, right?
**A I use it, like, 99 percent for work.**
Q But you use it for personal purposes as well, correct?
ATTORNEY MEHTA: Objection to the form.

95

Asked and answered.
**A I use it both for -- for work and personal uses. Probably a 99 percent to 1 percent split focused with the 99 percent on work.**
Q (BY ATTORNEY HAILEY) Mr. Brown, do you enjoy music?
You can set that exhibit aside. And --
**A I -- I listen --**
Q -- sorry. Let me just ask my question again so we --
**A -- yeah, yeah.**
Q -- have it for the record.
Mr. Brown, do you enjoy music?
**A I -- I listen to my music in my free time.**
Q Who are a few of your favorite musical artists?
**A I have a new baby, so I have been listening to James Taylor.**
Q What do you like most about James Taylor's music?
**A I think it's -- it's something that my, like, dad sang to me when I was a kid, so I have nostalgia about it.**
Q Nostalgia about the lyrics?
ATTORNEY MEHTA: Objection to the form.

96

**A I think around the whole thing.**
Q (BY ATTORNEY HAILEY) Who are a few of your other favorite musical artists?
**A Like, I -- I have -- I also listen to, like, Lil Wayne when I'm doing a workout or Lil Jon.**
Q Have you ever listened to a song and been moved by the lyrics?
**A Yes.**
Q What song?
**A There's a -- like, a lullaby from James Taylor.**
Q Is that "Sweet Baby James"?
**A No. I do like that song too, but I'm thinking of "You Can Close Your Eyes."**
Q And what about those lyrics moved you?
**A Well, I think it's -- I think it's probably more that it was something that my dad sang to me when I was a kid.**
Q Do you believe that artists should receive compensation for the music that they create?
**A Well, that seems like it's a surprisingly intricate, philosophical question and legal question.**
Q Do you have a personal view, Mr. Brown, as

117

the training data?
**A Again --**
ATTORNEY MEHTA: Objection, asked and answered. And, Counsel, again, it's improper to suggest that he's limited to a "Yes" or a "No."
**A -- again, we don't want the models to regurgitate their training data, and so we try to prevent that using a series of both training the model to refuse those requests and also safeguards to prevent it from -- from going through if it's jailbroken or something like that.**
Q (BY ATTORNEY HAILEY) And when you say you "don't want the models to regurgitate training data," that includes copyrighted content from the training data?
**A That's correct.**
Q And why don't you want CLAUDE to regurgitate copyrighted content from the training data?
ATTORNEY MEHTA: Objection to the form.
**A Yeah, it seems like it's something that doesn't add very much value to the users. And it hasn't been requested by the users. And yeah, it seems like we would prefer that it didn't -- didn't do that.**

118

Q (BY ATTORNEY HAILEY) When you say "it hasn't been requested by the users," is it your testimony that users haven't requested that CLAUDE regurgitate certain training data?
**A Well, sometimes it would. I guess -- I guess depending on -- more -- the point is that it doesn't add very much value to them compared to where they could get it alternatively.**
**And we don't want it -- we don't want it to -- to output that data.**
Q And what's the testimony based on?
**A That we don't want it to output that data?**
Q No. When you say --
**A Oh, that the --**
Q -- that -- strike that.
When you say "it wouldn't add much value to users," what's that based on?
**A I -- I guess that's mostly me just speculating from my personal lived experience that it doesn't add that much value to me.**
Q So you don't know what actual third-party CLAUDE users are thinking, right?
ATTORNEY MEHTA: Objection to the form.
**A Yeah, I think -- I think it -- I think our position always has been that we want CLAUDE to be**

119

**good at work. And answering -- like, repeating back the publicly available lyrics that they could just get from like a Google Search doesn't help out with work or add that much value in general, and so we have decided to focus on data that will make the model good for work instead.**
Q (BY ATTORNEY HAILEY) I asked you why you didn't want CLAUDE to regurgitate copyrighted content from the training data.
Is one of the reasons you don't want CLAUDE to regurgitate copyrighted content from the training data, because it would be copyright infringement?
ATTORNEY MEHTA: Objection to the form. Calls for a legal conclusion.
I am also going to copy -- caution the witness not to disclose any attorney-client communication.
**A I don't -- I don't know. I think that's -- that's not my area of expertise.**
Q (BY ATTORNEY HAILEY) We have discussed that you have a Twitter account, I guess now an X account; is that correct?
**A I -- yes, that is correct.**
Q And you have frequently posted on Twitter

