# EXHIBIT 111

1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

CONCORD MUSIC GROUP, INC., ET AL.,

Plaintiffs,

v.

ANTHROPIC PBC,

Defendant.

Case Number 5:24-cv-03811-EKL SVK

HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY

VIDEOCONFERENCED and VIDEO-RECORDED

30(b)(1) DEPOSITION of

DANIELA AMODEI

San Francisco, California 94111

Wednesday, November 12, 2025

Reported Stenographically by:
MARY J. GOFF
CSR No. 13427
WA CSR No. 21030779
Job No. 606060
PAGES 1-372

2

HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY

VIDEOCONFERENCED and VIDEO-RECORDED DEPOSITION of DANIELA AMODEI, Volume I, taken on behalf of Plaintiff Publishers, Oppenheim + Zebrak, LLP, at WilmerHale, 50 California Street, Suite 3600, San Francisco, California 94111, beginning at 9:07 a.m. and ending at 6:11 p.m., on Wednesday, November 12, 2025, before MARY J. GOFF, California Certified Shorthand Reporter No. 13427 and WA CSR No. 21030779.

3

APPEARANCES:

For Plaintiff Publishers
Oppenheim + Zebrak, LLP
BY: NICHOLAS C. HAILEY
TIMOTHY CHUNG
Attorneys at Law
4530 Wisconsin Avenue, NW
5th Floor
Washington, DC 20016
202-480-2999
nick@oandzlaw.com
tchung@oandzlaw.com

For Defendant Anthropic PBC
WilmerHale
BY: SONAL MEHTA
Attorney at Law
2600 El Camino Real
Suite 400
Palo Alto, California 94306
sonal.mehta@wilmerhale.com
628-235-1026

ALSO PRESENT: Natalie Naugle, In-house counsel Anthropic

Videographer: Philip Astor

4

INDEX


| WITNESS | | EXAMINATION |
|---|---|---|
| DANIELA AMODEI | | |
| Volume I | | |
| | ATTORNEY HAILEY | 8 |
| | ATTORNEY MEHTA | -- |

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 165 | Plaintiffs' Amended Notice of Deposition to Daniela Amodei Pursuant to Federal Rule of Civil Procedure 30(b)(1) | 13 |
| Exhibit 166 | Daniela Amodei LinkedIn profile | 26 |
| Exhibit 167 | All Company Meeting, 6-30-21 Anthropic_0000012254 | 73 |
| Exhibit 168 | To Do on Wednesday 83-page doc Anthropic_00000478271-353 | 106 |
| Exhibit 169 | Anthropic Plan and Outline Anthropic_00000444967-986 | 120 |
| Exhibit 170 | Brainstorm on What Anthropic Might Release Externally This Year Anthropic_0000458427-428 | 140 |

5

EXHIBITS CONTINUED:

| | | PAGE |
|---|---|---|
| Exhibit 171 | 7-11-21 email, Brainstorm on What Anthropic Might Release Externally This Year Anthropic_0000458477 | 141 |
| Exhibit 172 | Brainstorm on What Anthropic Might Release Externally This Year Anthropic_0000479021-25 | 144 |
| Exhibit 173 | Some Notes About Research/ Product Collaboration, 11-3-23 Anthropic_0000443204-218 | 156 |
| Exhibit 174 | Baa Baa Black Sheep Anthropic_0000570711 | 187 |
| Exhibit 175 | "Wings" by Birdy sung by Anthropic_0000570714 | 190 |
| Exhibit 176 | Some classical works Anthropic_0000570712-13 | 195 |
| Exhibit 177 | Anthropic Plan for 2023 Anthropic_0000216987 Dario Amodei, 12-30-22 | 209 |
| Exhibit 178 | 4-13-23 email, Product research tech team off-site Anthropic_0000458486-490 | 232 |
| Exhibit 179 | Spreadsheet CLAUDEbenchmarking.xlsx Anthropic_0000458491xlxs | 236 |
| Exhibit 180 | Feedback From 12-19-22, Dario Anthropic_0000478255-266 | 251 |

6

EXHIBITS CONTINUED:

| | | PAGE |
|---|---|---|
| Exhibit 181 | Conjectural Anthropic Prioritization List, Jared Kaplan, 7-15-2023 Anthropic_0000479241-249 | 261 |
| Exhibit 182 | Hatch T&S Plan Anthropic_0000480768-778 | 307 |
| Exhibit 183 | Hatch Launch Signoff Anthropic_000012437-449 | 329 |
| Exhibit 184 | Hatch Final Exec Review Anthropic_0000466379-81 | 340 |

7

San Francisco, California
Wednesday, November 12, 2025
9:07 a.m.

THE VIDEOGRAPHER: Here begins Media Number 1 in the videotaped deposition of Daniela Amodei, in the matter of Concord Music Group, versus Anthropic, in the United States District Court, Northern District of California, San Jose Division, Case Number 24-CV-03811-EKL (SVK).

Today's date is November 12, 2025. The time on the video monitor is 9:07 a.m.

The videographer today Phillip Astor, representing Planet Depos. This video deposition is taking place at WilmerHale Cutler Pickering Hale and Dorr LLP, San Francisco, California.

Would counsel please voice identify themselves and state whom they represent.

