# EXHIBIT 119

## (FILED UNDER SEAL)

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

CONCORD MUSIC GROUP, INC., ET AL.,
Plaintiffs,
v.
ANTHROPIC PBC,
Defendant.

Case Number 5:24-cv-03811-EKL SVK

HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY
VIDEOCONFERENCED and VIDEO-RECORDED
30(b)(6) DEPOSITION of
Anthropic PBC, by and through its Designated
Representative,
DEEP GANGULI, Ph.D.
San Francisco, California 94111
Thursday, November 6, 2025

Reported Stenographically by:
MARY J. GOFF
CSR No. 13427
WA CSR No. 21030779
Job No. 60706930b6
PAGES 1-167

2

HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY

VIDEOCONFERENCED and VIDEO-RECORDED DEPOSITION of DEEP GANGULI, Ph.D., Volume I, taken on behalf of Plaintiff Publishers, Oppenheim + Zebrak, LLP, at WilmerHale, 50 California Street, Suite 3600, San Francisco, California 94111, beginning at 8:04 a.m. and ending at 12:00 p.m., on Friday, November 6, 2025, before MARY J. GOFF, California Certified Shorthand Reporter No. 13427 and WA CSR No. 21030779.

3

APPEARANCES:

For Plaintiff Publishers
Oppenheim + Zebrak, LLP
BY: NICHOLAS C. HAILEY
MICHELLE GOMEZ-REICHMAN
Attorneys at Law
4530 Wisconsin Avenue, NW
5th Floor
Washington, DC 20016
202-480-2999
nick@oandzlaw.com
michelle@oandzlaw.com

For Defendant Anthropic PBC
WilmerHale
BY: TAYLOR GOOCH
Attorney at Law
50 California Street
Suite 3600
San Francisco, California 94111
taylor.gooch@wilmerhale.com
628-235-1026

ALSO PRESENT: Ian Chen, In-house counsel Anthropic
Becky Maz, Esquire, WilmerHale (remote DC)
Videographer: Philip Astor

4

INDEX


| WITNESS | EXAMINATION |
|---|---|
| DEEP GANGULI, Ph.D. | |
| Volume I | |
| ATTORNEY HAILEY | 7, 158 |
| ATTORNEY GOOCH | 157 |

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Plaintiffs' Notice of Deposition to Defendant Pursuant to Federal Rule of Civil Procedure 30(b)(6) | 9 |
| Exhibit 2 | Defendant Anthropic PBC's Amended and Supplemental Responses and Objections to Plaintiffs' Third Set of Interrogatories (No. 18) | 15 |
| Exhibit 3 | Prompt Anthropic_0000003118-274 | 80 |
| Exhibit 4 | CLAUDE Observability Dashboard, Alex Tamkin, 1-23-24 Anthropic_000052400-24011 | 117 |
| Exhibit 5 | Clio: Privacy-Preserving Insights into Real-World AI Use Anthropic_0000012987-3032 | 125 |
| Exhibit 6 | Spreadsheet Anthropic_0000429489 | 132 |

5

EXHIBITS CONTINUED: PAGE

| | | | |
|---|---|---|---|
| Exhibit 7 | Spreadsheet Anthropic_0000441309 | 136 |
| Exhibit 8 | Data Documentation CLAUDE and CLAUDE usage Anthropic_0000441363-368 | 139 |
| Exhibit 9 | Spreadsheet Anthropic_0000441232 | 143 |
| Exhibit 10 | Spreadsheet Anthropic_0000441541 | 145 |
| Exhibit 11 | Spreadsheet Anthropic_0000441532 | 146 |
| Exhibit 12 | Spreadsheet Anthropic_0000441312 | 148 |
| Exhibit 13 | Cluster Level Data Anthropic_0000441362 | 151 |
| Exhibit 14 | Spreadsheet Anthropic_0000441316 | 154 |

6

San Francisco, California
Thursday, November 6, 2025
8:04 a.m.

THE VIDEOGRAPHER: Here begins Media Number 1 in the videotaped deposition of Deep Ganguli, in the matter of Concord Music Group, versus Anthropic, in the United States District Court, Northern District of California, San Jose Division, Case Number 5:24-cv-03811-EKL (SVK).

