# EXHIBIT 120

## (FILED UNDER SEAL)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

CONCORD MUSIC GROUP, INC., ET AL.,
Plaintiffs,
vs. Case No. 5:24-cv-03811 EKL-SVK
ANTHROPIC PBC,
Defendant.
----------------------------

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**
VIDEO DEPOSITION OF JARED KAPLAN, Ph.D.
San Francisco, California
Friday, November 21, 2025
Volume 1

STENOGRAPHICALLY REPORTED BY:
REBECCA L. ROMANO, RPR, CSR, CCR
California CSR No. 12546
Nevada CCR No. 827
Oregon CSR No. 20-0466
Washington CCR No. 3491
JOB NO. 609877
PAGES 1 - 365



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

CONCORD MUSIC GROUP, INC., ET AL.,
Plaintiffs,
vs. Case No. 5:24-cv-03811 EKL-SVK
ANTHROPIC PBC,
Defendant.
----------------------------

DEPOSITION OF JARED KAPLAN, Ph.D., taken on behalf of the Plaintiffs, at Wilmer Cutler Pickering Hale and Dorr LLP, 50 California Street, Suite 3600, San Francisco, California, commencing at 10:04 a.m., Friday, November 21, 2025 before REBECCA L. ROMANO, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Court Reporter.



APPEARANCES OF COUNSEL

For the Plaintiffs:
OPPENHEIM ZEBRAK LAW, LLP
BY: NICK HAILEY
Attorney at Law
4530 Wisconsin Avenue
5th Floor
Washington, D.C. 20016
(202) 480-2999
nick@oandzlaw.com
and
BY: BRET MATERA
Attorney at Law
461 5th Avenue
19th Floor
New York, New York 10017
(212) 951-1156
bmatera@oandzlaw.com

/////



APPEARANCES OF COUNSEL(cont'd)

For the Defendant:
WILMER CUTLER PICKERING HALE AND DORR LLP
BY: TAYLOR GOOCH
Attorney at Law
50 California Street
Suite 3600
San Francisco, California 94111
(628) 235-1006
taylor.gooch@wilmerhale.com
and
BY: ALYSSA MILSTEAD(via Web videoconference)
Attorney at Law
2600 El Camino Real
Suite 400
Palo Alto, California 94306
(650) 858-6000
alyssa.milstead@wilmerhale.com

/////

E X H I B I T S(cont'd)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 245 | (Yet Another) Timelines Summary, Anthropic_0000428963 - Anthropic_0000428972. | 325 |

/////



San Francisco, California;
Friday, November 21, 2025
10:04 a.m.
---o0o---

THE VIDEOGRAPHER: Here begins Media No. 1 in the videotaped deposition of Jared Kaplan, in the matter of the Concord Music Group versus Anthropic, in the United States District Court, Northern District of California, San Jose Division, Case No. 5:24-cv-03811-EKL-SVK.

Today's date is November 21st, 2025. The time on the video monitor is 10:04 a.m.

The videographer today is Gary Garcia, representing Planet Depos.

This video deposition is taking place at 50 California Street, San Francisco, California.

Would counsel please voice-identify themselves and state whom they represent, starting with the taking attorney.

MR. HAILEY: Nick Hailey with the law firm of Oppenheim & Zebrak LLP, on behalf of the plaintiff music publishers.

I'm joined by my colleague Bret Matera.

MR. GOOCH: Taylor Gooch with WilmerHale.



With me remotely is Alyssa Milstead; also remotely, Ivana Dukanovic from -- co-counsel at Latham & Watkins.

And with and for the client, or in-house with the client, is Mr. Ian Chen, as well as the witness.

THE VIDEOGRAPHER: The court reporter today is Rebecca Romano representing Planet Depos.

The witness will now be sworn.

THE COURT REPORTER: My name is Rebecca Romano. I am a California-licensed Stenographic Court Reporter, No. 12546. I will be producing a transcript that is automatically admissible in court.

If you could raise your right hand for me, please.

THE DEPONENT: (Complies.)

THE COURT REPORTER: You do solemnly state, under penalty of perjury, that the testimony you are about to give in this deposition shall be the truth, the whole truth and nothing but the truth?

THE DEPONENT: I do.

