# EXHIBIT 125

## (FILED UNDER SEAL)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

- - - - - - - - - - - - - - x
CONCORD MUSIC GROUP, INC., et al., : Civil Action No. 5:24-cv-03811-EKL-SVK
Plaintiffs, :
v. :
ANTHROPIC PBC, :
Defendant. :
- - - - - - - - - - - - - - x

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

VIDEOCONFERENCED (HYBRID) AND VIDEO-RECORDED
DEPOSITION OF BENJAMIN MANN
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(b)(1)
San Francisco, California
Friday, November 21, 2025
12:07 p.m. Pacific Standard Time

VOLUME II

Job No. 609873
Pages: 146 - 226
Reported By: April L. Crites, RMR, CRR, CSR, CCR
California Certified Shorthand Reporter



DEPOSITION OF BENJAMIN MANN
HELD AT THE OFFICES OF:

WILMER CUTLER PICKERING HALE and DORR, LLP
50 California Street
Suite 3600
San Francisco, California 94111
(628) 235-1000

* * *

Pursuant to notice, and pursuant to the
Federal Rules of Civil Procedure,
before April L. Crites, RMR, CRR, CSR, CCR,
and California Certified Shorthand Reporter
No. 14493.

* * *



I N D E X

EXAMINATIONS CONDUCTED PAGE
BENJAMIN MANN
Cross-Examination by Mr. Miller............. 153

* * *

EXHIBITS

| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 210 | March 13, 2024, e-mail from Ben Mann to [redacted], Subject: [Auto summary] Ben/Nicholas (2024-03-12 14:03 GMT-7)-Transcript, Bates stamped Anthropic_0000218323 | 156 |
| Exhibit 211 | March 13, 2024, e-mail from Ben Mann, Subject: [Auto-summary] Data bottleneck (2024-03-12 15:34 GMT-7)-Transcript, Bates stamped Anthropic_0000012615 | 165 |
| Exhibit 212 | Jack Clark on X post: Technological Optimism and Appropriate Fear, Children in the Dark | 173 |
| Exhibit 213 | Time Magazine article: Pausing AI Developments Isn't Enough. We need to shut it all down | 178 |



| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 214 | Prompt, Bates stamped Anthropic_0000431956 | 214 |
| Exhibit 215 | Prompt: Stevie Wonder lyrics, Bates stamped Anthropic_0000524147 | 216 |

* * *

150

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS, THE MUSIC PUBLISHERS:
Corey Miller, Esq.
Michelle Gomez-Reichman, Esq.
OPPENHEIM + ZEBRAK LLP
4530 Wisconsin Avenue NW
Fifth Floor
Washington, D.C. 20016
202-596-5043
corey@oandzlaw.com
mgomez-reichman@oandzlaw.com

ON BEHALF OF THE DEFENDANT, ANTHROPIC, PBC:
Sonal N. Mehta, Esq.
WILMER CUTLER PICKERING HALE & DORR, LLP
2600 El Camino Real
Suite 400
Palo Alto, California 94306
650-858-6000
sonal.mehta@wilmerhale.com
- AND -

151

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF ANTHROPIC, PBC (CONTINUED):
JARED V. GRUBOW, ESQ. (VIA ZOOM)
WILMER CUTLER PICKERING HALEK& DORR, LLP
7 WORLD TRADE CENTER
250 GREENWICH STREET
NEW YORK, NEW YORK 10007
212-295-6474
JARED.GRUBOW@WILMERHALE.COM
- AND -
Sara E. Sampoli, Esq.
LATHAM & WATKINS LLP
555 Eleventh Street NW
Suite 1000
Washington, D.C. 20004
202-637-2200
saa.sampoli@lw.com

ALSO PRESENT:
Natalie Naugle, Esq.
Anthropic PBC
Addison McNaughten, Videographer
Planet Depos

* * *

152

THE VIDEOGRAPHER: Here begins media number 1 in the videotaped deposition of Benjamin Mann in the matter Concord Music Group, Inc., et al., versus Anthropic PBC in the United States District Court, Northern District of California, San Jose Division. The case number is 5:24-cv-03811-EKL-SVK.

Today's date is November 21, 2025, and the time on the video monitor is 12:07 p.m.

