# EXHIBIT 160

## (FILED UNDER SEAL)

1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

CONCORD MUSIC GROUP, INC., ET AL.,
Plaintiffs,
vs. Case No. 5:24-cv-03811 EKL-SVK
ANTHROPIC PBC,
Defendant.
----------------------------

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**
VIDEO DEPOSITION OF JARED KAPLAN, Ph.D.
San Francisco, California
Friday, November 21, 2025
Volume 1

STENOGRAPHICALLY REPORTED BY:
REBECCA L. ROMANO, RPR, CSR, CCR
California CSR No. 12546
Nevada CCR No. 827
Oregon CSR No. 20-0466
Washington CCR No. 3491
JOB NO. 609877
PAGES 1 - 365

2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

CONCORD MUSIC GROUP, INC., ET AL.,
Plaintiffs,
vs. Case No. 5:24-cv-03811 EKL-SVK
ANTHROPIC PBC,
Defendant.
----------------------------

DEPOSITION OF JARED KAPLAN, Ph.D., taken on behalf of the Plaintiffs, at Wilmer Cutler Pickering Hale and Dorr LLP, 50 California Street, Suite 3600, San Francisco, California, commencing at 10:04 a.m., Friday, November 21, 2025 before REBECCA L. ROMANO, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Court Reporter.

3

APPEARANCES OF COUNSEL

For the Plaintiffs:
OPPENHEIM ZEBRAK LAW, LLP
BY: NICK HAILEY
Attorney at Law
4530 Wisconsin Avenue
5th Floor
Washington, D.C. 20016
(202) 480-2999
nick@oandzlaw.com
and
BY: BRET MATERA
Attorney at Law
461 5th Avenue
19th Floor
New York, New York 10017
(212) 951-1156
bmatera@oandzlaw.com

/////

4

APPEARANCES OF COUNSEL(cont'd)

For the Defendant:
WILMER CUTLER PICKERING HALE AND DORR LLP
BY: TAYLOR GOOCH
Attorney at Law
50 California Street
Suite 3600
San Francisco, California 94111
(628) 235-1006
taylor.gooch@wilmerhale.com
and
BY: ALYSSA MILSTEAD(via Web videoconference)
Attorney at Law
2600 El Camino Real
Suite 400
Palo Alto, California 94306
(650) 858-6000
alyssa.milstead@wilmerhale.com

/////

E X H I B I T S(cont'd)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 245 | (Yet Another) Timelines Summary, Anthropic_0000428963 - Anthropic_0000428972. | 325 |

/////



San Francisco, California;
Friday, November 21, 2025
10:04 a.m.
---o0o---

THE VIDEOGRAPHER: Here begins Media No. 1 in the videotaped deposition of Jared Kaplan, in the matter of the Concord Music Group versus Anthropic, in the United States District Court, Northern District of California, San Jose Division, Case No. 5:24-cv-03811-EKL-SVK.
Today's date is November 21st, 2025. The time on the video monitor is 10:04 a.m.
The videographer today is Gary Garcia, representing Planet Depos.
This video deposition is taking place at 50 California Street, San Francisco, California.
Would counsel please voice-identify themselves and state whom they represent, starting with the taking attorney.
MR. HAILEY: Nick Hailey with the law firm of Oppenheim & Zebrak LLP, on behalf of the plaintiff music publishers.
I'm joined by my colleague Bret Matera.
MR. GOOCH: Taylor Gooch with WilmerHale.



With me remotely is Alyssa Milstead; also remotely, Ivana Dukanovic from -- co-counsel at Latham & Watkins.
And with and for the client, or in-house with the client, is Mr. Ian Chen, as well as the witness.
THE VIDEOGRAPHER: The court reporter today is Rebecca Romano representing Planet Depos.
The witness will now be sworn.
THE COURT REPORTER: My name is Rebecca Romano. I am a California-licensed Stenographic Court Reporter, No. 12546. I will be producing a transcript that is automatically admissible in court.
If you could raise your right hand for me, please.
THE DEPONENT: (Complies.)
THE COURT REPORTER: You do solemnly state, under penalty of perjury, that the testimony you are about to give in this deposition shall be the truth, the whole truth and nothing but the truth?
THE DEPONENT: I do.

