# EXHIBIT 164

# (FILED UNDER SEAL)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

----------------------------------------
________________________ )
CONCORD MUSIC GROUP, INC., ET AL., )
)
)
Plaintiffs, ) Case Number
v. ) 5:24-cv-03811-EKL
) SVK
)
ANTHROPIC PBC, )
)
Defendant. )
-----------------------------------)----

HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY

VIDEOCONFERENCED and VIDEO-RECORDED
DEPOSITION of
DARIO AMODEI, Ph.D.
San Francisco, California 94111
Thursday, January 8, 2026

Reported Stenographically by:
MARY J. GOFF
CSR No. 13427
WA CSR No. 21030779
Job No. 614290
PAGES 1-158



HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY

VIDEOCONFERENCED and VIDEO-RECORDED DEPOSITION of DARIO AMODEI, Ph.D., Volume I, taken on behalf of Plaintiff Publishers, Oppenheim Zebrak, LLP, at WilmerHale, 50 California Street, Suite 3600, San Francisco, California 94111, beginning at 1:44 p.m. and ending at 4:30 p.m., on Thursday, January 8, 2026, before MARY J. GOFF, California Certified Shorthand Reporter No. 13427 and WA CSR No. 21030779.



APPEARANCES:

For Plaintiff Publishers
Oppenheim Zebrak, LLP
BY: NICHOLAS C. HAILEY
Attorneys at Law
4530 Wisconsin Avenue, NW
5th Floor
Washington, DC 20016
202-480-2999
nick@oandzlaw.com

For Defendant Anthropic PBC
WilmerHale
BY: SONAL MEHTA
Attorneys at Law
2600 El Camino Real
Suite 400
Palo Alto, California 94306
sonal.mehta@wilmerhale.com
628-235-1026

ALSO PRESENT: Natalie Naugle, Brian Israel, In-house counsel Anthropic
Ellen Stephano, Esquire, WilmerHale (remote Boston)

Videographer: Addison McNaughton



INDEX


| WITNESS | | EXAMINATION |
|---|---|---|
| DARIO AMODEI, Ph.D. | | |
| Volume I | | |
| | ATTORNEY HAILEY | 6 |
| | ATTORNEY MEHTA | -- |

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 246 | 1-29-24 Slack message Anthropic_0000605700-785 | 9 |
| Exhibit 247 | Transcript: Ezra Klein Pages 1-18 | 45 |
| Exhibit 248 | Exhibit 40 Anthropic_0000462964-968 | 89 |
| Exhibit 249 | Anthropic Plan for 2023 Anthropic_0000463241-255 | 108 |
| Exhibit 250 | Why Anthropic CEO Dario Amodei Spends So Much Time Warning of AI's Potential Dangers | 136 |
| Exhibit 251 | AI Misalignment Risk Anthropic_0000478585 | 142 |

PREMARKED EXHIBITS:

| | | |
|---|---|---|
| Exhibit 235 | 1-8-2023 email Anthropic Plan | 123 |

San Francisco, California
Thursday, January 8, 2026
1:44 p.m.

THE VIDEOGRAPHER: Here begins Media Number 1 in the videotaped conception of Dr. Dario Amodei, in the matter of Concord Music Group Inc., et al., versus Anthropic PBC, in the United States District Court, Northern District of California, San Jose Division. The Case Number is 24-CV-03811-EKL (SVK).

Today's date is January 8, 2025, and the time ton the video monitor -- sorry -- January 8, 2026, and the time on the video monitor is 1:44 p.m.

The videographer today is Addison McNaughton, representing Planet Depos. And this video deposition is taking place at 50 California Street, Suite 3600, in San Francisco, California 94111.

Would counsel please voice identify themselves and state whom they represent.

ATTORNEY HAILEY: This is Nick Hailey, with the law firm of Oppenheim + Zebrak, on behalf of the Music Publisher Plaintiffs. I'm joined with my colleague by zoom, Tim Chung.

ATTORNEY MEHTA: Good afternoon, Sonal Mehta, from WilmerHale, on behalf of Anthropic. With me today are Natalie Naugle and Brian Israel, who are in-house Counsel at Anthropic.



