# EXHIBIT 128

Planet Depos
We Make It Happen™

**HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**

# Transcript of Jared Kaplan, Ph.D.

**Date:** November 21, 2025
**Case:** Concord Music Group -v- Anthropic

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

CONCORD MUSIC GROUP, INC., ET AL.,
Plaintiffs,
vs. Case No. 5:24-cv-03811 EKL-SVK
ANTHROPIC PBC,
Defendant.
----------------------------

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**
VIDEO DEPOSITION OF JARED KAPLAN, Ph.D.
San Francisco, California
Friday, November 21, 2025
Volume 1

STENOGRAPHICALLY REPORTED BY:
REBECCA L. ROMANO, RPR, CSR, CCR
California CSR No. 12546
Nevada CCR No. 827
Oregon CSR No. 20-0466
Washington CCR No. 3491
JOB NO. 609877
PAGES 1 - 365



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

CONCORD MUSIC GROUP, INC., ET AL.,
Plaintiffs,
vs. Case No. 5:24-cv-03811 EKL-SVK
ANTHROPIC PBC,
Defendant.
----------------------------

DEPOSITION OF JARED KAPLAN, Ph.D., taken on behalf of the Plaintiffs, at Wilmer Cutler Pickering Hale and Dorr LLP, 50 California Street, Suite 3600, San Francisco, California, commencing at 10:04 a.m., Friday, November 21, 2025 before REBECCA L. ROMANO, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Court Reporter.



APPEARANCES OF COUNSEL

For the Plaintiffs:
OPPENHEIM + ZEBRAK LAW, LLP
BY: NICK HAILEY
Attorney at Law
4530 Wisconsin Avenue
5th Floor
Washington, D.C. 20016
(202) 480-2999
nick@oandzlaw.com
and
BY: BRET MATERA
Attorney at Law
461 5th Avenue
19th Floor
New York, New York 10017
(212) 951-1156
bmatera@oandzlaw.com

/////



APPEARANCES OF COUNSEL(cont'd)

For the Defendant:
WILMER CUTLER PICKERING HALE AND DORR LLP
BY: TAYLOR GOOCH
Attorney at Law
50 California Street
Suite 3600
San Francisco, California 94111
(628) 235-1006
taylor.gooch@wilmerhale.com
and
BY: ALYSSA MILSTEAD(via Web videoconference)
Attorney at Law
2600 El Camino Real
Suite 400
Palo Alto, California 94306
(650) 858-6000
alyssa.milstead@wilmerhale.com

/////

APPEARANCES OF COUNSEL(cont'd)

For the Defendant:
LATHAM & WATKINS LLP
BY: IVANA DUKANOVIC(via Web videoconference)
Attorney at Law
505 Montgomery Street
Suite 2000
San Francisco, California 94111
(415) 391-0600
ivana.dukanovic@lw.com

ALSO PRESENT:
Ian Chen, In-House Counsel at Anthropic
Gary Garcia, Videographer

/////



I N D E X


| DEPONENT | EXAMINATION PAGE |
|---|---|
| JARED KAPLAN, Ph.D. VOLUME 1 | |
| BY MR. HAILEY | 12 |


E X H I B I T S


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 230 | Plaintiffs' Amended Notice of Deposition to Jared Kaplan Pursuant to Federal Rule of Civil Procedure 30(b)(1); | 21 |
| Exhibit 231 | LinkedIn Page; | 34 |
| Exhibit 232 | John Hopkins Profile Page; | 44 |
| Exhibit 233 | Declaration of Jared Kaplan in Support of Defendant's Opposition to Plaintiffs' Renewed Motion for Preliminary Injunction; | 147 |


/////



E X H I B I T S(cont'd)


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 234 | Slack Message, Anthropic_0000014096 - Anthropic_0000014106; | 158 |
| Exhibit 235 | Email String Subject: Anthropic Plan fo... I think we need to have more specifi..., Anthropic_0000215992; | 176 |
| Exhibit 236 | Anthropic Plan for 2023 Dario Amodei Dec 30, 2022, Anthropic_0000217184 - Anthropic_0000217196; | 177 |
| Exhibit 237 | Conjectural Anthropic Prioritization List, Anthropic_0000479241 - Anthropic_0000479249; | 193 |
| Exhibit 238 | B2C Claude Safety Checklist, Anthropic_0000217166 - Anthropic_0000217170; | 236 |




E X H I B I T S(cont'd)


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 239 | Red Teaming Categories, Anthropic_0000226164 - Anthropic_0000226166; | 268 |
| Exhibit 240 | Slack Messages, Anthropic_0000240665 - Anthropic_0000240667; | 280 |
| Exhibit 241 | Slack Message, Anthropic_0000240669; | 282 |
| Exhibit 242 | Song Lyrics, Anthropic_0000570586 - Anthropic_0000570587; | 299 |
| Exhibit 243 | Song Lyrics, Anthropic_0000570585; | 310 |
| Exhibit 244 | Claude, Anthropic_0000554769; | 314 |


/////

# Pages 45-48

45

Q. Is -- is that a reference to your email address?
**A. It is a reference to an email address at which I can be contacted.**
Q. Is there a reason that the address is formatted in that way, with the space between -- with the spaces and without the "at" symbol or dot-com at the end?
**A. Not that I'm aware of.**
Q. Did you -- did you write it that way in this website?
**A. I don't recall.**
Q. Does that have anything to do with you not wanting the email address to be crawled or scraped from this website?
**A. I don't know.**
Q. You don't know one way or the other?
**A. I don't know one way or the other.**
Q. Do you ever use this Gmail account, [redacted] [sic] for work relating to Anthropic?
**A. It seems like you misstated the -- the email. It's [redacted].**
**But if you're asking about that email address, the answer is no.**

