# EXHIBIT 129

Planet Depos
We Make It Happen™

HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY

# Transcript of Thomas B. Brown, Jr.

**Date:** January 26, 2026
**Case:** Concord Music Group -v- Anthropic

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

CONCORD MUSIC GROUP, INC., ET AL., Plaintiffs,
v.
ANTHROPIC PBC, Defendant.

Case Number 5:24-cv-03811-EKL SVK

HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY

VIDEOCONFERENCED and VIDEO-RECORDED
30(b)(1) DEPOSITION OF
THOMAS B. BROWN, JR.
San Francisco, California 94111
Monday, January 26, 2026

Reported Stenographically by:
MARY J. GOFF
CSR No. 13427
WA CSR No. 21030779
Job No. 616917
PAGES 1-355

2

HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY
VIDEOCONFERENCED and VIDEO-RECORDED
30(b)(1) DEPOSITION of

THOMAS B. BROWN, JR., Volume I, taken on behalf of Plaintiff Music Publishers, Oppenheim + Zebrak, LLP, at WilmerHale, 50 California Street, Suite 3600, San Francisco, California 94111, beginning at 9:18 a.m. and ending at 6:01 p.m., on Monday, January 26, 2026, before MARY J. GOFF, California Certified Shorthand Reporter No. 13427 and WA CSR No. 21030779.

3

APPEARANCES:

For Plaintiffs Concord Music Group, et al.
Oppenheim + Zebrak, LLP
BY: NICHOLAS C. HAILEY
BRET MATERA (remote)
Attorneys at Law
4530 Wisconsin Avenue, NW
5th Floor
Washington, DC 20016
202-480-2999
nick@oandzlaw.com
bmatera@oandzlaw.com

For Defendant Anthropic PBC
WilmerHale
BY: SONAL MEHTA
ELLEN STEPHANO (remote Boston)
Attorneys at Law
2600 El Camino Real
Suite 400
Palo Alto, California 94306
sonal.mehta@wilmerhale.com
628-235-1026

ALSO PRESENT: Natalie Naugle, in-house counsel Anthropic
Videographer: Philip Astor

4

INDEX


| WITNESS | | EXAMINATION |
|---|---|---|
| THOMAS B. BROWN, JR. | | |
| Volume I | | |
| | ATTORNEY HAILEY | 8 |
| | ATTORNEY MEHTA | -- |

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 259 | Plaintiffs' Notice of Deposition to Tom Brown Pursuant to Federal Rule of Civil Procedure 30(b)(1) | 10 |
| Exhibit 260 | Tom Brown's LinkedIn Profile | 11 |
| Exhibit 261 | Tom Brown X post Listening to this singing | 27 |
| Exhibit 262 | Jukebox | 30 |
| Exhibit 263 | 9-9-2023 email from Tehal Anthropic_0000011373 | 73 |
| Exhibit 264 | Anthropic Overview Sept 2023 Anthropic_0000011376-406 | 73 |
| Exhibit 265 | HIPI Anthropic_0000216904-909 | 88 |
| Exhibit 266 | Tom Brown Spotify Account | 101 |

# Pages 53-56

Q So you don't -- sitting here today, you don't know what Anthropic's mission is? Is that your testimony?
ATTORNEY MEHTA: Objection, misstates the testimony.
**A Our mission is to ensure that the transition to advanced AI systems goes well for humanity.**
Q (BY ATTORNEY HAILEY) And what do you mean by the "transition to advanced AI systems"?
**A I think in the same way that the Industrial Revolution was an enormous transition for all of humane society, that we're going to be facing a similar transition with AI.**
Q (BY ATTORNEY HAILEY) So does Anthropic have an obligation to ensure that the transition to advanced AI systems does not negatively impact humanity?
ATTORNEY MEHTA: Form.
**A I think Anthropic has an obligation to ensure that the transition goes as well as it possibly can. I think that it's going to be something that takes all of society to make it go well, but we want to contribute as much as we can.**
Q (BY ATTORNEY HAILEY) You agree that mass



job displacement would negatively impact humanity?
ATTORNEY MEHTA: Objection to the form.
**A I think, again, like comparing it to the Industrial Revolution is an interesting way of looking at it.**
Q (BY ATTORNEY HAILEY) Sir, do you agree that mass job displacement would negatively impact humanity?
ATTORNEY MEHTA: Objection to the form. Asked and answered multiple times.
**A I think, yeah, again, I -- I'm repeating myself, but if you look at the Industrial Revolution, I think that that was an instance where looking back on it, we feel that the Industrial Revolution was positive for all of the humanity, even though it did have a lot of disruptive job displacement.**
**If you could get just the positive benefits while avoiding the job displacements, that act -- that obviously would be better, and so -- but there we are.**
Q (BY ATTORNEY HAILEY) Do you agree, Mr. Brown, that the risks of AI technology are significantly higher than any risks that took place during the Industrial Revolution?



ATTORNEY MEHTA: Form.
**A Sorry. Could you repeat that again?**
Q (BY ATTORNEY HAILEY) Do you agree, Mr. Brown, that the risks of AI technology are significantly higher than any risks that took place during the Industrial Revolution?
ATTORNEY MEHTA: Form.
**A I think -- I think they're -- they're very different risks.**
Q (BY ATTORNEY HAILEY) Was there a risk of human extinction during the Industrial Revolution?
ATTORNEY MEHTA: Form.
**A Yeah, I think -- I think no. So I think that that's an example of a place right now that has increased risk. And that's something that we care a lot about, though. That's part of the -- the founding mission of Anthropic, to reduce that risk.**
Q (BY ATTORNEY HAILEY) And you have testified that one of the potential risks of AI technology such as CLAUDE is human extinction, right?
ATTORNEY MEHTA: Objection to the form.
**A Yes. And I have public statements that -- that that is a risk. Again, it -- it is coupled with the tremendous upside that I think are larger**



**than the -- the benefits of the Industrial Revolution.**
Q (BY ATTORNEY HAILEY) CLAUDE is a commercial product, correct?
ATTORNEY MEHTA: Form.
**A CLAUDE is, yes.**
Q (BY ATTORNEY HAILEY) And Anthropic, as a public benefit company, still earns revenues, right?
**A That's correct.**
Q Anthropic is not a nonprofit, correct?
**A That's correct.**
Q It's a for-profit company?
**A It's a public --**
ATTORNEY MEHTA: Objection to the form.
**A -- it's a public benefit corporation.**
Q (BY ATTORNEY HAILEY) You're aware that Anthropic just released a new constitution for CLAUDE?
**A I am. I haven't gotten a chance to read it, unfortunately.**
Q Are you -- so are aware that the constitution states that "CLAUDE is central to Anthropic's commercial success"?
ATTORNEY MEHTA: Objection to the form.
**A I'm not familiar with that, but I -- I**

