# EXHIBIT 130

Planet Depos
We Make It Happen™

HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY

# Transcript of Deep Ganguli, Ph.D., Corporate Designee

**Date:** November 6, 2025
**Case:** Concord Music Group -v- Anthropic

**Planet Depos**
**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com
**www.planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

----------------------------------------
CONCORD MUSIC GROUP, INC., ET AL., )
Plaintiffs, ) Case Number
v. ) 5:24-cv-03811-EKL
) SVK
ANTHROPIC PBC, )
Defendant. )
----------------------------------)----

HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY
VIDEOCONFERENCED and VIDEO-RECORDED
30(b)(6) DEPOSITION of
Anthropic PBC, by and through its Designated
Representative,
DEEP GANGULI, Ph.D.
San Francisco, California 94111
Thursday, November 6, 2025

Reported Stenographically by:
MARY J. GOFF
CSR No. 13427
WA CSR No. 21030779
Job No. 60706930b6
PAGES 1-167

2

HIGHLY CONFIDENTIAL--ATTORNEYS' EYES ONLY

VIDEOCONFERENCED and VIDEO-RECORDED DEPOSITION of DEEP GANGULI, Ph.D., Volume I, taken on behalf of Plaintiff Publishers, Oppenheim + Zebrak, LLP, at WilmerHale, 50 California Street, Suite 3600, San Francisco, California 94111, beginning at 8:04 a.m. and ending at 12:00 p.m., on Friday, November 6, 2025, before MARY J. GOFF, California Certified Shorthand Reporter No. 13427 and WA CSR No. 21030779.

3

APPEARANCES:

For Plaintiff Publishers
Oppenheim + Zebrak, LLP
BY: NICHOLAS C. HAILEY
MICHELLE GOMEZ-REICHMAN
Attorneys at Law
4530 Wisconsin Avenue, NW
5th Floor
Washington, DC 20016
202-480-2999
nick@oandzlaw.com
michelle@oandzlaw.com

For Defendant Anthropic PBC
WilmerHale
BY: TAYLOR GOOCH
Attorney at Law
50 California Street
Suite 3600
San Francisco, California 94111
taylor.gooch@wilmerhale.com
628-235-1026

ALSO PRESENT: Ian Chen, In-house counsel Anthropic
Becky Maz, Esquire, WilmerHale (remote DC)

Videographer: Philip Astor

4

INDEX

| WITNESS | | EXAMINATION |
|---|---|---|
| DEEP GANGULI, Ph.D. | | |
| Volume I | | |
| | ATTORNEY HAILEY | 7, 158 |
| | ATTORNEY GOOCH | 157 |

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Plaintiffs' Notice of Deposition to Defendant Pursuant to Federal Rule of Civil Procedure 30(b)(6) | 9 |
| Exhibit 2 | Defendant Anthropic PBC's Amended and Supplemental Responses and Objections to Plaintiffs' Third Set of Interrogatories (No. 18) | 15 |
| Exhibit 3 | Prompt Anthropic_0000003118-274 | 80 |
| Exhibit 4 | CLAUDE Observability Dashboard, Alex Tamkin, 1-23-24 Anthropic_000052400-24011 | 117 |
| Exhibit 5 | Clio: Privacy-Preserving Insights into Real-World AI Use Anthropic_0000012987-3032 | 125 |
| Exhibit 6 | Spreadsheet Anthropic_0000429489 | 132 |

# Pages 21-24

Q Were these Slack conversations -- let's start with the Slack conversations.
Who -- were they Anthropic employee Slack conversations?
**A They were Anthropic employee Slack conversation, yeah.**
Q What employees were involved in the conversations?
**A My memory --**
ATTORNEY GOOCH: Counsel -- actually, it's fine.
You can answer.
**A -- my memory is a little foggy. There -- there were a lot of Slack conversations, so no particular names kind of come to mind at the moment.**
**I was just looking -- mostly looking at the gist of the conversations, many of which I had no memory of.**
Q (BY ATTORNEY HAILEY) Were any of the company founders involved in the Slack conversations?
**A Possibly. I don't know for sure. I can't quite remember for sure.**
Q What code did you review to prepare for the deposition?