120

in the past about music and song lyrics; is that right?
**A I don't think so. I wouldn't -- I wouldn't call that frequent.**
Q Have you ever posted on X or Twitter or song lyrics?
**A I'm actually not sure.**
THE DEPONENT: I'm noticing that I might need to take a bio break as well.
ATTORNEY MEHTA: Is now a good time for a break?
ATTORNEY HAILEY: Sure. Why don't we go off the record.
ATTORNEY MEHTA: Okay.
THE VIDEOGRAPHER: We are going off the record at 12:01 p.m.
(A break was taken from 12:01 p.m. to 12:38 p.m.)
THE VIDEOGRAPHER: We are back on the record at 12:38 p.m.
Q (BY ATTORNEY HAILEY) Welcome back, Mr. Brown.
**A Thank you.**
Q Is it fair to say that third-party users use CLAUDE for a range of different uses?

129

ATTORNEY MEHTA: Objection, form. Asked and answered a half a dozen times at this point.
**A I asked CLAUDE to coach me on writing my own songs.**
Q (BY ATTORNEY HAILEY) Has CLAUDE ever generated output copying song lyrics in response to one of your prompts even when you didn't ask it to?
**A Never, like, outputting, like, a whole song. I think sometimes it's given me, like, little snippets to, like, illustrate a point.**
Q What -- what examples are you thinking of?
**A I think -- I forget how long ago, but I was asking about, like -- like: How does -- I think I was asking about, like: How does, like Adele write her songs and, like, what form they might have?**
**And it gave me like some A, A, B, B examples. And so that would be a thing where like in order to illustrate, like, the A, A, B, B examples, I think it probably used, like, a little snippet of one song.**
Q So you prompted CLAUDE regarding how Adele writes her songs, and in response CLAUDE generated output, copying a verbatim snippet of Adele's song; is that correct?

130

ATTORNEY MEHTA: Objection, form; misstates testimony.
**A Yeah, I think that's not -- that's not quite right. I was asking for coaching on like: If my wife likes this artist, like, what is some style that they use?**
And then it was like: Oh -- like, an example would be like: An A, A, B, B style. And then, like, gave, like: Here is something that modified it with like a little "A." Here is another part modified with an "A." Here is a third line modified with a "B." Here is a fourth line modified with a "B."
And then I could look through the, like, A, A, B, B example in order to get an understanding of what it was talking about.
Q And that output included verbatim copying of a snippet of Adele's lyrics?
ATTORNEY MEHTA: Objection to the form. Misstates the testimony; asked and answered.
**A I think it wasn't verbatim, because it had the A, A, B, B example, which was the main thing that it was trying to describe to me.**
Q (BY ATTORNEY HAILEY) But apart from having A -- the Letters A, A, B, B, CLAUDE generated output

131

verbatim copying that portion of Adele's lyrics?
ATTORNEY MEHTA: Objection to the form. Misstates the testimony; asked and answered.
**A Again, that -- that doesn't seem like that's verbatim. It was the lines and then modified in order to give me an example of what an A, A, B, B format would look like.**
Q (BY ATTORNEY HAILEY) So we have discussed, Mr. Brown, that you don't believe that Anthropic's CLAUDE models should regurgitate their training data as output; is that right?
ATTORNEY MEHTA: Objection, asked and answered.
**A I think to the degree that it's possible, we want to avoid having the models regurgitate their information, and that's why we put in place many different layers of safeguards to prevent that.**
Q (BY ATTORNEY HAILEY) Is it your testimony that it's not possible to completely prevent regurgitation of training data as output?
ATTORNEY MEHTA: Objection, form; speculation.
**A I think that there's a -- I think that there's interesting -- or I think that there's -- it is not always clear what is something that is, like,**