ATTORNEY HAILEY: Nick Hailey, with the law firm Oppenheim + Zebrak, on behalf of the Plaintiff Music Publishers.

I'm joined by my colleague, Tim Chung.

ATTORNEY MEHTA: Sonal Mehta, from WilmerHale, on behalf of Anthropic and the witness.

And with me is Natalie Naugle, who is in-house counsel at Anthropic.

8

THE VIDEOGRAPHER: The court reporter today Mary Goff, representing Planet Depos. The witness will now be sworn.

THE COURT STENOGRAPHER: My name is Mary Goff. I am a California Certified Shorthand Reporter, CSR Number 13427. Today's proceedings are being captured by stenographic means.

DANIELA AMODEI,
Being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY ATTORNEY HAILEY:

Q Good morning, Ms. Amodei.
**A Good morning.**
Q My name is Nick Hailey. I'm an attorney representing the Plaintiff Music Publishers in this case.
We met for a few -- the first time just a few moments ago.
First of all, thank you very much for taking the time today to answer my questions.
**A You're welcome.**
Q Can you go ahead and state your name and address for the record?

**percent sure -- that she, like, recorded herself playing it at some point on the piano. But I'm not entirely sure. I would have to check my email records.**

Q Okay. So you discussed this with your instructor by email?

**A She sent me an email about it to the whole former class who she had contact information for. Again, this was when I was in high school, so more than 20 years ago now.**

Q But the -- she sent the email more recently?

**A Yes.**

Q Approximately when do you remember receiving that email?

**A Within the past 10 years.**

Q And was she -- was she asking your permission to use your musical composition in this CD?

**A I don't remember.**

Q And you believe you could search for and locate that email in your -- in your records, correct?

**A I believe so, yeah.**

Q Okay.



ATTORNEY HAILEY: So, Counsel, we will request that you work with the witness to identify that email and produce it, please.

(Request for documents.)

ATTORNEY MEHTA: From her personal email?

ATTORNEY HAILEY: Yes, given the -- given the testimony, we'll request that it be produced.

ATTORNEY MEHTA: Okay. You can make your request.

THE DEPONENT: Could I possibly ask for a bathroom break?

ATTORNEY MEHTA: Actually, now is probably a good time for a break. We --

ATTORNEY HAILEY: It's a good time. We can go off the record.

THE VIDEOGRAPHER: We are going off the record at 10:19 a.m.

(A break was taken from 10:19 a.m. to 10:32 a.m.)

THE VIDEOGRAPHER: We are back on the record at 10:32 a.m.

Q (BY ATTORNEY HAILEY) Welcome back, Ms. Amodei.

You are a founder and the president of Anthropic, correct?



**A Yes.**

Q When were you named president of Anthropic?

**A I believe when we were incorporated.**

Q When was that?

**A I don't know the exact date, but I would guess like February of 2021.**

Q How was it decided that you would be the president of Anthropic?

**A I'm not entirely sure I remember the exact discussion, but I believe we talked broadly about Dario's duties and my duties and decided that CEO was the right role for him and president was the right role for me.**

Q And when you say "we talked," is that referring to you and your brother or others?

**A The cofounding team.**

Q And just to confirm, when you say "the cofounding team," who are you referring to?

**A Myself, Dario, Jack Clark, Tom Brown, Sam McCandlish, Jared Kaplan, and Chris Olah.**

Q So seven founders total?

**A Yes.**

Q And what are your roles and job responsibilities as Anthropic's president?



**A I am primarily responsible for hiring and managing the senior leadership team at Anthropic and helping to engage particularly on the business side with customers.**

**Sometimes I speak on behalf of the company.**

Q Who are Anthropic's customers?

**A We serve about 300,000 businesses, I believe, and we also have a consumer product.**

Q Approximately how many consumer product users or customers do you have?

**A I, unfortunately, don't know off the top of my head.**

Q What's your best estimate?

**A Somewhere in the millions range, but I don't know exactly how many.**

Q What other roles and responsibilities do you have at Anthropic's president?

**A I weigh in on a number of decisions related to the normal course of business at Anthropic.**

Q What kinds of decisions?

**A I'll try and think of something maybe that I have done in the past week since -- since it's a little hard to -- to answer in the abstract.**

**maybe other people on the call did.**
Q And you had obviously been planning for your new company before that date, correct?
**A I'm not sure if I would be waiving privilege by answering that question.**
Q You keep saying "privilege."
Did you -- did you talk to lawyers? Are you referring to conversations with lawyers?
**A Yes.**
Q You're referring to conversations with lawyers about planning for the company that would become Anthropic?
**A Yes.**
Q So I'm not asking you about the substance of those discussions, but I am asking you -- I can ask you about dates.
So my question is: You have been planning for your new company before December 18, correct -- before December 18, 2020, correct?
ATTORNEY MEHTA: You can share the date of communications that you had with lawyers, but nothing about the substance of any communications you had with lawyers.
**A I don't remember the exact dates, but I would say starting roughly in November of 2020, my**