Today's date is November 6, 2025. The time on the video monitor is 8:04 a.m.

The videographer today is Phillip Astor, representing Planet Depos. This video deposition is taking place at Wilmer Cutler Pickering Hale and Dorr LLP San Francisco, California.

Would counsel please voice identify themselves and state whom they represent.

ATTORNEY HAILEY: Nick Hailey, for the Plaintiff, Music Publishers.

Joined by Michelle Gomez-Reichman.

ATTORNEY GOOCH: Taylor Gooch with WilmerHale on behalf of Anthropic.

With me here today is Ms. Becky Maz remotely, as well as counsel -- in-house counsel for Anthropic and the witness.

7

THE VIDEOGRAPHER: The court reporter today is Mary Goff, representing Planet Depos. The witness will now be sworn.

THE COURT STENOGRAPHER: My name is Mary Goff. I am a California Certified Shorthand Reporter, CSR Number 13427. Today's proceedings are being captured by stenographic means.

DEEP GANGULI, Ph.D.,

Being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

ATTORNEY GOOCH: I'm just confirming. Do you want to mic on him?

THE VIDEOGRAPHER: Yes, please.

THE DEPONENT: Oh, sorry. Like here?

THE VIDEOGRAPHER: Yes.

ATTORNEY HAILEY: All set?

EXAMINATION

BY ATTORNEY HAILEY:

Q Good morning, Mr. Ganguli.
**A Good morning.**
Q How are you doing?
**A Good.**
Q We met just a few minutes ago. My name is Nick Hailey. I represent the Plaintiff Music

8

Publishers in this case, and I will be taking your deposition today.

First of all, thank you for taking the time out of your schedule to answer my questions today. We appreciate it.

Can you go ahead and state your full name and address for the record.
**A Yes.**
**My name is Deep Ganguli. My address is [redacted]**
Q Mr. Ganguli, have you ever been deposed before?
**A I have not.**
Q So I want to start by going over just a few ground rules for the deposition today.

You have just taken an oath that requires you to tell the truth, the whole the truth, and nothing but the truth.

Do you understand that?
**A I do.**
Q I'm interested in finding out everything you know about the topics that we discuss today. And for that reason, I'm looking for full and complete answers to the questions I'm going to ask.

Is that understood?

29

Q So just so I understand, it -- it's your testimony that Anthropic doesn't run top-down evaluations or other sorts sort of evaluations on -- to analyze CLAUDE usage or usage patterns?

**A To analyze CLAUDE usage or usage patterns?**

**I think -- again, there's a little bit of context here that can kind of help us get to -- to an answer that appreciates the nuance here.**

**We often are developing models that -- before we deploy them, we want to check them for safety characteristics.**

**So we don't have people actually interacting with them. But some of us researchers have access to these models, and so we will design experiments that often look like simple conversations, but they're not conversations users are having with the models. They're kind of conversations or prompts and -- that researchers are designing to characterize the system prior to it actually having users.**

**That's sort of what I mean by kind of a "top-down." We kind of know what we're trying to look for. We design kind of prompts to look for that, and then we reevaluate or measure something fundamentally about the model.**

30

**And that's not using real CLAUDE usage data, except -- you know, it depends on how you define it, because we are using some version of CLAUDE prior to deployment to design these things. So that's top-down.**

**And then bottom-up, my team -- sticking to what I know -- uses Clio to actually use CLAUDE to analyze CLAUDE conversations.**

**And so with that context in mind, can you repeat the question again one more time, please?**

Q Well, let's -- let's go back to Clio for a minute.

**A Okay.**

Q You and your team created Clio, correct?

**A Yes.**

Q And you -- you work with Clio and you manage Clio, correct?

**A That's -- so me and my team created Clio. My team works with Clio.**

**Clio is now owned and maintained by a different team now.**

Q What team?

**A Research infrastructure.**

Q When did Anthropic first start monitoring and analyzing CLAUDE usage using Clio?