/////



JARED KAPLAN, Ph.D.
having been administered an oath, was examined and testified as follows:

EXAMINATION

BY MR. HAILEY:

Q. Good morning, Dr. Kaplan.

**A. Good morning.**

Q. We met just a few moments ago. Again, my name is Nick Hailey. I represent the plaintiff music publishers in their lawsuit against your company, Anthropic. I will be taking your deposition today.

Can we start with you stating your name and home address for the record, please.

**A. My name is Jared Daniel Kaplan. I live at [redacted]**

Q. Have you ever been deposed before, Dr. Kaplan?

**A. I have.**

Q. How many times have you been deposed before?

**A. I believe I've been deposed once before.**

Q. And was that your deposition in the Bartz v. Anthropic case?

**A. Yes.**

61

monthly basis based on sort of hours worked, as -- as consultants usually are.
Q. (By Mr. Hailey) Did you receive any equity in OpenAI as part of your work?
**A. I have never received any equity in OpenAI.**
Q. Dr. Kaplan, are you proud of the work that you did at OpenAI?
**A. I feel like, as a scientist, many of the findings we obtained on sort of the science of AI during that period were exciting. And I was -- I was proud to participate in some of that work.**
Q. Is there work that you were not proud to participate in?
MR. GOOCH: And I'm just going to caution -- actually, to the extent you want to answer that question yes or no, that's fine. But I'm going to caution you not to reveal any confidential information that is subject to your agreements with OpenAI.
THE DEPONENT: Can you restate the question.
Q. (By Mr. Hailey) Is there work that you were not proud to participate in at OpenAI?
MR. GOOCH: And just because I think this

62

is relevant to your confidentiality agreements, counsel is asking a yes-or-no question, and I'll caution you not to reveal information subject to your agreements with OpenAI.
THE DEPONENT: No.
Q. (By Mr. Hailey) Do you have any concerns about any of the work that you did at OpenAI?
MR. GOOCH: Same cautions.
THE DEPONENT: No.
Q. (By Mr. Hailey) You left OpenAI in December of 2020; is that correct?
**A. As it shows in LinkedIn, I ended my work as a research consultant at OpenAI in December of 2020.**
Q. And why did you end your work as a research consultant at OpenAI at that time?
MR. GOOCH: Same cautions.
THE DEPONENT: At that time, I decided with the other founders of Anthropic to found Anthropic in January of 2021.
Q. (By Mr. Hailey) Why did you want to leave OpenAI at that time?
MR. GOOCH: Same cautions.
THE DEPONENT: As I indicated before, I -- I wasn't a full-time employee at OpenAI.

63

So, I mean, I was a full-time employee at Johns Hopkins University.
Q. (By Mr. Hailey) Why did you want to end your research consultancy with OpenAI at that time?
MR. GOOCH: Same cautions.
THE DEPONENT: Because I thought that I couldn't continue that research consultancy while founding Anthropic.
Q. (By Mr. Hailey) Did you disagree with the direction of the -- of OpenAI in some way?
**A. I -- as I said, I was primarily working at Johns Hopkins University prior to founding Anthropic.**
Q. So my question was a different one.
My question was, did you disagree with the direction of OpenAI in some way?
MR. GOOCH: Same cautions.
THE DEPONENT: Are you asking why I founded Anthropic?
Q. (By Mr. Hailey) I'm asking you, did you disagree with the direction of OpenAI in December 2020 when you decided to end your research consultancy with the company?
MR. GOOCH: Same cautions.
THE DEPONENT: At the time, I was very

64

excited to pursue my own vision with my cofounders at Anthropic of how to build an organization focused on making AI safe and beneficial.
Q. (By Mr. Hailey) So, again, that -- that wasn't my question. And I'll remind you, we talked at the beginning of the deposition about listening carefully to the question I ask and answering only the question I asked.
Do you remember that, Dr. Kaplan?
**A. I recall.**
Q. So let me try one more time --
MR. GOOCH: And to be clear, you should answer questions in a way consistent with your oath.
Q. (By Mr. Hailey) And I agree 100 percent with your counsel on that.
You recall you're under oath, and that's an oath to testify truthfully and accurately, correct, Dr. Kaplan?
**A. I -- I think that isn't how the oath is stated, but -- but I think that's the gist of it.**
Q. Are you testifying truthfully and accurately today?
**A. I am.**
Q. So I'll -- I'll try one more time.