The videographer today is Addison McNaughten, representing Planet Depos.

And this video deposition is taking place at 50 California Street, Suite 3600, San Francisco, California, 94111.

Would counsel please voice-identify themselves and state whom they represent?

MR. MILLER: Corey Miller from Oppenheim + Zebrak, LLP, on behalf of the plaintiff, music publishers. Also present with me today is Michelle Gomez-Reichman from Oppenheim + Zebrak.

MS. MEHTA: Good afternoon. Sonal Mehta from WilmerHale on behalf of Anthropic and the witness.

With me on the Zoom is my colleague Jared Grubow. We also have on the Zoom Sara Sampoli

153

from Latham & Watkins.

And then in the room with us is Natalie Naugle, who is in-house counsel at Anthropic.

THE VIDEOGRAPHER: The court reporter today is April Crites, representing Planet Depos.

The witness will now be sworn.

BENJAMIN MANN

of lawful age, Witness herein, having been first duly cautioned and sworn, as hereinafter certified, was examined and said as follows:

CROSS-EXAMINATION

BY MR. MILLER:

Q Good afternoon, Mr. Mann.

**A Hello.**

Q Do you understand that you just took an oath to tell the truth, the whole truth, and nothing but the truth?

**A Yes, I do.**

Q And that's the same oath you would take if you were -- if we were in a courtroom in front of a judge and jury, correct?

**A I understand that, yes.**

Q Is there any reason why you cannot testify in accordance with that oath today?

**A There is no such reason.**

186

**don't have to think much about because, again, it's not decision-relevant.**

**And then the third possible world, in which we're somewhere in between, where our actions do matter and are decision-relevant, is the world that we are most focused on.**

**I guess for the pessimistic world, we do have an option to try to convince policymakers and the rest of humanity and society that we are in the pessimistic world and that development of AI should be stopped. However, we don't have evidence to that effect yet. But if we did, we would shift our agenda to generating evidence that we're in that world.**

**So to come back to the middle world, our hypothesis is that by working on the most frontier models in existence today, we can generate new safety techniques and improve the ones that we already have, such as mechanistic interpretability, Constitutional AI, character training, et cetera, to improve our chances of making sure that the transition from today's society to one in which superintelligent AI exists is safe and beneficial for humanity.**

**So to answer your question directly, do we**

187

**think that our current safety techniques will transfer to artificial superintelligence? We hope so.**

**We have found that, to date, our safety techniques appear to be somewhat transferrable from weaker to stronger models, so at least the trends are promising. But this is something that nobody in the world knows, and that we are trying to push the boundaries on the technology to ensure that we do the best work possible.**

Q If Anthropic discovers that we're in what you described as the pessimistic world, would it shut down its models?

MS. MEHTA: Objection to the form.

THE WITNESS: So we have a document that we published called the Responsible Scaling Policy, and that document covers very specifically what kinds of things we would -- we have pre-committed to in terms of dangerous model capabilities and our ability to verify that we could deploy a model capable of dangerous things in a safe manner.

And that document includes clauses about stopping commercialization, or even emergency removing already commercialized models due to what

188

we call a safety emergency from production.

So, yes, we've publicly committed to potentially shutting down our models in the future for the right reasons.

BY MR. MILLER:

Q Anthropic isn't the only company currently attempting to develop a general superintelligent AI system, right?

**A That's correct.**

Q Do you think there is a risk of an -- of an existential-level event from a superintelligent AI model developed by somebody other than at Anthropic?

MS. MEHTA: Objection to the form.

THE WITNESS: So one of Anthropic's principles is what we call the race to the top. And our hope is that by showing that we, as one of the frontier labs, can prioritize both safety and capabilities at the same time, that we can put pressure on our competitors to also prioritize safety.

And an example of this working in practice is when we published our Responsible Scaling Policy, which described the kinds of testing that we do before we release a model and conditions

189

under which we would either delay a release or shut down an existing model.

We worked with the other labs to develop similar policies, and now most of the other leading labs have such policies. So I'm fairly proud of that effect happening.

Of course, there are plenty of labs that we aren't able to work with for whatever reason or aren't interested in working with us, and those labs could be barrelling ahead at -- without any regard to safety.