/////



JARED KAPLAN, Ph.D.
having been administered an oath, was examined and testified as follows:
EXAMINATION
BY MR. HAILEY:
Q. Good morning, Dr. Kaplan.
**A. Good morning.**
Q. We met just a few moments ago. Again, my name is Nick Hailey. I represent the plaintiff music publishers in their lawsuit against your company, Anthropic. I will be taking your deposition today.
Can we start with you stating your name and home address for the record, please.
**A. My name is Jared Daniel Kaplan. I live at [redacted]**
Q. Have you ever been deposed before, Dr. Kaplan?
**A. I have.**
Q. How many times have you been deposed before?
**A. I believe I've been deposed once before.**
Q. And was that your deposition in the Bartz v. Anthropic case?
**A. Yes.**

THE DEPONENT: I don't know.
Q. (By Mr. Hailey) You don't know whether Anthropic's goal is to become profitable or not?
MR. GOOCH: Asked and answered.
THE DEPONENT: I don't know.
Q. (By Mr. Hailey) What are Anthropic's current annual revenues, Dr. Kaplan?
MR. GOOCH: Calls for speculation. And form.
THE DEPONENT: I believe these financial details are quite confidential. But beyond that, I don't recall Anthropic's exact revenue.
Q. (By Mr. Hailey) So are you not answering because you're telling me that the information is confidential or because you don't recall?
MR. GOOCH: And to be clear, Dr. Kaplan, to the extent you know the exact financials, you're free to testify. We're not claiming confidentiality that would prevent you from answering, as there's a protective order in this case.
THE DEPONENT: I believe that journalists have public- -- have publicly reported that Anthropic's annualized revenue rate exceeds $7 billion per year as of some recent date. But I



don't know any more than that offhand.
Q. (By Mr. Hailey) Was that reporting correct?
**A. I don't know.**
Q. You're the chief science officer at Anthropic, and you don't know the answer to that question?
MR. GOOCH: Objection. Form. And asked and answered a couple times.
THE DEPONENT: I'm not sure.
Q. (By Mr. Hailey) So you just -- you just referred to reporting in the news media regarding Anthropic's annualized revenue rate. Anthropic told Reuters last month that its annual revenue run rate was approaching $7 billion in October of 2025.
Is that true or false?
MR. GOOCH: Objection. Form. Calls for speculation. And asked and answered.
THE DEPONENT: I'm not sure, but it sounds like if Anthropic officially commented on that that it's most likely true.
Q. (By Mr. Hailey) I'm asking you, is that a true statement that Anthropic's annual revenue run rate was approaching $7 billion in October 2025?



MR. GOOCH: Same objections. Including asked and answered.
THE DEPONENT: My sense is that something like that is probably roughly true.
Q. (By Mr. Hailey) Is it true that Anthropic is projecting $9 billion in annualized revenue by the end of 2025?
MR. GOOCH: Objection. Calls for speculation. And vague.
THE DEPONENT: Can you define what it would mean for Anthropic to be projecting.
Q. (By Mr. Hailey) Do you not understand?
**A. Anthropic isn't a person. I'm not sure what -- what exactly you're asking.**
Q. Is it true that the company, Anthropic, is projecting $9 billion in annualized revenue by the end of 2025, yes or no?
MR. GOOCH: Same objections.
THE DEPONENT: I -- I don't know.
I don't -- I don't think so.
Q. (By Mr. Hailey) Do you know whether Anthropic is projecting $26 billion in annualized revenue by the end of 2026?
MR. GOOCH: Calls for speculation. And form.



THE DEPONENT: I'm not sure.
Q. (By Mr. Hailey) Do those figures sound right to you?
MR. GOOCH: Asked and answered. Speculation. Form.
THE DEPONENT: They don't really sound right to me.
Q. (By Mr. Hailey) Do they sound too high or too low?
**A. I don't know.**
Q. Anthropic is currently valued at $183 billion, correct?
MR. GOOCH: Speculation.
THE DEPONENT: I believe it's the case that the last time that Anthropic raised money, investors were happy to buy equity in Anthropic at a share price that puts the valuation of Anthropic at that figure.
Q. (By Mr. Hailey) Dr. Kaplan, what's your understanding of the most recent valuation for Anthropic?
**A. I don't have any other understanding of it.**
Q. Other than the $183 billion figure that I just referenced, correct?