THE VIDEOGRAPHER: The court reporter today is Mary Goff, representing Planet Depos, the witness will now be sworn.

THE COURT STENOGRAPHER: My name is Mary Goff. I am a California Certified Shorthand Reporter, CSR Number 13427. Today's proceedings are being captured by stenographic means.

DARIO AMODEI, Ph.D.

Being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

ATTORNEY MEHTA: You can put your hand down.

THE DEPONENT: Okay.

EXAMINATION

BY ATTORNEY HAILEY:

Q Good afternoon. Name is Nick Hailey. I represent the Plaintiff, Music Publishers, in this case.

Can you go ahead and please state your name and home address for the record?

**A Are you speaking to me?**



Q Yes.

**A Can I state my name and home address for the record?**

ATTORNEY MEHTA: And I'm actually just going to -- for security reasons, I don't think you need his home address. I am --

**A I -- I, in fact -- no. I, in fact, don't even know it. Dario Amodei is my name.**

Q (BY ATTORNEY HAILEY) And what city do you live in?

**A I live in Woodside.**

Q And you -- your testimony is you don't know your home address?

ATTORNEY MEHTA: You can answer the question.

**A I don't -- I don't remember it. That's right.**

Q (BY ATTORNEY HAILEY) And do you prefer Mr. Amodei or Dr. Amodei?

**A Mr. Amodei is fine.**

Q And, Mr. Amodei, you understand you're under oath today, correct?

**A That is correct.**

Q And we have very limited time for the deposition today and a lot of ground to cover, so



it's important that you listen carefully to the questions that I ask and that you answer those questions directly and succinctly.

Do you understand that?

**A Yes.**

Q And if you do not understand a question, please ask me to clarify. Otherwise, if you answer my question, I will assume that you understood it.

Is that understood?

ATTORNEY MEHTA: Form.

You can answer.

**A Yes.**

Q (BY ATTORNEY HAILEY) Is there any reason why you cannot give full, complete, and accurate testimony today?

**A I mean, to the best of my ability, sure.**

Q Mr. Amodei, you're Anthropic's CEO and a founder of the company, correct?

**A That is correct.**

Q Who are Anthropic's competitors in the AI industry?

**A Who are Anthropic's competitors in the AI industry? You know, that's a subjective question.**

**It depends on who you -- who you list as**

output copying copyrighted content?

ATTORNEY MEHTA: Objection, asked and answered.

Q (BY ATTORNEY HAILEY) You still have to answer my question, sir.

ATTORNEY MEHTA: You can answer that any way you want, including saying, you know -- I'm going to stop. You can answer that question if you have anything you want --

**A This is -- this is the same content as the question that was asked before. I -- I answered the question before.**

Q (BY ATTORNEY HAILEY) Is the answer "Yes" or "No," sir?

ATTORNEY MEHTA: Objection --

**A I --**

ATTORNEY MEHTA: -- to the form; asked and answered.

**A -- I answered the question before.**

Q (BY ATTORNEY HAILEY) Okay. So you're not going to answer the question?

**A No. I already answered the question.**

Q I just want to make sure that I understand your answer for the record, so I'm going to ask you one more time, sir.



Is it your belief, yes or no, that CLAUDE can generate output copying copyrighted material?

**A I -- I already -- I already answered this question. You can ask me as many times as you want.**

**My understanding is that the question has already been asked. I don't have to answer it again. That is my understanding.**

Q As Anthropic's CEO, you have the authority to block the launch of a CLAUDE model if you have concerns about the output that the model is generating, correct?

**A Correct.**

Q But if we turn back to Exhibit 246 in front of you, you didn't want to delay the launch over the issues you were discussing in this --

**A Sorry. What -- which is -- which is 246? This one is 246?**

Q The one exhibit in front of you, sir.

**A Yes.**

Q Turn to page 740, where your comments --

**A That's --**

Q -- are.

**A -- right. That's right.**

Q And you didn't want to delay the launch over the issues you were discussing in this



conversation, correct?

ATTORNEY MEHTA: Form.

You can answer.