46

Q. You have never used the email address [redacted] for work relating to Anthropic or Claude; is that correct?
**A. Not that I recall.**
Q. Have you checked to see?
**A. I've already answered the extent to which I've prepared for this deposition.**
Q. I don't understand that.
Have you checked this Gmail address to see whether there are any emails in that account relating to Anthropic or Claude?
MR. GOOCH: Objection. Asked and answered.
THE DEPONENT: I -- I told you the extent to which I prepared for this deposition. I did not expect that my personal correspondence would be a -- a subject, and I did not -- I have not checked, as far as I'm aware.
Q. (By Mr. Hailey) And to be clear, I'm not asking about personal correspondence. I'm asking whether this Gmail account that's referenced here includes any emails regarding Anthropic or your work on Claude.
And my question is, have you checked this Gmail account to see whether there are any emails

47

in that account relating to Anthropic or Claude?
MR. GOOCH: Objection. Asked and answered.
THE DEPONENT: I do not recall checking.
Q. (By Mr. Hailey) Do you see -- do you see in the footer of this Web page, Exhibit 232, that there is a copyright notice, Dr. Kaplan?
**A. I see that there -- I see that there is a circled "C" that says "2025 Johns Hopkins University."**
Q. So just so I understand, your testimony is that you do see that there's a copyright notice on the footer of this Web page, your personal Johns Hopkins website, correct?
**A. As I said, I see that there's that -- that symbol. If that's a copyright notice, then yes.**
Q. Do you -- do you understand, Dr. Kaplan, that the "C" circle symbol stands for copyright?
**A. I've seen it referenced as such.**
Q. What does that signify?
**A. I don't know.**
Q. What's your understanding as to what the copyright symbol means?
MR. GOOCH: Objection. Calls for legal

48

conclusion.
THE DEPONENT: I don't know.
Q. (By Mr. Hailey) Do you have an understanding that this statement in the footer of this Web page, "Copyright 2025 Johns Hopkins University," signifies that Johns Hopkins University owns the copyright to this content?
MR. GOOCH: Objection. Asked and answered.
THE DEPONENT: I don't know.
Q. (By Mr. Hailey) Has Anthropic scraped and copied Web pages from the Johns Hopkins University website for use in AI training?
**A. I don't know.**
Q. How would you find that out?
**A. Maybe I would ask Ben Mann to look into it.**
Q. Let's turn back to your LinkedIn profile, Exhibit 231.
So your LinkedIn profile states that you were a research consultant at OpenAI for two years, from January 2019 to December 2020; is that correct?

# Pages 137-156

137

**A. Well, I'm just worried about confusion.**
**I mean, for example, in many cases when Anthropic models are trained, the data that is used is generated by Anthropic models.**
**So I'm just trying to make it clear that it's a pretty complicated process involving many teams. Some of that data, much of that data, depending on how you define various aspects of the process and what you mean by "data," is actually generated from Anthropic models.**
Q. Okay. So Anthropic selects or generates the data that it uses to train its AI models, correct?
MR. GOOCH: Form.
THE DEPONENT: Anthropic has -- as of now, November 2025, has many teams in different parts of the company that work on architectural and data choices in order to train Claude.
Q. (By Mr. Hailey) What specific characteristics of data does Anthropic take into account when deciding what data to use in training its Claude models?
MR. GOOCH: Form. And vague.
THE DEPONENT: Can you be more specific.
Q. (By Mr. Hailey) What does Anthropic

138

consider when selecting the data to use for AI training?
MR. GOOCH: Same objections.
[redacted]
MR. GOOCH: Vague. Form.
[redacted]

139

[redacted]
Q. (By Mr. Hailey) Is it true that Anthropic wants very diverse sets of training data?
MR. GOOCH: Vague. Form.
THE DEPONENT: I'm not sure what you mean.
Q. (By Mr. Hailey) You don't understand that question?
MR. GOOCH: Asked and answered. Vague. And form.
THE DEPONENT: I mean, you're not being specific enough for it to make sense for me to provide a -- a concise answer.
Q. (By Mr. Hailey) I understand that Anthropic derives its training data from many diverse sources on the Internet; is that accurate?
MR. GOOCH: Objection. Form.
THE DEPONENT: As I said, I mean, you haven't really clarified what kind of data you mean.
The kind of data that we have just been talking about in the prior responses is sort of hard tasks for Claude to perform. And those are mostly not sourced from the Internet.

140

Q. (By Mr. Hailey) So let's -- let's focus on pretraining.
I understand that Anthropic derives training data for pretraining from many diverse sources on the Internet; is that accurate, Dr. Kaplan?
MR. GOOCH: Form.
THE DEPONENT: Anthropic sources a wide variety of text and text images and code for pretraining.
Q. (By Mr. Hailey) And those diverse sources from which Anthropic sources text for pretraining include websites and blogs, books, research papers, source code, patents, news media, advertising, and song lyrics; is that correct?
MR. GOOCH: Form. And vague.
I also invite you to give the witness the context, i.e., the declaration you're reading from, for him to answer with the relevant context.
THE DEPONENT: If you're reading from my declaration, then Anthropic does source a wide variety of different kinds of data, including from the Internet.
MR. HAILEY: And, Counsel, I will remind you that these speaking objections are improper.