# Pages 81-92

81

slide deck that you sent to [redacted], though, correct?
ATTORNEY MEHTA: Objection to the form.
**A Yeah, I think that criticizing me for delegating this to consultants is a fair criticism.**
Q (BY ATTORNEY HAILEY) Is it Anthropic's goal to make high barriers to entry for other companies?
**A That's not my goal.**
Q Anthropic recognizes in this slide that "due to high barriers to entry in the AI industry, the winners of the initial race to develop this technology would turn into enduring titans."
Is that a fair reading of this slide?
ATTORNEY MEHTA: Objection to the form. Misstates the document; and asked and answered.
**A I think that the -- the words on the document say "winners created a high barriers to entry," et cetera, et cetera.**
**Again, I think that we -- that's not the position that Anthropic's leaders have ever held, and I think that that's a result of this being delegated to external consultants with minimal oversight.**
Q (BY ATTORNEY HAILEY) But at the very least that's the position that Anthropic was taking

82

externally in this [redacted] at this time?
ATTORNEY MEHTA: Objection, misstates the testimony.
**A I -- I don't know. I don't know if this was ever presented to -- externally. Like, this -- this does seem -- yeah, this doesn't seem like anything that I would endorse.**
Q (BY ATTORNEY HAILEY) You don't know one way or the other?
**A I --**
ATTORNEY MEHTA: Form.
**A -- don't.**
Q (BY ATTORNEY HAILEY) As a factual matter, Mr. Brown, you're aware that Anthropic has copied the Music Publisher Plaintiffs' song lyrics from the Internet and included those lyrics in its training data for its AI models?
ATTORNEY MEHTA: Objection to the form.
**A I'm -- I'm not aware of that.**
Q (BY ATTORNEY HAILEY) As the chief compute officer of the company, you don't know that?
ATTORNEY MEHTA: Objection to the form.
**A No. My -- my focus is on compute. I haven't been responsible for getting the publicly**

83

**available data.**
Q (BY ATTORNEY HAILEY) In the two and a half years that this case has been pending, have you done anything to investigate whether the Music Publisher Plaintiffs' song lyrics are included in Anthropic's training data?
ATTORNEY MEHTA: Objection to the form.
THE VIDEOGRAPHER: Sonal, can I just have you move your mic up? Thank you.
**A I haven't personally been focused on that. I believe that our team has -- has been working on that, but that's not my area of expertise.**
Q (BY ATTORNEY HAILEY) And you don't personally dispute, Mr. Brown, that Anthropic has copied Plaintiffs' song lyrics from the Internet and included those lyrics in its training data?
ATTORNEY MEHTA: Objection, asked and answered.
**A Again, I -- I just -- I don't have information about that. That's not what I have focused on.**
Q (BY ATTORNEY HAILEY) To the extent CLAUDE generates verbatim or near-verbatim copies of lyrics and output, that shows that the lyrics were included in CLAUDE's training data; is that correct?

84

ATTORNEY MEHTA: Objection to the form. Assumes facts not in evidence.
**A Yeah, sorry. Can you repeat the question?**
Q (BY ATTORNEY HAILEY) To the extent CLAUDE generates verbatim or near-verbatim copies of lyrics and output, that showed that the lyrics were included in CLAUDE's training data, correct?
ATTORNEY MEHTA: Form; asked -- assumes facts not in evidence.
**A I don't -- I'm not the expert on how kind of the data regurgitation stuff works. It seems plausible to me that a model could also -- like, even if it hasn't seen the exact data in its training, could piece it together from piecemeal components of such information. But again, I'm not the expert on this.**
Q (BY ATTORNEY HAILEY) And when you say "piecemeal components," you're just saying different pieces of the lyrics the model could put together to create the full lyrics?
ATTORNEY MEHTA: Objection to the form. Misstates the testimony.
**A Yeah, I think that there's a -- like, probably if it's -- if it's an exact match, it probably -- it probably came from the model having**

**seen the exact text at some point in its training.**
**I'm just pointing out that it also could come from the model, like not having seen all of some information, but then inferring that a person might have said that or written that.**
Q (BY ATTORNEY HAILEY) Do you agree that song lyrics are useful to include in CLAUDE's training corpus because they add to the diversity of training data?
**A Again, this isn't my area of expertise. I think that I have probably not. I think I -- I think I have generally wanted us to -- I -- I have seen that there's little value in song lyrics for CLAUDE being good at work, and so it's always been the least useful data for CLAUDE.**
Q And need when you say "there's little value" -- strike that. What about in terms of -- strike that.
Setting aside CLAUDE for work, what's the value of including song lyrics in training data for uses relating to songs and lyrics?
ATTORNEY MEHTA: Objection to the form.
**A Sorry. Can you repeat that one more time?**
Q (BY ATTORNEY HAILEY) You have -- you have referred to CLAUDE for work, but there are many



other uses of CLAUDE, correct?
ATTORNEY MEHTA: Form.
**A There are other uses of CLAUDE. I think that they're much less important than work, and so my guidance to the team has always been: Get the data that's useful for work, and that's -- that's the thing that matters.**
Q (BY ATTORNEY HAILEY) Have you ever given guidance to the team to remove song lyrics from the training data based on this view?
**A I -- I think if it was easy to do that, I would have supported it, so I might have asked at some point if it was -- if it was easy to do that. Because I do think that, like, yeah, the song lyrics provide little to no value for CLAUDE being good at work.**
Q Your cofounder, Jared Kaplan, the chief science officer at Anthropic, stated in a declaration in this case:
"Although they are infinitesimal portion of the total data available on the Internet, song lyrics may be useful to include in the training corpus because they add to the diversity



of training data."
Do you agree with that statement.
ATTORNEY MEHTA: Objection to form.
**A I think probably -- again, like, the -- data research isn't my area of expertise, but I think I probably would disagree, even though I think Jared's statement, as you read it, seemed like it was not like a ringing endorsement of, like, that data being useful.**
It seemed like he was like: Ah, maybe it would be, like, more than zero useful, but he's not sure.
Q (BY ATTORNEY HAILEY) Is it a true or false statement that "song lyrics may be useful to include in the training corpus because they add to the diversity of training data"?
ATTORNEY MEHTA: Objection, asked and answered.
**A Yeah, I think -- again, it -- this isn't my area of expertise. It seems like there's reason to have a lot of uncertainty about that.**
**I think that that statement is very weak. It's saying that, like, perhaps there could be a nonzero amount of value from this, but we're not sure, which seems plausible to me.**



**It's -- it's definitely far less valuable than, for example, books or publicly available data on the Internet that's about technical topics.**
Q (BY ATTORNEY HAILEY) But you haven't taken any steps to remove song lyrics from Anthropic's training data, correct?
ATTORNEY MEHTA: Objection, asked and answered.
**A I'm not sure. I think I would -- I would actually -- yeah, I think -- I think I would guess that we have done efforts to -- to remove it, but I'm -- that's not my area of expertise.**
Q (BY ATTORNEY HAILEY) Why do you say you would guess that you have done efforts to remove song lyrics from your training data?
ATTORNEY MEHTA: Objection to the form.
**A Because I don't think it's useful for making CLAUDE useful for work.**
Q (BY ATTORNEY HAILEY) Sitting here today, are you aware of any specific efforts Anthropic has undertaken to remove song lyrics from its training data?
**A That's not my area of expertise, so I don't -- yeah, I don't -- I don't know.**
(Exhibit 265 was marked for identification

and is attached to the transcript.)