**A What code did I review?**
**I'm sorry. I misspoke earlier.**
**Inside of that binder it was more pull requests from GitHub, more than source code, is my memory.**
**So from the documents that were kind of with my counsel, I don't -- I think I'm conflating code with actual -- like the metadata around the code from GitHub.**
**I personally did not review any code myself to prepare for this deposition.**
Q You mentioned "spreadsheets."
What spreadsheets did you review to prepare for this deposition?
**A There was a spreadsheet that had the output of a Clio run.**
Q Can you explain what you mean by that?
**A Yes.**
**So Clio is our platform that uses CLAUDE to analyze how people are using CLAUDE in a privacy-preserving way.**
**It takes this input, kind of conversations, and it takes this output sort of like a high-level summary of general patterns and trends in those conversations.**



**And when I say "output format," it outputs that data in a certain way, and we often -- for the -- sorry. Not often.**
**But for the Anthropic Economic Index, we have released those clusters in a certain sort of schema, and the Excel spreadsheet I saw was related to sort of a public-facing dataset that's an output of a Clio run.**
Q Was that a spreadsheet that you had seen before or you saw it for the first time during -- to prepare for today's deposition?
**A To be honest with you, I typically engage with the outputs of Clio files in code and not in spreadsheets, so that particular spreadsheet I had not seen in that exact form.**
Q Is that the only spreadsheet you reviewed to prepare for today's deposition?
**A Let me think.**
**There were some other spreadsheets, but I have -- I did not recognize those spreadsheets, so we did not spend much time on them.**
Q When you say you "didn't recognize them," what do you mean by that?
**A I didn't understand what I was looking at.**
Q And you -- so sitting here today, you



don't understand what those spreadsheets were?
**A I do not.**
Q So other than the -- the one spreadsheet that we have identified, you didn't review any other spreadsheets apart from the ones that you didn't recognize and understand?
**A Apart -- sorry.**
**Can you restate the question? I just want to make sure I got --**
Q Sure.
**A -- understood that clearly.**
Q You mentioned one spreadsheet about Clio data?
**A Um-hum.**
Q You mentioned some other spreadsheets that you didn't recognize and didn't understand and still don't understand.
And I'm asking you: Are there any other spreadsheets that you reviewed to prepare for today's deposition?
**A There are no other spreadsheets I reviewed to prepare for today's deposition, yeah.**
Q Did you review any other documents to prepare for today's deposition?
**A Not -- no, I did not.**

# Pages 57-64

57

which you have mentioned is outside of your area, Anthropic doesn't actually monitor or analyze CLAUDE usage to see the extent to which CLAUDE is a -- to use your words, "a regurgitation machine" --
ATTORNEY GOOCH: Objection --
Q (BY ATTORNEY HAILEY) -- is that right?
ATTORNEY GOOCH: -- objection, misstates prior testimony.
**A Sorry. Can you repeat that question one more time? I want to make sure I understand it.**
Q (BY ATTORNEY HAILEY) So apart from the guardrails, which you mentioned is outside of your area, your team hasn't done anything to actually analyze or evaluate CLAUDE usage to see one way or the other whether CLAUDE regurgitates copyrighted material; is that right?
ATTORNEY GOOCH: Objection, misstates prior testimony.
**A My team, all of our research is -- is published. We don't study copyright issues.**
**And I know that there's a guardrails team that puts those guardrails in place.**
Q (BY ATTORNEY HAILEY) Does Anthropic monitor or analyze the extent to which CLAUDE users seek output containing copyrighted song lyrics