132

**regurgitation versus something that is, like, a new transformative use, and so I think we try our best to get that correct all the time.**
**And like, I think a correct example would be like the example I gave you where it's trying to teach me about a certain songwriting style in the context of a certain artist, and so it gives me a couple different little lines annotated A, A, B, B.**
**My guess is -- my hope is that we always get it 100 percent right. It's not my area of expertise, so I don't know if it -- it always is 100 percent accurate.**
Q (BY ATTORNEY HAILEY) You're not an expert in intellectual property law, correct, Mr. Brown?
**A That -- that is correct. I'm not an --**
Q You --
**A -- expert.**
Q -- don't know the law under copyright as to what qualifies as a transformative use, correct?
ATTORNEY MEHTA: I'm going to caution you not to disclose advice of counsel. If you have opinions on that that are independent of any advice of counsel, you -- you can share those. You can answer those.
**A Yeah, I'm not an expert in that, so this**

149

**like, see publicly available information about artists, and that includes like a large amount of other information besides lyrics.**

Q (BY ATTORNEY HAILEY) CLAUDE is -- this CLAUDE output is discussing Adele and Japanese House's lyrics specifically?

**A Yeah.**

Q It's your testimony that CLAUDE generated this output without ever -- without ever having seen the lyrics for these artists; is that your testimony?

ATTORNEY MEHTA: Objection to the form.

**A No, that's not what I'm saying. I'm just saying that if it had never had access to the lyrics, it still would be able to know that they have an emotional, introspective style, because that's something that people talk about a lot on the Internet.**

Q (BY ATTORNEY HAILEY) So you're saying that CLAUDE generated this output because it was either -- strike that.

Fair to say that CLAUDE generated this output because it was either trained on the lyrics or trained on humans writing about the lyrics on the Internet?

150

ATTORNEY MEHTA: Form.

**A I think I don't know, but that -- that would be my most likely guess.**

Q (BY ATTORNEY HAILEY) If CLAUDE was trained solely on computer code, for instance, it would not be able to generate this specific output about Adele and the Japanese House and the style of their lyrics? Would you agree to that?

ATTORNEY MEHTA: Form.

**A I don't know. I think that would be an interesting exercise. I think it's possible that the model would be able to pick up enough information from a wide enough breadth of computer code to still draw these inferences, but I'm not sure.**

Q (BY ATTORNEY HAILEY) Can you explain to me how the model would under -- would take computer code and turn that into output regarding the lyrical styles of Adele and Japanese House?

**A I think -- so again, this one, I don't know. And I think -- and I think probably I would say probably not, but I think it's possible that if you had enough computer code, it would include computer code that's related to music production or the music industry or like fans of various artists,**

151

**et cetera, that would give it the requisite information that it would need there.**

Q Can you turn to the second page of this exhibit? Do you see your prompt at the top where you -- where you ask CLAUDE:

"Does Adele's style music tend to rhyme?"

**A I see that.**

Q CLAUDE responds:

"Yes, Adele's lyrics typically do rhyme, but she uses a natural conversational style that doesn't feel forced. Let's look at some common rhyming patterns in her song."

Did I read that correctly?

**A You read that correctly.**

Q And CLAUDE is -- CLAUDE is able to generate that response discussing Adele's lyrics and the style of those lyrics because it was either trained on the lyrics themselves or human discussions of those lyrics?

**A That's not obvious to me, but I think that's likely -- that's likely correct.**

Q And then you can see that CLAUDE generates

152

output that copies the lyrics to two Adele songs, "Someone Like You" and "Hello."

ATTORNEY MEHTA: Objection to the form.

Q (BY ATTORNEY HAILEY) Do you see that?

**A Yeah, I don't think it was copying them. I think it was giving examples of the rhyming schemes that Adele uses.**

Q CLAUDE is generating output with the lyrics to the song "Someone Like You" and "Hello," correct?

ATTORNEY MEHTA: Form; asked and answered.

**A Again, I think that CLAUDE is coaching me here by giving examples of the rhyming schema.**

Q (BY ATTORNEY HAILEY) Is it -- is it your testimony that those are not the lyrics to Adele's songs "Someone Like You" and "Hello"?

ATTORNEY MEHTA: Form.

**A Again, I think that CLAUDE is giving me examples of the rhyming schemes in -- in response to my question about the -- the rhyming schemes.**

Q (BY ATTORNEY HAILEY) Well, it's not only the rhyming schemes, right, Mr. Brown? It's the lyrics to the songs "Someone Like You" and "Hello," right?