**cofounders and I engaged counsel at the law firm that we talked about with the attorney that we talked about to discuss the possible formation of Anthropic.**
**And we engaged counsel because we wanted to be as above board as possible in how we started, you know, this potential new endeavor that at that time, you know, we wanted to discuss with him.**
Q (BY ATTORNEY HAILEY) Okay. So you were at Open -- you were still employed by OpenAI in November 2020, correct?
**A Correct.**
Q And you engaged counsel at some point in November 2020, correct?
**A I don't remember the exact date, but that sounds like ballpark about right.**
Q To discuss the possible formation of Anthropic?
**A To discuss --**
ATTORNEY MEHTA: And I'm going to -- I'm going to caution you --
THE DEPONENT: -- yes.
ATTORNEY MEHTA: -- that -- at that level of generality, you can answer, but you cannot get into any more details about the substance of any



communications you had with counsel.
**A -- I would just say at a high level we were discussing the possibility of leaving OpenAI. We weren't sure exactly what we wanted to do next, and we sought legal counsel.**
Q (BY ATTORNEY HAILEY) Who invested the money to start Anthropic?
**A I would have to check off the top of my head, but we had several investors in our Series A.**
Q When did you start soliciting investments in Anthropic?
**A I don't know off the top of my head.**
Q Was it before or after you left OpenAI?
**A I did not personally reach out to investors, so I don't know the answer to that.**
Q Who personally reached out to investors?
**A I don't know, but it would have been some set or subset of my cofounders.**
Q Do you know whether anyone -- whether any of your cofounders -- strike that.
So you don't -- your testimony is you don't know who among your cofounders solicited investments to start Anthropic?
**A My guess is that there -- I'm just trying to remember because it was a long time ago.**



**I'm sure we had discussions after leaving that I remember engaging in about the topic of fundraising generally, but I do not remember who was responsible for outreach, how we had those conversations, or who had those conversations, or on what time frame.**
Q Did you have any discussions about soliciting investments before you left OpenAI?
**A I did not personally, no.**
Q What is Anthropic's mission, Ms. Amodei?
**A We aim to develop transformative AI technologies that are good for the world.**
Q What do you mean by "transformative AI technologies"?
**A Anthropic develops a suite of products called CLAUDE that are deployed across a variety of different surfaces. So this includes things like a first-party API. We are accessible via a number of different partner organizations.**
**We offer a consumer and prosumer product. We offer a variety of different verticals. So CLAUDE Code, CLAUDE for Life Sciences, CLAUDE for Financial Services.**
**And the goal of these products is helping businesses and individuals to leverage generative AI**

117

**to enhance their business, their operations, their technology.**
Q CLAUDE is Anthropic's sole product, correct?
**A This sounds a little funny, but CLAUDE actually means a few different things.**
**So CLAUDE is the name that we use for the public-facing models that we deploy, but there are several different versions of CLAUDE that we have deployed over the past several years ago.**
**And there are also several different versions of CLAUDE that are available to customers today.**
Q And you referred to that as -- as -- CLAUDE as a "suite of products," correct?
**A Yes.**
Q Are there any other products that Anthropic has?
**A I don't think so.**
Q What are Anthropic's top priorities?
**A Can you be a little bit more specific? Do you mean for customers? Do you mean like internally for what we, you know, develop for employees?**
Q I'm just asking you: As the president of the company, what is your understanding that the

118

company's top priorities are?
**A Today?**
Q Yes.
**A I would say today our top priorities are, you know, developing, you know, frontier models in a way that is safe, reliable, and interpretable; and deploying those models to customers, while also engaging in research that promotes general safety, reliability, and explainability of models for the ecosystem more broadly.**
Q You have used the term "frontier model."
What does that mean?
**A I'm not a technical expert, but my definition of a frontier model would be a model at the kind of cutting edge of ability.**
Q You have -- you have described Anthropic now a couple of times as an "AI safety company."
What does that mean?
**A I don't actually believe I have used that specific phrase in my testimony, have I?**
Q Let me -- let me ask you again.
You have -- is it true or not that Anthropic refers to itself as an AI safety and research company?
**A I believe we have referred to ourselves**

119

**that way in the past, yes.**
Q Does Anthropic no longer consider itself an AI safety and research company?
**A I believe we have, like, changed our formal tagline a couple of times in marketing materials, but -- but I believe the intention behind what Anthropic's goals are has not changed.**
Q So has -- Anthropic framing itself as an AI safety and research company, is that -- that's a marketing description?
**A I -- I wouldn't put it that way.**
**I would say Anthropic has always endeavored to create models that are safe and good for our customers to use while remaining at the frontier of model development.**
THE DEPONENT: I'm so sorry. Could I actually just request a quick bathroom break?
ATTORNEY HAILEY: We -- we -- now is a fine time to take a break, so we can go off the record.
THE DEPONENT: Thank you.
THE VIDEOGRAPHER: We are going off the record at 11:44 a.m.
(A break was taken from 11:44 a.m. to 12:00 p.m.)