31

**A Let's see. So the -- this time last year -- I'm just working my way backwards. I can give you a rough estimate.**

**This time last year we had built it and were running it, so roughly for one year we have been using the system.**

Q And Clio is essentially using CLAUDE itself to monitor CLAUDE usage; is that accurate?

**A At a very high level, that's accurate. There's some details in there, but at a very high level, yes, it's using CLAUDE to analyze CLAUDE traffic in aggregate in a privacy-preserving way.**

Q Okay. So that's Clio. Let's go back to the evaluations outside of Clio.

What client -- what types of CLAUDE usage does Anthropic monitor or analyze through these other kinds of evaluations?

**A Sure.**

**So on my team, for example, we have tested for measures of bias and discrimination. For example, like: Does CLAUDE treat different people differentially?**

**And then there are other teams that look at different kinds of risks and harms as well.**

Q So your team does these evaluations, correct, some of them?

32

**A My team has done some of the evaluations. We have published all of what these evaluations are.**

**Once we sort of design them -- because, again, we're a research team -- they often get used by other teams for other reasons.**

Q So what other teams at Anthropic are responsible for doing these evaluations?

**A There's a big safeguards team that's also doing these evaluations. There's a frontier red team that's doing these kinds of evaluations. There's an alignment team that's doing the evaluations. There's a product team that's doing the evaluations.**

**So evaluations is sort of a large bucket of work, and it's very distributed across the entire organization.**

Q So we have talked about Clio. We have talked about other quote/unquote, top-down evaluations. You mentioned "red-teaming."

What is red-teaming?

ATTORNEY GOOCH: Objection, scope.

**A Red-teaming, at a very high level -- we published a paper on this in 2022 that sort of takes a stab at defining what we mean by it.**

33

**At a very high level, it's a process and procedure by which we pay people to adversarially probe our systems for harms prior to deployment so that we can then use that data to mitigate those harms and then rerun the process to show that the harms are indeed mitigated.**
**That's our definition of "red-teaming."**
Q (BY ATTORNEY HAILEY) And what time -- what types of harms have you tested or probed using red-teaming?
ATTORNEY GOOCH: Objection, scope.
**A That is all public information in our -- in the Ganguli 2022 paper on "Red-Teaming Language Models to Reduce Harms."**
**And we have also kind of opened-sourced all of the data from that exercise so it's publicly available.**
**I haven't looked at that paper a while now, so I would have to kind of go back and kind of look at it carefully, unless -- yeah, I would have to go back and kind of look at it carefully to give a strong answer.**
Q (BY ATTORNEY HAILEY) So let me -- let me ask it this way: What types of usage would you say Anthropic monitors or analyzes through red-teaming?

34

**A What kinds of uses does Anthropic monitor or observe through red-teaming? That was the question?**
Q Monitor or analyze through red-teaming, yes.
**A Yeah --**
ATTORNEY GOOCH: Object to form.
You can answer.
**A -- again, we pay the red team people to use their own ingenuity to look for the harms. We don't tell them what to look for. We have them -- sort of just give them very broad instructions where: I want you to adversarially probe the system to see if and where it can cause harm.**
Q (BY ATTORNEY HAILEY) And does Anthropic maintain records or data from red-teaming efforts?
ATTORNEY GOOCH: Objection, scope.
**A So in that paper we have published the outcomes of those red-teaming exercises, yes.**
Q (BY ATTORNEY HAILEY) And beyond that paper, does Anthropic maintain records or data from other red-teaming efforts?
ATTORNEY GOOCH: Objection, scope.
**A Does Anthropic maintain records?**
**So by "maintain records," do you mean like**

35

**save the data from the output of people red-teaming the systems?**
Q (BY ATTORNEY HAILEY) Yes. I'm asking whether you have -- whether you have records or documentation or data relating to the red-teaming that Anthropic has conducted.
ATTORNEY GOOCH: Same objection.
**A There's a little bit of context here.**
**We -- my understanding is that -- so that paper and those methods and processes are from 2022, in which we had crowd workers red-team the systems.**
**We have actually moved to a different method called "constitutional AI." So that paper and methods are a bit deprecated, so that's why I think there's probably kind of information from that, but it's sort of outdated.**
Q (BY ATTORNEY HAILEY) And just to be clear, my -- my questions weren't limited to that paper. I'm asking more broadly about when Anthropic employs red-teaming to test or analyzed the usage of CLAUDE, whether you maintain records or documentation regarding that red-teaming?
**A When Anthropic employees are red-teaming or --**
Q Employs red-teaming.