When you ended your research consultancy with OpenAI, did you disagree with the direction of the company in some way?
MR. GOOCH: Same caution.
THE DEPONENT: I -- I think, in general, the direction of the company is sort of a -- kind of an ambiguous -- there are many -- many directions, many -- many aspects of -- of the work.
When I ended my research consultancy, I was not a full-time employee. I wasn't very involved in day-to-day work at -- at OpenAI. And I was primarily motivated by wanting to work with my long-time friends and collaborators, who -- many of whom I've known for -- even at that time for more than a decade.
Q. (By Mr. Hailey) And we'll get to that, but I want to stay on OpenAI.
Did you have any concerns about OpenAI's approach to AI's safety and ethics?
MR. GOOCH: Objection. Form.
Also providing the witness the same cautions.
THE DEPONENT: At the time, I generally had -- was having a great time working with collaborators at OpenAI. And my main motivations



and a lot of what I knew about the -- the situation was based on the experiences of my cofounders, who were actually much more involved with OpenAI since it was their actual full-time job. And I wanted to continue working with them.
Q. (By Mr. Hailey) So is it your testimony under oath that you had no concerns about OpenAI's approach to AI safety and ethics?
MR. GOOCH: Asked and answered. Same cautions.
THE DEPONENT: I think that any person working at any organization is going to have some concerns about something or other that is happening at that organization.
Q. (By Mr. Hailey) And what concerns did you have about OpenAI?
MR. GOOCH: Same objections. Same cautions.
THE DEPONENT: I didn't have any serious firsthand concerns about OpenAI.
Q. (By Mr. Hailey) Okay. What about other concerns about OpenAI?
MR. GOOCH: Same objections. Same caution.
THE DEPONENT: As I said, I was only a



consultant at OpenAI. I was a research collaborator with other researchers there. So I wasn't particularly involved in the operations of the company.
I think some of my other cofounders were excited to form a new organization with their own vision that they thought would be more focused on our goals for what safe and beneficial AI development might look like.
Q. (By Mr. Hailey) So that was not my question, Dr. Kaplan.
My question was, you testified that you didn't have any serious firsthand concerns about OpenAI.
Do you recall giving that testimony?
MR. GOOCH: Objection. Form. Asked and answered. And same cautions.
THE DEPONENT: I do.
Q. (By Mr. Hailey) My question was, what about other concerns about OpenAI?
MR. GOOCH: Same objections. Same caution.
THE DEPONENT: As I indicated, I was not very involved. And I think some of my other cofounders may have had concerns and/or a desire to



form their own organization that allowed them to pursue our particular vision for safe and beneficial AI development.
But my concerns were largely based on the concerns of my cofounders.
Q. (By Mr. Hailey) Okay. So what concerns did your cofounders have about OpenAI at the time they left OpenAI?
MR. GOOCH: Same objections. Plus calls for speculation.
THE DEPONENT: I think that generally, there was a sense that we could form an organization that would focus more fully on safe and beneficial AI development.
Q. (By Mr. Hailey) So your cofounders had a concern that Anthropic was not focusing fully on safe and beneficial AI development?
**A. Are you asking about Anthropic?**
Q. Excuse me.
Your cofounders had a concerns that OpenAI was not focusing fully on safe and beneficial AI development; is that correct?
MR. GOOCH: Same objections.
THE DEPONENT: My cofounders believed it was possible to build an organization, namely

Anthropic, that would pursue a better, more focused, more effective vision for what safe and beneficial AI development might be like.
Q. (By Mr. Hailey) And by comparison, your cofounders felt that OpenAI was not focusing fully on safe and beneficial AI development; is that your testimony?
MR. GOOCH: Same objections. Misstates testimony. Calls for speculation.
THE DEPONENT: My cofounders believed that it was possible to pursue a better vision, in their view, by founding a new organization.
Q. (By Mr. Hailey) So, Dr. Kaplan, that's still not responsive to my question. I'm not asking about Anthropic. I'm asking about OpenAI.
So I can ask the question again.
You testified previously that your cofounders had concerns with OpenAI, correct?
**A. I testified previously that my cofounders felt that it would be possible to build a new organization, perhaps with some risk, that would pursue, in their view, a better vision for what safe and beneficial AI development would be like.**
Q. When you said that your cofounders may have had concerns about OpenAI, what concerns were



you referring to?
**A. I think I was referring to the concern that it was possible, in their view, to build an organization that did better with respect to developing safe and beneficial AI.**
Q. And which cofounders specifically are you referring to that held that view?
**A. I believe it was a general view.**
Q. Shared by all of your cofounders?
MR. GOOCH: Objection. Calls for speculation.
THE DEPONENT: I don't recall exactly who said or believed what, but I believe there were shared views.
Q. (By Mr. Hailey) Who do you recall that had these shared concerns about OpenAI?
**A. I believe most of the cofounders shared some desire to build a new organization that would pursue a better vision for safe and beneficial AI.**
Q. And, again, I'm not asking about Anthropic yet. I'm asking about your cofounders' concerns about OpenAI.
Which specific cofounders do you recall shared these concerns about OpenAI?
**A. As I have indicated, I believe the**