We try our best to influence those labs. We try to work with policymakers and regulators to put pressure on other labs to prioritize safety and transparency, but ultimately, we only have direct control over our own actions.

BY MR. MILLER:

Q Does Anthropic consider the safety techniques that it's developing and using to be proprietary trade secrets?

**A So, in general, Anthropic has a policy that when our research goes only to model capabilities, then we will not publish it. But when it bears on safety, we do publish it, even when it makes us look bad.**

198

When it comes to the amount of the data that's coming in, in the case of books in our training process, we have a chopping process. That means the model will often not see a book in its original format but instead will be cut up into little pieces. For things like song lyrics, the same thing could happen, where a song gets chopped into pieces and the model never sees the whole thing, if it were present in training data at all.

Oh, I guess for purpose, I would also say transformativity. Language models, we have a lot of research that pushes the models to generalize from works -- that's the thing we really care about -- and away from memorization. We've published some of this work, and we go to great lengths to avoid memorization and favor generalization.

Jumping back to nature, as we prioritize getting various kinds of datasets -- you probably have seen from the evidence and exhibits that we've produced for this case that we heavily prioritize things that are factual. And, in particular, STEM is a big focus for us to try to achieve Dario's vision of machines of loving

199

grace, of improving health outcomes, education, emotional well-being, et cetera, for humanity.

And then, finally, on the effect on society, we've discussed at length our Societal Impacts team's work where we're doing our best to quantify the effects of our models on society.

In the case of music lyrics, the evidence that we have shows that it is a vanishingly small fraction of how our models are used today and the value that people get out of them. So it would be extremely surprising to me, although we don't have hard evidence, if there was a significant impact on, for example, the music industry because we used our -- because we used lyrics in our model training.

BY MR. MILLER:

Q All right. I want to ask you a little bit about what you said about the first factor.

And -- and you focused on that you expect the model outputs to -- to not be regurgitations of the underlying content.

Am I understanding you correctly that because the model is designed to output new content, you think that makes it fair use to use existing content in the training of the model?

200

MS. MEHTA: Objection to the form. Hold on one second. Objection to the form. Legal conclusion. And it misstates the testimony.

You can answer, but, again, same caution. Only answer as to your personal understanding, independent of advice of counsel.

THE WITNESS: I'll reiterate that I'm not a lawyer, and I'm not a copyright expert. And despite my interest in the subject, for what actually constitutes fair use, I would defer to people who spend their whole careers researching this topic.

So as far as our models' outputs, we have a multilayered system that I believe both I and Vinay Rao have spoken at length about how we attempt to prevent the regurgitation of our outputs from our training corpus, and elsewhere as well, of content that we believe the model shouldn't be -- shouldn't be outputting.

Of course, this is a constantly evolving cat-and-mouse game. We have baked training directly into our model to try to better solve this problem, and we believe we have one of the best systems at preventing unwanted regurgitation in the industry. But we're always looking to

201

improve it. And we take feedback from both our users and content owners in that process.

I'm not sure if that completely answers your question.

BY MR. MILLER:

Q It doesn't, so I will try to clarify it and ask it again.

So what we've been discussing is your views on the using of -- on the use of copyrighted data for training a model. And in that context, you've pointed to the fact, or what you claim is the fact, that the model -- that Anthropic's models are not intended to regurgitate copyrighted content.

And my question is, in terms of the fair -- of fair use for training, do you think whether something -- whether use of content for training is fair use depends on what the outputs of the model are?

MS. MEHTA: Objection. Misstates the prior testimony. Asked and answered. Calls for a legal conclusion.

And I give you the same caution: You can answer as to your personal understanding, independent of advice of counsel.

CERTIFICATE OF REPORTER

I, April L. Crites, RPR, RMR, CRR, CSR, the officer before whom the foregoing deposition testimony was taken, do hereby certify:

That before being examined, BENJAMIN MANN was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That the foregoing transcript is a true and correct record of the testimony given;

That said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction;

That reading and signing was requested;

And that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its final disposition.

IN WITNESS WHEREOF, I have here unto subscribed my name this 25th of November, 2025.

My commission expires May 31, 2026:

April L. Crites
_______________________________
April L. Crites, RPR, RMR, CRR, CSR
CA Certified Shorthand Reporter No. 14493