113

MR. GOOCH: Objection. Misstates prior testimony.
THE DEPONENT: I don't have any understanding or evaluation other than the price that investors were willing to pay for Anthropic equity in our last fundraising round.
Q. (By Mr. Hailey) Which was at a valuation of $183 billion?
MR. GOOCH: Asked and answered. Form.
THE DEPONENT: I think I answered that.
Q. (By Mr. Hailey) And what was your answer?
MR. GOOCH: Asked and answered. Form.
THE DEPONENT: The last time that Anthropic had a investment round, investors were willing and happy to participate at a stock price such that that was the valuation when multiplying the stock price by the number of stocks.
Q. (By Mr. Hailey) And Anthropic has raised many billions of dollars from investors; is that correct?
MR. GOOCH: Vague. And form.
THE DEPONENT: It is correct that accumulated over the lifetime of Anthropic, Anthropic has raised billions of dollars from

114

investors.
Q. (By Mr. Hailey) Tens of billions of dollars, correct?
**A. I don't recall.**
Q. You and your Anthropic cofounders started discussing commercialization as early as 2021; is that correct?
MR. GOOCH: Speculation.
THE DEPONENT: When we formed Anthropic, we very seriously considered making Anthropic a nonprofit organization. And several of the cofounders advocated strongly that we should become a nonprofit organization in our pursuit of safe and beneficial AI.
However, in those discussions, we also speculated upon what kinds of resources might be necessary in order to have the positive impact that we hoped to have. And many considerations were at play, but one of them was that it wouldn't be possible to have the positive impact we hoped to have without some type of customer base or commercial activity.
At the time, the most popular reason for -- well, I think there were many different views, but one of the popular reasons advocating

115

for not being a nonprofit was to have customers so that the benefits of AI could be disseminated, and so that we could get information from users about how AI was being used in order to understand how AI was useful and improve it.
I mean, at that time, I would recall that this was several years before ChatGPT or -- or any now-familiar AI system. There was a great deal uncertainty about what form AI would take.
So it's the case that we considered the possibility of commercialization at that time. But the overall view of the founders in 2021, I would say, was strongly against commercialization, and towards the idea that we would effectively never pursue it, and that we might be funded primarily by philanthropists in perpetuity.
Q. (By Mr. Hailey) So Anthropic was not founded as a nonprofit, correct?
MR. GOOCH: Asked and answered.
THE DEPONENT: I already answered that question.
Q. (By Mr. Hailey) Anthropic was not found as a nonprofit, correct?
MR. GOOCH: Asked and answered.
THE DEPONENT: I answered that question.

116

Q. (By Mr. Hailey) What's the answer?
MR. GOOCH: Asked and answered.
THE DEPONENT: Anthropic was founded as a public benefit corporation.
Q. (By Mr. Hailey) You and your Anthropic founders started discussing commercialization as early as 2021, correct?
MR. GOOCH: Misstates testimony.
THE DEPONENT: When we were founding Anthropic and considering the possibilities, we very seriously considered founding Anthropic as a nonprofit. And several of the founders had a strong preference initially for creating a nonprofit organization at the time.
When we were engaged in these discussions, there were many different discussions of possible situations.
The principal consideration at the time, I believe kind of the overarching consideration, was a question of how much resources would be required to have the positive impact on AI safety and beneficial deployment of AI as we hoped to have.
And some argued that the total amount of resources we would need would be small enough that

we could easily succeed as a nonprofit organization and never pursue any commercial motive, nor raise funds from commercially motivated investors.
However, we also were open to the possibility that the level of resources we would need or the form it would take when we were trying to deliver the potential benefits of AI to the world would require us to have customers.
And, thus, we compromised and founded Anthropic as a public benefit corporation to give us the flexibility to pursue either avenue.
Q. (By Mr. Hailey) You sell commercial AI products now, right?
**A. Anthropic, as of November 2025, has commercial deployments of Claude.**
Q. And you could give those AI products to customers for free, right?
**A. I don't understand the question.**
Q. You could provide AI models to customers for free?
**A. I think that just as you could provide your legal counsel to all our clients for free, we could, in the same sense, I suppose, provide AI for free.**
**We do provide access to AI for free for**



**individual users and consumers. We have a free plan.**
**However, I think that for many different reasons, if we were to exclusively provide access to AI for free, it would greatly limit our ability to grow as an organization, to attract talent, to continue to build on investments and even to earn the trust of our customers.**
**For example, say, Microsoft or Amazon or Cursor, many of our customers, I think it would probably create a strange dynamic if we were providing all of our services to these large corporations entirely for free since it would be very obvious to anyone experienced in business that we couldn't do that forever, that these AI services were very expensive, and that we therefore couldn't be relied on to be a long-term partner or collaborator in -- in the world.**
**And I -- I just don't think that we could continue to function as an organization.**
**So I think the answer to the question, we could universally provide all of our AI products and services for free is pretty clearly no if we were to operate, survive as an entity with the mission we have.**