**A Yes. It was -- it was my comment that -- many -- many issues come up.** [redacted] **Of course it is the case that we would not block a launch over tiny issues or over issues that don't have -- over issues that don't have significance.**

**Imagine trying to run the company if, you know, we said: Oh, you know, the model shouldn't say the word "hell" or something like that.**

**And if the model once said the word "hell" after we outputted a thousand pages of content from the model, then, you know, that would -- that would lead us to block the launch.**

**That would be impractical and would -- you know, the cost versus the benefit of blocking a**



**launch under those conditions would be very lopsided.**

**For example, many people could use CLAUDE to help analyze their medical information. I have had family members who have used CLAUDE to help diagnose medical problems. I don't think we should block the launch of CLAUDE for those millions of people who can benefit from all the medical information and the medical, you know, value that CLAUDE can provide because CLAUDE -- you know, because CLAUDE once said a vulgar word.**

**That -- that would be an example of a trade-off that is lopsided.**

ATTORNEY HAILEY: I'll move to strike as nonresponsive everything after "yes."

Q (BY ATTORNEY HAILEY) Sir, you mentioned there were tiny issues, medium issues, large issues.

Is output copying copyrighted material a tiny issue, a medium issue, or a large issue?

**A You know, I -- you know, I wouldn't -- I wouldn't characterize it in this numerical -- I wouldn't characterize it in this numerical way.**

**What I would agree, again -- again, as I said before, is that subject to the bounds of fair use, the model should not -- the model should**

not output copyrighted material.
Q What are the bounds of fair use?
A What are --
ATTORNEY MEHTA: And I'm going to caution you. You can answer that to the extent that you have a view on the bounds of fair use that is not based on advice of counsel.
Anything that involves the advice of counsel, I instruct you not to provide in that answer.
THE DEPONENT: Okay.
A -- I can give -- I can give you my understanding of how fair use works for training and for outputting AI models.
You know, all of these were, you know, legal issues that had never been explored. AI is a new -- a novel technology, you know, when we look back at this in 2019 or 2021 or 2023.
But the way I think of AI models is I think that they're being trained in a way that's similar to the way the human brain is trained.
So I used to be a neuroscientist. I used to study the human brain. You know, that is part of what helped inspire my work in AI. And so my view is that, you know, there's -- there's an analogy to



humans here.
So if a human reads something that is freely available and then uses that to synthesize content of their own, then, you know, we -- you know, if I -- if I read book that was freely available that was in the public domain or if I buy a book and then I use that to train -- and you know, I -- I kind of absorb that into my brain and I have an idea that is inspired by having read a range of books, you know, that -- that idea and the outputs that come from it are -- you know, we don't even think of them as fair use.
We just think of it as: Yeah, humans can read books, and then they have ideas.
So that's -- that's how I think about fair use in terms of training AI models.
Q (BY ATTORNEY HAILEY) You agree that AI models can read a far greater magnitude of books and other copyrighted content than any single human brain could possibly every read, correct?
A I -- I don't see how that's -- I don't see how that's relevant. The mechanism of reading is the same.
Q But you agree, don't you, sir, that an AI model can read and ingest and be trained on far



greater -- millions and?
A It --
Q -- millions of --
A -- it depends -- it depends on the size of the AI model. If we made a very large AI model, it wouldn't necessarily be able to read as much as a -- as a human can.
[redacted]
It's complicated. It's not as simple as you're presenting it.
Q CLAUDE is trained of trillions of words of text; is that correct?
A CLAUDE is trained on trillions of words of text.
Q No human could possibly read trillions of words of text in the amount of time that CLAUDE is trained on that -- those trillions of words of text?
A That is correct.
Q Mr. Amodei, is it your belief that



Anthropic can download and copy copyrighted material to use as training data for AI models without getting a license or authorization from copyright holders?
ATTORNEY MEHTA: I'm going to, again, caution you: You can answer that to the extent you have a personal view on that independent of advice of counsel.
A Correct. Again, I will repeat my -- my understanding from the -- from the analogy to humans.
If information is freely available, if a human could read it for free and incorporate it into their brain and generate independent ideas from it, then my -- my belief was and is that an AI model can do the same.
If -- if, you know, a document, a piece of -- a piece of information such as, you know, a book or a pamphlet or multimodal material, you know, needs to be purchased, then similarly to how a human could purchase a copy of the book and then read the book and incorporate the ideas into their brain and then generate their own ideas from it, the same should apply -- the same should apply to an AI model.