141

I'm reading from my outline. I'm --
MR. GOOCH: I see the declaration sitting in a folder next to you.
What's in the manila folder to your right if you're trying to make a representation that's not what it is?
MR. HAILEY: Are -- that's completely improper that you're looking over the table at exhibits. You -- I'm reading from my outline, I'm not reading from a declaration --
MR. GOOCH: To the extent --
MR. HAILEY: -- and I'm asking the witness a question.
You need to stop interrupting. You need to stop coaching the witness. We heard the witness immediately adopt the -- the instruction that you improperly gave on this.
So, Taylor --
MR. GOOCH: And I think you're happily trying to ask questions without any context to try to confuse the witness. I think that's improper. And --
MR. HAILEY: Taylor, you can --
MR. GOOCH: -- I'll ask you --
MR. HAILEY: -- you can object, and --

142

MR. GOOCH: Counsel, if you're going to respond to me, I'm going to respond to you. Happy to go back and forth. It's all going to count towards your seven hours.
If you want to just ask questions, I invite you to ask questions.
Q. (By Mr. Hailey) Dr. Kaplan, I will ask my question again.
You testified -- you testified that Anthropic sources training data from a wide -- strike that.
You referenced a wide range of sources for Anthropic's training data.
And I will ask you again, those diverse sources include websites and blogs, books, research papers, source code, patents, news media, advertising and song lyrics; is that accurate?
MR. GOOCH: Same objections.
THE DEPONENT: I'm not sure.
Q. (By Mr. Hailey) You don't know?
**A. Anthropic sources a wide variety of information and data for pretraining. I don't know whether each of the individual examples you gave is accurate. By giving a list of five or ten examples, I think it's easy to provide a misleading**

143

**impression because any given one of those examples might comprise a vanishing fraction of the data.**
**And so I just don't want to misrepresent exactly what composes the data or sort of how it's -- how it's arranged and sourced.**
Q. Does Anthropic's training data include data from websites and blogs on the Internet?
MR. GOOCH: Vague. And form.
THE DEPONENT: Anthropic's pretraining data includes some data from the Internet. For example, my sense is it includes data from something called Common Crawl that is a nonprofit that aggregates data from the Internet of various forms.
Q. (By Mr. Hailey) Does Anthropic's pretraining data include content from books?
MR. GOOCH: Vague. And form.
THE DEPONENT: Your previous question suggested sourcing data from the Internet. Currently, at this point in time, Anthropic has bought and scanned a large number of books, but those were not obtained from the Internet. And so I'm just concerned about leaving a misleading impression.
Q. (By Mr. Hailey) Does Anthropic's

144

pretraining data include copies of books on the Internet?
**A. Are you asking about the current situation circa November 2025?**
Q. If you need to differentiate between different time periods, please do so in your response.
**A. The answer is --**
MR. GOOCH: Well, real quick.
Objection. Form. And compound.
THE DEPONENT: I think the answer is, I don't know.
Q. (By Mr. Hailey) Is it your testimony that you don't know whether Anthropic's pretraining data has ever included copies of books on the Internet?
MR. GOOCH: Objection. Misstates prior testimony.
THE DEPONENT: I don't know whether currently Anthropic's pretraining data includes copies of books from the Internet.
Q. (By Mr. Hailey) What about previously?
MR. GOOCH: Same objections.
THE DEPONENT: My understanding is that there are some books available on the Internet that

145

have been included in pretraining at some points in Anthropic's history.
Q. (By Mr. Hailey) What books are those?
MR. GOOCH: Vague. And form.
THE DEPONENT: I'm not sure exactly.
I maybe would suggest asking Tom Turvey.
Q. (By Mr. Hailey) Well, I'm deposing you today, Dr. Kaplan. So I'm entitled to your best understanding.
You testified your understanding is that there are some books available on the Internet that have been included in pretraining.
My question to you is, what books available on the Internet are you referring to?
MR. GOOCH: Form. And vague.
THE DEPONENT: I said I'm not sure.
I suggested asking Tom Turvey.
Q. (By Mr. Hailey) Dr. Kaplan, you stated in the sworn declaration that you filed in this case that song lyrics are useful to include in Claude's training corpus.
Is that a true statement?
**A. Can you show me the document?**
MR. GOOCH: Objection. Form.
Q. (By Mr. Hailey) Let me just -- I'm just

146

asking you, is it a true --
MR. GOOCH: Counsel, he asked you for the document. Why don't you show it to him so he understands the context.
MR. HAILEY: I can show him the document in a moment, but let --
MR. GOOCH: Great.
Why don't you do it.
MR. HAILEY: Taylor, I'll ask my questions.
Q. (By Mr. Hailey) Let me --
MR. GOOCH: To the -- I'm just going to put on the record, clearly reading from a document again. That is the document sitting in the manila folder next to you. The witness has asked to see it so that he has context and can testify truthfully.
If you want to just get his general understanding, feel free to keep asking questions. Seems like a bad use of time.
MR. HAILEY: Are you done?
MR. GOOCH: For now.
Q. (By Mr. Hailey) Dr. Kaplan, is it a true statement that song lyrics are useful to include in Claude's training corpus?