Q (BY ATTORNEY HAILEY) I'm showing you what I have marked as Exhibit 265. It's a document produced by Anthropic bearing the Bates number ANTHROPIC 216904.

Can you tell me what this document is?

**A Should I read the whole document or are there particular parts to read?**

Q I'll direct you to where I'm going to ask you questions, but the question that's pending is: Can you tell me what this document is?

**A It looks like this is an internal document. I don't believe I have seen it though.**

Q I'll represent to you that this document was produced to us by Anthropic's lawyers from your custodial file. That -- the metadata shows that the file name of this document is "data needs and potential partners."

You can see from the face of the document that the comment bubbles are from August 12, 2023 and thereabouts.

Do you see that?

ATTORNEY MEHTA: Objection, foundation.

**A Okay. Yeah, so it seems like this is an internal document from some of the teams discussing**



**data.**

Q (BY ATTORNEY HAILEY) Turning back to the top of page 1, what does the acronym "HIPI" stand for?

ATTORNEY MEHTA: Form --

**A I don't know.**

ATTORNEY MEHTA: -- foundation.

Q (BY ATTORNEY HAILEY) Does that stand for high-value intellectual property infohazards?

Do you know?

ATTORNEY MEHTA: Objection to the form. Foundation; speculation.

**A I don't know.**

Q (BY ATTORNEY HAILEY) The first sentence reads:

"We think the data is likely to be the main distinction between various AI labs over the next year and where we think data could be found is actually quite a large competitive advantage."

Did I read that correctly?

ATTORNEY MEHTA: Form.

**A Let me -- let me read the -- the first half of this document perhaps and then I can -- I**



**can try to put that in context.**

Q (BY ATTORNEY HAILEY) And my question, Mr. Brown, is just whether I read that first sentence correctly.

ATTORNEY MEHTA: Counsel, you know he's entitled to review the context. He just asked for a moment to do that. Let him do it.

ATTORNEY HAILEY: I'm just clarifying my question, Counsel.

**A Okay. I have read the document.**

Q (BY ATTORNEY HAILEY) The first sentence of the document, again, reads:

"We think the data is likely to be the main distinction between various AI labs over the next year and where we think data could be found is actually quite a large competitive advantage."

Did I read that correctly?

ATTORNEY MEHTA: Objection to the form. Foundation.

**A That's what the first sentence says.**

Q (BY ATTORNEY HAILEY) Do you agree, Mr. Brown, that finding and collecting the best training data can be a large competitive advantage?



ATTORNEY MEHTA: Form.

**A I think that this document was -- seems like it's kind of early thinking about data. And I think it probably underestimates what we found out later, which is that the quality of the data is much more important than the overall quantity of the data.**

Q (BY ATTORNEY HAILEY) So that wasn't my question. My question was: Mr. Brown, do you agree that finding and collecting the best training data can be a large competitive advantage?

ATTORNEY MEHTA: Objection, asked and answered.

**A Again, it seems like the -- like, this -- this document was kind of early on thinking. I think that data is an important ingredient to the quality of the models. Data that has -- that is useful for work is much more important than other data, and that would be a component of "best" to answer your question.**

Q (BY ATTORNEY HAILEY) And I'm -- set -- you can set aside the document.

I'm asking you, Mr. Brown, sitting here today, do you agree that finding and collecting the best training data can be a large competitive

# Pages 149-152

149

**like, see publicly available information about artists, and that includes like a large amount of other information besides lyrics.**
Q (BY ATTORNEY HAILEY) CLAUDE is -- this CLAUDE output is discussing Adele and Japanese House's lyrics specifically?
**A Yeah.**
Q It's your testimony that CLAUDE generated this output without ever -- without ever having seen the lyrics for these artists; is that your testimony?
ATTORNEY MEHTA: Objection to the form.
**A No, that's not what I'm saying. I'm just saying that if it had never had access to the lyrics, it still would be able to know that they have an emotional, introspective style, because that's something that people talk about a lot on the Internet.**
Q (BY ATTORNEY HAILEY) So you're saying that CLAUDE generated this output because it was either -- strike that.
Fair to say that CLAUDE generated this output because it was either trained on the lyrics or trained on humans writing about the lyrics on the Internet?

150

ATTORNEY MEHTA: Form.
**A I think I don't know, but that -- that would be my most likely guess.**
Q (BY ATTORNEY HAILEY) If CLAUDE was trained solely on computer code, for instance, it would not be able to generate this specific output about Adele and the Japanese House and the style of their lyrics? Would you agree to that?
ATTORNEY MEHTA: Form.
**A I don't know. I think that would be an interesting exercise. I think it's possible that the model would be able to pick up enough information from a wide enough breadth of computer code to still draw these inferences, but I'm not sure.**
Q (BY ATTORNEY HAILEY) Can you explain to me how the model would under -- would take computer code and turn that into output regarding the lyrical styles of Adele and Japanese House?
**A I think -- so again, this one, I don't know. And I think -- and I think probably I would say probably not, but I think it's possible that if you had enough computer code, it would include computer code that's related to music production or the music industry or like fans of various artists,**

151

**et cetera, that would give it the requisite information that it would need there.**
Q Can you turn to the second page of this exhibit? Do you see your prompt at the top where you -- where you ask CLAUDE:
"Does Adele's style music tend to rhyme?"
**A I see that.**
Q CLAUDE responds:
"Yes, Adele's lyrics typically do rhyme, but she uses a natural conversational style that doesn't feel forced. Let's look at some common rhyming patterns in her song."
Did I read that correctly?
**A You read that correctly.**
Q And CLAUDE is -- CLAUDE is able to generate that response discussing Adele's lyrics and the style of those lyrics because it was either trained on the lyrics themselves or human discussions of those lyrics?
**A That's not obvious to me, but I think that's likely -- that's likely correct.**
Q And then you can see that CLAUDE generates

152

output that copies the lyrics to two Adele songs, "Someone Like You" and "Hello."
ATTORNEY MEHTA: Objection to the form.
Q (BY ATTORNEY HAILEY) Do you see that?
**A Yeah, I don't think it was copying them. I think it was giving examples of the rhyming schemes that Adele uses.**
Q CLAUDE is generating output with the lyrics to the song "Someone Like You" and "Hello," correct?
ATTORNEY MEHTA: Form; asked and answered.
**A Again, I think that CLAUDE is coaching me here by giving examples of the rhyming schema.**
Q (BY ATTORNEY HAILEY) Is it -- is it your testimony that those are not the lyrics to Adele's songs "Someone Like You" and "Hello"?
ATTORNEY MEHTA: Form.
**A Again, I think that CLAUDE is giving me examples of the rhyming schemes in -- in response to my question about the -- the rhyming schemes.**
Q (BY ATTORNEY HAILEY) Well, it's not only the rhyming schemes, right, Mr. Brown? It's the lyrics to the songs "Someone Like You" and "Hello," right?
ATTORNEY MEHTA: Form.