58

specifically?
**A You're asking me does Anthropic explicitly look for CLAUDE regurgitating song lyrics?**
Q Well, let me start with user prompts first.
**A Okay.**
Q Okay. Does Anthropic monitor or analyze the extent to which CLAUDE users are prompting CLAUDE for output containing copyrighted song lyrics?
**A Again --**
ATTORNEY GOOCH: Objection, form.
**A -- again, the -- when we monitor usage data, my team uses the tool Clio.**
**Clio is not designed to look for a very specific granular detailed thing like the thing you mentioned.**
**It's designed to analyze a large swath of usage data and find high-level patterns. And then we analyze what those high-level patterns are and -- but it's not designed to, like, answer a very specific question from usage data, if that makes sense.**
**So no, we have never designed a Clio experiment explicitly looking for how people talk**

59

**about song lyrics. We have found clusters that are kind of in that -- that are people using CLAUDE to analyze lyrics, interpret lyrics, sort of discuss the generation of lyrics.**
**Because there's guardrails in place, you know, like we know that those clusters cannot be actually generating lyrics. And we know that those clusters are very rare. They're not -- it's not the typical usage of CLAUDE.**
**The typical usage of CLAUDE is for writing computer software.**
Q (BY ATTORNEY HAILEY) So let me unpack that answer a little bit.
So you -- first of all, you said that: Through Clio, you have identified a number of clusters that relate to songs and song lyrics; is that right?
**A Through Clio, we identify many, many clusters. And we have found a few clusters that are not common that are not typical that relate to people looking at sort of trying to interpret song lyrics, possibly making their own songs. Things like that.**
**And I know that there's guardrails in place to prevent the actual generation of song**

60

**lyrics. But outside of that, the clusters are high level. They're atypical, meaning that they're not common in prevalence. And that -- we have guardrails in place to prevent people actually using CLAUDE to generate copy written song lyrics.**
Q Clio doesn't tell you anything one way or the other whether the actual guardrails are working, correct?
**A No, Clio is not designed to tell you whether the actual guardrails are working or not.**
Q So when you say you -- you know the guardrails are working, that's not based on any Clio Clio -- Clio data, correct?
**A That's based off of my understanding that we have a safeguard teams building those guardrails.**
Q But you're not -- you're not testifying today that you know for a fact that those guardrails work?
**A I'm -- sorry. Can you say that one more time?**
**I'm not testifying today that I know for a fact that those guardrails actually work?**
Q Correct.
**A The -- if you want to -- yeah, so the guardrails team builds those guardrails, and they**

61

**are responsible for knowing if they work or not and evaluating their efficacy, yeah.**
Q So you're not testifying -- you don't have knowledge that -- one way or the -- one way or the other whether the guardrails actually work to prevent output of copyrighted lyrics?
**A Yes, as previously stated, I -- the guardrails team owns evaluating the efficacy of the guardrails.**
**And I know that when I look at Clio runs, I just don't see people -- it's not a common thing of people trying to recite any copyrighted material. It's not a thing that I have ever seen in any analysis of Clio data that I have looked at.**
Q (BY ATTORNEY HAILEY) But Clio is looking at user prompts and not outputs generated by CLAUDE, correct?
ATTORNEY GOOCH: Objection, misstates prior testimony.
**A No, that's not true. Clio analyzes conversations, so it's prompts and completions.**
**However, it does -- it does sort of first -- okay. So some context would be helpful here on how Clio works.**
**You start off with a high-level set of**

62

**conversations. We use CLAUDE to summarize the gist of what those conversations are about. Then we group similar kinds of conversations together.**
**And then we cluster those groups, and we have CLAUDE sort of analyze what's the high-level gist of what those conversations actually are, like, sort of about.**
**We don't actually read any of those conversations, because this is a privacy-preserving aggregate platform. So you know, your original question is like: Are you only looking at prompts?**
And the answer is: No. We're looking at the full conversations, summarizing them, kind of turning those into numbers, grouping things, aggregating, and trying to find meaning in, like, the high-level clusters using CLAUDE.
Q So the clusters summarize and generalize from individual conversations?
**A The clusters summarize and generalize? What do you mean by "generalize" in this context?**
Q Do you agree that the clusters summarize from individual conversations?
**A Yeah, the one cluster provides a high-level summary of a number of conversations.**
Q And a cluster won't tell you exactly what