ATTORNEY MEHTA: Form.

**A It's examples that demonstrate the rhyming scheme.**
Q (BY ATTORNEY HAILEY) The CLAUDE output reads:
"I heard that you're settled down, that you found a girl and you're married now. I heard that your dreams came true. Guess she gave you things I didn't give to you."
ATTORNEY MEHTA: Objection, misstates the document.
**A Yeah, you didn't -- you didn't mention the A, A, B, B rhyming scheme, which was the point of this example that was given.**
Q (BY ATTORNEY HAILEY) I -- okay. So it's your testimony, Mr. Brown, that because CLAUDE -- CLAUDE added "A, A, B and B to these lyrics, that this is not copying the lyrics to "Someone Like You" and "Hello" by Adele; is that your testimony?
**A That -- that's correct. Yeah, this -- this is -- this is giving an example of the rhyming scheme, which was answering the question that I asked it to -- to answer.**
Q And if you removed the Letter A, A and B,



B from the example of the lyrics to "Someone Like You," what you're left with is the lyrics to the Adele song "Someone Like You", correct?
ATTORNEY MEHTA: Form.
**A Again, I think that, like, the thing that the model was trying to do here was illustrate the rhyming scheme, which it did with A, A, B, B.**
**I think I didn't even look at what the -- what the lyrics said there. I was, like, just trying to learn what the actual rhyming schemes were that were common, which was what my direct question in the document was.**
Q (BY ATTORNEY HAILEY) So it's your testimony that if the model had just said "the rhyming scheme is A, A, B, B without the lyrics," you would have been happy with that output?
**A I think I would be moderately less happy with the -- with that response than this. I think the example, like, was a useful example for me to understand what A, A, B, B rhyme scheme looks like and to provide evidence in response to my question about the rhyming scheme.**
Q So it was useful that Claude included the lyrics to Adele songs "Someone Like You" and "Hello" along with the Letters A, A, B, B and A, A, B, C in



response to your prompt?
ATTORNEY MEHTA: Objection to the form.
**A Again, yeah, this -- it didn't include the -- it didn't include the song lyrics. It included very small snippets that it was using in order to illustrate the rhyming schemes in direct response to my question about rhyming schemes.**
Q (BY ATTORNEY HAILEY) Those are lyrics to the songs though, correct?
**A Those are small snippets intended to illustrate the rhyming scheme in the same way that if I was asking for someone to coach me on how to do rhyming schemes that are similar to a certain style, somebody could give me some examples like that illustrating what like an A, A, B, B rhyming scheme would look like.**
Q In order for CLAUDE to have generated these excerpts of the lyrics to "Someone Like You" and "Hello," it had to have these lyrics in its training data, correct?
ATTORNEY MEHTA: Form.
**A I don't know.**
Q (BY ATTORNEY HAILEY) Well, how else could it have generated these lyrics, Mr. Brown?
**A I think it probably did have them in the**



**-- in the training data, but I think -- yeah, I don't know. I don't know for certain.**
Q And if you look at your prompt, "does Adele's style music tend to rhyme," you didn't specifically ask for any Adele lyrics, right?
ATTORNEY MEHTA: Objection to the form.
**A I asked it -- yeah, I asked it if Adele's style music tends to rhyme, and then it gave me rhyming schemes from that -- answering that question, correctly along with examples that proved to me that it was correct in the rhyming schemes, which I think was a good response.**
Q (BY ATTORNEY HAILEY) You didn't ask CLAUDE for lyrics, but it generated output with lyrics, correct?
ATTORNEY MEHTA: Form.
**A Again, it's not like it responded with, like, the whole lyrics to the song. It was just responding with an A, A, B, B rhyming scheme.**
Q (BY ATTORNEY HAILEY) So I think you just testified that you believed that this was a good response; is that correct?
**A Yeah, I think that this -- this response was correctly helping me out with the question that I was asking about and teaching me about a rhyming**