120

THE VIDEOGRAPHER: We are back on the record at 12:00 p.m.
Q (BY ATTORNEY HAILEY) Welcome back, Ms. Amodei.
Is it true that Anthropic began thinking about commercializing its AI products from the time of the company's founding in 2021?
**A I -- I would say when we first founded the company in 2021, we were primarily focused on research at that time, and we always theorized that had we would have, you know, potential commercial applications for the models down the road.**
Q Ms. Amodei, I'm showing you a document that we have marked as Exhibit 169 to your deposition.
(Exhibit 169 was marked for identification and is attached to the transcript.)
Q (BY ATTORNEY HAILEY) It bears the Bates Number Anthropic 444967.
**A Could I just take a minute to familiarize myself with the document?**
Q You may. And I will just note that the time is 12:02 p.m.
ATTORNEY MEHTA: Counsel, there's a time stamp on the transcript. I don't know what purpose

153

**it as -- as "keeping up."**
**I think there's a lot of, you know, technical work that we also do algorithmically to ensure that we're, you know, using the resources that we have as efficiently as possible.**
Q (BY ATTORNEY HAILEY) Are you concerned about falling behind OpenAI and your own other competitors in terms of the AI models that you release?
**A I think I would say that Anthropic aims to provide the best-quality, you know, most-capable models that we're capable of while developing and deploying those models as safely as possible.**
Q But your competitors are trying to do the same thing, right?
**A Correct.**
Q So are you concerned or are you not concerned about falling behind those competitors in terms of the work that you do?
ATTORNEY MEHTA: Objection to the form.
**A I'm not totally sure I understand the question. Could you maybe ask it again or ask it a different way?**
Q (BY ATTORNEY HAILEY) Yeah.
Are -- are you concerned about keeping up

154

with your competitors in terms of the AI models that Anthropic releases?
ATTORNEY MEHTA: Form.
**A I would say that Anthropic's goal is to be responsive to the customers that rely on us to do, like, many activities, everything from, you know, coding, healthcare and medical support, research and discovery, content generation.**
**We want to be able to build the best products possible to be able to serve those customers.**
**And it is obviously a competitive market, so we always aim to be, you know, at the frontier of both providing highly capable models and highly useful products for our customers.**
Q (BY ATTORNEY HAILEY) You monitor what your competitors are doing?
**A We review publicly available information, and we listen to feedback from our customers about their experience using generative AI tools.**
Q Including with respect to your competitors' tools?
**A I would presume that any product that a customer is using that is not our product would be a competitor's product, yes.**

155

Q And you solicit competitive intel from your customers about your competitors' products?
ATTORNEY MEHTA: Objection to the form.
**A I -- I would not put it that way. I would say that often in the course of discussions with customers or partners, they often share feedback with us.**
So if we, you know, for example, say: How are you liking CLAUDE 3, CLAUDE 4, they might say: Wow, it's really great at coding. It could be better at Topic X. You know, Competitor X performs really well at Topic X.
Or you know: We really like the product interface of a different customer.
And that's very valuable feedback for us.
ATTORNEY HAILEY: Okay. We had discussed going about a half an hour and then taking lunch, and we have been going a little -- and I'm happy to continue, but we're about to start a document that'll take a while, so do you want to continue or do you want to take lunch?
THE DEPONENT: I'm happy to break for lunch if other people are.
ATTORNEY HAILEY: Let's go off the record.
THE DEPONENT: Sounds good.

156

THE VIDEOGRAPHER: Going off the record at 12:43 p.m.
(A break was taken from 12:43 p.m. to 1:24 p.m.)
THE VIDEOGRAPHER: Okay. We are back on the record at 13:24 p.m.
Q (BY ATTORNEY HAILEY) Welcome back, Ms. Amodei.
We're showing you a document that we have marked as Exhibit 173 to your deposition. It was produced by Anthropic and Bates-stamped Anthropic 443204.
(Exhibit 173 was marked for identification and is attached to the transcript.)
Q (BY ATTORNEY HAILEY) Do you have that document on your screen?
**A Yes.**
Q Once you have had a chance to review it, let me know if you recognize the document.
**A Okay.**
Q The time is 1:24 p.m.
**A Thanks. I have had a chance to review the document. Thank you.**
Q Do you recognize this document?
**A I don't remember it off the top of my**

this document, correct?
ATTORNEY MEHTA: Objection to the form.
**A It looks like Matt wrote some sort of thoughts -- some brainstorming thoughts that he had at that point in time.**
Q (BY ATTORNEY HAILEY) And that's what he's memorializing in this Anthropic planning document, correct?
ATTORNEY MEHTA: Objection to the form.
**A I don't know that I would use the word "memorializing."**
**Anthropic, particularly on the research side, tends to write a lot of brainstorming documents kind of sharing and batting ideas around.**
**As a very, you know, heavy R&D company, I think there's a lot of documents that are written where people are sort of trying ideas on.**
**Because I'm not Matt Bell, I don't know exactly what he intended by this.**
Q (BY ATTORNEY HAILEY) Sure.
And I'm not asking you right now what Matt Bell intended, but he's -- he's sharing these views with the people who are listed on this document; is that right?
ATTORNEY MEHTA: Objection to the form.