36

**A Oh, when Anthropic employs red-teaming.**
ATTORNEY GOOCH: Objection, scope.
If you could just pause, let me object, and then answer the question.
THE DEPONENT: Okay.
ATTORNEY GOOCH: Thank you.
You can answer.
THE DEPONENT: Okay.
**A I would have to -- I think those records must be stored somewhere.**
Q (BY ATTORNEY HAILEY) But sitting here today, you don't know?
ATTORNEY GOOCH: Same objection.
**A I could probably find out, but right now I'm not entirely sure.**
Q (BY ATTORNEY HAILEY) And --
**A I'm sorry. I should have said I can find out.**
Q For the top-down evaluations we were just discussing, does Anthropic maintain records or data from those evaluations?
**A Yeah, so some context. If you're -- if we're talking here about sort of static multiple-choice evaluations, those data are indeed the output -- outcomes of those experiments are**

53

one way or the other whether Anthropic monitors or analyzes the extent to which CLAUDE users are seek -- are using CLAUDE to seek copyrighted material?

**A I believe there are guardrails in place to prevent CLAUDE from doing that, again, owned by the safeguards team, so that -- but I don't know much beyond that.**

Q And we talked about guardrails before, and I know that you're not the guardrails expert.

And I -- so let me just re-ask my question and make sure --

**A Sure.**

Q -- I understand.

As we sit here today, you don't know whether Anthropic does anything to monitor or analyze CLAUDE usage in connection with requests or output for copyrighted material?

ATTORNEY GOOCH: Objection, misstates prior testimony.

**A I know that there are guardrails in place to prevent that kind of thing; that we take IP very seriously.**

**Outside of that, I don't know much about -- much more than what I have stated.**

54

ATTORNEY GOOCH: Great.

And that's an hour. Let's take a break.

THE VIDEOGRAPHER: We are going off the record at 9:01 a.m.

(A break was taken from 9:01 a.m. to 9:17 a.m.)

THE VIDEOGRAPHER: We are back on the record at 9:17 a.m.

Q (BY ATTORNEY HAILEY) Welcome back, Mr. Ganguli.

**A Thanks.**

**Can I just correct -- I misunderstood a question in the last section. Can I just explain myself?**

Q Sure.

**A Okay. So we -- my team has built Clio to analyze how -- aggregate high-level usage data.**

**And we -- you know, we take IP at Anthropic very seriously. There's a guardrails team that looks at sort of kind of the pro -- that has guardrails in place to make sure CLAUDE does not regurgitate sort of copyrighted material.**

**As for how those guardrails work and their efficacy, that's just not my domain of expertise.**

**In my analyses of usage data, I have never seen evidence of that kind of a thing.**

55

Q So let me just unpack that.

Guardrails are not your area of expertise and not what you're here to testify about today; is that -- first of all; is that right?

**A That is right. And you can talk to my former colleague, Vinay, about those kinds of things.**

Q But in terms of the monitoring and the evaluation and analysis of CLAUDE usage that your team does --

**A Yes.**

Q -- you haven't looked at whether or not users are using CLAUDE in connection with copyrighted material; is that correct?

ATTORNEY GOOCH: Objection, misstates prior testimony.

**A I have neither studied that directly, nor found evidence of it directly myself.**

Q (BY ATTORNEY HAILEY) And I -- just so I understand, you haven't -- you haven't looked at that issue?

ATTORNEY GOOCH: Objection, misstates prior testimony.

**A My team does not study copyright infringement, no.**

56

Q (BY ATTORNEY HAILEY) What about beyond your team?

Does Anthropic more broadly monitor, evaluate, or analyze CLAUDE usage in connection with requests regarding copyrighted terms?