**cofounders had a vision for what could be better. I don't know whether that counts as -- as -- as a concern for -- for -- for OpenAI. But I think there was a general sense that it was possible to do better at that time.**
Q. And your cofounders include Dario and Daniela Amodei, correct?
**A. My cofounders include Chris Olah, Jack Clark, Sam McCandlish, Tom Brown, Dario Amodei and Daniela.**
Q. And was there anyone among the list of cofounders you just shared that did not share these concerns about OpenAI and a desire to do something different at Anthropic?
MR. GOOCH: Asked and answered. Vague.
THE DEPONENT: Not that I recall.
Q. (By Mr. Hailey) So, Dr. Kaplan, I understand that over the course of your career, you've authored several academic papers and articles and book-length notes; is that correct?
**A. That is correct.**
Q. And you've -- you already referenced some of those articles today, some of the publications that you were an author from your work at OpenAI; is that correct?



**A. I have referenced papers that I wrote in collaboration with researchers at OpenAI.**
Q. And when you author or coauthor an article, Dr. Kaplan, you list your name on that work; is that correct?
**A. That -- that is generally correct.**
Q. And why do you include your name on the works that you author?
**A. In academia, it's standard practice to include one's name in papers that one authors. Sometimes, if one's contributions are quite minor, one only includes one's names in the acknowledgment section.**
Q. And authorship's very important in academia because things like authorship and publications, that's considered for tenure and other sorts -- other sorts of things, correct?
MR. GOOCH: Vague. Speculation.
THE DEPONENT: Are you asking how academic hiring works?
Q. (By Mr. Hailey) Well, let me just simplify my question.
Authorship of academic articles is important in academia; would you agree to that?
MR. GOOCH: Form.

THE DEPONENT: I believe it's fair to say that in the -- in 2021, especially early 2021, the founding team had worked together closely in the past. There was a very high level of trust. And generally, I think there was a lack of interest in imposing some sort of highly formal hierarchical structure on operations.

Q. (By Mr. Hailey) Whose idea was it to found Anthropic?

**A. I don't know.**

Q. You don't know among your cofounders whose idea it was to found Anthropic?

MR. GOOCH: Asked and answered.

THE DEPONENT: I don't know.

I believe that the founding of it seemed relatively organic, thus I don't know that it can be clearly ascribed to a specific person.

Q. (By Mr. Hailey) Why did you found Anthropic, Dr. Kaplan?

**A. We founded Anthropic because we wanted to pursue a vision of a -- as an organization that could sort of effectively make AI development as safe and beneficial as possible.**

Q. Anthropic is a for-profit company, correct?



**A. Anthropic --**

MR. GOOCH: Objection. Calls for a legal conclusion.

You can answer to the extent you know.

THE DEPONENT: Anthropic is a public benefit corporation.

Q. (By Mr. Hailey) And as a public benefit corporation, Anthropic is a for-profit company; is that correct?

MR. GOOCH: Same objection.

THE DEPONENT: Anthropic is a public benefit corporation.

Q. (By Mr. Hailey) What is a public benefit corporation, Dr. Kaplan?

MR. GOOCH: Calls for a legal conclusion.

And I'll caution you not to reveal things that you learned from counsel, as those are privileged.

THE DEPONENT: My general understanding is that a public benefit corporation is a corporation that can have a mission as its highest principle, and that it can legally, operationally, as -- as an entity hold its mission as its highest goal above profit motives.

Q. (By Mr. Hailey) Anthropic is not a



nonprofit, correct?

**A. Anthropic is not a nonprofit organization.**

Q. As a public benefit corporation, Anthropic can earn profits, right?

MR. GOOCH: Same objection. And same privilege caution.

THE DEPONENT: My general understanding is that as a public benefit corporation, Anthropic can earn money.