Q. How are you compensated for your work at Anthropic, Dr. Kaplan?
**A. I am compensated in a cash salary and in options.**
Q. Anything else?
**A. Currently, that is how I -- I mean, I receive benefits. So I receive health insurance, vision and dental care, life insurance. I have access to a Benepass program that allows me to spend on the order of $500 a month, maybe a thousand dollars a month, on office supplies, wellness, maybe some other categories.**
**It's possible that I'm forgetting other -- other -- other minor benefits of my employment.**
Q. What's your salary at Anthropic currently?
**A. I don't know.**
Q. And remind me, I believe you testified earlier to the approximate range of your salary.
Can you remind me what that testimony was.
**A. I believe I testified that my salary is** [redacted] **this time.**



Q. You mentioned, in addition to your cash salary and the benefits that you identified, that you have options in Anthropic; is that correct?
**A. That is my understanding.**
Q. Does that -- does that refer to equity in the company?
**A. Can you define "equity."**
Q. Well, let me ask you, when you say "options," what do you mean?
**A. I'm not honestly very familiar with the details of how these financial things work, but I believe these are stock options. For example, there is something called RSUs. I think there's -- I forget -- there's another acronym associated with some of these options that I don't recall.**
Q. So let's try it this way.
When the company was founded, did you receive initial equity or a stake in the company?
**A. I -- when the company was founded, I received -- I received equity in a plan that had some vesting schedule.**
Q. And you and your six cofounders all received equal equity at founding; is that accurate?
**A. It is accurate that the seven,**

221

testimony.
[redacted]
MR. GOOCH: Objection. Misstates prior testimony and the document.
THE DEPONENT: I think I've already answered the question.
Q. (By Mr. Hailey) What's the answer?
MR. GOOCH: Same objections, plus form.
[redacted]

222

Q. (By Mr. Hailey) Is it a true statement that Anthropic does not know all the contents of the datasets it uses to train its AI models?
MR. GOOCH: Form.
THE DEPONENT: Can you define what it means to "know."
Q. (By Mr. Hailey) Does Anthropic have an understanding of the contents of all the datasets it uses to train its AI models?
MR. GOOCH: Form. And vague.
THE DEPONENT: Can you tell me what it would mean to understand that.
Q. (By Mr. Hailey) Anthropic stated in an interrogatory response that you verified, Dr. Kaplan, quote, "Anthropic does not know all the contents of those datasets."
Was that a true statement when you verified that interrogatory?
MR. GOOCH: Form.
THE DEPONENT: Can you provide me with the interrogatory.
Q. (By Mr. Hailey) I'm asking you, was that a true statement, "Anthropic does not know all the contents of those datasets"?
MR. GOOCH: Form.

223

And I think the witness has asked you to review the context.
THE DEPONENT: Yeah, I'd like to see the context of the document.
Q. (By Mr. Hailey) So you can't -- Dr. Kaplan, you can't say one way or the other whether the statement, "Anthropic does not know all the contents of those datasets that it uses for AI training" -- you can't say one way or the other whether that's a true statement without reviewing an interrogatory response?
MR. GOOCH: Misstates the prior testimony. Vague and -- as to the content or what the surrounding content is from that document.
THE DEPONENT: I asked you to define what "know" would mean in this context.
For example, do you know everything that's in an encyclopedia; do you know everything that's in Wikipedia?
What would it mean to say "know" -- to know everything on Wikipedia?
What would be the requirements to affirm that one does know that?
MR. GOOCH: And I'll just note, Counsel, that you've asked the witness at the beginning of

224

the deposition to let you know when he didn't understand your question. And so I think the witness is just doing exactly what you asked.
So if you don't want to help him understand your question, it seems like that's inconsistent with what you told him you'd do at the beginning when you made your agreements.
MR. HAILEY: And I will ask you again, Taylor, to --
MR. GOOCH: That's fine.
MR. HAILEY: -- stop interrupting the questions with the speeches.
MR. GOOCH: You asked the deponent at the beginning to flag when he didn't understand the question. The witness has indicated he doesn't understand the question. So here we are.
MR. HAILEY: May I proceed with my questions now?
MR. GOOCH: You're always free to ask questions.
Q. (By Mr. Hailey) Dr. Kaplan, do you believe that Anthropic's use of copyrighted materials without permission to train Claude is a fair use?
MR. GOOCH: I'm going to direct the

225

witness not to answer to the extent that any of your knowledge or information regarding this question derives from conversations that you had with counsel.
Otherwise, you are free to respond.
THE DEPONENT: Based on my informal understanding, which is as not an expert, my understanding is that training AI models on text is highly transformative in roughly the same sense that a human being reading text is transformative and that it is most likely fair use.
Q. (By Mr. Hailey) And when did you form that informal understanding that you just described?
MR. GOOCH: Same caution. Same instruction.
THE DEPONENT: I don't know.
Q. (By Mr. Hailey) Was it before or after Anthropic began training its AI models using copyrighted materials?
MR. GOOCH: Same caution. Same instruction.
THE DEPONENT: I don't know.
Q. (By Mr. Hailey) How did you come to form that informal understanding regarding Anthropic's