Q (BY ATTORNEY HAILEY) So it's your position, Mr. Amodei, that Anthropic can copy copyrighted material on a massive scale from the Internet, use that material to train its AI models without asking copyright holders' permission and without paying them a cent?
**A I would --**
ATTORNEY MEHTA: The same caution with respect to your --
**A Yes --**
ATTORNEY MEHTA: -- personal view and --
**A -- I would -- I -- you know, this is essentially the same question you asked me before. I would, again, repeat the idea that if a human being can read it the free, then -- and incorporate it into their brain, then -- then an AI model can do the same.**
**That is -- that is the analogy. That is the picture that I have.**
Q (BY ATTORNEY HAILEY) But again, you agree that an AI model is different than a human, correct?
**A Again, there are differences between -- between the brain of an AI model and the brain of a human, just as there are differences between my brain and your brain.**



**But my legal point is that my -- my view -- and again, there's -- you know, these issues were completely unexplored in 2021.**
**But my view was and my view is that on this particular issue, on the issue of reading information and using it to generate ideas, there is an -- there -- that -- that this analogy holds regardless of any differences that there might be between a human brain and a brain of an AI.**
Q And in terms of your position that Anthropic can copy copyrighted material from the Internet and use that material to train its AI models without paying rightsholders, that's important to your company's business model --
**A Again --**
Q -- right?
**A -- you're putting words --**
ATTORNEY MEHTA: One second, Dr. Amodei.
Objection to the form. And the same caution. You can answer based on your personal views, not any advice of counsel.
**A -- yes, again, this is -- you know, this is -- you have -- all -- you asked me if something was my position, something stated in very inflammatory terms, something that assumes that I'm**



**doing something wrong. So you asked: Is your position X?**
And then you said: Your position that X is.
So you know, this is a -- this is a loaded question that, you know, assumes that I -- assumes that I see things a certain way.
And as I have said before and -- and as I will repeat before, my view is that there's an analogy between language models and a human brain here, which is that humans have to pay for data that is behind a -- that is behind a paywall that is not freely available such as a book.
If there's information that is freely available on the web, if it is legal for a human being to read that information on the web, then it is also legal for a LLM to read that -- read that information on the web.
That -- that was my personal opinion. These issues were not well-legally explored at the time. It's still my personal opinion that is my view.
Q (BY ATTORNEY HAILEY) And that opinion is important to your company's business model, correct?
**A Sorry. I -- again, you have stated this**



**question in a way that is very...**
Q Is that your answer, sir?
ATTORNEY MEHTA: Objection to the form.
You can answer, if you understand it.
**A Yeah, I don't understand what you mean. Sorry. You have confused me a little bit. You're going to have to start over.**
Q (BY ATTORNEY HAILEY) Anthropic doesn't pay for copyrighted material that it uses to train its AI models --
ATTORNEY MEHTA: Objection --
Q (BY ATTORNEY HAILEY) -- is that correct?
ATTORNEY MEHTA: -- objection to the form, misstates the record.
**A Misstates the record.**
Q (BY ATTORNEY HAILEY) To be clear, your attorney is making objections for the record.
**A That's right.**
Q I'm still entitled to answer to my question. I will ask again. I'm asking -- I'm asking the question.
Anthropic doesn't pay for copyrighted material that it uses to train its AI models --
**A Anthropic --**
ATTORNEY MEHTA: Objection --

**This comment didn't -- I -- again, I don't remember this comment. But from looking at it and from the context, my belief is that this content did not intend to address copyright one way or another.**

Q Well, sitting here today, sir, do you agree that copyright infringement falls within any of these categories of [redacted]

**A I would describe it as a -- you know, I -- again, I would describe copy -- generating copyrighted output that's not within the bounds of fair use as, you know, something that the model should not do.**

(Exhibit 247 was marked for identification and is attached to the transcript.)