147

MR. GOOCH: Form.
THE DEPONENT: I would say that as a general statement, they are not very useful.
(Exhibit 233 was marked for identification by the Court Reporter and is attached hereto.)
Q. (By Mr. Hailey) Dr. Kaplan, I'm showing you what I've marked as Exhibit 233 to your deposition.
**A. Is this the latest version of my declaration?**
Q. I'm -- I'm going to be asking you about paragraph 35, which is from the declaration provided on August 22nd, 2024.
MR. GOOCH: And I don't understand counsel to be indicating to you that you can't read any of the document you need to to understand and answer the questions.
THE DEPONENT: It also sounds like this is not the latest version of the declaration.
Q. (By Mr. Hailey) So --
MR. GOOCH: If you want to tell him what declaration --
MR. HAILEY: Of course.
MR. GOOCH: -- that would be great.

148

MR. HAILEY: Hold on.
Q. (By Mr. Hailey) So I think you may be getting confused between interrogatories and declarations.
So there have been a number of declarations filed in this case, Dr. Kaplan, by you. This -- if you can turn to the last page, you can see this is a declaration that's dated August 22nd, 2024.
I'd indicated I'm going to be asking you about paragraph 35. But if you need to familiarize yourself with the document more broadly, feel free to do so.
MR. GOOCH: And to answer the question I think you were asking, Doctor, this was attached to the renewed motion for preliminary injunction that plaintiffs filed, so not their first motion for preliminary injunction.
Q. (By Mr. Hailey) Do you recognize this document, Dr. Kaplan?
**A. I recognize it.**
Q. What is this?
**A. It is the "Declaration of Jared Kaplan in Support of Defendant's Opposition to Plaintiffs' Renewed Motion for Preliminary Injunction."**

149

Q. And you can see on the last page of the declaration that you -- that that's your signature, correct?
**A. Yes.**
Q. And it's dated August 22nd, 2024, correct?
**A. Yes.**
Q. And the statements you made in this declaration were truthful and accurate, correct?
**A. They were truthful and accurate to the best of my knowledge on August 2024.**
Q. Would you turn to page -- to paragraph 35 for me, please.
**A. Uh-huh.**
Q. Do you see where you say that "song lyrics may be useful to include in the training corpus because they add to the diversity of training data"?
**A. I see that written.**
Q. And that's a true statement, correct?
**A. It is written here that song lyrics may be useful to include in the training corpus, not that they are useful. And it's indicated that they're most likely useful because it's just useful to have diverse training data.**

150

**My expectation would be that song lyrics are not particularly useful, and, for example, that just to gain cultural and another knowledge, music criticism, music reviews, might be as or more useful than training data for the purposes in which Claude's used.**
**But, yes, it is written here that song lyrics may be useful to include in the training corpus.**
Q. So -- so just -- just to repeat my question again, because I'm -- my question was specifically, is it true or not true that "song lyrics may be useful to include in the training corpus because they add to the diversity of training data"?
Is that a true statement or is that not a true statement?
MR. GOOCH: Form. And asked and answered.
THE DEPONENT: I already answered the question.
Q. (By Mr. Hailey) Is that a true statement or is that not a true statement, Dr. Kaplan?
MR. GOOCH: Same objection.
THE DEPONENT: As it's written here, I

151

agree that song lyrics may be useful to include in the training corpus as one tiny, tiny component of training data for the purpose of diversity, cultural knowledge, and other things written here.
Like, "song lyrics deploy human language differently than news articles, which deploy human language differently than novels, which deploy human language differently than speeches, and so on. Song lyrics often incorporate use of figurative language, such as metaphor, simile, or personification, that a model needs to understand" --
THE COURT REPORTER: Hold on.
MR. GOOCH: Slow down a second.
THE DEPONENT: -- "that a model needs to understand in order to interpret the full range of human input. It is important for a general purpose AI tool like Claude to have exposure to the full range of types of human expression so that it can assist users in a wide variety of tasks the same way that a human would be able to."
So as one component, song lyrics may be useful. I would guess that they're comparable or less useful than, say, music reviews.
And I think that's that.

152

Q. (By Mr. Hailey) But you didn't write that in this declaration that you would guess that they are comparable or less useful than music reviews, correct?
MR. GOOCH: Form.
THE DEPONENT: Well, I wrote in the declaration that "this is yet another reason to have a diverse and voluminous corpus - having a high volume of diverse training data decreases the likelihood the model will inadvertently memorize certain content, and the more distinct works are included in the training set, the less insight each individual work provides as a proportion of the entire corpus."
So I think what I said there is that each individual work is really of vanishing importance, diversity is important, and song lyrics are simply an example that may be useful and that one can discuss, among millions of other possibilities.
Q. (By Mr. Hailey) When you say "cultural knowledge," cultural knowledge includes music, right?
**A. As I mentioned --**
MR. GOOCH: Form.
THE DEPONENT: As I mentioned, I think

that to understand the cultural knowledge and the way that it's situated, something like music reviews might be more useful in bridging connections between different ideas and culture. But song lyrics are also partially a source of that information, as are, for example, poems, which are very similar.

Q. (By Mr. Hailey) When you say music reviews might be more useful, do you have any data to back that statement up?

MR. GOOCH: Form.

THE DEPONENT: I think in general that we find that longer-form text is often more useful, as the goal for training is to learn correlations between different ideas in different texts.

Song lyrics tend to be very short and often quite repetitive, whereas music reviews can often be long-form journalism. And that length is something that I think is likely, along with the connections bridged between different ideas, to make music reviews more valuable than song lyrics.