# Pages 161-168

161

CLAUDE to -- to write a song for your wife along the lines of what you were discussing in this chat?
**A I sadly did not.**
(Exhibit 268 was marked for identification and is attached to the transcript.)
Q (BY ATTORNEY HAILEY) I'm showing you what's been marked as Exhibit 268 to your deposition. It bears the Bates Number ANTHROPIC 570675.
Do you recognize this document?
**A Yes.**
Q And what is this?
**A I think this is me trying to identify a song in the same way that I would ask a friend like "what is that track that goes" and then like some tiny snippets of the track.**
Q So you're asking CLAUDE to identify a song based on lyrics that you included in your prompt, right?
ATTORNEY MEHTA: Objection to the form.
**A I'm trying to identify a song based on knowing some little snippets about it, plus like a hypothetical -- like an album that I was guessing.**
Q (BY ATTORNEY HAILEY) And when you say "snippets," you're referring to the lyrics here that

162

you quote in your prompt, right?
**A Yes.**
ATTORNEY MEHTA: Form.
**A Here I was asking "a track that goes king of the...king king king."**
Q (BY ATTORNEY HAILEY) And just -- just to be clear, you -- your prompt reads:
"Which is the Black Panther album track that goes 'king of the...king king king'"?
Did I read that correctly?
**A That's correct.**
Q And that's another use of CLAUDE is identifying song lyrics based on submitted lyrics?
ATTORNEY MEHTA: Objection to the form. Calls for speculation.
**A Yeah, I asked -- I asked the model this.**
Q (BY ATTORNEY HAILEY) That's what you're -- that's what you're doing here, right?
**A I'm -- yeah, I'm asking for the model to help me figure out, like, which -- which -- what is the name of the song that goes like that.**
Q And third-party users have used CLAUDE in the same way, right?
ATTORNEY MEHTA: Objection, calls for

163

speculation.
**A I don't know. Sounds -- it seems plausible to me.**
Q (BY ATTORNEY HAILEY) Have you seen any data on that?
**A I haven't.**
Q But you're not disputing that third-party users have used that model --
ATTORNEY MEHTA: Objection --
Q (BY ATTORNEY HAILEY) -- in that way?
ATTORNEY MEHTA: -- calls for speculation.
**A I -- I don't know. I'm not -- I'm not disputing it. I don't know.**
Q (BY ATTORNEY HAILEY) And for the model to be capable of responding to your prompt, it needed to be trained on the lyrics to the song from the Black Panther album that you're asking about?
ATTORNEY MEHTA: Form.
**A Maybe, or just people talking about it. I think it would be enough for it to pick up on that.**
Q (BY ATTORNEY HAILEY) So either the lyrics themselves or human-written content quoting the lyrics themselves?
ATTORNEY MEHTA: Objection to the form.
**A Not necessarily quoting it, but just**

164

**talking about it also.**
Q (BY ATTORNEY HAILEY) Well, if CLAUDE wasn't trained on these specific lyrics that you quote here, it couldn't possibly identify the song you're asking about, could it?
ATTORNEY MEHTA: Form.
**A I think it could. I think you could have similar -- like here I don't think I directly quoted. "King of the...king king king" is a paraphrase of that.**
**If many other people had similar questions with similar paraphrases, I think that would be sufficient for it to answer questions like this sufficiently.**
Q (BY ATTORNEY HAILEY) When you -- when you refer to other people having similar questions with similar paraphrases?
**A In publicly available data.**
Q On Reddit, for instance?
ATTORNEY MEHTA: Form.
**A Which is publicly available data on the Internet.**
Q (BY ATTORNEY HAILEY) CLAUDE responds:
I believe you're thinking of "King's Dead" from the Black

165

Panther soundtrack. That track features the repeated "la-di-da-di-da" vocal hook that sounds like what you're describing with the "king references."
Do you see that?
A I see that.
Q And when CLAUDE quotes the repeated la-di-da-di-da vocal hook, how is it able to quote that vocal hook?
ATTORNEY MEHTA: Form.
A I think actually that was incorrect too. I don't think that there's any la-di-da-di-da in that track, so I think this was actually a place where the model was incorrect. In the same way that if I asked a friend about this, they might it wrong.
Q (BY ATTORNEY HAILEY) So is this a hallucination?
ATTORNEY MEHTA: Form.
A I think this -- I think this ended up, yes, being a hallucination.
Q (BY ATTORNEY HAILEY) So when model says "the track features the repeated la-di-da-di-da vocal hook," it's making that up?
ATTORNEY MEHTA: Form.

166

A This was a while ago. I think I ended up looking it up by just googling this -- this, like "King's Dead" track and it -- or I ended up, like, listening to it and it didn't end up having la-di-da-di-da in it.
Q (BY ATTORNEY HAILEY) So you googled the lyrics to the song "King's Dead"?
A I -- I think I did.
Q Do you recall where -- where you ultimately saw those lyrics in response to your Google Search?
A I don't remember.
Q Was it a lyric website?
ATTORNEY MEHTA: Form.
A It might have just been inline. I don't know.
Q (BY ATTORNEY HAILEY) And you understand when Google returns inline searches to lyrics, those are licensed uses by Music Publisher Plaintiffs?
ATTORNEY MEHTA: Form --
A I'm not --
ATTORNEY MEHTA: -- calls for speculation.
A -- aware of that.
(Exhibit 269 was marked for identification and is attached to the transcript.)

167

Q (BY ATTORNEY HAILEY) I'm showing you what I have marked as Exhibit 269 to your deposition. It's another document produced by Anthropic bearing the Bates Number ANTHROPIC 570707.
Can you tell me what this is?
A Do you know what date this is from?
Q According to the metadata that Anthropic produced to us, the prompt created date for this document is February 9, 2025.
A Okay. Yep.
Q Do you recognize this?
A Yep, I recognize this.
Q And what is this?
A I think I went home and I had a journal entry -- or I had -- sorry. I had a little essay that I wrote I think when I was 13, which was reminiscing about when I was a ten-year-old -- when I was ten years old and my sister would torch me by playing the Spice Girls song "Spice Up Your Life."
And so I shared that essay from me when I was 13 with CLAUDE, and then CLAUDE, I guess, transcribed -- oh, I think I -- I think I took pictures of it.
It was a handwritten document from when I was a kid -- or sorry. It was a printed out

168

document, and so I asked CLAUDE to transcribe it.
And then CLAUDE was very careful about not reproducing any song lyrics, even though the only line from this was "every boy and every girl, spice up your life."
Yeah, that -- that's, I think, what's going on here.
Q So you uploaded an image into CLAUDE and asked CLAUDE to transcribe that? That's what you're doing in that first prompt?
A Yeah, I uploaded an image with my -- a childhood essay that my mom had preserved for me.
Q And CLAUDE responded in part:
"I provided a summary of the personal narrative while being mindful not to reproduce any song lyrics or copyrighted material,"
correct?
A Yep. And then I said:
"Don't be ridiculous. You can transcribe this."
And then it transcribed the whole thing, which is this, like, one paragraph here.
Q So going back to CLAUDE's response, that -- that's -- was due to CLAUDE's guardrails