63

the prompt was for any individual conversation, correct?
**A A cluster will tell you neither what the prompt is, nor what any of the completions are or any of the exchanges in any individual conversation.**
Q So the cluster won't necessarily -- for a request for copyrighted lyrics, a cluster wouldn't tell you one way or the other whether the output contained copyrighted lyrics, correct?
ATTORNEY GOOCH: Objection, misstates prior testimony.
**A Sorry. Can you repeat that question one more time?**
Q (BY ATTORNEY HAILEY) Sure.
So if there's a user requesting lyrics from CLAUDE, the Clio cluster wouldn't say one way or the other whether the output actually contained lyrics?
ATTORNEY GOOCH: Objection, misstates prior testimony.
**A The Clio cluster is a high-level summary of the conversations that happened that kind of regrouped within that cluster, and that's what the analyst gets to look at.**
**I'll also say that for -- for getting song**

64

**lyrics, it's -- you can go to Google to get song lyrics, so we don't see this happening frequently -- well, we see people analyzing and interpreting sort of song lyrics, but there's other technologies if people want to get song lyrics outside of CLAUDE.**
Q (BY ATTORNEY HAILEY) Mr. Ganguli, you haven't studied the extent to which people use Google for song lyrics, right?
**A No, I have not studied that, yeah.**
Q Does Anthropic monitor or analyze the extent to which CLAUDE generates output containing copyrighted song lyrics specifically?
ATTORNEY GOOCH: Objection, asked and answered.
**A We -- the Clio runs cannot -- Clio is not instrumented to allow us to do that.**
Q (BY ATTORNEY HAILEY) Are you aware that Anthropic has produced a sample of 5 million CLAUDE prompt and output records as a part of this litigation?
**A Can you give me more context on what those records are to jog my memory?**
Q Yeah. And I'll tell you that Anthropic, as part of this litigation, produced a random sample of five million CLAUDE prompt and output records.

# Pages 73-76

73

**I do not know the answer to that question.**
**Again, we're -- we sort of designed CLAUDE to be very privacy preserving. And one of the ways we get there is by not knowing anything about the individual conversations, just the high-level patterns and aggregate information about any cluster of conversations.**
Q (BY ATTORNEY HAILEY) How frequently have third-party CLAUDE users requested song lyrics from CLAUDE? Do you know?
ATTORNEY GOOCH: Objection, scope.
**A It's very -- in the datasets that I have looked at, it's very infrequent, very uncommon, less than a percentage point of the data. Much less.**
Q (BY ATTORNEY HAILEY) What -- and what specific data is that based on?
**A I believe it's based off of our open-sourced Anthropic Economic Index data that you can find. It's sort of publicly available.**
**And we released some Clio clusters for economists to also be able to study and -- in addition to us.**
Q You don't have any Clio clusters that specifically focus on users requesting song lyrics from CLAUDE; is that right?

74

**A I have kind of described my -- my understanding of the cluster definitions that I, like, have seen in that public database, which again -- previously, like, my understanding of those clusters were people using CLAUDE to analyze the songs, ask questions about the songs. These kinds of things.**
**And I know that there's guardrails in place to prevent people from actually generating songs.**
**And also, I know that the whole thing is -- like talking about songs more generally is -- is not the typical usage of CLAUDE.**
**Yeah. And CLAUDE is not a place I would go to to look at -- look up song lyrics. There's other tools out there that allows a lot of people to do that.**
**So we haven't quite studied this problem, because it's just intuitively not a usage -- a usage of CLAUDE that we think makes a lot of sense.**
Q Since you haven't specifically studied this problem, you don't know exactly how frequently or how infrequently third-party CLAUDE users request song lyrics from CLAUDE; is that right?
ATTORNEY GOOCH: Objection, misstates