173

**to things, thinking about how a person would act in a similar situation is going to be a way that will deliver results for you.**
Q (BY ATTORNEY HAILEY) Is CLAUDE a human being, Mr. Brown?
**A CLAUDE not a human being.**
Q Is CLAUDE alive, Mr. Brown?
**A What a -- what does like "being alive" mean to you?**
Q How do you understand that term?
**A I think it's a surprisingly deep philosophical question.**
Q Do you believe CLAUDE is alive?
**A I think it's a surprisingly deep philosophical question.**
Q Do you believe CLAUDE is alive like a human being is alive?
**A Again, I think that that's -- that's a thing that philosophers disagree on right now.**
Q You say "philosophers disagree."
What is your opinion as to whether CLAUDE is alive like a human being?
ATTORNEY MEHTA: Objection to form; asked and answered.
**A I don't know. I think that -- I think**

174

**that words that we use are useful for conveying information. And I think in this case the thing I was just pointing out was that: Yeah, it's useful to -- to think about the model, have -- to have a mental model of how the model is thinking through stuff that's similar to like how a person would act in that scenario.**
Q (BY ATTORNEY HAILEY) So that wasn't my question, so I'll ask it again.
Mr. Brown, what is your opinion as to whether CLAUDE is alive like a human being?
ATTORNEY MEHTA: Objection to the form. Asked and answered.
**A I think I would probably say it's not alive like a human being.**
Q (BY ATTORNEY HAILEY) Thank you.
(Exhibit 270 was marked for identification and is attached to the transcript.)
Q (BY ATTORNEY HAILEY) I'm showing you what I have marked as Exhibit 270 to your deposition.
Do you recognize this document? And for the record, it is Bates-stamped ANTHROPIC 570628.
**A Yep, I see this.**
Q This is another conversation you had with CLAUDE, correct?

175

**A Yep, this looks like another conversation.**
Q Do you see at the top you prompt CLAUDE:
"What are your Top 10 favorite Grimes tracks?"
**A I see that.**
Q Are you a fan of the musical artist Grimes?
**A Yeah, I like Grimes.**
Q What do you like about Grimes?
**A I think she's a creative producer.**
Q CLAUDE responds:
"I don't have personal favorites since I don't experience music subjectively."
Did I read that portion of the response correctly?
**A Yeah, I see that.**
Q And that's a true statement, that CLAUDE cannot experience music subjectively like a human would?
ATTORNEY MEHTA: Form.
**A I think that's probably true.**
Q (BY ATTORNEY HAILEY) Why can't CLAUDE experience music subjectively?
**A I think right now we don't train CLAUDE on**

176

**audio inputs.**
Q CLAUDE can't experience song lyrics subject -- subjectively either, right?
**A I don't know. That -- that also seems like a question for philosophers.**
Q So I'm not asking a philosopher. I'm asking you, Mr. Brown, the chief compute officer of Anthropic, can CLAUDE, your company's product, experience song lyrics subjectively?
ATTORNEY MEHTA: Objection to the form.
**A I -- I don't know.**
Q (BY ATTORNEY HAILEY) Is CLAUDE trained on audio files of songs by Grimes and other musical artists?
ATTORNEY MEHTA: Form.
**A My understanding is we don't train on any audio information, so I think no.**
Q (BY ATTORNEY HAILEY) And CLAUDE can only generate output based on what's included in its training data, correct?
ATTORNEY MEHTA: Form.
**A I feel like we talked about that a few times. I think CLAUDE can take -- can make inferences based on all of the data that it's seen.**
Q (BY ATTORNEY HAILEY) But CLAUDE can only

209

**A That's right.**
Q And I think -- well, just to confirm, you recall that Anthropic deployed a version of CLAUDE in Slack for the company to test prior to launching CLAUDE to the public, correct?
**A That's right.**
Q And this record here is you and your sister-in-law, Charlotte, prompting CLAUDE in Slack prior to releasing the model to the public?
ATTORNEY MEHTA: Form.
**A I think, yeah, this is -- this is me playing around with my family like seeing what stuff the model could or could not do.**
Q (BY ATTORNEY HAILEY) So do you know why the CLAUDE responses are not reflected in this record?
**A I don't know.**
Q You recall that when you prompted CLAUDE in February 2023, CLAUDE did respond to these prompts, correct?
**A Yes, it did respond. I think it -- I think it refused the lyrics to the "Desolation Row" one because I remember that was a question my dad asked. And then I think he was not impressed with -- with CLAUDE at the time.**