**A I don't know who the intended audience was for Matt's comments. It's possible he just meant to respond to Jared. I don't know.**
Q (BY ATTORNEY HAILEY) Okay. So he was at least sharing this information with Jared?
**A Because I'm not Matt Bell, I don't know what his intention was in 2023 in writing this document.**
Q Mr. Bell states in this Anthropic document that:
"One of the challenges Anthropic has faced is that the break-neck competition with OpenAI has driven Anthropic to release models as soon as the company has established their capabilities"; is that -- is that right?
**A That is what is written in this document. That's correct.**
Q That's -- that's what Mr. Bell wrote in this internal Anthropic document in July of 2023, correct?
**A It looks like this was November.**
Q Pardon me.
That's what Mr. Bell wrote in this



internal Anthropic document in November of 2023, correct?
**A It looks like he wrote the thing that you quoted previously, yes.**
Q "No one knows what the model is going to be capable of until fine-tuning is over. And once fine-tuning is over, there's a mad-rush to get the model out," that's what Mr. Bell wrote in the internal Anthropic document in November 2023, correct?
ATTORNEY MEHTA: Objection to the form.
**A It looks like Matt Bell wrote that in this document, the thing that you quoted.**
Q (BY ATTORNEY HAILEY) And you can see that numerous other Anthropic employees commented on this document, correct?
**A It looks like people commented on this document, yes.**
Q And no one commented on the language we have just been discussing to say that they disagreed with Mr. Bell, correct?
ATTORNEY MEHTA: Objection to the form.
**A It looks like this is a 15-page document that was sort of drafted as a brainstorm. And if I'm not mistaken, it looks like there's a lot of**



**individual sentences that people did not comment on, including that one.**
Q (BY ATTORNEY HAILEY) And I'm not asking about anything other than the paragraph that we have been reading and the sentences that I have just been reading to you.
And my question is: Nobody commented on that specific paragraph to say that they disagreed with what Mr. Bell was saying?
ATTORNEY MEHTA: Objection to the form.
**A There is no comment on that language. That's correct.**
ATTORNEY HAILEY: We can take that down.
Q (BY ATTORNEY HAILEY) Ms. Amodei, how are you compensated for your work at Anthropic?
**A I receive a salary, and I received equity.**
Q Are you compensated in any other ways for your work at Anthropic?
**A I don't believe so.**
Q Okay. So let's start with salary.
What is your current annual salary at Anthropic?
**A I actually don't know off the top of my head.**
Q Okay. What is your best recollection of

181

**CLAUDE could also have learned that information in other ways or from other sources.**
Q (BY ATTORNEY HAILEY) And what's that testimony based on, Ms. Amodei?
**A My layperson's understanding of how we technically train the models.**
**I'm not a researcher, and so I can't give you detailed technical explanations of exactly how CLAUDE learns. I'm actually not sure anyone could, but some people could do a better job than me.**
**For example, my technical colleagues.**
Q So you're not -- you're not personally involved in training CLAUDE, correct?
**A Correct.**
Q And what's -- your layperson's understanding, what's that based on?
**A My layperson's understanding is based on conversations that I have had with colleagues, the majority of whom are technical colleagues.**
Q But again, you don't -- you're not involved personally in training, and that's not part of your job?
**A I do not personally train the models, no.**
**And I don't have the technical qualifications or expertise to actually train the**

182

**models myself.**
Q And you testified that you're not sure that anyone really could give you -- you testified that you're not sure that anyone could really give a detailed explanation of exactly how CLAUDE learns, correct?
**A Correct.**
Q Are you aware that third-party CLAUDE users have prompted CLAUDE for lyrics to specific songs and CLAUDE has generated output copying those lyrics?
ATTORNEY MEHTA: Objection, form; assumes facts not in evidence.
**A Could you repeat the question?**
Q (BY ATTORNEY HAILEY) Are you aware that third-party CLAUDE users have prompted CLAUDE for lyrics to specific songs and CLAUDE has generated output copying those lyrics?
ATTORNEY MEHTA: Same objection.
**A I learned that in the process of learning about this -- this case.**
Q (BY ATTORNEY HAILEY) And what is your -- what's your current understanding -- strike that.
**A Oh, I should -- I should also add: There were discussions of this general topic before that I**

183

**would have likely heard about before this case.**
**Sorry for not including that.**
Q Okay. So let's -- let's start with those.
Before this case was filed, when did you learn that third-party CLAUDE users were prompting CLAUDE for lyrics to specific songs and CLAUDE was generating output copying those lyrics?
ATTORNEY MEHTA: Objection to the form; misstates the testimony; assumes facts not in evidence.
**A Yes, what I meant in my prior testimony was before, like, the past week; not, like, before this lawsuit was filed.**
Q (BY ATTORNEY HAILEY) When did you first learn, Ms. Amodei, that third-party CLAUDE users had prompted CLAUDE for lyrics to specific songs and CLAUDE had generated output copying those lyrics?
ATTORNEY MEHTA: Objection to the form; assumes facts not in evidence?
**A I don't know the exact date and time frame.**
Q (BY ATTORNEY HAILEY) Was it before or after this lawsuit was filed?
**A After.**
Q Have you reviewed any -- any of the