**A We take IP very seriously. And the guardrails team, I know, has guardrails in place to prevent the recitation of copyrighted -- copyrighted materials.**

Q Apart from the guardrails that you have mentioned, does Anthropic do anything else to monitor or evaluate or analyze CLAUDE usage in connection with requests regarding copyrighted materials?

**A Outside of what I have told you, I have no extra knowledge.**

Q When you say "Anthropic takes IP very seriously," what do you mean?

**A We are not trying to create a regurgitation machine. We're trying to create an AI assistant that's helpful for other people. So we want to build a system that helps people be more productive and helps them in their day-to-day tasks.**

Q But aside from the team guardrails team

61

**are responsible for knowing if they work or not and evaluating their efficacy, yeah.**
Q So you're not testifying -- you don't have knowledge that -- one way or the -- one way or the other whether the guardrails actually work to prevent output of copyrighted lyrics?
**A Yes, as previously stated, I -- the guardrails team owns evaluating the efficacy of the guardrails.**
**And I know that when I look at Clio runs, I just don't see people -- it's not a common thing of people trying to recite any copyrighted material. It's not a thing that I have ever seen in any analysis of Clio data that I have looked at.**
Q (BY ATTORNEY HAILEY) But Clio is looking at user prompts and not outputs generated by CLAUDE, correct?
ATTORNEY GOOCH: Objection, misstates prior testimony.
**A No, that's not true. Clio analyzes conversations, so it's prompts and completions.**
**However, it does -- it does sort of first -- okay. So some context would be helpful here on how Clio works.**
**You start off with a high-level set of**

62

**conversations. We use CLAUDE to summarize the gist of what those conversations are about. Then we group similar kinds of conversations together.**
**And then we cluster those groups, and we have CLAUDE sort of analyze what's the high-level gist of what those conversations actually are, like, sort of about.**
**We don't actually read any of those conversations, because this is a privacy-preserving aggregate platform. So you know, your original question is like: Are you only looking at prompts?**
And the answer is: No. We're looking at the full conversations, summarizing them, kind of turning those into numbers, grouping things, aggregating, and trying to find meaning in, like, the high-level clusters using CLAUDE.
Q So the clusters summarize and generalize from individual conversations?
**A The clusters summarize and generalize? What do you mean by "generalize" in this context?**
Q Do you agree that the clusters summarize from individual conversations?
**A Yeah, the one cluster provides a high-level summary of a number of conversations.**
Q And a cluster won't tell you exactly what

63

the prompt was for any individual conversation, correct?
**A A cluster will tell you neither what the prompt is, nor what any of the completions are or any of the exchanges in any individual conversation.**
Q So the cluster won't necessarily -- for a request for copyrighted lyrics, a cluster wouldn't tell you one way or the other whether the output contained copyrighted lyrics, correct?
ATTORNEY GOOCH: Objection, misstates prior testimony.
**A Sorry. Can you repeat that question one more time?**
Q (BY ATTORNEY HAILEY) Sure.
So if there's a user requesting lyrics from CLAUDE, the Clio cluster wouldn't say one way or the other whether the output actually contained lyrics?
ATTORNEY GOOCH: Objection, misstates prior testimony.
**A The Clio cluster is a high-level summary of the conversations that happened that kind of regrouped within that cluster, and that's what the analyst gets to look at.**
**I'll also say that for -- for getting song**

64

**lyrics, it's -- you can go to Google to get song lyrics, so we don't see this happening frequently -- well, we see people analyzing and interpreting sort of song lyrics, but there's other technologies if people want to get song lyrics outside of CLAUDE.**
Q (BY ATTORNEY HAILEY) Mr. Ganguli, you haven't studied the extent to which people use Google for song lyrics, right?
**A No, I have not studied that, yeah.**
Q Does Anthropic monitor or analyze the extent to which CLAUDE generates output containing copyrighted song lyrics specifically?
ATTORNEY GOOCH: Objection, asked and answered.
**A We -- the Clio runs cannot -- Clio is not instrumented to allow us to do that.**
Q (BY ATTORNEY HAILEY) Are you aware that Anthropic has produced a sample of 5 million CLAUDE prompt and output records as a part of this litigation?
**A Can you give me more context on what those records are to jog my memory?**
Q Yeah. And I'll tell you that Anthropic, as part of this litigation, produced a random sample of five million CLAUDE prompt and output records.