Q. (By Mr. Hailey) What is the mission of Anthropic that you just referred to?

**A. I think I said that we founded Anthropic because we had a vision to collaborate, work together, create an organization that would effectively work towards the goal, all things considered, of making AI development as safe and beneficial as possible.**

Q. So you testified that public benefit corporations can have a mission as their highest goal.

Does Anthropic have a formal mission as its highest goal as a public benefit corporation?

MR. GOOCH: Asked and answered. Calls for speculation.



THE DEPONENT: I don't recall.

Q. (By Mr. Hailey) You're the chief science officer and a founding member of Anthropic, and you don't know whether Anthropic has a mission as a public benefit corporation?

Is that your testimony?

MR. GOOCH: Asked and answered. Misstates prior testimony.

THE DEPONENT: I don't recall the legal details of how that is organized or set up.

Q. (By Mr. Hailey) Anthropic earns profits, correct?

**A. No.**

Q. Anthropic earns revenues, correct?

**A. It is the case that since sometime in 2023, Anthropic has earned revenue.**

Q. Is it your testimony that Anthropic is not currently profitable?

MR. GOOCH: Speculation.

THE DEPONENT: My understanding, without having the details financially at my command, is that Anthropic is not currently profitable.

Q. (By Mr. Hailey) Anthropic's goal is to become profitable, correct?

MR. GOOCH: Speculation.

MR. GOOCH: Objection. Misstates prior testimony.
THE DEPONENT: I don't have any understanding or evaluation other than the price that investors were willing to pay for Anthropic equity in our last fundraising round.
Q. (By Mr. Hailey) Which was at a valuation of $183 billion?
MR. GOOCH: Asked and answered. Form.
THE DEPONENT: I think I answered that.
Q. (By Mr. Hailey) And what was your answer?
MR. GOOCH: Asked and answered. Form.
THE DEPONENT: The last time that Anthropic had a investment round, investors were willing and happy to participate at a stock price such that that was the valuation when multiplying the stock price by the number of stocks.
Q. (By Mr. Hailey) And Anthropic has raised many billions of dollars from investors; is that correct?
MR. GOOCH: Vague. And form.
THE DEPONENT: It is correct that accumulated over the lifetime of Anthropic, Anthropic has raised billions of dollars from



investors.
Q. (By Mr. Hailey) Tens of billions of dollars, correct?
**A. I don't recall.**
Q. You and your Anthropic cofounders started discussing commercialization as early as 2021; is that correct?
MR. GOOCH: Speculation.
THE DEPONENT: When we formed Anthropic, we very seriously considered making Anthropic a nonprofit organization. And several of the cofounders advocated strongly that we should become a nonprofit organization in our pursuit of safe and beneficial AI.
However, in those discussions, we also speculated upon what kinds of resources might be necessary in order to have the positive impact that we hoped to have. And many considerations were at play, but one of them was that it wouldn't be possible to have the positive impact we hoped to have without some type of customer base or commercial activity.
At the time, the most popular reason for -- well, I think there were many different views, but one of the popular reasons advocating



for not being a nonprofit was to have customers so that the benefits of AI could be disseminated, and so that we could get information from users about how AI was being used in order to understand how AI was useful and improve it.
I mean, at that time, I would recall that this was several years before ChatGPT or -- or any now-familiar AI system. There was a great deal uncertainty about what form AI would take.
So it's the case that we considered the possibility of commercialization at that time. But the overall view of the founders in 2021, I would say, was strongly against commercialization, and towards the idea that we would effectively never pursue it, and that we might be funded primarily by philanthropists in perpetuity.
Q. (By Mr. Hailey) So Anthropic was not founded as a nonprofit, correct?
MR. GOOCH: Asked and answered.
THE DEPONENT: I already answered that question.
Q. (By Mr. Hailey) Anthropic was not found as a nonprofit, correct?
MR. GOOCH: Asked and answered.
THE DEPONENT: I answered that question.