226

use of copyrighted material without permission to train Claude being a fair use?
MR. GOOCH: Same caution. Same instruction.
THE DEPONENT: I don't think I understand the question. It seems to me like you're putting a lot of extra information in the question.
If you're simply asking how did I come to form the view that language model training is transformative, I think that emerged slowly over the course of my learning how language models work at all, starting in maybe 2017.
In terms of my very informal, nonexpert, noninformed-by-counsel view of fair use, I think that was based on randomly reading various articles about the law in major media outlets when it has come up.
Q. (By Mr. Hailey) What articles?
**A. I --**
MR. GOOCH: Form.
THE DEPONENT: I don't recall.
Q. (By Mr. Hailey) You can't identify any specific articles or other materials you read in forming this informal understanding?
MR. GOOCH: Form.

227

THE DEPONENT: I cannot.
Q. (By Mr. Hailey) You've used now a couple times the term "transformative."
You understand "transformative" is a legal term of art with respect to fair use?
MR. GOOCH: I am going to provide the same instruction for privilege. And so anything that you learned from counsel that has informed your knowledge, I'm going to instruct you not to discuss that.
THE DEPONENT: I didn't know that.
I feel as though I've heard it used informally in various contents, and I don't have any specific definition in mind.
Q. (By Mr. Hailey) So when you say that it's your informal understanding that using copyrighted materials for AI training is transformative, you don't have any specific definition of "transformative" in mind?
MR. GOOCH: I'm going to provide the same privilege caution and the same privilege instruction.
THE DEPONENT: I don't think I can say anything more without potentially revealing privileged conversations.

228

Q. (By Mr. Hailey) Without getting into any privileged discussions, why do you believe that Anthropic's use of copyrighted materials to train Claude is a fair use?
MR. GOOCH: I'm going to provide -- first, asked and answered.
I'm also going to provide the same privilege instruction and the same privilege caution.
THE DEPONENT: I don't think I can answer without revealing privileged information.
Q. (By Mr. Hailey) So you don't remember -- strike that.
So you've testified that you have an informal understanding that Anthropic's use of copyrighted materials without permission to train Claude is a fair use?
MR. GOOCH: Objection.
I don't think that's what he said, Counsel.
THE DEPONENT: I didn't say what you just said.
I said that my general impression is not at the level of anything specific to Anthropic but is about the process of language model training in

361

didn't show up.
MR. GOOCH: Shall we go off the record, or do you want to talk about that too?
MR. HAILEY: I'm -- I'm happy to talk about that, but I don't -- I -- clearly, the witness is misinformed by you and has been misinformed as to the subsequent ruling of the magistrate judge. But I don't think that's relevant at this point.
I have nothing further to say on the record that I haven't already said.
MR. GOOCH: Great.
Let's go off the record.
THE VIDEOGRAPHER: Okay. This marks the end of today's deposition of Jared Kaplan. We are going off the record at 6:24 p.m.
(TIME NOTED: 6:24 P.M.)

---o0o---

362

I, JARED KAPLAN, Ph.D., do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear notes; that my testimony as contained herein, as corrected, is true and correct.

Executed this ____ day of __________________, 2025, at _____________, ___________________.

_______________________
JARED KAPLAN, Ph.D.

363

I, Rebecca L. Romano, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Court Reporter, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any deponents in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made stenographically by me and which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: November 26, 2025

Rebecca L. Romano, RPR, CCR
CSR. No 12546

364

DEPOSITION ERRATA SHEET

Case Name: Concord Music Group vs. Anthropic
Name of Deponent: Jared Kaplan, Ph.D.
Date of Deposition: November 21, 2025
Job No.: 609877
Reason Codes: 1. To clarify the record.
2. To conform to the facts.
3. To correct transcript errors.

Page _____ Line _____ Reason ____________________
From _______________ to ________________________
Page _____ Line _____ Reason ____________________
From _______________ to ________________________
Page Line Reason
From _______________ to ________________________
Page _____ Line _____ Reason ____________________
From _______________ to ________________________
Page _____ Line _____ Reason ____________________
From _______________ to ________________________
Page _____ Line _____ Reason ____________________
From _______________ to ________________________
Page _____ Line _____ Reason ____________________
From _______________ to ________________________
Page _____ Line _____ Reason ____________________
From _______________ to ________________________
Page _____ Line _____ Reason ____________________
From _______________ to ________________________
Page _____ Line _____ Reason ____________________
From _______________ to ________________________