Q (BY ATTORNEY HAILEY) Mr. Amodei, I'm showing you what we have marked as Exhibit 247 to your deposition.

ATTORNEY MEHTA: Do you have more copies of this one?

ATTORNEY HAILEY: Yes.

ATTORNEY MEHTA: Thank you.

Q (BY ATTORNEY HAILEY) It's a New York Times article titled "The Ezra Klein Show: Transcript:



Ezra Klein Interviews Dario Amodei," dated April 12, 2024.

Do you see that?

**A I see that, yes.**

Q And you recall being interviewed by Ezra Klein for the New York Times?

**A I -- I recall being interviewed by Ezra Klein. I don't recall the content of the interview in detail, but I recall being interviewed by Ezra Klein.**

Q And you agree this appears to be a transcript published in the New York Times of that interview, correct?

**A This -- this appears to be a transcript of -- of that interview. Of course, as with all transcripts, there could be errors in this transcript. It may not be exactly what I said, but yes, this is a transcript.**

Q And you're truthful and accurate when you give interviews?

**A I attempt to be truthful and accurate, yes.**

Q Please turn your attention to page 15, please.

Do you see two-thirds of the way down the



page, the question from Ezra Klein that begins:

But there's also the question of training data and the intellectual property that is going into things like CLAUDE, like GPT, like Gemini?

**A Yes.**

Q And I want to focus on the first sentence of your response, Mr. Amodei, which appears at the bottom of page 15. Are you with me at the bottom of page 15?

**A I am with you on the bottom of page 15.**

Q You respond:

I think everyone agrees the models shouldn't be verbatim outputting copyrighted content. First of all did I read that correctly?

**A You read that correctly.**

Q And that's a true statement that "everyone agrees AI models shouldn't be verbatim outputting copyrighted content"?

**A Again, you know, if -- if I were given full time to consider this question, I would -- I would make that statement.**



**But of course, many statements that are made without caveats on, you know, interviews where you have to respond quickly, you know, if -- if you had the fullness of time, you would make that -- you would make that same statement with a number of caveats or elaborate and describe the nuance, so I would say, again, you know, models should not be verbatim outputting copyright cont -- outputting copyrighted content, again, subject -- subject to the bounds of fair use.**

**For example, fair use allows, you know, short snippets of content to be -- to be -- to be outputted. Everyone would -- you know, everyone would agree that that is the case.**

Q And what's that statement based on, sir?

**A That statement is based on my -- my personal understanding of how fair use works.**

Q You didn't say that in this interview with Ezra Klein, correct?

**A That's -- that's right. There isn't time in an interview to offer every caveat or every piece of nuance.**

Q Instead you simply said:

I think everyone agrees that models shouldn't be verbatim

157

I, MARY J. GOFF, CSR No. 13427, Certified Shorthand Reporter of the State of California, certify;

That the foregoing proceedings were taken before me at the time and place herein set forth, at which time the witness declared under penalty of perjury; that the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed under my direction and supervision; that the foregoing is a full, true, and correct transcript of my shorthand notes so taken and of the testimony so given;

That before completion of the deposition, review of the transcript ( ) was (XX) was not requested: ( ) that the witness has failed or refused to approve the transcript.

I further certify that I am not financially interested in the action, and I am not a relative or employee of any attorney of the parties, nor of any of the parties.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct, dated this 9th day of January, 2026.

Mary J. Goff
MARY J. GOFF

158

ERRATA SHEET
PLANET DEPOS
451 Hungerford Drive, Suite 400
Rockville, Maryland 20850
888-433-3767

CASE: Concord v. Anthropic

PAGE LINE FROM TO

____ ______ ______________________ __________
____ ______ ______________________ __________
____ ______ ______________________ __________
____ ______ ______________________ __________
____ ______ ______________________ __________
____ ______ ______________________ __________
____ ______ ______________________ __________
____ ______ ______________________ __________
____ ______ ______________________ __________
____ ______ ______________________ __________
____ ______ ______________________ __________

______________________________
DARIO AMODEI, Ph.D.

Subscribed and sworn to before me this _____ day of ____________, 2026.

______________________________________
Notary Public