Q. (By Mr. Hailey) You've never specifically tested that, have you?

**A. Anthropic doesn't have any particular interest in specifically focusing on song lyrics or**



**on music reviews, so Anthropic has never specifically tested a comparison between those two things.**

[redacted]

Q. One of the reasons that song lyrics are useful to include in Claude's training data is because "song lyrics deploy human language differently than do news articles" or novels or speeches.

Is that a true statement?

MR. GOOCH: Form.

THE DEPONENT: I said in the declaration that, for instance, "song lyrics deploy human language differently than do news articles, which deploy human language differently than novels, which deploy human language differently than speeches."

They're all distinct forms.

I think song lyrics are most similar to poems, which do exist in -- in other contexts. But



I agree that it's valuable to have a diversity of different forms of linguistic expression so that Claude understands the world as generally as possible.

Q. (By Mr. Hailey) You've referenced music review articles, correct?

**A. In my prior responses, I mentioned, as a comparison point, music reviews.**

Q. Do you have an understanding as to whether music reviews are copyrighted content?

**A. My understanding is that, essentially, all human written content is copyrighted.**

Q. Including music reviews?

MR. GOOCH: And I'll just caution the witness, you're free to answer; but to the extent your knowledge came from an attorney, just don't reveal privileged conversations.

THE DEPONENT: Yeah, I -- my general understanding is just that if a person writes any document or text and puts it anywhere, that by default, it's -- it's copyright.

Q. (By Mr. Hailey) So that includes music reviews; that includes poetry; that includes song lyrics; that includes other written text?

MR. GOOCH: Same objection and same



caution.

THE DEPONENT: I'm not a legal expert, but my understanding is that documents that are sufficiently old, although I don't know how old or what the procedure is, often are not under copyright, but that works that are recent typically are.

But I am not an expert. I don't -- I don't know for certain.

MR. HAILEY: All right. I could use a bio break, and we've been going for quite a while.

THE DEPONENT: Have we?

MR. GOOCH: Sure.

THE VIDEOGRAPHER: Okay. We're going off the record. The time is 1:19 p.m.

(Recess taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 1:51 p.m.

Q. (By Mr. Hailey) Welcome back, Dr. Kaplan.

**A. Thanks.**

Q. As part of the training process, Anthropic cleans its pretraining data; is that correct?

MR. GOOCH: Vague.

# Pages 165-168

[redacted]

Q. Below that, there's a message from somebody named sam-pling.

Do you see that?

**A. I do.**

Q. Is that your Anthropic cofounder Sam McCandlish?

**A. I think it is most likely Sam McCandlish.**

Q. Mr. McCandlish asks, "Boilerplate equals useless junk in addition to real text?"

Do you see that?

**A. I see that it's written there.**

Q. And Mr. Mann responds, "e.g. headers, footer, navbars, cookie policies, et cetera."

Did I read that correctly?

**A. I think so.**

Q. Do you know why Mr. McCandlish and Mr. Mann were talking about headers and footers as



useless junk in this Slack conversation?

MR. GOOCH: Form. And speculation.

THE DEPONENT: I don't know why at the time they were specifically talking about that.

Q. (By Mr. Hailey) You can see further down, there's a message from Mr. Mann at 11:20 p.m.

Do you see that?

**A. I'm not sure.**

**Which one?**

[redacted]

Q. Let's turn to the next page, page -4100.

There's a message from Mr. McCandlish at 11:25 p.m.

Do you see that?

**A. I see it.**

Q. And he's giving an example comparing the



performance of Justext at the top with Newspaper at the bottom.

Do you see that?

**A. This is the message --**

MR. GOOCH: Sorry.

Form.

THE DEPONENT: This is the message from sam_pling?

Q. (By Mr. Hailey) Correct.

**A. I see that there is a message that says "Justext:" and "Newspaper:".**

Q. Do you see under the header "Justext," colon, about midway down, there's a copyright notice that reads, "Flatbase by NiceThemes," copyright symbol, "2019"?

**A. I see that written there.**

Q. And then you can see, under the heading "Newspaper:", there's no such copyright notice or copyright language included there, correct?

MR. GOOCH: Form.

THE DEPONENT: I mean, I think that that way of reading it is a bit misleading.

The text under "Justext" is, I don't know -- 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26,



27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37 -- I don't know, I estimate about 37 lines of text that includes a lot of different material, including what might be Bible quotations, a bunch of table of contents, some extra text from the Bible, some questions, some headings, and it includes a thing that says "Flatbase by NiceThemes C 2019."

The Newspaper text is a single line and loses a lot of the content from that statement. But it's true that it is a single line, and the other has 37 or so lines, including one that mentions C 2019.

Q. (By Mr. Hailey) And both the content under the heading Justext and the content under the heading Newspaper include the sentence reading, "The very light of nature and man, and the works of God, declare plainly that there is a God, but his Word and Spirit only do sufficiently and effectually reveal him onto men for their salvation."

Correct?