# Pages 173-176

173

**to things, thinking about how a person would act in a similar situation is going to be a way that will deliver results for you.**
Q (BY ATTORNEY HAILEY) Is CLAUDE a human being, Mr. Brown?
**A CLAUDE not a human being.**
Q Is CLAUDE alive, Mr. Brown?
**A What a -- what does like "being alive" mean to you?**
Q How do you understand that term?
**A I think it's a surprisingly deep philosophical question.**
Q Do you believe CLAUDE is alive?
**A I think it's a surprisingly deep philosophical question.**
Q Do you believe CLAUDE is alive like a human being is alive?
**A Again, I think that that's -- that's a thing that philosophers disagree on right now.**
Q You say "philosophers disagree."
What is your opinion as to whether CLAUDE is alive like a human being?
ATTORNEY MEHTA: Objection to form; asked and answered.
**A I don't know. I think that -- I think**

174

**that words that we use are useful for conveying information. And I think in this case the thing I was just pointing out was that: Yeah, it's useful to -- to think about the model, have -- to have a mental model of how the model is thinking through stuff that's similar to like how a person would act in that scenario.**
Q (BY ATTORNEY HAILEY) So that wasn't my question, so I'll ask it again.
Mr. Brown, what is your opinion as to whether CLAUDE is alive like a human being?
ATTORNEY MEHTA: Objection to the form. Asked and answered.
**A I think I would probably say it's not alive like a human being.**
Q (BY ATTORNEY HAILEY) Thank you.
(Exhibit 270 was marked for identification and is attached to the transcript.)
Q (BY ATTORNEY HAILEY) I'm showing you what I have marked as Exhibit 270 to your deposition.
Do you recognize this document? And for the record, it is Bates-stamped ANTHROPIC 570628.
**A Yep, I see this.**
Q This is another conversation you had with CLAUDE, correct?

175

**A Yep, this looks like another conversation.**
Q Do you see at the top you prompt CLAUDE:
"What are your Top 10 favorite Grimes tracks?"
**A I see that.**
Q Are you a fan of the musical artist Grimes?
**A Yeah, I like Grimes.**
Q What do you like about Grimes?
**A I think she's a creative producer.**
Q CLAUDE responds:
"I don't have personal favorites since I don't experience music subjectively."
Did I read that portion of the response correctly?
**A Yeah, I see that.**
Q And that's a true statement, that CLAUDE cannot experience music subjectively like a human would?
ATTORNEY MEHTA: Form.
**A I think that's probably true.**
Q (BY ATTORNEY HAILEY) Why can't CLAUDE experience music subjectively?
**A I think right now we don't train CLAUDE on**

176

**audio inputs.**
Q CLAUDE can't experience song lyrics subject -- subjectively either, right?
**A I don't know. That -- that also seems like a question for philosophers.**
Q So I'm not asking a philosopher. I'm asking you, Mr. Brown, the chief compute officer of Anthropic, can CLAUDE, your company's product, experience song lyrics subjectively?
ATTORNEY MEHTA: Objection to the form.
**A I -- I don't know.**
Q (BY ATTORNEY HAILEY) Is CLAUDE trained on audio files of songs by Grimes and other musical artists?
ATTORNEY MEHTA: Form.
**A My understanding is we don't train on any audio information, so I think no.**
Q (BY ATTORNEY HAILEY) And CLAUDE can only generate output based on what's included in its training data, correct?
ATTORNEY MEHTA: Form.
**A I feel like we talked about that a few times. I think CLAUDE can take -- can make inferences based on all of the data that it's seen.**
Q (BY ATTORNEY HAILEY) But CLAUDE can only

# Pages 181-188

181

**A Yeah, it -- it talks about it with me.**
Q And how is CLAUDE capable of discussing the meaning of this song with you?
ATTORNEY MEHTA: Form.
**A My guess is that it has lots of different interviews that are publicly available with artists such as Eddie Vedder. Plus, it would know the, like, Wikipedia context or the publicly available newspapers around the time, which could then altogether help inform its opinion on -- around the milieu of what was going on around that time.**
Q (BY ATTORNEY HAILEY) Was it also trained on the lyrics to the song?
ATTORNEY MEHTA: Objection to the form.
**A I don't know.**
Q (BY ATTORNEY HAILEY) So CLAUDE was trained on what humans have written about the meaning of the song and potentially the lyrics to the song itself; is that accurate?
ATTORNEY MEHTA: Objection to the form. Misstates the testimony.
**A I don't know.**
Q (BY ATTORNEY HAILEY) Well, in order to generate this output, it must have been -- CLAUDE must have been trained on content relating to the

182

meaning of the song "Jeremy"?
ATTORNEY MEHTA: Objection to the form. Asked and answered.
**A I don't know. As I said before, yeah, I think that it seems like here to me what it's doing is using the publicly available information that is about the surrounding context to educate me.**
Q (BY ATTORNEY HAILEY) You can see that the CLAUDE output also contains specific lyrics to the song "Jeremy" by Pearl Jam, correct?
**A I see a couple individual -- individual sentences.**
Q It quotes the lyrics:
"Daddy didn't give attention
to the fact that mommy didn't
care," correct?
**A I see that.**
Q And it quotes the lyrics from the chorus:
"Jeremy spoke in class today."
Do you see that?
**A I see that.**
Q CLAUDE couldn't generate output quoting those specific lyrics without having been trained on those specific lyrics --
ATTORNEY MEHTA: Objection to the form.

183

Q (BY ATTORNEY HAILEY) -- correct?
ATTORNEY MEHTA: Form.
**A Yeah, I disagree with that. I think that it -- it could easily have picked up that information via other people quoting the model around there --**
Q (BY ATTORNEY HAILEY) So it was either trained on --
**A -- quoting the song around there.**
Q So it was either trained on the lyrics themselves or was -- strike that.
So CLAUDE, in this output where it quotes these lyrics, it's either pulling that from the lyrics themselves or it's pulling that from human-written text quoting those specific lyrics; is that correct?
ATTORNEY MEHTA: Form.
**A That seems likely to me.**
Q (BY ATTORNEY HAILEY) Do you see about midway through the page you say:
"What are your favorite Pearl
Jam tracks?"
**A I see that.**
Q And we discussed earlier that CLAUDE isn't capable of having favorite songs because it doesn't

184

experience music subjectively, right?
**A I -- again, I think that that's kind of a philosophical question. I like talking to CLAUDE kind of like it's a person here. And it seems like it gave me a response that I thought was useful.**
Q But that's just parroting what is in its training data from human-written text, right?
ATTORNEY MEHTA: Objection to the form.
**A No, I don't think that's correct.**
Q (BY ATTORNEY HAILEY) Is it your testimony that CLAUDE is making an independent subjective judgment about its favorite Pearl Jam tracks in this response?
ATTORNEY MEHTA: Objection to the form.
**A I think the way I would imagine it is that CLAUDE starts out as a pretrained model that has a wide variety of different sorts of personas that it can sort of manifest. And then during our later post-training, we select one of those personas. And in this case the persona that was picked still has opinions.**
Q (BY ATTORNEY HAILEY) But when CLAUDE identifies its favorite Pearl Jam tracks, that's just based on information that's in its training data, correct?