75

prior testimony.
**A I think there's two things to unpack here.**
**Have I actually studied explicitly the usage of how people use CLAUDE to do anything with respect to song lyrics?**
The answer to that question is -- is: No, I have not explicitly designed experiments to do that.
We do use CLAUDE -- sorry. We do use Clio to, again, understand sort of broad patterns in the data. And I'm aware that I -- there's a set of clusters relating to song lyrics that are about kind of interpreting, finding the meaning behind these song lyrics, generating brand new -- or writing brand new song lyrics, asking questions about the song lyrics. Things like that.
And I know that this is sort of atypical. So putting it together, I do not study this phenomenon explicitly.
However, in other experiments that we have run or other analyses we have done, I am aware of people using CLAUDE to do all the things with song lyrics I just explicitly stated, and I know that it's a very uncommon usage of CLAUDE compared to the very common usage of CLAUDE, which are software

76

engineering, writing, learning.
Q (BY ATTORNEY HAILEY) But again, you can't give me specific numbers or figures about frequency of third-party CLAUDE users requesting song lyrics?
ATTORNEY GOOCH: Objection, asked and answered.
**A Yeah, the -- again, I can only tell you what's in the clusters, which include a variety of things related to song lyrics.**
**And I know that those clusters are very atypical. They're not common.**
Q (BY ATTORNEY HAILEY) Do you know whether CLAUDE has generated output containing song lyrics in response to third-party requests?
**A I have not seen evidence of that.**
Q But you have not seen evidence precluding that either, correct?
ATTORNEY GOOCH: Objection.
**A Yeah, I can't know what I don't know.**
Q (BY ATTORNEY HAILEY) So just to be clear, you don't know one way or the other whether CLAUDE has generated output containing song lyrics in response to third-party requests?
ATTORNEY GOOCH: Objection, misstates prior testimony.

# Pages 109-116

**A Okay.**
ATTORNEY GOOCH: And obviously, the metadata isn't being marked as an exhibit, so I can't -- I'll take the -- Counsel at his word.
Q (BY ATTORNEY HAILEY) I want to turn back to Clio, Mr. Ganguli.
So we have discussed that Clio relies on CLAUDE itself to analyze conversations that people are having with CLAUDE, right?
**A Yes.**
Q So no human at Anthropic actually reads the CLAUDE prompts and outputs that are analyzed as part of Clio; is that right?
**A My team does not read the prompts and completions that are analyzed as a part of Clio.**
Q Does any -- does any human at Anthropic beyond your team read those prompts and outputs?
**A The safeguards team -- again, this is outside of my lane -- has different privileges. My understanding of those privileges is that if a conversation violates our Acceptable Usage Policy, then they can investigate further.**
Q So if a conversation triggers a guardrail, it might be reviewed by trust and safety?
ATTORNEY GOOCH: Objection, scope.



**A Trust and safety, we call it safeguards now, but yes.**
Q (BY ATTORNEY HAILEY) But for prompts and outputs that do not trigger any guardrails, there's no human employee at Anthropic reviewing any of those --
ATTORNEY GOOCH: Objection --
Q (BY ATTORNEY HAILEY) -- prompt and output records?
ATTORNEY GOOCH: -- objection.
Sorry. I didn't mean to step on you.
Objection, calls for speculation; outside the scope.
**A Yeah, I would have to -- I -- I don't know the answer to that question.**
**I know that my team does not look at prompts and completions, especially in the context of Clio runs, because Clio is designed to obfuscate that for our purposes.**
Q (BY ATTORNEY HAILEY) And so just so we have a clear record, you testified that it's your understanding that human employees in the trust safety organization may review certain prompts and outputs that trigger guardrails, correct?
ATTORNEY GOOCH: Objection, calls for



speculation; and outside the scope.
**A Yeah, that's my high-level understanding.**
Q (BY ATTORNEY HAILEY) But that's outside of your area, so you're not sure?
**A It's outside of my area of expertise.**
Q And that's not what you're here to testify about today?
**A That's -- sorry. What do you -- yeah, I'm here to testify on behalf of the things marked in Exhibit 1, which -- and safeguards is not something I know -- have expertise in.**
Q But beyond certain individuals in trust safety reviewing certain prompts and outputs that may trigger safeguards, you're not aware of any human employees at Anthropic reviewing or analyzing specific CLAUDE prompt and output records?
ATTORNEY GOOCH: Objection, misstates prior testimony; and outside the scope.
**A My team does not look at sort of prompts and completions in our -- in the course of our research.**
Q (BY ATTORNEY HAILEY) What about any other teams apart from the safety -- the trust and safety team that we just discussed?
**A Apart from the --**