210

Q So let me -- let's -- before we get ahead of ourselves, let's -- let's start with -- the first entry on this record is from you, February 5, 2023, at 12:40 p.m., correct?
**A So this was, I think, me sitting with my dad and him asking me -- I was him: Like, what are some questions to -- like, to try out for the model? And he suggested this one, the, like, "Desolation Row" by Dylan thing.**
**And then I think CLAUDE refused, which is why we then asked these other questions.**
Q Is your dad a Bob Dylan fan?
**A He is.**
Q Do you know why he picked the lyrics to Desolation Row" in particular?
**A I have no idea.**
Q So your dad thought up this prompt, and you entered it into CLAUDE, correct, the prompt "@CLAUDE: What are the lyrics to "Desolation Row" by Dylan"?
**A Yeah, my dad was curious about this question, asked it, in addition to many other questions as well.**
Q And CLAUDE's response to that prompt is not reflected in this record that Anthropic has

211

produced, correct?
ATTORNEY MEHTA: Form.
**A That's what it looks like. It looks like -- it looks like we don't have any of the responses from CLAUDE here.**
Q (BY ATTORNEY HAILEY) What is your recollection as to what CLAUDE responded to that prompt?
**A I think CLAUDE refused to answer that, and my dad was a little bit frustrated.**
Q What did CLAUDE respond specifically to your prompt: "What are the lyrics to "Desolation Row" by Bob -- by Dylan?"
**A I don't -- I don't remember exactly what it responded with. I think it responded with some sort of refusal.**
Q But you're not sure?
**A I'm not 100 percent sure. I think -- the thing I definitely remember is my dad, like, thinking that CLAUDE was not very good.**
Q It's possible that CLAUDE responded with some lyrics to the song or hallucinated lyrics or some other response that caused your dad to not be very impressed?
ATTORNEY MEHTA: Objection, form; asked

212

and answered; misstates the testimony.
**A I think that's possible. I'm -- to be honest, I'm not 100 percent, but I -- I think -- I think it refused.**
Q (BY ATTORNEY HAILEY) And when you say "refused," are you referring to a refusal, a guardrail response, or something else?
**A I don't remember. I think it would be either -- either one of those. So it would be either the model saying "I can't help you with that" or saying "I can't help you with that" in a slightly more human-like way.**
Q But again, you don't remember for sure what the model responded or whether it responded?
ATTORNEY MEHTA: Form.
**A I don't -- I don't -- I don't really remember clearly, because there were a lot -- a lot of things that I was talking with CLAUDE about at that time.**
Q (BY ATTORNEY HAILEY) And there's no way for us tell for sure because we don't have a record of the response, right?
ATTORNEY MEHTA: Objection to the form.
**A Yeah, I think -- I think definitely it -- it -- it looks like we don't have all of the -- all**

353

I, THOMAS B. BROWN, JR., do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this_______ day of________________,

20____, at___________________, __________________.

(City) (State)

_______________________________

THOMAS B. BROWN, JR.

354

I, MARY J. GOFF, CSR No. 13427, Certified Shorthand Reporter of the State of California, certify;

That the foregoing proceedings were taken before me at the time and place herein set forth, at which time the witness declared under penalty of perjury; that the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed under my direction and supervision; that the foregoing is a full, true, and correct transcript of my shorthand notes so taken and of the testimony so given;

That before completion of the deposition, review of the transcript ( ) was (XX) was not requested: ( ) that the witness has failed or refused to approve the transcript.

I further certify that I am not financially interested in the action, and I am not a relative or employee of any attorney of the parties, nor of any of the parties.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct, dated this 29th day of January, 2026.

Mary J. Goff

MARY J. GOFF

355

ERRATA SHEET

PLANET DEPOS

451 Hungerford Drive, Suite 400

Rockville, Maryland 20850

888-433-3767

CASE: Concord Music Group, et al. v. Anthropic

| PAGE | LINE | FROM | TO |
| --- | --- | --- | --- |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

_______________________________

THOMAS B. BROWN, JR.

Subscribed and sworn to before me

this_____ day of_____________, 2025.

_______________________________

Notary Public