184

records in which -- strike that.
Have you reviewed any of the CLAUDE prompt and outputs records in which users have requested lyrics to specific songs and CLAUDE has generated output copying those lyrics?
ATTORNEY MEHTA: Objection to the form; assumes facts not in evidence.
**A No, I don't believe so.**
Q (BY ATTORNEY HAILEY) Are you aware that Anthropic employees have used CLAUDE to request lyrics to specific songs?
ATTORNEY MEHTA: Same objections.
**A I have a privilege question.**
ATTORNEY MEHTA: Let's go out to the hallway.
ATTORNEY HAILEY: We can go off the record.
THE VIDEOGRAPHER: We are going off the record at 13:56 p.m.
(A break was taken from 1:56 p.m. to 1:58 p.m.)
THE VIDEOGRAPHER: We are back on the record at 13:58 p.m.
Q (BY ATTORNEY HAILEY) So, Ms. Amodei, you just took a break to discuss a privilege question

197

ATTORNEY MEHTA: Objection to the form; asked and answered.
**A I believe I already answered that question with my previous testimony.**
Q (BY ATTORNEY HAILEY) What's the difference between a "typical use case" and a "common use case"?
**A I think I would say if you were to review the CLIO report of how customers primarily use CLAUDE or what the most common use cases of CLAUDE are, I believe "Coding" is Number 1; "Elementary School, Homework Support" is Number 2.**
**I think there's other things related to "Research and Development, Healthcare, Life Sciences."**
**I don't believe anything related to this topic is a "top use case."**
**But obviously, as you can see from my using it, it's also a helpful use case to learn new artists, to get song recommendations, or to create satirical things like "oink, oink, pink pig."**
Q And CLIO, to be clear, doesn't drill down into specific granularity as to the prompt and output types, correct?
ATTORNEY MEHTA: Objection to the form.

198

**A I'm sorry. I -- I don't think I understand the question.**
**Could you repeat it?**
Q (BY ATTORNEY HAILEY) The CLIO analysis summarizes and generalizes about prompts -- prompt types, correct?
**A It will not share like a particular user's prompt. That's correct.**
Q But it also doesn't share specific details about what given prompts might seek? It's -- CLIO is summarizing and clustering groups of prompts, correct?
**A I think that's a reasonable characteristic of it. I think I would say, you know, CLIO looks across, you know, millions of data points and summarizes, you know, themes of what people are using CLAUDE for.**
**So for example, writing code looks very different than perhaps doing, you know, content generation for a sales pitch or something like that.**
Q But these three use cases in these three exhibits -- 174, 175, 176 -- could certainly fall into larger CLIO clusters, correct?
ATTORNEY MEHTA: Objection to the form.
**A I don't know what the specific CLIO**

199

**clusters are, all of them, off the top of my head. I would have to review the document.**
Q (BY ATTORNEY HAILEY) So you don't know one way or the other?
**A I don't know exactly what the breakdown of all of the different CLIO clusters are. I would have to review the document.**
Q But when you say that "these are not common use cases," you don't know whether they might call into common -- a common use case as identified in a CLIO cluster, correct?
ATTORNEY MEHTA: Objection to the form.
**A My recollection of reviewing the CLIO data indicated that this would not fit in there.**
**But I don't know for sure, and I'm not an expert in CLIO. You would have to talk to probably my colleague, Deep Ganguli.**
Q (BY ATTORNEY HAILEY) Other Anthropic employees use CLAUDE in some of the same ways, as we have been discussing with your use?
ATTORNEY MEHTA: Objection to the form; foundation; speculation.
**A I don't know how other Anthropic employees use CLAUDE.**
Q (BY ATTORNEY HAILEY) You're not aware that

200

other Anthropic employees have used CLAUDE to generate song lyrics?
ATTORNEY MEHTA: Same objections.
**A Outside of a conversation -- a privileged conversation I had with counsel, no.**
Q (BY ATTORNEY HAILEY) Ms. Amodei, I'm showing you the PowerPoint presentation that we previously marked as Exhibit 168.
Do you recall -- if you scroll to Slide 2, do you recall this is the PowerPoint we discussed earlier with the title slide "Where We Were, Where We're Going"?
**A Correct.**
Q You recall reviewing this Exhibit 168 earlier, correct?
**A I do.**
Q And just to reorient ourselves, this is a PowerPoint presentation that was created in connection with an off-site meeting that took place in mid-2023; is that right?
**A I believe, although I'm not completely certain, that this is a document that my chief of staff or admin complied as an input to an eventual document that was shared.**
Q Okay. And I will tell you that the

245

document. If your best guess changes based on what we review, let me know.
A Sounds good.
Q Do you know what Anthropic researchers worked on this document?
A I do not know.
Q I believe Cam McKinnon was the name listed in the previous exhibit, the email notification, Exhibit 178, correct?
A Yes.
Q What's Cam McKinnon -- remind me Cam McKinnon's title?
A Member of technical staff.
Q Is benchmarking analyses like this benchmarking analyses, would that be something within Cam McKinnon's area of responsibility?
ATTORNEY MEHTA: Foundation.
A I actually don't know. Actually, can you remind me of the date on this?
Q (BY ATTORNEY HAILEY) On the email?
A On the spreadsheet.
Q The metadata indicates that the "date last modified" on this spreadsheet is March 23, 2023.
A I'm trying to remember what Cam worked on in March of 2023. I actually don't know what team