65

Are you aware of that?
**A So -- so full exchanges, five million of them, like actual individual conversations --**
Q Yes.
**A -- that people are having with CLAUDE were produced for this?**
**I was not aware of that.**
Q So I assume that you and your team haven't used -- haven't analyzed or evaluated that five million sample prompt; is that correct?
ATTORNEY GOOCH: Objection, scope.
**A I have not analyzed those data.**
Q (BY ATTORNEY HAILEY) Are you aware of anyone on your team analyzing that usage data from that -- from that prompt?
**A This is --**
ATTORNEY GOOCH: Objection, scope.
**A -- this is the first time I'm hearing about this datasets.**
Q (BY ATTORNEY HAILEY) Mr. Ganguli, can you describe for me at a high level the ways in which third-party users and subscribers use CLAUDE?
**A By "third" --**
ATTORNEY GOOCH: Objection, scope.
**A -- okay. Yeah, what do you mean by**

66

**"third-party users and subscribers"?**
Q (BY ATTORNEY HAILEY) So I'll just -- I can say "users and subsidiaries." I just want to be clear.
For purposes of this case, I'm not talking about how Anthropic employees use it or people -- people associated with the Plaintiffs in this case.
Does that sound make sense?
So I'm talking about just consumers and customers and users and who are not related to this particular litigation.
**A Okay. And this could include like users of CLAUDE.AI, the conversations with chatbot and the API and other product services like CLAUDE Code?**
**Because we have multiple product services. I just want to kind of understand the scope of the question.**
Q Sure. And I will -- I'll just go back to Topic 45 for your deposition today is:
Anthropic's understanding of the uses or potential uses of CLAUDE by users and subscribers.
And that's what you're here -- that's what you were prepared to testify to today, correct?
**A Yes.**

67

Q So if you need to differentiate between different user groups, different CLAUDE models or products, I would invite you to do so.
**A Okay.**
Q So let me re-ask my question.
**A Thank you.**
Q Can you describe for me at a high level the ways in which users and subscribers use CLAUDE?
**A Oh, yes. Okay. Sure.**
**So the -- at the very high level, the main use case of CLAUDE.AI and CLAUDE Code and our CLAUDE API is for writing code. It's for doing software engineering tasks. That is the most common use case across -- across the product surfaces I mentioned.**
**After that we have kind of published what the next kind of top uses are, but it's typically helping people to actually do work, whether that's writing, whether that's doing research, or whether that's an educator doing kind of curriculum design.**
**CLAUDE is a very general-purpose technology. Clio really helps us understand like the most common use cases, which are the ones I have described.**
**And yeah, those are the -- those are**

68

**the -- sort of the main -- the main uses that are the most sort of typical.**
Q Is it fair to say that CLAUDE users use CLAUDE for a number of different tasks?
ATTORNEY GOOCH: Objection, vague.
**A Yeah, what do you mean by "a number of different tasks"? It's -- it depends on the number --**
Q (BY ATTORNEY HAILEY) Okay.
**A -- yeah.**
Q Is it fair to say that CLAUDE users use CLAUDE for many different tasks?
ATTORNEY GOOCH: Objection, vague.
**A Yeah, it's unclear what you mean by "many" here in this context.**
**But CLAUDE is a general-purpose system. I have described to you what we find to be the most typical use cases.**
**But it's open ended. It's on open-ended system. It does have guardrails. And you know, there are other uses that are not the ones I described as well.**
Q (BY ATTORNEY HAILEY) Would you agree that some of the tasks for which third-party CLAUDE users use CLAUDE relate to songs and song lyrics?