Q. (By Mr. Hailey) What's the answer?
MR. GOOCH: Asked and answered.
THE DEPONENT: Anthropic was founded as a public benefit corporation.
Q. (By Mr. Hailey) You and your Anthropic founders started discussing commercialization as early as 2021, correct?
MR. GOOCH: Misstates testimony.
THE DEPONENT: When we were founding Anthropic and considering the possibilities, we very seriously considered founding Anthropic as a nonprofit. And several of the founders had a strong preference initially for creating a nonprofit organization at the time.
When we were engaged in these discussions, there were many different discussions of possible situations.
The principal consideration at the time, I believe kind of the overarching consideration, was a question of how much resources would be required to have the positive impact on AI safety and beneficial deployment of AI as we hoped to have.
And some argued that the total amount of resources we would need would be small enough that

149

Q. And you can see on the last page of the declaration that you -- that that's your signature, correct?
**A. Yes.**
Q. And it's dated August 22nd, 2024, correct?
**A. Yes.**
Q. And the statements you made in this declaration were truthful and accurate, correct?
**A. They were truthful and accurate to the best of my knowledge on August 2024.**
Q. Would you turn to page -- to paragraph 35 for me, please.
**A. Uh-huh.**
Q. Do you see where you say that "song lyrics may be useful to include in the training corpus because they add to the diversity of training data"?
**A. I see that written.**
Q. And that's a true statement, correct?
**A. It is written here that song lyrics may be useful to include in the training corpus, not that they are useful. And it's indicated that they're most likely useful because it's just useful to have diverse training data.**

150

**My expectation would be that song lyrics are not particularly useful, and, for example, that just to gain cultural and another knowledge, music criticism, music reviews, might be as or more useful than training data for the purposes in which Claude's used.**
**But, yes, it is written here that song lyrics may be useful to include in the training corpus.**
Q. So -- so just -- just to repeat my question again, because I'm -- my question was specifically, is it true or not true that "song lyrics may be useful to include in the training corpus because they add to the diversity of training data"?
Is that a true statement or is that not a true statement?
MR. GOOCH: Form. And asked and answered.
THE DEPONENT: I already answered the question.
Q. (By Mr. Hailey) Is that a true statement or is that not a true statement, Dr. Kaplan?
MR. GOOCH: Same objection.
THE DEPONENT: As it's written here, I

151

agree that song lyrics may be useful to include in the training corpus as one tiny, tiny component of training data for the purpose of diversity, cultural knowledge, and other things written here.
Like, "song lyrics deploy human language differently than news articles, which deploy human language differently than novels, which deploy human language differently than speeches, and so on. Song lyrics often incorporate use of figurative language, such as metaphor, simile, or personification, that a model needs to understand" --
THE COURT REPORTER: Hold on.
MR. GOOCH: Slow down a second.
THE DEPONENT: -- "that a model needs to understand in order to interpret the full range of human input. It is important for a general purpose AI tool like Claude to have exposure to the full range of types of human expression so that it can assist users in a wide variety of tasks the same way that a human would be able to."
So as one component, song lyrics may be useful. I would guess that they're comparable or less useful than, say, music reviews.
And I think that's that.

152

Q. (By Mr. Hailey) But you didn't write that in this declaration that you would guess that they are comparable or less useful than music reviews, correct?
MR. GOOCH: Form.
THE DEPONENT: Well, I wrote in the declaration that "this is yet another reason to have a diverse and voluminous corpus - having a high volume of diverse training data decreases the likelihood the model will inadvertently memorize certain content, and the more distinct works are included in the training set, the less insight each individual work provides as a proportion of the entire corpus."
So I think what I said there is that each individual work is really of vanishing importance, diversity is important, and song lyrics are simply an example that may be useful and that one can discuss, among millions of other possibilities.
Q. (By Mr. Hailey) When you say "cultural knowledge," cultural knowledge includes music, right?
**A. As I mentioned --**
MR. GOOCH: Form.
THE DEPONENT: As I mentioned, I think

DEPOSITION ERRATA SHEET

Page _____ Line _____ Reason _____________________
From _______________ to _________________________
Page _____ Line _____ Reason _____________________
From _______________ to _________________________
Page _____ Line _____ Reason _____________________
From _______________ to _________________________
Page _____ Line _____ Reason _____________________
From _______________ to _________________________
Page _____ Line _____ Reason _____________________
From _______________ to _________________________
Page _____ Line _____ Reason _____________________
From _______________ to _________________________
Page _____ Line _____ Reason _____________________
From _______________ to _________________________
Page _____ Line _____ Reason _____________________
From _______________ to _________________________
Page _____ Line _____ Reason _____________________
From _______________ to _________________________
Page _____ Line _____ Reason _____________________
From _______________ to _________________________

______ Subject to the above changes, I certify that the transcript is true and correct

______ No changes have been made. I certify that the transcript is true and correct.

______________________
JARED KAPLAN, Ph.D.