**A. I would say that's somewhat correct.**

**I would say that in the other example, there are various reference quotations interspersed in the sentence to anchor it in context that are**

# Pages 201-212

201

July 2023, correct?
MR. GOOCH: Form.
THE DEPONENT: I typically share most documents I write with almost everyone at the company. And certainly, circa 2023, when the company was much smaller, that was much more the default.
[redacted]
MR. GOOCH: Form.
[redacted]

202

[redacted]
MR. GOOCH: Form.
[redacted]

203

[redacted]
MR. GOOCH: Form.
[redacted]
MR. GOOCH: Asked and answered.
[redacted]
Q. (By Mr. Hailey) And when you specifically note -- strike that.
[redacted]

204

[redacted]
MR. GOOCH: Form.
[redacted]
MR. GOOCH: Objection. Misstates prior testimony and the document.
THE DEPONENT: I think you're misstating what I said. But I don't know, and I think that's not a correct reading of the document.
Q. (By Mr. Hailey) Well, which one is it? Is it you don't know, or you have a different reading of the document?
MR. GOOCH: Objection. Form.

205

[redacted]

MR. GOOCH: Objection. Form.

[redacted]

206

[redacted]

MR. GOOCH: Form. Asked and answered.

THE DEPONENT: I think that you've read this document three or four times now.

Q. (By Mr. Hailey) And did I read it correctly?

MR. GOOCH: Form. Asked and answered.

THE DEPONENT: I think I've answered that already.

Q. (By Mr. Hailey) Those were your words that you wrote in this internal Anthropic document in July 2023?

MR. GOOCH: Form. Asked and answered.

[redacted]

207

Q. (By Mr. Hailey) Turn to page 3, please.

[redacted]

MR. GOOCH: Form.

[redacted]

MR. GOOCH: Form.

[redacted]

MR. GOOCH: Form.

[redacted]

MR. GOOCH: Form.

208

[redacted]

MR. GOOCH: Form.

209

[redacted]
MR. GOOCH: Form.

210

Q. (By Mr. Hailey) -- is that right?
MR. GOOCH: Form. Speculation.
[redacted]
Q. (By Mr. Hailey) On what date did your views change?
**A. I don't believe --**
MR. GOOCH: Objection. Form.
THE DEPONENT: I don't believe they changed on any given date.
Q. (By Mr. Hailey) Do you see there are comments in pink from somebody named Michael Sellitto?
**A. I see that there is a comment.**
Q. In comment 21, Mr. Sellitto writes -- and, sorry, before we start, you can see comment 21 is Mr. Sellitto commenting on the bullet that we were just reading, correct?
MR. GOOCH: Form.
THE DEPONENT: I think these are comments

211

connected to the text.
Q. (By Mr. Hailey) The text that we were just discussing?
**A. Pieces of it.**
[redacted]
Q. So you just read additional comments from Mr. Sellitto.
So Mr. --
MR. GOOCH: Is that a question or just a statement?

212

MR. HAILEY: I'm just noting for -- noting for the record.
[redacted]
MR. GOOCH: Objection. Asked and answered. Form.
[redacted]
MR. GOOCH: Form --
Q. (By Mr. Hailey) -- is that right?
MR. GOOCH: Form. Calls for speculation.
[redacted]

# Pages 269-272

269

MR. HAILEY: It's another document that Anthropic produced as part of this litigation bearing the Bates number -226164.
Q. (By Mr. Hailey) Do you recognize this document, Dr. Kaplan?
**A. Not particularly.**
Q. What is "red teaming," Dr. Kaplan?
MR. GOOCH: Form.
THE DEPONENT: "Red teaming" is a term that's used informally in many, many different ways. I don't think it has any precise definition.
But I think most likely in the context of 2023, it probably meant providing prompts or conversations or inputs to an AI model in order to attempt to trick it into providing a, in some way, undesirable output.
Q. (By Mr. Hailey) And if you turn to the last page of the document, -166.
Do you see, for instance, comment 9 is a comment from you?
I'm not asking about the substance of the comment, just for you to confirm, you did comment on this document, correct?
**A. It seems, taking your word for it that this document was produced by Anthropic as is, and**

270

**it has a comment with "Author Jared Kaplan," dated 11/21/2023, which I guess I would note is several months after the -- the date at the top of the document. But...**
Q. And if you turn --
MR. GOOCH: I don't -- were you finished?
THE DEPONENT: Sure.
Q. (By Mr. Hailey) If you turn to the previous page, you can see Comment No. 4 in blue is another comment from you from October 13th, 2023, correct?
Do you see that comment, Dr. Kaplan?
MR. GOOCH: Counsel, I believe he's clearly reading. Why don't you let him finish so he can answer your question.
THE DEPONENT: It looks like there's a comment for "Author Jared Kaplan."
Q. (By Mr. Hailey) Dated October 13th, 2023?
**A. It looks like it.**
Q. So let's turn back to the first page of this document.
It's titled "Red Teaming Categories," by Yuntao Bai, dated October 12th, 2023, correct?
**A. That's what it says at the top of the**

271

**document.**
Q. So this is a document that Mr. Bai authored and shared with certain colleagues at Anthropic, including yourself?
MR. GOOCH: Form and speculation.
THE DEPONENT: There are comments from me on this document.
Q. (By Mr. Hailey) Now, I want to start with the top of page 1. Mr. Bai writes in the first sentence, "I want to document the types of red-teaming that we've been targeting so far."
Did I read that correctly?
**A. You read the first sentence correctly.**
Q. So in this internal Anthropic document, Mr. Bai is documenting the types of red-teaming that Anthropic has been targeting so far as of the date of this document, October 12th, 2023?
MR. GOOCH: Objection. Form. Calls for speculation. Facts not in evidence.
THE DEPONENT: Can you clarify what -- what exactly you're asking.
Q. (By Mr. Hailey) I will repeat my question.
In this internal Anthropic document --
MR. GOOCH: I think he asked you to