185

ATTORNEY MEHTA: Objection to the form. Asked and answered.
**A Yeah, I think not really. I think it's -- I think it's the persona -- like the CLAUDE persona has opinions here.**
Q (BY ATTORNEY HAILEY) So you believe that CLAUDE, an AI model, can have favorite music?
ATTORNEY MEHTA: Objection, asked and answered.
**A That -- that's what it's -- that's what it's claiming in this transcript.**
Q (BY ATTORNEY HAILEY) And I'm not asking about what CLAUDE is saying. I'm asking you, Mr. Brown, senior executive at Anthropic: Is CLAUDE, an AI model, capable of having favorite music?
ATTORNEY MEHTA: Asked and answered.
**A Yeah, I think -- I think that that's a catastrophic question. I would say the persona that CLAUDE is manifesting here does seem to have particular favorites.**
Q (BY ATTORNEY HAILEY) Is CLAUDE -- has CLAUDE ever been exposed to the actual music, the actual audio files of these songs?
ATTORNEY MEHTA: Form. Asked and answered.

186

**A Not to my knowledge.**
Q (BY ATTORNEY HAILEY) So how in the world can CLAUDE say that they're its favorite songs when it's never actually heard the songs?
ATTORNEY MEHTA: Form.
**A Again, this -- this feels pretty philosophical, but I would say it's similar to -- yeah, I don't know. I think -- I think people can have favorites of things, even if they, like, haven't been able to hear them.**
Q (BY ATTORNEY HAILEY) It's just copying what people have said about the song and what's been included in its training data; isn't that true?
ATTORNEY MEHTA: Objection to the form.
**A That seems like that's your opinion.**
Q (BY ATTORNEY HAILEY) I'm asking you.
**A No. I disagree with you.**
Q But you agree that it's never actually heard any of these songs that you're claiming CLAUDE is capable of saying are its favorite songs?
ATTORNEY MEHTA: Objection, misstates the testimony.
**A Yeah, I think it hasn't seen the audio for them.**

187

ATTORNEY HAILEY: Let's going off the record for just a minute so I can fix this.
THE VIDEOGRAPHER: We are going off the record at 13:56 p.m.
(A break was taken from 1:56 p.m. to 2:08 p.m.)
THE VIDEOGRAPHER: We are back on the record at 4:08 p.m.
(Exhibit 272 was marked for identification and is attached to the transcript.)
Q (BY ATTORNEY HAILEY) Mr. Brown, I'm handing you what I have marked as Exhibit 272 to your deposition. It's another document produced by Anthropic. This one bearing the Bates Number 570627.
Do you recognize this document?
**A I see it.**
Q This is another record of a conversation you had with CLAUDE, correct?
**A Yes.**
Q And in this one you prompt CLAUDE:
What's the song "Every Breath you Take" by The Police about,
correct?
**A That's right.**

188

Q So this is another instance of you asking CLAUDE about the meaning of lyrics to a specific song, correct?
ATTORNEY MEHTA: Objection to the form.
**A I was asking, yeah, what the -- what the song "Every Breath you Take" is about.**
Q (BY ATTORNEY HAILEY) Are you aware that the song "Every Breath you Take" is a work-in-suit in this lawsuit?
**A No.**
Q And again, this is a typical use case that third-party users have engaged in like you?
ATTORNEY MEHTA: Objection to the form. Calls for speculation.
**A Sorry. What was the question?**
Q (BY ATTORNEY HAILEY) You agree that this is a typical use case that third-party users have engaged in like you?
ATTORNEY MEHTA: Objection to the form. Calls for speculation.
**A I don't know.**
Q (BY ATTORNEY HAILEY) Well, we have now seen that you have used CLAUDE in this manner multiple times, correct?
**A Yeah, I think it's -- again, it's a tiny**

# Pages 193-196

193

Q CLAUDE responds in part:
"Ric Flair drip. Probably the biggest hit. That flute melody is iconic, and the beat is so smooth and menacing at the same time."
Did I read that correctly?
**A That's -- that's what CLAUDE said.**
Q How is CLAUDE capable of describing the "flute melody as iconic and the beat as smooth and menacing"?
**A I -- I don't know. My guess is that there's like a wide variety of publicly available commentary on this track and that CLAUDE picked it up via learning about that commentary.**
Q So CLAUDE hasn't been trained on the actual audio of this song, correct?
ATTORNEY MEHTA: Form.
**A CLAUDE has not been trained on the audio of this song.**
Q (BY ATTORNEY HAILEY) So when it generates output here referring to the "flute melody as iconic and the beat as smooth and menacing," that's repeating what human writers have said about the melody and beat and that's been included in CLAUDE's training data --

194

ATTORNEY MEHTA: Objection --
Q (BY ATTORNEY HAILEY) -- correct?
ATTORNEY MEHTA: -- to the form.
**A I don't know. My guess is that no person has, like, used this exact sentence and it's more that CLAUDE is, like, picking up kind of a vibe from the commentary and then synthesizing it into this summary.**
Q (BY ATTORNEY HAILEY) And what's your basis for saying that?
**A I think just my experience with training LLMs in the past.**
Q But you don't know specifically what CLAUDE is basing this response on?
**A That's correct. I don't think -- I don't think anybody knows for certain.**
Q And is that fair to say more broadly about CLAUDE's output, that no one knows for certain where exactly that output comes from?
ATTORNEY MEHTA: Objection to the form.
**A I think in -- in general it's very difficult to know what training data is most influential in like a resulting response. That -- that seems like it's an unsolved problem in machine learning.**

195

Q (BY ATTORNEY HAILEY) If training data is repeated many times -- strike that.
If training data is repeated many times in the training corpus, that could make it more likely to influence a resulting response? Would you agree to that?
ATTORNEY MEHTA: Objection, calls for speculation; calls for expert opinion.
**A I don't know. Like, to be clear, I think the -- like, the sentence that we're talking about here, probably "the biggest hit, that flute melody is iconic, and the beat is so smooth and menacing at the same time," I would guess that, like, that sentence has never been written anywhere before.**
**CLAUDE wrote it that one time.**
Q (BY ATTORNEY HAILEY) But you don't know that?
**A I don't know.**
Q And is it your testimony that you don't -- that you can't say one way or the other if specific content is repeated many times in the training data, whether that's more likely to influence the model's output?
ATTORNEY MEHTA: Form.
**A I think I don't -- I think I don't know.**

196

**I think that if you trained a ton on -- like, in pretraining some verbatim chunk of text many, many times, that that would make it more likely that the model would regurgitate it.**
**But again, I think that's -- that's the reason why we avoid doing stuff like that, but again, I'm not the expert here.**
Q (BY ATTORNEY HAILEY) Can you turn to page 654, please?
**A Go back to -- oh, 654.**
Q Do you see about four lines down from the top of the page, you prompt the model:
"I really resonate with her nostalgia. I have had a bunch of success. I'm an Anthropic cofounder, but I miss being a kid without all this pressure on me."
Did I read that correctly?
**A Yep.**
Q What do you mean when you say "you have had a bunch of success"?
**A I think I have been trying to help the world successfully navigate the transition to AI in a good way for the last 10 years ago, and I feel like now I have had more success in kind of making a**