ATTORNEY GOOCH: Objection, outside the scope.
**A -- yeah, apart from the trust and safety team, I just -- I'm not aware. I don't know.**
Q (BY ATTORNEY HAILEY) We also talked about how Clio looks -- strike that.
When -- when Clio anonymizes the CLAUDE prompts and outputs and puts those conversations into clusters, it's simplifying and summarizing those conversationalist, correct?
**A This is correct.**
Q Clio removes references to specific names and subject matter from the CLAUDE records when it creates these clusters?
**A This is correct. This is part of preserving people's privacy.**
Q So for instance, if a given prompt is requesting lyrics to a specific song or information about a specific song or songwriter, that wouldn't be reflected in the Clio data?
ATTORNEY GOOCH: Objection, misstates prior testimony.
**A If a -- sorry. Can you repeat the question one more time?**
Q (BY ATTORNEY HAILEY) Sure.

**A Yeah.**
Q If a given prompt is requesting lyrics to a specific song or information about a specific song or songwriter, that wouldn't be reflected in the Clio data?
**A The -- Clio is sort of a bottom-up discovery tool with, like, high-level patterns in the data. It's not the right tool if you know what you're looking for.**
**To go find that, that's what the top-down sort of monitoring and evaluation is for.**
**So if there's people sort of doing this and it's, like, very common, we could surface -- Clio might be able to surface such a thing.**
**However, I -- you know, as we have discussed, I have -- it's not a typical use case. And I can only tell you what I know CLAUDE to summarize the -- what the conversations in the -- in any cluster related to songs is about.**
Q It's true, Mr. Ganguli, that Clio cannot conclusively prove the absence of certain patterns or behaviors?
ATTORNEY GOOCH: Objection, form.
**A It's -- sorry. I'm just trying to understand. If -- there's a double negative.**



**It's true that Clio -- you're -- sorry. I'm just trying to repeat your question back at you.**
**It's true that Clio cannot observe --**
Q (BY ATTORNEY HAILEY) Let me just ask it again --
**A Okay.**
Q -- so that we can have a clear record.
**A Okay.**
Q Clio cannot conclusively prove the absence of certain patterns or behaviors --
ATTORNEY GOOCH: Objection, form.
Q (BY ATTORNEY HAILEY) -- correct?
ATTORNEY GOOCH: Objection, form.
**A Clio cannot conclusively say that something didn't happen. What I would -- what I would say is, like, if something is happening and it's common, it will pop up in a cluster.**
Q (BY ATTORNEY HAILEY) Well -- and I don't mean to hide the ball here. This is actually a quote from the Clio article that -- that you and Mr. Tamkin authored and others.
So I just want -- we can mark that article, but I'm just asking: Do you agree with the statement:
Clio cannot conclusively prove



the absence of certain patterns or behaviors?
ATTORNEY GOOCH: Objection, form.
**A Clio cannot conclusively prove the absence of particular things?**
**The thing I'm mulling over is like what can Clio conclusively prove?**
Clio is just: We take a sample of traffic. And then we sort of summarize it, and then we look for what we find.
And if something is not in Clio, we just don't know whether -- we just don't know much about whatever that thing that's absent is.
It's unlikely that that's occurring frequently enough to show -- like, if it were occurring very frequently, it would sort of show up.
But there -- you know, if it's very infrequent or if it's not happening, it won't show up.
Q (BY ATTORNEY HAILEY) So just to be sure I understand, does that mean that you agree that Clio cannot conclusively prove the absence of certain patterns or behaviors?
ATTORNEY GOOCH: Objection, form.
**A I think if something is happening and it's**