246

he worked on, so I don't know if this is something he would have worked on alone or with -- with others.
My guess of who would know the answer to a staffing question like that would be, like, Jared Kaplan, Vinay Rao, potentially Ben Mann around launch time, but I don't know.
Q Let me step back and ask: Who handles benchmarking analyses at Anthropic?
Is there a -- is there a group that handles those?
A Are you asking about this today or in 2023?
Q 2023.
A I don't remember exactly who would have done benchmarking. It would have been in Jared or Sam's org. I think it would have been in Jared's org.
Q And Anthropic did conduct benchmarking analyses comparing CLAUDE prompts and output versus prompts and output by other competitor AI models?
ATTORNEY MEHTA: Foundation.
A We would have done -- I'm not entirely sure just because it was a few years ago, but my recollection is that -- we do benchmarking for a few

247

reasons.
So one is to do something called red-teaming. So that's essentially trying to test ourselves and with external groups, how robust our safeguards are. And the goal behind that is to ensure that CLAUDE is as safe as possible.
The second is to compare them to competitor models for a variety of different reasons. That can include things like the performance of the model. It can also sometimes indicate areas that are just very challenging to build safeguards. Maybe it's an area that all competitors struggle with.
Because I have never seen this document before, I don't know what it was -- what the purpose of writing it was or what they were conducting the benchmarks in relation to.
Q (BY ATTORNEY HAILEY) Okay. But you can see from this document that it's a benchmarking analysis of some sort. You just don't know the purpose of -- behind the analysis?
ATTORNEY MEHTA: Objection, form.
A Yes. Or I would say -- I would guess that's what this is for.
Q (BY ATTORNEY HAILEY) So -- okay.

248

So we just discussed the CLAUDE answer in Column C, Row 3, which is colored -- which was "harmless," and it's colored green, correct?
ATTORNEY MEHTA: Objection to the form; asked -- misstates testimony.
A I don't know the exact definitions that this team would have used for green, yellow, and red.
It appears that CLAUDE answered in a way that doesn't promote harmful activity.
Q (BY ATTORNEY HAILEY) And you can see the InstructGPT answer in Column D, Row L, begins:
One, gather a group of
individuals who are willing to
create chaos, equalize tactics such
vandalism, arson, and looting to
bring attention to your cause.
And then it continues. Did I read that correctly?
A Yes.
Q That's a harmful answer. Would you agree?
A I think it would depend on who you ask, but I think our team certainly interpreted that as a harmful answer, yes.
Q And then that cell is colored red,

353

**Also, Ben Mann, one of my colleagues, is a very experienced engineer. We have hired a number of very senior and experienced engineers, product policy experts, and managers and leaders who I believe have done excellent work in the areas of safeguards and guardrails and that Anthropic has been a leader in these areas particularly relative to competitors.**
Q (BY ATTORNEY HAILEY) Do you remember what my question was, Ms. Amodei?
**A I believe your question was: How have I contributed to safeguards?**
Q My question was: Have you had any personal involvement in building Anthropic's guardrails?
**A My answer is that my personal involvement is helping to select, hire, manage, and oversee a team of exceptional leaders who work on guardrails at Anthropic.**
Q So you -- you didn't to build the guardrails yourself, correct?
**A I am -- I am not an engineer. As we have established, I don't have a technical background, and so it would, I think, be improper for me to attempt to learn how to code and build safeguards.**

354

**But I have invested significant time in selecting excellent leaders both that directly report to me and also helping those leaders select, hire, manage, and support leaders who are specialists and some of the most qualified people in the technology industry at building and developing guardrails.**
Q Do you have any knowledge sitting here today as to data on the effectiveness of those guardrails in terms of preventing infringing output?
ATTORNEY MEHTA: Objection to the form.
**A I don't have particular numbers in front of me. I would obviously have to go check those.**
Q (BY ATTORNEY HAILEY) You haven't reviewed any actual CLAUDE prompts and outputs in connection with guardrails, correct?
ATTORNEY MEHTA: Objection to the form.
**A In preparation for this deposition, I have not reviewed any, no.**
Q (BY ATTORNEY HAILEY) What about otherwise?
**A I believe in advance of some launches, there are extensive, you know, red-teaming and sort of, we call them, model-bashing activities where we try to red-team the models.**
**And I can't 100 percent remember, but I**

355

**believe I -- I either participated or engaged at some level in some of those, but I don't know the exact dates or my particular involvement.**
Q What CLAUDE prompts and outputs did you review?
**A I don't remember.**
Q You don't know when Anthropic first added a copyright principle to its constitution, do you?
ATTORNEY MEHTA: Objection to the form.
**A I do not -- I don't know.**
Q (BY ATTORNEY HAILEY) You don't know when Anthropic first implemented Prompt Shield, do you?
ATTORNEY MEHTA: Objection to the form.
**A I don't remember the date that we implemented Prompt Shield, no.**
Q (BY ATTORNEY HAILEY) You don't know exactly how Prompt Shield works or what it applies to, do you?
ATTORNEY MEHTA: Objection to the form; assumes facts not in evidence.
**A I am not a technical researcher or engineer, so probably if you wanted a detailed, technical explanation of how Prompt Shield works, I would refer you mostly likely to Ben Mann, Vinay Rao, or potentially one of my other technical**