69

**A I have seen evidence of people using CLAUDE to understand song lyrics; make their de novo song lyrics; try to interpret songs; try to, you know, ask about songs and artists more generally.**
**It's very -- it's not the most -- it's not the typical usage of CLAUDE that I have seen in any Clio analysis of usage data.**
**The most common uses I see again are sort of software engineering, help with writing, typically documents related to business, and learning and education and research.**
Q What is your understanding of the specific ways in which CLAUDE users use CLAUDE relating to songs and song lyrics?
ATTORNEY GOOCH: Objection, asked and answered.
**A Yeah, as I -- I sort of liked my previous answer. I can stick to that, if you would like me to repeat that.**
Q (BY ATTORNEY HAILEY) Well, this -- yeah, this question is a little bit different.
So why don't you tell me your understanding of all the ways in which CLAUDE users use CLAUDE relating to songs and song lyrics.
ATTORNEY GOOCH: Objection, asked and

70

answered.
**A Yeah, I still think that's the same question, so I'm happy to repeat my answer.**
**The clusters I see that are, again, rare and not typical are people using CLAUDE to analyze and interpret song lyrics, make new song lyrics, ask questions about song lyrics, so on and so forth.**
Q (BY ATTORNEY HAILEY) And when you say "rare or not typical," what data are you referring to?
**A So in our original -- so I'm referring to any of the data we have analyzed in any of our published papers.**
**So whether that's the very first Clio paper or any of our economic index papers, the thing that everyone is using CLAUDE for -- the most typical use case -- sorry. I shouldn't have said "everyone."**
**The most typical use case is using CLAUDE to write computer code.**
**When we look at those -- the outputs of Clio, there's -- you know, we can see, you know, what the most typical uses are.**
**And songs have never really -- up until this case I have never noticed that in the data at**

71

**all.**
Q You have never specifically looked for that in the data, correct?
**A Again Clio -- sorry.**
ATTORNEY GOOCH: I was going to say "misstates prior testimony."
**A -- Clio is not designed to know what you're looking for a priori and then go find evidence of that thing.**
**Clio is designed to do a bottom-up analysis of a large swath of conversation data and surface what the most common uses are.**
Q (BY ATTORNEY HAILEY) Mr. Ganguli, do you agree that third-party CLAUDE users have used CLAUDE to request copies of lyrics to specific existing songs?
**A I know what I saw in the Clio clusters, which I have sort of stated in advance.**
**But I have never -- again, the way Clio is designed -- there's two things I can say here. I don't know what the actual conversations are explicitly. I don't have access to the prompts and the full completions.**
**And I also know that there are guardrails in place to prevent the recitation of copyright**

72

**materials.**
Q So do not know one way or the other whether CLAUDE users have used CLAUDE to request copies of lyrics to existing songs?
ATTORNEY GOOCH: Objection, form.
**A Again, I'll -- again, I know what the outputs of Clio look like at a high level.**
**However, Clio is -- because it's privacy preserving, I cannot actually look at any individual conversations. All I can look at is CLAUDE's summaries of those individual conversations at a highish level, at a granular level in order to protect people's privacy. So I know that.**
**And I also know that there are guardrails in place to prevent the recitation of copyright materials. So putting that all together, right, I only know what CLAUDE tells me about that, and I know about -- that we have guardrails in place to prevent CLAUDE from regurgitating material.**
Q (BY ATTORNEY HAILEY) How many third-party CLAUDE users have requested copies of existing song lyrics from CLAUDE? Do you know?
ATTORNEY GOOCH: Objection, scope.
**A What I'm mulling over is, like, could -- could I know the answer to that question?**

77

**A Can you repeat the question one more time?**
Q (BY ATTORNEY HAILEY) Sure.
**A Yeah.**
Q You don't know one way or the other whether CLAUDE has generated output containing song lyrics in response to third-party requests?
**A I know that we have found clusters of CLAUDE conversations that are rare that are people using CLAUDE to analyze song lyrics, interpret song lyrics, ask questions about song lyrics, write new song lyrics.**
**I know that I can't actually see the actual conversations because that's not the way Clio is designed. It's designed to look for patterns.**
**And I know that there are guardrails in place to prevent the regurgitation of copyrighted material, and I know that I -- me and my team have never studied the explicit issue of people using CLAUDE to regurgitate sort of copy written song lyrics.**
**I also know that, like, that's not a usage of CLAUDE that makes a lot of sense given that one can look up song lyrics by searching for them.**
Q (BY ATTORNEY HAILEY) And you have -- you have referenced the guardrails a number of times