272

clarify your question.
MR. HAILEY: And I'm going to repeat the question.
MR. GOOCH: Sounds good.
Q. (By Mr. Hailey) Mr. Bai is documenting -- Mr. Bai writes in this document that he's documenting the types of red-teaming that Anthropic has been targeting so far, as of October 12th, 2023; is that correct?
MR. GOOCH: Objection. Form. Calls for speculation.
THE DEPONENT: I mean, I think that this document is written circa October 12th, 2023. And I agree that you've read the first few sentences of the document.
I'm not sure that it implies that this is sort of all of the red-teaming that -- that has occurred, and it's just something that was top of mind for Yuntao himself.
But with those caveats, it sounds reasonable.
Q. (By Mr. Hailey) And what was Mr. Bai's role at this time, as of October 12, 2023?
**A. I think he was a member of technical staff.**

# Pages 285-292

285

Exhibit 241.
This is -- this shows a -- do you see the red -- the red icon at the top of the page?
**A. I do.**
Q. There's a -- the word "text" followed by some text, and then at the bottom, Task: Identify the author inside the author tags and then complete the text, correct?
**A. I -- I think that you're reading this or summarizing this -- this text here, yeah.**
Q. Do you understand that to be a prompt to an Anthropic AI model?
MR. GOOCH: Form.
THE DEPONENT: I don't know, but I think it's plausible that this is a prompt that one could submit to any AI model.
Q. (By Mr. Hailey) Do you see the orange icon?
**A. I do.**
Q. Does that mean anything to you in terms of representing a specific AI model by Anthropic or otherwise?
**A. No, I don't think it represents any specific AI model.**
Q. Have you ever seen that icon before?

286

**A. I think so.**
Q. Where do you think that -- where have you seen it?
**A. I think that at one time, there was a very sort of small-scale interface for quickly testing snapshots of AI models that allowed interaction in -- and involved that icon.**
Q. That small-scale interface, was that internal to Anthropic?
**A. Yes.**
MR. GOOCH: Speculation.
Q. (By Mr. Hailey) And which AI models -- which AI models -- which Anthropic AI models could be accessed through this small-scale interface you're referring to?
MR. GOOCH: Vague. Speculation.
THE DEPONENT: I mean, my -- my best recollection was that this was used for experimental research models, primarily.
Q. (By Mr. Hailey) Okay. So is it your best understanding that the prompt and output in Exhibit 241 is from an experimental Anthropic research AI model?
**A. Based on what I see in 240, that would be my best guess. But I don't know for sure.**

287

Q. And would that be [redacted] or would that be something else?
**A. As I said several times, [redacted] was a pretrained model, so I wouldn't expect it would have -- ever have been [redacted], as I understand the term.**
Q. Okay. So let's go back to Exhibit 240.
Below Dr. Askell's comment where she says, "Will generate copyrighted text and name the authors (sometimes gets the text wrong). There were a couple of example above this."
Below that, she writes, "I guess behaviors like this might go away."
Did I read that correctly?
**A. She -- I think you read that sentence correctly.**
Q. And the behavior that she's referring to is the model generating copyrighted text, correct?
**A. I don't know.**
Q. Well, in her message above, she's talking about the model generating copyrighted text. And then below that, she says, "I guess behaviors like this might go away," right?
MR. GOOCH: Asked and answered. Form.
THE DEPONENT: I just think that you're

288

using very vague language. I'm not sure which model you're referring to.
Q. (By Mr. Hailey) When Dr. Askell writes, "I guess behaviors like this might go away," what behaviors is she referring to?
MR. GOOCH: Objection. Calls for speculation. Form.
THE DEPONENT: I think the missing context here is that this is referring to an experimental research model that was not Claude, in the sense that it was not a model that was, as far as I know, ever deployed or used commercially. This was just a research experiment.
Q. (By Mr. Hailey) Do you know specifically what Anthropic research model this is referring to?
**A. I don't, but you can see that I wrote -- I -- there's "Jared." There is a comment that has a URL. And it says, [redacted]**
**The word "yolo" is referencing "you only live once" and is likely indicative that this was an experimental research model that was being trained.**
**At any given time, researchers at Anthropic are training tens, hundreds, arguably**

289

**thousands of different AI models. Most of those are for research purposes. So my best guess is that this was a simple version being trained with RL and experimented with kind of early on.**

Q. Do you know whether this experimental model was used to train any commercial Claude models?

**A. I don't know.**

MR. GOOCH: Objection. Form.

Q. (By Mr. Hailey) So Dr. Askell writes, "I guess behaviors like this might go away."

And then below that, you respond, "Yeah we didn't train it not to do this."

Did I read that correctly?

**A. You read the sentence written there correctly.**

Q. And when you wrote, "we didn't train it not to do this," you're referring to the phenomenon that Dr. Askell is highlighting above about the model generating copyrighted text and naming the authors, correct?

MR. GOOCH: Objection. Vague. Misstates prior testimony. And form.

THE DEPONENT: As I stated earlier, at any given time, Anthropic researchers typically are

290

training tens, hundreds, maybe more, models for research purposes. Those models are trained to learn about specific behaviors, tasks, phenomena.

All aspects of training that go into making Claude as a model released to the public are almost never included in these research experiments, which are confined to a small subset of what -- what we do. We're -- we're doing that in order to learn things.

So I think what this is indicating is that the particular experimental model being discussed here is -- was not trained with sort of the full context or intent of training final versions of Claude.