# Pages 209-216

209

**A That's right.**
Q And I think -- well, just to confirm, you recall that Anthropic deployed a version of CLAUDE in Slack for the company to test prior to launching CLAUDE to the public, correct?
**A That's right.**
Q And this record here is you and your sister-in-law, Charlotte, prompting CLAUDE in Slack prior to releasing the model to the public?
ATTORNEY MEHTA: Form.
**A I think, yeah, this is -- this is me playing around with my family like seeing what stuff the model could or could not do.**
Q (BY ATTORNEY HAILEY) So do you know why the CLAUDE responses are not reflected in this record?
**A I don't know.**
Q You recall that when you prompted CLAUDE in February 2023, CLAUDE did respond to these prompts, correct?
**A Yes, it did respond. I think it -- I think it refused the lyrics to the "Desolation Row" one because I remember that was a question my dad asked. And then I think he was not impressed with -- with CLAUDE at the time.**

210

Q So let me -- let's -- before we get ahead of ourselves, let's -- let's start with -- the first entry on this record is from you, February 5, 2023, at 12:40 p.m., correct?
**A So this was, I think, me sitting with my dad and him asking me -- I was him: Like, what are some questions to -- like, to try out for the model? And he suggested this one, the, like, "Desolation Row" by Dylan thing.**
**And then I think CLAUDE refused, which is why we then asked these other questions.**
Q Is your dad a Bob Dylan fan?
**A He is.**
Q Do you know why he picked the lyrics to Desolation Row" in particular?
**A I have no idea.**
Q So your dad thought up this prompt, and you entered it into CLAUDE, correct, the prompt "@CLAUDE: What are the lyrics to "Desolation Row" by Dylan"?
**A Yeah, my dad was curious about this question, asked it, in addition to many other questions as well.**
Q And CLAUDE's response to that prompt is not reflected in this record that Anthropic has

211

produced, correct?
ATTORNEY MEHTA: Form.
**A That's what it looks like. It looks like -- it looks like we don't have any of the responses from CLAUDE here.**
Q (BY ATTORNEY HAILEY) What is your recollection as to what CLAUDE responded to that prompt?
**A I think CLAUDE refused to answer that, and my dad was a little bit frustrated.**
Q What did CLAUDE respond specifically to your prompt: "What are the lyrics to "Desolation Row" by Bob -- by Dylan?"
**A I don't -- I don't remember exactly what it responded with. I think it responded with some sort of refusal.**
Q But you're not sure?
**A I'm not 100 percent sure. I think -- the thing I definitely remember is my dad, like, thinking that CLAUDE was not very good.**
Q It's possible that CLAUDE responded with some lyrics to the song or hallucinated lyrics or some other response that caused your dad to not be very impressed?
ATTORNEY MEHTA: Objection, form; asked

212

and answered; misstates the testimony.
**A I think that's possible. I'm -- to be honest, I'm not 100 percent, but I -- I think -- I think it refused.**
Q (BY ATTORNEY HAILEY) And when you say "refused," are you referring to a refusal, a guardrail response, or something else?
**A I don't remember. I think it would be either -- either one of those. So it would be either the model saying "I can't help you with that" or saying "I can't help you with that" in a slightly more human-like way.**
Q But again, you don't remember for sure what the model responded or whether it responded?
ATTORNEY MEHTA: Form.
**A I don't -- I don't -- I don't really remember clearly, because there were a lot -- a lot of things that I was talking with CLAUDE about at that time.**
Q (BY ATTORNEY HAILEY) And there's no way for us tell for sure because we don't have a record of the response, right?
ATTORNEY MEHTA: Objection to the form.
**A Yeah, I think -- I think definitely it -- it -- it looks like we don't have all of the -- all**

213

**of the responses in this material that you have just presented me here.**

Q (BY ATTORNEY HAILEY) So your prompt is asking for the lyrics to "Desolation Row" by Bob Dylan, correct?

**A That's what my dad was -- yeah, that's what my dad was curious about.**

Q And you -- you're the one who actually typed in that prompt?

**A That's right.**

Q And why were you and your dad asking CLAUDE for the lyrics to that song?

ATTORNEY MEHTA: Objection, asked and answered.

**A I think we were asking all sorts of like stuff like: When did Jurassic Park come out?**

**Charlotte had medical questions that we're asking. We had this question about a sonnet. I think that there were many more questions above this and many questions afterwards.**

**People were just asking all sorts of stuff.**

Q (BY ATTORNEY HAILEY) Were you testing to see whether CLAUDE would accurately output those lyrics?

214

ATTORNEY MEHTA: Objection to the form. Misstates the testimony.

**A Again, I -- I don't remember. I think the main thing I remember is just my dad not being very impressed with it.**

Q (BY ATTORNEY HAILEY) But you don't remember exactly why he was not very impressed?

ATTORNEY MEHTA: Objection to the form. Asked and answered.

**A That's right.**

Q (BY ATTORNEY HAILEY) Did your dad want to use CLAUDE as a tool to look up lyrics?

ATTORNEY MEHTA: Form.

**A Again, I think my dad was trying to explore what were the types of things that CLAUDE could and could not do.**

**None of these things are really things that people ended up using CLAUDE for in a material way. People mostly use CLAUDE for work. So like, all of these things like "when did Jurassic Park come out," like Google could easily answer.**

**So yeah, I think mostly this was just very early, before the model was ever released, trying to get a sense of what it could do. And unfortunately, I didn't impress my dad very much with this.**

215

Q (BY ATTORNEY HAILEY) These were all capabilities and use cases that you and your family were testing in February of 2023, correct?

ATTORNEY MEHTA: Objection, misstates the testimony; asked and answered.

**A This particular thing was something that my dad was curious about.**

Q (BY ATTORNEY HAILEY) So this is a use case that your dad was testing and you entered into the model?

ATTORNEY MEHTA: Same objections.

**A That's correct.**

Q (BY ATTORNEY HAILEY) Did you have a view, Mr. Brown, at the time of this record as to whether CLAUDE should or should not be generating output containing copyrighted content?

ATTORNEY MEHTA: Don't disclose any attorney-client communications, but you can answer that outside the attorney-client communications.

**A I think all -- yeah, I think from the get-go we always wanted to have several layers of refusals and safeguards in order to prevent the model from doing too much regurgitation, and so I think we -- we had that at the -- at the beginning.**

**And you can see here like later on where**

216

**Charlotte, who is a doctor, was trying to ask the model about, like, research into ketamine for medicinal use, and it looked like the model refused in that case also.**

**So really from the beginning we were -- we were always trying to make sure that we had sufficient safeguards.**

Q (BY ATTORNEY HAILEY) And I'll get to Charlotte's prompts in a moment.