**common, Clio will show that it's -- it's happening. It will pop up as a cluster.**
**If something is not happening, that's either because it's not happening or because it's just really, really infrequent.**
Q (BY ATTORNEY HAILEY) But Clio can't prove that something is not happening?
**A If --**
ATTORNEY GOOCH: Objection, form; asked and answered.
**A -- yeah, if something doesn't show up in Clio, that could be because it's not happening or it's relatively infrequent or it's very -- sorry -- it's very infrequent.**
Q (BY ATTORNEY HAILEY) Do you agree, Mr. Ganguli, that prior to Clio, Anthropic had no idea how CLAUDE was being used in the world?
ATTORNEY GOOCH: Objection.
**A I would say that we had educated guesses as to how CLAUDE was being used in the world, and Clio gave us a lot more confidence and quantitative analyses of how CLAUDE is being used in -- in the world.**
**So it -- basically, instead of kind of relying on mar -- sort of, like, what our customers**

# Pages 125-128

125

**apply to an actual usage of CLAUDE even though we might not know a priori what an actual usage of CLAUDE is.**
Q (BY ATTORNEY HAILEY) So I'm showing you, Mr. Ganguli, what's been marked as Exhibit 5 to your deposition.
(Exhibit 5 was marked for identification and is attached to the transcript.)
Q (BY ATTORNEY HAILEY) Do you recognize this document?
**A I do recognize this document.**
Q This is the "Clio: Privacy-Preserving Insights into Real-World AI Use" article that we have referenced a couple of times this morning, correct?
**A Yeah.**
Q You are the last author on this paper?
**A I am the last author on this paper.**
ATTORNEY GOOCH: And just so record -- this is Anthropic_0000012987.
Q (BY ATTORNEY HAILEY) Mr. Ganguli, I just want to ask you about page 12999.
Do you see the "Section 5.1, Operational Limitations"?
**A Yes.**

126

Q And do you see the last paragraph in that section?
**A I see the last paragraph in this section.**
Q Could you read that paragraph into the record for me, please?
**A Yes. But let me read the context above it. So this is a section on "Limitations."**
**Okay. Great. And it has "Operational Limitations." Okay.**
**This call is about "extracting facets." Yep.**
**"Semantic Clustering," yep.**
**"Clustering Labeling and Hierarchization," Yep.**
THE COURT STENOGRAPHER: Wait.
THE DEPONENT: I'm so sorry.
THE COURT STENOGRAPHER: Cluster labeling?
**A And hierarchization.**
**"While we attempt to quantify many of these sorts of errors in Appendix C, they remain crucial considerations when interpreting Clio's outputs.**
**Given these limitations, we view Clio's outputs as a starting**

127

**point for generating insights and leads for further investigations. Its outputs should be considered preliminary and require additional validation before using -- used as the basis for decision-making. Taking automated actions based solely on Clio's output would require more rigorous analysis and human oversight to ensure both accuracy and fairness."**
Okay. Now we're at the last paragraph:
"Furthermore, Clio cannot conclusively prove the absence of certain patterns or behaviors."
Q (BY ATTORNEY HAILEY) Let me stop you right there.
So that was the sentence that I was asking you about before, correct, Mr. Ganguli?
**A That is correct.**
**I would like to read the next two sentences just so I have it fully in the surrounding context:**
**"The imperfections in the pipeline or potential adversarial**

128

**actions could allow harmful behavior to escape undetected by Clio. This underscores the importance of contemplating Clio's analysis with other methods."**
**Okay.**
Q (BY ATTORNEY HAILEY) And do you agree with that paragraph beginning with "furthermore" that you just read into the record?
**A Yeah. And I think that's consistent with what I said prior. Like, if something is absent, like it could mean that it's actually not happening or it could mean that it's happening so rarely as though it doesn't -- as -- because it doesn't -- it doesn't make it into a cluster.**
ATTORNEY HAILEY: Why don't we go off the record.
THE VIDEOGRAPHER: We are going off the record at 10:50 a.m.
(A break was taken from 10:50 a.m. to 11:08 a.m.)
THE VIDEOGRAPHER: We are back on the record at 11:08 a.m.
Q (BY ATTORNEY HAILEY) Mr. Ganguli, I want to spend some time talking about some of the data.