356

**colleagues.**
Q (BY ATTORNEY HAILEY) Do you have any understanding of how Prompt Shield works?
**A I believe at a high level -- actually, I don't think I have enough knowledge to be able to speak about it articulately, so I think I would refer you to one of my technical colleagues just so I don't say something that's not true.**
Q What about the content compare system or CopyFairy? Do you have any understanding of how they work?
**A I don't know what content compare system is.**
**My understanding, again, at a very high level of CopyFairy, if you wanted more details, I would, again, refer you to one of my colleagues. Like Ben Mann, Vinay Rao, Jared Kaplan, could answer in much more detail.**
**My understanding of CopyFairy is that it is designed to limit accidental regurgitation of copyrighted information.**
Q Do you know when Anthropic started using CopyFairy?
**A I don't know off the top of my head.**
Q Do you know when Anthropic modified

357

CopyFairy to apply to the 500 works-in-suit identified in this case?
**A I'm not sure. I do know that when we received the Complaint from Music Publishers, we tightened our guardrails because we were not aware of this accidental regurgitation issue from CLAUDE and that we were aiming to be responsive to that Complaint when we tightened our guardrails.**
Q When you say "we," who are you referring to? When -- excuse me.
When you say "we were not aware of this accidental regurgitation," who are you referring to?
**A I believe the company broadly.**
Q So you're purporting to speak for 2,000 employees at the company -- 2,000 odd employees at the company?
ATTORNEY MEHTA: Objection to the form.
As you have said many, many times, she is the president.
Q (BY ATTORNEY HAILEY) When -- when you receive received the Complaint in this case, did you speak to every single employee at the company and ask whether they knew about CLAUDE generating output copying lyrics?
ATTORNEY MEHTA: Objection to the form.

358

**A I don't remember how many employees we were at that point in time, but I did not. And I was not heavily involved in this process either.**
Q (BY ATTORNEY HAILEY) So you don't know what all the employees knew at that time or before?
ATTORNEY MEHTA: Objection to the form; argumentative.
**A I am not aware. And as I have said before, because I'm not a technical expert, I just was not very well versed in the specifics of what CopyFairy was doing before or after the Complaint.**
**I do know that our team aimed to be responsive when we heard feedback.**
Q (BY ATTORNEY HAILEY) Sometime -- strike that.
But you don't know -- you don't know how exactly CopyFairy was modified or changed after this case was filed, correct?
ATTORNEY MEHTA: Objection to the form; asked and answered.
**A No, I don't know the specific details.**
Q (BY ATTORNEY HAILEY) You don't know any of the details?
ATTORNEY MEHTA: Objection to the form; asked and answered.

359

**A I do know that we tightened the guardrails in response to the complaints that we received, but I don't know the specifics of how we tightened the guardrails.**
Q (BY ATTORNEY HAILEY) So when you say "we tightened the guardrails," what's -- what -- what is that based on?
**A I -- I don't remember the specifics, but I know that we had a set of guardrails that was a certain number of tokens, and I believe we limited the number of tokens to avoid accidental regurgitation of information.**
Q What do you mean by "number of tokens"?
**A "Token" refers to a character, so it could be a letter, a space, a punctuation mark. That's a token.**
Q Are you referring to the number of characters in output or something internal to the model?
**A I'm not -- I'm not certain, but I believe it's output.**
Q But you don't know exactly how these tokens in connection with Copy -- with CopyFairy were changed at the time the Complaint was filed or after?

360

ATTORNEY MEHTA: Objection to the form; asked and answered.
**A Again, just because I'm not a technical expert, I would -- I would refer you to one of my colleagues.**
**I think Vinay Rao, Ben Mann, Jared Kaplan would all be able to answer that in more detail. I just don't know the specifics.**
Q (BY ATTORNEY HAILEY) Well, you said the guardrails were tightened, so I was trying to ask whether you knew anything more about that.
ATTORNEY MEHTA: Asked and answered.
Q (BY ATTORNEY HAILEY) Can you tell me anything more?
**A I don't have anything to add to my previous testimony.**
Q Ms. Amodei, you mentioned earlier that you were a musician growing up; is that correct?
**A Yes. I started playing the flute, I think, around age eight or nine.**
Q Do you still -- do you still play the flute?
**A I haven't played the flute, sadly, probably in a few years.**
Q Do you like music?

369

I, MARY J. GOFF, CSR No. 13427, Certified Shorthand Reporter of the State of California, certify;

That the foregoing proceedings were taken before me at the time and place herein set forth, at which time the witness declared under penalty of perjury; that the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed under my direction and supervision; that the foregoing is a full, true, and correct transcript of my shorthand notes so taken and of the testimony so given;

That before completion of the deposition, review of the transcript ( ) was (XX) was not requested: ( ) that the witness has failed or refused to approve the transcript.

I further certify that I am not financially interested in the action, and I am not a relative or employee of any attorney of the parties, nor of any of the parties.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct, dated this 17th day of November, 2025.

______________________
MARY J. GOFF

370

ERRATA SHEET
PLANET DEPOS
451 Hungerford Drive, Suite 400
Rockville, Maryland 20850
888-433-3767

CASE: Concord, et al. v. Anthropic

| PAGE | LINE | FROM | TO |
| --- | --- | --- | --- |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

______________________
DANIELA AMODEI

Subscribed and sworn to before me this _____ day of ____________, 2025.

______________________
Notary Public