78

now, but just to be clear, you don't know the efficacy of those guardrails in terms of preventing or allowing output of copyrighted content --
**A That's --**
Q -- correct?
**A -- that's what the safeguards team does. And you can talk to Vinay about understanding the efficacy of those guardrails.**
Q And we will. I just want to be sure, since you keep referencing them in your testimony today, that we're clear.
You don't actually know whether those guardrails are effective or not?
**A It's not part of my team's research. It's part of the guardrails -- guard -- safeguards team's scope.**
Q So just to be clear, you don't know whether those guardrails are effective or not, right?
ATTORNEY GOOCH: Objection, asked and answered.
**A I'll stick to my -- my previous answer.**
Q (BY ATTORNEY HAILEY) Well, I think this is a "Yes" or "No," so I'll --
**A Okay.**

79

Q -- just ask it one more time.
Do you know whether those guardrails are effective?
ATTORNEY GOOCH: Same objection.
**A I just know that there's a safeguards team that puts those guardrails into place. And I have never seen evidence of those guardrails being violated personally.**
**That's all I can -- know.**
Q (BY ATTORNEY HAILEY) You haven't seen evidence of them being effective or ineffective?
ATTORNEY GOOCH: Objection, asked and answered.
**A Yeah, I haven't seen evidence in any of my Clio-based experiments of a cluster that's labeled "Generating Copyright Information," which is the best I could do. Because, again, I can't actually see full prompts and completions.**
Q (BY ATTORNEY HAILEY) Do you know how many times CLAUDE has outputted copies of song lyrics in response to third-party requests?
ATTORNEY GOOCH: Objection, asked and answered.
**A I do not know the answer to that question.**
Q (BY ATTORNEY HAILEY) Mr. Ganguli, I'm

80

showing you what we have marked as Exhibit 3 to your deposition.
(Exhibit 3 was marked for identification and is attached to the transcript.)
Q (BY ATTORNEY HAILEY) This is a set of "CLAUDE Prompt and Output Records."
ATTORNEY GOOCH: And I'm going to go ahead and mark the entirety of this deposition as "Highly Confidential-Attorneys' Eyes Only."
Q (BY ATTORNEY HAILEY) And again, this is a set of CLAUDE prompt and output records produced by Anthropic as part of this litigation.
The first page bears the Bates Number Anthropic_318. And just so the record clear, we have -- this includes a number of different prompts and outputs.
ATTORNEY GOOCH: Counsel, you misread the number.
Q (BY ATTORNEY HAILEY) Anthropic_0000003118.
ATTORNEY GOOCH: Yeah, you said "318" before.
THE DEPONENT: Oh, and I'm sorry. May I use the restroom? The coffee is --
ATTORNEY GOOCH: Yeah, absolutely. Let's take a break.

165

I, DEEP GANGULI, Ph.D., do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this_______ day of_________________, 20____, at___________________, ___________________.
(City) (State)

______________________________
DEEP GANGULI, Ph.D., 30(b)(6)

166

I, MARY J. GOFF, CSR No. 13427, Certified Shorthand Reporter of the State of California, certify;

That the foregoing proceedings were taken before me at the time and place herein set forth, at which time the witness declared under penalty of perjury; that the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed under my direction and supervision; that the foregoing is a full, true, and correct transcript of my shorthand notes so taken and of the testimony so given;

That before completion of the deposition, review of the transcript ( ) was (XX) was not requested: ( ) that the witness has failed or refused to approve the transcript.

I further certify that I am not financially interested in the action, and I am not a relative or employee of any attorney of the parties, nor of any of the parties.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct, dated this 10th day of November, 2025.

Mary J. Goff
MARY J. GOFF

167

ERRATA SHEET
PLANET DEPOS
451 Hungerford Drive, Suite 400
Rockville, Maryland 20850
888-433-3767

CASE: Concord v. Anthropic

| PAGE | LINE | FROM | TO |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

______________________________
DEEP GANGULI, Ph.D., 30(b)(6)

Subscribed and sworn to before me this _____ day of_____________, 2025.

________________________________
Notary Public