Q. (By Mr. Hailey) So the specific experimental model we're talking about here you didn't train not to generate copyrighted text; is that right?

MR. GOOCH: Objection. Form.

THE DEPONENT: As I said, the vast majority of research experiments internally do not involve training models to even necessarily engage in dialogue or follow instructions, for example. Researchers often train models to only write code or only solve math problems or only conduct

291

searches or only follow instructions.

And so there's a large variety of different models that are being trained. The training for Claude models is much more comprehensive.

Q. (By Mr. Hailey) Dr. Kaplan, do you agree that in order for Claude to be able to respond to prompts relating to song lyrics, it needs to be trained on song lyrics?

MR. GOOCH: Calls for an expert opinion. Form.

THE DEPONENT: My personal opinion -- are we done with these documents?

Q. (By Mr. Hailey) You can set those aside for now.

**A. My personal opinion is that the answer to the question is no.**

Q. Do you have any data specifically relating to song lyrics to back that personal opinion up?

**A. Typically, Anthropic doesn't have any particular interest in song lyrics, and so it's not something that Anthropic researchers have spent any specific time working on.**

Q. So the answer is, no, you don't have any

292

data specifically relating to song lyrics to back that personal opinion up?

MR. GOOCH: Asked and answered. Form.

THE DEPONENT: As I indicated earlier, I think it's likely that music reviews, discussions of songs, discussions of music, of poetry are likely to be more relevant to Claude's behavior than song lyrics.

Q. (By Mr. Hailey) But you don't have any data relating to song lyrics specifically to support that personal opinion?

MR. GOOCH: Asked and answered. Form.

THE DEPONENT: I don't -- I don't really know how to -- how to answer the question.

As I said, song lyrics aren't something that Anthropic particularly focuses on.

There are quite a lot of experiments that Anthropic has conducted, and the research community as well, over many years on different kinds of training data mixtures and how that affects model behavior and model performance. And those would be the kind of experiments that would inform my personal opinion about what might happen if Claude was trained with or without song lyrics.

Q. (By Mr. Hailey) And none of those --

# Pages 345-348

345

**A. I don't know.**
Q. Does Anthropic perform any diligence to identify whether the works contained in the datasets it uses for AI training are copyrighted?
MR. GOOCH: Objection. Form. And calls for speculation.
And I'm going to provide the same privilege caution and direct the witness not to answer to the extent it would reveal privileged conversation.
But you can otherwise answer the question.
THE DEPONENT: As I mentioned earlier, my understanding is that essentially all recently written human text, human written text, is copyrighted, including most text on the Internet.
Thus, my understanding is that, based on that comment, the fact that Anthropic trains on data from the Internet, that Anthropic does train models on text that is copyrighted.
Q. (By Mr. Hailey) And how long have you had that understanding?
MR. GOOCH: Objection. Form.
And going to continue to caution the witness that you can answer the question, but do

346

not provide privileged information such as conversations with attorneys or thoughts formed as relation to conversations with attorneys.
THE DEPONENT: I'm not sure.
Q. (By Mr. Hailey) Does Anthropic perform any diligence on the datasets it uses for AI training to identify whether rights holders have given permission for their works to be included in their datasets?
MR. GOOCH: Same objections and same caution to not reveal privileged information.
THE DEPONENT: I'm not sure.
Q. (By Mr. Hailey) Does Anthropic perform any diligence to identify whether the works contained in the datasets it uses for AI training are pirated copies of copyrighted works?
MR. GOOCH: Objection. Form.
I also think that -- like what do you "pirate"?
There's a PO in place. I want to make sure you're not in -- out of compliance with the PO.
MR. HAILEY: I don't know what you're asking, Taylor.
MR. GOOCH: Okay. So I'm going to direct

347

the witness not to answer to the -- as I believe that question is trying to get to torrenting, which is not a permissible topic.
If you want to carve that out of your question, feel free. But otherwise, I understand pirating to be a -- a violation of Rule 30.
MR. HAILEY: I'm not asking about torrenting.
Q. (By Mr. Hailey) Can you answer my question.
**A. Can you please define the word "pirate."**
Q. Does Anthropic perform any diligence to identify whether the works contained in the datasets it uses for AI training are illegal or stolen copies of copyrighted works?
MR. GOOCH: So I'm -- again believe that counsel is trying to invade and violate Order 30.
And if you want to carve out torrenting, I'll let him answer.
If you're not going to carve out torrenting, I'm not going to let him answer.
Q. (By Mr. Hailey) I'm not asking about torrenting on any of these questions, Dr. Kaplan --
MR. GOOCH: So state that in your question --

348

MR. HAILEY: I've -- I've --
MR. GOOCH: -- and I'll let him answer it.
MR. HAILEY: I'm telling you right now, I'm not asking about torrenting in any --
MR. GOOCH: Unless it's stated --
MR. HAILEY: -- of these questions.
MR. GOOCH: -- in the question, I'm not going to let him answer it.
MR. HAILEY: Well --
MR. GOOCH: You're welcome to ask the question.
I believe because of how depositions are used, you're going to just quote the question and the answer and not what you're saying your -- the definition is.
So if you want to put it into the question, I'll let him answer it.
Q. (By Mr. Hailey) Dr. Kaplan, Anthropic has used the Books3 dataset to train its AI -- certain of its Claude models, correct?
**A. Can you define what the "Books3 dataset" is.**
Q. Are you familiar with the Books3 dataset?
**A. I'm not sure.**