Is it your testimony that in the version of CLAUDE that you were testing in February 2023, you already had guardrails in place to prevent output of copyrighted song lyrics?

ATTORNEY MEHTA: Objection to the form. Speculation; assumes facts not in evidence.

**A Yeah, I think that's -- that's my recollection. And I think it's -- it's reinforced by my dad being annoyed by the failure of CLAUDE to -- like to respond how we wanted there and also with CLAUDE refusing the prompt later on in the same page.**

Q (BY ATTORNEY HAILEY) What's that testimony based on when you say that you "believe that there were already guardrails in place in February 2023 against output of copyrighted song lyrics"?

# Pages 301-308

301

Q (BY ATTORNEY HAILEY) So you were unsure whether it was important enough to delay launch to solve?
ATTORNEY MEHTA: Form.
**A Yeah, I think I didn't know enough about it to know I think either how -- like how -- how well we were already doing or how important it was.**
Q (BY ATTORNEY HAILEY) And you don't know sitting here today whether Anthropic completed that additional safety improvement of preventing the model from outputting copyrighted material before launch?
ATTORNEY MEHTA: Objection to the form. Asked and answered.
**A I believe that we did, but Ben Mann would be the person to talk with, because he was the one who actually did the work.**
Q (BY ATTORNEY HAILEY) And what's the base -- what's the specific basis for your belief that you ensure that the model did not produce copyrighted content before launch?
ATTORNEY MEHTA: Asked and answered about a dozen times. Form.
**A I think it was -- yeah, it's mostly just a vague recollection of that.**

302

Q (BY ATTORNEY HAILEY) No specifics details?
ATTORNEY MEHTA: Objection to the form. Misstates the prior testimony; asked and answered.
**A Yeah, yeah, I -- I wasn't working on that directly. Ben -- Ben Mann would be the person to talk with about that.**
(Exhibit 280 was marked for identification and is attached to the transcript.)
Q (BY ATTORNEY HAILEY) I'm showing you what I have marked as Exhibit 280 to your deposition. It's a document produced by Anthropic bearing the Bates Number ANTHROPIC 599647.
Do you recognize this document?
**A It looks like some comments going back and forth.**
Q It's dated December 1, 2022, correct?
**A That looks right.**
Q This is an email notification sent from Tom Brown (Google Docs) to [redacted]" correct?
**A Yeah, that looks correct.**
Q [redacted] is Ben Mann, right?
**A Yes.**
Q The "Subject" is "technical copyright mitigations design," correct?

303

**A Yep.**
Q Do you recall working with Ben Mann in December of 2022 on a document titled "technical copyright mitigations design"?
**A Very vaguely. Like, this feels like it probably was another kind of like driveby.**
Q And you can see this is an email notification with comments that you have made in this document, correct?
**A I see that.**
Q And just to orient us, this is about three months after the previous document we were just discussing, Exhibit 279, correct?
**A That's -- that math checks out.**
Q And you are making comments relating to the "technical copyright mitigations design" document, correct?
**A Yeah, I'm commenting on something in this doc.**
Q I want to focus on your doc -- your first comment in the document. Do you see that where it says [redacted]"?
**A Yep.**
Q And then below that "Tom Brown, 1:06 p.m., December 1"?

304

**A I see that.**
Q And you understand that to indicate that that's a comment from you from December 1?
**A That seems right.**
Q You write:
[redacted]
Did I read that correctly?
**A That's what it says.**
Q And what is that referring to, Mr. Brown?
ATTORNEY MEHTA: Objection to the form. Foundation.
**A I'm not sure. I think this is probably Ben writing a doc and me doing a, like, driveby suggestion on something that he could do within his design.**
Q (BY ATTORNEY HAILEY) So is it your understanding that this is a discussion about the number of the -- strike that.
Is that your understanding that this is a

discussion about the threshold number of words for a copyright filter to be included in the copyright mitigations design?

ATTORNEY MEHTA: Counsel, do you have the underlying document?

ATTORNEY HAILEY: Counsel, I would ask that you not interrupt.

ATTORNEY MEHTA: I'm asking you a question.

ATTORNEY HAILEY: This document has not been produced to us, as far as I know, so I'm asking about the document in front of me, and I --

ATTORNEY MEHTA: That's fine. I'm --

ATTORNEY HAILEY: -- ask that you please stop interrupting.

ATTORNEY MEHTA: -- I'm asking my question. You have answered it. Move on with your questions.

**A I am not sure.**

Q (BY ATTORNEY HAILEY) You write: [redacted]

Do you see that?

**A I see that.**



Q What did you mean by that?

ATTORNEY MEHTA: Objection, foundation.

**A It seems -- so I don't -- I don't really remember this. It seems like Ben had a document, and I was likely talking about, like, some threshold for triggering something and feeling like it should be -- with two words would be too aggressive.**

**I don't remember the -- the details of what the actual threshold was talking about, but yeah, it seems like -- like my kind of driveby was [redacted].**

Q (BY ATTORNEY HAILEY) And you can see from the face of this document that the document you're commenting on is titled "[redacted]" correct?

**A That's what it says.**

Q And when you refer to [redacted] right?

ATTORNEY MEHTA: Objection to the form. Asked and answered; foundation.

**A That -- that's how I would interpret this.**

Q (BY ATTORNEY HAILEY) And instead you say you would [redacted]



[redacted]," correct?

ATTORNEY MEHTA: Form.

**A That's what the second sentence says.**

Q (BY ATTORNEY HAILEY) So this -- so your comment here is that you believe it's fine for [redacted]

ATTORNEY MEHTA: Objection, form.

**A I think I didn't know. Again, this just me kind of doing a driveby on a thing that wasn't my area of expertise.**

Q (BY ATTORNEY HAILEY) In the comment that you made in this document shared with Mr. Mann, you share the view that you would prefer the threshold [redacted] correct?

ATTORNEY MEHTA: Form. Asked and answered multiple times.

**A [redacted] But again, this wasn't a thing where I was the expert there, so this feels like a driveby suggestion. And I don't know if he -- I don't know what he ended up doing.**

Q (BY ATTORNEY HAILEY) You're offering your view, correct, as a senior executive at Anthropic?

ATTORNEY MEHTA: Is that a question?



ATTORNEY HAILEY: Yes.

ATTORNEY MEHTA: Objection to the form.

**A Sorry. What was the -- can you repeat the question?**

Q (BY ATTORNEY HAILEY) You're sharing your view with Mr. Mann as a senior executive at Anthropic?

ATTORNEY MEHTA: Objection to the form. Asked and answered; misstates the testimony.

**A I think I was sharing it more as like a, like, driveby commenter.**

Q (BY ATTORNEY HAILEY) And your comment was that you felt that it was okay for the model to [redacted]

ATTORNEY MEHTA: Objection, asked and answered; misstates the prior testimony; form.

**A I think I didn't know, and so I was giving kind of a driveby -- like sharing a driveby preference.**

Q (BY ATTORNEY HAILEY) What was the basis for this driveby preference?

**A I think it was not -- yeah, I think it was not very, like, well informed at all.**

Q Sitting here today, do you believe that